# EXHIBIT 32

STJ – Electronic Petition (PET) 00126547/2015 received on 04/06/2015 10:10 p.m.                    (e-STJ PAGE 1920)
Left Sidebar – Electronic Petition added to case record on 04/07/2015 at 9:56 a.m. by user: LAURA CUNHA DE ALENCAR

ESCRITÓRIO DE ADVOCACIA
SERGIO BERMUDES

SERGIO BERMUDES
MARCIO VIEIRA SOUTO COSTA FERREIRA
MARCELLO FONTES
ALEXANDRE SIGMARINGA SEIXAS
GUILHERME VALDETARO MATHIAS
ROBERTO SARDINHA JUNIOR
MARCELO LAMEGO CARPENTER
ANTONIO CARLOS VELLOSO FILHO
FABIANO RODALGHIO CAVALCANTI
MARIA AZEVEDO SALGADO
MARCO AURÉLIO DE ALMEIDA ALVES
ERIC CERANTE PESTRE
VITOR FERREIRA ALVES DE BRITO
ANDRÉ SILVEIRA
RODRIGO TANUSHI
FREDERICO FERREIRA
ANTONELLA MARQUES CONSENTINO
MARCELO GONÇALVES
RICARDO SILVA MACHADO
RICARDO JUNQUEIRA DE ANDRADE
ANDRÉ TAVARES
CAROLINA CORDEIRO FRANCESCO
MARIANNA FUX
ANDRÉ CHATEAUBRIAND MARTINS
PHILIP FLETCHER CHAGAS

LUÍS FELIPE FREIRE LISBÔA
PEDRO PAULO DE BARROS BARRETO
WILSON PISICHELI
RICARDO LORETTI HENRICI
JAIME HENRIQUE PORCHAT SECCO
GRISSA RIBEIRO VENÂNCIO
MARCELO BORIA VEIGA
ADILSON VIEIRA MACABU FILHO
CAETANO BERENGUER
RAFAEL DIREITO SOARES
ANA PAULA DE PAULA
ALEXANDRE FONSECA
PEDRO HENRIQUE CARVALHO
RAFAELA FUCCI
GABRIEL LÓS
LOUIS DE CASTEJA
HENRIQUE ÁVILA
RENATO RESENDE BENEDIUI
DIEGO BARBOSA CAMPOS
ALESSANDRA MARTINI
MARIANA ARRUDA DE SOUZA
DANIEL CHACUR DE MIRANDA
PEDRO HENRIQUE NUNES
GABRIEL DE ORLÉANS E BRAGANÇA
LUIZA LOURENÇO BIANCHINI

GABRIEL PRISCO PARAISO
GLEIDMAR FEITOSA LIMA MENDES
FLAVIO JARDIM
GUILHERME COELHO
ANA LUIZA COMPARATO
LÍVIA IKEDA
LÍVIA SAAD
JULLIANA CUNHA
ALLAN BARCELLOS L. DE OLIVEIRA
PAULO BONATO
RENATO CALDEIRA GRAVA BRAZIL
VICTOR NADER BUJAN LAMAS
GUILHERME REGUEIRA PITTA
LUIZA PERRELLI BARTOLO
JOÃO ZACHARIAS DE SÁ
SERGIO SANTOS DO NASCIMENTO
GIOVANNA MARESARI
OLAVO RIBAS
MATHEUS PINTO DE ALMEIDA
FERNANDO NOVE
LUIS TOMÁS ALVES DE ANDRADE
MARCOS MARES GUIA
ROBERTA RASCIO SAITO
ANTONIA DE ARAÚJO LIMA
GUSTAVO FIGUEIREDO GSCHWEND

ANA LUISA BARBOSA BARRETO
PAULA MELLO
RAFAEL MOCARZEL
CONRADO RAUNHEITTI
LUIZA DIAS MARTINS
THAIS VASCONCELLOS DE SÁ
BRUNO TABERA
FÁBIO MANTUANO PRINCIPE

CONSULTORES
AMARO MARTINS DE ALMEIDA (1914-1998)
HELIO CAMPISTA GOMES (1925-2004)
SALVADOR CÍCERO VELLOSO PINTO
JORGE FERNANDO LORETTI
ELENA LANDAU
CAIO LUIZ DE ALMEIDA VIEIRA DE MELLO
PEDRO MARINHO NUNES

THE HONORABLE JUSTICE REPORTER OF PETITION NO. 9815

MARÍA AGUINDA SALAZAR, Ecuadorian, widow, homemaker, ID Card no. CC 150007906-4, CARLOS GREFA HUATATOCA, Ecuadorian, married, farmer, ID Card no. CC 150024060-9, CATALINA ANTONIA AGUINDA ZALAZAR, Ecuadorian, married, homemaker, ID Card no. CC 150020056-1, LIDIA ALEXANDRA AGUINDA AGUINDA, Ecuadorian, married, homemaker, ID Card no. CC 150053509-9, PATRICIO ALBERTO CHIMBO YUMBO, Ecuadorian, single, farmer, ID Card no. CC 150032278-7, CLIDE RAMIRO AGUINDA AGUINDA, Ecuadorian, married, farmer, ID Card no. CC 150037013-3, LUÍS ARMANDO CHIMBO YUMBO, Ecuadorian, married, farmer, ID Card no. CC 150020354-0, BEATRIZ MERCEDES GREFA TANGUILA, Ecuadorian, married, homemaker, ID Card no. CC 150051885-5, LUCIO ENRIQUE GREFA TANGUILA, Ecuadorian, married, farmer, ID Card no. CC 150056375-2, PATRICIO WUILSON AGUINDA AGUINDA, Ecuadorian, married, farmer, ID Card no. 150032679-6, CELIA IRENE VIVEROS

Electronic document e-Pet no. 1083599 with digital signature
Signatory: ANDRE LUIZ SOUZA DA SILVEIRA: 52872157115 Certificate Series No.: 59969861844135100752553324099019158213
Time Stamp ID: 239885 Date and Time: 04/06/2015 10:10 p.m.

CERT. MERRILL VER: JD

STJ – Electronic Petition (PET) 00126547/2015 received on 04/06/2015 10:10 p.m.                    (e-STJ PAGE 1921)
Left Sidebar – Electronic Petition added to case record on 04/07/2015 at 9:56 a.m. by user: LAURA CUNHA DE ALENCAR

2

CUSANGA, Ecuadorian, married, homemaker, ID Card no. CC 040084856-0, FRANCISCO MATIAS ALVARADO YUMBO, Ecuadorian, married, farmer, ID Card no. CC 15009328-9, FRANCISCO ALVARADO YUMBO, Ecuadorian, married, farmer, ID Card no. 150011615-5, OLGA GLORIA GREFA CERDA, Ecuadorian, married, homemaker, ID Card no. CC 160020225-1, LORENZO JOSÉ ALVARADO YUMBO, Ecuadorian, married, farmer, ID Card no. CC 150021110-5, NARCISA AIDA TANGUILA NARVAÉZ, Ecuadorian, married, homemaker, ID Card no. CC 150030173-2, BERTHA ANTONIA YUMBO TANGUILA, Ecuadorian, married, homemaker, ID Card no. CC 150025954-2, GLORIA LUCRECIA TANGUILA GREFA, Ecuadorian, married, homemaker, ID Card no. 150014256-5, FRANCISCO VICTOR TANGUILA GREFA, Ecuadorian, married, farmer, ID Card no. CC 150011193-3, ROSA TERESA CHIMBO TANGUILA, Ecuadorian, married, homemaker, ID Card no. 150015652-4, JOSÉ GABRIEL REVELO LLORE, Ecuadorian, single, farmer, ID Card no. CC 170181991-2, MARÍA CLELIA REASCOS REVELO, Ecuadorian, married, homemaker, ID Card no. CC 170705717-8, MARÍA MAGDALENA RODRIGUEZ BARCENES, Ecuadorian, married, homemaker, ID Card no. CC 170937767-3, HUGO GERARDO CAMACHO NARANJO, Ecuadorian, married, farmer, ID Card no. CC 020056932-5, HELEODORO PATARON GUARACA, Ecuadorian, married, farmer, ID Card no. CC 060055304-4, LUISA DELIA TANGUILA NARVÁEZ, Ecuadorian, married, homemaker, ID Card no. CC 150008487-4, LOURDES BEATRIZ CHIMBO TANGUILA, widow, homemaker, ID Card no. 150025494-9, MARÍA HORTENCIA VIVEROS CUSANGUA, Ecuadorian, married, homemaker, ID Card no. CC 040097554-6, SEGUNDO ANGEL AMANTA MILÁN, Ecuadorian, married, farmer, ID Card no. CC 02006608-9, OCTAVIO ISMAEL CÓRDOVA HUANCA, Ecuadorian, married, farmer, ID Card no. CC 110076783-7, ELÍAS ROBERTO PIYAHUAJE PAYAHUAJE, Ecuadorian, married, farmer, ID Card no. CC 150014131-0, JAVIER PIAGUAJE PAYAHUAJE, Ecuadorian, single, driver, ID Card no. CC 210004527-3, DANIEL CARLOS LUSITANDE YAIGUAJE, Ecuadorian, single, farmer, ID Card no. CC 210004562-0,

Electronic document e-Pet no. 1083599 with digital signature
Signatory: ANDRE LUIZ SOUZA DA SILVEIRA: 52872157115 Certificate Series No.: 599698618441351007525533240990019158213
Time Stamp ID: 239885 Date and Time: 04/06/2015 10:10 p.m.

CERT. MERRILL VER: JD

STJ – Electronic Petition (PET) 00126547/2015 received on 04/06/2015 10:10 p.m.                    (e-STJ PAGE 1922)
Left Sidebar – Electronic Petition added to case record on 04/07/2015 at 9:56 a.m. by user: LAURA CUNHA DE ALENCAR

3

BENANCIO FREDY CHIMBO GREFA, Ecuadorian, single, farmer, ID Card no. CC 210004574-5, GUILLERMO VICENTE PAYAGUAJE LUSITANTE, Ecuadorian, single, farmer, ID Card no. CC 150025906-2, DELFÍN LEONIDAS PAYAGUAJE PAYAGUAJE, Ecuadorian, single, farmer, ID Card no. CC 150029880-5, ALFREDO DONALDO PAYAGUAJE PAYAGUAJE, Ecuadorian, single, student, ID Card no. CC 150026016-9, TEODORO GONZALO PIAGUAJE PAYAGUAJE, Ecuadorian, single, farmer, ID Card no. CC 150028717-0, MIGUEL MARIO PAYAGUAJE PAYAGUAJE, Ecuadorian, single, farmer, ID Card no. CC 150035312-1, FERMIN PIAGUAJE PAYAGUAJE, Ecuadorian, single, farmer, ID Card no. CC 210004522-4, REINALDO LUSITANDE YAIGUAJE, Ecuadorian, single, farmer, ID Card no. CC 150025902-1, LUIS AGUSTÍN PAYAGUAJE PIAGUAJE, Ecuadorian, single, garment cutting machine operator, ID Card no. CC 150015571-6, EMILIO MARTÍN LUSITANDE YAIGUAJE, Ecuadorian, single, farmer, ID Card no. CC 150029879-7, SIMON LUSITANDE YAIGUAJE, Ecuadorian, unemployed, single, ID Card no. CC 150025908-8, ARMANDO WILFRIDO PIAGUAJE PAYAGUAJE, Ecuadorian, single, farmer, ID Card no. CC 210004556-2, and ANGEL JUSTINO PIAGUAJE, Ecuadorian, single, student, ID Card no. CC 210010299-1, all domiciled in Ecuador, at Calle Baltra, no. 002, y Fernandina, sector 6, in the city of Nueva Loja, province of Sucumbíos, all hereby, through their undersigned counsel (doc.1), with reference to the order on page 1,913,  present their response to the objection against their right to file *in forma pauperis* submitted by CHEVRON CORPORATION, as follows:

### HOMOLOGATION OF FOREIGN JUDGMENT
### PROCEDURE IS INDEPENDENT OF PAYMENT OF COURT COSTS

1.      Before any argument is made before this esteemed Court regarding the need to grant the benefit of filing *in forma pauperis* to the appellees, it is worth noting the uselessness of the claim filed by CHEVRON CORPORATION.

Electronic document e-Pet no. 1083599 with digital signature
Signatory: ANDRE LUIZ SOUZA DA SILVEIRA: 52872157115 Certificate Series No.: 59969861844135100752553324099019158213
Time Stamp ID: 239885 Date and Time: 04/06/2015 10:10 p.m.
CERT. MERRILL VER: JD

STJ – Electronic Petition (PET) 00126547/2015 received on 04/06/2015 10:10 p.m.                    (e-STJ PAGE 1923)
Left Sidebar – Electronic Petition added to case record on 04/07/2015 at 9:56 a.m. by user: LAURA CUNHA DE ALENCAR

4

2.      Based on the requests formulated therein, it can be seen that the purpose behind the objection now being answered is merely to force the appellees *"(i) to bear the costs of the litigation and its procedural expenses, disbursing at once the value regarding the court costs; and (ii) to pay ten times the judicial costs, pursuant article 4, §1 of Law No. 1060/50."* (page 22).

3.      However, when it filed the request transcribed above, CHEVRON CORPORATION did not pay attention to the fact that the foreign judgment homologation procedure, and the granting of an <u>exequatur</u> for letters rogatory, do not require payment of court costs, pursuant to the sole paragraph of art. 1 of the STJ Resolution no. 9/2005:

> "Art. 1 The procedural classes of Recognition of Foreign Awards and Letters Rogatory are hereby created and added to the list of suits referred to the Superior Court of Justice; which will be subject to the provisions of this Resolution, on a temporary basis, until the Plenary Board of this Court approves specific statutory rules therefore.
> Sole paragraph. **Payment of court costs will be suspended in relation to cases dealt with in this Resolution and filed in this Court after publication of the aforementioned Constitutional Amendment until the resolution referred to in the main section of this article is enacted.**"

4.      Just to confirm the practical application of the legal provision transcribed above, the appellees hereby present, as examples, some summaries of judgments issued by this esteemed Superior Court of Justice that waive payment of court costs in foreign judgment homologation proceedings, with all of the judgments cited containing the following phrase: "*No court costs, pursuant to the terms of art. 1, sole paragraph, of STJ Resolution no. 9/2005.*"

> "CIVIL PROCEDURE. FAMILY LAW. HOMOLOGATION OF FOREIGN JUDGMENT. DIVORCE. CONSENT OF THE DEFENDANT WITHOUT CONSULAR STAMP OF APPROVAL. SERVICE OF PROCESS BY LETTER ROGATORY. APPOINTMENT OF SPECIAL TRUSTEE AD LITEM. FULFILLMENT OF THE REQUIREMENTS

Electronic document e-Pet no. 1083599 with digital signature
Signatory: ANDRE LUIZ SOUZA DA SILVEIRA: 52872157115 Certificate Series No.: 59969861844135100752553324099019158213
Time Stamp ID: 239885 Date and Time: 04/06/2015 10:10 p.m.

CERT. MERRILL VER: JD

STJ – Electronic Petition (PET) 00126547/2015 received on 04/06/2015 10:10 p.m.                    (e-STJ PAGE 1924)
Left Sidebar – Electronic Petition added to case record on 04/07/2015 at 9:56 a.m. by user: LAURA CUNHA DE ALENCAR

5

ESTABLISHED IN STJ RESOLUTION 9/2005. CONSENSUAL DIVORCE DECREE HOMOLOGATED.

1.     The objection regarding the questioned authenticity of the foreign documents was legally set aside, given the application of art. 11 of Law no. 11.419/2006, as well as by the consolidation of the understanding of this Superior Court, pursuant to the precedents mentioned.

2.     The absence of the consular stamp of approval for the provisional judgment is overruled by the stamp on the final judgment, over which there was no objection.

3.     Compliance with all the requirements set forth in arts. 3, 5 and 6 of STJ Resolution 09/2005 has been proven.

4.     Foreign judgment homologated. **Court costs pursuant to the terms of STJ Resolution no. 9/2005**. Respondent ordered to pay attorney's fees, in the amount of R$1,000.00." (SEC 8959/EX, Special Court, Reporter Justice NAPOLEÃO NUNES MAIA FILHO, judgment dated 12.17.14).

. - . - . -.

"HOMOLOGATION OF FOREIGN JUDGMENT. UNITED STATES OF AMERICA. DIVORCE. REQUIREMENTS MET. REQUEST GRANTED.

1.     Service of process by publication was granted, pursuant to the terms of § 2 of article 220 of the RISTF, because the Respondent no longer resided at the address listed in the judgment being homologated, and the Petitioner, who did not have children, nor assets to divide with the ex-spouse, affirmed that she did not know of his whereabouts. After all, since more than eight years had passed between the judgment and the filing of this homologation request, the alleged lack of knowledge of the current address of the ex-spouse is natural and justifiable, and for this reason, the argument of nullity is not applicable. Precedents of the Special Court.

2.     The requirements in the court regulations have been met in regard to confirming the regularity of the service of process for a proceeding judged by a judge with jurisdiction, whose judgment, which has become final, was authenticated by the Brazilian consular authority and translated by a sworn professional in Brazil, with the other legal formalities fulfilled.

3.     Homologation request granted. **Court costs *ex lege***. Respondent ordered to pay attorney's fees." (SEC 7,536/EX, Special Court, Reporter Justice LAURITA VAZ, judgment dated 10.15.14)

. - . - . -.

"CIVIL PROCEDURE - HOMOLOGATION OF FOREIGN JUDGMENT – CUSTODY RIGHT – ART. 5 OF STJ RESOLUTION NO. 09/2005 – FORMAL REQUIREMENTS FULFILLED. 1. Once the requirements set forth in art. 5 of Resolution no. 9/2005 of this Court have been met, and since the hypotheses listed in art. 6 of this regulation do not apply, the homologation of the judgment

Electronic document e-Pet no. 1083599 with digital signature
Signatory: ANDRE LUIZ SOUZA DA SILVEIRA: 52872157115 Certificate Series No.: 5996986184413510075255332409901915213
Time Stamp ID: 239885 Date and Time: 04/06/2015 10:10 p.m.
CERT. MERRILL VER: JD

STJ – Electronic Petition (PET) 00126547/2015 received on 04/06/2015 10:10 p.m.                    (e-STJ PAGE 1925)
Left Sidebar – Electronic Petition added to case record on 04/07/2015 at 9:56 a.m. by user: LAURA CUNHA DE ALENCAR

6

issued by a foreign Court granting custody must be approved. 2. Homologation granted. **No court costs.** Legal fees to be paid by the Respondent." (SEC 8158, Special Court, Reporter Justice ELIANA CALMON, judgment dated 04.25.13)

5.      Thus, we see the inapplicability of the objection raised, since no practical effect will result from it. Thus, the appellees could conclude their response in this paragraph, however, in the following sections, they will not fail to respond to each of the points raised by CHEVRON CORPORATION, none of which are capable of removing the appellees' right to file *in forma pauperis*.

### RIGHT TO FILE *IN FORMA PAUPERIS* IN THE COUNTRY OF ORIGIN

6.      CHEVRON CORPORATION bases its objection on the affirmation that Law no. 1,060/50, which governs the right to file *in forma pauperis* in Brazil, restricts its application to citizens and foreigners who reside in the country, which would exclude the appellees from its benefits.

7.      In fact, the appellees  are not included in the possible beneficiaries of this law, but this does not prevent them from being granted the right to file *in forma pauperis*.

8.      Pursuant to the terms of article 5 of the Inter-American Convention on Extraterritorial Validity of Foreign Judgments and Arbitral Decisions, ratified by both Brazil and Ecuador, "**A declaration in forma pauperis recognized in the State of origin of the judgment shall be recognized in the State of destination.**"

9.      In a twisted effort to avoid the applicability of this legal provision, the appellant lies when it affirms that "at no time did the Claimants make a request for free justice (in forma pauperis) in the Ecuadorian action" (page 15).

Electronic document e-Pet no. 1083599 with digital signature
Signatory: ANDRE LUIZ SOUZA DA SILVEIRA: 52872157115 Certificate Series No.: 599698618441351007525533240990019158213
Time Stamp ID: 239885 Date and Time: 04/06/2015 10:10 p.m.
CERT. MERRILL VER: JD

STJ – Electronic Petition (PET) 00126547/2015 received on 04/06/2015 10:10 p.m.                                    (e-STJ PAGE 1926)
Left Sidebar – Electronic Petition added to case record on 04/07/2015 at 9:56 a.m. by user: LAURA CUNHA DE ALENCAR

7

10.     This false and inconsequential affirmation is struck down when we examine the Ecuadorian judgment issued on 10.15.12, under the following terms:

> "In relation to the filing of judicial proceedings in forma pauperis in Ecuador, it is declared that the Constitution of 2008 effectively confirms that court filings in Ecuador are free of charge (Art. 75), and even the Constitution of 1998, which was in effect at the time the litigation began, had a similar provision. In this regard, what is before this Court on the record, is that in this enforcement proceeding, the plaintiffs have not been required to pay any amount, fee, pledge or bond of any type."[1] (doc. 2).

11.     The ruling transcribed above results from the express request presented by the now appellees in the original proceeding, who, foreseeing the need to request the right to file *in forma pauperis* in the countries in which they would be requesting homologation of the Ecuadorian judgment, specifically requested a clear statement by that jurisdictional body about this matter so that they could take advantage of the provision in article 5 of the Inter-American Convention on Extraterritorial Validity of Foreign Judgments and Arbitral Awards mentioned above.

12.     Following is a transcription of the request presented by the appellees:

> "However, in order for a plaintiff to avail itself of the exemption in the other member countries of the Inter-American Conventions, it must demonstrate to the judges of those States that it proceeded in forma pauperis in the country of origin. And that is why we ask the Court to declare that the plaintiffs have litigated this lawsuit without having to pay costs, court fees and/or bonds of any kind, a situation that continues in the enforcement stage."[2] (doc. 3)

13.     As can be seen from the section transcribed above, the affirmation that the appellees never presented a request to file *in forma pauperis* in their country of origin is false,

---

[1] Free translation
[2] Free translation

Electronic document e-Pet no. 1083599 with digital signature
Signatory: ANDRE LUIZ SOUZA DA SILVEIRA: 52872157115 Certificate Series No.: 599698618441351007525533240990019158213
Time Stamp ID: 239885 Date and Time: 04/06/2015 10:10 p.m.

CERT. MERRILL VER: JD

STJ – Electronic Petition (PET) 00126547/2015 received on 04/06/2015 10:10 p.m.          (e-STJ PAGE 1927)
Left Sidebar – Electronic Petition added to case record on 04/07/2015 at 9:56 a.m. by user: LAURA CUNHA DE ALENCAR

8

and the affirmation that this benefit was not granted by the Ecuadorian courts is equally false.

14.     Applying the provision of article 5 of the Inter-American Convention on Extraterritorial Validity of Foreign Judgments and Arbitral Awards, the need to grant the benefit of filing *in forma pauperis* to the appellees is unquestionable.

<u>IRRELEVANT ARGUMENTS</u>

15.     Having proven that the right to file *in forma pauperis* was granted in the country of origin, the other arguments presented by CHEVRON CORPORATION in its objection become even more irrelevant; even so, the appellees will dedicate a section of their petition to respond to them.

16.     As it did in its answer to the request for homologation of the foreign decision (SEC no. 8542), and in their objection to the right to file *in forma pauperis,* CHEVRON CORPORATION raised a series of non-existent procedural frauds in order to justify its claim. If the allegations made in the answer to the request for homologation made little sense then, they make absolutely no sense in the context of this objection.

17.     We see that the appellant seeks to use the alleged "*fraudulent acts committed by the Appellees and their counsel*" to remove the right to file *in forma pauperis* requested by the appellees, arguing for this purpose that "*[t]he Brazilian people should not have to pay for a lawsuit to confirm an Ecuadorian decision that arises out of acts that, according to North-American courts, were tainted by fraud committed by the Claimants and their counsel*". (page 04).

Electronic document e-Pet no. 1083599 with digital signature
Signatory: ANDRE LUIZ SOUZA DA SILVEIRA: 52872157115 Certificate Series No.: 59969861844135100752553324099019158213
Time Stamp ID: 239885 Date and Time: 04/06/2015 10:10 p.m.
CERT. MERRILL VER: JD

STJ – Electronic Petition (PET) 00126547/2015 received on 04/06/2015 10:10 p.m.                    (e-STJ PAGE 1928)
Left Sidebar – Electronic Petition added to case record on 04/07/2015 at 9:56 a.m. by user: LAURA CUNHA DE ALENCAR

9

18.     It is quite obvious that the request is not grounded in any legal provision or jurisprudential understanding, since the existence or inexistence of procedural fraud — which was deeply and extensively debated in the case record for the request for homologation — does not have any bearing on whether to grant or deny the request for the right to file *in forma pauperis*.

19.     In regard to this point, the appellees will limit themselves to affirming that there was no procedural fraud, and refer the Honorable Justices of this esteemed Court to their reply filed in the case record of SEC no. 8,542, where each of the accusations of fraud made by CHEVRON CORPORATION is rebutted in a succinct and objective manner. The appellees can say no more, if for no other reason than the fact that they cannot see the relevance of this argument for this objection to the right to file *in forma pauperis*.

20.     In regard to the affirmation that "[t]he Claimants have received massive resources from investment funds and other investors to finance this sophisticated and complex saga perpetrated against the Defendant", no denial is necessary.

21.     In fact, the appellees have no alternative but to turn to third parties to finance the costly battle fought against them by CHEVRON CORPORATION in the courts throughout the world. On certain occasions, when they found themselves in situations in which payment of court costs or fees is essential— which is not the case in a procedure for homologation of a foreign judgment—, the appellees have sought external financing, since it is true that they do not have the funds to cover the proceedings.

22.     It is obvious that obtaining these funds greatly hinders the subsistence and support of the appellees, who live under very precarious conditions and maintain this fight for a question of survival and for redress of the harm caused to the environment of the

Electronic document e-Pet no. 1083599 with digital signature
Signatory: ANDRE LUIZ SOUZA DA SILVEIRA: 52872157115 Certificate Series No.: 5996986184413510075255332409901158213
Time Stamp ID: 239885 Date and Time: 04/06/2015 10:10 p.m.
CERT. MERRILL VER: JD

STJ – Electronic Petition (PET) 00126547/2015 received on 04/06/2015 10:10 p.m.                                    (e-STJ PAGE 1929)
Left Sidebar – Electronic Petition added to case record on 04/07/2015 at 9:56 a.m. by user: LAURA CUNHA DE ALENCAR

10

region where they live. It should be noted that Brazilian law does not require that a person have no resources nor the ability to obtain them in order to grant the right to file *in forma pauperis*; for the purpose of the law, it is sufficient for the person to not be able to pay court costs without harm to his subsistence or his family's, which is clearly applicable in this case.

23.     Accustomed to the U.S. practice of suffocating needy litigants until they give up on the action and sign a settlement agreement that is not at all in their best interests, CHEVRON CORPORATION is using every means it has at its disposal to bleed the now appellants, forcing them to obtain financing to allow them to continue their fight, which has lasted for more than two decades.

24.     On the aforementioned and customary practice mentioned above, Richard L. Marcus made the following diagnosis:

> "Whether or not the orientation of American procedure has tended toward delay, it certainly could lead to heightened costs in its aspiration to do perfect justice. (...) The cost of American litigation is hence a matter of enduring importance. (...) Repeatedly, there have been complaints that the American system makes substantial settlements cheaper than the large cost of litigating."[3]

25.     The hiring of "elite law firms" by the appellees, in turn, was made feasible by an agreement to pay success fees.

---

[3] Free translation. Original version: "Whether or not the orientation of American procedure has tended toward delay, it certainly could lead to heightened costs in its aspiration to do perfect justice. (...) The cost of American litigation is hence a matter of enduring importance. (...) Repeatedly, there have been complaints that the American system makes substantial settlements cheaper than the large cost of litigating." (MARCUS, Richard L., Malaise of the Litigation Superpower in Civil Justice in Crisis: Comparative Perspectives of Civil Procedure, Edited by Adrian Zuckerman, Oxford University Press, 1999, pp. 92/93)

Electronic document e-Pet no. 1083599 with digital signature
Signatory: ANDRE LUIZ SOUZA DA SILVEIRA: 52872157115 Certificate Series No.: 5996986184413510075255332409901158213
Time Stamp ID: 239885 Date and Time: 04/06/2015 10:10 p.m.

CERT. MERRILL VER: JD

STJ – Electronic Petition (PET) 00126547/2015 received on 04/06/2015 10:10 p.m.                    (e-STJ PAGE 1930)
Left Sidebar – Electronic Petition added to case record on 04/07/2015 at 9:56 a.m. by user: LAURA CUNHA DE ALENCAR

11

26.     In relation to the Sergio Bermudes law firm, it was hired solely and exclusively based on its success in this case, and the counsel to the appellees have not received any compensation for their work on this case to the present.

27.     It should be clarified that the collection in the amount of US$ 40 thousand added to the record by the appellant refers to the reimbursement of expenses paid in advance by the law firm for the sworn translation of the documents that accompanied the initial petition for homologation of the foreign decision and other costs that are not covered by the right to file *in forma pauperis*, and no part of this amount refers to attorney's fees.

28.     Regardless of the explanations now presented and of the amount spent by the appellees to seek their rights around the world, licitly obtained through third party financing, it is undeniable that the appellees themselves do not have the means to pay all the procedural costs, and for this reason, they should be granted the right to file *in forma pauperis*.

*       *       *

29.     Based on the foregoing, considering that the benefit of filing *in forma pauperis* was granted in Ecuador and that the payment of procedural costs by the appellees would clearly hurt their subsistence and that of their families, they trust that the objection to the right to file *in forma pauperis* will be denied, and that they will be granted this benefit, already recognized by the Ecuadorian courts.

30.     They request the right to present all the evidence allowed under the law, and to later add a sworn translation of the documents presented in a foreign language.

Electronic document e-Pet no. 1083599 with digital signature
Signatory: ANDRE LUIZ SOUZA DA SILVEIRA: 52872157115 Certificate Series No.: 599698618441351007525533240990019158213
Time Stamp ID: 239885 Date and Time: 04/06/2015 10:10 p.m.
CERT. MERRILL VER: JD

STJ – Electronic Petition (PET) 00126547/2015 received on 04/06/2015 10:10 p.m.                    (e-STJ PAGE 1931)
Left Sidebar – Electronic Petition added to case record on 04/07/2015 at 9:56 a.m. by user: LAURA CUNHA DE ALENCAR

12

31.    Finally, they declare that their counsel receive any notifications in the Federal District, at the address contained in the letterhead.

Respectfully submitted,

Brasília, April 6, 2015

[Signature]                                          [Signature]

Sergio Bermudes                        Marcio Vieira Souto Costa Ferreira

OAB/DF 2.192-A                                 OAB/RJ 59.384


[Signature]                                          [Signature]

Fabiano Robalinho Cavalcanti                  Caetano Berenguer

OAB/RJ 95.237                                  OAB/RJ 135.124


[Signature]                                          [Signature]

Andre Silveira                          Antonia de Araujo Lima

OAB/DF 16.369                                  OAB/RJ 171.377


T:\VAA\AFECTADOS VS. CHEVRON - RESPOSTA IMPUGNAÇÃO GRATUIDADE JUSTIÇA VF.DOC

Electronic document e-Pet no. 1083599 with digital signature
Signatory: ANDRE LUIZ SOUZA DA SILVEIRA: 52872157115 Certificate Series No.: 59969861844135100752553324099019158213
Time Stamp ID: 239885 Date and Time: 04/06/2015 10:10 p.m.

CERT. MERRILL VER: JD

**United Language Group**
1600 Utica Avenue South
Suite 750
Minneapolis, MN 55416
+1 855-7UNITED
legaltranslations@ulgroup.com

**ULG**
UNITED LANGUAGE GROUP

State of Minnesota                          )
Estado de Minnesota

                                           )                ss:
                                           )            a saber:

County of Hennepin                         )
Condado de Hennepin

### Certificate of Accuracy
### Certificado de Exatidão

This is to certify that the attached translation is, to the best of our knowledge and belief, a true and accurate translation from Portuguese into English of the attached document.

Pelo presente, certifico que a tradução anexa é, segundo meu conhecimento e entendimento, uma tradução fiel e completa do idioma português ao inglês do documento anexo.

Dated: September 27, 2018
Data: 27 de setembro de 2018

Kate Kaurova
Project Manager – Legal Translations
United Language Group
_____[firmado]_____
Kate Kaurova
Gerente de Projeto – Traduções Jurídicas
United Language Group

**MAKENZIE ANN SHOFNER**
**NOTARY PUBLIC**
**MINNESOTA**
My Commission Expires Jan. 31, 2021

Sworn to and signed before
Juramentado e assinado em
Me, this _____27th_____ day of
mina presença aos _27_ dias do
_____September_____ 2018
mês de ___ setembro ___ de 2018



Notary Public
Notário Público

[assinado]
[selo]

ESCRITÓRIO DE ADVOCACIA

### S E R G I O  B E R M U D E S

SERGIO BERMUDES
MARCIO VIEIRA SOUTO COSTA FERREIRA
MARCELO FONTES
ALEXANDRE SIGMARINGA SEIXAS
GUILHERME VALDETARO MATHIAS
ROBERTO SARDINHA JUNIOR
MARCELO LAMEGO CARPENTER
ANTONIO CARLOS VELLOSO FILHO
FABIANO ROBALINHO CAVALCANTI
MARIA AZEVEDO SALGADO
MARCO AURÉLIO DE ALMEIDA ALVES
ERIC CERANTE PESTRE
VITOR FERREIRA ALVES DE BRITO
ANDRÉ SILVEIRA
RODRIGO TANNURI
FREDERICO FERREIRA
ANTONELLA MARQUES CONSENTINO
MARCELO GONÇALVES
RICARDO SILVA MACHADO
RICARDO JUNQUEIRA DE ANDRADE
ANDRÉ TAVARES
CAROLINA CARDOSO FRANCISCO
MARIANNA FUX
ANDRÉ CHATEAUBRIAND MARTINS
PHILIP FLETCHER CHAGAS

LUÍS FELIPE FREIRE LISBÔA
PEDRO PAULO DE BARROS BARRETO
WILSON PIMENTEL
RICARDO LORETTI HENRICI
JAIME HENRIQUE PORCHAT SECCO
GRISSIA RIBEIRO VENÂNCIO
MARCELO BORJA VEIGA
ADILSON VIEIRA MACABU FILHO
CAETANO BERENGUER
RAFAEL DIREITO SOARES
ANA PAULA DE PAULA
ALEXANDRE FONSECA
PEDRO HENRIQUE CARVALHO
RAFAELA FUCCI
GABRIEL LÓS
LOUIS DE CASTEJA
HENRIQUE ÁVILA
RENATO RESENDE BENEDUZI
DIEGO BARBOSA CAMPOS
ALESSANDRA MARTINI
MARIANA ARRUDA DE SOUZA
DANIEL CHACUR DE MIRANDA
PEDRO HENRIQUE NUNES
GABRIEL DE ORLEANS E BRAGANÇA
LUIZA LOURENÇO BIANCHINI

GABRIEL PRISCO PARAISO
GUIOMAR FEITOSA LIMA MENDES
FLÁVIO JARDIM
GUILHERME COELHO
ANA LUIZA COMPARATO
LIVIA IKEDA
LIVIA SAAD
JULLIANA CUNHA
ALLAN BARCELLOS L. DE OLIVEIRA
PAULO BONATO
RENATO CALDEIRA GRAVA BRAZIL
VICTOR NADER BUJAN LAMAS
GUILHERME REGUEIRA PITTA
LUIZA PERRELLI BARTOLO
JOÃO ZACHARIAS DE SÁ
SERGIO SANTOS DO NASCIMENTO
GIOVANNA MARSSARI
OLAVO RIBAS
MATHEUS PINTO DE ALMEIDA
FERNANDO NOVIS
LUIS TOMÁS ALVES DE ANDRADE
MARCOS MARES GUIA
ROBERTA RASCIO SAITO
ANTONIA DE ARAUJO LIMA
GUSTAVO FIGUEIREDO GSCHWEND

ANA LUISA BARBOSA BARRETO
PAULA MELLO
RAFAEL MOCARZEL
CONRADO RAUNHEITTI
LUIZA DIAS MARTINS
THAÍS VASCONCELOS DE SÁ
BRUNO TABERA
FÁBIO MANTUANO PRINCIPE

CONSULTORES
AMARO MARTINS DE ALMEIDA (1914-1998)
HELIO CAMPISTA GOMES (1925-2004)
SALVADOR CÍCERO VELLOSO PINTO
JORGE FERNANDO LORETTI
ELENA LANDAU
CAIO LUIZ DE ALMEIDA VIEIRA DE MELLO
PEDRO MARINHO NUNES

EXMO. SR. MINISTRO RELATOR DA PETIÇÃO N° 9815

MARÍA AGUINDA SALAZAR, equatoriana, viúva, do lar, identidade n.° CC 150007906-4, CARLOS GREFA HUATATOCA, equatoriano, casado, agricultor, identidade n.° CC 150024060-9, CATALINA ANTONIA AGUINDA ZALAZAR, equatoriana, casada, do lar, identidade n.° CC 150020056-1, LIDIA ALEXANDRA AGUINDA AGUINDA, equatoriana, casada, do lar, identidade n.° CC 150053509-9, PATRICIO ALBERTO CHIMBO YUMBO, equatoriano, solteiro, agricultor, identidade n.° CC 150032278-7, CLIDE RAMIRO AGUINDA AGUINDA, equatoriano, casado, agricultor, identidade n.° CC 150037013-3, LUÍS ARMANDO CHIMBO YUMBO, equatoriano, casado, agricultor, identidade n.° CC 150020354-0, BEATRIZ MERCEDES GREFA TANGUILA, equatoriana, casada, do lar, identidade n.° CC 150051885-5, LUCIO ENRIQUE GREFA TANGUILA, equatoriano, casado, agricultor, identidade n.° CC 150056375-2, PATRICIO WUILSON AGUINDA AGUINDA, equatoriano, casado, agricultor, identidade n.° 150032679-6, CELIA IRENE VIVEROS

Documento eletrônico VDA15083569 assinatura digital.
Signatário(a): ANDRÉ LUIZ SOUZA DA SILVEIRA, Rua da Assembléia, 10 - salas 2901/10 - 20011-010 - Rio de Janeiro - RJ - Tel. (21) 3221.9000 - Fax. (21) 3221 9001 - e-mail: rjbermudes@sbadv.com.br
Id. Carimbo de Tempo: E3 55 AB. Data e hora: 06/04/2015 22:12:52. Rua Gomes de Carvalho, 1.510 - 6° andar - 04547-005 - São Paulo - SP - Tel. (11) 3549.6900 - Fax. (11) 3288 1843 - e-mail: spbermudes@sbadv.com.br
SHIS QL 14 - Conjunto 05 - Casa 01 - 71640-055 - Brasília - DF - Tel. (61) 3212 1200 - Fax. (61) 3248 0449 - e-mail: dfbermudes@sbadv.com.br

Petição Eletrônica juntada ao processo em 07/04/2015 às 09:56:57 pelo usuário: LAURA CUNHA DE ALENCAR

CUSANGUA, equatoriana, casada, do lar, identidade n.º CC 040084856-0, FRANCISCO MATIAS ALVARADO YUMBO, equatoriano, casado, agricultor, identidade n.º CC 15009328-9, FRANCISCO ALVARADO YUMBO, equatoriano, casado, agricultor, identidade n.º 150011615-5, OLGA GLORIA GREFA CERDA, equatoriana, casada, do lar, identidade n.º CC 160020225-1, LORENZO JOSÉ ALVARADO YUMBO, equatoriano, casado, agricultor, identidade n.º CC 150021110-5, NARCISA AIDA TANGUILA NARVÁEZ, equatoriano, casada, do lar, identidade n.º CC 150030173-2, BERTHA ANTONIA YUMBO TANGUILA, equatoriano, casada, do lar, identidade n.º CC 150025954-2, GLORIA LUCRECIA TANGUILA GREFA, equatoriano, casada, do lar, identidade n.º 150014256-5, FRANCISCO VICTOR TANGUILA GREFA, equatoriano, casado, agricultor, identidade n.º CC 150011193-3, ROSA TERESA CHIMBO TANGUILA, equatoriano, casada, do lar, identidade n.º CC 150015652-4, JOSÉ GABRIEL REVELO LLORE, equatoriano, solteiro, agricultor, identidade n.º CC 170181991-2, MARÍA CLELIA REASCOS REVELO, equatoriana, casada, do lar, identidade n.º CC 170705717-8, MARÍA MAGDALENA RODRIGUEZ BARCENES, equatoriana, casada, do lar, identidade n.º 170937767-3, HUGO GERARDO CAMACHO NARANJO, equatoriano, casado, agricultor, identidade n.º CC 020056932-5, HELEODORO PATARON GUARACA, equatoriano, casado, agricultor, identidade n.º CC 060055304-4, LUISA DELIA TANGUILA NARVÁEZ, equatoriana, casada, do lar, identidade n.º CC 150008487-4, LOURDES BEATRIZ CHIMBO TANGUILA, viúva, do lar, portadora da carteira de identidade n.º 150025494-9, MARÍA HORTENCIA VIVEROS CUSANGUA, equatoriana, casada, do lar, identidade n.º 040097554-6, SEGUNDO ANGEL AMANTA MILÁN, equatoriano, casado, agricultor, identidade n.º CC 02006608-9, OCTAVIO ISMAEL CÓRDOVA HUANCA, equatoriano, casado, agricultor, identidade n.º CC 110076783-7, ELÍAS ROBERTO PIYAHUAJE PAYAHUAJE, equatoriano, casado, agricultor, identidade n.º CC 150014131-0, JAVIER PIAGUAJE PAYAHUAJE, equatoriano, solteiro, motorista, identidade n.º CC 210004527-3, DANIEL CARLOS LUSITANDE YAIGUAJE, equatoriano, solteiro, agricultor, identidade n.º CC 210004562-0,

Petição Eletrônica juntada ao processo em 07/04/2015 as 09:56:57 pelo usuário: LAURA CUNHA DE ALENCAR

Documento eletrônico e-Pet nº 1083599 com assinatura digital
Signatário(a): ANDRE LUIZ SOUZA DA SILVEIRA:52872157115 NºSérie Certificado: 5996986184413510075255332409901 9158213
Id Carimbo de Tempo: 239885 Data e Hora: 06/04/2015 22:10:46hs

BENANCIO FREDY CHIMBO GREFA, equatoriano, solteiro, agricultor, identidade n.° CC 210004574-5, GUILLERMO VICENTE PAYAGUAJE LUSITANTE, equatoriano, solteiro, agricultor, identidade n.° CC 150025906-2, DELFÍN LEONIDAS PAYAGUAJE PAYAGUAJE, equatoriano, solteiro, agricultor, identidade n.° CC 150029880-5, ALFREDO DONALDO PAYAGUAJE PAYAGUAJE, equatoriano, solteiro, estudante, identidade n.° CC 150026016-9, TEODORO GONZALO PIAGUAJE PAYAGUAJE, equatoriano, solteiro, agricultor, identidade n.° CC 150028717-0, MIGUEL MARIO PAYAGUAJE PAYAGUAJE, equatoriano, solteiro, agricultor, identidade n.° CC 150035312-1, FERMIN PIAGUAJE PAYAGUAJE, equatoriano, solteiro, agricultor, identidade n.° CC 210004522-4, REINALDO LUSITANDE YAIGUAJE, equatoriano, solteiro, agricultor, identidade n.° CC 150025902-1, LUIS AGUSTÍN PAYAGUAJE PIAGUAJE, equatoriano, solteiro, operador de corte e confecção, identidade n.° CC 150015571-6, EMILIO MARTÍN LUSITANDE YAIGUAJE, equatoriano, solteiro, agricultor, identidade n.° CC 150029879-7, SIMON LUSITANDE YAIGUAJE, equatoriano, desempregado, solteiro, identidade n.° CC 150025908-8, ARMANDO WILFRIDO PIAGUAJE PAYAGUAJE, equatoriano, solteiro, agricultor, identidade n.° CC 210004556-2, e ANGEL JUSTINO PIAGUAJE, equatoriano, solteiro, estudante, identidade n.° CC. 210010299-1, todos domiciliados no Equador, na Calle Baltra, n.° 002, y Fernandina, sector 6, Ciudad Nueva Loja, Provincia de Sucumbíos, vêm, por seus advogados abaixo assinados (doc. 1), em atenção ao r. despacho de fls. 1.913, apresentar a sua resposta à impugnação à gratuidade de justiça apresentada pela CHEVRON CORPORATION, nos termos a seguir expostos:

## HOMOLOGAÇÃO DE SENTENÇA ESTRANGEIRA
## PROCEDIMENTO QUE INDEPENDE DO PAGAMENTO DE CUSTAS JUDICIAIS

1.       Antes de apresentar qualquer argumento no sentido de convencer essa e. Corte da necessidade de concessão do benefício da gratuidade de justiça aos impugnados, destaca-se desde já a inutilidade do pleito formulado pela CHEVRON CORPORATION.

Petição Eletrônica juntada ao processo em 07/04/2015 as 09:56:57 pelo usuário: LAURA CUNHA DE ALENCAR

Documento eletrônico e-Pet nº 1083599 com assinatura digital
Signatário(a): ANDRE LUIZ SOUZA DA SILVEIRA:52872157115 NºSérie Certificado: 59969861844135100752553324099019158213
Id Carimbo de Tempo: 239885 Data e Hora: 06/04/2015 22:10:46hs

2.        Perceba-se que o intuito da impugnação ora respondida, segundo os pedidos nela formulados, é tão somente obrigar os impugnados "*(i) a arcar com as custas e despesas processuais, desembolsando desde logo o valor referente às custas judiciais; e (ii) a efetuar o pagamento do décuplo das custas judiciais, nos termos do art. 4º, §1º da Lei nº 1.060/50*" (fls. 22).

3.        Ocorre que, ao formular o pedido transcrito acima, não atentou a CHEVRON CORPORATION para o fato de que o processo de homologação de sentença estrangeira, e também o de concessão de <u>exequatur</u> às cartas rogatórias, independem do recolhimento de custas processuais, nos termos do parágrafo único do art. 1º da Resolução STJ nº 9/2005:

> "Art. 1º Ficam criadas as classes processuais de Homologação de Sentença Estrangeira e de Cartas Rogatórias no rol dos feitos submetidos ao Superior Tribunal de Justiça, as quais observarão o disposto nesta Resolução, em caráter excepcional, até que o Plenário da Corte aprove disposições regimentais próprias.
> Parágrafo único. **Fica sobrestado o pagamento de custas dos processos tratados nesta Resolução que entrarem neste Tribunal após a publicação da mencionada Emenda Constitucional, até a deliberação referida no caput deste artigo.**"

4.        Apenas para confirmar a aplicação prática do dispositivo legal transcrito acima, os impugnados apresentam a seguir, exemplificativamente, algumas ementas desse e. Superior Tribunal de Justiça que dispensam o pagamento de custas em processos de homologação de sentença estrangeira, sendo comum ao inteiro teor de todos os julgados citados abaixo a seguinte frase: "*Sem custas, nos termos do art. 1.º, parágrafo único, da Resolução STJ no. 9/2005*".

> "PROCESSUAL CIVIL. FAMÍLIA. HOMOLOGAÇÃO DE SENTENÇA ESTRANGEIRA. DIVÓRCIO. ANUÊNCIA DO REQUERIDO SEM A CHANCELA CONSULAR. CITAÇÃO POR CARTA ROGATÓRIA. NOMEAÇÃO DE CURADOR ESPECIAL. PREENCHIMENTO DOS REQUISITOS

Documento eletrônico e-Pet nº 1083599 com assinatura digital
Signatário(a): ANDRE LUIZ SOUZA DA SILVEIRA:52872157115 NºSérie Certificado: 59969861844135100752553324099019158213
Id Carimbo de Tempo: 239885 Data e Hora: 06/04/2015 22:10:46hs

PREVISTOS NA RESOLUÇÃO STJ 9/2005. SENTENÇA DE DIVÓRCIO CONSENSUAL HOMOLOGADA.

1. A impugnação sobre a dúvida na autenticidade dos documentos estrangeiros foi juridicamente afastada dada a incidência do art. 11 da Lei no. 11.419/2006, e também pela consolidação do entendimento dessa Corte Superior, conforme os precedentes que menciona.

2. A ausência de chancela consular sobre a sentença provisória é suprida pela chancela havida na sentença definitiva, sobre a qual inclusive, não se verificou qualquer impugnação.

3. Comprovado o cumprimento de todos os requisitos previstos nos arts. 3o., 5o. e 6o. da Resolução STJ 09/2005.

4. Sentença estrangeira homologada. **Custas nos termos da Resolução STJ 9/2005**. Condenação do requerido em verba honorária, no valor de R\$ 1.000,00." (SEC 8.959/EX, Corte Especial, Rel. Min. NAPOLEÃO NUNES MAIA FILHO, j. 17.12.14)

.-.-.-.

"HOMOLOGAÇÃO DE SENTENÇA ESTRANGEIRA. ESTADOS UNIDOS DA AMÉRICA. DIVÓRCIO. REQUISITOS PREENCHIDOS. PEDIDO DEFERIDO.

1. A citação editalícia foi deferida, nos termos do § 2.º do art. 220 do RISTF, porque o Requerido não mais residia no endereço constante na sentença homologanda, e a Requerente, que não teve filhos nem bens a partilhar com o ex-cônjuge, afirmou não saber o seu paradeiro. Afinal, passados mais de oito anos desde a sentença até o ajuizamento deste pedido de homologação, é natural e justificável o alegado desconhecimento do endereço atual do ex-cônjuge, razão pela qual não procede a arguição de nulidade. Precedentes da Corte Especial.

2. Restaram atendidos os requisitos regimentais com a constatação da regularidade da citação para processo julgado por juiz competente, cuja sentença, transitada em julgado, foi autenticada pela autoridade consular brasileira e traduzida por profissional juramentado no Brasil, com o preenchimento das demais formalidades legais.

3. Pedido de homologação deferido. **Custas ex lege**. Condenação do Requerido ao pagamento dos honorários advocatícios." (SEC 7.536/EX, Corte Especial, Rel. Min. LAURITA VAZ, j. 15.10.14)

.-.-.-.

"PROCESSO CIVIL – HOMOLOGAÇÃO DE SENTENÇA ESTRANGEIRA – DIREITO DE GUARDA – ART. 5° DA RESOLUÇÃO N° 09/2005 DO STJ – REQUISITOS FORMAIS PRESENTES. 1. Uma vez atendidos os requisitos do art. 5° da Resolução n.° 9/2005 desta Corte, bem assim inocorrentes as hipótese do art. 6° do citado regramento, é imperiosa a homologação da sentença

Petição Eletrônica juntada ao processo em 07/04/2015 às 09:56:57 pelo usuário: LAURA CUNHA DE ALENCAR

Documento eletrônico e-Pet nº 1083599 com assinatura digital
Signatário(a): ANDRE LUIZ SOUZA DA SILVEIRA:52872157115 N°Série Certificado: 5996986184413510075255332409901915882 13
Id Carimbo de Tempo: 239885 Data e Hora: 06/04/2015 22:10:46hs

de guarda proferida por Corte Judicial estrangeira. 2. Homologação deferida. **Sem custas**. Honorários de sucumbência por conta da parte requerida." (SEC 8158, Corte Especial, Rel. Min. ELIANA CALMON, j. 25.04.13)

5.     Revela-se assim a imprestabilidade da impugnação que ora se responde, uma vez que nenhum efeito prático dela resultará. Sendo assim, poderiam os impugnados terminar a sua resposta neste parágrafo, mas nos capítulos que seguem não se furtarão a responder cada um dos pontos levantados pela CHEVRON CORPORATION, nenhum deles capaz de afastar a gratuidade de justiça a que fazem jus.

<u>GRATUIDADE DE JUSTIÇA NO PAÍS DE ORIGEM</u>

6.     A CHEVRON CORPORATION principia a sua impugnação pela afirmação de que a Lei nº 1.060/50, que disciplina a gratuidade de justiça no Brasil, restringe a sua aplicação aos nacionais e estrangeiros residente no país, o que excluiria os impugnados de seus benefícios.

7.     De fato os impugnados não se enquadram nos possíveis beneficiários da referida lei, mas isso não impede que a eles seja concedida a gratuidade de justiça.

8.     Com efeito, nos termos do art. 5º da Convenção Interamericana Sobre Eficácia Extraterritorial das Sentenças e Laudos Arbitrais Estrangeiros, ratificada tanto pelo Brasil quanto pelo Equador, "**o benefício de justiça gratuita reconhecido no Estado de origem da sentença será mantido no de sua apresentação**".

9.     Na tentativa canhestra de evitar a incidência do referido dispositivo legal a impugnante mente ao afirmar que "em momento algum os Impugnados formularam o pedido de gratuidade de justiça (*in forma pauperis*) na ação equatoriana" (fls. 15).

Petição Eletrônica juntada ao processo em 07/04/2015 às 09:56:57 pelo usuário LAURA CUNHA DE ALENCAR

Documento eletrônico e-Pet nº 1083599 com assinatura digital
Signatário(a):  ANDRE LUIZ SOUZA DA SILVEIRA:52872157115 NºSérie Certificado: 5996986184413510075255332409901915882 13
Id Carimbo de Tempo: 239885 Data e Hora: 06/04/2015 22:10:46hs

10.      A afirmação falsa e leviana cai por terra quando se examina a decisão equatoriana proferida em 15.10.12 nos seguintes termos:

> "Com relação à gratuidade dos processos judiciais no Equador, declara-se que, efetivamente, a Constituição de 2008 confirma a gratuidade de justiça no Equador (art. 75), e até mesmo a constituição de 1998, vigente à época do início deste litígio, dispunha em sentido similar. Neste ponto, o que perante este juiz consta do expediente, é que neste processo de execução não se exigiu dos demandantes o pagamento de valor, taxa, penhora ou qualquer garantia."[1] (doc. 2)

11.      A decisão transcrita acima decorre de expresso pedido formulado pelos impugnados no processo de origem, que, antevendo a necessidade de pleitear o benefício da gratuidade de justiça nos países onde fossem buscar a homologação do julgado equatoriano, requereram a manifestação expressa daquele órgão jurisdicional sobre o assunto a fim de que pudessem se valer do disposto no art. 5° da Convenção Interamericana Sobre Eficácia Extraterritorial das Sentenças e Laudos Arbitrais Estrangeiros mencionada acima.

12.      Confira-se abaixo a transcrição do pedido formulado pelos impugnados:

> "No entanto, para efeitos de aplicação da isenção nos demais países membro das mencionadas Convenções Interamericanas, faz-se necessário provar respectivos juízes destes Estados a vigência do benefício no país de origem. E é por isso que se solicita ao Sr. Juiz Presidente que declare que os demandantes litigaram perante este juízo sem que que lhes tenham sido exigidas taxas, despesas, custos e/ou garantias processuais de nenhum tipo, situação que se mantém vigente na fase de execução."[2] (doc. 3)

13.      Conforme se extrai do trecho reproduzido acima, é falsa a afirmação de que os impugnados jamais formularam pedido de

---

[1] Tradução livre
[2] Tradução livre

Documento eletrônico e-Pet nº 1083599 com assinatura digital
Signatário(a): ANDRE LUIZ SOUZA DA SILVEIRA:52872157115 NºSérie Certificado: 5996986184413510075255332409901915 8213
Id Carimbo de Tempo: 239885 Data e Hora: 06/04/2015 22:10:46hs

Petição Eletrônica juntada ao processo em 07/04/2015 às 09:56:57 pelo usuário: LAURA CUNHA DE ALENCAR

gratuidade de justiça no país de origem, e é igualmente falsa a afirmação de que o referido benefício não foi concedido pela justiça equatoriana.

14.      Aplicando-se ao presente caso o disposto no art. 5º da Convenção Interamericana Sobre Eficácia Extraterritorial das Sentenças e Laudos Arbitrais Estrangeiros, é inquestionável a necessidade de concessão do benefício de gratuidade de justiça aos impugnados.

<u>ARGUMENTOS IRRELEVANTES</u>

15.      Comprovada a concessão da gratuidade de justiça do país de origem, ainda mais irrelevantes se tornam os demais argumentos apresentados pela CHEVRON CORPORATION em sua impugnação, mas ainda assim os impugnados dedicarão um capítulo de sua petição para respondê-los.

16.      Tal qual fez em sua contestação ao pedido de homologação de sentença estrangeira (SEC nº 8.542), também em sua impugnação à gratuidade de justiça a CHEVRON CORPORATION suscita uma séria de inexistentes fraudes processuais a fim de justificar o seu pleito. Se pouco sentido faziam as alegações na contestação ao pedido de homologação, absolutamente nenhum sentido fazem na impugnação que hora se responde.

17.      Veja-se que impugnante pretende utilizar as supostas "*fraudes cometidas pelos Impugnados e seus advogados*" para afastar o benefício da gratuidade de justiça solicitada pelos impugnados, argumentando para tanto que "*o povo brasileiro não deve custear ação que visa a homologação de sentença que foi exarada como resultados de atos que, de acordo com corte norte-americanas, foram maculados por fraudes cometidas pelos Impugnados e seus advogados*" (fls. 04).

Documento eletrônico e-Pet nº 1083599 com assinatura digital
Signatário(a): ANDRE LUIZ SOUZA DA SILVEIRA:52872157115 NºSérie Certificado: 5996986184413510075255332409901915 8213
Id Carimbo de Tempo: 239885 Data e Hora: 06/04/2015 22:10:46hs

Petição Eletrônica juntada ao processo em 07/04/2015 as 09:56:57 pelo usuário: LAURA CUNHA DE ALENCAR

18.      Muito por óbvio o pedido não é embasado por qualquer dispositivo legal ou entendimento jurisprudencial, uma vez que a existência ou inexistência de fraude processual — já longa e profundamente debatida nos autos do pedido de homologação — não guarda qualquer relação com concessão ou não do pedido de gratuidade de justiça.

19.      Sobre este ponto os impugnados se limitarão a afirmar que inexistiu qualquer fraude processual, remetendo os eminentes ministros dessa e. Corte à sua réplica apresentada nos autos da SEC nº 8.542 onde cada uma das acusações de fraude feitas pela CHEVRON CORPORATION é rebatida de forma sucinta e objetiva. Mais não podem falar os impugnados, até mesmo porque não se compreende qual seria a relevância deste argumento para a discussão travada nos autos da impugnação à gratuidade de justiça.

20.      Quanto à afirmação de que "*os impugnados têm recebido volumosos recursos de fundos de investimentos e outros investidores para financiar essa sofisticada e complexa saga perpetrada contra a Impugnante*", nenhuma negativa é cabível.

21.      De fato aos impugnados não resta alternativa senão recorrer a terceiros para financiar a dispendiosa batalha contra eles travada pela CHEVRON CORPORATION em cortes de todo o mundo. Em certas ocasiões, quando se deparam com situações em que o pagamento de custas ou taxas judiciais é imprescindível — o que não ocorre no caso do processo de homologação de sentença estrangeira —, os impugnados buscam financiamentos externos, uma vez que de fato não dispõem de verba para custear os procedimentos.

22.      É óbvio que a obtenção desses recursos prejudica, em muito, a subsistência e o sustento dos impugnados que vivem em condições muito precárias e mantém essa luta por uma questão de sobrevivência e reparo dos prejuízos causados ao meio ambiente da

Petição Eletrônica juntada ao processo em 07/04/2015 às 09:56:57 pelo usuário: LAURA CUNHA DE ALENCAR

Documento eletrônico e-Pet nº 1083599 com assinatura digital
Signatário(a): ANDRE LUIZ SOUZA DA SILVEIRA:52872157115 NºSérie Certificado: 5996986184413510075255332409901915821 3
Id Carimbo de Tempo: 239885 Data e Hora: 06/04/2015 22:10:46hs

região onde vivem, valendo lembrar que a lei brasileira não exige que a pessoa não tenha recursos ou capacidade de obtê-los para conceder o benefício da gratuidade de justiça; para efeitos da lei basta que a pessoa não tenha condições de arcar com as custas judiciais sem o prejuízo sem prejuízo do sustento próprio ou da sua família, o que claramente é o caso dos autos.

23.         Acostumados com a prática norte-americana de sufocar os litigantes hipossuficientes até que desistam da ação e firmem um acordo nada vantajoso ou conveniente, a CHEVRON CORPORATION se vale de todos os expedientes ao seu alcance para sangrar os ora impugnados, forçando-os a busca de financiamentos que permitam a sua sobrevivência na luta que já dura mais de duas décadas.

24.         Sobre a referida e costumeira prática referida acima, assim a diagnosticou Richard L. Marcus:

> "Sendo ou não verdade que a orientação procedimental estadunidense tende à demora, é certo que pode acarretar custos mais elevados na sua ânsia de aplicar uma justiça perfeita. (...) O custo de litígio nos Estados Unidos é, portanto, uma questão de importância duradoura. (...) São frequentes as reclamações de que o sistema estadunidense resulta numa situação em que acordos com valores expressivos, são mais baratos que o custo alto de litígio."[3]

25.         A contratação de "escritórios de advocacia de elite" pelos impugnados, por sua vez, se viabiliza com o acordo de pagamento de honorários de êxito.

---

[3] Tradução livre. Versão original: "Whether or not the orientation of American procedure has tended toward delay, it certainly could lead to heightened costs in its aspiration to do perfect justice. (...)   The cost of American litigation is hence a matter of enduring importance. (...) Repeatedly, there have been complaints that the American system makes substantial settlements cheaper than the large cost of litigating." (MARCUS, Richard L., Malaise of the Litigation Superpower in Civil Justice in Crisis: Comparative Perspectives of Civil Procedure, Edited by Adrian Zuckerman, Oxford University Press, 1999, pp. 92/93)

Documento eletrônico e-Pet nº 1083599 com assinatura digital
Signatário(a)s: ANDRE LUIZ SOUZA DA SILVEIRA:52872157115 Nº Série Certificado: 59969861844135100752553324099019158213
Id Carimbo de Tempo: 239885 Data e Hora: 06/04/2015 22:10:46hs

Petição Eletrônica juntada ao processo em 07/04/2015 as 09:56:57 pelo usuário: LAURA CUNHA DE ALENCAR

26.     Com relação ao Escritório de Advocacia Sergio Bermudes, a contratação se deu única e exclusivamente com base no êxito, não tendo os patronos dos impugnados percebido qualquer remuneração pela sua atuação nos autos até o presente momento.

27.     Esclareça-se que a cobrança no valor de US$ 40 mil juntada aos autos pela impugnante se refere ao reembolso de despesas adiantadas pelo escritório para a tradução juramentada dos documentos que acompanharam a petição inicial do pedido de homologação de sentença estrangeira e outros custos que não estão cobertos pela gratuidade de justiça, não sendo nenhuma parte deste valor referente a honorários advocatícios.

28.     Independentemente das explicações ora expostas e do valor já despendido pelos impugnados para tentar valer o seu direito ao redor do mundo, obtido licitamente através de financiamentos de terceiros, é inegável que os próprios impugnados não dispõem de meios para arcar com todas as despesas processuais, motivo pelo qual lhes deve ser concedido o benefício da gratuidade de justiça.

*     *     *

29.     Por todo o exposto, considerando que o benefício da gratuidade de justiça foi concedido no Equador e que o pagamento de despesas processuais pelos impugnados claramente lhes causaria prejuízo ao sustento próprio e de suas famílias, confiam em que será desprovida a impugnação à gratuidade de justiça ora respondida, concedendo-se aos impugnados o benefício já reconhecido pela justiça equatoriana.

30.     Protestam pela produção de todas as provas em direito admitidas e também pela posterior juntada da tradução juramentada dos documentos apresentados em língua estrangeira.

Documento eletrônico e-Pet nº 1083599 com assinatura digital
Signatário(a): ANDRE LUIZ SOUZA DA SILVEIRA:52872157115 NºSérie Certificado: 5996986184413510075255332409901915821 3
Id Carimbo de Tempo: 239885 Data e Hora: 06/04/2015 22:10:46hs

Petição Eletrônica juntada ao processo em 07/04/2015 às 09:56:57 pelo usuário LAURA CUNHA DE ALENCAR

31.    Por fim, declaram que os seus advogados recebem intimações no Distrito Federal, no endereço constante do timbre.

Nestes termos,
P. deferimento.
Brasília, 6 de abril de 2015

Sergio Bermudes
OAB/DF 2.192-A

Marcio Vieira Souto Costa Ferreira
OAB/RJ 59.384

Fabiano Robalinho Cavalcanti
OAB/RJ 95.237

Caetano Berenguer
OAB/RJ 135.124

André Silveira
OAB/DF 16.379

Antonia de Araujo Lima
OAB/RJ 171.377

T:\AAL\AAFECTADOS VS. CHEVRON - RESPOSTA IMPUGNAÇÃO GRATUIDADE JUSTIÇA VF.DOC

Documento eletrônico e-Pet nº 1083599 com assinatura digital
Signatário(a):  ANDRE LUIZ SOUZA DA SILVEIRA:52872157115 NºSérie Certificado: 5996986184413510075255332409901915 8213
Id Carimbo de Tempo: 239885 Data e Hora: 06/04/2015 22:10:46hs

# EXHIBIT 33

[stamp] NATIONAL CIVIL COURT NO. 61– FEDERAL CAPITAL

# COPY OF COMPLAINT

"AGUINDA SALAZAR MARÍA ET AL. V. CHEVRON CORPORATION RE. EXEQUATUR AND RECOGNITION OF FOREIGN JUDGMENT" – 97,260/12 NATIONAL CIVIL TRIAL COURT 61, SOLE CLERK'S OFFICE

CERT. MERRILL VER: JD

[stamp] NATIONAL CIVIL COURT NO. 61– FEDERAL CAPITAL. November 21, 2012. 1:24 p.m.

**FIRST APPEARANCE. EXEQUATUR PROCEEDING. RELATED ACTION.**

<u>To the National Civil Court Judge,</u>

**We, Enrique Bruchou** (Bar Association registration in volume No. 41, page No. 928), in my capacity as attorney for plaintiffs, whose legal domicile is José Manuel Abascal E 12-79 y Portete, city of Quito, Republic of Ecuador, assisted by **Carlos María Rotman** (Bar Association registration in volume No. 30, page No. 544), **Rodolfo A. Ramírez** (Bar Association registration in volume No. 7, page No. 766), and **Martín Beretervide** (Bar Association registration in volume No. 81, page No. 927), all of whom, <u>for the purpose of service in this case, are domiciled at Ing. Butty 275, piso 12, City of Buenos Aires</u>, hereby appear before you and state as follows:

## I. <u>REPRESENTATION</u>

**Exhibit 1** to this complaint is a copy of the power of attorney the plaintiffs gave to the undersigned, authorizing them to pursue this action. We state, under oath, that it is an authentic document, which is in force. Furthermore, the original power of attorney—which is apostilled, under applicable international rules—appears in the case record of the related action *"Aguinda Salazar María v. Chevron Corporation on preventive measures"* (Case record No. 91814/2012).

The power of attorney was given under the terms of the *"Inter-American Convention on the Legal Regime of Powers of Attorney to Be Used Abroad,"*[1] adopted during the First Inter-American Conference on Private International Law (**CIDIP I**), held in 1975 in Panama.

---

[1] Approved in our country through Law No. 22550 [ADLA XIII- A, p. 46; Official Gazette 10/20/87]. In Ecuador, this instrument was approved in Supreme Decree No. 472, published in Official Gazette No. 827, June 18, 1975.

CERT. MERRILL VER: JD

## II. <u>PURPOSE</u>

On behalf of our clients, we appear before you, under the provisions of the *"Inter-American Convention on Extraterritorial Validity of Foreign Judgments and Arbitral Awards"*—signed and ratified by both Argentina and Ecuador[2]—to file this action for *recognition* of the foreign judgment issued against **Chevron Corporation** (hereinafter, "Chevron Corp." or "Chevron") by the courts of Ecuador from the Judicial District of Sucumbíos, in the case filed by *"Aguinda María et al."* against *"Chevron Corporation,"* styled in Ecuador No. 002- 2003 (at trial) and No. 2011-0106 (at the Sole Division of the Provincial Court of Justice of Sucumbíos).

We inform the Court that the defendant's legal domicile is **6001 Bollinger Canyon Road, San Ramon, California, United States of America.**

Defendant owns property in Argentina, and has even declared before the regulatory authorities of its country, the United States of America, that it owns 100 % of Chevron Argentina S.R.L. Some of its assets here have even been subject to attachment in the above-mentioned related actions (Case No. 91814/2012). The existence of assets owned by Chevron Corp. in Argentina, furthermore, is an issue that was already raised and decided—Chevron Corp. even appeared at a hearing on appeal, which was later denied—by the court of origin, i.e., the Ecuadorian judge who is currently presiding over the case. The foregoing is described in the original documents in the record of the preventive-measures case.

In the context of that case, defendant was ordered to pay the amount of nineteen billion twenty-one million

---

[2] Approved in our country through Law No. 22921 [ADLA XLHI-D, p. 3819; Official Gazette of 9/27/83]. In Ecuador, this international document was approved through Supreme Decree No. 853, published in Official Gazette No. 240 of May 11, 1982.

2

[stamp] NATIONAL CIVIL COURT NO. 61– FEDERAL CAPITAL

[stamp] PAULA GEROLA – CERTIFIED TRANSLATOR - LANGUAGE ENGLISH
Lic. T XIV F 388 – [illegible] Reg. C.T.T.C.I. No. 5073

five hundred fifty-two thousand ($19,021,552,000) American dollars—as calculated in decisions dated July 23, 2012 and July 30, 2012—as a result of **environmental damage** caused in the Ecuadorian Amazon by oil activities conducted by its predecessor Texaco Inc., which merged with Chevron Corp. in 2001.

The trial court rendered judgment on **February 14, 2011 (Exhibit 2)** and clarified its decision on **March 4, 2011 (Exhibit 3)**.

In turn, the Sole Division of the Provincial Court of Justice of Sucumbíos issued its judgment, affirming the trial court's decision in full, on **January 3, 2012 (Exhibit 4)**, and it issued an expansion on **January 13, 2012 (Exhibit 5)**.

All of the above judgments are attached hereto, with the relevant Apostille under the terms of the ***"Hague Convention Abolishing the Requirement of Legalization for Foreign Public Documents"*** (1961).

Please note the following: in this motion, unless expressly indicated otherwise, any reference to ***"the judgment"*** whose recognition is being sought extends to the four decisions mentioned above, which should be understood herein as a unit.

### III. "CONVENTION ON EXTRATERRITORIAL VALIDITY OF FOREIGN JUDGMENTS"

### III.1. ALL REQUIREMENTS OF ARTICLE 2 OF THE CONVENTION ARE MET.

Below we will analyze compliance with each subsection of Art. 2 of the Convention.

(i) FORMAL REQUIREMENTS (Subsection a)

CERT. MERRILL VER: JD

*"They fulfill all the formal requirements necessary for them to be deemed authentic in the State of origin."*

Since the documents have been apostilled by the authority of the State of origin, there is no doubt that they are considered **"authentic"** in Ecuador.

Article 5 of the Hague Convention abolishing the requirements of legalization states that *"When properly filled in, [the certificate] will certify the authenticity of the signature, the capacity in which the person signing the document has acted and, where appropriate, the identity of the seal or stamp which the document bears."*

(ii) <u>TRANSLATION (Subsection b)</u>

*"The judgment, award or decision and the documents attached thereto that are required under this Convention are duly translated into the official language of the State where they are to take effect."*

In this regard, Your Honor, no discussion is necessary since the documents we seek to have recognized were issued in Spanish, which is also the official language of our country.

The mentioned translation is thus inapplicable in this case.

(iii) <u>LEGALIZATION (Subsection c)</u>

*"They are presented duly legalized in accordance with the law of the State in which they are to take effect."*

Both Argentina and Ecuador have signed and ratified The Hague Convention Abolishing the Requirements of Legalization (1961).

CERT. MERRILL VER: JD

[stamp] NATIONAL CIVIL COURT NO. 61– FEDERAL CAPITAL

[stamp] PAULA GEROLA – CERTIFIED TRANSLATOR - LANGUAGE ENGLISH
Lic. T XIV F 388 – [illegible] Reg. C.T.T.C.I. No. 5073

And when that circumstance occurs—the two countries involved have ratified the Hague Convention—*"legalization by the Argentine Office of Foreign Affairs is not required."*[3]

This step is so unnecessary that Art. 9 of the Convention itself establishes that *"Each Contracting State shall take the necessary steps to prevent the performance of legalizations by its diplomatic or consular agents in cases where the present Convention provides for exemption."*

Further, Art. 5 of the Hague Convention (1961) states that *"When properly filled in, [the Apostille] will certify the authenticity of the signature, the capacity in which the person signing the document has acted and, where appropriate, the identity of the seal or stamp which the document bears."*

Therefore, when properly included with the judgment whose recognition is sought, the Apostille alone is enough to satisfy this requirement.

(iv) <u>INTERNATIONAL JURISDICTION (Subsection d)</u>

*"The judge or tribunal rendering the judgment is competent in the international sphere to try the matter and to pass judgment on it in accordance with the law of the State in which the judgment, award or decision is to take effect."*

"Competent in the international sphere" means *". . . the jurisdiction of the judge who rendered the judgment examined by the judge who must recognize or enforce it."*[4]

---

[3] Cfr. Commercial Court of Appeals, Division E, "Cri Holding Inc. v. Compañía Argentina de Comodoro Rivadavia", of 9/22/06.

[4] Cfr. Weinberg de Roca, Inés M., *Competencia Internacional y Ejecución de Sentencias Extranjeras* [*International Jurisdiction and Enforcement of Foreign Judgments*], Astrea, 1994, p. 57. The author distinguishes between "direct" and "indirect" international jurisdiction. The former involves a State's power to declare itself competent to judge certain controversies with foreign elements: it is the jurisdiction a judge has to render the judgment in an international case. The latter case ("indirect") involves a judge's power not to render judgment, but to enforce it. This is why everything concerning the exequatur or recognition and enforcement of foreign judgments corresponds to the latter, "indirect" international jurisdiction. As Goldschmidt writes, indirect jurisdiction *"protects one's own jurisdiction against usurpation by a foreign jurisdiction"* (Cfr. Goldschmidt W., *Derecho Internacional Privado* [*International Private Law*], Abeledo Perrot, 2009, p. 998.

CERT. MERRILL VER: JD

Although discussing the Spanish model that they examine, the ideas of Fernández Rozas and Sánchez Lorenzo apply *mutatis mutandi* to the legal situation in Argentina regarding this requirement, and they clarify the fundamental aspects of the concept:

*"International jurisdiction is substantially different from internal jurisdiction. Each State system has multiple bodies vested with jurisdiction that share the hearing of the diverse cases that are subject to factors that fall under the notion of 'jurisdiction... On a logical level, international jurisdiction is located before domestic jurisdiction, since conflicts of internal jurisdiction are only meaningful when Spanish courts have international jurisdiction. Further, conflicts regarding domestic jurisdiction and international jurisdiction are dissimilar: domestically, the resolution of those conflicts is not significantly obstructed by the fundamental rights to due process of law and the parties' right to present their case, at least not to the same extent as conflicts regarding international jurisdiction. In the latter, in general, the Spanish courts' lack of jurisdiction does not guarantee that the courts of other countries will hear the case, so due process becomes a fundamental value of the regulations."*[5]

Further, *"Oversight of international jurisdiction is a general concept established in almost every legal system, its purpose is to defend the exclusive jurisdiction of the destination State and to exclude the exorbitant fora of the State of origin."*[6]

The result of that test will depend on whether the court of the destination country deems itself competent to conduct the exequatur proceeding.

---

[5] Cfr. José Carlos Fernández Rozas and Sixto Sánchez Lorenzo, Derecho Internacional Privado [*Private International Law*], Civitas, Madrid, 1999, p. 80-81.
[6] Cfr. Feuillade, Milton C., *La Sentencia Extranjera* [*The Foreign Judgment*], Ed. Abaco, Buenos Aires, 2008, p. 137.

CERT. MERRILL VER: JD

[stamp] NATIONAL CIVIL COURT NO. 61– FEDERAL CAPITAL

[stamp] PAULA GEROLA – CERTIFIED TRANSLATOR - LANGUAGE ENGLISH
Lic. T XIV F 388 – [illegible] Reg. C.T.T.C.I. No. 5073

The first step is to establish whether the foreign judge has usurped jurisdiction that belonged <u>EXCLUSIVELY</u> to Argentine judges.

In this regard, stressing the importance of this test, it has been said that *"The only thing that matters to our law is that judgments are not recognized that have been rendered by judges who do not have jurisdiction because national judges have jurisdiction."*[7]

Goldschmidt, in turn, concludes that *"In order for that usurpation to exist, the appropriation of our jurisdiction by the foreign jurisdiction must violate our international public policy on procedure. It is not enough for our jurisdiction to be unique, it must have been exclusive."*[8]

The factual background explained in Section III suffices to eloquently answer the question.

**<u>In the present case, it is obvious that no Argentine judge had international jurisdiction to hear the case of the residents of the Ecuadorian Amazon against the American oil company that caused that damage</u> (Texaco Inc. first; then Chevron Corp. after the 2001 merger).**

So in this case, there is absolutely no chance that the foreign judgment usurped the exclusive jurisdiction of an Argentine judge.

---

[7] Cfr. Cortés, V., *Derecho procesal civil internacional,* "Revista de Derecho Privado," [*International Procedural Civil Law;* "Private Law Review"], Barcelona, 1981, p. 148; cited by Feuillade, ob. cit., p. 139, note No. 47. As the latter author writes, this view—that of Cortés, quoted in the body text—is correct in principle, though it may not be taken without pointing out some exceptions (for example, that the foreign court exceeded its powers or that justice was denied). Regardless, the quotation is useful in this context to emphasize that there can be no doubt that the foreign judge (in this case, Ecuadorian) did not usurp the exclusive jurisdiction of an Argentine judge.
[8] Cfr. Goldschmidt Werner, *Derecho Internacional Privado* [*International Private Law*], Abeledo Perrot, 2009, p. 998. In "Holiday Inns Inc. v. EBASA Exportadora Buenos Aires S.A. on Executive Proceeding," dated 4/5/05, the Supreme Court of Justice clearly explained this concept: only if the foreign judge decided a case in which the Argentine judge had exclusive jurisdiction can the Argentine court refuse recognition, but this serious consequence does not apply if the Argentine judge has "concurrent" jurisdiction with the foreign judge. It especially would not apply in a case such as this, where the Argentine judge had no jurisdiction, from any point of view, to hear the principal case.

7

Another matter to consider is that the foreign judge has not assumed ***EXORBITANT*** jurisdiction. As Boggiano states: *"...the nonrecognition of exorbitant jurisdiction must be stressed... All exorbitant jurisdiction must be refused... This involves refusing the exercise of exorbitant jurisdiction in defense of the interests of international traffic. The exorbitant forum must be sanctioned with nonrecognition."*[9]

The factor Boggiano especially highlights is the **case's relationship with the forum** where it has been decided. *"First*—he explains—*it is necessary to see what relationship the parties to the controversy have with the forum. Also, the relationship of the factual circumstances and the situations that serve as the cause of action or matter in dispute. And the relationship between the subject of the suit and the forum...*

*But there must always be a reasonable contact between the case and the forum. Otherwise, jurisdiction would be abusive or exorbitant, that is, exercised without even minimal reasonable contacts to support it."*[10]

If Your Honor reviews the background, you will easily notice that the most salient points of connection of the case point to Ecuadorian jurisdiction.

**The plaintiffs are citizens of that State, they are domiciled there, and the acts that caused the environmental damage took place in Ecuador.**[11]

**And the defendant, though a national of a different State, consented beforehand— and even proposed—Ecuadorian jurisdiction as a way to get the action originally filed in the United States dismissed there.**[12]

---

[9] Cfr. Boggiano, *ob. cit.*, V. I, p. 480.

[10] Cfr. Boggiano, *ob. cit.*, p. 201 *et seq.*

[11] In this regard, it is worth quoting the above-mentioned press release from Chevron Texaco celebrating the decision that the case would be heard in Ecuador: *"...The plaintiffs are in Ecuador, the operations took place in Ecuador, the state-owned oil company—with which Texaco operated as a minority shareholder and that continues to operate the fields today—is in Ecuador. The evidence is in Ecuador, and the remediation the plaintiffs seek may only be obtained in Ecuador."*

[12] In this regard, it is important to mention that this action was originally filed in the United States. Chevron argued that Ecuador was the proper jurisdiction, and that is what the U.S. court decided

CERT. MERRILL VER: JD

[stamp] NATIONAL CIVIL COURT NO. 61– FEDERAL CAPITAL

[stamp] PAULA GEROLA – CERTIFIED TRANSLATOR - LANGUAGE ENGLISH
Lic. T XIV F 388 – [illegible] Reg. C.T.T.C.I. No. 5073

Our Supreme Court of Justice has held that **"the existence of essential elements of contact with the forum,"** considered in light of **"the factual circumstances of the controversy,"** is a relevant factor for Argentine judges to take into account when examining international jurisdiction.[13]

From this point of view, the Ecuadorian judges who heard the case definitely had jurisdiction.

(v) <u>SUMMONS AND SUBPOENAS (Subsection e)</u>

**"The defendant has been summoned or subpoenaed in due legal form substantially equivalent to that accepted by the law of the State where the judgment, award or decision is to take effect."**

In this regard, it should be mentioned that in the proceeding filed in Ecuador Chevron Corp. served process in a way <u>substantially analogous</u> to the service required by Argentine procedural law for notification of the complaint.

A duly apostilled copy of the proof of notification is attached hereto as evidence that this requirement was met.

Convincing evidence that, in our case, the defendant received the summons or subpoena to stand trial is the indisputable fact that Chevron Corp. in fact answered the notification at length—an apostilled copy is also attached (**Exhibit 6**)—raising all the defenses and arguments it believed it was entitled to,

---

after requiring Chevron to agree—which it in fact did—to respect any judgment that the Ecuadorian courts may eventually render.

[13] Supreme Court of Justice, *in re* "Cri Holding Inc. v. Cía. Arg. de Comodoro Rivadavia S.A.," of 11/3/09. The idea quoted in the body comes from the prosecutor's opinion (2/19/09), which the Court adopted. In this case, the Court recognized the international jurisdiction of a U.S. court, since it did not find that *"...the foreign judge usurped exclusive Argentine jurisdiction and his jurisdiction was not exorbitant, arbitrary, abusive, artificial or*

CERT. MERRILL VER: JD

while also providing all the evidence it believed was appropriate to support its position.[14]

(vi) <u>RIGHT TO A DEFENSE (Subsection f)</u>

*"The parties had an opportunity to present their defense."*

After reviewing the attached background, **the conclusion is inescapable that Chevron's right to a present its case was strictly respected, and with such tolerance from local judges for its dilatory and repetitive arguments that it took ten years of litigation to get a judgment. To this we should add that the proceeding took place entirely in the jurisdiction Chevron fought for for nine years, as explained above, which, in the end, turned out to be "wasted time" for this party's pursuit of justice.**

The examination of this subsection must necessarily be complemented by the examination we will make below regarding "public policy"—in particular, the section addressing the procedural stage—as well as on meeting Art. 3 (b) of the Convention on Extraterritorial Validity of Foreign Judgments. The documents discussed there show that the courts not only respected the defendant's right to present its case, but also that it fully exercised that right and, in some cases, even exceeded and abused that right.

(vii) <u>FINAL JUDGMENT OR *RES JUDICATA* (Subsection g)</u>

---

*fraudulent, there was no violation of the [jurisdiction of the] natural judge or the right of the defendant to present its case"* (also quoting the prosecutor's opinion, adopted by the Court).

Since the case was a summary verbal proceeding, the act of "answering the complaint" occurs in the context of the settlement hearing. Section 23 of the Ecuadorian Code of Civil Procedure describes this procedure. It establishes that *"Once the complaint has been filed, if the summary verbal proceeding is appropriate, the judge shall so declare and shall order that the defendant be served with a copy of the complaint ..." (Art. 829). "Immediately following service of process, the judge shall set a time and date for the settlement hearing..."* (Art. 830); and then it is established that *"The settlement hearing will begin with the answer to the complaint, which shall contain the procedural and substantive defenses to which the defendant believes he is entitled..."*

CERT. MERRILL VER: JD

[stamp] NATIONAL CIVIL COURT NO. 61– FEDERAL CAPITAL

[stamp] PAULA GEROLA – CERTIFIED TRANSLATOR - LANGUAGE ENGLISH
Lic. T XIV F 388 – [illegible] Reg. C.T.T.C.I. No. 5073

*"They are final or, where appropriate, have the force of res judicata in the State in which they were rendered."*

As the rule itself states, to determine whether the judgment is final and/or *res judicata*, one must look to the law of the country of origin.

The National Civil Court of Appeals has adopted this standard, holding that the foreign judgment *"...must be* res judicata*, that is, it must not be subject to ordinary appeal under the laws of the country where it was rendered,"* later adding that *"...since the determination of whether a judgment is res judicata must be made based on the rules in effect in the State where the judgment was issued, the interested party must prove it."*[15]

That said, since we believe they are sufficient in and of themselves to meet this requirement, we will quote below the terms of the decision rendered by the Sole Division of the Provincial Court of Justice of Sucumbíos in the expansion it issued January 13, 2012 (**Exhibit 5**). Those opinions fully explain how Ecuadorian law and case law describe the institutions of *final judgment* and *res judicata*, **in other words, the interpretation the Argentine judge must follow, as required by Art. 2 of the Convention on General Rules of Private International Law, which takes precedent over our domestic law.**[16]

In the January 13 decision, the Ecuadorian court stated:

---

[15] Cfr. Civil Court of Appeals, Division K, of 6/10/10.
[16] This rule states "Judges and authorities of the States Parties shall enforce the foreign law in the same way as it would be enforced by the judges of the State whose law is applicable..." Referring to this rule, the Prosecutor told the Supreme Court of Justice that "Article 2 of the above-mentioned Convention... came to establish the theory of legal use, under which national judges are forced to apply foreign rules as judges of the place whose law applies would...," later adding: "...Article 2 lacks rules that directly regulate which law applies, but merely establishes interpretative guidelines for foreign law, requiring judges and authorities of the States Parties to interpret the rules as the judges of the State whose law applies would" (Cfr. Opinion of the Prosecutor General, dated 7/10/99, in "*Moka S.A. v. Graiver David on Succession proceeding*").

CERT. MERRILL VER: JD

> *"Given that the judgment of January 3, 2012, together with the amplification and clarification put an end to a proceeding to establish the parties' rights, deciding the merits of the case in the last ordinary proceeding, it is evident that judgment from the court of appeals produces material and formal res judicata, which is when a cassation appeal may be pursued, precisely because the proceeding has concluded."*

The Provincial Court of Justice of Sucumbíos also explained why a cassation appeal does not preclude a judgment from being *res judicata,* as that institution operates in Ecuador:

> *"Since the Cassation Act (1992), Ecuadorian law has repeatedly found, in at least a dozen cassation rulings, which are mandatory precedent, that Art. 2 of the Cassation Act means that "the extraordinary appeal [cassation] is appropriate only after a ruling has been issued that puts an end to the proceeding, producing the effect of formal and substantive res judicata, that is to say, a final and definitive decision, such that the same parties—identity of the parties—cannot renew the suit in which the same thing, amount or fact is in dispute, based on the same cause of action, reason or law—identity of the subject matter—issued in a proceeding that establishes the parties' rights."*[17]

It is not necessary here to quote doctrine or to analyze analogous precedent: **the court of appeals itself, which heard the case in the final ordinary**

---

[17]It should be mentioned here that under Art. 19, second paragraph, of the Ecuadorian Cassation Act, "If a cassation ruling is repeated three times, it will become mandatory and binding precedent for the interpretation and application of laws, except on the Supreme Court itself." That is why in the cited paragraph the Sole Division referred to the **"mandatory"** nature of the decision reached in "at least a dozen cassation rulings."

CERT. MERRILL VER: JD

[stamp] NATIONAL CIVIL COURT NO. 61– FEDERAL CAPITAL

[stamp] PAULA GEROLA – CERTIFIED TRANSLATOR - LANGUAGE ENGLISH
Lic. T XIV F 388 – [illegible] Reg. C.T.T.C.I. No. 5073

**proceeding, explicitly said, with no room for doubt, that the issue is *res judicata*, and that it was precisely because the judgment had that status that the door was then open for Chevron Corp. to file its cassation appeal.**[18] Under Ecuadorian law, that extraordinary appeal may only be pursued against judgments that are formally and substantively *res judicata*.

But it was not only in the amplification of January 13, 2012, that the Sole Division of the Court said that the issue was *res judicata*—in two later decisions, <u>February 17, 2012 (Exhibit 7)</u>[19] and **March 1, 2012 (Exhibit 8),**[20] the court said the same thing.

In the first decision, the court analyzed a request by Chevron to be released from the obligation of posting a bond required by law to stay the enforcement of the judgment. However misguided it was for a company of such size, with quarterly earnings of billions of dollars, to request such a release, the Sole Division still analyzed the defendant's arguments—that an interim award in a proceeding in which the plaintiffs are not a party supposedly prevented enforcement of the judgment—and rejected them because they were without legal merit and, consistent with what the court had already stated in the prior decision of January 13, 2012, in the sense that the judgment was *res judicata*, **it ordered that copies be made so that the trial court could move forward without further proceedings to enforce the judgment.**[21]

Even more explicitly, in the following decision of March 1, 2012—in response to Chevron's argument that a second interim award

---

[18] In a decision issued on February 17, 2012, the same court later admitted the extraordinary cassation appeal .
[19] A duly apostilled copy is attached hereto as an Exhibit. This decision also contains the admission of the extraordinary cassation appeal Chevron filed.
[20] A duly apostilled copy is attached hereto as an Exhibit.
[21] Entirely consistent with the terms of Art. 8 of the Ecuadorian Cassation Act, which orders that *"... copies be transferred to the judge or court with jurisdiction to enforce the judgment."*

CERT. MERRILL VER: JD

supposedly prevented enforcement of the judgment—the Court said: *"This Division will not re-address the arguments on the merits because they were analyzed in the [trial court and court of appeals] judgments. These arguments will not be taken into account **because there is a judgment, with the authority of res judicata, that analyzes the judicial evidence and reaches a decision about these matters**, and this is not the time to again debate the courts' appreciation of the evidence **res judicata**.*"[22] The court also analyzed the constitutional arguments on equality before the law (if, in order to stay enforcement of a judgment a party must post a bond, then why should a company like Chevron be allowed to achieve the same effect using a decision issued in a remote arbitral proceeding to which plaintiffs are not even a party?) and ended the decision stating—at the plaintiffs' request—that:

> *"this order constitutes, for all purposes and procedural requirements, the declaration that the decision issued at this level of jurisdiction is enforceable."*[23]

The concept addressed in the above decisions is also supported by renowned Argentine writers. María Elsa Uzal states that *"Art. 517 of the Code of Civil Procedure, in addition to controlling indirect jurisdiction, requires that the judgment must have [become] res judicata in the State that rendered it (subsection 1). This means that it is final, that it is definitive and, therefore, **that it not susceptible to an underline ordinary appeal.***"[24]

Likewise, this National Civil Court of Appeals has stated, regarding this specific point, that what must be proved to allow the exequatur is "... ***whether the judgment may***

---

[22] Emphasis added.

[23] We will address this again when discussing the requirement of Art. 3(c) of the Convention on Extraterritorial Validity of Judgments.

[24] Cfr. Uzal, María Elsa, *Solución de Controversias en el Comercio Internacional [Solution of Controversies in International Commerce]*, Ad Hoc, Bs. As., 1992, p. 36. Emphasis added. Also Colombo and Kiper state that exequatur would only be prevented by a pending ordinary appeal (Cfr. *Código Procesal... [Code of Procedure...]*, V. IV, p. 578).

CERT. MERRILL VER: JD

[stamp] NATIONAL CIVIL COURT NO. 61– FEDERAL CAPITAL

[stamp] PAULA GEROLA – CERTIFIED TRANSLATOR - LANGUAGE ENGLISH
Lic. T XIV F 388 – [illegible] Reg. C.T.T.C.I. No. 5073

*be subject to any <u>ordinary</u> appeal and, if so, whether that appeal has been filed and what the outcome was, or, if not, proof that the deadline for filing the appeal has lapsed...”*[25]

Along the same lines, Boggiano states that *“if the judgment is final, even though it may be challenged in an extraordinary appeal, as in our country, it may be recognized.”*[26]

**To conclude, the judgment rendered by the Sole Division of the Provincial Court of Justice of Sucumbíos is** *res judicata* **and the fact that an EXTRAORDINARY CASSATION APPEAL is pending before the Ecuadorian Superior Court of Justice does not, as we have already seen, prevent this recognition proceeding from moving forward.**

(viii) <u>PUBLIC POLICY (section h)</u>

***“They are not manifestly contrary to the principles and laws of the public policy (ordre public) of the State in which recognition or enforcement is sought.”***

There is no loophole that would lead to the conclusion that a judgment such as the one entered by the courts of Ecuador, ordering the defendant to pay for damage caused by the unlawful acts of its legal [predecesor], is in any way inconsistent with the with the principles that underlie the Argentine legal system. **Quite the contrary, the solution is perfectly consistent not only with Argentine legal rules but also with the more general guiding principles that inspire it: in fact, as our Supreme Court of Justice has said, the right to be fully compensated**

---

[25] Cfr. Civil Court of Appeals, Division H, "Freiré Guapo Garcao Femando M. v. Arrellano Laura E.," decision of August 13, 1997, [LL 1998-B, 176]. Emphasis added.
[26] Cfr. Boggiano Antonio, *Derecho Internacional Privado* [*Private International Law*], Depalma, Buenos Aires, 2nd Edition, 1983, V. II, p. 1333 (quoted by Uzal).

CERT. MERRILL VER: JD

as a result of a violation of the *alterum non laedere* principle has roots in Article 19 of our Constitution.[27]

The Argentine court must compare the material solution the foreign court reached to the spirit or the general principles of our own legal system. The Argentine court does not ensure that the laws of the foreign country that the court applied are replicated here in our own legislation, nor does the Argentine judge regulate the way the foreign judge applied those laws or the scope of those laws. And even if the foreign court applied Argentine law to decide the case, the Argentine court may not judge how that law was applied, as long as— of course—the foreign court did not violate the exclusive jurisdiction of Argentina, as explained above in the section on "international jurisdiction."[28]

**Not even an analysis of compatability with local public policy can open the door to an analysis on the merits.**[29]

Finally, public policy must also be analyzed from the strictly procedural view. The matter already discussed of the summons to appear in court—whether it was made in a regular manner substantially similarly to the service established in the destination State, as well as whether the defendant's right to present its case was respected—take on importance here.

---

[27] Cfr. CSJN, "Santa Coloma", *Fallos* 308:1160.

[28] Cfr. Boggiano, *op. cit*, volume I, page 486; the author says: "Not even when the foreign court has applied Argentine substantive law is its decision subject to review through recognition or exequatur; nor is it appropriate to review the conflict-of-law rules applied by the foreign court. So whether the foreign court applied Argentine conflict-of-law rules does not affect recognition; the court need not even apply equivalent conflict-of-law rules. Respect for the foreign decision includes respect for the conflict-of-law rules applied by the court that rendered the decision."

[29] Boggiano emphasizes that the analysis of whether this requirement has been met must never lead to an analysis of the merits of the foreign judgment. *"The review*—he points out—*refers to the material resolution of the dispute regarding its effectiveness or enforcement strictly in the country. This is why a substantive comparison between that resolution and the spirit of Argentine law is required."*

CERT. MERRILL VER: JD

[stamp] NATIONAL CIVIL COURT NO. 61– FEDERAL CAPITAL

[stamp] PAULA GEROLA – CERTIFIED TRANSLATOR - LANGUAGE ENGLISH
Lic. T XIV F 388 – [illegible] Reg. C.T.T.C.I. No. 5073

Regarding these requirements, we refer to the explanation made above regarding fulfilling the requirements of Article 2 *(e)* and *(f)* of the Convention, and we also refer to the explanation below regarding the documentation showing the effective observance of these reasonable requirements (section 3 *(b)* of the Convention).

### III.2. ALL OF THE REQUIREMENTS OF ARTICLE 3 OF THE CONVENTION ARE MET

Following the same methodology as was used to analyze the requirements of Article 2 of the Convention, we will also analyze here, section by section, how each of the legal requirements are fully met.

(i)

*"a. A certified copy of the judgment, award or decision"*

Duly observing the requirements of the *"Hague Convention Abolishing the Requirement of Legalization"* (1961), the following documents are attached: the trial judgment entered by Judge Nicolás Zambrano on February 14, 2011 (**Exhibit 2**) and the clarification order entered by the same judge on March 4, 2011 (**Exhibit 3**).

The court of appeals' judgment entered by the Provincial Court of Sucumbíos on January 3, 2012 (**Exhibit 4**) and the respective expansion order dated January 13, 2012 (**Exhibit 5**), also meet the Convention's requirements.

**These are the four decisions that we mentioned in the "Purpose" section of this motion as "the judgment" whose recognition is sought under the terms of the *"Inter-American***

17

*Convention on the Extraterritorial Recognition of Foreign Judgments and Awards,"* signed and ratified—as explained above—by both Ecuador and Argentina.

*(ii)*

*"b. A certified copy of the documents proving that the provisions of items (e) and (f) of the foregoing Article have been complied with"*

Recall that Article 2(e) requires that the defendant has been served notice in a substantially similar manner to the service required by the law of the destination State, while paragraph (f) requires that the parties' right to present their case was ensured.

Now, Article 3(b) requires [the judgment creditor] to attach the documents necessary to show that those requirements have been met.

For the purpose of showing that **service of process has been made,** we attach Exhibit 9, which shows that Chevron Corporation was served. **According to these documents, service of the complaint and all attachments was made on <u>July 11, 2003, at 2:22 PM</u>.**

[These documents] also show that along with the summons, Chevron also received *"Certified copies of the 78-page file containing the complaint and Exhibits thereto...."* Everything necessary so Chevron could fully exercise—as it in fact did—its right to present its case when answering.

As additional information, we also attach—always duly apostilled to certify authenticity—orders issued by the President of the Superior Court of Justice of

CERT. MERRILL VER: JD

[stamp] NATIONAL CIVIL COURT NO. 61– FEDERAL CAPITAL

[stamp] PAULA GEROLA – CERTIFIED TRANSLATOR - LANGUAGE ENGLISH
Lic. T XIV F 388 – [illegible] Reg. C.T.T.C.I. No. 5073

Nueva Loja (**Exhibit 9**), dated **September 4, 2003** and **October 8, 2003**, which show that Chevron Corporation was duly served.[30]

Regarding respect for defendant's right to present its case, the following documents are attached:

- Full record of the hearing in which Chevron answered the complaint (**Exhibit 9**).

- Appeal brief of the final judgment (**Exhibit 10**).

**These documents show that Chevron Corp. had the opportunity to raise any defenses it considered appropriate, to argue all orders without any factual or legal obstacles, to offer and submit evidence to support its assertions and rebut this party's assertions and to request a comprehensive review of the trial court's judgment at the court of appeals.**

**(iii)**

*"c. A certified copy of the document stating that the judgment, award or decision is final or has the force of res judicata"*

Referring to the *res judicata* requirement that the judgment must be *res judicata*, Palacio states that *"Evidence of this circumstance must be contained in a certified copy of the decision declaring that the judgment is final or has the force of* res judicata.*"*[31]

---

[30] These two orders showing that Chevron Corp. was duly served are also included in the **Exhibit**.

[31] Cfr. Palacio, Lino E., *op. cit.* volume VII, pages 320/21.

CERT. MERRILL VER: JD

In the same vein, Couture states that *"... as the act is typically a jurisdictional one, the declaration of certainty regarding the final and definitive nature of judgment, granting it the force of res judicata, must be issued by the court that rendered the judgment."*[32]

**It is important to highlight in this section that the declaration that the judgment is *res judicata* was issued by the same court that issued the judgment, and that this declaration is included in instruments whose specific content and true nature we already mentioned when discussing the fact that the requirements of Article 3(a) have been met and also in section III.l. on Article 2(g).**

For these specific purposes, not only is the **expansion order of January 13, 2012 (Exhibit 5)** important, but also the two subsequent orders entered by the same court on **January 17 (Exhibit 7)** and **March 1, 2012 (Exhibit 8)**, which are also attached—always duly apostilled—specifically to meet the supporting document requirement of this paragraph.

## IV. JURISDICTION. CONNECTION WITH THE LOCAL FORUM AND REQUEST BY THE PARTY SEEKING EXEQUATUR

<u>a.</u> The petition for recognition of a foreign judgment, known as *exequatur* ancillary proceedings, must be filed with the appropriate trial court (Article 518 CPCCN), according to the rules on jurisdiction, based on location and subject matter, under Article 5 of CPCCN and the provisions of decree-law 1285/58 on the Organization of the National Courts.[33]

---

[32] Cfr. Couture, Eduardo J., *Fundamentos del Derecho Procesal Civil* [Introduction to Civil Procedural Law], Depalma, Buenos Aires, 1997.

[33] Cfr. Boggiano, op.cit, volume I, page 490; id. Gozaíni, Osvaldo, *Procedural Code*..., La Ley, 2002, volume III, page 74; id. Palacio, Lino E., Derecho Procesal Civil [Civil Procedural Law], Abeledo- Perrot, volume VII, page 327. The latter also states that *"Federal courts may also have jurisdiction when, under the relevant constitutional and statutory provisions, a case must be heard there because of the subject matter or the parties."* In the present case, as

CERT. MERRILL VER: JD

[stamp] NATIONAL CIVIL COURT NO. 61– FEDERAL CAPITAL

[stamp] PAULA GEROLA – CERTIFIED TRANSLATOR - LANGUAGE ENGLISH
Lic. T XIV F 388 – [illegible] Reg. C.T.T.C.I. No. 5073

Decree-law 1285/58 establishes in Article 43 that *"Civil trial courts in the City of Buenos Aires will hear all matters governed by civil laws whose recognition has not been expressly assigned to judges of a different forum"* and then that rule establishes that *"They will also hear the following cases: [...]* ***(b) Cases seeking compensation for damages caused by unlawful acts."***

**Current case law also recognizes the applicability of Article 43 of decree-law 1285/58—to facts in the complaint filed abroad—for the purpose of assigning domestic jurisdiction at the judgment-recognition stage.**[34]

It is true that the Supreme Court of Justice recently affirmed the position that matters involving the protection of the environment must be heard by the local authorities in the affected jurisdiction.[35] That position, however, cannot be applied in this case, since the environmental damage occurred outside of Argentina—and its effects did not extend anywhere within our borders—so for the purpose of the cited cases, **there are no local courts to resort to.** And obviously for the same reason this is not a case of *inter-jurisdictionality* (in the sense that the damage

---

an analysis of the case background shows, neither of those two variables result in federal jurisdiction: the underlying issue involves liability derived from unlawful acts and the parties are private parties.

[34] Cfr. CNCiv.Com.Fed., Division II, *"Clarkson Hyde LLP v. Otero Monsegur María Antonia on Exequatur,"* on September 3, 2009. This was a case in which the Federal Civil and Commercial Court acted first, but then declared that it did not have jurisdiction and transferred the case to the National Civil Court, which in turn declined to hear the case, transferring it to the National Commercial Court, which also declined to hear the case. Finally, the Court of Appeals in the district that first declined the case ruled that the National Civil Court definitively had jurisdiction, since the subject matter of the litigation involved professional services, which Article 43 of decree-law 1285/58 reserves for that court.

[35] Cfr. CSJN, *in re*, "Benzrihen Carlos Jorge et al. v. Industrias Magromer Cueros y Pieles S.A.," dated 9/21/10.

CERT. MERRILL VER: JD

affects two or more provinces) activating the jurisdiction of federal courts, according to the position the Supreme Court adopted in that decision.[36]

**Having clarified that, we must highlight that a mere reading of the Ecuadorian judgment clarifies that this case involves compensation for damage caused by "unlawful acts" for which defendant is civilly liable due to its action or omission. This is the subject matter of this litigation. <u>In this case there is no contractual link of any kind between plaintiffs and the oil company, and there are no factual or legal elements that would militate for removing the case from the clear scope of application of the cited rule</u>** (Article 43(b) of decree-law 1285/58).

And this supports the conclusion that Your Honor, as National Civil Trial Judge, has jurisdiction over this case, a conclusion that is affirmed by Article 7 of General Environmental Law No. 25675, which establishes the jurisdiction of *"ordinary courts depending on the territory, the subject matter or the persons."* Article 32 of that Law then provides that *"Environmental jurisdiction of courts is that prescribed by the ordinary rules of jurisdiction."*

Finally, it is appropriate to highlight that, under the rules analyzed, the fact that defendant is a company with a commercial purpose does not affect the jurisdiction of the national civil courts. According to recent decisions, cases concerning damages caused by unlawful acts fall under the jurisdiction of the National Civil Trial Courts in Buenos Aires, <u>since the capacity of the parties</u>

---

[36] In the decision mentioned in the preceding footnote the Court wrote—by reference to the arguments of the Attorney General: "[…] it is appropriate to remember that the Court through different prior decisions has established certain guidelines for determining whether federal courts have jurisdiction because a case involves the environment. First, the court must determine what territory has been affected, because, as the national legislator has provided, the case must involve an inter-jurisdictional environmental resource (Judgments 327:3880; 329:2316), or a geographical area that extends beyond the provincial border, i.e., it must cover more than one state, provincial, city or international jurisdiction, since it must concern a matter that involves environmental problems shared by more than one jurisdiction (Judgments 330:4234; 331:1679)."

CERT. MERRILL VER: JD

[stamp] NATIONAL CIVIL COURT NO. 61– FEDERAL CAPITAL

[stamp] PAULA GEROLA – CERTIFIED TRANSLATOR - LANGUAGE ENGLISH
Lic. T XIV F 388 – [illegible] Reg. C.T.T.C.I. No. 5073

does not modify the nature of the legal relationship that gives rise to the litigation.[37]

**b.** In the judgment enforcement stage in Ecuador, the court issued **certain decisions expressly involving assets of Chevron Corp. in Argentina** (these decisions, dated October 15 and 25, 2012, were part of the letters rogatory—duly apostilled—added to the record in the related action).

That fact clearly shows **the case's direct connection with the local forum, which justifies the formal opening of this jurisdiction.**

Without prejudice to that factor concerning the existence of assets belonging to the judgment debtor in Argentina, the truth is that the connection to the local forum may also be justified from many other perspectives.

**c.** As an aspect that also appears connected with Your Honor hearing the case or, more precisely, with the modality of the petition activating those jurisdictional acts, it must be stated that the request for recognition of a foreign judgment need not be made through letters rogatory from a foreign judge.

Colombo and Kiper state that Articles 517 et seq. of the Code of Civil Procedure address *"...an autonomous proceeding, independent from the judgment whose enforcement is sought."*[38]

Sentís Melendo remarks that very same nature: *"It is an autonomous action. This is not an action subordinated to the one brought to obtain the judgment*

---

[37] Cfr. CNCiv., "Proyecto del Atlántico S.A. v. Rosetti Víctor J. on damages on jurisdiction," of 10/19/11.

[38] Cfr. Colombo and Kiper, Código Procesal Civil y Comercial de la Nación-Anotado y comentado [Civil and Commercial Procedural Code. Annotated and Commented], La Ley, volume IV, page 579.

CERT. MERRILL VER: JD

whose enforcement is sought or the judgment the petitioner seeks to have recognized as res judicata in the country."[39]

Because of this *autonomy,* the letter rogatory is unnecessary, since this case is not about "complying with" a foreign judge's order, but instead filing a new suit with a different procedural purpose all its own: examining whether the judgment is equivalent to a final local judgment. Which is why the **normal** and **typical** procedure to commence it is *"a complaint filed directly with the court that has jurisdiction to grant it."*[40]

In a similar vein, discussing a decision by the Civil and Commercial Court of Appeals of Rosario, Ciuro Caldani states that the appropriate way to file an action for recognition and enforcement is by request from the party, whose **"direct presence"** in the case, from a subjective viewpoint, **is consistent with the provision that the request must be made before a trial court** (as established by Article 518 of the Code of Civil Procedure) **and with the relevance of the act of the final judgment.** On the other hand, he points out, the letter rogatory is the proper and necessary way when a case involves requests for judicial assistance regarding notices, receipt of testimony or other kinds of judicial "proceedings" of lesser importance.[41]

In turn, Boggiano highlights the importance in this type of procedure of the "party's request," stating that the complaint *"... may be requested by the interested party or through letters rogatory."*[42]

---

[39] Cfr. Sentís Melendo, S., *La sentencia extranjera (Exequátur)* [Foreign Judgment (Exequatur)], Ediciones Jurídicas Europa- América, Buenos Aires, 1958, page 149.

[40] Cfr. Sentís Melendo, S., *op. cit.*, page 127.; the author states at the beginning of Chapter V, which exclusively analyzes this issue: *"The exequatur proceeding may be filed three different ways: an action filed directly with the court with jurisdiction to grant it, the diplomatic channel, and letters rogatory. **The normal procedure is the first one**"* (emphasis added).

[41] Cfr. Ciuro Caldani, Miguel A., *Un caso de Derecho Procesal Internacional Privado* [A case of international conflict of laws], in ED 112-411 [Comment of "Sociedad Anónima Comercial e Industrial v. Industrias Walter on complaint of enforcement of judgment, Letters Rogatory of Santa Cruz de la Sierra, Bolivia" decision]. The decision in itself is not important from a legal standpoint. It addresses an anomalous procedural situation that, according to the commentator, originated with *"... the mistaken use of letters rogatory by the Bolivian judge,"* who *"to request enforcement of a judgment introduced the confusion that the two Rosario courts attempted to resolve each by a different means."*

[42] Cfr. Boggiano, *op. cit.*, volume I, page 490.

CERT. MERRILL VER: JD

[stamp] NATIONAL CIVIL COURT NO. 61– FEDERAL CAPITAL

[stamp] PAULA GEROLA – CERTIFIED TRANSLATOR - LANGUAGE ENGLISH
Lic. T XIV F 388 – [illegible] Reg. C.T.T.C.I. No. 5073

Palacio also clearly states that ***"...the interested party may directly request this action or may request it through diplomatic channels using letters rogatory."***[43]

This issue was already debated in the "*Cri Holding*" case mentioned above, in which the defendant tried to get the Court to reject recognition, claiming the procedure was irregular since it had not been initiated with letters rogatory. The Court disagreed.

In that respect, in her opinion the Prosecutor General argued to the Commercial Court of Appeals:

*"In my view, the court must also reject the argument that the procedure was irregular, since the exequatur may be filed by the interested party or through letters rogatory, as understood by approved doctrine (Boggiano). In this case, although the foreign court did not issue a letter rogatory, the interested party did request exequatur."*[44]

The Court later issued a similar decision, stating: ***"Finally, the interested party requested exequatur, so the fact that it was not brought through letters rogatory is not a barrier."***[45]

## V. <u>ADDITIONAL CONSIDERATIONS ABOUT THE VIABILITY OF THE EXEQUATUR AGAINST CHEVRON CORPORATION.</u>

At one point, Chevron got a New York District Court, presided by Judge Lewis Kaplan, to issue an unusual <u>universal injunction,</u> by which the judge prohibited enforcement of the judgment

---

[43] Cfr. Palacio, *op. cit*., volume VII, page 327.
[44] Cfr. Opinion No. 113114 from the record of the Prosecutor General's Office before the National Court of Appeals in Commercial Matters for the City of Buenos Aires, dated 9/14/06 and signed by the then head judge, Alejandra Gils Carbó.
[45] Cfr. CNCom., Division E, "Cid Holding Inc. v. Compañía Argentina de Comodoro Rivadavia," of 9/22/06.

CERT. MERRILL VER: JD

issued by the Ecuadorian courts anywhere in the world. That <u>global injunction</u> was entered on March 7, 2011, i.e., a couple of weeks after the trial court's judgment.

As is evident without further discussion, Judge Kaplan's injunction was legally preposterous unlike no other.

As could be expected, the measure, which analyzed the issue with only the slightest common sense, was short lived, since on September 19, 2011, the Court of Appeals for the Second Circuit in New York first **<u>fully vacated</u>** [Kaplan's injunction] in a summary decision (decision attached—duly apostilled and translated, with the respective certificate of authenticity—as **Exhibit 12**), and then **<u>sharply undermined it from a legal perspective</u>** by explaining the Court's arguments for vacating on January 26, 2012 (decision attached—duly apostilled and translated, with the respective certificate of authenticity—as **Exhibit 13**).

**<u>Nothing remains of the decision preventing plaintiffs from trying to enforce the judgment outside of Ecuador.</u>**

Not to mention that even if that order were in effect, nothing would prevent plaintiffs from filing this recognition action, since a U.S. judge cannot tell a judge from a different country how to respond to a request of this nature. <u>The arguments on this matter in the January 26, 2012 ruling are eloquent.</u>

In addition to Chevron's scandalous *forum shopping* in the United States, it is important to stress, because it highlights the importance of its decision, that the Court of Appeals for the Second Circuit in New York is the U.S. court that has been hearing the case since the first stage of the litigation (1993-2002), **when Chevron successfully argued**

CERT. MERRILL VER: JD

[stamp] NATIONAL CIVIL COURT NO. 61– FEDERAL CAPITAL

[stamp] PAULA GEROLA – CERTIFIED TRANSLATOR - LANGUAGE ENGLISH
Lic. T XIV F 388 – [illegible] Reg. C.T.T.C.I. No. 5073

**that the proper jurisdiction for hearing the environmental suit, which the plaintiffs originally filed in New York, was Ecuador, which also offered a suitable and transparent judicial system. At the time, Chevron supported this argument with countless opinions from Ecuadorian jurists** (he decision issued by the Court of Appeals on August 16, 2002, in which the court granted Chevron's motion that the suit be heard in Ecuador, attached as **Exhibit 14**—always duly apostilled and translated, with the respective certificate of authenticity).

Of course to agree to grant the motion, the Court of Appeals required Chevron to not only waive the prescription period (so that the nine years lost in the United States did not harm the viability of plaintiffs' actions), but also to formally and expressly agree that it would observe whatever decision the Ecuadorian courts reached.

**And Chevron formally and expressly promised the courts of its country that it would observe whatever decision the judges of Ecuador reached.**

Faithful to its ways, Chevron tried to get wiggle out of that commitment, but once again the Court of Appeals for the Second Circuit in New York corrected things and **"reminded"** defendant that it would be held to its promise.

In a March 17, 2011 decision (attached as **Exhibit 15**, duly apostilled and translated— with the respective certificate of authenticity), the Court of Appeals stated:

*"Chevron Corporation claims, without citation to relevant case law, that it is not bound by the promises made by its predecessors in interest Texaco and ChevronTexaco, Inc. However, in seeking affirmance of the district court's forum non conveniens dismissal, lawyers from ChevronTexaco appeared*

CERT. MERRILL VER: JD

*in this Court and reaffirmed the concessions that Texaco had made in order to secure dismissal of Plaintiffs' complaint. In so doing, ChevronTexaco bound itself to those concessions. In 2005, ChevronTexaco dropped the name 'Texaco' and reverted to its original name, Chevron Corporation. There is no indication in the record before us that shortening its name had any effect on ChevronTexaco's legal obligations. Chevron Corporation therefore remains accountable for the promises upon which we and the district court relied in dismissing Plaintiffs' action."*

In **Exhibit 15** Your Honor can see that the Court of Appeals made these remarks to clarify the Background section, where it stated that *"Texaco also offered to satisfy any judgments in Plaintiffs' favor."*

The arguments in this section serve as a referential framework and explanation about the context in which the plaintiffs have requested this exequatur. They describe important circumstances that expose Chevron's systematic strategy of ignoring judicial decisions that are against its interests, regardless of what country issues them.

## VI. <u>RELATED ACTIONS.</u>

For the purposes of this exequatur and recognition of foreign judgment proceeding we inform the Court that *"Aguinda Salazar María v. Chevron Corporation on preventive measures"* is a related action (Case No. 91814/2012). The related proceedings were initially filed before Civil Trial Court No. 61. However, after the recusal raised by the defendant, the proceeding was then transferred to Court No. 98. Both courts claimed they lacked jurisdiction, so the case was sent up to the Court of Appeals.

CERT. MERRILL VER: JD

[stamp] NATIONAL CIVIL COURT NO. 61– FEDERAL CAPITAL

[stamp] PAULA GEROLA – CERTIFIED TRANSLATOR - LANGUAGE ENGLISH
Lic. T XIV F 388 – [illegible] Reg. C.T.T.C.I. No. 5073

Regardless of which court the Court of Appeals ultimately assigns that case to, it is clear that for reasons of good procedural order and unity, both cases (***preventive measures and exequatur***) must be handled jointly, since they are different stages of the same case.

Article 49 of the court's rules requires that outcome, stating that if a case involves preliminary preventive proceedings, then the court that heard the case first must hear the main case.

## VII. <u>COURT COSTS.</u>

In their country of origin, plaintiffs are exempt from paying any type of expense, fee, bond, etc., and this was declared in the letters rogatory used in the related case *"Aguinda Salazar María v. Chevron Corporation on Preventive measures"* (Case No. 91814/2012), initially pending before Trial Court No. 61.

In his decision of November 6, 2012, the judge of that court exempted plaintiffs from paying the mentioned items.

That noted, we only add that Article 5 of the Convention—which takes precedence over domestic law—clearly states: A declaration in forma pauperis recognized in the State of origin of the judgment shall be recognized in the State of destination, so **<u>since the [Ecuadorian court] affirmed that plaintiffs are exempt from court fees, costs, bonds or any other type of procedural expense in their country</u>**, it is not appropriate at this stage to require the fees established in our country under law No. 23898.

And, in any case, in the remote event that the situation in the country of origin changes or that due to any cause arising after this filing plaintiffs are required to pay the fees established under law No. 23898, we assert that the amount to be paid, considering the nature

29

of the action filed, is the amount established in Article 6 of that law for cases of undetermined amount.

In the cited case "Reef Exploration" the court found the recognition of foreign judgment sought was of "undetermined amount." And at the extraordinary appeal stage, on that specific point the Supreme Court of Justice—relying on the arguments of the Attorney General— **rejected** a party's request that the amount assigned to the proceeding be the amount of the foreign judgment.[46]

## VIII. FEDERAL ISSUE.

If this Court dismisses this party's petitions in whole or in part, then we raise the existence of a federal issue for the purpose of appealing to the Supreme Court of Justice under the terms of Article 14 of Law No. 48 and other applicable laws.

In fact, a party may turn to the Supreme Court if a case involves the interpretation and application of international treaties and the lower court's decision runs counter to the provisions of those instruments raised by the party.[47] [48]

---

[46] Cfr. CSJN, judgment of 2/21/06 [LL 2006-Q 429]. It must be clarified that although the court classified the case as one of "undetermined amount" for the purposes of ordering [attorneys'] fees, within the framework of Article 6(a) of law No. 21839, that classification also applies under the terms of law No. 23898 on court fees. It is, in fact, inconceivable that a case could be of "undetermined amount" for the purpose of attorneys' fees, but, on the contrary, of a determined amount for the purpose of court fees. In that regard, see CNFed. Mar del Plata, *"Far Eastern Shipping Company v. Arhenpez SA.,"* of 12/4/09, where the court held that: *"... the Supreme Court has affirmed the declaratory nature of the mentioned (recognition) procedure, stating that the translation in a document authorizing summary collection proceedings that would allow it to be admitted as such in our territory through exequatur does not in and of itself entail any monetary discussion"* (emphasis added).
An opinion that extends the conclusion in "Reef" to court fees may be found at: http://marval.com.ar/Publicaciones/MarvalNews/ArticuloMN/tabid/96/language/es-AR/Defaultaspx?ItemID=786
[47] Cfr. CSJN, *in re.*, "Vargas Lerena Alvaro v. Cadena País Producciones Publicitarias S.A. on collection proceedings," of March 2, 2011; id. Judgments 318:2639; 315:1848; 312:152, among others.
[48] Cfr. CSJN, *in re* "Riopar S.R.L. v. Transportes Fluviales Argenrio S.A." (R- 165.XXXII), of 10/15/96 [ED 171-539].

CERT. MERRILL VER: JD

[stamp] NATIONAL CIVIL COURT NO. 61– FEDERAL CAPITAL

[stamp] PAULA GEROLA – CERTIFIED TRANSLATOR - LANGUAGE ENGLISH
Lic. T XIV F 388 – [illegible] Reg. C.T.T.C.I. No. 5073

## IX. <u>DOCUMENTARY EVIDENCE</u>

To be clear, <u>all</u> attached documents bear the apostille created under The Hague Convention (1961).

**<u>Exhibit 1:</u>** Power of attorney, the original of which appears in the record of case *"Aguinda Salazar María v. Chevron Corporation on preventive measures"* (file No. 91.814/2012).

<u>**Exhibit 2:**</u> Trial court's judgment entered on February 14, 2011.

<u>**Exhibit 3:**</u> Clarification to trial court's judgment entered on March 4, 2011.

<u>**Exhibit 4:**</u> Judgment rendered by the Sole Division of the Provincial Court of Sucumbíos on January 3, 2012.

<u>**Exhibit 5:**</u> Judgment rendered by the Sole Division of the Provincial Court of Sucumbíos on January 13, 2012.

<u>**Exhibit 6:**</u> Full record of the hearing in which Chevron answered the complaint.

<u>**Exhibit 7:**</u> Judgment rendered by the Sole Division of the Provincial Court of Sucumbíos on February 17, 2012.

<u>**Exhibit 8:**</u> Judgment rendered by the Sole Division of the Provincial Court of Sucumbíos on March 1, 2012.

<u>**Exhibit 9:**</u> Documents showing that the complaint was in fact served on the defendant, as well as the court orders that were formally fulfilled in that process.

<u>**Exhibit 10:**</u> Appeal brief of the final judgment.[49]

---

[49] This motion includes all of binders 2067 and 2068; and starts with binder 2066, which is part of <u>Exhibit 3</u>.

CERT. MERRILL VER: JD

**Exhibit 11:** Copy of the judgment stating that the plaintiffs are proceeding *in forma pauperis*, as well as the fact that they are not subject to any fees of any kind (e.g., charges, bond, etc.). The original is included in the record of case ***"Aguinda, Salazar María v. Chevron Corporation on Preventive measures"*** (Case No. 91814/2012), while that decision was an integral part of the letters rogatory made therein.

**Exhibit 12:** Judgment—apostilled and translated, with the relevant certificate of authenticity—of the decision issued on September 19, 2011, by the Court of Appeals for the Second Circuit in New York.

**Exhibit 13:** Reasoned judgment—apostilled and translated, with the relevant certificate of authenticity—issued January 26, 2012, by the Court of Appeals for the Second Circuit in New York, regarding the September 19 decision.

**Exhibit 14:** Judgment—apostilled and translated, with the relevant certificate of authenticity—of the decision issued on August 16, 2002, by the Court of Appeals for the Second Circuit in New York.

**Exhibit 15:** Judgment—apostilled and translated, with the relevant certificate of authenticity—of the decision issued on March 17, 2011, by the Second Circuit Court in Appeals of New York.

We also offer as documentary evidence the entire record in the related case ***"Aguinda Salazar, María v. Chevron Corporation on Preventive measures"*** (Case No. 91814/2012), as well as the record in the underlying case, to the extent relevant.

## X. <u>AUTHORIZATIONS</u>

The following attorneys are authorized to see the case record: Leandro J. Caputo (Volume No. 64, page No. 827); Martín Saldico (Volume No. 103, page No. 337); Matías Mendioroz (Volume No. 100, page No. 704); and Mr. Agustín Brugo (ID No. 32173433); María Belén Capalbo

CERT. MERRILL VER: JD

[stamp] NATIONAL CIVIL COURT NO. 61– FEDERAL CAPITAL

[stamp] PAULA GEROLA – CERTIFIED TRANSLATOR - LANGUAGE ENGLISH
Lic. T XIV F 388 – [illegible] Reg. C.T.T.C.I. No. 5073

(ID No. 34384041); Matías Medici (ID No. 35140218); Luciano Litre Martínez (ID No. 34211514); and Juan P. Pascucci (ID No. 34564537).

## XI. <u>PRAYER FOR RELIEF</u>

Based on the above, we ask Your Honor to:

1) Consider the plaintiffs as having appeared in the proceeding and having established the above domicile.

2) After performing the service required by law, render a judgment recognizing the underlying decision, finding it equivalent for all purposes to a local judgment. Costs to be borne by defendant.

Respectfully submitted.

JUSTICE SHALL BE DONE.

[signature]
ENRIQUE BRUCHOU
ATTORNEY
CPACF, V. 41, P. 928

[signature]
CARLOS MARÍA ROTMAN
ATTORNEY
Volume 30, Page 544

[signature]
RODOLFO A. RAMÍREZ
ATTORNEY
CPACF, V. 7, P. 766

[signature]
MARTÍN BERETERVIDE
ATTORNEY
CPACF, V. 81, P. 927
CASI, V. XLIII, P. 252
TAX ID No. 20262814611
PREV. LEG. No. 3-26291461

CERT. MERRILL VER: JD


[stamp] PAULA GEROLA – CERTIFIED TRANSLATOR - LANGUAGE ENGLISH
Lic. T XIV F 388 – [illegible] Reg. C.T.T.C.I. No. 5073



TRADUCCIÓN PÚBLICA/TRANSLATION-------------------------------------

**APPEARS   IN   COURT.   INITIATES   EXEQUATUR PROCEEDINGS. GROUPING OF ACTIONS.** --------------------------------

[Seal: Civil Court No. 61, November 21, 2012, 1324] -------------------------------

Your Honor:------------------------------------------------------------------------

**Enrique Bruchou** (Volume 41 Folio 928), as attorney-in-fact of the plaintiffs, domiciled at José Manuel Abascal E 12-79 and Portete, City of Quito, Republic of Ecuador, represented by **Carlos María Rotman** (Volume 30 Folio 544), **Rodolfo A. Ramírez** (Volume 7 Folio 766) and **Martín Beretervide** (Volume 81 Folio 927), all of them establishing <u>domicile ad litem at Ing. Butty 275, 12th Floor, City of Buenos Aires</u>, respectfully allege: ----------------------------------------------------------------------

**I- LEGAL CAPACITY.** -----------------------------------------------------------------

The copy of the power of attorney granted by the plaintiffs to the undersigned for them to file these proceedings is hereto attached as **Exhibit 1**. Even though it is sworn on oath that the such power of attorney is effective and true, it is also noted that the original instrument  duly legalized with an apostille under the applicable international regulations- is added to the related proceedings *"Aguinda Salazar María c/ Chevron Corporation s/ Medidas precautorias"* [*"Aguinda Salazar María vs/ Chevron Corporation on Injunctions*] (Record 91814/2012). ----------------------------------------

The power of attorney was granted pursuant to the provisions of the *"Inter-American Convention on the Legal Regime of Powers of Attorney to be Used Abroad"*[1], adopted at the First Inter-American Specialized Conference on Private International Law **(CIDIP-I)** held in the Republic of Panama in 1975.--------------------------

**II- PURPOSE.** ----------------------------------------------------------------------

On behalf of plaintiffs, pursuant to the provisions of the *"Inter-American Convention on Extraterritorial Validity of Foreign Judgments and Arbitral Awards"* –signed and acknowledged both by Argentina and by Ecuador[2]- we hereby file an action for the acknowledgement of the validity of a foreign judgment against **Chevron Corporation**

---

[1] Approved in our country by Act No. 22550 [ADLA XLII- A, page 46; Official Gazette October 20, 1987]. In Ecuador, the Convention was approved by Supreme Decree No. 472, published in Official Record 827 on June 18, 1975.-----------------------------------------------------------------
[2] Approved in our country by Act No. 22921 [ADLA XLIII- D, page 3819; Official Gazette September 27, 1983]. In Ecuador, the Convention was approved by Executive Decree No. 853, published in Official Record 240 on May 11, 1982.-----------------------------------------------------------------

1

(hereinafter "Chevron Corp." or "Chevron"), in connection with the judgment pronounced by the judicial authorities in the Republic of Ecuador corresponding to the Legal Division of Sucumbios, in the proceedings *"Aguinda María and other parties vs. Chevron Corporation"*, identified in local records No. 002- 2003 (pending) and 2011-0106 (before the Single Court Room of the Provincial Court of Sucumbios).----
Defendant's domicile has been established at **6001 Bollinger Canyon Road, San Ramón, California, United States of America.** -------------------------------------------

Defendant owns property in the Republic of Argentina, to the extent that it has stated before the regulators in its country, United States of America, that it is the owner of 100% of Chevron Argentina S.R.L. Furthermore, an attachment has even been levied on some of the property it owns in the country in relation to the related proceedings mentioned above (Record 91814/2012). The fact that Chevron Corp. owns property in the Republic of Argentina has already been argued and decided –and a hearing has even been held with Chevron Corp. in the reconsideration then dismissed- by the legal authority of origin, i.e., the Judge in Ecuador currently hearing the proceedings. All of the above appears from the original documentation attached to the proceedings *Injunctions*. -------------------------------------------------------------------------------------

As a result of the proceedings referred to above, defendant was ordered to pay the sum of nineteen thousand twenty-one million five hundred and fifty two thousand United States dollars (US$ 19.021,552.000) –as calculated by resolutions dated July 23rd, 2012 and July 30th, 2012- derived from the **environmental damages** caused in the Ecuadorian Amazonia as a consequence of the oil activities performed by its former company, Texaco Inc., with which Chevron Corp. merged in 2001.----------------------

The judgment of the Court of Original Jurisdiction was rendered on **February 14th, 2011 (Exhibit 2)**, and explained by resolution issued on **March 4th, 2011 (Exhibit 3)**. Moreover, the Single Court Room of the Provincial Court of Sucumbios, which completely confirmed the judgment, was pronounced on **January 3rd, 2012 (Exhibit 4)**, and supplemented and extended on **January 13th, 2012 (Exhibit 5)**. ---------------

All these judgments are duly legalized with an apostille under the *"Hague Convention Abolishing the Requirement of Legalization for Foreign Public Documents"* (1961). The following is worth noting: whenever this writing refers to *"the judgment"* the acknowledgement of which is being requested, unless otherwise specified, the four

2

judgments mentioned before are included, all of which shall be deemed as only one judgment. ---------------------------------------------------------------------------------------------

### III- "CONVENTION ON EXTRATERRITORIAL VALIDITY OF FOREIGN JUDGMENTS". -------------------------------------------------------------------------------------

### III.I. COMPLIANCE WITH ALL THE REQUIREMENTS OF ARTICLE 2 OF THE CONVENTION -------------------------------------------------------------------------

The compliance with **each of the subsections of article 2 of the Convention** shall be hereinafter individually described. ----------------------------------------------------------------

(i) FORMAL REQUIREMENTS (a)------------------------------------------------------------------

*"They must fulfill all the formal requirements necessary for them to be deemed authentic in the State of origin".* ------------------------------------------------------------------

As the documents were legalized with an apostille by the authorities of the State of origin, they are certainly deemed **"authentic"** in Ecuador. ------------------------------------

Article 5 of the Hague Convention Abolishing the Requirement of Legalization for Foreign Public Documents sets forth that: *When properly filled in, the apostille will certify the authenticity of the signature, the capacity in which the person signing the document has acted and, where appropriate, the identity of the seal or stamp which the document bears".* -----------------------------------------------------------------------------------

(ii) TRANSLATION (b) -------------------------------------------------------------------------------

*"The judgment, award or decision and the documents attached thereto that are required under this Convention must be duly translated into the official language of the State where they are to take effect".* -----------------------------------------------------------

No explanation is needed in this case, as the documents whose acknowledgement is requested have been issued in Spanish, which is also the official language of our country. -------------------------------------------------------------------------------------------

The translation required by the above-mentioned subsection is therefore inapplicable.

(iii) LEGALIZATION (c) ------------------------------------------------------------------------------

*"They must be presented duly legalized in accordance with the law of the State in which they are to take effect".* ------------------------------------------------------------------

Both Argentina and Ecuador have signed and acknowledged the Hague Convention Abolishing the Requirement of Legalization for Foreign Public Documents (1961). --

3

And whenever any such circumstance occurs –acknowledgement by both countries of the Hague Convention-, *"the legalization by the Argentine Ministry of Foreign Affairs is not required"*[3]. --------------------------------------------------------------------

This requirement is not necessary to the extent Article 9 of the Convention specifies that "*Each Contracting State shall take the necessary steps to prevent the performance of legalizations by its diplomatic or consular agents in cases where the present Convention provides for exemption*". ------------------------------------------------------------

Additionally, article 5 of the Hague Convention (1961) establishes that "*When properly filled in, the apostille will certify the authenticity of the signature, the capacity in which the person signing the document has acted and, where appropriate, the identity of the seal or stamp which the document bears*". --------------------------------------------------------

Accordingly, the *Apostille* -duly added to the judgment whose acknowledgement is requested- is sufficient to meet this requirement. --------------------------------------------

(iv) INTERNATIONAL JURISDICTION (d) -------------------------------------------------

*"The judge or tribunal rendering the judgment must have jurisdiction in the international sphere to hear the matter and to render judgment on it in accordance with the law of the State in which the judgment, award or decision is to take effect".*

"Jurisdiction in the international sphere" is deemed as "…*the jurisdiction of the judge who rendered the judgment examined by the judge who must acknowledge or enforce it*"[4]. --------------------------------------------------------------------------------------------

When referring to the Spanish case analyzed by them, the concepts of Fernández Rozas- Sánchez Lorenzo are *mutatis mutandi* applicable to the Argentine legal position regarding this requirement, and mainly explained as follows: ------------------------------

"*International judicial jurisdiction is substantially different from national judicial jurisdiction. Each state system has several competent bodies, and each of them hears*

---

[3] Pursuant to National Court in Commercial Matters, Court Room E, CRI Holding Inc. vs. Compañia Argentina de Comodoro Rivadavia, September 22nd, 2006. -----------------------------------------------

[4] According to Weinberg de Roca, Inés M, *Competencia Internacional y Ejecución de Sentencias Extranjeras*, Astrea, 1994, page. 57. The author makes a distinction between "direct" and "indirect" jurisdiction. In the first case, the State has the power to deem itself competent and judge certain international disputes: the judge is competent  to pronounce judgment in an international action; in the second case ("indirect" jurisdiction), the judge has the power to enforce the judgment, not to pronounce it. This is why the exequatur proceedings or acknowledgement and enforcement of foreign judgments relate to the "indirect" jurisdiction field. As Goldschmidt has stated, the fact that the judge is indirectly competent "*helps protecting the own jurisdiction against foreign jurisdictions invading it*" (according to Goldsclimidt W., *Derecho Internacional Privado*, Abeledo Perrot, 2009, page 998). ----------------------

some of the lawsuits on the basis of criteria within the meaning of jurisdiction [suspensive dots]. International judicial jurisdiction lies before national judicial jurisdiction, because conflicts of national judicial jurisdiction only make sense when the Spanish bodies are internationally competent. On the other hand, conflicts solved by nationally competent and internationally competent authorities have a different nature: at a national level, the solution to these conflicts does not depend considerably on the fundamental rights to effective legal protection and not to be left unprotected, at least to the same extent as conflicts solved by internationally competent authorities. In the case of the latter, in general, the lack of jurisdiction of the Spanish courts does not ensure that the judges from other states will hear the case and, therefore, the effective legal protection lies as a fundamental concept of the regulation"[5]. -----------------------

On the other hand, "The control over international judicial jurisdiction is general and exerted in almost every legal system; it shall be aimed at defending the exclusive jurisdiction of the State and excluding any exorbitant jurisdiction of the State of origin"[6]. ---------------------------------------------------------------------------------

The result of this examination will determine whether the Judge of the country in which the acknowledgement is requested deems himself as competent to hear the *exequatur* proceedings. -----------------------------------------------------------------------------

Firstly, it shall be determined whether the foreign Judge has not invaded a jurisdiction belonging **EXCLUSIVELY** to the Argentine judges. -------------------------------------

In this sense, in order to highlight the importance of this examination, it has been stated that "The only thing that matters to our law is that the judgments rendered by non-competent judges not be acknowledged on the basis that the national judges have jurisdiction"[7]. -----------------------------------------------------------------------------

---

[5] According to José Carlos Fernández Rozas- Sixto Sánchez Lorenzo, *Derecho Internacional Privado*, Civitas, Madrid, 1999, pages 80/81. -----------------------------------------------------------------------

[6] According to Feuillade; Milton C, *La Sentencia Extranjera*, Ábaco Publishing House, Buenos Aires, 2008, page 137.-----------------------------------------------------------------------------------

[7] According to Cortés, V., *Derecho procesal civil internacional*, "Revista de Derecho Privado", Barcelona, 1981, page 148; quoted by Feuillade, *ob cit.*, page 139, note No. 47. As stated by this author, Cortés' criterion transcribed in the main part of this pleading is in principle correct, though it cannot be admitted without certain qualifications (for example, if the foreign court was exorbitant or the judge refused to enter a judgment). In any case, the quotation is useful in this context to emphasize that it must be ensured that the foreign judge (in this case, Ecuadorian) has not invaded the exclusive jurisdiction of an Argentine judge. -----------------------------------------------------------------------------

CERT. M

In addition, Goldschmidt concludes that "*For any such invasion to take place, it is necessary that when the foreign judge intervenes in our jurisdiction our international procedural public order be breached. It is not enough that our jurisdiction has been the only one, it must also have been exclusive*"[8]. ------------------------------------------------

The facts described in Chapter III are enough to provide a convincing answer to the question. ----------------------------------------------------------------------------------

In the case under analysis, it is evident that no Argentine judge had international jurisdiction to hear the claim of the inhabitants of the Ecuadorian Amazonia against the US oil company which had caused the damages (Texaco Inc. first; then Chevron Corp. after the merger completed in 2001). ------------------------------------------------------

Therefore, in this case, there is no chance that the judgment whose acknowledgement is requested may have invaded the exclusive jurisdiction of an Argentine judge. ---------

In order to consider this matter, it must also be analyzed whether the foreign judge has assumed an EXORBITANT jurisdiction. As stated by Boggiano, "(suspensive dots) *it is necessary to emphasize the fact that exorbitant jurisdictions must be disregarded... Any exorbitant jurisdiction must be disregarded... The exercise of exorbitant jurisdiction must be disregarded to protect the interests of international affairs. The exercise of exorbitant jurisdiction must be penalized by disregarding it*"[9]. ----------------

The author particularly makes reference to the relationship of the case with the jurisdiction in which it has been decided. "*First of all* –he explains- *it is necessary to analyze the relationship of the parties to the lawsuit with the forum; and the relationship of the factual circumstances and the situations entailing the cause or dispute; and the relationship between the subject-matter of the claim and the forum [suspensive dots]* ----------------------------------------------------------------------

---

[8] According to Goldschmidt Werner, *Derecho Internacional Privado*, Abeledo Perrot, 2009, page 998. In the judgment pronounced by the Supreme Court in the proceedings "Holiday Inns Inc. c/ EBASA Exportadora Buenos Aires SA. s/ ejecutivo" on April 5th, 2005, this concept was clearly explained: only if the foreign judge rendered a judgment in a claim in which the Argentine judge had exclusive jurisdiction the rejection of the acknowledgement is justified; however, this oppressive consequence is not applicable if the jurisdiction of the Argentine judge was "concurrent" with the jurisdiction of the foreign judge. And it certainly is not applicable in the case under analysis, where the Argentine judge was not competent at all to render judgment in the proceedings whose judgment is sought to be acknowledged. -------------------------------------------------------------------------------

[9] According to Boggiano. ob. cit., T.I, page 480. ----------------------------------------------------

CERT. M

*However, there must always be a reasonable relationship between the case and the forum. Otherwise, jurisdiction would be abusive or exorbitant, i.e., without any reasonable or minimum relationship supporting it* [10]. ----------------------------------

Your Honor may see that the background of the case shows that there is a reasonable relationship between such case and Ecuadorian jurisdiction.--------------------------------

Plaintiffs are nationals of that State, are domiciled there and the acts causing the environmental damages were performed in Ecuador[11]. ----------------------------------

Furthermore, defendant, although a national of another State, consented the Ecuadorian jurisdiction –and even proposed it itself- as a means to attain the dismissal of a claim previously initiated in USA[12] ----------------------------------

Our Supreme Court of Justice has weighed "*the existence of an essential relationship with the forum*" in light of "*the factual circumstances of the dispute*", as a relevant factor to be considered upon the evaluation by the Argentine judges of the international jurisdiction[13]. ----------------------------------

From this viewpoint, the jurisdiction of the Ecuadorian judges hearing the proceedings is definitely attested. ----------------------------------

(v) SERVICE OF SUMMONS AND NOTICE OF THE COMPLAINT (e) ------------

"*The defendant must have been summoned or subpoenaed in due legal form substantially equivalent to that accepted by the law of the State where the judgment, award or decision is to take effect*". ----------------------------------

---

[10] According to Boggiano, ob. cit., page 201 and following pages.----------------------------------
[11] In this sense, it is worth quoting the Press Release issued by Chevron Texaco praising the election of the Ecuadorian jurisdiction to hear in the proceedings: "[suspensive dots] *Plaintiffs are in Ecuador, business was conducted in Ecuador, the state oil company –with which Texaco operated as a minority partner and which is currently still operating the fields- is in Ecuador. Evidence is in Ecuador and the compensation sought by plaintiffs can only be obtained in Ecuador*". ----------------------------------
[12] In this regard, it should be noted that the proceedings were originally initiated in United States. Chevron claimed that the adequate jurisdiction was the Ecuadorian jurisdiction and, in this way, the US Court issued a decision in this sense; before, it ordered Chevron to agree –and Chevron actually did so- to observe the judgment eventually pronounced by the court in Ecuador. ----------------------------------
[13] Supreme Court of Justice, proceedings "Cri Holding Inc. c/ Cia. Arg. de Comodoro Rivadavia S.A", November 3rd, 2009. The conceptual idea transcribed in the text relates to the opinion issued by the Attorney General (February 19th, 2009), which the Court used as its own. This precedent acknowledged the international jurisdiction of a US Court, as it was not noted "…*whether the foreign judge has invaded the Argentine exclusive jurisdiction or whether the jurisdiction was exorbitant, arbitrary, abusive, artificial or fraudulent, or whether the natural judge or the right to defense has been breached*" (also a transcription of the opinion issued by the Attorney General which the Court used as its own).------------

7

CERT.

In this regard, it should be noted that in the proceedings filed in Ecuador, Chevron Corp. was summoned in a form substantially analogous to that set forth by the Argentine law of procedure when serving notice of the complaint. -----------------------

As evidence of compliance with this requirement, you will find attached a copy of the notices, legalized with an apostille.------------------------------------------------------------

This evidences that, in this case, the service of summons and notice of the complaint took place, as it is unquestionable that Chevron Corp., in fact, answered the summons through a long presentation of arguments –also attached with an apostille **(Exhibit 6)**- by which it raised all defenses and arguments to which it believed to be entitled and, at the same time, proposed the production of all evidence it deemed adequate to support its position[14]. ---------------------------------------------------------------------------------------

(vi) RIGHT TO DEFENSE (f) -------------------------------------------------------------------

"*The parties must have had an opportunity to present their defense*".------------------

After analyzing the background provided, it must be certainly concluded that Chevron's right to defense was truly respected; the local judges were so tolerant towards their continuous claims, which even caused delays, that the proceedings required ten years to a render judgment. Additionally, the proceedings were heard completely in the jurisdiction strongly defended by Chevron during nine years, which resulted in "lost time" for plaintiffs in pursuing justice. ------------------------------------

The analysis of this requirement must be necessarily supplemented by our analysis of the "public order" hereinafter performed, particularly when dealing with the procedural or adjective law, as well as the compliance with the provisions of article 3 b) of the Inter-American Convention on Extraterritorial Validity of Foreign Judgments and Arbitral Awards. The documents that will be referred to below show not only that defendant's right to defense was respected but also that defendant fully exercised that right, in some cases, even committing excess or abuse. ---------------------------------------

(vii) FINAL JUDGMENT OR RES JUDICATA (g) -----------------------------------------

---

[14] Since these are summary and oral proceedings, the "answer of the complaint" is carried out within the framework of the pretrial conference. Section 23of the Civil Code of Procedure of Ecuador refers to this procedure, as follows: "*After the complaint is filed, the judge, if summary and oral proceedings are applicable, shall declare so and order that defendant be provided with a copy of the complaint*" (article 829). "*Immediately after serving summons, the judge shall state the date and time to hold the pretrial conference (suspensive dots)*." (article 830); then it sets forth the following: "*The pretrial conference shall begin by answering the complaint, including the exceptions, either dilatory or peremptory, to which defendant believes to be entitled (suspensive dots)*". -----------------------------------------------------------

8

*"They must be final or, where appropriate, have the force of res judicata in the State in which they were rendered"* -------------------------------------------------------------------

As literally established by the convention, in order **to determine whether the judgment is final or has the force of res judicata, the laws of the country of origin must be analyzed.** -------------------------------------------------------------------

The National Court of Appeals in Civil Matters has adopted such criterion, when sustaining that the foreign judgment "(suspensive dots) *must be final or have the force of res judicata, i.e. it must not be subject to appeal by ordinary remedies admitted by the laws of the country in which it has been rendered"*; then it holds that "(suspensive dots) *as the qualification as res judicata must be decided pursuant to the laws in force in the State in which the judgment was rendered, the interested party must provide evidence of this"*[15]. -------------------------------------------------------------------

The terms of the resolution issued by the Single Court Room of the Provincial Court of Sucumbíos in the explanatory judgment rendered on January 13th, 2012 (**Exhibit 5**) must be quoted, as they are sufficient to deem this requirement as met. This resolution clearly shows what the Ecuadorian law and case law understand as a *final judgment* or *res judicata*; **i.e., the interpretation to be followed by the Argentine judge pursuant to the provisions of article 2 of the Convention on General Rules of Private International Law, whose hierarchy is higher than the laws of our legal system**[16]. In that judgment dated January 13th, the Ecuadorian Court stated: -----------------------

*"Since the judgment rendered on January 3rd, 2012, together with this amplifying and explanatory judgment, puts an end to the proceedings, deciding over the substance of the case in the court of last resort, it is evident that when the Court of*

---

[15] According to the National Court of Appeals in Civil Matters, Court Room K, June 10, 2010. ---------
[16] This convention specifies *"Judges and officials of the States Parties are required to apply foreign law in the same manner as the judges of the state whose law is applicable..."*. With respect to this regulation, the Attorney General held before the Supreme Court of Justice that *"article 2 of the Convention quoted...supported the" teoría del uso jurídico" (theory which establishes that in case of a foreign case, the judge must consider the case as the judge of the jurisdiction of the case would do it), by which national judges are bound to apply foreign regulations in the same manner as the judges of the state whose law is applicable (suspensive dots)* he added: "(suspensive dots) *article 2 referred to above has no regulations directly establishing which right is applicable, and merely sets interpretation guidelines for foreign law, by setting forth that only the judges and authorities of the states parties are bound to interpret the regulations in the same manner as the judges of the state whose law is applicable* (according to the Opinion of the Attorney General dated July 10, 1999 in the proceedings "Moka S.A. c/ Graiver David s/ sucesión"). --------------------------------------------------------------------

9

*Appeals renders a judgment, such judgment has the force of res judicata, materially and formally, precisely because the proceedings are over". --------------------------------*

In this judgment, the Court of the Province of Sucumbios explains why cassation appeals instance does not imply an obstacle to the res judicata concept, as applied in Ecuador. ----------------------------------------------------------------------------------------

*"After the enactment of the Law on Cassation Appeals (1992), the Ecuadorian law has defined by continuous case law –at least 12 cassation judgments, which imply a mandatory judicial precedent- that section 2 of the Law on Cassation Appeals entails that 'the extraordinary remedy is only enforceable when a decision has been issued that puts an end to the proceedings, which has the force of res judicata, formally and substantially, i.e. a final judgment, so that the action between the same parties (subjective) cannot be renewed to claim the same thing, quantity or facts, grounded on the same cause, reason or right (objective,) and when such judgment has been rendered in ordinary judicial proceedings "[17].* ----------------------------------------------------------

It is not necessary to resort to books of authority or the analysis of analogous precedents: <u>the Court in charge of hearing the case in the second and final instance expressly sustained, without any margin of doubts, that the issue has the force of res judicata, and that it was only because the judgment had that force that the appeal sought by Chevron Corp could be filed</u>[18]. This is based on the fact that this extraordinary remedy, pursuant to Ecuadorian laws, is only applicable against judgments with the force of *res judicata*, formally and substantially. --------------------

But it was not only in the explanatory judgment issued on January 13rd, 2012 that the Single Court Room of the Court stated that the action had the force of res judicata; on other two occasions, in two resolutions issued later on, on <u>February 17th, 2012 (Exhibit 7)</u>[19] and <u>March 1st, 2012 (Exhibit 8)</u>[20], the Court understood the same.------

The first resolution referred to a claim made by Chevron to be exempted from posting the surety bond legally required to suspend the enforcement of the judgment.

---

[17] It should be noted that, pursuant to the provisions of section 19, second paragraph, of the Law on Cassation Appeals of Ecuador, "*If a judgment that has been appealed is confirmed three times, this implies a mandatory judicial precedent for the interpretation and application of the laws, except for the Supreme Court*". This is why the Single Court Room, in the paragraph transcribed, has made reference to the "mandatory" condition of the criterion adopted in "*at least 12 judgments appealed*". -----------------
[18] The appeal was granted *a posteriori* by a resolution of the same Court issued on February 17th, 2012.
[19] A copy legalized with an apostille is attached as an Exhibit. This resolution also includes the approval of the extraordinary remedy filed by Chevron. ---------------------------------------------------------------
[20] A copy legalized with an apostille is attached as an Exhibit. ---------------------------------------------

10

CERT. MERRILL VER: JD

Independently of how inappropriate it is that a company such as Chevron, whose quarterly income amounts to billions of dollars (i.e. thousands of millions) may request such exemption, the Single Court Room anyhow addressed defendant's arguments –referred to the fact that a temporary arbitration award in an action where plaintiffs were not parties would prevent the enforcement of the judgment-, dismissed those arguments for being legally inapplicable and, in accordance with what had already been stated in the judgment rendered on January 13th, 2012, in the sense that the judgment had the force of res judicata, **instructed that copies be sent in order that the court of original jurisdiction may enforce the judgment without delay[21].**-----------------------

Even more explicitly, in the following decision issued on March 1st, 2012 -upon the arguments presented by Chevron as to the fact that a second temporary award would prevent the enforcement of the judgment-, the Court said:  *"This Court Room will not refer again to the substantial arguments because they have been analyzed in the judgments. These arguments will not be taken into account, as a judgment has been rendered with the force of res judicata, which analyzes the judicial evidence and decides over these matters, and it is not the time to discuss again how the evidence was examined"* [22]. At the same time, the court room made reference to constitutional arguments about legal equality (why does any party to a case have to post a surety bond in order to suspend the enforcement of a judgment, and a company such as Chevron would be allowed to obtain the same effect by means of an award issued in arbitration proceeding to which plaintiffs are not even parties?) and finished the ruling by stating -now at plaintiffs' request- that: --------------------------------------------------------

*"this ruling, for any procedural purposes and requirement, orders the enforcement of the judgment rendered in this jurisdiction* [23]. -------------------------------------------

The concept included in the judgments mentioned above is also supported by prestigious books of authority; accordingly, María Elsa Uzal holds that *"Section 517 of the National Code of Procedure in Civil and Commercial Matters, in addition to the control over the indirect jurisdiction, requires that the judgment must have timely* [sic]

---

[21] Pursuant to the terms of section 8 of the Law on Cassation Appeals Ecuador, which establishes that "(suspensive dots) *the copies* [of the record] *shall be sent to the judge or competent body for the enforcement of the judgment".* ------

[22] The highlighting and underlying are not part of the original document. ------------------------------

[23] In this regard, we will hereinafter refer to the requirement of article 3 c) of the Inter-American Convention on Extraterritorial Validity of Foreign Judgments and Arbitral Awards. -----------------

had the force of res judicata in the State in which it was rendered (subsection 1); this implies that the judgment must be final and conclusive and, therefore, not subject to appeal by means of an _ordinary_ remedy"[34] ------------------------------------------------

In this sense, the National Court of Appeals in Civil Matters held, in relation to this specific issue, that what had to be verified in order to approve the exequatur was " (suspensive dots) *whether the judgment is subject to appeal by means of any _ordinary_ remedy and, in such a case, whether any such remedies have been filed and their outcome or, if they have not been filed, the evidence that the due terms have expired (suspensive dots)*[35].

Likewise, Boggiano states that "if the judgment is final, even if it may be appealed by means of an extraordinary remedy, as in our country, it may be acknowledged"[36]. -----

**In conclusion, the judgment rendered by the Single Court of the Provincial Court of Sucumbíos has the force of res judicata and the fact that an EXTRAORDINARY APPEAL is pending with the Ecuadorian Supreme Court does not imply an obstacle to have the judgment acknowledged, as we noted before.** --------------------------------------------------------------------------------

(viii) PUBLIC ORDER (h) ----------------------------------------------------------------

*"They must not be manifestly contrary to the principles and laws of the public policy (ordre public) of the State in which recognition or execution is sought"* --------------

Nothing enables us to reach the conclusion that a judgment such as that rendered by the Ecuadorian judges, ordering the payment of damages caused by defendant's (the legal successor) illegal acts, is in any way inconsistent with the principles of the Argentine legal system. **On the contrary, the judgment is wholly in accordance with Argentine laws and their fundamental underlying principles: as a matter of fact, as decided by our Supreme Court, the right to obtain compensation as a**

---

[34] According to Uzal, María Elsa, *Solución de Controversias en el Comercio Internacional*, Ad Hoc, Bs. As., 1992, page 36. The highlighting and underlying are not part of the original document. Colombo-Kiper also allege that only a pending ordinary remedy shall entail an obstacle to the exequatur (according to *Code of Procedure (suspensive dots)*. Volume. IV, page 578). -------------------------------
[35] According to the National Court in Civil Matters, Court Room H, "Freire Guapo Garcao Fernando M. c/ Arrellano Laura E.", judgment rendered on August 13, 1997 [IX 1998-B, 176]. The highlighting is not part of the original document. ------------------------------------------------------------------------
[36] According to Boggiano Antonio, *Derecho Internacional Privado*, Depalma, Buenos Aires, 2nd Edition, 1983, Volume II. page 1333 (quoted by Uzal). -------------------------------------------------

consequence of the infringement of the *alterum non laedere* principle described in section 19 of our Constitution is a constitutional right[27]. ------------------------------

The verification must be made between the material solution offered to the case by the foreign court and the spirit or general principles inherent to our own legal system. It is not about verifying whether the laws in force in the country of the foreign judge and applied by him are similar to our own laws, or about controlling the manner or extent to which the foreign judge applied the laws; and, not even if the foreign judge has applied Argentine law to solve the dispute may the court of our country judge how the law was applied, provided –of course- that the Argentine exclusive jurisdiction has not been invaded, as explained in the chapter referred to "international jurisdiction"[28].

<u>In this way, not even the verification of consistency with the local public order may enable an examination of substance[29].</u>------------------------------------------------

Finally, the public order must also be examined from a strictly procedural or adjective viewpoint. The already mentioned issue of service of summons and notice of the complaint is important -whether made in due legal form substantially equivalent to that accepted by the law of the State where the acknowledgment is sought, and so is the above referred issue as to whether defendant's right to defense has been respected during the proceedings.------------------------------------------------------------------------

In this respect, we refer to what has been stated above when addressing the compliance with the requirements imposed by article 2 e) and f) of the Convention, as well as to what will be stated below in terms of the documentation evidencing the effective compliance with these requirements (article 3 b) of the Convention). --------------------

III.2. COMPLIANCE WITH ALL THE REQUIREMENTS OF ARTICLE 3 OF THE CONVENTION. -------------------------------------------------------------------------

---

[27] According to the Supreme Court, "Santa Coloma", Judgment 308: 1160. -------------------------------------

[28] According to Boggiano, *ob.cif.*, Volume I, page 486; the author states *"Not even when the foreign judge has applied Argentine law may his/her decision be revised by means of the acknowledgment or exequatur; nor may the conflict regulations applied by the foreign court be revised. Thus, it is not a condition for acknowledgement that the Argentine conflict regulations have been applied; not even the application of analogous conflict regulations is required. The respect for the foreign decision also entails the respect for the conflict regulations applied by the judge issuing that decision".* ----------------

[29] Boggiano particularly emphasizes that the compliance with this requirement may in no event lead to an examination of the substance of the foreign judgment. *"The control is related to the material solution of the dispute in terms of its effectiveness or enforcement strictly in the country. This is why a substantial comparison is required between that solution and the spirit of the Argentine law".* ----------------------

CERT. M

By following the same methodology as that applied to address the requirements of article 2 of the Convention, we will analyze below the compliance with each legal requirement.------------------------------------------------------------------------------------

(i) ------------------------------------------------------------------------------------------

*"a. True copy of the judgment, award or decision"*--------------------------------------

The judgment rendered by the Judge of Original Jurisdiction Nicolás Zambrano on February 14th, 2011 (**Exhibit 2**) and the explanatory judgment issued by the same judge on March 4th, 2011 (**Exhibit 3**) are hereto attached in compliance with the requirements imposed by the *"Hague Convention Abolishing the Requirement of Legalization for Foreign Public Documents"* (1961).------------------------------------

Additionally, in compliance with the provisions imposed by the international convention mentioned above, we enclose the judgment issued by the Provincial Court of Sucumbíos on January 3rd, 2012 (**Exhibit 4**) and its related explanatory judgment issued on January 13th, 2012 (**Exhibit 5**). -----------------------------------------------

**These are the four judgments we have identified in the "Purpose" section of this pleading as "the judgment" whose acknowledgement is sought under the terms of the "_Inter-American Convention on Extraterritorial Validity of Foreign Judgments and Arbitral Awards_" signed and confirmed –as timely explained- both by the Republic of Ecuador and by the Republic of Argentina.**------------------------------

(ii) -----------------------------------------------------------------------------------------

*"b. True copy of the documents required to prove that the provisions of subsections e) and f) of the foregoing article have been complied with"* ---------------------------------

It is worth remarking that article 2 e) required that the defendant be summoned or subpoenaed in due legal form substantially equivalent to that accepted by the law of the State where the acknowledgement is requested; whereas article 2 i) required that the parties have an opportunity to present their defense. ----------------------------------------

Now, article 3 b) under analysis requires the attachment of documents necessary to evidence that the provisions of those items have been complied with.--------------------

In order to evidence Your Honor that **notice of the complaint** has been served, **Exhibit 9** hereto attached includes the evidence of service of process to Chevron Corporation; by means of such legal process, on July 11th, 2003 at 2:22 pm notice of the complaint and its annexes was served. -----------------------------------------------------

CERT. M

14

Together with the summons, Chevron was provided with the "*Record including 98 pages in certified copies with the initial complaint and annexes thereto*". That is to say, everything that Chevron needed to freely exercise its right to defense upon answering the complaint, which the company actually did.----------------------------------------------

In addition, the two rulings –duly legalized with an apostille- (included as **Exhibit 9**) entered by the Chief Justice of the Superior Court of the Department of Nueva Loja, dated September 4th, 2003 and October 8th, 2003, whereby the notice of the complaint to Chevron Corporation was deemed duly made[30], are hereto attached. -----

Regarding the defendant's right to defense, the following documentation is attached:

- Complete minutes of the hearing at which Chevron answered the complaint (**Exhibit 9**). ----------------------------------------------------------------------------------------

- Appeal of the final judgment (**Exhibit 10**). -----------------------------------------------

Based on these documents, it is evidenced that Chevron Corp. had the opportunity to present its defense as deemed advisable, to present its arguments without any legal or factual restrictions, to offer and produce evidence to prove its statements and to refute the statements made by plaintiffs, and to appeal with the Court of Appeals the judgment rendered by the court of original jurisdiction. ---

(iii)--------------------------------------------------------------------------------------

"c. *True copy of the document stating that the judgment, award or decision is final or has the force of res judicata*".----------------------------------------------------------

When referring to the *force of res judicata* that the judgment must have, Palacio has sustained that *"The evidence of this circumstance must appear from the true copy of the resolution declaring that the judgment is final or has the force of res judicata"*[31]. ----

Couture agrees by stating the following " (suspensive dots) *since the proceedings belong to this jurisdiction, the declaration of certainty about the fact that the judgment is final and has the force of res judicata must arise from the judicial authority rendering such judgment*"[32]. ----------------------------------------------------------

It is worth highlighting that the declaration of certainty about the fact that the judgment has the force of res judicata has been issued by the Court hearing the

---

[30] These two rulings which deem as duly made the notice of complaint to Chevron Corp. are also included in the Exhibit. ------------------------------------------------------------------------------
[31] According to Palacio, Lino E., *ob. cit.* Volume VII, pages 320/21.-----------------------------------
[32] According to Couture, Eduardo J., *Fundamentos del Derecho Procesal Civil*, Depalma, Bs. As., 1997.

proceedings, and that such declaration is included in the instrument whose specific contents and truthfulness we have referred to above when addressing the compliance with the requirements of article 3 a) under analysis and, in addition, in paragraph III.l. when dealing with article 2. g). -----------------------------------------

For these particular purposes, the explanatory judgment issued on January 13th, 2012 (Exhibit 5) and the two subsequent judgments rendered by that same Court on February 17th (Exhibit 7) and March 1st, 2012 (Exhibit 8) are worth mentioning. They are also hereto attached –with an apostille- to comply with the supporting documentation required by this item. --------------------------------------------------------

## IV. JURISDICTION, RELATIONSHIP WITH THE LOCAL VENUE AND FILING OF THE *EXEQUATUR* PROCEEDINGS ON THE PARTY'S OWN INITIATIVE --------------------------------------------------------------------------------------

a.- The action for the acknowledgment of a foreign judgment, the so-called *exequatur* proceedings, must be filed with the applicable judge of original jurisdiction (section 518 of the National Code of Procedure in Civil and Commercial Matters), according to the jurisdiction and venue pursuant to location and subject-matter, according to the provisions of section 5 of the National Code of Procedure in Civil and Commercial Matters, and the provisions of Decree-Law 1285/58, on the National Justice Organization.[33] --------------------------------------------------------------------------------

Section 43 of the above-mentioned Decree-Law 1285/58 sets forth that *"The national courts of original jurisdiction in civil matters of the City of Buenos Aires shall hear any cases governed by civil law which have not been expressly attributed to judges of other venue "*; then, it establishes as follows: *"Such courts shall also hear the following cases: [suspensive dots] b) Those where compensation for damages caused by illegal acts is claimed"*. --------------------------------------------------------------------------------

---

[33] According to Boggiano, *ob.cit.*, Volume I, page 490; id. Gozaíni, Osvaldo, *Código Procesal*, La Ley, 2002, Volume III, page 74; idem Palacio, Lino E., *Derecho Procesal Civil*, Abeledo- Perrot, Volume VII, page 327. This author adds the following: *"In addition, the federal courts can have jurisdiction when, pursuant to the applicable constitutional and legal regulations, they are able to hear a case based on the subject matter or the parties involved"*. In the case under analysis, after examining the background, it appears that neither of these variables defines the federal jurisdiction: the subject matter is the liability derived from illegal acts and the parties involved are legal entities organized for private purposes. -------------------------------------------------------------------------------------

Recent case law has also recognized the effectiveness of section 43 of Decree-Law 1285/58 –applied to the facts of actions filed abroad- for the purposes of attributing national jurisdiction in the acknowledgement of the judgment[34]. ------

It is true that, recently, the Supreme Court of Justice has confirmed the criterion specifying that the matters related to environmental protection must be heard by the local authorities corresponding to the affected jurisdiction[35]; however, such criterion is not applicable to this case, as the damages recognized in the judgment were caused outside the territory of the Republic –and the effects were not extended within the boundaries of our country- and, therefore, for the purposes of the legal precedents mentioned above, there are no local legal authorities that can be resorted to. On the other hand, there are no various jurisdictions involved (in the sense that damages affect two or more provinces) giving rise to the federal jurisdiction, according to the criterion adopted by the Supreme Court in that precedent[36]. --------------------------------------------

After offering the above explanations, it is worth noting that the judgment whose acknowledgment is sought makes it clear that the action is about the compensation for damages caused by the "illegal acts" for which defendant has civil liability due to its acts or omissions. Such is the subject-matter of the case. There are no contractual relationships of any kind between plaintiffs and defendant –an oil company-, nor are there any elements –either factual or legal- justifying any jurisdiction other than as specified by the applicable regulation (section 43 b. of Decree-Law 1285/58). --------------------------------------------------------

---

[34] According to the National Court of Appeals in Civil and Commercial Matters, Court Room II, *"Clarkson Hyde LLP c/ Otero Monsegur María Antonia s/ Exequatur"*, dated September 3rd, 2009. In this case, the action was filed with the federal court in civil and commercial matters in the first place; the court alleged lack of jurisdiction and sent the case to the national court in civil matters, which did not accept it and sent it to the national court in commercial matters, which did not accept the case either. Finally, the National Court of Appeals in Civil and Commercial Matters decided that the national court in civil matters was competent, since section 43 of decree-law 1285/58 specified that such jurisdiction was applicable given the subject-matter of the case (provision of professional services).

[35] According to the Supreme Court, *in re*, "Benzrihen Carlos Jorge y otro c/ Industrias Magromer Cueros y Pieles S.A.", dated September 21st, 2010. -------------------------------------------------------

[36] In the precedent quoted in a previous note –when referring to the Attorney General's arguments- the Supreme Court held as follows: "[suspensive dots] *it should be noted that the Supreme Court, based on various legal precedents, has established the criteria to be followed in order to determine the existence of the federal jurisdiction over the environmental subject-matter; first, the affected territory must be specified because, as prescribed by national lawmakers, the environmental damages must affect various jurisdictions (Judgment 327:3880; 329:2316), or the geographical area involved must extend beyond the provincial boundaries; i.e., it must comprise more than one jurisdiction of a state, province, City of Buenos Aires or more than one international jurisdiction, as the matter must refer to environmental issues shared by more than one jurisdiction (Judgment 330:4234; 331:1679)".* -------------------------

The foregoing evidences that Your Honor is competent as a National Judge of Original Jurisdiction in Civil Matters. This conclusion is confirmed by the provisions of section 7 of General Environmental Law No. 25675, which sets forth the jurisdiction of *"ordinary courts as applicable in terms of the territory, subject-matter or parties involved"*; section 32 of that law ratifies that *"The environmental legal jurisdiction will be that applicable according to ordinary regulations on jurisdiction".* ------------------

Finally, the fact that defendant is a commercial company does not alter the jurisdiction of national judges in civil matters, based on the regulations analyzed; as recently decided, the actions for damages caused by illegal acts are heard by national courts of original jurisdiction in civil matters of the City of Buenos Aires, as the capacity of the parties does not change the legal relationship giving rise to the case[37]. --------------------

b.- Now that the judgment is being enforced, it is worth remarking that in the original action **certain resolutions were issued which expressly involve assets held by the unsuccessful party, Chevron Corp., in the Republic of Argentina** (those resolutions, dated October 15th and 25th, 2012, were part of the letters rogatory -legalized with an apostille- included in the related proceedings). ------------------------

Based on this precedent, **the direct relationship between the case and the local jurisdiction is clear, thus supporting that this jurisdiction is competent to hear the case**. -------------------------------------------------------------------------------------------

Independently of the unsuccessful party's assets held in Argentina, the relationship with the local jurisdiction can also be explained from other multiple viewpoints. ------

c.- Also supporting the involvement of Your Honor or, more precisely, the modality of the petition upon which such jurisdiction is exercised, it should be noted that the request for the acknowledgment of a foreign judgment does not require that letters rogatory be issued by the foreign judge.-------------------------------------------------------------------------

Colombo- Kiper hold that the procedure established by sections 517 and following sections of the National Code of Procedure in Civil and Commercial Matters (suspensive dots) *is an autonomous procedure, independent from the judgment whose enforcement is sought"*[38]. -------------------------------------------------------------

---

[37] According to the National Court of Appeals in Civil Matters., "Proyecto del Atlántico S.A. c/ Rosetti Victor J. s/ daños y perjuicios s/ competencia", dated October 19th, 2011.
[38] According to Colombo- Kiper, *Código Procesal Civil y Comercial de la Nación- Anotado y comentado*, La Ley, Volume IV, page 579.-----------------------------------------------------------

CERT. M

Sentís Melendo emphasizes the same: *"It is an autonomous action. It is not subordinated to the action filed to obtain the judgment whose enforcement is sought or the judgment with respect to which the force of res judicata is intended in the country"*. The *autonomy* relates to the fact that the letters rogatory are unnecessary, since this case is not about "complying with" the order of a foreign judge, but about filing new proceedings with a different procedural purpose: examine whether that judgment may be compared to a final judgment rendered locally. This is why the **normal** and **typical** procedure to file any such proceedings is the "**action filed directly with the legal authorities who are competent to render the judgment**"[40]. ---------------------------

Similarly, when commenting on a judgment rendered by the Court of Appeals in Civil and Commercial Matters of Rosario, Ciuro Caldani held that the appropriate form to file an action for the acknowledgement and enforcement of a judgment is the party's request, whose "**direct presence**" in the proceedings, from a weighing viewpoint, **is consistent with the provision that the request must be made with the judge of original jurisdiction** (as set forth by section 518 of the National Code of Procedure in Civil and Commercial Matters) **and the importance of the resulting judgment.** As opposed to it, the letters rogatory is a necessary and adequate procedure with respect to notices, testimonies or other less important judicial "formalities"[41]. ----------------------

Furthermore, Boggiano refers to the importance in this kind of proceedings of the "party's request" and expresses that the claim "(suspensive dots) *may be filed by the interested party or by means of letters rogatory*"[42]-------------------------------------------.

Palacio is also clear when indicating that this action "...*may be directly requested by the interested party, by letters rogatory or by diplomatic intervention*"[43].--------------

---

[39] According to Sentís Melendo. S. *La sentencia extranjera (Exequatur)*. Ediciones Jurídicas Europa-América, Bs.As., 1958, page 149.------------------------------------------------------------------------

[40] According to Sentís Melendo, S., *ob.cit,* page 127; at the beginning of chapter V, exclusively devoted to the analysis of this matter, the author says: *"Exequatur proceedings may be filed in three ways: an action filed directly with the legal authorities competent to render such judgment; the diplomatic intervention and letters rogatory.* **The normal procedure is the one mentioned in the first place**" (emphasis is added). -------------------------------------------------------------------------

[41] According to Guro Caidani, Miguel A., *Un caso de Derecho Procesal Internacional Privado,* in ED 112-411 [Commentary to the judgment "Sociedad Anónima Comercial e Industrial c/ Industrias Walter s/ demanda de ejecución de sentencia- Exhorto de Santa Cruz de la Sierra, Bolivia"]. The judgment in itself is not interesting from a legal viewpoint; it refers to an anomalous proceeding which, in the author's viewpoint, arose from "(suspensive dots) *the mistaken use of the letters rogatory by the Bolivian judge"* who *"to request the enforcement of a judgment, generated the confusion that is now trying to be solved by the two legal jurisdictions in Rosario".* --------------------------------------------------------

[42] According to Boggiano, *ob.cit.,* Volume I, page 490.-----------------------------------------------

The issue was discussed in the already quoted legal precedent "Cri Holding", where defendant, to reject the acknowledgment, unsuccessfully argued before the Court the alleged irregularity of the proceedings because no letters rogatory had been issued.---

The Attorney General, before the Court of Appeals in Commercial Matters, issued the following opinion: ---------------------------------------------------------------------------

*"The arguments referred to the irregular proceedings must also be rejected, as exequatur proceedings may be filed by the interested party and by means of letters rogatory, as understood by the applicable books of authority (according to Boggiano). In this case, although no letters rogatory have been issued by the foreign court, the interested party has made the request (suspensive dots)"*[43]. --------------------------------

Thereafter, the Court Room rendered a similar judgment, as follows: *"Finally, exequatur proceedings have been filed by the interested party and, therefore, the fact that they have not been initiated by means of letters rogatory does not prevent the proceedings from being heard"*[45]. -------------------------------------------------

## V. ADDITIONAL CONSIDERATIONS ABOUT THE FEASIBILITY OF THE EXEQUATUR PROCEEDINGS AGAINST CHEVRON CORPORATION. -----

At a given time, Chevron was granted by a District Court of New York, where Judge Lewis Kaplan sits, an unusual injunction having universal scope by which the Judge prohibited that the judgment rendered by the Ecuadorian courts be enforced in any country around the world. This injunction with a global scope was granted on March 7th, 2011, i.e. a few weeks after the court of original jurisdiction pronounced judgment. As it is noted without any further analysis, the injunction issued by Judge Kaplan implied a true legal incoherence never seen before. ----------------------------------------

This injunction, as expected if analyzed by using a bit of common sense, did not last long, as on September 19th, 2011 the Court of Appeals of the Second Circuit of New York, first **completely revoked it** in summary proceedings (the related decision is hereto attached, legalized with an apostille and translated –with the corresponding

---

[43] According to Opinion No. 113114 issued by the Attorney General's Office before the National Court of Appeals in Commercial Matters of the City of Buenos Aires, on September 14, 2006, signed by the then Attorney General Alejandra Gils Carbó. -----------------------------------------------------------

[44] According to Palacio, *ob.cit.*, Volume VII, page 327. -------------------------------------------

[45] According to the National Court of Appeals in Commercial Matters., Court Room E, "Cri Holding Inc. c/ Compañía Argentina de Comodoro Rivadavia", dated September 22, 2006. --------------------------

CERT. ME

legalization-, as **Exhibit 12**), and then <u>severely dismissed it from a legal and argumentative viewpoint,</u> presenting its grounds for the reconsideration on January 26th, 2012 (such decision is also attached, legalized with an apostille and translated –with the corresponding legalization-, as **Exhibit 13**). ---------------------------------------

<u>Consequently, the decision preventing plaintiffs from seeking the enforcement of the judgment outside Ecuador is no longer effective.</u> ------------------------------------

Furthermore, even if that decision were effective, this action for the acknowledgment of the judgment may nonetheless be filed, to the extent **a US Judge cannot order a Judge from another country how to proceed** upon any such action. <u>The grounds dated January 26th, 2012 are conclusive on this matter.</u> ------------------------------------

In addition to the scandalous forum shopping undertaken by Chevron in USA, it is worth noting, because it highlights the importance of the judgment, that the Court of Appeals of the Second Circuit of New York has been hearing the case in that country as from the first stage of the proceedings (1993-2002), <u>when Chevron successfully alleged that the adequate jurisdiction to hear the environmental action, originally filed by plaintiffs in New York, was the Ecuadorian jurisdiction, which offered –as timely argued and explained by Chevron by providing numerous *Opinions* issued by Ecuadorian legal authorities- a qualified and transparent legal system</u> (the decision issued by that Court of Appeals on August 16th, 2002, effectively sustaining Chevron's petition and ordering that the proceedings be heard in Ecuador, is hereto attached as **Exhibit 14**, legalized with an apostille and translated, with the corresponding legalization). ------------------------------------------------------------------

For these purposes, the Court of Appeals required from Chevron certain waivers referred to the statute of limitations (in order that the 9-year term during which the proceedings had been heard in New York may not affect the effective term of plaintiffs' action), as well as a formal and express commitment to observe the judgment to be eventually rendered by the Ecuadorian court. --------------------------------------------

<u>Accordingly, Chevron provided the judges of its country with a formal and express commitment to observe the judgment to be eventually rendered by the Ecuadorian judges.</u> ----------------------------------------------------------------------------

CERT. M

Typical of Chevron, it later on tried to ignore that commitment and the Court of Appeals of the Second Circuit of New York had to **"remind" defendant of the effectiveness of such commitment**. ---------------------------------------------------------

In a judgment rendered on March 17th, 2011 (hereto attached as **Exhibit 15**, legalized with an apostille and translated, with the corresponding legalization), the Court of Appeals stated the following: ---------------------------------------------------------

*"Chevron Corporation alleges, without referring to the relevant case law, that it is not bound by the commitments made by its former companies Texaco and Chevron Texaco Inc. However, when seeking to obtain the confirmation of the dismissal of the district court based on forum non-convenience grounds, Chevron Texaco's attorneys appeared in this court and reconfirmed the commitments made by Texaco to ensure the dismissal of plaintiffs' action. When doing so, Chevron Texaco became bound by these commitments. In 2005, Chevron Texaco changed its name from 'Texaco' to Chevron Corporation, its original name. It cannot be inferred from the record before us that the change in its name may have any effect on Chevron Texaco's legal obligations. Consequently, Chevron Corporation is liable for the commitments on which the district court based its decision to dismiss Plaintiffs' action".* ---------------------------------------------------------

By means of the comparison of documents in **Exhibit 15**, Your Honor may note that the statements transcribed above have been made by the Court of Appeals to provide an explanation when it mentioned, under *Background*, that "*Texaco also agreed to observe any judgment benefitting Defendants*". ---------------------------------------------------------

The considerations made in this chapter offer a referential and explanatory framework regarding the background of this exequatur action. They describe the relevant facts showing Chevron's strategy aimed at systematically *disregarding* any judgments not favoring it, wherever rendered. ---------------------------------------------------------

## VI. GROUPING OF ACTIONS. ---------------------------------------------------------

We hereby request that these exequatur proceedings and action for the acknowledgment of the validity of a foreign judgment be grouped with the case "*Aguinda Salazar María c/ Chevron Corporation s/ Medidas precautorias*" (Record 91814/2012). The latter proceedings were initially filed in Court No. **61** of this jurisdiction; however, after defendant's challenge, they were sent to Court No. **98**. Both

courts claimed to have no jurisdiction and, therefore, the case was sent to the Court of Appeals. -----------------------------------------------------------------------------------------

Notwithstanding which is the court finally assigned by the Court of Appeals to hear those proceedings, the truth is that based on procedural order and grouping of actions, both proceedings (*Injunctions* and *exequatur)* must be heard together, given that they refer to different stages of the same process.----------------------------------------------------

Section 49 of the Regulations applicable to the jurisdiction thus stipulates when establishing that in case any previous action has been filed to obtain an injunction, the main proceedings must be filed in the court granting any such injunction. --------------

## VII. COURT FEES. ---------------------------------------------------------------------------

Plaintiffs are exempt in their country of origin from the payment of any expenses, fees, surety bonds, etc., as specified in the letters rogatory issued in the related proceedings "*Aguinda Salazar María c/ Chevron Corporation s/ Medidas precautorias"* (Record 91814/2012), initially filed in Court No. 61 of the jurisdiction. ----------------------------

In its judgment rendered on November 6th, 2012, the Judge sitting in that Court took into account the exemption from those items. ------------------------------------------------

It is worth remarking that, in this regard, article 5 of the Convention –of a higher hierarchy than the laws of our legal system- makes it clear: a declaration in forma pauperis recognized in the State of origin of the judgment shall be recognized in the State of destination. Accordingly, **if it is evidenced that in the country of origin plaintiffs are exempt from the payment of court fees, legal costs and attorney's fees, guaranties or surety bonds and/or any other expenses related to the proceedings**, the court fees required by our legal system pursuant to Act No. 23898 may not be demanded. ---------------------------------------------------------------------------

In the unusual case that the terms applicable in the country of origin changed, or if due to any cause arising after this filing plaintiffs were required to pay the court fees pursuant to Act No. 23898, the sum that would be payable based on the characteristics of the action pursued is that set forth by section 6 of that Act for the cases where the amount is not determined. ---------------------------------------------------------------------------

In the precedent "Reef Exploration" referred to above, it was established that in the proceedings for the acknowledgment of a foreign judgment **"the amount was not determined"**. When that specific item of the judgment was appealed, the Supreme

Court --making reference to the Attorney General's grounds- **rejected** the interested parties' claim aimed at assigning to the proceedings the amount of the judgment whose acknowledgement was being sought[46]. ------------------------------------------------------------

## VIII. FEDERAL QUESTION. ----------------------------------------------------------------

In case the claims of this party were fully or partially dismissed, the "Federal Question" is raised in order to resort to the Supreme Court under the provisions of section 14, Act No. 48 and other applicable regulations. --------------------------------------------------------

The Supreme Court may hear the case when the interpretation and application of international treaties is at stake and the decision adopted by the judges hearing the proceedings is contrary to the rights on which the party based its legal grounds pursuant to those laws[47][48]. ----------------------------------------------------------------------------------

## IX. DOCUMENTARY EVIDENCE. ----------------------------------------------------

In every case, the documents were legalized with an *Apostille* under the Hague Convention (1961). ---------------------------------------------------------------------------------

**Exhibit 1**: Copy of the power of attorney for judicial matters, whose original is enclosed to the proceedings *"Aguinda Salazar María c/ Chevron Corporation s/ Medidas precautorias"* (Record 91814/2012).----------------------------------------------

**Exhibit 2**: Judgment rendered by the court of original jurisdiction on February 14th, 2011. -----------------------------------------------------------------------------------------------

**Exhibit 3**: Explanatory judgment issued by the court of original jurisdiction on March 4th, 2011. -----------------------------------------------------------------------------------------------

---

[46] According to the judgment rendered by the Supreme Court on February 21st, 2006 [LL 2006-C, 429). It should be noted that even though the proceedings were classified as having an "undetermined amount" in order to fix the attorney's fees, under the provisions of section 6 a) of Act No. 21839, this classification is also applicable pursuant to Court Fees Act No. 23898. The same proceedings cannot have an "undetermined amount" for the purposes of fixing the attorney's fees and a fixed sum for the purposes of calculating the court fees. In this sense, the Federal Court of Appeals of Mar del Plata, in the proceedings *"Far Eastern Shipping Company c/ Arhenpez S.A."*, dated December 4th, 2009, held that "....*the Supreme Court has sustained the declaratory nature of the*[acknowledgment] *proceedings, indicating that the conversion to an execution instrument for it to be admitted as such in our territory through the exequatur does not entail any monetary discussion"* (emphasis added). -----------------------------------------------
This link shows a like opinion by extending the conclusion of the judgment "Reef" to the court fees: http://f.marval.com.ar/Publicaciones/MarvalNews/ArticuloMN/tabid/96/language/es-AR/Default.aspx?I temID=786 ---------------------------------------------------------------------------
[47] According to the Supreme Court, "Vargas Lerena Alvaro c/ Cadena País Producciones Publicitarias S.A. s/ ejecutivo", dated March 2nd, 2011; Judgments 318:2639; 315:1848; 312:152, among others.
[48] According to the Supreme Court, *in re,* "Riopar S.R.L. c/ Transportes Fluviales Argenrio S.A." (R-165.XXXII), dated October 15th, 1996 [ED 171-539]. ----------------------------------------

CERT. MERR

**Exhibit 4**: Judgment rendered by the Single Court Room of the Provincial Court of Sucumbíos on January 3rd, 2012.------------------------------------------------------------

**Exhibit 5**: Judgment rendered by the Single Court Room of the Provincial Court of Sucumbíos on January 13th, 2012. ------------------------------------------------------------

**Exhibit 6**: Complete minutes of the hearing at which Chevron answered the complaint.

**Exhibit 7**: Judgment rendered by the Single Court Room of the Provincial Court of Sucumbíos on February 17th, 2012.------------------------------------------------------------

**Exhibit 8**: Judgment rendered by the Single Court Room of the Provincial Court of Sucumbíos on March 1st, 2012.------            --------------------------------------------

**Exhibit 9**: Evidence that notice of the complaint has been formally served. -----------

**Exhibit 10**: Appeal of the final judgment[49].------------------------------------------------

**Exhibit 11**: Copy of the judgment evidencing that plaintiffs incur no costs in connection with these proceedings, as well as such parties' *exemption* from expenses (for example, fees, surety bonds, etc.). The original is included in the proceedings *"Aguinda Salazar María c/ Chevron Corporation s/ Medidas precautorias"* (Record 91814/2012), as that resolution was an integral part of the letters rogatory served therein. ------------------------------------------------------------------------------------

**Exhibit 12**: Judgment legalized with an apostille and translated -with the corresponding legalization- rendered on September 19th, 2011 by the Court of Appeals of the Second Circuit of New York.------------------------------------------------------------

**Exhibit 13**: Judgment legalized with an apostille and translated -with the corresponding legalization- of the presentation of arguments dated January 26th, 2012 rendered by the Court of Appeals of the Second Circuit of New York, regarding the decision dated September 19th, 2012. ------------------------------------------------------

**Exhibit 14**: Judgment legalized with an apostille and translated -with the corresponding legalization- rendered on August 16th, 2002 by the Court of Appeals of the Second Circuit of New York. ------------------------------------------------------------

**Exhibit 15**: Judgment legalized with an apostille and translated -with the corresponding legalization- rendered on March 17th, 2011 by the by the Court of Appeals of the Second Circuit of New York. -----------------------------------------------

CERT. ME

[49] This pleading includes the complete volumes 2067 and 2068; and starts in volume 2066 composing Exhibit 3. --------------------------------------------------------------------------------

All the evidence of the related proceedings *"Aguinda Salazar Maria c/ Chevron Corporation s/ Medidas precautorias"* (Record 91814/2012), as well as the evidence of the original action, as applicable, is also offered as documentary evidence. -------------

X. <u>AUTHORIZATIONS</u>. ------------------------------------------------------------------

The attorneys Leandro J. Caputo (Volume 64 Folio 827), Matín Saldico (Volume 103 Folio 337) and Matías Mendioroz (Volume 100 Folio 704), and Agustín Brugo (Identity Document 32173433), María Belén Capalbo (Identity Document 34384041), Matías Medici (Identity Document 35140218); Luciano Litre Martínez (Identity Document 34211514) and Juan P. Pascucci (Identity Document 34564537) are authorized to make authenticated copies of these proceedings. ----------------------------

XI. <u>PRAYER FOR RELIEF</u>. ---------------------------------------------------------

Therefore, we request Your Honor: -------------------------------------------------------

1ª) That I be considered a party and that the domicile above be deemed as established.

2ª) Prior service of process pursuant to law, that a judgment be rendered for the acknowledgment of the decision subject matter off this complaint, and that such judgment be deemed equivalent to a local judgment, for all purposes. -------------------

Respectfully submitted, -------------------------------------------------------------------

[Seals and signatures of the following attorneys: ENRIQUE BRUCHOU, RODOLFO A. RAMÍREZ, CARLOS MARÍA ROTMAN, MARTÍN BERETERVIDE]------------

-------------------------------------------------------------------------------------------

This is a true translation - in 26 pages- from Spanish into English of the document I had before me and to which I refer in the City of Buenos Aires, on this 29th day of the month of January of the year 2013. ----------------------------------------------------------------

(Solely for legalization purposes, there follows the Spanish version of the closing statement above) ----------------------------------------------------------------------------

Es traducción fiel – en 26 carillas- del idioma castellano al idioma inglés del documento que tuve a la vista y al cual me remito en la Ciudad de Buenos Aires, a los 29 días del mes de enero del año 2013. -------------------------------------------------------------------

COLEGIO DE TRADUCTORES PUBLICOS
DE LA CIUDAD DE BUENOS AIRES
Corresponde a la Legalización
Nº 6298/13
SERGIO ALEJANDRO IERVASI

PAULA GEROLA
TRADUCTORA PÚBLICA
IDIOMA INGLÉS
Mat. Tº XIV Fº 388 Capital Federal
Inscrip. C.T.T.C.B.A. Nº 5073

CERT. MERF

26



CERT. MERRILL VER: JD

[stamp] NATIONAL CIVIL COURT NO. 61– FEDERAL CAPITAL

# SWORN TRANSLATORS' ASSOCIATION
# OF THE CITY OF BUENOS AIRES
### REPUBLIC OF ARGENTINA
### LAW 20,305

# <u>Certificate of Authenticity</u>

The *SWORN TRANSLATORS' ASSOCIATION OF THE CITY OF BUENOS AIRES*, by the right vested in it by article 10(d) of Law 20,305, certifies only that the signature and seal that appear on the attached translation match those of Public Translator GEROLA, PAULA

registered at this institution in Volume 14, page 388, in the ENGLISH language

Certificate of Authenticity Number: 6298

Buenos Aires, 2/1/2013

## <u>THIS CERTIFICATE OF AUTHENTICITY WILL NOT BE CONSIDERED VALID WITHOUT THE CORRESPONDING CONTROL STAMP ON THE LAST PAGE OF THE ATTACHED TRANSLATION</u>

**Internal Control:** 1494526298

[bar code]

Av. Corrientes 1834 – C1045AAN – Autonomous City of Buenos Aires – 4373-7173 and rotary lines

CERT. MERRILL VER: JD

THE *COLEGIO DE TRADUCTORES PÚBLICOS DE LA CIUDAD DE BUENOS AIRES* (Sworn translators association of the city of Buenos Aires) pursuant to 20305 act, section 10, subsection d, hereby certifies that the signature and the seal on the translation attached hereto match the signature and seal of the Sworn Translator (Traductor Público) in our files.

THIS CERTIFICATION IS NOT VALID WITHOUT THE PERTINENT CONTROL STAMP ON THE LAST PAGE OF THE TRANSLATION ATTACHED HERETO.

Vu par le *COLEGIO DE TRADUCTORES PÚBLICOS DE LA CIUDAD DE BUENOS AIRES* (Ordre de Traducteurs Officiels de la ville de Buenos Aires), en vertu des attributions que lui ont été accordées par l'article 10, alinéa d) de la Loi nº 20.305, pour la seule légalisation matérielle de la signature et du sceau du Traductor Público (Traducteur Officiel) apposés sur la traduction du document ci-joint, qui sont conformes à ceux déposés aux archives de cette Institution.

LE TIMBRE APPOSÉ SUR LA DERNIÈRE PAGE DE LA TRADUCTION FERA PREUVE DE LA VALIDITÉ DE LA LÉGALISATION.

Con la presente il *COLEGIO DE TRADUCTORES PÚBLICOS DE LA CIUDAD DE BUENOS AIRES* (Collegio dei Traduttori Giurati della Città di Buenos Aires) ai sensi della facoltà conferitagli dall'articolo 10, comma d), della Legge 20.305, CERTIFICA, esclusivamente, la firma ed il timbro del Traductor Público (Traduttore Giurato), apposti in calce alla qui unita traduzione, in conformità alla firma ed al timbro depositati nei propri registri.

LA PRESENTE LEGALIZZAZIONE SARÀ PRIVA DI VALIDITÀ OVE NON VENGA TIMBRATA NELL' ULTIMO FOGLIO DELLA TRADUZIONE.

Através da presente, o *COLEGIO DE TRADUCTORES PÚBLICOS DE LA CIUDAD DE BUENOS AIRES* (Colégio de Tradutores Públicos da Cidade de Buenos Aires), no uso de suas atribuições, de conformidade com o artigo 10, alínea "d", da Lei 20.305, certifica unicamente que a assinatura e o carimbo do Traductor Público (Tradutor Público) que subscreve a tradução anexa conferem com a assinatura e o carimbo arquivados nos registros desta instituição.

A PRESENTE LEGALIZAÇÃO SÓ SERÁ CONSIDERADA VÁLIDA COM A CORRESPONDENTE CHANCELA MECÂNICA APOSTA NA ÚLTIMA FOLHA DA TRADUÇÃO

BEGLAUBIGUNG. Der *COLEGIO DE TRADUCTORES PÚBLICOS DE LA CIUDAD DE BUENOS AIRES* (Kammer der Vereidigten Übersetzer der Stadt Buenos Aires), kraft der Befugnisse, die ihr nach Artikel 10, Abs.d) des Gesetzes 20.305 zustehen, bescheinigt hiermit lediglich die Übereinstimmung der Unterschrift und des Siegelabdruckes auf der beigefügten Übersetzung mit der entsprechenden Unterschrift und dem Siegelabdruck des Traductor Público (VereidigtenÜbersetzers), die in den Registern dieser Institution hinterlegt worden sind.

DIESE   BEGLAUBIGUNG   IST   NICHT   GÜLTIG   OHNE   DEN   ENTSPRECHENDEN GEBÜHRENSTEMPEL AUF DEM LETZTEN BLATT DER BEIGEFÜGTEN ÜBERSETZUNG.

CERT. N

# MERRILL CORPORATION



Merrill Communications LLC

225 Varick Street
New York, NY 10014 • (212) 620-5600

State of New York )
Estado de Nueva York )
                            )           ss:
                            )       a saber:
County of New York )
Condado de Nueva York )

## Certificate of Accuracy
## Certificado de Exactitud

This is to certify that the attached translation is, to the best of our knowledge and belief, a
true and accurate translation from Spanish into English of the attached document.

Por el presente certifico que la traducción adjunta es, según mi leal saber y entender,
traducción fiel y completa del idioma español al idioma inglés del documento adjunto.

Dated: December 23, 2013
Fecha: 23 de diciembre 2013

Kate Alexander
Project Manager – Legal Translations
Merrill Brink International/Merrill Corporation

_____[firmado]_____
Kate Alexander
Gerente de Proyecto – Traducciones Legales
Merrill Brink International/Merrill Corporation

Sworn to and signed before
Jurado y firmado ante
Me, this ____23rd____ day of
mí, a los ____23____ días del
____December____ 2013
mes de ___diciembre___ de 2013

ROBERT J. MAZZA
Notary Public, State of New York
No. 01MA5057911
Qualified in Kings County
Commission Expires April 1, 2014

Notary Public
Notario Público

[firmado]
[sello]

OFFICES IN MAJOR CITIES THROUGHOUT THE WORLD



# COPIA DEL ESCRITO DE DEMANDA

"AGUINDA SALAZAR MARÍA Y OTROS C/ CHEVRON CORPORATION S/ EXEQUÁTUR Y RECONOCIMIENTO DE SENTENCIA EXTRANJERA"- 97.260/12- JUZGADO NACIONAL DE PRIMERA INSTANCIA EN LO CIIVL 61 SECRETARÍA ÚNICA.

**SE PRESENTA. PROMUEVE EXEQUÁTUR. DENUNCIA CONEXIDAD.**

<u>Sr. Juez Nacional en lo Civil</u>:

Enrique Bruchou (T° 41 F° 928), en mi carácter de apoderado de los actores, cuyo domicilio legal se denuncia en la calle José Manuel Abascal E 12-79 y Portete de la ciudad de Quito, República del Ecuador, con el patrocinio de **Carlos María Rotman** (T° 30 F° 544), **Rodolfo A. Ramírez** (T° 7 F° 766) y **Martín Beretervide** (T° 81 F° 927), constituyendo todos <u>domicilio procesal a los fines del presente en la calle Ing. Butty 275 piso 12, de la Ciudad Autónoma de Buenos Aires</u>, nos presentamos a V.S. y respetuosamente decimos:

## I- PERSONERÍA.-

Como **Anexo 1** a esta demanda se acompaña copia del poder conferido por los demandantes a los suscriptos para promover y seguir la presente acción. Sin perjuicio de que se presta juramento de ley sobre su vigencia y autenticidad, se aclara que el original de dicho instrumento de poder –debidamente *apostillado* según la normativa internacional aplicable- se halla agregado en los autos conexos *"Aguinda Salazar María c/ Chevron Corporation s/ Medidas precautorias"* (Expte. 91.814/2012).

El poder fue otorgado en los términos de la *"Convención Interamericana sobre régimen legal de poderes para ser utilizados en el extranjero"*[1], adoptada en el marco de la Primera Conferencia Interamericana de Derecho Internacional Privado (**CIDIP I**) celebrada en el año 1975 en la República de Panamá.

---

[1] Aprobada en nuestro país por ley 22.550 [ADLA XLII- A, pág. 46; B.O. 20/10/87]. En el Ecuador dicho instrumento fue aprobado por Decreto Supremo N° 472, publicado en el Registro Oficial 827 del 18 de junio de 1975.

1

## II- OBJETO.-

En nombre de nuestros representados venimos en los términos de lo normado por la "*Convención Interamericana sobre Eficacia Extraterritorial de Sentencias y Laudos Arbitrales Extranjeros*" –suscripta y ratificada tanto por la Argentina como por el Ecuador[2]- a promover ante V.S. acción de *reconocimiento* de sentencia extranjera contra **Chevron Corporation** (en adelante, "Chevron Corp." o "Chevron"), respecto del fallo dictado por las autoridades judiciales de la República del Ecuador correspondientes al Departamento Judicial de Sucumbíos, en los autos seguidos por "*Aguinda María y otros*" contra "*Chevron Corporation*", identificado en los registros locales con la numeración 002- 2003 (en la instancia de trámite) y 2011-0106 (ante la Sala Única de la Corte Provincial de Sucumbíos).

Se denuncia como domicilio legal de la demandada, el sito en **6001 Bollinger Canyon Road, San Ramón, California, Estados Unidos de América.**

La demandada posee bienes en la República Argentina, al punto de que ella misma ha declarado ante las autoridades regulatorias de su país, los Estados Unidos de América, ser propietaria del 100% de Chevron Argentina S.R.L. Algunos de sus activos aquí, incluso, ya han sido objeto de embargo en los autos conexos identificados más arriba (Expte. 91.814/2012). La existencia de bienes en cabeza de Chevron Corp. en la República Argentina, además, es cuestión que fue ya planteada y decidida –incluso con audiencia de Chevron Corp. en instancia de revocatoria, luego desestimada- por la autoridad judicial de origen, esto es, el Juez del Ecuador actualmente a cargo del procedimiento. Todo ello surge de la documentación original acompañada en los autos de *Medidas precautorias*.

En el marco del pleito mencionado, la demandada fue condenada a abonar la suma de dólares estadounidenses diecinueve mil veintiún millones

---

[2] Aprobada en nuestro país por ley 22.921 [ADLA XLIII-D, pág. 3819; B.O. 27/9/83]. En el Ecuador este instrumento internacional se aprobó por Decreto Ejecutivo N° 853, publicado en Registro Oficial 240 del 11 de mayo de 1982.

quinientos cincuenta y dos mil (U\$S 19.021.552.000) —según fue liquidado por resoluciones de fecha 23 de julio de 2012 y 30 de julio de 2012- como consecuencia de los **daños medioambientales** causados en la Amazonía ecuatoriana en ocasión de las actividades petroleras de su antecesora, Texaco Inc., corporación esta última con la que Chevron Corp. se fusionó en el año 2001.

La sentencia de primera instancia fue dictada el día <u>14 de febrero de 2011</u> <u>(Anexo 2)</u>, y aclarada por la resolución del <u>4 de marzo de 2011 (Anexo 3)</u>.

En tanto que la sentencia de la Sala Única de la Corte Provincial de Sucumbíos, que la ratificó en forma íntegra, fue pronunciada el día <u>3 de enero de</u> <u>2012 (Anexo 4)</u>, y complementada por su ampliación del día <u>13 de enero de</u> <u>2012 (Anexo 5)</u>.

Todos los fallos aludidos se acompañan debidamente apostillados en los términos reglados por la "***Convención de La Haya sobre supresión de legalizaciones***" (1961).

Cabe formular la siguiente precisión: cuando, en el curso del presente escrito —y salvo indicación específica en contrario- se haga referencia a "*la sentencia*" cuyo reconocimiento se pide, quedan incluidos en dicha alocución los cuatro pronunciamientos recién indicados, que a estos fines deben entenderse como una unidad.

## III- LA "CONVENCIÓN SOBRE EFICACIA EXTRATERRITORIAL DE SENTENCIAS EXTRANJERAS".-

### III.1. EL CUMPLIMIENTO DE TODOS LOS REQUISITOS DEL ART. 2 DE LA CONVENCIÓN.

A continuación, se atenderá separadamente el cumplimiento de cada uno de los incisos del art. 2 de la Convención.

### (i) FORMALIDADES (Inc. a)

*"Que vengan revestidos de las formalidades externas necesarias para que sean considerados auténticos en el Estado de donde proceden"*.

Desde que los documentos vienen apostillados por la autoridad del Estado de donde proceden, existe total certeza acerca de su consideración como "**auténticos**" en el Ecuador.

La propia Convención de La Haya sobre supresión de legalizaciones regla en su art. 5 que *"Debidamente llena, la apostilla certificará la autenticidad de la firma, la calidad de la persona que firma el documento y, cuando proceda, la identidad del sello o timbre que porta el documento"*.

### (ii) TRADUCCIÓN (Inc. b)

*"Que la sentencia, laudo y resolución jurisdiccional y los documentos anexos que fueren necesarios según la presente Convención, estén debidamente traducidos al idioma oficial del Estado donde deban surtir efecto"*.

Este punto, V.S., no requiere de ninguna precisión, toda vez que los documentos cuyo reconocimiento se postula han sido dictados en el idioma castellano, que es también el idioma oficial de nuestro país.

La traducción indicada en el inciso deviene, pues, inaplicable al caso.

### (iii) LEGALIZACIÓN (Inc. c)

*"Que se presenten debidamente legalizados de acuerdo con la ley del Estado en donde deban surtir efecto"*.

Tanto la Argentina como el Ecuador han suscripto y ratificado la Convención de La Haya sobre supresión de legalizaciones (1961).

4

Y cuando concurre dicha circunstancia –ratificación por ambos países involucrados de la mencionada Convención de La Haya-, *"la legalización por la Cancillería argentina no resulta exigible"*[3].

A tal punto no es necesario este recaudo, que la propia Convención estipula en su art. 9 que *"Cada Estado contratante tomará las medidas necesarias para evitar que sus agentes diplomáticos o consulares efectúen legalizaciones en los casos en los que la presente Convención prevé su exoneración"*.

Asimismo, en el art. 5 de la propia Convención de La Haya (1961) se prevé que *"Debidamente llena, la apostilla certificará la autenticidad de la firma, la calidad de la persona que firma el documento y, cuando proceda, la identidad del sello o timbre que porta el documento"*.

Por ende, basta con la *Apostilla* –debidamente colocada en la sentencia cuyo reconocimiento se postula- para tener por satisfecho este recaudo.

### (iv) COMPETENCIA INTERNACIONAL (Inc. d)

*"Que el juez o tribunal sentenciador tenga competencia en la esfera internacional para conocer y juzgar del asunto de acuerdo con la ley del Estado donde deban surtir efecto"*.

Por "competencia en la esfera internacional" se entiende "... *la competencia del juez que dictó la sentencia examinada por el juez que debe reconocerla o ejecutarla"*[4].

---

[3] Cfr. CNCom., Sala E, "Cri Holding Inc. c/ Compañía Argentina de Comodoro Rivadavia", del 22/09/06.

[4] Cfr. Weinberg de Roca, Inés M., *Competencia Internacional y Ejecución de Sentencias Extranjeras*, Astrea, 1994, pág. 57. Distingue la autora entre competencia internacional "directa" e "indirecta"; en el primer caso hablamos de la facultad de un Estado de declararse competente y juzgar determinadas controversias con elementos extranjeros: es la competencia de un juez para dictar la sentencia en un caso internacional; en el segundo caso ("indirecta") hablamos de la facultad de un juez, no ya para dictarla, sino para ejecutar la sentencia. Por eso es que todo lo relacionado al exequátur o reconocimiento y ejecución de sentencias extranjeras corresponde a este último campo de la competencia internacional "indirecta". Puesto en palabras de Goldschmidt, la jurisdicción indirecta *"protege la propia jurisdicción contra la invasión efectuada por la extranjera"* (cfr. Goldschmidt W., *Derecho Internacional Privado*, Abeledo Perrot, 2009, pág. 998.

5

Bien que refiriéndose al modelo español sobre el cual reflexionan, los conceptos de Fernández Rozas- Sánchez Lorenzo resultan *mutatis mutandi* aplicables a la situación jurídica argentina frente a este requisito, y aclaran el concepto en sus aspectos fundamentales:

"*La competencia judicial internacional es sustancialmente diversa de la competencia judicial interna. En cada sistema estatal existe una pluralidad de órganos investidos de jurisdicción que se reparten el conocimiento de los diversos supuestos litigiosos merced a unos criterios que se encuadran en la noción de ´competencia´ [...] La competencia judicial internacional se sitúa en el plano lógico anterior a la competencia judicial interna, pues los conflictos de competencia interna sólo tienen sentido cuando los órganos jurisdiccionales españoles son competentes internacionalmente. Por otra parte, los conflictos relativos a la competencia judicial interna y a la competencia judicial internacional presentan una naturaleza muy dispar: en el plano interno, la solución de dichos conflictos no se encuentra mediatizada de forma relevante por los derechos fundamentales a la tutela judicial efectiva y a no quedar en indefensión, al menos en igual medida que los conflictos relativos a la competencia judicial internacional. En estos últimos, con carácter general, la falta de competencia de los tribunales españoles no garantiza el conocimiento por los órganos jurisdiccionales de otros Estados, por lo que la tutela judicial efectiva se erige en un valor fundamental de la reglamentación*"[5].*

Por otro lado, "*El control de la competencia judicial internacional es algo general establecido en casi todos los ordenamientos, su finalidad estará en la defensa de las competencias exclusivas del Estado requerido y en la exclusión de los foros exorbitantes del Estado de origen*"[6].*

Del resultado de ese examen dependerá que el Juez del país en el que se solicita el reconocimiento se asuma o no, a su vez, competente para intervenir en el juicio de *exequátur*.

---

[5] Cfr. José Carlos Fernández Rozas- Sixto Sánchez Lorenzo, *Derecho Internacional Privado*, Civitas, Madrid, 1999, pág. 80/ 81.
[6] Cfr. Feuillade, Milton C., *La Sentencia Extranjera*, Ed. Ábaco, Buenos Aires, 2008, pág. 137.

El primer extremo sobre el que es necesario adquirir certeza es que el Juez foráneo no haya invadido una jurisdicción que perteneciera **EXCLUSIVAMENTE** a los jueces argentinos.

En este sentido, para realzar la importancia de este examen, se ha dicho que "*Lo único que puede importar a nuestra ley es que no se reconozcan las sentencias de los jueces incompetentes por ser competentes los jueces nacionales*"[7].

Goldschmidt, por su parte, concluye que "*Para que haya tal invasión, es preciso que la usurpación de nuestra jurisdicción de parte de la extranjera viole nuestro orden público internacional procesal. No basta que nuestra jurisdicción haya sido única, debe haber sido exclusiva*"[8].

Los antecedentes fácticos puestos de relieve en el Capítulo III bastan para brindar al interrogante una respuesta del todo elocuente.

**En el caso bajo análisis, es obvio que ningún juez argentino contaba con jurisdiccción internacional para conocer en el reclamo de los habitantes de la Amazonía ecuatoriana contra la petrolera estadounidense causante de esos estragos** (Texaco Inc. primero; luego Chevron Corp. a partir de la fusión operada en el año 2001).

No hay, pues, en nuestro caso, chance ninguna de que la sentencia cuyo reconocimiento se postula hubiera invadido jurisdicción exclusiva de un juez argentino.

---

[7] Cfr. Cortés, V., *Derecho procesal civil internacional*, "Revista de Derecho Privado", Barcelona, 1981, p. 148; citado por Feuillade, *ob cit.*, pág. 139, nota n° 47. Como señala este último autor, se trata de un criterio –el de Cortés transcripto en el cuerpo del escrito- que es en principio correcto, aunque no puede ser admitido sin algunas salvedades (v.gr. que el tribunal foráneo hubiese actuado en exorbitancia o hubiese habido denegación de justicia). En cualquier caso, la cita sirve en el contexto en que aquí estamos hablando para enfatizar que no deben quedar dudas sobre que el juez extranjero (en el caso, ecuatoriano) no invadió la jurisdicción exclusiva de un juez argentino.
[8] Cfr. Goldschmidt Werner, *Derecho Internacional Privado*, Abeledo Perrot, 2009, pág. 998. En el fallo de la Corte Suprema dictado *in re* "Holiday Inns Inc. c/ EBASA Exportadora Buenos Aires S.A. s/ ejecutivo", del 5/04/05 este concepto ha sido expuesto con claridad: únicamente si el juez extranjero falló un caso para el cual el juez argentino tenía jurisdicción exclusiva se justifica el rechazo al reconocimiento; pero esta gravosa consecuencia ya no se aplica si la jurisdicción del juez argentino hubiera sido "concurrente" con la del juez extranjero. Y tanto menos podría aplicarse en un caso como el nuestro en el que la competencia del juez argentino, para el juzgamiento del caso cuya sentencia se busca reconocer, es inexistente desde todo punto de vista.

Otra pauta para la consideración de este asunto es que el juez extranjero no haya asumido una jurisdicción **EXORBITANTE**. Como señala Boggiano, "... *hay que poner énfasis en el desconocimiento de jurisdicciones exorbitantes... Toda jurisdicción exorbitante debe ser desconocida... Se trata de desconocer el ejercicio de una jurisdicción exorbitante en defensa de los intereses del tráfico internacional. El foro exorbitante debe ser sancionado con el desconocimiento*"[9].

En especial destaca el referido autor el factor de la <u>relación del caso con el foro</u> en donde se haya decidido. "*En primer lugar –explica- habrá que ver la relación de las partes de la controversia con el foro. También la relación de las circunstancias de hecho y las situaciones que sirvan de causa o controversia. Y la relación entre el objeto de la pretensión con el foro* [...]*

*Pero ha de haber siempre un contacto razonable entre el caso y el foro. De no haberlo, la jurisdicción sería abusiva o exorbitante, esto es, ejercida sin contactos razonables, siquiera mínimos, que la sustenten*"[10].

Si repara V.S. en los antecedentes del caso, fácilmente advertirá que los más relevantes puntos de conexión del caso conducen a la competencia de la jurisdicción ecuatoriana.

<u>Los demandantes son nacionales de ese Estado, se domicilian allí y los actos causantes del estrago medioambiental tuvieron lugar en el Ecuador</u>[11].

<u>Y la demandada, no obstante ser nacional de otro Estado, consintió de antemano –al punto de proponerla ella misma- la jurisdicción ecuatoriana como medio de lograr que la acción iniciada previamente en los Estados Unidos fuera rechazada.</u>[12]

---

[9] Cfr. Boggiano, ob. cit., T. I, pág. 480.

[10] Cfr. Boggiano, *ob.cit.*, pág. 201 y ss.

[11] En este sentido cabe citar el ya citado Comunicado de Prensa emitido por Chevron Texaco celebrando la consagración del foro ecuatoriano para conocer en el caso: "[...] *Los demandantes están en el Ecuador, las operaciones fueron en el Ecuador, la compañía petrolera estatal –con quien Texaco operó como socio minoritario y que continúa operando los campos en la actualidad- está en el Ecuador. La prueba está en el Ecuador, y la remediación perseguida por los actores sólo puede obtenerse en el Ecuador*".

[12] A este respecto, importa reseñar que esta acción fue iniciada originariamente en los Estados Unidos. Chevron postuló que la jurisdicción adecuada era la ecuatoriana, y así fue que el tribunal americano falló

Nuestra Corte Suprema de Justicia de la Nación ha ponderado "*la existencia de elementos de contacto esenciales con el foro*", apreciados a la luz de "*las circunstancias fácticas de la controversia*", como un factor relevante a tomar en consideración al momento de la evaluación por parte de los jueces argentinos de la competencia en la esfera internacional[13].

Desde ese óptica, queda definitivamente avalada la jurisdicción de los jueces del Ecuador que intervinieron en el pleito.

### (v) <u>NOTIFICACIÓN Y EMPLAZAMIENTO</u> (Inc. e)

"*Que el demandado haya sido notificado o emplazado en debida forma legal de modo sustancialmente equivalente a la aceptada por la ley del Estado donde la sentencia, laudo y resolución jurisdiccional deban surtir efecto*".

A este respecto, cabe señalar que la citación de Chevron Corp. en el proceso seguido en el Ecuador se hizo de un modo <u>análogo sustancialmente</u> al previsto por la ley procesal argentina para los supuestos de notificación del traslado de la demanda.

Se adjunta como prueba del cumplimiento de este recaudo copia debidamente apostillada de las constancias de notificación.

Prueba cabal de que, en nuestro caso, la citación o emplazamiento a juicio de la demandada tuvo lugar, viene dada por el hecho indisputable de que Chevron Corp., efectivamente, respondió a la citación a juicio mediante una extensa exposición –que también se acompaña apostillada (**Anexo 6**)- en la que dejó planteadas todas las defensas y argumentaciones defensivas a que se creía

---

en ese sentido, **no sin antes exigirle a Chevron –quien así lo hizo, en efecto- que se comprometiera a respetar el fallo que eventualmente dictara la justicia del Ecuador.**

[13] Corte Suprema de Justicia de la Nación, *in re*, "Cri Holding Inc. c/ Cía. Arg. de Comodoro Rivadavia S.A", del 3/11/09. La idea conceptual transcripta en el texto corresponde al dictamen de la Procuradora Fiscal (del 19/02/09) que la Corte hizo suyo. En este precedente se reconoció la competencia internacional de un Tribunal de los Estados Unidos, por cuanto no se advertía "… *que el juez extranjero haya invadido la jurisdicción exclusiva argentina o que su jurisdicción fuera exorbitante, arbitraria, abusiva, artificial o*

con derecho, a la vez que propuso la producción de toda la prueba que estimó adecuado producir para apoyar su postura[14].

### (vi) DERECHO DE DEFENSA (Inc. f)

*"Que se haya asegurado la defensa de las partes"*.

Luego de un repaso de los antecedentes acompañados, <u>no puede más que imponerse la certera conclusión de que el derecho de defensa de Chevron se respetó a rajatabla, y con una tolerancia tal por parte de los jueces locales a sus dilatorios y reiterados planteos, que fueron necesarios diez años de litigio para arribar a una sentencia. A lo que cabe agregar que el trámite debió llevarse a cabo íntegramente en la jurisdicción por cuya prevalencia, como se dijo, Chevron bregó con ahínco durante nueve años que, a la postre, resultaron "tiempo muerto" para esta parte en su consecución de la justicia.</u>

El examen de este inciso necesariamente debe complementarse con el que haremos *infra* respecto del "orden público" –en especial el apartado donde se aborda su faz procesal o adjetiva-, así como sobre el cumplimiento de lo dispuesto en el art. 3 inc. b) de la Convención sobre Eficacia Extraterritorial de Sentencias. Los documentos que se referirán en esa oportunidad demuestran que no solo se respetó a la demandada su derecho de defensa, sino que ésta incluso lo ejerció en plenitud y, en algunos casos, hasta con exceso o abuso.

### (vii) EJECUTORIA O COSA JUZGADA (Inc. g)

---

*fraudulenta o se haya violado el juez natural o el derecho de defensa"* (también transcripción del dictamen de la Procuradora Fiscal que la Corte hizo suyo).

[14] Al tratarse de un procedimiento verbal- sumario, el acto de "contestación de demanda" se lleva a cabo en el marco de la audiencia de conciliación. La Sección 23ra. del Código de Procedimiento Civil del Ecuador está dedicada a este procedimiento. Se establece que *"Propuesta la demanda, el juez, de ser procedente el trámite verbal sumario, lo declarará así y dispondrá que se entregue al demandado la copia de la demanda…"* (art. 829). *"Inmediatamente después de practicada la citación, el juez señalará día y hora para la audiencia de conciliación…"* (art. 830); y luego establece que *"La audiencia de conciliación empezará por la contestación a la demanda, que contendrá las excepciones, dilatorias y perentorias, de que se crea asistido el demandado…"*.

*"Que tengan el carácter de ejecutoriados o, en su caso, fuerza de cosa juzgada en el Estado en que fueron dictados"*.

Como surge de la literalidad de la norma, **para determinar si el fallo causa ejecutoria y/o ha pasado en autoridad de cosa juzgada, hay que estar a la ley del país de origen.**

La Excma. Cámara de este fuero Nacional en lo Civil ha adoptado dicho criterio, al sostener que la sentencia extranjera "… *debe estar dotada de la autoridad de cosa juzgada, o sea, que no debe ser susceptible de impugnación por medio de los recursos ordinarios que admita la legislación del país en el que ha sido dictada*"; agregando luego que "… *como la calidad de cosa juzgada debe juzgarse con arreglo a las normas vigentes en el Estado en que fue pronunciada la sentencia, es necesario que el interesado acredite este extremo*"[15].

Sentado ello, hemos de citar de forma textual, por considerar que son en sí mismos suficientes para tener por cumplido este recaudo, los términos de la resolución dictada por la Sala Única de la Corte Provincial de Sucumbíos en su sentencia ampliatoria del 13 de enero de 2012 (**Anexo 5**). Allí se da cuenta con toda claridad del entendimiento que la ley y la jurisprudencia ecuatoriana recogen en punto a las instituciones de la *ejecutoria* y la *cosa juzgada*; **es decir, de la interpretación que debe seguir el Juez argentino según lo prescribe el art. 2 de la Convención sobre Normas Generales de Derecho Internacional Privado, de jerarquía superior a las leyes en nuestro orden jurídico**[16].

Dijo el Tribunal ecuatoriano en aquél pronunciamiento del 13 de enero:

---

[15] Cfr. CNCiv. Sala K, del 10/06/10.

[16] Esta norma dice "*Los jueces y autoridades de los Estados Partes estarán obligados a aplicar el derecho extranjero tal como lo harían los jueces del Estado cuyo derecho resultare aplicable…*". En referencia a esta norma, sostuvo el Procurador Fiscal ante la Corte Suprema de Justicia de la Nación, que "*el artículo 2° de la Convención citada… vino a consagrar la teoría del uso jurídico, por la cual los jueces nacionales se ven obligados a aplicar la normativa extranjera, como lo harían los jueces del lugar cuyo derecho es aplicable…*"; y luego agrega: "… *el citado artículo 2° carece de normas que regulen directamente cuál derecho resulta aplicable, limitándose a disponer pautas interpretativas del derecho extranjero, al disponer que los jueces y autoridades de los Estados partes, deben interpretar las normas como lo harían los jueces del Estado cuyo derecho es aplicable*" (cfr. Dictamen de la Procuración General de la Nación de fecha 10/07/99 en autos "Moka S.A. c/ Graiver David s/ sucesión").

> *"Siendo que la sentencia del 3 de enero del 2012, junto con esta ampliación y aclaración pone fin a un proceso de conocimiento, decidiendo sobre el fondo de la litis en última instancia, resulta evidente que se produce cosa juzgada material y formal con sentencia de segunda instancia, que es cuando procede el recurso de casación, precisamente porque el proceso ha concluido".*

Allí mismo la Corte de la Provincia de Sucumbíos explica porqué el hecho de que se abra una instancia de casación no representa óbice a la configuración de la cosa juzgada tal como rige y se aplica esta institución en el Ecuador:

> *"El derecho ecuatoriano ha sido prolífico a partir de la ley de casación (1992) en definir mediante jurisprudencia reiterada en al menos una docena de fallos de casación, que forman precedente jurisprudencial obligatorio, que el Art. 2 de la Ley de Casación implica que 'únicamente procede el recurso extraordinario en caso de que se haya dictado una providencia que ponga fin al proceso, produciendo efecto de cosa juzgada formal y sustancial, es decir, final y definitiva, de manera que no puede renovarse la contienda entre las mismas partes –por lo subjetivo- en que se demande la misma cosa, cantidad o hecho, fundándose en la misma causa, razón o derecho –por lo objetivo- y que tal se haya dictado dentro de un proceso de conocimiento '"*[17].

No hace falta aquí recurrir a citas doctrinarias o al análisis de precedentes análogos: <u>es el propio Tribunal encargado de juzgar el caso en segunda y</u>

---

[17] Interesa señalar aquí que, de acuerdo a lo prescripto por el art. 19, segundo párrafo, de la Ley de Casación del Ecuador, *"La triple reiteración de un fallo de casación constituye precedente jurisprudencial obligatorio y vinculante para la interpretación y aplicación de las leyes, excepto para la propia Corte Suprema"*. De allí que la Sala Única, en el párrafo transcripto, haya aludido al carácter **"obligatorio"** del criterio plasmado en *"al menos una docena de fallos de casación"*.

última instancia quien dijo de un modo explícito, sin margen para la duda, que el asunto es *cosa juzgada*, y que fue precisamente por revestir el fallo tal condición que pudo luego habilitarse la vía del recurso de casación instada por Chevron Corp[18]. Es que ese remedio extraordinario, según la legislación ecuatoriana, no cabe sino contra fallos dotados de la cualidad de *cosa juzgada* en sentido formal y sustancial.

Pero no fue únicamente en la resolución ampliatoria del 13 de enero de 2012, que la Sala Única de la Corte dejó dicho que el asunto era cosa juzgada; por dos veces más, en sendas resoluciones posteriores del **17 de febrero de 2012 (Anexo 7)**[19] y del **1° de marzo de 2012 (Anexo 8)**[20] dejó el Tribunal expresado igual entendimiento.

En la primera de ellas atendió un planteo de Chevron para que se la eximiera de prestar la caución legalmente exigible a los efectos de suspender la ejecución del fallo. Al margen del desatino que significó que una compañía de semejante entidad, cuyas ganancias trimestrales se cuentan por <u>billones</u> de dólares (es decir, miles de millones), postule dicha exención, la Sala Única de todos modos abordó los argumentos de la demandada –vinculados a que un laudo arbitral interino de un proceso en el que los actores no son parte impediría la ejecución de la sentencia-, los desestimó por su improcedencia jurídica y, de acuerdo con lo que ya había señalado en el anterior pronunciamiento del 13 de enero de 2012, en el sentido de que la sentencia causaba cosa juzgada, **ordenó la extracción de copias para que en la primera instancia se procediera sin más trámite a la ejecución del fallo**[21].

Más explícitamente aún, en la siguiente decisión del 1 de marzo de 2012 – ante el planteo por parte de Chevron de que un segundo laudo interino

---

[18] La concesión del recurso extraordinario de casación ocurrió *a posteriori* mediante resolución del mismo Tribunal dictada el día 17 de febrero de 2012.

[19] Se acompaña copia debidamente apostillada como **Anexo**. En esta resolución se encuentra también la concesión del recurso extraordinario de Casación interpuesto por Chevron.

[20] Se acompaña copia debidamente apostillada como **Anexo**.

[21] En un todo de acuerdo con los términos del art. 8 de la Ley de Casación del Ecuador, que manda remitir "… *las copias* [del expediente] *al juez u órgano competente para la ejecución del fallo*".

impediría la ejecución de la sentencia-, dijo el Tribunal: "*Esta Sala no volverá a referirse a los argumentos de fondo porque fueron analizados en las sentencias. Estos argumentos no serán tomados en cuenta* **por cuanto existe una sentencia con autoridad de cosa juzgada, que analiza la prueba judicial y decide sobre estos particulares**, *sin que sea éste el momento para debatir nuevamente la apreciación que se hizo de la prueba*"[22]. Al mismo tiempo ahondó en argumentos constitucionales sobre la igualdad ante la ley (¿por qué cualquier litigante para lograr que se suspenda la ejecución de un fallo debe pagar una caución, y a una compañía como Chevron se le permitiría lograr ese mismo efecto por medio de una resolución dictada en un remoto proceso arbitral del que los demandantes no son siquiera parte?) y culminó el pronunciamiento señalando –a pedido ahora de los actores- que:

> "*este auto constituye para todo efecto y exigencia procesal, la declaración de ejecutoria del fallo dictado en este nivel de la jurisdicción*"[23].

El concepto contenido en los pronunciamientos reseñados es respaldado asimismo por prestigiosa doctrina entre nosotros; así, sostiene María Elsa Uzal que "*El art. 517 CPCCN, además del control de la jurisdicción indirecta, impone que la sentencia haya pasado en oportunidad* [sic] *de cosa juzgada en el Estado en que se ha pronunciado (inc. 1°); esto implica que se encuentre firme; que sea definitiva y, por ende,* **insusceptible de ser atacada por vía de recurso _ordinario_**"[24].

En igual sentido, jurisprudencia de la Excma. Cámara de este fuero nacional en lo Civil sostuvo, en relación con este punto específico, que lo que debía constatarse para dar curso al exequátur era "… *si la sentencia es pasible*

---

[22] El resalto y el subrayado no son del original.
[23] Sobre el punto volveremos al tratar la exigencia del art. 3 inc. c) de la Convención sobre Eficacia Extraterritorial de Sentencias.
[24] Cfr. Uzal, María Elsa, *Solución de Controversias en el Comercio Internacional*, Ad Hoc, Bs.As., 1992, pág. 36. El resalto y el subrayado no son del original. También Colombo- Kiper aluden a que solamente la pendencia de un recurso ordinario sería óbice para el exequátur (cfr. *Código Procesal…* T. IV, pág. 578).

*de algún recurso <u>ordinario</u> y, en tal caso, si han sido interpuestos y cuál fue su suerte, o, en caso negativo, la constancia de haber vencido los plazos pertinentes…*"[25].

Siempre en el mismo orden de ideas, Boggiano opina que "*si la sentencia es definitiva, aunque se la pueda impugnar por vía del recurso extraordinario, como ocurre en nuestro país, puede reconocérsela*"[26].

En conclusión, la sentencia dictada por la Sala Única de la Corte Provincial de Sucumbíos tiene fuerza de cosa juzgada y el hecho de que se halle pendiente de tratamiento un RECURSO EXTRAORDINARIO DE CASACIÓN ante la Corte Superior de Justicia ecuatoriana no representa óbice, según vimos, para el curso de esta demanda de reconocimiento.

### (viii) <u>ORDEN PÚBLICO</u> (Inc. h)

"*Que no contraríen manifiestamente los principios y las leyes de orden público del Estado en que se pida el reconocimiento o la ejecución.*"

No hay ningún resquicio que permita llegar a la conclusión de que una sentencia como la dictada por los jueces del Ecuador, que condena al pago de los daños provocados por los hechos ilícitos de la demandada (su sucesora jurídica), resulte en algún punto incompatible con los principios en los que abreva el ordenamiento jurídico argentino. Bien por el contrario, la solución está en un todo de acuerdo no solo con la normativa jurídica argentina, sino con los principios rectores más generales que la inspiran: en efecto, como lo ha resuelto nuestra Corte Suprema de Justicia de la Nación, tiene raíz constitucional el derecho a obtener una reparación integral como

---

[25] Cfr. CNCiv., Sala H, "Freire Guapo Garcao Fernando M. c/ Arrellano Laura E.", fallo del 13 de agosto de 1997 [LL 1998-B, 176]. El subrayado no es del original.
[26] Cfr. Boggiano Antonio, *Derecho Internacional Privado*, Depalma, Buenos Aires, 2da. Edición, 1983, t. II, pág. 1333 (citado por Uzal).

consecuencia de la infracción al principio de *alterum non laedere* recogido en el art. 19 de nuestra Ley Fundamental[27].

El confronte debe hacerse entre la solución material que dio al caso el tribunal extranjero y el espíritu o los principios generales de los que está imbuido nuestro propio orden jurídico. No se trata de verificar que las leyes de su país que haya aplicado el juez extranjero estén replicadas aquí en nuestra propia legislación, ni de controlar el modo o el alcance con que el juez foráneo las aplicó; más aún: ni siquiera en el supuesto de que el juez extranjero hubiera aplicado derecho argentino para la solución de la controversia, le es dado al tribunal de nuestro país juzgar sobre el modo en que ese derecho fue aplicado, en tanto y en cuanto –claro está– no se hubiera invadido la jurisdicción argentina exclusiva, tal como se explicó en el capítulo referido a la "competencia internacional"[28].

De modo que ni siquiera el examen de compatibilidad con el orden público local puede dar cabida a un examen de fondo[29].

Por fin, el orden público también corresponde sea examinado desde la óptica estrictamente procesal o adjetiva. Aquí cobra relevancia la cuestión ya tratada de la citación o emplazamiento en juicio –que se hubiera llevado a cabo de un modo regular y análogo, en lo sustancial, al previsto en el Estado donde se persigue el reconocimiento– así como lo referido a que se hubiera respetado a la condenada su derecho de defensa durante el trámite del pleito.

---

[27] Cfr. CSJN, "Santa Coloma", Fallos 308: 1160.

[28] Cfr. Boggiano, *ob.cit.*, T. I, pág. 486; dice el autor: *"Ni siquiera cuando el juez extranjero ha aplicado el derecho material argentino su decisión es revisable por vía de reconocimiento o exequátur; tampoco procede revisar las normas de conflicto aplicadas por el tribunal extranjero. Así, no es condición de reconocimiento que se hayan aplicado las normas de conflicto argentinas; ni siquiera se requiere la aplicación de normas de conflicto equivalentes. El respeto a la decisión extranjera comprende también el de las normas de conflicto aplicadas por el juez que la dictó".*

[29] Particularmente enfático es Boggiano al señalar que la indagación en torno del cumplimiento de este requisito en ningún caso debe conducir a un examen del fondo de la sentencia extranjera. *"El control – precisa– concierne a la solución material de la controversia en cuanto a su eficacia o ejecución en el país estrictamente. De ahí que se requiera una comparación sustancial entre aquella solución y el espíritu del derecho argentino".*

16

Tocante a estos extremos, remitimos, pues, a lo expuesto *supra* en ocasión de abordar el cumplimiento de los requisitos impuestos en los incisos *e)* y *f)* del art. 2 de la Convención; así como también remitimos a lo que se expondrá más abajo en materia de documentación que acredita el cumplimiento efectivo de esos sensibles extremos (inc. *b)* del art. 3 de la Convención).

## III.2. EL CUMPLIMIENTO DE TODOS LOS REQUISITOS DEL ART. 3 DE LA CONVENCIÓN.

Siguiendo igual metodología que la utilizada al abordar los requisitos del art. 2 de la Convención, también aquí analizaremos, inciso por inciso, el acabado cumplimiento de cada uno de los requerimientos legales.

(i)

"*a. Copia autentica de la sentencia o del laudo y resolución jurisdiccional*"

Se acompañan con el debido cumplimiento de los requisitos impuestos por la "*Convención de La Haya sobre supresión de legalizaciones*" (1961), la sentencia dictada en primera instancia por el Juez Nicolás Zambrano el día 14 de febrero de 2011 (**Anexo 2**) y la aclaratoria dictada por el mismo magistrado en fecha 4 de marzo de 2011 (**Anexo 3**).

Asimismo, y con igual cumplimiento de los recaudos impuestos por el instrumento internacional citado, se acompaña la sentencia de segunda instancia emitida por la Corte Provincial de Sucumbíos el día 3 de enero de 2012 (**Anexo 4**) y su respectiva ampliatoria de fecha 13 de enero de 2012 (**Anexo 5**).

<u>Tales los cuatro pronunciamientos judiciales que hemos identificado en el "Objeto" de este escrito como "la sentencia" cuyo reconocimiento se postula en los términos de la "*Convención*</u>

17

_**Interamericana Sobre Eficacia Extraterritorial de Sentencias y Laudos dictados en el Extranjero**_**, suscripta y ratificada –como se explicó oportunamente- tanto por la República del Ecuador como así también por la República Argentina.**

**(ii)**

"_**b. Copia auténtica de las piezas necesarias para acreditar que se ha dado cumplimiento a los incisos e) y f) del artículo anterior**_"

Recordemos que el inc. e) del art. 2 exigía que el demandado hubiera sido notificado o emplazado de un modo sustancialmente equivalente al previsto en la legislación del Estado en el que se solicita el reconocimiento; mientras que el inc. f) exigía que se hubiera asegurado el derecho de defensa de las partes.

Ahora, el art. 3 inc. b) bajo análisis requiere la adjunción de los documentos o piezas necesarias para acreditar el cumplimiento de aquellos extremos.

A los fines de acreditar a V.S. la **notificación del traslado de la demanda**, se acompaña en **Anexo 9** la constancia labrada con tal propósito en persona de Chevron Corporation; tal **diligencia arrojó como resultado que el día 11 de julio de 2003, a las 2:22 hs. PM, se produjo la notificación de la demanda con todos sus anexos.**

De allí surge asimismo que junto con la citación propiamente dicha se acompañó a Chevron "_Expediente de 78 fojas en copias certificadas que contienen demanda inicial y anexos a la misma…_". Todo lo necesario para que Chevron pudiera ejercer en plenitud –como de hecho lo hizo- su derecho de defensa al momento de responder la acción.

A mayor abundamiento, se acompañanan también –siempre con la debida apostilla para certificar su autenticidad- sendas providencias (que integran el **Anexo 9**) dictadas por la Presidencia de la Corte Superior de Justicia del

Departamento de Nueva Loja, datadas en <u>4 de septiembre de 2003</u> y en <u>8 de octubre de 2003</u>, mediante las que tiene por cumplida debidamente la diligencia de notificación del traslado de la demanda a Chevron Corporation[30].

Por lo que se refiere al respeto del derecho de defensa de la demandada, se acompaña la siguiente documentación:

- Acta íntegra de la audiencia en la que Chevron respondió la demanda (**Anexo 9**).

- Escrito de apelación de la sentencia definitiva (**Anexo 10**).

<u>Queda en evidencia, a partir de estos documentos, que Chevron Corp. tuvo ocasión de plantear cuanta defensa consideró conveniente a su derecho, de argumentar en todos los órdenes sin cortapisas fácticas ni jurídicas, de ofrecer y producir prueba para avalar sus dichos y rebatir los de esta parte y de acceder a una revisión íntegra del fallo de primera instancia en la Corte de Apelaciones.</u>

(iii)

"*c. Copia auténtica del auto que declare que la sentencia o el laudo tiene el carácter de ejecutoriado o fuerza de cosa juzgada*".

Al referirse a la calidad de *cosa juzgada* que ha de revestir la sentencia, sostiene Palacio que "*La prueba de esta circunstancia debe surgir de la copia auténtica de la resolución que declare que la sentencia tiene el carácter de ejecutoriada o pasada en autoridad de cosa juzgada*"[31].

---

[30] Estas dos providencias que tienen por debidamente cumplida la notificación a Chevron Corp. también integran el **Anexo**.
[31] Cfr. Palacio, Lino E., *ob. cit.* T. VII, págs. 320/21.

Coincidentemente, dice Couture que "… *tratándose del acto típicamente jurisdiccional, la declaración de certeza sobre la calidad de firme y definitiva de la sentencia, que le confiere la autoridad de la cosa juzgada, debe emanar del poder jurisdiccional que la dictó*"[32].

**Lo relevante para destacar en este ítem es que la declaración de que la sentencia posee las cualidades de la *cosa juzgada* ha sido emitida por el propio Tribunal de la causa, y que tal declaración se halla incluida en instrumentos sobre cuyo contenido específico y carácter auténtico ya nos hemos referido al abordar el cumplimiento de los requisitos del inc. a del art. 3 que estamos analizando y, asimismo, en el apartado III.1. al tratar el inc. g) del art. 2.**

A estos puntuales efectos, no solo cobra relevancia el **pronunciamiento ampliatorio del 13 de enero de 2012 (Anexo 5)**, sino también los dos pronunciamientos posteriores emitidos por el mismo Tribunal en fecha **17 de febrero (Anexo 7)** y **1 de marzo de 2012 (Anexo 8)**, los cuales también se acompañan –siempre con la debida *Apostilla*- con el específico propósito de cumplimentar el respaldo documental exigido por este inciso.

## IV. COMPETENCIA, CONEXIÓN CON EL FORO LOCAL E INSTANCIA DE PARTE EN LA PROMOCIÓN DEL *EXEQUÁTUR.*

**a.-** La petición para obtener el reconocimiento de una sentencia extranjera, el denominado incidente de *exequátur*, debe solicitarse ante el juez de primera instancia que corresponda (art. 518 CPCCN), según las normas de competencia por razón del lugar y de la materia, de acuerdo con el art. 5 del CPCCN y las normas del dec-ley 1285/58, sobre Organización de la Justicia Nacional. [33]

---

[32] Cfr. Couture, Eduardo J., *Fundamentos del Derecho Procesal Civil*, Depalma, Bs.As., 1997.

[33] Cfr. Boggiano, *Ob.cit.*, T. I, pág. 490; íd. Gozaíni, Osvaldo, *Código Procesal…*, La Ley, 2002, T. III, pág. 74; íd. Palacio, Lino E., *Derecho Procesal Civil*, Abeledo- Perrot, T. VII, pág. 327. Agrega este último autor que "*Puede asimismo ser competente la justicia federal cuando, de acuerdo con las pertinentes normas constitucionales y legales, le corresponde intervenir por razón de la materia o de las personas*". En el caso que aquí se postula, como

El citado decreto-ley 1285/58 prescribe en su art. 43 que *"Los juzgados nacionales de primera instancia en lo Civil de la Capital Federal, conocerán en todas las cuestiones regidas por las leyes civiles cuyo conocimiento no haya sido expresamente atribuido a los jueces de otro fuero"*; y a continuación, la misma norma establece –en lo pertinente- que *"Conocerán, además, en las siguientes causas: [...] **b) En las que se reclame indemnización por daños y perjuicios provocados por hechos ilícitos"***.

**También jurisprudencia actual reconoció la vigencia del art. 43 del decreto-ley 1285/58 –aplicado sobre los hechos de la demanda instaurada en el extranjero- a los fines de atribuir competencia interna en la instancia de reconocimiento del fallo**[34].

Es cierto que, recientemente, la Corte Suprema de Justicia de la Nación ha ratificado el criterio de que los asuntos ligados a la protección del medio ambiente deben tramitar por ante las autoridades locales correspondientes a la jurisdicción afectada[35]; tal criterio, sin embargo, no puede tener aplicación en el caso, puesto que los daños reconocidos en la sentencia ocurrieron fuera de los límites territoriales de la República –sin que tampoco sus efectos se hubieran propagado a ningún sitio dentro de nuestras fronteras-, por lo que a los fines de la doctrina jurisprudencial citada, **no existen autoridades judiciales locales ante quienes recurrir**. Y, obviamente, por el mismo motivo no se configura tampoco un supuesto de *interjurisdiccionalidad* (dicho en el sentido de que el daño

---

surge de un análisis de sus antecedentes, ninguna de esas dos variables determina la competencia federal: la temática de fondo versa sobre responsabilidad derivada de hechos ilícitos y las partes involucradas son sujetos de derecho privado.

[34] Cfr. CNCiv.Com.Fed., Sala II, *"Clarkson Hyde LLP c/ Otero Monsegur María Antonia s/ Exequátur"*, del 3.09.09. Se trató de un caso en el que previno el fuero Civil y Comercial Federal, quien se declaró incompetente en favor del fuero Nacional en lo Civil, el cual, a su vez, declinó su competencia en favor del fuero Nacional en lo Comercial, quien tampoco la aceptó. Finalmente, el Tribunal de Alzada del fuero que previno resolvió la contienda en forma definitiva asignando competencia al fuero Nacional en lo Civil, toda vez que la materia del litigio versaba sobre un asunto (prestación de servicios profesionales) que el art. 43 del decreto-ley 1285/58 reservaba para ese fuero.

[35] Cfr. CSJN, *in re*, "Benzrihen Carlos Jorge y otro c/ Industrias Magromer Cueros y Pieles S.A.", del 21/09/10.

afecte a dos o más provincias) que active la competencia de tribunales federales, según criterio adoptado por la Corte Suprema en el mismo precedente[36].

Aclarado ello, es de resaltar que la sola lectura de la sentencia cuyo reconocimiento se postula deja en claro que aquí se trata del resarcimiento de los daños provocados por los "hechos ilícitos" de los que la demandada resulta civilmente responsable por su acción u omisión. Tal la materia del pleito. No existen en el caso vínculos contractuales de ninguna índole entre los demandantes y la corporación petrolera demandada, así como tampoco elementos –ni fácticos ni jurídicos- que justifiquen un desplazamiento del caso por fuera del claro ámbito de aplicación de la norma transcripta (art. 43 inc. b. del decreto-ley 1285/58).

Y de ese modo se justifica la actuación de V.S. en tanto Juez Nacional de Primera Instancia en lo Civil, conclusión esta que se ve ratificada por las normas de la Ley General del Ambiente 25.675, cuyo art. 7° establece la competencia de los *"tribunales ordinarios según corresponda por el territorio, la materia o las personas"*; ratificando luego el art. 32 de dicho cuerpo legal que *"La competencia judicial ambiental será la que corresponda a las reglas ordinarias de la competencia"*.

Cabe, por fin, destacar que el hecho de que se trate la demandada de una sociedad cuyo objeto es mercantil, no altera la competencia de los jueces nacionales en lo Civil conforme a la normativa analizada; conforme se resolvió en jurisprudencia reciente, los asuntos por daños y perjuicios provocados por hechos ilícitos son de competencia de los Juzgados Nacionales de Primera Instancia en lo Civil de la Capital Federal, ya que la calidad de las personas

---

[36] Dijo la Corte en el precedente citado en nota previa –por remisión a los fundamentos de la Procuradora Fiscal -: "[…] *cabe recordar que la Corte a través de distintos precedentes ha delineado los criterios que deben tenerse en cuenta para determinar la procedencia de dicha competencia federal en razón de la materia ambiental, estableciendo, en primer término, que debe delimitarse el ámbito territorial afectado, pues, como lo ha previsto el legislador nacional, debe tratarse de un recurso ambiental interjurisdiccional (Fallos 327:3880; 329:2316), o de un área geográfica que se extienda más allá de la frontera provincial. Es decir, que abarque a más de una jurisdicción estatal, provincial, de la Ciudad de Buenos Aires o internacional, puesto que debe tratarse de un asunto que incluya problemas ambientales compartidos por más de una jurisdicción (Fallos 330:4234; 331:1679)"*.

intervinientes no modifica el carácter de la relación jurídica que da origen al juicio[37].

**b.-**  Ya en la etapa de ejecución de sentencia, en el juicio de origen fueron dictadas <u>ciertas resoluciones que involucran, en forma expresa, activos de la condenada Chevron Corp. en la República Argentina</u> (dichas resoluciones, fechadas los días 15 y 25 de octubre de 2012, integraron el exhorto –debidamente apostillado- que se halla agregado en los autos conexos).

A partir de dicho antecedente se advierte claramente, pues, la <u>conexión directa del caso con el foro local, justificándose así la apertura formal de esta jurisdicción.</u>

Sin perjuicio de ese factor relativo a la existencia de bienes de la condenada situados en la Argentina, lo cierto es que la conexión con el foro local bien puede justificarse también desde otras múltiples perspectivas.

**c.-**  Como aspecto que también aparece ligado con la actuación de V.S. o, más precisamente, con la modalidad de petición a partir de la cual se activa dicha actuación jurisdiccional, cabe señalar que la solicitud de reconocimiento de un fallo extranjero no exige un requerimiento del juez extranjero cursado por vía de exhorto.

Bien señalan Colombo- Kiper que el previsto en los arts. 517 y ss. del CPCCN "… *es un proceso autónomo, independiente de la sentencia que se pretende ejecutar*"[38].

Sentís Melendo enfatiza esa misma naturaleza: "*Se trata de una acción autónoma. No se trata de una acción subordinada a la que se ejercita para obtener la sentencia*

---

[37] Cfr. CNCiv., "Proyecto del Atlántico S.A. c/ Rosetti Víctor J. s/ daños y perjuicios s/ competencia", del 19/10/11.
[38] Cfr. Colombo- Kiper, *Código Procesal Civil y Comercial de la Nación- Anotado y comentado*, La Ley, T. IV, pág. 579.

*que se quiere ejecutar o a la sentencia respecto de la cual se pretende que se le reconozca el valor de cosa juzgada en el país"*[39].

Este dato de la *autonomía* predica sobre la innecesariedad del exhorto, ya que no se trata en este caso de "dar cumplimiento" a la orden de un juez extranjero, sino de tramitar un proceso nuevo con un objeto procesal distinto y propio: examinar si aquella sentencia puede equipararse a una sentencia definitiva local. Y de allí que el procedimiento **normal** y **típico** para darle inicio sea "*la demanda presentada directamente ante la autoridad judicial competente para otorgarla"*[40].

En un similar orden de ideas, al comentar un fallo de la Cámara Civil y Comercial de Rosario, Ciuro Caldani opina que el modo apropiado de instar una acción de reconocimiento y ejecución es la actuación de parte, cuya **"presencia directa"** en el proceso, desde una óptica valorativa, **condice con la previsión de que el pedido deba efectuarse ante un juez de primera instancia** (lo propio marca el art. 518 del CPCCN) y **con la significación que guarda el acto de la sentencia con que concluye**. En contraposición –apunta- el exhorto aparece como la vía propicia y necesaria cuando se trata de pedidos de auxilio judicial en materia de notificaciones, recepción de declaraciones u otro tipo de "diligencias" judiciales de menor significación[41].

Por su parte, destaca Boggiano la importancia que reviste en este tipo de procedimientos el "impulso de parte" y expresa que la demanda "… *puede ser requerida por la parte interesada o por exhorto*"[42].

---

[39] Cfr. Sentís Melendo, S., *La sentencia extranjera (Exequatur)*, Ediciones Jurídicas Europa- América, Bs.As., 1958, pág. 149.

[40] Cfr. Sentís Melendo, S., *ob.cit*, pág. 127.; dice el autor al inicio del capítulo V que dedica en forma exclusiva al análisis de este tópico: "*El procedimiento de exequatur admite tres formas distintas de incoación: la demanda presentada directamente ante la autoridad judicial competente para otorgarla, la vía diplomática y la carta rogatoria. Se ha de estimar que el procedimiento normal es el indicado en primer término*" (énfasis añadido).

[41] Cfr. Ciuro Caldani, Miguel A., *Un caso de Derecho Procesal Internacional Privado*, en ED 112-411 [Comentario al fallo "Sociedad Anónima Comercial e Industrial c/ Industrias Walter s/ demanda de ejecución de sentencia- Exhorto de Santa Cruz de la Sierra, Bolivia"]. El fallo en sí mismo no reviste mayor interés desde lo jurídico; da cuenta de una situación procesal anómala que, a juicio del comentarista, se originó con "… *el erróneo empleo del exhorto por el juez boliviano*", quien "*para pedir la ejecución de una sentencia introdujo la confusión que intentan resolver de maneras diversas las dos instancias rosarinas*".

[42] Cfr. Boggiano, *ob.cit.*, T. I, pág. 490.

Palacio se expresa con igual claridad, al indicar que esta acción "... *puede requerirse directamente por la parte interesada o mediante exhorto o carta rogatoria cursada por vía diplomática*"[43].

La cuestión fue objeto de debate en el ya citado precedente "Cri Holding", en el que la parte demandada, entre los motivos que –sin éxito- postuló ante el Tribunal para repeler el reconocimiento, planteó la supuesta irregularidad del trámite a partir del hecho de que la actuación no se hubiese iniciado con un exhorto.

Al respecto, sostuvo en su dictamen la Fiscal General ante la Excma. Cámara Comercial:

"*También debe rechazarse, a mi criterio, la articulación referida a la tramitación irregular, toda vez que la vía mediante la cual puede promoverse el exequátur puede ser tanto la de la parte interesada cuanto la del exhorto, según lo entiende autorizada doctrina (cf. Boggiano). En el caso, se advierte que si bien no hay un exhorto expedido por el tribunal extranjero, existe el impulso de la parte interesada...*"[44].

Luego, la Sala se expidió en iguales términos, al expresar que "*Finalmente, el exequátur ha sido deducido por la parte interesada, por lo que no obsta a su tramitación el hecho de que no se ha formado a partir de un exhorto judicial*"[45].

## V. CONSIDERACIONES ADICIONALES SOBRE LA VIABILIDAD DEL EXEQUÁTUR CONTRA CHEVRON CORPORATION.

En un momento dado, Chevron obtuvo de un Tribunal de Distrito de Nueva York, a cargo del Juez Lewis Kaplan, una insólita medida cautelar con alcance universal, mediante la cual dicho magistrado prohibía que la sentencia

---

[43] Cfr. Palacio, *ob.cit.*, T. VII, pág. 327.
[44] Cfr. Dictamen n° 113.114 del registro de la Fiscalía General ante la Cámara Nacional de Apelaciones en lo Comercial de la Capital Federal, fechado el 14/09/06 y suscripto por quien se desempeñaba entonces como su titular, Dra. Alejandra Gils Carbó.

emanada de la justicia ecuatoriana fuera ejecutada en cualquier país del mundo. Esta <u>resolución cautelar de alcance mundial</u> fue dictada en fecha 7 de marzo de 2011, vale decir, a pocas semanas de haberse emitido el fallo condenatorio en primera instancia.

Como salta a la vista sin necesidad de ahondar en mayores consideraciones, la medida del Juez Kaplan constituyó un verdadero absurdo jurídico como no se ha visto otro.

La medida, como era de esperar analizada la cuestión con un mínimo de sentido común, fue de corto aliento, ya que el día 19 de septiembre de 2011 la Cámara de Apelaciones para el Segundo Circuito de Nueva York, primero la **revocó íntegramente** en decisión sumaria (se adjunta dicha resolución, debidamente apostillada y traducida –a su vez con su respectiva legalización- como **Anexo 12**), y luego la **desautorizó en severos términos desde el plano jurídico y argumental** al exponer sus fundamentos para la revocatoria el día 26 de enero de 2012 (también se adjunta dicha resolución, debidamente apostillada y traducida –a su vez con su respectiva legalización- como **Anexo 13**).

<u>**Nada queda en vigencia, pues, de aquella resolución que impedía a los demandantes perseguir la ejecución del fallo fuera del Ecuador**</u>.

Dicho esto sin perjuicio de que, aun en el supuesto de aquella orden estuviese vigente, nada obstaría tampoco a la promoción de esta demanda de reconocimiento, en la medida en que **un Juez de los Estados Unidos no puede indicar a un Juez de otro país cómo proceder** frente a una solicitud de estas características. <u>Los citados fundamentos del 26 de enero de 2012 son elocuentes sobre el particular</u>.

Aparte el escandaloso *forum shopping* que Chevron ha hecho en los Estados Unidos, importa destacar, porque subraya la relevancia de su pronunciamiento, que la mencionada Cámara de Apelaciones para el Segundo Circuito de Nueva York es el tribunal que, dentro de aquel país, viene conociendo en el caso desde la primera etapa del juicio (1993-2002), <u>**cuando Chevron planteó –con éxito-**</u>

---

[45] Cfr. CNCom., Sala E, "Cri Holding Inc. c/ Compañía Argentina de Comodoro Rivadavia", del

que la jurisdicción adecuada para conocer de la demanda por daño ambiental, originariamente promovida por los demandantes en Nueva York, era la ecuatoriana, que además ofrecía –así lo fundó y justificó Chevron en su momento con un sinnúmero de *Opiniones* de juristas del Ecuador- un sistema judicial idóneo y transparente (siempre debidamente apostillada y traducida –con su respectiva legalización- se agrega como **Anexo 14** la resolución dictada por ese Tribunal de Apelaciones el día 16 de agosto de 2002, mediante la cual falla que, efectivamente, haciendo lugar a la moción de Chevron, el pleito debía ventilarse en el Ecuador).

Claro que, para ello, la Corte de Apelaciones exigió de Chevron, además de ciertas dispensas referidas al plazo de prescripción (para que los nueve años perdidos en los Estados Unidos no perjudicaran la vigencia de la acción de los demandantes) un compromiso formal y expreso de que respetaría el fallo que eventualmente dictara la justicia ecuatoriana.

Y Chevron extendió ante los jueces de su país ese compromiso formal y expreso de respetar el fallo que eventualmente dictaran los jueces del Ecuador.

Como, naturalmente, y fiel a su estilo, Chevron intentó luego desentenderse de aquel compromiso, otra vez la Corte de Apelaciones para el Segundo Circuito de Nueva York debió poner las cosas en su cauce, y **"recordarle" a la demandada la plena vigencia de aquella promesa.**

Fue en un fallo del 17 de marzo de 2011 (que se agrega como **Anexo 15**, debidamente apostillado y traducido –con su respectiva legalización-), en el que la Corte de Apelaciones apuntó:

"*Chevron Corporation alega, sin mención de la jurisprudencia relevante, que no se encuentra obligado por las promesas de sus predecesores Texaco y Chevron Texaco Inc. Sin embargo, al intentar la confirmación de la desestimación del tribunal de distrito por motivos de fuero inconveniente, los abogados de Chevron Texaco comparecieron ante*

22/09/06.

27

*este Tribunal y reconfirmaron las concesiones que Texaco había efectuado para garantizar la desestimación de la demanda de los demandantes. Al hacer esto, Chevron Texaco se obligó a estas concesiones. En el 2005, Chevron Texaco abandonó la denominación ´Texaco´ y retornó a su denominación original, Chevron Corporation. No existe indicio en el expediente ante nosotros de que la abreviación de su denominación tenga efecto alguno sobre las obligaciones legales de Chevron Texaco. En consecuencia, Chevron Corporation conserva la responsabilidad por las promesas en las que el tribunal de distrito fundamentó su decisión de no hacer lugar a la acción de los Demandantes*”.

Mediante la compulsa del **Anexo 15**, puede notar V.S. que la referencia transcripta fue efectuada por el Tribunal de Apelaciones a modo de inciso aclaratorio cuando refirió, en el relato de *Antecedentes*, que “**Texaco también ofreció cumplir cualquier sentencia a favor de los Demandados**”.

Las consideraciones que se hacen en este capítulo, V.S., sirven de marco referencial y explicativo sobre el contexto en que se promueve este exequátur. Dan cuenta de hechos relevantes que ponen al descubierto la estrategia de *no* acatamiento sistemático por parte de Chevron de los fallos judiciales que no la complazcan, sean del país que sean.

## VI. DENUNCIA CONEXIDAD.

A los fines de la tramitación de este proceso de exequátur y reconocimiento de sentencia extranjera se denuncia conexidad con los autos caratulados “*Aguinda Salazar María c/ Chevron Corporation s/ Medidas precautorias*” (Expte. 91.814/2012). Estas actuaciones con las que se plantea la conexidad radicaron inicialmente en el Juzgado N° **61** del fuero, no obstante lo cual –ante la recusación planteada por la demandada- fueron luego remitidas al Juzgado N° **98**. Entre ambos tribunales se planteó una contienda negativa de competencia, lo que motivó la elevación de los autos a la Excma. Cámara.

28

Al margen de cuál sea en definitiva el tribunal al que la Excma. Cámara asigne el conocimiento de aquellas actuaciones, lo cierto es que por una evidente razón de buen orden procesal y unidad de conocimiento, ambos procedimientos (de *Medidas precautorias* y *exequátur*) deben tramitar en forma conjunta, habida cuenta de que se trata de diferentes estadíos de un mismo proceso.

Así lo prevé, además, el art. 49 del Reglamento del fuero, al disponer que si se hubieren iniciado actuaciones previas de índole cautelar, la causa principal debe radicarse en el juzgado que hubiere prevenido.

## VII. <u>TASA DE JUSTICIA</u>.

Los demandantes se encuentran exentos, en su país de origen, de afrontar cualquier tipo de gasto, tasa, caución, etc., y así quedo declarado en el propio instrumento de exhorto tramitado en los autos conexos "*Aguinda Salazar María c/ Chevron Corporation s/ Medidas precautorias*" (Expte. 91.814/2012), de trámite inicialmente en el Juzgado 61 del fuero.

En su resolución del día 6 de noviembre de 2012, el Juez a cargo de dicho tribunal tuvo presente la exención de los rubros antedichos.

Destacado ello, solo cabe resaltar que, sobre el punto, la Convención –de jerarquí superior a la ley en nuestro orden jurídico- es clara en su artículo 5: el beneficio de pobreza reconocido en el Estado de origen conserva su plena eficacia en el Estado de destino, por lo que, <u>ante la acreditación de que en el país de origen los actores se hallan exentos de abonar tasas, costas, arraigos o cauciones procesales y/o cargas de cualquier tipo vinculadas con el trámite del litigio</u>, no procede en esta instancia exigir la gabela establecida en nuestro ordenamiento jurídico por la ley 23.898.

Y, a todo evento, para la remota hipótesis de que la situación en al país de origen variase, o que por alguna causa sobreviniente a esta presentación se exigiera a los demandantes el pago de la tasa prevista en la ley 23.898, se deja planteado que el importe que correspondería abonar, habida cuenta de la índole

29

de la acción que se intenta, es el previsto en el art. 6 de dicha ley previsto para los casos de monto indeterminado.

En el citado precedente "Reef Exploration" se estableció que el proceso mediante el cual se perseguía el reconocimiento de un fallo dictado en el extranjero era de **"monto indeterminado"**. Y, en instancia de recurso extraordinario contra ese punto específico del fallo, la Corte Suprema de la Nación –por remisión a los fundamentos de la Procuradora Fiscal– **rechazó** la queja de los interesados tendiente a que se asignara al proceso el monto de la sentencia que era objeto de reconocimiento[46].

## VIII. PLANTEA CASO FEDERAL.

Que, para el supuesto de que las peticiones de esta parte contenidas en el escrito fueran total o parcialmente desestimadas, se deja planteada la existencia de "Caso Federal" a los fines de recurrir por ante la Corte Suprema de Justicia de la Nación en los términos del art. 14 de la ley 48 y demás normativa aplicable.

En efecto, procede la intervención del Alto Tribunal cuando se halla en juego la interpretación y aplicación de tratados internacionales y la decisión adoptada por los jueces de la causa fuese contraria al derecho que la parte fundó en las normas de tales instrumentos[47] [48].

---

[46] Cfr. CSJN, fallo del 21/2/06 [LL 2006-C, 429]. Corresponde aclarar que, si bien la calificación del proceso como de "monto indeterminado" fue a los fines de la regulación de honorarios de los profesionales intervinientes, en el marco de lo dispuesto por el art. 6 inc. a) de la ley 21.839, tal calificación resulta también enteramente aplicable frente a los términos de la ley de tasa de justicia 23.898. No es concebible, en efecto, que un mismo proceso sea de "monto indeterminado" a los fines de la regulación de honorarios, pero que, por el contrario, se le asigne un valor fijo para la liquidación de la tasa judicial. En igual sentido, ver CNFed. Mar del Plata, *"Far Eastern Shipping Company c/ Arhenpez S.A."*, del 4.12.09, en donde se sostuvo que: *"… el Alto Tribunal ha sostenido la naturaleza declarativa del mentado procedimiento* [de reconocimiento] *indicando que la conversión en un título ejecutivo para que se admita como tal en nuestro territorio a través del exequátur no conlleva en sí mism[a] discusión patrimonial alguna"* (énfasis añadido).
Una opinión en este sentido de *extender* la conclusión del fallo "Reef" al supuesto de tasa puede verse en: http://www.marval.com.ar/Publicaciones/MarvalNews/ArticuloMN/tabid/96/language/es-AR/Default.aspx?ItemID=786

[47] Cfr. CSJN, *in re*, "Vargas Lerena Álvaro c/ Cadena País Producciones Publicitarias S.A. s/ ejecutivo", del 2 de marzo de 2011; id. Fallos 318:2639; 315:1848; 312:152, entre otros.
[48] Cfr. CSJN, *in re*, "Riopar S.R.L. c/ Transportes Fluviales Argenrío S.A." (R- 165.XXXII), del 15/10/96 [ED 171-539].



# IX. PRUEBA DOCUMENTAL.

Por de pronto, se deja aclarado que, <u>en todos los casos</u>, los documentos en cuestión vienen acompañados por la *Apostilla* creada por la Convención de La Haya (1961).

**Anexo 1**: Poder judicial en copia, cuyo original se halla glosado en los autos "*Aguinda Salazar María c/ Chevron Corporation s/ Medidas precautorias*" (Expte. 91.814/2012).

**Anexo 2**: Sentencia dictada en primera instancia el día 14 de febrero de 2011.

**Anexo 3**: Sentencia aclaratoria de primera instancia dictada el día 4 de marzo de 2011.

**Anexo 4**: Sentencia dictada por la Sala Única de la Corte Provincial de Sucumbíos el día 3 de enero de 2012.

**Anexo 5**: Sentencia dictada por la Sala Única de la Corte Provincial de Sucumbíos el día 13 de enero de 2012.

**Anexo 6**: Acta íntegra de la audiencia en la que Chevron respondió la demanda.

**Anexo 7**: Sentencia dictada por la Sala Única de la Corte Provincial de Sucumbíos el día 17 de febrero de 2012.

**Anexo 8**: Sentencia dictada por la Sala Única de la Corte Provincial de Sucumbíos el día 1 de marzo de 2012.

**Anexo 9**: Constancias que acreditan la notificación efectiva del traslado de la demanda, así como las providencias judiciales que tuvieron por formalmente cumplido dicho trámite.

**Anexo 10**: Escrito de apelación de la sentencia definitiva[49].

---

[49] Este escrito incluye la totalidad de los cuerpos 2067 y 2068; y comienza en el cuerpo 2066 que conforma el Anexo 3.

**Anexo 11**: Copia de la sentencia que hace constar la gratuidad del procedimiento para los actores, así como la *no imposición* a dicha parte de gasto de ninguna naturaleza (v.gr. tasa, caución, etc.). El original se halla glosado en los autos "***Aguinda Salazar María c/ Chevron Corporation s/ Medidas precautorias***" (Expte. 91.814/2012), en tanto dicha resolución fue parte integrante del exhorto allí diligenciado.

**Anexo 12**: Sentencia apostillada y traducida –con su respectiva legalización- del fallo emitido el día 19 de septiembre de 2011 por la Cámara de Apelaciones del Segundo Circuito de Nueva York.

**Anexo 13**: Sentencia apostillada y traducida –con su respectiva legalización- de la expresión de fundamentos del día 26 de enero de 2012 por la Cámara de Apelaciones del Segundo Circuito de Nueva York, respecto de la decisión del día 19 de septiembre de 2012.

**Anexo 14**: Sentencia apostillada y traducida –con su respectiva legalización- del fallo emitido el día 16 de agosto de 2002 por la Cámara de Apelaciones del Segundo Circuito de Nueva York.

**Anexo 15**: Sentencia apostillada y traducida –con su respectiva legalización- del fallo emitido el día 17 de marzo de 2011 por la Cámara de Apelaciones del Segundo Circuito de Nueva York.

Queda asimismo ofrecida como prueba documental la totalidad de las constancias de los autos conexos "***Aguinda Salazar María c/ Chevron Corporation s/ Medidas precautorias***" (Expte. 91.814/2012); así como las constancias del juicio de origen en lo que fuera pertinente.

## X. AUTORIZA.

Se autoriza a compulsar el presente expediente a los Dres. Leandro J. Caputo (T° 64 F° 827), Matín Saldico (T° 103 F° 337); Matías Mendioroz (T° 100 F° 704) y a los Sres. Agustín Brugo (D.N.I. 32.173.433); María Belén Capalbo

(D.N.I. 34.384.041); Matías Medici (D.N.I. 35.140.218); Luciano Litre Martínez (D.N.I. 34.211.514) y Juan P. Pascucci (D.N.I. 34.564.537).

## XI. PETITORIO.

Por todo lo aquí expuesto, solicitamos de V.S.:

1°) Tenga al presentante por parte y por constituido el domicilio indicado.

2°) Previo traslado de ley, dicte sentencia de reconocimiento del fallo objeto de esta demanda, equiparándolo en todos sus efectos a una sentencia local. Con costas.

Se provea de conformidad que,

SERÁ JUSTICIA.

CARLOS MARIA ROTMAN
Abogado
Tomo 30 Folio 544

ENRIQUE BRUCHOU
ABOGADO
C.P.A.C.F. T° 41 - F° 928

MARTIN BERETERVIDE
ABOGADO
C.P.A.C.F. T° 81 - F° 927
C.A.S.I. T° XLIII - F° 252
CUIT: 20-26281461-1
LEG. PREV. 3-26281461

RODOLFO A. RAMIREZ
ABOGADO
C.P.A.C.F. T° 7   F° 766

33

PAULA
TRADUCTO
IDIOM
Mat. T° XIV  F°
Inscrip. C.T.



TRADUCCIÓN PÚBLICA/TRANSLATION-----------------------------------------

APPEARS   IN   COURT.   INITIATES   EXEQUATUR
PROCEEDINGS.  GROUPING OF ACTIONS. --------------------------------

[Seal: Civil Court No. 61, November 21, 2012, 1324] -------------------------

Your Honor:--------------------------------------------------------------------

**Enrique Bruchou** (Volume 41 Folio 928), as attorney-in-fact of the plaintiffs, domiciled at José Manuel Abascal E 12-79 and Portete, City of Quito, Republic of Ecuador, represented by **Carlos María Rotman** (Volume 30 Folio 544), **Rodolfo A. Ramírez** (Volume 7 Folio 766) and **Martín Beretervide** (Volume 81 Folio 927), all of them establishing <u>domicile ad litem at Ing. Butty 275, 12th Floor, City of Buenos Aires</u>, respectfully allege: -------------------------------------------------------------

**I- LEGAL CAPACITY.** --------------------------------------------------------

The copy of the power of attorney granted by the plaintiffs to the undersigned for them to file these proceedings is hereto attached as **Exhibit 1.** Even though it is sworn on oath that the such power of attorney is effective and true, it is also noted that the original instrument  duly legalized with an apostille under the applicable international regulations- is added to the related proceedings *"Aguinda Salazar María c/ Chevron Corporation s/ Medidas precautorias"* [*"Aguinda Salazar María vs/ Chevron Corporation on Injunctions*] (Record 91814/2012). ----------------------------------

The power of attorney was granted pursuant to the provisions of the "*Inter-American Convention on the Legal Regime of Powers of Attorney to be Used Abroad*"[1], adopted at the First Inter-American Specialized Conference on Private International Law (**CIDIP-I**) held in the Republic of Panama in 1975.------------------------------------

**II- PURPOSE.** ----------------------------------------------------------------

On behalf of plaintiffs, pursuant to the provisions of the "*Inter-American Convention on Extraterritorial Validity of Foreign Judgments and Arbitral Awards*" –signed and acknowledged both by Argentina and by Ecuador[2]- we hereby file an action for the acknowledgement of the validity of a foreign judgment against **Chevron Corporation**

---

[1] Approved in our country by Act No. 22550 [ADLA XLII- A, page 46; Official Gazette October 20, 1987]. In Ecuador, the Convention was approved by Supreme Decree No. 472, published in Official Record 827 on June 18, 1975.----------------------------------------------------------------------
[2] Approved in our country by Act No. 22921 [ADLA XLIII- D, page 3819; Official Gazette September 27, 1983]. In Ecuador, the Convention was approved by Executive Decree No. 853, published in Official Record 240 on May 11, 1982.-------------------------------------------------------------------

(hereinafter "Chevron Corp." or "Chevron"), in connection with the judgment pronounced by the judicial authorities in the Republic of Ecuador corresponding to the Legal Division of Sucumbíos, in the proceedings *"Aguinda María and other parties vs. Chevron Corporation"*, identified in local records No. 002- 2003 (pending) and 2011-0106 (before the Single Court Room of the Provincial Court of Sucumbíos).----

Defendant's domicile has been established at **6001 Bollinger Canyon Road, San Ramón, California, United States of America.** -------------------------------------------

Defendant owns property in the Republic of Argentina, to the extent that it has stated before the regulators in its country, United States of America, that it is the owner of 100% of Chevron Argentina S.R.L. Furthermore, an attachment has even been levied on some of the property it owns in the country in relation to the related proceedings mentioned above (Record 91814/2012). The fact that Chevron Corp. owns property in the Republic of Argentina has already been argued and decided –and a hearing has even been held with Chevron Corp. in the reconsideration then dismissed- by the legal authority of origin, i.e., the Judge in Ecuador currently hearing the proceedings. All of the above appears from the original documentation attached to the proceedings *Injunctions*. -------------------------------------------------------------------------

As a result of the proceedings referred to above, defendant was ordered to pay the sum of nineteen thousand twenty-one million five hundred and fifty two thousand United States dollars (US$ 19.021,552.000) –as calculated by resolutions dated July 23rd, 2012 and July 30th. 2012- derived from the **environmental damages** caused in the Ecuadorian Amazonia as a consequence of the oil activities performed by its former company, Texaco Inc., with which Chevron Corp. merged in 2001. ----------------------

The judgment of the Court of Original Jurisdiction was rendered on **February 14th, 2011 (Exhibit 2)**, and explained by resolution issued on **March 4th, 2011 (Exhibit 3).** Moreover, the Single Court Room of the Provincial Court of Sucumbíos, which completely confirmed the judgment, was pronounced on **January 3rd, 2012 (Exhibit 4)**, and supplemented and extended on **January 13th, 2012 (Exhibit 5).** ---------------

All these judgments are duly legalized with an apostille under the *"Hague Convention Abolishing the Requirement of Legalization for Foreign Public Documents"* (1961). The following is worth noting: whenever this writing refers to *"the judgment"* the acknowledgement of which is being requested, unless otherwise specified, the four

2

judgments mentioned before are included, all of which shall be deemed as only one judgment. ----------------------------------------------------------------------------------

**III- "CONVENTION ON EXTRATERRITORIAL VALIDITY OF FOREIGN JUDGMENTS".**-------------------------------------------------------------------------

**III.I. COMPLIANCE WITH ALL THE REQUIREMENTS OF ARTICLE 2 OF THE CONVENTION** ------------------------------------------------------------

The compliance with **each of the subsections of article 2 of the Convention** shall be hereinafter individually described. --------------------------------------------------

(i) FORMAL REQUIREMENTS (a)------------------------------------------------------

*"They must fulfill all the formal requirements necessary for them to be deemed authentic in the State of origin".* ------------------------------------------------------

As the documents were legalized with an apostille by the authorities of the State of origin, they are certainly deemed **"authentic"** in Ecuador. ---------------------------

Article 5 of the Hague Convention Abolishing the Requirement of Legalization for Foreign Public Documents sets forth that: *When properly filled in, the apostille will certify the authenticity of the signature, the capacity in which the person signing the document has acted and, where appropriate, the identity of the seal or stamp which the document bears".* ---------------------------------------------------------------------

(ii) TRANSLATION (b) ------------------------------------------------------------

*"The judgment, award or decision and the documents attached thereto that are required under this Convention must be duly translated into the official language of the State where they are to take effect".* --------------------------------------------------

No explanation is needed in this case, as the documents whose acknowledgement is requested have been issued in Spanish, which is also the official language of our country. -----------------------------------------------------------------------------------

The translation required by the above-mentioned subsection is therefore inapplicable.

(iii) LEGALIZATION (c) ----------------------------------------------------------

*"They must be presented duly legalized in accordance with the law of the State in which they are to take effect".* ------------------------------------------------------------

Both Argentina and Ecuador have signed and acknowledged the Hague Convention Abolishing the Requirement of Legalization for Foreign Public Documents (1961). --

3

And whenever any such circumstance occurs –acknowledgement by both countries of the Hague Convention-, *"the legalization by the Argentine Ministry of Foreign Affairs is not required"*[3]. ------------------------------------------------------------------------

This requirement is not necessary to the extent Article 9 of the Convention specifies that *"Each Contracting State shall take the necessary steps to prevent the performance of legalizations by its diplomatic or consular agents in cases where the present Convention provides for exemption".* ----------------------------------------------

Additionally, article 5 of the Hague Convention (1961) establishes that *"When properly filled in, the apostille will certify the authenticity of the signature, the capacity in which the person signing the document has acted and, where appropriate, the identity of the seal or stamp which the document bears".* ------------------------------------------------

Accordingly, the *Apostille* -duly added to the judgment whose acknowledgement is requested- is sufficient to meet this requirement. -----------------------------------------------

(iv) <u>INTERNATIONAL JURISDICTION (d)</u> -------------------------------------------------

*"The judge or tribunal rendering the judgment must have jurisdiction in the international sphere to hear the matter and to render judgment on it in accordance with the law of the State in which the judgment, award or decision is to take effect".*

"Jurisdiction in the international sphere" is deemed as *"…the jurisdiction of the judge who rendered the judgment examined by the judge who must acknowledge or enforce it"*[4]. ----------------------------------------------------------------------

When referring to the Spanish case analyzed by them, the concepts of Fernández Rozas- Sánchez Lorenzo are *mutatis mutandi* applicable to the Argentine legal position regarding this requirement, and mainly explained as follows: ----------------------------

*"International judicial jurisdiction is substantially different from national judicial jurisdiction. Each state system has several competent bodies, and each of them hears*

---

[3] Pursuant to National Court in Commercial Matters, Court Room E, CRI Holding Inc. vs. Compañía Argentina de Comodoro Rivadavia, September 22nd, 2006. -----------------------------------------------------

[4] According to Weinberg de Roca, Inés M, *Competencia Internacional y Ejecución de Sentencias Extranjeras*, Astrea, 1994, page. 57. The author makes a distinction between "direct" and "indirect" jurisdiction. In the first case, the State has the power to deem itself competent and judge certain international disputes: the judge is competent  to pronounce judgment in an international action; in the second case ("indirect" jurisdiction), the judge has the power to enforce the judgment, not to pronounce it. This is why the exequatur proceedings or acknowledgement and enforcement of foreign judgments relate to the "indirect" jurisdiction field. As Goldschmidt has stated, the fact that the judge is indirectly competent *"helps protecting the own jurisdiction against foreign jurisdictions invading it"* (according to Goldsclimidt W., *Derecho Internacional Privado,* Abeledo Perrot, 2009, page 998). ----------------------

4

*some of the lawsuits on the basis of criteria within the meaning of jurisdiction [suspensive dots].International judicial jurisdiction lies before national judicial jurisdiction, because conflicts of national judicial jurisdiction only make sense when the Spanish bodies are internationally competent. On the other hand, conflicts solved by nationally competent and internationally competent authorities have a different nature: at a national level, the solution to these conflicts does not depend considerably on the fundamental rights to effective legal protection and not to be left unprotected, at least to the same extent as conflicts solved by internationally competent authorities. In the case of the latter, in general, the lack of jurisdiction of the Spanish courts does not ensure that the judges from other states will hear the case and, therefore, the effective legal protection lies as a fundamental concept of the regulation"*[5]. -----------------------

On the other hand, *"The control over international judicial jurisdiction is general and exerted in almost every legal system; it shall be aimed at defending the exclusive jurisdiction of the State and excluding any exorbitant jurisdiction of the State of origin"*[6]. ---------------------------------------------------------------

The result of this examination will determine whether the Judge of the country in which the acknowledgement is requested deems himself as competent to hear the *exequatur* proceedings. -------------------------------------------------------------

Firstly, it shall be determined whether the foreign Judge has not invaded a jurisdiction belonging **EXCLUSIVELY** to the Argentine judges. --------------------------------------

In this sense, in order to highlight the importance of this examination, it has been stated that *"The only thing that matters to our law is that the judgments rendered by non-competent judges not be acknowledged on the basis that the national judges have jurisdiction"*[7]. ---------------------------------------------------------------

---

[5] According to José Carlos Fernández Rozas- Sixto Sánchez Lorenzo, *Derecho Internacional Privado*, Civitas, Madrid, 1999, pages 80/81. ---------------------------------------------------------------
[6] According to Feuillade, Milton C, *La Sentencia Extranjera*, Ábaco Publishing House, Buenos Aires, 2008, page 137.---------------------------------------------------------------
[7] According to Cortés, V., *Derecho procesal civil internacional*, "Revista de Derecho Privado", Barcelona, 1981, page 148; quoted by Feuillade, *ob cit.*, page 139, note No. 47. As stated by this author, Cortés' criterion transcribed in the main part of this pleading is in principle correct, though it cannot be admitted without certain qualifications (for example, if the foreign court was exorbitant or the judge refused to enter a judgment). In any case, the quotation is useful in this context to emphasize that it must be ensured that the foreign judge (in this case, Ecuadorian) has not invaded the exclusive jurisdiction of an Argentine judge. ---------------------------------------------------------------

5

In addition, Goldschmidt concludes that *"For any such invasion to take place, it is necessary that when the foreign judge intervenes in our jurisdiction our international procedural public order be breached. It is not enough that our jurisdiction has been the only one, it must also have been exclusive"*[8]. ----------------------------------------------

The facts described in Chapter III are enough to provide a convincing answer to the question. ------------------------------------------------------------------------------

In the case under analysis, it is evident that no Argentine judge had international jurisdiction to hear the claim of the inhabitants of the Ecuadorian Amazonia against the US oil company which had caused the damages (Texaco Inc. first; then Chevron Corp. after the merger completed in 2001).--------------------------------------------------

Therefore, in this case, there is no chance that the judgment whose acknowledgement is requested may have invaded the exclusive jurisdiction of an Argentine judge. ---------

In order to consider this matter, it must also be analyzed whether the foreign judge has assumed an EXORBITANT jurisdiction. As stated by Boggiano, "(suspensive dots) *it is necessary to emphasize the fact that exorbitant jurisdictions must be disregarded… Any exorbitant jurisdiction must be disregarded… The exercise of exorbitant jurisdiction must be disregarded to protect the interests of international affairs. The exercise of exorbitant jurisdiction must be penalized by disregarding it"* [9]. ---------------

The author particularly makes reference to the relationship of the case with the jurisdiction in which it has been decided. *"First of all* –he explains- *it is necessary to analyze the relationship of the parties to the lawsuit with the forum; and the relationship of the factual circumstances and the situations entailing the cause or dispute; and the relationship between the subject-matter of the claim and the forum [*suspensive dots*]* ----------------------------------------------------------------------

---

[8] According to Goidschmidt Werner, *Derecho Internacional Privado,* Abeledo Perrot, 2009, page 998. In the judgment pronounced by the Supreme Court in the proceedings "Holiday Inns Inc. c/ EBASA Exportadora Buenos Aires SA. s/ ejecutivo" on April 5th, 2005, this concept was clearly explained: only if the foreign judge rendered a judgment in a claim in which the Argentine judge had exclusive jurisdiction the rejection of the acknowledgement is justified; however, this oppressive consequence is not applicable if the jurisdiction of the Argentine judge was "concurrent" with the jurisdiction of the foreign judge. And it certainly is not applicable in the case under analysis, where the Argentine judge was not competent at all to render judgment in the proceedings whose judgment is sought to be acknowledged. --------------------------------------------------------------------------

[9] According to Boggiano. ob. cit., T.I, page 480. ----------------------------------------------------

6

*However, there must always be a reasonable relationship between the case and the forum. Otherwise, jurisdiction would be abusive or exorbitant, i.e., without any reasonable or minimum relationship supporting it "*[10]. --------------------------------

Your Honor may see that the background of the case shows that there is a reasonable relationship between such case and Ecuadorian jurisdiction.------------------------------

<u>Plaintiffs are nationals of that State, are domiciled there and the acts causing the environmental damages were performed in Ecuador[11].</u> ---------------------------------

<u>Furthermore, defendant, although a national of another State, consented the Ecuadorian jurisdiction –and even proposed it itself- as a means to attain the dismissal of a claim previously initiated in USA[12]</u> ---------------------------------------

Our Supreme Court of Justice has weighed "*the existence of an essential relationship with the forum*" in light of "*the factual circumstances of the dispute*", as a relevant factor to be considered upon the evaluation by the Argentine judges of the international jurisdiction[13].--------------------------------------------------------------------

From this viewpoint, the jurisdiction of the Ecuadorian judges hearing the proceedings is definitely attested. -----------------------------------------------------------------

(v) <u>SERVICE OF SUMMONS AND NOTICE OF THE COMPLAINT (e)</u> ------------

*"The defendant must have been summoned or subpoenaed in due legal form substantially equivalent to that accepted by the law of the State where the judgment, award or decision is to take effect".* -----------------------------------------------------

---

[10] According to Boggiano, ob. cit., page 201 and following pages.---------------------------------------

[11] In this sense, it is worth quoting the Press Release issued by Chevron Texaco praising the election of the Ecuadorian jurisdiction to hear in the proceedings: "[suspensive dots] *Plaintiffs are in Ecuador, business was conducted in Ecuador, the state oil company –with which Texaco operated as a minority partner and which is currently still operating the fields- is in Ecuador. Evidence is in Ecuador and the compensation sought by plaintiffs can only be obtained in Ecuador ".* ---------------------------------------

[12] In this regard, it should be noted that the proceedings were originally initiated in the United States. Chevron claimed that the adequate jurisdiction was the Ecuadorian jurisdiction and, in this way, the US Court issued a decision in this sense; before, it ordered Chevron to agree –and Chevron actually did so- to observe the judgment eventually pronounced by the court in Ecuador.

[13] Supreme Court of Justice, proceedings "Cri Holding Inc. c/ Cia. Arg. de Comodoro Rivadavia S.A", November 3rd, 2009. The conceptual idea transcribed in the text relates to the opinion issued by the Attorney General (February 19th, 2009), which the Court used as its own. This precedent acknowledged the international jurisdiction of a US Court, as it was not noted "…*whether the foreign judge has invaded the Argentine exclusive jurisdiction or whether the jurisdiction was exorbitant, arbitrary, abusive, artificial or fraudulent, or whether the natural judge or the right to defense has been breached*" (also a transcription of the opinion issued by the Attorney General which the Court used as its own).-------------

7

In this regard, it should be noted that in the proceedings filed in Ecuador, Chevron Corp. was summoned in a form substantially analogous to that set forth by the Argentine law of procedure when serving notice of the complaint. -----------------------

As evidence of compliance with this requirement, you will find attached a copy of the notices, legalized with an apostille.-------------------------------------------------------

This evidences that, in this case, the service of summons and notice of the complaint took place, as it is unquestionable that Chevron Corp., in fact, answered the summons through a long presentation of arguments –also attached with an apostille (**Exhibit 6**)- by which it raised all defenses and arguments to which it believed to be entitled and, at the same time, proposed the production of all evidence it deemed adequate to support its position[14]. ------------------------------------------------------------------------------

(vi) RIGHT TO DEFENSE (f) ------------------------------------------------------------------

"***The parties must have had an opportunity to present their defense***".------------------

After analyzing the background provided, it must be certainly concluded that Chevron's right to defense was truly respected; the local judges were so tolerant towards their continuous claims, which even caused delays, that the proceedings required ten years to a render judgment. Additionally, the proceedings were heard completely in the jurisdiction strongly defended by Chevron during nine years, which resulted in "lost time" for plaintiffs in pursuing justice. -------------------------------------

The analysis of this requirement must be necessarily supplemented by our analysis of the "public order" hereinafter performed, particularly when dealing with the procedural or adjective law, as well as the compliance with the provisions of article 3 b) of the Inter-American Convention on Extraterritorial Validity of Foreign Judgments and Arbitral Awards. The documents that will be referred to below show not only that defendant's right to defense was respected but also that defendant fully exercised that right, in some cases, even committing excess or abuse. -------------------------------------

(vii) FINAL JUDGMENT OR RES JUDICATA (g) -----------------------------------------

---

[14] Since these are summary and oral proceedings, the "answer of the complaint" is carried out within the framework of the pretrial conference. Section 23of the Civil Code of Procedure of Ecuador refers to this procedure, as follows: "*After the complaint is filed, the judge, if summary and oral proceedings are applicable, shall declare so and order that defendant be provided with a copy of the complaint*" (article 829). "*Immediately after serving summons, the judge shall state the date and time to hold the pretrial conference (suspensive dots)."* (article 830); then it sets forth the following: *"The pretrial conference shall begin by answering the complaint, including the exceptions, either dilatory or peremptory, to which defendant believes to be entitled (suspensive dots)"*. ------------------------------------------------------------

*"They must be final or, where appropriate, have the force of res judicata in the State in which they were rendered"* -------------------------------------------------

As literally established by the convention, in order **to determine whether the judgment is final or has the force of res judicata, the laws of the country of origin must be analyzed**. --------------------------------------------------------------------

The National Court of Appeals in Civil Matters has adopted such criterion, when sustaining that the foreign judgment "(suspensive dots) *must be final or have the force of res judicata, i.e. it must not be subject to appeal by ordinary remedies admitted by the laws of the country in which it has been rendered";* then it holds that "(suspensive dots) *as the qualification as res judicata must be decided pursuant to the laws in force in the State in which the judgment was rendered, the interested party must provide evidence of this*"[15]. ----------------------------------------------------------------

The terms of the resolution issued by the Single Court Room of the Provincial Court of Sucumbíos in the explanatory judgment rendered on January 13th, 2012 (**Exhibit 5**) must be quoted, as they are sufficient to deem this requirement as met. This resolution clearly shows what the Ecuadorian law and case law understand as a *final judgment* or *res judicata*; **i.e., the interpretation to be followed by the Argentine judge pursuant to the provisions of article 2 of the Convention on General Rules of Private International Law, whose hierarchy is higher than the laws of our legal system**[16].

In that judgment dated January 13th, the Ecuadorian Court stated: ----------------------

*"Since the judgment rendered on January 3rd, 2012, together with this amplifying and explanatory judgment, puts an end to the proceedings, deciding over the substance of the case in the court of last resort, it is evident that when the Court of*

---

[15] According to the National Court of Appeals in Civil Matters, Court Room K, June 10, 2010. ----------
[16] This convention specifies *"Judges and officials of the States Parties are required to apply foreign law in the same manner as the judges of the state whose law is applicable..."*. With respect to this regulation, the Attorney General held before the Supreme Court of Justice that *"article 2 of the Convention quoted...supported the" teoría del uso jurídico" (theory which establishes that in case of a foreign case, the judge must consider the case as the judge of the jurisdiction of the case would do it), by which national judges are bound to apply foreign regulations in the same manner as the judges of the state whose law is applicable (suspensive dots) article 2 referred to above has no regulations directly establishing which right is applicable, and merely sets interpretation guidelines for foreign law, by setting forth that only the judges and authorities of the states parties are bound to interpret the regulations in the same manner as the judges of the state whose law is applicable* (according to the Opinion of the Attorney General dated July 10, 1999 in the proceedings "Moka S.A. c/ Graiver David s/ sucesión").--------------------------------------------------------------------

9

*Appeals renders a judgment, such judgment has the force of res judicata, materially and formally, precisely because the proceedings are over".* --------------------------------

In this judgment, the Court of the Province of Sucumbios explains why cassation appeals instance does not imply an obstacle to the res judicata concept, as applied in Ecuador. --------------------------------------------------------------------------------

*"After the enactment of the Law on Cassation Appeals (1992), the Ecuadorian law has defined by continuous case law –at least 12 cassation judgments, which imply a mandatory judicial precedent- that section 2 of the Law on Cassation Appeals entails that 'the extraordinary remedy is only enforceable when a decision has been issued that puts an end to the proceedings, which has the force of res judicata, formally and substantially, i.e. a final judgment, so that the action between the same parties (subjective) cannot be renewed to claim the same thing, quantity or facts, grounded on the same cause, reason or right (objective,) and when such judgment has been rendered in ordinary judicial proceedings"[17].* --------------------------------------------------------------

It is not necessary to resort to books of authority or the analysis of analogous precedents: <u>the Court in charge of hearing the case in the second and final instance expressly sustained, without any margin of doubts, that the issue has the force of *res judicata*, and that it was only because the judgment had that force that the appeal sought by Chevron Corp could be filed</u>[18]. This is based on the fact that this extraordinary remedy, pursuant to Ecuadorian laws, is only applicable against judgments with the force of *res judicata*, formally and substantially. --------------------

But it was not only in the explanatory judgment issued on January 13rd, 2012 that the Single Court Room of the Court stated that the action had the force of res judicata; on other two occasions, in two resolutions issued later on, on **February 17th, 2012 (Exhibit 7)**[19] and **March 1st, 2012 (Exhibit 8)**[20], the Court understood the same.------

The first resolution referred to a claim made by Chevron to be exempted from posting the surety bond legally required to suspend the enforcement of the judgment.

---

[17] It should be noted that, pursuant to the provisions of section 19, second paragraph, of the Law on Cassation Appeals of Ecuador, "*If a judgment that has been appealed is confirmed three times, this implies a mandatory judicial precedent for the interpretation and application of the laws, except for the Supreme Court*". This is why the Single Court Room, in the paragraph transcribed, has made reference to the "mandatory" condition of the criterion adopted in "*at least 12 judgments appealed*". ----------------
[18] The appeal was granted *a posteriori* by a resolution of the same Court issued on February 17th, 2012.
[19] A copy legalized with an apostille is attached as an Exhibit. This resolution also includes the approval of the extraordinary remedy filed by Chevron.-------------------------------------------------------
[20] A copy legalized with an apostille is attached as an Exhibit. -------------------------------------------------

10

Independently of how inappropriate it is that a company such as Chevron, whose quarterly income amounts to <u>billions</u> of dollars (i.e. thousands of millions) may request such exemption, the Single Court Room anyhow addressed defendant's arguments –referred to the fact that a temporary arbitration award in an action where plaintiffs were not parties would prevent the enforcement of the judgment-, dismissed those arguments for being legally inapplicable and, in accordance with what had already been stated in the judgment rendered on January 13th, 2012, in the sense that the judgment had the force of res judicata, **instructed that <u>copies be sent in order that the court of original jurisdiction may enforce the judgment without delay</u>[21].**----------------------

Even more explicitly, in the following decision issued on March 1st, 2012 -upon the arguments presented by Chevron as to the fact that a second temporary award would prevent the enforcement of the judgment-, the Court said:  *"This Court Room will not refer again to the substantial arguments because they have been analyzed in the judgments. These arguments will not be taken into account, <u>as a judgment has been rendered with the force of res judicata, which analyzes the judicial evidence and decides over these matters</u>, and it is not the time to discuss again how the evidence was examined"* [22]. At the same time, the court room made reference to constitutional arguments about legal equality (why does any party to a case have to post a surety bond in order to suspend the enforcement of a judgment, and a company such as Chevron would be allowed to obtain the same effect by means of an award issued in arbitration proceeding to which plaintiffs are not even parties?) and finished the ruling by stating –now at plaintiffs' request- that: -----------------------------------------------------

*"this ruling, for any procedural purposes and requirement, orders the enforcement of the judgment rendered in this jurisdiction"*[23]. ------------------------------------------------

The concept included in the judgments mentioned above is also supported by prestigious books of authority; accordingly, María Elsa Uzal holds that *"Section 517of the National Code of Procedure in Civil and Commercial Matters, in addition to the control over the indirect jurisdiction, requires that the judgment must have timely* [sic]

---

[21] Pursuant to the terms of section 8 of the Law on Cassation Appeals Ecuador, which establishes that "(suspensive dots) *the copies* [of the record] ***shall be sent to the judge or competent body for the enforcement of the judgment"***. --------------------------------------------------------------------------------
[22] The highlighting and underlying are not part of the original document. ----------------------------------
[23] In this regard, we will hereinafter refer to the requirement of article 3 c) of the Inter-American Convention on Extraterritorial Validity of Foreign Judgments and Arbitral Awards. ----------------------

11

*had the force of res judicata in the State in which it was rendered (subsection I); this implies that the judgment must be final and conclusive and, therefore, not subject to appeal by means of an __ordinary__ remedy* "[24]. ------------------------------------------------

In this sense, the National Court of Appeals in Civil Matters held, in relation to this specific issue, that what had to be verified in order to approve the exequatur was " (suspensive dots) *whether the judgment is subject to appeal by means of any __ordinary__ remedy and, in such a case, whether any such remedies have been filed and their outcome or, if they have not been filed, the evidence that the due terms have expired (suspensive dots)*[25].

Likewise, Boggiano states that "if the judgment is final, even if it may be appealed by means of an extraordinary remedy, as in our country, it may be acknowledged"[26]. -----

**In conclusion, the judgment rendered by the Single Court of the Provincial Court of Sucumbíos has the force of res judicata and the fact that an EXTRAORDINARY APPEAL is pending with the Ecuadorian Supreme Court does not imply an obstacle to have the judgment acknowledged, as we noted before.** -------------------------------------------------------------------------

(viii) PUBLIC ORDER (h) ----------------------------------------------------------------

*"They must not be manifestly contrary to the principles and laws of the public policy (ordre public) of the State in which recognition or execution is sought"* -------------

Nothing enables us to reach the conclusion that a judgment such as that rendered by the Ecuadorian judges, ordering the payment of damages caused by defendant's (the legal successor) illegal acts, is in any way inconsistent with the principles of the Argentine legal system. **On the contrary, the judgment is wholly in accordance with Argentine laws and their fundamental underlying principles: as a matter of fact, as decided by our Supreme Court, the right to obtain compensation as a**

---

[24] According to Uzal, María Elsa, *Solución de Controversias en el Comercio Internacional,* Ad Hoc, Bs. As., 1992, page 36. The highlighting and underlying are not part of the original document. Colombo-Kiper also allege that only a pending ordinary remedy shall entail an obstacle to the exequatur (according to *Code of Procedure (suspensive dots).* Volume. IV, page 578). --------------------------------
[25] According to the National Court in Civil Matters, Court Room H, "Freire Guapo Garcao Fernando M. c/ Arrellano Laura E.", judgment rendered on August 13, 1997 [IX 1998-B, 176]. The highlighting is not part of the original document.-------------------------------------------------------------------
[26] According to Boggiano Antonio. *Derecho Internacional Privado,* Depalma, Buenos Aires, 2nd Edition, 1983, Volume II. page 1333 (quoted by Uzal). -------------------------------------------------------------

consequence of the infringement of the *alterum non laedere* principle described in section 19 of our Constitution is a constitutional right[27]. -------------------------------

The verification must be made between the material solution offered to the case by the foreign court and the spirit or general principles inherent to our own legal system. It is not about verifying whether the laws in force in the country of the foreign judge and applied by him are similar to our own laws, or about controlling the manner or extent to which the foreign judge applied the laws; and, not even if the foreign judge has applied Argentine law to solve the dispute may the court of our country judge how the law was applied, provided –of course- that the Argentine exclusive jurisdiction has not been invaded, as explained in the chapter referred to "international jurisdiction"[28].

<u>In this way, not even the verification of consistency with the local public order may enable an examination of substance</u>[29].-----------------------------------------------------

Finally, the public order must also be examined from a strictly procedural or adjective viewpoint. The already mentioned issue of service of summons and notice of the complaint is important -whether made in due legal form substantially equivalent to that accepted by the law of the State where the acknowledgment is sought, and so is the above referred issue as to whether defendant's right to defense has been respected during the proceedings.----------------------------------------------------------------------------

In this respect, we refer to what has been stated above when addressing the compliance with the requirements imposed by article 2 e) and f) of the Convention, as well as to what will be stated below in terms of the documentation evidencing the effective compliance with these requirements (article 3 b) of the Convention). --------------------

III.2. COMPLIANCE WITH ALL THE REQUIREMENTS OF ARTICLE 3 OF THE CONVENTION. ---------------------------------------------------------------------------

---

[27] According to the Supreme Court, "Santa Coloma", Judgment 308: 1160. -----------------------------------
[28] According to Boggiano, *ob.cif.*, Volume 1, page 486; the author states *"Not even when the foreign judge has applied Argentine law may his/her decision be revised by means of the acknowledgment or exequatur; nor may the conflict regulations applied by the foreign court be revised. Thus, it is not a condition for acknowledgement that the Argentine conflict regulations have been applied; not even the application of analogous conflict regulations is required. The respect for the foreign decision also entails the respect for the conflict regulations applied by the judge issuing that decision".* --------------
[29] Boggiano particularly emphasizes that the compliance with this requirement may in no event lead to an examination of the substance of the foreign judgment. *"The control is related to the material solution of the dispute in terms of its effectiveness or enforcement strictly in the country. This is why a substantial comparison is required between that solution and the spirit of the Argentine law".* ----------------------

By following the same methodology as that applied to address the requirements of article 2 of the Convention, we will analyze below the compliance with each legal requirement.------------------------------------------------------------------------------

(i) -------------------------------------------------------------------------------------------------

*"a. True copy of the judgment, award or decision"*------------------------------------------

The judgment rendered by the Judge of Original Jurisdiction Nicolás Zambrano on February 14th, 2011 (**Exhibit 2**) and the explanatory judgment issued by the same judge on March 4th, 2011 (**Exhibit 3**) are hereto attached in compliance with the requirements imposed by the ***"Hague Convention Abolishing the Requirement of Legalization for Foreign Public Documents"*** (1961).-------------------------------------

Additionally, in compliance with the provisions imposed by the international convention mentioned above, we enclose the judgment issued by the Provincial Court of Sucumbíos on January 3rd, 2012 (**Exhibit 4**) and its related explanatory judgment issued on January 13th, 2012 (**Exhibit 5**). -------------------------------------------------

<u>These are the four judgments we have identified in the "Purpose" section of this pleading as "the judgment" whose acknowledgement is sought under the terms of the "*Inter-American Convention on Extraterritorial Validity of Foreign Judgments and Arbitral Awards*" signed and confirmed –as timely explained- both by the Republic of Ecuador and by the Republic of Argentina.</u>--------------------------------

(ii) ------------------------------------------------------------------------------------------------

*"b. True copy of the documents required to prove that the provisions of subsections e) and f) of the foregoing article have been complied with"*----------------------------------

It is worth remarking that article 2 e) required that the defendant be summoned or subpoenaed in due legal form substantially equivalent to that accepted by the law of the State where the acknowledgement is requested; whereas article 2 i) required that the parties have an opportunity to present their defense. ---------------------------------------

Now, article 3 b) under analysis requires the attachment of documents necessary to evidence that the provisions of those items have been complied with.--------------------

In order to evidence Your Honor that **notice of the complaint** has been served, **Exhibit 9** hereto attached includes the evidence of service of process to Chevron Corporation; **by means of such legal process, on July 11th, 2003 at 2:22 pm notice of the complaint and its annexes was served.** --------------------------------------------------------

14

Together with the summons, Chevron was provided with the "*Record including 78 pages in certified copies with the initial complaint and annexes thereto*". That is to say, everything that Chevron needed to freely exercise its right to defense upon answering the complaint, which the company actually did.------------------------------------------

In addition, the two rulings –duly legalized with an apostille- (included as **Exhibit 9**) entered by the Chief Justice of the Superior Court of the Department of  Nueva Loja, dated **September 4th, 2003** and **October 8th,  2003**, whereby  the notice of the complaint to Chevron Corporation was deemed duly made[30], are hereto attached. -----

Regarding the defendant's right to defense, the following documentation is attached:

- Complete minutes of the hearing at which Chevron answered the complaint (**Exhibit 9**). ----------------------------------------------------------------------------

- Appeal of the final judgment (**Exhibit 10**). --------------------------------------------

**Based on these documents, it is evidenced that Chevron Corp. had the opportunity to present its defense as deemed advisable, to present its arguments without any legal or factual restrictions, to offer and produce evidence to prove its statements and to refute the statements made by plaintiffs, and to appeal with the Court of Appeals the judgment rendered by the court of original jurisdiction.** ---

(iii)--------------------------------------------------------------------------------------------

"**c.** *True copy of the document stating that the judgment, award or decision is final or has the force of res judicata*". ---------------------------------------------------------

When referring to the *force of res judicata* that the judgment must have, Palacio has sustained that *"The evidence of this circumstance must appear from the true copy of the resolution declaring that the judgment is final or has the force of res judicata"*[31].  ----

Couture agrees by stating the following " (suspensive dots) *since the proceedings belong to this jurisdiction, the declaration of certainty about the fact that the judgment is final and has the force of res judicata must arise from the judicial authority rendering such judgment* "[32].  --------------------------------------------------------------

**It is worth highlighting that the declaration of certainty about the fact that the judgment has the force of res judicata has been issued by the Court hearing the**

---

[30] These two rulings which deem as duly made the notice of complaint to Chevron Corp. are also included in the Exhibit.-------------------------------------------------------------------
[31] According to Palacio, Lino E., *ob. cit.* Volume VII, pages 320/21.------------------------------------
[32] According to Couture, Eduardo J., *Fundamentos del Derecho Procesal Civil,* Depalma, Bs. As., 1997.



<u>proceedings, and that such declaration is included in the instrument whose</u> <u>specific contents and truthfulness we have referred to above when addressing the</u> <u>compliance with the requirements of article 3 a)  under analysis and, in addition,</u> <u>in paragraph III.l. when dealing with article 2. g).</u> -------------------------------------

For these particular purposes, <u>the explanatory judgment issued on January 13th,</u> <u>2012 (Exhibit 5)</u> and the two subsequent judgments rendered by that same Court on <u>February 17th (Exhibit 7)</u> and <u>March 1st, 2012 (Exhibit 8)</u> are worth mentioning. They are also hereto attached –with an apostille- to comply with the supporting documentation required by this item. ----------------------------------------------------------

## IV. JURISDICTION, RELATIONSHIP WITH THE LOCAL VENUE AND FILING OF THE *EXEQUATUR* PROCEEDINGS ON THE PARTY'S OWN INITIATIVE -------------------------------------------------------------------------------

<u>a.-</u> The action for the acknowledgment of a foreign judgment, the so-called *exequatur* proceedings, must be filed with the applicable judge of original jurisdiction (section 518 of the National Code of Procedure in Civil and Commercial Matters), according to the jurisdiction and venue pursuant to location and subject-matter, according to the provisions of section 5 of the National Code of Procedure in Civil and Commercial Matters, and the provisions of Decree-Law 1285/58, on the National Justice Organization.[33]-------------------------------------------------------------------------

Section 43 of the above-mentioned Decree-Law 1285/58 sets forth that *"The national courts of original jurisdiction in civil matters of the City of Buenos Aires shall hear any cases governed by civil law which have not been expressly attributed to judges of other venue ";* then, it establishes as follows: *"Such courts shall also hear the following cases: [*suspensive dots*] b) Those where compensation for damages caused by illegal acts is claimed".* --------------------------------------------------------------------------------

---

[33] According to Boggiano, *ob.cit.,* Volume I, page 490; id. Gozaíni, Osvaldo, *Código Procesal.,* La Ley, 2002, Volume III, page 74; idem Palacio, Lino E., *Derecho Procesal Civil,* Abeledo- Perrot, Volume VII, page 327. This author adds the following: *"In addition, the federal courts can have jurisdiction when, pursuant to the applicable constitutional and legal regulations, they are able to hear a case based on the subject matter or the parties involved".* In the case under analysis, after examining the background, it appears that neither of these variables defines the federal jurisdiction: the subject matter is the liability derived from illegal acts and the parties involved are legal entities organized for private purposes. -----------------------------------------------------------------------------------

16

<u>**Recent case law has also recognized the effectiveness of section 43 of Decree-Law 1285/58 –applied to the facts of actions filed abroad- for the purposes of attributing national jurisdiction in the acknowledgement of the judgment**</u>[34]. ------

It is true that, recently, the Supreme Court of Justice has confirmed the criterion specifying that the matters related to environmental protection must be heard by the local authorities corresponding to the affected jurisdiction[35]; however, such criterion is not applicable to this case, as the damages recognized in the judgment were caused outside the territory of the Republic –and the effects were not extended within the boundaries of our country- and, therefore, for the purposes of the legal precedents mentioned above, <u>there are no local legal authorities that can be resorted to</u>. On the other hand, there are no various jurisdictions involved (in the sense that damages affect two or more provinces) giving rise to the federal jurisdiction, according to the criterion adopted by the Supreme Court in that precedent[36]. --------------------------------------------

**After offering the above explanations, it is worth noting that the judgment whose acknowledgment is sought makes it clear that the action is about the compensation for damages caused by the "illegal acts" for which defendant has civil liability due to its acts or omissions. Such is the subject-matter of the case. <u>There are no contractual relationships of any kind between plaintiffs and defendant –an oil company-, nor are there any elements –either factual or legal-justifying any jurisdiction other than as specified by the applicable regulation</u>** (section 43 b. of Decree-Law 1285/58). --------------------------------------------------------

---

[34] According to the National Court of Appeals in Civil and Commercial Matters, Court Room II, *"Clarkson Hyde LLP c/ Otero Monsegur María Antonia s/ Exequatur"*, dated September 3rd, 2009. In this case, the action was filed with the federal court in civil and commercial matters in the first place; the court alleged lack of jurisdiction and sent the case to the national court in civil matters, which did not accept it and sent it to the national court in commercial matters, which did not accept the case either. Finally, the National Court of Appeals in Civil and Commercial Matters decided that the national court in civil matters was competent, since section 43 of decree-law 1285/58 specified that such jurisdiction was applicable given the subject-matter of the case (provision of professional services).

[35] According to the Supreme Court, *in re,* "Benzrihen Carlos Jorge y otro c/ Industrias Magromer Cueros y Pieles S.A.", dated September 21st, 2010.--------------------------------------------------------------------

[36] In the precedent quoted in a previous note –when referring to the Attorney General's arguments- the Supreme Court held as follows: "[suspensive dots] *it should be noted that the Supreme Court, based on various legal precedents, has established the criteria to be followed in order to determine the existence of the federal jurisdiction over the environmental subject-matter; first, the affected territory must be specified because, as prescribed by national lawmakers, the environmental damages must affect various jurisdictions (Judgment 327:3880; 329:2316), or the geographical area involved must extend beyond the provincial boundaries; i.e., it must comprise more than one jurisdiction of a state, province, City of Buenos Aires or more than one international jurisdiction, as the matter must refer to environmental issues shared by more than one jurisdiction (Judgment 330:4234; 331:1679)".* ----------------------------

17

The foregoing evidences that Your Honor is competent as a National Judge of Original Jurisdiction in Civil Matters. This conclusion is confirmed by the provisions of section 7 of General Environmental Law No. 25675, which sets forth the jurisdiction of *"ordinary courts as applicable in terms of the territory, subject-matter or parties involved"*: section 32 of that law ratifies that *"The environmental legal jurisdiction will be that applicable according to ordinary regulations on jurisdiction"*. ------------------

Finally, the fact that defendant is a commercial company does not alter the jurisdiction of national judges in civil matters, based on the regulations analyzed; as recently decided, the actions for damages caused by illegal acts are heard by national courts of original jurisdiction in civil matters of the City of Buenos Aires, <u>as the capacity of the parties does not change the legal relationship giving rise to the case</u>[37]. -------------------

<u>b.-</u> Now that the judgment is being enforced, it is worth remarking that in the original action **certain resolutions were issued which expressly involve assets held by the unsuccessful party, Chevron Corp., in the Republic of Argentina** (those resolutions, dated October 15th and 25th, 2012, were part of the letters rogatory –legalized with an apostille- included in the related proceedings). -----------------------

Based on this precedent, <u>**the direct relationship between the case and the local jurisdiction is clear, thus supporting that this jurisdiction is competent to hear the case**</u>. -------------------------------------------------------------------

Independently of the unsuccessful party's assets held in Argentina, the relationship with the local jurisdiction can also be explained from other multiple viewpoints. ------

<u>c-</u> Also supporting the involvement of Your Honor or, more precisely, the modality of the petition upon which such jurisdiction is exercised, it should be noted that the request for the acknowledgment of a foreign judgment does not require that letters rogatory be issued by the foreign judge.------------------------------------------------------------------

Colombo- Kiper hold that the procedure established by sections 517 and following sections of the National Code of Procedure in Civil and Commercial Matters (suspensive dots) *is an autonomous procedure, independent from the judgment whose enforcement is sought"*[38]. -------------------------------------------------------------

---

[37] According to the National Court of Appeals in Civil Matters., "Proyecto del Atlántico S.A. c/ Rosetti Víctor J. s/ daños y perjuicios s/ competencia", dated October 19th, 2011.

[38] According to Colombo- Kiper, *Código Procesal Civil y Comercial de la Nación- Anotado y comentado,* La Ley, Volume IV, page 579.-----------------------------------------------------------

18

Sentís Melendo emphasizes the same: *"It is an autonomous action. It is not subordinated to the action filed to obtain the judgment whose enforcement is sought or the judgment with respect to which the force of res judicata is intended in the country*[39]. The *autonomy* relates to the fact that the letters rogatory are unnecessary, since this case is not about "complying with" the order of a foreign judge, but about filing new proceedings with a different procedural purpose: examine whether that judgment may be compared to a final judgment rendered locally. This is why the **normal** and **typical** procedure to file any such proceedings is the "**action filed directly with the legal authorities who are competent to render the judgment**"[40]. ---------------------------

Similarly, when commenting on a judgment rendered by the Court of Appeals in Civil and Commercial Matters of Rosario, Ciuro Caldani held that the appropriate form to file an action for the acknowledgement and enforcement of a judgment is the party's request, whose "**direct presence**" in the proceedings, from a weighing viewpoint, **is consistent with the provision that the request must be made with the judge of original jurisdiction** (as set forth by section 518 of the National Code of Procedure in Civil and Commercial Matters) **and the importance of the resulting judgment.** As opposed to it, the letters rogatory is a necessary and adequate procedure with respect to notices, testimonies or other less important judicial "formalities"[41]. ---------------------

Furthermore, Boggiano refers to the importance in this kind of proceedings of the "party's request" and expresses that the claim "(suspensive dots) *may be filed by the interested party or by means of letters rogatory"*[42]------------------------------------------.

Palacio is also clear when indicating that this action "…*may be directly requested by the interested party, by letters rogatory or by diplomatic intervention"*[43].--------------

---

[39] According to Sentís Melendo. S. *La sentencia extranjera (Exeauatur).* Ediciones Turídicas Europa-América, Bs.As., 1958, page 149. ------------------------------------------------------------------
[40] According to Sentís Melendo, S., *ob.cit,* page 127; at the beginning of chapter V, exclusively devoted to the analysis of this matter, the author says: *"Exequatur proceedings may be filed in three ways: an action filed directly with the legal authorities competent to render such judgment; the diplomatic intervention and letters rogatory. **The normal procedure is the one mentioned in the first place"*** (emphasis is added). ----------------------------------------------------------------
[41] According to Guro Caidani, Miguel A., *Un caso de Derecho Procesal Internacional Privado,* in ED 112-411 [Commentary to the judgment "Sociedad Anónima Comercial e Industrial c/ Industrias Walter s/ demanda de ejecución de sentencia- Exhorto de Santa Cruz de la Sierra, Bolivia"]. The judgment in itself is not interesting from a legal viewpoint; it refers to an anomalous proceeding which, in the author's viewpoint, arose from "(suspensive dots) *the mistaken use of the letters rogatory by the Bolivian judge"* who *"to request the enforcement of a judgment, generated the confusion that is now trying to be solved by the two legal jurisdictions in Rosario".* -------------------------------------------------------
[42] According to Boggiano, *ob.cit.,* Volume I, page 490.----------------------------------------------------

19

The issue was discussed in the already quoted legal precedent "Cri Holding", where defendant, to reject the acknowledgment, unsuccessfully argued before the Court he alleged irregularity of the proceedings because no letters rogatory had been issued.---

The Attorney General, before the Court of Appeals in Commercial Matters, issued the following opinion: -------------------------------------------------------------------------------

*"The arguments referred to the irregular proceedings must also be rejected, as exequatur proceedings may be filed by the interested party and by means of letters rogatory, as understood by the applicable books of authority (according to Boggiano). In this case, although no letters rogatory have been issued by the foreign court, the interested party has made the request (suspensive dots)"*[44]. ---------------------------------

Thereafter, the Court Room rendered a similar judgment, as follows: *"Finally, exequatur proceedings have been filed by the interested party and, therefore, the fact that they have not been initiated by means of letters rogatory does not prevent the proceedings from being heard*"[45]. ---------------------------------------------

## V. <u>ADDITIONAL CONSIDERATIONS ABOUT THE FEASIBILITY OF THE EXEQUATUR PROCEEDINGS AGAINST CHEVRON CORPORATION</u>. -----

At a given time, Chevron was granted by a District Court of New York, where Judge Lewis Kaplan sits, <u>an unusual injunction having universal scope</u> by which the Judge prohibited that the judgment rendered by the Ecuadorian courts be enforced in any country around the world. This injunction with a global scope was granted on March 7th, 2011, i.e. a few weeks after the court of original jurisdiction pronounced judgment. As it is noted without any further analysis, the injunction issued by Judge Kaplan implied a true legal incoherence never seen before. ---------------------------------------------

This injunction, as expected if analyzed by using a bit of common sense, did not last long, as on September 19th, 2011 the Court of Appeals of the Second Circuit of New York, first **completely revoked it** in summary proceedings  (the related decision is hereto attached, legalized with an apostille and translated –with the corresponding

---

[43] According to Opinion No. 113114 issued by the Attorney General's Office before the National Court of Appeals in Commercial Matters of the City of Buenos Aires, on September 14, 2006, signed by the then Attorney General Alejandra Gils Carbó. --------------------------------------------------------------------
[44] According to Palacio, *ob.cit.,* Volume VII, page 327. --------------------------------------------------
[45] According to the National Court of Appeals in Commercial Matters., Court Room E, "Cri Holding Inc. c/ Compañía Argentina de Comodoro Rivadavia", dated September 22, 2006. ---------------------------

20

legalization-, as **Exhibit 12**), and then <u>**severely dismissed it from a legal and argumentative viewpoint**</u>, presenting its grounds for the reconsideration on January 26th, 2012 (such decision is also attached, legalized with an apostille and translated –with the corresponding legalization-, as **Exhibit 13**). ---------------------------------------

<u>**Consequently, the decision preventing plaintiffs from seeking the enforcement of the judgment outside Ecuador is no longer effective.**</u> ---------------------------------------

Furthermore, even if that decision were effective, this action for the acknowledgment of the judgment may nonetheless be filed, to the extent **a US Judge cannot order a Judge from another country how to proceed** upon any such action. <u>The grounds dated January 26th, 2012 are conclusive on this matter.</u> ---------------------------------------

In addition to the scandalous forum shopping undertaken by Chevron in USA, it is worth noting, because it highlights the importance of the judgment, that the Court of Appeals of the Second Circuit of New York has been hearing the case in that country as from the first stage of the proceedings (1993-2002), <u>**when Chevron successfully alleged that the adequate jurisdiction to hear the environmental action, originally filed by plaintiffs in New York, was the Ecuadorian jurisdiction, which offered –as timely argued and explained by Chevron by providing numerous *Opinions* issued by Ecuadorian legal authorities- a qualified and transparent legal system**</u> (the decision issued by that Court of Appeals on August 16th, 2002, effectively sustaining Chevron's petition and ordering that the proceedings be heard in Ecuador, is hereto attached as **Exhibit 14**, legalized with an apostille and translated, with the corresponding legalization). ------------------------------------------------------------------

For these purposes, the Court of Appeals required from Chevron certain waivers referred to the statute of limitations (in order that the 9-year term during which the proceedings had been heard in New York may not affect the effective term of plaintiffs' action), as well as a formal and express commitment to observe the judgment to be eventually rendered by the Ecuadorian court. ------------------------------------------------

<u>**Accordingly, Chevron provided the judges of its country with a formal and express commitment to observe the judgment to be eventually rendered by the Ecuadorian judges.**</u> ------------------------------------------------------------------

21

Typical of Chevron, it later on tried to ignore that commitment and the Court of Appeals of the Second Circuit of New York had to **"remind" defendant of the effectiveness of such commitment**. -------------------------------------------------------

In a judgment rendered on March 17th, 2011 (hereto attached as **Exhibit 15**, legalized with an apostille and translated, with the corresponding legalization), the Court of Appeals stated the following: --------------------------------------------------------------

*"Chevron Corporation alleges, without referring to the relevant case law, that it is not bound by the commitments made by its former companies Texaco and Chevron Texaco Inc. However, when seeking to obtain the confirmation of the dismissal of the district court based on forum non-convenience grounds, Chevron Texaco's attorneys appeared in this court and reconfirmed the commitments made by Texaco to ensure the dismissal of plaintiffs' action. When doing so, Chevron Texaco became bound by these commitments. In 2005, Chevron Texaco changed its name from 'Texaco' to Chevron Corporation, its original name. It cannot be inferred from the record before us that the change in its name may have any effect on Chevron Texaco's legal obligations. Consequently, Chevron Corporation is liable for the commitments on which the district court based its decision to dismiss Plaintiffs' action".* ----------------------------------------------------------------

By means of the comparison of documents in **Exhibit 15**, Your Honor may note that the statements transcribed above have been made by the Court of Appeals to provide an explanation when it mentioned, under *Background*, that "*Texaco also agreed to observe any judgment benefitting Defendants*". -------------------------------------------

The considerations made in this chapter offer a referential and explanatory framework regarding the background of this exequatur action. They describe the relevant facts showing Chevron's strategy aimed at systematically *disregarding* any judgments not favoring it, wherever rendered. --------------------------------------------------------------

VI. <u>**GROUPING OF ACTIONS.**</u> -------------------------------------------------------------

We hereby request that these exequatur proceedings and action for the acknowledgment of the validity of a foreign judgment be grouped with the case "*Aguinda Salazar María c/ Chevron Corporation s/ Medidas precautorias*" (Record 91814/2012). The latter proceedings were initially filed in Court No. **61** of this jurisdiction; however, after defendant's challenge, they were sent to Court No. **98**. Both

courts claimed to have no jurisdiction and, therefore, the case was sent to the Court of Appeals. ------------------------------------------------------------------------------------

Notwithstanding which is the court finally assigned by the Court of Appeals to hear those proceedings, the truth is that based on procedural order and grouping of actions, both proceedings (*Injunctions* and *exequatur)* must be heard together, given that they refer to different stages of the same process.------------------------------------------

Section 49 of the Regulations applicable to the jurisdiction thus stipulates when establishing that in case any previous action has been filed to obtain an injunction, the main proceedings must be filed in the court granting any such injunction. --------------

**VII. <u>COURT FEES</u>.** ------------------------------------------------------------------------

Plaintiffs are exempt in their country of origin from the payment of any expenses, fees, surety bonds, etc., as specified in the letters rogatory issued in the related proceedings "*Aguinda Salazar María c/ Chevron Corporation s/ Medidas precautorias"* (Record 91814/2012), initially filed in Court No. 61 of the jurisdiction. ---------------------------

In its judgment rendered on November 6th, 2012, the Judge sitting in that Court took into account the exemption from those items. ------------------------------------------------

It is worth remarking that, in this regard, article 5 of the Convention --of a higher hierarchy than the laws of our legal system- makes it clear: a declaration in forma pauperis recognized in the State of origin of the judgment shall be recognized in the State of destination. Accordingly, **<u>if it is evidenced that in the country of origin plaintiffs are exempt from the payment of court fees, legal costs and attorney's fees, guaranties or surety bonds and/or any other expenses related to the proceedings</u>**, the court fees required by our legal system pursuant to Act No. 23898 may not be demanded. -------------------------------------------------------------------------

In the unusual case that the terms applicable in the country of origin changed, or if due to any cause arising after this filing plaintiffs were required to pay the court fees pursuant to Act No. 23898, the sum that would be payable based on the characteristics of the action pursued is that set forth by section 6 of that Act for the cases where the amount is not determined. -----------------------------------------------------------------------

In the precedent "Reef Exploration" referred to above, it was established that in the proceedings for the acknowledgment of a foreign judgment "**the amount was not determined**". When that specific item of the judgment was appealed, the Supreme

23

Court –making reference to the Attorney General's grounds- **rejected** the interested parties' claim aimed at assigning to the proceedings the amount of the judgment whose acknowledgement was being sought[46]. ------------------------------------------------------------------

VIII. **FEDERAL QUESTION**.------------------------------------------------------------

In case the claims of this party were fully or partially dismissed, the "Federal Question" is raised in order to resort to the Supreme Court under the provisions of section 14, Act No. 48 and other applicable regulations. ------------------------------------------------------

The Supreme Court may hear the case when the interpretation and application of international treaties is at stake and the decision adopted by the judges hearing the proceedings is contrary to the rights on which the party based its legal grounds pursuant to those laws[47] [48].------------------------------------------------------------------------------

IX. **DOCUMENTARY EVIDENCE**. ------------------------------------------------------

In every case, the documents were legalized with an *Apostille* under the Hague Convention (1961). -----------------------------------------------------------------------------

**Exhibit 1**: Copy of the power of attorney for judicial matters, whose original is enclosed to the proceedings *"Aguinda Salazar María c/ Chevron Corporation s/ Medidas precautorias"* (Record 91814/2012).--------------------------------------------------

**Exhibit 2**: Judgment rendered by the court of original jurisdiction on February 14th, 2011. ---------------------------------------------------------------------------------------------

**Exhibit 3**: Explanatory judgment issued by the court of original jurisdiction on March 4th, 2011. ---------------------------------------------------------------------------------------

---

[46] According to the judgment rendered by the Supreme Court on February 21st, 2006 [LL 2006-C, 429). It should be noted that even though the proceedings were classified as having an "undetermined amount" in order to fix the attorney's fees, under the provisions of section 6 a) of Act No. 21839, this classification is also applicable pursuant to Court Fees Act No. 23898. The same proceedings cannot have an "undetermined amount" for the purposes of fixing the attorney's fees and a fixed sum for the purposes of calculating the court fees. In this sense, the Federal Court of Appeals of Mar del Plata, in the proceedings *"Far Eastern Shipping Company c/ Arhenpez S.A."*, dated December 4th, 2009, held that *"…the Supreme Court has sustained the declaratory nature of the*[acknowledgment] *proceedings, indicating that the conversion to an execution instrument for it to be admitted as such in our territory through the exequatur does not entail any monetary discussion"* (emphasis is added). ------------------------------------------------- This link shows a like opinion by extending the conclusion of the judgment "Reef" to the court fees: http://marval.com.ar/Publicaciones/MarvalNews/ArticuloMN/tabid/96/language/es-AR/Default.aspx?ItemID=786 --------------------------------------------------------------------------------------------------
[47] According to the Supreme Court, "Vargas Lerena Alvaro c/ Cadena País Producciones Publicitarias S.A. s/ ejecutivo", dated March 2nd, 2011; Judgments 318:2639; 315:1848; 312:152, among others.
[48] According to the Supreme Court, *in re,* "Riopar S.R.L. c/ Transportes Fluviales Argenrio S.A." (R-165.XXXII), dated October 15th, 1996 [ED 171-539].------------------------------------------------

**Exhibit 4**: Judgment rendered by the Single Court Room of the Provincial Court of Sucumbíos on January 3rd, 2012.--------------------------------------------------------

**Exhibit 5**: Judgment rendered by the Single Court Room of the Provincial Court of Sucumbíos on January 13th, 2012. -------------------------------------------------------

**Exhibit 6**: Complete minutes of the hearing at which Chevron answered the complaint.

**Exhibit 7**: Judgment rendered by the Single Court Room of the Provincial Court of Sucumbíos on February 17th, 2012.----------------------------------------------------

**Exhibit 8**: Judgment rendered by the Single Court Room of the Provincial Court of Sucumbíos on March 1st, 2012.-------------------------------------------------------

**Exhibit 9**: Evidence that notice of the complaint has been formally served. -----------

**Exhibit 10**: Appeal of the final judgment[49].--------------------------------------------

**Exhibit 11**: Copy of the judgment evidencing that plaintiffs incur no costs in connection with these proceedings, as well as such parties' *exemption* from expenses (for example, fees, surety bonds, etc.). The original is included in the proceedings *"Aguinda Salazar María c/ Chevron Corporation s/ Medidas precautorias"* (Record 91814/2012), as that resolution was an integral part of the letters rogatory served therein. -----------------------------------------------------------------------

**Exhibit 12**: Judgment legalized with an apostille and translated -with the corresponding legalization- rendered on September 19th, 2011 by the Court of Appeals of the Second Circuit of New York.-------------------------------------------------------

**Exhibit 13**: Judgment legalized with an apostille and translated -with the corresponding legalization- of the presentation of arguments dated January 26th, 2012 rendered by the Court of Appeals of the Second Circuit of New York, regarding the decision dated September 19th, 2012. ------------------------------------------------

**Exhibit 14**: Judgment legalized with an apostille and translated -with the corresponding legalization- rendered on August 16th, 2002 by the Court of Appeals of the Second Circuit of New York. ------------------------------------------------------

**Exhibit 15**: Judgment legalized with an apostille and translated -with the corresponding legalization- rendered on March 17th, 2011 by the by by the Court of Appeals of the Second Circuit of New York. -------------------------------------------

---

[49] This pleading includes the complete volumes 2067 and 2068; and starts in volume 2066 composing Exhibit 3. ----------------------------------------------------------------------------

A
ICA
Federal
073

All the evidence of the related proceedings *"Aguinda Salazar María c/ Chevron Corporation s/ Medidas precautorias"* (Record 91814/2012), as well as the evidence of the original action, as applicable, is also offered as documentary evidence. ------------

X. <u>AUTHORIZATIONS</u>. ------------------------------------------------------------

The attorneys Leandro J. Caputo (Volume 64 Folio 827), Matín Saldico (Volume 103 Folio 337) and Matías Mendioroz (Volume 100 Folio 704), and Agustín Brugo (Identity Document 32173433), María Belén Capalbo (Identity Document 34384041), Matías Medici (Identity Document 35140218); Luciano Litre Martínez (Identity Document 34211514) and Juan P. Pascucci (Identity Document 34564537) are authorized to make authenticated copies of these proceedings. ----------------------------

XI. <u>PRAYER FOR RELIEF</u>. ----------------------------------------------------------

Therefore, we request Your Honor: ----------------------------------------------------

1º) That I be considered a party and that the domicile above be deemed as established.

2º) Prior service of process pursuant to law, that a judgment be rendered for the acknowledgment of the decision subject matter off this complaint, and that such judgment be deemed equivalent to a local judgment, for all purposes. ------------------

Respectfully submitted, ----------------------------------------------------------------

[Seals and signatures of the following attorneys: ENRIQUE BRUCHOU, RODOLFO A. RAMÍREZ, CARLOS MARÍA ROTMAN, MARTÍN BERETERVIDE]------------

----------------------------------------------------------------------------------------

This is a true translation - in 26 pages- from Spanish into English of the document I had before me and to which I refer in the City of Buenos Aires, on this 29th day of the month of January of the year 2013. ----------------------------------------------------------------

(Solely for legalization purposes, there follows the Spanish version of the closing statement above) ----------------------------------------------------------------------------

Es traducción fiel – en 26 carillas- del idioma castellano al idioma inglés del documento que tuve a la vista y al cual me remito en la Ciudad de Buenos Aires, a los 29 días del mes de enero del año 2013. ----------------------------------------------------------------------

COLEGIO DE TRADUCTORES PÚBLICOS
DE LA CIUDAD DE BUENOS AIRES
Corresponde a la Legalización
N° 6298/13
SERGIO ALEJANDRO IERVASI

PAULA GEROLA
TRADUCTORA PÚBLICA
IDIOMA INGLÉS
Mat. Tº XIV Fº 388 Capital Federal
Inscrip. C.T.T.C.B.A. N° 5073

26









# COLEGIO DE TRADUCTORES PÚBLICOS
# DE LA CIUDAD DE BUENOS AIRES

REPÚBLICA ARGENTINA
LEY 20.305

## LEGALIZACIÓN

Por la presente, el *COLEGIO DE TRADUCTORES PÚBLICOS DE LA CIUDAD DE BUENOS AIRES*,

en virtud de la facultad que le confiere el artículo 10, inc.d) de la ley 20.305, certifica únicamente que

la firma y el sello que aparecen en la traducción adjunta concuerdan con los correspondientes

al/la Traductor/a Público/a GEROLA, PAULA

que obran en los registros de esta institución en el folio 388 del Tomo 14 en el idioma INGLES

Legalización Número: 6298

Buenos Aires, 01/02/2013





ESTA LEGALIZACIÓN NO SE CONSIDERARÁ VÁLIDA SIN EL CORRESPONDIENTE
TIMBRADO DE CONTROL EN LA ÚLTIMA HOJA DE LA TRADUCCIÓN ADJUNTA.



Control Interno: 1494526298

Colegio de Traductores Públicos
de la Ciudad de Buenos Aires

Av. Corrientes 1834 - C1045AAN - Ciudad Autónoma de Buenos Aires - 4373-7173 y líneas rotativas

THE *COLEGIO DE TRADUCTORES PÚBLICOS DE LA CIUDAD DE BUENOS AIRES* (Sworn translators association of the city of Buenos Aires) pursuant to 20305 act, section 10, subsection d, hereby certifies that the signature and the seal on the translation attached hereto match the signature and seal of the Sworn Translator (Traductor Público) in our files.

THIS CERTIFICATION IS NOT VALID WITHOUT THE PERTINENT CONTROL STAMP ON THE LAST PAGE OF THE TRANSLATION ATTACHED HERETO.

Vu par le *COLEGIO DE TRADUCTORES PÚBLICOS DE LA CIUDAD DE BUENOS AIRES* (Ordre de Traducteurs Officiels de la ville de Buenos Aires), en vertu des attributions que lui ont été accordées par l'article 10, alinéa d) de la Loi nº 20.305, pour la seule légalisation matérielle de la signature et du sceau du Traductor Público (Traducteur Officiel) apposés sur la traduction du document ci-joint, qui sont conformes à ceux déposés aux archives de cette Institution.

LE TIMBRE APPOSÉ SUR LA DERNIÈRE PAGE DE LA TRADUCTION FERA PREUVE DE LA VALIDITÉ DE LA LÉGALISATION.

Con la presente il *COLEGIO DE TRADUCTORES PÚBLICOS DE LA CIUDAD DE BUENOS AIRES* (Collegio dei Traduttori Giurati della Città di Buenos Aires) ai sensi della facoltà conferitagli dall'articolo 10, comma d), della Legge 20.305, CERTIFICA, esclusivamente, la firma ed il timbro del Traductor Público (Traduttore Giurato), apposti in calce alla qui unita traduzione, in conformità alla firma ed al timbro depositati nei propri registri.

LA PRESENTE LEGALIZZAZIONE SARÀ PRIVA DI VALIDITÀ OVE NON VENGA TIMBRATA NELL' ULTIMO FOGLIO DELLA TRADUZIONE.

Através da presente, o *COLEGIO DE TRADUCTORES PÚBLICOS DE LA CIUDAD DE BUENOS AIRES* (Colégio de Tradutores Públicos da Cidade de Buenos Aires), no uso de suas atribuições, de conformidade com o artigo 10, alínea "d", da Lei 20.305, certifica unicamente que a assinatura e o carimbo do Traductor Público (Tradutor Público) que subscreve a tradução anexa conferem com a assinatura e o carimbo arquivados nos registros desta instituição.

A PRESENTE LEGALIZAÇÃO SÓ SERÁ CONSIDERADA VÁLIDA COM A CORRESPONDENTE CHANCELA MECÂNICA APOSTA NA ÚLTIMA FOLHA DA TRADUÇÃO

BEGLAUBIGUNG. Der *COLEGIO DE TRADUCTORES PÚBLICOS DE LA CIUDAD DE BUENOS AIRES* (Kammer der Vereidigten Übersetzer der Stadt Buenos Aires), kraft der Befugnisse, die ihr nach Artikel 10, Abs.d) des Gesetzes 20.305 zustehen, bescheinigt hiermit lediglich die Übereinstimmung der Unterschrift und des Siegelabdruckes auf der beigefügten Übersetzung mit der entsprechenden Unterschrift und dem Siegelabdruck des Traductor Público (VereidigtenÜbersetzers), die in den Registern dieser Institution hinterlegt worden sind.

DIESE BEGLAUBIGUNG IST NICHT GÜLTIG OHNE DEN ENTSPRECHENDEN GEBÜHRENSTEMPEL AUF DEM LETZTEN BLATT DER BEIGEFÜGTEN ÜBERSETZUNG.

# EXHIBIT 34

# Representations to Canadian Courts and Payments To/From Canadian Counsel

10-1-18

# Representations to Canadian Courts and Payments To/From Canadian Counsel



## May 2016

**May 2, 2016**

Alan Lenczner, Glenn Krevlin

Alan Lenczner and Glenn Krevlin sign a partially executed "Ecuador Judgment Investment Agreement" granting Krevlin a 0.125% interest "in the total amount of the Ecuador Judgment" in exchange for $250,000.

🔗 Slavek Ex. 2

**May 10, 2016**

Lenczner Slaght wires to Donziger & Associates

Lenczner Slaght wires $74,990.00 to Donziger & Associates, PLLC.

🔗 MKS-327

## Jul. 2016

**July 11, 2016**

Alan Lenczner, Glenn Krevlin, FDA

Alan Lenczner is listed as a party to a partially executed addendum to the "Ecuador Judgment Investment Agreement" that is signed by Glenn Krevlin and the President of the FDA. The addendum grants Krevlin an additional 0.05% interest in the judgment in exchange for $100,000.

🔗 Slavek Ex. 2

**July 11, 2016**

Alan Lenczner, Cliff Eilser, FDA

Alan Lenczner, Cliff Eisler, and the President of the FDA execute an "Ecuador Judgment Investment Agreement" granting Eisler a 0.125% interest "in the total amount of the Ecuador Judgment" in exchange for $250,000.

🔗 Slavek Ex. 2

**July 19, 2016**

Lenczner Slaght wire to Donziger & Associates

Lenczner Slaght wires $104,990.00 to Donziger & Associates, PLLC.

🔗 MKS-328

## Aug. 2016

**August 24, 2016**

Alan Lenczner, WDIS Finance LLC (John van Merkensteijn), FDA, Ecuador Trust

Alan Lenczner, WDIS Finance LLC (John van Merkensteijn), the President of the FDA, and the Board President of the Ecuador Trust execute an "Ecuador Judgment Investment Agreement" granting van Merkensteijn's company, WDIS Finance LLC, a 0.165% interest in "the total amount of the Ecuador Judgment and the Ecuador Judgment Proceeds" in exchange for $300,000.

🔗 Slavek Ex. 2

**August 24, 2016**

Alan Lenczner, Wellbeck Partners (Jay L. Goldstein), FDA , Ecuador Trust

Alan Lenczner, Jay Goldstein, the President of the FDA, and the Board President of the Ecuador Trust execute an "Ecuador Judgment Investment Agreement" granting Jay Goldstein's company, Wellbeck Partners, a 0.110% interest in "the total amount of the Ecuador Judgment and the Ecuador Judgment Proceeds" in exchange for $200,000.

🔗 Slavek Ex. 2

Participants    |    🔗 Hyperlink

# Representations to Canadian Courts and Payments To/From Canadian Counsel

**September 9, 2016**

Donziger email to John van Merkensteijn

Donziger emails investor John van Merkensteijn: "Can you please send an instruction to Alan Lenczner, via email, that 50% of the investor funds under the Agreement received by his law firm are to be forwarded Steven R. Donziger for expenses related to the Ecuador litigation. . . . Alan has indicated he needs said instructions directly from you or your representative. I would appreciate it if you could take care of this with dispatch. If you need detail about use of funds, let me know."

JVM-3447

**October 6, 2016**

Lenczner Slaght wire to Donziger & Associates

Lenczner Slaght wires $143,490.00 to Donziger & Associates, PLLC.

MKS-331

**October 21, 2016**

Lenczner Slaght wire to Donziger & Associates

Lenczner Slaght wires $99,990.00 to Donziger & Associates, PLLC.

MKS-331

**November 10, 2016**

Alan Lenczner, WDIS Finance LLC (John van Merkensteijn), FDA, Ecuador Trust

Alan Lenczner, WDIS Finance LLC (John van Merkensteijn), the President of the FDA, and the Board President of the Ecuador Trust execute an "Ecuador Judgment Investment Agreement" granting van Merkensteijn's company, WDIS Finance LLC, an additional 0.055% interest in the Ecuador Judgment in exchange for a $100,000 investment.

Slavek Ex. 2

**November 24, 2016**

Alan Lenczner, Indigenous People Limited (Ian Watson), FDA , Ecuador Trust

Alan Lenczner, Indigenous People Limited (Ian Watson), the President of the FDA, and the Board President of the Ecuador Trust execute an "Ecuador Judgment Investment Agreement" granting Ian Watson's company, Indigenous People Limited, a 0.1375% interest in "the total amount of the Ecuador Judgment and the Ecuador Judgment Gross Proceeds" in exchange for $250,000.

Slavek Ex. 2

Sept. **2016**     Oct. **2016**     Nov. **2016**


Participants


Hyperlink

2 of 6

**Representations to Canadian Courts and Payments To/From Canadian Counsel**

12.2016 - 01.2017



**December 7, 2016**

Michael Ben-Jacob email to Alan Lenczner

Michael Ben-Jacob emails Alan Lenczner, with a copy to John van Merkensteijn and Donziger: "Alan, This confirms that Steven is authorized to give instructions to you regarding the allocation and disbursement of funds to counsel to pay legal fees."

🔗 JVM-2498

**December 19, 2016**

Lenczner Slaght wire to Donziger & Associates

Lenczner Slaght wires $64,990.00 to Donziger & Associates, PLLC.

🔗 MKS-333



**December 12, 2016**

Donziger & Associates Wire to Patricio Salazar

Donziger & Associates, PLLC wires $3,179.00 to Patricio Salazar.

🔗 TD Bank 128

**December 17, 2016**

Donziger email to John van Merkensteijn

Donziger emails investor John van Merkensteijn: "John: Sorry for the bother but Alan says his auditor is asking for the following instruction regarding the recent $95,000 investment. Please send this to Alan from the person (I assume MBJ) who represents your entity. I already have discussed this with Alan and he is in agreement with it. Please confirm or let me know if any problem. This is time-sensitive. . . .

Alan: I hereby instruct your law firm to allocate $65,000 of the $95,000 investment from ENTITY to the law firm of Steven Donziger for expenses related to work on the Ecuador environmental case against Chevron.

Sincerely,

Representative of ENTITY"

🔗 JVM-3276

Dec. 2016



**January 20, 2017**

Ontario Superior Court

The Ontario Superior Court grants Chevron's and Chevron Canada's Motions for Summary Judgment and dismisses Plaintiffs' claims against Chevron Canada because "Chevron and Chevron Canada are separate legal entities with separate rights and obligations" and Plaintiffs "have not established that Chevron Canada's corporate veil should be pierced."

🔗 Reasons for Decision on Motions for Summary Judgment

Jan. 2017

Participants       🔗 Hyperlink       |       3 of 6

**Representations to Canadian Courts and Payments To/From Canadian Counsel**

## Feb. 2017

**February 10, 2017**

 Ontario Superior Court

The Ontario Superior Court enters a Judgment and Order dismissing the Plaintiffs' "action against Chevron Canada" and states that the "issue of costs will be addressed in a separate order."

🔗 **Judgment and Order**

**February 21, 2017**

 Lenczner Slaght wire to Donziger & Associates

Lenczner Slaght wires $137,490.00 to Donziger & Associates, PLLC.

🔗 **TD Bank 133**

**June 2, 2017**

 Ontario Superior Court

The Ontario Superior Court enters a Costs Order requiring Plaintiffs to pay to Chevron Canada "costs in the amount of $533,001.81" and to Chevron Corporation "costs in the amount of $313,283.00" in respect of the Summary Judgment Motions." The Costs Order bears interest at the rate of two percent per annum.

🔗 **Costs Order**

**June 19, 2017**

 Alan Lenczner

Plaintiffs' counsel represents to the Canadian court that "neither the remediation trustee nor the indigenous appellants can fund the litigation," that "Chevron has known about past third party funding and has impeded any future funding," and that plaintiffs' counsel in Canada is "working on a contingency fee basis."

🔗 **Factum of the Respondents on the Motion for Security of Costs, ¶¶25-26**

## Jun. 2017

**June 22, 2017**

 Alan Lenczner

In a letter to counsel for Chevron, plaintiffs' counsel writes: "The fee contingency arrangements that Lenczner Slaght and Koskie Minsky have is to reimburse these firms at the rate of $1,000 per docketed hour." The $118,000 that the appellants received as costs for their successful appeals before the Ontario Court of Appeal and before the Supreme Court of Canada has been utilized for disbursements, including paying:
(a) HST;
(b) the costs awarded by Nordheimer, J to Chevron Corp.;
(c) very significant printing and photocopying costs for the prior Court of Appeal and Supreme Court of Canada proceedings, the proceedings before Hainey, J and before the Court of Appeal;
(d) courier charges for serving materials and court fees; and
(e) expenses for the travel and hotel bills for a trip to the Supreme Court of Canada and a trip to Ecuador. Plaintiffs' counsel failed to respond to questions regarding their funding arrangements.

🔗 **170623 Further Supp Joint MR of Chevron (Security for Costs), Tab 2**

**September 21, 2017**

 Court of Appeal for Ontario

The Court of Appeal finds that Plaintiffs "put forward no evidence to demonstrate that they are impecunious," that they cannot "demonstrate that their appeal has something akin to a 'good chance of success'," and that the "just order in this case is one for security costs." The Court orders Plaintiffs to post security for costs in the amount of $591,335.14 for Chevron Canada ($50,000 for the appeal and $541,335.12 "for the proceedings below) and $351,616.33 for Chevron Corporation ($30,000 for the appeal and $321,616.33 "for the proceedings below").

🔗 **Order to Pay Security Costs, ¶¶65, 71**

## Sept. 2017

  

 Participants   |   🔗 Hyperlink           4 of 6

# Representations to Canadian Courts and Payments To/From Canadian Counsel

**October 3, 2017**

 Alan Lenczner

Plaintiffs file a Motion to Vary the Court's September 21, 2017 order requiring the plaintiffs to pay $942,951.47 in security for costs and ask the Court to set aside or reduce "the requirement for security for costs as a condition of proceeding with the appeals." In the motion, plaintiffs' counsel represents that "any funding assistance that the plaintiffs had in place has long since evaporated" due to Chevron's settlements with previous funders. Plaintiffs' counsel also represents to the court that "counsel in Canada have an arrangement for a modest contingency fee of $1,000 per docketed hour, upon success, and counsel in the U.S.A. are also on a contingency arrangement."

🔗 Factum of the Applicants on the Motion to Vary, ¶¶28-29, 36(g)

**October 10, 2017**

 Patricio Salazar

Peter Grant attempts to file a motion record with the Ontario Court of Appeal containing a sworn affidavit from plaintiffs' lawyer Patricio Salazar. In the affidavit, Salazar provides tax data for individual plaintiffs and states that "all of them have very limited financial resources" without disclosing to the Court the existence of litigation investors or that both he and Peter Grant were compensated for their work. The Court does not accept the motion record.

🔗 Affidavit of Patricio Salazar

**October 31, 2017**

 Court of Appeal for Ontario

"While the question whether the Ecuadorian plaintiffs have third party litigation funding available to them was left unanswered, there should be no bright line rule that a litigant must establish that such funding is unavailable to successfully resist a motion in an appeal for security for costs. This is especially so in this case, where counsel for the appellants has advised the court he is operating under a contingency arrangement and where there is evidence that Chevron Corporation has sued some of the appellants' former third party funders, and the funders withdrew their financial support."

🔗 Reasons for Decision on Motion to Vary, ¶26(d)

**Oct. 2017**

 Participants      🔗 Hyperlink

# Representations to Canadian Courts and Payments To/From Canadian Counsel

**January 11, 2018**



CWP Associates Wire to Peter Grant Law Corp.

CWP Associates wires $101,849.59 to the Peter Grant Law Corp.

🔗 MKS-6480

**January 16, 2018**

CWP Associates Wire to Patricio Salazar

CWP Associates wires $4,642.74 to Patricio Salazar.

🔗 MKS-6480

**January 17, 2018**

CWP Associates Wire to Peter Grant Law Corp.

CWP Associates wires $4,732.12 to the Peter Grant Law Corp.

🔗 MKS-6480

**May 10, 2018**

Donziger & Associates Wire to Patricio Salazar

Donziger & Associates, PLLC wires $1,834.51 to Patricio Salazar.

🔗 TD Bank 651

Jan. **2018**

May **2018**

 Participants   |    🔗 Hyperlink