# EXHIBIT 35

Court File Nos.: C63309, C63310 and M48342
Court File No.: CV-12-9808-00CL

## COURT OF APPEAL FOR ONTARIO

BETWEEN:

DANIEL CARLOS LUSITANDE YAIGUAJE, BENANCIO FREDY CHIMBO
GREFA, MIGUEL MARIO PAYAGUAJE PAYAGUAJE, TEODORO
GONZALO PIAGUAJE PAYAGUAJE, SIMON LUSITANDE YAIGUAJE,
ARMANDO WILMER PIAGUAJE PAYAGUAJE, ANGEL JUSTINO
PIAGUAJE LUCITANTE, JAVIER PIAGUAJE PAYAGUAJE, FERMIN
PIAGUAJE, LUIS AGUSTIN PAYAGUAJE PIAGUAJE, EMILIO MARTIN
LUSITANDE YAIGUAJE, REINALDO LUSITANDE YAIGUAJE, MARIA
VICTORIA AGUINDA SALAZAR, CARLOS GREFA HUATATOCA,
CATALINA ANTONIA AGUINDA SALAZAR, LIDIA ALEXANDRIA
AGUINDA AGUINDA, CLIDE RAMIRO AGUINDA AGUINDA, LUIS
ARMANDO CHIMBO YUMBO, BEATRIZ MERCEDES GREFA TANGUILA,
LUCIO ENRIQUE GREFA TANGUILA, PATRICIO WILSON AGUINDA AGUINDA,
PATRICIO ALBERTO CHIMBO YUMBO, SEGUNDO ANGEL AMANTA MILAN,
FRANCISCO MATIAS ALVARADO YUMBO, OLGA
GLORIA GREFA CERDA, NARCISA AIDA TANGUILA NARVAEZ,
BERTHA ANTONIA YUMBO TANGUILA, GLORIA LUCRECIA TANGUILA
GREFA, FRANCISCO VICTOR TANGUILA GREFA, ROSA TERESA
CHIMBO TANGUILA, MARIA CLELIA REASCOS REVELO, HELEODORO
PATARON GUARACA, CELIA IRENE VIVEROS CUSANGUA, LORENZO
JOSE ALVARADO YUMBO, FRANCISCO ALVARADO YUMBO, JOSE
GABRIEL REVELO LLORE, LUISA DELIA TANGUILA NARVAEZ, JOSE
MIGUEL IPIALES CHICAIZA, HUGO GERARDO CAMACHO NARANJO,
MARIA MAGDALENA RODRIGUEZ BARCENES, ELIAS ROBERTO
PIYAHUAJE PAYAHUAJE, LOURDES BEATRIZ CHIMBO TANGUILA, OCTAVIO
ISMAEL CORDOVA HUANCA, MARIA HORTENCIA VIVEROS CUSANGUA,
GUILLERMO VINCENTE PAYAGUAJE LUSITANDE,
ALFREDO DONALDO PAYAGUAJE PAYAGUAJE
and DELFIN LEONIDAS PAYAGUAJE PAYAGUAJE

Plaintiffs/Appellants

and

CHEVRON CORPORATION, CHEVRON CANADA LIMITED and CHEVRON
CANADA FINANCE LIMITED

Defendants/Respondents

## FACTUM OF THE APPLICANTS
## ON THE MOTION TO VARY

October 3, 2017

**LENCZNER SLAGHT ROYCE
SMITH GRIFFIN LLP**
Barristers
Suite 2600
130 Adelaide Street West
Toronto ON  M5H 3P5

Alan J. Lenczner, Q.C. (11387E)
Tel:      (416) 865-3090
Fax:      (416) 865-2844
Email:    alenczner@litigate.com
Brendan F. Morrison (61635B)
Tel:      (416) 865-3559
Fax:      (416) 865-3731
Email:    bmorrison@litigate.com

**KOSKIE MINSKY LLP**
900-20 Queen Street West
Toronto, ON  M5H 3R3

Kirk M. Baert  (30942O)
Tel: (416) 595-2092
Fax: (416) 204-2889
Email: kmbaert@kmlaw.ca

Celeste Poltak  (46207A)
Tel: (416) 595-2701
Fax: (416) 204-2909
Email: cpoltak@kmlaw.ca

Garth Myers (62307G)
Tel: (416) 595-2102
Fax: (416) 977-3316
Email: gmyers@kmlaw.ca

Lawyers for the Moving Party/Plaintiffs

TO:     **NORTON ROSE FULBRIGHT CANADA LLP**
        Barristers and Solicitors
        Suite 3800
        Royal Bank Plaza, South Tower
        200 Bay Street
        P.O. Box 84
        Toronto, ON
        M5J 2Z4

        Robert Frank (35456F)
        Tel:      (416) 202-6741
        Clarke Hunter, Q.C.
        Tel:     1 (403) 267-8292
        Fax:     1 (403) 264-5973
        Anne Kirker, Q.C.
        Tel:     1 (403) 267-9564

        Lawyers for the Defendant,
        Chevron Corporation

AND TO:  **GOODMANS LLP**
        Barristers and Solicitors
        Bay Adelaide Centre
        333 Bay Street
        Suite 3400
        Toronto, ON
        M5H 2S7

        Benjamin Zarnett (17247M)
        Tel:      (416) 597-4204
        Suzy Kauffman (41703D)
        Tel:      (416) 597-6281
        Peter Kolla
        Tel:      (416) 597-6279

        Lawyers for the Defendant,
        Chevron Canada Limited

AND TO:    **OSLER, HOSKIN & HARCOURT LLP**
                   Barristers & Solicitors
                   100 King Street West
                   1 First Canadian Place
                   Suite 6200, P.O. Box 50
                   Toronto ON  M5X 1B8

                   Larry Lowenstein
                   Tel:    (416) 862-6454
                   Laura Fric
                   Tel: (416) 862-6454
                   Eric Morgan
                   Tel:    (416) 862-5871

                   Lawyers for the Defendant,
                   Chevron Corporation

## TABLE OF CONTENTS

PART I - OVERVIEW ..................................................................................................................1

PART II - FACTS GIVING RISE TO THE MOTION ................................................................5

PART III - LAW AND ANALYSIS ...........................................................................................7

    A.  No Security for Costs in Favour of a Judgment Debtor ...............................................7

    B.  The Supreme Court of Canada Mandated a New Approach in Actions for Enforcement and Recognition of a Judgment ...................................................................................8

    C.  Chevron Caused the Plaintiffs' Assets To Be Insufficient ........................................11

    D.  The Plaintiffs Are Impecunious .................................................................................13

    E.  The Overarching Principle – "As Is Just" ..................................................................16

    F.  Chevron's Delay Is Fatal ...........................................................................................22

    G.  A Review of the Merits Favours the Plaintiffs ..........................................................25

    H.  If the Plaintiffs Are Required to Post Costs, $943,051.47 Is Far Too High .................26

    I.  The U.S. Decisions Are Not Relevant........................................................................28

PART IV - RELIEF REQUESTED............................................................................................31

## PART I - OVERVIEW

1.     The applicants move to vary the Order of the Honourable Justice Epstein J.A. of September 21, 2107 wherein she ordered the Appellants to pay security for costs in the aggregate of $943,051.47 into Court, $591,535.14 for Chevron Canada and $351,616.33 for Chevron Corporation ("Chevron Corp."), a non-resident.

2.     This action raises matters of international public importance and novel points of law. What constitutes an exigible "interest" where a group of companies internationally functions in common? In what circumstances can a world-wide group of wholly owned companies be liable for a parent's debt? Is the theory of group enterprise available under Canadian law? Ought the corporate veil be treated differently in a modern world, and in particular, against a corporate group with 1,500 subsidiaries that are created and destroyed every day? Epstein J.A. failed to consider the novelty and public importance of this action in exercising her discretion to set the quantum of costs ordered.

3.     The order below represents precisely the "unsolicited and premature barrier" this Court, in this very case, already directed against. It is respectfully submitted that the learned Judge erred both in law and in principle in the exercise of discretion.

4.     There are four discrete errors of law.

5.     First, an indebted person is not entitled to security for costs from his creditor. Chevron Corp., which owes the plaintiffs USD $9.5 billion pursuant to presumed valid judgments in Ecuador, does not need and cannot receive security for costs in the amount of $943,051.47 from the applicants.

6.  The SCC, in this case in 2015, mandated that a recognition and enforcement action of a foreign judgment is be treated entirely differently than an action at first instance. The Court recognized a "crucial difference" and "different principles". Consequently, first instance cases are of very limited value. The crucial difference arises from the fact that in a recognition and enforcement action liability has been established and judgment issued. In a first instance case liability has not been judicially determined, the claim contains only allegations and the parties' positions are in balance.

7.  Third, the Supreme Court of Canada, in this case, underscored that comity and reciprocity towards foreign courts, "two of the backbones of private international law" required domestic courts to apply "a generous and liberal approach" to enforcement and not one that raises barriers. Epstein J.A.'s decision is the quintessential procedural barrier.

8.  Fourth, courts of Ontario have not required security for costs where the actions of the defendant have caused hardship and impoverishment to the claimant. In this case there are two elements of such conduct:

    (a)  the widespread contamination by Chevron Corp. which polluted the lands, fields, crops and water of the indigenous people devastating their livelihood and health; and

    (b)  cutting off their third party funding, which the plaintiffs required to advance their claim, by suing the third party funders for conspiracy.

9.  In the alternative, Epstein J.A. exercised her discretion on five erroneous principles:

    (a)  The plaintiffs are impecunious:

(i)     failing to apply the determination of this Court that this was "a major case involving poor and vulnerable foreign residents, one of the world's largest corporations in a long and difficult process in foreign court";

(ii)    failing to find impecuniosity from the characteristics of the applicants, the context of their living conditions, and the twenty-four (24) years of litigation to date to obtain the remedy of remediation;

(iii)   misapprehending the need for third party funding and mischaracterizing the effect of the litigation by Chevron Corp. against the plaintiffs' former funders who were released from the litigation against them in exchange for a cessation of all assistance, financial and otherwise, thus impeding any future funding; and

(iv)    ignoring the fact that counsel are on a contingency arrangement; and

(v)     applying too high a standard to individual plaintiffs, failing to appreciate that the test for impecuniosity for individuals is not as exacting as it is for corporate plaintiffs;

(b)   The wrong merits test was applied:

(i)     the overarching principle of what is "just" should have been applied and trumps any particular test;

(ii) if a particular test was to be applied, it should have been that of "plainly not devoid of merit" rather than "good chance of success"; and

(iii) Epstein J.A. did not have the benefit of the fresh evidence filed by the appellants which established that the Chevron group of companies functioned as one integrated unit;

(c) The defendants' delay in moving for security for costs is fatal:

 (i) failing to address the factor of delay, which ought to have been fatal to the motion for security for costs;

 (ii) a motion for security for costs must be made when the moving party knows of the applicable facts;

 (iii) Chevron knew of foreign residency of the applicants, the only basis on which it brought its motion for security for costs, but delayed at least five (5) years in Ontario in bringing the motion, and then brought it as a tactical manoeuver only after the applicants had perfected their appeal and the appeal date had been set, and after they had succeeded in cutting off funding;

(d) The broader principles of public interest novel points of law were not considered:

       (i)      failing to recognize that the principles permitted by the *Courts of Justice Act* and most often discussed in class actions require the court to alleviate the burden of costs where the matter raises "a public interest" or a "novel point of law"; and

   (e)    Irrelevant consideration of the U.S. judgments:

       (i)      in taking into account the U.S. Judgments which are irrelevant to the issues and not binding on the application.

