# EXHIBIT 42

1            UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF NEW YORK

3               C.A. No. 11 Civ. 0691 (LAK)

4

5    - - - - - - - - - - - - - - - - - X

6    CHEVRON CORPORATION,

7                         Plaintiff,

8         v.

9    STEVEN DONZIGER, et al.,

10                        Defendants.

11   - - - - - - - - - - - - - - - - - X

12    VOLUME II

13

14        CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

15          VIDEO DEPOSITION OF MARY K. SULLIVAN

16          Friday, September 28, 2018, 1:20 p.m.

17                   Cornerstone Research

18                    699 Boylston Street

19                 Boston, Massachusetts 02116

20

21

22

23    --- Reporter: Kimberly A. Smith, CRR, CRC, RDR ---

24             Realtime Systems Administrator

25

```
1    APPEARANCES:

2

3        Gibson, Dunn & Crutcher LLP

4        By:  Anne Marie Champion, Esq.

5        200 Park Avenue

6        New York, NY  10166-0193

7        (212) 351-4000

8        achampion@gibsondunn.com

9            and

10       Gibson, Dunn & Crutcher LLP

11       By:  Robert C. Blume, Esq.*

12       1801 California Street

13       Denver, CO  80202-2642

14       (303) 298-5700

15       rblume@gibsondunn.com

16           and

17

18

19

20

21

22

23

24

25
```

1    APPEARANCES: (continued)

2

3        Stern Kilcullen & Rufolo, LLC

4        By:  Michael Dinger, Esq. (via telephone)

5        and Joel Silverstein, Esq. (via telephone)

6        and Herbert Stern, Esq. (via telephone)

7        325 Columbia Turnpike, Suite 110

8        Post Office Box 992

9        Florham Park, NJ  07932-0992

10        (973) 535-2627

11        mdinger@sgklaw.com

12        jsilverstein@sgklaw.com

13        hstern@sgklaw.com

14                     for the Plaintiff;

15

16

17

18

19

20

21

22

23

24

25

1    APPEARANCES: (continued)

2

3        Steven Donziger (via telephone)

4        245 West 104th Street, Suite 7D

5        New York, NY  10025

6        (917) 566-2526

7        sdonziger@donzigerandassociates.com

8                    pro se for himself;

9

10       Rankin & Sultan

11       By:  Charles W. Rankin, Esq.

12       151 Merrimac Street

13       Boston, MA  02114

14       (617) 720-0011

15       crankin@rankin-sultan.com

16                    for the Witness.

17

18   Also Present:

19

20   Andres Romero, Chevron Corporation (via telephone)

21   Mati Kiin, CLVS, Video Operator

22

23

24

25

1                    I N D E X

2

3    WITNESS:  Mary K. Sullivan

4

5    EXAMINATION                                Page

6        Direct Examination by Ms. Champion    242

7        Cross-Examination by Mr. Donziger     244

8        Redirect Examination by Ms. Champion  344

9        Recross Examination by Mr. Donziger   376

10

11   EXHIBITS FOR IDENTIFICATION:

12   Sullivan        Description                Page

13   Exhibit 33  Witness's 9/28/18 affidavit    243

14              with attached exhibits

15

16

17

18

19

20

21

22

23

24   Original exhibits retained by reporter to be

25   returned to Gibson Dunn

1              THE VIDEO OPERATOR:  Good afternoon.

2    We're now going on the record at 1:20 p.m. on

3    Friday, September 28, 2018.  Please note the

4    microphones are sensitive and may pick up whispering

5    and private conversations and/or cellular

6    interference.  Audio and video recording will

7    continue to take place unless all parties agree to

8    go off the record.

9              This begins Media Unit 1 of the video

10   recorded deposition of Mary Katherine Sullivan,

11   taken by counsel for plaintiff in the matter of

12   Chevron Corporation, plaintiff vs. Steven Donziger,

13   defendant.  And this matter is filed in the United

14   States District Court, Southern District of New

15   York.

16             Our deposition today is being held at

17   Cornerstone Research, located at 699 Boylston

18   Street, Fifth Floor, Boston, Massachusetts 02116.

19             My name is Mati Kiin, certified legal

20   video specialist, representing Veritext New York,

21   and I'm the videographer.  Our court reporter today

22   is Kimberly Smith, also representing Veritext.

23             Counsel and all present in the room and

24   everyone attending remotely will now please state

25   their appearances and affiliations for the record.

1              If there are no objections to the
2    proceeding, please -- if there are any objections to
3    the proceeding, state them at the time of your
4    appearance, beginning with the noticing attorney.
5              MS. CHAMPION:  Anne Champion from Gibson
6    Dunn for Chevron Corporation.
7              MR. BLUME:  Rob Blume from Gibson Dunn
8    on behalf of Chevron Corporation.
9              MR. RANKIN:  Charles Rankin from --
10             MR. ROMERO:  Andres Romero for Chevron
11   Corporation.
12             MS. CHAMPION:  And then can we get the
13   Stern Kilcullen folks next, please.  Sorry.
14             MR. STERN:  Yes.  Herbert J. Stern,
15   Stern Kilcullen & Rufolo, for Chevron.
16             MR. SILVERSTEIN:  Joel Silverstein,
17   Stern Kilcullen & Rufolo, also for Chevron.
18             MR. DINGER:  Michael Dinger, Stern
19   Kilcullen & Rufolo, for Chevron.
20             MR. RANKIN:  Charles --
21             MR. ROMERO:  Let me spell my name so
22   that you capture it correctly.  A-n-d-r-e-s.  R --
23   that's the last name, Romero.  R-o-m-e-r-o.  For
24   Chevron Corporation.
25             THE VIDEO OPERATOR:  Thank you.

1    MR. RANKIN:  Charles Rankin for
2  Ms. Sullivan, the witness.
3    THE VIDEO OPERATOR:  Is that everyone?
4    MS. CHAMPION:  Mr. Donziger?
5    MR. DONZIGER:  Steven Donziger for
6  myself.  And I wanted to state an objection.
7    MR. BLUME:  Go ahead.  Go ahead.
8    MR. DONZIGER:  Yes.  I object to this
9  deposition proceeding under the circumstances.  I
10  adopt the content of an email I sent within the last
11  hour to Ms. Champion, Mr. Blume, and Ms. Neuman,
12  stating that I have been ambushed by a very long
13  declaration sent to me -- I don't know -- around
14  noon today when the deposition was supposed to start
15  at 10:00 a.m.
16    I had been told by Ms. Champion that the
17  deposition would take a half a day, which I allotted,
18  which I assume would mean to approximately 1:00,
19  maybe maximum 2:00 o'clock.
20    I have a scheduling conflict as a
21  result, and I cannot proceed in the proper fashion,
22  given the lateness of the submission and the
23  lateness of the start time today.
24    So I object to proceeding today.  I
25  would ask the parties to reschedule this deposition

1      for next week or the week after.  I'm generally

2      flexible.

3                   If that does not happen, if the parties

4      cannot agree, I will proceed -- I can only proceed

5      for a short period of time, 30, perhaps 60 minutes

6      at this time.

7                   But I will reserve the right, if the

8      parties will not agree to reschedule this

9      deposition, to seek another deposition of

10     Ms. Sullivan where I will have sufficient time to

11     ask the questions I need to ask over this extensive

12     and fact-intensive, you know, 23-page affidavit that

13     was just sprung on me.

14                  So I would like a response from

15     Chevron's attorneys as to whether they would agree

16     to put off this deposition until next week or the

17     week after on a day convenient to all parties.

18                  MS. CHAMPION:  Mr. Donziger, we will be

19     proceeding with the deposition now.  You know, when

20     I said a half day, that was my estimate of how long

21     it might take for Chevron to do its own direct.

22     Of course, how long you take on cross is up to you.

23                  We will not be rescheduling this

24     deposition.  We will do our direct examination of

25     Ms. Sullivan.  And frankly, I think 60 minutes is

1    probably plenty of time.  So why don't we proceed

2    and, you know, get this done.

3           MR. DONZIGER:  Excuse me.  I maintain my

4    objection, and it's not for you to say 60 minutes is

5    plenty of time for me.  Because it is not.  Not on a

6    23-page affidavit.  So that's not appropriate and

7    it's not something I agree with.  I have 60 minutes.

8    It is not enough time, not nearly enough time.  I

9    will use it to the best of my ability, given the

10   limited time.  But I maintain my objection.

11          MS. CHAMPION:  Mr. Donziger, this is no

12   different than if we had sat here and done that

13   testimony live.  You would have had to respond to it

14   immediately.  So we disagree with your contentions,

15   and we will be proceeding with the deposition.

16          MR. DONZIGER:  It is different in a

17   number of respects.  One is it's obvious you have

18   been doing -- preparing with Ms. Sullivan or her

19   counsel for several weeks to fashion this testimony

20   without informing me.

21          I've been ambushed because you never

22   indicated you'd be submitting her direct testimony

23   via affidavit form.  So it's not the same at all.

24          So I object to what you just said.

25   Obviously we can agree to disagree.  Please

1    proceed -- please go ahead and proceed if that's

2    your choice.

3                   THE VIDEO OPERATOR:  Would the court

4    reporter please swear in the witness.

5                   MARY K. SULLIVAN,

6        having been previously satisfactorily

7        identified by the production of her driver's

8        license, and duly sworn by the court reporter,

9        was further deposed  and testified as follows:

10                   DIRECT EXAMINATION

11   BY MS. CHAMPION:

12       Q.  Good afternoon, Ms. Sullivan.  You

13   understand that you're under oath?

14       A.  Yes.

15       Q.  And is there any reason that you can't

16   provide truthful testimony today?

17       A.  No.

18       Q.  And that you're here to provide testimony

19   for yourself personally and also on behalf of

20   Streamline Family Office?

21       A.  Correct.

22       Q.  Are you on any medication that would affect

23   your ability to testify truthfully today?

24       A.  None.

25       Q.  You're not suffering from any illness that

1    would affect your ability to testify truthfully

2    today?

3         A.   None.

4         Q.   Make sure you give oral answers because the

5    court reporter can only take down oral answers.

6         A.   Okay.

7         Q.   Did you sign a declaration in this matter?

8         A.   I did.

9         Q.   When did you sign that declaration?

10        A.   Today, about 11:30-ish.

11        Q.   Is this a copy of that declaration?

12             MS. CHAMPION:  For the record, I've

13   handed Ms. Sullivan a copy of her declaration with

14   the original signature page, as well as copies of

15   all the attached exhibits.

16             THE WITNESS:  Yes, it is.

17             MS. CHAMPION:  Can you please mark that,

18   court reporter, as Exhibit 33.

19                  (Sullivan Exhibit 33 was marked

20                   for identification.)

21   BY MS. CHAMPION:

22        Q.   So, Ms. Sullivan, is that your signature on

23   page 23 of the declaration?

24        A.   Yes.

25        Q.   And is that -- Exhibit 33 a true and

1    correct copy of your declaration?

2         A.   It is.

3         Q.   And was everything in that declaration true

4    and correct when you signed it?

5         A.   Yes.

6         Q.   And sitting here today a couple of hours

7    later, is everything in the declaration still true

8    and correct?

9         A.   Yes.

10             MS. CHAMPION:   I don't have any further

11   questions for the witness right now.  We reserve the

12   right to question her on redirect.

13   BY MS. CHAMPION:

14        Q.   Let me ask one more question, just so the

15   record is clear.  Do you adopt the testimony in that

16   declaration as your direct testimony in this

17   deposition today?

18        A.   Yes.

19             MS. CHAMPION:   Thank you.

20             Mr. Donziger?

21             MR. DONZIGER:   Thank you.

22                  CROSS-EXAMINATION

23   BY MR. DONZIGER:

24        Q.   Ms. Sullivan, I am -- can I call you Katie,

25   by the way?

1        A.   Sure.

2        Q.   I am obviously speaking to you by telephone,

3    and I know that's a bit awkward.  So if there's

4    anything that I ask that you don't understand for

5    whatever reason, you don't understand my question,

6    please stop me and ask for clarification.

7              Do you understand that?

8        A.   Yes.

9        Q.   When did you first -- Well, let me ask you

10   a general question.  How did this affidavit come

11   about?

12       A.   It came about -- I don't know -- two weeks

13   ago.  I sat in my attorney's office with Gibson

14   Dunn, with Annie and Rob, and there was one other

15   gentleman.  And we had a discussion.  And an

16   affidavit was prepared and I edited it.

17       Q.   What day did that meeting take place?

18       A.   I don't recall.  I'd have to look it up.

19       Q.   It was approximately two weeks ago from

20   today, in your estimation?

21       A.   I can move and go look.

22       Q.   I don't need an exact date.  Was it in the

23   month of September of 2018?

24       A.   Yes.  It was in the month of September.

25       Q.   Approximately two weeks ago?

1          MS. CHAMPION:  What was it?

2          MR. BLUME:  This is Rob Blume.  Just to

3   move this along, it was 18 September, which is a

4   week -- last -- two weeks ago Tuesday.  So 10 days

5   ago.

6   BY MR. DONZIGER:

7      Q.  Okay.  And when you say your lawyer, I

8   know -- is Mr. -- you're with a -- your lawyer today

9   is a Mr. Charles Rankin?

10     A.  Correct.

11     Q.  And is he your only counsel present with

12  you today?

13     A.  Correct.

14     Q.  And does he work in Mr. Libby's firm?

15  Is he a partner or a lawyer in Mr. Libby's firm?

16     A.  No.

17     Q.  Is Mr. Libby still -- Oh, at one point in

18  time you hired Mr. Libby to be your counsel, correct?

19     A.  Correct.

20     Q.  Is he still your counsel?

21     A.  No.

22     Q.  And when did he cease being your counsel?

23          MS. CHAMPION:  Object as outside the

24  scope.

25          MR. BLUME:  Yes.  It is outside the

1    scope and it is likely asking for work product
2    and/or privilege.
3                MR. DONZIGER:  Well, it's not work
4    product, is it?  I'm asking when she ceased having
5    one counsel and hired another.
6                MS. CHAMPION:  Well, we'll let her
7    counsel instruct her whether or not --
8                MR. RANKIN:  You can answer.
9                MS. CHAMPION:  We don't know, to be
10   honest, so . . .
11               MR. DONZIGER:  I'm not asking you --
12               THE WITNESS:  From my recollection, I
13   think it was September 6.  But that would have to be
14   verified.
15   BY MR. DONZIGER:
16       Q.  Bear with me one second.  In the meeting of
17   September 18 when you met with Chevron's counsel,
18   you mentioned that Annie was there and Rob was
19   there.  Is that Anne Champion when you say "Annie"?
20       A.  Yes.
21       Q.  And "Rob" is Rob Blume?
22       A.  Correct.
23       Q.  And you said there was another gentleman
24   there.  Who was the other gentleman?
25       A.  I can't remember his name.  It was -- but

1    he was from Gibson Dunn.

2         Q.  Do you remember what he looked like?

3         A.  Yes.  If I saw him -- he had an accent.  If

4    I saw him, I'd recognize him.  But I don't remember

5    his name.  He told me it was a nickname because his

6    name was hard to pronounce.

7         Q.  Approximately how old was this third person

8    from Gibson Dunn?

9         A.  33 to 35 would be my best guess.

10             MS. CHAMPION:  Just for the record,

11   Mr. Donziger, it was Delyan Dimitrov who's an

12   associate at Gibson Dunn.

13             MR. DONZIGER:  Thank you.

14   BY MR. DONZIGER:

15        Q.  So what time did the meeting of September 18

16   start?

17        A.  10:00 o'clock -- on or about -- on or about

18   10:00 -- between 10:00 and 11:00.  I don't remember

19   exactly.  But it was between 10:00 and 11:00.

20        Q.  And do you remember how long it lasted

21   approximately?

22        A.  Until about 3:00.

23        Q.  Did the meeting continue through lunch?

24        A.  We did not take a lunch.

25        Q.  Who wrote the first draft of this affidavit?

1      A.  It was delivered to me through my attorney,

2  so I'm not sure.  But I think it came from Gibson

3  Dunn, who was taking notes during our conversation.

4      Q.  How many pages was the first draft of the

5  affidavit that you saw?

6      A.  20 or 21.

7      Q.  You saw the copy of that draft?

8      A.  Yes.

9      Q.  I don't know, given -- I'm sorry.  This is

10  just for the record since I'm in a remote location.

11  I request a copy of that draft.  And I would ask

12  Mr. Rankin to communicate with me post this on-the-

13  record deposition to figure out how we can make that

14  happen.

15             MR. RANKIN:  What is your request?

16  A copy of the first --

17             MR. DONZIGER:  That I be given a copy of

18  the first -- or the draft -- the -- the draft that

19  Ms. Sullivan believes is the first draft that she

20  saw of the deposition -- I mean, of the -- sorry --

21  the affidavit.

22             MR. RANKIN:  I'll consider that.

23  BY MR. DONZIGER:

24      Q.  What time of day -- Or let me back up.

25             Was it during the meeting on September 18

1    that you were given a copy of what you describe as

2    the first draft of your affidavit?

3         A.  No.

4         Q.  When did you see the first draft of your

5    affidavit?  What date, if you remember?

6         A.  I think it was Wednesday, two days ago.  Or

7    it could have been late Tuesday.  But either late

8    Tuesday or sometime on Wednesday.

9         Q.  Was it your understanding that -- Well,

10   back up.  During the September 18 meeting, were you

11   asked questions by the Chevron lawyers?

12        A.  Yes.

13        Q.  And so they interviewed you that day?

14        A.  We -- yes.  We had a discussion.

15        Q.  Well, the discussion consisted largely of

16   the Chevron lawyers asking you questions and you

17   answering?

18        A.  I would say no, it wasn't a -- it wasn't a

19   conversation of firing questions at me.  There were

20   questions, but it wasn't a full Q&A.  I would call

21   it more of a conversation directed by questions.

22        Q.  Was it pretty much -- was that discussion

23   or questions and conversations pretty much continuous

24   from the time you began meeting with them until the

25   time the meeting ended?

1    A.  Yes.

2    Q.  Prior to that date, which Mr. Blume says

3  was September 18, had you met with any Chevron

4  lawyers or Chevron counsel at Gibson Dunn or any

5  other law firm?

6    A.  No.  Other than the deposition.

7    Q.  If you know, did your counsel prior to

8  Mr. Rankin meet with any Chevron lawyers from Gibson

9  Dunn or any other law firm with regard to this

10  matter?

11         MR. RANKIN:  Well, I'm going to instruct

12  her not to answer that to the extent that it calls

13  for information she obtained from her former lawyer.

14         MR. DONZIGER:  Am I supposed to come

15  back at you, or is she going to answer the question?

16         MR. RANKIN:  No, I think the only way

17  that she would know the answer to that question

18  would be from information she obtained from her

19  lawyer.  So why don't you put a different question.

20         MR. DONZIGER:  Well, I mean -- well, I

21  don't want to get hung up on this.  We might just

22  disagree.  But I don't think all information

23  obtained from lawyers is privileged and, you know,

24  I'm not asking for the contents of substantive

25  conversations.  I'm asking whether there was a

1    meeting between her lawyer and Chevron's lawyers.
2    And I don't think that's privileged.
3                MR. RANKIN:  Well, I'm going to instruct
4    her not to answer.
5    BY MR. DONZIGER:
6        Q.  Ms. Sullivan -- Katie -- when you received
7    the draft of the affidavit, did you receive it from
8    your lawyer?
9        A.  Yes.
10       Q.  Mr. Rankin?
11       A.  Yes.
12       Q.  And when you received it from Mr. Rankin,
13   were you with him physically?
14       A.  No.
15       Q.  He sent it to you, I assume, via email?
16       A.  Correct.
17       Q.  And when you got it, did you read it?
18       A.  I was not at a place where I could read it.
19   But as soon as I got to my office, I read it.
20       Q.  And once you got the first draft of the
21   affidavit, did you edit it and suggest changes?
22       A.  Yes.
23       Q.  Did you do it via Track or how did you make
24   the edits?
25       A.  I made them through Word with Tracking.

1    Q.  And how many edits/Track Changes did you

2    put in the first draft of the document?

3    A.  I would say I made a significant amount of

4    changes.

5    Q.  Approximately how many?  Was it more than

6    10?

7    A.  It was more than 10.

8    Q.  Was it more than 20?

9    A.  I would say --

10   Q.  Approximately, I mean.

11   A.  Yes.  Spelling errors, some typos, language

12   that I wanted to be my own words.  Yes, I would say

13   it was probably more than 20.  I spent a long time

14   reviewing it.

15   Q.  Did you -- As part of your Track Changes,

16   did you recommend or edit the deletion of any

17   complete sentences?

18   A.  Say that again, please.

19   Q.  As part of your suggested edits, did you

20   edit out any sentences?

21   A.  Yes.

22   Q.  Approximately how many sentences did you

23   edit out?

24   A.  I don't -- anywhere between six, seven,

25   eight full sentences, I would guess.

1    Q.  Did you edit out any complete paragraphs?

2    A.  Yes.

3    Q.  Can you tell me how many complete paragraphs

4  you edited out, if you remember?

5    A.  I would say two, if I was looking at them

6  from a numbered -- being numbered, I probably edited

7  two of them out.

8    Q.  And why did you edit out -- Let's just

9  break it down.  There were two paragraphs, based on

10  your recollection, edited out.  For the first one,

11  why did you edit it out?

12    A.  I don't recall specifically, but it would

13  be because it's something that I wouldn't say, would

14  be my reason for editing it out.

15    Q.  And you wouldn't say because why?  Was it

16  inaccurate in your estimation?

17    A.  You could characterize it that way.

18  Because if I wouldn't say it, I would call it

19  inaccurate.

20    Q.  Do you remember the content of the first

21  paragraph that you edited out?

22    A.  No.  Not -- no.  Not specifically.

23    Q.  Do you remember like the subject matter,

24  even anything general about it, of that paragraph,

25  the first paragraph that you edited out?

1      A.  It was related -- I know it was related to

2  RICO.  And there was some reference to injunction.

3  Like I wouldn't use a word "injunction."  I wouldn't

4  -- yes.  So it was related to that.

5      Q.  And when you read it, it struck you as

6  inaccurate?

7      A.  That paragraph?

8      Q.  Yes, the first paragraph that you edited

9  out.

10      A.  When I first -- Can you clarify that,

11  please.

12      Q.  Let me try to come at it another way.  In

13  reference -- with regard to the first paragraph that

14  you edited out, what was the nature of your concern

15  about that paragraph?

16      A.  My concern and my number one concern was to

17  make sure that this -- what was written would be my

18  own words and my own voice.

19      Q.  Are all the words in this affidavit that

20  you signed at 11:30 this morning, in your opinion,

21  your own words?

22      A.  I believe them to be true.

23      Q.  Well, that wasn't my question.  My question

24  is, are all the words in the affidavit that you

25  signed this morning at 11:30, in your view, your own

1    words?

2         A.  Yes.

3         Q.  With regard to the second paragraph that

4    you edited out, do you recall the subject matter of

5    that paragraph?

6         A.  Not in particular.  No.

7         Q.  Do you have some sort of general

8    recollection of what the topic of that paragraph

9    that you edited out was?

10        A.  Honestly I can't remember at this point.

11   It's -- having read through it so many times in the

12   past two days, it's honestly a bit of a blur.

13        Q.  Well, let's talk about the past two days

14   then.  Once you sent in your Track Changes, who did

15   you send them to?

16        A.  My attorney.

17        Q.  And do you remember when those were sent?

18        A.  I believe sometime Wednesday evening.

19        Q.  Wednesday evening after --

20        A.  No.  I'm sorry.  It would be this past

21   Wednesday at about 2:30.

22        Q.  That would be September 26, 2018, around

23   2:30 p.m.?

24        A.  Yes, when I sent them to my attorney.

25        Q.  Now, did there come a point in time after

1  you sent in the Track Changes that you got another
2  revised draft of the affidavit?
3      A.  Yes.
4      Q.  When was that?
5      A.  That would have been yesterday and that
6  would have been -- when I looked at it, when I was
7  able to access my email -- would have been
8  sometime -- probably sometime after 5:00.  I can't
9  recall when --
10     Q.  Yesterday being -- Sorry.  Go ahead and
11  finish.
12     A.  I can't recall when it came into my email.
13  But I looked at it sometime after 5:00.
14     Q.  That would be after 5:00 p.m. yesterday,
15  which would be September 27, 2018?
16     A.  Correct.
17     Q.  Now, when you got that document back --
18  I assume it came from your attorney?
19     A.  Yes.
20     Q.  And so just for ease of reference, why
21  don't we call that the second draft.  When you
22  received the second draft of your affidavit, did
23  you -- and after you read it, did you -- were all
24  the changes you had recommended adopted?
25     A.  No.

1    Q.  What changes that you recommend -- what
2  changes recommended by you were not adopted when
3  you -- upon reading the second draft?
4    A.  I don't -- I don't recall specifically.
5    Q.  How many changes that you suggested were
6  not adopted when you -- upon reading the second
7  draft?
8    A.  I would say that a majority of them were
9  adopted.  And then there were some additional
10  changes that I had to review and made edits to those
11  as well.
12    Q.  So in the second draft that you got, you
13  know, not only were you -- not only were your
14  suggested edits either adopted or not adopted, but
15  you found that there was additional language
16  inserted into the affidavit that you had not seen
17  before?
18    A.  There was some.  Not a lot, but there was
19  some.
20    Q.  And do you know who put that language in?
21    A.  I have no idea.
22    Q.  Did you assume it was the Chevron lawyers?
23    A.  I assumed they were preparing the draft
24  based on our conversation.
25    Q.  Well, you know they prepared the draft,

1    right?

2         A.  Yes.  Coming through my attorney, yes.

3    But I don't know who was doing it.

4         Q.  So it's fair to say that you didn't write

5    the affidavit that you signed today, correct?

6         A.  I did not -- I did not draft it, that is

7    correct.

8         Q.  It is fair to say that the affidavit was

9    drafted by Chevron's lawyers, correct?

10        A.  Correct.  The first draft, correct.

11        Q.  Well, the first draft became the second

12   draft, correct?

13        A.  Yes.  That was -- that is correct.

14        Q.  So there's no other affidavit that wasn't

15   drafted by Chevron's lawyers, correct?

16        A.  Correct.

17        Q.  After you got the second affidavit -- or

18   the second draft -- I'm sorry -- of your affidavit,

19   you made additional suggested changes in Track?

20        A.  Last night I did, yes.

21        Q.  And how long did that take you?

22        A.  Oh.  I had to start and stop because of my

23   life.  But I would say it probably took me an hour

24   and a half, two hours.

25        Q.  And then when you were done, what did you

1    do with your changes?

2         A.  I sent them to my attorney.

3         Q.  That was last night?

4         A.  Yes.

5         Q.  Now, with regard again to the second draft,

6    were there -- was there language when you received

7    the second draft that you noticed you had wanted

8    deleted that was still in there?

9         A.  I can't say with 100 percent certainty, but

10   I believe that everything that I wanted -- Can you

11   just say that again?  Everything that I wanted

12   deleted?

13        Q.  Go ahead.  If you want to answer, or would

14   you rather me rephrase the question?

15        A.  Well, just ask it again, please.

16        Q.  Okay.  So my question is, you know, you had

17   testified that with the first draft, you had

18   suggested several changes in Track.  My question is,

19   when you -- after you sent those in and you got the

20   second draft of your affidavit back, was there --

21   were there words that you had suggested be deleted

22   in your edits still in there; that is, they had not

23   been deleted?

24        A.  I would say that a majority of all the

25   things that I would have wanted deleted were still

1    deleted.

2         Q.  But not everything?

3         A.  I can't say 100 percent that not everything.

4    But I would -- majority.

5         Q.  Majority being a little over half or most

6    all?

7         A.  Most all.

8         Q.  But not everything?

9         A.  Not 100 percent.

10        Q.  Now, did you -- did you accept Chevron's

11   refusal to accept all of the changes?

12        A.  I don't know what you mean by, did I

13   accept.  Like in the Tracked Changes I hit "accept"

14   or -- what do you mean by "accept"?

15        Q.  Well, what I mean is, you know, when you

16   got the second draft, not all of the changes you had

17   suggested to the first draft were made.  That's what

18   I understand your testimony to be.

19             My question is, did you accept that some

20   of your suggested changes were not made?

21             Let me -- let me rephrase that.

22        A.  Yes.  That I . . .

23        Q.  Let me rephrase that.  I'm sorry.

24             Why did you accept when some of your

25   initial suggested changes were not made?

1            MS. CHAMPION:  Objection, lacks
2    foundation.
3            MR. RANKIN:  You can go ahead and answer
4    it.
5            THE WITNESS:  It's confusing.  The
6    question is confusing to me.
7    BY MR. DONZIGER:
8      Q.  So let me try again.  I'm a lawyer who
9    works largely on my own with no support, so I didn't
10    have a chance to prepare for this deposition
11    properly, given that I just got your affidavit
12    around noon today.  So just bear with me, please.
13            My question is this.  Why did you accept
14    the fact, which you've testified to, that not all of
15    your suggested changes were made when you received
16    the second draft of your affidavit?
17            MS. CHAMPION:  Objection, lacks
18    foundation, misstates the witness's testimony.
19            THE WITNESS:  For me to answer that,
20    I would have to look at the changes and what was
21    accepted and what wasn't accepted.  And I don't have
22    access to that.
23    BY MR. DONZIGER:
24      Q.  Okay --
25            MS. CHAMPION:  Mr. Donziger, the witness

1  has testified that everything in the declaration is

2  true and correct and that she adopted it as her

3  testimony today.  So would you like to cross her on

4  the substance of that testimony?

5          MR. DONZIGER:  I'll get to that in due

6  course, Anne.  I mean, I appreciate if you'd give me

7  a little leeway since you guys have obviously been

8  working with her for a number of days without

9  telling me.

10          And I've been questioning her for --

11  I don't know -- a half hour.  I want to keep

12  questioning her because how this affidavit was put

13  together is highly relevant to its credibility.

14  So I'm going to proceed with my line of questions.

15  Thank you.

16  BY MR. DONZIGER:

17      Q.  So, Ms. Sullivan -- Katie -- you testified

18  that you sent changes to the second draft of your

19  affidavit to your attorney last night, correct?

20      A.  Correct.

21      Q.  Did there come a point in time where you

22  saw another draft of your affidavit subsequent to

23  that?

24      A.  It was reviewed this morning when I arrived

25  in person.

1    Q.  Approximately what time did you arrive --
2    I'm sorry.  When you say "arrived," do you mean at
3    the place you're at right now?
4    A.  Yes.
5    Q.  I'm sorry.  Just clarify.  Are you at a law
6    office?
7    A.  No.  I'm at Cornerstone Research, a
8    litigation research firm.  Because I asked when I
9    arrived, where was I.
10   Q.  That's in downtown Boston?
11   A.  Yes, on Boylston Street.
12   Q.  What is Cornerstone Research, if you know?
13   A.  They told me they do litigation research.
14            MR. DONZIGER:  I assume, Anne, that's a
15   room that you-all rented for the purpose of this
16   deposition?
17            MS. CHAMPION:  That's correct,
18   Mr. Donziger.  We borrowed it since we don't have a
19   Boston office.
20            MR. DONZIGER:  Okay.  Thank you.
21   BY MR. DONZIGER:
22   Q.  I'm sorry.  Did you say you arrived around
23   9:00 a.m. this morning?
24   A.  I arrived at 9:00 a.m., but I found who I
25   needed to find around 9:20.  I was sitting in the

1    lobby for 20 minutes.

2         Q.  And then at some point, you received a copy

3    of another draft of your -- what became your

4    affidavit?

5         A.  Yes, with my attorney.

6         Q.  Approximately what time did you receive

7    that draft of the affidavit?

8         A.  I don't know.  9:35?  Maybe 15 minutes

9    after -- 10-15 minutes after I arrived in the room.

10        Q.  So for ease of reference, I'm going to call

11   that the third draft of the affidavit.  And I assume

12   when you got a copy of it, you read it?

13        A.  Yes.

14        Q.  With your attorney present?

15        A.  Yes.

16        Q.  Upon reading the third draft of your -- of

17   what became your affidavit, did you suggest any

18   additional changes?

19        A.  Yes.

20        Q.  Approximately -- Can you tell me how many,

21   if you remember?

22        A.  I don't know.  Maybe five, six.

23        Q.  Did you suggest any deletions of sentences

24   on the third draft of the affidavit?

25        A.  Honestly I don't remember.  I think there

1    were some phrases, but I'm not certain if there were
2    full sentences.
3         Q.  And did you make those suggested edits in
4    Track Changes or through some other way?
5         A.  I would have used my pen, because I had a
6    hard copy.  And they were changed based on my
7    recommendations and verification with my attorney.
8         Q.  When you say "would have used your pen,"
9    you did use your pen?
10        A.  I did.  Yes.  I had my pen and a piece of
11   paper that I was marking up.
12        Q.  And when you made those edits to the third
13   draft of what became your affidavit, what did you do
14   with the edits at that point?  Who did you give them
15   to?
16        A.  I shared them with Anne and Rob.
17        Q.  Were they present when you were making
18   edits to the third draft of what became your
19   affidavit?
20        A.  Yes.
21        Q.  Was the third gentleman there as well, I
22   think Anne identified him as Dimitry [sic]?
23        A.  No.
24        Q.  Did you have any discussions with the
25   Gibson Dunn lawyers, Anne, Rob, whoever else might

1    have been there as you were making your suggested

2    changes?

3         A.  I mean, I just -- I wanted to make sure

4    that they would -- it would be my words and my

5    voice.  That was my -- as I said, my number one

6    concern, and priority.

7         Q.  Did you have any discussions with Anne or

8    Rob during the time you were making the changes?

9         A.  I mean, we -- we spoke about, you know,

10   this is -- I want, you know, this changed or --

11   I mean, so that was a discussion.

12        Q.  Did either Anne or Rob, as you were having

13   these discussions, push back against any changes you

14   wanted to make?

15        A.  No.  I mean, there was -- No, I didn't --

16   I would say no.

17        Q.  So did the changes you suggested this

18   morning to the third draft of what became your

19   affidavit get implemented?

20        A.  Yes.

21        Q.  And did -- so there came a time that they

22   were implemented and you were given a revised draft

23   of the affidavit you initially saw around 9:30 this

24   morning, correct?

25        A.  Correct.

1    Q.  About what time did you get that draft?

2    A.  I don't -- 11:00.  I didn't have a watch.

3  My reference point is when I --

4    Q.  Approximately --

5    A.  -- approximately 11:30, 11:45.  That's my

6  guess.

7    Q.  Are you finished?

8    A.  Yes.  I said that was my guess.

9    Q.  Just for ease --

10    A.  I didn't have a clock with me.

11    Q.  Just for ease of reference, let's call that

12  the fourth draft of what became your affidavit.

13  When you got that draft, you obviously read it,

14  correct?

15    A.  Correct.

16    Q.  Did you have any further changes to that

17  draft?

18    A.  Oh, God.  I would say maybe one or two.

19  I -- one or two that were minor.  As you look at a

20  document over and over, you can always find, you

21  know, something to modify.  So maybe there were one

22  or two minor changes.

23    Q.  And then when you made those changes, you

24  gave them to who?

25    A.  To Anne and Rob.

1      Q.  Did you see them put them in -- make those

2   changes on a computer in front of you?

3      A.  Either on a computer or there was a phone

4   call and someone was modifying the document.

5      Q.  Was there a phone call between either Anne

6   and Rob and someone else while this document was

7   being modified?

8      A.  Yes.

9                    (Exit Mr. Blume.)

10  BY MR. DONZIGER:

11     Q.  And do you know who that person was?

12     A.  I assume it was an associate who had access

13  to the document.  I don't know who it was.

14     Q.  An associate in another Gibson Dunn law

15  office, perhaps in New York City?

16     A.  I assume so, yes.

17     Q.  And then I assume that those handful of

18  changes or two changes, as you testified, were made?

19     A.  Yes.

20     Q.  And then you were given another draft of

21  what became your affidavit, correct?

22     A.  Correct.

23     Q.  For ease of reference, let's call that the

24  fifth draft of what became your affidavit.

25                    With regard to that draft, did you have

1    any additional changes?

2        A.  No.

3        Q.  And is that the draft -- when you said you

4    signed the affidavit this morning around, I think

5    you testified around 11:30, that was the draft that

6    you signed?

7        A.  Yes.

8        Q.  Thank you for all that.  I know that was

9    kind of tedious, but it's important that we get that

10   information.

11               I'm going to kind of move to a different

12   time frame, which is prior to -- the time period

13   prior to your September 18 meeting with the Gibson

14   Dunn lawyers.

15               So I'm going to go back in time a little

16   bit with you following a string of questions.

17               When did you first become aware that the

18   Chevron lawyers wanted you to sign a sworn affidavit?

19       A.  I would say -- what day of the week was the

20   18th?

21               MS. CHAMPION:  Tuesday, I believe.

22               THE WITNESS:  Maybe the Thursday or

23   Friday prior to that.

24   BY MR. DONZIGER:

25       Q.  That would be --

1      A.   13th or 14th if I'm doing my math correctly,

2   of September.

3      Q.   Okay.  September 13 or 14?

4      A.   Sometime -- yes.  Everything seems to be --

5   moves fast.

6      Q.   And how did you find out that they wanted a

7   written affidavit?

8      A.   Through my attorney.

9           MR. DONZIGER:  Anne, can I take a

10   10-minute break?  I'm going to try to rearrange my

11   schedule to do this a little longer.  And we can

12   reconvene in 10 minutes.

13           MS. CHAMPION:  Sure.

14           MR. DONZIGER:  I'm probably only going

15   to need 45 more minutes.

16           MS. CHAMPION:  Okay.  Thank you.  We'll

17   come back on the record in 10 minutes.

18           THE VIDEO OPERATOR:  The time is

19   2:13 p.m.  We're now off the record.

20               (Recess at 2:13 p.m.,

21                resumed at 2:25 p.m.)

22           THE VIDEO OPERATOR:  The time is

23   2:25 p.m., and we're now back on the record.

24           You may go, Mr. Donziger.

25           MR. DONZIGER:  Thank you.

1    BY MR. DONZIGER:

2        Q.  I'm going to -- Katie, I'm going to direct

3    you to a couple of passages in your affidavit and

4    ask you about those.  Do you have it in front of you?

5        A.  Yes.

6        Q.  Please turn to page 3, paragraph No. 8.

7        A.  Okay.

8        Q.  In the middle of paragraph 8, you state

9    that, "At no time did Steven disclose to me that the

10   FDA was an organization that he created."

11              Do you see that?

12       A.  Yes.

13       Q.  What is the basis of your knowledge to say

14   that?

15              MS. CHAMPION:  Objection.  It's a

16   negative statement.

17   BY MR. DONZIGER:

18       Q.  What is the basis -- I'll rephrase the

19   question.

20              What is the basis of your knowledge to

21   say that I created the FDA?

22              MS. CHAMPION:  Objection.

23   Mischaracterizes the witness's testimony.

24   She didn't say that you did or didn't create it.

25   She said you did not disclose something.

 1              MR. DONZIGER:  Anne, you've got to be

 2    kidding me.

 3    BY MR. DONZIGER:

 4         Q.  Katie, will you please answer the question.

 5    What is the basis of your knowledge?

 6         A.  The basis is that I did not know that the

 7    FDA was an organization that was -- that was created

 8    or controlled.

 9         Q.  By who?

10         A.  By you.

11         Q.  So you assume in making this statement that

12    the FDA was created by me?

13         A.  If someone were to ask me a question, did

14    Steven disclose that the FDA was an organization --

15    disclose to you that the FDA was an organization

16    that he created, I would say, No, he did not.

17         Q.  But you don't know whether I created the

18    FDA or not, do you?

19         A.  Correct.

20         Q.  Why would you put that in there, in your

21    affidavit?

22              MS. CHAMPION:  Objection, argumentative,

23    mischaracterizes the witness's testimony.

24    BY MR. DONZIGER:

25         Q.  Answer the question, please.

1        A.  Can you restate the question.

2                MR. DONZIGER:  Maybe the reporter can

3    read it back.  I think the reporter is -- sorry --

4    a female.  Ma'am, could you please read it back.

5                (Record read as requested.)

6                THE WITNESS:  It would have come up in

7    conversation that we had on the 18th, and it -- and

8    it's true.  At no time did you disclose to me "that

9    the FDA was an organization that he created and

10   controlled."

11   BY MR. DONZIGER:

12       Q.  It's pretty clear, Katie, the assumptions

13   in that statement in your affidavit that you earlier

14   testified, in your words, is that I created the FDA.

15   And I'm asking you, what is the basis of your

16   knowledge that I created the FDA?  You do not have

17   any knowledge that I created the FDA.  That's okay

18   if you don't.

19       A.  I don't have knowledge that -- yes.

20   I don't have knowledge that you created the FDA.

21       Q.  Well, if you have no knowledge I created

22   the FDA, why would you put that statement in the

23   affidavit?

24                MS. CHAMPION:  Objection, argumentative.

25

1    BY MR. DONZIGER:

2        Q.  Please answer the question.

3        A.  It was -- it was in a draft that was

4    presented to me, and I could say that that statement

5    is true.  "At no time did Steven disclose to me that

6    the FDA was an organization that he created and

7    controlled."  It's a true statement.  You did not.

8        Q.  You have no knowledge, zero knowledge, as

9    to whether I created -- There's two parts to this:

10   created and controlled.  Let's just focus on

11   "created."  You have no knowledge as to whether I

12   created or did not create the FDA, correct?

13       A.  Correct.

14       Q.  You don't even know what year the FDA was

15   created, do you?

16       A.  Correct.

17       Q.  You don't know the people in Ecuador who

18   founded the FDA, do you?

19       A.  Correct.

20       Q.  You don't know the city in Ecuador where

21   the FDA was founded, do you?

22              MS. CHAMPION:  Objection, lacks

23   foundation.

24   BY MR. DONZIGER:

25       Q.  You can answer the question.

1      A.  Correct.

2      Q.  The fact is, those words were put in your

3   affidavit by the people at Chevron who drafted it,

4   correct?

5                MS. CHAMPION:  Objection, lacks

6   foundation, misstates the witness's testimony.

7                MR. DONZIGER:  I'm not repeating her

8   testimony.

9   BY MR. DONZIGER:

10     Q.  Please answer the question, Katie.  Let me

11  rephrase that.

12               That sentence was written by the Chevron

13  lawyers when they drafted your affidavit, correct?

14     A.  Correct.  It was in one of the drafts that

15  was presented to me.

16     Q.  So the other part of that sentence

17  relates -- concerns an assumption you seem to make

18  that I control or controlled the FDA, correct?

19     A.  There were -- I see the word "controlled,"

20  correct.

21     Q.  Yes.  What is the -- Well, let me rephrase.

22               You don't have any knowledge of how the

23  FDA functions as an organization, do you?

24     A.  I do not.

25     Q.  You don't know who controls the FDA, do you?

1      A.  I do not.

2      Q.  The fact is that the Chevron lawyers when

3    they presented you with a draft of this affidavit

4    wanted that statement to be in there, correct?

5      A.  I'd assume so, but I didn't have a

6    conversation with them about it, so I don't know for

7    certain.

8      Q.  But you didn't write that yourself, did you?

9      A.  I did not write the draft of the affidavit

10   myself.

11     Q.  With regard to that one sentence, given

12   that you didn't write that and you testified you

13   don't have knowledge who controlled the FDA or who

14   created it, the Chevron lawyers were essentially

15   putting words in your mouth, weren't they?

16     A.  I put in a lot of effort to make sure that

17   words were not put into my mouth.

18     Q.  I have no doubt you made effort based on my

19   contact with you.  My question is, with regard to

20   this one sentence, Chevron's lawyers were putting

21   words in your mouth: true or false?

22     A.  False.  I can say that this statement is

23   true.  "At no time did Steven disclose to me that

24   the FDA was an organization that he created and

25   controlled."

1      Q.  How long -- how long did you work with me
2   on this case?
3      A.  I worked with you sometime October of 2017,
4   when I said -- when I determined that perhaps I
5   could help, through March of '18.
6      Q.  And during that time, we had numerous
7   conversations, correct?
8      A.  Correct.
9      Q.  We spent time together in person on
10  numerous occasions, correct?
11     A.  Correct.
12     Q.  We were in Ecuador on at least two
13  occasions together, correct?
14     A.  Correct.
15     Q.  And you're aware that I've worked on this
16  matter for almost 25 years?
17     A.  Correct.
18     Q.  And you're aware that it's a fact that
19  there is a tremendous amount of information related
20  to this matter that I did not tell you in the period
21  of time that you and I had contact working on this,
22  correct?
23     A.  Correct.
24     Q.  I'm going to refer you to a different part
25  of your affidavit.  It's on page 7.  And it's the

1    first full sentence at the top of the page.

2              Do you see page 7?

3        A.   Yes.  The first full sentence is 15?

4        Q.   No.  Up above 15 where it says -- the

5    sentence that starts with, "I am unaware of whether

6    Professor Mahoney."

7        A.   Oh, yes, I see that.

8        Q.   Can you just read that sentence real quick

9    and I'll ask you a question about it, please.

10       A.   "I am unaware of whether Professor Mahoney

11   disclosed to the university or others that her

12   partner signed an agreement to obtain a percentage

13   interest in the Ecuador judgment or that the

14   conference was funded by Steven using monies raised

15   based on the Ecuador judgment."

16       Q.   Well, that sentence -- Let me rephrase.

17            Chevron's lawyers suggested you put that

18   sentence in your affidavit, correct?

19       A.   That was in the draft, correct.

20       Q.   Did Chevron, in putting that in the draft,

21   want to put pressure on Professor Mahoney to not

22   work on this matter?

23            MS. CHAMPION:  Objection, calls for

24   speculation.  Also it's potentially work product

25   privilege.

1            MR. DONZIGER:  Work product?  You're not
2      her lawyer.
3            MR. RANKIN:  You can answer.
4            MR. DONZIGER:  I'm going to rephrase.
5            THE WITNESS:  Yes.
6      BY MR. DONZIGER:
7         Q.  Why did you put that sentence -- why did
8      you put that sentence in there?
9         A.  I didn't put that sentence in there.
10     It was part of the draft that I received.
11        Q.  You received the draft from the Chevron
12     lawyers?
13        A.  Correct.
14        Q.  Why would you sign off on a sentence that
15     says you're unaware of something?
16            MS. CHAMPION:  Objection, argumentative.
17            THE WITNESS:  Because I am unaware of
18     that.
19     BY MR. DONZIGER:
20        Q.  I mean, there's a lot of sentences you
21     could have put in there where you could have
22     started, I'm unaware of something, correct?
23        A.  Correct.
24        Q.  So why did you put in this particular
25     sentence that relates to a professor in Canada and

1  her husband?

2      A.  I did not put it in there.  It was part of

3  the draft.  And I didn't delete it because it is

4  true: I was unaware of whether Professor Mahoney

5  disclosed to the university or others.

6      Q.  Chevron obviously wanted you to put that in

7  your affidavit, the Chevron lawyers, correct?

8      A.  It was in the draft that I received.

9      Q.  Did you get any assurances from Chevron in

10  exchange for signing this affidavit?

11      A.  Have I received any assurances?  No.

12      Q.  Yes.  For anything.

13      A.  No.  I have received zero.  I am paying for

14  this.

15      Q.  By "paying," what do you mean?

16      A.  I'm paying legal fees for this.  I have

17  received zero.

18      Q.  Well, you know that your legal fees would

19  be -- probably be lower if you signed the affidavit,

20  right?

21      A.  There was a discussion of how could I get

22  myself extracted from this circumstance as quickly

23  and painlessly and financially responsibly as

24  possible.

25      Q.  And that discussion was with who?

1      A.  That discussion was with my attorney.

2      Q.  You mean Mr. Rankin?

3      A.  Yes.

4      Q.  Do you understand there will be fewer costs,

5  financial costs to you, say, for example, document

6  production, if you sign the affidavit?

7      A.  No.  Everything that was -- I was

8  produced -- I was required to produce, I produced.

9      Q.  But you feel like it would be -- it's more

10  cost effective for you to sign the affidavit than to

11  continue to litigate against Chevron and its

12  attorneys at Gibson Dunn, correct?

13      A.  There was a determination that I wanted

14  this to be over as quickly as possible and what was

15  that path that was best for me and me alone.

16      Q.  When you made that analysis -- Well, I'll

17  rephrase.

18          Did you ever receive any comments from

19  the Chevron lawyers that the company was considering

20  litigation against you directly for participating

21  with me on this matter?

22      A.  Any conversations would have been with my

23  attorney.

24      Q.  Well, were you worried at all that Chevron

25  might sue you over this?

1    A.  There's -- anything seems to be possible

2    when you're a part of this.

3    Q.  "This," meaning this particular case, legal

4    case?

5    A.  This particular situation that I find

6    myself in.

7    Q.  When you say "anything seems possible,"

8    what are you talking about exactly?

9    A.  I don't know.  Some of the things that I

10   read that were filed on some system that I have no

11   access to, but if I read some of the memos or

12   motions or whatever they're called.

13             I was called names.  I was -- by both --

14   both sides.  And so to me, anything was -- anything

15   is possible when you find yourself stuck in the

16   middle of a battle.  And that's where I found myself.

17   Q.  And you felt that there was a possibility

18   Chevron would sue you, right?

19   A.  Yes.  I was called a possible

20   co-conspirator, and a crony, and hand-in-glove with

21   Chevron, so that's where I found myself.

22   Q.  Did you find yourself in the situation

23   starting when you initially got the subpoena or

24   sometime thereafter?

25   A.  Would have been sometime thereafter.

1   I didn't even know what a subpoena even meant.

2        Q.  And when -- As you sort of look back over

3   the period of time from March when you got the

4   Chevron subpoena to today, when did the feelings

5   you're describing about, you know, the pressure you

6   were under begin to manifest themselves?

7   Approximately what month?

8        A.  What month did I start feeling pressure?

9        Q.  Well, what you've testified to: the feeling

10  like anything could happen.  When did you start to

11  feel that?

12       A.  I would say after my first deposition when

13  I was being -- trying to be protected by my attorney.

14       Q.  Did you get the feeling as a result of your

15  experience in your first deposition of feeling like

16  anything could happen?

17       A.  No.  I had -- there were boundaries in that

18  deposition.  It was after that.

19       Q.  Did something happen after that that sort

20  of made you start feeling that way?

21       A.  Well, what was happening was motions back

22  and forth, and my name being called out in documents

23  that I had no say in, and everyone making claims and

24  assumptions.  And I tried to protect myself further.

25  And that was completely denied by the judge.

1      Q.   When you say "the judge," do you mean Judge
2  Kaplan?
3      A.   Yes.
4      Q.   And the documents that made you feel like
5  you -- Well, let me go back and lay a foundation.
6           These documents you're referring to
7  contained references to you that you would describe
8  as unflattering?
9      A.   I would describe them as unflattering, yes.
10  And not true.
11      Q.   And these are documents that were filed by
12  Chevron?
13      A.   I don't know.  They're documents that it
14  seems every day something gets filed, and my
15  attorneys have to track what goes on to see where I
16  may or may not fall into it.
17      Q.   You were scared, fair to say, right?
18      A.   I wouldn't characterize it as scared.  But
19  I did not enjoy not knowing what was to come or have
20  any voice in any of it.
21      Q.   Did you ever receive any suggestions, you
22  know, from Chevron or its attorneys that they were
23  considering litigation against you?
24      A.   I remember seeing a letter that was filed
25  to the judge in response to the protective order

1    that Frank Libby submitted on my behalf asking for
2    further boundaries.
3              And it was that letter that was
4    submitted by Gibson Dunn that made some reference to
5    that -- there was a lot of mischaracterization in
6    that letter: that I was potentially a co-conspirator
7    or, I think, some preservation order, wrongdoing was
8    possible.
9              As I said, it felt like anything was
10   possible because anyone can seem to say anything or
11   send anything to anyone, and it's all okay.  Besides
12   to me.
13       Q.  Also you understood these documents to be
14   public, correct?
15       A.  They were on some judge's -- yes, some
16   system that I didn't have access to, but they were
17   public to my attorneys and anyone who was an
18   attorney and had access to whatever system it was.
19   That was my only way of knowing they were there.
20   And, yes.
21       Q.  So you described a letter I think your
22   prior counsel sent to Judge Kaplan seeking a
23   protective order.  And then you described Chevron's
24   response.  Are you testifying that Chevron's
25   response made you really nervous, given the way you

1    were characterized in that letter?

2        A.  Nervous in the sense that I didn't know

3    when this was going to end.  And I thought it was

4    very -- I thought it was mean.  It was not -- just

5    not -- it was mean.  I felt -- I felt it was unfair.

6              But I also found myself in the middle of

7    this, so I was focused on getting myself out of it,

8    not continuing to play in the sandbox, I call it.

9        Q.  That's understandable.  What is the letter

10   that you describe as mean, what specifically -- if

11   you remember, what did they say in the letter that

12   you thought was mean?

13       A.  I don't know.  It was the whole tone.

14   There were things in there that were not true.  And

15   at a certain point, you make a decision to continue

16   to fight and battle back and forth because he -- I

17   say one thing through my lawyer and then they say

18   another thing and then I say another thing, and it

19   never ends.

20       Q.  Is it fair --

21       A.  And I didn't -- I don't want to play that.

22       Q.  Go ahead.  I'm sorry.

23       A.  I said I'm not interested in having those

24   types of dialogues.  Whether they're through the

25   legal system or over dinner.

1      Q.  Do you know if Chevron's lawyers ever

2   contacted -- Chevron's lawyers or anyone from

3   Chevron ever contacted any of your clients over

4   this?

5      A.  They contacted one related to the Elliott

6   meeting when I got the same batch of documents.

7   But I'm not aware of anyone else.

8      Q.  And that client -- is that Jonathan Bush?

9      A.  Yes.

10     Q.  Did you ever have any discussions with

11  Jonathan Bush about the subpoena that Chevron served

12  on him?

13     A.  I did because I called him that night and

14  said, Heads up.  I just got something.  Your name's

15  on it.  You might get something.  And then the next

16  day I reached out to his counsel, and she said, I'll

17  talk to your lawyer, which I did not have.

18     Q.  Did Chevron's service of a subpoena on your

19  client worry you?

20     A.  Of course.

21     Q.  Why?

22     A.  Because I don't like to be in a position of

23  pulling people into chaos.

24     Q.  Did you think it was unfair of Chevron to

25  have served a subpoena on your client under the

1    circumstances?

2         A.  I thought it's just what they do.  If I

3    coordinated a meeting and they wanted me and he set

4    up the meeting, they would want him.  I don't -- I

5    didn't -- it worried me because it was -- I didn't

6    know what it meant.

7              But beyond that, I -- it was what it was

8    and I was just trying to understand where to go from

9    there.

10        Q.  As you look back on the Jonathan Bush

11   subpoena with the benefit of time, as you sit here

12   today, do you think looking back on it, it was an

13   effort by the Chevron lawyers to intimidate you?

14        A.  Possibly.  I don't -- I don't know.

15   I don't think in those spaces, so it's hard for me

16   to understand why.

17        Q.  Did it make you feel like your involvement

18   with me in this Ecuador case could negatively impact

19   your business, given that Chevron was subpoenaing

20   you and your clients?

21        A.  Yes.  It's fair to say that.  I didn't know

22   what was going to happen.  So I didn't -- I feared

23   the unknown.

24        Q.  Has your involvement in this litigation --

25   when I say "this litigation," I don't mean the

1    Ecuador case; I mean the Chevron subpoenaing of you

2    and the depositions and this affidavit -- has your

3    involvement in this aspect of the litigation

4    negatively affected your business?

5        A.  No.  I have an amazing team.

6        Q.  It took you away from your normal business

7    activities in order to deal with it, correct?

8        A.  It took me away -- it took a lot away from

9    me, correct.

10       Q.  How many hours would you estimate you had

11   to spend dealing with the Chevron litigation against

12   you since it began last March?

13       A.  I don't know.  I'd have to go back and look

14   at the time that my attorneys spent on my behalf.

15   But I spent a fair amount of time with them.  It

16   would be hard for me to estimate because it came in

17   fits and spurts.

18       Q.  Approximately how many meetings did you

19   have with your prior attorney?

20       A.  10, 12.  An hour turned into five hours.

21       Q.  And in those meetings, there was usually

22   more than one attorney, correct?

23       A.  Correct.

24       Q.  And I assume you were being billed by your

25   prior counsel on an hourly basis for the time he was

1      spending -- he and his team were spending on this

2      matter?

3          A.   Yes.  I expected that, and I was.

4          Q.   And that was money you had to pay out of

5      your own pocket?

6          A.   Correct.  And still paying.

7          Q.   What's the total amount of the legal fees

8      you've paid to deal with the Chevron litigation

9      against you from the time it started to today,

10     if you know?

11         A.   I would estimate 170 to $180,000.

12         Q.   Has that amount of money impacted your

13     financial well-being or that of your family?

14         A.   Of course.

15         Q.   Is it your belief that after today, your

16     involvement in this aspect of the litigation

17     initiated by Chevron will end?

18              MS. CHAMPION:  I just would object to

19     the characterization of litigation initiated against

20     [sic] Chevron.  We have not initiated any litigation

21     against Ms. Sullivan.

22              MR. DONZIGER:  Let me rephrase.

23     BY MR. DONZIGER:

24         Q.   Katie, is it your understanding that your

25     involvement in this litigation with Chevron that

1  began with Chevron subpoenaing of you last March

2  will end?

3      A.  It is my biggest dream, although I expect

4  that somehow I'll have to be involved in ways that I

5  don't yet know.  But I pray that it is over.

6      Q.  Has anyone from Chevron indicated to you

7  that it will end after today if you sign -- you

8  know, once you sign the affidavit and get through

9  this deposition?

10     A.  No.

11     Q.  Has anyone from Chevron suggested that it

12 will at least begin to wind down after today?

13     A.  I don't -- I don't know what's to come.

14 All of this is new to me.  So I literally have no

15 idea.

16     Q.  But you had earlier testified that you were

17 in the same room with your attorney and Rob Blume

18 and Annie Champion earlier today, correct?

19     A.  Correct.

20     Q.  When you were with them today, did either

21 Rob or Annie indicate to you that this would -- your

22 involvement in this litigation would begin to wind

23 down after today?

24     A.  I asked on the 18th and I asked again today,

25 where do I go from here?  And there's -- you know,

1   I asked on the 18th if I could be done forever by
2   3:00 p.m., and here I am today.
3           And I asked today, Will this -- will I
4   be done after today?  And, you know, they said,
5   Well, there could be a hearing or a -- I don't
6   know -- something in the courts.  I could have to go
7   to New York to the courts.  I don't know.  That's
8   all I know, which is unknown and not comforting.
9       Q.  I'm just thinking for a second.  I'll be
10  right there.  Hold on a second.
11          Did Annie or -- Annie Champion or Rob
12  Blume tell you today that at least you wouldn't be
13  deposed again by them?
14      A.  I didn't ask them that specifically and
15  they didn't mention it.  I'm assuming that this will
16  be the end of it, but I don't know.
17      Q.  And signing the affidavit, in your mind, in
18  your calculation, would lead to -- in your mind
19  would lead to less litigation involving Chevron,
20  correct?
21      A.  It would lead to less of my time, energy,
22  and money allocated towards this, correct.
23      Q.  Do you know how many times your prior
24  counsel met with Chevron's lawyers?
25      A.  I do not.  I've heard --

1    Q.  You know he met with Chevron's lawyers?

2  You're aware that was happening, correct?

3              MS. CHAMPION:  Objection.

4  Mischaracterizes the witness's testimony.  Assumes

5  facts, lacks foundation.

6              MR. RANKIN:  So do you know, aside from

7  talking with Mr. Libby, whether Mr. Libby met with

8  Chevron's lawyers, other than the deposition you

9  attended?

10             THE WITNESS:  I don't.  I learned the

11  term "meet and confer."  And I still don't really

12  know what that means.  But I know that term.

13             MS. CHAMPION:  For the record, we had no

14  meetings with Mr. Libby in person aside from seeing

15  him at the deposition.

16  BY MR. DONZIGER:

17    Q.  Okay, Katie.  I know this is not pleasant

18  for you and it's not pleasant for me, but I just

19  want to ask you a few more questions with regards to

20  some things in your affidavit.

21             So I'm going to ask you to look at --

22  I'm going to ask you to look on page 3, paragraph 7,

23  which is the paragraph above the one where I was

24  questioning you before.

25             Do you see paragraph 7?

1      A.  Yes.

2      Q.  So did you write paragraph 7, or did

3  Chevron's lawyers write it?

4      A.  That was -- paragraph 7 was part of the

5  draft that I received.

6      Q.  Chevron's lawyers -- Chevron's lawyers

7  wrote paragraph 7?

8      A.  Yes.  It was part of the draft that I

9  received through my lawyer that came from Gibson

10  Dunn.

11      Q.  I'm going to ask you about a couple things

12  that are said in this paragraph 7.  In the first

13  sentence, it says, "Steven spent the majority of his

14  time coordinating 'out-of-court' 'nonlegal'

15  strategies to put 'pressure' on Chevron."

16          Do you see that?

17      A.  Yes.

18      Q.  You didn't write that, did you?

19      A.  I did not write that sentence.  It was part

20  of the draft.

21      Q.  Now, you don't have any knowledge, or

22  firsthand knowledge of how I spend the totality of

23  my time on this case, correct?

24          MS. CHAMPION:  Objection.  Compound,

25  confusing, mischaracterizes the witness's testimony,

1    lacks foundation.

2    BY MR. DONZIGER:

3        Q.  Can you answer the question, please.

4        A.  The only knowledge -- well, the knowledge I

5    have is just based on conversations and then trying

6    to help you feel less busy and overwhelmed and

7    understanding if any of my insights or -- could be

8    helpful.

9             But as far as I knew, you were always

10   in -- incredibly busy.

11       Q.  You were not with me on a day-to-day basis,

12   were you?

13       A.  I was not.

14       Q.  And we only met -- I think you say in your

15   affidavit, we met approximately seven times in

16   person during the time we were working together,

17   correct?

18       A.  That was my estimation, correct.

19       Q.  And we were working together at least --

20   I don't know -- five months, would you say?

21       A.  Yes.

22       Q.  So we met seven times in five months,

23   correct, roughly?

24       A.  That was -- yes.  That was my -- correct --

25   my estimation.

1    Q.  And we talked on the phone during that same

2    period of time, you know, what would you say

3    15-20 times?

4    A.   In five months we only talked on the phone

5    15-20 times?  I would say more.

6    Q.  Well, I don't -- how many times do you

7    think we talked on the phone over the five months we

8    worked together?  Would you say it was like maybe

9    three, four times a week?

10    A.  Yes.  Sometimes more if there was something

11   going on.  Or it was -- again, when -- when something

12   was needed.  There could be a week where we didn't

13   talk on the phone.  Or there could be -- yes --

14   just -- I wouldn't know on average.  But . . .

15    Q.  You would really have no basis of knowledge

16   to comment on how I spent the majority of my time,

17   correct?

18    A.  Other than conversations you and I would

19   have and my takeaways of how -- you know, traveling,

20   raising money, working media, coordinating lots of

21   people and lawyers.  Like more case management.

22    Q.  In the sentence I'm asking about at the

23   very beginning of paragraph 7, the words "out-of-

24   court" and "nonlegal" -- do you see the words

25   "out-of-court" is in quotes?

1      A.   Yes.

2      Q.   That was put there by the Chevron lawyers,

3   right?

4      A.   Correct.  That was in the draft.

5      Q.   And then the phrase "nonlegal" in quotes

6   was also put there by the Chevron lawyers in the

7   draft?

8      A.   Correct.

9      Q.   And the word "pressure" in quotes, do you

10   see that?

11      A.   Yes.

12      Q.   That was also put there by the Chevron

13   lawyers in the draft?

14      A.   Yes.

15      Q.   Why do you think they put quotes around the

16   word "pressure"?

17      A.   I do not know.

18      Q.   And the next sentence, "The goal of his

19   pressure campaign was twofold," those are Chevron's

20   words from the draft, correct?

21      A.   "Pressure campaign," yes, that was in the

22   draft.

23      Q.   You don't see anything wrong with people in

24   the position of my clients in Ecuador wanting to put

25   pressure on Chevron to settle the case, do you?

1      A.   No.  I think -- from my perspective, there

2   was legal stuff going on in court in Canada, and

3   then there's other strategies that were in place to

4   put pressure on them.  "Pressure" is not a -- I

5   would say that's not a new word.

6      Q.   It's not a bad thing, is it, in this

7   context?

8      A.   No.  I think -- no, I don't think it's a

9   bad word.  You just have to work many angles in

10  whatever you're -- whatever you're doing.

11     Q.   In the very last part of paragraph 7, the

12  last -- the end of the last sentence, it says,

13  "I did not work with Steven on any legal issues or

14  observe him working on any."

15            Do you see that?

16     A.   Yes.

17     Q.   That was words that came from Chevron's

18  lawyers in the draft, correct?

19     A.   Correct.

20     Q.   When you say, "I did not work with Steven

21  on any legal issues," the reason that's the case is

22  because you're not a lawyer, right?  We were not

23  working on legal issues related to the Ecuador case

24  against Chevron, correct?

25            MS. CHAMPION:  Objection.  Calls for

1    speculation, misstates the witness's testimony.

2              THE WITNESS:  I -- you would have been a

3    fool to work with me on legal issues because I had

4    no legal background.  So I did not work with you on

5    any legal issues.

6    BY MR. DONZIGER:

7         Q.  That was not part of what you were hired by

8    our team to do, correct?

9         A.  You did not ask for any of my help in legal

10   issues, correct.

11        Q.  And when you say you didn't observe me

12   working on any legal issues, you obviously don't

13   know when you were not observing me if I was working

14   on legal issues, correct?

15        A.  Correct.

16              MR. DONZIGER:  Just as a general

17   objection, I'm going to state on the record, and I

18   want Annie and Rob to hear this.  I believe there

19   are examples in this affidavit of the use of sort of

20   opinion work product.  And I am protesting that.

21   And I'm going to ask that the parts of the affidavit

22   that use my opinion work product be removed.

23              And as an example, although I'm going to

24   look at this more carefully when I have -- you know,

25   when we get through the deposition, and I will write

1    you a letter.  But as an example, if you look at the
2    top of page 3, the first full sentence at the top of
3    page 3 is an example of opinion work product.
4                    So I would ask that you guys look at
5    this affidavit for that.  I will too.
6                    MS. CHAMPION:  Mr. Donziger, if you want
7    to make a work product claim, you're going to have
8    to specifically identify the sentences in here that
9    you believe are opinion work product.  You're
10   talking about the last sentence of paragraph 6?
11   Did I get that right?
12                   MR. DONZIGER:  Yes.  That's --
13                   MS. CHAMPION:  This is something that
14   you've stated in dozens of press releases and
15   reports.  So, you know, we can deal with this, but
16   you need to give us specific objections, all right,
17   by letter.
18   BY MR. DONZIGER:
19        Q.  Katie, on page 4, paragraph 10, can you
20   look at that please.
21        A.  I see it.
22        Q.  So you make reference in that paragraph to
23   Ben Barnes and Simon Billenness.
24                   Do you see that in the first sentence?
25        A.  Yes.

1      Q.  I want to focus a couple of questions on

2   Simon Billenness, okay?

3             First of all, did you ever meet Simon

4   Billenness?

5      A.  I did not meet with him in person.  I spoke

6   with him on the phone.

7      Q.  How many times did you speak to him on the

8   phone?

9      A.  Once.

10     Q.  Do you remember why you talked?

11     A.  Because I had an opportunity to possibly

12  meet the woman in charge of proxy voting at State

13  Street Bank because my sister was putting on a

14  nonprofit lunch, and she was going to be a speaker.

15  And I was going to go to that lunch to support my

16  sister.

17            And I said, Well, if I meet this woman,

18  that would be interesting.  And if I meet her,

19  I have no idea what to say to her.  And so I was

20  connected to Simon by you.

21     Q.  And when you say in paragraph 10, "Although

22  this work was directed by Steven," that's Chevron's

23  lawyers' words from the drafting of the affidavit,

24  correct?

25     A.  That is correct.

1    Q.  You never did any independent inquiry with

2  Simon as to who directed his work, correct?

3    A.  I did not.

4    Q.  How was it that all of the paragraphs

5  related to the Calgary conference were put into this

6  affidavit?  Was that put into the draft by the

7  Chevron lawyers?

8    A.  Where do you see that?

9    Q.  I'm sorry.  My apologies.  Look at page 6,

10  paragraph 13.

11    A.  Can you ask the question again.  Sorry.

12    Q.  Yes.  How was it -- What's your

13  understanding of how a paragraph about a conference

14  on the Ecuador litigation in Canada scheduled for

15  November found its way into your affidavit?  How did

16  that happen?

17    A.  I would say because of the -- there were

18  payments out of CWP, and there was documents that I

19  produced, because I had to produce them, that were

20  related to this.

21    Q.  And this paragraph 13 on page 6 of your

22  affidavit was drafted by the Chevron lawyers in that

23  first draft you got?

24    A.  Correct.

25    Q.  Now, when you -- you say in this affidavit

1    that your knowledge of the RICO judgment only came

2    from me.

3              Do you remember signing off on those

4    words?

5       A.  Where are they?

6       Q.  Give me one minute.  I'm sorry.  Page 2,

7    paragraph 6.

8       A.  Yes.  "My understanding of the RICO judgment

9    came from Steven."

10      Q.  When you and I met, I told you about this,

11   right?

12      A.  I first learned about it when -- in Ecuador

13   at the Pachamama Alliance trip in August of 2016.

14      Q.  And did you learn about it from me

15   directly?  I don't remember.  Remind me.

16      A.  Yes.  You gave a presentation to the group

17   and explained the situation in Ecuador and the

18   current status.

19      Q.  So you were aware back as early as August

20   of 2016 that I had a RICO judgment against me from

21   Judge Kaplan, correct?

22      A.  Correct.

23      Q.  Did you ever do any independent research or

24   investigation aside from what I told you as to what

25   the nature of that RICO judgment was and what the

1  evidence was that Chevron presented?  Independent of

2  me.

3       A.  I don't recall doing any.  I still don't

4  really even know what "RICO" means, to be honest,

5  but . . .

6       Q.  But you understand that it's your

7  responsibility when you get involved in a project or

8  investment to do your own due diligence, correct?

9       A.  Correct.

10      Q.  And you also knew that at least -- well,

11 some of the documents that I was sending to

12 potential investors had links to Chevron materials

13 so they could easily access them as regards

14 Chevron's view of the Ecuador litigation, correct?

15           MS. CHAMPION:  Objection, lacks

16 foundation.

17           THE WITNESS:  I don't --

18 BY MR. DONZIGER:

19      Q.  Well, you knew -- Hold on.  I'm going to

20 rephrase and lay a proper foundation.

21           You recall that I had created, or our

22 team had created a document that we would give

23 potential investors that summarized the status of

24 the case, correct?

25      A.  Are you referring to Addendum 1 that was

1    700-some-odd pages?

2        Q.  I don't see Addendum -- is this Addendum 1

3    to your affidavit?

4        A.  No.  Just in reference to -- there was a

5    document that was -- I don't know -- seven or 800

6    pages that gave -- and I never read it, but I knew

7    it existed.

8                 And my understanding of that document

9    was that it was for investors, and they would

10   receive that as part of their due diligence or --

11   I don't know -- information.  If that's what you're

12   referring to, then I was aware of it but never read

13   through it.

14       Q.  As a general matter, you were aware that in

15   the document or documents that we would send to

16   investors, we would have links to Chevron's website

17   so investors could easily access Chevron's view of

18   the case, correct?

19       A.  I would have to go back to emails to verify

20   that.  I know that there were a lot of links.  And I

21   can't say with certainty where they were linked to.

22                 THE VIDEO OPERATOR:  Mr. Donziger, this

23   is the videographer.  In about five minutes, I need

24   to swap a disk.

25                 MR. DONZIGER:  You know, it might be --

1    Anne, it might be helpful to just take maybe a

2    10-minute break, let the videographer swap out, let

3    me get reorganized on my end, and I'll try to wrap

4    up quickly when we come back.

5                MS. CHAMPION:  Thank you.  That's fine,

6    Mr. Donziger.  We'll be back on in 10 minutes?  Is

7    that enough?

8                MR. DONZIGER:  Yes.  Let's get back on

9    in 10 minutes.

10              THE VIDEO OPERATOR:  Thank you.  The

11    time now is 3:27 p.m.  This brings us to the end of

12    Media Unit No. 1.  And we are now going off the

13    record.

14                   (Recess at 3:28 p.m.,

15                   resumed at 3:40 p.m.)

16              THE VIDEO OPERATOR:  The time now is

17    3:40 p.m.  We're now coming back on the record,

18    beginning Media Unit No. 2 in the deposition with

19    Mary Katherine Sullivan.  We're now back on the

20    record.

21              Please, Mr. Donziger, we're back.

22              MR. DONZIGER:  Thank you.  I'll proceed.

23    BY MR. DONZIGER:

24      Q.  Katie, are you okay to continue with a few

25    more questions?  I know it's probably been a pretty

1    long day.  Are you still okay?

2        A.  Yes.  I'm totally fine.  Thank you.

3        Q.  I wanted to ask you about an investor to

4    whom you introduced me named Tony Abbiati.  You know

5    who he is, right?

6        A.  I do.

7        Q.  Do you know if Chevron has had any contact

8    with Tony Abbiati since you were subpoenaed by

9    Chevron in March of this year?

10       A.  I am not aware.

11       Q.  Are you still in communication with Tony

12   Abbiati?

13       A.  No.  Well, I sent him a letter, handwritten

14   note on Friday -- maybe Friday or Thursday of last

15   week, expressing -- assuming that he received out of

16   the 57 or so people that were subpoenaed in addition

17   to me.  And I just said that -- I told him that I

18   did everything I could do to protect him.  And I

19   feel like I failed.

20              MS. CHAMPION:  Do you need a tissue?

21              THE WITNESS:  No.

22              MR. DONZIGER:  Do you want to take a

23   break --

24              THE WITNESS:  No.

25              MR. DONZIGER:  -- or keep going?

1           THE WITNESS:  Keep going, please.

2    BY MR. DONZIGER:

3       Q.  You know that Tony's investment in the case

4    is still in existence, correct?

5       A.  I have no reason to believe the contrary.

6       Q.  And you know if there's a recovery against

7    Chevron in this case, that his investment contract

8    will be honored by the Ecuadorians; you know that,

9    right?

10      A.  That is my hope.

11      Q.  If you ever want to take a break or

12   whatever, just let me know, and we can take a break.

13      A.  No, I'd like to power through this, please.

14      Q.  At the time that -- you know, at the end of

15   the period of time when we were working together,

16   which I would really put it maybe the beginning of

17   March of this year, you had told me that there were

18   other potential investors who you knew that might be

19   interested in funding litigation expenses for the

20   Ecuadorians' lawsuit against Chevron?  That's

21   correct, right?

22      A.  I don't recall that specifically said in

23   March.

24      Q.  But there was a -- there was a general

25   understanding between us that you were trying to

1  help me raise money for my Ecuadorian clients to pay

2  litigation expenses, right?

3      A.  Yes.  I thought that my potential best

4  value would be to create conversations for people

5  that might find this investment opportunity

6  interesting and explore making an investment.

7      Q.  And as part of that work for the case, you

8  on your own reached out to certain potential

9  investors, correct?

10     A.  I reached out to, I would say -- yes.  I

11 reached out to, I would say, a few investors where I

12 took the lead in reaching out to them.  And the

13 others would have been part of a conversation of,

14 Hey, what are you up to?  What are you doing?  And I

15 would explain what I was exploring.  And then it

16 might have led to a follow-up email or a subsequent

17 conversation.

18     Q.  And you also were present either in person

19 or on the phone when I had conversations with

20 potential investors about the opportunity, correct?

21     A.  I was present, yes, for the ones that I'm

22 aware of and was present for.  That seems obvious

23 but . . .

24     Q.  That would include the meeting with Elliott

25 Capital Management?

1      A.  Elliott Management, correct.

2      Q.  And that would include a phone meeting with

3  Tony Abbiati, correct?

4      A.  Correct.

5      Q.  Do you remember any other meetings or phone

6  conversations that you were either there with me or

7  listening on the phone with me when I was talking to

8  potential investors other than those two?

9      A.  Jeff Kahn.

10     Q.  Any others?

11     A.  No.  I think those were the three where I

12  was -- I participated in.

13     Q.  So in the -- in any of those three meetings

14  with Elliott, Tony Abbiati, or Jeff Kahn, you never

15  heard me try to sell my own equity interest in the

16  Ecuador case to investors, did you?

17     A.  That is correct, I did not.

18     Q.  Has your involvement in this litigation

19  with the Chevron subpoena been made public in the

20  media in the Boston area, to the best of your

21  knowledge?

22     A.  No.  The only place I've seen it is in a

23  CSR wire where it was referenced.  When I searched

24  my name and Chevron, that came up because I didn't

25  know what was being said, to whom, by whom, or

1    where.  I had a fear.

2        Q.  Do you still have a fear it could come out

3    like in the media: your involvement in the

4    litigation against Chevron?

5        A.  I would do everything in my power to

6    prevent that.  I do not want -- want it, nor do I

7    appreciate it, nor will I -- I just -- I don't -- I

8    don't -- I want this to be done.  And I don't -- I

9    want to be forgotten.

10       Q.  That's a fear you currently have, correct?

11       A.  It is a fear I have, and it's my reputation

12   that I want to keep to be my own.

13       Q.  Do you think Chevron has done anything as

14   part of this litigation involving the subpoena

15   against you to harm your reputation?

16       A.  Not that I'm aware of.  And I also pray

17   that they have not.

18       Q.  I'm going to refer to a couple more little

19   things in your affidavit, and then I'll try to wrap

20   up, okay?

21       A.  Okay.

22       Q.  If you look at page 3, paragraph 8, which

23   was the paragraph I had earlier questioned you about,

24   about the FDA.

25       A.  Okay.

1       Q.  The part about press releases says -- it
2   says, "I estimated, based on my observations and
3   discussions with Steven, that Steven spent about
4   15 hours on each press release, and that there have
5   been over 50 press releases in the past three years
6   or so."
7               Do you see that?
8       A.  I do.
9       Q.  Did you ever actually observe me spend
10  15 hours writing a press release?
11      A.  No.  That was my estimate when I took it
12  upon myself to count how many there were and how
13  much time and energy it took you.  And I shared that
14  with you.  But that was my estimation if I were to
15  use my best guess.
16      Q.  It was a guess?
17      A.  It was a guess, correct.
18      Q.  You never actually sat with me or
19  physically with me when I wrote a press release from
20  start to finish, were you?
21      A.  I was not.
22      Q.  Did the Chevron lawyers suggest you put
23  that in the affidavit?  In other words, did it show
24  up in that first draft?
25      A.  The whole paragraph or the estimate?

1     Q.  Well, about the 15 hours that I --

2     A.  No, that was --

3     Q.  -- in your affidavit?

4     A.  Those were my specific words because I

5   counted them and I put -- I don't know -- I think

6   there were 50, 52, 53.  And then 15 hours per each

7   and how much time -- I put an hourly rate on it.

8              I was curious because that is not an

9   area that I -- I don't know about media and press

10  releases and whatnot.  And so I was -- I was -- that

11  was -- I took that upon myself to make that estimate.

12    Q.  And part of your estimate was that there

13  were 50 press releases over the past three years or

14  so?

15    A.  Yes.  I went through the historical press

16  releases on CSR Wire, and I hope added them

17  correctly.  But that's where I got the information,

18  whichever are posted currently.  Well, at that time.

19    Q.  And 50 press releases over three years

20  would be what, about one every three weeks?

21    A.  Yes.  If I recall, there was some where --

22  months there were none, some months there were two.

23  It varied but . . .

24    Q.  When you signed off on the words about

25  press releases, were you aware that Chevron puts out

1    press releases on this case, from the Ecuador case?

2        A.  I was aware that there was some website

3    that Chevron has.  I can't remember the name of it.

4    But I never actively saw their press releases.  I

5    would see the ones that were part of a mail list, or

6    that you would share with me directly.

7        Q.  But you're aware that Chevron has a public

8    relations strategy to publicize its view of the

9    Ecuador litigation, correct?

10               MS. CHAMPION:  Objection, lacks

11    foundation.

12               THE WITNESS:  I'm aware that there's a

13    website that I -- I understood that Chevron

14    controlled.  But that would only be coming from

15    something that I heard.  I have no other way to

16    validate that.

17    BY MR. DONZIGER:

18        Q.  So you've never looked at Chevron's website

19    on what they say about this case?

20        A.  I may have in the past clicked on it.  But

21    I don't know how or why I did.  I remember looking

22    at their annual report to see the disclosure that

23    was on the annual report, because I know that was

24    mentioned, so out of curiosity I looked at that.

25    But I was aware of their website.  I can't recall

1    going on it more than probably -- a couple times.

2    Probably through links.

3        Q.  On the top of -- just getting back to the

4    contents of your affidavit, if you'd turn to page 4,

5    please.

6        A.  Okay.

7        Q.  Look, if you don't mind, I'm directing you

8    to the very top of the page.  There is a sentence

9    that says, "In connection with seeking investments

10   in the judgment, Steven would tell investors that

11   these press releases would 'help hold Chevron

12   accountable.'"

13            Do you see that?

14       A.  Yes.

15       Q.  And those are words that Chevron's lawyers

16   had put in the first draft that you got?

17       A.  Yes.  They are.

18       Q.  And when you say, "Steven would tell

19   investors that these press releases would 'help hold

20   Chevron accountable,'" do you have any specific

21   recollection of me saying that to any investor?

22       A.  I do -- I do not recall a specific comment

23   related to press releases.

24       Q.  To investors?

25       A.  Correct.

1      Q.  Or potential investors?

2      A.  Correct.

3      Q.  You're aware, are you not, that the

4  Ecuadorian plaintiffs in the Aguinda case -- that is

5  the underlying litigation -- have an enforcement

6  action pending against Chevron in Canadian courts,

7  correct?

8      A.  I'm aware that there is enforcement action

9  in Canada related to this case, correct.

10     Q.  And I believe on one occasion, we had

11 traveled to Canada for an event related to our case

12 activities in that country?

13     A.  It was the AFN meeting, yes.

14     Q.  That was in Ottawa in, I believe,

15 December of last year?

16     A.  Correct.

17     Q.  And you understood that the main way that I

18 believe Chevron could be held accountable was

19 through the Canadian litigation in court, correct?

20     A.  Correct.  I understood it had been there

21 for about five years already.

22     Q.  And you had heard me say that to potential

23 investors in the meetings that you accompanied me

24 at, correct?

25          MS. CHAMPION:  Objection, lacks

1    foundation, mischaracterizes the witness's testimony.
2    BY MR. DONZIGER:
3        Q.  Let me rephrase.
4            Katie, you had heard me talk about the
5    Canadian litigation that the Ecuadorians maintained
6    against Chevron in the conversations I had with
7    potential investors, correct?
8        A.  Correct.
9        Q.  And you had heard me characterize that
10   litigation as the main way that Chevron would have
11   to pay the Ecuadorian judgment, correct?
12           MS. CHAMPION:  Objection, lacks
13   foundation, misstates the witness's testimony.
14   BY MR. DONZIGER:
15       Q.  Please answer the question.
16       A.  Could it be repeated.
17           MR. DONZIGER:  Could the reporter please
18   read it back.
19               (Record read as requested.)
20           THE WITNESS:  I would characterize it
21   saying that that was the primary -- primary way.
22   BY MR. DONZIGER:
23       Q.  That being the Canadian litigation against
24   Chevron, the enforcement litigation, correct?
25       A.  Right.  The legal work going on in Canada.

1      Q.  I never -- I never told you that I believed

2   that Chevron would pay the judgment based on press

3   releases, did I?

4              MS. CHAMPION:  Objection, lacks

5   foundation.

6              THE WITNESS:  I never heard you say

7   that.

8   BY MR. DONZIGER:

9      Q.  Katie, directing your attention to page 5,

10   paragraph 12, do you see that paragraph?

11      A.  Yes.

12      Q.  In the second sentence, it says, "Similarly,

13   in May 2017, Steven directed the FDA to grant Phil

14   Fontaine a 0.125 percent interest in the Ecuador

15   judgment in return for 'professional services' that

16   were to be defined at a later time."

17              Do you see that?

18      A.  I do.

19      Q.  Those were words that Chevron's lawyers

20   wrote in the first draft that you received, correct?

21      A.  Correct.

22      Q.  And when it says, "Steven directed the

23   FDA," those were words that Chevron's lawyers put in

24   there, right?

25              MS. CHAMPION:  Objection, lacks

1    foundation.

2    BY MR. DONZIGER:

3        Q.  Well, let me rephrase.

4            Those were words that were in the first

5    draft of the affidavit given to you by the Chevron

6    lawyers, correct?

7            MS. CHAMPION:  Objection, calls for

8    speculation.  You cannot expect a witness to

9    remember every word of every draft, every iteration.

10   This is not a memory test.  She stated that the

11   statements in here are true and correct.

12   BY MR. DONZIGER:

13       Q.  Will you please answer the question, Katie.

14       A.  This was in the draft that I received.

15       Q.  And when it says, "Steven directed the FDA,"

16   I know that you didn't write that.  But, you know,

17   you signed off on it.

18           You don't really know that I directed

19   the FDA to do that, do you?

20           MS. CHAMPION:  Objection, lacks

21   foundation, mischaracterizes the witness's

22   testimony.

23           MR. DONZIGER:  Anne, if I may, I think

24   you're being really disruptive, okay?  There's no

25   lack of foundation.  I'm asking her about something

1  in her own affidavit.  So please stop interrupting

2  with objections that have no basis.  Like I get

3  you're trying to delay this and disrupt it.  But

4  please allow me to finish.  I have just a few more

5  questions.

6  BY MR. DONZIGER:

7      Q.  Katie, I'm going to ask it again, if you

8  don't mind.

9      A.  Thank you.

10     Q.  When it says, "Steven directed the FDA to

11 grant Phil Fontaine" that interest, you have no

12 firsthand knowledge of any conversation I had about

13 that with any FDA official, do you?

14     A.  I do not.

15     Q.  So what is the basis for you to sign off on

16 those -- those words: "Steven directed the FDA" in

17 your own mind?

18     A.  The FDA looked to you to manage the case

19 and how expenses were directed.  And so the FDA

20 empowered you to -- to engage in any contract

21 discussions and execution, and the FDA would go on

22 your word.

23     Q.  Do you have any knowledge of who in the FDA

24 makes final decisions about any contractual

25 arrangements where equity is granted?

1      A.  Only by looking at copies of signed

2   contracts and seeing their names.

3      Q.  Well, you've seen, for example, the

4   contract with Tony Abbiati, right?

5      A.  Yes.

6      Q.  And this isn't a memory test.  If you don't

7   remember, that's fine.

8              But looking at that contract, you do

9   know I'm not the person to sign contracts on behalf

10  of the FDA, correct?

11     A.  I -- if I recall, I do not -- on Tony's

12  contract, I don't believe that your signature was on

13  there, correct, or required.

14     Q.  And you do recall that the person who signs

15  contracts for the FDA when equity is granted to

16  investors is the president of the FDA, correct?

17             MS. CHAMPION:  Objection, lacks

18  foundation.

19             THE WITNESS:  I believe that is true.

20  I know there was at one point a woman.  And I think

21  there's a man's name.  But they're names that I --

22  I can't say exactly what they are.

23  BY MR. DONZIGER:

24     Q.  Have you ever been present when I've had a

25  conversation with an FDA president or official

1    regarding a grant of equity in the case?

2        A.  I have not.

3        Q.  So you don't really know what I said to the

4    FDA president about the grant of equity to Phil

5    Fontaine, do you?

6        A.  I was not part of that conversation,

7    correct.

8        Q.  Do you remember when you were in Ecuador

9    really a year ago this month, in September of 2017,

10   with a delegation of Canadians and myself?

11       A.  Yes.

12       Q.  And you were a member of that delegation?

13       A.  I remember that trip.

14       Q.  Did that trip motivate you to want to work

15   with me in this case?

16       A.  That trip was inspiring to me.

17       Q.  What about it -- if you think back to that

18   time on the trip, what about it was inspiring to

19   you?

20       A.  The people that I met on the trip seemed to

21   be very passionate.  And I could kind of just sense

22   a positive energy by all the people that were there.

23   As I was -- I wouldn't really call myself a

24   participant other than I was there.

25               But I was more of kind of just a witness

1    in seeing what was going on and having some

2    conversations with individuals.  But it was an

3    interesting and inspiring trip.  And I enjoyed being

4    part of it.

5         Q.   In terms of -- still talking about that

6    trip, in terms of what you observed of conditions on

7    the ground in the areas that we toured, what kind of

8    stuff did you see?

9         A.   We saw one or two of the pits that are

10   still exposed.  And there was a demonstration with

11   an auger to show the crude or the oil or the sticky

12   substance, whatever it's referred to, that is still

13   present at the -- at the surface.

14             We saw just -- drive -- being on the bus

15   for however many hours that was, eight hours, you

16   know, the surrounding towns and the oil pipes that

17   are aboveground and the cemetery that we stopped at.

18   Yes.  That's what I -- I mean, from --

19        Q.   Do you remember -- Go ahead.

20        A.   From that particular part of the trip,

21   that's what I remember.

22        Q.   Do you remember visiting the grave site at

23   the cemetery of Rosa Moreno?

24        A.   Yes.

25        Q.   Do you remember the grave site at Grand

1   Chief Ed John saying a prayer in his native

2   language?

3        A.  I do.

4        Q.  Do you remember talking to some of the

5   local residents who work on the case?

6        A.  If they spoke English, then, yes.

7        Q.  Did you get involved in this because you

8   really cared about the well-being of those people at

9   that time?

10       A.  Yes.  I have a -- I care about people and I

11  had an appreciation -- greater appreciation for the

12  planet.  And it was a new awareness that I received

13  being in both parts of Ecuador.  So I was

14  synthesizing that, processing it, and understanding

15  what type of impact that I could have beyond my

16  little world could be.

17       Q.  And before Chevron subpoenaed you, we --

18  would you say you and I worked productively together

19  toward the goals of -- that we had outlined?

20       A.  I would say for the most part, I was

21  getting frustrated with my ability to move things

22  forward because of lack of focus, and I found that

23  to be a challenge.  The things that I --

24       Q.  Thank you for that.  I appreciate that.

25  I'm smiling.  I'm just joking.

1          You know, part of what you were hired to
2     do was to help better organize the contract we had
3     with investors, correct?
4          A.  Correct.
5          Q.  And toward that end, you put together a
6     booklet with all the contracts; do you remember that?
7          A.  Yes.
8          Q.  Where is that booklet right now, by the way?
9          A.  Um --
10         Q.  Do you know?
11         A.  I brought it to my attorney's office, and I
12    haven't -- I haven't seen it since.
13         Q.  But you felt comfortable enough with the
14    materials we had at that time to be ready to present
15    them in a professional way to a potential investor
16    in the State of Texas, correct?
17         A.  I was -- that was one of the primary
18    drivers of getting everything organized and just to
19    have -- I don't know -- to know where -- just to
20    have everything organized.  It was that simple.
21         Q.  Well, I think you did a great job with that.
22    But my question is this.  You felt comfortable
23    enough with the materials as they had been organized
24    by me and then by your team --
25         A.  By me.

1      Q.   -- to be able -- Huh?

2      A.   Sorry.  I said by me.

3      Q.   Okay.  Anyway, let me rephrase.  So you

4   felt comfortable enough with the materials that we

5   had put together, I'd given you and you had

6   reorganized, to be able to take them to a potential

7   investor, correct?

8      A.   They were getting closer.  I would say

9   they -- I wouldn't say that they were there.  But I

10  think it was -- As far as I could take them, they

11  were well organized.

12     Q.   And they were well organized enough for you

13  to feel comfortable presenting them to a potential

14  investor, correct?

15     A.   Yes.  If it included kind of a summary of

16  things that were missing.  To the best of my

17  ability, the documents were -- in what was provided

18  to me in paper form or just verbally or -- they

19  were -- they were documented -- and I believed they

20  were documented as well as they could have been.

21     Q.   They were documented well enough that you'd

22  be comfortable to present them to a potential

23  investor at that time, understanding that there were

24  still some inevitable questions one might have,

25  correct?

1          MS. CHAMPION:  Objection.

2   Mischaracterizes the witness's testimony.

3          MR. DONZIGER:  I'm going to rephrase the

4   question.

5   BY MR. DONZIGER:

6      Q.  You felt comfortable enough with the

7   materials as you had organized -- as I had given

8   them to you and you had organized them to present

9   them to a potential investor, correct?

10     A.  I was -- I guess I'm a little bit stuck on

11  the word "comfortable."

12     Q.  Well --

13     A.  I was --

14     Q.  Go ahead.

15     A.  I was going to say, I was doing what I

16  thought would add value so if there was a dialogue

17  with an investor who needed to see the documents

18  organized and where things stood at that time, then

19  they were at -- at that point, they were as good as

20  they were going to get.  And prior to that, I don't

21  think something like that could have been easily

22  produced.

23     Q.  And I acknowledged to you that we needed to

24  better organize the documents when I gave them to

25  you, correct?

1    A.  Correct.  There was an organization

2  challenge, I would say, and an area that I enjoy

3  creating clarity in.

4    Q.  Katie, directing your attention to page 17,

5  paragraph 42.

6    A.  Okay.

7    Q.  Do you see in the last sentence, it says,

8  "Thus, out of a total budget of $1.278 million for

9  2018, more than a third of it was earmarked to be

10  paid to Steven."

11        Do you see that?

12    A.  I do.

13    Q.  I had told you at the time that a

14  significant portion of the funds that were earmarked

15  to me were for past unreimbursed expenses; did I not?

16    A.  Yes.  You said it was reimbursement for

17  times when you had to put up your own money to cover

18  costs, which I don't have clarity into what those

19  costs were.  But that's what I was -- that's what I

20  understood.

21    Q.  And when I sent you, I think, an invoice

22  for $150,000 that I described as reimbursement,

23  before you paid it, I told you to hold that in

24  abeyance, correct?

25    A.  Or just hold off from paying it, so . . .

1      Q.  And that particular payment was never made

2   to me, correct?

3      A.  Yes.  If it's referring to a $150,000

4   invoice that is referenced in paragraph 52, that is

5   correct.

6      Q.  And on page 19, paragraph 50, do you see

7   that?

8      A.  Yes.

9      Q.  You say there, "As far as I could tell,

10  Steven had complete control and discretion over how

11  this money, which belonged to the FDA, was spent.

12  I was not aware of any approval process that existed

13  or was followed with respect to any of the funds

14  disbursed in the CWP account pursuant to Steven's

15  directions."

16          Do you see that?

17     A.  What number is that?

18     Q.  It's paragraph 50 on page 19.

19     A.  Oh, I'm sorry.  I was above it.  Okay, I

20  see that.

21     Q.  Yes.  I'm referencing the second and third

22  complete sentences of paragraph 50.

23     A.  I see that.

24     Q.  You were -- you were not aware -- you say

25  there you were not aware of any approval process,

1   right?

2       A.  I -- correct.

3       Q.  You're not aware that there was an approval

4   process, are you?

5       A.  That is correct.  I was not aware of --

6                   (Court reporter inquiry.)

7   BY MR. DONZIGER:

8       Q.  Let me just ask another question.  You have

9   no awareness of my relationship with the FDA as

10  regards approvals for expenditures, do you?

11      A.  I do not.

12      Q.  You never had direct contact with the FDA

13  regarding expenditures, did you?

14      A.  I did not.

15                  MR. DONZIGER:  I'm pretty much done, but

16  I wanted to just take two minutes.  I'm going to put

17  you on mute and just make sure I don't have anything

18  else.  And I'll be back and I'll either finish or

19  I'll ask one or two questions, okay?

20                  THE WITNESS:  Okay.

21                  MR. DONZIGER:  Thank you.

22                  THE VIDEO OPERATOR:  At 4:24 p.m., we're

23  now going off the record.

24                  (Recess at 4:24 p.m.,

25                  resumed at 4:28 p.m.)

1                   THE VIDEO OPERATOR:  At 4:29 p.m., we're

2     now back on the record.

3     BY MR. DONZIGER:

4          Q.  Katie, I just have a couple more questions.

5     Thank you for your patience.

6                   If you can look on your affidavit,

7     page 11, paragraph 26.

8          A.  I see it.

9          Q.  Do you see the last sentence of that

10    paragraph?  It says, "While I was not aware of it at

11    the time, it has become clear to me that Steven took

12    advantage of my lack of understanding of the legal

13    system (many times telling me that I was naive) and

14    misled me about the RICO case and the nature of the

15    court findings against him."

16                   Do you see that?

17         A.  I do.

18         Q.  Now, was that written by Chevron's lawyers

19    and given to you in the first draft?

20                   MS. CHAMPION:  Again, objection, lacks

21    foundation, calls for speculation.

22    BY MR. DONZIGER:

23         Q.  You can answer.

24         A.  I'd have to look at it, but I know that my

25    words were inserted that I felt taken advantage of

1    for my lack of understanding, and many times telling

2    me that I was naive.  I can confirm that those

3    are -- those were inserted words.

4         Q.  Do you remember -- do you remember me

5    telling you on occasion that the job I was asking

6    you to do was one where Chevron might end up suing

7    me, don't you?

8         A.  Not -- not specifically.

9         Q.  Well, you do remember a -- You do remember

10   me telling you that the case was really tough,

11   correct?

12        A.  I remember that the case was very complex

13   and I had been privy to hearing stories about some

14   things that had happened in the past.

15        Q.  Well, you definitely knew that they had

16   sued me, right?

17        A.  Yes.

18        Q.  Chevron sued me?

19        A.  Yes.  That was part of the RICO, was my

20   assumption.

21        Q.  Yes.  And you knew -- you knew that there

22   was a civil nonmonetary judgment against me from a

23   U.S. federal judge that I had committed fraud on the

24   case, correct?

25        A.  I was aware that -- yes, that there was

1    a -- there was a judgment that said that the --
2    I'm going to put it in my own words -- that the --
3    the case in Ecuador could never be -- was not --
4    basically was not recognized by the United States
5    because they -- it was -- they claimed, or it was
6    stated that it was one with fraudulent means or -- I
7    don't -- I mean, that's not a very good description,
8    but those are my words and my understanding.
9    Because lawyers use words that I might not use.
10       Q.  You were aware that despite that judgment
11   against me, that the underlying case was being
12   enforced against Chevron's assets in Canada, correct?
13       A.  Correct.
14            MS. CHAMPION:  Objection, lacks
15   foundation.
16   BY MR. DONZIGER:
17       Q.  And you were aware, because I've told you
18   this -- Well, let me rephrase.
19            You were aware at some point when we
20   were working together that Canada's Supreme Court
21   had ruled that the Ecuadorian plaintiffs had the
22   right to try to pursue an enforcement action in
23   Canada's courts, correct?
24       A.  My understanding was that they were --
25   I mean, I can't say 100 percent that that was my

1    clear understanding because I was not close to the

2    legal proceedings that were going on there at all.

3              But I was under the impression that

4    things were moving forward as expected with, you

5    know, the expected appeals and -- I don't -- the

6    process that seems to take a very long time.  But I

7    was aware that I was in Canada being attempted --

8         Q.  Well, you were -- I'm sorry.  Go ahead.

9         A.  -- being attempted to --

10        Q.  Go ahead.  I apologize.

11        A.  I'm done.  I'm done.

12        Q.  Just sort of to cut to the chase, you were

13   aware that the Ecuadorians maintained a judgment

14   enforcement action against Chevron in Canadian

15   courts, correct?

16        A.  Yes.  And that's why there was legal action

17   in Canada, yes.

18        Q.  And you were aware that the decision by

19   Judge Kaplan in the RICO case against me does not

20   block the right of the Ecuadorians to pursue

21   enforcement of Chevron in Canada, correct?

22        A.  Correct.  My understanding was outside of

23   the U.S., it was -- you could enforce it wherever --

24   or wherever anyone chose to enforce it.

25        Q.  And I had told you that previous funders of

1    the litigation had been either subpoenaed or sued by

2    Chevron, correct?

3        A.   Correct.

4        Q.   So you knew getting into your work with me

5    that this would be a tough situation potentially,

6    correct?

7        A.   I -- I would say today that I was not fully

8    aware, or maybe did not fully appreciate it.  But I

9    do now.

10       Q.   You recognize, Katie, that as an adult

11   business owner, you had a responsibility to do your

12   own due diligence about the risks involved in this

13   work, correct?

14       A.   I was in the process of doing that.

15   I believe that information and due diligence and

16   figuring things out regardless of where you want to

17   put your time and energy takes time.  And I was in

18   the -- I was in the process of doing -- of doing

19   that.

20            MS. CHAMPION:  I just want to --

21   I didn't have a chance to state an objection.

22   I object to that question to the extent it calls for

23   a legal conclusion, lacks foundation.

24   BY MR. DONZIGER:

25       Q.   You know, Katie, that the RICO judgment by

1   Judge Kaplan is publicly available, correct?

2        A.  I -- Yes.

3        Q.  Did you ever read it?

4        A.  No.

5        Q.  "Yes" or "no"?

6             But you knew it was available to read,

7   right?

8        A.  I knew it was 500-some-odd pages, and it

9   was available, correct.

10       Q.  When you said I misled you about the RICO

11  case, how exactly do you think I misled you?  If you

12  believe that.  Maybe you don't.  Well, let me

13  rephrase.

14            Do you still believe that I misled you

15  about the RICO case?

16       A.  I believe that I was -- was misled, I would

17  say just in general.  And I would put the RICO case

18  in there in the same context that -- while I was

19  very clear that I didn't have the legal wherewithal

20  to understand it, that there were possibly areas

21  that were not explained to me.  And that could be

22  characterized as being misleading.

23       Q.  Well, specifically, as you sit here today,

24  what do you think -- what do you think was not

25  explained to you that should have been explained to

1  you by me?

2      A.  I don't -- you know what?  I haven't given

3  it that much thought.  I'm just trying to move away

4  from this.

5      Q.  Those are words that Chevron's lawyers

6  wanted in your affidavit, right?

7      A.  I'd have to look at the draft and see.

8  I mean, as I said, some of it was -- a part of it

9  could have been a part of the original draft.

10  And what I explained were my words were my words.

11          MS. CHAMPION:  Objection, calls for

12  speculation.

13  BY MR. DONZIGER:

14      Q.  Based on your involvement in this matter

15  from beginning to today, do you believe that Chevron

16  has any lack of integrity in the way it's conducted

17  itself?

18          MS. CHAMPION:  Objection, calls for

19  opinion, outside the witness's knowledge.

20  BY MR. DONZIGER:

21      Q.  You can answer.

22      A.  I think the -- all I can say is that this

23  process has been overwhelming, fascinating, not in

24  the spirit of cooperation, and with no regard for

25  the human beings involved.

1          And I say that from my perspective only.

2     There is no compassion from all -- from the triangle

3     that I've been trying to get out of.

4          Q.  Almost done.  I'm so sorry you have to go

5     through this, Katie.  I really am.

6          Just the first -- I'm sorry -- the

7     second sentence in paragraph 26.  You say, "During

8     the time I knew him," meaning me, "I experienced a

9     lack of integrity."

10         A.  I see that.

11         Q.  You never -- Yes.  My question is, you

12     never told me that to my face during the time we

13     worked together, did you?

14         MS. CHAMPION:  Objection, argumentative,

15     badgering.

16    BY MR. DONZIGER:

17         Q.  You can answer.

18         A.  I never told you that to your face.

19    I alluded to it when I last saw you in person, and I

20    said, I just am trying to figure out, either where

21    the bones or where the bodies are buried, and if

22    you're using me.

23         Q.  Where did you tell me that?  Where were we?

24         A.  We were at a hotel in the lobby trying to

25    go through all of the contracts so that I could

1  understand missing pieces, and there was some -- I

2  don't know -- one of the -- I don't know if it was

3  Agustin or a couple Ecuadorians kind of came in at

4  the -- towards the end, and I had to leave for the

5  train.

6      Q.  You never questioned my integrity during

7  your first deposition, did you?

8           MS. CHAMPION:  Objection.  I don't even

9  understand what that question -- What are you

10 asking?

11          MR. DONZIGER:  Don't worry about it,

12 Anne, okay?  You guys wrote an affidavit where she

13 questions my integrity.  I'm asking her about it.

14 BY MR. DONZIGER:

15     Q.  Please answer the question.

16          MS. CHAMPION:  Do you mean during the

17 deposition did she question your integrity?  It's an

18 unclear question.

19          MR. DONZIGER:  Let me rephrase.

20 BY MR. DONZIGER:

21     Q.  Katie, you remember you were deposed by

22 Chevron, I think in July, right?

23     A.  I don't know when it was.  But it was --

24 yes, I was deposed --

25          MS. CHAMPION:  In June, I believe, 21st

1    or something like that.

2            THE WITNESS:  -- by Chevron.

3    BY MR. DONZIGER:

4        Q.  So over the summer of this year, you were

5    deposed by Chevron -- Chevron's lawyers, I believe

6    in Boston, correct?

7        A.  Yes.

8        Q.  And that deposition lasted a few hours?

9        A.  Five, five and a half.

10       Q.  During that deposition -- that is, during

11   your testimony on record during that deposition --

12   you never questioned my integrity, did you?

13       A.  I was never asked about your integrity, if

14   that's what you were asking.

15       Q.  That was the subject to a great degree of

16   questioning during that deposition, correct?

17       A.  There were -- Yes.  I mean, you're the

18   subject of all of this.  So, yes, it was confined to

19   three areas, but . . .

20       Q.  Had you wanted to question my integrity

21   during that deposition, you could have, correct?

22           MS. CHAMPION:  Objection, calls for

23   speculation, lacks foundation.

24   BY MR. DONZIGER:

25       Q.  You can answer.

1      A.  I guess I'm a little confused because I

2   wasn't asking questions.  Questions were being asked

3   of me.

4      Q.  Well, you certainly never questioned my

5   integrity prior to the time that Chevron subpoenaed

6   you in March of this year, correct?

7      A.  I did without sharing it to you

8   specifically.  I was questioning that there was a

9   lot of contracts that hadn't been finalized.  And I

10  was confused by that.

11          So I would put that into a category of

12  not following through on promises.  And then I

13  learned through the nature of this work that there

14  is not a lot of transparency, probably for really

15  good reasons, and then for reasons that people are

16  just conditioned to not have.  And that was very

17  hard for me to work in.  It was becoming hard for me

18  to work in.

19      Q.  You understand that I told you that Chevron

20  had paid people to follow me around Manhattan at one

21  point, correct?

22          MS. CHAMPION:  Objection.  Outside the

23  scope.  Where are you going with this?  Are you

24  testifying or is she?

25          MR. DONZIGER:  Anne, chill, babe.

1   Sorry.

2              MS. CHAMPION:  I'm very chill, Steven.

3              MR. DONZIGER:  It goes to the issue of

4   transparency and why certain informations were not

5   given to everybody, which is the subject of her

6   affidavit.  Let me continue questioning.

7   BY MR. DONZIGER:

8       Q.  Katie, can you please answer the question.

9       A.  I was aware from what you told me that

10  Kroll or some company followed you around, from what

11  you -- from what you told me.

12      Q.  You were aware of what you would describe

13  as a lack of organization with some of our contracts

14  when you began working with me in October of 2017,

15  correct?

16             MS. CHAMPION:  Objection, misstates the

17  witness's testimony, lacks foundation.

18             THE WITNESS:  I was aware of an

19  organizational need.  If that's the question, then,

20  yes, I was aware of that.

21  BY MR. DONZIGER:

22      Q.  And you introduced the investment

23  opportunity to Tony Abbiati in December of 2017,

24  correct?

25      A.  In November.

1      Q.   November of 2017?

2      A.   Yes.

3           MR. DONZIGER:  Anne, I have no further

4   questions for Katie.  Are you going to redirect?

5           MS. CHAMPION:  Yes.  Just briefly.

6           MR. DONZIGER:  Okay.

7                REDIRECT EXAMINATION

8   BY MS. CHAMPION:

9      Q.   Ms. Sullivan, you testified earlier in

10  response to Mr. Donziger's question that you were

11  working to help him raise money for his Ecuadorian

12  clients to pay litigation expenses.

13           Do you recall that?

14     A.   I was helping -- yes -- helping making

15  introductions.

16     Q.   I just want to refer you to Exhibit 30 to

17  your declaration, which should be pretty close to

18  the bottom there.  I think there's 39 exhibits

19  total, so it's No. 30.

20           You understood that you were helping to

21  raise money for other purposes as well, right?

22  I mean, not strictly to pay litigation expenses?

23     A.   Yes.  For -- yes, there was nonlegal

24  expenses.

25     Q.   Just briefly looking at this budget, you

1    helped prepare this; is that correct?

2        A.  Um --

3        Q.  It's page -- it's on the second page --

4        A.  Oh, yes, I do.

5        Q.  -- of the exhibit.

6        A.  Yes.

7        Q.  So you helped prepare this budget with

8    input from Steven, correct?

9        A.  Correct.

10       Q.  And this includes a category for "PR costs,"

11   correct?

12       A.  Yes.

13       Q.  "Stipend payments"?

14       A.  Yes.

15       Q.  And the stipend payments are to Simon

16   Billenness, correct?

17       A.  Correct.

18       Q.  Mr. Aulestia, Juan Aulestia?

19       A.  Correct.

20       Q.  Luis Yanza?

21       A.  Correct.

22       Q.  Rex Weyler?

23       A.  Yes.

24       Q.  And FDA --

25       A.  Yes.

1        Q.  -- correct?  His own client?  Isn't that
2    Mr. Donziger's own client: the FDA?
3        A.  I understood he was representing them.
4        Q.  And it also includes some payments to --
5    well, projected payments to Streamline for
6    administrative and accounting reasons, correct?
7        A.  Correct.
8        Q.  And so none of the people here -- I mean,
9    these people were not being paid to represent the
10   Ecuadorian plaintiffs in any litigation; is that
11   correct?
12       A.  They're not lawyers, so I would assume that
13   that is correct.
14       Q.  And the PR costs, these weren't -- these
15   aren't to lawyers either, right?  These people
16   aren't being paid to represent the Ecuadorian
17   plaintiffs in any legal proceeding?
18       A.  That's my understanding, correct.
19       Q.  How about Mr. Page?  Does he represent the
20   Ecuadorian plaintiffs in any legal proceedings?
21            MR. DONZIGER:  Objection.  She doesn't
22   know the answer to that.
23            THE WITNESS:  I'm unaware.  I don't
24   know.
25            MR. DONZIGER:  I mean, that's a matter

1    of public record.  I mean, just -- I get it.

2    I mean, it's a matter of public record.

3              MS. CHAMPION:  Mr. Donziger, I'm asking

4    the questions now.  If you want to state an

5    objection, state it briefly, okay?

6    BY MS. CHAMPION:

7       Q.  Mr. Donziger, does he represent the

8    Ecuadorian plaintiffs in any legal proceedings?

9       A.  I'm not sure.

10             MR. DONZIGER:  Objection.  Objection.

11   BY MS. CHAMPION:

12      Q.  Do you know whether he's even licensed to

13   practice law at this point?  Does he have a license

14   to practice law; are you aware?

15      A.  I was aware that it was under scrutiny or

16   there was a threat of it being -- I don't know what

17   you call it -- taken away, is the only word that

18   comes to mind.

19      Q.  But you're not aware whether he represents

20   the Ecuadorian plaintiffs in any legal proceedings?

21      A.  I would have no knowledge of that.

22      Q.  And, you know, you -- you testified earlier

23   in response to some of Mr. Donziger's questions, he

24   asked you -- and, again, if I get it wrong, please

25   correct me -- but something like, you know, that he

1   had told you that the funds earmarked for him were

2   for past unreimbursed expenses.

3            Do you remember that?

4       A.  Yes.

5       Q.  But you never saw documentation of those

6   past expenses, did you, these supposed past

7   unreimbursed expenses?

8       A.  I never saw specific documents, correct.

9       Q.  And in fact, weren't you asked to work on

10  this issue a little bit to -- to show -- help Steven

11  show the FDA what he had personally invested in the

12  case?  Do you remember that?

13      A.  There was a -- yes, to basically reconcile

14  what he had put into the case personally.

15      Q.  And were you able to substantiate that?

16      A.  No.

17      Q.  Now, you also testified about your trip to

18  Ecuador.  You said you saw some of the -- some oil

19  contamination there; is that correct?

20      A.  Yes.

21      Q.  Are you aware whether Chevron has ever

22  operated in Ecuador?

23      A.  I believe it was Texaco at the time.

24      Q.  So you're not aware whether Chevron's ever

25  operated in Ecuador?

1          A.   I know that there was a merger between --

2     Chevron purchased Texaco.  I don't know -- I can't

3     tell you when or -- you know, the details of that.

4          Q.   Yes, understood.  So what is your

5     understanding of when any TEXPET-affiliated company

6     last operated -- I mean Texaco-affiliated company

7     last operated in Ecuador?

8          A.   I would be making a guess.

9          Q.   So you don't know?

10         A.   I don't know.  Long time ago.

11         Q.   Decades ago even?

12         A.   Perhaps.  I don't --

13              MR. DONZIGER:  Objection.

14              THE WITNESS:  I don't have a timeline.

15    BY MS. CHAMPION:

16         Q.   And do you know the names of the sites that

17    you were taken to on this trip?

18         A.   I do not.

19         Q.   And do you know whether they were sites

20    that were ever operated in any way by any Texaco-

21    affiliated company?

22         A.   I would have no way of validating that.

23         Q.   Do you know how long it's been since

24    Petroecuador has been exclusively operating the

25    sites in that region?

1      A.  No idea.

2              MR. DONZIGER:  Objection.

3  BY MS. CHAMPION:

4      Q.  Do you have any familiarity with

5  Petroecuador's environmental record?

6      A.  Zero.

7      Q.  You've stated already that you didn't read

8  the RICO decision.  Are you familiar with the BIT

9  decision?  Do you know what that means?

10      A.  No idea.

11      Q.  So you haven't read it, I'm assuming?

12      A.  I don't . . .

13      Q.  The BIT is an arbitration between the

14  Republic of Ecuador and Chevron and I believe

15  TEXPET, the Texaco affiliate that operated in

16  Ecuador.

17      A.  Yes.

18      Q.  But you haven't read that; you're not

19  familiar with that?

20      A.  No idea.

21      Q.  You testified earlier also that Chevron had

22  not threatened to file a lawsuit against you; is

23  that correct?  Had not.

24      A.  I testified that I saw a letter that was

25  concerning that I could be -- I don't -- considered

1    a co-conspirator or having violated a preservation

2    order.  However -- that was in the air somewhere.

3    I don't know legally what that translates to.

4        Q.  And that was a letter filed with the court;

5    is that your understanding?

6        A.  Correct.  In response to my attorney trying

7    to put in some limits in a protective order so I

8    wouldn't be --

9        Q.  Understood.

10       A.  -- hung out to dry.

11       Q.  But Chevron never sent a letter to you or

12   your attorney threatening to file a lawsuit against

13   you?

14       A.  I never -- Not that I'm aware of.

15       Q.  And in your communications with Mr. Blume

16   and I or anyone else from the Chevron -- who

17   represents Chevron that has spoken to you or to your

18   attorneys, none of them has ever threatened to file

19   a lawsuit against you that you're aware; is that

20   correct?

21       A.  That's correct.  It was just the letter

22   that was filed with the courts.

23       Q.  But Mr. Page threatened to file a lawsuit

24   against you; isn't that correct?

25       A.  There was a threat that I didn't know what

1    it meant, but it meant that they're -- yes.  I

2    felt -- I didn't know what to think.  I didn't --

3    I received a -- you know, put me in touch with your

4    lawyer, paraphrasing, or else we'll have to do

5    something.  And I was like . . .

6        Q.  But you understood that to be a threat to

7    take you to court for something; is that correct?

8        A.  I -- Yes.

9        Q.  Did you have any other conversations with

10   Mr. Page other than what's in the text message about

11   that?

12       A.  No.

13       Q.  And the text message I'm referring to is

14   also an exhibit to your declaration.  It is

15   Exhibit 37, I believe.  And that message, sent to

16   you, if I'm reading this correctly, on April 23,

17   does that sound about right, of this year --

18       A.  Yes.

19       Q.  -- 2018?

20            And he says to you, "If we can't hear

21   from you, we may need to send a litigation hold

22   letter, and perhaps intervene, which I had hoped

23   wouldn't be necessary."

24            Do you see that?

25       A.  Yes.

1      Q.  "Your lawyer should be able to ask Chevron

2  for more time, start a discussion, and we can all

3  work out a process that gets Chevron off your back

4  and avoids court.  Otherwise, we may need to go to

5  court, which would suck," correct?

6      A.  Correct.

7      Q.  So you interpreted that as a threat to take

8  you to court; is that correct?

9      A.  Correct.

10      Q.  I'm just going to quickly run through some

11  documents.  If you look at what's Exhibit 2 to your

12  declaration.  I mean, is it your recollection that

13  Mr. Donziger frequently made the claim that the RICO

14  judgment was based on fabricated evidence?

15      A.  Yes.  There was a -- someone was paid off

16  and -- yes.  There was -- I think that -- that's the

17  one that comes to mind.

18      Q.  And so this Exhibit 2 to your declaration

19  is an email that Steven forwarded you from May 15,

20  2017, correct?

21      A.  March?  Are you on 2?

22      Q.  Yes.  I believe so.  Am I -- Let me make

23  sure I have the right document.  Hang on.  Sorry.

24      A.  Oh, May 15.  Sorry.  It was on the

25  subsequent page.

1    Q.  Oh, sorry about that.  Did I flip it and
2  didn't even realize it.
3              So this is an email that is on May 15,
4  2017 that Donziger forwarded to you, correct?
5    A.  Correct.
6    Q.  And it was an email to David Friedman, do
7  you see that?
8    A.  Yes.
9    Q.  And Mr. Friedman was an investor he was
10 soliciting?
11   A.  I assume so.  I don't -- that name -- I
12 don't know that name beyond looking at this email.
13   Q.  And here he is explaining to him, if you
14 look at the third paragraph down where he says,
15 "The decision in the RICO case, which we believe is
16 deeply flawed."
17              Do you see that?
18   A.  Yes.
19   Q.  And he goes on to say "is currently being
20 appealed to the U.S. Supreme Court on the grounds
21 that Chevron fabricated much of the evidence relied
22 on by the U.S. trial court."
23              Do you see that?
24   A.  Yes.
25   Q.  And is that consistent with other claims

1  that you heard Donziger make about the RICO

2  judgment?

3       A.  Yes.  I think that's consistent.

4       Q.  And just looking at Exhibit 1 -- I guess I

5  should have started with that one, but we'll go back

6  to it.

7            And Steven also often talked about his

8  out-of-court strategies and the pressure campaign;

9  is that correct?

10      A.  Yes.

11      Q.  So if we look at Exhibit 1, do you see that

12 there's an email from Mr. Donziger -- it's about the

13 third email down -- January 18, 2018.

14           Do you see that?

15      A.  Yes.

16      Q.  And so this whole email string, if you look

17 down further -- just take a minute to look at it --

18 is -- relates to the Calgary conference, right, the

19 conference that they were setting up through the

20 University of Calgary?

21           Do you see that?

22      A.  I do.

23      Q.  And Donziger forwards it to you and some

24 other people, do you see that, at 4:57 p.m. on

25 January 18?

1      A.  Yes.

2      Q.  And he says, "The below is a key part of

3   our out-of-court strategy."

4           Do you see that?

5      A.  I do.

6      Q.  And he forwards that to you, Mr. van

7   Merkensteijn, and Mr. Watson; is that correct?

8      A.  Yes.

9      Q.  And going to Exhibit 5 of your declaration,

10  now, this is an email -- an email chain from

11  February 4, 2018.

12          Do you see that?

13     A.  Yes.

14     Q.  And in the bottom email, the one at

15  5:47 p.m., Mr. Donziger says, "Friends, Let's

16  discuss a way we can do research on the Canadian

17  fund scene to mobilize support for the resolutions

18  and against Chevron in Canada."

19          Do you see that?

20     A.  Yes.

21     Q.  What did you understand him to mean by "the

22  Canadian fund scene"?

23     A.  I'm not sure I actually read that because I

24  don't know what that means.

25     Q.  What about "mobilize support for the

1    resolutions and against Chevron in Canada"?
2            Just take a minute to look at it if you
3    need to refamiliarize yourself with it.
4        A.  Honestly I don't know.
5        Q.  Well, the top email may help a little bit.
6    So the top email is from Mr. Billenness, correct?
7        A.  Yes.
8        Q.  And what did you understand his work to be?
9        A.  He was a shareholder activist, advocate, or
10   something of that nature.
11       Q.  And do you know Anton Tabuns?
12       A.  I don't know him.  I know who he is.
13       Q.  And what was your understanding of why he
14   was asked to work on the matter?
15       A.  To -- he was -- I understood him, he was an
16   attorney in Canada and that he was going to work
17   with Steven to help leverage Steven's time and work
18   on various projects.
19       Q.  Including with Mr. Billenness; is that
20   correct?  I mean, Mr. Billenness says at the end of
21   the email, "I'm very happy to work with Anton again."
22            Do you see that?
23       A.  I do.  I didn't -- I was not aware of their
24   prior -- any prior work relationship or how that
25   would be constructed.

1    Q.  Right.  But that he -- that Anton is going

2   to be working with Mr. Billenness on the work that

3   Mr. Billenness does, correct?

4    A.  From this email, yes.

5    Q.  It also says -- Mr. Billenness says -- he

6   talks -- he says -- quoting the email, "Thanks,

7   Steve.  We already have a strong foothold in Canada

8   with the addition this year of NEI, the Vancouver

9   mutual fund manager, as a co-sponsor of the

10   independent chair resolution."

11          Do you see that?

12    A.  Yes.

13    Q.  Does that refresh your recollection about

14   what was meant in the lower email about research on

15   the Canadian fund scene to mobilize support for the

16   resolutions?

17    A.  Maybe -- the only thing I can think of now

18   is that if you get -- if you have funds or companies

19   that are top shareholders in Chevron, that they can

20   influence their -- the proxy or write letters or do

21   something.  That's what I have come to understand.

22    Q.  And the second paragraph of

23   Mr. Billenness's letter says, "We can build on that,

24   but it has to be in coordination with NEI and Zevin."

25          Do you see that?

1      A.  Yes.

2      Q.  And then he says, "It's very bad optics -

3   possibly even counterproductive - for legal team to

4   be seen doing it."

5           Do you see that?

6      A.  Yes.

7      Q.  And he says, "That's what you have me for"?

8      A.  Yes.

9      Q.  And Exhibit 6, this is another email that

10  Mr. Donziger has forwarded to you, right?  It seems

11  like he often did that; is that correct?

12     A.  Yes.  I was always happy to learn or

13  listen -- you know, receive or listen so I could

14  learn.

15     Q.  And then again, do you see the email at the

16  bottom -- this is from Pat Tomaino at Zevin.com?

17     A.  Yes.

18     Q.  And it's to, you know, some folks, not

19  including you, but cc'ing Mr. Billenness; do you see

20  that?

21     A.  Yes.

22     Q.  And he says at the top, "Hello colleagues,

23  I wanted to share Chevron's statement of opposition

24  to our independent chair policy proposal," correct?

25     A.  Yes.

1          Q.  Do you see that?

2                And so is it your understanding that

3     this is the proposal that's discussed in that email

4     that we just looked at?

5          A.  They could be linked.  I honestly have no

6     way of validating that.

7          Q.  But the prior email mentions Zevin; isn't

8     that correct?

9          A.  Um --

10         Q.  You can refer back to it if you want.

11         A.  Yes.  I knew that there was some letters

12    being prepared to the board or to shareholders or --

13    that were going -- I don't know where.

14         Q.  And that -- you know, the purpose of that

15    wasn't so that Chevron could win in the Canadian --

16    its enforcement action in Canada, right?

17         A.  I would say that it was a strategy, along

18    with what was happening in the courts.  I would put

19    this in the category of out-of-court strategy.

20         Q.  And just moving on to Exhibit 7, so this is

21    a pretty long email chain.  Just take a minute maybe

22    to look it over.  And this is another email chain

23    that Donziger has forwarded to you and -- just to

24    you, I guess, from January 10, 2018.

25                Do you see that?

1      A.  Yes.

2      Q.  And if you look at the last email in the

3  chain, it starts on -- it starts on the bottom of

4  the second page, the very bottom, Friday, December 8,

5  2017.

6            Do you see that?

7      A.  Yes.

8      Q.  From Mr. Donziger, correct?

9      A.  Yes.  Looks like a mail server on behalf of,

10  yes.

11      Q.  Okay, yes.  Got you.  To Tony Chapelle at

12  Agenda Week.

13            Do you see that?

14      A.  Yes.

15      Q.  And then did you understand -- why do you

16  think Mr. Donziger was sharing this email with you?

17      A.  To keep me apprised of what was going on in

18  addition to -- yes, just to keep me apprised of what

19  was going on.

20      Q.  So if you look at the email that he sent to

21  Mr. Chapelle, he says at the beginning, "Journalists

22  and colleagues."

23            Do you see that?

24      A.  Yes.

25      Q.  And he says, "I write to inform you about

CONFIDENTIAL

Page 362

two developments in the campaign by indigenous and

farmer communities in Ecuador to hold Chevron

accountable."

        Do you see that?

    A.  Yes.

    Q.  And he talks about -- you know, I'm

paraphrasing -- but that the AFN signed a joint

protocol with Ecuador's national indigenous

federation.

        Do you see that?

    A.  Yes.

    Q.  And it says here that the purpose of this

protocol is "to hold Chevron accountable for

violations of First Nations rights in both

countries."

        Do you see that?

    A.  Um . . .

    Q.  It's kind of in the middle of that first --

of that paragraph that begins with "first."

    A.  I'm looking for it, the purpose.

    Q.  Well --

    A.  I don't see "the purpose."  Are you in the

second paragraph?

    Q.  Why don't we just read the whole sentence.

It's a very long sentence.  I was trying to avoid

two developments in the campaign by indigenous and

farmer communities in Ecuador to hold Chevron

accountable."

        Do you see that?

    A.  Yes.

    Q.  And he talks about -- you know, I'm

paraphrasing -- but that the AFN signed a joint

protocol with Ecuador's national indigenous

federation.

        Do you see that?

    A.  Yes.

    Q.  And it says here that the purpose of this

protocol is "to hold Chevron accountable for

violations of First Nations rights in both

countries."

        Do you see that?

    A.  Um . . .

    Q.  It's kind of in the middle of that first --

of that paragraph that begins with "first."

    A.  I'm looking for it, the purpose.

    Q.  Well --

    A.  I don't see "the purpose."  Are you in the

second paragraph?

    Q.  Why don't we just read the whole sentence.

It's a very long sentence.  I was trying to avoid

1    it.  But the paragraph beginning with "First"?

2        A.  Okay.

3        Q.  "First, this week in Ottawa, the Canada

4    Assembly of First Nations (AFN) - which represents

5    634 nationalities in Canada and is probably the most

6    influential organization of indigenous leaders in

7    the world - signed a joint protocol with Ecuador's

8    national indigenous federation (CONAIE) and the

9    Front for the Defense of the Amazon (FDA) to hold

10    Chevron accountable for violations of First Nations

11    rights in both countries."

12              Do you see that?

13        A.  Yes.

14        Q.  So is it fair to say this is another out-of-

15    court strategy?

16        A.  I would classify it as that.

17        Q.  And then going further down, it says --

18    do you see the paragraph starting "Second"?

19        A.  Yes.

20        Q.  "On behalf of my clients in Ecuador, I

21    recently sent evidence to the U.S. Department of

22    Justice that Chevron and some of its lawyers engaged

23    in a criminal conspiracy to present false evidence

24    in the RICO matter to try to taint the Ecuador

25    judgment."

1              Do you see that?

2      A.  Yes.

3      Q.  And how about the next paragraph, "I am

4  also resending this article by Greenpeace cofounder

5  Rex Weyler.  Weyler writes that Chevron's toxic

6  dumping in Ecuador reveals 'almost unthinkable

7  corporate irresponsibility, intimidation, and

8  arrogance.'"

9              Do you see that?

10     A.  Yes.

11     Q.  Did you understand these things to have

12  anything to do with enforcing a judgment in the

13  Canadian court?

14     A.  I would again put them in the category that

15  it was part of the out-of-court strategy.

16     Q.  And so if the out-of-court --

17          MR. DONZIGER:  Anne --

18  BY MS. CHAMPION:

19     Q.  -- if the out-of-court strategy was not

20  intended to --

21          MR. DONZIGER:  Anne --

22  BY MS. CHAMPION:

23     Q.  -- to win the enforcement action in Canada,

24  what exactly was it intended for, in your

25  understanding.

1    I'm sorry.  Mr. Donziger, do you have an
2    objection to the question?
3         MR. DONZIGER:  No.  I'm trying to figure
4    something out on the time front.  How much longer do
5    you think you're going to have?
6         MS. CHAMPION:  Not very much longer.
7    About, you know, maybe 10-15 more minutes.
8         MR. DONZIGER:  Go ahead.
9         THE WITNESS:  Can you repeat that
10   question.
11        MS. CHAMPION:  Can you read it back,
12   court reporter?
13        THE COURT REPORTER:  I don't think I
14   can --
15        MS. CHAMPION:  Okay.
16        THE COURT REPORTER:  -- because he kept
17   interrupting and you kept going.
18        MS. CHAMPION:  Oh, no problem.
19   BY MS. CHAMPION:
20   Q.  So you testified that you understood these
21   things to be out-of-court strategies, right?
22   A.  Yes.
23   Q.  So my question is, if it was your
24   understanding that these actions were not aimed at
25   winning an enforcement action in the Canadian court,

1    what were they aimed at?  What was the purpose of
2    them?  In your understanding.
3        A.  I -- my understanding was that they were
4    part of an overall strategy, which included legal,
5    like pure legal in-the-court lawyers doing lawyering
6    in the court.
7                And then there were other strategies
8    that happened -- they're in the court or they're out
9    of the court.  And the out of the court would be
10   media, shareholder resolutions, and advocacy towards
11   that.  You know, garnering support in different
12   places and spaces with different people who could
13   support the -- you know, to support the Ecuadorians.
14       Q.  To lead to what though?  What was the
15   ultimate purpose?  It wasn't to seize Chevron's
16   assets using an executable judgment, right?  These
17   strategies weren't intended for that?
18       A.  My understanding is that it was part of --
19   they were pieces of a whole strategy and I didn't
20   have full transparency into what that full strategy
21   was.  I had, you know, access to information along
22   the way as I was learning.
23       Q.  But what was the ultimate goal?
24       A.  The ultimate goal was to have monies paid
25   by Chevron, whether in a settlement or in a --

1    I don't know -- the court orders you to do something,

2    which is confusing to me.  But there would be some

3    monies paid.  And that would be considered kind of

4    this train being -- reaching the last stop.

5       Q.  Understood.  So just looking at Exhibit 10,

6    this is an email from Mr. Donziger to you on

7    September 22, 2017.

8            Do you see that?

9       A.  Yes.

10      Q.  And so this says -- what was your

11   understanding of why he sent this to you?  And if

12   you need a minute to look at it, go ahead.

13           MR. DONZIGER:  Can I -- I apologize

14   because I'm really in the dark.  What -- can you

15   just describe this exhibit.

16           MS. CHAMPION:  Yes.  They've been sent

17   to you, Mr. Donziger.  I'm just referring to the

18   exhibits to her actual declaration.  My colleague --

19           MR. DONZIGER:  Anne, can I state an

20   objection here.  And I -- just please hear me out.

21   My objection is the following: I don't know how this

22   line of questioning relates to the scope of this

23   deposition.  I mean, as I understand it --

24           MS. CHAMPION:  I can explain that

25   perfectly, Mr. Donziger.  You singled out in her

1  declaration her use of the words "pressure," "out-of-
2  court," and whatever other word it was, and I'm just
3  giving you examples of where you used those exact
4  words in various documents.
5          That's what this is about.  This is just
6  redirecting her on your cross regarding the use of
7  those words in her declaration.
8          MR. DONZIGER:  I just want to finish
9  making my objection because you interrupted me.
10  The objection is there are parts of your affidavit --
11  I mean, of Katie Sullivan's affidavit that to me go
12  well beyond the scope of the deposition.  The scope
13  of the deposition, as I understand it, is whether or
14  not -- information related to whether or not I
15  violated the RICO judgment.
16          And you're asking her about a public
17  pressure campaign that obviously took place, if you
18  just look at the documents you're giving her.  So,
19  you know, there's a lot of people who could testify
20  to this, including myself.  So, you know, she had a
21  very limited role with regard to helping with
22  getting financing and dealing with administrative
23  stuff.
24          So I'm questioning whether this is the
25  most productive use of our time because a lot of

1    this stuff is stuff that, you know, she wasn't

2    involved in, number one.

3              And number two, it is -- even in the

4    affidavit that she signed it's not a super big

5    important part of that affidavit.

6              MS. CHAMPION:  I'm almost done,

7    Mr. Donziger.  Can I please continue?

8              MR. DONZIGER:  Yes.

9              MS. CHAMPION:  Thank you.

10   BY MS. CHAMPION:

11       Q.  So this is an email from Mr. Donziger to

12   you dated September 22, 2017.

13             Do you see that?

14       A.  Yes.

15       Q.  And the subject is, "Canadian indigenous

16   leaders wallop Chevron over Ecuador pollution

17   judgment."

18             Do you see that?

19       A.  Yes.

20       Q.  And the second full paragraph of that.

21   So this is to "Journalists and colleagues," right?

22       A.  This is -- this is to a list.

23       Q.  A list, okay.  And do you know what the

24   name of that list was?

25       A.  No idea.

1      Q.  So this says, "Three" --
2              But you understood it to be going to
3   whom?
4      A.  A broad -- a broad -- yes, broad email.
5      Q.  To investors?
6      A.  Whoever was on that list.  And I have no
7   idea --
8      Q.  You don't know who was on it?
9      A.  -- who was on that list.
10     Q.  Okay.  But it says "Journalists and
11  colleagues."  And the second full paragraph says,
12  "Three major Canadian indigenous leaders and a
13  cofounder of Greenpeace have joined forces with
14  rainforest villagers in Ecuador to force Chevron to
15  pay the pollution judgment."
16             Do you see that?
17     A.  Yes.
18     Q.  So were these indigenous leaders, did they
19  join forces in order to represent the Ecuadorians in
20  the Canadian enforcement action?
21     A.  I didn't write this so it's hard for me to
22  say if that's true.  I just received it.
23     Q.  But -- and the cofounder of Greenpeace, who
24  do you understand that to refer to?
25     A.  Rex Weyler.

1      Q.  And is he a lawyer?

2      A.  I am not certain, but I don't think so

3   but . . .

4      Q.  And does he represent the Ecuadorian

5   plaintiffs in any court proceeding?

6      A.  No.

7      Q.  So then I'm going to just go through a

8   couple more emails here.  I promise I'm almost done.

9           This is Exhibit 13 to your declaration.

10  And this is an email from you to Mr. Donziger; do

11  you see that?

12     A.  Yes.

13     Q.  Dated November 14, 2017?

14     A.  Yes.

15     Q.  Do you understand -- What was this?  Was

16  this you providing him comments on an email that he

17  had drafted or you drafting an email for him?

18          Because the subject says, "Dear Cliff,"

19  but then it's signed, "With gratitude, Steven," even

20  though it's from you.

21          Do you see that?

22     A.  Yes.

23     Q.  Do you remember, did he ask you to draft

24  this or did you just edit something he drafted?

25     A.  I recall this was an attempt of how to

1    articulate to go back to another -- an investor in

2    the case and ask for more support.  And so I was

3    offering my suggestion of how that might be

4    articulated.

5        Q.  And you see the second -- the second

6    sentence of that email, "We have amazing momentum

7    and are in the process of aligning with partners

8    like you, who will bring both capital and strategic

9    leadership to put pressure on Chevron in and out of

10   court."

11              Do you see that?

12       A.  Yes.

13              MS. CHAMPION:  I'm sorry.  We just --

14   Exhibit 14 to your declaration was a document that

15   was just in Spanish.  And so we've gotten a

16   translation of it.  So I want you to just add that

17   so that the copy of the exhibit in the record has

18   both English and Spanish.

19              THE WITNESS:  Okay.

20              MS. CHAMPION:  Mr. Donziger, I'll send

21   you that document.  I'll send it to you right now.

22   This is just a translation of what was already there.

23              MR. DONZIGER:  Okay.

24   BY MS. CHAMPION:

25       Q.  Exhibit 15 -- actually, I think we already

1    did this.  I'm going to skip that because I think we

2    already got that -- we pretty much captured that in

3    another email.

4              Exhibit 31.  And so this is another

5    email that Mr. Donziger has forwarded you,

6    December 11, 2017.

7              Do you see that?

8        A.  Yes.

9        Q.  And he says here -- this is an email to

10   Mr. Krevlin.  And he's an investor in the Ecuadorian

11   judgment, correct?

12       A.  Correct.

13       Q.  And he had asked that Donziger prepare the

14   budget that you helped Donziger prepare that we

15   looked at earlier; is that correct?

16       A.  He -- Yes.  He wanted to see a budget.

17       Q.  And so this is a transmittal email where

18   Donziger is sending him that budget?  Do you see

19   that?  At the beginning of the email it says,

20   "Attached is a budget"?

21       A.  Yes.

22       Q.  So if you look down at the second full

23   paragraph of this email, and he says, "I have some

24   ideas about how best to structure the discount to

25   allow us optimal flexibility for the major capital

1   partners we are seeking and whose participation will

2   help put major pressure on Chevron to settle the

3   matter."

4            Do you see that?

5       A.  Yes.

6       Q.  And that's an email from Mr. Donziger to

7   Mr. Krevlin on Monday, December 11, 2017.

8            Do you see that?

9       A.  Yes.

10      Q.  And just briefly touching on, do you

11  remember approximately how much money was put into

12  the CWP account?

13      A.  $750,100.

14      Q.  And do you know how much of that was paid

15  to Mr. Donziger?  And if you don't remember down to

16  the last cent, that's fine.  But just approximately.

17      A.  I'd have to look at my declaration.  But I

18  think that there were four payments.

19      Q.  Yes.  You're right.  It is in your

20  declaration.

21            MR. RANKIN:  Paragraph 52, page 20.

22            THE WITNESS:  Yes.

23            MS. CHAMPION:  Paragraph 52?

24            MR. RANKIN:  Yes.

25

1    BY MS. CHAMPION:

2        Q.  So of that $750,000, you paid $125,000 to

3    Mr. Donziger, correct?

4        A.  Yes.  Three invoices for $125,000.

5        Q.  And so out of that $750,000, how much was

6    left in the account at the time that you closed it?

7                MR. DONZIGER:  Anne, objection.  It's in

8    the declaration.

9                MS. CHAMPION:  Okay.  That's fine.

10               THE WITNESS:  Three hundred some odd

11   thousand.

12               MR. RANKIN:  Paragraph 59.

13               THE WITNESS:  $342,045.

14   BY MS. CHAMPION:

15       Q.  So of approximately $400,000 spent out of

16   that account, $150,000 at least went to Mr. Donziger;

17   is that correct?

18       A.  125.

19       Q.  $125,000?

20       A.  That is correct.

21       Q.  Let me just look at my notes.  I don't

22   think I have anything further.

23               I just want to confirm, you already

24   testified to this earlier.  When you signed your

25   declaration this morning at 11:30, you believed

1   everything in there was true and correct; is that

2   correct?

3      A.  Yes.

4      Q.  And you signed it under penalty of perjury;

5   is that correct?

6      A.  Correct.

7      Q.  And is everything in your declaration still

8   true and correct as you sit here now?

9      A.  It is.

10           MS. CHAMPION:  I don't think I have any

11  further questions for this witness.

12           MR. DONZIGER:  I'm going to do a recross

13  on some of the points that you just redirected,

14  Katie.  It shouldn't take more than just a few

15  minutes.

16           THE VIDEO OPERATOR:  Mr. Donziger, this

17  is the videographer.  I have about 13 minutes left

18  on my disk.

19           MR. DONZIGER:  Okay.  I'm going to

20  endeavor to try to finish within that time frame.

21  So let me get going.  Thank you for that.

22               RECROSS-EXAMINATION

23  BY MR. DONZIGER:

24      Q.  So, Katie, you said that -- as I understand

25  it, you had testified that I had told you that I had

1    past unreimbursed expenses, correct?

2        A.  Correct.

3        Q.  And you don't know -- you don't have

4    complete records from me on what those unreimbursed

5    expenses are, do you?

6        A.  I do not.

7        Q.  And you know that this case began in 1993,

8    correct?

9        A.  I know it began a long time ago.

10       Q.  And you know I've worked on it since it

11   began for many years, right?

12       A.  Yes.

13              MS. CHAMPION:  Objection, lacks

14   foundation.

15   BY MR. DONZIGER:

16       Q.  So you -- so during the period of time in

17   1990 -- from 1993 to 1999 when I was working on the

18   case, did you ever receive any records from me with

19   regard to unreimbursed expenses I had during that

20   time?

21       A.  No.

22       Q.  The period of time beginning January 1, 2000

23   through the end of 2005, did you ever get any records

24   from me regarding unreimbursed expenses?

25       A.  No.

1      Q.  From the period of time between January 1,
2   2006 and December 31, 2011, you never got any
3   records from me regarding my unreimbursed expenses,
4   did you?
5      A.  The only thing -- I could have received
6   them if they were in the boxes that Josh passed over
7   to me.  But I can't recall that specifically.
8      Q.  With regard to the boxes Josh Rizack gave
9   you, you never looked through every piece of paper
10   in all of those boxes to figure out my unreimbursed
11   expenses, did you?
12      A.  No, I thumbed through the documents to see
13   what was contained within them.  But I never went
14   through them in detail.  I -- No.
15      Q.  So when you testified just before this to
16   the fact that you couldn't substantiate what I put
17   in personally, that's because you never had the
18   records to be able to do that work, correct?
19      A.  Correct.
20      Q.  And with regard to Ms. Champion's questions
21   about whether Chevron threatened to sue you, you
22   were aware, were you not, that Chevron had actually
23   sued other funders who had helped fund the
24   litigation on this matter prior to the time that you
25   started working on it, correct?

1      A.  I don't know what "sued" really means.
2  I feel like I've been sued even though technically
3  I don't think I have been.  So I'm not equipped to
4  answer that appropriately.
5      Q.  Well, you were aware that Chevron had
6  initiated litigation of some sort against prior
7  funders of the case, correct?
8              MS. CHAMPION:  How is this within the
9  scope, Mr. Donziger?  And she's not a funder, so
10  where are you going with this?
11             MR. DONZIGER:  I would just like her to
12  answer the question.
13             THE WITNESS:  I was aware that --
14  BY MR. DONZIGER:
15      Q.  Go ahead.
16      A.  I was aware that prior funders were no
17  longer involved -- were no longer involved.  And I
18  don't know if it was because of -- they were sued or
19  lawsuits or they backed away from it because of the
20  RICO.  I don't know specifically.
21             I know what I know because of contracts
22  that were shared with me that had information on
23  them.  But I was not aware of specific details as
24  to -- I mean, that was part of the process of
25  understanding who was who and where were they and

1   why and how.

2        Q.  Feel free, by the way, to answer my

3   questions "yes" or "no" if you want.  With the next

4   question, try to answer "yes" or "no."

5        A.  My pleasure.

6        Q.  You're aware that Chevron has the

7   capability to sue people who helped the Ecuadorians,

8   correct?

9        A.  Correct.

10       Q.  And you're aware that Chevron has actually

11  sued people like myself who have tried to help the

12  Ecuadorians clean up their environment, correct?

13            MS. CHAMPION:  Objection,

14  mischaracterizes the witness's testimony, lacks

15  foundation.

16            THE WITNESS:  I'm aware that you and

17  other people were sued by Chevron.

18  BY MR. DONZIGER:

19       Q.  And that's part -- your awareness of the

20  fact I was sued, for example, forms part of the

21  reason why you said earlier that you were scared of

22  the litigation you're involved in, correct?

23            MS. CHAMPION:  Objection,

24  mischaracterizes the witness's testimony.

25            THE WITNESS:  Can you ask that question

1    again because it's not clear.

2    BY MR. DONZIGER:

3        Q.  Yes.  Let me try to rephrase it.  So the

4    fact that I got sued is part of the reason why you

5    felt a little scared when Chevron subpoenaed you?

6            MR. RANKIN:  Let me just say that I'm

7    not sure she used -- adopted the word "scared"

8    during earlier questioning.

9            MR. DONZIGER:  Yes.  Well, let me -- let

10   me rephrase the question again without using that

11   word.

12   BY MR. DONZIGER:

13       Q.  Katie, the fact that I had been sued was

14   part of the reason why you had some degree of fear

15   when Chevron subpoenaed you, that you also might be

16   sued, correct?

17           MS. CHAMPION:  Objection, lacks

18   foundation.

19           THE WITNESS:  Now I'm totally confused.

20           MR. RANKIN:  Maybe you could try the

21   question again.  I'm sorry.

22           MR. DONZIGER:  Yes.  I apologize.  It's

23   getting late in the day here.

24   BY MR. DONZIGER:

25       Q.  So you testified earlier that you -- you

1    know, I was questioning you why you did the

2    affidavit, I believe.  And you said -- I believe you

3    testified that you felt some fear that this would go

4    on and on, and you might get sued.

5                    Is that accurate?

6        A.  There was the potential for a lot of

7    unknowns and being -- that is correct.  Being a

8    co-contemner and violating some order was referenced

9    and possibly in my horizon.  To be determined.

10       Q.  Do you feel like you're out of any

11   potential danger at this point from that happening?

12       A.  I hope but I know that there is no

13   guarantee.  I don't know what that guarantee would

14   be.  I would love to have it.

15                   THE VIDEO OPERATOR:  Five minutes.

16                   MR. DONZIGER:  I'm finished.  I'm

17   finished.

18                   MS. CHAMPION:  Okay --

19                   MR. DONZIGER:  I just want to say,

20   before we leave the record, to Ms. Sullivan, thank

21   you for your patience with my questions.  I know

22   this has been difficult and I really appreciate you

23   sitting there and patiently answering my questions.

24                   And with regard to Anne and your team,

25   I think we should be in touch early next week, if

1    you don't mind, about how to handle some of the

2    issues with this affidavit.  I'll send you an email.

3                    MS. CHAMPION:  You need to send us

4    promptly any objections you have, as you said, on

5    the basis of work product.  I don't see how you have

6    any work product protection here, that is, if it

7    ever existed, hasn't been waived.  So you need to

8    promptly inform us if you think that's the case.

9    And I mean within the next 48 hours.

10                   MR. DONZIGER:  I'll deal with it as soon

11   as I can.  I hope to get it to you within the next

12   48 hours or Monday at the latest.

13                   MS. CHAMPION:  All right.  I don't have

14   any questions so I think we're done.

15                   MR. DONZIGER:  Thank you very much.

16   Bye.

17                   THE VIDEO OPERATOR:  We are off the

18   record at 5:38 p.m.  And this concludes today's

19   testimony given by Mary Katherine Sullivan.  The

20   number of media units was two and will be retained

21   by Veritext New York.  We're off the record and this

22   deposition is closed.

23                   (Deposition concluded at 5:38 p.m.)

24

25

1

2

3      I, MARY K. SULLIVAN, have read the foregoing

4  transcript of my deposition and except for any

5  corrections or changes noted, I hereby subscribe to

6  the transcript as an accurate record of the

7  statements made by me.

8

9      Executed this _____ day of _____, 2018.

10

11            _____

12                      MARY K. SULLIVAN

13

14

15

16

17

18

19

20

21

22

23

24

25

1 C E R T I F I C A T E

2     I, Kimberly A. Smith, a Certified Realtime

3 Reporter, Certified Realtime Captioner, Registered

4 Diplomate Reporter, Realtime Systems Administrator,

5 and Notary Public in and for the Commonwealth of

6 Massachusetts, do hereby certify that the foregoing

7 deposition of MARY K. SULLIVAN, who was first duly

8 sworn, taken at the place and on the date previously

9 set forth, was stenographically reported by me and

10 later reduced to print through computer-aided

11 transcription, and the foregoing is a full and true

12 record of the testimony given by the deponent.

13     Before completion of the deposition, review of

14 the transcript was not requested.  Any changes made

15 by the deponent (and provided to the reporter)

16 during the period allowed are appended hereto.

17     I further certify that I am a disinterested

18 person in the outcome of this cause of action.

19     THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT

20 DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY

21 ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR

22 DIRECTION OF THE CERTIFYING COURT REPORTER.

23     Signed this 1st day of October, 2018.

24

25         KIMBERLY A. SMITH, CRR, CRC, RDR

1                        ERRATA SHEET

2     NAME OF CASE: CHEVRON CORPORATION V. STEVEN DONZIGER, et al.,

      DATE OF DEPOSITION:  SEPTEMBER 28, 2018

3     NAME OF DEPONENT: MARY K. SULLIVAN

4     PAGE   LINE(S)      CHANGE            REASON

5     ____|_____|_____|_____

6     ____|_____|_____|_____

7     ____|_____|_____|_____

8     ____|_____|_____|_____

9     ____|_____|_____|_____

10    ____|_____|_____|_____

11    ____|_____|_____|_____

12    ____|_____|_____|_____

13    ____|_____|_____|_____

14    ____|_____|_____|_____

15    ____|_____|_____|_____

16    ____|_____|_____|_____

17    ____|_____|_____|_____

18    ____|_____|_____|_____

19    ____|_____|_____|_____

20    ____|_____|_____|_____

21                        _____

                          MARY K. SULLIVAN

22

      SUBSCRIBED AND SWORN TO BEFORE ME

23    THIS___DAY OF _____, 20__.

24

      _____    _____

25    (NOTARY PUBLIC)          MY COMMISSION EXPIRES:

| & |
|---|
| **&**  233:3,10 234:3 235:10 238:15,17 238:19 |

| 0 |
|---|
| **0.125**  319:14 |
| **02114**  235:13 |
| **02116**  232:19 237:18 |
| **0691**  232:3 |
| **07932-0992**  234:9 |

| 1 |
|---|
| **1**  237:9 305:25 306:2 307:12 355:4,11 377:22 378:1 |
| **1.278**  329:8 |
| **10**  246:4 253:6,7 271:10,12,17 290:20 301:19 302:21 307:2,6,9 360:24 367:5 |
| **10-15**  265:9 365:7 |
| **100**  260:9 261:3,9 334:25 |
| **10025**  235:5 |
| **10166-0193**  233:6 |
| **104th**  235:4 |
| **10:00**  239:15 248:17,18,18,19 |
| **11**  232:3 332:7 373:6 374:7 |
| **110**  234:7 |
| **11:00**  248:18,19 268:2 |
| **11:30**  243:10 255:20,25 268:5 270:5 375:25 |
| **11:45**  268:5 |

| 12  290:20 319:10 |
|---|
| **125**  375:18 |
| **125,000**  375:2,4,19 |
| **13**  271:3 303:10,21 371:9 376:17 |
| **13th**  271:1 |
| **14**  271:3 371:13 372:14 |
| **14th**  271:1 |
| **15**  265:8 279:3,4 313:4,10 314:1,6 353:19,24 354:3 372:25 |
| **15-20**  297:3,5 |
| **150,000**  329:22 330:3 375:16 |
| **151**  235:12 |
| **17**  329:4 |
| **170**  291:11 |
| **18**  246:3 247:17 248:15 249:25 250:10 251:3 270:13 278:5 355:13,25 |
| **180,000**  291:11 |
| **1801**  233:12 |
| **18th**  270:20 274:7 292:24 293:1 |
| **19**  330:6,18 |
| **1990**  377:17 |
| **1993**  377:7,17 |
| **1999**  377:17 |
| **1:00**  239:18 |
| **1:20**  232:16 237:2 |
| **1st**  385:23 |

| 2 |
|---|
| **2**  304:6 307:18 353:11,18,21 |
| **20**  249:6 253:8,13 265:1 374:21 386:23 |

| 200  233:5 |
|---|
| **2000**  377:22 |
| **2005**  377:23 |
| **2006**  378:2 |
| **2011**  378:2 |
| **2016**  304:13,20 |
| **2017**  278:3 319:13 323:9 343:14,23 344:1 353:20 354:4 361:5 367:7 369:12 371:13 373:6 374:7 |
| **2018**  232:16 237:3 245:23 256:22 257:15 329:9 352:19 355:13 356:11 360:24 384:9 385:23 386:2 |
| **21**  249:6 |
| **212**  233:7 |
| **21st**  340:25 |
| **22**  367:7 369:12 |
| **23**  240:12 241:6 243:23 352:16 |
| **2300**  385:24 |
| **242**  236:6 |
| **243**  236:13 |
| **244**  236:7 |
| **245**  235:4 |
| **25**  278:16 |
| **26**  256:22 332:7 339:7 |
| **27**  257:15 |
| **28**  232:16 237:3 386:2 |
| **298-5700**  233:14 |
| **2:00**  239:19 |
| **2:13**  271:19,20 |
| **2:25**  271:21,23 |

| 2:30  256:21,23 |
|---|

| 3 |
|---|
| **3**  272:6 294:22 301:2,3 312:22 |
| **30**  240:5 344:16,19 |
| **303**  233:14 |
| **31**  373:4 378:2 |
| **325**  234:7 |
| **33**  236:13 243:18 243:19,25 248:9 |
| **342,045**  375:13 |
| **344**  236:8 |
| **35**  248:9 |
| **351-4000**  233:7 |
| **37**  352:15 |
| **376**  236:9 |
| **39**  344:18 |
| **3:00**  248:22 293:2 |
| **3:27**  307:11 |
| **3:28**  307:14 |
| **3:40**  307:15,17 |

| 4 |
|---|
| **4**  301:19 316:4 356:11 |
| **400,000**  375:15 |
| **42**  329:5 |
| **45**  271:15 |
| **48**  383:9,12 |
| **4:24**  331:22,24 |
| **4:28**  331:25 |
| **4:29**  332:1 |
| **4:57**  355:24 |

| 5 |
|---|
| **5**  319:9 356:9 |
| **50**  313:5 314:6,13 314:19 330:6,18 330:22 |
| **500**  337:8 |
| **52**  314:6 330:4 374:21,23 |

**53** 314:6
**535-2627** 234:10
**566-2526** 235:6
**57** 308:16
**59** 375:12
**5:00** 257:8,13,14
**5:38** 383:18,23
**5:47** 356:15

**6**

**6** 247:13 301:10
303:9,21 304:7
359:9
**60** 240:5,25 241:4
241:7
**617** 235:14
**634** 363:5
**699** 232:18 237:17

**7**

**7** 278:25 279:2
294:22,25 295:2,4
295:7,12 297:23
299:11 360:20
**700** 306:1
**720-0011** 235:14
**750,000** 375:2,5
**750,100** 374:13
**7d** 235:4

**8**

**8** 272:6,8 312:22
361:4
**800** 306:5
**80202-2642**
233:13

**9**

**9/28/18** 236:13
**917** 235:6
**973** 234:10
**992** 234:8

**9:00** 264:23,24
**9:20** 264:25
**9:30** 267:23
**9:35** 265:8

**a**

**a.m.** 239:15
264:23,24
**abbiati** 308:4,8,12
311:3,14 322:4
343:23
**abeyance** 329:24
**ability** 241:9
242:23 243:1
325:21 327:17
**able** 257:7 327:1,6
348:15 353:1
378:18
**aboveground**
324:17
**accent** 248:3
**accept** 261:10,11
261:13,13,14,19
261:24 262:13
**accepted** 262:21
262:21
**access** 257:7
262:22 269:12
283:11 286:16,18
305:13 306:17
366:21
**accompanied**
317:23
**account** 330:14
374:12 375:6,16
**accountable**
316:12,20 317:18
362:3,13 363:10
**accounting** 346:6
**accurate** 382:5
384:6

**achampion** 233:8
**acknowledged**
328:23
**action** 317:6,8
334:22 335:14,16
360:16 364:23
365:25 370:20
385:18
**actions** 365:24
**actively** 315:4
**activist** 357:9
**activities** 290:7
317:12
**actual** 367:18
**add** 328:16 372:16
**added** 314:16
**addendum** 305:25
306:2,2
**addition** 308:16
358:8 361:18
**additional** 258:9
258:15 259:19
265:18 270:1
**administrative**
346:6 368:22
**administrator**
232:24 385:4
**adopt** 239:10
244:15
**adopted** 257:24
258:2,6,9,14,14
263:2 381:7
**adult** 336:10
**advantage** 332:12
332:25
**advocacy** 366:10
**advocate** 357:9
**affect** 242:22
243:1
**affidavit** 236:13
240:12 241:6,23

245:10,16 248:25
249:5,21 250:2,5
252:7,21 255:19
255:24 257:2,22
258:16 259:5,8,14
259:17,18 260:20
262:11,16 263:12
263:19,22 265:4,7
265:11,17,24
266:13,19 267:19
267:23 268:12
269:21,24 270:4
270:18 271:7
272:3 273:21
274:13,23 276:3
276:13 277:3,9
278:25 279:18
281:7,10,19 282:6
282:10 290:2
292:8 293:17
294:20 296:15
300:19,21 301:5
302:23 303:6,15
303:22,25 306:3
312:19 313:23
314:3 316:4 320:5
321:1 332:6 338:6
340:12 343:6
368:10,11 369:4,5
382:2 383:2
**affiliate** 350:15
**affiliated** 349:5,6
349:21
**affiliations** 237:25
**afn** 317:13 362:7
363:4
**afternoon** 237:1
242:12
**agenda** 361:12
**ago** 245:13,19,25
246:4,5 250:6

323:9 349:10,11
377:9
**agree** 237:7 240:4
240:8,15 241:7,25
**agreement** 279:12
**aguinda** 317:4
**agustin** 340:3
**ahead** 239:7,7
242:1 257:10
260:13 262:3
287:22 324:19
328:14 335:8,10
365:8 367:12
379:15
**aided** 385:10
**aimed** 365:24
366:1
**air** 351:2
**al** 232:9 386:2
**aligning** 372:7
**alliance** 304:13
**allocated** 293:22
**allotted** 239:17
**allow** 321:4
373:25
**allowed** 385:16
**alluded** 339:19
**amazing** 290:5
372:6
**amazon** 363:9
**ambushed** 239:12
241:21
**amount** 253:3
278:19 290:15
291:7,12
**analysis** 282:16
**andres** 235:20
238:10
**angles** 299:9
**anne** 233:4 238:5
247:19 263:6

264:14 266:16,22
266:25 267:7,12
268:25 269:5
271:9 273:1 307:1
320:23 340:12
342:25 344:3
364:17,21 367:19
375:7 382:24
**annie** 245:14
247:18,19 292:18
292:21 293:11,11
300:18
**annual** 315:22,23
**answer** 247:8
251:12,15,17
252:4 260:13
262:3,19 273:4,25
275:2,25 276:10
280:3 296:3
318:15 320:13
332:23 338:21
339:17 340:15
341:25 343:8
346:22 379:4,12
380:2,4
**answering** 250:17
382:23
**answers** 243:4,5
**anton** 357:11,21
358:1
**anyway** 327:3
**apologies** 303:9
**apologize** 335:10
367:13 381:22
**appealed** 354:20
**appeals** 335:5
**appearance** 238:4
**appearances**
233:1 234:1 235:1
237:25

**appended** 385:16
**apply** 385:20
**appreciate** 263:6
312:7 325:24
336:8 382:22
**appreciation**
325:11,11
**apprised** 361:17
361:18
**appropriate** 241:6
**appropriately**
379:4
**approval** 330:12
330:25 331:3
**approvals** 331:10
**approximately**
239:18 245:19,25
248:7,21 253:5,10
253:22 264:1
265:6,20 268:4,5
284:7 290:18
296:15 374:11,16
375:15
**april** 352:16
**arbitration** 350:13
**area** 311:20 314:9
329:2
**areas** 324:7
337:20 341:19
**argumentative**
273:22 274:24
280:16 339:14
**arrangements**
321:25
**arrive** 264:1
**arrived** 263:24
264:2,9,22,24
265:9
**arrogance** 364:8
**article** 364:4

**articulate** 372:1
**articulated** 372:4
**aside** 294:6,14
304:24
**asked** 250:11
264:8 292:24,24
293:1,3 341:13
342:2 347:24
348:9 357:14
373:13
**asking** 247:1,4,11
250:16 251:24,25
274:15 286:1
297:22 320:25
333:5 340:10,13
341:14 342:2
347:3 368:16
**aspect** 290:3
291:16
**assembly** 363:4
**assets** 334:12
366:16
**associate** 248:12
269:12,14
**assume** 239:18
252:15 257:18
258:22 264:14
265:11 269:12,16
269:17 273:11
277:5 290:24
346:12 354:11
**assumed** 258:23
**assumes** 294:4
**assuming** 293:15
308:15 350:11
**assumption**
276:17 333:20
**assumptions**
274:12 284:24
**assurances** 281:9
281:11

attached 236:14
243:15 373:20
attempt 371:25
attempted 335:7,9
attended 294:9
attending 237:24
attention 319:9
329:4
attorney 238:4
249:1 256:16,24
257:18 259:2
260:2 263:19
265:5,14 266:7
271:8 282:1,23
284:13 286:18
290:19,22 292:17
351:6,12 357:16
attorney's 245:13
326:11
attorneys 240:15
282:12 285:15,22
286:17 290:14
351:18
audio 237:6
auger 324:11
august 304:13,19
aulestia 345:18,18
available 337:1,6
337:9
avenue 233:5
average 297:14
avoid 362:25
avoids 353:4
aware 270:17
278:15,18 288:7
294:2 304:19
306:12,14 308:10
310:22 312:16
314:25 315:2,7,12
315:25 317:3,8
330:12,24,25

331:3,5 332:10
333:25 334:10,17
334:19 335:7,13
335:18 336:8
343:9,12,18,20
347:14,15,19
348:21,24 351:14
351:19 357:23
378:22 379:5,13
379:16,23 380:6
380:10,16
awareness 325:12
331:9 380:19
awkward 245:3

**b**

babe 342:25
back 249:24
250:10 251:15
257:17 260:20
267:13 270:15
271:17,23 274:3,4
284:2,21 285:5
287:16 289:10,12
290:13 304:19
306:19 307:4,6,8
307:17,19,21
316:3 318:18
323:17 331:18
332:2 353:3 355:5
360:10 365:11
372:1
backed 379:19
background 300:4
bad 299:6,9 359:2
badgering 339:15
bank 302:13
barnes 301:23
based 254:9
258:24 266:6
277:18 279:15
296:5 313:2 319:2

338:14 353:14
basically 334:4
348:13
basis 272:13,18,20
273:5,6 274:15
290:25 296:11
297:15 321:2,15
383:5
batch 288:6
battle 283:16
287:16
bear 247:16
262:12
becoming 342:17
began 250:24
290:12 292:1
343:14 377:7,9,11
beginning 238:4
297:23 307:18
309:16 338:15
361:21 363:1
373:19 377:22
begins 237:9
362:19
behalf 238:8
242:19 286:1
290:14 322:9
361:9 363:20
beings 338:25
belief 291:15
believe 255:22
256:18 260:10
270:21 300:18
301:9 309:5
317:10,14,18
322:12,19 336:15
337:12,14,16
338:15 340:25
341:5 348:23
350:14 352:15
353:22 354:15

382:2,2
believed 319:1
327:19 375:25
believes 249:19
belonged 330:11
ben 301:23
benefit 289:11
best 241:9 248:9
282:15 310:3
311:20 313:15
327:16 373:24
better 326:2
328:24
beyond 289:7
325:15 354:12
368:12
big 369:4
biggest 292:3
billed 290:24
billenness 301:23
302:2,4 345:16
357:6,19,20 358:2
358:3,5 359:19
billenness's
358:23
bit 245:3 256:12
270:16 328:10
348:10 350:8,13
357:5
block 335:20
blume 233:11
238:7,7 239:7,11
246:2,2,25 247:21
251:2 269:9
292:17 293:12
351:15
blur 256:12
board 360:12
bodies 339:21
bones 339:21

CONFIDENTIAL

**booklet** 326:6,8
**borrowed** 264:18
**boston** 232:19
235:13 237:18
264:10,19 311:20
341:6
**bottom** 344:18
356:14 359:16
361:3,4
**boundaries** 284:17
286:2
**box** 234:8
**boxes** 378:6,8,10
**boylston** 232:18
237:17 264:11
**break** 254:9
271:10 307:2
308:23 309:11,12
**briefly** 344:5,25
347:5 374:10
**bring** 372:8
**brings** 307:11
**broad** 370:4,4,4
**brought** 326:11
**budget** 329:8
344:25 345:7
373:14,16,18,20
**build** 358:23
**buried** 339:21
**bus** 324:14
**bush** 288:8,11
289:10
**business** 289:19
290:4,6 336:11
**busy** 296:6,10
**bye** 383:16

**c**

**c** 233:11 385:1,1
**c.a.** 232:3
**calculation** 293:18

**calgary** 303:5
355:18,20
**california** 233:12
**call** 244:24 250:20
254:18 257:21
265:10 268:11
269:4,5,23 287:8
323:23 347:17
**called** 283:12,13
283:19 284:22
288:13
**calls** 251:12
279:23 299:25
320:7 332:21
336:22 338:11,18
341:22
**campaign** 298:19
298:21 355:8
362:1 368:17
**canada** 280:25
299:2 303:14
317:9,11 318:25
334:12 335:7,17
335:21 356:18
357:1,16 358:7
360:16 363:3,5
364:23
**canada's** 334:20
334:23
**canadian** 317:6,19
318:5,23 335:14
356:16,22 358:15
360:15 364:13
365:25 369:15
370:12,20
**canadians** 323:10
**capability** 380:7
**capital** 310:25
372:8 373:25
**captioner** 385:3

**capture** 238:22
**captured** 373:2
**care** 325:10
**cared** 325:8
**carefully** 300:24
**case** 278:2 283:3,4
289:18 290:1
295:23 297:21
298:25 299:21,23
305:24 306:18
309:3,7 310:7
311:16 315:1,1,19
317:4,9,11 321:18
323:1,15 325:5
332:14 333:10,12
333:24 334:3,11
335:19 337:11,15
337:17 348:12,14
354:15 372:2
377:7,18 379:7
383:8 386:2
**category** 342:11
345:10 360:19
364:14
**cause** 385:18
**cc'ing** 359:19
**cease** 246:22
**ceased** 247:4
**cellular** 237:5
**cemetery** 324:17
324:23
**cent** 374:16
**certain** 266:1
277:7 287:15
310:8 343:4 371:2
**certainly** 342:4
**certainty** 260:9
306:21
**certification**
385:19

**certified** 237:19
385:2,3
**certify** 385:6,17
**certifying** 385:22
**chain** 356:10
360:21,22 361:3
**chair** 358:10
359:24
**challenge** 325:23
329:2
**champion** 233:4
236:6,8 238:5,5,12
239:4,11,16
240:18 241:11
242:11 243:12,17
243:21 244:10,13
244:19 246:1,23
247:6,9,19 248:10
262:1,17,25
264:17 270:21
271:13,16 272:15
272:22 273:22
274:24 275:22
276:5 279:23
280:16 291:18
292:18 293:11
294:3,13 295:24
299:25 301:6,13
305:15 307:5
308:20 315:10
317:25 318:12
319:4,25 320:7,20
322:17 328:1
332:20 334:14
336:20 338:11,18
339:14 340:8,16
340:25 341:22
342:22 343:2,16
344:5,8 347:3,6,11
349:15 350:3
364:18,22 365:6

365:11,15,18,19
367:16,24 369:6,9
369:10 372:13,20
372:24 374:23
375:1,9,14 376:10
377:13 379:8
380:13,23 381:17
382:18 383:3,13
**champion's**
378:20
**chance** 262:10
336:21
**change** 386:4
**changed** 266:6
267:10
**changes** 252:21
253:1,4,15 256:14
257:1,24 258:1,2,5
258:10 259:19
260:1,18 261:11
261:13,16,20,25
262:15,20 263:18
265:18 266:4
267:2,8,13,17
268:16,22,23
269:2,18,18 270:1
384:5 385:14
**chaos** 288:23
**chapelle** 361:11,21
**characterization**
291:19
**characterize**
254:17 285:18
318:9,20
**characterized**
287:1 337:22
**charge** 302:12
**charles** 235:11
238:9,20 239:1
246:9

**chase** 335:12
**chevron** 232:6
235:20 237:12
238:6,8,10,15,17
238:19,24 240:21
250:11,16 251:3,4
251:8 258:22
270:18 276:3,12
277:2,14 279:20
280:11 281:6,7,9
282:11,19,24
283:18,21 284:4
285:12,22 288:3
288:11,24 289:13
289:19 290:1,11
291:8,17,20,25
292:1,6,11 293:19
295:15 298:2,6,12
298:25 299:24
303:7,22 305:1,12
308:7,9 309:7,20
311:19,24 312:4
312:13 313:22
314:25 315:3,7,13
316:11,20 317:6
317:18 318:6,10
318:24 319:2
320:5 325:17
333:6,18 335:14
335:21 336:2
338:15 340:22
341:2,5 342:5,19
348:21 349:2
350:14,21 351:11
351:16,17 353:1,3
354:21 356:18
357:1 358:19
360:15 362:2,13
363:10,22 366:25
369:16 370:14
372:9 374:2

378:21,22 379:5
380:6,10,17 381:5
381:15 386:2
**chevron's** 240:15
247:17 252:1
259:9,15 261:10
277:20 279:17
286:23,24 288:1,2
288:18 293:24
294:1,8 295:3,6,6
298:19 299:17
302:22 305:14
306:16,17 315:18
316:15 319:19,23
332:18 334:12
338:5 341:5
348:24 359:23
364:5 366:15
**chief** 325:1
**chill** 342:25 343:2
**choice** 242:2
**chose** 335:24
**circumstance**
281:22
**circumstances**
239:9 289:1
**city** 269:15 275:20
**civ** 232:3
**civil** 333:22
**claim** 301:7
353:13
**claimed** 334:5
**claims** 284:23
354:25
**clarification** 245:6
**clarify** 255:10
264:5
**clarity** 329:3,18
**classify** 363:16
**clean** 380:12

**clear** 244:15
274:12 332:11
335:1 337:19
381:1
**clicked** 315:20
**client** 288:8,19,25
346:1,2
**clients** 288:3
289:20 298:24
310:1 344:12
363:20
**cliff** 371:18
**clock** 268:10
**close** 335:1 344:17
**closed** 375:6
383:22
**closer** 327:8
**clvs** 235:21
**cofounder** 364:4
370:13,23
**colleague** 367:18
**colleagues** 359:22
361:22 369:21
370:11
**columbia** 234:7
**come** 245:10
251:14 255:12
256:25 263:21
271:17 274:6
285:19 292:13
307:4 312:2
358:21
**comes** 347:18
353:17
**comfortable**
326:13,22 327:4
327:13,22 328:6
328:11
**comforting** 293:8
**coming** 259:2
307:17 315:14

CONFIDENTIAL

comment 297:16
316:22
comments 282:18
371:16
commission
386:25
committed 333:23
commonwealth
385:5
communicate
249:12
communication
308:11
communications
351:15
communities
362:2
companies 358:18
company 282:19
343:10 349:5,6,21
compassion 339:2
complete 253:17
254:1,3 330:10,22
377:4
completely 284:25
completion 385:13
complex 333:12
compound 295:24
computer 269:2,3
385:10
conaie 363:8
concern 255:14,16
255:16 267:6
concerning 350:25
concerns 276:17
concluded 383:23
concludes 383:18
conclusion 336:23
conditioned
342:16

conditions 324:6
conducted 338:16
confer 294:11
conference 279:14
303:5,13 355:18
355:19
confidential
232:14
confined 341:18
confirm 333:2
375:23
conflict 239:20
confused 342:1,10
381:19
confusing 262:5,6
295:25 367:2
connected 302:20
connection 316:9
consider 249:22
considered 350:25
367:3
considering
282:19 285:23
consisted 250:15
consistent 354:25
355:3
conspiracy 363:23
conspirator
283:20 286:6
351:1
constructed
357:25
contact 277:19
278:21 308:7
331:12
contacted 288:2,3
288:5
contained 285:7
378:13
contamination
348:19

contemner 382:8
content 239:10
254:20
contentions
241:14
contents 251:24
316:4
context 299:7
337:18
continue 237:7
248:23 282:11
287:15 307:24
343:6 369:7
continued 234:1
235:1
continuing 287:8
continuous 250:23
contract 309:7
321:20 322:4,8,12
326:2
contracts 322:2,9
322:15 326:6
339:25 342:9
343:13 379:21
contractual
321:24
contrary 309:5
control 276:18
330:10 385:21
controlled 273:8
274:10 275:7,10
276:18,19 277:13
277:25 315:14
controls 276:25
convenient 240:17
conversation
249:3 250:19,21
258:24 274:7
277:6 310:13,17
321:12 322:25
323:6

conversations
237:5 250:23
251:25 278:7
282:22 296:5
297:18 310:4,19
311:6 318:6 324:2
352:9
cooperation
338:24
coordinated 289:3
coordinating
295:14 297:20
coordination
358:24
copies 243:14
322:1
copy 243:11,13
244:1 249:7,11,16
249:17 250:1
265:2,12 266:6
372:17
cornerstone
232:17 237:17
264:7,12
corporate 364:7
corporation 232:6
235:20 237:12
238:6,8,11,24
386:2
correct 242:21
244:1,4,8 246:10
246:13,18,19
247:22 252:16
257:16 259:5,7,9
259:10,10,12,13
259:15,16 263:2
263:19,20 264:17
267:24,25 268:14
268:15 269:21,22
273:19 275:12,13
275:16,19 276:1,4

276:13,14,18,20
277:4 278:7,8,10
278:11,13,14,17
278:22,23 279:18
279:19 280:13,22
280:23 281:7
282:12 286:14
290:7,9,22,23
291:6 292:18,19
293:20,22 294:2
295:23 296:17,18
296:23,24 297:17
298:4,8,20 299:18
299:19,24 300:8
300:10,14,15
302:24,25 303:2
303:24 304:21,22
305:8,9,14,24
306:18 309:4,21
310:9,20 311:1,3,4
311:17 312:10
313:17 315:9
316:25 317:2,7,9
317:16,19,20,24
318:7,8,11,24
319:20,21 320:6
320:11 322:10,13
322:16 323:7
326:3,4,16 327:7
327:14,25 328:9
328:25 329:1,24
330:2,5 331:2,5
333:11,24 334:12
334:13,23 335:15
335:21,22 336:2,3
336:6,13 337:1,9
341:6,16,21 342:6
342:21 343:15,24
345:1,8,9,11,16,17
345:19,21 346:1,6
346:7,11,13,18

347:25 348:8,19
350:23 351:6,20
351:21,24 352:7
353:5,6,8,9,20
354:4,5 355:9
356:7 357:6,20
358:3 359:11,24
360:8 361:8
373:11,12,15
375:3,17,20 376:1
376:2,5,6,8 377:1
377:2,8 378:18,19
378:25 379:7
380:8,9,12,22
381:16 382:7
**corrections** 384:5
**correctly** 238:22
271:1 314:17
352:16
**cost** 282:10
**costs** 282:4,5
329:18,19 345:10
346:14
**counsel** 237:11,23
241:19 246:11,18
246:20,22 247:5,7
247:17 251:4,7
286:22 288:16
290:25 293:24
**count** 313:12
**counted** 314:5
**counterproductive**
359:3
**countries** 362:15
363:11
**country** 317:12
**couple** 244:6
272:3 295:11
302:1 312:18
316:1 332:4 340:3
371:8

**course** 240:22
263:6 288:20
291:14
**court** 232:1
237:14,21 242:3,8
243:5,18 295:14
297:24,25 299:2
317:19 331:6
332:15 334:20
351:4 352:7 353:4
353:5,8 354:20,22
355:8 356:3
360:19 363:15
364:13,15,16,19
365:12,13,16,21
365:25 366:5,6,8,9
366:9 367:1 368:2
371:5 372:10
385:22
**courts** 293:6,7
317:6 334:23
335:15 351:22
360:18
**cover** 329:17
**crankin** 235:15
**crc** 232:23 385:25
**create** 272:24
275:12 310:4
**created** 272:10,21
273:7,12,16,17
274:9,14,16,17,20
274:21 275:6,9,10
275:11,12,15
277:14,24 305:21
305:22
**creating** 329:3
**credibility** 263:13
**criminal** 363:23
**crony** 283:20
**cross** 236:7 240:22
244:22 263:3

368:6
**crr** 232:23 385:25
**crude** 324:11
**crutcher** 233:3,10
**csr** 311:23 314:16
**curiosity** 315:24
**curious** 314:8
**current** 304:18
**currently** 312:10
314:18 354:19
**cut** 335:12
**cwp** 303:18 330:14
374:12

### d

**d** 236:1 238:22
**danger** 382:11
**dark** 367:14
**date** 245:22 250:5
251:2 385:8 386:2
**dated** 369:12
371:13
**david** 354:6
**day** 239:17 240:17
240:20 245:17
249:24 250:13
270:19 285:14
288:16 296:11,11
308:1 381:23
384:9 385:23
386:23
**days** 246:4 250:6
256:12,13 263:8
**deal** 290:7 291:8
301:15 383:10
**dealing** 290:11
368:22
**dear** 371:18
**decades** 349:11
**december** 317:15
343:23 361:4
373:6 374:7 378:2

decision 287:15
335:18 350:8,9
354:15
decisions 321:24
declaration
239:13 243:7,9,11
243:13,23 244:1,3
244:7,16 263:1
344:17 352:14
353:12,18 356:9
367:18 368:1,7
371:9 372:14
374:17,20 375:8
375:25 376:7
deeply 354:16
defendant 237:13
defendants 232:10
defense 363:9
defined 319:16
definitely 333:15
degree 341:15
381:14
delay 321:3
delegation 323:10
323:12
delete 281:3
deleted 260:8,12
260:21,23,25
261:1
deletion 253:16
deletions 265:23
delivered 249:1
delyan 248:11
demonstration
324:10
denied 284:25
denver 233:13
department
363:21
deponent 385:12
385:15 386:3

deposed 242:9
293:13 340:21,24
341:5
deposition 232:15
237:10,16 239:9
239:14,17,25
240:9,9,16,19,24
241:15 244:17
249:13,20 251:6
262:10 264:16
284:12,15,18
292:9 294:8,15
300:25 307:18
340:7,17 341:8,10
341:11,16,21
367:23 368:12,13
383:22,23 384:4
385:7,13 386:2
depositions 290:2
describe 250:1
285:7,9 287:10
343:12 367:15
described 286:21
286:23 329:22
describing 284:5
description 236:12
334:7
despite 334:10
detail 378:14
details 349:3
379:23
determination
282:13
determined 278:4
382:9
developments
362:1
dialogue 328:16
dialogues 287:24
different 241:12
241:16 251:19

270:11 278:24
366:11,12
difficult 382:22
diligence 305:8
306:10 336:12,15
dimitrov 248:11
dimitry 266:22
dinger 234:4
238:18,18
dinner 287:25
diplomate 385:4
direct 236:6
240:21,24 241:22
242:10 244:16
272:2 331:12
385:21
directed 250:21
302:22 303:2
319:13,22 320:15
320:18 321:10,16
321:19
directing 316:7
319:9 329:4
direction 385:22
directions 330:15
directly 282:20
304:15 315:6
disagree 241:14
241:25 251:22
disbursed 330:14
disclose 272:9,25
273:14,15 274:8
275:5 277:23
disclosed 279:11
281:5
disclosure 315:22
discount 373:24
discretion 330:10
discuss 356:16
discussed 360:3

discussion 245:15
250:14,15,22
267:11 281:21,25
282:1 353:2
discussions 266:24
267:7,13 288:10
313:3 321:21
disinterested
385:17
disk 306:24
376:18
disrupt 321:3
disruptive 320:24
district 232:1,2
237:14,14
document 253:2
257:17 268:20
269:4,6,13 282:5
305:22 306:5,8,15
353:23 372:14,21
documentation
348:5
documented
327:19,20,21
documents 284:22
285:4,6,11,13
286:13 288:6
303:18 305:11
306:15 327:17
328:17,24 348:8
353:11 368:4,18
378:12
doing 241:18
259:3 271:1
299:10 305:3
310:14 328:15
336:14,18,18
359:4 366:5
donziger 232:9
235:3 236:7,9
237:12 239:4,5,5,8

240:18 241:3,11
241:16 244:20,21
244:23 246:6
247:3,11,15
248:11,13,14
249:17,23 251:14
251:20 252:5
262:7,23,25 263:5
263:16 264:14,18
264:20,21 269:10
270:24 271:9,14
271:24,25 272:1
272:17 273:1,3,24
274:2,11 275:1,24
276:7,9 280:1,4,6
280:19 291:22,23
294:16 296:2
300:6,16 301:6,12
301:18 305:18
306:22,25 307:6,8
307:21,22,23
308:22,25 309:2
315:17 318:2,14
318:17,22 319:8
320:2,12,23 321:6
322:23 328:3,5
331:7,15,21 332:3
332:22 334:16
336:24 338:13,20
339:16 340:11,14
340:19,20 341:3
341:24 342:25
343:3,7,21 344:3,6
346:21,25 347:3,7
347:10 349:13
350:2 353:13
354:4 355:1,12,23
356:15 359:10
360:23 361:8,16
364:17,21 365:1,3
365:8 367:6,13,17

367:19,25 368:8
369:7,8,11 371:10
372:20,23 373:5
373:13,14,18
374:6,15 375:3,7
375:16 376:12,16
376:19,23 377:15
379:9,11,14
380:18 381:2,9,12
381:22,24 382:16
382:19 383:10,15
386:2
**donziger's** 344:10
346:2 347:23
**donzigerandasso...**
235:7
**doubt** 277:18
**downtown** 264:10
**dozens** 301:14
**draft** 248:25 249:4
249:7,11,18,18,19
250:2,4 252:7,20
253:2 257:2,21,22
258:3,7,12,23,25
259:6,10,11,12,18
260:5,7,17,20
261:16,17 262:16
263:18,22 265:3,7
265:11,16,24
266:13,18 267:18
267:22 268:1,12
268:13,17 269:20
269:24,25 270:3,5
275:3 277:3,9
279:19,20 280:10
280:11 281:3,8
295:5,8,20 298:4,7
298:13,20,22
299:18 303:6,23
313:24 316:16
319:20 320:5,9,14

332:19 338:7,9
371:23
**drafted** 259:9,15
276:3,13 303:22
371:17,24
**drafting** 302:23
371:17
**drafts** 276:14
**dream** 292:3
**drive** 324:14
**driver's** 242:7
**drivers** 326:18
**dry** 351:10
**due** 263:5 305:8
306:10 336:12,15
**duly** 242:8 385:7
**dumping** 364:6
**dunn** 233:3,10
236:25 238:6,7
245:14 248:1,8,12
249:3 251:4,9
266:25 269:14
270:14 282:12
286:4 295:10

**e**

**e** 236:1 238:22,23
385:1,1
**earlier** 274:13
292:16,18 312:23
344:9 347:22
350:21 373:15
375:24 380:21
381:8,25
**early** 304:19
382:25
**earmarked** 329:9
329:14 348:1
**ease** 257:20
265:10 268:9,11
269:23

**easily** 305:13
306:17 328:21
**ecuador** 275:17,20
278:12 279:13,15
289:18 290:1
298:24 299:23
303:14 304:12,17
305:14 311:16
315:1,9 319:14
323:8 325:13
334:3 348:18,22
348:25 349:7
350:14,16 362:2
363:20,24 364:6
369:16 370:14
**ecuador's** 362:8
363:7
**ecuadorian** 310:1
317:4 318:11
334:21 344:11
346:10,16,20
347:8,20 371:4
373:10
**ecuadorians** 309:8
309:20 318:5
335:13,20 340:3
366:13 370:19
380:7,12
**ed** 325:1
**edit** 252:21 253:16
253:20,23 254:1,8
254:11 371:24
**edited** 245:16
254:4,6,10,21,25
255:8,14 256:4,9
**editing** 254:14
**edits** 252:24 253:1
253:19 258:10,14
260:22 266:3,12
266:14,18

**effective** 282:10
**effort** 277:16,18
　289:13
**eight** 253:25
　324:15
**either** 250:7
　258:14 267:12
　269:3,5 292:20
　310:18 311:6
　331:18 336:1
　339:20 346:15
**elliott** 288:5
　310:24 311:1,14
**email** 239:10
　252:15 257:7,12
　310:16 353:19
　354:3,6,12 355:12
　355:13,16 356:10
　356:10,14 357:5,6
　357:21 358:4,6,14
　359:9,15 360:3,7
　360:21,22 361:2
　361:16,20 367:6
　369:11 370:4
　371:10,16,17
　372:6 373:3,5,9,17
　373:19,23 374:6
　383:2
**emails** 306:19
　371:8
**empowered**
　321:20
**endeavor** 376:20
**ended** 250:25
**ends** 287:19
**energy** 293:21
　313:13 323:22
　336:17
**enforce** 335:23,24
**enforced** 334:12

**enforcement**
　317:5,8 318:24
　334:22 335:14,21
　360:16 364:23
　365:25 370:20
**enforcing** 364:12
**engage** 321:20
**engaged** 363:22
**english** 325:6
　372:18
**enjoy** 285:19
　329:2
**enjoyed** 324:3
**environment**
　380:12
**environmental**
　350:5
**equipped** 379:3
**equity** 311:15
　321:25 322:15
　323:1,4
**errata** 386:1
**errors** 253:11
**esq** 233:4,11 234:4
　234:5,6 235:11
**essentially** 277:14
**estimate** 240:20
　290:10,16 291:11
　313:11,25 314:11
　314:12
**estimated** 313:2
**estimation** 245:20
　254:16 296:18,25
　313:14
**et** 232:9 386:2
**evening** 256:18,19
**event** 317:11
**everybody** 343:5
**evidence** 305:1
　353:14 354:21
　363:21,23

**exact** 245:22 368:3
**exactly** 248:19
　283:8 322:22
　337:11 364:24
**examination** 236:5
　236:6,7,8,9 240:24
　242:10 244:22
　344:7 376:22
**example** 282:5
　300:23 301:1,3
　322:3 380:20
**examples** 300:19
　368:3
**exchange** 281:10
**exclusively** 349:24
**excuse** 241:3
**executable** 366:16
**executed** 384:9
**execution** 321:21
**exhibit** 236:13
　243:18,19,25
　344:16 345:5
　352:14,15 353:11
　353:18 355:4,11
　356:9 359:9
　360:20 367:5,15
　371:9 372:14,17
　372:25 373:4
**exhibits** 236:11,14
　236:24 243:15
　344:18 367:18
**existed** 306:7
　330:12 383:7
**existence** 309:4
**exit** 269:9
**expect** 292:3 320:8
**expected** 291:3
　335:4,5
**expenditures**
　331:10,13

**expenses** 309:19
　310:2 321:19
　329:15 344:12,22
　344:24 348:2,6,7
　377:1,5,19,24
　378:3,11
**experience** 284:15
**experienced** 339:8
**expires** 386:25
**explain** 310:15
　367:24
**explained** 304:17
　337:21,25,25
　338:10
**explaining** 354:13
**explore** 310:6
**exploring** 310:15
**exposed** 324:10
**expressing** 308:15
**extensive** 240:11
**extent** 251:12
　336:22
**extracted** 281:22

**f**

**f** 385:1
**fabricated** 353:14
　354:21
**face** 339:12,18
**fact** 240:12 262:14
　276:2 277:2
　278:18 348:9
　378:16 380:20
　381:4,13
**facts** 294:5
**failed** 308:19
**fair** 259:4,8
　285:17 287:20
　289:21 290:15
　363:14
**fall** 285:16

**false** 277:21,22
363:23
**familiar** 350:8,19
**familiarity** 350:4
**family** 242:20
291:13
**far** 296:9 327:10
330:9
**farmer** 362:2
**fascinating** 338:23
**fashion** 239:21
241:19
**fast** 271:5
**fda** 272:10,21
273:7,12,14,15,18
274:9,14,16,17,20
274:22 275:6,12
275:14,18,21
276:18,23,25
277:13,24 312:24
319:13,23 320:15
320:19 321:10,13
321:16,18,19,21
321:23 322:10,15
322:16,25 323:4
330:11 331:9,12
345:24 346:2
348:11 363:9
**fear** 312:1,2,10,11
381:14 382:3
**feared** 289:22
**february** 356:11
**federal** 333:23
**federation** 362:9
363:8
**feel** 282:9 284:11
285:4 289:17
296:6 308:19
327:13 379:2
380:2 382:10

**feeling** 284:8,9,14
284:15,20
**feelings** 284:4
**fees** 281:16,18
291:7
**felt** 283:17 286:9
287:5,5 326:13,22
327:4 328:6
332:25 352:2
381:5 382:3
**female** 274:4
**fewer** 282:4
**fifth** 237:18
269:24
**fight** 287:16
**figure** 249:13
339:20 365:3
378:10
**figuring** 336:16
**file** 350:22 351:12
351:18,23
**filed** 237:13
283:10 285:11,14
285:24 351:4,22
**final** 321:24
**finalized** 342:9
**financial** 282:5
291:13
**financially** 281:23
**financing** 368:22
**find** 264:25 268:20
271:6 283:5,15,22
310:5
**findings** 332:15
**fine** 307:5 308:2
322:7 374:16
375:9
**finish** 257:11
313:20 321:4
331:18 368:8
376:20

**finished** 268:7
382:16,17
**firing** 250:19
**firm** 246:14,15
251:5,9 264:8
**first** 245:9 248:25
249:4,16,18,19
250:2,4 252:20
253:2 254:10,20
254:25 255:8,10
255:13 259:10,11
260:17 261:17
270:17 279:1,3
284:12,15 295:12
301:2,24 302:3
303:23 304:12
313:24 316:16
319:20 320:4
332:19 339:6
340:7 362:14,18
362:19 363:1,3,4
363:10 385:7
**firsthand** 295:22
321:12
**fits** 290:17
**five** 265:22 290:20
296:20,22 297:4,7
306:23 317:21
341:9,9 382:15
**flawed** 354:16
**flexibility** 373:25
**flexible** 240:2
**flip** 354:1
**floor** 237:18
**florham** 234:9
**focus** 275:10 302:1
325:22
**focused** 287:7
**folks** 238:13
359:18

**follow** 310:16
342:20
**followed** 330:13
343:10
**following** 270:16
342:12 367:21
**follows** 242:9
**fontaine** 319:14
321:11 323:5
**fool** 300:3
**foothold** 358:7
**force** 370:14
**forces** 370:13,19
**foregoing** 384:3
385:6,11,19
**forever** 293:1
**forgotten** 312:9
**form** 241:23
327:18
**former** 251:13
**forms** 380:20
**forth** 284:22
287:16 385:9
**forward** 325:22
335:4
**forwarded** 353:19
354:4 359:10
360:23 373:5
**forwards** 355:23
356:6
**found** 258:15
264:24 283:16,21
287:6 303:15
325:22
**foundation** 262:2
262:18 275:23
276:6 285:5 294:5
296:1 305:16,20
315:11 318:1,13
319:5 320:1,21,25
322:18 332:21

334:15 336:23
341:23 343:17
377:14 380:15
381:18
**founded** 275:18,21
**four** 297:9 374:18
**fourth** 268:12
**frame** 270:12
376:20
**frank** 286:1
**frankly** 240:25
**fraud** 333:23
**fraudulent** 334:6
**free** 380:2
**frequently** 353:13
**friday** 232:16
237:3 270:23
308:14,14 361:4
**friedman** 354:6,9
**friends** 356:15
**front** 269:2 272:4
363:9 365:4
**frustrated** 325:21
**full** 250:20 253:25
266:2 279:1,3
301:2 366:20,20
369:20 370:11
373:22 385:11
**fully** 336:7,8
**functions** 276:23
**fund** 356:17,22
358:9,15 378:23
**funded** 279:14
**funder** 379:9
**funders** 335:25
378:23 379:7,16
**funding** 309:19
**funds** 329:14
330:13 348:1
358:18

**further** 242:9
244:10 268:16
284:24 286:2
344:3 355:17
363:17 375:22
376:11 385:17

**g**

**garnering** 366:11
**general** 245:10
254:24 256:7
300:16 306:14
309:24 337:17
**generally** 240:1
**gentleman** 245:15
247:23,24 266:21
**getting** 287:7
316:3 325:21
326:18 327:8
336:4 368:22
381:23
**gibson** 233:3,10
236:25 238:5,7
245:13 248:1,8,12
249:2 251:4,8
266:25 269:14
270:13 282:12
286:4 295:9
**gibsondunn.com**
233:8,15
**give** 243:4 263:6
266:14 301:16
304:6 305:22
**given** 239:22
241:9 249:9,17
250:1 262:11
267:22 269:20
277:11 286:25
289:19 320:5
327:5 328:7
332:19 338:2
343:5 383:19

385:12
**giving** 368:3,18
**glove** 283:20
**go** 237:8 239:7,7
242:1 245:21
257:10 260:13
262:3 270:15
271:24 285:5
287:22 289:8
290:13 292:25
293:6 302:15
306:19 321:21
324:19 328:14
335:8,10 339:4,25
353:4 355:5 365:8
367:12 368:11
371:7 372:1
379:15 382:3
**goal** 298:18
366:23,24
**goals** 325:19
**god** 268:18
**goes** 285:15 343:3
354:19
**going** 237:2
251:11,15 252:3
263:14 265:10
270:11,15 271:10
271:14 272:2,2
278:24 280:4
287:3 289:22
294:21,22 295:11
297:11 299:2
300:17,21,23
301:7 302:14,15
305:19 307:12
308:25 309:1
312:18 316:1
318:25 321:7
324:1 328:3,15,20
331:16,23 334:2

335:2 342:23
344:4 353:10
356:9 357:16
358:1 360:13
361:17,19 363:17
365:5,17 370:2
371:7 373:1
376:12,19,21
379:10
**good** 237:1 242:12
328:19 334:7
342:15
**gotten** 372:15
**grand** 324:25
**grant** 319:13
321:11 323:1,4
**granted** 321:25
322:15
**gratitude** 371:19
**grave** 324:22,25
**great** 326:21
341:15
**greater** 325:11
**greenpeace** 364:4
370:13,23
**ground** 324:7
**grounds** 354:20
**group** 304:16
**guarantee** 382:13
382:13
**guess** 248:9
253:25 268:6,8
313:15,16,17
328:10 342:1
349:8 355:4
360:24
**guys** 263:7 301:4
340:12

| | | | |
|---|---|---|---|

**h**

**half** 239:17 240:20
259:24 261:5
263:11 341:9
**hand** 283:20
**handed** 243:13
**handful** 269:17
**handle** 383:1
**handwritten**
308:13
**hang** 353:23
**happen** 240:3
249:14 284:10,16
284:19 289:22
303:16
**happened** 333:14
366:8
**happening** 284:21
294:2 360:18
382:11
**happy** 357:21
359:12
**hard** 248:6 266:6
289:15 290:16
342:17,17 370:21
**harm** 312:15
**heads** 288:14
**hear** 300:18
352:20 367:20
**heard** 293:25
311:15 315:15
317:22 318:4,9
319:6 355:1
**hearing** 293:5
333:13
**held** 237:16
317:18
**hello** 359:22
**help** 278:5 296:6
300:9 310:1
316:11,19 326:2

344:11 348:10
357:5,17 374:2
380:11
**helped** 345:1,7
373:14 378:23
380:7
**helpful** 296:8
307:1
**helping** 344:14,14
344:20 368:21
**herbert** 234:6
238:14
**hereto** 385:16
**hey** 310:14
**highly** 263:13
**hired** 246:18
247:5 300:7 326:1
**historical** 314:15
**hit** 261:13
**hold** 293:10
305:19 316:11,19
329:23,25 352:21
362:2,13 363:9
**honest** 247:10
305:4
**honestly** 256:10
256:12 265:25
357:4 360:5
**honored** 309:8
**hope** 309:10
314:16 382:12
383:11
**hoped** 352:22
**horizon** 382:9
**hotel** 339:24
**hour** 239:11
259:23 263:11
290:20
**hourly** 290:25
314:7

**hours** 244:6
259:24 290:10,20
313:4,10 314:1,6
324:15,15 341:8
383:9,12
**hstern** 234:13
**huh** 327:1
**human** 338:25
**hundred** 375:10
**hung** 251:21
351:10
**husband** 281:1

**i**

**idea** 258:21
292:15 302:19
350:1,10,20
369:25 370:7
**ideas** 373:24
**identification**
236:11 243:20
**identified** 242:7
266:22
**identify** 301:8
**ii** 232:12
**illness** 242:25
**immediately**
241:14
**impact** 289:18
325:15
**impacted** 291:12
**implemented**
267:19,22
**important** 270:9
369:5
**impression** 335:3
**inaccurate** 254:16
254:19 255:6
**include** 310:24
311:2
**included** 327:15
366:4

**includes** 345:10
346:4
**including** 357:19
359:19 368:20
**incredibly** 296:10
**independent** 303:1
304:23 305:1
358:10 359:24
**indicate** 292:21
**indicated** 241:22
292:6
**indigenous** 362:1
362:8 363:6,8
369:15 370:12,18
**individuals** 324:2
**inevitable** 327:24
**influence** 358:20
**influential** 363:6
**inform** 361:25
383:8
**information**
251:13,18,22
270:10 278:19
306:11 314:17
336:15 366:21
368:14 379:22
**informations**
343:4
**informing** 241:20
**initial** 261:25
**initially** 267:23
283:23
**initiated** 291:17
291:19,20 379:6
**injunction** 255:2,3
**input** 345:8
**inquiry** 303:1
331:6
**inserted** 258:16
332:25 333:3

CONFIDENTIAL

| | | | |
|---|---|---|---|
| **insights** 296:7 | **investor** 308:3 | **jeff** 311:9,14 | 335:19 337:1 |
| **inspiring** 323:16 | 316:21 326:15 | **job** 326:21 333:5 | **katherine** 237:10 |
| 323:18 324:3 | 327:7,14,23 328:9 | **joel** 234:5 238:16 | 307:19 383:19 |
| **instruct** 247:7 | 328:17 354:9 | **john** 325:1 | **katie** 244:24 252:6 |
| 251:11 252:3 | 372:1 373:10 | **join** 370:19 | 263:17 272:2 |
| **integrity** 338:16 | **investors** 305:12 | **joined** 370:13 | 273:4 274:12 |
| 339:9 340:6,13,17 | 305:23 306:9,16 | **joint** 362:7 363:7 | 276:10 291:24 |
| 341:12,13,20 | 306:17 309:18 | **joking** 325:25 | 294:17 301:19 |
| 342:5 | 310:9,11,20 311:8 | **jonathan** 288:8,11 | 307:24 318:4 |
| **intended** 364:20 | 311:16 316:10,19 | 289:10 | 319:9 320:13 |
| 364:24 366:17 | 316:24 317:1,23 | **josh** 378:6,8 | 321:7 329:4 332:4 |
| **intensive** 240:12 | 318:7 322:16 | **journalists** 361:21 | 336:10,25 339:5 |
| **interest** 279:13 | 326:3 370:5 | 369:21 370:10 | 340:21 343:8 |
| 311:15 319:14 | **invoice** 329:21 | **jsilverstein** 234:12 | 344:4 368:11 |
| 321:11 | 330:4 | **juan** 345:18 | 376:14,24 381:13 |
| **interested** 287:23 | **invoices** 375:4 | **judge** 284:25 | **keep** 263:11 |
| 309:19 | **involved** 292:4 | 285:1,1,25 286:22 | 308:25 309:1 |
| **interesting** 302:18 | 305:7 325:7 | 304:21 333:23 | 312:12 361:17,18 |
| 310:6 324:3 | 336:12 338:25 | 335:19 337:1 | **kept** 365:16,17 |
| **interference** 237:6 | 369:2 379:17,17 | **judge's** 286:15 | **key** 356:2 |
| **interpreted** 353:7 | 380:22 | **judgment** 279:13 | **kidding** 273:2 |
| **interrupted** 368:9 | **involvement** | 279:15 304:1,8,20 | **kiin** 235:21 237:19 |
| **interrupting** 321:1 | 289:17,24 290:3 | 304:25 316:10 | **kilcullen** 234:3 |
| 365:17 | 291:16,25 292:22 | 318:11 319:2,15 | 238:13,15,17,19 |
| **intervene** 352:22 | 311:18 312:3 | 333:22 334:1,10 | **kimberly** 232:23 |
| **interviewed** | 338:14 | 335:13 336:25 | 237:22 385:2,25 |
| 250:13 | **involving** 293:19 | 353:14 355:2 | **kind** 270:9,11 |
| **intimidate** 289:13 | 312:14 | 363:25 364:12 | 323:21,25 324:7 |
| **intimidation** 364:7 | **irresponsibility** | 366:16 368:15 | 327:15 340:3 |
| **introduced** 308:4 | 364:7 | 369:17 370:15 | 362:18 367:3 |
| 343:22 | **ish** 243:10 | 373:11 | **knew** 296:9 |
| **introductions** | **issue** 343:3 348:10 | **july** 340:22 | 305:10,19 306:6 |
| 344:15 | **issues** 299:13,21 | **june** 340:25 | 309:18 333:15,21 |
| **invested** 348:11 | 299:23 300:3,5,10 | **justice** 363:22 | 333:21 336:4 |
| **investigation** | 300:12,14 383:2 | | 337:6,8 339:8 |
| 304:24 | **iteration** 320:9 | **k** | 360:11 |
| **investment** 305:8 | | **k** 232:15 236:3 | **know** 239:13 |
| 309:3,7 310:5,6 | **j** | 242:5 384:3,12 | 240:12,19 241:2 |
| 343:22 | **j** 238:14 | 385:7 386:3,21 | 245:3,12 246:8 |
| **investments** 316:9 | **january** 355:13,25 | **kahn** 311:9,14 | 247:9 249:9 251:7 |
| | 360:24 377:22 | **kaplan** 285:2 | 251:17,23 255:1 |
| | 378:1 | 286:22 304:21 | |

258:13,20,25
259:3 260:16
261:12,15 263:11
264:12 265:8,22
267:9,10 268:21
269:11,13 270:8
273:6,17 275:14
275:17,20 276:25
277:6 281:18
283:9 284:1,5
285:13,22 287:2
287:13 288:1
289:6,14,21
290:13 291:10
292:5,8,13,25
293:4,6,7,8,16,23
294:1,6,12,12,17
296:20 297:2,14
297:19 298:17
300:13,24 301:15
305:4 306:5,11,20
306:25 307:25
308:4,7 309:3,6,8
309:12,14 311:25
314:5,9 315:21,23
320:16,16,18
322:9,20 323:3
324:16 326:1,10
326:19,19 332:24
335:5 336:25
338:2 340:2,2,23
346:22,24 347:12
347:16,22,25
349:1,2,3,9,10,16
349:19,23 350:9
351:3,25 352:2,3
354:12 356:24
357:4,11,12,12
359:13,18 360:13
360:14 362:6
365:7 366:11,13

366:21 367:1,21
368:19,20 369:1
369:23 370:8
374:14 377:3,7,9
377:10 379:1,18
379:20,21,21
382:1,12,13,21
**knowing** 285:19
286:19
**knowledge** 272:13
272:20 273:5
274:16,17,19,20
274:21 275:8,8,11
276:22 277:13
295:21,22 296:4,4
297:15 304:1
311:21 321:12,23
338:19 347:21
**krevlin** 373:10
374:7
**kroll** 343:10

**l**

**lack** 320:25
325:22 332:12
333:1 338:16
339:9 343:13
**lacks** 262:1,17
275:22 276:5
294:5 296:1
305:15 315:10
317:25 318:12
319:4,25 320:20
322:17 332:20
334:14 336:23
341:23 343:17
377:13 380:14
381:17
**lak** 232:3
**language** 253:11
258:15,20 260:6
325:2

**largely** 250:15
262:9
**lasted** 248:20
341:8
**late** 250:7,7
381:23
**lateness** 239:22,23
**latest** 383:12
**law** 251:5,9 264:5
269:14 347:13,14
**lawsuit** 309:20
350:22 351:12,19
351:23
**lawsuits** 379:19
**lawyer** 246:7,8,15
251:13,19 252:1,8
262:8 280:2
287:17 288:17
295:9 299:22
352:4 353:1 371:1
**lawyering** 366:5
**lawyers** 250:11,16
251:4,8,23 252:1
258:22 259:9,15
266:25 270:14,18
276:13 277:2,14
277:20 279:17
280:12 281:7
282:19 288:1,2
289:13 293:24
294:1,8 295:3,6,6
297:21 298:2,6,13
299:18 302:23
303:7,22 313:22
316:15 319:19,23
320:6 332:18
334:9 338:5 341:5
346:12,15 363:22
366:5
**lay** 285:5 305:20

**lead** 293:18,19,21
310:12 366:14
**leaders** 363:6
369:16 370:12,18
**leadership** 372:9
**learn** 304:14
359:12,14
**learned** 294:10
304:12 342:13
**learning** 366:22
**leave** 340:4 382:20
**led** 310:16
**leeway** 263:7
**left** 375:6 376:17
**legal** 237:19
281:16,18 283:3
287:25 291:7
299:2,13,21,23
300:3,4,5,9,12,14
318:25 332:12
335:2,16 336:23
337:19 346:17,20
347:8,20 359:3
366:4,5
**legally** 351:3
**letter** 285:24
286:3,6,21 287:1,9
287:11 301:1,17
308:13 350:24
351:4,11,21
352:22 358:23
**letters** 358:20
360:11
**leverage** 357:17
**libby** 246:17,18
286:1 294:7,7,14
**libby's** 246:14,15
**license** 242:8
347:13
**licensed** 347:12

CONFIDENTIAL

**life**  259:23
**limited**  241:10
  368:21
**limits**  351:7
**line**  263:14 367:22
  386:4
**linked**  306:21
  360:5
**links**  305:12
  306:16,20 316:2
**list**  315:5 369:22
  369:23,24 370:6,9
**listen**  359:13,13
**listening**  311:7
**literally**  292:14
**litigate**  282:11
**litigation**  264:8,13
  282:20 285:23
  289:24,25 290:3
  290:11 291:8,16
  291:19,20,25
  292:22 293:19
  303:14 305:14
  309:19 310:2
  311:18 312:4,14
  315:9 317:5,19
  318:5,10,23,24
  336:1 344:12,22
  346:10 352:21
  378:24 379:6
  380:22
**little**  261:5 263:7
  270:15 271:11
  312:18 325:16
  328:10 342:1
  348:10 357:5
  381:5
**live**  241:13
**llc**  234:3
**llp**  233:3,10

**lobby**  265:1
  339:24
**local**  325:5
**located**  237:17
**location**  249:10
**long**  239:12
  240:20,22 248:20
  253:13 259:21
  278:1,1 308:1
  335:6 349:10,23
  360:21 362:25
  377:9
**longer**  271:11
  365:4,6 379:17,17
**look**  245:18,21
  262:20 268:19
  284:2 289:10
  290:13 294:21,22
  300:24 301:1,4,20
  303:9 312:22
  316:7 332:6,24
  338:7 353:11
  354:14 355:11,16
  355:17 357:2
  360:22 361:2,20
  367:12 368:18
  373:22 374:17
  375:21
**looked**  248:2
  257:6,13 315:18
  315:24 321:18
  360:4 373:15
  378:9
**looking**  254:5
  289:12 315:21
  322:1,8 344:25
  354:12 355:4
  362:20 367:5
**looks**  361:9
**lot**  258:18 277:16
  280:20 286:5

  290:8 306:20
  342:9,14 368:19
  368:25 382:6
**lots**  297:20
**love**  382:14
**lower**  281:19
  358:14
**luis**  345:20
**lunch**  248:23,24
  302:14,15

**m**

**m**  238:23
**ma**  235:13
**ma'am**  274:4
**mahoney**  279:6,10
  279:21 281:4
**mail**  315:5 361:9
**main**  317:17
  318:10
**maintain**  241:3,10
**maintained**  318:5
  335:13
**major**  370:12
  373:25 374:2
**majority**  258:8
  260:24 261:4,5
  295:13 297:16
**making**  266:17
  267:1,8 273:11
  284:23 310:6
  344:14 349:8
  368:9
**man's**  322:21
**manage**  321:18
**management**
  297:21 310:25
  311:1
**manager**  358:9
**manhattan**  342:20
**manifest**  284:6

**march**  278:5
  284:3 290:12
  292:1 308:9
  309:17,23 342:6
  353:21
**marie**  233:4
**mark**  243:17
**marked**  243:19
**marking**  266:11
**mary**  232:15
  236:3 237:10
  242:5 307:19
  383:19 384:3,12
  385:7 386:3,21
**massachusetts**
  232:19 237:18
  385:6
**materials**  305:12
  326:14,23 327:4
  328:7
**math**  271:1
**mati**  235:21
  237:19
**matter**  237:11,13
  243:7 251:10
  254:23 256:4
  278:16,20 279:22
  282:21 291:2
  306:14 338:14
  346:25 347:2
  357:14 363:24
  374:3 378:24
**maximum**  239:19
**mdinger**  234:11
**mean**  239:18
  249:20 251:20
  253:10 261:12,14
  261:15 263:6
  264:2 267:3,9,11
  267:15 280:20
  281:15 282:2

285:1 287:4,5,10
287:12 289:25
290:1 324:18
334:7,25 338:8
340:16 341:17
344:22 346:8,25
347:1,2 349:6
353:12 356:21
357:20 367:23
368:11 379:24
383:9
**meaning** 283:3
339:8
**means** 294:12
305:4 334:6 350:9
356:24 379:1
385:21
**meant** 284:1 289:6
352:1,1 358:14
**media** 237:9
297:20 307:12,18
311:20 312:3
314:9 366:10
383:20
**medication** 242:22
**meet** 251:8 294:11
302:3,5,12,17,18
**meeting** 245:17
247:16 248:15,23
249:25 250:10,24
250:25 252:1
270:13 288:6
289:3,4 310:24
311:2 317:13
**meetings** 290:18
290:21 294:14
311:5,13 317:23
**member** 323:12
**memory** 320:10
322:6

**memos** 283:11
**mention** 293:15
**mentioned** 247:18
315:24
**mentions** 360:7
**merger** 349:1
**merkensteijn**
356:7
**merrimac** 235:12
**message** 352:10,13
352:15
**met** 247:17 251:3
293:24 294:1,7
296:14,15,22
304:10 323:20
**michael** 234:4
238:18
**microphones**
237:4
**middle** 272:8
283:16 287:6
362:18
**million** 329:8
**mind** 293:17,18
316:7 321:8,17
347:18 353:17
383:1
**minor** 268:19,22
**minute** 271:10
304:6 307:2
355:17 357:2
360:21 367:12
**minutes** 240:5,25
241:4,7 265:1,8,9
271:12,15,17
306:23 307:6,9
331:16 365:7
376:15,17 382:15
**mischaracterizat...**
286:5

**mischaracterizes**
272:23 273:23
294:4 295:25
318:1 320:21
328:2 380:14,24
**misleading** 337:22
**misled** 332:14
337:10,11,14,16
**missing** 327:16
340:1
**misstates** 262:18
276:6 300:1
318:13 343:16
**mobilize** 356:17
356:25 358:15
**modified** 269:7
**modify** 268:21
**modifying** 269:4
**momentum** 372:6
**monday** 374:7
383:12
**money** 291:4,12
293:22 297:20
310:1 329:17
330:11 344:11,21
374:11
**monies** 279:14
366:24 367:3
**month** 245:23,24
284:7,8 323:9
**months** 296:20,22
297:4,7 314:22,22
**moreno** 324:23
**morning** 255:20
255:25 263:24
264:23 267:18,24
270:4 375:25
**motions** 283:12
284:21
**motivate** 323:14

**mouth** 277:15,17
277:21
**move** 245:21
246:3 270:11
325:21 338:3
**moves** 271:5
**moving** 335:4
360:20
**mute** 331:17
**mutual** 358:9

**n**

**n** 236:1 238:22
**naive** 332:13
333:2
**name** 237:19
238:21,23 247:25
248:5,6 284:22
311:24 315:3
322:21 354:11,12
369:24 386:2,3
**name's** 288:14
**named** 308:4
**names** 283:13
322:2,2,21 349:16
**national** 362:8
363:8
**nationalities** 363:5
**nations** 362:14
363:4,10
**native** 325:1
**nature** 255:14
304:25 332:14
342:13 357:10
**nearly** 241:8
**necessary** 352:23
**need** 240:11
245:22 271:15
301:16 306:23
308:20 343:19
352:21 353:4
357:3 367:12

383:3,7
**needed** 264:25
  297:12 328:17,23
**negative** 272:16
**negatively** 289:18
  290:4
**nei** 358:8,24
**nervous** 286:25
  287:2
**neuman** 239:11
**never** 241:21
  287:19 303:1
  306:6,12 311:14
  313:18 315:4,18
  319:1,1,6 330:1
  331:12 334:3
  339:11,12,18
  340:6 341:12,13
  342:4 348:5,8
  351:11,14 378:2,9
  378:13,17
**new** 232:2 233:6
  235:5 237:14,20
  269:15 292:14
  293:7 299:5
  325:12 383:21
**nickname** 248:5
**night** 259:20 260:3
  263:19 288:13
**nj** 234:9
**nonlegal** 295:14
  297:24 298:5
  344:23
**nonmonetary**
  333:22
**nonprofit** 302:14
**noon** 239:14
  262:12
**normal** 290:6
**notary** 385:5
  386:25

**note** 237:3 308:14
**noted** 384:5
**notes** 249:3 375:21
**noticed** 260:7
**noticing** 238:4
**november** 303:15
  343:25 344:1
  371:13
**number** 241:17
  255:16 263:8
  267:5 330:17
  369:2,3 383:20
**numbered** 254:6,6
**numerous** 278:6
  278:10
**ny** 233:6 235:5

## o

**o** 238:23,23
**o'clock** 239:19
  248:17
**oath** 242:13
**object** 239:8,24
  241:24 246:23
  291:18 336:22
**objection** 239:6
  241:4,10 262:1,17
  272:15,22 273:22
  274:24 275:22
  276:5 279:23
  280:16 294:3
  295:24 299:25
  300:17 305:15
  315:10 317:25
  318:12 319:4,25
  320:7,20 322:17
  328:1 332:20
  334:14 336:21
  338:11,18 339:14
  340:8 341:22
  342:22 343:16
  346:21 347:5,10

347:10 349:13
  350:2 365:2
  367:20,21 368:9
  368:10 375:7
  377:13 380:13,23
  381:17
**objections** 238:1,2
  301:16 321:2
  383:4
**observations**
  313:2
**observe** 299:14
  300:11 313:9
**observed** 324:6
**observing** 300:13
**obtain** 279:12
**obtained** 251:13
  251:18,23
**obvious** 241:17
  310:22
**obviously** 241:25
  245:2 263:7
  268:13 281:6
  300:12 368:17
**occasion** 317:10
  333:5
**occasions** 278:10
  278:13
**october** 278:3
  343:14 385:23
**odd** 306:1 337:8
  375:10
**offering** 372:3
**office** 234:8
  242:20 245:13
  252:19 264:6,19
  269:15 326:11
**official** 321:13
  322:25
**oh** 246:17 259:22
  268:18 279:7

330:19 345:4
  353:24 354:1
  365:18
**oil** 324:11,16
  348:18
**okay** 243:6 246:7
  260:16 262:24
  264:20 271:3,16
  272:7 274:17
  286:11 294:17
  302:2 307:24
  308:1 312:20,21
  312:25 316:6
  320:24 327:3
  329:6 330:19
  331:19,20 340:12
  344:6 347:5
  361:11 363:2
  365:15 369:23
  370:10 372:19,23
  375:9 376:19
  382:18
**old** 248:7
**once** 252:20
  256:14 292:8
  302:9
**ones** 310:21 315:5
**operated** 348:22
  348:25 349:6,7,20
  350:15
**operating** 349:24
**operator** 235:21
  237:1 238:25
  239:3 242:3
  271:18,22 306:22
  307:10,16 331:22
  332:1 376:16
  382:15 383:17
**opinion** 255:20
  300:20,22 301:3,9
  338:19

**opportunity**
302:11 310:5,20
343:23
**opposition** 359:23
**optics** 359:2
**optimal** 373:25
**oral** 243:4,5
**order** 232:14
285:25 286:7,23
290:7 351:2,7
370:19 382:8
**orders** 367:1
**organization**
272:10 273:7,14
273:15 274:9
275:6 276:23
277:24 329:1
343:13 363:6
**organizational**
343:19
**organize** 326:2
328:24
**organized** 326:18
326:20,23 327:11
327:12 328:7,8,18
**original** 236:24
243:14 338:9
**ottawa** 317:14
363:3
**outcome** 385:18
**outlined** 325:19
**outside** 246:23,25
335:22 338:19
342:22
**overall** 366:4
**overwhelmed**
296:6
**overwhelming**
338:23
**owner** 336:11

**p**
**p.m.** 232:16 237:2
256:23 257:14
271:19,20,21,23
293:2 307:11,14
307:15,17 331:22
331:24,25 332:1
355:24 356:15
383:18,23
**pachamama**
304:13
**page** 236:5,12
240:12 241:6
243:14,23 272:6
278:25 279:1,2
294:22 301:2,3,19
303:9,21 304:6
312:22 316:4,8
319:9 329:4 330:6
330:18 332:7
345:3,3 346:19
351:23 352:10
353:25 361:4
374:21 386:4
**pages** 249:4 306:1
306:6 337:8
**paid** 291:8 329:10
329:23 342:20
346:9,16 353:15
366:24 367:3
374:14 375:2
**painlessly** 281:23
**paper** 266:11
327:18 378:9
**paragraph** 254:21
254:24,25 255:7,8
255:13,15 256:3,5
256:8 272:6,8
294:22,23,25
295:2,4,7,12
297:23 299:11

301:10,19,22
302:21 303:10,13
303:21 304:7
312:22,23 313:25
319:10,10 329:5
330:4,6,18,22
332:7,10 339:7
354:14 358:22
362:19,23 363:1
363:18 364:3
369:20 370:11
373:23 374:21,23
375:12
**paragraphs** 254:1
254:3,9 303:4
**paraphrasing**
352:4 362:7
**park** 233:5 234:9
**part** 253:15,19
276:16 278:24
280:10 281:2
283:2 295:4,8,19
299:11 300:7
306:10 310:7,13
312:14 313:1
314:12 315:5
323:6 324:4,20
325:20 326:1
333:19 338:8,9
356:2 364:15
366:4,18 369:5
379:24 380:19,20
381:4,14
**participant** 323:24
**participated**
311:12
**participating**
282:20
**participation**
374:1

**particular** 256:6
280:24 283:3,5
324:20 330:1
**parties** 237:7
239:25 240:3,8,17
**partner** 246:15
279:12
**partners** 372:7
374:1
**parts** 275:9 300:21
325:13 368:10
**passages** 272:3
**passed** 378:6
**passionate** 323:21
**pat** 359:16
**path** 282:15
**patience** 332:5
382:21
**patiently** 382:23
**pay** 291:4 310:1
318:11 319:2
344:12,22 370:15
**paying** 281:13,15
281:16 291:6
329:25
**payment** 330:1
**payments** 303:18
345:13,15 346:4,5
374:18
**pen** 266:5,8,9,10
**penalty** 376:4
**pending** 317:6
**people** 275:17
276:3 288:23
297:21 298:23
308:16 310:4
323:20,22 325:8
325:10 342:15,20
346:8,9,15 355:24
366:12 368:19
380:7,11,17

**percent** 260:9
261:3,9 319:14
334:25
**percentage** 279:12
**perfectly** 367:25
**period** 240:5
270:12 278:20
284:3 297:2
309:15 377:16,22
378:1 385:16
**perjury** 376:4
**person** 248:7
263:25 269:11
278:9 294:14
296:16 302:5
310:18 322:9,14
339:19 385:18
**personally** 242:19
348:11,14 378:17
**perspective** 299:1
339:1
**petroecuador**
349:24
**petroecuador's**
350:5
**phil** 319:13 321:11
323:4
**phone** 269:3,5
297:1,4,7,13 302:6
302:8 310:19
311:2,5,7
**phrase** 298:5
**phrases** 266:1
**physically** 252:13
313:19
**pick** 237:4
**piece** 266:10 378:9
**pieces** 340:1
366:19
**pipes** 324:16

**pits** 324:9
**place** 237:7 245:17
252:18 264:3
299:3 311:22
368:17 385:8
**places** 366:12
**plaintiff** 232:7
234:14 237:11,12
**plaintiffs** 317:4
334:21 346:10,17
346:20 347:8,20
371:5
**planet** 325:12
**play** 287:8,21
**pleasant** 294:17
294:18
**please** 237:3,24
238:2,13 241:25
242:1,4 243:17
245:6 253:18
255:11 260:15
262:12 272:6
273:4,25 274:4
275:2 276:10
279:9 296:3
301:20 307:21
309:1,13 316:5
318:15,17 320:13
321:1,4 340:15
343:8 347:24
367:20 369:7
**pleasure** 380:5
**plenty** 241:1,5
**pocket** 291:5
**point** 246:17
256:10,25 263:21
265:2 266:14
268:3 287:15
322:20 328:19
334:19 342:21
347:13 382:11

**points** 376:13
**policy** 359:24
**pollution** 369:16
370:15
**portion** 329:14
**position** 288:22
298:24
**positive** 323:22
**possibility** 283:17
**possible** 281:24
282:14 283:1,7,15
283:19 286:8,10
**possibly** 289:14
302:11 337:20
359:3 382:9
**post** 234:8 249:12
**posted** 314:18
**potential** 305:12
305:23 309:18
310:3,8,20 311:8
317:1,22 318:7
326:15 327:6,13
327:22 328:9
382:6,11
**potentially** 279:24
286:6 336:5
**power** 309:13
312:5
**pr** 345:10 346:14
**practice** 347:13,14
**pray** 292:5 312:16
**prayer** 325:1
**prepare** 262:10
345:1,7 373:13,14
**prepared** 245:16
258:25 360:12
**preparing** 241:18
258:23
**present** 235:18
237:23 246:11
265:14 266:17

310:18,21,22
322:24 324:13
326:14 327:22
328:8 363:23
**presentation**
304:16
**presented** 275:4
276:15 277:3
305:1
**presenting** 327:13
**preservation**
286:7 351:1
**president** 322:16
322:25 323:4
**press** 301:14 313:1
313:4,5,10,19
314:9,13,15,19,25
315:1,4 316:11,19
316:23 319:2
**pressure** 279:21
284:5,8 295:15
298:9,16,19,21,25
299:4,4 355:8
368:1,17 372:9
374:2
**pretty** 250:22,23
274:12 307:25
331:15 344:17
360:21 373:2
**prevent** 312:6
**previous** 335:25
**previously** 242:6
385:8
**primary** 318:21
318:21 326:17
**print** 385:10
**prior** 251:2,7
270:12,13,23
286:22 290:19,25
293:23 328:20
342:5 357:24,24

360:7 378:24
379:6,16
**priority** 267:6
**private** 237:5
**privilege** 247:2
279:25
**privileged** 251:23
252:2
**privy** 333:13
**pro** 235:8
**probably** 241:1
253:13 254:6
257:8 259:23
271:14 281:19
307:25 316:1,2
342:14 363:5
**problem** 365:18
**proceed** 239:21
240:4,4 241:1
242:1,1 263:14
307:22
**proceeding** 238:2
238:3 239:9,24
240:19 241:15
346:17 371:5
**proceedings** 335:2
346:20 347:8,20
**process** 330:12,25
331:4 335:6
336:14,18 338:23
353:3 372:7
379:24
**processing** 325:14
**produce** 282:8
303:19
**produced** 282:8,8
303:19 328:22
**product** 247:1,4
279:24 280:1
300:20,22 301:3,7
301:9 383:5,6

**production** 242:7
282:6
**productive** 368:25
**productively**
325:18
**professional**
319:15 326:15
**professor** 279:6,10
279:21 280:25
281:4
**project** 305:7
**projected** 346:5
**projects** 357:18
**promise** 371:8
**promises** 342:12
**promptly** 383:4,8
**pronounce** 248:6
**proper** 239:21
305:20
**properly** 262:11
**proposal** 359:24
360:3
**protect** 284:24
308:18
**protected** 284:13
**protection** 383:6
**protective** 232:14
285:25 286:23
351:7
**protesting** 300:20
**protocol** 362:8,13
363:7
**provide** 242:16,18
**provided** 327:17
385:15
**providing** 371:16
**proxy** 302:12
358:20
**public** 286:14,17
311:19 315:7
347:1,2 368:16

385:5 386:25
**publicize** 315:8
**publicly** 337:1
**pulling** 288:23
**purchased** 349:2
**pure** 366:5
**purpose** 264:15
360:14 362:12,20
362:22 366:1,15
**purposes** 344:21
**pursuant** 232:14
330:14
**pursue** 334:22
335:20
**push** 267:13
**put** 240:16 251:19
253:2 258:20
263:12 269:1
273:20 274:22
276:2 277:16,17
279:17,21 280:7,8
280:9,21,24 281:2
281:6 295:15
298:2,6,12,15,24
299:4 303:5,6
309:16 313:22
314:5,7 316:16
319:23 326:5
327:5 329:17
331:16 334:2
336:17 337:17
342:11 348:14
351:7 352:3
360:18 364:14
372:9 374:2,11
378:16
**puts** 314:25
**putting** 277:15,20
279:20 302:13

**q**

**q&a** 250:20
**question** 244:12
244:14 245:5,10
251:15,17,19
255:23,23 260:14
260:16,18 261:19
262:6,13 272:19
273:4,13,25 274:1
275:2,25 276:10
277:19 279:9
296:3 303:11
318:15 320:13
326:22 328:4
331:8 336:22
339:11 340:9,15
340:17,18 341:20
343:8,19 344:10
365:2,10,23
379:12 380:4,25
381:10,21
**questioned** 312:23
340:6 341:12
342:4
**questioning**
263:10,12 294:24
341:16 342:8
343:6 367:22
368:24 381:8
382:1
**questions** 240:11
244:11 250:11,16
250:19,20,21,23
263:14 270:16
294:19 302:1
307:25 321:5
327:24 331:19
332:4 340:13
342:2,2 344:4
347:4,23 376:11
378:20 380:3

382:21,23 383:14
**quick** 279:8
**quickly** 281:22
282:14 307:4
353:10
**quotes** 297:25
298:5,9,15
**quoting** 358:6

**r**

**r** 238:22,22,23,23
385:1
**rainforest** 370:14
**raise** 310:1 344:11
344:21
**raised** 279:14
**raising** 297:20
**rankin** 235:10,11
235:15 238:9,9,20
239:1,1 246:9
247:8 249:12,15
249:22 251:8,11
251:16 252:3,10
252:12 262:3
280:3 282:2 294:6
374:21,24 375:12
381:6,20
**rate** 314:7
**rblume** 233:15
**rdr** 232:23 385:25
**reached** 288:16
310:8,10,11
**reaching** 310:12
367:4
**read** 252:17,18,19
255:5 256:11
257:23 265:12
268:13 274:3,4,5
279:8 283:10,11
306:6,12 318:18
318:19 337:3,6
350:7,11,18

356:23 362:24
365:11 384:3
**reading** 258:3,6
265:16 352:16
**ready** 326:14
**real** 279:8
**realize** 354:2
**really** 286:25
294:11 297:15
305:4 309:16
320:18,24 323:3,9
323:23 325:8
333:10 339:5
342:14 367:14
379:1 382:22
**realtime** 232:24
385:2,3,4
**rearrange** 271:10
**reason** 242:15
245:5 254:14
299:21 309:5
380:21 381:4,14
386:4
**reasons** 342:15,15
346:6
**recall** 245:18
254:12 256:4
257:9,12 258:4
305:3,21 309:22
314:21 315:25
316:22 322:11,14
344:13 371:25
378:7
**receive** 252:7
265:6 282:18
285:21 306:10
359:13 377:18
**received** 252:6,12
257:22 260:6
262:15 265:2
280:10,11 281:8

281:11,13,17
295:5,9 308:15
319:20 320:14
325:12 352:3
370:22 378:5
**recess** 271:20
307:14 331:24
**recognize** 248:4
336:10
**recognized** 334:4
**recollection**
247:12 254:10
256:8 316:21
353:12 358:13
**recommend**
253:16 258:1
**recommendations**
266:7
**recommended**
257:24 258:2
**reconcile** 348:13
**reconvene** 271:12
**record** 237:2,8,25
243:12 244:15
248:10 249:10,13
271:17,19,23
274:5 294:13
300:17 307:13,17
307:20 318:19
331:23 332:2
341:11 347:1,2
350:5 372:17
382:20 383:18,21
384:6 385:12
**recorded** 237:10
**recording** 237:6
**records** 377:4,18
377:23 378:3,18
**recovery** 309:6
**recross** 236:9
376:12,22

**redirect** 236:8
244:12 344:4,7
**redirected** 376:13
**redirecting** 368:6
**reduced** 385:10
**refamiliarize**
357:3
**refer** 278:24
312:18 344:16
360:10 370:24
**reference** 255:2,13
257:20 265:10
268:3,11 269:23
286:4 301:22
306:4
**referenced** 311:23
330:4 382:8
**references** 285:7
**referencing**
330:21
**referred** 324:12
**referring** 285:6
305:25 306:12
330:3 352:13
367:17
**refresh** 358:13
**refusal** 261:11
**regard** 251:9
255:13 256:3
260:5 269:25
277:11,19 338:24
368:21 377:19
378:8,20 382:24
**regarding** 323:1
331:13 368:6
377:24 378:3
**regardless** 336:16
**regards** 294:19
305:13 331:10
**region** 349:25

registered 385:3
reimbursement
  329:16,22
related 255:1,1,4
  278:19 288:5
  299:23 303:5,20
  316:23 317:9,11
  368:14
relates 276:17
  280:25 355:18
  367:22
relations 315:8
relationship 331:9
  357:24
release 313:4,10
  313:19
releases 301:14
  313:1,5 314:10,13
  314:16,19,25
  315:1,4 316:11,19
  316:23 319:3
relevant 263:13
relied 354:21
remember 247:25
  248:2,4,18,20
  250:5 254:4,20,23
  256:10,17 265:21
  265:25 285:24
  287:11 302:10
  304:3,15 311:5
  315:3,21 320:9
  322:7 323:8,13
  324:19,21,22,25
  325:4 326:6 333:4
  333:4,9,9,12
  340:21 348:3,12
  371:23 374:11,15
remind 304:15
remote 249:10
remotely 237:24

removed 300:22
rented 264:15
reorganized 307:3
  327:6
repeat 365:9
repeated 318:16
repeating 276:7
rephrase 260:14
  261:21,23 272:18
  276:11,21 279:16
  280:4 282:17
  291:22 305:20
  318:3 320:3 327:3
  328:3 334:18
  337:13 340:19
  381:3,10
report 315:22,23
reported 385:9
reporter 232:23
  236:24 237:21
  242:4,8 243:5,18
  274:2,3 318:17
  331:6 365:12,13
  365:16 385:3,4,15
  385:22
reports 301:15
represent 346:9
  346:16,19 347:7
  370:19 371:4
representing
  237:20,22 346:3
represents 347:19
  351:17 363:4
reproduction
  385:20
republic 350:14
reputation 312:11
  312:15
request 249:11,15
requested 274:5
  318:19 385:14

required 282:8
  322:13
reschedule 239:25
  240:8
rescheduling
  240:23
research 232:17
  237:17 264:7,8,12
  264:13 304:23
  356:16 358:14
resending 364:4
reserve 240:7
  244:11
residents 325:5
resolution 358:10
resolutions 356:17
  357:1 358:16
  366:10
respect 330:13
respects 241:17
respond 241:13
response 240:14
  285:25 286:24,25
  344:10 347:23
  351:6
responsibility
  305:7 336:11
responsibly
  281:23
restate 274:1
result 239:21
  284:14
resumed 271:21
  307:15 331:25
retained 236:24
  383:20
return 319:15
returned 236:25
reveals 364:6
review 258:10
  385:13

reviewed 263:24
reviewing 253:14
revised 257:2
  267:22
rex 345:22 364:5
  370:25
rico 255:2 304:1,8
  304:20,25 305:4
  332:14 333:19
  335:19 336:25
  337:10,15,17
  350:8 353:13
  354:15 355:1
  363:24 368:15
  379:20
right 240:7 244:11
  244:12 259:1
  264:3 281:20
  283:18 285:17
  293:10 298:3
  299:22 301:11,16
  304:11 308:5
  309:9,21 310:2
  318:25 319:24
  322:4 326:8 331:1
  333:16 334:22
  335:20 337:7
  338:6 340:22
  344:21 346:15
  352:17 353:23
  355:18 358:1
  359:10 360:16
  365:21 366:16
  369:21 372:21
  374:19 377:11
  383:13
rights 362:14
  363:11
risks 336:12
rizack 378:8

**rob** 238:7 245:14
246:2 247:18,21
247:21 266:16,25
267:8,12 268:25
269:6 292:17,21
293:11 300:18
**robert** 233:11
**role** 368:21
**romero** 235:20
238:10,10,21,23
**room** 237:23
264:15 265:9
292:17
**rosa** 324:23
**roughly** 296:23
**rufolo** 234:3
238:15,17,19
**ruled** 334:21
**run** 353:10

**s**

**s** 238:22 386:4
**sandbox** 287:8
**sat** 241:12 245:13
313:18
**satisfactorily**
242:6
**saw** 248:3,4 249:5
249:7,20 263:22
267:23 315:4
324:9,14 339:19
348:5,8,18 350:24
**saying** 316:21
318:21 325:1
**says** 251:2 279:4
280:15 295:13
299:12 313:1,2
316:9 319:12,22
320:15 321:10
329:7 332:10
352:20 354:14
356:2,15 357:20

358:5,5,6,23 359:2
359:7,22 361:21
361:25 362:12
363:17 367:10
370:1,10,11
371:18 373:9,19
373:23
**scared** 285:17,18
380:21 381:5,7
**scene** 356:17,22
358:15
**schedule** 271:11
**scheduled** 303:14
**scheduling** 239:20
**scope** 246:24
247:1 342:23
367:22 368:12,12
379:9
**scrutiny** 347:15
**sdonziger** 235:7
**se** 235:8
**searched** 311:23
**second** 247:16
256:3 257:21,22
258:3,6,12 259:11
259:17,18 260:5,7
260:20 261:16
262:16 263:18
293:9,10 319:12
330:21 339:7
345:3 358:22
361:4 362:23
363:18 369:20
370:11 372:5,5
373:22
**see** 250:4 269:1
272:11 276:19
279:2,7 285:15
294:25 295:16
297:24 298:10,23
299:15 301:21,24

303:8 306:2 313:7
315:5,22 316:13
319:10,17 324:8
328:17 329:7,11
330:6,16,20,23
332:8,9,16 338:7
339:10 352:24
354:7,17,23
355:11,14,21,24
356:4,12,19
357:22 358:11,25
359:5,15,19 360:1
360:25 361:6,13
361:23 362:4,10
362:16,22 363:12
363:18 364:1,9
367:8 369:13,18
370:16 371:11,21
372:5,11 373:7,16
373:18 374:4,8
378:12 383:5
**seeing** 285:24
294:14 322:2
324:1
**seek** 240:9
**seeking** 286:22
316:9 374:1
**seen** 258:16
311:22 322:3
326:12 359:4
**seize** 366:15
**sell** 311:15
**send** 256:15
286:11 306:15
352:21 372:20,21
383:2,3
**sending** 305:11
373:18
**sense** 287:2 323:21
**sensitive** 237:4

**sent** 239:10,13
252:15 256:14,17
256:24 257:1
260:2,19 263:18
286:22 308:13
329:21 351:11
352:15 361:20
363:21 367:11,16
**sentence** 276:12
276:16 277:11,20
279:1,3,5,8,16,18
280:7,8,9,14,25
295:13,19 297:22
298:18 299:12
301:2,10,24 316:8
319:12 329:7
332:9 339:7
362:24,25 372:6
**sentences** 253:17
253:20,22,25
265:23 266:2
280:20 301:8
330:22
**september** 232:16
237:3 245:23,24
246:3 247:13,17
248:15 249:25
250:10 251:3
256:22 257:15
270:13 271:2,3
323:9 367:7
369:12 386:2
**served** 288:11,25
**server** 361:9
**service** 288:18
**services** 319:15
**set** 289:3 385:9
**setting** 355:19
**settle** 298:25 374:2
**settlement** 366:25

**seven** 253:24
296:15,22 306:5
**sgklaw.com**
234:11,12,13
**share** 315:6
359:23
**shared** 266:16
313:13 379:22
**shareholder** 357:9
366:10
**shareholders**
358:19 360:12
**sharing** 342:7
361:16
**sheet** 386:1
**short** 240:5
**show** 313:23
324:11 348:10,11
**sic** 266:22 291:20
**sides** 283:14
**sign** 243:7,9
270:18 280:14
282:6,10 292:7,8
321:15 322:9
**signature** 243:14
243:22 322:12
385:24
**signed** 244:4
255:20,25 259:5
270:4,6 279:12
281:19 314:24
320:17 322:1
362:7 363:7 369:4
371:19 375:24
376:4 385:23
**significant** 253:3
329:14
**signing** 281:10
293:17 304:3
**signs** 322:14

**silverstein** 234:5
238:16,16
**similarly** 319:12
**simon** 301:23
302:2,3,20 303:2
345:15
**simple** 326:20
**singled** 367:25
**sister** 302:13,16
**sit** 289:11 337:23
376:8
**site** 324:22,25
**sites** 349:16,19,25
**sitting** 244:6
264:25 382:23
**situation** 283:5,22
304:17 336:5
**six** 253:24 265:22
**skip** 373:1
**smiling** 325:25
**smith** 232:23
237:22 385:2,25
**soliciting** 354:10
**soon** 252:19
383:10
**sorry** 238:13
249:9,20 256:20
257:10 259:18
261:23 264:2,5,22
274:3 287:22
303:9,11 304:6
327:2 330:19
335:8 339:4,6
343:1 353:23,24
354:1 365:1
372:13 381:21
**sort** 256:7 284:2
284:19 300:19
335:12 379:6
**sound** 352:17

**southern** 232:2
237:14
**spaces** 289:15
366:12
**spanish** 372:15,18
**speak** 302:7
**speaker** 302:14
**speaking** 245:2
**specialist** 237:20
**specific** 301:16
314:4 316:20,22
348:8 379:23
**specifically** 254:12
254:22 258:4
287:10 293:14
301:8 309:22
333:8 337:23
342:8 378:7
379:20
**speculation**
279:24 300:1
320:8 332:21
338:12 341:23
**spell** 238:21
**spelling** 253:11
**spend** 290:11
295:22 313:9
**spending** 291:1,1
**spent** 253:13
278:9 290:14,15
295:13 297:16
313:3 330:11
375:15
**spirit** 338:24
**spoke** 267:9 302:5
325:6
**spoken** 351:17
**sponsor** 358:9
**sprung** 240:13
**spurts** 290:17

**start** 239:14,23
248:16 259:22
284:8,10,20
313:20 353:2
**started** 280:22
291:9 355:5
378:25
**starting** 283:23
363:18
**starts** 279:5 361:3
361:3
**state** 237:24 238:3
239:6 272:8
300:17 302:12
326:16 336:21
347:4,5 367:19
**stated** 301:14
320:10 334:6
350:7
**statement** 272:16
273:11 274:13,22
275:4,7 277:4,22
359:23
**statements** 320:11
384:7
**states** 232:1
237:14 334:4
**stating** 239:12
**status** 304:18
305:23
**stenographically**
385:9
**stern** 234:3,6
238:13,14,14,15
238:17,18
**steve** 358:7
**steven** 232:9 235:3
237:12 239:5
272:9 273:14
275:5 277:23
279:14 295:13

299:13,20 302:22
304:9 313:3,3
316:10,18 319:13
319:22 320:15
321:10,16 329:10
330:10 332:11
343:2 345:8
348:10 353:19
355:7 357:17
371:19 386:2
**steven's** 330:14
357:17
**sticky** 324:11
**stipend** 345:13,15
**stood** 328:18
**stop** 245:6 259:22
321:1 367:4
**stopped** 324:17
**stories** 333:13
**strategic** 372:8
**strategies** 295:15
299:3 355:8
365:21 366:7,17
**strategy** 315:8
356:3 360:17,19
363:15 364:15,19
366:4,19,20
**streamline** 242:20
346:5
**street** 232:18
233:12 235:4,12
237:18 264:11
302:13
**strictly** 344:22
**string** 270:16
355:16
**strong** 358:7
**struck** 255:5
**structure** 373:24
**stuck** 283:15
328:10

**stuff** 299:2 324:8
368:23 369:1,1
**subject** 254:23
256:4 341:15,18
343:5 369:15
371:18
**submission** 239:22
**submitted** 286:1,4
**submitting** 241:22
**subpoena** 283:23
284:1,4 288:11,18
288:25 289:11
311:19 312:14
**subpoenaed** 308:8
308:16 325:17
336:1 342:5 381:5
381:15
**subpoenaing** 289:19 290:1
292:1
**subscribe** 384:5
**subscribed** 386:22
**subsequent** 263:22
310:16 353:25
**substance** 263:4
324:12
**substantiate** 348:15 378:16
**substantive** 251:24
**suck** 353:5
**sue** 282:25 283:18
378:21 380:7
**sued** 333:16,18
336:1 378:23
379:1,2,18 380:11
380:17,20 381:4
381:13,16 382:4
**suffering** 242:25
**sufficient** 240:10

**suggest** 252:21
265:17,23 313:22
**suggested** 253:19
258:5,14 259:19
260:18,21 261:17
261:20,25 262:15
266:3 267:1,17
279:17 292:11
**suggestion** 372:3
**suggestions** 285:21
**suing** 333:6
**suite** 234:7 235:4
**sullivan** 232:15
236:3,12 237:10
239:2 240:10,25
241:18 242:5,12
243:13,19,22
244:24 249:19
252:6 263:17
291:21 307:19
344:9 382:20
383:19 384:3,12
385:7 386:3,21
**sullivan's** 368:11
**sultan** 235:10
**sultan.com** 235:15
**summarized** 305:23
**summary** 327:15
**summer** 341:4
**super** 369:4
**support** 262:9
302:15 356:17,25
358:15 366:11,13
366:13 372:2
**supposed** 239:14
251:14 348:6
**supreme** 334:20
354:20

**sure** 243:4 245:1
249:2 255:17
267:3 271:13
277:16 331:17
347:9 353:23
356:23 381:7
**surface** 324:13
**surrounding** 324:16
**swap** 306:24 307:2
**swear** 242:4
**sworn** 242:8
270:18 385:8
386:22
**synthesizing** 325:14
**system** 283:10
286:16,18 287:25
332:13
**systems** 232:24
385:4

**t**

**t** 385:1,1
**tabuns** 357:11
**taint** 363:24
**take** 237:7 239:17
240:21,22 243:5
245:17 248:24
259:21 271:9
307:1 308:22
309:11,12 327:6
327:10 331:16
335:6 352:7 353:7
355:17 357:2
360:21 376:14
**takeaways** 297:19
**taken** 237:11
332:25 347:17
349:17 385:8
**takes** 336:17

talk 256:13 288:17
297:13 318:4
talked 297:1,4,7
302:10 355:7
talking 283:8
294:7 301:10
311:17 324:5 325:4
talks 358:6 362:6
team 290:5 291:1
300:8 305:22
326:24 359:3
382:24
technically 379:2
tedious 270:9
telephone 234:4,5
234:6 235:3,20
245:2
tell 254:3 265:20
278:20 293:12
316:10,18 330:9
339:23 349:3
telling 263:9
332:13 333:1,5,10
term 294:11,12
terms 324:5,6
test 320:10 322:6
testified 242:9
260:17 262:14
263:1,17 269:18
270:5 274:14
277:12 284:9
292:16 344:9
347:22 348:17
350:21,24 365:20
375:24 376:25
378:15 381:25
382:3
testify 242:23
243:1 368:19
testifying 286:24
342:24

testimony 241:13
241:19,22 242:16
242:18 244:15,16
261:18 262:18
263:3,4 272:23
273:23 276:6,8
294:4 295:25
300:1 318:1,13
320:22 328:2
341:11 343:17
380:14,24 383:19
385:12
texaco 348:23
349:2,6,20 350:15
texas 326:16
texpet 349:5
350:15
text 352:10,13
thank 238:25
244:19,21 248:13
263:15 264:20
270:8 271:16,25
307:5,10,22 308:2
321:9 325:24
331:21 332:5
369:9 376:21
382:20 383:15
thanks 358:6
thing 287:17,18,18
299:6 358:17
378:5
things 260:25
283:9 287:14
294:20 295:11
312:19 325:21,23
327:16 328:18
333:14 335:4
336:16 364:11
365:21
think 240:25
247:13 249:2

250:6 251:16,22
252:2 265:25
266:22 270:4
274:3 286:7,21
288:24 289:12,15
296:14 297:7
298:15 299:1,8,8
311:11 312:13
314:5 320:23
322:20 323:17
326:21 327:10
328:21 329:21
337:11,24,24
338:22 340:22
344:18 352:2
353:16 355:3
358:17 361:16
365:5,13 371:2
372:25 373:1
374:18 375:22
376:10 379:3
382:25 383:8,14
thinking 293:9
third 248:7 265:11
265:16,24 266:12
266:18,21 267:18
329:9 330:21
354:14 355:13
thought 287:3,4
287:12 289:2
310:3 328:16
338:3
thousand 375:11
threat 347:16
351:25 352:6
353:7
threatened 350:22
351:18,23 378:21
threatening
351:12

three 297:9 311:11
311:13 313:5
314:13,19,20
341:19 370:1,12
375:4,10
thumbed 378:12
thursday 270:22
308:14
time 238:3 239:23
240:5,6,10 241:1,5
241:8,8,10 246:18
248:15 249:24
250:24,25 253:13
256:25 263:21
264:1 265:6 267:8
267:21 268:1
270:12,12,15
271:18,22 272:9
274:8 275:5
277:23 278:6,9,21
284:3 289:11
290:14,15,25
291:9 293:21
295:14,23 296:16
297:2,16 307:11
307:16 309:14,15
313:13 314:7,18
319:16 323:18
325:9 326:14
327:23 328:18
329:13 332:11
335:6 336:17,17
339:8,12 342:5
348:23 349:10
353:2 357:17
365:4 368:25
375:6 376:20
377:9,16,20,22
378:1,24
timeline 349:14

CONFIDENTIAL

times 256:11
293:23 296:15,22
297:3,5,6,9 302:7
316:1 329:17
332:13 333:1
tissue 308:20
today 237:16,21
239:14,23,24
242:16,23 243:2
243:10 244:6,17
245:20 246:8,12
259:5 262:12
263:3 284:4
289:12 291:9,15
292:7,12,18,20,23
292:24 293:2,3,4
293:12 336:7
337:23 338:15
today's 383:18
told 239:16 248:5
264:13 304:10,24
308:17 309:17
319:1 329:13,23
334:17 335:25
339:12,18 342:19
343:9,11 348:1
376:25
tomaino 359:16
tone 287:13
tony 308:4,8,11
311:3,14 322:4
343:23 361:11
tony's 309:3
322:11
top 279:1 301:2,2
316:3,8 357:5,6
358:19 359:22
topic 256:8
total 291:7 329:8
344:19

totality 295:22
totally 308:2
381:19
touch 352:3
382:25
touching 374:10
tough 333:10
336:5
toured 324:7
towns 324:16
toxic 364:5
track 252:23
253:1,15 256:14
257:1 259:19
260:18 266:4
285:15
tracked 261:13
tracking 252:25
train 340:5 367:4
transcript 384:4,6
385:14,19
transcription
385:11
translates 351:3
translation 372:16
372:22
transmittal 373:17
transparency
342:14 343:4
366:20
traveled 317:11
traveling 297:19
tremendous
278:19
trial 354:22
triangle 339:2
tried 284:24
380:11
trip 304:13 323:13
323:14,16,18,20
324:3,6,20 348:17

349:17
true 243:25 244:3
244:7 255:22
263:2 274:8 275:5
275:7 277:21,23
281:4 285:10
287:14 320:11
322:19 370:22
376:1,8 385:11
truthful 242:16
truthfully 242:23
243:1
try 255:12 262:8
271:10 307:3
311:15 312:19
334:22 363:24
376:20 380:4
381:3,20
trying 284:13
289:8 296:5
309:25 321:3
338:3 339:3,20,24
351:6 362:25
365:3
tuesday 246:4
250:7,8 270:21
turn 272:6 316:4
turned 290:20
turnpike 234:7
two 245:12,19,25
246:4 250:6 254:5
254:7,9 256:12,13
259:24 268:18,19
268:22 269:18
275:9 278:12
311:8 314:22
324:9 331:16,19
362:1 369:3
383:20
twofold 298:19

type 325:15
types 287:24
typos 253:11

u

u.s. 333:23 335:23
354:20,22 363:21
ultimate 366:15
366:23,24
um 326:9 345:2
360:9 362:17
unaware 279:5,10
280:15,17,22
281:4 346:23
unclear 340:18
underlying 317:5
334:11
understand
242:13 245:4,5,7
261:18 282:4
289:8,16 305:6
337:20 340:1,9
342:19 356:21
357:8 358:21
361:15 364:11
367:23 368:13
370:24 371:15
376:24
understandable
287:9
understanding
250:9 291:24
296:7 303:13
304:8 306:8
309:25 325:14
327:23 332:12
333:1 334:8,24
335:1,22 346:18
349:5 351:5
357:13 360:2
364:25 365:24
366:2,3,18 367:11

379:25
**understood**
  286:13 315:13
  317:17,20 329:20
  344:20 346:3
  349:4 351:9 352:6
  357:15 365:20
  367:5 370:2
**unfair** 287:5
  288:24
**unflattering** 285:8
  285:9
**unit** 237:9 307:12
  307:18
**united** 232:1
  237:13 334:4
**units** 383:20
**university** 279:11
  281:5 355:20
**unknown** 289:23
  293:8
**unknowns** 382:7
**unreimbursed**
  329:15 348:2,7
  377:1,4,19,24
  378:3,10
**unthinkable** 364:6
**use** 241:9 255:3
  266:9 300:19,22
  313:15 334:9,9
  368:1,6,25
**usually** 290:21

**v**

**v** 232:8 386:2
**validate** 315:16
**validating** 349:22
  360:6
**value** 310:4
  328:16
**van** 356:6

**vancouver** 358:8
**varied** 314:23
**various** 357:18
  368:4
**verbally** 327:18
**verification** 266:7
**verified** 247:14
**verify** 306:19
**veritext** 237:20,22
  383:21
**video** 232:15
  235:21 237:1,6,9
  237:20 238:25
  239:3 242:3
  271:18,22 306:22
  307:10,16 331:22
  332:1 376:16
  382:15 383:17
**videographer**
  237:21 306:23
  307:2 376:17
**view** 255:25
  305:14 306:17
  315:8
**villagers** 370:14
**violated** 351:1
  368:15
**violating** 382:8
**violations** 362:14
  363:10
**visiting** 324:22
**voice** 255:18 267:5
  285:20
**volume** 232:12
**voting** 302:12
**vs** 237:12

**w**

**w** 235:11
**waived** 383:7
**wallop** 369:16

**want** 251:21
  260:13 263:11
  267:10 279:21
  287:21 289:4
  294:19 300:18
  301:6 302:1
  308:22 309:11
  312:6,6,8,9,12
  323:14 336:16,20
  344:16 347:4
  360:10 368:8
  372:16 375:23
  380:3 382:19
**wanted** 239:6
  253:12 260:7,10
  260:11,25 267:3
  267:14 270:18
  271:6 277:4 281:6
  282:13 289:3
  308:3 331:16
  338:6 341:20
  359:23 373:16
**wanting** 298:24
**watch** 268:2
**watson** 356:7
**way** 244:25 251:16
  254:17 255:12
  266:4 284:20
  286:19,25 303:15
  315:15 317:17
  318:10,21 326:8
  326:15 338:16
  349:20,22 356:16
  360:6 366:22
  380:2
**ways** 292:4
**we've** 372:15
**website** 306:16
  315:2,13,18,25
**wednesday** 250:6
  250:8 256:18,19

256:21
**week** 240:1,1,16
  240:17 246:4
  270:19 297:9,12
  308:15 361:12
  363:3 382:25
**weeks** 241:19
  245:12,19,25
  246:4 314:20
**went** 314:15
  375:16 378:13
**west** 235:4
**weyler** 345:22
  364:5,5 370:25
**whatnot** 314:10
**wherewithal**
  337:19
**whichever** 314:18
**whispering** 237:4
**win** 360:15 364:23
**wind** 292:12,22
**winning** 365:25
**wire** 311:23
  314:16
**witness** 235:16
  236:3 239:2 242:4
  243:16 244:11
  247:12 262:5,19
  262:25 270:22
  274:6 280:5,17
  294:10 300:2
  305:17 308:21,24
  309:1 315:12
  318:20 319:6
  320:8 322:19
  323:25 331:20
  341:2 343:18
  346:23 349:14
  365:9 372:19
  374:22 375:10,13
  376:11 379:13

380:16,25 381:19
**witness's** 236:13
  262:18 272:23
  273:23 276:6
  294:4 295:25
  300:1 318:1,13
  320:21 328:2
  338:19 343:17
  380:14,24
**woman** 302:12,17
  322:20
**word** 252:25 255:3
  276:19 298:9,16
  299:5,9 320:9
  321:22 328:11
  347:17 368:2
  381:7,11
**words** 253:12
  255:18,19,21,24
  256:1 260:21
  267:4 274:14
  276:2 277:15,17
  277:21 297:23,24
  298:20 299:17
  302:23 304:4
  313:23 314:4,24
  316:15 319:19,23
  320:4 321:16
  332:25 333:3
  334:2,8,9 338:5,10
  338:10 368:1,4,7
**work** 246:14 247:1
  247:3 278:1
  279:22,24 280:1
  299:9,13,20 300:3
  300:4,20,22 301:3
  301:7,9 302:22
  303:2 310:7
  318:25 323:14
  325:5 336:4,13
  342:13,17,18

348:9 353:3 357:8
  357:14,16,17,21
  357:24 358:2
  378:18 383:5,6
**worked** 278:3,15
  297:8 325:18
  339:13 377:10
**working** 263:8
  278:21 296:16,19
  297:20 299:14,23
  300:12,13 309:15
  334:20 343:14
  344:11 358:2
  377:17 378:25
**works** 262:9
**world** 325:16
  363:7
**worried** 282:24
  289:5
**worry** 288:19
  340:11
**wrap** 307:3 312:19
**write** 259:4 277:8
  277:9,12 295:2,3
  295:18,19 300:25
  320:16 358:20
  361:25 370:21
**writes** 364:5
**writing** 313:10
**written** 255:17
  271:7 276:12
  332:18
**wrong** 298:23
  347:24
**wrongdoing** 286:7
**wrote** 248:25
  295:7 313:19
  319:20 340:12

| x |
| --- |
| **x** 232:5,11 236:1 |

| y |
| --- |

**yanza** 345:20
**year** 275:14 308:9
  309:17 317:15
  323:9 341:4 342:6
  352:17 358:8
**years** 278:16
  313:5 314:13,19
  317:21 377:11
**yesterday** 257:5
  257:10,14
**york** 232:2 233:6
  235:5 237:15,20
  269:15 293:7
  383:21

| z |
| --- |

**zero** 275:8 281:13
  281:17 350:6
**zevin** 358:24 360:7
**zevin.com** 359:16

# Federal Rules of Civil Procedure

## Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

# EXHIBIT 43

**CWP ASSOCIATES**                                                          1001

   Simon Billenness                                          1/12/2018
                                                                        3,622.21




   CWP Associates        JAN 8, 2018 invoice                           3,622.21

**CWP ASSOCIATES**                                                          1001

   Simon Billenness                                          1/12/2018
                                                                        3,622.21




   CWP Associates        JAN 8, 2018 invoice                           3,622.21

MKS-0006404

# INVOICE

*Shareholder advocacy*

**FROM:**

Simon Billenness
President, CSR Strategy Group

January 8, 2018

**Work To Be Performed: January-April, 2018**

Organize further shareholder pressure on Chevron through:

- Help defend shareholder resolutions from any challenges by Chevron at the Securities & Exchange Commission (SEC)

- Help organize press outreach by shareholders on the filing of the resolutions

- Coordinate lobbying of proxy advisory firms (ISS and Glass Lewis)

- Organize filing of a shareholder SEC complaint

- Organize an investor letter to new Chevron CEO

---

**For Expenses for Attending the Chevron AGM in Midland, Texas: May 2017 = $1,122.21.**

**For Consulting Services:**

Consulting services for the months of January-April, 2018 = $5,000

*Pay Jan 11, 2018    Ck # 1001    KB*

**Payment Schedule:**

$3,622.21: immediately upon receipt of this invoice
$2,500: March 1st, 2018   —Set up

---

**Payment Instructions:**

**Via check,** payable to Simon Billenness, to: 1403 F Street NE, Washington, DC 20002

**Via Wire:**

Receiving Bank: Chase Bank
Receiving Bank Address: 55 Water Street, New York, NY 10003
SWIFT CODE: CHASUS33

Beneficiary Bank: Amalgamated Bank
Beneficiary Bank Address: 275 7th Avenue, New York, NY 10001
ABA/Routing: ▮▮3379

Beneficiary Name: Ann Corbett and Simon Billenness
Beneficary Account #: ▮▮5393
Beneficiary Address: 1403 F Street NE, Washington, DC 20002

# EXHIBIT 44

April 30, 2018

Michael K. Wirth
Chairman of the Board and CEO
Chevron Corporation
6001 Bollinger Canyon Road
San Ramon, CA 94583-2324

Re:     Investor Letter on Risks from Ecuador Litigation

Dear Mr. Wirth:

We congratulate you on your promotion this year to the role of Chairman of the Board and CEO of Chevron.

As shareholders that collectively represent $109.44 billion in assets under management, we have a long history of successful dialogue with the Company.  We wish to continue that tradition by inviting you and your new management team to an important conversation regarding the long-term interests of Chevron, its shareholders, and other key stakeholders.

One item of particular concern on our agenda is the risk posed by long-standing litigation over the acquired liability of Texaco pollution in the Ecuadorian Amazon.  To further frame this aspect of our proposed dialogue, we have questions regarding the adequacy of management's disclosure of the risk to shareholders from the Ecuador litigation and whether our Company could benefit from exploring alternative approaches that might better protect future investor value.

We note that in Canada, Ecuadorian plaintiff communities have won three consecutive appellate court decisions in their attempt to attach Company assets to satisfy a $12 billion[1] judgment against Chevron.  Canada's courts are currently considering[2] whether to allow seizure of assets held by a wholly-owned Chevron subsidiary in Canada, an action which poses substantial risk to shareholders.

When Chevron acquired Texaco in 2001, it inherited significant legal, financial, and reputational liabilities stemming from pollution of the water and lands of communities in the Ecuadorian Amazon.  As you know, for twenty years the affected communities brought suit against Texaco (and subsequently Chevron), and the case reached its conclusion in November 2013 when Ecuador's highest court confirmed a $9.5 billion[1] judgment against Chevron.

*continued on next page...*

---

[1]  $9.5 billion original judgment, now $12 billion including interest.
[2]  See, for example: "Court sets aside cash order in Ecuadorians' appeal of Chevron decision: 'Impractical' to force plaintiffs to prove they don't have the money: appeals court", CBC News, Oct. 31 2017, http://www.cbc.ca/news/indigenous/court-appeals-ecuadorians-cheveron-cash-1.4381020

Instead of negotiating an expedient, fair, and comprehensive settlement with the affected communities in Ecuador, Chevron management pursued a costly legal strategy that has continued for more than two decades. Along the way, it appears that management has made significant missteps, including when it moved the case from New York to Ecuador. In failing to negotiate a reasonable settlement prior to the Ecuadorian high court's ruling, Chevron's Board of Directors and management exposed the Company to a substantial financial liability and risk to its operations. Finally, as shareholders, we must note with grave concern that prior management harassed and subpoenaed Chevron shareholders who questioned the prudence of the Company's legal strategy around the Ecuadorian matter.

Chevron is on record, in the sworn statements of one of its officers, testifying that the Company is at risk of "irreparable injury to [its] business reputation and business relationships" from any potential enforcement of the Ecuadorian court judgment. Chevron is also on record that such an injury to the Company "would not be remediable by money damages."[3] Perhaps more concerning, Chevron's aggressive legal strategy and the deterioration of relations with affected communities in Ecuador threatens the Company's social license to operate in regions around the world where local authorities must routinely assess whether they wish to initiate or continue business dealings with Chevron.

Despite the appearance of significant liability and increasing risk with each of the Canadian lower court determinations, over time Chevron has not fully disclosed these risks in public filings or statements to shareholders. As a result, investors have petitioned the U.S. Securities and Exchange Commission to investigate whether Chevron may have violated securities law regarding potential misrepresentations or omissions of material information.

This has led shareholders to question whether the Company's leadership can properly manage the array of environmental and human rights challenges that it faces. In recent years, a significant and increasing number of shareholders have voted in support of corporate governance reforms designed to strengthen shareholder oversight of management. We note that a resolution that referenced management's mishandling of the Ecuador case and called for an independent board chair policy received the support of 39 percent of Chevron investors at the 2017 annual meeting. As a further indication of rising concern, this year investors submitted additional shareholder proposals that reference the Ecuador matter, which survived Company no-action requests and will appear in the 2018 proxy statement.

*continued on next page...*

---

[3] Declaration of Chevron Deputy Comptroller Rex Mitchell in support of Chevron Corporation Motion for a Preliminary Injunction, filed 2/5/11, p. 4.

Mr. Wirth, as your ascension to top leadership represents the beginning of a new era in Chevron management, we believe it would set the right tone for you to broaden the existing conversation by engaging directly in constructive dialogue with investors. Toward that end, we invite you to arrange a meeting with the shareholders signed below to address the following issues, as well as any you may like to add to the agenda:

- The adequacy of the disclosure of risk to the Company's business and its operations from a full or partial enforcement of the $12 billion[4] Ecuador judgment. In particular, we would be grateful for an account of how Chevron reconciles its statements citing the possibility of "irreparable damage" to its business with the Company's past public statements to shareholders, which did not reference this risk.

- A reevaluation of whether seemingly endless litigation is in the best interests of shareholders or whether management could adopt a more productive approach, such as exploring an equitable settlement, to provide proper remediation for past environmental damages and better protection of future shareholder value.

- An examination of whether existing corporate governance arrangements and board structure promote sufficient oversight of the long-term challenges that face Chevron. These include the ongoing risk presented by the Ecuador litigation, the political and human rights risks affecting areas such as Nigeria and Myanmar, as well as the existential threat of climate change – a massive risk to Chevron's business which has already manifested and is set to intensify in the long run via regulation, energy price swings, and growing market uncertainty around the viability of fossil fuel investments.

In closing, we hope this message finds you well, enjoying the transition into your new role, and open to a new path forward in dialogue with shareholders. We would appreciate hearing from you with your thoughts, as well as an invitation to meet prior to the 2018 annual meeting of shareholders. Thank you.

Sincerely,

**Bruce T. Herbert, AIF**
Chief Executive
Investor Voice | Newground Social Investment

**Pat Miguel Tomaino**
Director of Socially Responsible Investing
Zevin Asset Management, LLC

*All signatories listed on next page...*

---

[4]  $9.5 billion original judgment, now $12 billion including interest.

**Consortium that represents USD $109.44 billion in total assets:**

1. Zevin Asset Management (co-organizer)
2. Newground Social Investment (co-organizer)

3. Adrian Dominican Sisters, Portfolio Advisory Board
4. As You Sow
5. Azzad Asset Management
6. Calvert Research and Management
7. Congregation of St. Basil
8. Congregation of St. Joseph
9. Dana Investment Advisors
10. Daughters of Charity, Province of St. Louise
11. Dominican Sisters ~ Grand Rapids
12. Epic Capital
13. Folksam
14. Fonds de Solidarité FTQ
15. Franciscan Sisters of Perpetual Adoration
16. Horizons Sustainable Financial Services, Inc.
17. Impact Investors
18. JLens
19. JSA Financial Group
20. Mercy Health
21. Mercy Investment Services, Inc.
22. Northwest Coalition for Responsible Investment
23. Pension Plan of The United Church of Canada
24. Priests of the Sacred Heart, US Province
25. Reynders, McVeigh Capital Management
26. School Sisters of Notre Dame Cooperative Investment Fund
27. School Sisters of St. Francis
28. Seventh Generation Interfaith Coalition for Responsible Investment
29. Shareholder Association for Research and Education (SHARE)
30. Sisters of St. Francis of Philadelphia
31. Sisters of St. Francis Charitable Trust, Dubuque
32. Skye Advisors
33. Socially Responsible Investment Coalition
34. Stance Capital
35. Unitarian Universalist Association
36. United Methodist Women

~ ~ ~

Transfer Submitted                                                          close window

Print this Page

**Transfer status: In Process**
**Confirmation Number: 226230972**

### Transfer Accounts

**From:** CWP Associates : Avail. Bal $405,332.71

**To:** Simon Billenness (Amalgamated Bank)

### Transfer Details

**Send amount**

Send amount: $5,000.00

Additional fee: $10.00

### Transfer description

### Transfer dates

Frequency: One time, immediately

Delivery speed: Next Business Day

Delivery method: ACH

Start on date: 03/14/2018

Estimated delivery date: 03/15/2018
**Note:** The receiving bank may make funds available later than this.

**Send email to recipient**

Email to:

Email from:

Subject:

Message:

**Transfer on behalf of**

Name:

ID:

Email:

Street address:

City:

MKS-0006466

# INVOICE

## FROM:

Simon Billenness
President, CSR Strategy Group

March 14, 2018

## Work To Be Performed: March-May, 2018

Organize further shareholder pressure on Chevron through:

- Help organize press outreach by shareholders on the the resolutions

- Coordinate lobbying of proxy advisory firms (ISS and Glass Lewis)

- Organize filing of a shareholder SEC complaint

- Organize an investor letter to new Chevron CEO

- Attend Chevron AGM to assist in moving the resolutions and press work

_[handwritten notation]_

| For Consulting Services: |
|---|
| Consulting services for the months of March-May, 2018 = $5,000 |

| Payment Instructions: |
|---|
| **Via Wire:** |
| Receiving Bank: Chase Bank |
| Receiving Bank Address: 55 Water Street, New York, NY 10003 |
| SWIFT CODE: CHASUS33 |
| |
| Beneficiary Bank: Amalgamated Bank |
| Beneficiary Bank Address: 275 7th Avenue, New York, NY 10001 |
| ABA/Routing: ▮▮▮3379 |
| |
| Beneficiary Name: Ann Corbett and Simon Billenness |
| Beneficary Account #: ▮▮▮5393 |
| Beneficiary Address: 1403 F Street NE, Washington, DC 20002 |

# INVOICE

**FROM:**

Simon Billenness
President, CSR Strategy Group

January 8, 2018

**Work To Be Performed: January-April, 2018**

Organize further shareholder pressure on Chevron through:

- Help defend shareholder resolutions from any challenges by Chevron at the Securities & Exchange Commission (SEC)

- Help organize press outreach by shareholders on the filing of the resolutions

- Coordinate lobbying of proxy advisory firms (ISS and Glass Lewis)

- Organize filing of a shareholder SEC complaint

- Organize an investor letter to new Chevron CEO

**For Consulting Services:**

Consulting services for the months of January-April, 2018 = $5,000

**Payment Schedule:**

$2,500: immediately upon receipt of this invoice
$2,500: March 1st, 2018

*Pay March 1st* (handwritten)

*Mail to Campaign Int'l Campaign for The Rohingya Po Box 481698 Wash DC 20002* (handwritten)

**Payment Instructions:**

**Via check**, payable to Simon Billenness, to: 1403 F Street NE, Washington, DC 20002

**Via Wire:**

Receiving Bank: Chase Bank
Receiving Bank Address: 55 Water Street, New York, NY 10003
SWIFT CODE: CHASUS33

Beneficiary Bank: Amalgamated Bank
Beneficiary Bank Address: 275 7th Avenue, New York, NY 10001
ABA/Routing: ███3379

Beneficiary Name: Ann Corbett and Simon Billenness
Beneficary Account #: ███5393
Beneficiary Address: 1403 F Street NE, Washington, DC 20002

*renegotiated by SRD - 6 key to pay new inv 3/14/18* (handwritten)

MKS-0006468

# INVOICE

**FROM:**

Simon Billenness
President, CSR Strategy Group

September 18, 2017

**Work To Be Performed: September-October, 2017**

Organize further shareholder pressure on Chevron through:

- Keep shareholders updated with news of Ecuador-related litigation

- Arrange for investors to submit SEC complaint

- Arrange for investors to send a sign-on letter to Chevron's lead director regarding the Ecuador litigation

- Continue to build and develop coalition of shareholders in advance of re-filing resolutions at Chevron in December

---

**For Consulting Services:**

Consulting services for the month of September-October, 2017 = $2,000

No Anticipated miscellaneous expenses = $0

**TOTAL = $2,000**

---

Wiring Instructions

Receiving Bank: Chase Bank
Receiving Bank Address: 55 Water Street, New York, NY 10003
SWIFT CODE: CHASUS33

Beneficiary Bank: Amalgamated Bank
Beneficiary Bank Address: 275 7th Avenue, New York, NY 10001
ABA/Routing: ███3379

Beneficiary Name: Ann Corbett and Simon Billenness
Beneficary Account #: ███5393
Beneficiary Address: 1403 F Street NE, Washington, DC 20002

# EXHIBIT 46

| | |
|---|---|
| **From:** | Steven Donziger <sdonziger@donzigerandassociates.com> |
| **Sent:** | Monday, March 12, 2018 7:13 PM |
| **To:** | Katie Sullivan <Katie@Streamlinefamilyoffice.com> |
| **Subject:** | FYI -- going to put this out tomorrow |

**Facing Critical Court Showdown, Chevron Selling Oil Assets In Canada While Trying to Evade $9.5 Billion Pollution Liability**

Toronto – Ecuador rainforest communities trying to seize Chevron assets in Canada to enforce their $9.5 billion pollution judgment say they are "extremely concerned" that the oil giant is undermining the rule of law by selling off critical assets in the country just before a major court showdown scheduled for next month.

Patricio Salazar, the lead Ecuadorian lawyer for the communities, said new research conducted by his team demonstrates that the oil giant has sold or been in talks to sell close to $6 billion in Canadian assets since the enforcement case was filed in the country in 2012. Since then, the villagers have won three consecutive unanimous appellate decisions – including one from Canada's Supreme Court -- and are on the verge of forcing the oil giant into a trial where it could be exposed for engaging in fraud to evade paying the liability.

The Canada appellate court decisions not only have shaken Chevron's confidence in the outcome of the enforcement litigation – providing a possible motive to sell assets -- but they come at a time when the company's large team of lawyers must appear in the Ontario Court of Appeal on April 17 to argue a critical issue in the presence of national indigenous leaders from Ecuador and Canada. The last argument before the court was attended by former National Chief Phil Fontaine and Greenpeace co-founder Rex Weyler, both of whom were highly critical of Chevron's toxic dumping in Ecuador. (See here for background.)

The issue in the upcoming hearing – whether the Ecuadorians can collect their debt from Chevron's wholly-owned subsidiary in Canada – will be argued for the villagers by noted commercial litigator Alan Lenczner and aboriginal rights specialist Peter Grant. If the Ecuadorians win, Chevron's main technical defense to the enforcement action would completely collapse, according to observers.

"It is clear that there is a significant possibility that Chevron's sudden asset sales in Canada are of such magnitude and frequency that they are disconnected from any legitimate business purpose and are designed to evade a legitimate court judgment," said Salazar, who works for the Front for the Defense of the Amazon (FDA), the grass roots coalition which brought the case against Chevron and represents the indigenous and farmer communities in the collection of the judgment.

"Our fear is that these sales are part of a broader strategy by Chevron to inflict yet more harm its victims in the rainforest, just as the company did in Ecuador during the trial when the evidence mounted against it," he added. "We are exploring all legal options to block future Chevron asset sales in Canada while our enforcement litigation is pending, at least without notice to the court where a determination can be made as to whether they have a legitimate purpose."

Luis Yanza, a Goldman Prize winner and community leader in Ecuador who founded the FDA, said: "Chevron has a long history of fraudulent behavior in Ecuador and we are not going to just sit back and let major asset sales happen again in Canada without notifying the court and seeking an appropriate remedy if justified. The lives of thousands of Ecuadorians are far more important at this point than Chevron's economic interests in evading the judgment."

A new analysis by lawyers for the rainforest villagers shows what Salazar calls a "disturbing level" of low-profile asset sales in Canada by Chevron and its wholly-owned subsidiary, Chevron Canada. Just last week, news outlets reported that Chevron is in talks to sell its large stake in the Kitimat Liquified Natural Gas Project in British Columbia.

In 2017, Chevron sold a $1.5 billion stake in its Burnaby refinery along with 129 service stations. The company in 2017 also was reportedly seeking to sell a $2.5 billion stake in its Athabasca tar sands project. The company also has sold its stakes in various storage facilities and service stations as sell as a second tar sands project.

The asset sales are controversial because the Ecuadorians won a $9.5 billion damages judgment against Chevron in 2013 in the courts of the South American nation. If Chevron dissipates its assets in Canada, there might not be enough funds to pay the judgment of the Ecuadorians and force the company to comply with the law. The Ecuador judgment is now worth $12 billion

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

with interest.

Chevron had insisted the underlying environmental trial be held in Ecuador and had promised to pay any judgment as a condition of moving the case out of the United States, where the company feared a jury trial. Ecuador's courts found Chevron deliberately dumped billions of gallons of toxic waste into the rainforest and abandoned more than 1,000 open-air waste pits, decimating indigenous groups and causing an outbreak of cancer. (See here for a summary of the evidence against Chevron.) The company operated in Ecuador from 1964 to 1992.

Since losing the trial in Ecuador, Chevron has engaged in a pattern of bad faith conduct and fraud to evade paying the Ecuador liability, according to the evidence. A top-level Chevron official threatened the villagers with a "lifetime of litigation" if they continued pressing their claims, while Chevron's General Counsel said, "We will fight this until hell freezes over, and then fight it out on the ice." One Chevron lobbyist was quoted in Newsweek as saying: "We can't let little countries screw around with big companies like this." The company also admitted its strategy was to "demonize" the U.S. legal counsel for the Ecuadorians, Steven Donziger.

The company also paid an admittedly corrupt witness at least $2 million to claim that Donziger approved a bribe of the Ecuador trial judge to be able to ghostwrite the judgment. The Chevron witness later admitted he perjured himself while a forensic report proved the ghostwriting allegation was false. (See here for a detailed report on Chevron's fraud.)

Chevron also recently sent former Trump campaign manager and company lobbyist Paul Manafort – currently under criminal indictment in the United States – to secretly meet with Ecuador's new President in an apparent effort to get him to quash the case against it. (See here.)

Salazar made it clear that any Chevron argument that the villagers cannot freeze asset sales because they do not have a judgment in Canada will be determined by courts. "We have fought for more than two decades to achieve the judgment that is now before Canadian courts, and Chevron has no right to dissipate its assets such that this litigation will be rendered futile at the end," he said.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

# EXHIBIT 47



Custom Search

NEWS    LIFE    FOOD & DRINK    MUSIC    MOVIES & TV    CULTURE    EVENTS

HOME / NEWS /

# Canada's First Nations join Amazon fight against Chevron

Chevron Canada lawyers faced tough questions in a Toronto court last week over U.S. parent's refusal to pay $12 billion judgment awarded to Indigenous farmers in Ecuador

BY **CHRISTIAN PEÑA**

APRIL 25, 2018  4:40 PM



Christian Peña

*Assembly of First Nations National Chief Perry Bellegarde (right) with Rafael Pandam, president of the Amazonian Indigenous Parliament of Ecuador, in Toronto on April 18.*

An Indigenous group from Ecuador was in the Ontario Court of Appeal last week trying to recover a historic $9.5 billion judgment ($12 billion with interest) against U.S. oil giant Chevron Corporation.

The plaintiffs in the case, the Amazonian Indigenous Parliament of Ecuador, which represents some 30,000 villagers, are asking the court to enforce an Ecuadorian court judgment from 2011 against Chevron over the dumping of billions of gallons of toxic wastewater near farming communities in the Ecuadorean Amazon that dates back to the early 1960s. Chevron is fighting the Ecuadorian court order to pay billions in damages with an army of 20 lawyers that took up most of the front rows in the Osgoode Hall courtroom where two days of hearings began on Tuesday April 17.

The plaintiffs argue that they should be able to seize the assets of Chevron Canada to pay for the pollution of its U.S. parent. The **Supreme Court of Canada** found in 2015 that Canadian courts do have jurisdiction in the matter, but that decision stopped short of determining whether Chevron Canada is an asset of Chevron Corp.

The company's lawyers argue that Ontario has no jurisdiction to enforce the Ecuador court decision. The U.S. parent company and the claim itself, they say, have no connection to Ontario.

Chevron maintains that its Canadian subsidiary is a separate company, even though 100 per cent of Chevron Canada's shares are owned by Chevron Corp through its wholly owned subsidiaries.

The stakes are extremely high for both sides. A decision for the plaintiffs could reshape Indigenous rights around the globe. In Canada, the case against Chevron is receiving support from the Assembly of First Nations (AFN) and several prominent environmental groups.

**AFN National Chief Perry Bellegarde**, and his predecessor Phil Fontaine, were both in court Wednesday (April 18) to show support.

"Investor rights should not supersede Indigenous rights," Bellegarde said during a break in proceedings outside the court. "The corporate veil shouldn't be something that anyone hides behind when lands and waters and health are affected."

Bellegarde has also written to Canada's Minister of Justice, Jody Wilson-Raybould, urging consideration of new legislation that will provide more "expeditious" enforcement of foreign judgments in Canada.

Fontaine **visited several of the affected areas** with Canadian Grand Chief Ed John last September. "What I witnessed was devastating, and shocking," says Fontaine. "Clearly Chevron has caused significant harm to the environment and to the health of the Indigenous peoples in this area and must be held accountable."

Those **transgressions**, according to the Ecuador judgment, includes, the dumping of cancer-causing "produced water" by the company into streams and rivers; the abandoning of some 900 unlined wastewater pits carved out of the floor of the Amazon jungle; frequent oil spills; poorly maintained flares to burn natural gas; and the destruction of documents establishing a Chevron policy that only major environmental events be reported to Ecuadorean government authorities.

During two days of often tense arguments, Chervon lawyers faced a series of tough questions from the three-judge panel.

Chevron Canada lawyer Benjamin Zarnett put forward the argument that "corporate separateness," what he called a "bedrock principle" of Canadian corporate law, states that a corporation has the same legal rights as a natural person – and one of those rights is that the debts of one person cannot be visited onto another.

The key legal doctrines being relied on by the plaintiffs' lawyers include the Execution Act, which basically states money in a judgment can be seized from any interests of the defendant.

Lawyers for the Ecuadorians argued that Chevron Corp's 1,500 subsidiaries and holding companies, including Chevron Canada, are essentially operating as a single company.

"It is simply unfair for Indigenous peoples to win a judgment and not be able to collect because of corporate structuring related to subsidiaries," adds Steven Donziger, the lead lawyer who took on the original case 25 years ago.

"This is a simple case involving the collection of a debt," Dozinger said by phone in a interview with NOW last week. "There is no need to change corporate law if the court does not want to. Chevron owes the money: Chevron Canada is an asset of Chevron: thus the Ecuadorians have a right to seize Chevron Canada to collect on their judgment."

Speaking at the conclusion of last week's hearing, Rafael Pandam, president of the Amazonian Indigenous Parliament of Ecuador, charged Chevron with lying to Indigenous communities. He said Indigenous communities "will continue to fight this case here in Canada to seek justice." On Monday (April 24), meanwhile, a Manhattan court issued an extraordinary "global injunction," to bar the collection of the Ecuadorean judgment.

**news@nowtoronto.com** | **@nowtoronto**

🏷 Tags   **First Nations,  decolonization,  news,  feature,  This week in NOW**

---

## RELATED


transmountain.com

### Trans Mountain pipeline crisis is a watershed moment for Trudeau-First Nations relations
Apr 26, 2018



### Indigenous symbols: lessons in what's sacred
May 9, 2018


Samuel Engelking

### Artisans fight Made in Canada appropriation of Indigenous crafts
Jul 17, 2018


Illustration by Jason Carter

### Decolonizing cannabis: can legalization set Indigenous communities free?
Apr 19, 2018


Distant Thunder

### Grassy Narrows community ravaged by mercury poisoning ups fight for justice
Apr 30, 2018

**1 Comment**

Sort by    Oldest



Add a comment...

### Rod Gentry

What this comes down to is that if Ecuador was a properly functioning country, this polution would never have happened. It isn't a properly functioning country, which is something that has to be taken into consideration when considering the judgements of it's courts. If Canada, which has elements, particularly in oil, of a branch plant economy, is to be forced to apply the decisions of unreliable countries and collect those judgements against Canadian subsidiaries, Canada will be destroyed as a location for foreign investment. Which as nice as that might sound to some, will certainly end up hitting our indignious people if the economy is cut in half. Canada has it own national interests, and it needs to consider those rather than looking first at what it can do for everyone else.

Like · Reply · 17w

Facebook Comments Plugin

## NOW Newsletters

Sign up to receive the latest from **nowtoronto.com** and to win incredible prizes!

☐ THIS WEEK IN NOW    ☐ CONTEST CLIQUE    ☐ FRESH DISH    ☐ DEALS & PROMOTIONS

Email Address                    **Subscribe**

**SECTIONS**

News
Life
Food & Drink
Music
Movies & TV
Culture
Events
Classifieds

**DISCOVER**

Contests
NOW in the Media
NOW's Archive
F.A.Q.

**COMPANY**

About Us
Contact Us
Our People
Jobs
Advertise with us

**CONNECT WIT**

©NOW Communications Inc.

Privacy Policy | Terms of Service

Built with Metro Publisher

# EXHIBIT 48

| From: | Steven Donziger <sdonziger@donzigerandassociates.com> |
|---|---|
| Sent: | Thursday, December 14, 2017 4:58 PM |
| To: | Katie Sullivan <Katie@Streamlinefamilyoffice.com>; Aaron Marr Page <aaron@forumnobis.org> |
| Subject: | urgent -- contracts for trip to Ecuador |

Katie and Aaron,

I need to get contracts ready for execution next week in Ecuador with translations, etc. Let's talk about this first thing Friday morning to see what is feasible to accomplish in next 3 days or so. Most important are the investment contracts and the translations. Can we talk tomorrow at 10 am EST? Best, Steven

TA investment contract
MF new contract
GK new contract
Eva Golinger
Ben Barnes
Simon Billiness for equivalent of $100k
KS (now or later)

Canada

John Phillips
Peter Grant
Phil Fontaine
Kathleen Mahoney (later)
Ed John: (later)
Rex Weyler (later)

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

# EXHIBIT 49

**Defensa de la Amazonia – Aguinda Environmental Damages Award**
**Contingency Interests**

**Non-Recourse Investment Agreements**

|  | Funder I<br>Glenn Krevlin | Funder II<br>Cliff Eisler |
|---|---|---|
|  | *These agreements are substantially the same* | |
| **Parties** | FDA<br>Alan Lenczner<br>Funder | FDA<br>Alan Lenczner<br>Funder |
| **Document Name** | Ecuador Judgment Investment Agreement | Ecuador Judgment Investment Agreement |
| **Date** | May 2, 2016 | July 11, 2016 |
| **Language of Document** | English & Spanish | English |
| **Investment Amount** | $250,000 | $250,000 |
| **Percentage Interest** | 0.12500% | 0.12500% |
| **Recover / Proceeds Defined** | Net recovery, including interest, fees & penalties and 10% due to the FDA | Net recovery, including interest, fees & penalties and the 10% due to the FDA |
| **Dilution** | | |
| **Responsibility for Environmental Remediation** | | |
| **Follow on Investment** | up to $250,000 additional in each round at a 25% discount | up to $250,000 additional in each round at a 25% discount |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

| | Funder III<br>WDIS Finance LLC<br>*(John van Merkensteijn)* | Funder VI<br>Wellbeck Partners<br>*(Josh)* | Funder IV<br>Indigenous People Limited<br>*(Ian Watson)* | Funder V<br>Fenwick<br>*(Roger Waters)* |
|---|---|---|---|---|
| | | *These agreements are substantially the same* | | |
| | FDA (as holder of 10% award and beneficiary of the Trust)<br>Trust & Board of the Trust<br>Funder<br>Alan Lenczner | FDA (as holder of 10% award and beneficiary of the Trust)<br>Trust & Board of the Trust<br>Funder<br>Alan Lenczner | FDA (as holder of 10% award and beneficiary of the Trust)<br>Trust & Board of the Trust<br>Funder<br>Alan Lenczner | FDA (as holder of 10% award and beneficiary of the Trust)<br>Trust & Board of the Trust<br>Funder |
| | Ecuador Judgment Investment Agreement | Ecuador Judgment Investment Agreement | Ecuador Judgment Investment Agreement | Ecuador Judgment Investment Agreement |
| | August 24, 2016 | August 24, 2016 | November 24, 2016 | February 3, 2017 |
| | English | English & Spanish | English & Spanish | English & Spanish |
| | $300,000 minus up to $15k for legal fees | $200,000 | $250,000 minus up to $12.5k for legal fees | $152,000 |
| | 0.16500% | 0.11000% | 0.13750% | 0.07600% |
| | Ecuador Judgment Gross Proceeds, including interest, fees & penalties and the 10% due to the FDA | Ecuador Judgment Gross Proceeds, including interest, fees & penalties and the 10% due to the FDA | Ecuador Judgment Gross Proceeds, including interest, fees & penalties and the 10% due to the FDA | Ecuador Judgment Gross Proceeds, including interest, fees & penalties and the 10% due to the FDA |
| | No dilution | No dilution | No dilution | No dilution |
| | No responsibility | No responsibility | No responsibility | No responsibility |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

**Funder VII**
**CHV LLC**
*(Tony Abbiati & Client)*

FDA (as beneficiary of the Trust)

Trust & Board of the Trust
US Representative
Funder

Ecuador Judgment Investment
Agreement

December 20, 2017

English & Spanish

$500,000

0.250000%

Judgment Proceeds, including
interest, fees & penalties and the 10%
due to the FDA

No dilution without Funder's written
consent

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED. R. EVID. 502(d)

MKS-0002046

| Priority | *parri possu* with other 3rd party equity holders, prior to any distributions to the claimants Wording is redundant, awkward & confusing (unless I'm not understanding) | *parri possu* with other 3rd party equity holders, prior to any distributions to the claimants Wording is redundant, awkward & confusing (unless I'm not understanding) |
| --- | --- | --- |
| FDA Obligations | 10% award used to guarantee full payment to Funder | 10% award used to guarantee full payment to Funder |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

all obligations under this Agreement
will be satisfied prior to distributions
to Ecuador Parties
Wording is awkward & confusing
(unless I'm not understanding)

10% award used to guarantee full
payment to Funder

all obligations under this Agreement
will be satisfied prior to distributions
to Ecuador Parties
Wording is awkward & confusing
(unless I'm not understanding)

10% award used to guarantee full
payment to Funder

all obligations under this Agreement
will be satisfied prior to distributions
to Ecuador Parties
Wording is awkward & confusing
(unless I'm not understanding)

10% award used to guarantee full
payment to Funder

all obligators under this Agreement
will be satisfied prior to distributions
to Ecuador Parties
Wording is awkward & confusing
(unless I'm not understanding)

10% award used to guarantee full
payment to Funder

MKS-0002048

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

all obligations under this Agreement
will be satisfied prior to distributions
to Ecuador Parties; pro-rata
compensation in event of partial
collection
Wording is awkward & confusing
(unless I'm not understanding)

10% award used to guarantee full
payment to Funder

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0002049

MKS-0002050

| | | Escrow Agent | Lenczner Slaght or Escrow Agent |
|---|---|---|---|
| **Investment Paid To** | *Escrow Agent* | An independent law firm in Canada other than Lenczner Slaght; Funds to be paid to Lenczner Slaght as directed by Funder | An independent law firm in Canada other than Lenczner Slaght |
| **Recovered Funds** | | Recovered funds to be paid to escrow agent | Recovered funds to be paid to escrow agent |
| **Use of Proceeds** | | To fund litigation and other expenses dedicated to securing collection of Ecuador Judgment | To fund litigation and other expenses dedicated to securing collection of Ecuador Judgment |
| **Assignment** | | | Agreement may be assigned to a family member or a trust for their benefit |
| **Governing Law** | | Ontario | Ontario |
| **Missing Signatures** | *English Version* | FDA | None missing |
| | *Spanish Version* | Funder | |

| | | |
|---|---|---|
| **Document Name** | Addendum | Letter Agreement |
| **Date** | May 20, 2016 | January 3, 2017 |
| **Language of Document** | English | English & Spanish |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

| | | | |
|---|---|---|---|
| Escrow Agent | Escrow Agent | Escrow Agent | |
| Beard Winter LLP; to be paid to Lenczner Slaght on direction of US Rep, Funder & FDA | Lenczner Slaght; to be held until use (cross-reference in Section 8 of document appears to be incorrect) | Beard Winter LLP; to be paid to Lenczner Slaght on direction of US Rep, Funder & FDA | Investment to be paid in accordance with the instructions of the US Rep |
| Lenczner Slaght is the distribution escrow agent | Lenczner Slaght is the distribution escrow agent | Lenczner Slaght is the distribution escrow agent | Lenczner Slaght is the distribution escrow agent |
| To fund litigation and other expenses dedicated to securing collection of Ecuador Judgment; Budget to be prepared and approved by US Rep & Funder, with US Rep having final authority | To fund litigation and other expenses dedicated to securing collection of Ecuador Judgment; Budget to be prepared and approved by US Rep & Funder, with US Rep having final authority | To fund litigation and other expenses dedicated to securing collection of Ecuador Judgment; Budget to be prepared and approved by US Rep & Funder, with US Rep having final authority | To fund litigation and other expenses dedicated to securing collection of Ecuador Judgment; Funder entitled to consult with US Rep as to how funds are spent, with US Rep having final authority pursuant to instructions of FDA |
| Agreement may be assigned to a family member or a trust for their benefit | Agreement may be assigned to a family member or a trust for their benefit | Agreement may be assigned to a family member or a trust for their benefit | |
| Ontario | Ontario | Ontario | Ontario |
| Funder missing on App 2; Alan Lenczner missing on Joint App 3 (but he has signed this Joint Appendix so it just needs to be slip sheeted) | Funder & Alan Lenczner | FDA & Trust missing on App 2 | Funder (we have a version signed by the Funder, but it is not the same agreement as signed by the FDA & Trust) |
| Alan Lenczner missing on body of agreement | Funder & Alan Lenczner | Funder & Alan Lenczner missing on body of agreement | Funder |
| Letter Agreement | | | Addendum |
| November 10, 2016 | | | December 17, 2017 |
| English & Spanish | | | English |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

Funding Escrow Agent

Account to be created by the FDA and US Rep; distributions in accordance with instructions of the US Rep

Account to be created by the FDA and US Rep; distributions in accordance with instructions of the US Rep

To fund legal efforts to collect the Ecuador judgment and for other puposes such as defending retaliatory actions by Chevron, manintaining communication with affected community groups in Ecuador, media relations, public education and outreach to investment community

Ontario

None missing

Funder

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0002052

| | | |
|---|---|---|
| Substance of Amendment | Agreement may be assigned to a family member or a trust for their benefit | Percentage interest increased by .0175% from .175% to .195% to compensate Funder for more favourable rates granted to more recent investors. However, original % was .125% not .175% and in any event .175% + .0175% = .1925% 19.25000% |
| Missing Signatures | English | Alan Lenczner |
| | Spanish | Alan Lenczner |
| | FDA | |
| Document Name | Segundo Addendum | |
| Date | Julio 11, 2016 | |
| Language of Document | Spanish | |
| Substance of Amendment | $100,000 further investment for an additional .05000% (according to the subsequent Letter Agreement) | |
| Missing Signatures | Alan Lenczner, Funder | |
| Document Name | Letter Agreement | |
| Date | January 2, 2018 | |
| Language of Document | English | |
| Substance of Amendment | $250,000 further investment for an additional .16675% (if 25% discount, it should be .16667%) | |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

$100,000 further investment, less $5k for legal fees, for an additional .05500%

$50k additional investment increased by .025% to 0.101%

$50k wired to SRD law

None
Funder, Alan Lenczner

FDA, Trust, SRD, Funder

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0002055

**Follow on Investment**

right to invest up to $500,000 in the next round at a 20% discount if that round raises $1M from other investors; otherwise he has the right to invest only $250,000 in the next round (no mention of discount % in this case). Right to invest at a discount expires on the earlier of 1/1/2020 and the failure to invest in the next round.

How is "round" defined?

**Missing Signatures**

all signatures missing

parties are different than under the original agreement; not necessarily a problem, but consider whether they should be the same

| | | |
|---|---|---|
| **TOTAL INVESTMENT** | $600,000 | $250,000 |
| **TOTAL % INTEREST** | 0.34175% | 0.19500% |
| | | (math doesn't work on this %) |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED. R. EVID. 502(d)

MKS-0002057

$400,000

0.22000%

$200,000

0.11000%

$250,000

0.13750%

$202,000

0.10100%

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

$500,000

0.25000%

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0002058

**Defensa de la Amazonia – Aguinda Environmental Damages Award**
**Contingency Interests**

**Attorney Contingency Fee Agreements**

| | Lenczner Slaght LLP | Steven Donziger | Aaron Marr Page (Forum Nobis PLLC) |
|---|---|---|---|
| **Parties** | Individual Plaintiffs FDA & Assembly of Communities Affected by Texaco Trust Lenczner Slaght LLP | FDA Steven Donziger | FDA Trust Forum Nobis PLLC Alan Lenczner |
| **Document Name** | Retainer Agreement | | Agreement for Compensation and Investment Professional Services |
| **Date** | March 1, 2012 | November 11, 2017 | November 11, 2017 (date on 1st page is Nov 2016, but signatures are dated Nov 11, 2017) |
| **Language of Document** | English | Spanish | English & Spanish |
| **Services** | Legal services to enforce the final judgment of the Ecuadorian Court | | Prior and future legal services |
| **Compensation** | Hourly rates (at discounted rates), plus a bonus on favourable resolution. Bonus = 2 x (firm's normal rates - discounted rates charged) | | |
| **Percentage Interest** | | 6.30000% | 0.25000% |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

| Agustin Salazar Cordova | Patricio Salazar Cordova | Eva Golinger | John Kingman Phillips (Phillips Gill LLP) | Peter Grant |
|---|---|---|---|---|
| | | DRAFT #2 dated May 2017 | Two versions of this | |
| FDA | FDA | FDA | FDA | |
| Agustin Salazar Cordova | Patricio Salazar Cordova | Trust | Trust | |
| | | Eva Golinger | Phillips Gill LLP | |
| | | | Alan Lenczner | |
| | | Agreement for Compensation and Investment Professional Services | Agreement for Compensation and Investment Professional Services | |
| | | | November xx, 2016 | |
| Spanish | Spanish | English | English | |
| | | Past and future services (political, communications, strategic services) | Prior and future legal sadvice and strategic consulting services | |
| 0.250000% | 0.250000% | 0.125000% | Draft #1: the option to take .0002080% of Recovery per hour of recorded time to a maximum of .125% (but doesn't say what the alternative is) Draft #2: $250,000 payable *pari passu* with other interest holders (specify US$ or Cdn$) | |

**Recover / Proceeds Defined**   Recovery of environmental damages, 10% award to the FDA, post-judgment interest, additional award of fees

**Dispute Settlement**   Mediation (Canada), then Arbitration (Toronto, Canada)

**Missing Signatures**

| | | |
|---|---|---|
| **English** None missing | | |
| **Spanish** | Steven Domziger | Aaron Marr Page |
| | | Aaron Marr Page |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

| FDA & Agustin Salazar Cordova | FDA & Patricio Salazar Cordova |
|---|---|
| Recovery of environmental damages, 10% award to the FDA, post-judgment interest, additional award of fees | Recovery of environmental damages, 10% award to the FDA, post-judgment interest, additional award of fees |
| Mediation (Canada), then Arbitration (Toronto, Canada) | Mediation (Canada), then Arbitration (Toronto, Canada) |
| DRAFT - not yet executed | DRAFT - not yet executed |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

**Document Name**    Superceding Retainer Agreement

**Date**             November 1, 2016

**Language of Document**    English

**Substance of Document**    Continue to prosecute the action

**Missing Signatures**

**English** none missing
**Spanish**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0002063

**Defensa de la Amazonia – Aguinda Environmental Damages Award**

**Contingency Interests**

**Payments out of Steven Donziger's Share**

|  | **Funder I** |
|---|---|
|  | **Glenn Krevlin** |
| **Parties** | Glenn Krevlin and Stephen Donziger |
| **Date** | February 17, 2011 |
| **Document Name** | Convertible Promissory Note (missing a copy; but this note has been replaced) |
| **Language of Document** | English |
| **Loan Amount** | $250,000 |
| **Interest Rate** | 6.00% |
| **Due Date** | August 17, 2011 |
| **Percentage Interest** | 103% of .06420% of Net Recoveries |
| **Net Recoveries** | Net recovery, including interest, fees & penalties and 10% due to the FDA |
| **Missing Signatures** | *English Version* |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0002064

**Sherman**

David Sherman III and
Stephen Donziger

February 17, 2011

Convertible Promissory Note

English

$250,000

6.00%

August 17, 2011

103% of .06420% of Net Recoveries = Pro-Rata Portion
(Part about the Net Recoveries being less than the Pro-Rata Portion makes no
sense because by definition it will always be larger (unless I'm not understanding)

Net recovery, including interest, fees & penalties and 10% due to the FDA

Steven Donziger

_____

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0002065

**Date**                        March xx, 2012

**Document Name**               Replacement Promissory Note #1

**Language of Document**        English

**Substance of Document**       Half of promissory note ($128,750) transferred
                                by Glenn Krevlin to the The Glenn J Krevlin Irr
                                Trust FBO Adam W Krevlin Trust

**Percentage Interest**         50% of 103% of .06420% of Net Recoveries =
                                Payment Amount
                                (Part about the Net Recoveries being less than
                                the Payment Amount makes no sense because
                                by definition it will always be larger (unless I'm
                                not understanding)

**Governing Law**               New York

**Missing Signatures**          None

---

**Date**                        March xx, 2012

**Document Name**               Replacement Promissory Note #2
**Language of Document**        English

**Substance of Document**       Half of promissory note ($128,750) transferred
                                by Glenn Krevlin to the The Glenn J Krevlin Irr
                                Trust FBO Sam A Krevlin Trust

**Percentage Interest**         50% of 103% of .06420% of Net Recoveries =
                                Payment Amount
                                (Part about the Net Recoveries being less than
                                the Payment Amount makes no sense because
                                by definition it will always be larger (unless I'm
                                not understanding)

**Governing Law**               New York

**Missing Signatures**          Signed by Trustee on behalf of the Glenn J
                                Krevlin Irr Trust FBO Adam W Krevlin (should be
                                FBO Sam A Krevlin)

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0002066

Apparently $125,000 was paid off, but we have no documentation of that

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0002067

A Purrington Moody Weil LLP memo dated January 23, 2012 suggests that the note holders may want to convert their Pro-Rata Portion would then not flow through Steven where they could be seized by other creditors (e.g., a judgment against him). Ste

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED. R. EVID. 502(d)

MKS-0002069

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED. R. EVID. 502(d)

into a direct equity interest in the award. This might be advisable since the funds even would need to assign part of his interest to the note holders.

Steven Donziger
Promissory Notes Payable to Krevlin and Sherman

Recovery of Note Holders - based on $250,000 Loan

| | | |
|---|---|---|
| Advance | 17-Feb-11 | $250,000.00 |
| Interest Rate | | 6% |
| Unpaid Amount on Due Date | 11-Aug-11 | $257,500.00   A |

Pro-Rata Amount =

(A + $250,000) * 0.000542 * Net Recoveries

| Accumulated Net Recoveries | Incremental Pro-Rata Portion | Accumulated Amount of Pro-Rata Portion |
|---|---|---|
| $20,000,000 | $13,225.20 | $13,225.20 |
| $25,000,000 | $3,306.30 | $16,531.50 |
| $30,000,000 | $3,306.30 | $19,837.80 |
| $35,000,000 | $3,306.30 | $23,144.10 |
| $40,000,000 | $3,306.30 | $26,450.40 |
| $45,000,000 | $3,306.30 | $29,756.70 |
| $50,000,000 | $3,306.30 | $33,063.00 |
| $55,000,000 | $3,306.30 | $36,369.30 |
| $60,000,000 | $3,306.30 | $39,675.60 |
| $65,000,000 | $3,306.30 | $42,981.90 |
| $70,000,000 | $3,306.30 | $46,288.20 |
| $75,000,000 | $3,306.30 | $49,594.50 |
| $80,000,000 | $3,306.30 | $52,900.80 |
| $85,000,000 | $3,306.30 | $56,207.10 |
| $90,000,000 | $3,306.30 | $59,513.40 |
| $95,000,000 | $3,306.30 | $62,819.70 |
| $100,000,000 | $3,306.30 | $66,126.00 |
| $200,000,000 | $66,126.00 | $132,252.00 |
| $300,000,000 | $66,126.00 | $198,378.00 |
| $400,000,000 | $66,126.00 | $264,504.00 |
| $500,000,000 | $66,126.00 | $330,630.00 |
| $600,000,000 | $66,126.00 | $396,756.00 |
| $700,000,000 | $66,126.00 | $462,882.00 |
| $800,000,000 | $66,126.00 | $529,008.00 |
| $900,000,000 | $66,126.00 | $595,134.00 |
| $1,000,000,000 | $66,126.00 | $661,260.00 |
| $1,100,000,000 | $66,126.00 | $727,386.00 |
| $1,200,000,000 | $66,126.00 | $793,512.00 |
| $1,300,000,000 | $66,126.00 | $859,638.00 |
| $1,400,000,000 | $66,126.00 | $925,764.00 |
| $1,500,000,000 | $66,126.00 | $991,890.00 |
| $1,600,000,000 | $66,126.00 | $1,058,016.00 |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

| | |
|---|---|
| $1,700,000,000 | $1,124,142.00 |
| $1,800,000,000 | $1,190,268.00 |
| $1,900,000,000 | $1,256,394.00 |
| $2,000,000,000 | $1,322,520.00 |
| $3,000,000,000 | $1,983,780.00 |
| $4,000,000,000 | $2,645,040.00 |
| $5,000,000,000 | $3,306,300.00 |
| $6,000,000,000 | $3,967,560.00 |
| $7,000,000,000 | $4,628,820.00 |
| $8,000,000,000 | $5,290,080.00 |
| $9,000,000,000 | $5,951,340.00 |
| $10,000,000,000 | $6,612,600.00 |

| | |
|---|---|
| $66,126.00 | |
| $66,126.00 | |
| $66,126.00 | |
| $66,126.00 | |
| $661,260.00 | |
| $661,260.00 | |
| $661,260.00 | |
| $661,260.00 | |
| $661,260.00 | |
| $661,260.00 | |
| $661,260.00 | |
| $661,260.00 | |

Amounts shown in red differ from those shown on the Schedule to the
Purrington Moody Weil LLP memo dated January 23, 2012.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

**Defensa de la Amazonia – Aguinda Environmental Damages Award**
**Contingency Interests**

**Service Providers Contingency Fee Agreements**

| | Karen Hinton (Hinton Communications) | (Josh Rizack) The Rising Group Consulting |
|---|---|---|
| **Parties** | FDA<br>Trust<br>Karen Hinton<br>Lenczner Slaght Royce Smith Griffin LLP | FDA<br>Trust<br>The Rising Group Consulting<br>Lenczner Slaght Royce Smith Griffin LLP |
| **Document Name** | Agreement for Compensation and Investment Professional Services | Agreement for Compensation and Investment Professional Services |
| **Date** | November 11, 2017 | November 11, 2017<br>(date on 1st page is Nov 2016, but signatures are dated Nov 11, 2017) |
| **Language of Document** | English & Spanish | English & Spanish |
| **Services** | Prior and future media relations, public relations, strategic consulting services | Prior and future consulting and business services |
| **Percentage Interest** | 0.125000% | 0.250000% |
| **Recover / Proceeds Defined** | Recovery of environmental damages, 10% award to the FDA, post-judgment interest, additional award of fees | Recovery of environmental damages, 10% award to the FDA, post-judgment interest, additional award of fees |
| **Dispute Settlement** | Mediation (Canada), then Arbitration (Toronto, Canada) | Mediation (Canada), then Arbitration (Toronto, Canada) |
| **Missing Signatures** English<br>Spanish | Karen Hinton & Alan Lenczer<br>Karen Hinton & Alan Lenczer | Josh Rizack & Alan Lenczer<br>Josh Rizack & Alan Lenczer |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED. R. EVID. 502(d)

MKS-0002072

| Phil Fontaine (ISHKONIGAN) | Sullivan | Bames | Billiness |
|---|---|---|---|
| Several Drafts in Binder … I think this one is the final (but not signed by all parties, so who knows??) | | | |
| FDA | | | |
| Trust | | | |
| Phil Fontaine | | | |
| Lenczner Slaght Royce Smith Griffin LLP | | | |
| Agreement for Compensation and Investment Professional Services | | | |
| May xx, 2017 | | | |
| English & Spanish | | | |
| Prior and future services | | | |
| 0.12500% | | | |
| Recovery of environmental damages, 10% award to the FDA, post-judgment interest, additional award of fees | | | |
| Mediation (Canada), then Arbitration (Toronto, Canada) | | | |
| FDA & Steven Donziger | | | |
| FDA & Steven Donziger | | | |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

# EXHIBIT 50

## ECUADOR

### Amazonia

More Ecuador news (/centro/ecuador/)

### U.S. journalist joins "The dirty hand of Chevron" campaign



(http://i.eldiario.com.ec/fotos-manabi-ecuador/2014/05/20140515114316_periodista-estadounidense-se-une-a-.jpg)

*Eva Golinger, host of the program "Behind the news," by RT, joined the "The dirty hand of Chevron" campaign.*

Thursday, May 15, 2014 | 11:43

The U.S. journalist travelled to the Ecuadorian Amazon rainforest region to see firsthand the environmental damage caused in that region by U.S. oil company Chevron.

Golinger called the contamination "the hand of death."

(whatsapp://send?text=Diario Centro: U.S. journalist joins campaign)

CERT. ULG VER: JD



State of New York )
Estado de Nueva York

)        ss:
)        a saber:
County of New York )
Condado de Nueva York

## Certificate of Accuracy
## Certificado de Exactitud

This is to certify that the attached translation is, to the best of our knowledge and belief, a true and accurate translation of the attached document, carried out by translators competent to translate from Spanish into English.

Por el presente certifico que la traducción adjunta es, según mi leal saber y entender, traducción fiel y precisa del documento adjunto, realizada por traductores competentes para traducir del español al inglés.

Dated: September 27, 2018
Fecha: 27 de septiembre de 2018

Yasushi Sasaki
Senior Project Manager – Legal Translations
United Language Group

[firmado]

Yasushi Sasaki
Gerente de Proyeto Senior – Traducciones Legales
United Language Group

Sworn to and signed before
Jurado y firmado ante
me, this _____ 27th _____ day of
mí, a los _____ 27 _____ días del
_____ September _____ 2018
mes de _____ septiembre _____ de 2018

Notary Public
Notario Público

GINA MARIE STLAURENT
Notary Public, State of New York
No. 01ST6148442
Qualified in New York County
Commission Expires May 15, 2022

[firmado]
[sello]



## ECUADOR

más noticias de Ecuador    (/centro/ecuador/)

**Amazonía**

# Periodista estadounidense se une a la campaña "La mano sucia de Chevron"



(http://i.eldiario.com.ec/fotos-manabi-ecuador/2014/05/20140515114316_periodista-estadounidense-se-une-a-.jpg)

*Eva Golinger, presentadora del programa "Detrás de la noticia" emitido por RT, se unió a campaña "La mano sucia de Chevron".*

Jueves 15 Mayo 2014 | 11:43

La estadounidense viajó a la selva amazónica de Ecuador para conocer de primera mano el daño medioambiental causado en esa región por la petrolera estadounidense Chevron.

Golinger llamó "la mano de muerte" a la contaminación.

(whatsapp://send?text=Diario Centro: Periodista estadounidense se une a la campaña )

# EXHIBIT 51

This copy is for your personal non-commercial use only. To order presentation-ready copies of Toronto Star content for distribution to colleagues, clients or customers, or inquire about permissions/licensing, please go to: www.TorontoStarReprints.com





## INTRODUCING    LOCAL, NATIONAL & GLOBAL COVERAGE.

# Roger Waters lends star power to Ecuadorians' $9.5B Chevron fight



By **COLIN PERKEL** The Canadian Press
Tues., Oct. 10, 2017

Two groups of Indigenous Ecuadorian villagers, backed by some star power from legendary British rocker Roger Waters, faced off briefly against oil giant Chevron in a Canadian court Tuesday as they fight to collect on a $9.5-billion (U.S.) judgment awarded to them.

But as with almost every other step of the long-running legal battle, the case was delayed a day at the request of one of the groups to allow their new lawyer to get up to speed.

Pink Floyd bassist Roger Waters was at a Toronto court on Tuesday to show "solidarity" for Ecuadorian villagers in their long-running case against Chevron for alleged environmental contamination. (The Canadian Press)

The first issue Ontario's top court needs to sort out is whether the villagers must come up with almost $1 million as a security deposit before they can appeal a ruling that went against them.

Pink Floyd co-founder Waters, who was in the courtroom, called the case deeply important.

"It's a fundamental question of whether corporations like Chevron . . . should be allowed to use their financial muscle to destroy people with an absolute vital claim to reparations for damages that was caused to them over many years," Waters said before the hearing. "The way Chevron has behaved here is against everything that any of us might believe society ought to be like."

The case dates back decades when Texaco, now owned by Chevron, dumped billions of litres of toxic oil-drilling waters into hundreds of open-air pits in Ecuador. According to the plaintiffs, the affected area sees, among other problems, the highest rates of childhood leukemia in the country and far more cancer deaths and miscarriages than elsewhere.

Chevron calls the health concerns a "point of debate," saying there's no evidence to tie any issues to Texaco.

The lawsuit, filed in 1993 on behalf of 30,000 Ecuadorians, took until late 2013 when the courts in Ecuador awarded the Indigenous plaintiffs US$9.5-billion — one of the largest awards ever arising from environmental destruction.

The ruling, which Chevron argued was obtained fraudulently, sparked new rounds of fighting in several countries, including the United States. U.S.-based Chevron, which has also long argued Texaco cleaned up the mess, denies any responsibility for the contamination.

Because the corporation no longer has assets in Ecuador, the plaintiffs have been trying to get asset-rich Chevron Canada to pay up instead, arguing the Canadian company should be liable.



Roger Waters, centre, with Canadian Indigenous leader Phil Fontaine, left, and Paul Paz y Mino, associate director of Amazon Watch in Toronto on Tuesday.  (CHRIS YOUNG / THE CANADIAN PRESS)

"The judgment that they are trying to enforce through Canada's judicial system has been found to be a complete fraud in the United States by the U.S. judicial system where it is not enforceable," Morgan Crinklaw, a spokesman for Chevron, said Tuesday from near San Francisco.

An Ontario judge earlier backed Chevron, ruling the Ecuadorians could not "pierce the corporate veil." Chevron Canada is a separate entity and cannot be held liable. It is that decision the plaintiffs are looking to the Ontario Court of Appeal to overturn, but Chevron wants the villagers to put up cash as security for its legal costs before the appeal is heard.

Last month, Appeal Court Justice Gloria Epstein sided with Chevron. She accepted the grounds for the Ecuadorians' appeal were weak and that the plaintiffs had failed to show they couldn't afford the security money. She ordered the villagers to put up $945,000 to cover Chevron's legal costs if the oil company wins on appeal.

The plaintiffs, who decried Chevron's gambit as an abuse of the legal system and another attempt to thwart the villagers, want the Appeal Court to set aside Epstein's costs ruling.

The two sides were to argue the case Tuesday, but lawyer Peter Grant asked for an adjournment, saying he had recently been asked to represent 10 of the 47 Ecuadorian plaintiffs and needed time. The costs hearing will now be heard Wednesday.

Also on hand to show support for the villagers was Phil Fontaine, former national chief of the Assembly of First Nations. Fontaine, who recently visited the South American country, said he was dismayed by what he found.

"We saw with our own eyes the terrible conditions," Fontaine said. "This is an important step in their attempt to seek justice."

REPORT AN ERROR       JOURNALISTIC STANDARDS       ABOUT US



VW to stop making iconic Beetle next summer

Copyright owned or licensed by Toronto Star Newspapers Limited. All rights reserved. Republication or distribution of this content is expressly prohibited without the prior written consent of Toronto Star Newspapers Limited and/or its licensors. To order copies of Toronto Star articles, please go to: www.TorontoStarReprints.com

# EXHIBIT 52

**AMAZON WATCH**

MENU

⬚ HOME / NEWS & MULTIMEDIA / 2017

# Chevron CEO Clings To "Alternative Facts" When Confronted With Truth About Ecuador Mismanagement

CEO John Watson unable to respond to shareholder allegation of bribing a federal witness and cuts off microphones to avoid Ecuador issue

MAY 31, 2017
FOR IMMEDIATE RELEASE

Amazon Watch

FOR MORE INFORMATION, CONTACT:

Paul Paz y Miño, +1.510.281.9020 x302 or paz@amazonwatch.org

*Midland, TX* – Chevron CEO John Watson faced a firestorm of criticism over the company's expanding Ecuador liability at the company's annual meeting today from a group of institutional investors, one of whom accused the oil executive of "materially mishandling" the case. Faced with mounting opposition from shareholders and allegations of violation of federal law for bribing a witness, Watson resorted to reciting complete falsehoods, clinging to "alternative facts" and cutting off the microphones.

Clearly a sharp rebuke to Watson, all three shareholder resolutions presented by investors motivated by the Ecuador liability received significant support – with one receiving a whopping 39% of shareholder votes, which represents billions in assets. Normally, shareholder resolutions that receive anything over 10% of shareholder votes are considered successful. Yet, faced with these facts, Watson incorrectly responded, "shareholders have universally supported Chevron management in this case."

Watson and his management team vigorously opposed the three shareholder resolutions critical of their actions in the Ecuador case. The resolution that received the most votes, put

[forth by Zevin Asset Management](#), called for Watson to be removed as Chairman of Chevron's Board of Directors in part due to his mishandling of the case:

> Proponents are concerned that Chevron's management has materially mishandled legal matters brought against the Company by communities in Ecuador – in ways that increased liabilities for the Company, currently amounting to more than $9 billion. Moreover, proponents are concerned about the adequacy of the Company's disclosure of those risks to shareholders. Finally, proponents are deeply troubled that the Company has evidently sought to intimidate longstanding shareholders who questioned the Company's approach to these issues.

A second, calling for greater shareholder power to call special meetings, won 31% of the vote. The third, calling for the appointment of a director with expertise in environmental liability, won 20%.

"Today was a resounding victory for the rainforest communities of Ecuador who are on a historic path to hold Chevron accountable for its toxic dumping and fraudulent cover-up in Ecuador," said Simon Billenness, who works as a liaison between the affected communities and institutional shareholders.

Chevron's Ecuador liability stems from findings by three levels of courts in Ecuador in 2013 that the oil giant deliberately dumped billions of gallons of toxic waste into the rainforest, decimating indigenous groups and [causing an outbreak of cancer](#) that has killed or threatens to kill thousands of innocent civilians. Chevron operated in Ecuador under the Texaco brand from 1964 to 1992.

"It's no surprise that Watson, who has grown weary of being barraged about the Ecuador case year after year, grew frustrated once again and made outright false claims in an effort to defend himself and his management team from criticism," said Paul Paz y Miño, Associate Director at Amazon Watch, a U.S. based NGO that for years has supported the victims of Chevron's toxic legacy. "He even went so far as to claim that the only legal decision in favor of

the Ecuadorians was the initial verdict in Ecuador – a patently false claim."

Chevron's strategy in the Ecuador case has long been to attempt to demonize New York attorney Steven Donziger, who represents the Ecuadorians, and Watson's statements today demonstrates that he still clings to this strategy. In actuality, every decision since the initial Ecuadorian verdict, aside from Chevron's own retaliatory suit brought under the U.S. Racketeer Influenced and Corrupt Organizations Act – known as RICO – which refused to consider evidence of the contamination and specifically did not exonerate Chevron in Ecuador – has thus far gone against the oil company.

"The walls continue to close in on Watson and it's never been more obvious than at today's meeting. Watson can turn off the mic in Texas, but Chevron will not have that luxury in Canada, where it faces another enforcement proceeding in an Ontario court this October," said Kevin Koenig, Amazon Watch Ecuador Program Director.

What may have also outraged Watson was the fact that, just prior to the shareholder meeting, hundreds of thousands of people engaged with social media traffic calling for Chevron's Board of Directors to bring Watson to account for spending millions of shareholder funds to bribe a federal witness, Alberto Guerra. Guerra was Chevron's key witness in its retaliatory racketeering suit against the Ecuadorians and their lawyers. Chevron paid Guerra $2 million and its lawyers coached him for 53 days before putting him on the stand in U.S. courts, where forensic evidence and his later admissions prove he lied repeatedly to help Chevron evade paying the Ecuador judgment. This is not only a serious violation of ethics and a misuse of shareholder funds, but also a federal crime. According to Guerra himself, the exorbitant payments he received were arranged directly in a meeting in Chicago by Randy Mastro, Chevron's lead outside counsel at the law firm of Gibson, Dunn & Crutcher.

Chevron Board Member and former U.S. Ambassador to China Jon Huntsman was also targeted in the social media action, though he has remained silent on the Ecuador matter to date. It has been reported that Huntsman is Donald Trump's first pick for U.S. Ambassador to Russia.

Amazon Watch and the Rainforest Action Network signed a brief on May 1st to the U.S. Supreme Court, filed by EarthRights International, which details the fabrication of evidence by

Chevron with the help of Guerra. Chevron's reliance on the discredited Guerra is likely to backfire in Canada, where it will be called to defend Guerra's statements and explain not only his lack of physical evidence but his admission under oath to having lied for Chevron specifically to get a larger payout from the oil giant. Chevron's sole victory in the Ecuador matter, the RICO suit that offered no actual legal remedy to help the company escape a $9.5 billion liability, has fallen apart in the wake of Guerra's admission of lying and actual forensic evidence, disproving Chevron's key claim that the original Ecuadorian decision was ghostwritten.

"While Watson buries his head in the sand, the irrefutable facts are Chevron's reputation continues to worsen and pressure from shareholders and the international community continues to grow. The question remains how much longer the board will allow him to cling to weak lies to defend illegal and unethical actions that are likely to cost billions of shareholder funds," said Paz y Miño.

Share & Comment

| Short URL: | https://amwt.ch/4054 |
|---|---|

## Tell Chevron's New CEO to Finally Clean up Ecuador!

TAKE ACTION

MORE ABOUT

Ecuador

Chevron

RELATED ARTICLES

New Report: Northern Consumers Finance Assault on Brazilian Amazon and Its Peoples Complicity in Destruction

Dirty Energy

Corporate Accountability

Oil and Gas

Brazilian Legislators Break Law, Attack Amazon, Trade Freely with World: Report

"They Won't Be Able to Eat Their Money"

Indigenous, Frontline Community Groups and Climate Leaders Decry Greenwashed Climate Summit, Deliver Open Letter to Gov. Brown

Thousands March in San Francisco to Draw Attention to Global Climate Change Ahead of World Summit

## RELATED MULTIMEDIA



Sarayaku Launches Living Forest Proposal - Viva Kawsak Sacha!



Helping the Achuar Say #AdiosGeoPark



Join Us on September 8th to RISE for the Climate!

# FEATURES



Stop the Financing of Amazon Destruction!



Tell Chevron's New CEO to Finally Clean up Ecuador!



Join the Call to Protect Earth Defenders!



Amazon Watch is a 501(c)(3) nonprofit organization founded in 1996 to protect the rainforest and advance the rights of indigenous peoples in the Amazon Basin.

☐ Home    ☐ Search    ☐ Donate    ☐ Contact

© 2000 - 2018 Amazon Watch. All Rights Reserved.

Excerpts and links are encouraged, provided that credit is given to Amazon Watch. Unauthorized use of photos, text, or any other content without express written permission is prohibited.

Any personal information collected on our website is protected by our Privacy Policy and Terms of Service.

# EXHIBIT 53

**PRIVILEGED & CONFIDENTIAL**

**Ecuador Case Management - 12 MONTH EXPENSE PROJECTION**
**DECEMBER 2017**

prepared by

STREAMLINE
FAMILY OFFICE, INC.

|  | | Projected Budget 2018 Monthly | Projected Budget 2018 Annual |
|---|---|---|---|
| **EXPENSES** | | | |
| **Legal Fees** | | | |
| Steven Doniziger | | $ 25,000 | $ 300,000 |
| Aaron Marr Page | | $ 5,000 | $ 60,000 |
| Full time attorney  *Anton* | | $ 10,000 | $ 120,000 |
| Alan Lenczner | | $ - | $ - |
| John Phillips | | $ - | $ - |
| Legal contingency | | $ 4,000 | $ 48,000 |
| | | $ 44,000 | $ 528,000 |
| **PR costs** | | | |
| Cristina Munoz - Ecuador | | $ 500 | $ 6,000 |
| Press releases | | $ 1,000 | $ 12,000 |
| | | $ 1,500 | $ 18,000 |
| **Stipend Payments** | | | |
| Simon Billiness - shareholder support/resolutions | | $ 1,500 | $ 18,000 |
| Streamline - administrative/accounting | | $ 2,000 | $ 24,000 |
| Juan Aulestia - Ecuador management | | $ 2,000 | $ 24,000 |
| Luis Yanza - Ecuador community/client relations | | $ 1,000 | $ 12,000 |
| FDA - client group | | $ 3,000 | $ 36,000 |
| Rex Weyler | | $ 2,000 | $ 24,000 |
| | | $ 11,500 | $ 138,000 |
| **Travel** | | | |
| Travel - Ecuador in country | | $ 1,000 | $ 12,000 |
| Travel - Ecuadorians outside country | | $ 4,000 | $ 48,000 |
| Travel - US, fundraising | | $ 8,000 | $ 96,000 |
| Travel - Canadian attorneys | | $ 4,000 | $ 48,000 |
| | | $ 17,000 | $ 204,000 |
| Contingency | | $ 5,000 | $ 60,000 |
| **TOTAL** | | $ 79,000 | $ 948,000 |
| **Onetime payments** | | | |
| Sept 2017 Canadian Delegate trip reimbursement to SRD | | | $ 50,000 |
| Peter Grant legal retainer | | | $ 110,000 |
| Reimburse SRD (back salary, direct expenses) | | | $ 150,000 |
| Travel - Chief trip to Ecuador | | | $ 20,000 |
| | | | $ 330,000 |
| **2018 projected expenses** | | | $ 1,278,000 |
| **2019 projected expenses** | | | $ 948,000 |
| **TOTAL capital funding required thru Dec 2019** | | | $ 2,226,000 |

*Handwritten annotations:*
- Steven Doniziger: "10K first mo. 15K first 2 mo. Then $5K"
- Full time attorney: "Anton"
- Legal contingency / below: "Peter Grant   $100K $50K then April → Diane Seroko via Peter"
- Cristina Munoz: "2K"  Press releases: "2cf K"
- "Website costs   $5k annually"
- Simon Billiness: "10K annually"
- Juan Aulestia: "1K"
- Luis Yanza: "included in FDA"
- FDA: "$13K/quarter"
- Left margin: "Plan $1.5m"
- Travel US fundraising: "T&E   /case management"
- Travel Ecuadorians outside country: "Consider increasing"
- Travel - Chief trip to Ecuador: "Belgrade"

MKS-0006010

# EXHIBIT 54

Great, soon enough! :)

On Nov 8, 2017, at 9:15 PM, Steven Donziger <sdonziger@donzigerandassociates.com> wrote:

> that happens after the revolution
>
> they don't cover the case unless it makes chevron look good
>
> **From:** Katie Sullivan <Katie@Streamlinefamilyoffice.com>
> **Sent:** Wednesday, November 8, 2017 8:31:11 PM
> **To:** Steven Donziger
> **Subject:** Re: how does this read to you
>
> I like it!
>
> How does this hit the front page of the WSJ?
>
> On Nov 8, 2017, at 8:10 PM, Steven Donziger <sdonziger@donzigerandassociates.com> wrote:
>
> > This is a press release I am going to send out soon -- could affect fundraising:
> >
> > ## Chevron Faces Criminal Investigation Over $2m Witness Bribery Payments In Ecuador Pollution Dispute
> >
> > Washington, D.C. – Amazon indigenous groups and farmer communities in Ecuador have requested that the U.S. Department of Justice open a criminal investigation of Chevron after uncovering a witness bribery scheme designed by the company to fabricate evidence to evade payment of a $9.5 billion environmental liability, according to a letter sent to several top DOJ officials and made public today.
> >
> > The criminal referral letter – sent to the Chief of the Department of Justice (DOJ) fraud section and the U.S. attorneys in three major cities -- describes how in 2012 Chevron gave an illegal benefits package totaling at least $2 million to a former Ecuadorian judge, Alberto Guerra. Guerra, who admitted to Chevron prior to accepting the payments that he had engaged in numerous corrupt acts in Ecuador, later testified under oath that he lied repeatedly before a U.S. federal court as part of the company's strategy to evade paying the Ecuador environmental liability, which was confirmed by the country's highest court in 2013.

Guerra's lies before the U.S. federal court, in Chevron's controversial non-jury civil "racketeering" or RICO case, led to a hotly contested finding in 2014 by U.S. trial judge Lewis A. Kaplan that the Ecuador judgment was obtained by fraud. That decision was contradicted by eight appellate judges in Ecuador who unanimously affirmed Chevron's liability, including the entirety of the country's Supreme Court.

Canada's Supreme Court also rejected Kaplan's findings when Chevron tried to use it to block efforts by Ecuadorian indigenous peoples to seize company assets in that country.

"Undisputed facts indicate that Chevron used Guerra's false testimony to commit extensive fraud on the indigenous people of Ecuador that appears to have been planned at the highest levels of the company," said Patricio Salazar, the lead Ecuadorian lawyer for the affected communities. "The United States Department of Justice must use its full investigative power to gather all relevant facts related to Guerra's false testimony and if appropriate, hold those responsible fully accountable."

(For background on Chevron's RICO fraud and the erroneous findings in the decision, see this 33-page report.)

Among those cited in the letter as orchestrating the Chevron fraud are CEO John Watson, who is retiring in January; Chevron General Counsel R. Hewitt Pate; and Chevron outside counsel Randy Mastro, Reed Brodsky, Andres Rivero, Andrea Neumann and Avi Weitzman, all of the Gibson Dunn law firm. Gibson Dunn has deployed hundreds of lawyers to fight the indigenous groups and has reaped an estimated $1 billon in fees from Chevron for doing so -- thought to be the largest fee in history paid by a corporation for litigation defense.

In the summer of 2013, Chevron lawyers from the Gibson Dunn firm coached Guerra for 53 days before he testified falsely that the Ecuador trial judgment against Chevron was "ghostwritten" by lawyers for the plaintiffs. The story later was proven false by a forensic examination performed by one of the world's leading computer experts, J. Christopher Racich.

The DOJ letter also recounts how Chevron provided Guerra and his extended family with free health care, a housing allowance, and the payment of fees to secure family members asylum so they could legalize their immigration status in the United States. Chevron also

paid Guerra's personal income taxes as part of the deal.

Chevron lawyers led by Mastro of the Gibson Dunn law firm flew to Chicago to craft the first version of Guerra's false testimony in 2012 at the same time they were negotiating the benefits package with him, which provided a salary at least 24 times higher than what Guerra had been earning in Ecuador, according to the letter. Guerra insisted on meeting in Chicago because one of his children lived there, said Salazar.

Chevron's liability in Ecuador stems from <u>judicial findings</u> that the oil major abandoned 1,000 open-air toxic waste pits gouged out of the jungle floor and systematically discharged billions of gallons of toxic oil waste into rivers and streams relied on by the local population for their drinking water and for fishing. Cancer rates in the area have exploded and at least hundreds, possibly thousands, of indigenous persons and farmers are believed to have died as a result, according to data in <u>independent health studies</u>.

Chevron operated in Ecuador under the Texaco brand from 1964 to 1992 and reaped an estimated $25 billion in profits over the life of its operating contract. It was the exclusive operator of six major fields covering parts of a 1,500 sq. mile swath of rainforest that once was home to five thriving indigenous nationalities, all of whom are now plaintiffs in the lawsuit.

Even though the environmental damages claims were filed in the United States in 1993, Chevron insisted the trial be held in Ecuador and accepted jurisdiction there as a way to avoid a jury of impartial fact finders in its home country. After the case was shifted to Ecuador by a U.S. judge, Chevron challenged jurisdiction anyway and began to sell off its assets in the country. Company officials, led by General Counsel Charles James, threatened the indigenous groups with "a lifetime of litigation" if they persisted.

The DOJ letter – signed by Steven R. Donziger, the American lawyer for the Ecuadorians and the primary target of a Chevron retaliation campaign -- also was sent to the U.S. Attorneys in offices located in areas with a strong connection to the Chevron scheme. Donziger said the Guerra fraud appears to have been planned in company headquarters near San Francisco after previous company attempts to prove due process violations in the case based on an expert report were rejected by Ecuador's courts.

"It is our belief that Chevron's exorbitant witness payments to Guerra

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

had the ultimate aim of deceiving courts around the world to block enforcement of the Ecuador judgment, thereby consigning thousands of vulnerable indigenous people to a lifetime of suffering and likely death," said Donziger, who is part of the international legal team representing the villagers. "Chevron's approach to this entire litigation is based on intimidation and deceit and its goal is to obtain impunity for environmental crimes.

"The cost to the people of Ecuador from Chevron's strategy is off the charts," added Donziger. "This might be the world's worst ongoing humanitarian catastrophe and it is the product of pure greed by an American company."

Even though Chevron has used at least 2,000 lawyers as part of its retaliation campaign against Donziger and the affected communities, the company's Guerra "fraud" narrative has completely fallen apart in recent months.

Several media outlets (see here and here) reported that Guerra admitted under oath in a related international arbitration proceeding that he lied repeatedly before the U.S. federal court about key facts that formed the basis of the court's findings. Guerra's claim that the lawyers for the indigenous groups "ghostwrote" the judgment against Chevron was debunked by a forensic examination of the Ecuadorian trial judge's office computers by Racich, as explained here.

The Racich report found the Ecuador trial judge created and saved a Word document that became the judgment more than 400 times on his computer in the weeks prior to its issuance, and that it was not provided by lawyers for the indigenous groups on a flash drive as Guerra had testified.

Two Chevron lawyers in the Ecuador matter, Andres Rivero and Yohi Ackerman, admitted in 2012 that they gave Guerra $18,000 in cash out of a suitcase in Ecuador to enlist his initial cooperation. Ackerman later gave Guerra another $10,000 in cash for a handful of documents while Rivero promised he could receive at least $1 million more from Chevron if he "flipped" the trial judge who wrote the decision against the company – essentially another bribe attempt by Chevron using Guerra as the intermediary, said Donziger.

Chevron admitted during pre-trial discovery in the U.S. case that it paid for Guerra to fly from Ecuador to Chicago to negotiate his personal services contract that would guarantee the ongoing payments for his

testimony. Upon arrival in Chicago, the former judge made several crass comments that suggested he was motivated to lie by greed – comments such as "money talks but gold screams" and "couldn't you add a few zeroes" after the Chevron lawyers made an offer. The comments were recorded by Chevron's investigators and released as part of the court process.

The Chevron payments to Guerra appear to be ongoing, said Donziger.

Chevron declined to contest the facts of its pollution in Ecuador during the retaliatory U.S. "racketeering" case where it made the false bribery allegation, essentially admitting its guilt in the U.S. case after it was found guilty in Ecuador based on 105 technical evidentiary reports documenting its pollution , said Donziger.

*(For background on Kaplan's flawed RICO ruling, see here and this new report – "Chevron's RICO Fraud". The report documents the many ways in which the company fabricated and distorted evidence to try to taint the Ecuador judgment.)*

**Background**

Two respected legal commentators – Aaron Page of Forum Nobis and Michelle Harrison of EarthRights International -- recently published articles (here and here) concluding that the Chevron witness payments to Guerra not only were wrong, but "criminal" and "illegal". Those articles follow the recent publication of a comprehensive report documenting how Chevron fabricated and distorted evidence before U.S. courts to evade paying the environmental judgment.

Seventeen human rights and environmental groups and 19 international law scholars recently filed separate briefs attacking the company for using false evidence and violating international law. (Background on those briefs is here and here.)

Two federal judges from the United States have sanctioned the Gibson Dunn team for harassing U.S.-based lawyers for the Ecuadorians, while a California state court fined Chevron for filing a frivolous lawsuit against an American lawyer who formerly represented the Ecuadorian villagers. Separately, in echoes of Chevron's strategy in the Ecuador case, the High Court of London recently sanctioned a lawyer at Gibson Dunn for fabricating evidence to frame a political opponent of the leader of the African nation of Djibouti, one of the firm's major clients.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

\#\#

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

# EXHIBIT 55



NEWS BY CATEGORY ⌄

**MORE INFORMATION**

DISTRIBUTION

ABOUT US

SERVICES

ARCHIVE

CONTACT

CATEGORIES

SUBSCRIBE

✉ SUBSCRIBE TO ALERTS

RSS SUBSCRIBE TO RSS



# CSR News

🖨 Print   🔊 Alerts

## Chevron and Gibson Dunn Face Potential Criminal Probe Over $2m Witness Bribery Plot in Ecuador Pollution Case

Submitted by:   **Amazon Defense Coalition - FDA**
Categories:     Activism, Environment
Posted:         Nov 09, 2017 – 01:32 PM EST



WASHINGTON, D.C., Nov. 09 /CSRwire/ - Amazon indigenous groups and farmer communities in Ecuador have requested that the U.S. Department of Justice open a criminal investigation of Chevron and the Gibson Dunn law firm after uncovering a witness bribery scheme designed by the company to fabricate evidence to evade payment of a $9.5 billion environmental liability, according to a letter sent to several top DOJ officials and made public today.

The referral letter -- sent to the Chief of the Department of Justice (DOJ) fraud section and the U.S. attorneys in three major cities -- describes how in 2012 Chevron gave an illegal benefits package totaling at least $2 million to a former Ecuadorian judge, Alberto Guerra. Guerra, who admitted to Chevron prior to accepting the payments that he had engaged in numerous corrupt acts in Ecuador, later testified under oath that he lied repeatedly before a U.S. federal court as part of the company's strategy to evade paying the Ecuador environmental liability, which was confirmed by the country's highest court in 2013.

A copy of the DOJ letter can be read in full here.

Guerra's lies before the U.S. federal court, in Chevron's controversial non-jury civil "racketeering" or RICO case, led to a contested finding in 2014 by U.S. trial judge Lewis A. Kaplan that the Ecuador judgment was obtained by fraud. That decision was contradicted by eight appellate judges in Ecuador who unanimously affirmed Chevron's liability, including the entirety of country's Supreme Court.

Canada's Supreme Court also rejected Kaplan's findings when Chevron tried to use it to block efforts by Ecuadorian indigenous peoples to seize company assets in that country. In all, the Ecuadorians have won three unanimous appellate decisions in Canada against Chevron, all of which have ignored Kaplan's findings.

"Undisputed facts indicate that Chevron used Guerra's false testimony to commit extensive fraud on the indigenous people of Ecuador that appears to have been planned at the highest levels of the company," said Patricio Salazar, the lead Ecuadorian lawyer for the affected communities. "The United States Department of Justice must use its full investigative power to gather all relevant facts related to Guerra's false testimony and if appropriate, hold those responsible fully accountable."

(For background on Chevron's RICO fraud and the erroneous findings in the decision, see this 33-page report.)

Among those cited in the letter as orchestrating the Chevron fraud are CEO John Watson, who is retiring in January; Chevron General Counsel R. Hewitt Pate; and Chevron outside counsel Randy Mastro, Reed Brodsky, Andres Rivero, and Avi Weitzman, all of the Gibson Dunn law firm. Gibson Dunn has deployed hundreds of lawyers to fight the indigenous groups and has reaped an estimated $1 billon in fees from Chevron for doing so -- thought to be the largest fee in history paid by a corporation for litigation defense.

In the summer of 2013, Chevron lawyers from the Gibson Dunn firm coached Guerra for 53 days before he testified falsely that the Ecuador trial judgment against Chevron was "ghostwritten" by lawyers for the plaintiffs. The story later was proven false by a forensic examination performed by one of the world's leading computer experts, J. Christopher Racich.

The truth about the contamination in the Amazon caused by Chevron-Texaco.

⛶ Membership Page

**Recent News**

▸ Global Conference on Indigenous Solutions for Environmental Challenges Set for November in Canada
▸ Chevron Facing Furious Backlash for Using Secret Court to Violate Ecuador Pollution Judgment, Say Ecuadorians
▸ Ecuador Indigenous Leaders Criticize Secret Trade Arbitrators For Interference With $12b Chevron Pollution Judgment

The DOJ letter also recounts how Chevron provided Guerra and his extended family with free health care, a housing allowance, and the payment of fees to secure family members asylum so they could legalize their immigration status in the United States. Chevron also paid Guerra's personal income taxes as part of the deal.

Chevron lawyers led by Mastro of the Gibson Dunn law firm flew to Chicago to craft the first version of Guerra's false testimony in 2012 at the same time they were negotiating the benefits package with him, which provided a salary at least 24 times higher than what Guerra had been earning in Ecuador, according to the letter. Guerra insisted on meeting in Chicago because one of his children lived there, said Salazar.

Chevron's liability in Ecuador stems from judicial findings that the oil abandoned 1,000 open-air toxic waste pits gouged out of the jungle floor and systematically discharged billions of gallons of toxic oil waste into rivers and streams relied on by the local population for their drinking water and for fishing. Cancer rates in the area have exploded and at least hundreds, possibly thousands, of indigenous persons and farmers are believed to have died as a result, according to data in independent health studies.

Chevron operated in Ecuador under the Texaco brand from 1964 to 1992 and reaped an estimated $25 billion in profits over the life of its operating contract. It was the exclusive operator of six major fields covering parts of a 1,500 sq. mile swath of rainforest that once was home to five thriving indigenous nationalities, all of whom are now plaintiffs in the lawsuit.

Even though the environmental damages claims were filed in the United States in 1993, Chevron insisted the trial be held in Ecuador and accepted jurisdiction there as a way to avoid a jury of impartial fact finders in its home country. After the case was shifted to Ecuador by a U.S. judge, Chevron challenged jurisdiction anyway and began to sell off its assets in the country. Company officials, led by General Counsel Charles James, threatened the indigenous groups with "a lifetime of litigation" if they persisted.

The DOJ letter – signed by Steven R. Donziger, the American lawyer for the Ecuadorians and the primary target of a Chevron retaliation campaign -- also was sent to the U.S. Attorneys in offices located in areas with a strong connection to the Chevron scheme. Donziger said the Guerra fraud appears to have been planned in company headquarters near San Francisco after previous company attempts to prove due process violations in the case based on an expert report and other issues were rejected by Ecuador's courts.

"It is our belief that Chevron's exorbitant witness payments to Guerra had the ultimate aim of deceiving courts around the world to block enforcement of the Ecuador judgment, thereby consigning thousands of vulnerable indigenous people to a lifetime of suffering and likely death," said Donziger, who is part of the international legal team representing the villagers. "In our view, Chevron's approach to this entire litigation is based on intimidation and deceit and its goal is to obtain impunity for environmental crimes. The cost to the people of Ecuador from Chevron's unethical and even illegal strategy is enormous."

Even though Chevron has used at least 2,000 lawyers as part of its retaliation campaign against Donziger and the affected communities, the company's Guerra "fraud" narrative has completely fallen apart in recent months.

Several media outlets (see here and here) reported that Guerra admitted under oath in a related international arbitration proceeding that he lied repeatedly before the U.S. federal court about key facts that formed the basis of the court's findings. Guerra's claim that the lawyers for the indigenous groups "ghostwrote" the judgment against Chevron was debunked by a forensic examination of the Ecuadorian trial judge's office computers by Racich, as explained here.

The Racich report found the Ecuador trial judge created and saved a Word document that became the judgment more than 400 times on his computer in the weeks prior to its issuance, and that it was not provided by lawyers for the indigenous groups on a flash drive as Guerra had testified.

Two Chevron lawyers in the Ecuador matter, Andres Rivero and Yohi Ackerman, admitted in 2012 that they gave Guerra $18,000 in cash out of a suitcase in Ecuador to enlist his initial cooperation. Ackerman later gave Guerra another $10,000 in cash for a handful of documents while Rivero promised he could receive at least $1 million more from Chevron if he "flipped" the trial judge who wrote the decision against the company – essentially another bribe attempt by Chevron using Guerra as the intermediary, said Donziger.

Chevron admitted during pre-trial discovery in the U.S. case that it paid for Guerra to fly from Ecuador to Chicago to negotiate his personal services contract that would guarantee the ongoing payments for his testimony. Upon arrival in Chicago, the former judge made several crass comments that suggested he was motivated to lie by greed – comments such as "money talks but gold screams" and "couldn't you add a few zeroes" after the Chevron lawyers made an offer. The comments were recorded by Chevron's investigators and released as part of the

court process.

The Chevron payments to Guerra appear to be ongoing, said Donziger.

Chevron declined to contest the facts of its pollution in Ecuador during the retaliatory U.S. "racketeering" case where it made the false bribery allegation, essentially admitting its guilt in the underlying case, said Donziger. Chevron also dropped all damages claims on the eve of the RICO trial to avoid a jury of impartial fact finders.

*(For background on Kaplan's flawed RICO ruling, see here and* this new report *– "Chevron's RICO Fraud". The report documents the many ways in which the company fabricated and distorted evidence to try to taint the Ecuador judgment.)*

<u>Background</u>

Two respected legal commentators -- Aaron Page of Forum Nobis and Michelle Harrison of EarthRights International -- recently published articles (here and here) concluding that the Chevron witness payments to Guerra not only were wrong, but "criminal" and "illegal". Those articles follow the recent publication of a comprehensive report documenting how Chevron fabricated and distorted evidence before U.S. courts to evade paying the environmental judgment.

Seventeen human rights and environmental groups and 19 international law scholars recently filed separate briefs attacking the company for using false evidence and violating international law.  (Background on those briefs is here and here.)

Two federal judges from the United States have sanctioned the Gibson Dunn team for harassing U.S.-based lawyers for the Ecuadorians, while a California state court fined Chevron for filing a frivolous lawsuit against an American lawyer who formerly represented the Ecuadorian villagers. Separately, in echoes of Chevron's strategy in the Ecuador case, the High Court of London recently sanctioned a lawyer at Gibson Dunn for fabricating evidence to frame a political opponent of the leader of the African nation of Djibouti, one of the firm's major clients.

---

For more information, please contact:

**Paul Paz**
Phone: 510-773-4635

**Karen Hinton**
Phone: 703-798-3109

For more from this organization:

Amazon Defense Coalition - FDA

©2018 CSRwire, LLC. All Rights Reserved.

ISSUERS OF NEWS RELEASES AND NOT CSRWIRE ARE SOLELY RESPONSIBLE FOR THE ACCURACY OF THE CONTENT

Terms of Use   Privacy Policy   Site Map

WEB DESIGN & DEVELOPMENT BY <u>FUZZ PRODUCTIONS</u> & <u>SINGLEBROOK</u>

# EXHIBIT 56

| **From:** | Steven Donziger <sdonziger@donzigerandassociates.com> |
| **Sent:** | Thursday, February 1, 2018 9:02 AM |
| **To:** | Katie Sullivan <Katie@Streamlinefamilyoffice.com> |
| **Subject:** | Fw: press reelase |

if u have a moment, click on the link below and let me know what you think. have not posted yet

---

**From:** Gina Sibilia <gsibilia@3blmedia.com>
**Sent:** Thursday, February 1, 2018 10:01 AM
**To:** Steven Donziger
**Cc:** Editor
**Subject:** Re: press reelase

Hi Steven,

I added in the new title:
http://www.csrwire.com/preview/press_release/axT6EWGGQU4G5RTrvB9STZDYYiYIuKG3Nx90moz5

Let me know if you like the format or if you want me to use the previous title. Once you let me know I will make any changes if necessary and publish immediately.

Thanks,
Gina

On Thu, Feb 1, 2018 at 9:56 AM, Steven Donziger <sdonziger@donzigerandassociates.com> wrote:

# Sorry for the bother: try the following headline. I am trying to fit it into two lines I want to see if this fits. If not let's use the one we have. please advise. otherwise, no changes

# U.S. Judge Approved Secret Payments From Chevron to "Neutral" Court Official Who Swayed RICO Case for Company

---

**From:** Gina Sibilia <gsibilia@3blmedia.com>
**Sent:** Thursday, February 1, 2018 9:50:54 AM

**To:** Steven Donziger
**Cc:** Editor
**Subject:** Re: press reelase

Hi Steven,

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

Here is the link to the updated press release:
http://www.csrwire.com/preview/press_release/axT6EWGGQU4G5RTrvB9STZDYYiYIuKG3Nx90moz5

Please let our team know if you need any other edits or if this is approved.

Thanks,
Gina

On Thu, Feb 1, 2018 at 9:45 AM, Steven Donziger <sdonziger@donzigerandassociates.com> wrote:
Please remove the headline and substitute with the following:

## U.S. Judge Kaplan Approved Secret Payments From Chevron to "Neutral" Court Official Who Swayed RICO Case

**From:** Carreen Warner <cwarner@3blmedia.com>
**Sent:** Thursday, February 1, 2018 7:59:41 AM
**To:** Steven Donziger
**Cc:** Editor
**Subject:** Re: press reelase

Hi Steven,

Thank you for providing an updated document. The links look good now.

Here is a link to your updated preview:

http://www.csrwire.com/preview/press_release/axT6EWGGQU4G5RTrvB9STZDYYiYIuKG3Nx90moz5

Please let us know if you have any changes, or if this is approved for immediate publication.

Best,
Carreen

On Thu, Feb 1, 2018 at 7:46 AM, Steven Donziger <sdonziger@donzigerandassociates.com> wrote:
Thanks

**From:** Carreen Warner <cwarner@3blmedia.com>
**Sent:** Thursday, February 1, 2018 7:45:04 AM
**To:** Steven Donziger
**Cc:** Gina Sibilia; editor@csrwire.com
**Subject:** Re: press reelase

Hi Steven,

I am working on updating it right now and we send you a preview as soon as possible.

Thanks,

Carreen

On Thu, Feb 1, 2018 at 7:41 AM, Steven Donziger <sdonziger@donzigerandassociates.com> wrote:
Please set this up as a preview and send to me as soon as you can this morning. I want to post this around 10 a.m. EST or so. Thanks

---

**From:** Aaron Marr Page <aaron@forumnobis.org>
**Sent:** Wednesday, January 31, 2018 10:59 PM
**To:** Carreen Warner
**Cc:** Gina Sibilia; editor@csrwire.com; Steven Donziger
**Subject:** RE: added some links -- please preview

Okay, links should be fixed in the attached. Note the blog author in the last paragraph is Marissa **Vahlsing**

**From:** Carreen Warner [mailto:cwarner@3blmedia.com]
**Sent:** Wednesday, January 31, 2018 1:17 PM
**To:** Aaron Marr Page <aaron@forumnobis.org>
**Cc:** Gina Sibilia <gsibilia@3blmedia.com>; editor@csrwire.com; Steven Donziger <sdonziger@donzigerandassociates.com>
**Subject:** Re: added some links -- please preview

Hello Aaron,

Some of the links do work, but others do not. I have attached the Word document that Steven sent us and screenshots that highlight the links that are not working.

Please let us know if you need anything else.

Best,
Carreen

On Wed, Jan 31, 2018 at 2:04 PM, Aaron Marr Page <aaron@forumnobis.org> wrote:

Can someone send me the Word doc or specify which links?

The links in the email chain below look fine...

---

**From:** Steven Donziger [mailto:sdonziger@donzigerandassociates.com]
**Sent:** Wednesday, January 31, 2018 12:18 PM
**To:** Gina Sibilia <gsibilia@3blmedia.com>
**Cc:** editor@csrwire.com; Aaron Marr Page <aaron@forumnobis.org>

**Subject:** Re: added some links -- please preview

Aaron can u please help Gina w the links

Sent from my iPhone

On Jan 31, 2018, at 1:07 PM, Gina Sibilia <gsibilia@3blmedia.com> wrote:

Hi Steven,

I am so sorry this seems to still not be working. Despite being in Word Doc form there are several links that although they appear hyperlinked are not actually clickable.

Is this press release available on a website? If so, can you send me the link to the site? I can try to copy the links that are needed directly from the website.

I attached some screen shots of the links that are not working and highlighted them for you.

Thanks,
Gina

On Wed, Jan 31, 2018 at 12:34 PM, Steven Donziger <sdonziger@donzigerandassociates.com> wrote:

See if u can work with this

**From:** Gina Sibilia <gsibilia@3blmedia.com>
**Sent:** Wednesday, January 31, 2018 12:33:23 PM
**To:** Steven Donziger
**Cc:** editor@csrwire.com
**Subject:** Re: added some links -- please preview

Hi Steven,

There are still several links that are not hyperlinking. A solution may be for you to email the press release in Word Doc form. If you want to send that over to our team we can try to copy it from the Word Doc.

Thanks,
Gina

On Wed, Jan 31, 2018 at 12:16 PM, Gina Sibilia <gsibilia@3blmedia.com> wrote:

Hi Steven,

Thank you for sending this, I'll get to work on this and will let you know if there is a problem with any links.

Thanks,
Gina

On Wed, Jan 31, 2018 at 12:12 PM, Steven Donziger <sdonziger@donzigerandassociates.com> wrote:

**Gina, not sure why some of the links are not working. Maybe**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

preview it and call me and I can email the few (if any) links that are dead and you can stick in on hour end.  Let me know what's dead on the links front.  Need to get this up asap if possible.  Also, this is an FDA release with Hinton and Paz as contacts. Thanks, Steven


## U.S. Judge Authorized Secret Payments From Chevron to Court Official Who Swayed Discredited RICO Case In Company's Favor

*Allegations That Judge Lewis A. Kaplan Engaged In Cronyism With A Friend Who Billed $1,300 per hour to Help Chevron Undermine Ecuador Environmental Judgment*

New York – Chevron secretly paid at least $245,000 – and likely well over $1 million – by transferring funds to the private account of a court official who made pivotal decisions in favor of the oil giant during the lead-up to its now-discredited civil "racketeering" case against Ecuadorian indigenous villagers, according to new evidence recently produced as part of a court order.

The evidence demonstrates that Chevron sent the funds in 2013 to the account of Max Gitter, a court-appointed Special Master who at the time was working as Senior Counsel at the high-profile corporate law firm Cleary Gottlieb. Gitter is a personal friend and former law partner of Lewis A. Kaplan, the controversial federal judge who presided over the Chevron "racketeering" (or RICO) case and who repeatedly has been accused of bias in favor of the oil giant in its multiyear attempt to try to taint a $9.5 billion environmental judgment against it handed down by Ecuadorian courts.

Gitter and an associate were secretly billing Chevron a total of $1,330 per hour for their work sitting in weeks of depositions leading up to the civil RICO trial, which began in October 2013. That amount is more than many of the indigenous peoples in Ecuador who won the judgment make in one year, said Patricio Salazar, the Ecuadorian lawyer for the Front for the Defense of the Amazon (FDA), the group that represents the affected communities.

News that Chevron secretly paid Gitter based on a threadbare bill (see here) follow a stunning admission by the company that it paid its star witness in the RICO case – held without a jury -- at least $2 million in cash and other benefits. That Chevron witness, a former Ecuadorian judge named Alberto Guerra, later admitted under oath in a separate proceeding that he lied repeatedly about key facts Kaplan cited for findings in favor of the company. Kaplan's findings have been rejected in whole or in part in five different unanimous decisions by appellate courts in Canada and Ecuador, including the entire Supreme Courts of both countries.

*(For general background, see this blog on the bias of Gitter and Judge Kaplan during the RICO case. Here is a summary of the overwhelming evidence that led to*

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

*the judgment against Chevron in Ecuador, where the company accepted
jurisdiction. Ecuador's Supreme Court <u>affirmed the judgment</u> against Chevron in a
unanimous opinion in 2013.)*

Steven R. Donziger, a solo practitioner and the longtime U.S. legal advisor to the
Ecuadorians who Chevron sued under RICO for $60 billion before the company
dropped all damages claims to avoid a jury, said it is unethical and a sign of
potential corruption for a court-appointed Special Master to receive secret
payments from one party in a litigation without disclosure to the adversary party.
This is particularly true when the adversary party – in this case the Ecuadorian
villagers -- was alleging bias on the part of the trial judge and the Special Master
and seeking the removal of both, said Donziger.

The fact the payments were transferred to Gitter directly without disclosure and
were not paid through his law firm is "highly suspicious and suggests
consciousness by Gitter and Chevron that what they were doing was unethical, as
it clearly was," said Donziger. The lawyer has demanded Judge Kaplan allow him
and his Ecuadorian clients to depose Gitter under oath, but Kaplan has yet to rule
on the request.

"These secret payments from Chevron to a powerful court official are extremely
worrisome," said Donziger. "They suggest Chevron and Gitter knew they had
something to cover up. Chevron was secretly paying huge sums to a man who
was an extension of the judge and who exercised enormous power over the
litigation and who did so consistently in favor of the company. The secret
payments were encouraged by Judge Kaplan which further discredits his deeply
flawed handling of the case. This is yet another example of why Chevron's RICO
judgment, obtained without a jury of impartial fact finders and based largely on
fabricated witness testimony, has now been rejected in whole or in part by no
fewer than 21 appellate judges around the world.

"Another extremely disturbing aspect of this affair is that Special Master Gitter
clearly used a seminal human rights case involving vulnerable indigenous groups
to personally enrich himself, no doubt believing that he would never have to
disclose his bills or the amount he was paid," added Donziger. "Years later, the
chickens are coming home to roost. It is clear that Gitter billed $1,330 per hour
for his work and that of an associate. One can understand just how revolting that
must be to the indigenous peoples of Ecuador who now must face the reality that
a court-appointed official in the United States personally reaped huge fees to
facilitate Chevron's scheme to block a clean-up of their ancestral lands."

Some of the facts surrounding the Chevron payments to Gitter emerged only
recently when he finally disclosed some of his billing documents, almost four
years after the end of the RICO proceeding. They include:

**Gitter was working as Senior Counsel at Clearly Gottlieb at the time he was
Special Master but he never used the firm's billing software. Instead, he simply
sent Chevron the threadbare bill for a fixed sum ($245,425) for payment.
Apparently without asking questions, the company sent Gitter a check for the full

amount to his home address in upper Manhattan. Normally, such fees are paid to a lawyer's firm. Even more unusual, another Cleary Gottlieb lawyer who worked with Gitter on the case used the firm's billing software and was paid by Chevron via the law firm.

**When in the lead-up to the RICO trial in 2013 the Ecuadorians insisted that Gitter -- who was facing credible allegations of bias -- disclose his bills and who was paying his fees, he continually refused. Only years later, when Chevron filed a highly aggressive motion insisting that Donziger personally reimburse the oil giant a whopping $33 million for legal fees, did Gitter finally disclose the secret payments.

**Gitter only released his back-up time sheets (see here) -- which seem to have been created hastily -- after Donziger insisted he be able to review them. Donziger recently filed a motion asking Kaplan to order Gitter to produce any metadata to determine when the time sheets were created.

**As part of its fee application, Chevron also is asking Kaplan to order Donziger to reimburse the company for 100% of its secret payments to a second Special Master, former state court judge Theodore Katz, and a law associate from Gitter's firm, Justin Ormand. Both worked alongside Gitter on the RICO matter. The fees of Gitter and his two colleagues total almost $900,000, with Ormand charging roughly $420,000 and Katz roughly $213,000. Donziger claims the Chevron fee motion is another SLAPP-style intimidation effort designed to silence his advocacy and threaten him with bankruptcy.

**The bills also disclose that Ormand, the young associate at Cleary whom Gitter brought to most of the depositions, billed his time at $630 per hour. For Ormand's work, Chevron paid Cleary roughly $394,000 without time sheets being provided (see here). Some of that total likely was distributed to Gitter as a senior lawyer in the firm. Unlike Gitter, Ormand used the firm's billing software. (His completed time sheets, disclosed after Chevron paid his firm, are here.)

**Ormand also billed for the work of several staff members at Cleary as well as his own first-class air travel and other perks, including roughly $800 for meals in Peru over four days after Kaplan ordered depositions of certain Ecuadorians to take place in the U.S. embassy in Lima. A typical meal in Peru usually costs no more than $10, said Salazar.

**Gitter and Kaplan thus far have failed to act on multiple requests that they disclose the still-secret Chevron payments related to a separate portion of Gitter's work in 2011 overseeing at least 20 days of depositions of Donziger and the filmmaker Joe Berlinger, who made a critically-acclaimed documentary about the case. Those depositions were conducted by a team of approximately 20 Chevron lawyers with Gitter often taking over the questioning from Chevron. Chevron likely paid Gitter at least another $1 million for that portion of his work, which is directly to the RICO matter, said Donziger.

Neither Kaplan nor Gitter has offered a defense to the secret payments, which

Kaplan authorized after the Ecuadorians and Donziger stated they would not pay the bills of the Special Masters because of a paucity of funds. Separately, Donziger and his clients had objected to Gitter's appointment given evidence of his pro-Chevron bias and because of a conflict stemming from his long friendship with Kaplan. (See here for the objections.)

Donziger, a human rights lawyer who has advised the Ecuadorian communities since 1993 (see here for Donziger bio), has called for Kaplan's recusal from ruling on the few remaining issues in the RICO case given his various conflicts and other problems as outlined in this legal filing. Donziger also said he plans to file a complaint about Judge Kaplan's conduct under the federal Judicial Conduct and Disability Act, which governs ethical issues involving federal judges.

Separately, Donziger has referred Chevron officials and certain of its outside lawyers from the Gibson Dunn firm involved in the fabrication of evidence – including Randy Mastro, Avi Weitzman, and Andrea Neumann -- to the U.S. Department of Justice and the offices of three U.S. Attorneys for a possible criminal probe. (See here for referral letter.) Chevron's main outside law firm, Gibson Dunn already has been sanctioned by the High Court of London for fabricating evidence to frame an innocent man who had run afoul of one of the firm's clients. Chevron's lawyers at Gibson Dunn coached Guerra for 53 days before he testified falsely in the RICO proceeding to try to frame Donziger in a fake fraud in Ecuador, according to this report.

Donziger's full statement in response to the news of Chevron's secret payments to Gitter is here:

*"Chevron's secret and clearly unethical payments to Special Master Gitter during the RICO trial are no more shocking than Judge Kaplan failing to throw out his clearly erroneous findings in the case, as proven by Chevron's witness bribery and other fabricated evidence documented in our report Chevron's RICO Fraud. The Chevron payments to Mr. Gitter can be added to the growing pile of unethical conduct by the oil company and the court that has led to worldwide skepticism both of Judge's Kaplan's bizarre and inappropriate behavior and his flawed pro-Chevron factual findings based largely on fabricated evidence. The secret Chevron payments also suggest that Judge Kaplan and Mr. Gitter ran what looks like a pay-to-play scheme for Chevron in a taxpayer-funded U.S. federal court taking advantage of a human rights case brought by impoverished indigenous groups. This scheme was designed to help a powerful U.S. company evade its liability to the indigenous peoples it harmed in Ecuador, with the added benefit that Gitter could personally enrich himself. This is a very bad look for the federal judiciary and in my view it creates the perception, if not the reality, of official corruption. We will continue to draw the attention of the U.S. Department of Justice and foreign courts to these facts as the Ecuadorians enforce their environmental judgment against Chevron assets around the world. We also will continue to take all steps necessary to hold the U.S. lawyers working for Chevron at the Gibson Dunn firm, the Chevron executives who orchestrated their work, and relevant court officials involved in this abuse of power fully accountable for their unethical and possibly criminal misconduct. Ultimately, these efforts are about ensuring*

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

*that the rule of law applies to Chevron and that the company will be held
accountable to the people it continues to harm in Ecuador. "*

Salazar, the Ecuadorian lawyer for the affected communities, said he was
"astonished" to hear of the secret payments. "It is clear that Chevron was more
than happy to pay 100% of the bills of Gitter because it knew he was a key part of
the company's scheme to help move the RICO case, despite massive legal and
factual obstacles including outright witness bribery," Salazar said. "News of these
long-hidden payments and the circumstances around them are extremely
disturbing to anybody who believes in the rule of law."

As Special Master overseeing depositions in the RICO matter of several high-level
Chevron officials, including then-CEO John Watson, Gitter continually tried to
limit questioning that was likely to damage the company's litigation position. For
example, Gitter struck most questions about Chevron's environmental
contamination in Ecuador on which the court decision against Chevron was
based. He also refused to permit questions about Chevron's fraudulent attempt
to remediate the environmental damage in Ecuador and he ruled that any
inquiries about the political pressure Chevron applied to Ecuador's government
to quash the case were off-limits. Kaplan backed virtually all of Gitter's rulings
when they were challenged.

Kaplan – who held undisclosed investments in Chevron during the trial --
also denied Donziger the right to litigate his extensive counterclaims alleging the
company committed criminal violations and fraud in Ecuador and the United
States. Kaplan made a number of intemperate remarks in favor of Chevron during
the RICO proceeding, calling the Ecuadorian villagers the "so-called plaintiffs" and
said "I got it from the beginning" regarding Chevron's allegations prior to holding
even an evidentiary hearing, much less a trial. On two occasions, the federal
appellate court overseeing Kaplan held extraordinarily rare hearings to consider
his recusal from the case.

*(For more background, see here for a legal brief outlining Kaplan's bias; here for a
report on how Chevron committed fraud during the RICO
matter; here and here for comments by prominent attorney John Keker calling the
RICO case a "Dickensian farce". See this essay by Harvard lawyer Marissa Vahring
for an insider's view of Kaplan's animus toward the Ecuadorians.)*

--
Gina Sibilia
Content Editor
US: 866.508.0993 x110
Int'l: 802.535.3215 x110

gsibilia@3blmedia.com

**Corporate Responsibility & Sustainability Communications**
**3BL Media | CR Magazine | CSRwire | Ethical Performance | ReportAlert | TriplePundit**

**How the World's Best Brands Tell Their CSR & Sustainability Stories**

--
Gina Sibilia
Content Editor
US: 866.508.0993 x110
Int'l: 802.535.3215 x110
gsibilia@3blmedia.com

**Corporate Responsibility & Sustainability Communications**
**3BL Media | CR Magazine | CSRwire | Ethical Performance | ReportAlert | TriplePundit**

**How the World's Best Brands Tell Their CSR & Sustainability Stories**

--
Gina Sibilia
Content Editor
US: 866.508.0993 x110
Int'l: 802.535.3215 x110
gsibilia@3blmedia.com
**Corporate Responsibility & Sustainability Communications**
**3BL Media | CR Magazine | CSRwire | Ethical Performance | ReportAlert | TriplePundit**

**How the World's Best Brands Tell Their CSR & Sustainability Stories**

<BrokenLinks1.png>

<BrokenLinks2.png>

--
_____
**CARREEN WARNER**
Content Editor

US: 866.508.0993 x 122
Int'l: 802.535.3215 x 122
cwarner@3blmedia.com


--
_____
**CARREEN WARNER**
Content Editor
US: 866.508.0993 x 122
Int'l: 802.535.3215 x 122
cwarner@3blmedia.com


--
_____
**CARREEN WARNER**
Content Editor
US: 866.508.0993 x 122
Int'l: 802.535.3215 x 122
cwarner@3blmedia.com


--
Gina Sibilia
Content Editor
US: 866.508.0993 x110
Int'l: 802.535.3215 x110
gsibilia@3blmedia.com

**Corporate Responsibility & Sustainability Communications**
**3BL Media | CR Magazine | CSRwire | Ethical Performance | ReportAlert | TriplePundit**

**How the World's Best Brands Tell Their CSR & Sustainability Stories**


-
Gina Sibilia
Content Editor
US: 866.508.0993 x110
Int'l: 802.535.3215 x110
gsibilia@3blmedia.com

**Corporate Responsibility & Sustainability Communications**

3BL Media | CR Magazine | CSRwire | Ethical Performance | ReportAlert | TriplePundit

How the World's Best Brands Tell Their CSR & Sustainability Stories

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

# EXHIBIT 57

Transfer Submitted

close window

Print this Page

**Transfer status: In Process**
**Order Number: 221092316**

### Transfer Accounts

From: CWP Associates : Avail. Bal $393,116.41

To: Forum Nobis (Citibank)

### Transfer Details

**Send amount**

Send amount: $10,000.00

Additional fee: $30.00

**Transfer description**

legal fees

**Transfer dates**

Frequency: One time, immediately

Delivery speed: Same Day

Start on date: 01/12/2018

Estimated delivery date: 01/12/2018
**Note**:The receiving bank may make funds available later than this.

**Send email to recipient**

Email to:

Email from:

Subject:

Message:

**Transfer on behalf of**

Name:

ID:

Email:

Street address:

City:

MKS-0006401

*Aaron legal fees*

# FORUM NOBIS

PLLC

# INVOICE FOR PROFESSIONAL SERVICES

**DATED:** January 9, 2018

**SERVICES DATED:** August 1, 2017 - January 12, 2018

# $10,000.00

**STEVEN R. DONZIGER**
245 W. 104th St, #7D
New York, NY 10025
sdonziger@donzigerandassociates.com

*pd 1/12/18*
*KS*

**FORUM NOBIS PLLC**
513 Capitol Court NE
Washington, D.C. 20002
Tel. 202-618-2218
aaron@forumnobis.org

**MATTER(s):**     **Ecuador**

## FEES

| DATE | ITEM | HOURS | TOTAL |
|------|------|-------|-------|
| Aug to Dec 2017 | FOR PROFESSIONAL SERVICES RENDERED | | $2,500.00 |
| Jan 12 - Feb 9, 2018 | RETAINER (Approx. 75% of full-time) | | $7,500.00 |
| | | Total | $10,000.00 |

## EXPENSES

| DATE | ITEM | QUANTITY | TOTAL |
|------|------|----------|-------|
| | [ incorporated ] | | |
| | | Net Total | - |

| | **TOTAL** | **$10,000.00** |
|--|-----------|----------------|

PAYMENT DETAILS

**Name of Beneficiary:** Forum Nobis PLLC / Aaron Marr Page
**Name of Bank:** Citibank NA
**Address:** 1000 Vermont Ave NW, Washington, D.C. 20005
**Account Number:** ▮▮▮▮1194
**Routing Number:** ▮▮▮0116
**SWIFT:** CITIUS33

OTHER INFORMATION

Aaron Marr Page
Tel. 202-618-2218
Fax 202-499-1370
http://forumnobis.org
aaron@forumnobis.org

MKS-0006402

# FORUM NOBIS

## ACCOUNT STATUS

PLLC

**DATED:** August 16, 2017

**BALANCE:**

# -$2,500.00

**STEVEN R. DONZIGER**
245 W. 104th St, #7D
New York, NY 10025
sdonziger@donzigerandassociates.com

**FORUM NOBIS PLLC**
513 Capitol Court NE
Washington, D.C. 20002
Tel. 202-618-2218
aaron@forumnobis.org

## TRUST ACCOUNT

| DATE | TRANSACTION | AMOUNT | BALANCE |
|------|-------------|--------|---------|
| 1-Aug-17 | Outstanding balance | -912.50 | -912.50 |
| 16-Oct-17 | Payment | 15,000.00 | 14,087.50 |
| 9-Jan-18 | Agreed charges re Fall 2017 work and expenses | -16,587.50 | -2,500.00 |

**BALANCE**   **-2,500.00**

PAYMENT DETAILS

**Name of Beneficiary:** Forum Nobis PLLC / Aaron Marr Page
**Name of Bank:** Citibank NA
**Address:** 1000 Vermont Ave NW, Washington, D.C. 20005
**Account Number:** ▮▮▮▮▮1194
**Routing Number:** ▮▮▮0116
**SWIFT:** CITIUS33

OTHER INFORMATION

Aaron Marr Page
Tel. 202-618-2218
Fax 202-499-1370
http://forumnobis.org
aaron@forumnobis.org

MKS-0006403

# EXHIBIT 58

Transfer Submitted                                                       close window

Print this Page

**Transfer status: In Process**
**Confirmation Number: 226230644**

### Transfer Accounts

**From:** CWP Associates : Avail. Bal $405,332.71

**To:** Forum Nobis (Citibank)

### Transfer Details

**Send amount**

Send amount: $7,500.00

Additional fee: $10.00

**Transfer description**

**Transfer dates**

Frequency: One time, immediately

Delivery speed: Next Business Day

Delivery method: ACH

Start on date: 03/14/2018

Estimated delivery date: 03/15/2018
**Note:**The receiving bank may make funds available
later than this.

**Send email to recipient**

Email to:

Email from:

Subject:

Message:

**Transfer on behalf of**

Name:

ID:

Email:

Street address:

City:

MKS-0006464

# FORUM NOBIS

## INVOICE FOR PROFESSIONAL SERVICES

PLLC

**DATED:** March 5, 2018

**SERVICES DATED:** Feb. 9 - March 9, 2018

# $7,500.00

STEVEN R. DONZIGER
245 W. 104th St, #7D
New York, NY 10025
sdonziger@donzigerandassociates.com

**FORUM NOBIS PLLC**
513 Capitol Court NE
Washington, D.C. 20002
Tel. 202-618-2218
aaron@forumnobis.org

**MATTER(s):**     **Ecuador**

## FEES

| DATE | ITEM | HOURS | TOTAL |
|---|---|---|---|
| Feb 9 - March 9, 2018 | FOR PROFESSIONAL SERVICES RENDERED | | $7,500.00 |
| | | Total | $7,500.00 |

## EXPENSES

| DATE | ITEM | QUANTITY | TOTAL |
|---|---|---|---|
| | [ incorporated ] | | |
| | | Net Total | - |
| | | **TOTAL** | **$7,500.00** |

## PAYMENT DETAILS

**Name of Beneficiary:** Forum Nobis PLLC / Aaron Marr Page
**Name of Bank:** Citibank NA
**Address:** 1000 Vermont Ave NW, Washington, D.C. 20005
**Account Number:** ████1194
**Routing Number:** ████0116
**SWIFT:** CITIUS33

### OTHER INFORMATION

Aaron Marr Page
Tel. 202-618-2218
Fax 202-499-1370
http://forumnobis.org
aaron@forumnobis.org

okay to send SRP
3/13/18

MKS-0006465

# EXHIBIT 59

**From:** Steven Donziger <sdonziger@donzigerandassociates.com>
**Sent:** Tuesday, June 6, 2017 5:13 PM
**To:** 'Clifford Eisler'; 'John van Merkensteijn'
**Subject:** Latest on Ecuador

**Categories:** KF2

Chevron starting to feel serious pressure. We can get them to the table if we keep this up and implement the strategy, in my opinion:

http://www.csrwire.com/press_releases/40066-Facing-Bribery-Charges-Chevron-Trying-to-Mislead-U-S-Supreme-Court-With-Fake-Facts-and-Flawed-Arguments

Facing Bribery Charges, Chevron Trying to Mislead U.S. Supreme Court With Fake Facts and Flawed Arguments – Press Releases on CSRwire.com

www.csrwire.com

Press Releases get your corporate social responsibility news and information out to journalists, investors, and industry professionals utilizing CSRwire's targeted reach.

JVM 002526

# EXHIBIT 60

| **From:** | Steven Donziger <sdonziger@donzigerandassociates.com> |
| **Sent:** | Monday, October 16, 2017 10:03 PM |
| **To:** | Ian Watson; John van Merkensteijn |
| **Subject:** | see below -- important/confidential |

| **Categories:** | KF2 |

Please do not send around.

This is potentially breakthrough stuff -- see below.

Want to talk about this when u guys get a chance. Kathleen is Phil Fontaine's wife and she is a major force in Canada as a human rights lawyer and activist.

SRD

Hi Steven
Thanks for your note. I have as you know a few ideas that could perhaps be of some assistance going forward with the case, one of which is a conference at my university with national and international experts. The emphasis would be on restorative justice and would bring together experts from a variety of backgrounds - law, environment, history , business, philosophy, climate change specialists, etc., including of course some of the claimants themselves. The concept would be to re–frame the case, assuming resolution in the form of a win-win settlement. If we could get representation from the oil industry here in Calgary, the epicentre of the oil industry in Canada, that would, I think, bring significant pressure to bear on Chevron to come to the table instead of following their scorched earth policy which does not fly well in Canada. Let me know what you think. I have raised the concept with a few of my senior colleagues at the law faculty and they think it would be a great idea. I would need some significant funding to pull it off. I think if we got funding , we could work on a timeline of having conference in the spring. I could get a lot of law student volunteers I am sure. We also have public interest law clinic that is a possible resource. Let me know what you think,
All the best,
Kathleen
Kathleen Mahoney FRSC, QC
Fellow of the Royal Society of Canada
Trudeau Fellow
Fulbright Fellow
Sir Allen Sewell Fellow
Barrister and Solicitor
Professor of Law
Website: http://www3.telus.net/kmahoney

Kathleen Mahoney - telus.net

www3.telus.net

JVM 002886

Welcome to Kathleen Mahoney's web-site. Here you will find Kathleen's biography, her CV, her latest blogs, and the latest news.

Tel: (403) 239-8982
Fax: (403) 208-1714

JVM 002887

# EXHIBIT 61

- subscription settings
- Become a member
- Submit your news

September 28, 2018

- facebook
- twitter
- google+



 Custom Search

# CSR News

## Global Conference on Indigenous Solutions for Environmental Challenges Set for November in Canada

Organizers For Banff Event Include Major Canadian and Ecuadorian Indigenous Leaders and Environmentalists

| | |
|---|---|
| Submitted by: | **Amazon Defense Coalition - FDA** |
| Categories: | Environment, Activism |
| Posted: | Sep 14, 2018 – 12:24 PM EST |



CALGARY, Canada, Sep. 14 /CSRwire/ - A major international conference focused on indigenous legal principles, the environment, and the landmark $12 billion pollution judgment won by rainforest communities in Ecuador against Chevron is scheduled to take placeNovember 10-12 in Banff, Canada. The conference is being organized by a group of professors at the University of Calgary Faculty of Law. Indigenous leaders from North and South America, environmentalists, resource company representatives, government officials and lawyers are planning to attend. A significant part of the conference will engage with indigenous youth and grass roots peoples.

Registration for the conference is open via this website, which contains a list of speakers and a current overview of the program.

Organizers say one of the main goals of the conference is to establish a global coalition that would further the ideas and solutions coming out of the conference discussions. "We live in a critically important moment in history when extractive activities on traditional indigenous lands raise a number of cutting edge legal and policy issues that the conference will explore," said Kathleen Mahoney, Professor of Law at the University of Calgary, and an organizer of the event.  The coalition project would be "intimately connected" to the Paris Accords to reverse global warming trends and also will closely consider the consultative process with Indigenous groups as informed by a recent court decision in Canada suspending construction of the Trans Mountain pipeline, she said.



Above: Phil Fontaine Below: Kathleen E. Mahoney (Images courtesy of Banff Conference 2018)

The conference is being co-hosted by Phil Fontaine, the thrice-elected National Chief of Canada, and the recipient of 19 honorary doctoral degrees; Luis Macas, the Saraguro leader considered the father of the modern Indigenous movement in Ecuador; and Mahoney, who was a lead negotiator in the historic class action settlement of Canada's Indian residential schools case and a Fellow of the Royal Society of Canada. Sponsors include the Social Sciences and Humanities Research Council; Amazon Defense Coalition; the Center for International Governance Innovation; Ian, Victoria, and Lucinda Watson; and IndigenEYEZ, an organization focused on empowering Aboriginal youth.



The Ecuador case, *Aguinda v Chevron*, involving unpaid judgments for the world's worst oil-related environmental disaster, will be one of the important issues discussed by both experts and indigenous representatives who will attend from Canada, the United States, Ecuador, and several other countries. Indigenous peoples and farmer communities in Ecuador won the judgment against Chevron after four layers of courts found the company discharged billions of gallons of oil waste into the rainforest, decimating Indigenous groups and causing a major public health catastrophe.

Top officials from Canada's Assembly of First Nations, a national group which represents all 634 First Nations in Canada and is considered one of the most influential rights groups in the world, will also attend and speak at the event. The AFN last year signed a joint protocol with Ecuadorian Indigenous groups to hold Chevron accountable for failing to address its pollution issues.

In addition to the above hosts, those slated to speak at the conference include Canadian environmentalist, author, and scientist David Suzuki; Aritha van Herk, an award-winning Canadian novelist from Alberta who has won acclaim throughout North America and Europe; Cora Voyageur, a Dene leader from the Athabasca Chipewyan First Nation, and advocate of interests of First Nations; Grand Chief Ed John, a noted lawyer and a former expert to the United Nations Permanent Forum On Indigenous Issues; and Glen Murray formerly of the Pembina Institute, Canada's leading energy think tank.

Also speaking will be Charles Nesson, the William F. Weld Professor at Harvard Law School; Sharon Mascher, a professor at the University of Calgary Faculty of Law and expert on climate change litigation; Steven Donziger, American social justice advocate who has represented survivors in Ecuador for 25 years; Grand Chief Wilton Littlechild, an international lawyer and architect of the United Nations Declaration On the Rights of Indigenous Peoples; and Rex Weyler, the co-founder of Greenpeace and author.

Fontaine said he had high hopes for the conference, calling it "a potential paradigm-shifting" event by advancing the use of Indigenous legal traditions in national court systems.

"This is also about examining better ways to hold polluters accountable for wrongdoing in a timely fashion," he said. "The Ecuador pollution case is an important context in which to better understand the issues involved which are critical for all Indigenous peoples in Canada and around the world.  We stand with our brothers and sisters in Ecuador as they seek fair and just reparations for the tremendous harms that has been done to them and their lands. We are going to use the conference to try to make that happen."

Panels will include one with survivors from Ecuador's Amazon rainforest devastation; an analysis of reparations based on indigenous legal principles; how corporate obstructionism to human rights and environmental cases creates impunity; how private arbitrations under international trade treaties impact human rights protections; an analysis of successful reparations for mass harms in Canada; and conceptualizing harms from the perspectives of those harmed rather than those who harm.

Also planning to attend are 15 Ecuadorian indigenous persons and farmers who are part of the class that won the judgment against Chevron. Among them is Luis Yanza, an Ecuadorian author and community leader who in 2008 won the Goldman Environmental Prize.

A limited number of scholarships are available to attend the conference. To apply, please contact Penny Jacko at pjacko@ishkonigan.com.

For follow-up for media and academics, please contact Kathleen Mahoney at kmahoney@ucalgary.ca or Phil Fontaine at lfontaine@ishkonigan.com.

---

For more information, please contact:

**Kathleen Mahoney**

**Phil Fontaine**

For more from this organization:

Amazon Defense Coalition - FDA

# EXHIBIT 62

# INDIGENOUS SOLUTIONS FOR ENVIRONMENTAL CHALLENGES

## NOVEMBER 10-12, 2018 BANFF, ALBERTA

### CONFERENCE:

# INDIGENOUS SOLUTIONS FOR ENVIRONMENTAL CHALLENGES

**WHAT**

The conference will use the context of the historic Aguinda v. Chevron environmental case to consider the critical role of judicial remedies for violations of the rights of

**WHEN**

NOVEMBER 10-12, 2018

**WHERE**

BANFF CENTRE FOR ARTS AND CREATIVITY

107 TUNNEL MOUNTAIN DR, BANFF, AB T1L 1H5

**COST**

indigenous and other affected peoples and the leading systemic obstacles to the realization of remedies in particular cases, both in Canada and beyond.

**Conference Steering Committee: Kathleen Mahoney, Sharon Mascher, Phil Fontaine, Robert Hamilton, Nigel Bankes, Aaron Marr Page, Michelle Davis, Rajvir Gil**

**EARLY BIRD REGISTRATION DEADLINE:** OCTOBER 1, 2018

**REGULAR REGISTRATION:** OCTOBER 2, 2018 TO NOVEMBER 10, 2018

**CORPORATE/PROFESSIONAL/ACADEMIC:** $555.00 CAD (EARLY BIRD); $630.00 CAD (REGULAR)

**REGULAR REGISTRANT:** $399.00 CAD (EARLY BIRD); $475.00 CAD (REGULAR)

**STUDENT:** $100.00 CAD (EARLY BIRD); $150.00 CAD (REGULAR)

* Please note that a limited number of scholarships to cover the cost of registration fees will be available. Please contact Penny Jacko at pjacko@ishkonigan.com or Michelle Davis at kmahoney@ucalgary.ca to apply.

**REGISTRATION INCLUDES: BREAKFAST, LUNCH, MORNING AND AFTERNOON BREAK REFRESHMENTS, PREMADE RESERVATIONS FOR DINE AROUND ON NOVEMBER 10TH.**

REGISTER NOW



# PROGRAM

## DAY 1

**8:30am – 9:30am : Opening Ceremony**

- Elders' Circle led by Chief Reg Crowshoe

- Welcome Message from Michael Hart, Vice Provost (Indigenous Engagement), University of Calgary

**9:00am – 9:30am : Introduction**

- Goals and Objectives
    - *Kathleen Mahoney, Phil Fontaine, Luis Macas*

**9:30am – 10:00am: Opening Keynote Address**

- Setting the Bottom Line in the Anthropocene
    - *David Suzuki*

**10:00am – 11:00am: The Path Forward: Victories for Indigenous Peoples Rights in National and International Fora**

- *CHAIR: Grand Chief Ed John*
- The Path to an Indigenous Rights-Respecting Jurisprudence in the Inter-American System
    - *Juan Aulestia*
- The Indian Residential School Settlement Agreement: Effective use of Indigenous Principles
    - *Kathleen Mahoney*
- Success in domestic litigation regarding indigenous rights.
    - *Bill Gallagher*

**11:00am – 11:15pm : Health Break**

**11:15am – 12:15pm : Challenges facing Ecuadorian peoples of Ecuador after the largest environmental catastrophe in the world**

- *CHAIR: Luis Macas*
- Five or six survivors talk about their relationship to resource development in their Amazonian territories, their experiences with the resource development that has taken place, how they worked with NGO's and other local rights groups over many years of struggle, what it's like to grow up in a community struggling for its life, what reparations they need to repair the harms done to them, their families, their communities, their environment, their health, their economies and their lives. There could also be workshops throughout the conference to hear and record survivors' stories through skype.

**12:15 – 1:00pm: Lunch Break**

**1:00pm - 1:30pm: A Lawyer's Experience: The history of the *Aguinda* litigation**

- *MODERATOR: Charles Nesson*
- *Steven Donziger*

**1:30pm – 2:30pm:** : **Corporate Strategies of Obstruction**

*CHAIR: Shaun Fluker*

- Corporate Accountability: From 'Here, There and Everywhere' to 'Nowhere Man'
  - *Shin Imai*
- The New Corporate Playbook: Targeting victims and their Lawyers with harassing SLAPP lawsuits and public "demonization"
  - *Rachel Deming*

**2:30pm – 3:00pm: Keynote: Impediments to Achieving Indigenous Environmental Justice in the Court System**

- How courts deal with entrenched power
  - *TBA and Phil Fontaine*

**3:00pm - 4:00pm: Building New Relationships through the use of Indigenous Principles and Processes: The Residential School Example**

- *CHAIR: TBA*
- Limiting the Range of Permissible Lies: The importance of Truth Commissions for Reconciliation
  - *Willy Littlechild*
- Re-building Indigenous Families After Residential Schools
  - *Cora Voyageur*
- Reconciliation, Forgiveness, and Healing
  - *Chief Bobby Joseph*

**4:00pm – 4:15pm : Health Break**

**4:15pm – 5:15pm : The Political and Operational Dimensions of Reparations**

- Methodology for Bottom Up Engagement for Victims of Institutional Abuse: The Northern Ireland Experience
  - *Patricia Lundy*
- Keeping the Grass roots in Solidarity
  - *Jon McCourt, Derry Survivors Society*
- Methodology Problems with the Missing and Murdered Indigenous Women Inquiry: Lessons learned
  - *Marilyn Poitras*

**6:30pm – 11:00pm : Cultural Activities**

- Country and Western Barbecue and Cultural Night

On Saturday night November 10th, a country and western venue in Banff will be the venue for a "hoe down" western bar-be-que complete with hay bales and country music, line dancing and tunes by the famous Juno nominated indigenous band, Indian City.

- Mini Film festival - Friday November 9th

The mini film festival will present a selection of documentaries on the conference themes. The films will be shown at the opening reception on Friday November 9th and will be hosted. Films will also be shown after the conference sessions and dinners.

Fractured Land - Caleb Behn Host http://www.fracturedland.com

Crude - https://chevrontoxico.com/crude/ *TBC*

# Day 2

**9:00am – 9:30am: Indigenous Rights and the Arts: Taking the Message to the People**

- *MODERATOR TBA*
    - Aritha van Herk: The role of the arts in creating public awareness about the interrelationship between the use of natural resources human rights, women's rights, indigenous self-determination and the planet's life support system.
    - *Roger Waters:* Use of Pop Culture and Music to Inform the Masses
    - *Caleb Behn :* Use of Indigenous centered documentaries

**9:30 am– 9:45am : Q and A**

**9:45am – 10:45am:  Human Rights, Indigenous Rights and Business: Taking the message to Corporations**

- *CHAIR: Brian Calliou*
- The Importance of Relationship Between Business and Human Rights
    - *Glen Murray*
- Hearing from the Capital Markets: Calling Corporate Polluters to Account from the Inside
    - *Simon Billenness*
- UNDRIP and the Business Community: What has Changed?
    - *Basil Ugochukwo*
- Hearing from the Multinationals: The Changing Corporate Approach to Resource Development

- ○ *Audrey Mascarenhas*

**10:45am – 11:00am: Health Break**

**11:00am– 12:30pm: Overlapping Interests: Building Bridges Between Environmental NGO's and Indigenous Communities**

- *CHAIR: Iris Almeida-Côté*
- The Interrelationship Between the Rainforest, Human Rights, Women's Rights, Indigenous Self-Determination and the Planet's Life Support System
  - ○ *Paul Paz y Miño*
- Shifting the Global Conservancy Structure to a More Supportive Role for Indigenous Groups
  - ○ *Jenny Brown*
- Making Connections between Environmental NGOs
  - ○ *Hannah Askew*
- Direct Action: Strategies and Successes with NGOs
  - ○ *Rex Weyler*

**12:30pm – 1:30pm:  Lunch Break**

**1:30pm – 3:00pm: Turning to Indigenous Law: Conceiving Harms and Reparations Through Indigenous Legal Traditions**

- *CHAIR: Robert Hamilton*
- A workshop for teaching Indigenous Legal Principles
  - ○ *Val Napoleon*
- Cree responses to harms to lands/water
  - ○ *Darcy Lindberg*
- Overview of the Indigenous Law Research Unit's Methodology and its Application in Practice
  - ○ *Jessica Asch*

**3:00pm-3:30pm: Health Break**

**3:30pm – 4:30pm: The Master's Tools? Examining the Role and Promise of Existing Law Affecting Indigenous Rights and Interests**

- *CHAIR: TBA*
- Promises Hopes & Fantasies: Can Existing International Arbitration and Judgment Enforcement Mechanisms Serve Indigenous Peoples?

- - Aaron Marr Page
- Enforcement of Foreign Judgments in Canada- Subsidiary Liability/Enterprise Liability
  - Evar Oshionebo
- UNDRIP Legislation and how it should be Applied to Environment, Human Rights, Interests of Indigenous peoples, and Trade Treaties
  - Nigel Bankes
- *Building Environmental Assessment Processes that Endorses the Principles of the UNDRIP*
  - Sharon Mascher

**6:30pm- 11:00pm: Social Activities**

- Dinner Away Night

On Sunday, November 11, Instead of a banquet, we are organizing a "dinner away" evening at a variety of Banff's best restaurants. Delegates will have networking and conversation opportunities through a variety of themed tables hosted by experts attending the conference. Delegates will sign up for a particular dinner table conversation theme when they register and will be assigned to an appropriate group. The hosts will lead informal conversations over dinner. Delegates would be encouraged to sign up for tables where topics of their particular interest will be discussed. The dinners will provide excellent networking opportunities, promote consciousness raising, and achieve more in-depth discussion on the conference themes.

Concurrent dinner discussions at local restaurants on:

- RICO and SLAPP suits: Fighting back
- Growing the Indigenous Coalition between Ecuador and Canada
- Shaping a model for Settling the Aguinda Claim
- Intersections between Environmental and Indigenous Rights Cases
- Indigenous Strategizing for Social Justice
- NGO's and CEO's – Finding Common Ground
- Understanding Indigenous Legal Traditions
- Art and Indigenous Resistance
- Aboriginal Women and Dispute Resolution
- Corporate Responsibility in the 21st Century
- Internationalization of Domestic Law
- Direct Action

Participating Restaurants:

Chuck's Steakhouse - www.chuckssteakhouse.ca

The Maple Leaf - www.banffmapleleaf.com

The Bison -  www.thebison.ca

Park Distillery Restaurant + Bar - www.parkdistillery.com

The Balkan - www.banffbalkan.ca

Castello Ristorante - https://www.fairmont.com/banff-springs/dining/castelloristorante/

Grapes Wine Bar - https://www.fairmont.com/banff-springs/dining/grapeswinebar/

Saltlik Banff - http://www.saltlik.com/banff/

The Vermillion Room - https://www.vermillionroom.com

Primrose Dining Room - http://www.rimrockresort.com/primrose.html


# Day 3

**9:00am – 9:30am: Going Forward Together**

- *MODERATOR: Sharon Mascher*
- *Conversation about Canada's role in Ensuring Indigenous Participation in Resource Decision-Making are Recognized and Respected by Resource Developers*
    - *Speaker TBA*
- The role of organized labour unions
    - *Speaker TBA*

**9:30am – 10:00am: Q and A**

**10:00am – 11:00am: Rapporteur's Report**

- *Richard Devlin*

**11:00am – 12:00pm: Wrap Up**

- Statement of Commitment
- Signing Ceremony and Witnessing
- Formation of a Global Movement to Fight Global Corruption

- Establish a Website to Create a Network for Indigenous and Non-Indigenous Youth Groups

**Other Conference Activities:**

- Poster Display

Graduate students will be invited to present their research on relevant topics in poster displays. These posters could be displayed throughout the conference. Selection of posters would be by a peer review committee.

- Art Display

The art show will include pieces by established and emerging indigenous artists to demonstrate how Indigenous Art challenges colonial law.

# REGISTRATION IS NOW OPEN

*We hope you will join us for this groundbreaking conference*

REGISTER HERE

Powered by Squarespace

Indigenous Solutions for Environmental Challenges

