# EXHIBIT 63

**INDIGENOUS SOLUTIONS FOR ENVIRONMENTAL CHALLENGES (/)**

HOME (/#HOME-1-SECTION)   OVERVIEW (/#RESTAURANT-SECTION)   PROGRAM (/#MENU-SECTION)

REGISTER (/#RESERVATIONS-SECTION)   SPEAKERS (/SPEAKERS/)

# SPEAKERS



## Phil Fontaine

Mr. Fontaine is an articulate advocate for the future of Canada and for Indigenous peoples. He is the former three-term National Chief of the Assembly of First Nations (http://www.afn.ca/), known for his calm and confident demeanor and has a proven track record of opening the lines of communication and bringing people together in a common cause for a better future and to resolve issues of the past. Mr. Fontaine has been instrumental in facilitating change and advancement for First Nations people from the time he was first elected to public office as chief, when he was only 28 years old.

As a fierce advocate for human rights, one of Mr. Fontaine's crowning achievements to date is the residential schools settlement. At $5.6 billion in individual compensation, Mr. Fontaine negotiated the largest settlement in Canadian history –for the largest human rights violation in Canadian history – arising out of the 150-year Indian residential school tragedy.

Phil Fontaine has dedicated most of his life to the advancement of First Nations people. Respected at home and abroad, Fontaine attended President Obama's inauguration, met with Pope Benedict XVI to gain an apology for his people, and raised the Corporate Challenge to Canadian organizations.

LEARN MORE (HTTP://WWW.ISHKONIGAN.COM)



## Reg Crowshoe

Reg Crowshoe is a Blackfoot Cultural and Spiritual Advisor, and is the former Chief of the Piikani Nation. Reg and his late father, Joe Crowshoe, travelled extensively around the world bringing awareness and education about Blackfoot history, traditions and spirituality.  In 1997, Reg developed the Blackfoot Framework for Decision-Making and Mediation Process called Akak'stiman, and presents it widely to Corporations, Government, Aboriginal organizations and the Non-Profit sector.  Akak'stiman is a Blackfoot World View on dual paradigms; Western Thinking and Blackfoot Thinking, and how these paradigms can be integrated to best serve Aboriginal people.  Reg sits on

Treaty Commitments and became noteable by contributing his image to other provincial and national organizations. As the Board for Calgary 2012 concluded in March 2013, he ensured the Legacy Project for Calgary 2012 was the Making of Treaty 7 Project; a project that tells the important local history of Treaty 7. Beginning in 2011, he played an instrumental role as the Cultural and Spiritual Advisory for the University of Calgary's (UofC) 2011 Solar House Decathlon project which was designed to respond to First Nations housing issues, and named the solar house Spo'pi. Spo'pi is now a permanent fixture on the UofC Campus for use in research and education. Reg provides advice to Treaty 7 Management Corporation, and leads a group of Treaty 7 Elders so that they can better be a support system to members in Treaty 7. Reg Crowshoe, is also a member of the University of Calgary Senate.

**LEARN MORE (HTTPS://WWW.UCALGARY.CA/SENATE/NODE/1164)**



# Michael Hart

Michael Hart is the vice-provost for an Indigenous engagement at the University of Calgary. As part of his role he serves as a key champion and advocate for the Indigenous Strategy at the University of Calgary, and as a strong and visible role model for everyone, but in particular to the University of Calgary's Indigenous scholars and students. Mr. Hart's career has been focused on Indigenous Peoples and ways of helping that will enable the University of Calgary to realize its goals for indigenization on our campuses. His approach is about connecting with and learning from Indigenous elders and traditional knowledge keepers to explore how these philosophies can guide us, transcend boundaries and take incremental steps to change the conversation between different cultures. Since 2012, Michael Hart has held a Canada Research Chair in Indigenous Knowledges and Social Work through the University of Manitoba. He has also held the role of acting director of the Master of Social Work in Indigenous Knowledges program at the University of Manitoba. For the past 17 years, he has been a board member for the Aboriginal Social Workers' Society in Manitoba and was a founding committee member. His work has spanned multiple provinces, including Manitoba, Quebec and Yukon. Hart holds a BSW, MSW and PhD in Social Work from the University of Manitoba, as well as a BA in Psychology from the University of Manitoba.

**LEARN MORE (HTTPS://WWW.UCALGARY.CA/UTODAY/ISSUE/2018-06-21/FIVE-THINGS-YOU-SHOULD-KNOW-ABOUT-MICHAEL-HART-UCALGARYS-INAUGURAL-VICE-PROVOST)**



# Kathleen E. Mahoney

Kathleen E. Mahoney is a Professor of Law at the University of Calgary and Queen's Counsel. She was the Chief Negotiator for Canada's Aboriginal peoples claim for cultural genocide against Canada, achieving the largest financial settlement in Canadian history for the mass human rights violations against the indigenous peoples of Canada. She was



they primarily address issues of truth and reconciliation. Commissage of Canada and led the negotiations for the historic apology from the Canadian Parliament and from Pope Benedict XVI at the Vatican.

She was co-counsel for Bosnia Herzegovina in their genocide action against Serbia in the International Court of Justice with the result that the definition of genocide in the Genocide Convention was altered to include mass rapes and forced pregnancy as genocide offences.

Among her many awards and distinctions, Professor Mahoney is a Fellow of the Royal Society of Canada, Queen's Counsel, a Trudeau Fellow, and a Fulbright and Human Rights Fellow (Harvard). She received the Governor General's medal for her contribution to equality in Canada. She has held Visiting Professorships or Fellowships at Harvard University, The University of Chicago, Adelaide University, University of Western Australia, Griffiths University, the National University of Australia and Ulster University.

**LEARN MORE (HTTP://WWW3.TELUS.NET/KMAHONEY)**

# David Suzuki



David Suzuki is a scientist, broadcaster, author, and co-founder of the David Suzuki Foundation. He is Companion to the Order of Canada and a recipient of UNESCO's Kalinga Prize for science, the United Nations Environment Program medal, the 2012 Inamori Ethics Prize, the 2009 Right Livelihood Award, and UNEP's Global 500. Dr. Suzuki is Professor Emeritus at the University of British Columbia in Vancouver and holds 29 honorary degrees from universities around the world. He is familiar to television audiences as host of the CBC science and natural history television series *The Nature of Things*, and to radio audiences as the original host of CBC Radio's *Quirks and Quarks*, as well as the acclaimed series *It's a Matter of Survival* and *From Naked Ape to Superspecies*. In 1990 he co-founded with Dr. Tara Cullis, The David Suzuki Foundation to "collaborate with Canadians from all walks of life including government and business, to conserve our environment and find solutions that will create a sustainable Canada through science-based research, education and policy work." David is adopted into three Indigenous families:  (in absentia) by Chief Wah Moodmx(Killerwhale, Johnny Clifton) of Hartley Bay, BC and was given the name Gootm Lgu Waalksik (Heart of a Prince); and by Chief George Housty of the Heiltsuk; and by Ada Yovanovitch (Eagle Clan) of the Haida of Haida Gwaii and given the name Gyaagan (My Own).  He has also received from Indigenous Peoples the following names; Nuchi (Big Mountain) from the Nuu Chah Nulth of BC; Nan Wa Kawi (Man Who Knows Much) from the Kwagiulth of BC; Nattoo Istuk (Sacred Mountain) from the Kainai (formerly Blood) First Nation of Alberta; Karnumeya (Mountain Man) from the Kaurna of Australia; and Kehiwawasis (Eagle Child) Honorary Chief from the Cree of Alberta.  His written work includes more than 55 books, 19 of them for children.  Dr. Suzuki lives with his wife and family in Vancouver, B.C.

**LEARN MORE (HTTP://WWW.DAVIDSUZUKI.ORG/DAVID/)**

# Grand Chief Edward John



Grand Chief Edward John is a Hereditary Chief of Tl'azt'en Nation located in Northern BC.



Chief John was called to the BC Bar in 1980. He holds a B.A. degree from the University of Victoria, an LL.B from the University of British Columbia. As well, he holds Honorary Doctor of Laws degrees from the University of Northern British Columbia and the University of Victoria.

Chief John has served in many leadership roles at the local, provincial, national and international levels. Chief John is currently serving his eleventh consecutive term (June 2016 – June 2019) as an elected leader on the First Nations Summit Political Executive. He is a former Expert Member of the United Nations Permanent Forum on Indigenous Issues (January 2011 – December 2016) and was involved in the development of the Declaration on the Rights of Indigenous Peoples, adopted by the United Nations General Assembly in September 2007.

Chief John continues to actively engage with all levels of government, as well as community groups and organizations, to advocate for the full recognition and implementation of the Declaration.

**LEARN MORE (HTTP://FNS.BC.CA/OUR-TEAM/GRAND-CHIEF-EDWARD-JOHN-AKILE-CHOH)**

## Juan Aulestia



Juan Aulestia is a distinguished international scholar, social activist, and expert in community development. Since completing his doctorate in Education and Development and his master in International Administration, Dr. Aulestia has taught both undergraduate and graduate students in Ecuador and the US, focusing on Lain American Studies, development issues, research methodology, project planning and leadership training. As Oxfam America's South America Program Coordinator he incorporates more than 35 years of experience with indigenous and afro descendent communities in Bolivia, Peru, Ecuador and Brazil, where he was directly involved in the conceptualization of indigenous universities in the Andean region. He has spearheaded project strengthening bilingual and intercultural education in Ecuador, North-South partnership programs, and other projects of international collaboration. In 2004 he served as Under Secretary of the Ministry of Foreign Affairs in the area of International Cooperation and holds Ambassador status.

Dr. Aulestia is the founder Director of Fundacion Ñaupa for Andean Knowledge.

**LEARN MORE (HTTPS://WWW.OXFAM.ORG/EN)**

## Bill Gallagher



Bill Gallagher has extensive project experience in all regions of the country. He is an authority on the rise of native empowerment in Canada's resources sector: having defused native logging tensions in New Brunswick's 'War in the Woods'; oil patch eco-terrorism in Alberta; helping guide Inco's Voisey's Bay impact benefits agreements to successful



conclusion that a more complex resource dispute can—and does—draw on previous career successes as a corporate lawyer in Calgary, an energy regulator in Ottawa, and a treaty negotiator on the prairies.

LEARN MORE (HTTP://BILLGALLAGHER.CA)



## Luis Macas

**Luis Macas** is a Kichwa (https://en.wikipedia.org/wiki/Kichwa) politician and intellectual from Saraguro Ecuador. Macas has honorary university degrees in anthropology, linguistics and jurisprudence. He was one of the founders of the CONAIE (https://en.wikipedia.org/wiki/CONAIE) and of the Pachakutik Movement (https://en.wikipedia.org/wiki/Pluri-National_Pachakutik_United_Movement_-_New_Country), and was member of the National Congress of Ecuador. In 2003 he joined Lucio Gutiérrez's government as Minister of Agriculture, quit because of disagreements with his neoliberal policies. Macas was vice-president of the CONAIE (*Confederación de Nacionalidades Indígenas de Ecuador*) from 1988 to 1991, and CONAIE president from 1991 to 1996 and from 2004–2008.

On May 24, 2006 Macas was proclaimed by the Pachakutik Movement as presidential candidate for the October 15, 2006 election. He came in seventh (out of 13 candidates), with just over 2 percent of the vote.

LEARN MORE (HTTPS://EN.WIKIPEDIA.ORG/WIKI/LUIS_MACAS)



## Charles R. Nesson

**Charles R. Nesson** is the William F. Weld Professor of Law at Harvard Law School and the founder of the Berkman Center for Internet & Society and of the Global Poker Strategic Thinking Society. He is author of *Evidence*, with Murray and Green, and has participated in several cases before the U.S. Supreme Court, including the landmark case *Daubert v. Merrell Dow Pharmaceuticals*. In 1971, Nesson defended Daniel Ellsberg in the Pentagon Papers case. He was co-counsel for the plaintiffs in the case against W. R. Grace and Company that was made into the book *A Civil Action*, which was, in turn, made into the film of the same name. Nesson's nickname in the book, **Billion-Dollar Charlie**, was given to him by Mark Phillips, who worked with him on the W.R. Grace case. Nesson is currently "interested in advancing justice in Jamaica, the evolution of the Internet, as well as national drug policy."

LEARN MORE
(HTTPS://HLS.HARVARD.EDU/FACULTY/DIRECTORY/10615/NESSON)



# Steven Donziger

Steven Donziger is part of a team of advocates representing indigenous and farmer communities in an area of the Ecuadorian Amazon rainforest polluted by oil operations conducted by Texaco, now owned by Chevron. In 2011, the communities won a landmark $19 billion judgment against Chevron for the cleanup of what is considered to be one of the worst oil-related environmental catastrophes in the world. Steven has been involved in advocacy for the affected communities since first visiting the region in 1993. Steven was the founder and director of Project Due Process, a legal advocacy group for Cuban detainees who came to the United States in the Mariel boatlift. He is the former director of the non-partisan National Criminal Justice Commission that produced the book *The Real War on Crime* (HarperCollins). His analysis and commentary on human rights, environmental, and criminal justice matters has been featured in numerous legal publications, academic journals, and news outlets. After graduating from law school in 1991, Steven worked as a trial attorney with the District of Columbia Public Defender Service. He currently serves on the Board of Advisors to the Fortune Society, the largest self-help organization for ex-offenders in the United States. In 1991, Steven led a mission of lawyers and public health specialists to Iraq to assess the impact on civilians of the bombing during the first Gulf War.

LEARN MORE (HTTP://STEVENDONZIGER.COM)



# Shaun Fluker

Shaun Fluker is an Associate Professor with the Faculty of Law at the University of Calgary. Subjects that he lectures on include administrative law, legal theory, statutory interpretation, legal drafting, law and policy, environmental law and ethics, as well as endangered species law. Mr. Fluker has also led the Faculty of Law environmental law clinic since 2011. Currently, his work includes an investigation into how the AER exercises its discretion to grant cost awards, an investigation into the operation of environmental law clinics at Canadian law schools and exploring the use of wilderness rhetoric in legal reasoning. Mr. Fluker is an active member of the Law Society of Alberta with experience providing legal services in the areas of corporate/commercial, securities, environmental and administrative law. Mr. Fluker has appeared as counsel before all levels of Alberta courts.

LEARN MORE (HTTP://CONTACTS.UCALGARY.CA/INFO/LAW/PROFILES/198-462)



# *Shin Imai*



Imai was a lawyer in 1990 Shri Iwai practiced at Keewaytinok Native Legal Services in Moosonee and later had his own practice in the areas of human rights, refugee law and indigenous rights. He joined the Ontario Ministry of the Attorney General in 1989 to work on the development of Alternative Dispute Resolution programs and to initiate justice projects in indigenous communities. He was appointed to faculty at Osgoode in 1996 and is currently a director of the Justice and Corporate Accountability Project (http://www.justice-project.org/). He has served as Academic Director at Parkdale Community Legal Services, the Director of the Intensive Program on Aboriginal Lands, Resources and Governments, Director of Clinical Education, and Co-director of the Latin American Network on Research and Education in Human Rights (RedLEIDH). Imai was awarded the Excellence in Teaching Award at the Law School in 2004 and 2007, and the University-wide Teaching Award in 2010.Research Interests: Canada's extra territorial obligation to regulate Canadian mining companies in Latin America, Aboriginal law in Canada, and clinical legal education.

LEARN MORE (HTTPS://WWW.OSGOODE.YORKU.CA/FACULTY-AND-STAFF/IMAI-SHIN/)

## *Rachel Deming*



Professor Rachel E. Deming is an Assistant Professor of Law and director of the Environmental and Earth Law Clinic. She teaches seminar courses on environmental dispute resolution and toxic torts at environmentally impacted sites. Professor Deming joined the Barry faculty in the fall of 2013. Before coming to Barry, she was co-director of the International Transactions Clinic and a professor from practice at the University of Michigan. She also taught environmental dispute resolution at Pace University School of Law. Prior to joining academia, Professor Deming practiced law in New York for over 25 years. She began her career as an associate at a large New York law firm working on international banking issues and cross-border mergers and acquisition litigation. She left to become in-house environmental counsel for a Swiss-based global manufacturing company, a position which led to an increasing range of managerial responsibilities and included advocacy on environmental concerns and corporate sustainable development. She negotiated several consent agreements involving cleanups of major Superfund sites and also managed the resolution of high-profile tort claims against the company outside the courtroom. Recognizing the value of alternative dispute resolution, Professor Deming returned to private practice in 2007 and became a mediator. In recognition of her expertise in environmental and financial issues, Professor Deming was appointed by the Administrator of the U.S. Environmental Protection Agency to its Environmental Financial Advisory Board in 2005 and served on that board until 2011. She was also involved in the establishment of an environmental dispute resolution center at Pace Law School, the Kheel Center for the Resolution of Environmental Interest Disputes, and received the Founder's Award for her work in 2009.

LEARN MORE (HTTPS://WWW.BARRY.EDU/LAW/FUTURE-STUDENTS/FACULTY/STAFF/DEMING.HTML)



# Willy Littlechild

Wilton Littlechild, is a Cree chief, residential school survivor, and lawyer who has worked both nationally and internationally including with the United Nations to advance Indigenous rights and Treaties. He has also – through leadership with the Truth and Reconciliation Commission – raised awareness of former Canadian policies that decimated the livelihood and culture of Indigenous Canadians.

Chief Littlechild was a member of the 1977 Indigenous delegation to the United Nations (UN), and worked on the UN Declaration on the Rights of Indigenous Peoples. He organized within the UN to increase Indigenous input in the economic and social issues the UN tackles.

Chief Littlechild has been a member of parliament, Vice-President of the Indigenous Parliament of the Americas, North American representative to the UN Permanent Forum on Indigenous Issues, and a chairperson for the UN Expert Mechanism on the Rights of Indigenous Peoples and the Commission on First Nations and Métis Peoples and Justice Reform.

**LEARN MORE (HTTPS://STTPCANADA.CTF-FCE.CA/LESSONS/WILTON-LITTLECHILD/BIO/)**



# Cora Voyageur

Cora Voyageur is a Dene woman from the Athabasca Chipewyan First Nation at Fort Chipewyan, Alberta Canada. Her research interests explore the Aboriginal experience in Canada including: leadership employment, community and economic development, women's issues, and health.

She is has published 40 academic papers and has written more than 30 commissioned research reports. She is the author of the books, Firekeepers of the 21st Century: Women Chiefs in Canada and My Heroes have always been Indians: Contributions of Alberta's Indigenous Peoples She is co-editor of Hidden in Plain Sight: Contributions of Aboriginal Peoples to Canadian Identity and Culture, Volumes I and II. She is currently working on manuscripts on Aboriginal Leadership in Canada and the position of Aboriginal women in Canada.

**LEARN MORE (HTTPS://SOCI.UCALGARY.CA/PROFILES/CORA-VOYAGEUR)**



# Chief  Robert Joseph

Chief Robert Joseph, O.B.C., O.C. is a true peace-builder whose life and work are examples of his personal commitment. A Hereditary Chief of the Gwawaenuk First Nation, Chief Joseph has dedicated his life to bridging the differences brought about by intolerance, lack of understanding and racism at home and abroad.



have insight on the destructive impact these torces can have on peoples lives, families and cultures were shaped by his experience with the Canadian Indian Residential School system.

As one of the last few speakers of the Kwakwaka'wakw language, Chief Joseph is an eloquent and inspiring Ceremonial House Speaker. He shares his knowledge and wisdom in the Big House and as a Language Speaker with the University of British Columbia, an internationally recognized art curator and as co-author of "Down from the Shimmering Sky: Masks of the Northwest Coast".

Chief Joseph is currently the Ambassador for Reconciliation Canada and a member of the National Assembly of First Nations Elders Council. He was formerly the Executive Director of the Indian Residential School Survivors Society and is an honourary witness to Canada's Truth and Reconciliation Commission (TRC). As Chairman of the Native American Leadership Alliance for Peace and Reconciliation and Ambassador for Peace and Reconciliation with the Interreligious and International Federation for World Peace (IFWP), Chief Joseph has sat with the leaders of South Africa, Israel, Japan, South Korea, Mongolia and Washington, DC to learn from and share his understanding of faith, hope, healing and reconciliation.

**LEARN MORE (HTTP://RECONCILIATIONCANADA.CA/ABOUT/TEAM/CHIEF-DR-ROBERT-JOSEPH/)**



# Patricia Lundy

Patricia Lundy is a Professor of sociology. She studied as an undergraduate and postgraduate at Queen's University Belfast (QUB); in 1993 she received her PhD.

In 2016, Patricia was awarded a Leverhulme Trust Major Research Fellowship. She was the recipient of a British Academy Senior Research Fellowship in 2009/2010 and has received other grants from prestigious funding bodies including the Nuffield Foundation, Irish Academy and British Academy. Her research has also been funded by Community Relations Council, Joseph Rowntree Charitable Trust and European Union's Peace funding.

Patricia's research has focused on post-conflict transformation, mechanisms for 'dealing with the past', 'truth' recovery and the politics of memory. She has researched both community-based 'truth' recovery processes and official police-led historical conflict-related inquiries. Her in-depth study of the Police Service Northern Ireland's, Historical Enquiries Team achieved considerable media coverage and impact and  has been widely regarded in changing the landscape in dealing with the past in NI.

Her most recent work is a major empirical study of historic child abuse. She is committed to 'bottom-up' participatory approaches and a desire to ensure that survivors needs drive the form that redress takes. In this regard, Patricia was instrumental in working with survivor groups to set up a panel of experts on Redress. In collaboration with Professor Kathleen Mahoney (Calgary University), she has published a number of practical and policy relevant reports designed to assist redressing historic child abuse; including a framework for compensation. She is committed to linking academia to the wider community and strives to make her research impact positively on beneficiaries.

**LEARN MORE (HTTPS://WWW.ULSTER.AC.UK/STAFF/P-LUNDY)**

# Jon McCourt

McCourt has been a community peace activist and a member of the Peace and Reconciliation Group in the City of Derry, Northern Ireland for more than 30 years.  He has also travelled to and worked with those involved in conflicts in other areas of the world, including Bosnia, the Middle East, Ukraine and conflict torn countries in Africa, and he is en route to Bogota, Colombia, to assist in the FARC Peace Agreement.

He has met with Hope students in Belfast on the Celtic May Term for the past four years. While on campus, he will also be meeting with classes.

McCourt went on the first Civil Rights March in Derry as a young man in October 1968. He was actively engaged in almost every aspect of the conflict that arose as the result of that march.  He took part in the Battle of the Bogside, when the police laid siege to the Catholic/Nationalist of Derry for three days. He saw the first soldiers arrive on the streets of Derry in August 1969, and witnessed the murder of friends and neighbors on Bloody Sunday when 14 people died at the hands of the British Army's 1st Battalion of the Parachute Regiment.

From 1978 he has worked at building bridges between the two major communities in Derry, encouraging and engaging in cross community activities that have assisted in rebuilding contact, trust and cooperation across the city. Through the 1980s he continued with this work while at the same time working with representatives of the major protagonists to the conflict, to limit the impact of the conflict on local communities. He played a major part in the development of the Community Awareness Training Programme used by the British Army which contributed to the reduction of soldiers on the streets, through a process of de-escalation and disengagement locally. With others he founded and established the first Victim Support Service in Northern Ireland in 1986.

**LEARN MORE (HTTPS://WWW.BELFASTTELEGRAPH.CO.UK/NEWS/NORTHERN-IRELAND/LIVES-SHORTENED-BY-RESIDENTIAL-HOME-ABUSE-VICTIM-SAYS-34540974.HTML)**



# Marilyn Poitras

Professor Poitras joined the University of Saskatchewan in 2009. Prior to the appointment her professional life was a fusion of law, governance, community and institutional education. Her expertise and passion is around Constitutional/Aboriginal Law with a life study of customary laws. Marilyn's legal career began as a Native Court Worker and moved into the area of Constitutional law after her articles with the Saskatchewan Department of Justice. She has developed a number of legal education initiatives including the precursor to the Akitsiraq Law School in Nunavut, where she has also been a professor, and the Indigenous People's Resource Management Program at the University of Saskatchewan. Marilyn has worked in private practice and litigated in every level of court in Canada. She has significant experience in the development of Self Government with the Beaufort Delta Agreement, Treaty Implementation with the Federation of Saskatchewan Indian Nations Treaty Table Justice Portfolio as well as the revisions to the Saskatchewan Métis Election Process. Marilyn also works on CIDA funded research on Ancestral Domain and land conflict in Central Mindanao. Her four children keep her laughing, rounded, grounded and real.

LEARN MORE (HTTPS://LAW.USASK.CA/PEOPLE/FACULTY/MARILYN-POITRAS.PHP#PROFESSIONALEDUCATION)



# Caleb Behn

Caleb Behn is a young Dene lawyer and documentary filmmaker. Caleb Behn is Eh-Cho Dene and Dunne Za/Cree from the Treaty 8 Territory of Northeastern BC. Caleb graduated from the University of Victoria with a Juris Doctor degree and is among the first UVic Law students granted the *Concentration in Environmental Law and Sustainability.* Prior to law school, he was the Oil and Gas Officer for the West Moberly First Nations and a Lands Manager for the Saulteau First Nations.

Here is the synopsis of his acclaimed documentary *Fractured Land*:

With some of the world's largest fracking operations on his territory, a young indigenous leader and lawyer confronts the fractures within his community and himself as he struggles to reconcile traditional teachings with the law to protect the land.

LEARN MORE (HTTP://WWW.FRACTUREDLAND.COM)



# Aritha Van Herk

Aritha van Herk is a cultural commentator as well as an award-winning Canadian novelist whose work has been acclaimed throughout North America and Europe. Her popular, creative and critical work has been widely published and her work has been translated into ten languages.

AvH was born in central Alberta, read every book in the library at Camrose, and studied at the University of Alberta. She first rose to international literary prominence with the publication of *Judith* (http://avh.igpykin.com/books/fiction/judith/), which received the Seal First Novel Award and which was published in North America, the United Kingdom and Europe. Her book *Mavericks: An Incorrigible History of Alberta* (http://avh.igpykin.com/books/history/mavericks-an-incorrigible-history-of-alberta/) offers an unorthodox narrative of that province's past. *Mavericks* so inspired the Glenbow Museum (http://www.glenbow.org/) of Calgary, that they created a permanent Alberta gallery and named the gallery after the book. AvH returned to her Alberta stories to create *Audacious and Adamant: A Maverick History of Alberta* (http://avh.igpykin.com/books/history/audacious-and-adamant/), the companion book to the exhibition.

AvH is a member of the Royal Society of Canada (https://www.rsc-src.ca/en), and a Professor who teaches Canadian Literature and Creative Writing in the Department of English (http://english.ucalgary.ca/profiles/aritha-van-herk) at the University of Calgary (http://www.ucalgary.ca/), but first of all, she is a writer who loves stories.

LEARN MORE ()



# Roger Waters

Roger Waters is an English songwriter, singer, bassist, and composer. In 1965, he co-founded the progressive rock band Pink Floyd (https://en.wikipedia.org/wiki/Pink_Floyd) with drummer Nick Mason, keyboardist Richard Wright, rhythm guitarist Bob Klose (https://en.wikipedia.org/wiki/Bob_Klose), as well as lead guitarist, singer, and songwriter Syd Barrett. Waters initially served as the bassist, but following the departure of Barrett in 1968, he also became their lyricist, co-lead vocalist, and conceptual leader. Roger Waters is also a prominent environmental and human rights activist and has been vocal in his support for the Indigenous Ecuadorian villagers, in their case against Chevron.

**LEARN MORE (HTTPS://ROGERWATERS.COM)**



# Brian Calliou

Brian Calliou is the Program Director for the Banff Centre's Indigenous Leadership and Management program area, which designs and delivers leadership development and organizational development programs and applied research for Indigenous leaders. Brian is Cree and a member of the Sucker Creek First Nation in the Treaty 8 area of northern Alberta. Brian is also a PLSNP alumnus.

Brian holds a BA in Political Science, an LLB and an LLM from the University of Alberta. Brian has published several articles and chapters in books of his research. His research interests include Indigenous leadership, self-government, economic development, and treaty rights.

**LEARN MORE (HTTPS://WWW.BANFFCENTRE.CA/PEOPLE/LOUGHEED-LEADERSHIP)**



# Glen Murray

Glen Murray is the executive director of the Pembina Institute, Canada's leading energy think tank.

Prior to joining the Institute, Glen was an Ontario cabinet minister, and oversaw several portfolios, including transportation; training, colleges, and universities; research and innovation, and most recently, environment and climate change. In his role as environment



Minister, Quebec's development minister, cap-and-trade system, and extended producer responsibility in Ontario. His work was foundational to the creation of the Quebec-Ontario-California carbon market.

Glen has held a number of leadership roles, including serving as mayor of Winnipeg from 1998-2004, and was chair of the Big City Mayors' Caucus. During his time as mayor, he led the successful fight to transfer the five cents/litre federal gas tax to municipalities.

He also served as chair of the National Round Table on the Environment and the Economy, under Prime Ministers Harper and Martin. Glen was also president and CEO of the Canadian Urban Institute.

Glen started his career in activism as a founding member of the Canadian AIDS Society, and helped establish the Village Clinic in Winnipeg, a centre for AIDS prevention and care. He has worked internationally, helping establish the World Health AIDS Service Organization's working group.

LEARN MORE (HTTP://WWW.PEMBINA.ORG/CONTACT/GLEN-MURRAY)



## Simon Billenness

Described by the New York Times "a super-specialist" in human rights advocacy, Simon Billenness has over 25 years of experience helping investors, non-profits, universities, communities, and unions use their power to lobby their governments and hold corporations accountable.

LEARN MORE (HTTP://WWW.ROHINGYACAMPAIGN.ORG/WHAT-WE-DO.HTML)



## Audrey Mascarenhas

Audrey Mascarenhas has worked in energy for over 30 years with Gulf Canada Resources Ltd. and Questor Technology Inc. She holds a Bachelor's degree in Chemical Engineering from the University of Toronto and a Master's Degree in Petroleum Engineering from the University of Calgary. Audrey served as a distinguished lecturer with the Society of Petroleum Engineers. She is a member of the Schulich Industry Engineering Advisory Council. She is an appointee to Alberta Government Small Medium Enterprise Export Council. Audrey was the recipient of the Ernst & Young Entrepreneur of the Year 2011 Prairies Award for Cleantech and Environmental Services and Valued Innovation.

LEARN MORE (HTTP://ENERGYFUTURESLAB.COM/FELLOWS/AUDREY-MASCARENHAS/)



# Iris Almeida-Côté

Iris Almeida-Côté, ICD.D/IAS.A., LL.M., M.A.is President and Chief Executive Officer at INNOVACONNECT Inc. offering strategic management services to organisations in Executive leadership, governance, public affairs, strategic communications, branding and audit processes. Iris has considerable experience in organizational development and partnerships, governance and indigenous leadership skills and training.

A senior executive leading transformations in organisations over the past thrity-five years, she served as Executive Director at the Royal Society of Canada where she worked with a network of Canada's leading scientists, scholars and artists. She also served as Strategic Executive Director at the International Association for Public Participation and worked with trainers around the world to refine the content and methodologies for effective Stakeholder Engagement. Iris was President and Chief Executive Officer at Canada World Youth, and President and Chief Executive Officer at the Canadian Pension & Benefits Institute. She was Director of Policy and Programs at the Canadian Parliamentary Centre - Rights and Democracy from 1991 to 2006, and Director of Programs at Partnership Africa Canada from 1988 to 1991. On an international level, she was Assistant Secretary-General of CIDSE (*Coopération Internationale pour le Développement et la Solidarité*) an international organisation with consultative status and UN and the European Union in Brussels, and President of the International Movement of University Students in Paris.

**LEARN MORE (HTTP://LEADERSHIPINNOVATIONS.CA)**



# Paul Paz y Miño

Paul joined Amazon Watch in 2007. He has an MA in International Affairs from George Washington University. Since 1995, he has volunteered as Colombia Country Specialist for Amnesty International USA and was the Guatemala/Chiapas Program Director at the Seva Foundation for seven years. Paul has lived in Chiapas, Mexico and Quito, Ecuador, promoting human rights and community development and working directly with indigenous communities. Paul is also an Associate Fellow at the Institute for Policy Studies and served on the board of Peace Brigades International USA.

**LEARN MORE (HTTPS://AMAZONWATCH.ORG)**



# Jenny Brown



Jenny Brown is the Director of Conservation for TNC Canada, the Canadian affiliate of The Nature Conservancy, a global organization working in over 72 countries worldwide. She has worked for the Conservancy for 20 years and a decade ago began working on the coast of British Columbia, where she worked with partners to start figuring out how a large NGO can work effectively and ethically with Indigenous people. Now she leads the work of a conservation team in coastal BC, the Northwest Territories and the boreal forest of Canada that focuses on supporting Indigenous people as they work to strengthen their leadership and authority over natural resource management, as well as working to align economic drivers with sustainability while ensuring local benefit. Jenny holds a PhD in Ecology from the University of California, Davis, as well as an MS and BS in mechanical engineering, an education history that follows her professional shift from aerospace engineering to conservation. She lives in Washington state with her husband, an Australian cattledog (named Brio) and 4 chickens.

**LEARN MORE (HTTPS://WWW.TNCCANADA.CA/INDEX.HTM)**



## Hannah Askew

Hannah is the Executive Director of Sierra Club BC. She loves plants, animals, trees, water and rocks, and is passionate about ensuring healthy wild spaces for present and future generations.

Hannah is a lawyer and practiced public interest environmental law prior to joining Sierra Club BC. Her work focused on addressing the cumulative impacts of industrial development on ecosystems, and advocating for proactive and inclusive planning processes for the land and water. As a part of this work, she traveled to communities across northern BC to hear from people from all walks of life about the impact of industrial activity on their lives and about their hopes for the future of their communities.

Over the past ten years of her career, Hannah has also been deeply involved in learning from Indigenous communities about their systems of law and governance. She worked as a researcher on Anishinaabe and Coast Salish legal orders for the Indigenous Law Research Unit at the University of Victoria, and taught as an instructor in the Aboriginal Justice Studies Program at the Native Education College. She also researched Tsilhqot'in and Ktunaxa law as part of the RELAW project ("Revitalizing Indigenous Law for Land, Air and Water"). The knowledge received from Indigenous colleagues and mentors has been transformative for Hannah and influences every aspect of her work.

Hannah holds Master of Arts degrees in history and anthropology from the University of Toronto and McGill University, as well as a law degree from Osgoode Hall Law School. She was born on Anishinaabe territory into a family of English and Scottish descent.

**LEARN MORE (HTTPS://SIERRACLUB.BC.CA/HANNAH-ASKEW/)**



## Rex Weyler



Journalist Rex Weyler is best known for his early Greenpeace organizing and as co-founder of Greenpeace International. He has written several books, including _Greenpeace: How a Group of Ecologists, Journalists and Visionaries Changed the World_. His history of indigenous American cultures, _Blood of the Land_, was nominated for a Pulitzer.

Between 1974 and 1982, he served as a director of Greenpeace. He was editor of the _Greenpeace Chronicles_ magazine. He sailed on the first Greenpeace whale campaign, and his photographs and news accounts of Greenpeace appeared worldwide.

Weyler's photography and essays have been published in the _New York Times, Oceans, Smithsonian, Rolling Stone, New Age Journal, Conscious Choice, New Times, Shared Vision, National Geographic_, and other publications. Weyler co-authored the self-help classic _Chop Wood, Carry Water_. He co-founded Hollyhock Educational Centre on Cortes Island in British Columbia – dedicated to environmental, personal, and professional studies.

**LEARN MORE (HTTPS://WWW.GREENPEACE.ORG/ARCHIVE-INTERNATIONAL/EN/)**

## Robert Hamilton



Robert holds a B.A. (Hons) in Philosophy from St. Thomas University, a J.D. from University of New Brunswick Law School, and an LL.M. from Osgoode Hall Law School. Robert is a PhD candidate at the University of Victoria Faculty of Law. His dissertation focuses on Aboriginal and Treaty rights in Canada's Maritime Provinces and his research engages law, legal history, and theoretical perspectives on law and history. He has published on Aboriginal land rights in the Maritime Provinces and has presented his research at numerous academic conferences. Robert has also worked with First Nations on treaty rights and Aboriginal title issues and in the development of governance policies.

