## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - x

CHEVRON CORPORATION,

      Plaintiff,

      v.

STEVEN DONZIGER, et al.,

      Defendants.

11 Civ. 0691 (LAK)

- - - - - - - - - - - - - - - - - - - - - - - - - - x

### DECLARATION OF MARY K. SULLIVAN

    I, MARY K. SULLIVAN hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

    **A.**    **Background**

    1.    My name is Mary Katherine Sullivan, but I am called Katie. I reside in Dover, Massachusetts.

    2.    I graduated from the University of Rhode Island with a degree in Psychology in 1994. Since 2003, I have owned and operated my own "wealth coordination" business called Streamline Family Office, Inc. ("Streamline"). Streamline provides private wealth coordination to individuals and families with significant assets—usually between $100 million and $500 million.

    3.    I first met Steven Donziger in August 2016, when I traveled to Ecuador as part of a 10-day "founders" trip hosted by the Pachamama Alliance, a non-profit organization. My motivation to attend the trip was to meet one of the founders. I began learning more about and exploring the possibility of supporting the work Steven was engaged in around November of



**Exhibit 33**

Sullivan
9/28/2018

Reporter: Kimberly A. Smith

2016 and stopped having any contact with him on or around March 26, 2018, after receiving the preservation order in this action.

4.      While I was trying to understand the current status and objectives of the Ecuador case and the various people involved, I helped Steven in several areas relating to the Ecuador judgment: managing paperwork related to investors past and present, attempting to create budgets for the case, and receiving and distributing investor funds. I also offered to and did connect him with potential investors. In my experience, Steven did not have adequate documentation on or keep clear records of who had previously invested in the Ecuador judgment, and did not have adequate documentation of past or expected expenses to create an accurate budget. From my perspective, he lacked the skills, focus, and support to effectively manage the details. He seemed to have full authority to decide how investor money was spent, and a majority of the investor funds were allocated to himself for what he claimed were case management and reimbursements, and on items relating to an ongoing out-of-court strategy against Chevron.

5.      During the time I worked with Steven, we were in contact on at least a weekly basis, and sometimes on a daily basis. I met with Steven approximately seven times during the time that we worked together. We communicated primarily by email, phone, and WhatsApp. We also communicated via text message. We used Dropbox to share documents.

6.      My understanding of the RICO judgment came from Steven. He said that there was a court judgment against him in a RICO case brought by Chevron in New York and that the RICO judgment prevented him from recovering his contingency interest in the underlying Ecuador case. But he explained that he could continue to raise funds from investors and be paid a retainer out of those funds. He also said he could continue to manage the case. Steven never

told me, nor did I hear him tell anyone else, that the RICO judgment required him to assign his interest in the Ecuador judgment to Chevron. Steven added that he believed the RICO judgment came as a result of false evidence presented to the New York court.

### B.   Donziger Spent His Time Coordinating a Pressure Campaign Against Chevron

7.     During the 18 months that I knew and explored helping him, Steven spent the majority of his time coordinating "out of court" "non-legal" strategies to put "pressure" on Chevron.[1]  The goal of his pressure campaign was twofold: to increase the potential for obtaining new investors and to ultimately to force Chevron to pay some portion of Ecuador judgment. While I worked with him on what he called his pressure campaign and on obtaining investor money, I did not work with Steven on any legal issues or observe him working on any.

8.     **Press Releases**: I saw a number of press releases distributed through CSRwire on behalf of the FDA. Steven told me that the FDA was his client. At no time did Steven disclose to me that the FDA was an organization that he created and controlled. In the course of our conversations, Steven told me that he wrote all those press releases himself. I estimated, based on my observations and discussions with Steven, that Steven spent about 15 hours on each press release, and that there had been over fifty press releases in the past three years or so. Steven seemed obsessed with the press releases and I was trying to demonstrate that, perhaps, his time and energy could be channeled in a more productive manner.

9.     Steven frequently sent his press releases to investors and potential investors, and had me do the same. Attached hereto as Exhibit 2 **(MKS-0000799; MKS-0002519)** are true and correct copies of emails we sent to potential investors citing the press releases that Steven had

---

[1]   Attached hereto as Exhibit 1 is a true and correct copy of an email chain from Steven to Ian Watson, John van Merkensteijn, and myself dated January 18, 2018.  MKS-0004126.

drafted. In connection with seeking investments in the judgment, Steven would tell investors that these press releases would "help hold Chevron accountable." I did not verify the accuracy of any of these press releases before distributing them. I relied on Steven for the accuracy of the information contained in them.

