UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
CHEVRON CORPORATION,  :
:
           Plaintiff, :
:
  v. :  11 Civ. 0691 (LAK)
:
STEVEN DONZIGER, *et al*., :
:
           Defendants. :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**CHEVRON CORPORATION'S BRIEF IN SUPPORT OF ITS PROPOSED
FORENSIC PROTOCOL**

 

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

STERN, KILCULLEN & RUFOLO LLC
325 Columbia Tpke, Ste 110
P.O. Box 992
Florham Park, New Jersey 07932-0992
Telephone: 973.535.1900
Facsimile: 973.535.9664

*Attorneys for Chevron Corporation*

**Page**

**TABLE OF CONTENTS**

I. PRELIMINARY STATEMENT ................................................................................................ 1

II. CHEVRON'S PROPOSED FORENSIC PROTOCOL COMPLIES WITH THE STANDARDS GOVERNING FORENSIC DISCOVERY WHILE ACCOUNTING FOR DONZIGER'S KNOWN DISCOVERY ABUSES AND CRIMINAL BEHAVIOR .................... 1

    A.    The Protocol Provides for Imaging by a Neutral Forensic Expert Thereby Protecting Donziger's Legitimate Privacy Interests and the Integrity of His Data. ................................................................................................................................ 1

    B.    The Protocol Requires Both Search Terms and Advanced Search Techniques, Given Donziger's Proven Pattern of Discovery Abuse, Document Destruction, Use of Code Names, and Other Hallmarks of Criminal Conduct. ................................. 3

    C.    The Protocol Also Authorizes A Forensic Analysis Regarding the Potential Alteration, Destruction, and/or Deletion of Data Given Donziger's Historical Practices. ............................................................................................................................ 11

    D.    The Benefits of the Proposed Protocol Outweigh Any Minimal Burden or Expense ................................................................................................................................ 11

III. CONCLUSION ........................................................................................................................ 12

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Ameriwood Indus., Inc. v. Liberman*,
    2006 WL 3825291 (E.D. Mo. Dec. 27, 2006) ....................................................................2, 11

*Antioch Co. v. Scrapbook Borders, Inc.*,
    210 F.R.D. 645 (D. Minn. 2002) ................................................................................................11

*Aurelius Capital Partners v. Republic of Argentina*,
    2013 WL 857730 (S.D.N.Y. Mar. 7, 2013) ...............................................................................10

*Balboa Threadworks, Inc. v. Stucky*,
    2006 WL 763668 (D. Kan. Mar. 24, 2006) ................................................................................12

*Freres v. Xyngular Corp.*,
    2014 WL 1320273 (D. Utah Mar. 31, 2014) ........................................................................11, 12

*Modin Assocs., Inc. v. City of New York*,
    523 N.Y.S.2d 150 (2d Dep't 1988) ............................................................................................10

*Simon Prop. Grp. L.P. v. MySimon, Inc.*,
    194 F.R.D. 639 (S.D. Ind. 2000) ................................................................................................11

*Sony BMG Music Entm't v. Arellanes*,
    2006 WL 8201075 (E.D. Tex. Oct. 27, 2006) .......................................................................8, 10

*Vaughan Co. v. Global Bio-Fuels Tech., LLC*,
    WL 6605070 (N.D.N.Y. May 20, 2016) ....................................................................................12

*Rio Tinto PLC v. Vale S.A.*,
    306 F.R.D. 125 (S.D.N.Y. 2015) ................................................................................................10

**Rules**

22 CRR-NY 1215.1 ...........................................................................................................................4

Rules of Professional Conduct (22 NYCRR 1200.0) rule 1.5(b) ................................................4, 5

Rules of Professional Conduct (22 NYCRR 1200.0) rule 1.15(a) ..................................................6

Rules of Professional Conduct (22 NYCRR 1200.0) rule 1.15(b)(1) .............................................7

Rules of Professional Conduct (22 NYCRR 1200.0) rule 1.15(c)(3) .............................................7

Rules of Professional Conduct (22 NYCRR 1200.0) rule 1.15(d) .................................................7

