**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHEVRON CORPORATION, <br><br>      Plaintiff, <br><br>   v. <br><br> STEVEN DONZIGER *et al.*, <br><br>      Defendants. | 11 Civ. 0691 (LAK) |

**OPPOSITION TO CONTEMPT MOTION (DKT. 2090)**

I. <u>**Introduction**</u>

 Chevron's latest motion to hold me in contempt is not really a legal document. It is an unrelenting and deeply disingenuous *ad hominem* attack laundered through the auspices of a federal court filing but aimed at the media and the human rights and environmental community, part of what the company long ago identified as its "long-term strategy" to evade liability for its Ecuadorian contamination: "***demonize Donziger***." This Court should not only reject the abuse this motion represents, but should impose costs and warn Chevron's counsel that further efforts so explicitly aimed at unconstitutionally chilling corporate accountability advocates generally and Chevron critics specifically will be met with Rule 11 sanctions.

 It is clear there is no valid basis for these post-judgment proceedings. As I have repeatedly explained, *see, e.g.*, Dkts. 1986, 2018, 2026, 2032, 2034, 2042, 2051, 2118, it is *impossible given its own rulings in this case* for the Court to find my fund-raising assistance to my clients to be contemptuous given the lack of a clear prohibition on fundraising in light of the Court's April 25, 2014 Opinion. The Court cannot disagree, so it stays silent and refuses to rule, while allowing

Chevron a blank warrant to seize as much confidential and privileged information from me and my colleagues as it can. The seizure is a transparently desperate search for something to shore up Chevron's ill-founded contempt claims and dry up funding for the entirely appropriate and constitutionally-protected litigation and advocacy campaign to enforce the *Aguinda* judgment and to hold Chevron accountable for its admitted dumping of billions of gallons of oil waste in Ecuador.

As for the money judgment, I have long since offered Chevron all available information about my assets. Chevron could care less about my assets, which in total likely would not match even a day's worth of the company's expenditures in its national discovery campaign. Chevron covets the discovery process for its raw brutality: the massive financial burden and intimidation effect of subpoenas on innocent third-party supporters of the Ecuadorian environmental case, who suddenly think they have done something wrong, *see infra*, as well as the instillation of the fear in non-subpoenaed third parties who will now be "chilled" from providing any future support.[1]

## II.   Ms. Sullivan's Declaration: A Window into Chevron's Methodology

Chevron's demonization campaign has been driven in large part by its practice of "flipping" colleagues and allies of mine and convincing them to provide written declarations attacking me. Chevron's latest motion is no exception, using the declaration of Ms. Sullivan in this regard. It is impossible for Chevron and Gibson Dunn to hide the fact that the tactics employed are abusive: Chevron obtains these declarations, which are ghostwritten by Chevron's own lawyers,

---

[1]   Chevron has exploited the Court's blank warrant to issue a blitzkrieg of subpoenas to individuals and entities, including several funders, a news agency that distributes press releases, my brother-in-law who once made a loan to me in 2012, and my wife who has nothing to do with the case. Each Chevron subpoena deliberately and misleadingly omits the key April 2014 Opinion. Instead, it cites only the court's March 2014 order and its later default judgment without the critical clarification provided by the April 2014 Opinion. Chevron's subpoena strategy again underscores that this is a SLAPP-style attack not just on me but on all supporters of the Ecuadorians and is designed to silence us and convince us to "give up"—the explicit strategy endorsed by former CEO John Watson on an investor conference call in 2013.

by inflicting brutally costly and time-consuming discovery demands (Ms. Sullivan testified she already had spent over $170,000 of her own money responding to Chevron's subpoenas), maligning the targeted individual in threatening letters and court papers, and even going after the individual's other business interests to the point that the individual fears for their entire career and ability to provide for their family. Ms. Sullivan's deposition on September 28, 2018, revealed all these ugly features of Chevron's tactics. It is worth considering in depth before proceeding into my response to Chevron's bogus contempt allegations.

Ms. Sullivan's declaration is really the declaration of Gibson Dunn partner Robert Blume and his colleagues. While Gibson Dunn will no doubt make predictable excuses about the "usual" practice of attorneys drafting client affidavits, the practice in this case was extreme. Ms. Sullivan was not a trusted client of Gibson Dunn, but an adverse witness. She received the draft in full from Blume. When she made edits to the draft, not all her changes to her own declaration were "accepted" by Chevron's lawyers and new material was added. The declaration is filled with petty and craven attacks on me and my colleagues that Ms. Sullivan, on cross, had no knowledge about or interest in. They were drafted and included by the Gibson Dunn lawyers to serve the "demonization" mission, and Ms. Sullivan was not going to fight over them. In fact, Ms. Sullivan was helpfully clear about exactly why she cooperated and how she saw the whole process: "There was a determination that I wanted this *to be over as quickly as possible* and what was that path that was best for me and me alone." Deposition of Katie Sullivan. Sept. 28, 2018, at 282.

Ms. Sullivan candidly admitted that her declaration was drafted in whole by Gibson Dunn lawyers. *Id.* at 259. While she was allowed to edit "her" declaration, only some of her changes were "accepted" by its true Gibson Dunn authors. *Id.* at 258. Not surprisingly, both Chevron and Ms. Sullivan have adamantly refused to produce the intermediate drafts which would show what

3

edits by Ms. Sullivan the Gibson Dunn authors refused to accept. Gibson Dunn is shamelessly asserting attorney work-product protection over drafts containing Ms. Sullivan's edits to the Gibson Dunn-authored declaration.

