## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

|  |  |
|---|---|
| CHEVRON CORPORATION, | x |
| Plaintiff, | : |
| | : |
| v. | : |
| | :    11 Civ. 0691 (LAK) |
| STEVEN DONZIGER, et al., | : |
| | : |
| Defendants. | : |
| | x |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

### DECLARATION OF ANNE CHAMPION IN SUPPORT OF CHEVRON CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO HOLD STEVEN DONZIGER IN CONTEMPT OF COURT FOR HIS FAILURE TO COMPLY WITH THE RICO AND DEFAULT JUDGMENTS AND THE APRIL 16, 2018 RESTRAINING NOTICE

I, ANNE CHAMPION, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I am an attorney licensed to practice law in the State of New York and before this Court.  I am a partner in the law firm of Gibson, Dunn & Crutcher LLP, and I am counsel for Chevron Corporation ("Chevron") in the above-captioned matter.  I am personally familiar with the facts set forth herein, unless the context indicates otherwise.

2.      Attached to this declaration as **Exhibit 93** are excerpts from a true and correct copy of the transcript of the deposition of John van Merkensteijn on October 31, 2018.  In these excerpts, Donziger "stipulate[s]" on the record that he "was involved in a public pressure campaign to hold Chevron accountable . . ." (Tr. 175:24-176:2), and van Merkensteijn testifies that Donziger entered into an agreement with David Zelman in which Donziger "pledge[d] [Zelman] an interest in the Ecuador judgment from [Donziger's] fees should they be collected" in exchange for $14,000 in services" (Tr. 180:13-184:16).

3.     Attached to this declaration as **Exhibit 94** is a true and correct copy of an undated document titled "Contracts, Reasons and Recommendations," produced by Mr. Rizack and bearing Bates numbers RIZACK PJD-0000522.  This document is stamped as Exhibit 5350 to Mr. Rizack's deposition and was authenticated by Mr. Rizack (*see infra* **Exhibit 113** at 265:9–266:22). In the document, Mr. Donziger and/or Mr. Rizack (*see infra* **Exhibit 113** at 266:10–24) recorded Mr. Donziger's purported reasons for recommending that certain of his associates receive an interest in the Ecuadorian judgment from the FDA.  For Mr. Aaron Page, Donziger's stated reason for his recommendation is that "Aaron has worked over one hundred years as an attorney in this case, mostly without pay."  For Mr. Rizack, Donziger's stated reason for his recommendation is that Mr. Rizack "has worked 4-5 years mostly without pay" and "will be key in organizing investments and attracting more funds."  For Karen Hinton, Donziger's stated reason for his recommendation is that she "has worked several years without any pay."

4.     Attached to this declaration as **Exhibit 95** is a true and correct copy of a December 22, 2016 email from John van Merkensteijn to David Zelman, produced by Mr. Merkensteijn and bearing Bates numbers JVM 011236–37.  At the bottom of the chain is an email from Donziger to Mr. Zelman, dated December 21, 2016, that includes a draft agreement for Mr. Zelman's "consulting services . . . to develop [Donziger's] professional capacities with regard to the Ecuador litigation matter against Chevron."  In return for $14,000 in services, Donziger "pledge[s] to [Mr. Zelman] an interest in the Ecuador judgment from [his] fees" in an amount of "14/250 of an eighth of a point of whatever is recovered of the total claim."

5.     Attached to this declaration as **Exhibit 96** is a true and correct copy of a December 18, 2014 email from Steven Donziger to Campbell Ford, produced by Mr. Ford and bearing Bates numbers PCFord_000018-19.  In the email, Donziger writes, "I propose that you lower your outstanding invoice by one-third (to around $40,000 as I understand it) and hold the amount frozen

and in abeyance. If I get a recovery from the Ecuador matter, I will pay you that amount outstanding at that time. If I get a windfall from that matter, I would consider paying you a bonus in my complete discretion."

6.      Attached to this declaration as **Exhibit 97** is a true and correct copy of an October 15, 2018 email from Aaron Marr Page to Andrea Neuman regarding a subpoena served on Mr. Page by Chevron Corporation. Mr. Page states, "You know perfectly well I have a retainer agreement to provide legal advice to Mr. Donziger . . . ."

7.      Attached to this declaration as **Exhibit 98** is a true and correct copy of a September 25, 2018 press release and a petition titled Human Rights Petition of Steven R. Donziger, both purportedly authored by Aaron Marr Page, Managing Attorney of Forum Nobis PLLC, on behalf of Donziger. In the petition, which was purportedly filed with the Inter-American Commission on Human Rights on September 24, 2018, Mr. Page alleges that "Mr. Donziger's treatment by judicial and lawyer regulation authorities in the United States has severely violated his rights to due process and judicial protection . . . as well as rights to freedom of association and expressions . . . , privacy . . . , and property." This petition and the press release accompanying it are available at *http://forumnobis.org/wp-content/uploads/2018/09/IACHR-Petition-of-Steven-Donziger-Briefing-Memorandum.pdf* and *http://forumnobis.org/wp-content/uploads/2018/09/20180925-IACHR-filing-press-release.pdf*.

8.      Attached to this declaration as **Exhibit 99** is a true and correct copy of a September 28, 2018 email from Meredith Stead to Steven Donziger, Derek Stoldt, John van Merkensteijn, Alan Lenczner, and Aaron Marr Page regarding, and attaching, an investment agreement for WDIS Finance LLC, including appendices, bearing Bates numbers JVM 000991–1017. The Ecuador Judgment Investment Agreement is signed by Mr. Merkensteijn on behalf of WDIS Finance LLC.

The Agreement refers to a "U.S. Representative" "[a]s identified in Appendix 2, in the possession of Canadian Counsel."  Appendix 2 states that "U.S. Representative means: Steven R. Donziger."

9.      Attached to this declaration as **Exhibit 100** is a true and correct copy of excerpts from the May 8, 2018 hearing before this Court.  In these excerpts, Donziger admits that the term "collection" is not limited to recovery on the Ecuadorian judgment through an enforcement action.  Tr. 20:8-10.

10.      Attached to this declaration as **Exhibit 101** is a true and correct copy of a January 11, 2017 email from John van Merkensteijn to Steven Donziger, produced by Mr. Merkensteijn and bearing Bates numbers JVM 011239–40.  Mr. Merkensteijn forwards to Donziger an email from Ian Watson to Mr. Merkensteijn, who also invested funds in exchange for an interest in the Ecuadorian judgment, dated January 11, 2017.  In that email, Mr. Watson writes that Alan Lenczner, who represents the LAPs in pending Canadian proceedings, "asked about [Mr. Watson's] investment being paid to him [i.e. Lenczner] and he, in turn paying part of it to Steven. He has advised Steven that has been a [sic] irregular way in Alan's view to handle the distribution of funds."

11.      Attached to this declaration as **Exhibit 102** are excerpts from a true and correct copy of excerpts of the transcript of the trial proceedings held in this matter on November 18, 2013.  In these excerpts, Donziger testifies that it "sounds about right" that Joseph Kohn paid him over $1 million dollars in connection with the Lago Agrio case between 2003 and 2009.

12.      Attached to this declaration as **Exhibit 103** is a true and correct copy of an August 31, 2016 email from Steven Donziger to John van Merkensteijn produced by Mr. Merkensteijn and bearing Bates numbers JVM 003762–63.  The email contains an attached document and a certified translation thereof, titled "Certification," dated August 29, 2016 and signed by Ms. Gladys Solano, Secretary of the Frente de la Defensa de la Amazonia.  The Certification

purportedly "authorizes" Carlos Humberto Guaman Gaibor to sign Mr. Merkensteijn's agreement to invest "$300,000, which will be used for expenses incurred to enforce the 'Aguinda v. Chevron' judgment in Canada."