## PART II - FACTS GIVING RISE TO THE MOTION

10.    The applicants have a judgment from three (3) levels of Ecuadorian court in the amount of USD \$9.5 billion, payable not to the applicants, but to a trustee, to remediate the lands and waters that were contaminated over fifteen (15) years by the negligence of Chevron Corp. The only benefit to the applicants is a healthier future.

11.    In Ontario, the applicants were successful in the Supreme Court of Canada in September 2015 in maintaining jurisdiction to try the action to recognize and enforce the Ecuadorian judgment against Chevron Corp., the judgment debtor and Chevron Canada, a 7th level wholly-owned subsidiary.[1]

12.    In September 2015, the Chevron companies filed Statements of Defence and then, contemporaneously, brought summary judgment motions as follows: (a) Chevron Canada, seeking a dismissal of the action against it as not being an exigible asset of Chevron Corp.;

---

[1] *Chevron Corp. v. Yaiguaje*, 2015 SCC 42, Brief of Authorities ("BOA") Tab 1.

and (b) Chevron Corp. seeking to strike the paragraphs of the Statement of Claim that had assertions against Chevron Canada.  Hainey J struck 24 paragraphs of the Statement of Defence of Chevron Corp. and remitted the remainder for trial.[2]

13.   The summary judgment motions proceeded on the basis that the Ecuadorian judgment would be recognized and enforced in Ontario; but that the shares and assets of Chevron Canada would not, in the event, be exigible. Hainey J. framed the issues before him as follows:

> [23] The parties agree that this in an appropriate case for summary judgment. Therefore, the only issues that I must decide on this motion are the following:
>
> (a)     Are the shares and assets of Chevron Canada exigible and available for execution and seizure pursuant to the Execution Act to satisfy the Ecuadorian judgment against Chevron?
>
> (b)     If they are not, should Chevron Canada's corporate veil be pierced so that its shares and assets are available to satisfy the Ecuadorian judgment against its indirect parent, Chevron?[3]

14.   Hainey J. answered the first question he posed as follows:

> [36] Chevron Canada is not an asset of Chevron. It is separate legal person. It is not an asset of any other person including its own parent, CCCC. The Supreme Court of Canada confirmed this in *BCE Inc. v. 1976 Debentureholders*, where the court stated, "While the corporation is ongoing, shares confer no right to its underlying assets."[4]

---

[2] *Yaiguaje v Chevron Corporation,* 2017 ONSC 135, para. 1, Motion Record of the Applicants on the Motion to Vary ("Motion Record") Tab 4.

[3] *Yaiguaje v Chevron Corporation,* 2017 ONSC 135, para. 23, Motion Record Tab 4.

[4] *Yaiguaje v Chevron Corporation,* 2017 ONSC 135, para. 36, Motion Record Tab 4.

15.    Hainey J. answered the second question by stating that the two pronged test of *Transamerica* i.e. complete domination and control and incorporation of a subsidiary for an improper purpose, were not met.[5]

16.    The applicants appealed Hainey J.'s judgment. The appeals were scheduled, by this Court, in May 2017 to proceed on October 10 and 11, 2017.

17.    The Chevron companies each brought motions for security for costs returnable on June 27, 2017 and, after a reserve, an Endorsement of Justice Epstein was issued on September 21, 2017.[6]

## PART III - LAW AND ANALYSIS

### A.    No Security for Costs in Favour of a Judgment Debtor

18.    In circumstances where a defendant admits to owing a debt to a plaintiff, the courts have not ordered security for costs even though the provisions of Rule 56 would otherwise apply:

> Because the defendant is admittedly indebted to the plaintiff in an amount greater than its anticipated costs in defending the action, it cannot be in need of protection for its cost of defence.[7]

19.    In the much stronger circumstances of this case, the defendant has been held liable through three (3) levels of Ecuadorian courts for contamination and those judgments are presumed for the purposes of the summary judgment motions to be valid in Ontario. In such a case, security for costs is not warranted. Chevron Corp. owes USD $9.5 billion, is a very large

---

[5] *Yaiguaje v Chevron Corporation,* 2017 ONSC 135, paras. 65, 72, Motion Record Tab 4.

[6] *Yaiguaje v. Chevron Corporation,* 2017 ONCA 741, Motion Record Tab 2.

[7] *Yuanda Canada Enterprise Ltd. v. Pier 27 Toronto Inc.,* 2017 O.J. 13144 at paras. 26-27, BOA Tab 23.

international conglomerate with 1,500 subsidiaries, doing business in more than 30
countries, has revenues exceeding USD $200 billion annually and annual profits of USD
$25 billion. It is not in need of protection, particularly from the plaintiffs. The presumption
of validity, for not only the Ecuadorian judgments but, for the purposes of the summary
judgment motions, of an Ontario judgment recognizing and enforcing the Ecuadorian
judgments, should result in no order of costs.

**B.    The Supreme Court of Canada Mandated a New Approach in Actions for
Enforcement and Recognition of a Judgment**

20.    In this very case, the Supreme Court of Canada, in September 2015, made it crystal clear
that it mandated a new approach that courts must employ with respect to all aspects of an
action for recognition and enforcement of a foreign judgment. Over and over, the Court
explained that "distinct principles" and a "crucial difference" exist between an action at
first instance and an action to recognize and enforce a foreign judgment. This recognition
and enforcement action is not to be equated with an action at first instance. At first instance
the parties' positions are equal. In a recognition and enforcement action the plaintiff has
established, by judicial determination, the liability of the defendant.

21.    The Supreme Court of Canada has, in September 2015, detailed the manner in which
recognition and enforcement actions are to be approached. Comity and reciprocity towards
courts of other nations are to be respected if Canadian courts expect their judgments to be
recognized and enforced abroad:

> (a) "In a world in which businesses, assets, and people cross borders with
> ease, courts are increasingly called upon to recognize and enforce
> judgments from other jurisdictions. Sometimes, successful recognition

and enforcement in another forum is the only means by which a foreign judgment creditor can obtain its due."[8]

(b)  "The dispute underlying the appeal originated in the Lago Agrio region of Ecuador. The oil-rich area has long attracted the exploration and extraction activities of global oil companies, including Texaco, Inc. ("Texaco '). As a result of those activities, the region is said to have suffered extensive environmental pollution that has, in turn, disrupted the lives and jeopardized the futures of its residents. The 47 respondents (the "plaintiffs") represent approximately 30,000 indigenous Ecuadorian villagers. For over 20 years, they have been seeking legal accountability as well as financial and environmental reparation for harms they allegedly have suffered due to Texaco's former operations, in the region, Texaco has since merged with Chevron."[9]

(c)  "As this review of the Court's statements on comity shows, the need to acknowledge and show respect for the legal acts of other states has consistently remained one of the principle's core components. Comity, in this regard, militates in favour of recognition and enforcement. Legitimate judicial acts should be respected and enforced, not sidetracked or ignored."[10]

(d)  "Canadian courts, like many others, have adopted a generous and liberal approach to the recognition and enforcement of foreign judgments."[11]

(e)  "Facilitating comity and reciprocity, two of the backbones of private international law, calls for assistance, not barriers."[12]

(f)  "Chevron, a U.S. corporation incorporated in Delaware, was served at its head office in San Ramon, California. Chevron Canada, a Canadian corporation governed by the *Canadian Business Corporations Act*, R.S.C. 1985, c. C-44, with its head office in Alberta, is a seventh-level indirect subsidiary of Chevron, which has 100 per cent ownership of every company in the chain between itself and Chevron Canada. "[13]

(g)  "Two considerations of principle support the view that the real and substantial connection test should not be extended to an enforcing court in an action for recognition and enforcement. First, the crucial difference between an action at first instance and an action for recognition and enforcement is that, in the latter case, the only purpose of the action is to allow a pre-existing obligation to be fulfilled. Second, the notion of comity, which has consistently underlain actions for recognition and enforcement, militates in favour of generous rules."[14]

---

[8] *Chevron Corp. v. Yaiguaje*, 2015 SCC 42, para. 1, BOA Tab 1.

[9] *Chevron Corp. v. Yaiguaje*, 2015 SCC 42, para. 4, BOA Tab 1.
[10] *Chevron Corp. v. Yaiguaje*, 2015 SCC 42, para. 53, BOA Tab 1.
[11] *Chevron Corp. v. Yaiguaje*, 2015 SCC 42, para. 27, BOA Tab 1.
[12] *Chevron Corp. v. Yaiguaje*, 2015 SCC 42, para. 69, BOA Tab 1.
[13] *Chevron Corp. v. Yaiguaje*, 2015 SCC 42, para. 9, BOA Tab 1.
[14] *Chevron Corp. v. Yaiguaje*, 2015 SCC 42, para. 42, BOA Tab 1.

22.    The Supreme Court of Canada also stated, repeatedly, as did this Court, that in recognition

and enforcement actions, the role of the domestic court is to facilitate collection of the

judgment debt and not to raise barriers. Seeking security for costs of a meritorious appeal at

the eleventh hour is Chevron's attempt to impose an insuperable barrier and avoid the case

being determined on its merits:

> [43] The following comment made by McLachlin C.J. in *Pro Swing*
> (although in dissent) also reflects this logic: "Barring exceptional
> concerns, a court's focus when enforcing a foreign judgment is not on
> substantive and procedural law on which the judgment is based, but
> instead on the obligation created by the judgment itself. (para.77)
>
> [44] Important consequences flow from this observation. First, the
> purpose of an action for recognition and enforcement is not to evaluate the
> underlying claim that gave rise to the original dispute, but rather to assist
> in enforcing an already-adjudicated obligation. **In other words, the
> enforcing court's role is not of substance, but is instead one of
> facilitation**: *Pro Swing*, at para. 11. The court merely offers an
> enforcement mechanism to facilitate the collection of a debt within the
> jurisdiction.[15] [emphasis added]

23.    Chevron, many years ago, withdrew all of its assets from Ecuador. As a consequence, the

plaintiffs had no choice but to pursue recognition and enforcement of their Judgment in a

foreign jurisdiction and, whichever one they chose, they would be presenting themselves

as a non-resident.