**LEARN MORE (HTTP://CONTACTS.UCALGARY.CA/INFO/LAW/PROFILES/1-7827675)**

## Val Napoleon



Val Napoleon (LLB (UVic) 2001, PhD (UVic) 2009, called to the British Columbia Bar in 2002), was appointed Law Foundation Professor of Aboriginal Justice and Governance at the Faculty of Law, University of Victoria on January 1, 2012. She is from north east British Columbia (Treaty 8) and a member of Salteaux First Nation. She is also an adopted member of the Gitanyow (Gitksan) House of Luuxhon, Ganada (Frog) Clan. Prior to joining the Faculty of Law at UVIC, she was an associate professor cross-appointed with the Faculties of Native Studies and Law at the University of Alberta.

She worked as a community activist and consultant in northwestern BC for over 25 years, specializing in health, education, and justice issues. She has also worked with a number of regional, provincial, national, and international projects relating to indigenous legal

traditions, conflict management, education, citizenship, and a dissertation on Gitksan law and legal theory was awarded the UVIC Governor General's Gold Medal for best dissertation in 2009. Her current research focuses on indigenous legal traditions, indigenous legal theory, indigenous feminism, citizenship, self-determination, and governance. Several of her major initiatives include the proposed JID (joint JD and indigenous law degree) program and establishing an indigenous law clinic. She works with numerous community partners on a range of Indigenous law projects, and also with several national and international Indigenous law research initiatives. She has taught and published on aboriginal legal issues, indigenous legal theory, indigenous feminist legal studies, self-government, critical issues in restorative justice, oral traditions, and contemporary aboriginal issues. She also teaches property law. One of her interests is the development of Indigenous law materials that are plain language and non-text for use beyond the university.

**LEARN MORE**
(HTTPS://WWW.UVIC.CA/LAW/FACULTYSTAFF/FACULTYDIRECTORY/NAPOLEON.PHP)



## Darcy Lindberg

Darcy Lindberg is mixed-rooted Nehiyaw (Plains Cree) from Wetaskiwin, Alberta. Darcy is a current Ph.D student with the Faculty of Law at the University of Victoria. His research is focused on Nehiyaw legal and constitutional ordering and relationships with the land. Lindberg also holds an LLM from the University of Victoria; his thesis explores Cree legal orders through an examination of ceremonial rules of procedure and the transformation of gendered protocols. His article "Transforming Buffalo: Plains Cree Constitutionalism and Food Sovereignty" will be published in a forthcoming collection on Food Law in Canada.

Previously, Lindberg practiced with Davis LLP in Whitehorse as an articling student and then lawyer, where he said the first-hand experience he gained during his time in northern Canada shaped his studies and research.

In addition, for nearly 15 years he's been involved with Alberta's Future Leaders Program (https://albertasport.ca/programs/future-leaders-program/), an Indigenous-focused youth program that helps build sport, recreation and cultural programs in Indigenous communities. He's also been a research assistant in the Indigenous Law Research Unit and is the cultural support coordinator at the University of Victoria Faculty of Law.

**LEARN MORE**
(HTTPS://WWW.UVIC.CA/LAW/FACULTYSTAFF/STAFFDIRECTORY/DARCYLINDBERG.PHP)



## Jessica Asch

Jessica Asch is the Research Director for the Indigenous Law Research Unit at the University of Victoria.



LEARN MORE
(HTTPS://WWW.UVIC.CA/LAW/ABOUT/INDIGENOUS/INDIGENOUSLAWRESEARCHUNIT/IN



# Aaron Marr Page

Aaron Marr Page is an international human rights and U.S. criminal justice attorney. Wearing the former hat, he serves as managing attorney at Forum Nobis PLLC (http://forumnobis.org/), an international human rights and environmental public interest law and consulting firm that works with indigenous people and other affected communities around the world struggling to better understand and assert their rights. Wearing the latter hat, he has served as a Criminal Justice Act panel attorney in Washington, D.C., and maintains a docket of select trial and appellate matters in both state and federal court. He also has experience litigating U.S.-based civil rights (Section 1983) cases.

LEARN MORE (HTTPS://UICHR.UIOWA.EDU/WHO-WE-ARE/ADVISORY-BOARD/AARON-MARR-PAGE/)



# Evaristus Oshionebo

Evaristus Oshionebo joined the University of Calgary's Faculty of Law on July 1, 2013. Evar was awarded a Students' Union Teaching Excellence Award in 2014, a rarity for professors in their first year at an institution. The award honours faculty members and instructors for their commitment to student success.

Prior to joining the University of Calgary, he was a tenured Associate Professor at the Faculty of Law, University of Manitoba. In 2013, he won the University of Manitoba/University of Manitoba Faculty Association Merit Award for Excellence in Teaching, as well as the Students' Teacher Recognition Award for outstanding teaching. Prior to his academic career, Evar practiced law in Nigeria specializing in corporate and commercial litigation. He was also Deputy Editor of a number of Law Reports including the Supreme Court of Nigeria Law Reports, the Nigerian Weekly Law Reports, and the Commercial Law Reports Quarterly.

LEARN MORE (HTTP://CONTACTS.UCALGARY.CA/INFO/LAW/PROFILES/1-4244471)

# Nigel Bankes



Nigel has been with the Faculty of Law since 1984 and is the current holder of the Chair of Natural Resources Law. He teaches or has taught courses in property law, aboriginal law, natural resources law, energy law, oil and gas law and international environmental law. He was seconded to the Department of Foreign Affairs and International Trade in Ottawa as Professor in Residence in the legal bureau in the 1999/2000 academic year. He holds an appointment as an adjunct professor at the University of Tromsø, Norway. In 2010 the University of Akureyri, Iceland conferred an honorary doctoral degree on Nigel in recognition of his contributions to the development of Arctic law in the areas of natural resources law, international environment law and the rights of indigenous peoples. Nigel is the Vice-Chair, Board of Directors for the Canadian Institute of Resources Law.

**LEARN MORE (HTTP://CONTACTS.UCALGARY.CA/INFO/LAW/PROFILES/198-250)**

# Sharon Mascher



Sharon Mascher is a Professor at the Uiversity of Calgary's  Faculty of Law. Prior to joining the Faculty of Law, Sharon was a Professor at Thompson Rivers University's Faculty of Law and an Associate Professor and the Deputy Director (Environment and Climate Change) of the Centre for Mining, Energy and Resources Law at the University of Western Australia's Faculty of Law. She has also held academic positions in the Faculties of Law at Victoria University of Wellington (New Zealand) and the University of Saskatchewan.

Sharon's research focused on legal issues relating to climate change law, environmental law, property law and laws affecting Indigenous peoples. Her recent publications include: a co-authored chapter on the constitutional recognition of aboriginal title (forthcoming, Federation Press, 2016) and a co-authored article comparing the Australian and Canadian approaches to adaptive management in water law (forthcoming, McGill International Journal of Sustainable Development Law & Policy, 2016). Sharon's current research is focused on the design of climate change mitigation legislation and liability for climate change damage.

**LEARN MORE (HTTP://CONTACTS.UCALGARY.CA/INFO/LAW/PROFILES/198-1686)**

# The Honourable Jim Carr



The Honourable Jim Carr has been a dedicated business and community leader in Winnipeg for more than 30 years. He began his career as a musician, as an oboist and trustee with the Winnipeg Symphony Orchestra. He then moved on to journalism, working as an editorial writer and columnist with the *Winnipeg Free Press* as well as for CBC Radio.

Minister Carr entered public life in 1988, when he was elected to represent Fort Rouge in the Legislative Assembly of Manitoba. He was also the deputy leader of his party. He later went on to become the founding CEO of the Business Council of Manitoba, where he worked alongside business leaders to address issues critical to Manitobans and Canadians.

In particular, Minister Carr was one of the architects of the Winnipeg Consensus' process, which brought together Canadian think tanks and energy leaders, and informed the Canadian Energy Strategy released in 2015 by Canada's provinces and territories.

Minister Carr has been an active volunteer with a number of local, provincial, and national organizations. He was the founding co-chair of the Winnipeg Poverty Reduction Council, and was a member of the board of the Winnipeg Symphony Orchestra, the Canada West Foundation, and the Arthur V. Mauro Centre for Peace and Justice at the University of Manitoba.

Minister Carr's community leadership has earned him numerous awards, including the Canada 125 Medal, the Queen Elizabeth II Diamond Jubilee Medal, and the Order of Manitoba.

Minister Carr has served as a minister since 2015, and is currently the Minister of International Trade Diversification..

LEARN MORE
(HTTPS://WWW.OURCOMMONS.CA/PARLIAMENTARIANS/EN/MEMBERS/JIM-CARR(89059))



# Richard Devlin

Richard Devlin is a Professor of Law at the Schulich School of Law, Dalhousie University. In 2005, he was appointed a Dalhousie University Research Professor, and this position was renewed in 2010. His areas of teaching include Contracts, Jurisprudence, Legal Ethics and Graduate Studies. He has published widely in various journals, nationally and internationally. Recent books include editing Critical Disability Theory and Lawyers' Ethics and Professional Regulation (2nd ed. 2012). In 2003, and again in 2010, he received the Hanna and Harold Barnett Award for Excellence in Teaching First Year. In 2008 he was a recipient of the Canadian Association of Law Teachers Award for Academic Excellence. In 2013 he won Dalhousie University's Centre for Teaching and Learning "Change One Thing Challenge". He has been involved in the design, development and delivery of Judicial Education programmes in Canada and abroad for more than 20 years. In 2012 he agreed to serve as the Founding President of the Canadian Association for Legal Ethics. In 2015 he was inducted as a Fellow of the Royal Society of Canada.

LEARN MORE (HTTPS://WWW.DAL.CA/FACULTY/LAW/FACULTY-STAFF/OUR-FACULTY/RICHARD-DEVLIN.HTML)

**BACK TO TOP OF PAGE (/TEST)**

Powered by Squarespace (http://www.squarespace.com)

# EXHIBIT 64

**Ecuador Case Management - 12 MONTH EXPENSE PROJECTION**
**DECEMBER 2017**

prepared by

STREAMLINE

| EXPENSES | | Projected Budget 2018 Monthly | | Projected Budget 2018 Annual | |
|---|---|---|---|---|---|
| **Legal Fees** | | | | | |
| | Steven Donziger | $ 25,000 | | $ 300,000 | |
| | Aaron Marr Page | $ 5,625 | | $ 67,500 | |
| | Full time attorney | $ 10,000 | | $ 120,000 | |
| | Peter Grant | $ 8,333 | | $ 100,000 | |
| | John Phillips | $ - | | $ - | |
| | Legal contingency | $ 4,000 | | $ 48,000 | |
| | | | $ 52,958 | | $ 635,500 |
| **PR costs** | | | | | |
| | Cristina Munoz - Ecuador | $ 500 | | $ 6,000 | |
| | Press releases | $ 2,000 | | $ 24,000 | |
| | Website mgt | $ 500 | | $ 6,000 | |
| | Media coverage | $ 850 | | $ 10,200 | |
| | | | $ 3,850 | | $ 46,200 |
| **Stipend Payments** | | | | | |
| | Simon Billiness - shareholder support/resolutions | $ 850 | | $ 10,200 | |
| | Streamline - administrative/accounting | $ 2,000 | | $ 24,000 | |
| | Juan Aulestia - Ecuador management | $ 1,000 | | $ 12,000 | |
| | Luis Yanza - Ecuador community/client relations | $ - | | $ - | |
| | FDA - client group | $ 4,333 | | $ 51,996 | |
| | Rex Weyler | $ 2,000 | | $ 24,000 | |
| | | | $ 10,183 | | $ 122,196 |
| **Travel** | | | | | |
| | Travel - Ecuador in country | $ 1,000 | | $ 12,000 | |
| | Travel - Ecuadorians outside country | $ 4,000 | | $ 48,000 | |
| | Travel & Entertainment - fundraising/case mgt | $ 8,000 | | $ 96,000 | |
| | Travel - Canadian attorneys | $ 4,000 | | $ 48,000 | |
| | | | $ 17,000 | | $ 204,000 |
| Contingency | | | $ 5,000 | | $ 60,000 |
| **TOTAL** | | | **$ 88,991** | | **$ 1,067,896** |
| **Onetime payments** | | | | | |
| | Sept 2017 Canadian Delegate trip reimbursement to SRD | | | $ 50,000 | |
| | Peter Grant legal retainer | | | $ 100,000 | |
| | Reimburse SRD (back salary, direct expenses) | | | $ 150,000 | |
| | Travel - Chief trip to Ecuador | | | $ 20,000 | |
| | Calgary conference – Oct 2018 | | | $ 200,000 | |
| | | | | | $ 520,000 |
| **2018 projected expenses** | | | | | **$ 1,587,896** |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

# EXHIBIT 65

| | |
|---|---|
| **From:** | Katie Sullivan <Katie@Streamlinefamilyoffice.com> |
| **Sent:** | Friday, March 16, 2018 1:47 PM |
| **To:** | Kathleen Elizabeth Mahoney <kmahoney@ucalgary.ca> |
| **Cc:** | Steven Donziger <sdonziger@donzigerandassociates.com> |
| **Subject:** | RE: UOA1811 -- November 9-12, 2018 Indigenous Solutions to Environmental Catastrophe - |

Hi Michelle,
The wire has been initiated today. Please let me know if there are any issues on your end.
Many thanks,
Katie

**From:** Kathleen Elizabeth Mahoney [mailto:kmahoney@ucalgary.ca]
**Sent:** Monday, March 12, 2018 3:21 PM
**To:** Katie Sullivan <Katie@Streamlinefamilyoffice.com>
**Cc:** Steven Donziger <sdonziger@donzigerandassociates.com>
**Subject:** FW: UOA1811 -- November 9-12, 2018 Indigenous Solutions to Environmental Catastrophe –
**Importance:** High

Dear Katie,

The dean of University of Calgary is wanting to have the full contract amount for the Banff center of 50k in the account because he fears if the conference was cancelled for some reason, the terms of the contract would put the faculty on the hook for the amount of the contract. Please see Page 4 of 14 in the revised contract that refers to this. I've attached an invoice for the amount of $27, 012.50.

Best regards,

Michelle Davis, BAMus
Assistant to Professor Kathleen Mahoney, QC
Tel: (403) 239-8982
Fax: (403) 208-1714

CONFIDENTIALITY NOTICE: This e-mail and any files transmitted with it are intended solely for the use of the individual or entity to whom they are addressed and may contain confidential and privileged information protected by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of the e-mail is strictly prohibited. Please notify the sender immediately by return e-mail and delete all copies from your system.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

# EXHIBIT 66

| From: | Katie Sullivan <Katie@Streamlinefamilyoffice.com> |
| Sent: | Wednesday, December 13, 2017 12:48 PM |
| To: | Steven Donziger <sdonziger@donzigerandassociates.com> |
| Cc: | Aaron Marr Page <aaron@forumnobis.org> |
| Subject: | RE: final contract w appendices |
| Attach: | Ecuador Judgment - Existing Equity Agreements 2017.12.13.docx |

See attached.

The loan conversions are currently tied to SRD shares unless converted pro-rata to equity. Leave as zero for now while we figure out what that percentage equivalent would be.

Added Salazar's pieces

Should we add Fontaine (.25), Golinger (.125) and Phillips (formula based on hours worked)?

**From:** Steven Donziger [mailto:sdonziger@donzigerandassociates.com]
**Sent:** Wednesday, December 13, 2017 12:49 PM
**To:** Katie Sullivan <Katie@Streamlinefamilyoffice.com>
**Cc:** aaron@forumnobis.org
**Subject:** final contract w appendices

Here you go. Still waiting for appendix 3. Let's shoot to get this to him by the end of the day.

thanks

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0001141

# EXHIBIT 67

IN THE CIRCUIT COURT IN AND FOR
DUVAL COUNTY, FLORIDA
PROBATE DIVISION

CASE NO.: 89-1102-CP
DIVISION: PR-A

IN RE:     ESTATE OF

LEON DONZIGER,

Deceased

## STEVEN DONZIGER'S DEFENSES TO THE MOTION TO APPROVE ACCOUNTING FEES, ATTORNEYS' FEE APPLICATION, AND PETITION FOR TRUSTEE FEE

COMES NOW, Petitioner, Steven Donziger, beneficiary of the Leon S. Donziger Family Trust (hereinafter the "Trust"), by and through the undersigned counsel, and files his Defenses to the Motion to Approve Accounting Fees, Attorneys' Fee Application, and Petition for Trustee Fee, and states:

### DEFENSE ONE

Michael Schneider became the Trustee only as the result of an amendment to the Trust. The Trust was procured through a consent document containing the forged signature of Steven Donziger. This amendment was a fraud upon the Court and it *void ab initio*. Without the fraud upon the Court, there would be no trustee as all Trust assets should have been distributed to Steven Donziger.

### DEFENSE TWO

Due to the fraud upon the Court, at the time Michael Schneider purportedly served as Trustee, the Trust did not exist by its own terms as Steven Donziger was the sole beneficiary upon the death of his father, Michael Donziger. Michael Schneider is claiming fees for services rendered after Michael Donziger's death.

## DEFENSE THREE

Steven Donziger was an innocent party to the fraud and should not be required to pay for services that arose from the fraud upon the Court.

## DEFENSE FOUR

Due to the fraud upon the Court, at the time that Michael Schneider employed the legal services of Charles Pillans, III, Esquire, Michael Schneider was not legally acting as the Trustee as the Trust no longer existed by its own terms upon the death of Michael Donziger. Charles Pillans, III is claiming fees for services allegedly rendered to the Trust after Michael Donziger's death.

## DEFENSE FIVE

Due to the fraud upon the Court, at the time that Michael Schneider employed the accounting services of Jim Lipham, Michael Schneider was not legally acting as the Trustee.

## DEFENSE SIX

Due to the fraud upon the Court, at the time that Michael Schneider employed the accounting services of Jim Lipham, the Trust did not exist by its own terms. Steven Donziger was the sole beneficiary upon the death of his father, Michael Donziger. Jim Lipham is claiming fees for services allegedly rendered to the Trust after Michael Donziger's death.

## DEFENSE SEVEN

Accounting fees requested by Jim Lipham relating to any work performed with respect to the opinion that the undistributed income belonged to the Estate of Michael Donziger should not be paid by the assets of the Trust as this advice was not correct.

## DEFENSE EIGHT

After Michael Schneider became aware of the fraud upon the Court thereby rendering the amendment void *ab initio,* he then sought legal counsel to advise him of, *inter alia*, the conflicts of interest involved in being the trustee, attorney for the estate, and attorney for Michael Donziger. As the amendment was void *ab initio*, Michael Schneider was not legally acting as Trustee and did not have the right to retain legal counsel on his own behalf as Trustee.

## DEFENSE NINE

Prior to retaining legal counsel, Mr. Schneider offered to step down as trustee as repeatedly requested by Steven Donziger, but then refused to do so for two (2) months and instead hired legal counsel and charged the Trust. Steven Donziger is not required to pay for attorney's fees that arose from a fraud upon the Court and additionally, when Mr. Schneider had been repeatedly asked to step down as trustee as a result of the fraud upon the Court.

## DEFENSE TEN

Michael Schneider was only acting as the Trustee as a result of a fraud upon the Court. Michael Schneider was not legally acting as the Trustee, he had no authority to retain legal counsel, especially since the Trust no longer existed after the death of Michael Donziger and Mr. Schneider was aware there was a fraud upon the Court. It was the duty of Mr. Schneider to step down as Trustee.

## DEFENSE ELEVEN

The fees being sought in the motions/petition are not reasonable.

## DEFENSE TWELVE

Respondent requests all costs associated with the defense of this claim.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished to

Charles Pillans, III, Esquire via electronic service at cpp@bedellfirm.com this 25th day of

February 2013.

FORD, MILLER & WAINER, P.A.


P. CAMPBELL FORD, ESQUIRE
Florida Bar No.: 0480495
ford@fordmiller.com
servicefmw@fordmiller.com
1835 N. Third Street
Jacksonville Beach, Florida 32250
Telephone: (904) 390-1970
Facsimile: (904) 390-1975
Attorney for Steven Donziger

# EXHIBIT 68

CaseView

**Appellate E-Filing System**
C-Track, the browser based CMS for Appellate Courts

Login

Find Case...

### Cases
- Case Search
- Participant Search

**Case Information: 18-BG-0967**

| | | | |
|---|---|---|---|
| Short Caption: | IN RE STEVEN R. DONZIGER, BAR REGISTRATION NO. 431577 | Classification: | Bar Governance - Bar - Disciplinary Reciprocal |
| Superior Court or Agency Case Number: | DDN288-16 | Filed Date: | 09/14/2018 |
| Opening Event Date: | 09/14/2018 | Case Status: | Stayed/On hold |
| Record Completed: | | Post-Decision Matter Pending: | |
| Briefs Completed: | | | |
| Argued/Submitted: | | | |
| Disposition: | | Next Scheduled Action: | |
| Mandate Issued: | | | |

### Party Information

| Appellate Role | Party Name | IFP | Attorney(s) | Arguing Attorney | E-Filer |
|---|---|---|---|---|---|
| Petitioner | Board on Professional Responsibility | | James T. Phalen | N | Y |
| Petitioner | Bar Counsel | | Hamilton P. Fox | N | Y |
| | | | William R. Ross | N | Y |
| Respondent | Steven R. Donziger | N | Michael S. Frisch | N | N |

### Events

| Event Date | Status | Description | Result |
|---|---|---|---|
| 09/14/2018 | Filed | Notice of Discipline under Rule XI s. 11 and a certified order of the Appellate Division of the Supreme Court for the First Judicial Department in the County of New York, New York, temporarily suspending the respondent. | |
| 09/20/2018 | Filed | Ordered that respondent is suspended from the practice of law in the District of Columbia and the proceeding is stayed pending resolution of the disciplinary matter in New York. | |

# EXHIBIT 69

## District of Columbia
## Court of Appeals



FILED

SEP 20 2018

DISTRICT OF COLUMBIA
COURT OF APPEALS

No. 18-BG-967

In the Matter of
STEVEN R. DONZIGER
A Member of the Bar of the
District of Columbia
Court of Appeals
Bar Registration No. 431577                    DDN:  288-18

# O R D E R

This court having received a certified copy of an order of the Appellate Division of the Supreme Court of the First Judicial Department in the County of New York, New York, temporarily suspending the respondent from the practice of law, it is, accordingly, pursuant to D.C. Bar Rule XI, § 11 (d),

ORDERED that respondent is suspended from the practice of law in the District of Columbia pending final disposition of this proceeding, effective on the date of entry of this order, and it is

FURTHER ORDERED that this proceeding is hereby stayed pending resolution of the disciplinary matter in New York.  It is

FURTHER ORDERED that while this matter is stayed, Disciplinary Counsel shall file, at a minimum, annual reports on the status of the disciplinary proceedings in New York. It is

FURTHER ORDERED that respondent's attention is drawn to the requirement of Rule XI, § 14 relating to suspended attorneys and to the provisions of Rule XI, § 16 (c) dealing with the timing of eligibility for reinstatement as related to compliance with Rule XI, § 14, including the filing of the required affidavit.

No. 18-BG-967

BY THE COURT:

ANNA BLACKBURNE-RIGSBY
Chief Judge

Copies to:

Steven R. Donziger
c/o Michael S. Frisch, Esquire
600 New Jersey Avenue, NW
Room 415
Washington, DC 20001

Copies e-served to:

James T. Phalen, Esquire
Executive Attorney
Board on Professional Responsibility
430 E Street, NW, Suite 138
Washington, DC  20001

Hamilton P. Fox, III, Esquire
Disciplinary Counsel
 Office of Disciplinary Counsel
515 5th Street, NW, Suite 117
Washington, DC  20001

oio

# EXHIBIT 70

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- X

CHEVRON CORPORATION,

     Plaintiff,

v.

                                   11 Civ. 0691 (LAK)

STEVEN DONZIGER, et al.,

     Defendants.

------------------------------------------------- x

## CHEVRON CORPORATION'S FIRST INFORMATION SUBPOENA IN AID OF THE SUPPLEMENTAL JUDGMENT AND RESTRAINING NOTICE TO DEFENDANTS STEVEN DONZIGER, THE LAW OFFICES OF STEVEN R. DONZIGER AND DONZIGER & ASSOCIATES, PLLC

In the above entitled action in the United States District Court for the Southern District of

New York,[1] a supplemental judgment was entered on February 28, 2018 in favor of Chevron

Corporation against Steven Donziger, The Law Offices of Steven R. Donziger, Donziger &

Associates, PLLC, and others, for the sum of $813,602.71, which remains due and unpaid.

---

[1] The parties to this action are Chevron Corporation (Plaintiff) and Defendants Steven Donziger, The Law Offices of Steven R. Donziger, Donziger & Associates, PLLC, Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje, Stratus Consulting, Inc. Douglas Beltman, Anne Maest, Pablo Fajardo Mendoza, Luis Yanza, Frente de Defensa de la Amazonia A/K/A Amazon Defense Front, Selva Viva Selviva Cia, Ltda, Maria Aguinda Salazar, Carlos Grefa Huatatoca, Catalina Antonia Aguinda Salazar, Lidia Alexandra Aguinda Aguinda, Patricio Alberto Chimbo Yumbo, Clide Ramiro Aguinda Aguinda, Luis Armando Chimbo Yumbo, Beatriz Mercedes Grefa Tanguila, Lucio Enrique Grefa Tanguila, Patricio Wilson Aguinda Aguinda, Celia Irene Viveros Cusangua, Francisco Matias Alvarado Yumbo, Francisco Alvarado Yumbo, Olga Gloria Grefa Cerda, Lorenzo Jose Alvarado Yumbo, Narcisa Aida Tanguila Narvaez, Bertha Antonia Yumbo Tanguila, Gloria Lucrecia Tanguila Grefa, Francisco Victor Tanguilla Grefa, Rosa Teresa Chimbo Tanguila, Jose Gabriel Revelo Llore, Maria Clelia Reascos Revelo, Maria Magdalena Rodriguez Barcenes, Jose Miguel Ipiales Chicaiza, Heleodoro Pataron Guaraca, Luisa Delia Tanguila Narvaez, Lourdes Beatriz Chimbo Tanguila, Maria Hortencia Viveros Cusangua, Segundo Angel Amanta Milan, Octavio Ismael Cordova Huanca, Elias Roberto Piyahuaje Payahuaje, Daniel Carlos Lusitande Yaiguaje, Benancio Fredy Chimbo Grefa, Guillermo Vicente Payaguaje Lusitante, Delfin Leonidas Payaguaje Payaguaje, Alfredo Donaldo Payaguaje Payaguaje, Teodoro Gonzalo Piaguaje Payaguaje, Miguel Mario Payaguaje Payaguaje, Fermin Piaguaje Payaguaje, Reinaldo Lusitande Yaiguaje, Luis Agustin Payaguaje Piaguaje, Emilio Martin Lusitande Yaiguaje, Simon Lusitande Yaiguaje, Armando Wilfrido Piaguaje Payaguaje, and Angel Justino Piaguage Lucitante.

**YOU ARE HEREBY COMMANDED,** pursuant to Rule 69 of the Federal Rules of Civil Procedure and CPLR Sections 5223 and 5224, to answer, in writing and under oath, separately and fully, each question in the questionnaire accompanying this subpoena, each answer referring to the question to which it responds; and that you return the answers together with the original questions within 10 days after your receipt of the questions and this subpoena to Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, NY 10166-0193. False swearing or failure to comply with this subpoena is punishable as a contempt of court.

I HEREBY CERTIFY THAT THIS INFORMATION SUBPOENA COMPLIES WITH RULE 5224 OF THE CIVIL PRACTICE LAW AND RULES AND SECTION 601 OF THE GENERAL BUSINESS LAW THAT I HAVE A REASONABLE BELIEF THAT THE PARTY RECEIVING THIS SUBPOENA HAS IN THEIR POSSESSION INFORMATION ABOUT THE DEBTOR THAT WILL ASSIST THE CREDITOR IN COLLECTING THE JUDGMENT.

Pursuant to Rule 69 of the Federal Rules of Civil Procedure and CPLR Section 5222, **YOU ARE HEREBY RESTRAINED**, as detailed below.

### RESTRAINING NOTICE

**TAKE NOTICE** that, pursuant to CPLR 5222(b), which is set forth in full herein, you are hereby **FORBIDDEN** to make or suffer any sale, assignment, transfer or interference with any PROPERTY in which YOU have an interest, or pay over or otherwise dispose of any debt owed to YOU, except as provided in Section 5222.

**TAKE FURTHER NOTICE** that this notice INCLUDES all PROPERTY in which YOU have an interest hereafter coming into YOUR possession or custody and all debts of any other PERSON hereafter coming due to YOU.

**TAKE FURTHER NOTICE** that disobedience of this Restraining Notice is punishable as contempt of court.

## CIVIL LAW AND PRACTICE RULES

5222(b) Effect of restraint; prohibition of transfer; duration. A judgment debtor or obligor served with a restraining notice is forbidden to make or suffer any sale, assignment, transfer or interference with any property in which he or she has an interest, except as set forth in subdivisions (h) and (i) of this section, and except upon direction of the sheriff or pursuant to an order of the court, until the judgment or order is satisfied or vacated, A restraining notice served upon a person other than the judgment debtor or obligor is effective only if, at the time of service, he or she owes a debt to the judgment debtor or obligor or he or she is in the possession or custody of property in which he or she knows or has reason to believe the judgment debtor or obligor has an interest, or if the judgment creditor or support collection unit has stated in the notice that a specified debt is owed by the person served to the judgment debtor or obligor or that the judgment debtor or obligor has an interest in specified property in the possession or custody of the person served. All property in which the judgment debtor or obligor is known or believed to have an interest then in and thereafter coming into the possession or custody of such a person, including any specified in the notice, and all debts of such a person, including any specified in the notice, then due and thereafter coming due to the judgment debtor or obligor, shall be subject to the notice except as set forth in subdivisions (h) and (i) of this section. Such a person is forbidden to make or suffer any sale, assignment or transfer of, or any interference with, any such property, or pay over or otherwise dispose of any such debt, to any person other than the sheriff or the support collection unit, except as set forth in subdivisions (h) and (i) of this section, and except upon direction of the sheriff or pursuant to an order of the court, until the expiration of one year after the notice is served upon him or her, or until the judgment or order is satisfied or vacated, whichever event first occurs. A judgment creditor or support collection unit which has specified personal property or debt in a restraining notice shall be liable to the owner of the property or the person to whom the debt is owed, if other than the judgment debtor or obligor, for any damages sustained by reason of the restraint. If a garnishee served with a restraining notice withholds the payment of money belonging or owed to the judgment debtor or obligor in an amount equal to twice the amount due on the judgment or order, the restraining notice is not effective as to other property or money.

## SUBPOENA DEFINITIONS AND INSTRUCTIONS

1.      The definitions and rules of construction set forth in Rule 26.3 of the Local Rules for the Southern and Eastern Districts of New York are incorporated herein.

2.      The term "ACCOUNT" as used herein means and INCLUDES savings accounts, checking accounts, money market accounts, brokerage accounts, certificates of deposit, lines of credit, and any other credits or debits.

3.      The term "ACCOUNTING" means and refers to any record of financial information. This INCLUDES accountings, financial statements, bank statements, ledgers, books, audits, registers, financial reconciliations, summaries of financial information, and reports of financial information.

4.      The term "ASSET" means any tangible or intangible PROPERTY, INCLUDING real PROPERTY, personal PROPERTY, intellectual PROPERTY, chattels, cash, securities, derivative products, ACCOUNTS, debts, contract rights, security interests, claims, and causes of action, anywhere in the world.

5.      The term "PROPERTY" means anything that may be the subject of OWNERSHIP.

6.      The term "CONTROL" (INCLUDING, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any PERSON or ENTITY, shall mean the possession, directly or indirectly, of the power to direct or cause the actions, direction of the management, or policies of such PERSON or ENTITY, whether through the OWNERSHIP of voting securities, by contract or otherwise.

7.      The term "ENTITY" and "ENTITIES" shall INCLUDE all corporations, associations, partnerships, joint ventures, companies, funds, trusts, limited liability companies,

limited liability partnerships, any government or regulatory authority, and all other forms of incorporated and unincorporated organizations that are not natural persons.

8.    The terms "INCLUDE" and "INCLUDING" mean including, but not limited to. When the word "INCLUDE" or "INCLUDING" is followed by one or more specific examples, those examples are illustrative only and do not limit in any way the information requested.

9.    The terms "OWN" and "OWNERSHIP" mean owned directly or indirectly, in whole or in part, as sole owner or jointly with others, either of record or beneficially, INCLUDING as a partner, general or limited, limited liability member, fiduciary, and as an equity or debt holder, or demand deposit holder.

10.    "AMAZON DEFENSE FRONT" means and refers to the Frente de Defensa de la Amazonía a/k/a Amazon Defense Front, and INCLUDES the Front's officers, directors, employees, partners, corporate parent, subsidiaries, or affiliates.

11.    "ECUADOR ENFORCEMENT ACTIONS" means and refers to any proceeding seeking recognition and/or enforcement of the ECUADOR JUDGMENT anywhere in the world.

12.    "ECUADOR JUDGMENT" means and refers to the judgment entered in the ECUADOR LITIGATION on February 14, 2011 as modified by subsequent proceedings.

13.    "ECUADOR JUDGMENT TRUST" means and refers to the trust discussed in the March 30 filing of Pablo Fajardo Mendoza to the Provincial Court of Justice of Sucumbíos regarding the "Commercial Trust for the Administration of Funds ADAT, granted by Maria Victoria Aguinda Salazar, Lidia Alexandra Aguinda, et al., the AMAZON DEFENSE FRONT and Compañia Fiduciaria Ecuador FIDUECUADOR S.A. funds and trusts administrator" executed on March 1, 2012 by Dr. Sandra Veronica Barrazueta Molina.

14.   "ECUADOR LITIGATION" means and refers to the proceeding *Maria Aguinda y Otros v. Chevron Corporation*, in the Provincial Court of Justice of Sucumbíos in Ecuador, and all appellate proceedings and subsequent proceedings stemming therefrom.

15.   "LAGO AGRIO PLAINTIFFS" means and refers to Defendants Alfredo Donaldo Payaguaje Payaguaje; Angel Justino Piaguaje Lucitante; Armando Wilfrido Piaguaje Payaguaje; Beatriz Mercedes Grefa Tanguila; Benancio Freddy Chimbo Grefa; Bertha Antonia Yumbo Tanguila; Carlos Grega Huatatoca; Catalina Antonia Aguinda Salazar; Celia Irene Viveros Cusangua; Clide Ramiro Aguinda Aguinda; Daniel Carlos Lusitande Yaiguaje; Delfin Leonidas Payaguaje Payaguaje; Elias Roberto Piyahuaje Payahuaje; Emilio Martin Lusitande Yaiguaje; Fermin Piaguaje Payaguaje; Francisco Alvarado Yumbo; Francisco Matias Alvarado Yumbo; Francisco Victor Tanguila Grefa; Gloria Lucrecia Tanguila Grefa; Guillermo Vicente Payaguaje Lusitante; Heleodoro Pataron Guaraca; Hugo Gerardo Camacho Naranjo; Javier Piaguaje Payaguaje; José Gabriel Revelo Llore; José Miguel Ipiales Chicaiza; Lidia Alexandra Aguinda Aguinda; Lorenzo José Alvarado Yumbo; Lourdes Beatriz Chimbo Tanguila; Lucio Enrique Grefa Tanguila; Luis Agustin Payaguaje Piaguaje; Luis Armando Chimbo Yumbo; Luisa Delia Tanguila Narvaez; Maria Victoria Aguinda Salazar; Maria Clelia Reascos Revelo; Maria Hortencia Viveros Cusangua; Maria Magdalena Rodriguez Barcenes; Miguel Mario Payaguaje Payaguaje; Narcisa Aida Tanguila Narvaez; Octavio Ismael Cordova Huanca; Olga Gloria Grefa Cerda; Patricio Alberto Chimbo Yumbo; Patricio Wuilson Aguinda Aguinda; Reinaldo Lusitande Yaiguaje; Rosa Teresa Chimbo Tanguila; Segundo Angel Amanta Milan; Simon Lusitande Yaiguaje; and Teodoro Gonzalo Piaguaje Payaguaje.