10.    **Shareholder Resolutions**: Steven also worked with Ben Barnes and Simon Billenness on Steven's strategies to pressure Chevron. From my work on budgets, case expenses, and documenting persons with interests in the Ecuador judgment, I know that Ben Barnes had been promised a 0.6% interest in the judgment.[2] I also know that Simon Billenness was compensated for his work with Steven on shareholder pressure strategies.[3] I learned that Billenness, among other things, was focused on out-of-court strategies designed to pressure Chevron to settle the case. Although his work was directed by Steven, he wanted to maintain the appearance that it was separate from the legal team, as he said it would be "counterproductive" if the legal team were "seen doing" the things he was hired to do.[4]

11.    **Canada Pressure Campaign**: In September 2017, I took another trip to Ecuador with Steven that he had planned and described as key to putting pressure on Chevron to settle.[5]

---

[2]   Attached hereto as Exhibit 3 is a true and correct copy of a document I helped Steven prepare which outlined the equity interests that had been granted in the Ecuador judgment. **MKS-0016124**. Ben Barnes's 0.6% interest is listed under his initials, BB.

[3]   Attached hereto as Exhibit 4 is a true and correct copy of a document dated March 10, 2018 and titled Equity Contract Status, that I created when organizing the documents, which shows that Billenness was to be compensated with an equity stake equal to a $100,000 investment in the Ecuador judgment. **MKS-0006498**.

[4]   Attached hereto as Exhibit 5 is true and correct email of an email from Simon Billenness to Steven dated February 4, 2018. **MKS-0001583**. Attached hereto as Exhibit 6 is a true and correct copy of an email chain between Pat Tomaino, Simon Billenness, and others that was forwarded to me by Steven on March 12, 2018 **MKS-0005821**. Attached hereto as Exhibit 7 is a true and correct copy of an email chain between Simon Billenness, Steven, and Tony Chappelle that was forwarded to me by Steven on January 10, 2018. **MKS-0016326**.

[5]   Attached hereto as Exhibit 8 is a true and correct copy of an email I sent on November 6, 2017 to the other individuals who attended the September 2017 trip to Ecuador. **MKS-0000037**.

He invited and paid for Chief Ed John and Phil Fontaine, former Chief of the Assembly of First Nations Canada ("AFN"), to participate in this trip.[6] Also on this trip, with expenses covered by Steven and the FDA (at Steven's direction, as it was my experience and understanding that Steven decided how funds were spent), were Steven's wife Laura Miller and their son, Aaron Page, Canadian lawyers John Phillips and Peter Grant, Ian and Victoria Watson, Greenpeace activist Rex Weyler, Lisa Gibbons, Karen Hinton and her husband Howard Glaser, Juan Aulestia, Lupita de Heredia, and Cristina Munoz. Steven drafted and distributed press releases describing meetings that occurred during this trip as ones where indigenous leaders "joined forces."[7] I was aware that the trip was planned for the Canadian delegates and all of their costs to participate would be covered out of funds controlled by Steven.

12.     Steven was also planning to offer Chief Ed John an equity stake in the Ecuador judgment in exchange for his services.[8] Similarly, in May 2017, Steven directed the FDA to grant Phil Fontaine a 0.125% interest in the Ecuador judgment in return for "professional services" that were to be defined at a later time.[9] Steven then organized a follow-up meeting with the AFN in December 2017 in Canada, which I attended.[10] Steven told me that the purpose of this meeting was for AFN representative Chief Bellegarde and the FDA to sign a protocol of

---

[6]  Attached hereto as Exhibit 9 is a true and correct copy of an email dated October 2, 2017 that Steven sent to Chief Ed John, Phil Fontaine, and others instructing them to submit invoices to him for reimbursement of their expenses related to the Ecuador trip. **MKS-0003325.**

[7]  Attached hereto as Exhibit 10 is a true and correct copy of an email dated September 22, 2017 Steven sent to investors attaching a press release regarding the September 2017 trip to Ecuador. **MKS-0004190.**

[8]  Attached hereto as Exhibit 11 is a true and correct copy of an email chain between Steven, Aaron, and myself dated December 14, 2017. **MKS-0001080.**

[9]  Attached hereto as Exhibit 12 is a true and correct copy of an investment agreement between Mr. Fontaine and the FDA, signed by Mr. Fontaine. **MKS-0000796.**

[10]  Attached hereto as Exhibit 13 is a true and correct copy of an email I sent to Steven on November 14, 2017, providing a draft message Steven could send to an existing investor, Cliff Eisler, regarding a follow-on investment following the AFN conference. **MKS-0001415.**

cooperation that Steven planned to use as another pressure point against Chevron.[11]  Steven issued a press release about the meeting and the protocol.  I do not know whether Steven disclosed to Chief Bellegarde that he had any role in organizing the meeting or drafting the protocol.