# I.
# PRELIMINARY STATEMENT

On October 18, 2018, the Court granted Chevron's motion to compel and held that, "given Donziger's stonewalling of post-judgment discovery and the other circumstances described in Chevron's memorandum, it is appropriate that Donziger's electronic devices be imaged and examined for any documents that Donziger has not thus far produced." Dkt. 2108 at 1–2. The Court's order provided that Donziger should "produce for forensic imaging all computers and electronic, optical and magnetic storage devices and media within his possession, custody or control" to a third-party forensic vendor. *Id.* at 2. The Court further ordered the parties to agree to a protocol implementing the forensic imaging and searches on or before October 26, 2018. *Id.* As set forth in Dkt. 2119, Donziger refused to participate in a meet-and-confer process on the Court's forensic imaging order, so Chevron filed its own proposed forensic inspection protocol (attached, as amended, as Appendix "A" hereto) (the "Protocol") on October 26, 2018.

Chevron proposes a three-part process: (1) identification and imaging of Devices and Accounts; (2) searches for responsive documents; and (3) analysis of the available forensic data. As explained below, this proposed approach ensures, at each stage of the process, Chevron's right to complete discovery responses, while, at the same time, showing appropriate consideration of Donziger's interests.

# II.
# CHEVRON'S PROPOSED FORENSIC PROTOCOL COMPLIES WITH THE STANDARDS GOVERNING FORENSIC DISCOVERY WHILE ACCOUNTING FOR DONZIGER'S KNOWN DISCOVERY ABUSES AND CRIMINAL BEHAVIOR

A.     **The Protocol Provides for Imaging by a Neutral Forensic Expert Thereby Protecting Donziger's Legitimate Privacy Interests and the Integrity of His Data.**

The Court's order directs Donziger to first identify in writing and then to surrender for imaging both his electronic devices ("Devices") and media, defined in the Protocol as "Accounts."

Dkt. 2108 at 2-3; Protocol ¶ 2.  To the extent Donziger has disposed of, lost, or otherwise claims to be unable to currently locate and produce Device or Account information, the Protocol provides that Donziger must explain these phenomena.  Protocol ¶ 2.  The Protocol next provides for Donziger to physically produce his Devices and provide access to his Accounts to a "Neutral Forensic Expert" for imaging.  *Id*. at ¶ 4–5.

Chevron's letter on Friday, October 26, 2018, Dkt. 2119, proposed Alix Partners to serve as a Neutral Forensic Expert.  Chevron's counsel has since learned that Alix Partners performed document hosting services for Chevron in litigation in Gibraltar, in which Chevron is represented by separate counsel.  While this is not disqualifying, Counsel is in the process of contacting additional potential forensics vendors and will propose alternative qualified Neutral Forensic Expert(s) in the coming days.

This Neutral Forensic Expert is required to ensure that Donziger's data is fully imaged while the integrity of his Devices and Accounts remain intact.  Protocol ¶ 7.  The Neutral Forensic Expert is likewise required to keep all of Donziger's access, password, and other information, as well as the copy of the images of his Devices and Accounts that it retains, confidential per the Protective Order in this matter.  *Id.* at ¶ 3.  And because the Protocol provides for the creation of four sets of images, at least two of which would initially remain unexamined, Donziger would have access to an original image if any need to examine one arose.  *Id.* at ¶ 10.

These multi-layered safeguards—the use of a Neutral Forensic Expert, implementation of all accepted industry imaging standards, and the retention of multiple unaltered sets of images (one with the Neutral Forensic Expert and one lodged with the Court)—should more than address any legitimate privacy and/or data integrity concerns that Donziger might have relative to the imaging process.  *See, e.g.*, *Ameriwood Indus., Inc. v. Liberman*, 2006 WL 3825291, at *5–6 (E.D. Mo.

Dec. 27, 2006) (endorsing similar procedures for the collection and imaging of electronic devices by a neutral expert), *as amended on clarification*, 2007 WL 685623 (E.D. Mo. Feb. 23, 2007).