The result is a declaration filled with strategically attacking material that while Ms. Sullivan may not be willing to disavow—she just wants "this to be over as quickly as possible"— she clearly has no connection to. Most clear in this regard are the numerous points in Ms. Sullivan's affidavit at which she states that she has no knowledge about various things that there would be no reason for her to know about. These points would be silly and meaningless, except of course they fit neatly into Chevron's larger rhetorical attacks, painting me as scheming or dishonest.

For example, I confronted Ms. Sullivan at deposition with her statement from her declaration that "[a]t no time did Steven disclose to me that the FDA was an organization that he created and controlled." Both Chevron and I know that I neither created nor have ever controlled the FDA, and Ms. Sullivan knows little to nothing about the FDA or how it operates. The statement is a Gibson Dunn statement, written to further Chevron's attacks. Ms. Sullivan's defense of it at deposition is, respectfully, just pathetic:

> Q. What is the basis of your knowledge?
>
> A. The basis is that I did not know that the FDA was an organization that was -- that was created or controlled.
>
> Q. By who?
>
> A. By you.
>
> Q. So you assume in making this statement that the FDA was created by me?
>
> A. If someone were to ask me a question, did Steven disclose that the FDA was an organization -- disclose to you that the FDA was an organization that he created, I would say, No, he did not.
>
> Q. But you don't know whether I created the FDA or not, do you?
>
> A. Correct.
>
> Q. Why would you put that in there, in your affidavit? . . .

4

> A. I don't have knowledge that you created the FDA.
>
> Q. Well, if you have no knowledge I created the FDA, why would you put that statement in the affidavit?
>
> A. It was -- *it was in a draft that was presented to me*, and I could say that that statement is true. "At no time did Steven disclose to me that the FDA was an organization that he created and controlled." It's a true statement. You did not.

*Id.* at 272-73. *See also id.* at 275-76 ("Q. You have no knowledge as to whether I created or did not create the FDA, correct? A. Correct. Q. You don't even know what year the FDA was created, do you? A. Correct. Q. You don't know the people in Ecuador who founded the FDA, do you? A. Correct. Q. You don't know the city in Ecuador where the FDA was founded, do you? ... A. Correct. You don't have any knowledge of how the FDA functions as an organization, do you? 24 A. I do not. 25 Q. You don't know who controls the FDA, do you? A. I do not. . . . 2 Q. The fact is that the Chevron lawyers when they presented you with a draft of this affidavit wanted that statement to be in there, correct? A. I'd assume so, but *I didn't have a conversation with them about it*, so I don't know for certain. Q. But you didn't write that yourself, did you? A. I did not write the draft of the affidavit myself.").

The examples go on and on, completely undermining Ms. Sullivan's credibility and laying bare the extent of Chevron's witness intimidation. Regarding another "I am unaware of" type statement in Ms. Sullivan's declaration:

> Q.  I mean, there's a lot of sentences you could have put in there where you could have started, I'm unaware of something, correct?
>
> A. Correct.
>
> Q. So why did you put in this particular sentence that relates to a professor in Canada and her husband?
>
> A. *I did not put it in there. It was part of the draft.* And I didn't delete it because it is true: I was unaware.

*Id.* at 280-81. Gibson Dunn's ghostwriting is so overbearing that it usurps not just the tone and scope of the declaration, but in fact also its content—despite Ms. Sullivan's pro forma protestations

5

that she verified the content as not untrue. Another example concerns Ms. Sullivan's apparent attacks on me concerning my practice of putting pressure on Chevron over its Ecuador liability:

> Q. In the first sentence, it says, 'Steven spent the majority of his time coordinating 'out-of-court' 'nonlegal' strategies to put 'pressure' on Chevron. Do you see that?
>
> A. Yes.
>
> Q. You didn't write that, did you?
>
> A. I did not write that sentence. . . .
>
> Q. Why do you think they put quotes around the word 'pressure'?
>
> A. I do not know.

*Id.* at 295, 298. When I questioned Ms. Sullivan directly about what she thought about pressure tactics in the context of a social justice litigation and advocacy effort, her answers leave quite a different impression than her declaration:

> Q. And the next sentence, "The goal of [Steven's] pressure campaign was twofold," those are Chevron's words from the draft, correct?
>
> A. "Pressure campaign," yes, that was in the draft.
>
> Q. You don't see anything wrong with people in the position of my clients in Ecuador wanting to put pressure on Chevron to settle the case, do you?
>
> A. No. I think -- from my perspective, there was legal stuff going on in court in Canada, and then there's other strategies that were in place to put pressure on them. "Pressure" is not a -- I would say that's not a new word.
>
> Q. It's not a bad thing, is it, in this context?
>
> A. No. I think -- no, I don't think it's a bad word. You just have to work many angles in whatever you're -- whatever you're doing.

*Id.* at 298-99. Ms. Sullivan also provided a blow-by-ugly-blow account of how the tactics against her mounted to the point she was willing to surrender to Chevron's demands. She was served a subpoena, produced documents, and sat for deposition—generally a burdensome and expensive but not unusual practice. But in her first deposition, she didn't participate in any attacks on me or

the Ecuadorian case. *See, e.g.*, *id.* at 340-42. In her own recollection, "there were boundaries in

that deposition." *Id.* at 284. At some point, Chevron decided additional pressure was necessary.