13.     Attached to this declaration as **Exhibit 104** is a true and correct copy of a document, and a certified translation thereof, titled "Certification," dated July 4, 2016 and signed by Ms. Gladys Solano, Secretary of the Frente de la Defensa de la Amazonia, produced by Mr. Merkensteijn and bearing Bates numbers JVM 003929.  The Certification purportedly "authorizes" Carlos Humberto Guaman Gaibor to sign a financing agreement in the amount of $250,000, "which will be used exclusively for enforcement of the 'Aguinda v. Chevron' judgment in Canada."

14.     Attached to this declaration as **Exhibit 105** is a true and correct copy of a document, and a certified translation thereof, titled "Certification," dated April 25, 2016 and signed by Ms. Gladys Solano, Secretary of the Frente de la Defensa de la Amazonia, produced by Ms. Sullivan and bearing Bates numbers MKS-0007999.  The Certification purportedly "authorizes" Carlos Humberto Guaman Gaibor to sign a financing agreement in the amount of $250,000, "which will be used exclusively for enforcement of the 'Aguinda v. Chevron' judgment in Canada."

15.     Exhibit 106 is intentionally omitted.

16.     Attached to this declaration as **Exhibit 107** are excerpts from a true and correct copy of the transcript of the deposition of Clifford Eisler on November 5, 2018.  Eisler testified that his understanding was that his investment would be used "[f]or Alan Lenczner's litigation expenses," and not that they would be paid to Donziger or used to generate press releases to pressure Chevron.  Tr. 63:14-65:5.

17.     Attached to this declaration as **Exhibit 108** is a true and correct copy of an August 2, 2017 email chain between Steven Donziger to Aaron Marr Page and Joshua Rizack, produced

by Mr. Rizack and bearing Bates number RIZACKPJD-0001613.  At the bottom of the chain is an email from Donziger to Messrs.  Page and Rizack, also dated August 2, 2017, in which Donziger requests a "deep dive into [Donziger's] authority from the FDA . . . and what we need to do to clarify/expand it at this juncture" because, according to Donziger, "I've got someone hot on our tail who is asking for this."

18.      Attached to this declaration as **Exhibit 109** is a true and correct copy of excerpts from the June 28, 2018 hearing before this Court.  In these excerpts, Donziger stated that although he testified in his deposition that he thought that the Default Judgment "did not change the landscape in terms of fund raising[,] . . . upon further reflection, realized that that is a mistake."

19.      Attached to this declaration as **Exhibit 110** is a true and correct copy of an April 26, 2018 email from Steven Donziger to John van Merkensteijn, produced by Mr. Merkensteijn and bearing Bates numbers JVM 009896–97.  At the bottom of the chain is an email from Donziger to Don Johnson, also dated April 26, 2018, "regarding a potential investment opportunity related to a large environmental judgment ($12b U.S.) current [sic] being enforced against Chevron in Canadian courts."

20.      Attached to this declaration as **Exhibit 111** is a true and correct copy of a May 11, 2018 email from John van Merkensteijn to Steven Donziger, produced by Mr. Merkensteijn and bearing Bates numbers JVM 011579–80.  At the bottom of the chain is an email from Mr. Merkensteijn to Joshua Mailman and others, also dated May 11, 2018, in which Mr. Merkensteijn refers to the "litigation in Canada" and writes, "Josh if you are interested, maybe this would be an opportune time to get together with Steven [Donziger]."

21.      Attached to this declaration as **Exhibit 112** are excerpts from a true and correct copy of excerpts of the transcript of the deposition of Steven Donziger on June 25, 2018.  In these excerpts, Donziger testifies that he has "more documents that you are seeking that I don't believe

is [sic] appropriate to turn over at this point" (Tr. 47:11-13) and that he has not "searched for documents responsive to every request" in Chevron's subpoena (Tr. 48:3-5).

22.     Attached hereto as **Exhibit 113** are excerpts from a true and correct copy of the transcript of the deposition of Joshua Rizack on October 5, 2018.  Mr. Rizack testified that Donziger's statement in Deposition Exhibit 5350 (attached as **Exhibit 94** to this declaration) that "[i]n the future, [Rizack] will be key in organizing investments and attracting more funds" is not accurate.  Tr. 269:6–17, 271:17–22.  However, Mr. Rizack testified that he was paid $10,000 after he "brought in an investor," Wellbeck Partners LLC.  *Id.* at 286:4–287:19.  Mr. Rizack also testified that he "worked on other cases," and stopped work on the Ecuador litigation, around the time of the RICO trial.  *Id.* at 279:15–280:12.

23.     Below is a chart detailing Chevron's evidentiary objections to Donziger's Declaration, Dkt. 2122-1.  In addition to the objections detailed below, Chevron objects to Donziger's Declaration in its entirety on the basis that it provides testimony that relates almost exclusively to topics about which Donziger refused to answer questions at his June 25, 2018 deposition.  *See United States v. Hansen*, 277 F. App'x 692, 693 (9th Cir. 2008) (unpublished) (holding that the district court did not abuse its discretion by striking a declaration when the declarant refused to answer questions regarding the subject matter of the declaration at his deposition and failed to appear for a subsequent deposition); *United States v. Parcels of Land*, 903 F.2d 36, 43 (1st Cir. 1990) (holding that the district court did not err by striking a declaration when the declarant invoked the Fifth Amendment and refused to answer questions at his deposition).

| DONZIGER DECLARATION | CHEVRON'S OBJECTION |
| --- | --- |
| Paragraph 1: "This affidavit addresses discrete issues to the best of my personal knowledge and recollection. This affidavit is not intended to be exhaustive regarding the voluminous amount of factual allegations in Chevron's motion given that most of those | No objection. |

| **DONZIGER DECLARATION** | **CHEVRON'S OBJECTION** |
|---|---|
| allegations are false, misleading, tangential, or irrelevant to the legitimate issues in these post-judgment proceedings. The absence of a response in this affidavit to certain of Chevron's factual allegations in its motion does not in any way suggest I concede their veracity. I maintain all applicable privileges." | |
| Paragraph 2: "Since the early 1990s, I have worked as an attorney and advocate for Indigenous and farmer communities in Ecuador's Amazon region, specifically in the provinces of Sucumbíos and Orellana. My clients live in roughly 80 communities and towns and are organized through various entities, one of which is called the Frente de Defensa de la Amazonia or the "Frente" which is also known by its Spanish acronym, FDA. | **Lacks foundation (Fed. R. Ev. 602) (entire paragraph).** |
| Paragraph 3: "The FDA is the beneficiary under Ecuadorian law of the judgment in the Aguinda v. ChevronTexaco case and is responsible for the execution of the judgment against Chevron's assets both in Ecuador and other jurisdictions where the affected communities choose to enforce. As the entity that organized and sustained the representative Aguinda action, the FDA was named in that judgment as the beneficiary of an independent award under Ecuador's Environmental Management Act.1 The FDA has been my client for several years, including all of the years following the imposition of the RICO judgment issued in 2014 by the U.S. district court in the Chevron v. Donziger case. I also have an attorney-client relationship with certain affected community members and constituent community organizations."<br><br>FN 1: "The Unión de Afectados y Afectadas por las Operaciones de las Petrolera Texaco (UDAPT) ("Union of Persons Affected by Texaco") is a more newly-created grassroots advocacy organization that grew out of what was formerly known as "the Assembly," an informal or "de facto" organization (initially | **Lacks foundation (Fed. R. Ev. 602) (entire paragraph).**<br><br>"The FDA is the beneficiary under Ecuadorian law of the judgment in the Aguinda v. ChevronTexaco case and is responsible for the execution of the judgment against Chevron's assets both in Ecuador and other jurisdictions where the affected communities choose to enforce. As the entity that organized and sustained the representative Aguinda action, the FDA was named in that judgment as the beneficiary of an independent award under Ecuador's Environmental Management Act." **Improper opinion testimony (Fed. R. Ev. 701, 702).**<br><br>"The UDAPT, however, does not exercise any legal authority over the environmental damages award, or its enforcement, or the subsequent environmental remediation that will be accomplished with the funds once collected. It also has no formal authority over the execution of the judgment in Canada or elsewhere, although it is actively involved in said efforts." **Improper opinion testimony (Fed. R. Ev. 701, 702).**<br><br>"Mr. Fajardo's motives are not worth dwelling on, except to note that his attacks on |