24.    A judgment creditor, who must seek enforcement of his judgment because of the actions of

the judgment debtor withdrawing its assets from the jurisdiction ought not, for fairness and,

in equity, face a security for costs motion. It becomes a barrier and contravenes the

principle of "facilitation" articulated by the Supreme Court. That cannot be a just result for

a claim to remediate environmental damages, a claim under which the individual 30,000

indigenous persons obtain no direct compensable remuneration.

---

[15] *Chevron Corp. v. Yaiguaje*, 2015 SCC 42, paras. 43-44, BOA Tab 1.

## C.    Chevron Caused the Plaintiffs' Assets To Be Insufficient

25.    Courts have never denied a plaintiff the ability to proceed, even if he fails to establish the
sufficiency of its assets, in circumstances where the defendant's conduct has caused the
plaintiff's assets to be insufficient.[16] The three (3) robust judgments of the Ecuadorian
courts encompassing nearly 500 pages of Reasons make it plain that Chevron Corp. was
negligent in that, contrary to the safeguards it employed in its oil extraction practices in the
U.S.A., it forewent those safeguards in the Amazonian Rainforest, in particular:

> (a)  It did not put an impermeable membrane in the 968 pits into which it
> placed toxic drilling muds and it did not take care to prevent overflow
> from those pits with the result that harmful contaminants seeped into the
> ground waters and overflowed onto the agricultural lands and into the
> life-sustaining waterways; and
>
> (b)  It failed to treat the 15 billion gallons of oil containing production
> waters either by pumping those waters back underground or by filtering
> out the oil before spilling those waters into the environment thereby
> polluting the bathing rivers, drinking water and fish habitat of the 30,000
> residents.

26.    The Courts of Ecuador relied on 100 expert reports, more than 50,000 soil and water
samples and a chapter in a text written by a Chevron engineer (Texaco) in reaching its
conclusions.

27.    In this case the actions by Chevron against third party funders and against the applicants'
U.S. law firm, resulting in the funders withdrawing financial and other support, were well
publicized by Chevron on its website and would have the desired effect of discouraging
any other third party funder.[17]

---

[16] *Malamas v. National Bank of Greece,* [2009] O.J. No. 4368, at para. 104, BOA Tab 14.
[17] *Cigar500.com v. Ashton Distributors Inc.,* [2009] O.J. 3680 at paras. 33-38, BOA Tab 5.

28. The applicants obtained the necessary third party funding for the eight (8) year trial proceedings in Ecuador. Immediately after the adverse trial judgment of 2011, Chevron sued the third party funders for conspiracy and sued Patton Boggs, the U.S. law firm assisting the applicants. The claims in each action were for many billions of dollars. Chevron then offered settlements, including withdrawal of the law suits for a cessation of any further assistance, monetary or otherwise, and Chevron-crafted press release expressing remorse at having aided the action.

> (a) In December 2012 Chevron Corp. brought a claim against Russell DeLeon, a funder of the Ecuadorian litigation seeking damages and an injunction against further funding of any prosecution of the action or any enforcement proceedings. The claim was settled by Settlement Agreement of February 13, 2015. The DeLeon parties agreed "irrevocably and forever to cease funding or in any way deliberately aiding or abetting..." the plaintiffs.
>
> (b) In June 2014 Chevron Corp. brought a claim against a funder, Woodsford Litigation Funding Limited, in the Supreme Court of Gibraltar claiming an injunction against it from any further funding of the case or its enforcement efforts. That claim was settled by Settlement Agreement on May 1, 2015 whereby the Woodsford parties agreed to cease funding or aiding directly or indirectly the plaintiffs in the matter.
>
> (c) By Settlement and Release Agreement dated May 7, 2014, Chevron Corp. agreed with Patton Boggs, a U.S. law firm that had "represented or advised" the plaintiffs with respect to the Ecuadorian proceedings "including in connection with efforts to enforce the Lago Agrio Judgment" (the Ecuadorian Judgment) that Patton Boggs would immediately cease and desist from all further assistance to the Appellants and that Patton Boggs would pay USD $15 million to Chevron's attorneys and that Patton Boggs' partners would make themselves available for deposition by Chevron including producing its work product documents.[18]

29. By Chevron Corp.'s actions, any funding assistance that the plaintiffs had in place has long since evaporated.

---

[18] Settlement Agreement of Chevron Corporation and James Russell DeLeonm entered into on February, 13, 2015, Settlement Agreement and Particulars of Claim of Chevron Corporation and Woodsford Litigation Funding Limited, entered into on May 1, 2015 and Stipulation of Order of Dismissal of Patton Briggs LLP and Chevron Corporation, filed on May 7, 2014, Motion Record, Tabs 7, 8 and 9

30.   Epstein, J.A. was, respectfully, in error in rejecting and ignoring the evidence of the settlements. The settlements were not put in by Affidavit but came directly from press releases issued by Chevron and from its website. The applicants, strangers to the lawsuits and the settlements, could not have added anything further. The Chevron press releases and their website and their contents are reliable and are evidence.

31.   In any event, it was an error of principle to inquire into potential third party funding arrangements *vis-à-vis* individual plaintiffs when such inquiries have been judicially limited to cases where the plaintiff is a corporation.

**D.   The Plaintiffs Are Impecunious**

32.   Epstein J.A. determined that the Ecuadorian plaintiffs "have failed to demonstrate that they are impecunious".[19] That finding fails to take into account the characteristics of the plaintiffs, the context of their situation and prior judicial findings of fact.

33.   This Court stated in its earlier judgment in this case that this was:

> "...a major case involving poor and vulnerable foreign residents, one of the world's largest corporations, a long and difficult process in a foreign court... "[20]

34.   This statement should lay to rest the question of impecuniosity.

35.   Both this Court and the Supreme Court of Canada have referred to the applicants as indigenous villagers living in the Amazon Rainforest.[21] It is not in dispute that their lands and waters have been repeatedly contaminated over many years. Common sense and the

---

[19] *Yaiguaje v. Chevron Corporation,* 2017 ONCA 741, para. 31, Motion Record Tab 2.
[20] *Yaiguaje v. Chevron Corporation,* 2013 ONCA 758, para. 53, BOA Tab 2.
[21] *Chevron Corp. v. Yaiguaje,* 2015 SCC 4, para. 4, BOA Tab 1.

very fact that third party funding was necessary should give rise to a sufficient finding of impecuniosity.

36.     Epstein J.A required the applicants to "lead evidence of robust, particularity with full and frank disclosure, and supporting documentation as to income, expenses and liability." Such a task, in the context of this case, fails to recognize the following:

(a)     That the applicants have a presumed valid judgment.  This is not an action at first instance;

(b)     That the applicants receive no monetary benefit therefrom;

(c)     That each of the 47 applicants is merely a representative of 30,000 indigenous, impoverished villager.  Would each one have to canvass its representatives and disclose assets, liabilities, income and expenses of everyone in the group?;

(d)     That funding was necessary to mount the initial action against Chevron, because the applicants could not sustain it;

(e)     That the funding was truncated by the aggressive actions of Chevron in the U.S.A. and Gibraltar;

(f)     That Chevron publicized the settlements which would suggest that no other funder would risk its monies; and

(g)     That Epstein J.A.'s statement that "they are similarly represented by a large team of experienced counsel in Canada" ignores the fact that counsel in Canada

have an arrangement for a modest contingency fee of $1,000 per docketed hour,

upon success, and counsel in the U.S.A. are also on a contingency arrangement.

37.    Counsel in this action are acting on a contingency fee basis. As Nordheimer J. concluded in

*Intellibox Concepts Inc. v. Intermec Technologies et al.*, security for costs should not be

ordered where counsel is working on a contingency fee basis:

> [12]    As I have noted, the logical extension of ordering security for
> costs to be posted by an impecunious corporate plaintiff by reason of the
> fact that its solicitors are operating on a contingency fee basis is, in effect
> to require those solicitors to provide the security. Solicitors who make
> legal services available based on contingency fee arrangements with
> clients, who could not otherwise afford to litigate a claim, assume the risk
> that they may not be paid for their work unless a favourable result is
> achieved. To require those solicitors to assume the additional burden of
> posting security for costs, with the concomitant risk of losing those funds
> (in additional to going unpaid for their own services), would impose a
> significant disincentive to contingency fee arrangements would run
> contrary to the very rationale by which they are permitted. In my view, it
> wold be incongruous to interpret the Rules of Civil Procedure in such a
> fashion.[22]

38.    Moreover, the jurisprudence is clear that subrule 56.01(1)(d) "places a higher onus on

corporate plaintiffs" and that a "corporate plaintiff carries a significant burden of

establishing direct and indirect impoverishment [citations omitted]. Rule 56.01(d) and its

equivalents are clearly intended to place corporate plaintiffs in a more vulnerable position

than plaintiffs who are individuals".[23] By applying the test she did, "robust particularity",

Epstein J.A. held these individual plaintiffs to the same standard as that required of a

corporate plaintiff which was wrong.

39.    It is respectfully submitted that from all of the above the Court should conclude that the

applicants are impecunious.

---

[22] *Intellibox Concepts Inc. v. Intermec Technologies et al.*, 2005 CanLII 13787 (ON SC), para. 12, BOA Tab 10.
[23] *Crudo Creative Inc. v. Marin*, [2007] O.J. No. 5334 (Div.Ct.) at para. 33, BOA Tab 6.

### E.    The Overarching Principle – "As Is Just"

40.    Even if first instance cases provide guidance, which it is respectfully submitted they do not, this Court nevertheless retains a broad discretion whether or not to grant security for costs. A respondent is not entitled as of right to an Order for security for costs of an appeal. Courts have consistently rejected the notion of any *prima facie* right to security, even if the first branch of Rule 56.01 has been satisfied.

41.    The overarching principle to be applied to all the circumstances is the justness of the Order sought:

> [16] Rule 61.06(1) affords three discrete bases upon which a judge may order an appellant to provide security for costs of an appeal:
>
>> i.    there is good reason to believe that the appeal is frivolous and vexatious and that the appellant has insufficient Ontario assets to pay the appeal costs;
>>
>> ii.    an order for security for costs could be made again the appellant under Rule 56.01; or
>>
>> iii.    there is some other good reason to order security for costs.
>
> [17] The language of Rule 61.06 is permissive, not mandatory. A respondent is not entitled as of right to an order for security for costs for the appeal. The permissive "may" and not the imperative or mandatory "shall" frames the authority to make the order. Even if the respondent meets the requirements in the applicable paragraph of Rule 61.06(1), the permissive "may" would seem to reserve to the motion judge a vestige of discretion to refuse the order. The overarching principle to be applied to all the circumstances is the justness of the order sought.[24]

42.    The wide discretion afforded in Rule 56.01 specifically contemplates a situation where the test may appear to be *prima facie* satisfied, but for a variety of other reasons, in balancing the equities, security is nevertheless denied:

---

[24] *Pickard and London Police Services Board*, 2010 ONCA 643 at paras. 16 and 17, BOA Tab 16.