16.   "REPUBLIC OF ECUADOR" means and refers to the governing political body in Ecuador, INCLUDING all branches of government and political subdivisions, its current and

former presidents, attorneys general, judges, prosecutors, other officials, politicians, partners, contractors, employees, representatives, agents, agencies, officers, attorneys, accountants, assigns, or any other PERSON acting, or purporting to act, on the REPUBLIC OF ECUADOR's behalf, either directly or indirectly, INCLUDING: Lenín Moreno; Rafael Correa; Martha Escobar; Patricio Garcia; Alexis Mera; Alberto Acosta; Ana Alban; Galo Chiriboga; Rene Vargas Pazos; Mauricio Montalvo Samaniego; Judge Alberto Guerra Bastidas; Judge Efrain Novillo Guzmán; Judge Germán Yánez Ricardo Ruiz; Judge Juan Evangelista Núñez Sanabria; Judge Leonardo Ordóñez Pina; Judge Nicolás Augusto Zambrano Lozada; Judge Juan Carlos Encarnación Sanchez; Judge Cruz María Ávila Delgado; Judge Marco Antonio Yaguache Mora; Judge Milton David Rafael Toral Zevallos; Judge Alejandro Kleber Orellana Pineda; Judge Lilia Marlene Ortiz Vásquez; José María Borja; Washington Pesántez; Cecilia Armas Erazo de Tobar; Jorge German; Diego Borja (former Economic Policy Minister); Esperanza Martinez; Diego García Carrión; Alianza Pais; the National Intelligence Secretariat; and any current or former official at the offices of the Fiscal, Prosecutor General, or Attorney General.

17.     "PERSON" means and refers to any natural person or any business, legal or governmental ENTITY or association.

18.     "SELVA VIVA" means and refers to Defendant Selva Viva Selviva Cia. Ltda., and its officers, directors, employees, partners, corporate parent, subsidiaries, or affiliates.

19.     "YOU" and "YOUR" mean and refer to Steven Donziger, The Law Offices of Steven R. Donziger, and Donziger & Associates, PLLC, and, where applicable, their officers, directors, employees, partners, corporate parent, subsidiaries, or affiliates.

20.     Defined terms may be capitalized for the convenience of the parties; the definitions herein apply whether or not the term is capitalized.

7

21.     If any information called for by this subpoena is withheld on the basis of privilege, please state the nature of the information being claimed as privileged, the type of privilege claimed, and all circumstances upon which you are relying to support each claim of privilege with enough specificity so that a court can determine the appropriateness of the objection.

## SUBPOENA

The following questions must be answered separately and fully, in writing under oath, and are to be returned as provided in the attached subpoena. If you cannot give the full information called for by a particular question, so state and give the best information you have on the subject.

1.     Identify and describe in detail any domestic or foreign ASSET that YOU OWN or CONTROL, INCLUDING identifying the value of such ASSET, how and where the ASSET is held, and what documents relate to such ASSET.

2.     Identify and describe in detail any interest in any domestic or foreign ASSET that YOU have transferred, sold, assigned, pledged, gifted, encumbered, or otherwise disposed of since the issuance of the Court's March 4, 2014 Judgment (Dkt. 1875), as modified, INCLUDING describing in detail the relevant transactions and the circumstances surrounding such transfer, sale, assignment, pledging, gift, encumbrance, or other disposition.

3.     Identify and describe in detail all YOUR current sources of income or revenue of any nature, whether domestic or foreign.

4.     Identify and describe in detail the status of YOUR OWNERSHIP or other interest in, and value of, any domestic or foreign real estate.

5.      Identify and describe in detail any domestic or foreign savings ACCOUNTS, checking ACCOUNTS, money market ACCOUNTS, investment ACCOUNTS, certificates of deposit, or any other ACCOUNTS held, either directly or indirectly, by YOU, as well as the date each such ACCOUNT or certificate of deposit was opened, created, or closed, and their current and greatest historical value.

6.      Identify and describe in detail the status of YOUR OWNERSHIP interest, direct or beneficial, in any real or personal PROPERTY, whether domestic or foreign, INCLUDING cooperative corporation shares, automobiles, trucks, other motor vehicles, boats, artwork, jewelry, aircraft, stocks, bonds, commodities, securities, partnership interests, patents, inventions, trade names, copyrights, royalty agreements, promissory notes, drafts or other commercial paper, or causes of action.

7.      Identify and describe in detail the status of YOUR current OWNERSHIP in any inherited PROPERTY, INCLUDING those ASSETS YOU received or are entitled to future receipt of, from any estates in which YOU may have or have had an interest, as well as the current value of such PROPERTY.

8.      Identify and describe in detail any life interest or remainder interest, either vested or contingent, in any trust or estate. If YOU are a beneficiary of any trust, furnish the: (a) name of trust or estate, (b) value of assets, (c) value of YOUR interest, and (d) any amounts received.

9.      Identify and describe in detail the status of YOUR current OWNERSHIP interest in any domestic or foreign ENTITIES or ACCOUNTS, as well as the current value of such PROPERTY and, if the PROPERTY was sold or transferred since the issuance of the Court's March 4, 2014 Judgment (Dkt. 1875), as modified, the date of such transfer, the identity of the purchaser, and the value received for such transfer.

10.     Identify and describe in detail all ACCOUNTS in which YOU have or have had an interest since March 4, 2014, wherever found, the location of those ACCOUNTS, the ACCOUNT number, the amount in said ACCOUNTS, the date/approximate date the ACCOUNT was opened, and the date/approximate date when the ACCOUNT was closed (if applicable).

11.     Identify all means by which YOU have transferred, paid, received, or conducted any financial transactions since March 4, 2014, or any other transaction involving an exchange of value.

12.     Identify any device, electronic or otherwise, that YOU have used to access any ACCOUNT or conduct any financial transaction since March 4, 2014, INCLUDING credit, debit, and/or automatic teller (ATM) cards, regardless of whether such device or card is titled in YOUR name.

13.     Identify all internet-based services used by YOU and/or the other Defendants for ACCOUNTING, banking, document storage, collaboration, file sharing, and creating and/or modifying documents.

14.     Identify and describe in detail all debts or credits due, owing, or which could or will become due or owing to YOU, wherever found, the location of those debts or credits, the amount of the debt or credit, and the date and time at which such debt or credit will be payable to YOU.

15.     Identify YOUR current net worth.

16.     State the total amount of money YOU have received from YOUR involvement in the ECUADOR LITIGATION and any subsequently related litigation and identify the source and date of all such payments.

17.     Identify and describe in detail any ASSET, payment, compensation, revenue, or any other thing of value YOU have received, contracted to receive, or have been promised at any time related to any aspect of YOUR involvement in the ECUADOR LITIGATION, the ECUADOR JUDGMENT, or the ECUADOR ENFORCEMENT ACTIONS.

18.     Identify and describe in detail any attempted or completed sale or transfer of any license, copyright, life rights, trademark, media rights, or other right to exploit, market or publicize any aspect of the ECUADOR LITIGATION, ECUADOR JUDGMENT, or ECUADOR ENFORCEMENT ACTIONS, and YOUR involvement or the involvement of any other PERSON therein.

19.     Identify and describe in detail any actual, contemplated, anticipated, or potential movie, documentary, book, television program, podcast, or other media project relating in any way to the ECUADOR LITIGATION, the ECUADOR JUDGMENT, or the ECUADOR ENFORCEMENT ACTIONS, INCLUDING YOUR role and any value YOU might receive in connection therewith.

20.     Identify and describe in detail any and all ASSETS that YOU CONTROL, that YOU have received, or hereafter may receive, directly or indirectly, or to which YOU have or hereafter obtain, any right, title or interest, directly or indirectly, that are traceable to the ECUADOR LITIGATION, the ECUADOR JUDGMENT or the enforcement of the ECUADOR JUDGMENT anywhere in the world.

21.     Identify and describe in detail any act that YOU, the LAGO AGRIO PLAINTIFFS, or any PERSON acting on YOUR behalf or on behalf of the LAGO AGRIO PLAINTIFFS, has undertaken to monetize or profit from the ECUADOR JUDGMENT, INCLUDING by selling, assigning, pledging, transferring, or encumbering any interest therein.

22.     Identify and describe in detail any communication after March 4, 2014, between YOU and any PERSON concerning the ECUADOR JUDGMENT or any attempts by anyone, successful or not, to monetize or profit from it.

23.     Identify any PERSON who financially supported or invested in, was asked to financially support or invest in, or who offered to financially support or invest in any aspect of the ECUADOR JUDGMENT or the enforcement thereof and describe in detail the terms or proposed terms of such investment or support.

24.     Identify and describe in detail any funding commitments in support of the ECUADOR LITIGATION or ECUADOR ENFORCEMENT ACTIONS from any PERSON or ENTITY, INCLUDING from the following:

      a.  Kohn Swift & Graf, P.C.

      b.  Russell DeLeon

      c.  Orin Kramer

      d.  Torvia Limited

      e.  Burford

      f.  88 Capital

      g.  Equitable Outcomes

      h.  Jonaks Limited

      i.  Satee GMBH

      j.  David Sherman III

      k.  Glenn Krevlin

      l.  Michael Donziger

      m. Russell O. Wiese

n. TC Payment Services International

o. Amazonia Recovery Limited

p. Woodsford Litigation Funding Limited

25.    Identify and describe in detail any ASSET, payment, proceeds, compensation, revenue, or any other thing of value YOU have delivered, contracted to deliver, or have promised to any PERSON or ENTITY from any proceeds received or that may be received from the ECUADOR JUDGMENT, enforcement of the ECUADOR JUDGMENT, or any investment in the ECUADOR JUDGMENT.

26.     Describe in detail how the monies (totaling $32,360,647) shown in the below

chart as "commitments" from investors in the ECUADOR LITIGATION were expended,

INCLUDING in YOUR description the identification of any ACCOUNTS into which any

portion of said monies were deposited and the specific amounts received or expended by YOU at

any time:

## Funding for the Enterprise

| Investor | Investments Contributed | Commitment Amounts[1] |
|---|---|---|
| Kohn Swift & Graf, P.C. | $ 6,360,647 | $ 6,360,647 |
| Russell DeLeon | $ 1,500,000 | $ 2,000,000 |
| Orin Kramer | $ 150,000 | $ 150,000 |
| Torvia Limited | $ 3,413,387 | $ 7,250,000 |
| Burford | $ 4,000,000 | $ 15,000,000 |
| 88 Capital | | $ 250,000 |
| Equitable Outcomes | | $ 150,000 |
| Jonaks Limited | | $ 200,000 |
| Satee GMBH | | $ 300,000 |
| David Sherman III | | $ 250,000 |
| Glenn Krevlin | | $ 250,000 |
| Michael Donziger | | $ 150,000 |
| Russell O. Wiese | | $ 50,000 |
| TC Payment Services International | $ 424,948 | |
| Amazonia Recovery Limited | $ 149,000 | |
| TOTAL | $ 15,997,963 | $ 32,360,647 |

PX 2143     Confidential

PLAINTIFF'S
EXHIBIT
2143

Plaintiff's Exhibit 2143  p. 1 of 1
Plaintiff's Exhibit 4900  p. 114 of 144

27.     Identify and describe in detail any ACCOUNTINGS, reports, summaries,

analyses, statements, ledgers, or any other kind of record relating to how funds received in

support of the ECUADOR LITIGATION, ECUADOR JUDGMENT, or ECUADOR

ENFORCEMENT ACTIONS have been received or expended, INCLUDING anything prepared

in response to any demand by the Union of People Affected by Texaco (aka UDAPT) and their agents and representatives.

28.     Identify and describe in detail all ASSETS, benefits, payments, or things of value that have been or will be conferred, offered, or promised to YOU or any agent, attorney, or representative of YOU or the LAGO AGRIO PLAINTIFFS (INCLUDING attorneys in this action, attorneys in the ECUADOR LITIGATION, Pablo Fajardo Mendoza, Servicios Fromboliere Compania Limitada, Luis Yanza, Julio Prieto Méndez, Juan Pablo Sáenz, Andrew Woods, Aaron Marr Page, Laura Garr, Brian Parker, Joseph Kohn, Patricio Salazar Cordova, Agustin Salazar, Serafin Angel Cajo, and SELVA VIVA), by the REPUBLIC OF ECUADOR, INCLUDING the date, description, medium and purpose of such benefits, payments, or things of value, and identify all PERSONS and/or ENTITIES involved in, and documents concerning such ASSETS, benefits, payments, or things of value.

29.     Identify and describe in detail the ASSETS and liabilities of the AMAZON DEFENSE FRONT.

30.     Identify and describe in detail YOUR current OWNERSHIP interest in Amazonia Recovery Limited, INCLUDING identifying the value of such ASSET, how and where the ASSET is held, and what documents relate to such ASSET.

31.     Identify and describe in detail any past or present trust, corporation, or other ENTITY created to hold, distribute, administer, or otherwise affect any proceeds of the ECUADOR JUDGMENT.

Dated: April 16, 2018
      New York, New York

GIBSON, DUNN & CRUTCHER LLP

By: _____

Randy M. Mastro
Andrea E. Neuman
200 Park Avenue, 47th Floor
New York, New York 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

William E. Thomson
333 South Grand Avenue
Los Angeles, California 90071
Telephone: 213.229.7891
Facsimile: 213.229.6891

STERN, KILCULLEN & RUFOLO LLC
Herbert J. Stern
Joel M. Silverstein
325 Columbia Tpke, Ste 110
P.O. Box 992
Florham Park, New Jersey 07932-0992
Telephone: 973.535.1900
Facsimile: 973.535.9664

*Attorneys for Chevron Corporation*

## NOTICE TO JUDGMENT DEBTOR OR OBLIGOR

Money or property belonging to you may have been taken or held in order to satisfy a judgment or order which has been entered against you. Read this carefully.

## YOU MAY BE ABLE TO GET YOUR MONEY BACK

State and federal laws prevent certain money or property from being taken to satisfy judgments or orders. Such money or property is said to be "exempt". The following is a partial list of money which may be exempt:

1. Supplemental security income, (SSI);

2. Social security;

3. Public assistance (welfare);

4. Spousal support, maintenance (alimony) or child support;

5. Unemployment benefits;

6. Disability benefits;

7. Workers' compensation benefits;

8. Public or private pensions;

9. Veterans benefits;

10. Ninety percent of your wages or salary earned in the last sixty days;

11. Twenty-five hundred dollars of any bank account containing statutorily exempt payments that were deposited electronically or by direct deposit within the last forty-five days, including, but not limited to, your social security, supplemental security income, veterans benefits, public assistance, workers' compensation, unemployment insurance, public or private pensions, railroad retirement benefits, black lung benefits, or child support payments;

12. Railroad retirement; and

13. Black lung benefits.

If you think that any of your money that has been taken or held is exempt, you must act promptly because the money may be applied to the judgment or order. If you claim that any of your money that has been taken or held is exempt, you may contact the person sending this notice.

Also, YOU MAY CONSULT AN ATTORNEY, INCLUDING ANY FREE LEGAL SERVICES ORGANIZATION IF YOU QUALIFY. You can also go to court without an

attorney to get your money back. Bring this notice with you when you go. You are allowed to try to prove to a judge that your money is exempt from collection under New York civil practice law and rules, sections fifty-two hundred twenty-two-a, fifty-two hundred thirty-nine and fifty-two hundred forty. If you do not have a lawyer, the clerk of the court may give you forms to help you prove your account contains exempt money that the creditor cannot collect. The law (New York civil practice law and rules, article four and sections fifty-two hundred thirty-nine and fifty-two hundred forty) provides a procedure for determination of a claim to an exemption.

# EXHIBIT 71

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHEVRON CORPORATION,

INDEX NUMBER: 11 CIV. 0691
(LAK)

vs                                                           *Plaintiff*

STEVEN DONZIGER, et al.,

*Defendant*

## AFFIDAVIT OF SERVICE

State of New York }
County of New York }  ss.:

The undersigned, being duly sworn, deposes and says;

Deponent is not a party herein, is over 18 years of age and resides in Woodside, New York

That on 4/16/2018 at 1:49 PM at 245 West 104th Street, New York, NY 10025

deponent served the following documents:

- Chevron Corporation's Subpoena Ad Testificandum to Steven R. Donziger;
- Chevron Corporation's First Set of Requests for Production of Documents in Aid of the Supplemental Judgment to Defendants Steven Donziger, the Law Offices of Steven R. Donziger, and Donziger & Associates, PLLC;
- Chevron Corporation's First Information Subpoena in Aid of the Supplemental Judgment and Restraining Notice to Defendants Steven Donziger, the Law Offices of Steven R. Donziger, and Donziger & Associates, PLLC, self-addressed postpaid return envelope;

- Subpoena to Testify at a Deposition in a Civil Action to Athenahealth, Inc.
- Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action with Exhibit A to Athenahealth, Inc.
- Attachment to Subpoena to Produce Documents ("Chevron Corporation's First Information Subpoena, Subpoena Duces Tecum, and Subpoena Ad Testificandum to Athenahealth, Inc."), self-addressed prepaid return envelope

- Subpoena to Testify at a Deposition in a Civil Action to Jonathan Bush
- Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action with Exhibit A to Jonathan Bush
- Attachment to Subpoena to Produce Documents ("Chevron Corporation's First Information Subpoena, Subpoena Duces Tecum, and Subpoena Ad Testificandum to Jonathan Bush"), self-addressed prepaid return envelope

- Subpoena to Testify at a Deposition in a Civil Action to Katie Sullivan, in her capacity as President of Streamline Family Office, Inc.
- Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action with Exhibit A to Katie Sullivan, in her capacity as President of Streamline Family Office, Inc.
- Attachment to Subpoena to Produce Documents ("Chevron Corporation's First Information Subpoena, Subpoena Duces Tecum, and Subpoena Ad Testificandum to Katie Sullivan, in her capacity as President of Streamline Family Office, Inc."), self-addressed prepaid return envelope

Serving By Irving, Inc. | 233 Broadway, Suite 2201 | New York, NY 10279
New York City Dept. of Consumer Affairs License No. 0761160

1

- Subpoena to Testify at a Deposition in a Civil Action to Katie Sullivan
- Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action with Exhibit A to Katie Sullivan
- Attachment to Subpoena to Produce Documents ("Chevron Corporation's First Information Subpoena, Subpoena Duces Tecum, and Subpoena Ad Testificandum to Katie Sullivan."), self-addressed prepaid return envelope

- Subpoena to Testify at a Deposition in a Civil Action to Joshua Rizack
- Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action with Exhibit A to Joshua Rizack
- Attachment to Subpoena to Produce Documents ("Chevron Corporation's First Information Subpoena, Subpoena Duces Tecum, and Subpoena Ad Testificandum to Joshua Rizack"), self-addressed prepaid return envelope

on **Steven R. Donziger** witness therein named,

by delivering thereat a true copy of each to **Manny "Doe" (Doorman - refused to give his last name and refused server access to apartment)**, a person of suitable age and discretion. Said premises is witness's dwelling place / usual place of abode within the state.

Description of Person Served:
Gender: Male
Skin: Tan
Hair: Bald
Age: 36 - 50 Yrs.
Height: 5' 4" - 5' 8"
Weight:161-200 Lbs.
Other:

Sworn to before me this
17th day of April, 2018

NOTARY PUBLIC

JOHN DICANIO
NOTARY PUBLIC STATE OF NEW YORK
WESTCHESTER COUNTY
LIC #01DI4977768
COMMISSION EXPIRES 2/11/2019

Nicholai Granados
License No.2028666

Serving By Irving, Inc. | 233 Broadway, Suite 2201 | New York, NY 10279
New York City Dept. of Consumer Affairs License No. 0761160

2

# EXHIBIT 72

| | |
|---|---|
| **From:** | Katie Sullivan <Katie@Streamlinefamilyoffice.com> |
| **Sent:** | Monday, March 12, 2018 7:09 PM |
| **To:** | Steven Donziger <sdonziger@donzigerandassociates.com> |
| **Subject:** | Re: CVX. A pleasure to meet you / 60 Minutes segment. |

Wow, really nice note! And, your power to make grown men emotional. :)

On Mar 12, 2018, at 6:24 PM, Steven Donziger <sdonziger@donzigerandassociates.com> wrote:

> fyi
>
> ----
>
> **From:** Bruce Herbert (NSI) <bh@newground.net>
> **Sent:** Sunday, March 11, 2018 5:10 PM
> **To:** Anton Tabuns; Steven Donziger
> **Subject:** Re: CVX. A pleasure to meet you / 60 Minutes segment.
>
> Winchester, Va.  |  Sun 3/11/2018
>
> Dear Anton & Steve,
>
> Thank you for recalling to send this link, Anton, which I've just watched, and which later I'll
> rewatch with my 94-year-old mother, whom I'm visiting with following NY.
>
> Not only was it a pleasure to spend that snowy evening together, it was deeply meaningful to
> learn about the case and to witness first-hand Steve's devotion to the cause of Ecuadorian and
> environmental justice.
>
> At one point Steve mentioned feeling lifted by our participation as shareholders, but it is really I
> who feel inspired by his dedication and deeply humbled by his generous words — had we not
> been a company of men meeting for the first time that night out in public, I might have let show
> more of the emotion I felt in that moment (and even now as I write these words).
>
> Steve's work (and yours, Anton) has importance to the affected people living today but also is of
> inestimable precedential value for the future.  Though I can only echo, as Abraham Lincoln once
> wrote: "I feel how weak and fruitless must be any word of mine...", it gives me hope that our
> shareholder efforts are somehow contributive.  Know that you may count on my abiding respect
> and perseverance for however long this proceeding may take.
>
> Yours, most sincerely and respectfully,          . . . Bruce
>
> ----------
> **Bruce Herbert, aif**
> **Chief Executive**
> **Newground Social Investment, spc**
> www.newground.net

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0015817

## Newground Social Investment, SPC

www.newground.net

Newground Social Investment, SPC is a Registered Investment Advisor that is incorporated and registered in the State of Washington. In accordance with applicable law ...

(206) 522-1944
bh@newground.net

**Connecting Money**
**to What Matters**
**for 25+ years**

Sent from a device: *Please excuse brevity, typos, and auto-corrects.*

<<<<<<< >>>>>>>

On Mar 11, 2018, at 10:54 AM, Anton Tabuns <tabuns@gmail.com> wrote:

Bruce and Pat,

Steven and I wanted to convey what a pleasure it was for us to meet this week. Thank you again for your important work in the shareholder space and also for allowing us the opportunity to share the views of the affected communities in Ecuador regarding Chevron's environmental liability. Thanks as well to Simon for your incredibly important work and for facilitating the meeting.

As discussed, please find a link to the 60 Minutes segment here: http://chevrontoxico.com/news-and-multimedia/2009/0503-60-minutes-amazon-crude

Feel free to reach out if you need more information or have follow-up questions. We will be in touch as new information arises.

Kind regards,

Anton

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

# EXHIBIT 73

 **Bank**

America's Most Convenient Bank®

7          STATEMENT OF ACCOUNT

DONZIGER AND ASSOCIATES PLLC
245 W 104TH ST
NEW YORK NY  10025

| | |
|---|---|
| Page: | 1 of  2 |
| Statement Period: | May 01 2016-May 31 2016 |
| Cust Ref #: | 36845140-719-7-### |
| Primary Account #: | 8783 |

# Summary of Accounts

| DEPOSIT ACCOUNTS | ACCOUNT NUMBER | BALANCE |
|---|---|---|
| TD Business Premier Checking | 8783 | 6,993.32 |
| **Total Deposit Accounts** | | **6,993.32** |

## TD Business Premier Checking

DONZIGER AND ASSOCIATES PLLC

Account # 8783

### ACCOUNT SUMMARY

| | | | |
|---|---|---|---|
| Beginning Balance | 5,088.32 | Average Collected Balance | 14,510.57 |
| Other Credits | 74,990.00 | Annual Percentage Yield Earned | 0.00% |
| | | Days in Period | 31 |
| Other Withdrawals | 73,055.00 | | |
| Service Charges | 30.00 | | |
| Ending Balance | 6,993.32 | | |

### DAILY ACCOUNT ACTIVITY

**Other Credits**

| POSTING DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 5/10 | WIRE TRANSFER INCOMING, LENCZNER SLAGHT ROYCE SMITH | 74,990.00 |
| | Subtotal: | 74,990.00 |

**Other Withdrawals**

| POSTING DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 5/10 | WIRE TRANSFER FEE | 15.00 |
| 5/13 | WITHDRAWAL TRANSFER, To Checking 2265 | 70,000.00 |
| 5/23 | WIRE TRANSFER OUTGOING, Shuyana Natalia Yanza Allauca | 3,000.00 |
| 5/23 | WIRE TRANSFER FEE | 40.00 |
| | Subtotal: | 73,055.00 |

**Service Charges**

| POSTING DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 5/31 | MAINTENANCE FEE | 30.00 |
| | Subtotal: | 30.00 |

### DAILY BALANCE SUMMARY

| DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|
| 4/30 | 5,088.32 | 5/23 | 7,023.32 |
| 5/10 | 80,063.32 | 5/31 | 6,993.32 |
| 5/13 | 10,063.32 | | |

**Call 1-800-937-2000 for 24-hour Bank-by-Phone services or connect to www.tdbank.com**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0000327

# EXHIBIT 74

 **Bank**

America's Most Convenient Bank®

7          STATEMENT OF ACCOUNT

DONZIGER AND ASSOCIATES PLLC
245 W 104TH ST
NEW YORK NY  10025

| | |
|---|---|
| Page: | 1 of  2 |
| Statement Period: | Jul 01 2016-Jul 31 2016 |
| Cust Ref #: | 36845140-719-7-### |
| Primary Account #: | ████8783 |

## Summary of Accounts

| DEPOSIT ACCOUNTS | ACCOUNT NUMBER | BALANCE |
|---|---|---|
| TD Business Premier Checking | ████8783 | 11,908.32 |
| **Total Deposit Accounts** | | **11,908.32** |

### TD Business Premier Checking

DONZIGER AND ASSOCIATES PLLC                                      Account # ████8783

| ACCOUNT SUMMARY | | | |
|---|---|---|---|
| Beginning Balance | 6,963.32 | Average Collected Balance | 18,727.02 |
| Other Credits | 104,990.00 | Annual Percentage Yield Earned | 0.00% |
| | | Days in Period | 31 |
| Other Withdrawals | 100,015.00 | | |
| Service Charges | 30.00 | | |
| Ending Balance | 11,908.32 | | |

### DAILY ACCOUNT ACTIVITY

**Other Credits**

| POSTING DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 7/19 | WIRE TRANSFER INCOMING, LENCZNER SLAGHT ROYCE SMITH | 104,990.00 |
| | Subtotal: | 104,990.00 |

**Other Withdrawals**

| POSTING DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 7/19 | WIRE TRANSFER FEE | 15.00 |
| 7/22 | WITHDRAWAL TRANSFER, To Savings ████6418 | 100,000.00 |
| | Subtotal: | 100,015.00 |

**Service Charges**

| POSTING DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 7/29 | MAINTENANCE FEE | 30.00 |
| | Subtotal: | 30.00 |

**DAILY BALANCE SUMMARY**

| DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|
| 6/30 | 6,963.32 | 7/22 | 11,938.32 |
| 7/19 | 111,938.32 | 7/29 | 11,908.32 |

**Call 1-800-937-2000 for 24-hour Bank-by-Phone services or connect to www.tdbank.com**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0000328

# EXHIBIT 75

 **Bank**

America's Most Convenient Bank®

7

**STATEMENT OF ACCOUNT**

DONZIGER AND ASSOCIATES PLLC
245 W 104TH ST
NEW YORK NY 10025

| | |
|---|---|
| Page: | 1 of 3 |
| Statement Period: | Oct 01 2016-Oct 31 2016 |
| Cust Ref #: | 36845140-719-7-### |
| Primary Account #: | ████8783 |

## Summary of Accounts

| DEPOSIT ACCOUNTS | ACCOUNT NUMBER | BALANCE |
|---|---|---|
| TD Business Premier Checking | ████8783 | 200,248.32 |
| **Total Deposit Accounts** | | **200,248.32** |

### TD Business Premier Checking

DONZIGER AND ASSOCIATES PLLC

Account #████8783

**WE'RE CHANGING OUR BUSINESS CHECKING CASH DEPOSIT FEE**
BEGINNING NOVEMBER 1, 2016, WE'RE INCREASING OUR CASH DEPOSIT FEE FOR ALL BUSINESS DEPOSIT
ACCOUNTS FROM $0.15 TO $0.20 PER $100 CASH DEPOSITED IN EXCESS OF YOUR MONTHLY THRESHOLD.
QUESTIONS? CALL 1-888-751-9000 OR VISIT A LOCAL TD BANK.

### ACCOUNT SUMMARY

| | | | |
|---|---|---|---|
| Beginning Balance | 7,228.32 | Average Collected Balance | 151,727.51 |
| Other Credits | 248,080.00 | Annual Percentage Yield Earned | 0.00% |
| | | Days in Period | 31 |
| Electronic Payments | 25,000.00 | | |
| Other Withdrawals | 30,030.00 | | |
| Service Charges | 30.00 | | |
| Ending Balance | 200,248.32 | | |

### DAILY ACCOUNT ACTIVITY

**Other Credits**

| POSTING DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 10/6 | WIRE TRANSFER INCOMING, LENCZNER SLAGHT ROYCE SMITH | 143,490.00 |
| 10/17 | WIRE TRANSFER INCOMING, DUE TO OTHER - WIRES | 4,600.00 |
| 10/21 | WIRE TRANSFER INCOMING, LENCZNER SLAGHT ROYCE SMITH | 99,990.00 |
| | Subtotal: | 248,080.00 |

**Electronic Payments**

| POSTING DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 10/31 | eTransfer Debit, Online Xfer | 25,000.00 |
| | Transfer to CK████2265 | |
| | Subtotal: | 25,000.00 |

**Other Withdrawals**

| POSTING DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 10/6 | WIRE TRANSFER FEE | 15.00 |
| 10/17 | WIRE TRANSFER OUTGOING, 3BI Media Llc | 4,600.00 |

Call 1-800-937-2000 for 24-hour Bank-by-Phone services or connect to www.tdbank.com

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0000331

# EXHIBIT 76



**Bank**

America's Most Convenient Bank®

E       STATEMENT OF ACCOUNT

DONZIGER AND ASSOCIATES PLLC
245 W 104TH ST
NEW YORK NY 10025

Page:                    1 of  3
Statement Period:   Dec 01 2016-Dec 31 2016
Cust Ref #:          36845140-719-E-***
Primary Account #:                   8783

# Summary of Accounts

| DEPOSIT ACCOUNTS | ACCOUNT NUMBER | BALANCE |
|---|---|---|
| TD Business Premier Checking | 8783 | 114,562.85 |
| **Total Deposit Accounts** | | **114,562.85** |

## TD Business Premier Checking

DONZIGER AND ASSOCIATES PLLC

Account #          8783

### ACCOUNT SUMMARY

| | | | |
|---|---|---|---|
| Beginning Balance | 189,034.85 | Average Collected Balance | 165,437.17 |
| Other Credits | 68,124.00 | Annual Percentage Yield Earned | 0.00% |
| | | Days in Period | 31 |
| Electronic Payments | 14,222.00 | | |
| Other Withdrawals | 128,374.00 | | |
| Ending Balance | 114,562.85 | | |

### DAILY ACCOUNT ACTIVITY

**Other Credits**

| POSTING DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 12/8 | WIRE TRANSFER INCOMING, BANK OF AMERICA | 3,134.00 |
| 12/19 | WIRE TRANSFER INCOMING, LENCZNER SLAGHT ROYCE SMITH | 64,990.00 |
| | Subtotal: | 68,124.00 |

**Electronic Payments**

| POSTING DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 12/8 | eTransfer Debit, Online Xfer | 14,222.00 |
| | Transfer to CC          4968 | |
| | Subtotal: | 14,222.00 |

**Other Withdrawals**

| POSTING DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 12/5 | WIRE TRANSFER OUTGOING, Aaron Marr Page | 5,000.00 |
| 12/5 | WIRE TRANSFER OUTGOING, Frente De Defensa De La Amazonia | 5,000.00 |
| 12/5 | WIRE TRANSFER FEE | 40.00 |
| 12/5 | WIRE TRANSFER FEE | 25.00 |
| 12/8 | WIRE TRANSFER OUTGOING, Patricio Salazar Cordova | 3,179.00 |
| 12/8 | WIRE TRANSFER FEE | 25.00 |
| 12/16 | WIRE TRANSFER OUTGOING, Deepak Gupta | 25,000.00 |
| 12/16 | WIRE TRANSFER OUTGOING, Aaron Marr Page | 5,000.00 |

**Call 1-800-937-2000 for 24-hour Bank-by-Phone services or connect to www.tdbank.com**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER
PROTECTED BY FED R. EVID. 502(d)

MKS-0000333

# EXHIBIT 77

 **Bank**

America's Most Convenient Bank®

E          STATEMENT OF ACCOUNT

DONZIGER AND ASSOCIATES PLLC
245 W 104TH ST
NEW YORK NY 10025

| | |
|---|---|
| Page: | 1 of 2 |
| Statement Period: | Feb 01 2017-Feb 28 2017 |
| Cust Ref #: | 36845140-719-E-*** |
| Primary Account #: | ████8783 |

## Summary of Accounts

| DEPOSIT ACCOUNTS | ACCOUNT NUMBER | BALANCE |
|---|---|---|
| TD Business Premier Checking | ████8783 | 285,917.85 |
| | | |
| Total Deposit Accounts | | 285,917.85 |

### TD Business Premier Checking

DONZIGER AND ASSOCIATES PLLC                    Account # ████ 8783

**ACCOUNT SUMMARY**

| | | | |
|---|---|---|---|
| Beginning Balance | 113,522.85 | Average Collected Balance | 170,970.52 |
| Other Credits | 187,490.00 | Annual Percentage Yield Earned | 0.00% |
| | | Days in Period | 28 |
| Other Withdrawals | 15,095.00 | | |
| Ending Balance | 285,917.85 | | |

**DAILY ACCOUNT ACTIVITY**

Other Credits

| POSTING DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 2/14 | WIRE TRANSFER INCOMING, GEORGE R WATERS | 50,000.00 |
| 2/21 | WIRE TRANSFER INCOMING, LENCZNER SLAGHT ROYCE SMITH | 137,490.00 |
| | Subtotal: | 187,490.00 |

Other Withdrawals

| POSTING DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 2/13 | WIRE TRANSFER OUTGOING, Frente De Defensa La Amazonia | 10,000.00 |
| 2/13 | WIRE TRANSFER OUTGOING, Aaron Marr Page | 5,000.00 |
| 2/13 | WIRE TRANSFER FEE | 40.00 |
| 2/13 | WIRE TRANSFER FEE | 25.00 |
| 2/14 | WIRE TRANSFER FEE | 15.00 |
| 2/21 | WIRE TRANSFER FEE | 15.00 |
| | Subtotal: | 15,095.00 |

**DAILY BALANCE SUMMARY**

| DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|
| 1/31 | 113,522.85 | 2/14 | 148,442.85 |
| 2/13 | 98,457.85 | 2/21 | 285,917.85 |

Call 1-800-937-2000 for 24-hour Bank-by-Phone services or connect to www.tdbank.com

Bank Deposits FDIC Insured | TD Bank, N.A. | Equal Housing Lender 

**TD BANK 0000133**

# EXHIBIT 78

 **Bank**
America's Most Convenient Bank®

E          STATEMENT OF ACCOUNT

DONZIGER AND ASSOCIATES PLLC
245 W 104TH ST
NEW YORK NY 10025

| | |
|---|---|
| Page: | 1 of 3 |
| Statement Period: | Dec 01 2016-Dec 31 2016 |
| Cust Ref #: | 36845140-719-E-*** |
| Primary Account #: | ▇8783 |

# Summary of Accounts

| DEPOSIT ACCOUNTS | ACCOUNT NUMBER | BALANCE |
|---|---|---|
| TD Business Premier Checking | ▇8783 | 114,562.85 |
| | | |
| Total Deposit Accounts | | 114,562.85 |

## TD Business Premier Checking

DONZIGER AND ASSOCIATES PLLC                    Account # ▇ 8783

### ACCOUNT SUMMARY

| | | | |
|---|---|---|---|
| Beginning Balance | 189,034.85 | Average Collected Balance | 165,437.17 |
| Other Credits | 68,124.00 | Annual Percentage Yield Earned | 0.00% |
| | | Days in Period | 31 |
| Electronic Payments | 14,222.00 | | |
| Other Withdrawals | 128,374.00 | | |
| Ending Balance | 114,562.85 | | |

### DAILY ACCOUNT ACTIVITY

**Other Credits**

| POSTING DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 12/8 | WIRE TRANSFER INCOMING, BANK OF AMERICA | 3,134.00 |
| 12/19 | WIRE TRANSFER INCOMING, LENCZNER SLAGHT ROYCE SMITH | 64,990.00 |
| | Subtotal: | 68,124.00 |

**Electronic Payments**

| POSTING DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 12/8 | eTransfer Debit, Online Xfer | 14,222.00 |
| | Transfer to CC▇4968 | |
| | Subtotal: | 14,222.00 |

**Other Withdrawals**

| POSTING DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 12/5 | WIRE TRANSFER OUTGOING, Aaron Marr Page | 5,000.00 |
| 12/5 | WIRE TRANSFER OUTGOING, Frente De Defensa De La Amazonia | 5,000.00 |
| 12/5 | WIRE TRANSFER FEE | 40.00 |
| 12/5 | WIRE TRANSFER FEE | 25.00 |
| 12/8 | WIRE TRANSFER OUTGOING, Patricio Salazar Cordova | 3,179.00 |
| 12/8 | WIRE TRANSFER FEE | 25.00 |
| 12/16 | WIRE TRANSFER OUTGOING, Deepak Gupta | 25,000.00 |
| 12/16 | WIRE TRANSFER OUTGOING, Aaron Marr Page | 5,000.00 |

Call 1-800-937-2000 for 24-hour Bank-by-Phone services or connect to www.tdbank.com

Bank Deposits FDIC Insured | TD Bank, N.A. | Equal Housing Lender

# How to Balance your Account

Page:        2 of 3

Begin by adjusting your account register as follows:

◉ Subtract any services charges shown on this statement.