13.     In or around October 2017, Steven also began to work with Kathleen Mahoney, Phil Fontaine's partner and a Professor at the University of Calgary, on organizing a November 2018 conference on the Ecuador litigation to take place in Alberta, Canada, under the auspices of the University of Calgary.  As Professor Mahoney put it, "The concept would be to re-frame the case, assuming resolution in the form of a win-win settlement.  If we could get representation from the oil industry here in Calgary, the epicenter of the oil industry in Canada, that would, I think, bring significant pressure to bear on Chevron to come to the table instead of following their scorched earth policy which does not fly well in Canada."  The conference is titled the "Indigenous Solutions for Environmental Challenges" and Steven has referred to it as "a key part of our out-of-court strategy."[12]  Steven told me that he and the other conference organizers did not intend to charge any fees for attending the conference and that they intended even to pay for the attendees' accommodations at a luxury hotel and resort.  The details of the financial obligations of the conference were not fully known by me, other than Steven included a line item in the 2018 budget to cover the anticipated costs.

14.     At Steven's direction, I paid from the CWP account (discussed below) the following expenses related to this conference:  (1) on March 9, 2018, I made a $19,993 payment

---

[11]   Attached hereto as Exhibit 14 is a true and correct copy of the protocol that was signed at the AFN conference. **MKS-0005889.**

[12]   Attached hereto as Exhibit 15 is a true and correct copy of an email sent by Steven to Ian Watson, John van Merkensteijn, and me on January 18, 2018.  **MKS-0003232.**

to the University of Calgary; and (2) on March 16, 2018, I made a $21,158 payment to the University of Calgary.  I am unaware of whether Professor Mahoney disclosed to the University or others that her partner signed an agreement to obtain a percentage interest in the Ecuador judgment or that the conference was funded by Steven using monies raised based on the Ecuador judgment.

### C.      Raising Money Based on the Ecuador Judgment

15.      Starting in December 2016, at Steven's request, when an opportunity arose in my network with those I thought might find the opportunity interesting, I mentioned the opportunity to purchase a 0.125% interest in the Ecuador judgment in return for an investment of $250,000. Given my business, it is very common for people to want to share their ideas with me even though it has always been clear that I would never, under any circumstances, receive any compensation if it translated into an investment.  Steven instructed me to tell potential investors that they would receive a return of 50 times their initial investment, based on a $12 billion judgment recovery.[13]  While I was not shown documentation of this, Steven told me that the FDA was authorized to sell 30% of the Ecuador judgment as a whole.[14]

16.      Steven, with assistance from Aaron Page, prepared a memorandum that they had me send to potential investors.[15]  This memo claimed that "the evidence behind" this Court's factual findings in the RICO case "has largely collapsed."  This memo also linked to multiple

---

[13]  Attached hereto as Exhibit 16 is a true and correct copy of an email dated December 10, 2016 that I sent to Steven Haley, a confidant and someone whose opinion I value. **MKS-0001521.**

[14]  Attached hereto as Exhibit 17 is a true and correct copy of a February 2018 draft of my ideas, based on information provided to me, to raise capital for the Ecuador judgement.  The plan notes that Steven has been authorized to sell up to 30% of the judgment to investors. This document was never discussed after I shared it. **MKS-0006028.**

[15]  Attached hereto as Exhibit 18 is a true and correct copy of the memorandum prepared by Steven and Aaron. **MKS-0001523.**

press releases Steven had written about the case.  Using this memo and other approaches and materials, I had conversations with several people whom I believed to be sophisticated investors and whom I thought might be interested in learning more.  Of the persons I mentioned this opportunity to, only one, Tony Abbiati, invested.  In addition, although they did not invest, I arranged and participated in a meeting with Elliott Management.  I was interested to hear what other people thought of this opportunity as an investment and, being action oriented, I created conversations to share and learn.

### D.    Elliott Management Solicitation

17.    After a few people mentioned that Elliott Management might be interested in this type of litigation investment and, because I enjoy a challenge, I sent Paul Singer, the head of Elliott, a Led Zeppelin book and miniature musical box, knowing that he was a fan of Led Zeppelin, along with a hand written note asking him for a meeting.[16]  When Singer did not respond, I talked to a client who I thought likely had contacts at Elliott, as the fund was in the process of acquiring his company.  He immediately made a phone call to put me in contact with Jesse Cohn at Elliott and then had no further involvement.  Mr. Cohn, who I understood to be responsible for investment decisions at Elliott, agreed to an introductory meeting on November 6, 2017 to discuss a potential investment or partnership.  I told Steven about the meeting and encouraged him to attend.[17]

---

[16]   Attached hereto as Exhibit 19 is a true and correct copy of an email chain between Steven and myself dated October 19, 2017.  **MKS-00000139.**

[17]   Attached hereto as Exhibit 20 is a true and correct copy of an email chain between Jesse Cohn, Natalie Underwood, and myself, which I forwarded to Steven on November 3, 2017.  **MKS-0000130.**

18.     After discussing it with Steven, I emailed the individuals who were on the trip to Ecuador in September of 2017 to tell them about the upcoming meeting with Elliott.[18]  But then, after I sent the email, Steven became upset that the email had gone out to what he called a wide group of people, including Lupita de Heredia.  Steven told me that if the many people who performed work for him without payment, in particular in Ecuador, "became aware that there was money coming, they would all demand to be paid for their services, as they often worked for months or even years without any compensation from Steven.