**B.     The Protocol Requires Both Search Terms and Advanced Search Techniques, Given Donziger's Proven Pattern of Discovery Abuse, Document Destruction, Use of Code Names, and Other Hallmarks of Criminal Conduct.**

Both his conduct in prior litigation and his conduct now confirm that Donziger is not only refusing to participate in the discovery process, but is actively obstructing it.  Donziger, who has historically engaged the use of code words, claimed an inability or lack of authority to access documents in Ecuador when it suited him, and utilized other devices to conceal his obstruction of justice, bribery, corruption, and other criminal acts, has been shown in these post-judgment proceedings to have lied in discovery responses,[1] destroyed documents,[2] and adopted the use of encrypted messaging devices like "WhatsApp" to try to conceal or eliminate any record of his conduct.[3]  Even a forensic search of Donziger's Devices and Accounts will thus face significant hurdles in uncovering all responsive documents.  Accordingly, in determining the appropriate search parameters and tools to include in the Protocol, Chevron considered the following facts regarding Donziger's actions, each of which increase the difficulty of locating all responsive documents:

- *Thousands of Documents*:  The productions of Katie Sullivan, John van Merkensteijn, Joshua Rizack, and third-party banks, among others, confirm that Donziger sent, received, and was copied on *thousands* of responsive documents he has failed to produce.  As but one example, Katie Sullivan, an agent of Donziger, produced 21,206 pages of documents, essentially all

---

[1] *See* discussion *infra*, at 4–6.

[2] For instance, documents produced by third parties demonstrate that Donziger instructed investors and conspirators to delete emails discussing efforts to monetize and profit from the Ecuadorian Judgment.  On November 5, 2017, in response to a Sullivan email about an impending meeting with Elliott Management, Donziger told everyone on the email chain to "delete all emails related to this."  Ex. 1 at MKS-0000090.  Unless otherwise indicated, all citations to Ex. __ are citations to exhibits to the Declaration of Anne Champion.

[3] *See* Declaration of Mary K. Sullivan, September 28, 2018, Dkt. 2116 ("Sullivan Decl.") ¶ 5; Ex. 3 at JVM006399.

of which Donziger failed to produce. The same is true of the productions of John van Merkensteijn (13,101 pages) and Josh Rizack (1,947 pages). These documents include asset information, investment solicitations, and investment agreements, among numerous other types of responsive documents. *See, e.g.*, Dkt. 2113. They also reveal ongoing criminal behavior, including instructing others to destroy documents so as to avoid their discovery. *See id*. at 37.

- *Potentially Destroyed and/or Fabricated Documents*: Donziger has also described responsive documents under oath, only to thereafter produce ones bearing no resemblance to his testimony. For example, the FDA retainer agreement that Donziger testified he is currently operating under and eventually produced at the June 28, 2018 contempt hearing is *not* the one he had previously described at his deposition. At his deposition, Donziger testified that he entered into his most recent retainer with the FDA two or three years ago, and stated that he could not narrow it down further than that. Ex. 2 at 58:15–25; *see also id*. 29:2–9. His testimony concerning the retainer agreement's contents was similarly hazy—he could not remember if the agreement was governed by New York law, *id*. 59:5–11, or if it provided for him to receive any type of monthly payments, *id*. 60:10–18. In addition, although he claimed that he did not know if his current FDA retainer agreement provided for a monthly payment, he testified that there was some agreement, perhaps unwritten, that authorized him to receive, in its "most recent iteration, $25,000 a month" from client funds. *Id*. 62:3–13.[4]

---

[4] If it is true that Donziger has an "unwritten" agreement with the FDA providing him with a $25,000 per month retainer (from other people's money), Ex. 2 at 62:3–13, this would violate ethical provisions requiring retainer agreements to be in writing. 22 CRR-NY 1215.1 ("[A]n attorney who undertakes to represent a client and enters into an arrangement for, charges or collects any fee from a client shall provide to the client a written letter of engagement before commencing the representation, or within a reasonable time thereafter"); *see also* Rules of Professional Conduct (22 NYCRR 1200.0) rule 1.5(b) (providing that a retainer must be in writing if "required by statute or court rule")).

In stark contrast, the document that Donziger ultimately produced as his supposedly operative FDA retainer was entered into months—not years—prior to his deposition, and gives Donziger broad and memorable powers, without providing for him to receive any payments beyond his contingency interest. Ex. 4. Accordingly, whatever retainer agreement Donziger was describing at his deposition is not the one he produced. Either he lied at the deposition or he failed to produce the described document. In light of Chevron's inability to rely on Donziger's representations regarding even the type of agreements that exist related to the judgment, in depth forensic searches are necessitated.