As experienced by Ms. Sullivan:

> I remember seeing a letter that was filed to the judge in response to
> the protective order that [my lawyer] Frank Libby submitted on my
> behalf asking for further boundaries. And it was that letter that was
> submitted by Gibson Dunn that made some reference to that -- there
> was a lot of mischaracterization in that letter: that I was potentially
> a co-conspirator or, I think, some preservation order, wrongdoing
> was possible. As I said, it felt like anything was possible because
> anyone can seem to say anything or send anything to anyone, and
> it's all okay. . . . I thought it was very -- I thought it was mean. It was
> not -- just not -- it was mean. I felt -- I felt it was unfair. . . . It was
> the whole tone. There were things in there that were not true. And
> at a certain point, you make a decision to continue to fight and battle
> back and forth because he -- I say one thing through my lawyer and
> then they say another thing and then I say another thing, and it never
> ends.

*Id.* at 285-87. As Ms. Sullivan was very quick to perceive, when you go up against an army of

lawyers who litigate like Gibson Dunn in court, you literally get trapped. You might eventually

escape, but only if you surrender.

     Ms. Sullivan also explained at deposition the sadly unexceptional fact that Chevron chose

to target not just her but also her clients, which put her in fear of losing the business she had worked

her entire career to establish and that was critical to supporting her family:

> Q. Did Chevron's service of a subpoena on your client worry you?
>
> A. Of course. . . .
>
> Q. Did it make you feel like your involvement with me in this
> Ecuador case could negatively impact your business, given that
> Chevron was subpoenaing you and your clients?
>
> A. Yes. . . .
>
> Q. It took you away from your normal business activities in order to
> deal with it, correct?
>
> A. It took me away -- it took a lot away from me, correct.

*Id.* at 288-90. And then of course there is the raw, brutal cost of facing off against Chevron. Ms.

Sullivan estimated that she had been forced to spend **between $170,000 and $180,000 merely to initially respond to Chevron's discovery requests** as a supposedly well-protected Rule 45 third-party witness. If this was the cost to cooperatively sit for one deposition and produce all her documents, Ms. Sullivan was justified in fearing that the cost for putting up any meaningful resistance to what Chevron wanted would be devastating. *Id.* at 291 ("Q. Has that amount of money impacted your financial well-being or that of your family? A. Of course."). And thus the "determination" was made for "this to be over as quickly as possible." *Id.* at 282. *See also id.* at 293 ("Q. And signing the affidavit, in your mind, in your calculation, would lead to -- in your mind would lead to less litigation involving Chevron, correct? A. It would lead to less of my time, energy, and money allocated towards this, correct.").

Chevron has been perfecting this dance of intimidation against the lawyers and supporters of its Ecuadorian victims for years. The "truth" of these six years' of litigation against me in this Court is largely built on carefully constructed  "truths" just like those in the Sullivan declaration, *i.e.* the rhetorical machinations of Gibson Dunn. With this clearly in mind, I turn to the last round of insinuations and distortions in Chevron's most recent motion for contempt.

III.    **Funds raised prior to August 2018 were not "traceable" to the Ecuador Judgment under the scope of the RICO Judgment as articulated by the Court**

Chevron admits: "***In its August 15, 2018 order***, the Court held that 'there is no uncertainty in the language of paragraph 1 of the judgment' [and] went on to explain that 'any property (1) that Donziger (a) had as of the date of the judgment in this case, or (b) acquired from the date of the judgment until now, or (c) hereafter may acquire and (2) that Donziger was 'enabled to acquire' by the Ecuadorian Judgment or its enforcement is traceable to that Judgment' and 'subject to the constructive trust imposed by the judgment in this case.'" Dkt. 2090 ("Mot.") at 22.

This sweeping understanding of what is "traceable" to the Ecuadorian Judgment is deeply

troubling as a matter of due process and will be challenged on appeal. The more important point for purposes of this motion is that it only emerged ***in August 2018***—and even now has not been held explicitly to apply to investor-provided funds received between March 2014 and August 2018 when all such funds that are relevant to Chevron's motion were raised. Indeed, until August 2018, the Court's guidance as to understanding the scope of what was "traceable" to the Ecuadorian Judgment was that set out in its April 2014 Opinion. There, the Court very clearly explained that while "***as long as no collections are made*** in respect of the Lago Agrio Judgment and funneled to Donziger as retainer payments, the NY Judgment would not prevent Donziger from being paid, ***just as he has been paid*** at least $958,000 and likely considerably more over the past nine or ten years." Dkt. 1901 at 7-8 (emphasis added). The Court knew perfectly well that I had always been paid out of litigation finance funds raised from contingency interests in the Ecuadorian Judgment; indeed, in the same Opinion the Court observes that the "case ***always*** has been financed on the movants' side by outside investors." *Id.* at 14. In consistent fashion, the Court rejected my concern that the RICO Judgment would be used by Chevron to shut down fund-raising necessary both for the appeal as "fanciful" and "border[ing] on the irresponsible." Why? Because "[t]here is no reason to suppose that the Lago Agrio Judgment will be ***collected*** in any material part during the pendency of the appeal." *Id.* at 11.