| DONZIGER DECLARATION | CHEVRON'S OBJECTION |
|---|---|
| sponsored by the FDA) that held periodic meetings starting in 2001 where representatives from the various affected communities were invited to share the views of their respective communities about the legal case and related issues. While the UDAPT formally registered as an organization in 2011, it remains a novel and uniquely flexible organization with a number of different mandates, including maintaining solidarity between the suffering affected communities and providing an outlet for those communities' diverse range of views and perspectives. The UDAPT, however, does not exercise any legal authority over the environmental damages award, or its enforcement, or the subsequent environmental remediation that will be accomplished with the funds once collected. It also has no formal authority over the execution of the judgment in Canada or elsewhere, although it is actively involved in said efforts. The UDAPT is also not the "exclusive" voice of the affected people, as there are many different grassroots organizations working in the affected communities, each of which has a role to play. My impression is that the UDAPT has been "taken over" in recent years by my former colleague Pablo Fajardo, who often uses the organization as a vehicle to publicly attack me and thus regrettably serve the purposes of his supposed opponent, Chevron. Mr. Fajardo's motives are not worth dwelling on, except to note that his attacks on me serve at times to distract from the outrage in the affected communities that followed Mr. Fajardo's decision to waive—at the request of the Ecuadorian government, but without consulting his clients—a legal embargo the communities had obtained on $112 million in government funds payable to Chevron that should have been redirected to community health and environmental remediation projects." | me serve at times to distract from the outrage in the affected communities that followed Mr. Fajardo's decision to waive—at the request of the Ecuadorian government, but without consulting his clients—a legal embargo the communities had obtained on $112 million in government funds payable to Chevron that should have been redirected to community health and environmental remediation projects."  **Speculation (Fed. R. Ev. 602, 701).** |
| Paragraph 4: "I have worked closely with the leaders of the FDA and certain community | "My relationship with this organization and some of its individuals stretches back 25 |

| DONZIGER DECLARATION | CHEVRON'S OBJECTION |
|---|---|
| members for decades. These individuals include, among others, Luis Yanza, Carmen Cartuche, Alejandro Soto (deceased in 2018), Rosa Moreno (deceased in 2016), Ermel Chavez, Hugo Camacho, and Medardo Shingue. The FDA and its duly authorized leaders instruct me both in writing and orally. I travel to Ecuador to meet with them several times a year and I participate in conference calls and one-on-one calls with FDA leadership regularly. My relationship with this organization and some of its individuals stretches back 25 years, and is grounded in deep trust based on our shared commitment to obtain justice for those harmed by Chevron's reckless environmental practices and the resulting devastation which was the basis of the liability imposed by the Aguinda court." | years, and is grounded in deep trust based on our shared commitment to obtain justice for those harmed by Chevron's reckless environmental practices and the resulting devastation which was the basis of the liability imposed by the Aguinda court." **Lacks foundation (Fed. R. Ev. 602), speculation (Fed. R. Ev. 602, 701).** |
| Paragraph 5: "My responsibilities as an attorney (subject to interim suspension which I am contesting) and advocate for the FDA are intentionally broad. I serve as both a legal case manager and social justice campaign manager for my clients in what is widely recognized as one of the most complex and important corporate accountability battles in the last half-century, or even in all of history." | "I serve as both a legal case manager and social justice campaign manager for my clients in what is widely recognized as one of the most complex and important corporate accountability battles in the last half-century, or even in all of history."  **Lacks foundation (Fed. R. Ev. 602), hearsay (Fed. R. Ev. 802), speculation (Fed. R. Ev. 602, 701).** |
| Paragraph 6: "My responsibilities in this regard have included, but are not limited to, the following: a) providing advice regarding strategy, including judgment enforcement activities and efforts in resistance to Chevron's various SLAPP lawsuits, including this RICO action; b) providing advice regarding the corporate accountability campaign my clients have carried out against Chevron since the inception of the case in 1993, which is designed to educate the public about Chevron's toxic dumping and its impacts on people, Indigenous culture, and the environment; c) helping my clients raise and administer funds to pay expenses for both litigation and campaign-related activities concerning Chevron's misconduct in Ecuador, and its impacts; d) engaging in advocacy and | "[W]hat the FDA believes to be the illegitimate arbitration action initiated by Chevron against the Republic of Ecuador . . . ."  **Lacks foundation (Fed. R. Ev. 602), speculation (Fed. R. Ev. 602, 701).** |

| DONZIGER DECLARATION | CHEVRON'S OBJECTION |
|---|---|
| public education with government officials and non-government leaders in the United States, Canada and elsewhere to ensure relevant individuals are adequately informed about the viewpoint of the FDA with regard to various issues, among them, what the FDA believes to be the illegitimate arbitration action initiated by Chevron against the Republic of Ecuador; e) enlisting lawyers to carry out various legal and legal-related activities and to defend against Chevron's retaliatory SLAPP litigation in Ecuador, Canada, the United States, and elsewhere; and f) enlisting support from individuals and organizations, including non-profit advocacy organizations such as Amazon Watch, Rainforest Action Network, and Global Witness, to help publicize the campaign of the Ecuadorians. My work requires me to communicate regularly with the FDA leadership and community leaders, which in turn necessitates regular trips to Ecuador to conduct meetings, community listening sessions, networking events, and the like." | |
| Paragraph 7: "I have been given authority by the FDA (and other client organizations or representatives of the affected communities) to undertake efforts to raise funds necessary to continue the enforcement of the Aguinda judgment and the overall corporate accountability campaign against Chevron over its toxic dumping in Ecuador. While the specifics of such efforts are intentionally left to my discretion, my work is subject to regular oversight from the leadership of the FDA and those individuals have final word should our views come into conflict." | **Lacks foundation (Fed. R. Ev. 602), hearsay (Fed. R. Ev. 802) (entire paragraph).** |
| Paragraph 8: "As part of my effort to assist the FDA obtain funds, since the 2014 RICO judgment issued I often have served as an intermediary between the FDA leadership and potential funders. I believed, and still believe, that the language of the April 2014 Opinion assured me and others that the scope of the RICO injunction was limited to proceeds on a | No objection. |