> "In the second stage, the court must make the order 'as is just'. In arriving at the appropriate order, the court must inquire into all factors that have a bearing on the "justice of the case", including the merits of the case. The end result could be an order that no security is required, notwithstanding that the moving party cleared the first hurdle."[25] [emphasis added]

43.   In usual domestic cases, an appellant neither posts security for costs for the proceeding below, nor pays any damages awarded, nor posts security for the costs of the appeal. What differentiates this situation is that it is a foreign plaintiff seeking recognition and enforcement. Every recognition and enforcement action, will, by its nature, involve a foreign plaintiff. But the foreign plaintiff is, unlike a domestic plaintiff, a judgment creditor who has established liability. There is no reason why this foreign plaintiff should be in a worse position than a domestic plaintiff.

44.   There is ample authority for the proposition that courts are reluctant to deprive a worthy litigant of the opportunity to have his or her claim adjudicated when it is not plainly devoid of merit:

> [18] Despite the value that the law places on finality, there will be situations in which other legitimate interests outweigh finality concerns. In *Larabie v. Montfils* (2004), 44 C.P.C. (5th) 66 (Ont. C.A.), Blair J.A. refused to order security for costs despite the fact that the respondent was impecunious and had failed to pay previous costs awards. He refused because a "worthy but impecunious litigant" should not be deprived of the opportunity to have his claim adjudicated "when it is not plainly devoid of merit". Blair J.A. was satisfied that ordering security for costs would prevent the appellant from continuing with the appeal. I am satisfied that this case presents a similar situation.[26]

45.   The Rule itself does not impose conditions. It expresses itself in a permissive manner by using "may" and governs itself by the principle "as is just". Where a foreign judgment

---

[25] *Shuter et al. v. Toronto Dominion Bank et al.,* [2007] O.J. No. 3435 (Ont. Master) at para. 63, BOA Tab 20.
[26] *Royal Bank of Canada v. Korman,* 2009 ONCA 590 at para. 18, BOA Tab 18. *Larabie v. Montfils,* [2004] O.J. No, 179 (C.A.) at para. 17, BOA Tab 13.

creditor comes to Ontario to seek the reciprocity of the Ontario court in assisting the foreign court that had jurisdiction over the parties, it is "just" that the judgment creditor be permitted to proceed. Epstein J.A. ought to have denied security for costs on the basis of this overarching principle.

46.    There appears to be only one case which squarely addresses security for costs on a situation of a foreign judgment creditor seeking to proceed in Ontario. In this case, Master Haberman stated:

> Despite the fact that Medpace has filed no evidence regarding its assets in Ohio, on the basis of the current state of law, that does not necessarily end the inquiry, as the merits can still be considered along with any other relevant factors.[27]

47.    The failure below to undertake the required consideration of what was "just", taking into account a multitude of factors, is a palpable and overriding error: if those words [as is just] are to mean anything, they must mean that the person hearing the motion – Master or Judge – may consider all matters which will assist him in making a "just order".[28]

## F.    The Wrong Merits Test Was Applied

48.    In any event, if a particular test was to be applied, the proper test should have been that of "when it is plainly not devoid of merit" rather than the test that Epstein J.A. did apply of "good chance of success".[29] Epstein J.A. applied the more conservative test because of her determination that impecuniosity had not been demonstrated.

---

[27] *Medpace Reference Laboratories, LLC v. KGK Synergize Inc.*, 2009 CanLII 63133 (ON SC), at p.5, BOA Tab 15.
[28] *Horvat v. Feldman* (1986), 15 C.P.C. (2d) 220 (Ont. H.C.J.) at para. 5, BOA Tab 9.
[29] In *John Wink Ltd. v. Sico*, [1987] O.J. No. 5 (H.C.J.), at para. 11, BOA Tab 11, the standard applied to the merits was "plainly devoid of merit". In *Intellibox Concepts Inc. v. Intermec Technologies Canada Ltd.* (2005), 14 C.P.C. (6th) 339 (S.C.), at para. 7, BOA Tab 10, Nordheimer J. applied the standard of whether the action is devoid of merits or not

49.    In the preceding sections, submissions have been made which should have led Epstein J.A.
to conclude that the applicants are impecunious. Nevertheless, and in any case, courts have
been flexible in their determination of the test to be applied whether or not impecuniosity
has been established. Courts have looked at all factors including whether the defendant
really requires protection for its costs. Chevron, a large multinational corporation has spent
hundreds of millions of dollars in legal and expert fees in resisting this pollution claim.
Chevron Canada has filed an ESTMA report for the year 2016 indicating that it paid, in that
year, 3.3. billion dollars in taxes and royalties to the governments of Nigeria and Indonesia.

50.    In balancing the positions of the parties no hardship accrues to the Chevron companies and
patent prejudice results to the applicants from the Order of Epstein J.A.

51.    Further, the *Courts of Justice Act* permits an even wider exercise of discretion where the
claim is "in the public interest" or "a novel point of law". In these circumstances the issue
of costs is relaxed. The appeal in this case engages both elements as is evident from the
Facta on the appeal.

52.    The issues in these summary judgment appeals are neither frivolous nor vexatious. They
are meritorious. The collection of a debt owed by the Chevron Corp. can be collected from
the shares and assets of its 100% wholly-owned subsidiary Chevron Canada. As the
Supreme Court of Canada stated in this very case regarding Chevron Canada, at paragraphs
92 and 93:

---

almost certain to fail. In *Malamas v. National Bank of Greece,* [2009] O.J. No. 4368, at para. 96, BOA Tab 14, the
standard that applied was whether the action was frivolous.

> The subject matter of recognition and enforcement proceedings is the collection of a debt. A debt is enforceable against any and all assets of a given debtor, not merely those that may have a relationship to the claim.
>
> …
>
> In this respect, the subject matter of the claim is not the Ecuadorian events that led to the foreign judgment to which Chevron Canada is a stranger, but rather, at least arguably, the collection of a debt using shares and assets that are alleged to be available for enforcement purposes. In an enforcement process like this for the collection of a debt against a third party, assets in the jurisdiction through the carrying on of business activities are undoubtedly tied to the subject matter of the claim. From that standpoint, seizeable assets are not merely the subject matter of the dispute, they are its core. In this regard the third party is the direct object of the proceedings.[30] [emphasis added]

53.     Whether or not Chevron Corp. has an exigible interest in Chevron Canada is a worthy question, deserving of this Court's disposition, especially given the broad language of the *Execution Act* and the fact that these corporations function in such a common or singular fashion.

54.     Finally, in concluding that the appeal does not "have a good chance of success", Epstein J.A. did not have the benefit of the full appeal record nor the appellants' motion to file fresh evidence. The fresh evidence sought to be adduced was only reported and available in May 2017, eight (8) months after the summary judgment motions were argued and five (5) months after the release of the Decision below. The fresh evidence consists of a two (2) page *Extractive Sector Transparency Measures Act* ("ESTMA") report (the "ESTMA Report") filed by Chevron Canada and Chevron Canada Resources with National Resources Canada ("NRCAN") in May 2017.

55.     The ESTMA, effective for the calendar year 2016, required companies listed on a Canadian Stock Exchange or Canadian companies with operations in Canada or elsewhere

---

[30] *Chevron Corp. v. Yaiguaje*, 2015 SCC 4, paras. 92 and 93, BOA Tab 1.

to report, for the first time, by May 31, 2017, the amount of money paid in 2016 to governments and to government agencies, including national, provincial, regional, municipal and foreign.[31] Accordingly, pursuant to ESTMA, for the year ending 2016, Chevron Canada was required for the first time to file its ESTMA Report disclosing payments made by it to any governments or governmental agencies.

56.    The May 2017 ESTMA Report confirmed Chevron Canada made $3.3 billion of payments to the governments of Nigeria and Indonesia: [32]

57.    However, to the best of the plaintiffs' knowledge neither Chevron Canada nor Chevron Canada Resources, a wholly-owned subsidiary, had either directly or through any controlled subsidiary, conducted any extractive business in either Nigeria or in Indonesia. On whose behalf were these payments then made and at whose behest?

58.    Epstein J.A. did not have the benefits of the ESTMA Report. The inference to be drawn from Chevron Canada's refusal to clarify the matter is that Chevron Canada made the payments and reported the payments even though it carries on no business directly or through a controlled subsidiary in Nigeria or Indonesia. The fact of making payments on behalf of Chevron Corp. or of a subsidiary of Chevron Corp. is relevant and material to establish that the Chevron Group of Companies act as a single enterprise funneling monies to where it is needed and from where it is readily available without concern regarding the corporate separateness or independence of any subsidiary company.

---

[31] Exhibit A to the Myers Affidavit, sworn September 1, 2017, Motion Record, Tab 10 (2)(A).
[32] Exhibit B to the Myers Affidavit, sworn September 1, 2017, Motion Record ,Tab 10(2)(B).

59. Epstein J.A. exceeded her jurisdiction when she purported to determine the appeal from the Rule 20 summary judgment decision of Hainey J. Her focus should have been to restrict herself to whether arguable points had been raised in the appeal.

60. Coupled with the limited time on the motion for security for costs and the lack of a complete record before her, Epstein J.A. could not have had a full appreciation of the appeal arguments. For this reason too, her inquiry ought to have been limited

**F.   Chevron's Delay Is Fatal**

61. Epstein J.A. did not address the factor of delay although it was squarely raised before her and ought to have been determinative and fatal to the Chevron companies.

62. Security for costs will not be awarded where there has been delay by the moving party. A moving party must move promptly and seek security for costs at the earliest opportunity that it knows of the facts upon which it will rely.[33]

63. In *Kawkaban Corporation v. The Second Cup Ltd.*, the Divisional Court (O'Driscoll, Cameron and Swinton JJ.) held that, "when deciding the issue of delay, it is incumbent upon the master or the motions judge to inquire into all the factors, the whole record, and ask the question: "When did the respondents have good reason to believe the appellants had insufficient assets in Ontario to pay the costs of the respondents?"[34] Respectfully, Epstein J.A. failed to ask this crucial question.