◉ Subtract any automatic payments, transfers or other electronic withdrawals not previously recorded.

◉ Add any interest earned if you have an interest-bearing account.

◉ Add any automatic deposit or overdraft line of credit.

◉ Review all withdrawals shown on this statement and check them off in your account register.

◉ Follow instructions 2-5 to verify your ending account balance.

1   Your ending balance shown on this statement is:

2   List below the amount of deposits or credit transfers which do not appear on this statement. Total the deposits and enter on Line 2.

3   Subtotal by adding lines 1 and 2.

4   List below the total amount of withdrawals that do not appear on this statement. Total the withdrawals and enter on Line 4.

5   Subtract Line 4 from 3. This adjusted balance should equal your account balance.

❶  Ending Balance       114,562 85

❷  Total Deposits   +

❸  Sub Total

❹  Total Withdrawals

   Adjusted Balance

| ❷ DEPOSITS NOT ON STATEMENT | DOLLARS | CENTS |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
| Total Deposits |  | ❷ |

| ❹ WITHDRAWALS NOT ON STATEMENT | DOLLARS | CENTS |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

| WITHDRAWALS NOT ON STATEMENT | DOLLARS | CENTS |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
| Total Withdrawals |  | ❹ |

**FOR CONSUMER ACCOUNTS ONLY  IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS:**

If you need information about an electronic fund transfer or if you believe there is an error on your bank statement or receipt relating to an electronic fund transfer, telephone the bank immediately at the phone number listed on the front of your statement or write to

TD Bank, N.A., Deposit Operations Dept, P O  Box 1377, Lewiston, Maine 04243-1377

We must hear from you no later than sixty (60) calendar days after we sent you the first statement upon which the error or problem first appeared.  When contacting the Bank, please explain as clearly as you can why you believe there is an error or why more information is needed.  Please include

   ◉  Your name and account number.
   ◉  A description of the error or transaction you are unsure about.
   ◉  The dollar amount and date of the suspected error.

When making a verbal inquiry, the Bank may ask that you send us your complaint in writing within ten (10) business days after the first telephone call.

We will investigate your complaint and will correct any error promptly.  If we take more than ten (10) business days to do this, we will credit your account for the amount you think is in error, so that you have the use of the money during the time it takes to complete our investigation.

**INTEREST NOTICE**

Total interest credited by the Bank to you this year will be reported by the Bank to the Internal Revenue Service and State tax authorities. The amount to be reported will be reported separately to you by the Bank.

**FOR CONSUMER LOAN ACCOUNTS ONLY  BILLING RIGHTS SUMMARY**

In case of Errors or Questions About Your Bill

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us at P.O. Box 1377, Lewiston, Maine 04243-1377 as soon as possible.  We must hear from you no later than sixty (60) days after we sent you the FIRST bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights. In your letter, give us the following information

   ◉  Your name and account number.
   ◉  The dollar amount of the suspected error.
   ◉  Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question.

FINANCE CHARGES  Although the Bank uses the Daily Balance method to calculate the finance charge on your Moneyline / Overdraft Protection account (the term "ODP" or "OD" refers to Overdraft Protection), the Bank discloses the Average Daily Balance on the periodic statement as an easier method for you to calculate the finance charge.  The finance charge begins to accrue on the date advances and other debits are posted to your account and will continue until the balance has been paid in full. To compute the finance charge, multiply the Average Daily Balance times the Days in Period times the Daily Periodic Rate (as listed in the Account Summary section on the front of the statement).  The Average Daily Balance is calculated by adding the balance for each day of the billing cycle, then dividing the total balance by the number of Days in the Billing Cycle. The daily balance is the balance for the day after advances have been added and payments or credits have been subtracted plus or minus any other adjustments that might have occurred that day.  There is no grace period during which no finance charge accrues.  Finance charge adjustments are included in your total finance charge.

TD BANK 0000129



**Bank**

America's Most Convenient Bank®

STATEMENT OF ACCOUNT

DONZIGER AND ASSOCIATES PLLC

| | |
|---|---|
| Page: | 3 of 3 |
| Statement Period: | Dec 01 2016-Dec 31 2016 |
| Cust Ref #: | 36845140-719-E-*** |
| Primary Account #: | ███ 8783 |

---

DAILY ACCOUNT ACTIVITY

Other Withdrawals (continued)

| POSTING DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 12/16 | WIRE TRANSFER OUTGOING, Frente De Defensa De La Amazonia | 5,000.00 |
| 12/16 | WIRE TRANSFER FEE | 40.00 |
| 12/16 | WIRE TRANSFER FEE | 25.00 |
| 12/16 | WIRE TRANSFER FEE | 25.00 |
| 12/19 | WIRE TRANSFER FEE | 15.00 |
| 12/27 | WITHDRAWAL TRANSFER, To Checkin███ 3420 | 80,000.00 |
| | Subtotal: | 128,374.00 |

DAILY BALANCE SUMMARY

| DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|
| 11/30 | 189,034.85 | 12/16 | 129,587.85 |
| 12/5 | 178,969.85 | 12/19 | 194,562.85 |
| 12/8 | 164,677.85 | 12/27 | 114,562.85 |

Call 1-800-937-2000 for 24-hour Bank-by-Phone services or connect to www.tdbank.com

Bank Deposits FDIC Insured | TD Bank, N.A. | Equal Housing Lender

**TD BANK 0000130**

*Bus Platinum Privileges*

**Bank of America**

P.O. Box 15284
Wilmington, DE 19850

**Customer service information**

📞 1.888.BUSINESS (1.888.287.4637)

🖥 bankofamerica.com

✉ Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

STREAMLINE FAMILY OFFICE INC
DBA CWP ASSOCIATES
30 SPRINGDALE AVE
DOVER, MA 02030-2374

## Your Business Advantage Checking
## Bus Platinum Privileges

for January 1, 2018 to January 31, 2018                          Account number: ▮▮▮▮ 9158

**STREAMLINE FAMILY OFFICE INC    DBA CWP ASSOCIATES**

## Account summary

| | | |
|---|---:|---|
| Beginning balance on January 1, 2018 | $100.00 | # of deposits/credits: 11 |
| Deposits and other credits | 825,020.00 | # of withdrawals/debits: 33 |
| Withdrawals and other debits | -269,823.79 | # of items-previous cycle[1]: 0 |
| Checks | -4,765.21 | # of days in cycle: 31 |
| Service fees | -599.00 | Average ledger balance: $462,602.62 |
| **Ending balance on January 31, 2018** | **$549,932.00** | [1]*Includes checks paid,deposited items&other debits* |

---

Bank of America **Business Advantage**



Online Banking
TIP OF
THE MONTH

# Send payments with ACH

As a small business owner, did you know you can pay vendors and suppliers at other
financial institutions — outside of Bank of America — using ACH payments?

Simply use Online Banking to make cost-effective electronic fund transfers with ACH:
$10 for next-day delivery and $3 for 3-day delivery. Log in or enroll at bankofamerica.com/smallbusiness.
Click the **Transfers** tab, then select **Send Money to Someone** and then **Using Their Account
Number at Another Bank**.

AR7C4SJ9
SSM-02-17-0641.B

---

PULL: E   CYCLE: 43   SPEC: E   DELIVERY: E   TYPE:    IMAGE: A   BC: MA

MKS-0006477

STREAMLINE FAMILY OFFICE INC   |   Account # ████████ 9158   |   January 1, 2018 to January 31, 2018

# IMPORTANT INFORMATION:
## BANK DEPOSIT ACCOUNTS

How to Contact Us - You may call us at the telephone number listed on the front of this statement.

Updating your contact information - We encourage you to keep your contact information up-to-date. This includes address, email and phone number. If your information has changed, the easiest way to update it is by visiting the Help & Support tab of Online Banking.

Deposit agreement - When you opened your account, you received a deposit agreement and fee schedule and agreed that your account would be governed by the terms of these documents, as we may amend them from time to time. These documents are part of the contract for your deposit account and govern all transactions relating to your account, including all deposits and withdrawals. Copies of both the deposit agreement and fee schedule which contain the current version of the terms and conditions of your account relationship may be obtained at our financial centers.

Electronic transfers: In case of errors or questions about your electronic transfers - If you think your statement or receipt is wrong or you need more information about an electronic transfer (e.g., ATM transactions, direct deposits or withdrawals, point-of-sale transactions) on the statement or receipt, telephone or write us at the address and number listed on the front of this statement as soon as you can. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

  – Tell us your name and account number.
  – Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
  – Tell us the dollar amount of the suspected error.

For consumer accounts used primarily for personal, family or household purposes, we will investigate your complaint and will correct any error promptly. If we take more than 10 business days (10 calendar days if you are a Massachusetts customer) (20 business days if you are a new customer, for electronic transfers occurring during the first 30 days after the first deposit is made to your account) to do this, we will provisionally credit your account for the amount you think is in error, so that you will have use of the money during the time it will take to complete our investigation.

For other accounts, we investigate, and if we find we have made an error, we credit your account at the conclusion of our investigation.

Reporting other problems - You must examine your statement carefully and promptly. You are in the best position to discover errors and unauthorized transactions on your account. If you fail to notify us in writing of suspected problems or an unauthorized transaction within the time period specified in the deposit agreement (which periods are no more than 60 days after we make the statement available to you and in some cases are 30 days or less), we are not liable to you and you agree to not make a claim against us, for the problems or unauthorized transactions.

Direct deposits - If you have arranged to have direct deposits made to your account at least once every 60 days from the same person or company, you may call us to find out if the deposit was made as scheduled. You may also review your activity online or visit a financial center for information.

© 2018 Bank of America Corporation



**Bank of America, N.A. Member FDIC and**   **Equal Housing Lender**

MKS-0006478

 **Bank of America**

## Your checking account

STREAMLINE FAMILY OFFICE INC   |   Account # ▊▊▊ 9158   |   January 1, 2018 to January 31, 2018

## Deposits and other credits

| Date | Description | Amount |
|------|-------------|--------|
| 01/02/18 | WIRE TYPE:WIRE IN DATE: 180102 TIME:1732 ET TRN:2018010200472168 SEQ:2018010200050902/006888 ORIG:ANTONY ABBIATI ID:4740846 SND BK:STATE STREET BANK AND TRUST C ID:▊▊▊0028 PMT DET:05740000005 04526CHV LLC | 250,000.00 |
| 01/05/18 | WIRE TYPE:WIRE IN DATE: 180105 TIME:1731 ET TRN:2018010500397002 SEQ:2018010500044349/005174 ORIG:JAMES MCCAFFREY ID:4741676 SND BK:STATE STREE T BANK AND TRUST C ID:▊▊▊0028 PMT DET:0574000000 504702JAMES MCCAFFREY | 250,000.00 |
| 01/17/18 | Offer Fulfillment: Refund FX Wire Fee 1/11/2018 | 25.00 |
| 01/18/18 | WIRE TYPE:WIRE IN DATE: 180118 TIME:1652 ET TRN:2018011800403747 SEQ:S0680182933801/454326 ORIG:GLENN J. KREVLIN REVOCABL ID:▊▊▊9601 SND BK:CITIBANK, N.A. ID:0008 PMT DET:PER YOUR REQ UEST | 250,000.00 |
| 01/24/18 | WIRE TYPE:WIRE IN DATE: 180124 TIME:1818 ET TRN:2018012400389583 SEQ:2018012400276403/004604 ORIG:DUE TO OTHER - WIRES ID:▊▊▊8455 SND BK:TD BANK, NA ID:▊▊▊3673 PMT DET:221947770 RET YOUR R EF 221947770 DATED JAN 24BY TD BANK UTA INVALID BN | 24,965.00 |
| 01/24/18 | Offer Fulfillment: Refund FX Wire Fee 1/17/2018 | 25.00 |
| 01/24/18 | Offer Fulfillment: Refund FX Wire Fee 1/17/2018 | 25.00 |
| 01/24/18 | Offer Fulfillment: Refund FX Wire Fee 1/17/2018 | 25.00 |
| 01/26/18 | WIRE TYPE:WIRE IN DATE: 180126 TIME:1837 ET TRN:2018012600390848 SEQ:2018012600212529/005557 ORIG:DUE TO OTHER - WIRES ID:▊▊▊8455 SND BK:TD BANK, NA ID:▊▊▊3673 PMT DET:222153806 RTN SNDRF 222153806 DD26JAN BY TD BANK UTA INVLD BNF ACCT NB | 24,965.00 |
| 01/29/18 | WIRE TYPE:WIRE IN DATE: 180129 TIME:1836 ET TRN:2018012900471197 SEQ:2018012900282817/005865 ORIG:DUE TO OTHER - WIRES ID:▊▊▊8455 SND BK:TD BANK, NA ID:▊▊▊3673 PMT DET:222318112 RTN YR REF 222318112 DD JAN29 FUNDSRTND BY TD BANK UTA INVAL | 24,965.00 |
| 01/31/18 | Offer Fulfillment: Refund FX Wire Fee 1/24/2018 | 25.00 |

**Total deposits and other credits**                                                                                      **$825,020.00**

---

Bank of America **Business Advantage**



Activity Center
Alerts

Online Banking
**TIP OF THE MONTH**

## Stay informed around the clock

### Online Alerts[1] help keep you informed.

- Monitor your account balances and receive alerts when payments are due
- Be notified when transactions have cleared

Log in or enroll at **bankofamerica.com/smallbusiness** and click on **Alerts** in the Activity Center.

[1]Alerts received as text messages on your mobile access device may incur a charge from your mobile access service provider. This feature is not available on the Mobile website. Wireless carrier fees may apply.   ©2017 Bank of America Corporation.   |   ARV85JGG   |   SSM-04-17-0040.B

MKS-0006479

STREAMLINE FAMILY OFFICE INC | Account # ███████ 9158 | January 1, 2018 to January 31, 2018

## Withdrawals and other debits

| Date | Description | Amount |
|------|-------------|--------|
| 01/11/18 | TRANSFER STREAMLINE FAMILY OF:Independent Media In Confirmation# 1870584542 | –5,000.00 |
| 01/11/18 | WIRE TYPE:FX OUT DATE:180112 TIME:1626 ET TRN:2018011100395938 FX:CAD 125000.00 1.2273 BNF:PETER R GRANT LAW CORPORAT ID:███████26729 BNF BK:COAST CAPITAL SAVINGS.. ID:CC19180 PMT DET: 221001274 RETAINER LEGAL FEES POP SERVICES /FXREF/ | –101,849.59 |
| 01/12/18 | WIRE TYPE:WIRE OUT DATE:180112 TIME:1255 ET TRN:2018011200303296 SERVICE REF:009390 BNF:FORUM NOBIS ID:████████ 194 BNF BK:CITIBANK, N .A. ID:███70116 PMT DET:221092316 LEGAL FEES | –10,000.00 |
| 01/12/18 | WIRE TYPE:INTL OUT DATE:180112 TIME:1729 ET TRN:2018011200421604 SERVICE REF:924641 BNF:FRENTE DE DEFENSA DE LA AM ID:███████3804 BNF BK:BANCO DEL PICHINCHA C.A ID:001901333971 PMT DET:221124746 POP SERVICES | –13,100.00 |
| 01/16/18 | WIRE TYPE:WIRE OUT DATE:180116 TIME:1055 ET TRN:2018011600509843 SERVICE REF:010587 BNF:PATRICIO SALAZAR CORDOVA ID:██████ 5844 BNF BK: CITIBANK, N.A. ID:266086554 PMT DET:221313408 EXPE NSE REIMBURSEMENT | –4,642.74 |
| 01/17/18 | WIRE TYPE:INTL OUT DATE:180117 TIME:1241 ET TRN:2018011700329277 SERVICE REF:393979 BNF:FUNDACION NAUPA ID:██████09591 BNF BK:PRODUBANC O ID:PRODECEQ/(CH1328 PMT DET:221429346 POP SERVIC ES | –15,286.75 |
| 01/17/18 | WIRE TYPE:FX OUT DATE:180118 TIME:1251 ET TRN:2018011700332430 FX:CAD 5662.93 1.1967 BNF:PETER R GRANT LAW CORPORAT ID:████████6729 BNF BK:COAST CAPITAL SAVINGS.. ID:CC19180 PMT DET: 221430330 TRAVEL REIMBURSEMENT POP OTHER /TRAVEL R | –4,732.12 |
| 01/17/18 | WIRE TYPE:INTL OUT DATE:180117 TIME:1305 ET TRN:2018011700337725 SERVICE REF:400015 BNF:UYUNKAR DOMING PEAS NAMPIC ID:██████09429 BNF BK:BANCO INTERNACIONAL S.A ID:BINTECEQ/(CH0509 PMT DET:221431696 TRAVEL REIMBURSEMENT POP OTHER / | –1,365.00 |
| 01/17/18 | WIRE TYPE:FX OUT DATE:180118 TIME:1340 ET TRN:2018011700350453 FX:CAD 4510.01 1.1947 BNF:FIRST NATIONS SUMMIT SOCIE ID:██-009-0 BNF BK:ROYAL BANK OF CANADA ID:ROYCCAT2 PMT DET:22 1435400 POP OTHER/TRAVEL REIMBURSEMENT /FXREF/TE-3 | –3,775.01 |
| 01/17/18 | WIRE TYPE:FX OUT DATE:180118 TIME:1346 ET TRN:2018011700352763 FX:CAD 9381.39 1.1947 BNF:REX WEYLER ID:███████5753 BNF BK:ROYAL BANK O F CANADA ID:ROYCCAT2 PMT DET:221435974 POP SERVICE S /FXREF/TE-3-18-155812625 | –7,852.51 |
| 01/24/18 | WIRE TYPE:WIRE OUT DATE:180124 TIME:1225 ET TRN:2018012400276403 SERVICE REF:007274 BNF:STEVEN DONZIGER ID:█████88783 BNF BK:TD BANK, NA ID:026013673 PMT DET:221947770 | –25,000.00 |
| 01/24/18 | WIRE TYPE:FX OUT DATE:180125 TIME:1329 ET TRN:2018012400297609 FX:CAD 2646.10 1.1919 BNF:WADDELL PHILLIPS PROFESSIO ██████ 1232 BNF BK:BANK OF MONTREAL, THE ID:BOFMCAM2 PMT DET:2 21953396 POP SERVICES /FXREF/TE-2-23-142601523 | –2,220.07 |
| 01/26/18 | WIRE TYPE:WIRE OUT DATE:180126 TIME:0913 ET TRN:2018012600212529 SERVICE REF:004294 BNF:DONZIGER & ASSOCIATES ID:██████8783 BNF BK:TD BANK, NA ID:026013673 PMT DET:222153806 LEGAL SER VICES | –25,000.00 |
| 01/29/18 | WIRE TYPE:WIRE OUT DATE:180129 TIME:0950 ET TRN:2018012900282817 SERVICE REF:005578 BNF:DONZIGER AND ASSOCIATES PL ID:██████8783 BNF BK:TD BANK, NA ID:026013673 PMT DET:222318112 | –25,000.00 |
| 01/30/18 | WIRE TYPE:WIRE OUT DATE:180130 TIME:1108 ET TRN:2018013000280850 SERVICE REF:006727 BNF:DONZIGER AND ASSOCIATES PL ID:██████8783 BNF BK:TD BANK, NA ID:026013673 PMT DET:222439070 | –25,000.00 |

Total withdrawals and other debits                                    –$269,823.79

MKS-0006480

**Bank of America** ⟩⟩⟩                                    ## Your checking account

STREAMLINE FAMILY OFFICE INC   |   Account #████████ 9158   |   January 1, 2018 to January 31, 2018

## Checks

| Date | Check # | Amount | Date | Check # | Amount |
|------|---------|--------|------|---------|--------|
| 01/18/18 | 1001 | -3,622.21 | 01/23/18 | 1002 | -1,143.00 |
| | | | **Total checks** | | **-$4,765.21** |
| | | | **Total # of checks** | | **2** |

## Service fees

| Date | Transaction description | Amount |
|------|------------------------|--------|
| 01/11/18 | CHECK ORDER00493 DES:FEE    ID:1C5N7911<br>PMT INFO: PRODUCT(S): 93.18    S&H: 0.00    MA TAX: 5.82 | -99.00 |
| 01/11/18 | Wire Transfer Fee | -35.00 |
| 01/12/18 | Wire Transfer Fee | -45.00 |
| 01/12/18 | Wire Transfer Fee | -30.00 |
| 01/12/18 | External transfer fee - Next Day - 01/11/2018 | -10.00 |
| 01/16/18 | Wire Transfer Fee | -30.00 |
| 01/17/18 | Wire Transfer Fee | -45.00 |
| 01/17/18 | Wire Transfer Fee | -45.00 |
| 01/17/18 | Wire Transfer Fee | -35.00 |
| 01/17/18 | Wire Transfer Fee | -35.00 |
| 01/17/18 | Wire Transfer Fee | -35.00 |
| 01/24/18 | Wire Transfer Fee | -35.00 |
| 01/24/18 | Wire Transfer Fee | -30.00 |
| 01/26/18 | Wire Transfer Fee | -30.00 |
| 01/29/18 | Wire Transfer Fee | -30.00 |
| 01/30/18 | Wire Transfer Fee | -30.00 |
| **Total service fees** | | **-$599.00** |

*Note your Ending Balance already reflects the subtraction of Service Fees.*

## Daily ledger balances

| Date | Balance ($) | Date | Balance($) | Date | Balance ($) |
|------|-------------|------|------------|------|-------------|
| 01/01 | 100.00 | 01/16 | 365,258.67 | 01/26 | 575,002.00 |
| 01/02 | 250,100.00 | 01/17 | 332,077.28 | 01/29 | 574,937.00 |
| 01/05 | 500,100.00 | 01/18 | 578,455.07 | 01/30 | 549,907.00 |
| 01/11 | 393,116.41 | 01/23 | 577,312.07 | 01/31 | 549,932.00 |
| 01/12 | 369,931.41 | 01/24 | 575,067.00 | | |

MKS-0006481

This page intentionally left blank

MKS-0006482

# EXHIBIT 80

 **Bank**
America's Most Convenient Bank®

T **STATEMENT OF ACCOUNT**

STEVEN R DONZIGER
245 W 104TH ST APT 7D
NEW YORK NY 10025-

| | |
|---|---|
| Page: | 1 of 2 |
| Statement Period: | May 07 2018-Jun 05 2018 |
| Cust Ref #: | 4311018132-631-T-### |
| Primary Account #: | ███8132 |

### Privacy Notice:

Our privacy notice describes how we collect, share and protect your personal information. It has not materially changed since May 2015. For a copy, go to tdbank.com/exc/pdf/privacy_shareinformation.pdf or call 888-937-1050.

## TD Premier Checking

STEVEN R DONZIGER                                                          Account # ███8132

### ACCOUNT SUMMARY

| | | | |
|---|---|---|---|
| Beginning Balance | 0.00 | Average Collected Balance | 52,629.52 |
| Other Credits | 377,047.32 | Interest Earned This Period | 2.16 |
| | | Interest Paid Year-to-Date | 2.16 |
| Other Withdrawals | 343,904.67 | Annual Percentage Yield Earned | 0.05% |
| Ending Balance | 33,142.65 | Days in Period | 30 |

### DAILY ACCOUNT ACTIVITY

**Other Credits**

| POSTING DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 05/08 | WIRE TRANSFER INCOMING, FORUM NOBIS PLLC | 342,045.16 |
| 05/10 | DEPOSIT TRANSFER, From Checking ███8174 | 35,000.00 |
| 06/05 | INTEREST PAID | 2.16 |
| | Subtotal: | 377,047.32 |

**Other Withdrawals**

| POSTING DATE | DESCRIPTION | AMOUNT |
|---|---|---|
| 05/10 | WITHDRAWAL TRANSFER, To Checking ███8174 | 342,045.16 |
| 05/10 | WIRE TRANSFER OUTGOING, Patricio Salazar Cordova | 1,834.51 |
| 05/10 | WIRE TRANSFER FEE | 25.00 |
| | Subtotal: | 343,904.67 |

### DAILY BALANCE SUMMARY

| DATE | BALANCE | DATE | BALANCE |
|---|---|---|---|
| 05/07 | 0.00 | 05/10 | 33,140.49 |
| 05/08 | 342,045.16 | 06/05 | 33,142.65 |

**Call 1-800-937-2000 for 24-hour Bank-by-Phone services or connect to www.tdbank.com**

Bank Deposits FDIC Insured | TD Bank, N.A. | Equal Housing Lender 

**TD BANK 0000651**

# How to Balance your Account

Page:                    2 of 2

**Begin by adjusting your account register as follows:**

- Subtract any services charges shown on this statement.

- Subtract any automatic payments, transfers or other electronic withdrawals not previously recorded.

- Add any interest earned if you have an interest-bearing account.

- Add any automatic deposit or overdraft line of credit.

- Review all withdrawals shown on this statement and check them off in your account register.

- Follow instructions 2-5 to verify your ending account balance.

1. Your ending balance shown on this statement is:

2. List below the amount of deposits or credit transfers which do not appear on this statement. Total the deposits and enter on Line 2.

3. Subtotal by adding lines 1 and 2.

4. List below the total amount of withdrawals that do not appear on this statement. Total the withdrawals and enter on Line 4.

5. Subtract Line 4 from 3. This adjusted balance should equal your account balance.

| | | |
|---|---|---|
| ❶ Ending Balance | | 33,142.65 |
| ❷ Total Deposits | + | |
| ❸ Sub Total | | |
| ❹ Total Withdrawals | - | |
| ❺ Adjusted Balance | | |

| ❷ DEPOSITS NOT ON STATEMENT | DOLLARS | CENTS |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| **Total Deposits** | | ❷ |

| ❹ WITHDRAWALS NOT ON STATEMENT | DOLLARS | CENTS |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

| WITHDRAWALS NOT ON STATEMENT | DOLLARS | CENTS |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| **Total Withdrawals** | | ❹ |

**FOR CONSUMER ACCOUNTS ONLY    IN CASE OF ERRORS OR QUESTIONS ABOUT YOUR ELECTRONIC FUNDS TRANSFERS**

If you need information about an electronic fund transfer or if you believe there is an error on your bank statement or receipt relating to an electronic fund transfer, telephone the bank immediately at the phone number listed on the front of your statement or write to:

**TD Bank, N.A., Deposit Operations Dept, P.O. Box 1377, Lewiston, Maine 04243-1377**

We must hear from you no later than sixty (60) calendar days after we sent you the first statement upon which the error or problem first appeared.  When contacting the Bank, please explain as clearly as you can why you believe there is an error or why more information is needed.  Please include:

> Your name and account number.
> A description of the error or transaction you are unsure about.
> The dollar amount and date of the suspected error.

When making a verbal inquiry, the Bank may ask that you send us your complaint in writing within ten (10) business days after the first telephone call.

We will investigate your complaint and will correct any error promptly.  If we take more than ten (10) business days to do this, we will credit your account for the amount you think is in error, so that you have the use of the money during the time it takes to complete our investigation.

**INTEREST NOTICE**

Total interest credited by the Bank to you this year will be reported by the Bank to the Internal Revenue Service and State tax authorities. The amount to be reported will be reported separately to you by the Bank.

**FOR CONSUMER LOAN ACCOUNTS ONLY    BILLING RIGHTS SUMMARY**

In case of Errors or Questions About Your Bill:

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us at P.O. Box 1377, Lewiston, Maine 04243-1377 as soon as possible. We must hear from you no later than sixty (60) days after we sent you the FIRST bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights. In your letter, give us the following information:

> Your name and account number.
> The dollar amount of the suspected error.
> Describe the error and explain, if you can, why you believe there is an error.
> If you need more information, describe the item you are unsure about.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your question, we cannot report you as delinquent or take any action to collect the amount you question.

FINANCE CHARGES: Although the Bank uses the Daily Balance method to calculate the finance charge on your Moneyline/Overdraft Protection account (the term "ODP" or "OD" refers to Overdraft Protection), the Bank discloses the Average Daily Balance on the periodic statement as an easier method for you to calculate the finance charge. The finance charge begins to accrue on the date advances and other debits are posted to your account and will continue until the balance has been paid in full. To compute the finance charge, multiply the Average Daily Balance times the Days in Period times the Daily Periodic Rate (as listed in the Account Summary section on the front of the statement). The Average Daily Balance is calculated by adding the balance for each day of the billing cycle, then dividing the total balance by the number of Days in the Billing Cycle. The daily balance is the balance for the day after advances have been added and payments or credits have been subtracted plus or minus any other adjustments that might have occurred that day. There is no grace period during which no finance charge accrues. Finance charge adjustments are included in your total finance charge.

# EXHIBIT 81

**CITATION:** Yaiguaje v. Chevron Corporation, 2017 ONSC 135
**COURT FILE NO.:** CV-12-9808-00CL
**DATE:** 20170120

## ONTARIO

## SUPERIOR COURT OF JUSTICE

### (Commercial List)

BETWEEN:

DANIEL CARLOS LUSITANDE YAIGUAJE, BENANCIO FREDY CHIMBO GREFA, MIGUEL MARIO PAYAGUAJE PAYAGUAJE, TEODORO GONZALO PIAGUAJE PAYAGUAJE, SIMON LUSITANDE YAIGUAJE, ARMANDO WILMER PIAGUAJE PAYAGUAJE, ANGEL JUSTINO PIAGUAJE LUCITANTE, JAVIER PIAGUAJE PAYAGUAJE, FERMIN PIAGUAJE, LUIS AGUSTIN PAYAGUAJE PIAGUAJE, EMILIO MARTIN LUSITANDE YAIGUAJE, REINALDO LUSITANDE YAIGUAJE, MARIA VICTORIA AGUINDA SALAZAR, CARLOS GREFA HUATATOCA, CATALINA ANTONIA AGUINDA SALAZAR, LIDIA ALEXANDRIA AGUINDA AGUINDA, CLIDE RAMIRO AGUINDA AGUINDA, LUIS ARMANDO CHIMBO YUMBO, BEATRIZ MERCEDES GREFA TANGUILA, LUCIO ENRIQUE GREFA TANGUILA, PATRICIO WILSON AGUINDA AGUINDA, PATRICIO ALBERTO CHIMBO YUMBO, SEGUNDO ANGEL AMANTA MILAN, FRANCISCO MATIAS ALVARADO YUMBO, OLGA GLORIA GREFA CERDA, NARCISA AIDA TANGUILA NARVAEZ, BERTHA ANTONIA YUMBO TANGUILA, GLORIA LUCRECIA TANGUILA GREFA, FRANCISCO VICTOR TANGUILA GREFA, ROSA TERESA CHIMBO TANGUILA , MARIA CLELIA REASCOS REVELO, HELEODORO PATARON GUARACA, CELIA IRENE VIVEROS CUSANGUA, LORENZO JOSE ALVARADO YUMBO, FRANCISCO ALVARADO YUMBO, JOSE GABRIEL REVELO LLORE, LUISA DELIA TANGUILA NARVAEZ, JOSE MIGUEL IPIALES CHICAIZA, HUGO GERARDO CAMACHO NARANJO, MARIA MAGDALENA RODRIGUEZ BARCENES, ELIAS ROBERTO PIYAHUAJE PAYAHUAJE, LOURDES BEATRIZ CHIMBO TANGUILA, OCTAVIO ISMAEL CORDOVA HUANCA, MARIA HORTENCIA VIVEROS CUSANGUA, GUILLERMO VINCENTE PAYAGUAJE LUSITANDE, ALFREDO DONALDO PAYAGUAJE PAYAGUAJE and DELFIN LEONIDAS PAYAGUAJE PAYAGUAJE

Plaintiffs/Moving Parties

– and –

CHEVRON CORPORATION, CHEVRON CANADA LIMITED and CHEVRON CANADA FINANCE LIMITED

Defendants/Respondents

*Alan J. Lenczner, Q.C., Brendan F. Morrison, Kirk M. Baert, Celeste Poltak* and *Garth Myers*, for the Plaintiffs / Moving Parties

*Larry Lowenstein, Laura Fric, Eric Morgan, Clarke Hunter, Q.C.,* and *Robert Frank,* for the Defendant / Respondent, Chevron Corporation

*Benjamin Zarnett, Suzy Kauffman* and *Peter Kolla*, for the Defendant / Respondent, Chevron Canada Limited

**HEARD:** September 12-15, 2016

2017 ONSC 135 (CanLII)

**HAINEY J.**

**REASONS FOR DECISION**

**Introduction**

[1]     Chevron Corporation ("Chevron"), Chevron Canada Limited ("Chevron Canada") and the plaintiffs each move for summary judgment with respect to the plaintiffs' claim against Chevron Canada.

[2]     The plaintiffs also move to strike the defences pleaded by Chevron in its statement of defence.

[3]     I heard all of these motions together. I will give my reasons for decision with respect to Chevron Canada's motion for summary judgment first. The result of this motion will determine the results of the other two motions for summary judgment. My reasons for decision with respect to the plaintiffs' motion to strike Chevron's defences will follow my reasons on the summary judgment motions.

[4]     More than a month after the completion of the argument of these motions, the plaintiffs brought a motion to further amend their statement of claim to add Chevron Canada Capital Company ("CCCC") as a defendant to this proceeding. At counsel's suggestion I deferred delivering my ruling on the four earlier motions until I had heard the plaintiffs' subsequent motion. I intend to provide my decision on this motion in a separate ruling to be released following the release of these reasons.

***CHEVRON CANADA'S MOTION FOR SUMMARY JUDGMENT***

**Background**

[5]     The plaintiffs are residents of Ecuador who hold a judgment of US$9.5 billion against Chevron ("Ecuadorian judgment"). The Ecuadorian judgment was obtained against Chevron in February 2011. It was originally in the amount of approximately US$18 billion. The judgment was upheld by an Ecuadorian intermediate appellate court in 2012. The National Court of Justice of Ecuador partially varied the judgment in November 2013 by reducing it to US$9.5 billion.