19.     Steven replied to the email I sent and asked the recipients to keep the information "strictly confidential" as a leak could "be counterproductive."  Peter Grant, a Canadian lawyer, suggested that all recipients of the message delete it because of what he "saw the opposition acquired."  Steven and Aaron Page also encouraged the recipients of my email to delete it.   I have deleted some emails related this exchange, but produced all copies in my possession, and to the best of my knowledge, what I produced is a complete record of the exchanges related to my initial message.

20.     The hour and half meeting with Elliot was attended by Steven, Jesse Cohn, Lee Grinberg, and myself.  Mr. Cohn left after 15-20 minutes.  Steven and Mr. Grinberg did most of the talking.  Steven's pitch to Elliott was that the Ecuadorian plaintiffs had a strong chance of success in their enforcement action in Canada, and that this was therefore an opportune time to settle the case.  Steven told Mr. Grinberg that Chevron wanted to avoid a trial in Canada.  The subject of how many shares of the judgment had already been sold came up—Steven told Mr.

---

[18]   Attached hereto as Exhibit 21 is a true and correct copy of this email chain between Steven, Aaron, Peter Grant, myself, and others, dated November 6, 2018.  MKS-0000090.

Grinberg that he held a 6.3% interest and that another 15%-16% was held by others.  The subject of the RICO injunction also came up, but I do not recall it being discussed in detail.

21.     When I did not hear anything from Elliott for over a month and a half after the meeting, I sent Mr. Grinberg a follow up email.  In response to my email, Mr. Grinberg advised me that Elliot was not interested.

### E.     Tony Abbiati Investment

22.     In mid-November 2017, I spoke to Tony Abbiati, a money manager and someone I consider to be a good friend and a highly sophisticated investor, and the topic of learning more about my second trip to Ecuador and making an investment in the Ecuador judgment came up. After we finished talking, I sent Tony links to a number of articles discussing the background of the Ecuador litigation, and told him what a tremendous opportunity I believed it was.[19]

23.     By November 27, 2017, Tony told me that he could raise a $500,000 investment "in about 30 seconds," but that he was on the fence about investing given the publicly available information regarding the RICO judgment against Steven.[20]  During a subsequent phone call between Steven, myself, and Tony, it is my recollection that Steven told Tony that the RICO judgment was based on fabricated evidence and that Chevron's key witness in the RICO lawsuit was bribed and now lives under protective custody.  I heard Steven make these same statements whenever he addressed the RICO judgment with others.

24.     On November 28, 2017, I emailed Tony to provide him with additional information.  In that email, I told Tony that investors were not "flocking" to fund Steven's efforts

---

[19]  Attached hereto as Exhibit 22 is a true and correct copy of an email chain between Tony, Steven, and myself dated November 19-November 20, 2017.  MKS-0017007.

[20]  Attached hereto as Exhibit 23 is a true and correct copy of an email chain between John van Merkensteijn and myself dated November 27, 2017.  MKS-0001359.

because investors were afraid "of Chevron finding out," which is what Steven had told me. I also passed along a "33 page detailed rebuttal to the civil [RICO] judgement [sic] against Steven," from a May 2017 FDA press release. I also told Tony, per Steven's direction, that the RICO case against Steven was "over" and that the case was now moving into a new phase in Canada. Finally, I told Tony that, if I had been in a financial position to do so, I would have invested in Steven's efforts myself.[21] I was sharing everything I believed to be true at that time largely based on information provided to me by Steven.

25.     On December 16, 2017, Tony executed an investment agreement under which he agreed to invest $500,000 in exchange for a .25% interest in the Ecuador judgment. On December 23, 2017, I sent countersigned copies of the investment agreement in both English and Spanish to Tony.[22] In total, $500,000 was deposited into the Bank of America account held by CWP Associates as result of this investment.

26.     I've come to realize that my trust in Steven was misplaced. During the time I knew him, I experienced a lack of integrity and transparency. In reflection, I would not have introduced him to any of my contacts, including Tony, had I known then what I know now. In retrospect, the information I passed along to Tony was one-sided. While I was not aware of it at the time, it has become clear to me that Steven took advantage of my lack of understanding of the legal system (many times telling me that I was naïve) and misled me about the RICO case and the nature of the court findings against him.