- *The Increases and Decreases in Donziger's "Interest" in the Judgment Through Multiple Third-Party Transactions with Previously Unknown Persons*: Donziger has also falsely represented to this Court that he has not personally profited from the Ecuadorian Judgment or altered what he calls "his interest" in the Ecuadorian Judgment, while actively hiding the documents that prove his perjury and contempt. *See* Ex. 5 (Transcript of May 8, 2018 Hearing) at 17:14–19:5. To date, third-party discovery has revealed at least five occasions on which Donziger either conveyed or reallocated portions of "his interest" in the Ecuadorian Judgment to eliminate personal debts or increase his personal return. For instance, in a recently discovered email dated December 21, 2016, Donziger offered Dr. David Zelman a portion of his interest in the Ecuadorian Judgment in return for $14,000 of "consulting services" meant "to develop [Donziger's] professional capacities": "In exchange for you providing me with $14,000 of such services, I pledge to you an interest in the Ecuador judgment from my fees should they be collected. . . . To be more

specific, your amount under this agreement with be 14/250 of an eighth of a point of whatever is recovered of the total claim." Ex. 6 at JVM 011236–37.[5]

Donziger has likewise, since the RICO judgment was entered, used the Ecuadorian Judgment to extinguish personal debts to at least Glenn Krevlin and David Sherman, and likely to Rick Friedman and Zoe Littlepage, as described in detail in Chevron's pending Motion to Hold Steven Donziger, The Law Offices of Steven R. Donziger, and Donziger Associates, PLLC in Contempt of Court for Their Failure to Comply With the RICO and Default Judgments and the April 16, 2018 Restraining Notice. *See* Dkt. 2113 at 18–19. Given Donziger's indiscriminate use of the Ecuadorian Judgment for his personal profit and benefit, locating the documents that discuss these issues with currently unknown third parties needs to be addressed with relatively broad search terms.

- *Intentional Obfuscation of Fund Movement and Origins*: Donziger frequently moves funds with little or no documentation and constantly commingles his business, personal, and client funds. *See* Declaration of John A. Slavek, September 30, 2018, Dkt. 2115 ¶¶ 27 (noting that "funds from investors and personal funds were comingled in all seven [of Donziger's] accounts"), 33.[6] Donziger also engages in, and apparently requests that investors engage in, methods

---

[5] According to the website for his company, Transition Institute, Inc., Dr. Zelman is a psychotherapist. *See* Bio, Transitions Institute, http://www.transitionsinstitute.com/bio/ (last visited Oct. 26, 2018).

[6] Donziger also appears to have used case funds for personal expenses without client authorization, in violation of Rule 1.15 of the Rules of Professional Responsibility. Rule 1.15(a) provides that "[a] lawyer in possession of any funds . . . must not misappropriate such funds." Rules of Professional Conduct (22 NYCRR 1200.0) rule 1.15(a). The expert analysis of Donziger's bank accounts confirms that investor funds were used to make personal payments. Slavak Decl. ¶ 27 ("[F]unds from investors were never kept in a segregated account, but transferred to personal accounts on numerous occasions and used to pay personal expenses."). Sullivan also testified that Donziger "had complete control and discretion over how" investor money was spent, that she never saw any approval from the FDA, and that "a majority of the investor funds were allocated to himself for what he claimed were case management and reimbursements, and on items relating to an ongoing out-of-court strategy against Chevron." Sullivan Decl. ¶¶ 4, 50. Donziger has also commingled hundreds of thousands of dollars in personal and case funds, in violation of New York Rule of Professional Conduct 1.15. *See* 22 NY-CRR 1200.0 rule 1.15(a) ("A lawyer in possession of any funds . . . must not . . . commingle such funds . . . with his or her own."); 1.15(b)(1)

for transferring funds to him that appeared designed to conceal the source of the funds.[7]  Moreover, as this Court has noted, "there is already a record of willingness on the part of Donziger to shift assets in which he has an interest into foreign locations to avoid what he may regard as judicial 'interference'" (Dkt. 2009 at 2).  And post-judgment discovery confirms that Donziger is continuing to travel all over the world.