The April 2014 and August 2018 understandings of "traceable" are flatly contradictory. If any and all funds raised from contingency interests given to outside investors were "traceable" to the Judgment and thus subject to constructive trust, I could not continue "being paid, just as [I] ha[d] been paid . . . over the past nine or ten years." There is no wiggle room here. The Court had a different understanding of "traceable" in April 2014. It described that understanding in a critical operative decision. I conformed my conduct to that decision. *See* Donz. Decl. at ¶ 8. As I recently

wrote, even if it has now changed its mind, the Court cannot pretend that it has the ability to travel

back in time and make "traceable" mean something different than was described in the April 2014

Opinion. Dkt. 2118.

My conduct in raising and spending investor funds on litigation expenses (including my

own fees) from April 2014 to August 2018 not only was not contemptuous, but entirely proper.

For the same reasons, the funds themselves were not raised "in violation" of the injunctive scope

of the RICO Judgment as the Court itself had articulated it. These funds cannot now be considered

improper or subject to a claim of any sort by Chevron.

## IV.   **Chevron's refusal to recognize the effect of the April 2014 Opinion is in flagrant bad faith**

Chevron's limited attempts to rebut the significance of the April 2014 Opinion show only

willful blindness, desperation, and bad faith.[2] For the most part, Chevron simply trots out

conclusions drawn from the RICO Judgment language that ignore or are flatly inconsistent with

the April 2014 Opinion with no attempt at reconciliation—*e.g.*, the RICO Judgment "does not

provide for an exception for so-called 'fees' or 'expenses' traceable to the Ecuadorian judgment

that are paid to Donziger," "[p]aying himself money that would otherwise be transferred to

Chevron certainly qualifies as Donziger 'benefitting personally' [from the Ecuador Judgment]."

At pages 29-31 of its motion, Chevron finally attempts a more specific rebuttal, making three

arguments:

- First there is the desperately strained and convoluted argument that because my

  own interest (which I legally didn't own as it was subject to the constructive trust)

  was purportedly diluted by the introduction of new investors, this dilution must be

---

[2]   Chevron's flagrant refusal to cite or quote from the April 2014 Opinion in its intimidation-style subpoenas
further illustrates the bad faith.

considered some sort of *quid pro quo* for the provision of "cash on hand" to me from these investors. *See* Mot. at 29. This is ridiculous on many levels. No documents or other evidence reflect any sort of bargaining related to the dilution of my interest; rather, the documents reflect, just as I have told the Court over and over again, that the finance agreements were careful to pledge only the FDA's interest in the judgment, not mine. Donz. Decl. at ¶ 8. The evidence further shows that the money provided by investors was not "cash on hand" or "profit" to me, but funds to cover litigation expenses (including my fees, which the Court explicitly held I could continue be paid "just as [I had] been paid," *supra*) that I (and others) distributed appropriately in accordance with the agreements and FDA direction. *Id.* at ¶¶ 9-11.

- "Second . . . there is no evidence that Donziger has performed bona fide legal services." Mot. at 30. This of course is belied by my actual work, which has encompassed all sorts of legal services (including defending these very post-judgment proceedings and helping with strategy across multiple jurisdictions) and related advocacy, and does not merit a further response.[3] *See* Donz. Decl. at ¶¶ 5-6.

- "Finally, the evidence demonstrates that Donziger has likely been selling his own interests [because] the FDA, has no legal right to sell shares in the Ecuadorian judgment." Mot. at 31. This argument is premised entirely on the Velasquez declaration, which is wildly overreaching and just plain wrong. To be clear at the

---

[3]    As noted, I am subject to an "interim suspension" without a hearing by judicial authorities in New York and the District of Columbia based entirely on this court's RICO findings. I am contesting that suspension as well as this court's findings. As a result of my suspension, I do not give legal advice nor offer legal services to my clients in Ecuador nor to any other client. Donz. Decl at ¶ 4.

outset of my brief response, my clients and I have **no obligation whatsoever to litigate the FDA's rights under Ecuadorian law before this Court**, which has demonstrated its utter and willful ignorance of Ecuadorian law—indeed its outright contempt for Ecuadorian law and legal institutions—time and again. However, for the purposes of rebutting the absurd argument that the supposed limits on FDA authority means I must have been selling my own interest, I will respond as follows:

- o The main Velasquez claim is supported by one citation from the Ecuador Judgment and one citation from the Ecuador Trust document. Both citations fail to support Velasquez's conclusion.