| DONZIGER DECLARATION | CHEVRON'S OBJECTION |
|---|---|
| collection on a judgment, meaning I could continue to assist my clients in raising funds to finance the RICO appeal, the enforcement litigation in Canada, the broader corporate accountability campaign, and specifically that I could continue to pay my own fees "just as [I had] been paid . . . over the past nine or ten years," i.e. from "finance[ing] [provided] by outside investors." Dkt. 1901 at 7-8, 14. On behalf of the FDA, I have helped potential funders and supporters understand the nature of the Aguinda case and provided relevant materials for review. I have always encouraged those interested to undertake independent due diligence, including by reviewing Chevron's materials and public filings. To the best of my understanding of the relevant transactions, I have never "monetized" my contingency interest with an investor in any way. To the best of my understanding, and consistent with my efforts, all fund-raising arrangements were designed to be lawful under the injunctive scope of the RICO Judgment and the Court's April 25, 2014 Opinion, as I understood them." | |
| Paragraph 9: "I have repeatedly been given authority and instructions by the FDA to spend and direct the distribution of funds from investors. These funds were necessary to continue the enforcement litigation and overall corporate accountability campaign against Chevron. Again, the specifics of such expenditures have been intentionally left by the FDA to my discretion, an arrangement which the FDA leaders feel comfortable with given my demonstrated long-term loyalty and deep experience working on the case and advocacy campaign. My work and that of others in this regard and others is subject to FDA oversight which takes place on a regular basis through phone communication and in-person meetings in Ecuador." | "I have repeatedly been given authority and instructions by the FDA to spend and direct the distribution of funds from investors." **Hearsay (Fed. R. Ev. 802), lacks foundation (Fed. R. Ev. 602).**<br><br>"These funds were necessary to continue the enforcement litigation and overall corporate accountability campaign against Chevron." **Lacks foundation (Fed. R. Ev. 602).**<br><br>"Again, the specifics of such expenditures have been intentionally left by the FDA to my discretion, an arrangement which the FDA leaders feel comfortable with given my demonstrated long-term loyalty and deep experience working on the case and advocacy campaign. My work and that of others in this regard and others is subject to FDA oversight which takes place on a regular basis through phone communication and in-person meetings |

| Donziger Declaration | Chevron's Objection |
|---|---|
| | in Ecuador."  **Lacks foundation (Fed. R. Ev. 692), hearsay (Fed. R. Ev. 802).** |
| Paragraph 10: "FDA representatives have assured me on multiple occasions that they understand my unique value to their litigation and accountability campaign given my years of experience working on it; my deep institutional knowledge, given that I am the only lawyer who originated the case in 1993 still working for the clients; my wide network of personal contacts with supporters and investors across multiple countries; and, my range of legal and advocacy skills." | **Hearsay (Fed. R. Ev. 802), lacks foundation (Fed. R. Ev. 602), speculation (Fed. R. Ev. 602, 701) (entire paragraph).** |
| Paragraph 11: "The FDA has committed to compensate me at a fixed rate of $25,000 per month for my work on all the responsibilities described above. Given the amount of hours I spend on the matter in an average month, this actually translates into a relatively modest hourly rate. It is often the case that there are not funds available to pay me and meet other critical case expenses. Often, I insist that certain other critical expenses (such as legal fees in enforcement jurisdictions) are covered first. Although it is understood that any unpaid monthly fee gets rolled into arrears, non-payment has occurred frequently enough over the course of many years (including long stretches without any compensation) that full payment of my arrears has become highly unlikely, a situation that FDA leadership has explicitly recognized in discussions with me. Accordingly, again in light of the long-standing and trusting relationship I have with my clients, the FDA has authorized me to pay down my arrears to the extent possible, at my discretion and in light of other demands on available funds. I have endeavored to do this responsibly as regards my clients without short-shifting what I am due under my agreements with them. I did not always provide detailed invoices because the FDA leaders not only did not request them, but in fact repeatedly expressed a preference that all of my past invoices be resolved essentially by | "The FDA has committed to compensate me at a fixed rate of $25,000 per month for my work on all the responsibilities described above."  **Hearsay (Fed. R. Ev. 802), lacks foundation (Fed. R. Ev. 602).** "Given the amount of hours I spend on the matter in an average month, this actually translates into a relatively modest hourly rate. It is often the case that there are not funds available to pay me and meet other critical case expenses. Often, I insist that certain other critical expenses (such as legal fees in enforcement jurisdictions) are covered first."  **Lacks foundation (Fed. R. Ev. 602).** "Although it is understood that any unpaid monthly fee gets rolled into arrears, non-payment has occurred frequently enough over the course of many years (including long stretches without any compensation) that full payment of my arrears has become highly unlikely, a situation that FDA leadership has explicitly recognized in discussions with me. Accordingly, again in light of the long-standing and trusting relationship I have with my clients, the FDA has authorized me to pay down my arrears to the extent possible, at my discretion and in light of other demands on available funds."  **Hearsay (Fed. R. Ev. 802), lacks foundation (Fed. R. Ev. 602), speculation (Fed. R. Ev. 602, 701).** "I did not always provide detailed invoices because the FDA leaders not only did not |

| DONZIGER DECLARATION | CHEVRON'S OBJECTION |
|---|---|
| way of settlement when sufficient funds might be available." | request them, but in fact repeatedly expressed a preference that all of my past invoices be resolved essentially by way of settlement when sufficient funds might be available." **Hearsay (Fed. R. Ev. 802).** |
| Paragraph 12: "Similarly, the FDA, through its representatives and after extensive consultation, has been apprised of the substantial outstanding debts I am owed by the case arising from times when I was forced to rely on personal funds to keep case operations going. Again, the FDA though its representatives has agreed that investor-provided funds should be used to pay down such debt to the extent possible given the availability of funds and the exigency of other funding needs. The FDA, through its representatives and after extensive consultation, also has agreed that all of my legal expenses incurred in responding to Chevron's SLAPP-style and other attacks on me (including the RICO case itself, appeals thereto, and post-judgment proceedings) are properly considered expenses owing to the overall litigation that should be paid from investor-provided funds as they become available and in light of other funding needs." | **Hearsay (Fed. R. Ev. 802), lacks foundation (Fed. R. Ev. 602) (entire paragraph).** |
| Paragraph 13: "Even though I often was legally entitled draw down funds to satisfy the debts and arrears discussed above as soon as funds were raised, I typically chose to pay other members of our team prior to reimbursing myself for expenditures. Other times, I would pay myself as appropriate, but later, as funds became tight once again, I would pay other individuals and case expenses from my personal accounts so that necessary efforts could continue with minimal interruption." | "Even though I often was legally entitled draw down funds to satisfy the debts and arrears discussed above as soon as funds were raised, I typically chose to pay other members of our team prior to reimbursing myself for expenditures." **Lacks foundation (Fed. R. Ev. 602), improper opinion testimony (Fed. R. Ev. 701, 702).** "Other times, I would pay myself as appropriate, but later, as funds became tight once again, I would pay other individuals and case expenses from my personal accounts so that necessary efforts could continue with minimal interruption." **Lacks foundation (Fed. R. Ev. 602).** |
| Paragraph 14: "Because funds for the litigation and enforcement efforts related to the Aguinda judgment generally were not | "Because funds for the litigation and enforcement efforts related to the Aguinda judgment generally were not sufficient to |