---

[33] *SeeWind Design Corp and Accenture Business et al.*, 2013 ONSC 5040, at para. 73, BOA Tab 19. *Shuter v. Toronto Dominion Bank*, 2007 O.J. No. 3435 (S.C.), at paras. 106-107, BOA Tab 20.
[34] *Kawkaban Corporation v. The Second Cup Ltd.*, 2005 CanLII 65683 (Ont. Div. Ct.), at p. 15, BOA Tab 12.

64.    The oft-cited 1938 Ontario High Court decision *Charron v. MacDonald* sets out the

reasoning behind considering delay as a factor:

> There is, however, a much more serious objection to this motion: namely,
> the delay in bringing the application. Where a defendant believes that he is
> entitled to an order for security for costs, he should move at the earliest
> possible moment in order that the plaintiff may know whether or not he
> will be required to give security and to prevent him from proceeding at
> very considerable expense down to trial and then find himself faced with
> an order for security with which he is unable to comply.
>
> [...]
>
> Some seven days after the plaintiff served notice of trial the defendant
> MacDonald launched his motion for security for costs. The plaintiff was,
> therefore, lulled into the belief that she would be permitted to proceed to
> trial without being asked to give security. If the application for security
> had been made immediately after the service of the writ or even after the
> delivery of the statement of claim, the plaintiff would have had an
> opportunity, in the event of an order for security having been made, to
> decide whether she was in a position financially to comply with the order
> for security and finance the action down to trial.
>
> By reason of the delay of the defendant MacDonald in making his
> application for security, the plaintiff has gone to the expense of bringing
> the action down to the eve of trial when she is faced with this application
> for security for costs. She should not be prevented at this late date from
> going to trial even if the material should be sufficient to warrant an order
> for security.[35]

65.    Chevron relied only on the foreign residency to the Plaintiffs as the basis for its motion for

security for costs, and it has known of that fact for many years. The appeals in this matter

had been fixed by May 2017 to be heard on October 10 and 11, 2017. The appeals had been

perfected by the Appellants.

66.    Chevron provided no explanation for its delay.

67.    Delay of this nature was the reason why security for costs were not ordered in *Trillium

Motor World Ltd. v. General Motors of Canada Limited*:

---

[35] *Charron v. MacDonald*, [1938] O.W.N. 410 (Ont. H.C.), pp. 2 - 3, BOA Tab 4.

> [37] I decline to award security for costs for the appeal, again because
> GM's delay and prejudice it has caused.
>
> ...
>
> [42] GM has, by its actions, allowed Trillium to perfect its appeal at great
> expense. This is no small matter. The complicated nature of the appeal is
> evidenced by the length of the factum filed by Trillium, which runs over
> 90 pages and the supporting materials that have been prepared and filed, it
> would not be just to make an order for security for costs at this late stage.[36]

68.    Sharpe JA in *Ravenda* endorsed the rationale of *Trillium* and declined, for reasons of delay,

       to order security for costs.[37]

69.    Chevron Corp. is a sophisticated litigant with the benefit of a vast and highly sophisticated

       legal team. It was well aware of the possibility of bringing a motion for security for costs in

       Canada for many years. Chevron Corp. has known for more than twenty (20) years that the

       plaintiffs reside solely in Ecuador. Chevron Corp. has never sought costs in the eight years

       of litigation in the U.S.A. (1993 - 2002), in nine years of litigation in Ecuador (2003 -

       2012) nor has it or Chevron Canada sought security for costs in five years of litigation in

       Canada (2012 - 2017).

70.    This Honourable Court should view its motion now with a high degree of suspicion and

       circumspection. Security for costs motions should not be granted in favour of defendants

       who bring them, late and actually, to bar meritorious claims.

71.    Finally, the failure of the moving party to explain the delay is, without more, fatal to the

       motion for security.[38] Chevron offered no explanation. All the more reason Epstein J.A.

       ought to have relied on delay as a critical factor in denying the request for security.

---

[36] *Trillium Motor World Ltd. v. General Motors of Canada Limited*, 2016 ONCA 702, paras. 37, 42, BOA Tab 22.
[37] *Ravenda Homes Ltd. v. 1372708 Ontario Inc.*, Endorsement of Sharpe J.A., M47591 (C61630 , at paras. 12 - 14, BOA Tab 17.

72.   The applicants need not, but can, demonstrate prejudice in, at least two respects:

> (a) Had the motion for security for costs been brought in 2015 or, at any time, before Hainey J. ruled in January 2017, the only judgment outstanding would have been the judgments in Ecuador, not that of Hainey J.; and
>
> (b) Since the applicants had been successful in 3 courts in Ecuador, their chances of obtaining third party funding would have been more compelling.

## G.   A Review of the Merits Favours the Plaintiffs

73.   On the merits of the appeal, the Court is directed to the Factum and Reply Factum of the Appellants which detail the errors of law of Hainey J. It is respectfully requested that the Court carefully review these Facta. The Factum is in the Motion Record. The Reply Factum is in the requisitioned Appeal materials, which contain many arguable points of law.  Those points include:

(a)   the erroneous interpretation of *BCE*;

(b)   the failure to interpret "interest" in the *Execution Act* as intended by the legislature;

(c)   misplaced reliance on *Salomon*. The ratio of *Salomon* was directed to protecting an investor's assets but leaving his investment at risk. It was never intended to protect both his assets and his investment by the mere fact of incorporating one or more descending subsidiaries; and

---

[38] *423322 Ontario Ltd. v. Bank of Montreal,* [1988] OJ No 1486 (H.C.J.), at paras. 16-17, BOA Tab 3. *Susin v. Genstar Developments Co.,* [2011] O.J. No. 3825, para. 7, BOA, Tab 21. *Shuter v. Toronto Dominion Bank,* [2007] O.J. No. 3435 (S.C.J.), para. 107, BOA Tab 20. *Gosselin v. Wong,* [1983] O.J. No. 2112 (H.C.J.), at para. 4, BOA Tab 7.

(d)     the failure to apply the many decisions of this Court which declined to apply the principle of corporate separateness where to do so would result in injustice.

74.     This action raises matters of public importance and novel points of law. What constitutes an exigible "interest" where a group of companies internationally functions in common? In what circumstances can a world-wide group of companies be liable for a parent's debt? Is the theory of group enterprise available under Canadian law? Ought the corporate veil be treated differently in a modern world, and in particular, against a corporate group with 1,500 subsidiaries that are created and destroyed every day? Epstein J.A. failed to consider the novelty and public importance of this action in exercising her discretion to set the quantum of costs ordered.

**H.     If the Plaintiffs Are Required to Post Costs, $943,051.47 Is Far Too High**

75.     The applicants have also filed a Factum for leave to appeal costs, were their appeal to fail. As discussed below, the submissions in that factum militate in favour of a significantly reduced costs award.

76.     In ordering that the plaintiffs are required to post $943,051.47 in security for costs, respectfully, Epstein J.A. erred by not considering: (a) that the amount ordered for costs for the motion below is under appeal; (b) that the action raises matters of public interest and novel points of law; and (c) the defendants' delay in fixing the amount for security.

77.     First, the plaintiffs have appealed the order of Hainey J. awarding Chevron Corp. and Chevron Canada $862,951.47 in costs arising from the motion below. This order, which

arose from a four (4) day hearing, was excessive and disproportionate, particularly so after the defendant Chevron Corp. already caused USD $9.5 billion worth of damage to the plaintiffs land and waterways. The plaintiffs' appeal of Hainey J's costs order is meritorious. Consequently, an injustice arises in not permitting the plaintiffs to appeal the cost award.

78.    Second, in ordering that the plaintiffs pay security for costs in the full amounts ordered from the motions below, Epstein J.A. failed to consider the impact of the defendants' delay in bringing the motion. In circumstances where the delay has not sufficient to warrant a dismissal of the motion for security for costs, courts have nevertheless considered it in the context of determining the quantum of security sought.

79.    For example, in *Hallum v. Canadian Chiropractic College*, because of the delay in moving for security for costs, Doherty J. (as he was then) ordered that the quantum of security for costs should only reflect the costs of the proceedings from that point onward.[39] Ordering the plaintiffs to post security for costs for the entire proceeding is a draconian step, particularly in light of the defendants' delay in bringing their motion.

80.    Finally, in considering whether it is "just" to make an order for security for costs, the closing words of Granger J. in *423322 Ontario Ltd. v. Bank of Montreal* are apt:

> In my opinion, having regard to the delay in bringing the motion and the fact that the plaintiffs' action is not frivolous or vexatious and is founded upon the actions of the defendants which the plaintiffs alleged caused its insolvency, I am not prepared to exercise my discretion and order the plaintiffs to submit to an order for security for costs at this stage. If I was to make such an order it would cause an injustice.[40]

---

[39] *Hallum v. Canadian Chiropractic College* (1989) 70 O.R. (2d) 119 (S.C.), p. 7 BOA Tab 8.
[40] *423322 Ontario Ltd. v. Bank of Montreal*, 1988 CanLII 4678 (ON SC), at paras. 16 - 17, BOA Tab 3.

81.    All of these factors are present in the within action and consequently, no security for costs should have been ordered.

I.    **The U.S. Decisions Are Not Relevant**

82.    Epstein J.A. referred to the U.S. Decision of Judge Kaplan and to the fact that it was upheld. Those decision are wholly irrelevant to the issues to be considered and ought to have been ignored.

83.    The Chevron companies raise here and raised repeatedly in their Facta on the appeal the U.S. Judgments. Excerpts from the Reply Factum on appeal are reproduced to demonstrate both the irrelevancy of the U.S. Judgments and their non-binding nature.

84.    Both the Respondents, Chevron Corp. at paragraphs 3, 4, 5, 10, 11 and 12 of its Factum and Chevron Canada at paragraph 17 of its Factum emphasize the judgment of Judge Kaplan in the U.S.A., and of the courts upholding it, even though it is entirely irrelevant to the issues in the appeal, does not involve the same parties and expressly does not declare the Ecuadorian judgments, 3 of them, to be invalid.

85.    Moreover the allegations of an offer or a bribe to Judge Zambrano on "ghost writing" his decision and of the corruption of the entire judiciary in Ecuador are all the subject of a heavily contested proceeding progressing to a trial in the Superior Court of Justice.

86.    The only remedies and practical effects of the U.S. judgments are:

(a)    to impose a constructive trust over any monies Steven Donzinger, a U.S. lawyer might receive from the payment of the Ecuadorian judgment. Donzinger is neither an appellant nor a resident of Ecuador; and

(b)     to restrain the filing of any action in the U.S.A. to collect on the Ecuadorian judgment.

87.     Judge Kaplan's Decision has no probative value in the Ontario proceeding. It cannot be enforced against the 47 Plaintiffs in Ontario. It is not *res judicata*. Issue estoppel also does not apply.