[6]     The dispute underlying the Ecuadorian judgment originated in the Oriente region of Ecuador. This oil-rich area attracted exploitation and extraction activities by oil companies, including Texaco Inc., from 1964 to 1992. As a result of these activities, the region suffered extensive environmental pollution that seriously disrupted the lives of its residents. The 47 plaintiffs in this proceeding represent approximately 30,000 indigenous Ecuadorian villagers who live in the region and who have been affected by the environmental pollution.

[7]     The plaintiffs commenced proceedings against Texaco in 1993 in New York. That proceeding was eventually dismissed on the grounds of international comity and *forum non conveniens*. This decision was upheld on appeal, in part, because Texaco agreed to submit to the jurisdiction of the Ecuadorian courts.

2017 ONSC 135 (CanLII)

Page: 3

[8]     The plaintiffs commenced proceedings against Chevron in Ecuador in 2003. By then Texaco had merged with Chevron.

[9]     Chevron is a Delaware corporation with its head office in California. It is a public company. Its principal business is the holding of shares in subsidiary corporations and managing those investments.

[10]     Chevron Canada is a seventh level, indirect subsidiary of Chevron. It was originally incorporated in 1966. It has since amalgamated under the *Canada Business Corporations Act*[1] ("*CBCA*"). Its head office is in Calgary, Alberta.

[11]     Chevron Canada is an operating company. It has no connection to the legal proceedings in Ecuador that led to the Ecuadorian judgment.

[12]     Chevron Canada's major business activities involve petroleum and natural gas exploration in Canada. It has never carried on business in Ecuador and played no role in the events leading up to the Ecuadorian judgment.

[13]     Chevron Canada's shares are wholly owned by CCCC, which is currently not a defendant in these proceedings. However, as indicated above, the plaintiffs have brought a motion to add CCCC as a defendant. I will deal with this motion separately.

[14]     Chevron has refused to acknowledge or pay the Ecuadorian judgment. It has no assets in Ecuador. As a result, in 2012, the plaintiffs commenced an action in the Ontario Superior Court of Justice for the recognition and enforcement of the Ecuadorian judgment against Chevron, Chevron Canada and Chevron Canada Finance Limited ("CCFL"). The action against CCFL has since been discontinued ("Ontario Action").

[15]     In the Ontario Action, the plaintiffs seek the following relief against Chevron Canada:

(a)     the Canadian equivalent of US$9,510,000,000 resulting from the Ecuadorian judgment against Chevron;

(b)     the Canadian equivalent of costs to be determined by the Ecuadorian court;

(c)     a declaration that the shares of Chevron Canada are exigible to satisfy the Ecuadorian judgment, should it be enforced in Ontario;

(d)     the appointment of an equitable receiver over the shares and assets of Chevron Canada; and

(e)     interest and costs.

---

[1] *Canada Business Corporations Act*, R.S.C. 1985, c. C-44 [*CBCA*].

2017 ONSC 135 (CanLII)

[16]     The plaintiffs do not allege that Chevron Canada was a party to the Ecuadorian action or that it is an agent of Chevron. In their amended amended statement of claim, the plaintiffs plead that they do not allege any wrongdoing against Chevron Canada.

[17]     Further, the plaintiffs do not allege that the corporate structure of which Chevron Canada is a part was designed or used as an instrument of fraud or wrongdoing.

[18]     The plaintiffs do, however, plead the following, in paras. 17-26 of their amended amended statement of claim:

17.     Chevron no longer has assets in Ecuador.

18.     In Canada, Chevron has two wholly-owned subsidiaries: Chevron Canada Limited and Chevron Canada Financial Limited (collectively, "Chevron Canada"). The assets of Chevron Canada are significant and are located in many provinces and territories throughout Canada. The assets are beneficially-owned by Chevron and, through it, by the shareholders of Chevron.

19.     In its required Form 10-K filing with the United States [Securities] and Exchange Commission for the fiscal year ended December 31, 2011, Chevron declares and the fact is that it manages its investments in subsidiaries, provides administrative, financial, management and technology support to its US and international subsidiaries that engage in fully-integrated petroleum operations, chemical operations, mining operations, power generation and energy services. In its Annual Report, Chevron states and the fact is that its operating segments (subsidiaries) are managed by segment managers who report to the CODM (Chief Operating Decision Maker), which is Chevron's Executive Committee.

20.     Chevron wholly owns and controls Chevron Canada. Chevron consolidates the financial results of its wholly owned subsidiaries including Chevron Canada and reports them as its own. Chevron raises capital in the equities markets based on the assets, operations and results of its wholly owned subsidiaries including Chevron Canada. Chevron Canada does not have an independent Board of Directors. Chevron provides a parent guarantee for the debts of its wholly owned subsidiaries including Chevron Canada.

21.     As a condition of obtaining the dismissal of the action in New York, Texaco promised not only to submit to the jurisdiction of the Ecuadorean Court, but also to satisfy the Judgment.

22.     After the Judgment, Chevron has resiled from that position. Chevron now repudiates its undertaking to the New York Court to respect and pay the Judgment rendered in the jurisdiction of its own choosing and, through its general counsel, has stated that "[w]e're going to fight this until Hell freezes over and then fight it out on the ice".

Page: 5

23.     As a result of the allegations in paragraphs 4, 5, 17-20 and the fact that the great majority of its assets are held in 73 subsidiaries (as set out in Schedule "A" hereto), Chevron Canada is a necessary party to this action in order to achieve equity and fairness between parties and to yield a result that is not "too flagrantly opposed to justice…".

24.     The plaintiffs do not allege any wrongdoing against Chevron Canada. The action is for collection of a judgment debt.  The plaintiffs will execute against Chevron Canada any legal, equitable or other right, personal property, interest, whether direct or indirect, or equity of redemption that Chevron, the judgment debtor, has in Chevron Canada.

25.     The plaintiffs plead and rely on the *Execution Act*, R.S.O. 1990, c. E.24 and the *Securities Transfer Act, 2006*, S.O. 2006, c. 8.

26.     The plaintiffs seek the appointment of an equitable Receiver to seize the shares and assets of Chevron Canada, the entire beneficial ownership of which belongs to the Judgment-Debtor, Chevron.

**Judicial History in Canada**

[19]    In 2013, Chevron and Chevron Canada challenged the jurisdiction of the Ontario Superior Court of Justice to recognize and enforce the Ecuadorian judgment. The motion judge, D.M. Brown J. (as he then was), dismissed their motion and concluded that the Ontario court has jurisdiction to recognize and enforce the judgment against these defendants.[2] D.M. Brown J. also concluded that this was an appropriate case in which to exercise the court's power to stay the proceedings on its own initiative pursuant to s. 106 of the *Courts of Justice Act*.[3]

[20]    The Court of Appeal for Ontario overruled his imposition of a discretionary stay of the proceedings and upheld his decision on the jurisdictional issue. The court concluded that an Ontario court has jurisdiction to determine whether the Ecuadorian judgment against Chevron may be recognized and enforced in Ontario. The Court of Appeal also upheld D.M. Brown J.'s jurisdictional decision with respect to Chevron Canada concluding (as the Supreme Court of Canada observed) that an Ontario court "has jurisdiction to adjudicate a recognition and enforcement action against Chevron that also names Chevron Canada as a defendant."[4] The Supreme Court of Canada upheld the Court of Appeal for Ontario's decision with respect to the Ontario court's jurisdiction. The Supreme Court made it clear, however, that its decision did not determine the issue of whether

---

[2] *Yaiguaje v. Chevron Corporation*, 2013 ONSC 2527, 361 D.L.R. (4th) 489 [*Ont SC Decision*], aff'd in part 2013 ONCA 758, 118 O.R. (3d) 1, aff'd in part 2015 SCC 42, [2015] 3 S.C.R. 69.
[3] *Courts of Justice Act*, R.S.O. 1990, c. C.43, s. 106.
[4] *Chevron Corp. v. Yaiguaje*, 2015 SCC 42, [2015] 3 S.C.R. 69, at para. 22 [*SCC Decision*].

2017 ONSC 135 (CanLII)

Chevron Canada has a separate corporate personality from Chevron and whether its assets are available to satisfy the Ecuadorian judgment against Chevron. Gascon J. stated the following:[5]

> Further, my conclusion that the Ontario courts have jurisdiction in this case should not be understood to prejudice future arguments with respect to the distinct corporate personalities of Chevron and Chevron Canada.  I take no position on whether Chevron Canada can properly be considered a judgment-debtor to the Ecuadorian judgment.  Similarly, should the judgment be recognized and enforced against Chevron, it does not automatically follow that Chevron Canada's shares or assets will be available to satisfy Chevron's debt.  For instance, shares in a subsidiary belong to the shareholder, not to the subsidiary itself.   Only those shares whose ownership is ultimately attributable to the judgment debtor could be the valid target of a recognition and enforcement action.

**Facts**

[21]    D.M. Brown J. set out the following basic facts about Chevron and Chevron Canada. I agree with and accept these facts for the purpose of this motion:[6]

### C.  Basic facts about the Chevron defendants

[17]    The following uncontested facts emerged from the affidavits of Frank Soler, a Chevron employee, sworn on August 7, 2012, and Jeffrey Wasko, a Chevron Canada employee, sworn August 8, 2012:

(i)    Chevron was incorporated in the State of Delaware, U.S.A. and has its head office in San Ramon, California;

(ii)    Chevron does not itself engage in the exploring, producing, refining or marketing of petroleum products; those activities are carried on by its indirect subsidiaries;

(iii)    Chevron is not currently, and never has been, registered to carry on business in Ontario or anywhere else in Canada;

(iv)    With the exception of its interest in two Bermudian companies, all of Chevron's assets are owned and located in the U.S.A.;

(v)    Chevron does not own the shares of Chevron Canada;

(vi)    Chevron Canada is an operating company which is a 7th level indirect subsidiary of Chevron;

---

[5] *SCC Decision*, at para. 95.
[6] *Ont SC Decision*, at para. 17.

2017 ONSC 135 (CanLII)

Page: 7

2017 ONSC 135 (CanLII)

(vii)   Chevron files consolidated financial statements because it is required by the U.S. Securities and Exchange Commission to do so;

(viii)   Chevron Canada was incorporated in 1966 under the *Canada Corporations Act* with its head office, at the time of incorporation, in Ottawa, Ontario. In 1980 it was continued under the *Canada Business Corporations Act* with its registered head office in Vancouver, British Columbia. Then, in 2003 it amalgamated under the *CBCA* with its registered office in Calgary, Alberta;

(ix)   As of August 2012, Chevron Canada was registered extra-provincially in a number of provinces, but not in Ontario;

(x)   Chevron Canada has never carried on business in Ecuador;

(xi)   All of the shares of Chevron Canada are owned by Chevron Canada Capital Company; and

(xii)   Chevron and Chevron Canada have separate and independent boards of directors, and none of the Chevron directors or executive officers serve on the board or are involved in managing the operations of Chevron Canada.

[22]   The evidentiary record before me establishes the following additional facts concerning Chevron and Chevron Canada:

(a)   Chevron Canada maintains its own separate corporate records at its head office in Calgary. It complies with all applicable Canadian corporate laws, rules and regulations.

(b)   Chevron Canada prepares annual financial statements that comply with Canadian accounting standards and tax requirements.

(c)   Chevron Canada employs a substantial workforce in Canada ranging from 700 to 900 people.

(d)   Chevron Canada employs, trains and directs the activities of its own professional, operational and administrative staff. It pays their salaries and benefits and provides its own pension plan for its employees, which Chevron does not sponsor or guarantee.

(e)   Chevron Canada has extensive operations in Canada that include ownership in significant oil sands projects, petroleum and natural gas explorations and the ownership of an oil refinery in British Columbia.

Page: 8

(f)    Chevron Canada develops its own plans and budgets for its businesses and is responsible for and implements its business plans, and manages its own budgets.

(g)    Chevron Canada is a fully capitalized corporation that generates substantial revenue. In the years 2006 to 2014 it generated billions of dollars of revenue and net earnings. In 2014, it had billions of dollars of shareholders equity.

(h)    Chevron Canada funds its significant day-to-day operations and investments without any financial contribution from Chevron. It does not distribute any of its profits or capital to Chevron. It receives no money from Chevron.

(i)    Chevron has provided guarantees of Chevron Canada's obligations to certain of its joint venture partners and to banks for some of Chevron Canada's projects. Chevron has never been called upon to pay under any of these guarantees.

(j)    Chevron Canada adheres to certain policies of Chevron. These policies involve, among other things,

    (i)    the review and approval of certain business plans and budgets;

    (ii)    the reporting to officers designated by Chevron's policies of certain expenditures or transactions over certain limits or thresholds; and

    (iii)    in certain cases, the obtaining of concurrence of a Reporting Officer or his or her delegate, or from Chevron's Executive Committee, for expenditures or transactions.

(k)    Chevron Canada provides these reports, as well as other detailed reports of its financial results, to Chevron so that, among other things,

    (i)    Chevron can meet its obligations as a publicly-traded company under the regulatory regime that applies to it, including the *Sarbanes-Oxley*[7] legislation, in order to manage its investments and make timely disclosure; and

    (ii)    Chevron can report consolidated financial information to its shareholders and to regulators to meet its obligations as a publicly traded company under *Sarbanes-Oxley* and other regulatory requirements.

(l)    Chevron has approximately 1,500 indirect subsidiaries operating in approximately 60 countries in the world. Chevron Canada is one of these indirect subsidiaries.

---

[7] *Sarbanes-Oxley Act of 2002*, Pub. L. No. 107-204, 116 Stat. 745.

2017 ONSC 135 (CanLII)

Page: 9

## Issues

[23]    The parties agree that this is an appropriate case for summary judgment. Therefore, the only issues that I must decide on this motion are the following:

(a)    Are the shares and assets of Chevron Canada exigible and available for execution and seizure pursuant to the *Execution Act*[8] to satisfy the Ecuadorian judgment against Chevron?

(b)    If they are not, should Chevron Canada's corporate veil be pierced so that its shares and assets are available to satisfy the Ecuadorian judgment against its indirect parent, Chevron?

## Positions of the Parties

[24]    Chevron Canada submits that the plaintiffs' claim against it should be dismissed for the following reasons:

(a)    Chevron Canada was not a party to the Ecuadorian proceeding.

(b)    It is not a judgment-debtor under the Ecuadorian judgment.

(c)    The plaintiffs do not allege any wrongdoing against Chevron Canada.

(d)    Chevron Canada is its own separate legal entity, distinct from Chevron. Its shares and assets do not belong to Chevron.

(e)    The plaintiffs' claim against it is barred by the legal principle of corporate separateness and there is no basis to pierce Chevron Canada's corporate veil to make either its shares or assets available to satisfy the Ecuadorian judgment against Chevron.

[25]    The plaintiffs submit that Chevron Canada is an asset of Chevron that is exigible and available for execution and seizure pursuant to the *Execution Act* to satisfy the Ecuadorian judgment against Chevron. In the alternative, the plaintiffs submit that the court should pierce Chevron Canada's corporate veil to make its shares and assets available to satisfy the Ecuadorian judgment because of Chevron's total effective control over Chevron Canada and the injustice that would result from applying the limited liability principle to Chevron in the circumstances of this case.

---

[8] *Execution Act*, R.S.O. 1990, c. E.24.

2017 ONSC 135 (CanLII)

Page: 10

## Analysis

### *Previous Judicial Consideration of Chevron Canada's Corporate Separateness*

[26]   D.M. Brown J. considered the issue of Chevron Canada's corporate separateness in the context of his determination of whether there should be a stay of the proceedings pursuant to s. 106 of the *Courts of Justice Act*. Although the Court of Appeal for Ontario reversed his decision to stay the proceedings, it did not consider his decision on the corporate separateness issue. Neither the Court of Appeal nor the Supreme Court of Canada concluded that his decision on this issue was incorrect or that he applied the wrong legal principles in determining that Chevron Canada's corporate veil should not be pierced. Although D.M. Brown J.'s decision on this issue is not binding upon me, I regard it as persuasive authority on the issue. I agree with Chevron Canada's submission that his findings on this issue are a useful guide on this motion.

[27]   After reviewing the evidence adduced on the issue of Chevron Canada's separate corporate identity (which was almost identical to the evidence before me), D.M. Brown J. concluded that there was "no basis in law or fact" to pierce Chevron Canada's corporate veil.[9] He also rejected the plaintiffs' assertion that Chevron Canada's assets were exigible to satisfy a judgment against its ultimate parent, Chevron.

[28]   In his reasons for decision, D.M. Brown J. concluded as follows:[10]

> [104]  In my view, when taken as a whole, the evidence filed on these motions supports a finding that the relationship between Chevron and Chevron Canada is, to echo the language of Sharpe J. (as he then was) in the *Transamerica* case, "that of a typical parent and subsidiary", not an instance of a parent corporation exercising complete domination and control over the subsidiary. Or, to phrase that conclusion in the language of the Court of Appeal in the *Canada Life Assurance* case, the evidence demonstrates that Chevron Canada "looks as though it has its own business, rather than being completely subservient to and dependent upon its parent".

> [105]  Nor do the plaintiffs allege any improper conduct which would support a piercing of the corporate veil of Chevron Canada. In paragraph 21 of their Amended Statement of Claim the plaintiffs specifically pleaded:

>> The plaintiffs do not allege any wrongdoing against Chevron Canada.

> Even the most liberal reading of the Amended Statement of Claim does not disclose any pleading of material facts which would suggest or hint that the activities of Chevron Canada were or are in any way, shape or form carried on as instruments of fraud or as a mechanism or conduit to avoid or to conceal liability for an impropriety

---

[9] *Ont SC Decision*, at para. 109.
[10] *Ont SC Decision*, at paras. 104-106.

committed by Chevron. The Amended Statement of Claim contains no pleading of facts which links Chevron Canada in any way to the events which gave rise to the Ecuadorean Judgment or to events designed to shield Chevron from any liability under that Judgment.

[106]   Under Ontario law, the absence of any pleading of such material facts or the adducing of any evidence to support some arguable case on the issue of improper conduct, coupled with the plaintiffs' admission that they are not alleging any wrongdoing against Chevron Canada, are fatal to the plaintiffs' assertion in the Amended Statement of Claim that the separate corporate identity of Chevron Canada should be ignored so that its assets become available for execution in satisfaction of the Judgment rendered against its ultimate parent.

[29]   D.M. Brown J. concluded on essentially the same evidentiary record as is before me, that there was no basis to consider the assets or shares of Chevron Canada to be owned by Chevron. He declined to pierce Chevron Canada's corporate veil on the basis of the following findings of fact:

(a)   "The management of Chevron Canada operates its business in a fashion which is separate and distinct from that of its parents up the corporate 'family tree', subject to the direction of its own board of directors which does not contain any over-lapping members with the Chevron board or executive."[11]

(b)   "Chevron Canada employs, trains and directs the activities of its own professional, operational and administrative staff; it pays their salaries and benefits; and it provides Workers' Compensation coverage as required."[12]

(c)   "As part of a worldwide 'family' of companies, Chevron Canada is subject to certain 'family' budget reporting requirements and large capital expenditure approval processes, but it initiates its own plans and budgets, it funds its own day to day operations, and the capital expenditures made by it in recent years for the major Athabasca Oil Sands Project, Hibernia Project and Hebron Project were funded from its own operating revenues."[13]

(d)   "Chevron Canada is a fully capitalized corporation which funds its own day to day operations without financial contributions from Chevron Corp. or any other Chevron entity."[14]

(e)   "Chevron Canada files its own tax returns and corporate statements."[15]

---

[11] *Ont SC Decision*, at para. 99.
[12] *Ont SC Decision*, at para. 99.
[13] *Ont SC Decision*, at para. 100.
[14] *Ont SC Decision*, at para. 100.
[15] *Ont SC Decision*, at para. 102.

2017 ONSC 135 (CanLII)

Page: 12

(f)  Chevron files a consolidated set of financial statements because it is required to do so by the U.S. Securities and Exchange Commission and the *Sarbanes-Oxley* legislation.

(g)  The provision of guarantees by Chevron in relation to Chevron Canada underscored the separate corporate existence of each. He concluded that "[c]ertainly the lenders in those cases proceeded on the basis that parent and indirect sub were separate legal entities, otherwise they would not have asked for the guarantees of the ultimate parent."[16]

[30]    I make the same findings of fact on the evidentiary record before me.

**ISSUE # 1**

**Are the shares and assets of Chevron Canada exigible and available for execution and seizure pursuant to the *Execution Act* to satisfy the Ecuadorian judgment against Chevron?**

[31]    The plaintiffs' principal submission is that Chevron Canada is an asset of Chevron that is exigible and available for execution and seizure.

[32]    The plaintiffs submit that the *Execution Act* authorizes and empowers the sheriff to execute against any interest of a judgment-debtor and that the broad wording of this Act entitles the sheriff to seize any property in which a judgment-debtor has a direct or indirect legal or beneficial interest.

---

[16] *Ont SC Decision*, at para. 101.

Page: 13

According to the plaintiffs, this includes property in which the judgment-debtor has an indirect beneficial interest, such as Chevron's indirect beneficial interest in Chevron Canada. They rely upon the following language in s. 18(1) of the *Execution Act* in support of their position:[17]

> The sheriff may seize and sell any equitable or other right, property, interest or equity of redemption in or in respect of any goods, chattels or personal property, including leasehold interests in any land of the execution debtor….

[33]   The plaintiffs explain their position, at paras. 51-60 of their factum, as follows:

51.   Chevron Canada is a seventh level wholly-owned subsidiary of Chevron Corp. Chevron Corp. owns 100% of the shares of each descending subsidiary, which in turn owns 100% of the next descending subsidiary. None of the intermediary subsidiary companies carries on business. The directors of five of these six subsidiaries are all employees of either Chevron Corp. or of Chevron Global Downstream LLC, itself a wholly-owned subsidiary of Chevron Corp. The four directors of Chevron Canada are all employees. It is obvious that Chevron Canada is wholly-owned and controlled by Chevron Corp. for the sole benefit of Chevron Corp.'s shareholders. Chevron's Corporate Structure Chart, attached at Tab C herein, is illustrative.

52.   Chevron itself does not carry on any business. Its revenue producing subsidiaries operate in approximately 60 countries in the world. The vast majority of its 1,500 subsidiaries, well over 90% are interposed, in layers, between Chevron and the operating subsidiaries. They carry on no business. As Chevron's witness Soler stated when asked how many subsidiaries there are in the Chevron group:

> "It varies literally on a daily basis.  I mean, we create and dissolve companies constantly.  But approximately, there are 1500 companies around the world."

53.   As the Court of Appeal found:

> "… Chevron's income is wholly derived from dividends from indirect subsidiaries that carry out its actual business functions, which include Chevron Canada." … "Chevron guarantees the debt of its indirect subsidiaries which in turn furnish capital to Chevron Canada and [Chevron] has directly guaranteed certain performance obligations of Chevron Canada."

---

[17] *Execution Act*, s. 18(1).

2017 ONSC 135 (CanLII)

2017 ONSC 135 (CanLII)

54.     One hundred percent ownership by Chevron over the shares and assets of Chevron Canada means it has total control over the affairs of its subsidiary. It can mandate an investment, restrict an expenditure, change the officers and directors and veto any activity.

55.     The shareholders, bondholders, bankers and other lenders to Chevron, consider that all the 1,500 subsidiaries, their shares operations and physical assets are all assets of the public company, Chevron (stock symbol CVX). Logically, no shareholder would buy a share of CVX at about USD 100 to only know that he/she owns only the California bank account of Chevron.  No bondholder or other lender would lend to Chevron believing that, on default, it could only execute on the bank account.

56.     Chevron's own Annual Reports, 10Ks and public pronouncements promote this belief and confirm its validity.

57.     The agencies that rate its debt and its commercial paper program are in no doubt that the assets of this unified entity belong unequivocally to Chevron:

DBRS          Chevron Corporation (Chevron) is one of the world's largest integrated non-government-owned petroleum companies.

              CVX's ratings are supported by its very strong financial profile, the scale and diversity of the Company's integrated operations and its sizeable portfolio of upstream growth projects.

              **Strengths**

                1.  Global diversification in core petroleum segments;

                2. Good production growth prospects;

                3. Increasingly focused Downstream operations;

                4. Strong balance sheet and financial flexibility.

Moody's       The ratings upgrade recognizes Chevron's increasingly diversified upstream reserves and production portfolio, the sustainability of its strong financial profile …

58.     Chevron is the sole owner of the shares of Chevron Canada. It is the owner through the 100% ownership of cascading intermediary subsidiaries which carry on no business. If one asks the question: who has the beneficial, indirect ownership of Chevron Canada's shares, the answer must be Chevron. If one asks the corollary question: does anyone else have a beneficial right to those shares, the answer must be no.

Page: 15

2017 ONSC 135 (CanLII)

59.    By its complete dominion and control of the boards of directors of each intervening subsidiary, none of which has an independent director and all of which are populated by Chevron group employees, only Chevron can order a sale of all or substantially all of the assets.

[34]    I do not accept the plaintiffs' submission that Chevron Canada's shares and assets are exigible pursuant to the *Execution Act* to satisfy the Ecuadorian judgment against Chevron, for the following reasons.

[35]    Chevron Canada's incorporating statute, the *CBCA*, gives it all the rights, powers and privileges of a natural person. Section 15(1) of the *CBCA* provides the following:[18]

A corporation has the capacity and, subject to this Act, the rights, powers and privileges of a natural person.

[36]    Chevron Canada is not an asset of Chevron. It is a separate legal person. It is not an asset of any other person including its own parent, CCCC. The Supreme Court of Canada confirmed this in *BCE Inc. v. 1976 Debentureholders*,[19] where the court stated, "While the corporation is ongoing, shares confer no right to its underlying assets."

[37]    The *Execution Act*, which is a procedural statute, does not create any rights in property but merely provides for the seizure and sale of property in which a judgment-debtor already has a right or interest. It does not establish a cause of action against Chevron Canada. Chevron Canada is not the judgment-debtor under the Ecuadorian judgment and, therefore, the *Execution Act* does not apply to it with respect to that judgment. The *Execution Act* does not give Chevron any right or interest, equitable or otherwise, in the shares or assets of Chevron Canada.

[38]    Conway J. came to the same conclusion in *Belokon et al. v. The Kyrgyz Republic*.[20] Her decision was recently upheld by the Court of Appeal for Ontario.[21] She concluded as follows:[22]

31.    The *Execution Act* is a procedural statute. It does not create new rights – it only provides a process for the enforcement of otherwise existing rights.

32.    The issue to be determined is whether the Republic has any "equitable or other right, property, interest or equity of redemption in or in respect of" the Centerra shares that are registered in Kyrgyzaltyn's name. If the Republic does, the court has the authority to order the sheriff to seize and sell the Republic's interest in those shares to

---

[18] *CBCA*, s. 15(1).
[19] *BCE Inc. v. 1976 Debentureholders*, 2008 SCC 69, [2008] 3 S.C.R. 560, at para. 34.
[20] *Belokon et al. v. The Kyrgyz Republic*, 2016 ONSC 4506 [*Belokon*], aff'd 2016 ONCA 981.
[21] *Belokon v. Krygyz Republic* [*sic*], 2016 ONCA 981.
[22] *Belokon*, at paras. 31-32.

satisfy a debt owed by the Republic to the Applicants. If the Republic does not, the procedural mechanisms of the *Execution Act* are not engaged.

[39]   I am satisfied that the *Execution Act* does not give Chevron any interest, beneficial or otherwise, in the shares or assets of Chevron Canada.

[40]   Decisions of other courts are consistent with my conclusion. For example, in *Budd v. MBE Jet Ltd.*,[23] the court held that the Alberta execution legislation does not allow the assets of an indirect subsidiary of a potential judgment-debtor to be subject to a pre-judgment attachment order if the test for piercing the corporate veil has not been met. The court concluded that unless the corporate veil is pierced, the debtor has no indirect or other interest in the assets of its indirect subsidiary.

[41]   In *Nevsun Resources Ltd. v. Delizia Limited*,[24] the Federal Court overturned a garnishment order made against a parent company in relation to a judgment debt owed by an indirect subsidiary. The court concluded that the garnishment order could not stand unless the test for piercing the corporate veil had been satisfied.

[42]   The decisions in *Belokon*, *Budd* and *Nevsun* support my conclusion that the *Execution Act* does not give Chevron any interest in the shares or assets of Chevron Canada.

[43]   The jurisprudence relied upon by the plaintiffs does not support their position. The decision of Thorburn J. in *Sistem Muhendislik Insaat Sanayi Ve Ticaret Anonim Sirketi v. Kyrgyz Republic*,[25] was overturned by the Court of Appeal for Ontario on the ground that the court lacked jurisdiction because the judgment-debtor did not have notice of the proceeding. I prefer Conway J.'s analysis and decision in *Belokon*. She considered the same issue and her decision was upheld by the Court of Appeal for Ontario.

[44]   The plaintiffs rely upon the decision of Pepall J. (as she then was) in *Banglar Progoti Ltd. v. Ranka Enterprises Inc.*,[26] in which a judgment-creditor was permitted to execute a foreign arbitral award against property that was held in a bare trust. However, in *Banglar*, the trust agreement expressly provided that the property was held in trust for the judgment-debtor. The sole beneficiary of a bare trust clearly has beneficial ownership of the trust property. However, a parent corporation does not beneficially own the property of its wholly-owned direct subsidiary, let alone an indirect subsidiary such as Chevron Canada. That case does not assist the plaintiffs.

---

[23] *Budd v. MBE Jet Ltd.*, 2014 ABQB 778, at para. 82.
[24] *Nevsun Resources Ltd. v. Delizia Limited*, 2016 FC 393, at paras. 42-60.
[25] *Sistem Muhendislik Insaat Sanayi Ve Ticaret Anonim Sirketi v. Kyrgyz Republic*, 2014 ONSC 2407, rev'd 2015 ONCA 447, 126 O.R. (3d) 545, leave to appeal refused, [2015] S.C.C.A. No. 354.
[26] *Banglar Progoti Ltd. v. Ranka Enterprises Inc.*, 2009 CanLII 16292 (ON SC).

2017 ONSC 135 (CanLII)

[45]    The plaintiffs also rely upon the decision in *Edward Tracy v. The Iranian Ministry of Information and Security*.[27] That case, which involved the enforcement of a recognition order against bank accounts and real property that were determined by the court to be beneficially owned by the judgment-debtor, does not support the plaintiffs' position that the *Execution Act* creates substantive property rights.

[46]    The plaintiffs also rely upon the decision of Cameron J. in *1454495 Ontario Inc. v. J= Systems Inc.*,[28] in support of their position. In that case, shares of a company owned by a judgment-debtor had been pledged to a credit union under a secured guarantee of the company's debts. A judgment-creditor sought to execute against the judgment-debtor's interest in the shares. The court concluded that the judgment-debtor's residual interest in the shares after the credit union's prior security interest had been satisfied could be seized and sold under the *Execution Act*. That case does not assist the plaintiffs because it was clear that the judgment-debtor owned the shares as they were in his name. Accordingly, he had a legally recognized residual interest in the shares that could be sold subject to the prior rights of the credit union. Chevron has no legally recognized interest in Chevron Canada's assets unless the corporate veil between the two companies is pierced.

[47]    A plain reading of the *Execution Act* makes it clear that it does not create any substantive rights that override or supplant the long-established principle of corporate separateness.

[48]    I also agree with Chevron's submission at para. 39 of its reply factum, concerning the effect of the plaintiffs' contention:

> 39.    If the Plaintiffs' position regarding the effect of section 18(1) of the *Execution Act* is accepted, the assets of Ontario subsidiaries of both domestic and foreign companies would automatically and always be subject to execution orders to satisfy judgments against their parent companies.    In fact, the debts of individual shareholders could be enforced against the assets of any Ontario company. This result is not only contrary to law, it would have startling and stark consequences for Ontario's businesses and their ability to attract investment.

[49]    For all of these reasons, I have concluded that the *Execution Act* does not make Chevron Canada's shares and assets exigible and available for execution and seizure in satisfaction of the Ecuadorian judgment against Chevron, absent a finding that Chevron Canada's corporate veil should be pierced for this purpose.

---

[27] *Edward Tracy v. The Iranian Ministry of Information and Security*, 2014 ONSC 1696.
[28] *1454495 Ontario Inc. v. J=Systems Inc.* (2002), 17 C.P.C. (5th) 564 (Ont. S.C.).

Page: 18

2017 ONSC 135 (CanLII)

**ISSUE # 2**

**Should Chevron Canada's corporate veil be pierced?**

[50]    Chevron Canada submits that the plaintiffs' claim against it is barred by the "bedrock legal principle of corporate separateness." Under this principle, Chevron Canada maintains that the Ecuadorian judgment against Chevron cannot be visited upon it.

[51]    According to the plaintiffs, the following principles which apply to the application of the principle of corporate separateness demonstrate that the principle should not apply to shield Chevron Canada's assets from being available to satisfy the Ecuadorian judgment against Chevron:

(a)    Corporate separateness will not be applied where it would result in an injustice or to default on a legal obligation.

(b)    Corporate separateness will not be applied between a parent and a subsidiary where "there exists a sufficient degree of relationship between the different legal entities" or where there is "an economically significant relationship" such that the "true commercial and practical nature" of the relationship "is of one enterprise."

(c)    Corporate separateness will not be applied to the issue of ownership.

[52]    At para. 71 of their responding factum, the plaintiffs submit that these three principles apply to Chevron and Chevron Canada for the following reasons:

(a)    To declare that the shares and assets of Chevron Canada are so separate by virtue only of its incorporation as a 100% subsidiary, so as to make them unavailable to satisfy the legitimate judgment debt of Chevron, would be an injustice to the 30,000 indigenous people whose way of life has been ruined by Chevron's polluting activities. Such a declaration would undermine the legal obligation they fought for more than 20 years to achieve in both Ecuador and Ontario. It would undermine the whole process of reciprocity and comity.

(b)    As the facts amply demonstrate, Chevron has total effective control over Chevron Canada and immerses itself intimately in the affairs of Chevron Canada. None of Chevron Canada's major projects was accomplished without approval from Chevron for each step from initiation of exploration to drilling, to operation to transportation.

(c)    Ownership is not a corporate separateness issue. Incorporation prevents a plaintiff from joining in an action, as a defendant, the uninvolved, innocent parent of a contract breaking or tortfeasing subsidiary. Corporate separateness has always been an issue answering the question: who is liable? But once judgment ensues against the guilty party, in this case Chevron, there is then no room for the application of corporate separateness.

Page: 19

[53]   The plaintiffs rely upon the following statement by Wilson J. in the Supreme Court of Canada's decision in *Kosmopoulos v. Constitution Insurance Co.*,[29] in support of their position that corporate separateness will not be applied if it will result in an injustice:

> As a general rule a corporation is a legal entity distinct from its shareholders: *Salomon v. Salomon & Co.*, [1897] A.C. 22 (H.L.) The law on when a court may disregard this principle by "lifting the corporate veil" and regarding the company as a mere "agent" or "puppet" of its controlling shareholder or parent corporation follows no consistent principle. The best that can be said is that the "separate entities" principle is not enforced when it would yield a result "too flagrantly opposed to justice, convenience or the interests of the Revenue": L. C. B. Gower, *Modern Company Law* (4th ed. 1979), at p. 112.
>
> …
>
> There is a persuasive argument that "those who have chosen the benefits of incorporation must bear the corresponding burdens, so that if the veil is to be lifted at all that should only be done in the interests of third parties who would otherwise suffer as a result of that choice": Gower, *supra*, at p. 138.

[54]   The plaintiffs also rely upon the Supreme Court of Canada's decision in *Bazley v. Curry*,[30] in support of their position that corporate separateness will not be applied where the true relationship between the parent corporation and its subsidiary is in the nature of an enterprise.