---

[21]  Attached hereto as Exhibit 24 is a true and correct copy of an email chain between Tony and myself dated November 28, 2017. **MKS-0001914.**

[22]  Attached hereto as Exhibit 25 is a true and correct copy of an email I sent to Tony on December 23, 2017. **MKS-0016397.** Attached hereto as Exhibit 26 is a true and correct copy of a fully-executed investment agreement between Tony and the FDA. **MKS-0016398.**

F.      Investment Agreements and Investor Status

27.      In late 2017, I offered to help organize all the investor documents and details related to the Ecuador judgment because I couldn't imagine exploring a solution if there was a lack of clarity on how the past investments were structured. In my worldview, following the flow of funds is a critical component to understanding the current situation and informs how best to proceed. I was confused on how conversations could be had with potential investors or about a settlement without this information readily available.

28.      In connection with seeking investors, I discussed with Steven the current status of investors in the judgment, how much money he was trying to raise, and what we should tell investors about how the money they invested would be spent. On the topics of how much money we were trying to raise in total and what we should tell investors about how the money would be spent, Steven told me that his fundraising goal was to "just get as much as [he] can get."

29.      As to the existing investors of the Ecuador judgment, Steven never provided me with adequate documentation to confirm the status of all prior investments, nor did he seem to be tracking the totality of the investments himself. In fact, in reviewing the documents Steven provided me, I found that a number of the investment agreements did not contain the name of the investor. Steven told me that the name of the investor was sometimes intentionally often left off the investment agreements for confidentiality purposes.

30.      Despite these challenges, in late 2017 and early 2018, I attempted to document the various interests granted in the Ecuador judgment based on the documents Steven made available to me. When I was working on this project, Steven told me that some investors had "forfeited" their interests in the judgment by settling with Chevron because entering into a settlement meant that the investor was breaking confidentiality or "walking away" from their investment. There

was also another category of contingency interests that Steven classified as "disputed."
According to Steven, disputed interests were ones he did not recognize as legitimate even though
these were held by persons who had been granted interests in the judgment and had not settled
with Chevron. I did not do any independent analysis regarding whether interests were
"disputed" or "forfeited" and, instead, listed the status of each interest as legitimate, forfeited, or
disputed according to Steven and Aaron's direction.

31.     For example, Steven told me to characterize the interest of Pablo Fajardo (through
his law firm Fromboliere) as "disputed." *See* Exhibit 3 at 3 (MKS-0016124). Aaron mentioned
Fajardo as a lawyer representing the Ecuadorian plaintiffs in Ecuador. While Steven never
talked about Fajardo in detail, Aaron confided in me that, at one point, Fajardo and Steven had
been very close—like a "father and son," type of relationship while they were in Ecuador
working on the case—and that Steven had helped Fajardo win a Goldman Environmental Prize.
I understood from Aaron that, at some point, Fajardo and Steven had a falling out.

32.     Attached hereto as Exhibit 3 (**MKS-0016124**) is the most complete schedule of
interests in the Ecuador judgment I was able to create based on the information available to me.
I do not believe that I had complete information and thus cannot verify all of the information on
this schedule. To the extent I had copies of investment agreements related to the Ecuador
judgment, I produced true and correct copies of those agreements and their terms are reflected on
Exhibit 3. Although they have received payments from Steven for their involvement in the
pressure against Chevron, I do not know whether Simon Billenness, Rex Weyler, and Kathleen
Mahoney have interests in the Ecuador judgment. Neither do I know whether Charles Nesson
has an interest in the Ecuador judgment.

33.     To the best of my knowledge and based on the documents shared with me, the equity holders in the Ecuador judgment according to Steven are: (1) Glenn Krevlin; (2) Cliff Eisler; (3) WDIS Finance LLC (which I understood to be acting at the direction of John van Merkensteijn); (4) Indigenous People Limited (which I understood to be acting at the direction of Ian Watson); (5) Fenwick (which I understood to be acting at the direction of Roger Waters); (6) Wellbeck Partners (which I understood to be an investment sourced by Josh Rizack); (7) CHV LLC (which I understood to be acting at the direction of Tony Abbiati); (8) Steven; (9) Aaron Page; (10) Patricio Salazar; (11) Augustin Salazar; (12) Eva Golinger; (13) Karen Hinton; (14) Downey McGrath; (15) The Rising Group (which I understood to be acting at the direction of Josh Rizack); and (16) Phil Fontaine.  These individuals and entities are listed by their initials in Exhibit 3.  Equity investments were contemplated for Peter Grant, John Philips, Ben Barnes, and Campbell Ford, but I am not aware of any executed contract regarding these potential investments.