Donziger further obfuscates fund movements and origins by referring to potential investors by code names in communications and by actively discussing ways to conceal investor identities.  For example, one potential investor, Daniel Israel, is often referred to as "Mr. Brussels" or "Mr. Belgium."  See Ex. 11 at JVM 011444.  Other code names describing potential investors include "Hong Kong guy" and "Hong Kong person."  Exs. 12, 13.  Van Merkensteijn even asked a potential investor, Bill Twist, in an email, "Hey Bill were you the person that was talking to me about somebody you know that [could] educate me on the use of block chain in bitcoin?  I was thinking maybe it was your idea that this could be useful for investors in the Chevron litigation so that their names would not be disclosed . . ."  Ex. 14.  The purpose, explained further in the email chain, was "to shield [an] investor's identity."  Ex. 15.

---

(providing that a lawyer "shall maintain [client] funds . . . in a special ac-count or accounts, separate from any business or personal accounts of the lawyer or lawyer's firm. . ."); 1.15(c)(3) (requiring a lawyer to "maintain complete records of all funds . . and render appropriate accounts to the client . . . regarding them."); 1.15(d) (requiring a lawyer to maintain records for seven years).  He has attempted to attribute these ethical violations to not being "very organized."  Ex. 2 at 73:20–74:4.

[7] For instance, multiple emails document investor funds routed first to Canadian counsel Alan Lenczner before making their way finally to Donziger.  See Ex. 7 (Donziger emails van Merkensteijn on September 9, 2016 asking that he instruct Alan Lenczner to forward 50% of the funds to "Steven R. Donziger for expenses related to the Ecuador litigation"); see also Ex. 8; Ex. 9 at MKS-0006685 (Lenczner confirming that his firm received nearly $1.1 million in investor funds and disbursed $423,000 to Donziger).  Similarly, many documents detail Donziger's absolute control over investor funds, which further complicates any attempts to track these funds.  See Ex. 10 (Email from Michael Ben Jacob to Alan Lenczner, copying van Merkensteijn and Donziger confirming "that [Donziger] is authorized to give instructions to [Lenczner] regarding the allocation and disbursement of funds to counsel to pay legal fees").

Chevron developed the Protocol's search provisions with Donziger's unethical, criminal, and other evasive practices in mind. Once the Device and Account images are obtained, Chevron's Forensic Expert will search the images for responsive documents pursuant to Chevron's subpoenas, as modified by the Court. Having Chevron's forensic expert conduct these searches prevents Donziger from engaging inadequate searches or deliberately omitting relevant documents—as he has done in the past. *See* Protocol ¶¶ 13–16. There are three types of searches the forensic expert would undertake according to the Protocol.

First, Chevron's Forensic Expert will map the Devices and Accounts and produce lists of file names. *See id*. at ¶ 13. These lists will be provided to both Donziger and Chevron's counsel. *Id.* The lists will not disclose substantive information, but will allow for the identification of files or folders where responsive documents are likely to be found, even in the absence of knowing (as Donziger would if he were conducting a proper search) the names of those involved or the terminology utilized. Chevron's counsel can designate files from this list as responsive and subject to review. *Id*. at ¶¶ 13, 14.

Second, search terms are provided by which to run word searches of the forensic images of Donziger's Devices and Accounts. *See id.* at ¶ 15, Ex. C. Courts have previously endorsed the use of party-generated search terms to identify responsive information on forensically imaged devices. *See Sony BMG Music Entm't v. Arellanes*, 2006 WL 8201075, at *1 (E.D. Tex. Oct. 27, 2006) (allowing a party to suggest search terms and methodologies to a forensic expert in order to identify relevant information on forensically imaged devices and instructing the expert to "make every effort to utilize those methodologies"). The search terms now attached to the Protocol as Exhibit C have been carefully crafted to capture all relevant and responsive documents. To this end, Chevron first developed basic search terms based on the language and topics of its requests.