- o The citation to the Ecuador Judgment is as follows: "The entire endowment shall have as its purpose to cover the necessary costs for the contracting of the persons in charge of carrying out the measures of reparation contemplated in part Thirteenth of the Findings, and the legal and administrative expenses of the trust." The argument is apparently that a contingency interest paid to an investor would not be a "cost" "necessary" to the contracting of persons to carry out reparation measures. But to the contrary, the reality is that fund-raising off of contingency interests is absolutely "necessary" to obtaining the funds by way of judgment enforcement that will be used to accomplish the remediation. The Ecuador Judgment will not enforce itself, as Chevron of course knows after having hired four major law firms in Canada and spent millions of dollars to tie up enforcement efforts in preliminary objections and appeals that have lasted for over six years. Litigation finance interests clearly are considered a legal

expense of the trust, which, through its sole beneficiary the FDA, is working to raise funds for remediation by way of enforcement proceedings and other advocacy. Again, neither I nor the FDA is taking a position regarding the legal basis for financing in response to the illegitimate introduction of this Ecuadorian law issue into this illegitimate collateral attack in New York. But the observations just made are sufficient to show that Velasquez's claim in this regard is unsupported. In any event, this motion is decidedly *not the place nor the time* to resolve any desperate last-ditch Chevron objections related to litigation financing under Ecuadorian law, which it has failed to make in 17 years' worth of litigation in Ecuador's courts.

o  The citation to the Ecuador Trust document is as follows: "The BENEFICIARY of this TRUST is subject to a negative covenant consisting of the commitment not to assign its rights as BENEFICIARY under any title." But the litigation finance contracts did not assign away any rights of the FDA under the terms of the Trust, but rather memorialized a promise by the FDA to pay a percentage amount of any recovery in the contingent event of a recovery. Any recovery in enforcement or settlement would be received by a representative of the FDA in the first instance, and then distributed pursuant to the FDA's directions and contractual commitments. Again without taking any position on this issue in this collateral and illegitimate context, there is no assignment of rights under the Trust as I or my clients have understood the relevant language.

o  Velazquez's further claim that the FDA doesn't have a right to sell an

interest in the 10% award made by the Ecuador Judgment to the FDA apart from the damages judgment is even more unfounded. Velasquez claims that the express award to the FDA in the 2011 trial court judgment was improper and should have gone to the named plaintiffs. Apart from being wrong as a matter of law, this Chevron objection is again so untimely as to be ridiculous. The Ecuador trial court judgment has been affirmed on appeal by the country's National Court of Justice and its Constitutional Court. To my knowledge, Chevron never made this argument in any of these appeals and if they did they were rejected. Now we are supposed to take it as the gospel truth from this "expert" who was clearly told what conclusions to reach by company lawyers and therefore had to concoct some superficial way to justify them.

### V. **Funding raised through legitimate litigation finance transactions was used for litigation expenses, including my own fees, and accounted for to the satisfaction of my clients**

Woven throughout Chevron's contempt motions are assertions transparently designed to appear salacious and suggest that I am somehow corruptly managing, disbursing, or misusing investor-provided funds—rather than, in fact, legitimately using those funds at the direction of my clients to keep their claims and advocacy against Chevron not just alive but indeed such a problem for Chevron that it has green-lighted another Gibson Dunn three-ring circus of litigation in this post-judgment context.

Chevron's assertions in this regard consist entirely of rhetoric. They are as devoid of facts as Chevron's opening bluster, when Chevron, breathlessly quoting the Sullivan Declaration that it drafted itself, tries to malign how I went about helping my vulnerable and impoverished clients

14

finance their case: "***With a 'goal' to 'just get as much as [he] can get,' since March 2014 Donziger has sold interests*** . . . ." Mot. at 1. Yes, Chevron, that's how fund-raising efforts (at least for anybody other than a government or corporate bond-issuer) typically go: you try to raise as much money as you need. I will refrain from responding further to this kind of nonsense.

My fund-raising efforts were successful because many well-resourced individuals of conscience, unlike this Court, actually give Two Cents about the Ecuadorian communities who have been devastated by Chevron's contamination and want to keep their historic litigation and corporate accountability campaign moving forward. It is also clear that the asset those individuals are investing in is extraordinary: a multi-billion dollar environmental judgment based on obvious and horrendous contamination that has been affirmed by all four layers of Ecuadorian courts and the enforcement of which has been endorsed by Canada's Supreme Court. No matter how much this Court attacks the Ecuador Judgment, those attacks will be seen for what they are: a U.S. judge with no apparent jurisdiction conveniently issuing order after order trying to help a U.S. company (described by the judge as "a company of considerable importance to our economy") evade a major liability imposed by a foreign court. The Ecuadorian communities, through the FDA, have the same rights as any other judgment creditor, which include the right to choose where to enforce their judgment. In a Canadian enforcement proceeding on an Ecuadorian Judgment, the words of a judge from a collateral proceeding in the defendant's home country matter very little, as they should. Wise investors see the inherent strength of the case despite this Court's collateral attack campaign. These investors have freely and intelligently chosen, many after substantial independent due diligence, to invest. *See* Donz. Decl. at ¶ 8.

As Chevron itself describes: "Donziger raised at least $2.4 million through [litigation finance] agreements, in exchange for interests totaling at least 1.28525% of the Ecuadorian

judgment." Mot. at 4-5. I am proud of that fact and my clients have been greatly pleased with it. That's a damn good deal for the vulnerable communities harmed by Chevron. For a relatively tiny percentage of the recovery, while under an extraordinary amount of outside pressure, the Ecuadorian communities and the FDA have obtained critically important resources to continue their case and campaign. As the Court knows, plaintiffs (even those in an enforcement context) generally hand over 20 or 30 times that amount of recovery interest to obtain significant litigation financing. While Chevron's motion references attacks on me from a rival group of plaintiffs who work through a different organization that has no right to any proceeds from the judgment (this group has failed entirely to raise funds for the case and some of its leaders are motivated by jealousy and personal animosity), it makes no reference to any complaints from my actual main client (the FDA) nor the FDA-represented communities and individuals with whom I collaborate and consult with on my regular trips to Ecuador. *See* Donz. Decl. at ¶ 21.