| DONZIGER DECLARATION | CHEVRON'S OBJECTION |
|---|---|
| sufficient to meet the diverse needs of the litigation and corporate accountability campaign and to pay regular fees to all of those working on it, I sought to reduce overhead by administering funds myself and with help from colleagues like Mr. Josh Rizack rather than engaging costly outside professionals. This did lead to some degree of disarray in the bookkeeping. While the Slavek assessment of Mr. Rizack's work (paragraphs 54-61 of his declaration) is undoubtedly harsh, in Mr. Rizack's defense I note that it appears he was paid a total of $12,566.33 over a period of more than five years ending June 2018—that is, just over $2,000 per year. I also knew that all transactions taking place were accounted for electronically and would be reconciled as soon as we got the resources to hire an appropriate entity to do so." | "meet the diverse needs of the litigation and corporate accountability campaign and to pay regular fees to all of those working on it, I sought to reduce overhead by administering funds myself and with help from colleagues like Mr. Josh Rizack rather than engaging costly outside professionals." **Lacks foundation (Fed. R. Ev. 602).** <br><br>"I also knew that all transactions taking place were accounted for electronically and would be reconciled as soon as we got the resources to hire an appropriate entity to do so." **Lacks foundation (Fed. R. Ev. 602), speculation (Fed. R. Ev. 602, 701).** |
| Paragraph 15: "As a result of this and for other reasons, I gratefully accepted the offer of financial management help from Ms. Katie Sullivan and her company, Streamline Family Office. Once Ms. Sullivan signed on, I had Mr. Rizack transfer to her all of the materials he had gathered over a period of years regarding case expenses and my personal expenditures on the case. Ms. Sullivan played an instrumental role in helping our team raise funds in transactions designed, as always, to be lawful under the injunctive scope of the RICO Judgment and the Court's April 25, 2018 Opinion. Ms. Sullivan left our team soon after Chevron subpoenaed her in the Spring of 2018. She later admitted under oath to signing an affidavit written by Chevron lawyers at the Gibson Dunn firm—including many of the same lawyers who signed the company's various motions to hold me in contempt that are still pending—that contained a number of statements for which she possessed no knowledge and which are demonstrably false." | "As a result of this and for other reasons, I gratefully accepted the offer of financial management help from Ms. Katie Sullivan and her company, Streamline Family Office." **Hearsay (Fed. R. Ev. 802).** <br><br>"Ms. Sullivan played an instrumental role in helping our team raise funds in transactions designed, as always, to be lawful under the injunctive scope of the RICO Judgment and the Court's April 25, 2018 Opinion." **Lacks foundation (Fed. R. Ev. 602).** <br><br>"[Ms. Sullivan] later admitted under oath to signing an affidavit written by Chevron lawyers at the Gibson Dunn firm—including many of the same lawyers who signed the company's various motions to hold me in contempt that are still pending—that contained a number of statements for which she possessed no knowledge and which are demonstrably false." **Hearsay (Fed. R. Ev. 802), lacks foundation (Fed. R. Ev. 602), misstates prior testimony.** |
| Paragraph 16: "The Slavek analysis submitted by Chevron is mistaken in some respects, but | "Investor-provided funds almost always were deposited into my law firm account, and from |

| DONZIGER DECLARATION | CHEVRON'S OBJECTION |
|---|---|
| it confirms critical information in others. Investor-provided funds almost always were deposited into my law firm account, and from there transferred to other accounts for administrative convenience as part of the process of distributing funds to meet case expenses. Case expenses often were transferred to me before being transferred to other for reasons of administrative convenience, or due to the payment-repayment process outlined above." | there transferred to other accounts for administrative convenience as part of the process of distributing funds to meet case expenses. Case expenses often were transferred to me before being transferred to other for reasons of administrative convenience, or due to the payment-repayment process outlined above." **Lacks foundation (Fed. R. Ev. 602).** |
| Paragraph 17: "Some exceptions to the foregoing involved a payment from Mr. Waters in January 2016 that was initially characterized as a personal gift and later converted by me to equity as part of an agreement approved by the FDA. Another example is the transfer of the remaining case funds from Ms. Sullivan to me by Mr. Page, once Ms. Sullivan had made the decision to withdraw. Although the funds sent by Mr. Page were accidentally wired to a personal account, once received by me I immediately opened a new business checking account at the suggestion of an employee in my bank for purposes of administrative convenience. I then proceeded to distribute these funds to meet various case expenses and outstanding fees, including my own and Mr. Page's." | "Some exceptions to the foregoing involved a payment from Mr. Waters in January 2016 that was initially characterized as a personal gift and later converted by me to equity as part of an agreement approved by the FDA." **Lacks foundation (Fed. R. Ev. 602), hearsay (Fed. R. Ev. 802).**<br><br>"Although the funds sent by Mr. Page were accidentally wired to a personal account, once received by me I immediately opened a new business checking account at the suggestion of an employee in my bank for purposes of administrative convenience." **Lacks foundation (Fed. R. Ev. 602), hearsay (Fed. R. Ev. 802), speculation (Fed. R. Ev. 602, 701).**<br><br>"I then proceeded to distribute these funds to meet various case expenses and outstanding fees, including my own and Mr. Page's." **Lacks foundation (Fed. R. Ev. 602).** |
| Paragraph 18: "The remaining investor funds from Ms. Sullivan's account were provided first to Mr. Page at the insistence of her former lawyer, Frank Libby. I never had any direct communication with Mr. Libby by telephone or in person and he refused such contact with me. For reasons not understood by me, Mr. Libby refused to transfer the remaining case funds directly to me even though I was named as the lead representative of the FDA in the United States. He also refused to explain the basis for this refusal." | "The remaining investor funds from Ms. Sullivan's account were provided first to Mr. Page at the insistence of her former lawyer, Frank Libby. I never had any direct communication with Mr. Libby by telephone or in person and he refused such contact with me." **Hearsay (Fed. R. Ev. 802), lacks foundation (Fed. R. Ev. 602).**<br><br>"For reasons not understood by me, Mr. Libby refused to transfer the remaining case funds directly to me even though I was named as the lead representative of the FDA in the United States." **Hearsay (Fed. R. Ev. 802), lacks foundation (Fed. R. Ev. 602),** |

| DONZIGER DECLARATION | CHEVRON'S OBJECTION |
|---|---|
| | improper opinion testimony (Fed. R. Ev. 701, 702. |
| | "[Mr. Libby] also refused to explain the basis for this refusal." **Hearsay (Fed. R. Ev. 802), lacks foundation (Fed. R. Ev. 602).** |
| Paragraph 19: "Mr. Libby was willing to transfer the remaining funds held by Ms. Sullivan to Mr. Page. After Mr. Page received them in his lawyer trust account in Washington, D.C., I instructed him to transfer the funds to me for distribution and expenditure in the normal course pursuant to my FDA-granted authority. He and I both understood that the funds were not 'traceable' to the Ecuador Judgment in light of how the Court had defined that term in its April 2014 Opinion for the reasons set forth in paragraph 8 above and explained repeatedly to the Court. The Court had not at the time of the Libby transfer even suggested any contrary understanding of 'traceable' and I expected the Court to promptly confirm my understanding of the express terms of its April 2014 understanding given the uncontroverted evidence that I have never benefited from proceeds traceable to the judgment. Because the Court's default judgment against the FDA and others used precisely the same language as the RICO Judgment, I understood that the limited scope of the RICO Judgment applied equally to the default judgment." | "Mr. Libby was willing to transfer the remaining funds held by Ms. Sullivan to Mr. Page." **Hearsay (Fed. R. Ev. 802), lacks foundation (Fed. R. Ev. 602).** "[Mr. Page] and I both understood that the funds were not "traceable" to the Ecuador Judgment in light of how the Court had defined that term in its April 2014 Opinion for the reasons set forth in paragraph 8 above and explained repeatedly to the Court." **Lacks foundation (Fed. R. Ev. 602), speculation (Fed. R. Ev. 602, 701).** |
| Paragraph 20: "The TD accounts in existence when I provided that information to Chevron in June of this year were accurate. They had been given to me when I went personally to a TD Bank branch only days earlier and asked for a list of accounts. Although the Slavek analysis strains to suggest that there was some meaningful impropriety in my disclosure, Slavek's own data confirms what I disclosed to Chevron: that those were the only five accounts that were open as of June 15, 2018. I was not aware that other accounts had been closed and did not think to ask the TD Bank | **Lacks foundation (Fed. R. Ev. 602) (entire paragraph).** |