88.     The U.S. judgment does not address the question of ownership of assets or corporate separateness, the only issues to be determined in these appeals. It is raised by the defendants, disingenuously, by way of emotion, not to assist legal analysis.

89.     In order in circumvent the U.S. 2nd Circuit Court of Appeals' 2012 Judgment determining that a worldwide injunction prohibiting the plaintiffs from enforcing their Ecuadorian Judgment was unavailable as a pre-emptive strike, Judge Kaplan made the following determinations:

(a)     the Ecuadorian Judgment is not declared to be invalid;

(b)     the only two plaintiffs that were before him could seek to enforce it in any other country but not in the U.S.A.; and

(c)     Chevron had a constructive trust over any monies that the two individual Plaintiffs personally received. Chevron and Judge Kaplan knew, from the Ecuadorian judgments, that the two individual Plaintiffs were not to receive any monies. All monies recovered are to be remitted to a trustee for remediation of the lands and waters.

90.   If the U.S. judgment was enforceable in Canada against the defendants, Chevron Corp. would have sought to do so.

91.   To counterbalance Judge Kaplan's conclusions on the two main allegations of offering a bribe to Judge Zambrano and of the Plaintiffs ghostwriting his judgment, this Court should be aware that in a subsequent arbitration proceeding between Chevron Corp. and the Republic of Ecuador, Chevron's main witness regarding the "bribe" and the "ghost writing" allegations, former Judge Guerra, resiled from the testimony he gave before Judge Kaplan both as to the circumstances surrounding the "bribe" and "ghostwriting". In addition, the Republic of Ecuador produced a forensic expert's report on the examination of the hard drive from the relevant computers demonstrating that Judge Zambrano wrote the Judgment. Judge Zambrano's computer had many variations of the judgments on it.

92.   Two additional matters should be noted:

   (a)   the Intermediate Court of Appeals in Ecuador is a *de novo* court with jurisdiction to accept new evidence, change facts and with unfettered jurisdiction to alter the trial judge's determinations. Chevron Corp. filed 20,000 pages of new evidence , the Intermediate Court of Appeal revised some factual findings but upheld the trial judgment. The Court of Cassation in a well-reasoned 250 page plus decision upheld the judgments. There is no suggestion that any of these judges were offered a bribe; and

   (b)   Guerra in return for his testimony was immediately given a badly needed USD $18,000, emigrated by Chevron Corp. at its expense, with his whole family to the

U.S.A. in 2012. Chevron Corp. rents a house and a car for him and pays him, since

2012, USD $12,000 a month. It also provided him with a lawyer who prepared him

for 53 days for his testimony before Kaplan J.

## PART IV - RELIEF REQUESTED

93.    Chevron has contaminated the applicants' lands and waters imperilling their livelihood and

health. Chevron has isolated the applicants from their funders and their U.S. lawyers by

carrying out their expressed vow to "fight this case until hell freezes over and then to fight

it out on the ice."

94.    It is respectfully requested the decision of Epstein J.A. set aside or be varied to dismiss the

requirement for security for costs as a condition of proceeding with the appeals and if not

vacated altogether, that alternatively, the quantum be reduced to reflect the reasonable

costs of the appeal alone.

95.    **ALL OF WHICH IS RESPECTFULLY SUBMITTED** this 3rd day of October, 2017.

Alan J. Lenczner, Q.C.

Brendan F. Morrison

Kirk M. Baert

Celeste Poltak

Garth Myers

## SCHEDULE "A"

| TAB | AUTHORITY |
|---|---|
| 1 | *Chevron Corp. v. Yaiguaje*, 2015 SCC 42 |
| 2 | *Yaiguaje v. Chevron Corporation*, 2013 ONCA 758 |
| 3 | *423322 Ontario Ltd. v. Bank of Montreal*, [1988] OJ No 1486 (H.C.J.) |
| 4 | *Charron v. MacDonald*, [1938] O.W.N. 410 (Ont. H.C.) |
| 5 | *Cigar500.com v. Ashton Distributors Inc.*, [2009] O.J. 3680 |
| 6 | *Crudo Creative Inc., v. Marin*, [2007] O.J. No. 5334 (Div.Ct.), 2007 CanLII 60834 |
| 7 | *Gosselin v. Wong*, [1983] O.J. No. 2112 (H.C.J.) |
| 8 | *Hallum v. Canadian Chiropractic College* (1989) 70 O.R. (2d) 119 (S.C.) |
| 9 | *Horvat v. Feldman* (1986), 15 C.P.C. (2d) 220 (Ont. H.C.J.) |
| 10 | *Intellibox Concepts Inc. v. Intermec Technologies et al.*, [2005] O.J. No. 1087 (S.J.C), 2005 CanLII 13787 (ON SC) |
| 11 | *John Wink Ltd. v. Sico*, [1987] O.J. No. 5 (H.C.J.) |
| 12 | *Kawkaban Corporation v. The Second Cup Ltd.*, 2005 CanLII 35683 (Ont. Div. Ct.) |
| 13 | *Larabie v. Montfils*, [2004] O.J. No. 179 (C.A.), 2004 CanLII 11299 (ON CA) |
| 14 | *Malamas v. National Bank of Greece*, [2009] O.J. No. 4368 |
| 15 | *Medpace Reference Laboratories, LLC v. KGK Synergize Inc.*, 2009 CanLII 63133 |
| 16 | *Pickard v. London Police Services Board*, 2010 ONCA 643 |
| 17 | *Ravenda Homes Ltd. v. 1372708 Ontario Inc.*, Endorsement of Sharpe J.A., M47591 (C61630) |
| 18 | *Royal Bank of Canada v. Korman*, 2009 ONCA 590 |
| 19 | *SeeWind Design Corp and Acenture Business et al.*, 2013 ONSC 5040 |
| 20 | *Shuter et al. v. Toronto Dominion Bank et al.*, [2007] O.J. No. 3435 (Ont. Master) |
| 21 | *Susin v. Genstar Developments Co.*, [2001] O.J. No. 3825 |
| 22 | *Trillium Motor World Ltd. and General Motors of Canada Limited and Cassels brock & Blackwell LLP*, 2016 ONCA 702 |
| 23 | *Yuanda Canada Enterprise Ltd. v. Pier 27 Toronto Inc.*, 2017 O.J. 13144, 2017 CanLII 13788 |

## SCHEDULE "B"

## TEXT OF STATUTES, REGULATIONS & BY-LAWS

### Courts of Justice Act, R.S.O. 1990, c. C. 43

7(1)  Composition of court hearings – A proceeding in the Court of Appeal shall be heard and determined by not fewer than three judges sitting together, and always by an uneven number of judges.

(2) Idem, motions – A motion in the Court of Appeal and an appeal under clause 6(1)(c) shall be heard and determined by one judges.

(3) Idem – Subsection (2) does not apply to a motion for leave to appeal, a motion to quash an appeal or any other motion that is specified by the rules of court.

(4) Idem – A judge assigned to hear and determine a motion may adjourn the motion to a panel of the Court of Appeal.

(5) Idem – A panel of the Court of Appeal may, on motion, set aside or vary the decision of a judge who hears and determines a motion.

### Rules of Civil Procedure, R.R.O. 1990, Reg. 194

**56.01** (1)  The court, on motion by the defendant or respondent in a proceeding, may make such order for security for costs as is just where it appears that,

(a)      the plaintiff or applicant is ordinarily resident outside Ontario;

(b)      the plaintiff or applicant has another proceeding for the same relief pending in Ontario or elsewhere;

(c)      the defendant or respondent has an order against the plaintiff or applicant for costs in the same or another proceeding that remain unpaid in whole or in part;

(d)      the plaintiff or applicant is a corporation or a nominal plaintiff or applicant, and there is good reason to believe that the plaintiff or applicant has insufficient assets in Ontario to pay the costs of the defendant or respondent;

(e)      there is good reason to believe that the action or application is frivolous and vexatious and that the plaintiff or applicant has insufficient assets in Ontario to pay the costs of the defendant or respondent; or

(f)      a statute entitles the defendant or respondent to security for costs.  R.R.O. 1990, Reg. 194, r. 56.01 (1).

(2) Subrule (1) applies with necessary modifications to a party to a garnishment, interpleader or other issue who is an active claimant and would, if a plaintiff, be liable to give security for costs.  R.R.O. 1990, Reg. 194, r. 56.01 (2).

**61.06** (1) In an appeal where it appears that,

    (a) there is good reason to believe that the appeal is frivolous and vexatious and that the appellant has insufficient assets in Ontario to pay the costs of the appeal;

    (b) an order for security for costs could be made against the appellant under rule 56.01; or

    (c) for other good reason, security for costs should be ordered,

a judge of the appellate court, on motion by the respondent, may make such order for security for costs of the proceeding and of the appeal as is just.  R.R.O. 1990, Reg. 194, r. 61.06 (1); O. Reg. 465/93, s. 6.

    (1.1) If an order is made under subrule (1), rules 56.04, 56.05, 56.07 and 56.08 apply, with necessary modifications.  O. Reg. 288/99, s. 21.

    (2) If an appellant fails to comply with an order under subrule (1), a judge of the appellate court on motion may dismiss the appeal.  R.R.O. 1990, Reg. 194, r. 61.06 (2).

DANIEL CARLOS LUSITANDE YAIGUAJE et al.
Plaintiffs
(Appellants)

-and-

CHEVRON CORPORATION et al.
Defendants
(Respondents)

Court File Nos.: C63309, C63310 and M48342
Court File No.: CV-12-9808-00CL

COURT OF APPEAL FOR ONTARIO

PROCEEDING COMMENCED AT TORONTO

FACTUM OF THE APPLICANTS
ON THE MOTION TO VARY

LENCZNER SLAGHT ROYCE
SMITH GRIFFIN LLP
Barristers
Suite 2600
130 Adelaide Street West
Toronto ON  M5H 3P5

Alan J. Lenczner, Q.C. (11387E)
Tel:     (416) 865-3090
Fax:     (416) 865-2844
Email:   alenczner@litigate.com
Brendan F. Morrison (61635B)
Tel:     (416) 865-3559
Fax:     (416) 865-3731
Email:   bmorrison@litigate.com

Lawyers for the Plaintiffs (Appellants)

# EXHIBIT 36

| | |
|---|---|
| **From:** | Steven Donziger <sdonziger@donzigerandassociates.com> |
| **Sent:** | Tuesday, September 5, 2017 9:36 PM |
| **To:** | John van Merkensteijn |
| **Subject:** | here's the profit and loss |
| **Attachments:** | Profit and Loss Detail2.pdf |
| | |
| **Categories:** | KF2 |

This is what I showed Ian. Needs to be updated.