[55]   They cite the following decision of Belobaba J. in *Teti and ITET Corp. v. Mueller Water Products*,[31] as further support for the principle that a court may not apply corporate separateness where the nature of the relationship is a group enterprise:

> … The best explanation of the cases that have considered the "group enterprise" or "single business entity" concept can be found in the 1994 decision of Spence J. in *MacKenzie Trust*:
>
> > These decisions [*Manley* and others] do not support a claim that the test in *Salomon v. Salomon* has been superseded by a new "business entity" or "single business entity" test. They merely illustrate the principle that, *in particular fact situations where the nature of the legal issue in dispute makes it appropriate to have regard to the larger business entity, the court is not precluded by Salomon from doing so.* In a few cases, there are statements that the court will lift the corporate veil" where injustice would otherwise result". I am not able to conclude that such statements are intended to remove the authority of the *Salomon* principle. I think they may be more in the nature of a shorthand formulation reflecting the approach of the courts in the cases discussed above.

---

[29] *Kosmopoulos v. Constitution Insurance Co.*, [1987] 1 S.C.R. 2, at pp. 10-11.
[30] *Bazley v. Curry*, [1999] 2 S.C.R. 534.
[31] *Teti and ITET Corp. v. Mueller Water Products*, 2015 ONSC 4434, 134 C.P.R. (4th) 249, at paras. 19-21.

Spence J.'s analysis was recently cited with approval by Strathy J., as he then was, in *Fairview Donut* and by Horkins J. in *Durling*.

I therefore conclude that the "group enterprise" or "single business entity" theory *does* exist in Canadian law but only as a carefully limited exception to the well-established proposition set out in *Salomon*. As Spence J. noted in *MacKenzie Trust*, "in particular fact situations where the nature of the legal issue in dispute makes it appropriate to have regard to the larger business entity, the court is not precluded by *Salomon* from doing so."

[56]   The plaintiffs also rely upon the decision of the Court of Appeal for Ontario in *Christian Brothers of Ireland in Canada* (*Re*),[32] in support of their position that the principle of corporate separateness does not apply to a subsidiary that may be liable to pay the debt of its parent corporation. In the *Christian Brothers* case, the Court of Appeal concluded that "all assets of the CBIC, whether owned beneficially or on trust for one or more charitable purposes, are exigible and may be used by the liquidator to pay the claims of the tort victims."[33]

[57]   In my view, the plaintiffs have not established that Chevron Canada's corporate veil should be pierced for the following reasons.

[58]   Chevron and Chevron Canada are separate legal entities with separate rights and obligations. The principle of corporate separateness has been recognized and respected since the 1896 decision of the House of Lords in *Salomon v. Salomon & Co.*[34]

[59]   This principle applies equally to groups of companies such as Chevron's group of companies of which Chevron Canada is a part. The English Court of Appeal made this clear in *Adams v. Cape Industries Plc.*,[35] as follows:

> There is no general principle that all companies in a group of companies are to be regarded as one. On the contrary, the fundamental principle is that "each company in a group of companies … is a separate legal entity possessed of separate legal rights and liabilities."
>
> …
>
> Our law, for better or worse, recognizes the creation of subsidiary companies, which though in one sense the creatures of their parent companies, will nevertheless under the general law fall to be treated as separate legal entities with all the rights and liabilities which would normally attach to separate legal entities.

---

[32] *Christian Brothers of Ireland in Canada (Re)* (2000), 47 O.R. (3d) 674 (C.A.), leave to appeal refused, [2000] S.C.C.A. No. 277, reconsideration refused, 2002 CarswellOnt 1770 (S.C.C.).
[33] *Christian Brothers*, at para. 94.
[34] *Salomon v. Salomon & Co.*, [1897] A.C. 22 (H.L. (Eng.)).
[35] *Adams v. Cape Industries Plc.*, [1990] Ch. 433 (C.A.), at pp. 532, 536.

[60]    The principle of corporate separateness provides that shareholders of a corporation are not liable for the obligations of the corporation. It also provides that the assets of the corporation are owned exclusively by the corporation, not the shareholders of the corporation. As a result, Chevron does not have any legal or equitable interest in the assets of Chevron Canada as an indirect shareholder seven-times removed.

[61]    Further, the plaintiffs' claim against Chevron Canada for its shares cannot succeed because its shares do not belong to Chevron Canada. Gascon J. made this clear in the Supreme Court of Canada's decision, in this case, when he stated the following:[36]

> Similarly, should the judgment be recognized and enforced against Chevron, it does not automatically follow that Chevron Canada's shares or assets will be available to satisfy Chevron's debt.  For instance, shares in a subsidiary belong to the shareholder, not to the subsidiary itself.

[62]    The plaintiffs have brought a motion for leave to add CCCC as a defendant in this action. I will decide that motion in a separate ruling. However, whether CCCC is a defendant in this action does not affect my conclusion that Chevron Canada does not own its own shares and, therefore, cannot be sued by the plaintiffs to recover those shares.

[63]    Because the principle of corporate separateness applies to Chevron and Chevron Canada, the plaintiffs must satisfy the test for piercing Chevron Canada's corporate veil, established in *Transamerica Life Insurance Co. of Canada v. Canada Life Assurance Co*.[37] In *Transamerica*, Sharpe J. (as he then was) held the following:[38]

> As just indicated, the courts will disregard the separate legal personality of a corporate entity where it is completely dominated and controlled and being used as a shield for fraudulent or improper conduct. The first element, "complete control", requires more than ownership. It must be shown that there is complete domination and that the subsidiary company does not, in fact, function independently.
>
> …
>
> The second element relates to the nature of the conduct: is there "conduct akin to fraud that would otherwise unjustly deprive claimants of their rights"? In my view, while Transamerica has alleged fraud against C.L.M.S. there is no evidence to suggest that Canada Life has any involvement in that alleged fraud, apart from the fact that C.L.M.S. is its wholly owned subsidiary. The officers and employees of Canada Life were not involved in the dealings between C.L.M.S. and Transamerica, and no evidence has been advanced sufficient to give rise to a triable issue that Canada Life is somehow using C.L.M.S. as a shield for some nefarious purpose.

---

[36] *SCC decision*, at para. 95.
[37] *Transamerica Life Insurance Co. of Canada v. Canada Life Assurance Co*. (1996), 28 O.R. (3d) 423 (Ct. (Gen. Div.)) [*Transamerica*], aff'd 1997 CarswellOnt 3496 (C.A.).
[38] *Transamerica*, at pp. 433-434.

[64]     The Court of Appeal for Ontario upheld Sharpe J.'s decision in *Transamerica*.[39] In the more recent case of *Indcondo Building Corporation v. Sloan*,[40] the Court of Appeal for Ontario further clarified the test in *Transamerica*, holding that the corporate veil will not be pierced even where complete domination is present in the absence of wrongdoing akin to fraud in the establishment or use of the corporation.

[65]     The plaintiffs do not allege that the corporate structure of which Chevron Canada is a part was designed or used as an instrument of fraud or wrongdoing. In fact, they specifically plead that they "do not allege any wrongdoing against Chevron Canada". As such, they cannot establish wrongdoing akin to fraud in the corporate structure between Chevron and Chevron Canada. They, therefore, do not meet this fundamental condition of piercing Chevron Canada's corporate veil.

[66]     However, the plaintiffs submit that corporate separateness should not be applied as a "strict, inflexible rule" where it will yield a result "too flagrantly opposed to justice". I do not accept the plaintiffs' submission that the corporate veil will be pierced when it is just and equitable to do so. Sharpe J. came to the same conclusion in *Transamerica*, as follows:[41]

> In my view, the argument advanced by Transamerica reads far too much into a dictum plainly not intended to constitute an in-depth analysis of an important area of the law or to reverse a legal principle which, for almost 100 years, has served as a cornerstone of corporate law.
>
> It was conceded in argument that no case since *Kosmopoulos* has applied the preferred "just and equitable" test.
>
> …
>
> There are undoubtedly situations where justice requires that the corporate veil be lifted. The cases and authorities already cited indicate that it will be difficult to define precisely when the corporate veil is to be lifted, but that lack of a precise test does not mean that a court is free to act as it pleases on some loosely defined "just and equitable" standard. …

[67]     The Court of Appeal for Ontario agreed with Sharpe J.'s conclusion in *Parkland Plumbing & Heating Ltd. v. Minaki Lodge Resort 2002 Inc.*,[42] in which E.A. Cronk J.A. stated the following, "But this does not mean that the courts enjoy 'carte blanche' to lift the corporate veil absent fraudulent or improper conduct whenever it appears 'just and equitable' to do so."

---

[39] *Transamerica Life Insurance Co. of Canada v. Canada Life Assurance Co.*, 1997 CarswellOnt 3496 (C.A.).
[40] *Indcondo Building Corporation v. Sloan*, 2015 ONCA 752, 31 C.B.R. (6th) 110, at para. 9.
[41] *Transamerica*, at pp. 431, 433.
[42] *Parkland Plumbing & Heating Ltd. v. Minaki Lodge Resort 2002 Inc.*, 2009 ONCA 256, 305 D.L.R. (4th) 577, at para. 50.

2017 ONSC 135 (CanLII)

Page: 23

[68]   I am satisfied on the strength of these decisions that there is not an independent "just and equitable" exception to the principle of corporate separateness as the plaintiffs suggest. This is not a basis for piercing Chevron Canada's corporate veil in this case.

[69]   As I have already indicated, the applicable jurisprudence makes it clear that even if the plaintiffs were able to establish that Chevron exercises total effective control over Chevron Canada, which they have not done, this would not satisfy the test for ignoring Chevron Canada's corporate separateness and piercing its corporate veil. There would also have to be wrongdoing "akin to fraud" to meet the test. There is no such wrongdoing in this case.

[70]   I do not accept the plaintiffs' submission that Chevron Canada's corporate veil should be pierced on a theory of enterprise group liability. Belobaba J.'s decision in *Teti*, which is relied upon by the plaintiffs for this purpose, does not stand for this proposition. In *Teti*, Belobaba J. found that the various defendant corporations had worked in common as a single business entity in dealing with the plaintiffs' invention, which supported the allegation that the defendants "together and in concert misappropriated [the plaintiffs'] confidential information" (footnotes omitted).[43] His decision has no application to this case. Chevron Canada had no involvement in the activities in Ecuador that led to the Ecuadorian judgment.

[71]   I also do not accept the plaintiffs' reliance on the *Christian Brothers* case to pierce Chevron Canada's corporate veil. The court's decision in that case had nothing to do with the principle of corporate separateness; rather, it concerned the liquidation of the assets of an incorporated religious order that included shares in not-for-profit schools. The issue before the court was whether the Christian Brothers' corporation, as beneficial owners of the shares in the schools, was impeded from causing the schools to be wound up because the shares were held in trust for the specific purpose of operating the schools. In my view, that case has nothing to do with piercing the corporate veil or with the plaintiffs' contention that the assets of one corporation can be used to pay another corporation's creditors. That case does not assist the plaintiffs.

[72]   I am also satisfied that the plaintiffs have failed to meet the first part of the *Transamerica* test. D.M. Brown J. summarized the jurisprudence on what constitutes complete domination and control in his reasons for decision, as follows:[44]

> Complete control requires more than ownership, but necessitates a demonstration that there is complete domination of the subsidiary corporation and the sub does not, in fact, function independently - or, as put in one case, a demonstration that the subsidiary is a "puppet" of the parent.

---

[43] *Teti*, at para. 13.
[44] *Ont SC decision*, at para. 95.

2017 ONSC 135 (CanLII)

Page: 24

[73]    The evidence does not establish that Chevron Canada is Chevron's "'puppet'". Rather, I find that Chevron and Chevron Canada have a typical parent/subsidiary relationship. Chevron does not exercise complete dominance or control over the affairs of Chevron Canada. I accept and adopt, for the purpose of this motion, the following findings and analysis of D.M. Brown J. concerning the corporate relationship between Chevron and Chevron Canada, from his reasons for decision:[45]

> [100]   As part of a worldwide "family" of companies, Chevron Canada is subject to certain "family" budget reporting requirements and large capital expenditure approval processes, but it initiates its own plans and budgets, it funds its own day to day operations, and the capital expenditures made by it in recent years for the major Athabasca Oil Sands Project, Hibernia Project and Hebron Project were funded from its own operating revenues. Mr. Wasko deposed:
>
> > Chevron Canada is a fully capitalized corporation which funds its own day to day operations without financial contributions from Chevron Corp. or any other Chevron entity.
>
> This corporate structure has been in place since 1966; it was not a recent creation designed to blunt the effect of the Ecuadorean Judgment. I do not regard the existence of a central review and approval process for large capital expenditures, especially of the magnitude found in the resource extraction industry, as signifying a complete domination by the parent of the indirect subsidiary such as to dissolve the separate legal identity of the subsidiary, especially when, as the evidence showed in this case, the indirect subsidiary carries on its own business operations. Put another way, the centralized strategic planning and allocation of large amounts of capital, by itself, does not undermine the separate legal entity of a company down the corporate chain which operates a tangible business managed by separate directors, officers and senior managers.
>
> [101]   Nor does the fact that on several occasions Chevron guaranteed debt financings and project-related performance obligations of Chevron Canada indicate that the corporations possess a single legal identity. Certainly the lenders in those cases proceeded on the basis that parent and indirect sub were separate legal entities, otherwise they would not have asked for the guarantees of the ultimate parent. Moreover, inter-corporate guarantees are common-place in our commercial world. The granting of a guarantee by Company A does not merge its assets, in the eyes of the law, with those of borrower Company B. The guarantee does expose the separate assets of Company A to the risk of execution in the event of a default by Company B, but that result simply flows from the contractual terms agreed to by Company A, not some dissolution of its corporate separatedness.

---

[45] *Ont SC decision*, at paras. 100-104.

2017 ONSC 135 (CanLII)

Page: 25

[102]   Chevron Canada files its own tax returns and corporate statements. That Chevron files a consolidated set of financial statements simply reflects the legal reporting requirements of its home jurisdiction, in particular the *Sarbanes-Oxley Act of 2002* and the *Securities and Exchange Act of 1934*; it is not an *indicia* of the complete domination and control of the subsidiary by the parent. The same observation applies to the common reporting requirements found in the Chevron family of companies. At a time when legislators are insisting on higher standards of corporate governance for related groups of companies, including the disclosure of material information, efforts to comply with those requirements do not signify that the individual companies have lost their separate legal identities.

[103]   Nor does the dividending-up by Chevron Canada of some of its operating profits to its parent, Chevron Canada Capital Company, which, in turn, may issue dividends up the chain signify, in itself, complete domination of the subsidiary's operations. The distribution of profits from sub to parent via dividends is a standard fact of inter-corporate life. No evidence in this case suggested that the flow of dividends reflected complete domination in the sense used by the *alter ego* cases.

[104]   In my view, when taken as a whole, the evidence filed on these motions supports a finding that the relationship between Chevron and Chevron Canada is, to echo the language of Sharpe J. (as he then was) in the *Transamerica* case, "that of a typical parent and subsidiary", not an instance of a parent corporation exercising complete domination and control over the subsidiary. Or, to phrase that conclusion in the language of the Court of Appeal in the *Canada Life Assurance* case, the evidence demonstrates that Chevron Canada "looks as though it has its own business, rather than being completely subservient to and dependent upon its parent".

**Conclusion on Summary Judgment Motions**

[74]   For all of these reasons, I have concluded that the plaintiffs' claim cannot succeed against Chevron Canada. Chevron Canada's motion for summary judgment is granted. The plaintiffs' claim against it is dismissed.

[75]   As a result of my conclusion on this motion, Chevron's motion for summary judgment is granted and the plaintiffs' motion for summary judgment is dismissed.

## *THE PLAINTIFFS' MOTION TO STRIKE CHEVRON'S DEFENCE*

### Background

[76]     The plaintiffs move pursuant to r. 21.01(1)(b) of the *Rules of Civil Procedure*[46] to strike the defences pleaded by Chevron in its statement of defence.

[77]     Chevron delivered its statement of defence in October 2015, following the Supreme Court of Canada's decision confirming the jurisdiction of the Ontario court to hear the Ontario Action.

[78]     The plaintiffs submit that Chevron's entire statement of defence should be struck because it raises impermissible defences that have no reasonable prospect of success. They base their position on the Supreme Court of Canada's decision in *Beals v. Saldanha*.[47] They argue that the Supreme Court stipulated that only three limited and narrowly applied defences are permissible in an action to recognize and enforce a foreign judgment.

[79]     The plaintiffs also submit that none of Chevron's defences fall within the permitted defences established in *Beals* and that they constitute an attempt by Chevron to re-litigate issues that have been finally determined by the Ecuadorian courts.

[80]     Chevron submits that the Ecuadorian judgment was fraudulently procured by the plaintiffs. Chevron argues that its statement of defence sets out the facts it relies upon in support of its position that the Ecuadorian judgment is incapable of enforcement under Canadian law because the plaintiffs obtained it by corrupt and fraudulent acts, including the manipulation of the judicial process and by bribing and intimidating experts and judges of the Ecuadorian courts.

[81]     Chevron's statement of defence also incorporates the extensive facts set out in a decision of Judge Lewis Kaplan of the United States District Court for the Southern District of New York (the "SDNY"), who concluded, following a seven-week trial, that the Ecuadorian judgment was obtained by fraud and bribery.[48]   In his lengthy judgment, Judge Kaplan outlined the plaintiffs' extensive acts of fraud, bribery, forgery, intimidation and collusion in the Ecuadorian proceedings. His decision has been affirmed by the United States Court of Appeals for the Second Circuit.

### Chevron's Statement of Defence

[82]     Paragraphs 3 and 4 of Chevron's statement of defence summarize the nature of the defences raised by Chevron, as follows:

---

[46] *Rules of Civil Procedure*, R.R.O. 1990, Reg. 194, r. 21.01(1)(b).
[47] *Beals v. Saldanha*, 2003 SCC 72, [2003] 3 S.C.R. 416.
[48] *Chevron Corp. v. Donziger*, 974 F. Supp. 2d. 362 (S.D.N.Y. 2014), aff'd 833 F. 3d. 74 (2d Cir. 2016).

2017 ONSC 135 (CanLII)

3. The Ecuador judgment described in paragraphs 1 and 9 through 16 of the Amended Amended Statement of Claim (the "Ecuador Judgment") cannot be recognized or enforced in Ontario, or elsewhere in Canada, for several reasons:

> (a)  The Ecuador court did not have jurisdiction over Chevron Corp.;

> (b)  The Ecuador Judgment is based upon a law applied in a manner which retroactively created a cause of action against Chevron Corp. for which the Republic of Ecuador had previously issued a binding release;

> (c)  Chevron Corp. was denied Canadian standards of fairness and natural justice throughout the Ecuador proceedings;

> (d) As found by the United States District Court for the Southern District of New York ("SDNY"), the Ecuador Judgment was obtained by fraudulent means and rendered by a systemically corrupt and biased court; and

> (e) Any recognition and enforcement of the Ecuador Judgment would constitute a violation of the obligations of the Republic of Ecuador ("the ROE") under international law;

> all of which offends Canadian standards of natural justice and public policy for the recognition and enforcement of foreign judgments.

4.  The plaintiffs are bound by the factual findings made by the SDNY, including *inter alia* that "… [the Ecuador judge] agreed with [plaintiffs' counsel] to fix the case for a payment of $500,000 paid out of any judgment proceeds, … [plaintiffs' counsel] drafted all or most of the Judgment, and [the Ecuador judge] signed their draft without consequential modification as part of the *quid pro quo* for the promise of $500,000."

[83]   Chevron's statement of defence is divided into 14 sections, which contain the following defined terms:

- "TexPet" – The Texaco Petroleum Company, which is a fourth-level subsidiary of Texaco that was originally granted exploration and production rights for the Oriente region of Ecuador. TexPet was the initial operator of the oil production consortium in the region.

- "ROE" – The Republic of Ecuador.

- "Petroecuador" – ROE's state-owned oil agency that operated the oil production consortium with TexPet and took over as its sole operator in 1990.

- "Cabrera" – Richard Stalin Cabrera Vega was a court-appointed independent global assessment expert. He purported to prepare an expert report for the Ecuadorian court that assessed damages of more than US$16 billion arising from Texaco's alleged pollution of the region.

[84]     The 14 sections of Chevron's statement of defence can be summarized as follows:

**I. Introduction** – This section summarizes why Chevron maintains that the Ecuadorian judgment cannot be recognized or enforced in Ontario.

**II. Roles of TexPet and Petroecuador in Ecuadorian Operations** – This section describes the operation of the oil-production consortium between TexPet and Petroecuador in the Oriente region of the ROE from 1964 to 1992.

**III. Remediation, Settlements and Releases of TexPet and its Affiliates** – This section describes the 1995 Settlement Agreement between the ROE, Petroecuador and TexPet, entered into in 1995 whereby TexPet agreed to perform environmental remediation work to the region at a cost to TexPet of US$40 million. In 1998, upon the completion of this work, the ROE and Petroecuador provided TexPet with a final release.

Under the terms of the 1995 Settlement Agreement, TexPet was also required to continue negotiating with certain municipalities in the region, including Lago Agrio. These municipalities had each sued TexPet in 1994 to protect the health of their citizens and rivers. TexPet settled with all of these municipalities in 1996, and it was released from all claims arising from the operation of the oil-production consortium in the region. Under Ecuadorian law, these settlements had the effect of final judgments.

**IV. The Aguinda Action in New York** – This section refers to a class action commenced against Texaco in 1993 in New York by 76 Ecuadorian citizens representing 30,000 residents of the Oriente region (the "Aguinda Action"). The SDNY dismissed this action on *forum non conveniens* grounds.

**V. Reversal of ROE Position and Enactment of the *Environmental Management Act*** – This section refers to the *Environmental Management Act* ("EMA"), which was enacted in 1999 by the ROE. The EMA created a new private right of action to redress public environmental harms. Chevron maintains its enactment was the result of improper influence exerted upon the ROE by the plaintiffs in the Aguinda Action.

**VI. Dismissal of the Aguinda Action** – This section refers to the affirmation in 2002 by the United States Court of Appeals for the Second Circuit of the SDNY's dismissal of the Aguinda Action on grounds of *forum non conveniens*. The court noted that Texaco had agreed with the plaintiffs that it would waive any statute of limitation defence and would consent to personal jurisdiction in Ecuador and accept service of process there.

**VII. Reverse Triangular Merger of Chevron Corp. and Texaco** – This section refers to the fact that Texaco and TexPet became indirect subsidiaries of Chevron Corp. in October 2001. According to Chevron, they have continued as separate legal entities since then.

**VIII. The Ecuador Action and Judgment** – This section refers to the commencement of the action against Chevron, that resulted in the Ecuadorian judgment by 42 of the Aguinda Action plaintiffs and 6 others (the "Ecuador Action"). This action relied upon the retroactive application of the EMA. The Ecuador Action was brought against Chevron as the sole

2017 ONSC 135 (CanLII)

defendant. Chevron contested the jurisdiction of the Ecuadorian court but was required by the court to participate in the proceedings under protest. Chevron never acquiesced to the jurisdiction of the Ecuador court.

In February 2011, Judge Nicolas Augusto Zambrano Lozada ("Judge Zambrano") awarded the plaintiffs judgment against Chevron in the amount of US$8.646 billion plus punitive damages, resulting in a total judgment of over US$19 billion The US$8.646 billion in damages was awarded to "'the community'", for environmental remediation, healthcare costs and damages to indigenous cultures. According to Chevron, all of these claims had been released by the 1995 Settlement Agreement.

The Ecuadorian judgment was affirmed by the Appellate Division of the Provincial Court of Justice of Sucumbios on January 3, 2012. The Appellate Division concluded that it did not have competence to rule upon Chevron's contention that the Ecuadorian judgment had been procured by fraud and corruption, noting that these issues were being litigated in the United States before the SDNY. On November 12, 2013, the National Court of Justice of Ecuador, the final level of appeal in Ecuador, dismissed the punitive damages award but otherwise affirmed the decision of the Appellate Division. As a result, the Ecuadorian judgment now totals approximately US$9.52 billion.

**IX. Pressure Tactics, Political Interference and Systemic Corruption** – This section refers to the findings of the SDNY that the Ecuador Action was replete with political interference, organized pressure tactics intended to influence and intimidate the Ecuadorian judiciary, extortion, fraud and systemic corruption of the judicial system. The pressure tactics carried out by the plaintiffs' "'private army'" and the political interference into the judicial proceedings by the ROE's President, Attorney General and other political officials are detailed in this section. According to Chevron, the public and private support for the plaintiffs by the president of the ROE and his campaign against Chevron ensured that it did not receive a fair trial in Ecuador.

Further, Chevron alleges, in this section of its statement of defence that the plaintiffs' counsel conspired to fraudulently manipulate expert evidence and repeatedly engaged in improper *ex parte* communications with the various Ecuador judges who heard the trial of the Ecuadorian action, for the purpose of gaining unfair and illegal advantages. According to Chevron, the plaintiffs' counsel also manipulated and falsified expert evidence presented to the court. Expert reports filed with the court were "ghostwritten" by the plaintiffs' counsel. They then engaged in fraudulent efforts to "cleanse" the ghostwritten expert reports.

Ultimately, in exchange for the payment of a US$500,000 bribe to Judge Zambrano, which was payable upon the enforcement of the Ecuadorian judgment, Judge Zambrano allowed the plaintiffs' counsel to draft the Ecuadorian judgment. Although the Ecuadorian judgment was signed by Judge Zambrano, the decision was not his own. It was ghostwritten by the plaintiffs' counsel. Accordingly, Chevron maintains that the Ecuadorian judgment was not the decision of an impartial judge or the product of a fair and independent process.

2017 ONSC 135 (CanLII)

**X. The Ecuador Judgment Cannot be Recognized or Enforced in Ontario** – This section sets out the following reasons why Chevron submits that the Ecuadorian judgment cannot be enforced against it in Ontario.

- The Ecuador court did not have jurisdiction over Chevron because Chevron has no real or substantial connection to the jurisdiction or the subject matter of the claim, it had no involvement in the events leading to the Ecuadorian judgment, it is a corporate entity separate from Texaco and TexPet and it did not attorn to the jurisdiction of the Ecuador court.

- The EMA, the legislation upon which the Ecuadorian judgment is based, was enacted and retroactively applied to improperly contrive a claim against Chevron. As such it is contrary to Canadian public policy and repugnant to Canadian concepts of justice. Further, the Ecuador court's decision not to dismiss the claim against Chevron on the basis of the 1995 Settlement Agreement is also contrary to Canadian public policy because Chevron is entitled to rely upon the release provided to TexPet pursuant to the 1995 Settlement Agreement.

- The enforcement of the Ecuadorian judgment against Chevron would constitute a violation of the ROE's obligations under international law and would therefore offend Canadian public policy. Chevron submits that the ROE is subject to a decision of an arbitral tribunal pursuant to the Bilateral Investment Treaty (the "BIT") between the United States and the ROE that recognizes the enforceability of the 1995 Settlement Agreement and requires that the ROE suspend and prevent enforcement of the Ecuadorian judgment.

- The Ecuador court process was contrary to Canada's concept of natural justice because Chevron was denied any meaningful opportunity to be heard by an impartial and unbiased court.

- The Ecuadorian judgment is the product of conspiracy, fraud and systemic corruption because members of the judiciary were coerced, intimidated, extorted and ultimately bribed to decide the case in the plaintiffs' favour. To recognize the Ecuadorian judgment under these circumstances would be contrary to Canadian public policy.

**XI. The Plaintiffs Cannot Dispute the Findings of Fraud and Corruption Made by the SDNY** – This section sets out Chevron's position that it would be unfair and an abuse of the court's process to allow the plaintiffs to re-litigate the findings of fact made by the SDNY, a court of competent jurisdiction, between the same parties and their representatives.

**XII. Chevron Corp. is Not Estopped from Defending this Action -** This section sets out Chevron's position on why the conditions of the dismissal of the Aguinda Action do not preclude Chevron from defending this action on any grounds available under Canadian law.

**XIII. The Shares and Assets of Chevron Canada Limited are not the Shares and Assets of Chevron Corp.** - This section sets out Chevron's position on why the shares and assets of Chevron Canada are not the shares and assets of Chevron.

**XIV. Relief Requested** - This section requests that the action be dismissed with costs on a full indemnity basis.

## Issue

[85]   The issue that I must decide on this motion is whether it is plain and obvious that the defences pleaded by Chevron have no chance of success because they are not permitted defences to an action for the recognition and enforcement of a foreign judgment in accordance with the Supreme Court of Canada's decision in *Beals*.

## Positions of the Parties

[86]   The plaintiffs submit that the defences pleaded by Chevron are either not permissible as a result of *Beals* or were raised or could reasonably have been raised before the courts in Ecuador. During oral argument Mr. Lenczner, on behalf of the plaintiffs, conceded that the questions of whether Judge Zambrano was bribed and whether his decision was ghostwritten by the plaintiffs' counsel were permissible defences for Chevron to raise in this proceeding. However, he argued that these two discrete issues could be summarily determined on a mini-trial. He maintained his position that all of the other defences pleaded by Chevron were impermissible and should be struck.

[87]   Chevron submits that all of the defences it has pleaded are permissible under the *Beals* decision and that I cannot conclude that it is plain and obvious that these defences have no chance of success.

## Analysis

*Applicable Law*

[88]   The test for striking out a defence under r. 21.01(1)(b) of the *Rules of Civil Procedure* was clearly articulated by the Court of Appeal for Ontario in *Rausch v. Pickering (City)*.[49] It can be summarized as follows:

- The test is stringent, and the moving party must satisfy a very high threshold in order to succeed.

- Unless it is 'plain and obvious' that there is no chance of success, a [defence], even a novel one, ought to be allowed to proceed.

- The motion proceeds on the basis that the facts pleaded are true unless they are manifestly incapable of being proven.

- While the facts pleaded are the basis upon which the possibility of success must be evaluated, the pleading must be read as generously as possible, erring on the side of permitting an arguable [defence] to proceed to trial.

---

[49] *Rausch v. Pickering (City)*, 2013 ONCA 740, 369 D.L.R. (4th) 691, at para. 34.

[89]    In addition, no evidence is admissible on a motion to strike out a defence.[50]

[90]    The Court of Appeal in *Paton Estate v. Ontario Lottery and Gaming Corporation (Fallsview Casino Resort and OLG Casino Brantford)*[51] recently stated that "the purpose of a motion to strike is to eliminate hopeless claims". In *R. v. Imperial Tobacco Canada Ltd.*,[52] the Supreme Court of Canada stressed that it "is a tool that must be used with care." It is against this background that I must determine whether Chevron's defences should be struck.

[91]    The court's role in an action to recognize and enforce a foreign judgment is different than in an action at first instance. The Supreme Court of Canada explained this difference, as follows, in its judgment in this case:[53]

> … First, the purpose of an action for recognition and enforcement is not to evaluate the underlying claim that gave rise to the original dispute, but rather to assist in enforcing an already-adjudicated obligation.  In other words, the enforcing court's role is not one of substance, but is instead one of facilitation: *Pro Swing*, at para. 11. The court merely offers an enforcement mechanism to facilitate the collection of a debt within the jurisdiction.  This entails that the enforcing court does not exercise jurisdiction in the same way as it does in actions at first instance.  In a first instance case like *Van Breda*, the focus is on whether the court has jurisdiction to determine the merits of a substantive legal claim; in a recognition and enforcement case, the court does not create a new substantive obligation, but instead assists with the fulfillment of an existing one.

[92]    The Supreme Court continued, as follows:[54]

> No concern about the legitimacy of the exercise of state power exists in actions to recognize and enforce foreign judgments against judgment debtors.  As I have explained, when such an action comes before a Canadian court, the court is not assuming jurisdiction over the parties in the same way as would occur in a first instance case.  The enforcing court has no interest in adjudicating the original rights of the parties.  Rather, the court merely seeks to assist in the enforcement of what has already been decided in another forum. …

[93]    In *Beals* the Supreme Court of Canada considered the scope of defences available to a domestic defendant in contesting the recognition and enforcement of a foreign judgment. The court held that the defences of fraud, public policy and lack of natural justice are available defences.

2017 ONSC 135 (CanLII)

---

[50] *Rules of Civil Procedure*, r. 21.01(2)(b).
[51] *Paton Estate v. Ontario Lottery and Gaming Corporation (Fallsview Casino Resort and OLG Casino Brantford)*, 2016 ONCA 458, 19 E.T.R. (4th) 171, at para. 11, citing *R. v. Imperial Tobacco Canada Ltd.*, 2011 SCC 42, [2011] 3 S.C.R. 45, at para. 19.
[52] *Imperial Tobacco Canada*, at para. 21.
[53] *SCC decision*, at para. 44.
[54] *SCC decision*, at para. 48.

Although the court stated that these defences are "narrow in application", Major J. qualified this, stating, "Unusual situations may arise that might require the creation of a new defence to the enforcement of a foreign judgment."[55]

*Defence of Fraud*

[94]    In *Beals*, Major J. stated, "As a general but qualified statement, neither foreign nor domestic judgments will be enforced if obtained by fraud."[56] He explained that this is to prevent an abuse of the judicial process. However, he limited the defence of fraud to allegations that are "new and not the subject of prior adjudication", with the exception of fraud going to the jurisdiction of the foreign court, which he concluded "can always be raised before a domestic court to challenge the judgment."[57]

*Defence of Natural Justice*

[95]    Major J. also concluded in *Beals* that if the foreign judgment was obtained in a manner that is contrary to Canadian notions of fundamental justice, it may not be recognized or enforced. He stated, in part, as follows:[58]

> 61      The enforcing court must ensure that the defendant was granted a fair process. … The burden of alleging unfairness in the foreign legal system rests with the defendant in the foreign action.
>
> 62      Fair process is one that, in the system from which the judgment originates, reasonably guarantees basic procedural safeguards such as judicial independence and fair ethical rules governing the participants in the judicial system.  This determination will need to be made for all foreign judgments. … In the case of judgments made by courts outside Canada, the review may be more difficult but is mandatory and the enforcing court must be satisfied that fair process was used in awarding the judgment. …
>
> 63      … If fair process was not provided to the defendant, recognition and enforcement of the judgment may be denied.

---

[55] *Beals*, at paras. 41-42.
[56] *Beals*, at para. 43.
[57] *Beals*, at para. 51.
[58] *Beals*, at paras. 61-63.

2017 ONSC 135 (CanLII)

Page: 34

*Defence of Public Policy*

[96]    The public policy defence prevents the enforcement of a foreign judgment that is contrary to Canadian concepts of justice. According to Major J., this defence "turns on whether the foreign <u>law</u> is contrary to our view of basic morality" and it "guards against the enforcement of a judgment rendered by a foreign court proven to be corrupt or [biased]." [59]

*Test to be Applied*

[97]    In light of this jurisprudence, my consideration of whether the defences pleaded by Chevron in its statement of defence should be struck is to be carried out in the following manner:

- I must consider all of the facts pleaded by Chevron to be true unless I conclude that they are manifestly incapable of being proven.

- I must read Chevron's statement of defence generously and err on the side of allowing an arguable defence to proceed to trial.

- I must consider whether the defences pleaded constitute the defences of fraud, public policy, denial of natural justice or whether this case presents an unusual situation that requires the creation of a new defence.

- Unless I am satisfied that it is plain and obvious that a defence pleaded in Chevron's statement of defence has no chance of successfully raising a defence permitted by *Beals*, I must allow the defence to proceed to trial.

[98]    Mr. Lenczner concedes, and I agree, that to the extent Chevron alleges that Judge Zambrano was bribed and that his decision was ghostwritten by the plaintiffs' counsel, this constitutes a permissible defence under *Beals*.

[99]    If all of the allegations of fraud, corruption, bribery, ghostwriting and the overall corruption of the Ecuadorian judicial system contained in Chevron's statement of defence are considered to be true, I am of the view that they raise all three permissible defences under *Beals*. A judgment obtained from a corrupt judicial system in which the trial judge accepted an offer of a bribe and allowed the plaintiffs' counsel to write his decision would clearly constitute,

- a judgment obtained by fraud;

- a judgment obtained from an unfair process; and

- a judgment that is contrary to Canadian concepts of fundamental justice.

---

[59] *Beals*, at paras. 71-72.

Page: 35

[100]   These defences raised by Chevron, which are permitted under *Beals*, all challenge the jurisdiction of the court presided over by Judge Zambrano, which rendered the Ecuadorian judgment. As such it is not necessary that they are new and not the subject of prior adjudication.