## G.     Awarding of Interests in the Judgment in Exchange for Services

34.     Based on my review of the outstanding equity contracts, I was aware that Steven had given equity interests in the Ecuador judgment to various people who were not investors—including Aaron Page, Karen Hinton, Ben Barnes, and Josh Rizack.  I understood from my conversations with Steven that these were people who were performing or had performed services at Steven's direction, including in support of the pressure campaign or other activities related to the Ecuador judgment.  Steven gave his bookkeeper before me, Rizack, a 0.25% interest; Aaron a 0.25% interest; Hinton a 0.125% interest; and considered awarding Barnes a 0.6% interest.

35.     Steven and I had a conversation about similarly compensating me for my services by granting me an interest in the Ecuador judgment.  I was still determining how I wanted to be involved and fairness or value created would be a critical component of my decision.  Steven was the one driving the conversation that he could give me a percentage of equity.  A contract was never drafted to reflect this, but my potential interest was listed on the summary since he mentioned it.

### H.     Conversion of Personal Debt to Interests in the Judgment

36.     Steven told me and potential investors that he held a 6.3% interest in the Ecuador judgment. I was not aware, and Steven never mentioned, that the Ecuadorian plaintiffs had determined that he had to give back part of this interest after evidence of fraud emerged in U.S. courts.  I noted in some of the documents that his lawyers during the RICO trial were granted a percentage of his 6.3% and this was documented in the equity summary.

37.     Based on the documents I reviewed and my discussions with Steven, I became aware that, on or about February 17, 2011, Glenn Krevlin, an investor in the Ecuador judgment, had made a personal loan to Steven of $250,000.[23]  Steven initially wanted to pay this loan off with a portion of his claimed 6.3% interest in the Ecuador judgment.[24]  But he later decided that he wanted to change the method of paying off of the Krevlin loan "from SRD share to direct equity," that is, Krevlin would be given an interest in the judgment without reducing Steven's 6.3% share. *See* Exhibit 4. **MKS-0006498.**  I am not aware whether the loan Krevlin made to Steven was converted to equity in the Ecuador judgment.

---

[23]  Attached hereto as Exhibit 27 is a true and correct copy of a letter dated May 9, 2012 sent by Purrington Moody Weil LLP to Mr. Krevlin and attaching two replacement promissory notes evidencing Steven's debt to Mr. Krevlin. **MKS-0002564.**

[24]  Attached hereto as Exhibit 28 is a true and correct copy of an email chain between Steven, Aaron, and myself dated January 2, 2018. **MKS-0002169.**

38.     Steven wanted to treat a personal loan from David Sherman similarly. *See* Exhibit 4. **MKS-0006498.** I am not aware of whether Sherman's loan was ultimately converted into equity in the judgment. However, Steven provided me with capitalization tables, initially prepared by Josh Rizack, that list Sherman as having a portion of Steven's equity stake. I was told that Steven paid back $125,000 of the $250,000 loan, but never saw any supporting documentation.

39.     Steven also discussed converting shares in his 6.3% interest that I understood were held by his trial counsel in the RICO case, Zoe Littlepage and Rick Friedman, into general shares in the judgment. I am not aware whether this was done.

40.     Steven also instructed me to prepare an agreement granting "[e]quity" in exchange for "$100k of services" to Campbell Ford. I had never heard of Mr. Ford previously and noticed that he was an attorney based in Jacksonville, FL.[25] Steven told me it was a personal matter. I am not sure whether this agreement was executed.

**I.     Forward Looking Budget for Investors and Potential Investors**

41.     In late 2017, Glenn Krevlin insisted that Steven provide him with a budget for expenses going forward before Krevlin would agree to make any further investment. Attached hereto as Exhibit 30 (**MKS-0016057**) is the budget for 2018 that I created to provide to Mr. Krevlin. Steven provided me with the figures for this budget, which he reviewed and approved, and told me it included payments to persons who had received payments from Steven in the past for their services.

---

[25] Attached hereto as Exhibit 29 is a true and correct copy of an email chain between Steven and myself dated March 9, 2018. MKS-0002083.

42.     As reflected on Exhibit 30, the budget represents that going forward the bulk of the money would be spent on Steven and others working with him on his pressure campaign, including Aaron Page.  The single largest line item in the budget was a $300,000 allocation for Steven's "retainer," and a $150,000 line item that he described as "reimbursement" for "back salary" and "direct expenses."  Thus, out of a total budget of $1.278 million for 2018, more than a third of it was earmarked to be paid to Steven.