Chevron then analyzed the responsive documents received in post-judgment discovery to date, exported the metadata from those documents, and extracted the names and email addresses of individuals who had sent, received, or were copied on those documents. Chevron then reviewed that list and excised any individuals who appeared to be personal contacts with no apparent relation to the Ecuadorian Judgment. In addition, Chevron augmented the resulting list of search terms based on a substantive analysis of the post-judgment discovery and its existing knowledge of Donziger's ongoing contempt and money judgment issues. The resulting search terms are broken into nine main categories—all of which are directly responsive to Chevron's Request for Production of Documents (Dkt. 1988-1), as modified by the Court (Dkt. 2009):

- Search Terms Related to the Ecuador Judgment and RICO Injunction, responsive to requests 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36.

- Search Terms Related to Enforcement of the Money Judgment and RICO Injunction, responsive to requests 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36.

- Team Members and Consultants Related to the LAPs and the Ecuadorian Judgment, responsive to requests 20, 21, 22, 23 24, 25, 27, 28, 29, 31, 32, 33, 34, 35, 36, 37.

- Individuals and Entities Involved in the Pressure Campaign, responsive to requests 20, 21, 27, 28, 29, 31, 32, 35, 36.

- Individuals and Entities Related to Interests in the Ecuadorian Judgment, responsive to requests 19, 20, 21, 22, 23, 24, 25, 29, 30, 31, 32, 33, 34, 35, 38.

- Individuals and Entities Related to Potential Investors in the Ecuadorian Judgment, responsive to requests 19, 20, 21, 22, 23, 29, 30, 31, 32, 33, 35, 38.

- Lago Agrio Plaintiffs, responsive to requests 20, 21, 23, 24, 25, 26, 29, 31, 32, 33, 34, 35, 36, 37, 38.

- Individuals and Entities Paid from LAP/Donziger/CWP Accounts, responsive to requests 20, 21, 26, 29, 30, 32, 34, 35, 36, 37.

- Individuals Related to the Republic of Ecuador, responsive to requests 21, 36.

Given that assets and liabilities are at issue, as well as multiple types of contempt, some of the search terms by their nature are relatively generic, but all are related to either the financial concepts or behavior at issue and/or include words utilized by Donziger and his associates in connection with these activities that have been identified from documents produced to date. *See* Protocol at Ex. C. Documents that hit on a search term will be provided to Chevron's counsel as responsive. *Id*. at ¶¶ 15–16. The time frame for these searches is specified as the Devices and Accounts Donziger has used and maintained since January 1, 2012.[8] *Id*. at ¶ 2.

Third, Chevron's Forensic Expert is permitted to utilize "algorithms and/or machine learning programs designed to reveal responsive information." *Id.* at ¶ 15. These searching techniques are generally accepted in the industry and by the courts. *See generally Rio Tinto PLC v. Vale S.A.*, 306 F.R.D. 125, 126 (S.D.N.Y. 2015) (discussing the generally accepted use of algorithms and other "technology assisted review" in the production of electronically stored information).

In light of Donziger's waiver of privilege, document destruction, refusal to participate in discovery, and other ongoing discovery abuses, the Protocol does not provide for Donziger to pre-screen responsive folders or documents. *See Arellanes*, 2006 WL 8201075, at *1 (adopting a forensic imaging and search protocol that did not allow for a review by the party whose devices were imaged prior to the disclosure of the information revealed by the forensic inspection and

---

[8] While Chevron's Request for Production of Documents vary in terms of timing—some requests are unbounded and others specify a beginning date of March 4, 2014 (Dkt. 1988-1)—Chevron's Protocol provides that Donziger must identify both the electronic Devices in his possession and Accounts he maintains or has used since January 1, 2012. Protocol at ¶ 2. This time period is appropriate as the statute of limitations in New York for fraudulent conveyance claims is six years. *Modin Assocs., Inc. v. City of New York*, 523 N.Y.S.2d 150, 151 (2d Dep't 1988) (noting that the statute of limitations for fraudulent conveyance of real property in New York is six years). Moreover, courts have approved expansive discovery periods, particularly where a party is attempting to locate assets. *See, e.g.*, *Aurelius Capital Partners v. Republic of Argentina*, 2013 WL 857730, at *3 (S.D.N.Y. Mar. 7, 2013) (approving discovery seeking records going back as far as four years to locate another party's assets).

search terms). Instead, any concerns regarding confidential and personal information are adequately addressed both by: (1) Donziger's right to designate any materials "confidential" within 14 days, and (2) the protections the Protective Order provides (Dkt. 723). *See* Protocol at ¶¶ 3, 17.