While $2.4 million might seem substantial, it is actually a paltry fraction of what Chevron spends on its litigation expenses and its own advocacy campaign which involves multiple law firms, investigations firms, public relations firms, and experts. The small amount of funds raised by the FDA has been managed to support a litany of litigation and advocacy efforts on multiple continents, including most significantly the litigation expenses in Canada, client administrative costs in Ecuador, and of course my own time needed to respond to the blitzkrieg of litigation against me while keeping the overall case and advocacy effort on track. *See* Donz. Decl. at ¶ 5-6. While I manage expenditures in furtherance of these efforts with a significant amount of discretion, I do so with the authorization and understanding of my clients who have seen me work tirelessly on the case for over 25 years. My clients know how motivated I am to achieve justice for them and to impose accountability on Chevron. My clients have ample opportunity to consult with me and

discuss particular spending issues during the visits to Ecuador I make each year and the dozens of conference calls I participate in with FDA leaders and other FDA members annually. *See* Donz. Decl. at ¶ 4.

The Slavek analysis contradicts none of the above. To the contrary, his analysis confirms that with a few exceptions explained by inadvertence and changed circumstances, *see* Donz. Decl. at ¶¶ 16-17, almost all investor funds were received into my law firm account. Because I was authorized to draw down funds to satisfy certain debts and arrears, *see* Donz. Decl. at ¶ 11-13, I often transferred appropriate payments to myself, even though I would later pay other individuals and case expenses out of essentially those same funds (which were owing to me) when funds became tight once again, to ensure that necessary litigation and advocacy efforts would continue with minimal interruption. *Id.* at ¶ 13.

While there was a certain amount of unfortunate (and inevitable) disorganization on the administrative and bookkeeping side, *see* Donz. Decl. at ¶ 14-15, I note again that my clients—the FDA and the communities and individuals it represents and those who choose to associate with it—have not made *any complaint* about my management of investor-provided funds. Their despised enemy Chevron is hardly positioned to stand in for them and plead a claim that they have never made themselves. It is true that a splinter group led by Mr. Pablo Fajardo and now centered around the UDAPT organization has repeatedly attacked me, *see* Donz. Decl. at ¶ 3 n.1, but my actual clients are pleased with my fund-raising and management of the funds, *id.* at ¶¶ 4, 10.

Finally, it may be that my lifestyle, while relatively modest, might not meet the standards of penury that Chevron's executives and Gibson Dunn's partners—all of whom earn vastly more than me for doing the dirty work of desperately attempting to avoid paying sick Ecuadorians any compensation for their suffering—might wish to see from a human rights lawyer. So be it. Even

though I made virtually nothing from working on the *Aguinda* matter, I have no qualms about the modest and largely sporadic compensation I sometimes have received for my tireless efforts working on this massive global litigation and advocacy project, and neither do my clients. *See* Donz. Decl. at ¶ 10.

**VI.    Until August 15, 2018, I had no reason to believe that investor-provided funds might be considered "traceable" to the Ecuador Judgment**

The Court's first opinion on the whole subject of Chevron's contempt claims was issued May 16, 2018. Until then, my view of the scope of the RICO injunction was precisely as was set out in my April 24, 2018 opposition to Chevron's motion to contempt:

> [The April 25, 2014 Opinion] makes clear that funds "traceable to the judgment" would not include the sorts of funds that undersigned raised and used to pay case expenses, including for his own fees, in the years prior to the RICO litigation. The only funds subject to the order are those obtained by way of "collections [that] are made in respect of the Lago Agrio Judgment." Dkt. 1901 at 8 (emphasis added). The Court outright chastised the undersigned for seeing any concern regarding his ability to raise funds (and compensate himself and others) implied in the language of paragraph 5 of the RICO Judgment.

Dkt. 1986 at 5. Until May 16, 2018, I didn't consider it remotely plausible that litigation finance funds could be considered subject to the constructive trust in the RICO Judgment (or, relatedly, the Default Judgment). I genuinely believed, and still believe, that Chevron's suggestion to the contrary was totally bogus and foreclosed by the language of the April 2014 Opinion. This Opinion had assured me, and was explicitly intended to assure me, that "traceability" as used in the RICO Judgment was limited to proceeds on a collection on the judgment. As such, I obviously could continue to assist my clients in raising funds to finance the RICO appeal, the enforcement litigation in Canada, the broader corporate accountability campaign, and specifically that I could continue to pay my own fees "just as [I had] been paid . . . over the past nine or ten years," *i.e.* from

"finance[ing] [provided] by outside investors." Dkt. 1901 at 7-8, 14. *See* Donz. Decl. at ¶ 8.