| DONZIGER DECLARATION | CHEVRON'S OBJECTION |
|---|---|
| representative. One of the accounts Slavek claims was 'missing' was in fact closed over a year earlier with funds consolidated for administrative purposes in one or more of the other accounts that was disclosed. I do not recall any such transfer as being meaningful at the time of my disclosures. Another 'missing' account according to Slavek was closed roughly two months before my disclosures. Again, I believe this account was simply shifted or transformed into a different account that was disclosed." | |
| Paragraph 21: "The contingency interest stated in the updated power of attorney signed by FDA leadership in November 2017 was not intended to grant a new interest, but to recognize my existing interest in any Aguinda recovery. The Court has now coerced me into signing what I understand to be the entirety of my contingency interest over to Chevron. I am not taking the position that the November 2017 contract is protected or separable from the Court's other orders with respect to my contingency interest. If Chevron feels like it needs some additional documentation with respect to the November 2017 power, it should just ask me rather than rush to file for contempt." | "The contingency interest stated in the updated power of attorney signed by FDA leadership in November 2017 was not intended to grant a new interest, but to recognize my existing interest in any Aguinda recovery." **Lacks foundation (Fed. R. Ev. 602), speculation (Fed. R. Ev. 602, 701).** |

24.     Attached to this declaration as **Exhibit 114** is a Timeline of Travel for Steven Donziger, charting Mr. Donziger's whereabouts between October 2015 and November 2018.  A hyperlinked, electronic version of this Timeline will be submitted to the Court on a thumb drive.

25.     Attached to this declaration as **Exhibit 115** are exhibits to the Travel Timeline for Steven Donziger, which is attached as Exhibit 114 to this Declaration, and includes the following documents:

- A true and correct copy of an excerpt from the transcript of the deposition of Josh Rizack on June 26, 2018.

- A true and correct copy of an excerpt from the transcript of the deposition of Mary K. Sullivan on September 28, 2018.

- A true and correct copy of an excerpt from the transcript of the deposition of Josh Rizack on October 5, 2018.

- A true and correct copy of an excerpt of an American Express account statement, produced by American Express and bearing Bates numbers AMEX001803-AMEX001817.

- A true and correct copy of an excerpt of an American Express account statement, produced by American Express and bearing Bates numbers AMEX001823-AMEX001834.

- A true and correct copy of an excerpt of an American Express account statement, produced by American Express and bearing Bates numbers AMEX001841-AMEX001858.

- A true and correct copy of an excerpt of an American Express account statement, produced by American Express and bearing Bates numbers AMEX001869-AMEX001882.

- A true and correct copy of an excerpt of an American Express account statement, produced by American Express and bearing Bates numbers AMEX001921-AMEX001936.

- A true and correct copy of an article Now Magazine by Christian Peña, titled "Canada's First Nations join Amazon fight against Chevron". Available at https://nowtoronto.com/news/first-nations-%C2%ADamazon-chevron/.

- A true and correct copy of an email chain dated February 23, 2016 between C. Eisler and S. Donziger, produced by Cliff Eisler and bearing Bates number CE 003381.

- A true and correct copy of an email chain dated February 6, 2016 between C. Eisler and S. Donziger, produced by Cliff Eisler and bearing Bates numbers CE 004123-CE 002126.

- A true and correct copy of an email chain dated February 19, 2016 between C. Eisler and S. Donziger, produced by Cliff Eisler and bearing Bates number CE 004677.

- A true and correct copy of an email chain dated February 26, 2016 between C. Eisler and S. Donziger, produced by Cliff Eisler and bearing Bates numbers CE 005565-CE 005566.

- A true and correct copy of an email chain dated February 29, 2016 between C. Eisler and S. Donziger, produced by Cliff Eisler and bearing Bates numbers CE 005573-CE 005595.

- A true and correct copy of an email chain dated April 14, 2016 between C. Eisler and S. Donziger, produced by Cliff Eisler and bearing Bates number CE 006138.

- A true and correct copy of an email chain dated April 19, 2016 between C. Eisler and S. Donziger, produced by Cliff Eisler and bearing Bates numbers CE 006191-CE 006193.

- A true and correct copy of a an email chain dated April 20, 2016 between C. Eisler and S. Donziger, produced by Cliff Eisler and bearing Bates numbers CE 006211-CE 006212.

- A true and correct copy of an email chain dated May 30, 2016 between C. Eisler and S. Donziger, produced by Cliff Eisler and bearing Bates numbers CE 006441-CE 006443.

- A true and correct copy of an email chain dated June 20, 2016 between C. Eisler and S. Donziger, produced by Cliff Eisler and bearing Bates numbers CE 006591-CE 006592.

- A true and correct copy of an email chain dated September 26, 2016 between C. Eisler and S. Donziger, produced by Cliff Eisler and bearing Bates number CE 006960.

- A true and correct copy of an email chain dated October 13, 2016 between C. Eisler and S. Donziger, produced by Cliff Eisler and bearing Bates numbers CE 006963-CE 006964.

- A true and correct copy of an email chain dated October 18, 2016 between C. Eisler and S. Donziger, produced by Cliff Eisler and bearing Bates numbers CE 006971-CE 006973.

- A true and correct copy of an email chain dated October 24, 2016 between C. Eisler and S. Donziger, produced by Cliff Eisler and bearing Bates numbers CE 007001-CE 007007.

- A true and correct copy of an email chain dated November 1, 2016 between C. Eisler and S. Donziger, produced by Cliff Eisler and bearing Bates numbers CE 007216-CE 007218.

- A true and correct copy of an email chain dated November 1, 2016 between C. Eisler and S. Donziger, produced by Cliff Eisler and bearing Bates numbers CE 007286-CE 007291.

- A true and correct copy of an email chain dated December 4, 2016 between C. Eisler and S. Donziger, produced by Cliff Eisler and bearing Bates numbers CE 009477-CE 009480.

- A true and correct copy of an email chain dated January 8, 2017 between C. Eisler and S. Donziger, produced by Cliff Eisler and bearing Bates numbers CE 012628-CE 012662.

- A true and correct copy of an email chain dated January 13, 2017 between C. Eisler and S. Donziger, produced by Cliff Eisler and bearing Bates number CE 012790.

- A true and correct copy of an email chain dated March 1, 2017 between C. Eisler and S. Donziger, produced by Cliff Eisler and bearing Bates numbers CE 014492.

- A true and correct copy of an email chain dated April 12, 2017 between C. Eisler and S. Donziger, produced by Cliff Eisler and bearing Bates number CE 015138.

- A true and correct copy of an email chain dated May 1, 2017 between C. Eisler and S. Donziger, produced by Cliff Eisler and bearing Bates numbers CE 015250-CE 015257.

- A true and correct copy of an email chain dated May 30, 2017 between C. Eisler and S. Donziger, produced by Cliff Eisler and bearing Bates numbers CE 015355-CE 015357.

- A true and correct copy of an email chain dated July 24, 2017 between C. Eisler and S. Donziger, produced by Cliff Eisler and bearing Bates number CE 015711.

- A true and correct copy of an email chain dated August 3, 2017 between C. Eisler and S. Donziger, produced by Cliff Eisler and bearing Bates number CE 016004.

- A true and correct copy of an email chain dated August 22, 2017 between C. Eisler and S. Donziger, produced by Cliff Eisler and bearing Bates number CE 016016.

- A true and correct copy of an email chain dated September 7, 2017 between C. Eisler and S. Donziger, produced by Cliff Eisler and bearing Bates number CE 016073.

- A true and correct copy of an email chain dated September 12, 2017 between C. Eisler and S. Donziger, produced by Cliff Eisler and bearing Bates number CE 016331.