JVM 002465

ENFORCEMENT OF ECUADORIAN JUDGMENT, LLC
Profit and Loss Detail
May 1, 2016 through February 2, 2017
02/02/17

| | Type | Date | Num | Name | Memo | Clr | Split | Amount | Balance |
|---|---|---|---|---|---|---|---|---|---|
| **Ordinary Income/Expense** | | | | | | | | | |
| **Income** | | | | | | | | | |
| **Investor Funds** | | | | | | | | | |
| | Deposit | 05/09/16 | | Investor I | Deposit | | Lenczner Slaght Escrow Account | 250,000.00 | 250,000.00 |
| | Deposit | 07/13/16 | | Investor I | Deposit | | Lenczner Slaght Escrow Account | 100,000.00 | 350,000.00 |
| | Deposit | 07/19/16 | | Investor II | Deposit | | Lenczner Slaght Escrow Account | 250,000.00 | 600,000.00 |
| | Deposit | 10/03/16 | | Investor III | Deposit | | Lenczner Slaght Escrow Account | 285,000.00 | 885,000.00 |
| | Deposit | 10/19/16 | | Investor IV | Deposit | | Lenczner Slaght Escrow Account | 200,000.00 | 1,085,000.00 |
| | Deposit | 12/01/16 | | Investor III | Deposit | | Lenczner Slaght Escrow Account | 95,000.00 | 1,180,000.00 |
| | Deposit | 01/03/17 | | Investor V | Deposit | | Lenczner Slaght Escrow Account | 237,500.00 | 1,417,500.00 |
| **Total Investor Funds** | | | | | | | | 1,417,500.00 | 1,417,500.00 |
| **Total Income** | | | | | | | | 1,417,500.00 | 1,417,500.00 |
| **Expense** | | | | | | | | | |
| **Bank Service Charges** | | | | | | | | | |
| | Check | 05/10/16 | | Wire Transfer Fee | | | Donziger Escrow Account | 15.00 | 15.00 |
| | Check | 05/23/16 | | Wire Transfer Fee | | | Donziger Escrow Account | 40.00 | 55.00 |
| | Check | 07/08/16 | | Wire Transfer Fee | | | Donziger Escrow Account | 25.00 | 80.00 |
| | Check | 08/16/16 | | Wire Transfer Fee | | | Donziger Escrow Account | 15.00 | 95.00 |
| | Check | 08/16/16 | | Wire Transfer Fee | | | Donziger Escrow Account | 40.00 | 135.00 |
| | Check | 08/19/16 | | Wire Transfer Fee | | | Donziger Escrow Account | 25.00 | 160.00 |
| | Check | 08/19/16 | | Wire Transfer Fee | | | Donziger Escrow Account | 25.00 | 185.00 |
| | Check | 08/19/16 | | Wire Transfer Fee | | | Donziger Escrow Account | 25.00 | 210.00 |
| | Check | 08/30/16 | | Wire Transfer Fee | | | Donziger Escrow Account | 40.00 | 250.00 |
| | Check | 09/26/16 | | Wire Transfer Fee | | | Donziger Escrow Account | 40.00 | 290.00 |
| | Check | 10/06/16 | | Wire Transfer Fee | | | Donziger Escrow Account | 15.00 | 305.00 |
| | Check | 11/09/16 | | Wire Transfer Fee | | | Donziger Escrow Account | 40.00 | 345.00 |
| | Check | 12/05/16 | | Wire Transfer Fee | | | Donziger Escrow Account | 40.00 | 385.00 |
| | Check | 12/08/16 | | Wire Transfer Fee | | | Donziger Escrow Account | 25.00 | 410.00 |
| **Total Bank Service Charges** | | | | | | | | 410.00 | 410.00 |
| **Consulting** | | | | | | | | | |
| **Case Help** | | | | | | | | | |
| | Check | 05/23/16 | WIRE | Shuyana Natalia Yanza Allauca | | | Donziger Escrow Account | 3,000.00 | 3,000.00 |
| | Check | 08/16/16 | WIRE | Shuyana Natalia Yanza Allauca | | | Donziger Escrow Account | 2,000.00 | 5,000.00 |
| | Check | 08/30/16 | WIRE | Shuyana Natalia Yanza Allauca | | | Donziger Escrow Account | 1,500.00 | 6,500.00 |
| | Check | 11/09/16 | WIRE | Shuyana Natalia Yanza Allauca | | | Donziger Escrow Account | 2,000.00 | 8,500.00 |
| **Total Case Help** | | | | | | | | 8,500.00 | 8,500.00 |
| **Total Consulting** | | | | | | | | 8,500.00 | 8,500.00 |
| **Ecuador** | | | | | | | | | |
| | Check | 09/26/16 | | Luis Yanze | | | Donziger Escrow Account | 1,000.00 | 1,000.00 |
| | Check | 12/05/16 | WIRE | Frente De Defense De La Amazonia | | | Donziger Escrow Account | 5,000.00 | 6,000.00 |
| | Check | 12/08/16 | WIRE | Patricia Salazar Cordova | | | Donziger Escrow Account | 3,179.00 | 9,179.00 |
| **Total Ecuador** | | | | | | | | 9,179.00 | 9,179.00 |
| **Expenses/Loan Pay Down** | | | | | | | | | |
| | Check | 05/11/16 | | Donziger & Associates PLLC | | | Donziger Escrow Account | 40,000.00 | 40,000.00 |
| | Check | 07/20/16 | | Donziger & Associates PLLC | | | Donziger Escrow Account | 85,000.00 | 125,000.00 |
| | Check | 10/07/16 | | Donziger & Associates PLLC | | | Donziger Escrow Account | 50,000.00 | 175,000.00 |
| | Check | 10/22/16 | | Donziger & Associates PLLC | | | Donziger Escrow Account | 75,000.00 | 250,000.00 |
| | Check | 12/20/16 | | Donziger & Associates PLLC | | | Donziger Escrow Account | 30,000.00 | 280,000.00 |
| **Total Expenses/Loan Pay Down** | | | | | | | | 280,000.00 | 280,000.00 |
| **Legal** | | | | | | | | | |
| **Canadian Legal** | | | | | | | | | |
| | Check | 05/10/16 | | Lenczner Slaght | | | Lenczner Slaght Escrow Account | 175,000.00 | 175,000.00 |
| | Check | 07/19/16 | | Lenczner Slaght | | | Lenczner Slaght Escrow Account | 245,000.00 | 420,000.00 |
| | Check | 10/06/16 | | Lenczner Slaght | | | Lenczner Slaght Escrow Account | 141,500.00 | 561,500.00 |
| | Check | 10/21/16 | | Lenczner Slaght | | | Lenczner Slaght Escrow Account | 100,000.00 | 661,500.00 |
| | Check | 12/19/16 | | Lenczner Slaght | | | Lenczner Slaght Escrow Account | 30,000.00 | 691,500.00 |
| **Total Canadian Legal** | | | | | | | | 691,500.00 | 691,500.00 |
| **Legal – Other** | | | | | | | | | |
| | Check | 07/08/16 | WIRE | Meyers Saxon & Col | | | Donziger Escrow Account | 15,570.00 | 15,570.00 |
| | Check | 07/08/16 | WIRE | Meyers Saxon & Col | | | Donziger Escrow Account | 15,750.00 | 31,320.00 |
| | Check | 08/19/16 | WIRE | Aaron Marr Page | | | Donziger Escrow Account | 5,000.00 | 36,320.00 |
| | Check | 08/19/16 | WIRE | Long Tuminello LLP | | | Donziger Escrow Account | 10,000.00 | 46,320.00 |
| | Check | 12/05/16 | WIRE | Aaron Marr Page | | | Donziger Escrow Account | 5,000.00 | 51,320.00 |
| | Check | 12/08/16 | WIRE | Deepak Gupta | | | Donziger Escrow Account | 25,000.00 | 76,320.00 |
| | Check | 12/16/16 | WIRE | Aaron Marr Page | | | Donziger Escrow Account | 5,000.00 | 81,320.00 |
| **Total Legal – Other** | | | | | | | | 81,320.00 | 81,320.00 |
| **Total Legal** | | | | | | | | 772,820.00 | 772,820.00 |
| **PR Wire Service** | | | | | | | | | |
| | Check | 10/17/16 | WIRE | 3BI Media LLC | | | Donziger Escrow Account | 4,600.00 | 4,600.00 |
| **Total PR Wire Service** | | | | | | | | 4,600.00 | 4,600.00 |
| **Total Expense** | | | | | | | | 1,075,509.00 | 1,075,509.00 |
| **Net Ordinary Income** | | | | | | | | 341,991.00 | 341,991.00 |
| **Net Income** | | | | | | | | 341,991.00 | 341,991.00 |

| Available Cash in Escrow Accounts | |
|---|---|
| **Lenczner Slaght** | 237,500.00 |
| **Donziger** | 104,466.00 |
| | 341,966.00 |



JVM 002466

# EXHIBIT 37

## Ecuador Judgment Investment Agreement

In consideration of an Investment of $500,000 from the Funder (defined below) to help obtain a monetary recovery of the Ecuador Judgment (defined below) against Chevron Corporation and its subsidiaries and related entities ("Chevron"), the Frente de Defensa de la Amazonia (FDA), in its capacity as the sole beneficiary of the environmental remediation award under the Ecuador Judgment and the Ecuador Trust (defined below), and the Funder, hereby agree as follows:

1. Definitions:

    a. "Ecuador Judgment": The final judgment and award in the case of *Maria Aguinda et al. v. Chevron Corp.*, rendered in the first instance by the Provincial Court of Justice of Sucumbíos, 14 Feb. 2011, affirmed on appeal by the Sole Chamber of the Provincial Court of Justice of Sucumbíos, 3 Jan. 2012, certified for enforcement on 17 Feb. 2012, and affirmed by the National Court of Justice on 12 Nov. 2013. "Ecuador Judgment" in this Agreement refers to the legal obligation imposed on Chevron by the Ecuadorian courts as reflected in the aforementioned decisions **(attached in Appendix 1)** collectively.

    b. "Ecuador Trust": "FIDEICOMISO MERCANTIL DE ADMINISTRACIÓN DE FLUJOS ADAT," created 1 March 2012 in Quito, Ecuador, pursuant to instructions in the Ecuador Judgments, in which the individual claimants in the *Aguinda* case placed the entirety of their interest in trust for the implementation of remediation and payment of related expenses, naming the Frente de Defensa de la Amazonia (FDA) as the sole beneficiary.

    c. "Judgment Proceeds": "Judgment Proceeds" as used herein shall mean the total amount of any and all funds actually collected by the Ecuador Parties or any of their agents or related parties related to the Ecuador Judgment. This includes, without limitation, any settlement monies paid by Chevron; any judicial orders obtained by claimants against Chevron that result in the recovery of funds, non-monetary assets, or anything of value; the additional 10% Award to the FDA entitled by Ecuador's Environmental Management Law; any post-judgment interest payments or penalties awarded by the Canadian courts or any court; and any additional award of fees or expenses by the Ecuadorian, Canadian, or any other court. Ecuador Judgment Gross Proceeds includes, without limitation, any interest payments on the pending judgment, fees, penalties, and the 10% Award.