[101]   In *R. v. Curragh Inc.*,[60] the Supreme Court of Canada held that a reasonable apprehension of bias deprives a judge of jurisdiction, and it stated the following:

> … However, when a court of appeal determines that the trial judge was biased or demonstrated a reasonable apprehension of bias, that finding retroactively renders all the decisions and orders made during the trial void and without effect.

[102]   If all of the allegations of judicial corruption and bribery are accepted as true, Judge Zambrano had no jurisdiction to render the Ecuadorian judgment, and it should not be recognized or enforced in Ontario. It, therefore, cannot be said that it is plain and obvious that these defences have no chance of success.

[103]   For these reasons, I will not strike the defences pleaded by Chevron at paras. 3(c) and (d), 4, 27-70, and 81-90 of its statement of defence because these parts of Chevron's statement of defence raise permitted defences that arise from the allegations that the Ecuadorian court was biased and, therefore, lacked jurisdiction.

[104]   I will now consider the other defences raised by Chevron that are not based on the corruption and bias of the Ecuadorian court.

*Paragraph 3(a)*

[105]   In this paragraph of its statement of defence, Chevron pleads that the Ecuadorian court did not have jurisdiction over it for reasons other than judicial corruption and bias. Chevron relies upon the following grounds to challenge the Ecuadorian court's jurisdiction:

- It never attorned to and it contested the jurisdiction of the Ecuadorian court.

- It never conducted any business in Ecuador and the entities that did operate in Ecuador are legally separate from it.

- There was no real and substantial connection between Chevron and Ecuador or the subject matter of the action in Ecuador to permit the Ecuadorian court to take jurisdiction over Chevron under Ontario law.

[106]   Since it is a precondition to the recognition and enforcement of a foreign judgment that the foreign court had jurisdiction according to Canadian law, it is open to Chevron to challenge the Ecuadorian judgment on this basis. The plaintiffs submit that Chevron is precluded from challenging

---

[60] *R. v. Curragh Inc.*, [1997] 1 S.C.R. 537, at para. 8.

2017 ONSC 135 (CanLII)

the jurisdiction of the Ecuadorian court because it did so and lost before all three levels of court in Ecuador. The Court of Appeal for Ontario determined in *CIMA Plastics Corporation v. Sandid Enterprises Ltd.*,[61] that an Ontario court is not bound by a foreign court's determination of its own jurisdiction in an action for the recognition and enforcement of a foreign judgment in Ontario.

[107]   It is, therefore, not plain and obvious that this defence has no chance of success. The fact that Chevron raised it before the Ecuadorian court does not preclude it from raising it again in the Ontario court as a defence. I will not strike paras. 3 (a), 26, and 71-74 of Chevron's statement of defence for this reason. I should note that paras. 30-31 also contain factual allegations that support this defence and should not be struck for this reason. However, I have already determined that I will not strike these two paragraphs as they also relate to the allegation that the Ecuadorian court was biased.

*Paragraph 3(b)*

[108]   In this paragraph of its statement of defence, Chevron pleads that the Ecuadorian judgment is based upon a law applied in a manner that retroactively created a cause of action against Chevron for which the ROE had previously issued a binding release. The factual allegations in support of this defence are contained in sections III and V of Chevron's statement of defence, which refer to the events leading up to the 1985 Settlement Agreement and the enactment of the EMA by the ROE.

[109]   This defence was raised before the Ecuadorian courts. The plaintiffs submit that it cannot be raised again in this proceeding because that would constitute the re-litigation of a defence to the underlying claim. Chevron submits that it is contrary to Canadian public policy to recognize and enforce a foreign judgment that is based upon a law that the Ecuadorian government enacted to operate retroactively and which ignores the ROE's previous release of Chevron. I do not agree with this submission. Governments often enact retroactive legislation. I do not consider the enactment of the EMA by the ROE to constitute a law that is contrary to our Canadian view of "basic morality". The Court of Appeal for Ontario has cautioned courts to exercise great care "in relying upon public policy as a ground for refusing enforcement" (citations omitted) because of the following: [62]

> The common ground of all expressed reasons for imposing the doctrine of public policy is essential morality. This must be more than the morality of some persons and must run through the fabric of society to the extent that it is not consonant with our system of justice and general moral outlook to countenance the conduct….

[110]   The applicability of the release provided to TexPet under the 1995 Settlement Agreement relates to a defence to the underlying claim on the merits, which the Supreme Court of Canada has stated the domestic court is not to adjudicate in an action for recognition and enforcement of a foreign judgment.

---

[61] *CIMA Plastics Corporation v. Sandid Enterprises Ltd.*, 2011 ONCA 589, 341 D.L.R. (4th) 442.
[62] *Boardwalk Regency Corp. v. Maalouf* (1992), 6 O.R. (3d) 737 (C.A.), at p. 743.

[111]   In my view, for this reason this defence is not permissible under *Beals*. I am, therefore, satisfied that it is plain and obvious that this defence has no chance of success.

[112]   I, therefore, strike paras. 3(b), 5-20, 23-24 and 75-78 of Chevron's statement of defence. These parts of its statement of defence plead an impermissible defence and it is therefore not appropriate to grant Chevron leave to amend these paragraphs.

*Paragraph 3(e)*

[113]   In this paragraph of its statement of defence, Chevron pleads that the recognition and enforcement of the Ecuadorian judgment would constitute a violation of the ROE's obligations under international law. Chevron submits that the ROE is in breach of its obligations to comply with an award of the BIT arbitral panel requiring the ROE to prevent the enforcement of the Ecuadorian judgment. The BIT arbitral panel subsequently concluded that the ROE had violated international law. According to Chevron, the ROE's violation of its international legal obligations is contrary to Canadian public policy.

[114]   I do not consider the ROE's failure to take steps to prevent the enforcement of the Ecuadorian judgment in accordance with the BIT arbitral panel's award to be contrary to our Canadian view of basic morality within the meaning of the Court of Appeal's description in *CIMA*. I have, therefore, concluded that this is not a permissible defence under *Beals*.

[115]   I am satisfied that it is plain and obvious that this defence has no chance of success for this reason. I therefore strike para. 3(e) of Chevron's statement of defence as well as paras. 79 and 80, which contain the factual allegations in support of this defence. I do not grant Chevron leave to amend these paragraphs because they plead an impermissible defence.

*The Remaining Paragraphs*

[116]   Paragraphs 21, 22, 25 and 88-90 of Chevron's statement of defence refer to the Aguinda Action originally brought in the SDNY in 1993 and its eventual dismissal. These facts are relevant to respond to the plaintiffs' allegation that Chevron is estopped from defending this action because of an undertaking given by Texaco in that proceeding. I am satisfied that this is a permissible defence as Chevron is entitled to respond to this allegation contained in the plaintiffs' statement of claim. I will, therefore, not strike these paragraphs of Chevron's statement of defence.

[117]   Paragraphs 91 and 92 of Chevron's statement of defence relate to the plaintiffs' claim against Chevron Canada and the issue of corporate separateness. It is a permissible pleading in light of the plaintiffs' allegations against Chevron Canada. I will not strike these paragraphs of Chevron's statement of defence.

[118]   Paragraphs 1, 2 and 93 contain standard pleadings and are permissible.

2017 ONSC 135 (CanLII)

Page: 38

**Conclusion on Motion to Strike**

[119]   For the reasons outlined above, I have concluded that the plaintiffs' motion is granted in part. The following paragraphs of Chevron's statement of defence are struck pursuant to r. 21.01(1)(b) of the *Rules of Civil Procedure*: 3(b), 3(e), 5-20, 23-24 and 75-80. The remainder of the paragraphs of Chevron's statement of defence all constitute permissible pleadings and may proceed to trial.

**Costs**

[120]   I urge the parties to settle the issue of costs. If they cannot, they may schedule a 9:30 a.m. appointment before me to address the issue of costs.

[121]   I sincerely thank all counsel for the very professional and efficient manner in which they conducted these motions.

_____

HAINEY J.

**Released:** January 20, 2017

2017 ONSC 135 (CanLII)

**CITATION:** Yaiguaje v. Chevron Corporation, 2017 ONSC 135
**COURT FILE NO.:** CV-12-9808-00CL
**DATE:** 20170120

# ONTARIO

# SUPERIOR COURT OF JUSTICE

## (Commercial List)

**BETWEEN:**

DANIEL CARLOS LUSITANDE YAIGUAJE, BENANCIO FREDY
CHIMBO GREFA, MIGUEL MARIO PAYAGUAJE PAYAGUAJE,
TEODORO GONZALO PIAGUAJE PAYAGUAJE, SIMON
LUSITANDE YAIGUAJE, ARMANDO WILMER PIAGUAJE
PAYAGUAJE, ANGEL JUSTINO PIAGUAJE LUCITANTE,
JAVIER PIAGUAJE PAYAGUAJE, FERMIN PIAGUAJE, LUIS
AGUSTIN PAYAGUAJE PIAGUAJE, EMILIO MARTIN
LUSITANDE YAIGUAJE, REINALDO LUSITANDE YAIGUAJE,
MARIA VICTORIA AGUINDA SALAZAR, CARLOS GREFA
HUATATOCA, CATALINA ANTONIA AGUINDA SALAZAR,
LIDIA ALEXANDRIA AGUINDA AGUINDA, CLIDE RAMIRO
AGUINDA AGUINDA, LUIS ARMANDO CHIMBO YUMBO,
BEATRIZ MERCEDES GREFA TANGUILA, LUCIO ENRIQUE
GREFA TANGUILA, PATRICIO WILSON AGUINDA AGUINDA,
PATRICIO ALBERTO CHIMBO YUMBO, SEGUNDO ANGEL
AMANTA MILAN, FRANCISCO MATIAS ALVARADO YUMBO,
OLGA GLORIA GREFA CERDA, NARCISA AIDA TANGUILA
NARVAEZ, BERTHA ANTONIA YUMBO TANGUILA, GLORIA
LUCRECIA TANGUILA GREFA, FRANCISCO VICTOR
TANGUILA GREFA, ROSA TERESA CHIMBO TANGUILA ,
MARIA CLELIA REASCOS REVELO, HELEODORO PATARON
GUARACA, CELIA IRENE VIVEROS CUSANGUA, LORENZO
JOSE ALVARADO YUMBO, FRANCISCO ALVARADO YUMBO,
JOSE GABRIEL REVELO LLORE, LUISA DELIA TANGUILA
NARVAEZ, JOSE MIGUEL IPIALES CHICAIZA, HUGO
GERARDO CAMACHO NARANJO, MARIA MAGDALENA
RODRIGUEZ BARCENES, ELIAS ROBERTO PIYAHUAJE
PAYAHUAJE, LOURDES BEATRIZ CHIMBO TANGUILA,
OCTAVIO ISMAEL CORDOVA HUANCA, MARIA HORTENCIA
VIVEROS CUSANGUA, GUILLERMO VINCENTE PAYAGUAJE
LUSITANDE, ALFREDO DONALDO PAYAGUAJE PAYAGUAJE
and DELFIN LEONIDAS PAYAGUAJE PAYAGUAJE

Plaintiffs/Moving Parties

– and –

CHEVRON CORPORATION, CHEVRON CANADA LIMITED and
CHEVRON CANADA FINANCE LIMITED

Defendants/Respondents

---

## REASONS FOR DECISION

---

2017 ONSC 135 (CanLII)

HAINEY J.

**Released:** January 20, 2017

# EXHIBIT 82

Court File No. CV-12-9808-00CL

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### COMMERCIAL LIST

THE HONOURABLE         ) FRIDAY, THE 20TH DAY OF

                         )

JUSTICE HAINEY           ) JANUARY, 2017

B E T W E E N:

DANIEL CARLOS LUSITANDE YAIGUAJE, BENANCIO FREDY CHIMBO GREFA, MIGUEL MARIO PAYAGUAJE PAYAGUAJE, TEODORO GONZALO PIAGUAJE PAYAGUAJE, SIMON LUSITANDE YAIGUAJE, ARMANDO WILMER PIAGUAJE PAYAGUAJE, ANGEL JUSTINO PIAGUAJE LUCITANTE, JAVIER PIAGUAJE PAYAGUAJE, FERMIN PIAGUAJE, LUIS AGUSTIN PAYAGUAJE PIAGUAJE, EMILIO MARTIN LUSITANDE YAIGUAJE, REINALDO LUSITANDE YAIGUAJE, MARIA VICTORIA AGUINDA SALAZAR, CARLOS GREFA HUATATOCA, CATALINA ANTONIA AGUINDA SALAZAR, LIDIA ALEXANDRIA AGUINDA AGUINDA, CLIDE RAMIRO AGUINDA AGUINDA, LUIS ARMANDO CHIMBO YUMBO, BEATRIZ MERCEDES GREFA TANGUILA, LUCIO ENRIQUE GREFA TANGUILA, PATRICIO WILSON AGUINDA AGUINDA, PATRICIO ALBERTO CHIMBO YUMBO, SEGUNDO ANGEL AMANTA MILAN, FRANCISCO MATIAS ALVARADO YUMBO, OLGA GLORIA GREFA CERDA, NARCISA AIDA TANGUILA NARVAEZ, BERTHA ANTONIA YUMBO TANGUILA, GLORIA LUCRECIA TANGUILA GREFA, FRANCISCO VICTOR TANGUILA GREFA, ROSA TERESA CHIMBO TANGUILA, MARIA CLELIA REASCOS REVELO, HELEODORO PATARON GUARACA, CELIA IRENE VIVEROS CUSANGUA, LORENZO JOSE ALVARADO YUMBO, FRANCISCO ALVARADO YUMBO, JOSE GABRIEL REVELO LLORE, LUISA DELIA TANGUILA NARVAEZ, JOSE MIGUEL IPIALES CHICAIZA, HUGO GERARDO CAMACHO NARANJO, MARIA MAGDALENA RODRIGUEZ BARCENES, ELIAS ROBERTO PIYAHUAJE PAYAHUAJE, LOURDES BEATRIZ CHIMBO TANGUILA, OCTAVIO ISMAEL CORDOVA HUANCA, MARIA HORTENCIA VIVEROS CUSANGUA, GUILLERMO VINCENTE PAYAGUAJE LUSITANTE, ALFREDO DONALDO PAYAGUAJE PAYAGUAJE and DELFIN LEONIDAS PAYAGUAJE PAYAGUAJE

Plaintiffs

- and -

CHEVRON CORPORATION, CHEVRON CANADA LIMITED and CHEVRON CANADA FINANCE LIMITED

Defendants

### JUDGMENT AND ORDER

-2-

**THESE MOTIONS:**

a)   by the Defendant Chevron Canada Limited ("Chevron Canada"), for summary judgment dismissing the claim in this action by the Plaintiffs as against Chevron Canada, as set out in Chevron Canada's Notice of Motion dated October 2, 2015 (the "Chevron Canada Motion");

b)   by the Defendant Chevron Corporation ("Chevron Corp."), for summary judgment dismissing the Plaintiffs' claims in this action in and relating to paragraphs 1(c), 1(d), 18-20 and 23-26 of the Amended Amended Statement of Claim as set out in the Notice of Motion of Chevron Corp. dated October 2, 2015 (the "Chevron Corp. Motion"); and

c)   by the Plaintiffs, for an Order for summary judgment that, upon obtaining an Ontario Judgment for the recognition and enforcement of the Ecuadorian Judgment for USD $9.51 billion, plus pre-judgment and post-judgment interest, the shares and assets of Chevron Canada are exigible to satisfy the Judgment Debt of Chevron Corp. as set out in the Plaintiffs' Notice of Motion dated October 23, 2015 (the "Plaintiffs' Summary Judgment Motion")

were heard on September 12 and 13, 2016 at the court house, 330 University Avenue, Toronto.

**ON READING** the affidavit of Frank G. Soler sworn August 7, 2012, the affidavit of Jeffrey C. Wasko sworn August 8, 2012, the affidavit of Frank G. Soler sworn October 7, 2015, the affidavit of Beverley Keyes sworn October 9, 2015, and the affidavit of Frank G. Soler sworn June 13, 2016 and the exhibits to such affidavits, and the cross-examinations conducted on such

-3-

affidavits and the exhibits and answers to undertakings on those cross-examinations (parts of which were filed on a confidential basis pursuant to the Further Protective Order of this Court dated December 21, 2015), and on hearing the submissions of the lawyers for Chevron Canada, Chevron Corp. and the Plaintiffs, judgment having been reserved until this day:

1.   **THIS COURT ORDERS AND ADJUDGES** that the Chevron Canada Motion is granted and that this action against Chevron Canada is dismissed.

2.   **THIS COURT ORDERS** that the Chevron Corp. Motion is granted and that the Plaintiffs' claims in and relating to paragraphs 1(c), 1(d), 18-20 and 23-26 of the Amended Amended Statement of Claim are dismissed as against Chevron Corp.

3.   **THIS COURT ORDERS** that the Plaintiffs' Summary Judgment Motion is dismissed.

4.   **THIS COURT ORDERS** that the issue of costs will be addressed in a separate order.

ENTERED AT / INSCRIT À TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO:

FEB 1 0 2017

PER / PAR:

DANIEL CARLOS LUSITANDE YAIGUAJE *et al.*
Plaintiffs

- and -

CHEVRON CORPORATION *et al.*
Defendants

Court File No. CV-12-9808-00CL

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

Proceeding commenced at Toronto

**JUDGMENT AND ORDER**

**Goodmans LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON M5H 2S7

**Benjamin Zarnett** LSUC#: 17247M
bzarnett@goodmans.ca
**Suzy Kauffman** LSUC#: 41703D
skauffman@goodmans.ca
**Peter Kolla** LSUC#: 54608K
pkolla@goodmans.ca
Tel:   416.979.2211
Fax:   416.979.1234

Lawyers for the Defendant, Chevron Canada Limited

6654846

# EXHIBIT 83

Court File No. CV-12-9808-00CL

## *ONTARIO*
## SUPERIOR COURT OF JUSTICE
## COMMERCIAL LIST

| THE HONOURABLE | ) FRIDAY, THE 26TH DAY OF |
| | ) |
| JUSTICE HAINEY | ) MAY, 2017 |

B E T W E E N:

DANIEL CARLOS LUSITANDE YAIGUAJE, BENANCIO FREDY CHIMBO
GREFA, MIGUEL MARIO PAYAGUAJE PAYAGUAJE, TEODORO GONZALO
PIAGUAJE PAYAGUAJE, SIMON LUSITANDE YAIGUAJE, ARMANDO
WILMER PIAGUAJE PAYAGUAJE, ANGEL JUSTINO PIAGUAJE
LUCITANTE, JAVIER PIAGUAJE PAYAGUAJE, FERMIN PIAGUAJE, LUIS
AGUSTIN PAYAGUAJE PIAGUAJE, EMILIO MARTIN LUSITANDE
YAIGUAJE, REINALDO LUSITANDE YAIGUAJE, MARIA VICTORIA
AGUINDA SALAZAR, CARLOS GREFA HUATATOCA, CATALINA ANTONIA
AGUINDA SALAZAR, LIDIA ALEXANDRIA AGUINDA AGUINDA, CLIDE
RAMIRO AGUINDA AGUINDA, LUIS ARMANDO CHIMBO YUMBO,
BEATRIZ MERCEDES GREFA TANGUILA, LUCIO ENRIQUE GREFA
TANGUILA, PATRICIO WILSON AGUINDA AGUINDA, PATRICIO ALBERTO
CHIMBO YUMBO, SEGUNDO ANGEL AMANTA MILAN, FRANCISCO
MATIAS ALVARADO YUMBO, OLGA GLORIA GREFA CERDA, NARCISA
AIDA TANGUILA NARVAEZ, BERTHA ANTONIA YUMBO TANGUILA,
GLORIA LUCRECIA TANGUILA GREFA, FRANCISCO VICTOR TANGUILA
GREFA, ROSA TERESA CHIMBO TANGUILA, MARIA CLELIA REASCOS
REVELO, HELEODORO PATARON GUARACA, CELIA IRENE VIVEROS
CUSANGUA, LORENZO JOSE ALVARADO YUMBO, FRANCISCO
ALVARADO YUMBO, JOSE GABRIEL REVELO LLORE, LUISA DELIA
TANGUILA NARVAEZ, JOSE MIGUEL IPIALES CHICAIZA, HUGO
GERARDO CAMACHO NARANJO, MARIA MAGDALENA RODRIGUEZ
BARCENES, ELIAS ROBERTO PIYAHUAJE PAYAHUAJE, LOURDES
BEATRIZ CHIMBO TANGUILA, OCTAVIO ISMAEL CORDOVA HUANCA,
MARIA HORTENCIA VIVEROS CUSANGUA, GUILLERMO VINCENTE
PAYAGUAJE LUSITANTE, ALFREDO DONALDO PAYAGUAJE PAYAGUAJE
and DELFIN LEONIDAS PAYAGUAJE PAYAGUAJE

Plaintiffs

- and -

CHEVRON CORPORATION, CHEVRON CANADA LIMITED and
CHEVRON CANADA FINANCE LIMITED

Defendants

## COSTS ORDER

-2-

**MOTIONS** by the Defendants Chevron Canada Limited, Chevron Corporation, and the Plaintiffs for summary judgment (the "Summary Judgment Motions") were heard on September 12 and 13, 2016 at the court house, 330 University Avenue, and determined by Judgment and Order dated January 20, 2017, which ordered in paragraph 4 that the issue of costs would be addressed in a separate order.

**A MOTION** brought by the Plaintiffs under Rule 21.01(1)(b) to strike all the defences pleaded by Chevron Corporation in its Statement of Defence dated October 2, 2015 (the "Strike Motion") was heard on September 14 and 15, 2016 at the court house, 330 University Avenue, and determined by Order dated January 20, 2017, which ordered in paragraph 3 that the issue of costs would be addressed in a separate order.

**ON READING** the written costs submissions of the parties, and for reasons released this day:

1.  **THIS COURT ORDERS** that the Plaintiffs shall pay to Chevron Canada Limited costs in the amount of $533,001.81, inclusive of tax and disbursements, in respect of the Summary Judgment Motions, by June 26, 2017.

2.  **THIS COURT ORDERS** that the Plaintiffs shall pay to Chevron Corporation costs in the amount of $313,283.00, inclusive of tax and disbursements, in respect of the Summary Judgment Motions and the Strike Motion, by June 26, 2017.

_____
CM CHIBA, Registrar
Superior Court of Justice

THIS ORDER BEARS INTEREST at the rate of 2 percent per year commencing on June 26, 2017.

ENTERED AT / INSCRIT À TORONTO
ON / BOOK NO:
LE / DANS LE REGISTRE NO:

JUN 0 2 2017

330 UNIVERSITY AVE.   230 AVE. UNIVERSITY
7TH FLOOR            7E ÉTAGE
TORONTO, ONTARIO    TORONTO, ONTARIO
M5G 1R7             M5G 1R7

PER / PAR

Court File No. CV-12-9808-00CL

DANIEL CARLOS LUSITANDE YAIGUAJE *et al.*    - and -    CHEVRON CORPORATION *et al.*

Plaintiffs    Defendants

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

Proceeding commenced at Toronto

**COSTS ORDER**

**Goodmans LLP**
Barristers & Solicitors
Bay Adelaide Centre
333 Bay Street, Suite 3400
Toronto, ON  M5H 2S7

**Benjamin Zarnett** LSUC#: 17247M
bzarnett@goodmans.ca
**Suzy Kauffman** LSUC#: 41703D
skauffman@goodmans.ca
**Peter Kolla** LSUC#: 54608K
pkolla@goodmans.ca
Tel:    416.979.2211
Fax:    416.979.1234

Lawyers for the Defendant, Chevron Canada Limited

6669359

# EXHIBIT 84

Court File No.: C63309 and C63310
Court File No.:  CV-12-9808-00CL

## COURT OF APPEAL FOR ONTARIO

B E T W E E N:

DANIEL CARLOS LUSITANDE YAIGUAJE, BENACIO FREDY CIMBO
GREFA, MIGUEL MARIO PAYAGUAJE PAYAGUAJE, TEODORO
GONZALO PIAGUAJE PAYAGUAJE, SIMON LUSITANDE YAIGUAJE,
ARMANDO WILMER PIAGUAJE PAYAGUAJE, ANGEL JUSTINO
PIAGUAJE LUCITANTE, JAVIER PIAGUAJE PAYAGUAJE, FERMIN
PIAGUAJE, LUIS AGUSTIN PAYAGUAJE PIAGUAJE, EMILIO MARTIN
LUSITANDE YAIGUAJE, REINALDO LUSITANDE YAIGUAJE, MARIA
VICTORIA AGUINDA SALAZAR, CARLOS GREGA HUATATOCA,
CATALINA ANTONIA AGUINDA SALAZAR, LIDIA ALEXANDRIA
AGUINDA AGUINDA, CLIDE RAMIRO AGUINDA AGUINDA, LUIS
ARMANDO CHIMBO YUMBO, BEATRIZ MERCEDES GREFA TANGUILA,
LUCIO ENRIQUE GREFA TANGUILA, PATRICIO WILSON AGUINDA
AGUINDA, PATRICIO ALBERTO CHIMBO YUMBO, SEGUNDO ANGEL
AMANTA MILAN, FRANCISCO MATIAS ALVARADO YUMBO, OLGA
GLORIA GREFA CERDA, NARCISA AIDA TANGUILA NARVAEZ,
BERTHA ANTONIA YUMBO TANGUILA, GLORIA LUCRECIA TANGUILA
GREFA, FRANCISCO VICTOR TANGUILA GREFA, ROSA TERESA
CHIMBO TANGUILA, MARIA CLELIA REASCOS REVELO, HELEODORO
PATARON GUARACA, CELIA IRENE VIVEROS CUSANGUA, LORENZO
JOSE ALVARADO YUMBO, FRANCISCO ALVARADO YUMBO, JOSE
GABRIEL REVELO LLORE, LUISA DELIA TANGUILA NARVAEZ, JOSE
MIGUEL IPIALES CHICAIZA, HUGO GERARDO CAMACHO NARANJO,
MARIA MAGDALENA RODRIGUEZ BARCENES, ELIAS ROBERTO
PIYAHUAJE PAYAHUAJE, LOURDES BEATRIZ CHIMBO TANGUILA,
OCTAVIO ISMAEL CORDOVA HUANCA, MARIA HORTENCIA VIVEROS
CUSANGUA, GUILLERMO VINCENTE PAYAGUAJE LUSITANDE,
ALFREDO DONALDO PAYAGUAJE PAYAGUAJE and DELFIN LEONIDAS
PAYAGUAJE PAYAGUAJE

Plaintiffs
(Appellants)

and

CHEVRON CORPORATION, CHEVRON CANADA LIMITED and CHEVRON
CANADA FINANCE LIMITED

Defendants
(Respondents)

## FACTUM OF THE RESPONDENTS
## ON THE MOTION FOR SECURITY OF COSTS

June 19, 2017

**LENCZNER SLAGHT ROYCE
SMITH GRIFFIN LLP**

Barristers
Suite 2600
130 Adelaide Street West
Toronto ON  M5H 3P5

Alan J. Lenczner, Q.C. (11387E)
Tel:      (416) 865-3090
Fax:      (416) 865-2844
Email:    alenczner@litigate.com
Brendan F. Morrison (61635B)
Tel:      (416) 865-3559
Fax:      (416) 865-3731
Email:    bmorrison@litigate.com

**KOSKIE MINSKY LLP**

900-20 Queen Street West
Toronto, ON  M5H 3R3

Kirk M. Baert  (30942O)
Tel: (416) 595-2092
Fax: (416) 204-2889
Email: kmbaert@kmlaw.ca

Celeste Poltak  (46207A)
Tel: (416) 595-2701
Fax: (416) 204-2909
Email: cpoltak@kmlaw.ca

Garth Myers (62307G)
Tel: (416) 595-2102
Fax: (416) 977-3316
Email: gmyers@kmlaw.ca

Lawyers for the Appellants/Plaintiffs

TO:        **NORTON ROSE FULBRIGHT CANADA LLP**

Barristers and Solicitors
Suite 3800
Royal Bank Plaza, South Tower
200 Bay Street
P.O. Box 84
Toronto, ON
M5J 2Z4

Robert Frank (35456F)
Tel:    (416) 202-6741
Clarke Hunter, Q.C.
Tel:    1 (403) 267-8292
Fax:    1 (403) 264-5973
Anne Kirker, Q.C.
Tel:    1 (403) 267-9564

Lawyers for the Defendant,
Chevron Corporation

AND TO:    **GOODMANS LLP**

Barristers and Solicitors
Bay Adelaide Centre
333 Bay Street
Suite 3400
Toronto, ON
M5H 2S7

Benjamin Zarnett (17247M)
Tel:    (416) 597-4204
Suzy Kauffman (41703D)
Tel:    (416) 597-6281
Peter Kolla
Tel:    (416) 597-6279

Lawyers for the Defendant,
Chevron Canada Limited

4

AND TO:   **OSLER, HOSKIN & HARCOURT LLP**
          Barristers & Solicitors
          100 King Street West
          1 First Canadian Place
          Suite 6200, P.O. Box 50
          Toronto ON  M5X 1B8

          Larry Lowenstein
          Tel:      (416) 862-6454
          Laura Fric
          Tel: (416) 862-6454
          Eric Morgan
          Tel:      (416) 862-5871

          Lawyers for the Defendant,
          Chevron Corporation

# INDEX

Page

Recognition and Enforcement Actions ........................................................................................... 1

The Supreme Court of Canada ...................................................................................................... 2

Class Action ................................................................................................................................. 5

First Instance Case ....................................................................................................................... 6

Unfettered Discretion ................................................................................................................... 7

Meritorious and Just Appeal ........................................................................................................ 8

Undue Delay ................................................................................................................................ 9

Tactical Motion .......................................................................................................................... 11

The Proceedings ......................................................................................................................... 14

The Appeal ................................................................................................................................. 16

Meritorious Appeal .................................................................................................................... 17

The Execution Act ...................................................................................................................... 20

Costs Appeal .............................................................................................................................. 23

## RECOGNITION AND ENFORCEMENT ACTIONS

### *Security for Costs*

1.    In this very case the Supreme Court of Canada, in September 2015, made it crystal clear
      that it mandated a new approach that courts must employ with respect to all aspects of an
      action for recognition and enforcement of a foreign judgment.  Over and over the Court
      explained that "distinct principles" and a "crucial difference" exist between an action at
      first instance and an action to recognize and enforce a foreign judgment.  This recognition
      and enforcement action is not to be equated with an action at first instance.  The cases
      relied on by the Respondents are all actions at first instance.

2.    The Court stated strongly that the principles of comity and reciprocity for judgments of
      foreign courts were fundamental to recognition and enforcement actions.   These
      principles require that the court facilitate prosecution of the recognition and enforcement
      actions, not raise any barriers to impede it.

3.    The principle of facilitation makes logical sense because, in almost every such action, the
      Plaintiff will be a foreigner, an out of province or country resident, seeking to collect on a
      judgment of debt ordered by a foreign court.  To require such a Creditor Plaintiff to post
      security raises barriers particularly after the Plaintiffs, in this case, have endured an eight
      year trial and two appeals and have succeeded at all levels.  The imposition of a security
      for costs order victimizes the Plaintiffs a second time.

4.    Chevron, many years ago, withdrew all of its assets from Ecuador.  As a consequence the
      Plaintiffs had no choice but to pursue recognition and enforcement of their Judgment in a

foreign jurisdiction and, whichever one they chose, they would be presenting themselves as a non-resident.   A judgment creditor who must seek enforcement of his judgment because of the actions of the judgment debtor withdrawing its assets from the jurisdiction ought not, for fairness and, in equity, face a security for costs motion.  It becomes a barrier and contravenes the principle of "facilitation" articulated by the Supreme Court.  What should Plaintiffs do if they cannot post security for costs?  Let their judgment languish?  That cannot be a just result for a claim to remediate environmental damages, a claim under which the individual 30,000 indigenous persons obtain no direct compensable remuneration.

## THE SUPREME COURT OF CANADA[1]

5.    The Supreme Court of Canada has, in September 2015, detailed the manner in which recognition and enforcement actions are to be approached, an approach which markedly differs from a first instance action:

   (a)    *"In a world in which businesses, assets, and people cross borders with ease, courts are increasingly called upon to recognize and enforce judgments from other jurisdictions.  Sometimes, successful recognition and enforcement in another forum is the only means by which a foreign judgment creditor can obtain its due.", para. 1*

   (b)    *"The dispute underlying the appeal originated in the Lago Agrio region of Ecuador.  The oil-rich area has long attracted the*

---

[1] *Chevron Corp. v. Yaiguaje*, 2015 S.C.C., Brief of Authorities, ("BOA"), Tab 1

*exploration and extraction activities of global oil companies, including Texaco, Inc. ("Texaco"). As a result of those activities, the region is said to have suffered extensive environmental pollution that has, in turn, disrupted the lives and jeopardized the futures of its residents. The 47 respondents (the "plaintiffs") represent approximately 30,000 indigenous Ecuadorian villagers. For over 20 years, they have been seeking legal accountability as well as financial and environmental reparation for harms they allegedly have suffered due to Texaco's former operations, in the region, Texaco has since merged with Chevron.", para. 4*

(c)   *"As this review of the Court's statements on comity shows, the need to acknowledge and show respect for the legal acts of other states has consistently remained one of the principle's core components. Comity, in this regard, militates in favour of recognition and enforcement. Legitimate judicial acts should be respected and enforced, not sidetracked or ignored.", para. 53*

(d)   *"Canadian courts, like many others, have adopted a generous and liberal approach to the recognition and enforcement of foreign judgments.", para. 27*

(e)   *"Facilitating comity and reciprocity, two of the backbones of private international law, calls for assistance, not barriers.", para. 69*

(f)     *"Chevron, a U.S. corporation incorporated in Delaware, was served at its head office in San Ramon, California.   Chevron Canada, a Canadian corporation governed by the Canadian Business Corporations Act, R.S.C. 1985, c. C-44, with its head office in Alberta, is a seventh-level indirect subsidiary of Chevron, which has 100 per cent ownership of every company in the chain between itself and Chevron Canada.", para. 9*

(g)     *"Two considerations of principle support the view that the real and substantial connection test should not be extended to an enforcing court in an action for recognition and enforcement.   First, the <u>crucial</u> difference between an action at first instance and an action for recognition and enforcement is that, in the latter case, the only purpose of the action is to allow a pre-existing obligation to be fulfilled.   Second, the notion of comity, which has consistently underlain actions for recognition and enforcement, militates in favour of generous rules.", para. 42 [Emphasis added]*

6.     The Supreme Court of Canada also stated, repeatedly, that in recognition and enforcement actions, the role of the domestic court is to facilitate collection of the judgment debt and not to raise barriers.   Seeking security for costs of a meritorious appeal is Chevron's attempt to impose an insuperable barrier.

> [43] The following comment made by McLachlin C.J. in *Pro Swing* (although in dissent) also reflects this logic: "Barring exceptional concerns, a court's focus when enforcing a foreign judgment is not on

substantive and procedural law on which the judgment is based, but instead on the obligation created by the judgment itself" (para.77)."

Important consequences flow from this observation. First, the purpose of an action for recognition and enforcement is not to evaluate the underlying claim that gave rise to the original dispute, but rather to assist in enforcing an already-adjudicated obligation. **In other words, the enforcing court's role is not of substance, but is instead one of facilitation:** *Pro Swing*, at para. 11. The court merely offers an enforcement mechanism to facilitate the collection of a debt within the jurisdiction. This entails that the enforcing court does not exercise jurisdiction in the same way as it does in action at first instance. In a first instance case like Van Breda, the focus is on whether the court has jurisdiction to determine merits of a substantive legal claim; in a recognition and enforcement case, the court does not create a new substantive obligation, but instead assists with the fulfillment of an existing one.

### *This Case is a Class Action*

7.  This case is, in pith and substance a class action. In form it cannot, and indeed no recognition and enforcement action can, be a class action in Ontario. But the Court should recognize the underlying claim for its substance, a class action of 47 Plaintiffs representing 30,000 indigenous people.

8.  Class actions, at first instance, were permitted precisely to enhance access to justice and to allow many persons to collectively advance claims arising out of a common occurrence, be it factual or legal. Environmental claims are a prime example of the quintessential class action. Having succeeded in Ecuador in obtaining a judgment, and having also, in addition, impliedly succeeded in Ontario in a obtaining judgment for recognition and enforcement of the Ecuadorian judgment, it would be contrary to the Supreme Court of Canada's mandated principle to erect the barrier of security for costs.