43.     The budget also included allocations for cash payments to a number of individuals and entities that provide services to Steven in support of his efforts to wage a pressure campaign against Chevron.  For example, the budget included payments to Aaron Page.  In my observation, Aaron did whatever Steven asked.  From what Steven shared with me, Aaron's work was prioritized by Steven on a weekly or monthly basis.  Based on the agreement I reviewed and my discussions with him, in addition to receiving cash payments, Aaron was granted a 0.25% equity stake in the Ecuador judgment on January 11, 2017.  When I was working on these budgeting issues and managing the expenses paid, Aaron told me he was surprised that Steven was giving me access to so much of the financial information because he usually did not allow anyone access to that information.

44.     The budget also included a $120,000 annual salary for a full-time attorney, which Steven told me was slated for Anton Tabuns, a Canadian attorney hired to work on out-of-court strategies and to leverage Steven's time.  He mentioned that Anton was familiar with the case already, although I was not aware in what capacity.  Additionally, the budget provided for payments to Cristina Muñoz, a journalist; Rex Weyler, one of the founders of Greenpeace, who was paid to write articles about the case; and Simon Billenness, who worked on shareholder strategies against Chevron in the United States.

45.     The other budget items were payments to a number of individuals and entities in Ecuador, the purposes of which were not explained in detail to me, including $36,000 in payments to the FDA, for what I was told were annual overhead expenses; $24,000 in payments to Juan Aulestia for "Ecuador management;" and $12,000 to Luis Yanza for "Ecuador community / client relations." Mr. Yanza was paid through his daughter, Shuyana Natalia Alluaca.

46.     In the cover email to Krevlin to which the budget was attached, which I helped edit, Steven explained that he was seeking "major capital partners" "whose participation will help put major pressure on Chevron to settle the matter."[26]

47.     Steven also asked me to create a document that would summarize what he called his "investment" in the Ecuador case so that he could show the FDA what he had personally invested in the case. Upon Steven's approval, Josh Rizack shared a spreadsheet that he explained to me tracked Steven's supposed investment. However, the spreadsheet was so disorganized that I could not use it and there was no documentation to substantiate anything in it. When I reviewed some of the historical materials contained in the boxes that Josh Rizack passed along, I did note that a personal credit card summary reflected approximately 40% of the expenses during that period were allocated to restaurants.

**J.     Canadian Counsel's Involvement in Fundraising and the CWP Account**

48.     From my discussions with Steven and review of documents, I learned that prior to my involvement, Lenczner Slaght Royce Smith Griffin LLP, and in particular, Alan Lenczner (who Steven told me represents the Ecuadorian plaintiffs in the Canadian enforcement action)

---

[26] Attached hereto as Exhibit 31 is a true and correct copy of the cover email Steven sent to Glen Krevlin on December 11, 2017. **MKS-0002338.**

were signatories on investor agreements, received investor funds in an account in Canada, and then passed on some of those funds to Steven. After I got involved, Steven told me that he wanted to change this practice and have me open an account and manage the investor funds going forward. Steven told me that he didn't want the investor funds to be directed to Lenczner because it was no longer necessary now that Lenczner's firm had been sufficiently compensated and he was afraid that Lenczner would ask for more money if Lenczner knew that there were new investors. Steven asked if a Canadian bank account could be established and, upon doing some research, I learned that the account owner had to be a Canadian citizen or landowner. Beginning in or around December 2017, according to the investment summary, Alan Lenczner was left off of any new investment agreements and I am not aware if he knew of the new investments.

49.     In order to be in a position to manage investor monies as Steven had requested, in December of 2017, I created a d/b/a entity called "CWP," for "Chevron Will Pay," and opened a bank account at Bank of America (the "CWP Account"). The d/b/a CWP Associates is a pass-through entity under the umbrella of my company, Streamline. Attached hereto as Exhibit 32[27] is a true and correct copy of the Bank of America CWP Account statement for the period from December 22, 2017, through December 31, 2017.

50.     The purpose of the CWP Account was to receive and disburse investor monies at Steven's direction. As far as I could tell, Steven had complete control and discretion over how this money, which belonged to the FDA, was spent. I was not aware of any approval process that existed or was followed with respect to any of the funds disbursed from the CWP Account pursuant to Steven's directions. I never saw any approval from the FDA, the Ecuadorian

---

[27] MKS-0006473.

plaintiffs, or others for Steven's retainer or other invoices or for any payments of his invoices, or any agreement reflecting his entitlement to these payments. He told me that he spoke to the FDA regularly regarding the way funds were allocated and spent. I understood Luis Yanza and Carmen Cartuche to be associated with the FDA.