**C.** **The Protocol Also Authorizes a Forensic Analysis Regarding the Potential Alteration, Destruction, and/or Deletion of Data Given Donziger's Historical Practices.**

It is, of course, unknown how many times Donziger deleted documents or instructed others to delete documents, or how many of those instructions were followed. But given his prior conduct and his total production of a scant 30 pages, it is reasonable to infer that many documents have been destroyed or deleted. Additionally, Donziger failed to respond when Chevron's counsel requested that he confirm that he had "not altered or otherwise disposed of any devices and accounts at any time during these proceedings." *See* Ex. 16 at 1. The Protocol thus appropriately permits Chevron's Forensic Expert to search for evidence of hidden, deleted, or destroyed documents and recover them to the extent possible. *See* Protocol ¶¶ 13, 19.

Courts have repeatedly recognized that parties should be allowed to investigate forensic images for evidence of deleted files and, when possible, should be allowed to recover those files. *See, e.g.*, *Ameriwood Indus., Inc.*, 2006 WL 3825291, at *6; *Antioch Co. v. Scrapbook Borders, Inc.*, 210 F.R.D. 645, 652 (D. Minn. 2002) (same). Here, in light of Donziger's conduct, searches for deleted or altered files are both appropriate and necessary.

**D.** **The Benefits of the Proposed Protocol Outweigh Any Minimal Burden or Expense.**

Imaging Donziger's electronic Devices and Accounts per the terms of the Protocol will not impose an undue burden on Donziger. *See Simon Prop. Grp. L.P. v. mySimon, Inc.*, 194 F.R.D. 639, 641 (S.D. Ind. 2000) (noting that the court found that the adoption of a protocol using a neutral forensic expert to image a party's devices offered "the best approach" to address any potential burden on the party whose devices were to be imaged); *Freres v. Xyngular Corp.*, 2014 WL

11

1320273 at *5 (D. Utah Mar. 31, 2014) ("[W]hile there may be some burden associated with producing [plaintiff's] cell phone for copying and inspection, the court does not believe it is an undue burden."). To minimize any burden, the Protocol provides that the Devices will be collected from Donziger at his office and returned as soon as the imaging is complete without unnecessary delay. Protocol ¶¶ 4, 5. The Protocol further provides that the Neutral Forensic Expert will protect the integrity of the data on Donziger's Devices and Accounts. *Id.* ¶ 7. And, finally, because Chevron is willing to bear the cost of creating, searching, and analyzing the images, Donziger cannot argue that costs prohibit compliance or are an undue burden. *See Vaughan Co. v. Global Bio-Fuels Tech.*, LLC, 2016 WL 6605070, at *3 (N.D.N.Y. May 20, 2016); *Balboa Threadworks, Inc. v. Stucky*, 2006 WL 763668, at *4 (D. Kan. Mar. 24, 2006).

### III.
### CONCLUSION

In sum, Donziger is a proven liar with much to hide, and Chevron's proposed Protocol seeks to remedy, to the extent possible, these and other acts of discovery misconduct by Donziger through appropriate imaging and search procedures. In light of Donziger's ongoing pattern of discovery abuse and the broader context in which it has occurred, Chevron respectfully requests that this Court adopt its proposed Protocol.

Dated: October 29, 2018

New York, New York

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

　　　／s／ Randy M. Mastro

Randy M. Mastro
Andrea E. Neuman
Anne M. Champion
200 Park Avenue
New York, New York 10166

12

Telephone: 212.351.4000
Facsimile: 212.351.4035
Email: RMastro@gibsondunn.com
Email: ANeuman@gibsondunn.com

William E. Thomson
333 South Grand Avenue
Los Angeles, California 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520
Email: WThomson@gibsondunn.com

STERN, KILCULLEN & RUFOLO LLC
Herbert J. Stern
Joel M. Silverstein
325 Columbia Tpke, Ste 110
P.O. Box 992
Florham Park, New Jersey 07932-0992
Telephone:  973.535.1900
Facsimile:  973.535.9664
Email: hstern@sgklaw.com
Email: jsilverstein@sgklaw.com

*Attorneys for Chevron Corporation*