In its May 16, 2018 Opinion and May 17, 2018 Order, the Court conspicuously did not rule or even comment on the merits of my understanding of traceability in light of the April 2014 Opinion. Rather, it set the issue down for what can only be described as a bizarre hearing on June 28, 2018 where I was forced to appear pro se for myself, represent my clients, appear as a witness, and also examine two witnesses while Chevron had 12 lawyers present in court with six at counsel's table. I continued to believe that there is no way I could be incorrect in my view of the issue, as my subsequent written pleadings confirm. *See, e.g.*, Dkt. 2018 ("financing for expenses is not a 'profit' on, nor involves 'proceeds' of, the Ecuador Judgment, and thus is not property 'traceable' to the Ecuador Judgment, as this Court has established"); Dkt. 2026 at 14 n.27; Dkt. 2032; Dkt. 2034; Dkt 2042 at 2. I vigorously argued my position at the June 28 hearing and the Court acknowledged that it was faced with a legitimate issue:

> I understand what you think, Mr. Donziger, of the April 25th document said. I wrote it. I can read it. I think we may well have or there may well be a disagreement about what its significance is. I am sure there is. Certainly I know Mr. Mastro has a different view whatever it says and whatever it was could be construed as. I understand that.

6/28 Tr. at 69-10. I expected a ruling on the issue in my favor promptly and I continued to vigorously assert my position regarding the limited scope of RICO Judgment traceability, fixed by law of the case, after the June 28 hearing. *See, e.g.*, Dkt. 2051 at 2; Dkt. 2061 at 7.

In a mysteriously cursory order dated July 23, 2017, the Court still refused to rule on the core issue of traceability in light of its April 2014 Opinion. Instead, the Court merely noted that "hearing has now been concluded" and ordered me to produce certain discovery, with zero explanation. Dkt. 2056. It was not until the Court's memorandum order on the Amazonia transfer issue on August 15, 2018, that the Court finally articulated its novel and sweeping interpretation

of what "traceable" could mean under the RICO Judgment. Even there, the Court only applied its new interpretation to the issue of the Amazonia and judgment interests transfers, conspicuously declining to address the issue of the new traceability as applied to investor-provided funds. *See* Dkt. 2072 at 8 n.18.  As noted in my most recent letter to the Court, the Court has still not squarely ruled on the issue while allowing Chevron a blank warrant to intrude into the internal workings of the team enforcing the judgment and its supporters. *See* Dkt. 2118.

In light of the foregoing, I had no reason, on and around May 10, 2018, to consider that the remaining investor-provided funds that I received from Ms. Sullivan were impacted by either the RICO Judgment or the Default Judgment, which of course used precisely the same language as the RICO Judgment. I still maintain that it would be improper and unlawful to interpret those Judgments *ex post* to be subject to this Court's injunction when the Court made clear to me in April 2014 that this would not be the case.

## VII.    A whole new RICO Judgment?

The most shocking element of Chevron's latest (I believe its eleventh) effort to hold me in contempt emerges at pages 34-36 of its motion. For enforcement purposes, the Court's RICO Opinion was distilled into injunctive form in very clear and specific terms in what we have been calling the RICO Judgment, Dkt. 1875. In pages 34-36, Chevron essentially pretends that the RICO Opinion should be read as a *500-page injunction* prohibiting any and all conduct that the Court and/or Chevron found (incorrectly, I still maintain) to be illegal or improper. Doing so would raise a tsunami of legal and constitutional problems, some of which are articulated below. But as a simple matter of common sense, what would have been the point of the Court's specific articulation of the injunctions in the RICO Judgment if the whole Opinion was to act as a free-form injunction? Chevron's ambition is simply unhinged at this point. Its requests are so patently inappropriate that

I will limit myself to the following illustrative observations:

- **"Extortion."** Mot. at 34. Chevron appears to be asking for an injunction that would prohibit not just me but all the non-parties who Chevron freely calls "co-conspirators" from engaging in any efforts to pressure Chevron into doing the right thing, *i.e.* settling the enforcement actions rather than drag its victims in Ecuador through yet more decades of litigation while they live in the midst of life-threatening contamination. If endorsed, Chevron's wide-ranging view of the scope of the injunction would amount to a constitutionally-reprehensible gag order against advocacy considered essential not just by me and my clients but by countless public interest groups and persons of conscience.[4] The reality is that the Court itself, at the insistence of the Second Circuit, kept its hands off of non-U.S. enforcement actions, as repeatedly emphasized throughout the RICO Opinion and the Second Circuit's affirmance thereof. *See, e.g.*, *Chevron Corporation v. Donziger*, 833 F.3d 74, 151 (2016) ("[t]he relief tailored by the district court . . . does not invalidate the Ecuadorian judgment and does not prohibit any of the LAPs from seeking enforcement of that judgment anywhere outside of the United States"); *id.* at 81 ("the district court confine[d] its injunction to a grant of *in personam* relief against the three defendants-appellants without disturbing the Ecuadorian judgment"); *id.* at 144 (the district court granted only "limited, non-global equitable relief"); *id.* at 145 (the district court "granted equitable *in personam* relief that does not invalidate the Ecuadorian judgment").

---

[4]  Among the many groups advocating for the Ecuadorians and their defenders are Amazon Watch, Rainforest Action Network, Amnesty International, Global Witness, Greenpeace, Friends of the Earth, and Pachamama. Individuals who have expressed support for the campaign of the Ecuadorians include, among many others, the actor and producer Trudie Styler; singer-songwriter Sting; Roger Waters, a founder of Pink Floyd; Phil Fontaine, the former National Chief of Canada, and the thrice-elected President of the Assembly of First Nations; Alec Baldwin, the actor; Canadian Grand Chief Ed John and Canadian Grand Chief Wilton Littlechild, both drafters of the U.N. Declaration of the Rights of Indigenous Peoples; National Chief Perry Bellegarde, the elected leader (by 653 chiefs) of Canada's Assembly of First Nations; and countless others.