- A true and correct copy of an email chain dated September 12, 2017 between C. Eisler and S. Donziger, produced by Cliff Eisler and bearing Bates numbers CE 016379-CE 016386.

- A true and correct copy of an email chain dated October 1, 2017 between C. Eisler and S. Donziger, produced by Cliff Eisler and bearing Bates numbers CE 016407-CE 016408.

- A true and correct copy of an email chain dated October 2, 2017 between C. Eisler and S. Donziger, produced by Cliff Eisler and bearing Bates numbers CE 016780-CE 016781.

- A true and correct copy of an email chain dated February 21, 2018 between C. Eisler and S. Donziger, produced by Cliff Eisler and bearing Bates number CE 016867.

- A true and correct copy of an excerpt from a Citibank account statement, produced by Citibank and bearing Bates number CITI-0001573.

- A true and correct copy of a Citibank account statement, produced by Citibank and bearing Bates numbers CITI-0001575-CITI-0001580.

- A true and correct copy of an excerpt from a Citibank account statement, produced by Citibank and bearing Bates number CITI-0001576.

23

- A true and correct copy of an excerpt from a Citibank account statement, produced by Citibank and bearing Bates numbers CITI-0001576-CITI-0001577.

- A true and correct copy of an excerpt from a Citibank account statement, produced by Citibank and bearing Bates number CITI-0001582.

- A true and correct copy of an excerpt from a Citibank account statement, produced by Citibank and bearing Bates numbers CITI-0001583-CITI-0001584.

- A true and correct copy of a Citibank account statement, produced by Citibank and bearing Bates numbers CITI-0001587-CITI-0001593.

- A true and correct copy of an excerpt from a Citibank account statement, produced by Citibank and bearing Bates numbers CITI-0001588-CITI-0001592.

- A true and correct copy of an excerpt from a Citibank account statement, produced by Citibank and bearing Bates number CITI-0001590.

- A true and correct copy of a Citibank account statement, produced by Citibank and bearing Bates numbers CITI-0001594-CITI-0001596.

- A true and correct copy of a Citibank account statement, produced by Citibank and bearing Bates numbers CITI-0001597-CITI-0001601.

- A true and correct copy of an excerpt from a Citibank account statement, produced by Citibank and bearing Bates number CITI-0001598.

- A true and correct copy of an excerpt from a Citibank account statement, produced by Citibank and bearing Bates number CITI-0001605.

- A true and correct copy of a Citibank account statement, produced by Citibank and bearing Bates numbers CITI-0001607-CITI-0001612.

- A true and correct copy of an excerpt from a Citibank account statement, produced by Citibank and bearing Bates number CITI-0001608.

- A true and correct copy of an excerpt from a Citibank account statement, produced by Citibank and bearing Bates number CITI-0001628.

- A true and correct copy of an excerpt from a Citibank account statement, produced by Citibank and bearing Bates numbers CITI-0001629-CITI-0001630.

- A true and correct copy of a Citibank account statement, produced by Citibank and bearing Bates numbers CITI-0001636-CITI-0001644.

- A true and correct copy of an excerpt from a Citibank account statement, produced by Citibank and bearing Bates number CITI-0001637.

- A true and correct copy of an excerpt from a Citibank account statement, produced by Citibank and bearing Bates number CITI-0001638.

- A true and correct copy of an excerpt from a Citibank account statement, produced by Citibank and bearing Bates number CITI-0001641.

- A true and correct copy of an excerpt from a Citibank account statement, produced by Citibank and bearing Bates number CITI-0001643.

- A true and correct copy of a Citibank account statement, produced by Citibank and bearing Bates numbers CITI-0001645-CITI-0001653.

- A true and correct copy of an excerpt from a Citibank account statement, produced by Citibank and bearing Bates numbers CITI-0001646-CITI-0001650.

- A true and correct copy of an excerpt from a Citibank account statement, produced by Citibank and bearing Bates numbers CITI-0001651-CITI-0001652.

- A true and correct copy of a Citibank account statement, produced by Citibank and bearing Bates numbers CITI-0001654-CITI-0001664.

- A true and correct copy of a of Facebook MP4 video, available at https://www.facebook.com/lisa.gibbons.169/videos/1370003246428117/?lst=100 003745197768%3A100002553656892%3A1539877127.

- A true and correct copy of a Facebook Post, available at https://www.facebook.com/conpedioficial/photos/ a.250553305137556/904410223085191/?type=3&theater, and a certified translation of the same.

- A true and correct copy of an email chain between G. Krevlin and S. Donziger produced by Glenn Krevlin and bearing Bates number GKrevlin_0000024.

- A true and correct copy of an email chain between G. Krevlin and S. Donziger produced by Glenn Krevlin and bearing Bates number GKrevlin_0000228.

- A true and correct copy of a an email chain between G. Krevlin and S. Donziger produced by Glenn Krevlin and bearing Bates number GKrevlin_0000263.

- A true and correct copy of a Booklet for Conference regarding Indigenous Solutions for Environmental Challenges, available at https://www.banffconference2018.com/.

- A true and correct copy of an invoice at Manos Premier Hotel, produced by Mary K. Sullivan, introduced as Exhibit 5341 to the deposition of Joshua Rizack, and bearing Bates number MKS-0000254-MKS-0000256.

- A true and correct copy of an email chain dated August 27, 2017 between Steven Donziger and John van Merkensteijn, produced by Mr. van Merkensteijn and bearing Bates numbers JVM 001067–68.

- A true and correct copy of an email dated May 8, 2017 from Steven Donziger to John van Merkensteijn, produced by Mr. van Merkensteijn and bearing Bates numbers JVM 002222–225.

- A true and correct copy of an email dated May 9, 2017 from Steven Donziger to Bill Twist, with a copy to John van Merkensteijn, produced by Mr. van Merkensteijn and bearing Bates number JVM 002495.

- A true and correct copy of an email chain dated February 23, 2017 between Ian Watson and John van Merkensteijn, produced by Mr. van Merkensteijn and bearing Bates numbers JVM 002830–831.

- A true and correct copy of an email dated May 15, 2017 from Steven Donziger to Alan Harter, with a copy to John van Merkensteijn, produced by Mr. van Merkensteijn and bearing Bates number JVM 003432.

- A true and correct copy of an email chain dated August 28, 2016 between David Sausen, Michael Ben-Jacob, John van Merkensteijn, Derek Stoldt, Bill Twist, and Steven Donziger, produced by Mr. van Merkensteijn and bearing Bates numbers JVM 004918–919.

- A true and correct copy of an email chain dated March 20, 2018 between Steven Donziger and John van Merkensteijn, produced by Mr. van Merkensteijn and bearing Bates number JVM 006914.

- A true and correct copy of a record of immigration for Steven R. Donziger, dated June 6, 2018, signed by Anita Isabel Chaves Villafuerte of the Ecuadorian Ministry of the Interior, attaching a "Certificate of Migratory Movements," along with a certified translation of the same.

- A true and correct copy of a CSRwire article dated October 25, 2018 titled "Donziger to Speak at Harvard Law on Historic Environmental Litigation of Amazon Indigenous Groups Against Chevron," available at http://www.csrwire.com/press_releases/40817-Donziger-to-Speak-at-Harvard-Law-on-Historic-Environmental-Litigation-of-Amazon-Indigenous-Groups-Against-Chevron, and archived on October 25, 2018.

- A true and correct copy of an email chain dated December 4, 2017 between Aaron Page, Katie Sullivan and Steven Donziger, produced by Mary K. Sullivan and bearing Bates numbers MKS-0000753–792.

- A true and correct copy of an email chain dated January 5, 2018 between Katie Sullivan and Steven Donziger, produced by Mary K. Sullivan and bearing Bates number MKS-0000957.