2. Parties and Agents:

1 / 6

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0000627

a. "FDA":  Frente de Defensa de la Amazonia, Eloy Alfaro No. 801 y Progreso, Nueva Loja, Ecuador.

b. "Trust Board President": The individual (Ermel Chavez) appointed upon the establishment of the Ecuador Trust and responsible for carrying out duties and exercising authority specified therein.

c. "Ecuador Parties": The FDA and the Trust Board President.

d. "Funder": As identified in Appendix 2A, to be provided by the Funder upon completion and execution of this Agreement.

e. "Funding Escrow Account": As identified in Appendix 2B, to be provided by the Funder upon completion and execution of this Agreement.

f. "U.S. Representative": As identified in Appendix 2B, to be provided by the Funder upon completion and execution of this Agreement.

3. Investment: In satisfaction of the Investment amount, the Funder shall cause the Investment amount to be paid to the Funding Escrow Account. Once Funder transfers and clears the full amount of the Investment to the Funding Escrow Account, the investment will have been deemed to be made and the Funder will be absolutely and irrevocably entitled to the Funder's Interest as defined above and will immediately become the co-owner of the Ecuador Judgment, subject only to the conditions and limitations outlined herein.

4. Grant of Interest: In consideration for the Investment, the FDA hereby grants, and the Trust President hereby acknowledges, an Interest owing to the Funder of .25% of the total amount of the Ecuador Judgment and the Judgment Proceeds as further set forth herein.

5. Co-ownership of Ecuador Judgment:  As per this Agreement, the Funder will be a co-owner of the Ecuador Judgment up to the amount of his Interest in the Judgment.  The Funder will not have the independent power to enforce his ownership Interest against Chevron or its subsidiaries. The Ecuador Parties, together with the *Aguinda* claimants and the communities affected by Chevron's contamination, retain ultimate authority over settlement and disposition of the dispute.

6. Guarantee of Obligations:  The FDA warrants that it is the sole beneficiary of the Ecuador Judgment in trust and the FDA hereby irrevocably warrants that the Funder is legally entitled to receive its Interest in accordance with this Agreement.

2 / 6

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

7. Ecuador Parties' Recognition of Existing Equity Holders: The Ecuador Parties hereby acknowledge that over the course of the litigation against Chevron, they have entered into various agreements with funders, lawyers, and other service providers **(including the Priority Existing Equity Holders identified by the Ecuador Parties in Appendix 3 to this Agreement)**. These agreements also provide a grant of interest in the Judgment Proceeds. The Ecuador Parties guarantee to the Funder that the Funder's Interest does not infringe directly and/or indirectly on any obligations under these agreements and that the Funder's Interest will paid in full out of the Judgment Proceeds recovered.

8. Priority: The Ecuador Parties hereby irrevocably warrant that all obligations to the Funder and the Priority Existing Equity Holders identified by the Ecuador Parties in **Appendix 3** to this Agreement will be satisfied in accordance with this Agreement prior to any distributions to the Ecuador Parties, the Ecuador Trust, or any Claimants.

9. FDA Guarantee Regarding the 10% Award:  The FDA hereby irrevocably warrants that in addition to the other obligations outlined herein, the full amount of its additional 10% Award due under the judgment, as well as any interest on the judgment collected in any enforcement jurisdiction and available for dispensation by the FDA, shall be used to guarantee full payment to the Funder and any Priority Existing Equity Holders as listed in Appendix 3 until all have fully received their Interests as per this Agreement and others referenced in the Appendix.

10. Escrow Accounts: Two escrow accounts shall be created by the FDA and the U.S. Representative, as follows:

   a. The Funding Escrow Account, as identified in Appendix 2.B, will be created to hold investment monies transferred under this Agreement in escrow to be distributed per the instructions of the U.S. Representative. Upon due consultation with the FDA and the Funder, final authority over distribution of said funds will rest with the U.S. Representative.

   b. A second escrow account ("Distribution Escrow Account") shall be created in due course to collect the Judgment Proceeds and distribute the same to satisfy the interests of the Funder and all other equity holders, including those identified on Appendix 3. This Account, or a separate escrow or trust, shall then distribute the remaining funds (after all Agreements of the equity holders have been paid) to the Ecuador Trust to implement the environmental remediation ordered by the Ecuador Judgment.

*[handwritten: leave vague]*

*[handwritten: 100% conflicted]*

*[handwritten: SRD is hiring 3d party admin back-up # A/C & execute expenses]*

3 / 6

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0000629

11. No Further Funding Requirement: The Ecuador Parties and the US Representative hereby confirm to the Funder that, upon the realization of the investment, there will there be no requirement or further funding from the Funder in order for the Ecuador Parties to continue seeking the collection of the Ecuador Judgment Gross Proceeds.

12. Use of funds:  The Investment shall be used by the FDA and U.S. Representative to fund ongoing legal efforts to collect on the Ecuador Judgment in Canada and in other jurisdictions as chosen by the Ecuador Parties. Funds also will be used for various purposes, including (but not limited to) to defend against retaliatory actions brought by Chevron to try to attack the Ecuador judgment; media relations and public education; and outreach to the investment community.

13. Obligations of the Funder:  Once the Funder has made its investment, the Funder will be under no other obligation whatsoever as per this Agreement.

14. No Dilution: Following realization of the investment, the Funder's interest will not be subject to dilution absent the express and written consent of the Funder.

15. Partial Recovery in Non-Settlement Scenario: If the collection of funds from the Ecuador Judgment takes place on a partial or incremental basis (for example, if Chevron assets are seized in an enforcement jurisdiction and sold incrementally over time, while the litigation continues in other jurisdictions in an effort to realize a full recovery of the judgment), the Ecuador Parties irrevocably warrant that the Funder (along with other Priority Existing Equity Holders as listed in Appendix 3) will be compensated a percentage of funds corresponding to its respective interest, prior to any payments to the Ecuador Parties.  Said payments shall be made promptly upon receipt of any funds recovered under the terms of this Agreement.

16. Binding and Irrevocable Authority of the FDA:  The signatory of the FDA to this Agreement affirms she has the authority, upon ratification by the FDA Executive Committee, to fully and irrevocably bind the organization.

17. Information: Investor will be kept apprised on a regular basis of all material developments in the litigation.

18. Common Legal Interest: The FDA, the Ecuador Trust, the Funder, and the U.S. Representative have a "common legal interest" in the Claim, this Agreement and any discussion, evaluation and negotiation or other communications and exchanges of information relating thereto.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0000630

19. Counterparts: This Agreement may be signed in multiple counterparts.   Each counterpart shall be considered an original instrument, but all of them in the aggregate shall constitute one Agreement.

20. Confidentiality: The Parties agree that the details of this Agreement, and all related communications, will be kept confidential as between the Parties and will not be divulged to third parties.

21. Conflict of Language:   To the extent there is a conflict between the English and Spanish versions of this Agreement, the English version shall apply.

22. Assignment: This Agreement shall inure to the benefit of, and shall be binding upon the parties hereto and their respective assignees, transferees and successors-in-title or interest.   References to the parties include their assignees, transferees and successors-in-title or interest, and shall include both corporate and unincorporated associations, partnerships, and individuals.

23. Severability & Invalidity: If any term or provision in this Agreement shall in whole or part be held to be illegal or unenforceable under any judicial decision or legal act, that term or provision shall be deemed to be excluded from this Agreement and the enforceability of the remainder of this Agreement will not be affected.

24. Entire Agreement:  This Agreement shall constitute the entire agreement between the parties hereto, and shall supersede all prior agreements, understandings and negotiations between the parties with respect to the subject matter of this Agreement.

25. Governing law:  This Agreement shall be governed by the law of Ontario, Canada. The courts of Ontario shall have exclusive jurisdiction to hear any claim or dispute related to this Agreement.


DATED: _____          _____
                                   Carmen Cartuche
                                   President, FDA


DATED: _____          _____
                                   Ermel Gabriel Chávez Parra
                                   Board President, Ecuador Trust

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0000631

DATED: _____       _____

U.S. Representative

DATED: _____       _____

Funder

* Not having Alan sign

reassign to vote Alan     setting up Phil Fitzing
                                          Kathleen
                                          John Phillips
                                          Stewart

conduct
need to know

* Alan signing all other contracts
  JF to look over & do acceptable

6 / 6

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0000632

# EXHIBIT 38

| | |
|---|---|
| **From:** | Aaron Marr Page <aaron@forumnobis.org> |
| **Sent:** | Thursday, January 11, 2018 4:22 PM |
| **To:** | Steven Donziger <sdonziger@donzigerandassociates.com>; Katie Sullivan <Katie@Streamlinefamilyoffice.com> |
| **Subject:** | Re: need translation of Krevlin side letter |

We can do it however you want it. This is the translation of what you sent. Let me know if you want me to rework it...


-------- Original message --------
From: Steven Donziger <sdonziger@donzigerandassociates.com>
Date: 1/11/18 4:18 PM (GMT-06:00)
To: Aaron Marr Page <aaron@forumnobis.org>, Katie Sullivan <Katie@Streamlinefamilyoffice.com>
Subject: Re: need translation of Krevlin side letter

should i send this down now to be signed, or wait for the funder to sign first?  should we have a separate signature page for purposes of confidentiality like before?  that would be my preference

From: Aaron Marr Page <aaron@forumnobis.org>
Sent: Thursday, January 11, 2018 3:07:06 PM
To: Steven Donziger; Katie Sullivan
Subject: RE: need translation of Krevlin side letter

Here is it in Word and PDF, English and Spanish.

Remember that this is in the form of a letter from Krevlin to the FDA, that will then be countersigned by Carmen. So Glenn should go ahead and sign the English and Spanish and send to you/Katie to send to Luis/Carmen for counter-signature.

I took out Ermel because he has not been a signatory to any of Glenn's earlier agreements and doesn't add anything the way things are currently structured.

Took out Alan because, yeah.

Available to chat later this afternoon and this evening.

From: Steven Donziger [mailto:sdonziger@donzigerandassociates.com]
Sent: Thursday, January 11, 2018 5:41 AM
To: Aaron Marr Page <aaron@forumnobis.org>; Katie Sullivan <Katie@Streamlinefamilyoffice.com>
Subject: need translation of Krevlin side letter

so clients can sign

aaron, can u do or let me know.  top priority

thanks

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)