9.  Class action claims, even at first instance, benefit from a much wider exercise of discretion where the judge can take into account whether the action is in public interest, is a test case or raises a novel point of law in diminishing or eliminating a costs order against

a class. This case encompasses all three criteria. And when viewed in the context of a successful judgment in Ecuador and impliedly, a successful judgment in Ontario, no barrier to the appeals should be imposed by the Court.[2]

## APPLICABLE PRINCIPLES IN FIRST INSTANCE CASES

10.   In any event, and in the alternative, principles applicable to actions at first instance always permit a meritorious appeal to proceed.

11.   Rule 63.01 provides that there is an automatic stay, pending disposition of the appeal of any provision of an order for the payment of money:

> 63.01(1) The delivery of a notice of appeal from an interlocutory of final order stays, until the disposition of the appeal, any provision of the order for the payment of money, except a provision that awards support or enforces a support order.

12.   This includes any Order for the payments of costs. Were it not for the mere fact that the Appellants reside outside Ontario, the only circumstance relied upon by the Respondents, there could not be a request for an order for security for costs pending appeal.

13.   A most important fact to remember is that the monies owed by Chevron Corp. are not to be paid to the 30,000 indigenous people represented by the 47 Appellants but to a Trustee who is required to remediate the lands and waters damaged by Chevron Corp.'s drilling and oil exploitation activities. The benefit to the Appellants is a return to a healthy living standard, clean water, safe food and improved health.

---

[2] S. 12 and 31(1) of the *Class Proceeding Act*

14.   The following principles apply to the determination whether security for costs will be granted. The application of these principles to the facts and circumstances of the pending appeals should lead to the conclusion that no security for costs be granted.

**BROAD DISCRETION – JUST AND MERITORIOUS PROCEEDING**

15.   The Court retains a broad discretion whether or not to grant security for costs. A Respondent is not entitled as of right to an Order for security for costs of an appeal. The overarching principle to be applied to all the circumstances is the fairness of the Order sought. Where a claim involves the issue of exigibility of assets, after the Plaintiffs, Appellants succeeded in an 8 year trial in Ecuador and implicitly obtaining a Judgment in Ontario enforcing the Ecuadorian judgment it is just and right that the matter proceed to appeal without restriction or impediment.

> [16] Rule 61.06(1) affords three discrete bases upon which a judge may order an appellant to provide security for costs of an appeal:
>
> i.    there is good reason to believe that the appeal is frivolous and vexatious and that the appellant has insufficient Ontario assets to pay the appeal costs;
>
> ii.   an order for security for costs could be made again the appellant under Rule 56.01; or
>
> iii.  there is some other good reason to order security for costs.
>
> [17] The language of Rule 61.06 is permissive, not mandatory. A respondent is not entitled as of right to an order for security for costs for the appeal. The permissive "may" and not the imperative or mandatory "shall" frames the authority to make the order. Even if the respondent meets the requirements in the applicable paragraph of Rule 61.06(1), the permissive "may" would seem to reserve to the motion judge a vestige of discretion to refuse the order. The overarching principle to be applied to all the circumstances is the justness of the order sought.[3]

---

[3] *Scott Pickard and London Police Services Board*, 2010 ONCA 643 at paras. 16 and 17, BOA, Tab 2

16.     The enforcement of the Ecuadorian Judgment from the National Court of Cassation is a
        just proceeding. The collection of a judgment debt to remediate lands and waters is on all
        fours with the Supreme Court's statements on comity:

> [53] As this review of the Court's statements on comity shows, the need to
> acknowledge and show respect for the legal acts of other states has
> consistently remained one of the principle's core components. Comity, in
> this regard, militates in favour of recognition and enforcement.
> Legitimate judicial acts should be respected and enforced, not sidetracked
> or ignored.
>
> [1] In a world in which business, assets, and people can cross borders with
> ease, courts are increasingly called upon to recognize and enforce
> judgments from other jurisdictions. Sometimes, successful recognition
> and enforcement in another forum is the only means by which a foreign
> judgment creditor can obtain its due.

17.     This Court should exercise its discretion in favour of allowing these appeals to proceed
        and to be disposed on its merits.

## A MERITORIOUS APPEAL TRUMPS ALL OTHER CONSIDERATIONS

18.     There is ample authority for the proposition that Courts are reluctant to deprive a worthy
        litigant of the opportunity to have his or her claim adjudicated when it is not plainly
        devoid of merit:

> [18] Despite the value that the law places on finality, there will be
> situations in which other legitimate interests outweigh finality concerns.
> In *Larabie v. Montfils* (2004), 44 C.P.C. (5th) 66 (Ont. C.A.), Blair J.A.
> refused to order security for costs despite the fact that the respondent was
> impecunious and had failed to pay previous costs awards. He refused
> because a "worthy but impecunious litigant" should not be deprived of the
> opportunity to have his claim adjudicated "when it is not plainly devoid of
> merit". Blair J.A. was satisfied that ordering security for costs would

prevent the appellant from continuing with the appeal. I am satisfied that this case presents a similar situation.[4]

19.     The issues in these summary judgment appeals are neither frivolous nor vexatious. They are meritorious, indeed likely to succeed. The collection of a debt owed by the Parent Chevron Corp. ("Chevron Parent") can be collected from the shares and assets of its 100% wholly owned subsidiary Chevron Canada. As the Supreme Court of Canada stated in this very case regarding Chevron Canada, at paragraphs 92 and 93:

> "The subject matter of recognition and enforcement proceedings is the collection of a debt. A debt is enforceable against any and all assets of a given debtor, not merely those that may have a relationship to the claim."

> "In this respect, the subject matter of the claim is not the Ecuadorian events that led to the foreign judgment to which Chevron Canada is a stranger, but rather, at least arguably, the collection of a debt using shares and assets that are alleged to be available for enforcement purposes. In an enforcement process like this for the collection of a debt against a third party, assets in the jurisdiction through the carrying on of business activities are undoubtedly tied to the subject matter of the claim. From that standpoint, seizeable assets are not merely the subject matter of the dispute, they are its core. In this regard the third party is the direct object of the proceedings." [emphasis added]

**UNDUE DELAY**

20.     Security for costs will not be awarded where there has been delay on behalf of the moving party. The appeals in this matter have been fixed to be heard on October 10 and 11, 2017. The appeals have been perfected by the Appellants; Facta and all other materials have been served and filed.

> [37] I decline to award security for costs for the appeal, again because GM's delay and prejudice it has caused.
>
> ...

---

[4] *Royal Bank of Canada v. Korman*, 2009 ONCA 590 at para. 18, BOA, Tab 3; *J.L v. Monfils*, [2004] O.J. No. 179 (C.A.) at para. 17, BOA, Tab 4

> [42] GM has, by its actions, allowed Trillium to perfect its appeal at great
> expense. This is no small matter. The complicated nature of the appeal is
> evidenced by the length of the factum filed by Trillium, which runs over
> 90 pages and the supporting materials that have been prepared and filed, it
> would not be just to make an order for security for costs at this late stage.[5]

21.   Chevron Parent is a sophisticated litigant with the benefit of a vast and highly
      sophisticated legal team. It therefore ought to have been well aware of the possibility of
      bringing a motion for security for costs in Canada for many years. This Honourable Court
      should view its motion now with a high degree of suspicion and circumspection. Security
      for costs motions may not be granted in favour of defendants who bring them as veiled
      summary judgment motions to bar meritorious claims.[6]

22.   Chevron Corp. has known for more than 20 years that the Plaintiffs reside solely in
      Ecuador. Chevron Parent has never sought costs in the eight years of litigation in the
      U.S.A. (1993 – 2002), in nine years of litigation in Ecuador (2003 – 2012) nor has it or
      Chevron Canada sought security for costs in five years of litigation in Canada (2012 –
      2017). If a regime for security for costs was available in Ecuador it can be inferred that,
      Chevron has intentionally delayed or has known that the Plaintiffs were impecunious and
      unable to post security for costs. If such a regime was not available, then it ought not to be
      imposed in an action for recognition and enforcement where the principle is facilitation of
      the judgment of a foreign court.

23.   Most notably Chevron Parent and Chevron Canada served and filed their Statements of
      Defence in September 2015 after the Supreme Court of Canada ruled that the Ontario

---

[5] *Trillium Motor World Ltd. and General Motors of Canada Limited and Cassels Brock & Blackwell LLP*, 2016
ONCA 702 at paras. 37 and 42, BOA, Tab 5
[6] *Intellibox Concepts Inc. v. Intermec Technologies et al.*, [2005] O.J. No. 1087 (S.C.J.) at para. 6, BOA, Tab 6

Court had jurisdiction over those two companies.  From then until November 2016 there was voluminous production of documents (7,000 pages), cross examinations on Affidavits, interlocutory motions and then four days of motions before Justice Hainey in September and November, 2016.  No motion for security for costs was brought during this entire period:

> [10] In this case 137 did not move for security before trial and only moved on the eve of the date set for oral argument of these appeals.  While this might not always be fatal to a claim for security for the trial costs, it is a factor to be taken into account in relation to the delay point I will consider later in this endorsement.

> [12] The claim for security for costs was brought on the eve of the date set for oral argument of these appeals.  All of the information relied upon by 137 in support of its contention that Ravenda has no assets has been available to it for a considerable period of time.  Ravenda had made substantial disclosure through the discovery process of its financial statements.  137 proceeded in these actions for several years without requesting security for costs.  I do not accept the submission that 137 had to wait until after the two appeals are joined together to be argued in this Court.  While there are cases in which security costs has been ordered after perfection of an appeal, it remains within the discretion of the judge of this Court to refuse an order on grounds of delay:  see *Trillium Motor World Ltd. v. General Motors of Canada Ltd.* 2015 ONCA 702 at para. 43.[7]

## A TACTICAL NOT BONA FIDE MOTION

24.    The motions now brought on the eve of the appeal are tactical and aimed at avoiding the appeal.  This Court has stated:

> [67] Once the Ecuadorian courts made their decision, Chevron chose not to abide by them.

> Indeed, Chevron sought and obtained a global injunction from a New York federal district court barring the enforcement of the Ecuadorian judgment in any court in any country in the world:  Chevron Corp. v. Donziger, 768 F. Supp. 2d 581 (S.D.N.Y. 2011).  The United States Court

---

[7] Endorsement of Sharpe J.A., *Ravenda Homes Ltd. v. 1372708 Ontario Inc.*, M47591, BOA, Tab 7

12

of Appeals for the Second Circuit reversed this decision and remitted the case to the district court with instructions to dismiss Chevron's declaratory judgment claim in its entirety: Chevron Corporation v. Naranjo, 667 F. 3d 232 (2d Cir. 2012).

[68] Now the Ecuadorian plaintiffs have decided to try to have the Ecuadorian judgment enforced in Ontario. Chevron's response is to contest the jurisdiction of the Ontario court; it has not attorned to its jurisdiction.

[69] The picture from the above history is an obvious one. For 20 years, Chevron has contested the legal proceedings of every court involved in this litigation – in the United States, Ecuador and Canada. Chevron even sought and briefly obtained, a global injunction against enforcement of the Ecuadorian judgment.

[71] In the end, I agree with what Pepall J. said in BNP Paribas (Canada), at para. 12:

As set out in Morguard v. De Savoye Investments Ltd. [1990] 3 S.C.R. 1077, the purpose of comity is to secure the ends of justice and contemplated the recognition of judgments in multiple jurisdictions. The court should grant its assistance in enforcing an outstanding judgment, not raise barriers.

[72] This case cries out for assistance, not unsolicited and premature barriers.[8]

25.    Although the Chevron companies brought these motions on non-residency they have, disingenuously, raised the issue of impecuniosity. Chevron knows from 20 years of litigation that neither the remediation trustee nor the indigenous appellants can fund the litigation. Chevron has known about past third party funding and has impeded any future funding:

(a)    In December 2012 Chevron Corp. brought a claim against Russell DeLeon, a funder of the Ecuadorian litigation seeking damages and an injunction against further funding of any prosecution of the action or any enforcement proceedings. The claim was settled by Settlement Agreement of February 13, 2015. The DeLeon parties agreed "irrevocably and forever to cease funding or in any way deliberately aiding or abetting…" the Plaintiffs.[9]

---

[8] *Yaiguaje v. Chevron Corporation*, 2013 ONCA 758, BOA, Tab 8
[9] Responding Motion Record, Tab 1

(b)    In June 2014 it brought a claim against a funder, Woodsford Litigation Funding Limited, in the Supreme Court of Gibraltar claiming an injunction against it from any further funding of the case or its enforcement efforts.   That claim was settled by Settlement Agreement on May 1, 2015 whereby the Woodsford parties agreed to cease funding or aiding directly or indirectly the plaintiffs in the matter.[10]

(c)    By Settlement and Release Agreement dated May 7, 2014, Chevron Corp. agreed with Patton Boggs, a U.S. law firm that had "represented or advised" the Appellants with respect to the Ecuadorian proceedings "including in connection with efforts to enforce the Lago Agrio Judgment" (the Ecuadorian Judgment) that Patton Boggs would immediately cease and desist from all further assistance to the Appellants and that Patton Boggs would pay USD 15 million to Chevron's attorneys and that Patton Boggs' partners would make themselves available for deposition by Chevron including producing its work product documents.[11]

26.    Lastly, as Nordheimer J. concluded in *Intellibox Concepts Inc. v. Intermec Technologies et al.*, security for costs should not be ordered where counsel is working on a contingency fee basis, as is the case here:

> [12]   As I have noted, the logical extension of ordering security for costs to be posted by an impecunious corporate plaintiff by reason of the fact that its solicitors are operating on a contingency fee basis is, in effect to require those solicitors to provide the security.  Solicitors who make legal services available based on contingency fee arrangements with clients, who could not otherwise afford to litigate a claim, assume the risk that they may not be paid for their work unless a favourable result is achieved.  To require those solicitors to assume the additional burden of posting security for costs, with the concomitant risk of losing those funds (in additional to going unpaid for their own services), would impose a significant disincentive to contingency fee arrangements would run contrary to the very rationale by which they are permitted.  In my view, it wold be incongruous to interpret the Rules of Civil Procedure in such a fashion.[12]

---

[10] Responding Motion Record, Tab 2
[11] Responding Motion Record, Tab 3
[12] *Intellibox Concepts Inc. v. Intermec Technologies et al.*, [2005] O.J. No. 1087 (S.J.C.) at para. 12, BOA, Tab 6

## THE PROCEEDINGS

27.  The core of this case is about Chevron Parent's refusal to pay $9.51 billion to remediate 1,500 square kilometres of toxic contamination that is deposited, from 1972 to 1990, on the lands, rivers, streams and ponds in the Ecuadorian Amazon.  The Appellants represent 30,000 indigenous people who drink and bathe in polluted waters, eat crops grown on contaminated lands, and continue to suffer illness, disease, and premature deaths.  This case is not about preventing potential damage.  It is about paying for the remediation of massive environmental contamination.  The Appellants will not receive any monetary proceeds.  Their struggle is to once again eat healthy food, drink clean water, breathe unpolluted air and stop health deterioration.

28.  In 1993, the Appellants filed a class action against Texaco, Inc., the predecessor to Chevron, in the U.S.A.  Chevron argued that the class action properly belonged in Ecuador as it had everything to do with Ecuador and nothing to do with the U.S.A.  The United States' 2nd Circuit Court of Appeals granted Chevron its wish based on promises and undertakings given to the Court which included:

   a)  a promise to accept service of process in Ecuador and not to object to the civil jurisdiction of a court of competent jurisdiction in Ecuador;

   b)  a recognition of the binding nature of any judgment issued in Ecuador; and

   c)  "Texaco also offered to satisfy any judgments in Plaintiffs' favor, reserving its right to contest their validity only in the limited circumstances permitted by New York's Recognition of Foreign Country Money Judgment Act."

Chevron now resiles from those undertakings and states:

> We're going to fight this until hell freezes over. And then we'll fight it out
> on the ice.[13]

29.    From 2003 to February 2011, Chevron defended itself vigorously in an eight year trial that featured 216,000 pages of evidence, examinations and cross-examinations, more than 100 expert reports, 50 well-site visits and approximately 1,000 in-trial motions.    A Remediation Judgment was issued on February 14, 2011.   Chevron appealed to the Intermediate Court of Appeal, which undertook a *de novo* review of the evidentiary record and legal submissions.   Chevron fully participated by filing significant, comprehensive briefs.    The Intermediate Court of Appeal rendered its Judgment in January 2012 upholding the Remediation Award.   Chevron then further appealed to Ecuador's National Court of Cassation which upheld the Remediation Award of $9.51 billion to be paid to a trustee to remediate the contaminated lands and water and to provide health clinics to treat the thousands of ill and diseased indigenous people.

30.    In 2012 in response to an Amended Statement of Claim, Chevron Parent and Chevron Canada each filed jurisdiction motions contesting the jurisdiction of the Superior Court of Justice to hear the recognition and enforcement action.   The Chevron companies lost the jurisdiction arguments before Brown J., as he then was, before an unanimous Court of Appeal and before a unanimous SCC, which rendered its judgment in September 2015.

---

[13] *Yaiguaje v. Chevron Corporation*, 2013 ONCA 758 at para. 74, BOA, Tab 8

**SUMMARY JUDGMENT BEING APPEALED ON OCTOBER 10 AND 11, 2017**

31.  Chevron Canada and Chevron Parent brought motions for summary judgment to strike the

action against the Chevron Canada, Chevron Parent's subsidiary, on the premise that there

could only be an enforceable judgment in Ontario against the assets of Chevron Parent.

32.  The Supreme Court of Canada determined that Chevron Canada, not a party to the

Ecuadorian judgment and a 7th level wholly-owned subsidiary of Chevron Parent, was a

proper defendant in Ontario where there was a claim for execution of its shares and assets.

The SCC stated that all assets of a judgment debtor were exigible and that Chevron

Canada was, arguably, an exigible asset.

> [92] In the recognition and enforcement context, it would hardly make
> sense to require that the carrying on of business in the province relate to
> the subject matter of the dispute.  The subject matter of recognition and
> enforcement proceedings is the collection of a debt.  A debt is enforceable
> against any and all assets of a given debtor, not merely those that may have
> a relationship to the claim.
>
> [93] Second, one aspect of the plaintiffs' claim in this case is for
> enforcement of Chevron's obligation to pay the foreign judgment using
> shares and assets of Chevron Canada to satisfy its parent corporation's
> debt obligation.  In this respect, the subject matter of the claim is not the
> Ecuadorian events that led to the foreign judgment to which Chevron
> Canada is a stranger, but rather, at least arguably, the collection of a debt
> using shares and assets that alleged to be available for enforcement
> purposed.  In an enforcement process like this for the collection of a debt
> against a third party, assets in the jurisdiction through the carrying on of
> business activities are undoubtedly tied to the subject matter of the claim.
> From that standpoint, seizable assets are not merely the subject matter of
> the dispute, they are its core. [emphasis added]

33.  The Supreme Court of Canada also stated, repeatedly, that in a recognition and

enforcement action of a foreign judgment, the role of the domestic court is to facilitate collection

of the judgment debt and not to raise barriers.  Seeking security for costs of a meritorious appeal is

Chevron's attempt to impose an insuperable barrier.

[43] The following comment made by McLachlin C.J. in *Pro Swing* (although in dissent) also reflects this logic: "Barring exceptional concerns, a court's focus when enforcing a foreign judgment is not on substantive and procedural law on which the judgment is based, but instead on the obligation created by the judgment itself" (para.77)."

Important consequences flow from this observation. First, the purpose of an action for recognition and enforcement is not to evaluate the underlying claim that gave rise to the original dispute, but rather to assist in enforcing an already-adjudicated obligation. **In other words, the enforcing court's role is not of substance, but is instead one of facilitation:** *Pro Swing*, at para. 11. The court merely offers an enforcement mechanism to facilitate the collection of a debt within the jurisdiction. This entails that the enforcing court does not exercise jurisdiction in the same way as it does in action at first instance. In a first instance case like Van Breda, the focus is on whether the court has jurisdiction to determine merits of a substantive legal claim; in a recognition and enforcement case, the court does not create a new substantive obligation, but instead assists with the fulfillment of an existing one. [emphasis added]

## A MERITORIOUS APPEAL

34.     Whose asset is Chevron Canada? It must be someone's. The motion judge is incorrect when he characterizes it as an orphan.

35.     At paragraph 23 the motions judge identifies the issue:

> [23]   The parties agree that this is an appropriate case for summary judgment. Therefore, the only issues that I must decide on this motion are the following:
>
> (a)   Are the shares and assets of Chevron Canada exigible and available for execution and seizure pursuant to the Execution Act to satisfy the Ecuadorian judgment against Chevron?
>
> (b)   If they are not, should Chevron Canada's corporate veil be pierced so that its shares and assets are available to satisfy the Ecuadorian judgment against its indirect parent, Chevron?

36.     Hainey J. answered the first question at paragraph 36 with the astonishing conclusion that Chevron Canada is not an asset of anyone, not even of its direct parent Chevron Canada Capital

Corporation ("**CCCC**"). In error, the motion judge, at the very outset of his analysis, embarked on a wrong principle which coloured the remainder of his analysis:

> Chevron Canada is not an asset of Chevron. It is a separate legal person. It is not an asset of any other person including its own parent, CCCC. The Supreme Court of Canada confirmed this in *BCE Inc. v. 1976 Debentureholders*, where the court stated, "While the corporation is ongoing, shares confer no right to its underlying assets.[14]

37.    The action in Ontario is simply one for the collection of a judgment debt, and not one to establish liability. "Different principles" and "a crucial difference" underlie "actions for recognition and enforcement as opposed to actions at first instance." Hainey J failed to follow the mandate of the Supreme Court of Canada and approached the central issue as though this were an action at first instance.

> [42] Two considerations of principle support the view that the real and substantial connection test should not be extended to an enforcing court in an action for recognition and enforcement. First, the crucial difference between an action at the first instance and an action for recognition and enforcement is that, in the latter case, the only purpose of the action is to allow a pre-existing obligation to be fulfilled. Second, the notion of comity, which has consistently underlain actions for recognition and enforcement, militates in favour of generous enforcement rules.[15]

38.    Hainey J. also misunderstood and misapplied *BCE Inc. v. 1976 Debentureholders*. It does not hold that, after judgment, shareholders cannot seize assets. Quite the contrary.

39.    The only relevant facts are those that follow:

- Chevron Canada is a 7th level wholly-owned subsidiary of Chevron Parent.

---

[14] Reasons of Hainey J. at para. 36, Motion Record of Chevron Canada Limited (Security for Costs), Tab 2G

[15] *Chevron Corp. v. Yaiguaje* at para. 42, BOA, Tab I

- All intervening subsidiaries are 100% wholly-owned by Chevron Parent.

- All intervening subsidiaries are all holding companies only – holding title to all the shares of each subsidiary in the line below it.

- None of the intervening wholly-owned subsidiaries are engaged in Chevron Parent's business activities, the exploration for, production of and distribution and sale of oil and gas.

- Chevron Parent itself is a merely a holding company. As the motion judge found "Chevron does not itself engage in the exploring, producing, refining or marketing petroleum products; those activities are carried on by its indirect subsidiaries."

- Every single director and officer of Chevron Parent's wholly-owned subsidiaries is a direct employee of Chevron Parent or employees of a direct or indirect subsidiary of Chevron Parent. There is not one outside, independent person in the chain of officers and directors. For example, Frank Soler and Karl Endries, who are directors of four of the subsidiaries, are employees of Chevron Parent in the corporate governance and secretary's office.

- As this Court stated at paragraph 38 of its Reasons on the jurisdiction motion: "Furthermore Chevron's [Parent] income is wholly derived from dividends from indirect subsidiaries that carry out its actual business functions, which include Chevron Canada."[16]

40.    None of these facts are in dispute. Chevron Parent owns a subsidiary that in turn owns a subsidiary, all the way down the line to Chevron Canada. Chevron Parent is a holding company that does not itself engage in the extraction or production activities of the business. All revenue obtained by it flows up from its operating subsidiaries including Chevron Canada.

41.    Does Chevron Parent own Chevron Canada? Yes. Can Chevron Parent sell Chevron Canada? Yes. Can Chevron Parent replace the directors of Chevron Canada? Yes. Can Chevron Parent wind up or dissolve Chevron Canada and distribute its assets? Yes. Who else owns Chevron Canada? No one.

---

[16] *Yaiguaje v. Chevron Corp.*, 2013 ONCA 758 at para. 38, BOA, Tab 8

42.     The above criteria are the essential hallmarks of ownership.  100% ownership by Chevron Parent of all the shares of every company in the chain means ownership of the shares and assets of Chevron Canada.

**THE EXECUTION ACT**

43.     To conclude otherwise, as the motion judge did, means that a polluter who has been adjudged liable in Ontario to pay USD $9.51 billion for remediation costs can escape its obligations because all its assets are held by a subsidiary. Such a proposition is illogical, makes a mockery of what ownership means, is contrary to justice, and is an escape into fiction.  As a matter of law, such an outcome is in direct violation of the *Execution Act*, which intended to use the broadest definition of "interest" or "right" as possible.[17]

44.     The motion judge erroneously interpreted and misapplied the *Execution Act*. In fact, he never addressed or analyzed the words of the *Execution Act*. He never offered any explanation for the plain language of its provisions.

45.     The sections of the *Execution Act* that state what may be seized in respect of a judgment debt contain words of the widest import and reach, including "the interest … in a security or a security entitlement", "dividends", "distributions", "interest" and "other rights to payment in respect of a security", any "equitable right" or "**other right**":

> **Seizure of execution debtor's interest in security, security entitlement**
>
> 14. (1)  The interest of an execution debtor in a security or security entitlement may be seized by the sheriff in accordance with sections 47 to 51 of the *Securities Transfer Act, 2006*.
>
> Seizure includes dividends, other rights to payment

---

[17] *Execution Act*, R.S.O. 1990, c. E.24, s. 18, Respondent's Factum, Schedule "B"

> 14(3)   Every seizure and sale made by the sheriff shall include all dividends, distributions, interest and other rights to payment in respect of the security, if issued by an issuer incorporated or otherwise organized under Ontario law, or in respect of the security entitlement and, after the seizure becomes effective, the issuer or securities intermediary shall not pay the dividends, distributions or interest or give effect to other rights to payment to or on behalf of anyone except the sheriff or a person who acquires or takes the security or security entitlement from the sheriff.
>
> 18(1)   <u>The sheriff may seize and sell any equitable or other right, property, interest or equity of redemption in or in respect of any goods, chattels or personal property,</u> including leasehold interests in any land of ...[18]

46.     The language of the *Execution Act* extends far beyond the confines of legal title. The *Act* would not be necessary if it only addressed assets directly held by a judgment debtor. By including broad statutory language indicating that it covers not only legal assets of the judgment debtor but "**equitable**" rights or even more broadly any "**other right**", "**property**", "**interest**", the Legislature clearly intended that a judgment debtor should pay its obligations; and that technical arguments based on direct ownership should not allow any escape from payment of a judgment debt. Courts are required to facilitate the collection of a judgment debt, not raise technical arguments as barriers.

47.     As this Court found, millions of dollars of dividends flow annually from Chevron Canada to Chevron Parent.[19] The motion judge did not address the ability to seize those dividends. Section 14(3) of the *Act* makes it clear that dividends can be seized. The motion judge completely ignored the finding of this Court regarding dividends and the Act's authorization for their seizure. And it makes no logical sense that if dividends can be seized, that the assets that generate those dividends cannot.

---

[18] *Execution Act*, R.S.O. 1990, c. E.24, ss. 14(1) and (3), Respondents' Factum, Schedule "B"

[19] *Yaiguaje v. Chevron Corporation, 2013 ONCA 758* at para. 38, BOA, Tab 8

48.    Likewise, as the Supreme Court of Canada found in *BCE*, on a wind-up, shareholders have a right to a proportionate share of the assets. Shareholders therefore have a conditional right to the company's assets – a "right" within the meaning of the *Execution Act*.

49.    The full Factum is included at Tab 4 of the Responding Motion Record to demonstrate the meritorious arguments being advanced, regarding corporate separateness and piercing the corporate veil.[20]

## QUANTUM – IN THE ALTERNATIVE

50.    If security for costs is ordered, the quantum for both Respondents should not exceed $50,000 in the aggregate.

51.    The legal arguments to be advanced in the Court of Appeal will be the fourth time they have been canvassed.  A review of the excerpts from the Facta before the Supreme Court of Canada and before Hainey J. plainly demonstrate identical and recycled arguments regarding corporate separateness and veil piercing.  Little preparation will be necessary to press those arguments for the fourth time.  These excerpts are included in the Supplementary Appeal Book and Compendium to the Costs Appeal which has been perfected.  They are also included in the Responding Motion Record.[21]

52.    The positions of Chevron Canada and of Chevron Parent on the factual and legal arguments are identical.  Both seek only one remedy , the removal of Chevron Canada as a

---

[20] Factum of the Appellants on the Appeal, Responding Motion Record, Tab 4

[21] Excerpts of Factum of Chevron Corporations, Responding Motion Record, Tab 5

Defendant in the action. Counsel for Chevron Canada will carry the argument and counsel for Chevron Parent will adopt those arguments with little addition.

## APPEAL OF THE COSTS BELOW

53.　If the appeals are allowed, as is probable, the Respondents will be deprived on their costs and, instead Costs, will be awarded to the Appellants both of the motions below and the appeals.

54.　If the appeals are dismissed, then the Appellants have challenged the excessive quantum of costs awarded by Hainey J. Hainey J.'s costs award was issued on May 26, 2017 after the main appeals were perfected. As a consequence the Appellants have filed a supplementary appeal regarding the quantum of costs and have perfected that appeal. The Factum is included at Tab 6.[22]

55.　A few of the errors of law and of principle are:

(a)　The motions judge allowed form to trump substance. He failed to appreciate that the underlying action was a class action and that the recognition and enforcement of a foreign judgment could never be presented as a class action;

(b)　As a result he failed to apply the principles of novel point of law, test case and public interest which apply not only to class actions but more generally. Had he done so he not have awarded costs to the Respondents or would have done so in a very modest amount pursuant to the principles expounded in *Edward v. Law Society of Upper Canada*, [1998] O.J. No. 6192, *Brown v. Canada (Attorney General)*, [2013] O.J. No. 174 at para. 59, *McCracken v. Canadian National*

---

[22] Factum of the Appellants on Costs Appeal, Responding Motion Record, Tab 6

*Railway Co.*, [2012] O.J. No. 5716 at para. 82 and *Moyes v. Fortune Financial Corp.*, [2002] O.J. No. 4298.

**RELIEF REQUESTED**

56.    It is respectfully submitted that the motions be dismissed with costs.

**ALL OF WHICH IS RESPECTFULLY SUBMITTED** this 19th day of June, 2017.

Alan J. Lenczner, Q.C.

Brendan F. Morrison

Kirk M. Baert

Celeste Poltak

Garth Myers

**LENCZNER SLAGHT ROYCE
SMITH GRIFFIN LLP**

Barristers
Suite 2600
130 Adelaide Street West
Toronto ON  M5H 3P5

Alan J. Lenczner, Q.C. (11387E)
Tel:      (416) 865-3090
Fax:      (416) 865-2844
Email:    alenczner@litigate.com
Brendan F. Morrison (61635B)
Tel:      (416) 865-3559
Fax:      (416) 865-3731
Email:    bmorrison@litigate.com

**KOSKIE MINSKY LLP**

900-20 Queen Street West
Toronto, ON  M5H 3R3

Kirk M. Baert  (30942O)
Tel: (416) 595-2092
Fax: (416) 204-2889
Email: kmbaert@kmlaw.ca

Celeste Poltak  (46207A)
Tel: (416) 595-2701
Fax: (416) 204-2909
Email: cpoltak@kmlaw.ca

Garth Myers (62307G)
Tel: (416) 595-2102
Fax: (416) 977-3316
Email: gmyers@kmlaw.ca

Lawyers for the Plaintiffs (Appellants)

26

**SCHEDULE "A"**

**LIST OF AUTHORITIES**

1. *Chevron Corp. v. Yaiguaje*, 2015 SCC 42

2. *Scott Pickard and London Police Services Board*, 2010 ONCA 643

3. *Royal Bank of Canada v. Korman*, 2009 ONCA 590

4. *J.L v. Monfils*, [2004] O.J. No. 179 (C.A.)

5. *Trillium Motor World Ltd. and General Motors of Canada Limited and Cassels Brock & Blackwell LLP*, 2016 ONCA 702

6. *Intellibox Concepts Inc. v. Intermec Technologies et al.*, [2005] O.J. No. 1087 (S.J.C.)

7. Endorsement of Sharpe J.A., Ravenda Homes Ltd. v. 1372708 Ontario Inc., M47591

8. *Yaiguaje v. Chevron Corporation*, 2013 ONCA 758

## SCHEDULE "B"

## TEXT OF STATUTES, REGULATIONS & BY-LAWS

### *Class Proceedings Act, 1992, S.O. 1992, c. 6*

12   The court, on the motion of a party or class member, may make any order it considers appropriate respecting the conduct of a class proceeding to ensure its fair and expeditious determination and, for the purpose, may impose such terms on the parties as it considers appropriate. 1992, c. 6, s. 12.

31(1)  In exercising its discretion with respect to costs under subsection 131 (1) of the Courts of Justice Act, the court may consider whether the class proceeding was a test case, raised a novel point of law or involved a matter of public interest.  1992, c. 6, s. 31 (1).

### *Execution Act, R.S.O. 1990, c. E.243*

14(1) The interest of an execution debtor in a security or security entitlement may be seized by the sheriff in accordance with sections 47 to 51 of the Securities Transfer Act, 2006.  2006, c. 8, s. 143 (1).

14(3) Every seizure and sale made by the sheriff shall include all dividends, distributions, interest and other rights to payment in respect of the security, if issued by an issuer incorporated or otherwise organized under Ontario law, or in respect of the security entitlement and, after the seizure becomes effective, the issuer or securities intermediary shall not pay the dividends, distributions or interest or give effect to other rights to payment to or on behalf of anyone except the sheriff or a person who acquires or takes the security or security entitlement from the sheriff. 2006, c. 8, s. 143 (1).

18. (1) The sheriff may seize and sell any equitable or other right, property, interest or equity of redemption in or in respect of any goods, chattels or personal property, including leasehold interests in any land of the execution debtor, and, except where the sale is under an execution against goods issued out of the Small Claims Court, the sale conveys whatever equitable or other right, property, interest or equity of redemption the debtor had or was entitled to in or in respect of the goods, chattels or personal property at the time of the delivery of the execution to the sheriff for execution, and, where the sale is under an execution against goods issued out of the Small Claims Court, the sale conveys whatever equitable or other right, property, interest or equity of redemption the debtor had or was entitled to in or in respect of the goods, chattels or personal property at the time of the seizure.  R.S.O. 1990, c. E.24, s. 18; 2010, c. 16, Sched. 2, s. 3 (26).

DANIEL CARLOS LUSITANDE YAIGUAJE et al.          -and-          CHEVRON CORPORATION et al.
Plaintiffs                                                                          Defendants
(Appellants)                                                                       (Respondents)

Court File No.: C63309 and C63310
Court File No.:  CV-12-9808-00CL

**COURT OF APPEAL FOR ONTARIO**

PROCEEDING COMMENCED AT TORONTO

**FACTUM OF THE RESPONDENTS**
**ON THE MOTION FOR SECURITY OF COSTS**

**LENCZNER SLAGHT ROYCE**
**SMITH GRIFFIN LLP**

Barristers
Suite 2600
130 Adelaide Street West
Toronto ON  M5H 3P5

Alan J. Lenczner, Q.C. (11387E)
Tel:      (416) 865-3090
Fax:     (416) 865-2844
Email:   alenczner@litigate.com
Brendan F. Morrison (61635B)
Tel:      (416) 865-3559
Fax:     (416) 865-3731
Email:   bmorrison@litigate.com

Lawyers for the Plaintiffs (Appellants)