51.    **Deposits**: Following the opening of the CWP Account, on or around January 2, 2018, an entity called CHV, LLC (Tony Abbiati's investment vehicle) wired $250,000 into the account pursuant to an investment agreement. On or about January 5, 2018, James McCaffrey, who I understood to be acting with Tony and the CHV entity, transferred another $250,000 into the CWP Account. On or around January 18, 2018, Glenn Krevlin, another investor in the Ecuador judgment, wired $250,000 into the CWP Account. The total amount that investors wired into the CWP account over the few months during which it was active was $750,000. Attached hereto as Exhibit 33[28] are true and correct copies of the Bank of America CWP Account statements confirming these deposits.

52.    **Payments**: As soon as I had the CWP account opened and investor money had been deposited, Steven immediately sent me various "invoices" payable to him. Specifically, he sent me the 4 invoices attached hereto as Exhibit 34 (**MKS-0000396; MKS-0000398; MKS-0000405; MKS-0000404; MKS-0000389**), seeking total payments of $325,000 from the $750,000 in investor monies we had just received. No back-up was ever provided to me for these invoices. I paid three of the invoices in the total amount of $125,000 at Steven's direction in the period from January 30, 2018 to March 9, 2018. I did not pay a $200,000 invoice Steven submitted to me on February 5, 2018 for a "[p]artial reimbursement for legal and consultative services and expenses/Ecuador environmental case," which directed that $50,000 be paid to

---

[28]  MKS-0006477.

Laura Miller (Steven's wife), and the remaining $150,000 be paid to Steven.  I did not pay the
February 5, 2018 invoice because Steven told me to hold off.

53.     In addition, in April 2018, I processed two payments from the CWP account to
pay Steven's monthly American Express credit card expenses.  On or about April 2, 2018, I paid
Steven's American Express credit card balance in the amount of $1,115.86.  On or about April
16, 2018, I paid Steven's American Express credit card balance in the amount of $10,992.
Attached hereto as Exhibit 35[29] is a true and correct copy of the Bank of America CWP Account
statement for the period from April 1, 2018 to April 30, 2018, which reflects these payments.

54.     At Steven's instruction, I also processed a number of payments to a variety of
individuals or entities.  These payments can be seen in the CWP P&L Detail chart I created,
which is attached hereto as Exhibit 36 (**MKS-0006026**).

55.     I understood the $15,286 and $2,000 payments to Fundación Naupa that are
documented in Exhibit 36 to be intended for Juan Aulestia, an Ecuadorian.  I had met Aulestia in
person when I visited Ecuador in September 2017, and I understood that he had a role in
coordinating things in Ecuador, but I was not sure as to his specific role, and I do not know what
services were provides in exchange for these payments.  I understood Fundación Naupa to be the
name of Juan's consulting firm.

56.     **Closing the CWP Account:**  In or around March 2018, I decided that working
with Steven was going to be a challenge and began considering how to move on and transfer the
bookkeeping responsibilities.  Thereafter, on March 19, 2018, I received a document
preservation order from counsel for Chevron and on April 13, 2018, I received document and
deposition subpoenas from Chevron.  About one week after receiving the preservation order, I

---

[29] MKS-0006493.

told Steven that this work was no longer going to be a part of my future and ceased communication. I then received a series of WhatsApp messages from Aaron. Aaron requested that I put him in touch with my lawyer and threatened that, if I did not turn the balance of CWP Account over to him, he and Steven would be forced to take legal action against me.[30]

57.     After consultation with my lawyer at the time, Frank Libby, on May 3, 2018, I closed the CWP account and, after all outstanding payments had been made, transferred the remaining funds to Aaron. Per Aaron's request, and after consulting with counsel, I also transferred to Aaron my case related files, after first making a copy of the same.

58.     Aaron acknowledged receipt of these funds and files in a letter to my attorney Frank Libby, dated May 3, 2018. A true and correct copies of the May 3, 2018 letter is attached hereto as Exhibit 38.[31]

59.     I made the payment to Aaron by obtaining a cashier's check in the amount of $342,045. A true and correct copy of the Cashier's Check Customer Copy is attached hereto as Exhibit 39.[32]

60.     Before closing the CWP Account and transferring the remaining funds to Aaron, I paid Steven's American Express credit card statement in the amount of $11,796 via a cashier's check, and also issued a cashier's check in the amount of $2,580 to myself to cover my out- of- pocket expenses in connection with this project. *See* Exhibit 39. I was not aware that, shortly after these funds were transferred to Aaron, he transferred them to an account controlled by Steven.

---

[30]  Attached hereto as Exhibit 37 is a true and correct copy of my WhatsApp messages with Aaron, which is an excerpt of the WhatsApp messages that I produced in this action. **MKS-0020982.**

[31]  **MKS-0021204.**

[32]  **MKS-0021203.**

61.     I am no longer involved with Steven or his efforts related to the Ecuador judgment.

Executed on this 28ᵀᴴ day of September, 2018 at Boston, Massachusetts.

_____
Mary R. Sullivan