Furthermore, even the Court's *in personam* injunctive relief directed at me never purported to enjoin my speech or advocacy. *See* Dkt. 1875 at <u>nowhere</u>. Rather it articulated specific required actions and injunctions related to "profiting" from "proceeds" on a "collection" of the Ecuador Judgment. Chevron cannot now, on a post-judgment motion, fundamentally transform the nature of the relief provided by the Court and affirmed on appeal just because it is clear its massive spending to obtain a RICO judgment against three individuals has not detained the forward advance of the enforcement action in Canada.

- **"Wire and Mail Fraud."** Chevron claims that I "continue to engage in acts that are indictable under the wire or mail fraud statute." Mot. at 35. Please. The use of the word "indictable" is particularly pathetic. Chevron knows that no public prosecutor (who would not have a multi-billion dollar self-interest in the prosecution, as Chevron has) would ever proceed on its trumped-up claims based on paid-for witness testimony. Even Chevron— led by the fearless self-described "mob prosecutor" Randy Mastro—was too afraid to present its case to a jury, which of course a real prosecutor proceeding on a real indictment with real evidence would have to do.

- **"Money Laundering."** As in the original RICO case, this claim is entirely predicated on the supposed illegality of the predicate activity. If advocacy against Chevron is illegal, then funding for advocacy against Chevron is money laundering. What a terrifying world we live in, if Chevron gets its way.

- **"Obstruction of Justice."** Chevron has two claims here. First: "Donziger violated multiple discovery orders of this Court by concealing bank accounts and assets, failing to conduct even the most basic document searches, failing to produce responsive documents, and refusing to respond to deposition questions." Mot. at 37. Even setting aside my good faith

discovery responses in these post-judgment proceedings (I have produced documents and representations and withheld documents on the basis of clearly articulated objections, many of which are currently the subject of my pending appeals), Chevron in this claim is ***openly seeking to criminalize alleged non-compliance with civil discovery***—not by way of contempt, but by way of federal obstruction of justice. Second, Chevron claims that I "encouraged the deletion of emails." It can point to precisely **one** incident of this, despite unfettered access to discovery through Ms. Sullivan. There is no law against deleting emails, and at the time of Chevron's one incident it does not even pretend that I or any of my colleagues were under any preservation order. Instead it desperately cites authority for the conclusion that obstruction may be found for "destruction prior to service of subpoena of evidence material to known investigation," citing *United States v. Solow*, 138 F. Supp. 812, 814-15 (S.D.N.Y. 1956). But there was no "known investigation" even by Chevron in November 2017 when the relevant email was sent, and Chevron, a private party, is not even able to serve as a source for the kind of "investigation" that would trigger an open-ended preservation duty. (*Solow*, of course, involved a widely-known, ongoing criminal investigation by public prosecutors.) The reason for the suggested deletion was to prevent Chevron from learning of the identity of the proposed funder/supporter and then going on the attack to dry up support for the case, a strategy that Chevron has demonstrated its penchant for time and again. *See* Patton Boggs, Deleon, Woodsford, and most recently Sullivan, Eisler, Van Merkensteijn, Krevlin, Rizack and others. This was clearly explained in the same email chain at the time:

> [T]o clarify[,]the request for deletion does not reflect anything problematic about the meeting itself, but rather the fact that Chevron has in the past improperly used information about perfectly legitimate funding discussions to start put pressure on potential funders and kill off potential deals.

> Confidentiality here is important to protect a process that is not only perfectly legitimate but also as we all know an important piece of delivering access to justice for the affected clients in this case.

Dkt. 2058-14 at MKS-0000090.

Chevron's rage at me appears to have left it entirely unhinged, living in a fantasy world—and one with a terrifying lack of due process. The Court did not impose a free-form injunction against speech and advocacy in its original RICO Judgment and it cannot do so now.

## VIII.    Specific objections to Chevron's "Requested Relief"

Chevron seems to relish the possible imposition of what it outright calls "severe sanctions". However, sanctions are not warranted because non-compliance with the RICO Judgment is absent. As I have repeatedly advised the Court, if the Court has now improperly changed its mind on the injunctive scope of the RICO Judgment and wishes to dramatically expand it beyond what was affirmed by the Second Circuit in 2016, it should simply state this in an appropriate final order that will allow me to seek appellate review. I have repeatedly committed to abiding by the contours of any newly-interpreted RICO Judgment pending such an appeal.

All of the actions that Chevron cites indicating my unwillingness to comply with a newly-interpreted RICO Judgment in fact pre-date the Court's new interpretation, which is still not fully formed as it was only applied in part (to Amazonia and my interest in the Ecuador Judgment) in the Court's August 15, 2018 memorandum order. Chevron has no legal basis to assert contemptuous behavior on the relevant facts alleged, and the Court has no basis to find contempt.

DATED:        October 31, 2018                Respectfully submitted,

_s/ Steven R. Donziger_
Steven R. Donziger
245 W. 104th Street, #7D
New York, NY 10025
Tel: (917) 678-3943
Fax: (212) 409-8628
Email: sdonziger@donzigerandassociates.com

*Pro se*

25