- A true and correct copy of an email chain dated January 4, 2018 between Katie Sullivan, Tim Howard, Steven Donziger, and Jeffrey Kahn, produced by Mary K. Sullivan and bearing Bates numbers MKS-0000960–964.

- A true and correct copy of an email chain dated November 20, 2017 between Toni Abbiati, Katie Sullivan and Steven Donziger, produced by Mary K. Sullivan and bearing Bates number MKS-0001949.

- A true and correct copy of an email chain dated December 27, 2017 between Steven Donziger, Aaron Page, and Katie Sullivan, produced by Mary K. Sullivan and bearing Bates number MKS-0002188.

- A true and correct copy of an email dated December 3, 2017 from Steven Donziger to Katie Sullivan, produced by Mary K. Sullivan and bearing Bates numbers MKS-0002367–370.

- A true and correct copy of an email chain dated January 16, 2018 between Katie Sullivan, Charles Nesson, Martin Garbus, and Steven Donziger, produced by Mary K. Sullivan and bearing Bates numbers MKS-0003234–235.

- A true and correct copy of an email dated December 8, 2017 from Steven Donziger to Katie Sullivan, produced by Mary K. Sullivan and bearing Bates number MKS-0005896.

- A true and correct copy of an email chain dated February 20, 2018 between Katie Sullivan, John van Merkensteijn, and Steven Donziger, produced by Mary K. Sullivan and bearing Bates numbers MKS-0011556–557.

- A true and correct copy of an email chain dated June 27, 2017 between Katie Sullivan and Steven Donziger, produced by Mary K. Sullivan and bearing Bates number MKS-0011657.

- A true and correct copy of an email chain dated May 23, 2017 between Katie Sullivan and Steven Donziger, produced by Mary K. Sullivan and bearing Bates numbers MKS-0011693–695.

- A true and correct copy of a TD Bank account statement, produced by TD Bank and bearing Bates numbers TD BANK 0000717–TD BANK 0000720.

- A true and correct copy of an excerpt of a TD Bank account statement, produced by TD Bank and bearing Bates numbers TD BANK 0000724–TD BANK 0000725.

- A true and correct copy of an excerpt of a TD Bank account statement, produced by TD Bank and bearing Bates number TD BANK 0000728.

- A true and correct copy of an excerpt of a TD Bank account statement, produced by TD Bank and bearing Bates number TD BANK 0000747.

- A true and correct copy of an excerpt of a TD Bank account statement, produced by TD Bank and bearing Bates number TD BANK 0000753.

- A true and correct copy of an excerpt of a TD Bank account statement, produced by TD Bank and bearing Bates number TD BANK 0000769.

- A true and correct copy of an excerpt of a TD Bank account statement, produced by TD Bank and bearing Bates number TD BANK 0000773.

- A true and correct copy of a TD Bank account statement, produced by TD Bank and bearing Bates numbers TD BANK 0000775–TD BANK 0000778.

- A true and correct copy of an excerpt of a TD Bank account statement, produced by TD Bank and bearing Bates number TD BANK 0000785.

- A true and correct copy of an excerpt of a TD Bank account statement, produced by TD Bank and bearing Bates number TD BANK 0000830.

- A true and correct copy of an excerpt of a TD Bank account statement, produced by TD Bank and bearing Bates number TD BANK 0000834.

- A true and correct copy of an excerpt of a TD Bank account statement, produced by TD Bank and bearing Bates numbers TD BANK 0000834–TD BANK 0000835.

- A true and correct copy of a TD Bank account statement, produced by TD Bank and bearing Bates numbers TD BANK 0000840–TD BANK 0000845.

- A true and correct copy of excerpts of TD Bank account statements, for the period April 6, 2017–May 5, 2017 and for the period May 6, 2017–June 5, 2017, produced by TD Bank, and bearing Bates numbers TD BANK 0000842–TD BANK 0000849.

- A true and correct copy of an excerpt of a TD Bank account statement, produced by TD Bank and bearing Bates numbers TD BANK 0000848–TD BANK 0000849.

- A true and correct copy of an excerpt of a TD Bank account statement, produced by TD Bank and bearing Bates number TD BANK 0000854.

- A true and correct copy of an excerpt of a TD Bank account statement, produced by TD Bank and bearing Bates number TD BANK 0000858.

- A true and correct copy of an excerpt of a TD Bank account statement, produced by TD Bank and bearing Bates number TD BANK 0000862.

- A true and correct copy of an excerpt of a TD Bank account statement, produced by TD Bank and bearing Bates numbers TD BANK 0000862–TD BANK 0000863.

- A true and correct copy of an excerpt of a TD Bank account statement, produced by TD Bank and bearing Bates number TD BANK 0000887.

- A true and correct copy of an excerpt of a TD Bank account statement, produced by TD Bank and bearing Bates number TD BANK 0000896–TD BANK 0000897.

- A true and correct copy of an excerpt of a TD Bank account statement, produced by TD Bank and bearing Bates number TD BANK 0000923.

- A true and correct copy of an excerpt of a TD Bank account statement, produced by TD Bank and bearing Bates number TD BANK 0000928.

- A true and correct copy of an excerpt of a TD Bank account statement, produced by TD Bank and bearing Bates number TD BANK 0000929.

- A true and correct copy of an excerpt of a TD Bank account statement, produced by TD Bank and bearing Bates number TD BANK 0000930.

- A true and correct copy of an excerpt of a TD Bank account statement, produced by TD Bank and bearing Bates number TD BANK 0000936.

- A true and correct copy of an excerpt of a TD Bank account statement, produced by TD Bank and bearing Bates number TD BANK 0000942.

- A true and correct copy of an excerpt of a TD Bank account statement, produced by TD Bank and bearing Bates numbers TD BANK 0000947–TD BANK 0000948.

- A true and correct copy of a TD Bank account statement, produced by TD Bank and bearing Bates numbers TD BANK 0000950–TD BANK 0000953.

- A true and correct copy of an excerpt of a TD Bank account statement, produced by TD Bank and bearing Bates number TD BANK 0000952.

- A true and correct copy of a tweet from Steven Donziger, through the user name @SDonziger, dated December 7, 2017, available at https://twitter.com/SDonziger/status/938959108362919936, archived on October 26, 2018.

- A true and correct copy of a Twitter .mp4 video, from the account @eluniversocom, available at https://twitter.com/eluniversocom/status/1042129771218526209.

- A true and correct copy of a tweet from Steven Donziger, through the user name @SDonziger, dated October 17, 2018, available at https://twitter.com/SDonziger/status/1052609566880485377, archived on October 26, 2018.

- A true and correct copy of a tweet from Amazon Watch, through the user name @AmazonWatch, dated October 9, 2017, available at https://twitter.com/AmazonWatch/status/917428943958966272, archived on October 26, 2018.

- A true and correct copy of a tweet from Steven Donziger, through the user name @SDonziger, dated April 16, 2018, available at https://twitter.com/SDonziger/status/985898822852317185, archived on October 26, 2018.

- A true and correct copy of a tweet from Steven Donziger, through the user name @SDonziger, dated April 16, 2018, available at https://twitter.com/SDonziger/status/985907415265751042, archived on October 26, 2018.

- A true and correct copy of a tweet from Day One, through the user name @dayone_event, dated October 9, 2018, available at https://twitter.com/dayone_event/status/1049581540567605249, archived on October 26, 2018.

- A true and correct copy of a Youtube .mp4 video, available at https://www.youtube.com/watch?v=a8n4y_yxHlw.

Executed on this 7th day of November, 2018 at New York, New York.

/s/ <em>Anne Champion</em>
Anne Champion

33