# EXHIBIT 93

Page 1

```
 1
 2    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 3    Case No. 11 Civ. 0691 (LAK)
      ----------------------------------------x
 4    CHEVRON CORPORATION,
 5                         Plaintiff,
 6         - against -
 7    STEVEN DONZIGER, et al.,
 8                         Defendants.
 9    ----------------------------------------x
10                    October 31, 2018
                      9:13 a.m.
11
12
13        DEPOSITION of JOHN VAN MERKENSTEIJN,
14    held at the offices of Gibson, Dunn &
15    Crutcher LLP, located at 200 Park Avenue,
16    New York, New York 10166, before Anthony
17    Giarro, a Registered Professional Reporter
18    and a Notary Public of the State of New
19    York.
20
21
22
23
24
25
```

Page 175

1              JOHN VAN MERKENSTEIJN

2    Watson.  He states, "Dear, colleagues,

3    here is my Chevron Ecuador story with

4    some revisions suggested by Steven at the

5    Greenpeace Deep Green Blog.  We're going

6    to be pushing this out on social media

7    today and this weekend."  Did you receive

8    this in September of 2017?

9         A        Presumably, yes.

10        Q        Does that refresh your

11   recollection at all as to whether the

12   story that Mr. Weyler wrote was paid for

13   out of investor funds?

14        A        Well, I don't know what the

15   relevance of that is.  But that doesn't

16   tell me that.

17        Q        Were you aware that

18   Mr. Donziger had edited Mr. Weyler's

19   story?

20                 MR. DONZIGER:  Objection,

21        objection.  Irrelevant, beyond the

22        scope.  I'll stipulate that I helped

23        him edit it.  Where is this going?

24        I'll stipulate that I was involved in

25        a public pressure campaign to hold

```
 1              JOHN VAN MERKENSTEIJN
 2     Chevron accountable for its
 3     environmental contamination in
 4     Ecuador.  You know that.  Why are you
 5     harassing this witness?  He doesn't
 6     know.  He invested money for all
 7     these activities.  He already
 8     testified to that.
 9              MS. NEUMAN:  Mr. Donziger,
10     you don't need to yell.  We can hear
11     you.
12              MR. DONZIGER:  I just wanted
13     to be sure.
14      A       I read it in this e-mail I
15   just saw.
16              MS. NEUMAN:  I'll show the
17     witness a document we're going to
18     mark as Plaintiff's Exhibit 5408,
19     bearing the Bates number MKS908.
20              (The above-referred-to
21     document was marked as Plaintiff's
22     Exhibit 5408 for identification, as
23     of this date.)
24      Q       This is an e-mail exchange
25   between yourself and Katie Sullivan and
```

```
                                          Page 180

 1                    JOHN VAN MERKENSTEIJN

 2       A        Yes.

 3       Q        What are you referring to

 4   when you say "give Zelman a piece of the

 5   future payout"?

 6       A        I wanted David to have some

 7   rooting interest in the case, in case,

 8   you know, anything ever came of it, he

 9   would have something.

10       Q        And what was Mr. Zelman

11   going to provide in exchange for an

12   interest in the case?

13       A        David Zelman is an executive

14   coach.  And when I met Steven, I said,

15   One of the things, Steven, that would

16   benefit you, which I do with all my

17   friends, is to say, work with David

18   Zelman, it'll reinvigorate you, get you

19   back to Square 1.

20                When I met Steven, he had

21   been through whatever 20 years of

22   litigation takes you to.  So I thought he

23   could use spiritual uplifting.  And David

24   as an executive coach is very effective

25   at that.  So most of the people I meet
```

```
 1                JOHN VAN MERKENSTEIJN
 2   that need help, I introduce David Zelman
 3   to that.
 4       Q       To them to get executive
 5   coaching?
 6       A       Yeah.  Sort of reinvent your
 7   life, is what he does.
 8               I mean just to tell you the
 9   story real quick, so I asked David to do
10   that.  David was on board with me.  David
11   went with me to Ecuador when I went to
12   Ecuador five years ago with Bill Twist
13   and Lynn Twist who had funded -- founded
14   this organization Pachamama.  They took
15   us to a trip into the rain forest.  We
16   hung out with the Ashwarya.  I still
17   carry their bracelets from five years
18   ago.
19               And that's where I started
20   to get really interested in this case
21   because I heard about all the pollution
22   in the north.  And the people in the
23   south are trying to prevent that from
24   happening.  David Zelman was with me on
25   that trip.  So he also really cared about
```

```
                                          Page 182
 1                  JOHN VAN MERKENSTEIJN
 2    this.
 3                  And so when I said to him I
 4    recently met Steven Donziger, you could
 5    really help him, he volunteered to help.
 6    And then I said to Steven he ought to
 7    give him something so if anything ever
 8    comes of all this or you settle it or
 9    whatever, David at least gets something
10    for it.
11         Q        Do you know if Mr. Donziger
12    entered into such an agreement with
13    Mr. Zelman?
14         A        I believe so, yeah.
15         Q        So does Mr. Zelman currently
16    have an interest in the Ecuador judgment?
17         A        Well, I don't think it's
18    been canceled.  If they did it, I don't
19    think it's been canceled.
20                  But to be clear, David was
21    providing whatever help he was going to
22    provide.  I'm the guy who said you ought
23    to give him something.
24         Q        As compensation for helping
25    Mr. Donziger?
```

Page 183

```
 1              JOHN VAN MERKENSTEIJN
 2      A         No.  Just be nice that he
 3   had a rooting interest in the outcome.
 4   This is what Steven's 20 years is all
 5   about.
 6              MS. NEUMAN:  I'm going to
 7        mark as Plaintiff's Exhibit 5411, a
 8        document bearing the Bates numbers
 9        JVM011236 to 237.
10              (The above-referred-to
11        document was marked as Plaintiff's
12        Exhibit 5411 for identification, as
13        of this date.)
14      Q         It's an e-mail exchange from
15   December of 2016 that Mr. Zelman
16   forwarded to you that he originally
17   received from Mr. Donziger.
18              In it, Mr. Donziger writes,
19   "David, I write to confirm our agreement
20   regarding consulting services you are
21   providing to me to develop my
22   professional capacities."
23              It goes on to say, "In
24   exchange for you providing me with
25   $14,000 worth of such services, I pledge
```

                    JOHN VAN MERKENSTEIJN

1

2  you an interest in the Ecuador judgment

3  from my fees should they be collected."

4  Do you see that?

5        A        Yes.

6        Q        Is this the agreement that

7  you understand Mr. Donziger and

8  Mr. Zelman entered into?

9        A        Yes.

10        Q        And are you aware whether or

11  not Mr. Zelman provided services to

12  Mr. Donziger?

13        A        Yes.

14        Q        Yes, he did provide the

15  services?

16        A        Yes, he did.

17                MS. NEUMAN:  I'm going to

18        mark as Exhibit 5412, a document

19        bearing the Bates numbers JVM2318 to

20        2319.

21                (The above-referred-to

22        document was marked as Plaintiff's

23        Exhibit 5412 for identification, as

24        of this date.)

25        Q        It's an e-mail from

Page 252

1

2               C E R T I F I C A T I O N

3

4

5          I, ANTHONY GIARRO, a Shorthand

6   Reporter and a Notary Public, do hereby

7   certify that the foregoing witness, JOHN

8   VAN MERKENSTEIJN, was duly sworn on the

9   date indicated, and that the foregoing, to

10   the best of my ability, is a true and

11   accurate transcription of my stenographic

12   notes.

13          I further certify that I am not

14   employed by nor related to any party to

15   this action.

16

17

18

      _____

19          ANTHONY GIARRO

20

21

22

23

24

25

# EXHIBIT 94

ACCREDITED TRANSLATION

## Contracts, Reasons and Recommendations

### Aaron Page/.25 (quarter point)

Aaron has worked over one hundred years as an attorney in this case, mostly without pay;

### Joshua Rizack/.25

Josh helps with fund raising; he has worked 4-5 years mostly without pay organizing POINTS, contracts, expenses and revenues. He is an expert in financing. In the future he will be key in organizing investments and attracting more funds.

### Patricio Salazar/.25

Attorney for the FDA and some plaintiffs. He has already worked 18 months without any pay. Key role. He works until the end of the case.

### Augustin Salazar/.25

Patricio's brother and excellent attorney for FDA/plaintiffs

### Karen Hinton/.125 (eighth)

Has been the plaintiffs' spokeswoman in the U.S. and the world for years; has worked several years without any pay.

### Derek Snowdy DS/.125 (eighth)

Conducts investigations and political work in Canada; general protection.

### John Phillips/.125 (eighth)

Part of the Canadian legal team. [English-language text]

Monitoring and other services in Canada; contacts with indigenous groups; Plan B attorney; money protection.

### Deepak Gupta and his law firm/.125

RICO Case appeal, including representing the two colleagues; he will erase debt of more than a million.

### Rick Friedman

Attorney in RICO Case (SRD's fee acknowledged by the plaintiffs)

RIZACKPJD-0000521



PLAINTIFF'S EXHIBIT
5350
10/5/18 AG
PENGAD 800-631-6989

*A C C R E D I T E D   T R A N S L A T I O N*

**Zoe Littlepage**

Ditto (SRD's fee acknowledged)

**Glen Krevlin**

Investor (SRD's fee acknowledged)

**David Sherman**

Investors (SRD's fee acknowledged)

**Eva Contact /.0612 (half of an eighth)**
**Consultant dealing with particular legal issues and settlement discussions.** [*Englis*h text]

**Simon Billiness/.0612 (half of an eighth)**
Consultant dealing with Shareholder outreach/public relations to make Chevron shareholders aware of the case and actions of company. [*English text*]

**RIZACKPJD-0000522**

# RIVERA INTERPRETING, INC.

*Tel. 310.621.7683 ▪ jrivera@riverainterpreting.com*

Oct. 2, 2018

## STATEMENT OF ACCREDITATIONS

To Whom It May Concern:

I, Jesús Rivera, affirm that I am a certified judicial interpreter and translator of the Spanish and English languages. I am certified and accredited by:

- The Judicial Council of the State of California, since 2000 (No. 300764);
- The Administrative Office of the U.S. Courts, since 2006; and
- The American Translators Association (English ↔ Spanish) since 2008.

On Oct. 2, 2018, I translated from the Spanish into the English language these two documents:

1. "Contracts. Reasons and Recommendations," RIZACKPJD-0000519-20 (two pages)
2. "Contracts. Reasons and Recommendations," RIZACKPJD-0000521-22 (two pages)

I affirm that I translated these documents accurately, correctly and to the best of my ability.

Sincerely,

Jesús Rivera

## Contratos, Razones y Recomendaciones

### Aaron Page/.25 (cuarto de un punto)

Aaaron ha trabajado como abogado mas de cien anos en el caso, la mayoria sin pago;

### Ioshua Rizack/.25

Josh ayuda en le recolecta de plata; ha trabajado 4-5 years mayormente sin pago organizando los puntos, contratos, gastos y ingresos Es experto en financiamiento. En el future va a ser clave en organizer inversiones y atraer mas plata.

### Patricio Salazar/.25

Abogado de FDA y algunos demandantes. Ya ha trabajado 18 meses sin pago ningun. Papel clave. Trabaja hasa el fin del caso.

### Augustin Salazar/.25

Hermando de Patricio y abogado excelente de FDA/demandantes

### Karen Hinton/.125 (octavo)

Es porta voz de los demandantes en EEUU y el mundo por anos; ha trabajado varios anos sin pago ningun.

### Derek Snowdy DS/.125 (octavo)

Hace investigaciones y trabajo politico en Canada; proteccion general.

### John Phillips/.125 (octavo)

Part of the Canadian legal team.

Monitoreo y otros servicios en Canada; contactos con grupos indigenas; abogado Plan B; proteccion de plata.

### Deepak Gupta y su bufete/.125

Apelacion del caso RICO, incluso representacion de los dos companeros; mas de un millon en deuda que va a borrar.

### Rick Friedman

Abogado en caso RICO (honorario de SRD reconocido por los demandantes)

RIZACKPJD-0000521

**<u>Zoe Littlepage</u>**

Ditto (Honorario de SRD reconocido)

**<u>Glen Krevlin</u>**

Inversionista (Honorario de SRD reconocido)

**<u>David Sherman</u>**

Inversionistas (Honorario de SRD reconocido)

**Eva Contacto /.0612 (mitad de octavo)**
**Consultant dealing with particular legal issues and settlement discussions.**

**Simon Billiness/.0612  (mitad de octavo)**
Consultant dealing with Shareholder outreach/public relations to make Chevron
shareholders aware of the case and actions of company.

RIZACKPJD-0000522



Contractos.Recomendations[3] Properties

General | Security | Details | Previous Versions

| Property | Value |
|---|---|
| Origin | |
| Authors | Steven Donziger |
| Last saved by | Josh Rizack |
| Revision number | 2 |
| Version number | |
| Program name | Microsoft Macintosh Word |
| Company | |
| Manager | |
| Content created | 9/26/2016 8:32 PM |
| Date last saved | 9/26/2016 8:32 PM |
| Last printed | 8/29/2016 2:03 PM |
| Total editing time | 00:00:00 |
| Content | |
| Content status | |
| Content type | application/vnd.openxmlformats-offi... |
| Pages | 2 |
| Word count | 263 |
| Character count | 1503 |

Remove Properties and Personal Information

OK | Cancel | Apply

# EXHIBIT 95

| | |
|---|---|
| **From:** | John van Merkensteijn <jhvm@rossteq.com> |
| **Sent:** | Thursday, December 22, 2016 5:35 PM |
| **To:** | David Zelman |
| **Subject:** | Re: draft agreement for professional services |

Looks ok to me

John H. van Merkensteijn III
Managing Director
Rossi Technology LLC
60 Riverside Boulevard
Suite 2101
New York, NY. 10069
Phone (212) 769-4055
jhvm@rossteq.com

**From:** David Zelman <dzelman@transitionsinstitute.com>
**Date:** Thursday, December 22, 2016 at 9:49 AM
**To:** John van Merkensteijn Quadrant Office <jhvm@rossteq.com>
**Subject:** FW: draft agreement for professional services

Looks good to me.
Any thoughts??

**From:** Steven Donziger <sdonziger@donzigerandassociates.com>
**Date:** Wednesday, December 21, 2016 at 4:42 PM
**To:** David Zelman <dzelman@transitionsinstitute.com>
**Subject:** draft agreement for professional services

David:

Let me know if the language below is acceptable.  If so, I will send as a formal letter on letterhead that you can countersign.  If you have any questions, let me know and we can talk it though. Under this agreement, if there is a full recovery, and I collect my fees in full, you will be entitled to 700,000.  You're a pretty good negotiator.  Any chance I can fold another person (thinking my wife) into the same deal?

Thanks much, Steven


David,

I write to confirm our agreement regarding consulting services you are providing to me to develop my professional capacities with regard to the Ecuador litigation matter against Chevron, and other endeavors.

1

JVM 011236

In exchange for you providing me with $14,000 worth of such services, I pledge to you an interest in the Ecuador judgment from my fees should they be collected.  The amount pledged is based on a pro rata proportion of the latest investment round in the case, which values a $250,000 investment as one-eighth of a point in the total claim won by villagers against Chevron.  Your interest thus will be valued equally with this round based on an investment of $14,000.  The actual amount that will be paid to you will be based on the total amount collected.  To be more specific, your amount under this agreement will be 14/250 of an eighth of a point of whatever is recovered of the total claim.

Note that I am pledging this amount out of my personal fees from this litigation.  Should my personal fees not be recovered from the Ecuador case, you will not be entitled to any recovery of the $14,000. Should a proportion of my fees be recovered, but not the full amount, your recovery will be decreased on a pro rata basis equal to the overall decrease affecting my fees.

If this is acceptable to you, please send me back an email so confirming.

Thanks so much.

Steven

JVM 011237

# EXHIBIT 96

## Campbell Ford

**From:**          Steven Donziger <sdonziger@donzigerandassociates.com>
**Sent:**          Thursday, December 18, 2014 5:13 PM
**To:**            Campbell Ford
**Subject:**       outstanding fee issue

Campbell –


I think the amount you want is too much given the circumstances. I wanted to propose another way to approach this and I think it would be easier to do in writing so you can think about it.


Please remember that I am out for a lot of funds – the fees I have paid you so far (the precise amount of which I still can't figure out, but I assume must be in the neighborhood of $75,000 or more); plus the money I paid Schneider for his work on the trust (which I think is $15,000 but might be more); plus the money for Schneider's counsel, which I think is about $80,000 or more. Plus I had travel costs to get down there. In all, I am out about $150,000 to $200,000 or more over a fight for a $15,000 fee to Schneider. Worse, this comes at the worst possible time given my situation with the RICO case and my inability for the time being to work as a lawyer on new matters.


I recognize I share part of the responsibility for going forward against Schneider. We no doubt had what appeared to be a good case. But I never understood prior to going forward that my chances of losing were so great given the "hometown risk" that obviously existed given Schneider's relationships down there. And I never understood – and I don't believe you ever explained to me – that if I lost I would be liable for Schneider's attorney's fees. That was just devastating to me. Had I really known the risk of losing would involve paying fees of opposing counsel, I would like to think I would not have proceeded given the paltry amount at stake. I believe the risk assessment on our side was lacking and that the complete risk was not understood by me.


Given the amount of the fees you already have received representing me plus the circumstances, I think it would be fair for you to forego the rest of your fees and we just agree to close out the case as is. I also want you to send me the money in the account which in any event should be closed out (or instruct me how I can do it myself). I've lost track of the account and have not received any statements nor do I know whom to contact at the bank.


In recognition of your good faith and hard work, I will offer you a back-up plan. If I get a recovery in the Ecuador matter – and I hope this happens soon but as you know there are no guarantees– I will pay you something toward your existing invoice.


Along those lines, I would propose that you lower your outstanding invoice by one-third (to around $40,000 as I understand it) and hold the amount frozen and in abeyance. If I get a recovery from the Ecuador matter, I will pay you

1

PCFord_000018

that amount outstanding at that time. If I get a windfall from that matter, I would consider paying you a bonus in my complete discretion. If I don't get a recovery from the Ecuador matter, we will agree I will have no obligation in that respect.

Any additional work you do to help me on any real estate stuff will be billed and paid separately. I hope you will be open to continuing to do work on those matters as they arise.

Please understand that this is not a commentary on the work you and your associate did in the courtroom. I appreciate the obvious hard work and skill involved. That said, I believe we have a shared responsibility for the result and the huge amount it has cost me. I think my proposal is reasonable in light of these circumstances.

Let me know if this would be acceptable. Call me if you want to discuss. Most importantly, let's get the bank account closed out.

Thanks much.

xx
--
Steven Donziger
212-570-4499 (land)
917-566-2526 (cell)
212-409-8628 (fax)

Steven R. Donziger
Law Offices of Steven R. Donziger, P.C.
245 W. 104th St., #7D
New York, New York 10025

To learn more about Steven and the Ecuador matter please visit StevenDonziger.com.
Follow on Twitter: @SDonziger
Like on Facebook: Steven Donziger
------------------------

This e-mail is confidential and privileged. If the reader is not the intended recipient, any review, dissemination or copying of any part of this e-mail is prohibited. If you received this e-mail in error, please notify the sender by e-mail or at 212-570-4499.

PCFord_000019

# EXHIBIT 97

| | |
|---|---|
| **From:** | Aaron Marr Page |
| **To:** | Neuman, Andrea E. |
| **Subject:** | Objections to subpoenas dated 10/1/2018 |
| **Date:** | Monday, October 15, 2018 11:55:52 PM |

[External Email]

Dear Andrea,

I am in receipt of your subpoenas dated 10/1/2018 to me (in Iowa) and my solo practice Forum Nobis PLLC (in Washington DC). I provide my preliminary objections below. However, let me begin with a few observations.

I am not unwilling to cooperate with you on a voluntary production, subject to appropriate confidentiality, non-waiver, and burden-sharing protocols, of non-privileged and redacted documents pertaining to my assistance with the litigation financing efforts of Mr. Donziger since the issuance of the RICO Judgment. The battle lines on the propriety of such financing are fairly clearly drawn: Mr. Donziger's good faith basis to proceed with financing interests in the Ecuadorian judgment other than his, prior to any collection on the judgment, has been repeatedly explained in response to your contempt claims. Nonetheless, I recognize that Judge Kaplan has allowed you some investigation to ensure that the nature of the financing was indeed as I have just described. I believe the discovery you have taken from Ms. Sullivan is sufficient in this regard, and I object the basis of the sufficiency of Ms. Sullivan's production below, but I am nonetheless willing to discuss further production as necessary to satisfy legitimate outstanding issues of investigation.

While the opening document Requests in Exhibit A to your subpoenas are at least facially directed at relevant documents in this regard, the Requests quickly devolve into a farce of overbreadth, undue burden, and the targeting of obviously privileged matter. Your Request No. 6 demands "ALL DOCUMENTS reflecting ANY COMMUNICATION between YOU and DONZIGER." This is not in good faith. You know perfectly well I have a retainer agreement to provide legal advice to Mr. Donziger, that you are required under Rule 26 to seek "nonprivileged matter," and required under Rule 45 to take "reasonable steps to avoid imposing undue burden"—including the burden of moving to quash ridiculously overbroad and intrusive Requests. I respectfully believe your decision to propound this Request is inconsistent with your ethical duties as an attorney and will expose you sanctions under Rule 45(d), including my lost earnings and reasonable attorney's fees related to quashing this Request, if you fail to withdraw it, and to take other reasonable steps necessary to avoid imposing an undue burden and only target information relevant to the litigation financing basis of your contempt claims. It is difficult to proceed with the assessment of appropriately responsive documents regarding other requests with an all-consuming request like this in the background.

I am also going to ask that you refrain from unfounded personal attacks and rhetorical excess as we go through this process. In your recent papers filed before Judge Kaplan, you noted the existence of a retainer payment from Mr. Donziger to me in May of this year. Your papers reflected awareness of the regular invoices I provide to Mr. Donziger and the FDA for my legal services. Yet you chose to describe this payment as a "kickback." Such rhetoric is gratuitous, defamatory, and unprofessional. You are litigating the appropriateness of the litigation financing, but Mr. Donziger has clearly articulated the basis for his position that the financing efforts were appropriate; it is simply an issue under dispute. There is no reason we cannot litigate it in the regular fashion without resorting to the rhetorical smears and attacks exemplified by the "kickback" language.

I hereby request a telephonic meet-and-confer to discuss the possibility of a voluntary production agreement that would give you access to relevant litigation finance-related documents under appropriate safeguards and burden-sharing protocols. I believe the production of non-privileged material should be sufficient to establish the nature and scope of all litigation finance-related efforts to the extent I have been exposed to them. To the extent you disagree after reviewing the non-privileged material, and can articulate reasons, we can discuss the possibility of safeguarded access to redacted privileged or potentially-privileged material as appropriate.

Because I hope and expect that such an agreement will resolve the demands made in the subpoenas, I will state my specific objections below in summary fashion. In support of my privilege claims, I also set out my initial assessment of the numerous, substantial categories of privileged documents that are inappropriately targeted by your Requests as written—again, in summary fashion due to my expectation that we can resolve this process with a tailored

voluntary production. The burden of preparing a detailed privilege log would of course be extreme, requiring literally hundreds of hours of my time, as described below.

I also note that I am in possession of three boxes of documents that Ms. Sullivan's lawyer Frank Libby sent to me (at his insistence) earlier this year. I believe the documents are the property of Mr. Donziger and/or the FDA. Mr. Libby told me that a document processing firm had produced an identical digital copy of the documents, which I expect has already been produced to you. If you have a legitimate need to inspect the original documents, or to make your own digital copy, I can make the documents available to you in due course. We can discuss this issue during our telephonic conference.

**General Objections:**

1. Privilege and work-product to the extent the Request calls for attorney-client communications and/or attorney opinion or fact work product. As noted, I am nonetheless willing to work with you on the production of non-privileged and redacted documents responsive to the Request under appropriate safeguards as described above.

2. Undue burden to extent the same material has already been produced by Ms. Sullivan or others.

3. Relevance to the extent the Request calls for documents that do not related to litigation finance efforts subject to the contempt claims, but rather seeks to intrude into constitutionally-protected speech, associational activity, strategic deliberations, and legitimately confidential personal and professional affairs.

4. Undue burden to the extent the Request is substantially identical to another Request or subsumed in the scope of another Request.

5. Vague.

6. Overbroad re lack of sufficient temporal limitation.

**Specific Objections:**

*AMP = Aaron Page; SRD = Steven Donziger; FN = Forum Nobis*

| # | SUMMARY | OBJECTIONS |
|---|---------|------------|
| **1** | All docs re SRD/concert re monetize/profit from Ec J since 3/4/14 | 1, 2 |
| **2** | All docs re RICO dfds/concert re monetize/profit from Ec J since 4/23/18 | 1, 2 |
| **3** | All docs re AMP/concert re monetize/profit from Ec J since 3/4/14 | 1, 2 |
| **4** | All docs re comms between AMP and anybody concerning "attempts by SRD, successful or not" to monetize/profit from Ec J since 3/4/14 | 1, 2, 3 |
| **5** | All docs re comms between AMP and anybody concerning "attempts by any RICO dfds, successful or not" to monetize/profit from Ec J since 3/4/14 | 1, 2, 3 |
| **6** | All docs re any comms between AMP and SRD | Flagrantly overbroad, unduly burdensome, and aimed at attorney-client privileged communications and attorney work product. |
| **7** | All docs re any person who financially supported or invested, or was asked, or offered, since 3/4/14 | 1, 2, 3 |
| **8** | All docs re "utilization of the Ec J or any interest in or portion thereof" to raise funds since 3/4/14 | 1, 2, 3, 5 |
| **9** | All docs re any SRD property traceable to Ec J and received since 3/4/14 | 1, 2, 3. No documents exist because no property "traceable" to the Ecuadorian Judgment exists according to how that term was defined by |

| | | Judge Kaplan on 4/25/2014. |
|---|---|---|
| 10 | All docs re any RICO dfd property traceable to Ec J and received since 4/23/18 | 1, 2, 3. No documents exist because no property "traceable" to the Ecuadorian Judgment exists according to how that term was defined by Judge Kaplan on 4/25/2014. |
| 11 | All docs re property AMP has received traceable to the Ec J since 3/4/14 | 1, 3. No documents exist because no property "traceable" to the Ecuadorian Judgment exists according to how that term was defined by Judge Kaplan on 4/25/2014. |
| 12 | Identical to 1 | 1, 2, 3, 4 |
| 13 | Identical to 2 | 1, 2, 3, 4 |
| 14 | Identical to 3 | 1, 2, 3, 4 |
| 15 | All docs re AMP interest in any recovery | 1, 3 |
| 16 | All docs re any actual or potential past present or future distribution of proceeds from Ec J enforcement | 1, 2, 3, 6 |
| 17 | All docs re media projects | 1, 3 |
| 18 | All docs re any payments/promises to SRD since 3/4/14 | 1, 2, 3, 4 |
| 19 | All docs re any payments/promises to RICO dfds since 4/23/18 | 1, 2, 3, 4 |
| 20 | All docs re any payments/promises to AMP since 3/4/14 | 1, 3, 4 |
| 21 | All docs re Trust | 1, 3, 6 |
| 22 | All docs re any entity created to hold, etc, incl Amazonia | 1, 3, 6 |
| 23 | All docs re Amazonia | 1, 3, 4 |
| 24 | All docs re any dispute re any monies raised in connection with Ec J | 1, 3, 6 |
| 25 | All docs re any agreement between SRD and UDAPT/FDA etc | 1, 3, 6 |
| 26 | All docs re any agreement between AMP and UDAPT/FDA etc | 1, 3, 6 |
| 27 | All docs re any agreement between SRD and RICO dfds | 1, 3, 6 |
| 28 | All docs re any agreement between SRD and AMP | 1, 3, 6 |
| 29 | All docs re any agreement between RICO dfds and AMP | 1, 3, 6 |
| 30 | All docs re any agreement naming SRD as representative of FDA etc | 1, 2, 3, 6 |
| 31 | All docs re any agreement naming AMP as representative of FDA etc | 1, 2, 3, 6 |
| 32 | All docs re SRD accounts into which were deposited traceable funds | 1, 3, 6 |
| 33 | Identical to 32 | 1, 3, 4, 6 |
| 34 | All docs re AMP accounts into which transfers were made from SRD accounts | 1, 3, 6. Appropriate account statements showing extent of transfers from Donziger-related accounts can be provided under appropriate confidentiality and non-waiver safeguards. |

| 35 | All docs re accounts used re enforcement | 1, 3, 6 |
|---|---|---|
| 36 | All docs reflecting 5/10/16 transfer | No responsive documents. |
| 37 | All docs reflecting 7/19/16 transfer | No responsive documents. |
| 38 | All docs reflecting 10/6/16 transfer | No responsive documents. |
| 39 | All docs reflecting 10/21/16 transfer | No responsive documents. |
| 40 | All docs reflecting 12/19/16 transfer | No responsive documents. |
| 41 | All docs reflecting 2/21/17 transfer | No responsive documents. |
| 42 | All docs reflecting 5/8/18 of $342 from FN to Donziger | Responsive documents not already produced by Ms. Sullivan can be provided under appropriate confidentiality and non-waiver safeguards. |
| 43 | All docs reflecting 5/10/18 of $50 from Donziger to FN | Responsive documents can be provided under appropriate confidentiality and non-waiver safeguards. |
| 44 | All docs re communications w Sullivan, incl Dropbox materials and funds transfer communications | 1, 2, 3, 4 |
| 45 | All docs re investment agreement drafts | 1, 2, 4, 6 |
| 46 | All docs describing AMP services to Donziger or RICO dfds | 1, 3, 6 |
| 47 | All docs re invoices from AMP to Donziger or RICO dfds | 1, 3, 6 |
| 48 | All docs re Billenness or Mahoney invoices | 3, 6 |
| 49 | All docs re communications with indivs re Ec litigation | 1, 3, 6 |

**Privilege**

With respect to the assertion of attorney-client privilege and/or attorney work product, especially in response to Requests 6, 16, 17, and 21-24, the following category-based log of potentially privileged documents and communications is provided. This log, the preparation of which has already imposed an undue burden on me in light of the flagrant overbreadth of many of the Requests, especially Request 6, is being compiled as diligently and quickly as possible under the circumstances. I reserve the right to, and will, supplement and update this log as may be necessary in the course of the adjudication of these subpoenas. As described above, I hope that good-faith cooperation on a voluntary production agreement focused on litigation finance-related materials will obviate the need to litigate privilege or work-product as regards these subpoenas. I note for the record that completion of the log on an individual, document-by-document basis would require me to review, assess, log, and potentially describe over 50,000 emails (as well as an unknown number of documents), which at an ambitious rate of 2 documents per minute would require at least 400 hours of my time, not inclusive document search, organization, and production time.

The category-based log provided below is consistent with my vigorous assertion of all applicable privileges and work product protection with respect to documents targeted by the Requests. It may not be construed as intending or effecting any waiver of any privilege or protection.

**Claims**

- P1: Attorney-client communications
  - Attorney-client communications regarding the FDA or UDAPT includes communications with (or reflecting, in confidential communications to other litigation team members, information obtained from or given to) any of the following individuals, among others: Luis Yanza, Pablo Fajardo, Donald Moncayo, Julio Prieto, Juan Pablo Saenz, Paola Romero, Vanessa Barham, Humberto Piaguaje, Hugo Camacho Naranjo, Javier Paiguaje, Ermel Chavez, Carmen Aguilar, Santiago Huanca, Oscar Herrera, Verónica Asimbaya, Juan Aulestia, Patricio Salazar, Agustín Salazar, Angel Cajo, Carmen Cartuche Uchuari, Carlos Guaman, Gladys Huanca, Alejandro Soto, Medardo Zhingre, Rosa Chimbo Tanguila, Maria Rodriguez Barcenas, María Viveros Cusangua, Jose Ipiales Chicaiza, Segundo

Amanta Milán, Francisco Tanguila Grefa, Heleodoro Patarón Guaraca, José Gabriel Revelo, María Clelia Reascos Revelo, Orlando Guarnizo Mocha, Daniel Saavedra, Santos Arrobo, Luz Cusangua, Manuel Salazar, Wuilmo Moreta, Marco Ajila, and others.

- P2: Confidential material reflecting privileged attorney-client information
- P3: Fact work product prepared for litigation
- P4: Attorney opinion work product

| Approx. Date Range | To/From | Description | Claim |
|---|---|---|---|
| 3/2014 - 7/2017 | Donziger, Deepak Gupta/team (Greg Beck, Jon Taylor, others), John Campbell, Justin Marceau, Rick Friedman/team, Zoe Littlepage/team, Julio Gomez, Burt Neuborne, UDAPT, FDA, prospective counsel, others | AMP/FN advice and assistance re appeal of Kaplan RICO judgment and petition for certiorari | P1, P2, P3, P4 |
| 7/2017 - ongoing | Donziger, prospective counsel | AMP/FN advice and assistance re Donziger pro se opposition to attorneys fees and costs motions in RICO proceeding | P1, P2, P3, P4 |
| 2/2017 - ongoing | Donziger, Rick Friedman, prospective counsel | AMP/FN advice and assistance re Donziger pro se litigation in NY Superior Court Appellate Division and DC Office of Disciplinary Counsel (re suspension) | P1, P2, P3, P4 |
| 2012 - ongoing | Donziger, Alan Lenczner/team (Brendan Morrison, others), Peter Grant, John Phillips/team, Anton Tabuns, Graham Erion, FDA, UDAPT | AMP/FN advice and assistance re Ecuadorian Judgment enforcement litigation in Canada | P1, P2, P3, P4 |
| 2012 - ongoing | Donziger, Sergio Bermudes/team (Fabiano Robalinho, Antonia de Araujo Lima), FDA, UDAPT | AMP/FN advice and assistance re Ecuadorian Judgment enforcement litigation in Brazil | P1, P2, P3, P4 |
| 2017 - ongoing | Donziger | AMP/FN advice and assistance re violations of Donziger's human rights | P1, P2, P3, P4 |
| 11/2013 - ongoing | Donziger, FDA, UDAPT | AMP/FN advice and assistance re Constitutional Court proceeding in Ecuador | P1, P4 |
| 2010 - ongoing | Donziger, FDA, UPDAT | AMP/FN advice and assistance re litigation strategy and client organization issues in Ecuador | Some documents may contain P1, P2, P4 |
| 2010 - ongoing | Donziger, FDA, UDAPT | AMP/FN advice re Chevron/Ecuador BIT arbitration | Some documents may contain P1, P4 |
| 2010 - ongoing | Donziger, Karen Hinton, FDA, UDAPT | AMP/FN advice re content of Donziger public communications | Some documents may contain P1, P4 |

| 8/2016 - 3/2018 | Donziger, Sullivan, Rizack, others | AMP/FN advice and assistance re litigation finance efforts | Some documents may contain P1, P4 |
| 2010 - ongoing | Donziger | AMP/FN advice re litigation strategy re Chevron litigation | Some documents may contain P1, P2, P4 |
| 2014 - ongoing | Donziger, other counsel | Discussion of non-Chevron-related prospective litigation | P4 |

Sincerely,

Aaron Marr Page

Forum Nobis PLLC

513 Capitol Court NE, Suite 100

Washington, D.C. 20002

(202) 618 2218

# EXHIBIT 98



**PRESS RELEASE**

**U.S. Attorney Steven Donziger Files Human Rights Petition Claiming U.S. Judicial Authorities Failed to Protect Him from Vicious Chevron Retaliation Campaign**

*Case Raises Larger Issues of Corporate "SLAPP" Retaliation Lawsuits Against Critics and Human Rights Advocates; Global Witness, Greenpeace, and UN Agencies Monitoring Situation and Raising Alarms*

Washington, D.C. / Sept. 25, 2018 – Renowned U.S. human rights attorney Steven Donziger, who has helped impoverished communities in the Ecuadorian Amazon maintain a global litigation and advocacy effort against Chevron for over 25 years, filed a petition with the Inter-American Commission on Human Rights (IAHCR) on Monday. The petition details how Donziger has suffered a massive campaign of retaliatory litigation and media attacks from Chevron that has been facilitated by U.S. judicial and other institutions. Chevron has openly bragged of its efforts to "demonize Donziger," has frozen Donziger's bank accounts, and recently asked a U.S. court to imprison him.

The new petition raises broader issues of the ability of corporations to abuse the legal process to silence critics and punish adversaries with "Strategic Lawsuits Against Public Participation," or SLAPPs. The SLAPP problem has been identified for decades, but recent years have seen a massive uptick in such cases. Greenpeace, Human Rights Watch, and other organizations recently launched a national campaign to raise awareness and push back on SLAPPs, using the Twitter hashtags #SLAPPtaskforce and #ProtectTheProtest. The groups identify Chevron's attacks on Donziger as the seed from which a whole new generation of attacks has grown.

Judicial harassment of human rights defenders by corporations and governments is also a high-profile issue for human rights organizations and UN agencies at the global level. The UN has a dedicated research office or "rapporteur" focused on the problem, and organizations including Amnesty International, Global Witness, and Frontline Defenders regularly issue reports expressing alarm at the growing incidence of retaliation. Global Witness recently indicated that it would be closely monitoring the Donziger case.

While the retaliation and outright "demonization" of Donziger has been driven by Chevron, acting as a private party hoping to "taint" the legitimacy of the $12 billion environmental liability that four layers of Ecuadorian courts have imposed on the company, the petition asserts that ultimately responsibility lies with the U.S. institutions which have tolerated, facilitated, and at times openly encouraged the attacks.

In one example of the problematic judicial conduct in the case, in September 2010, U.S. federal judge Lewis A. Kaplan mocked Donziger from the bench as a supposed "plaintiff's lawyer" with a big "imagination" for daring to sue Chevron in Ecuador. Shortly thereafter, Chevron filed a civil "racketeering" lawsuit against Donziger and the U.S. judge, Lewis A. Kaplan, took extraordinary

Forum Nobis

steps to assign it to himself. At the first hearing in the racketeering case, Kaplan praised Chevron as "a company of considerable importance to our economy" and worried that U.S. consumers would be hurt by enforcement of the Ecuadorian environmental liability. "I don't think there is anybody in this courtroom who wants to pull his car into a gas station to fill up and finds that there isn't any gas there because [Donziger's clients have enforced their environmental judgment] in Singapore or wherever else," the judge said.

Kaplan refused to seat a jury—unprecedented in a racketeering case—and ultimately decided the merits of Chevron's claims himself, in a 500-page decision that concluded that the Ecuadorian environmental judgment was tantamount to "extortion" by Donziger against Chevron. The court acknowledged it could not stop efforts to enforce the judgment in other countries, but issued the lengthy decision in response to Chevron's calls for "a freestanding determination" of the facts as Chevron saw them, that the oil company could then use to try to shut down enforcement efforts elsewhere.

Kaplan's judgment was decided under a low civil standard of proof—"more likely than not"— even though it purported to find Donziger responsible for criminal acts under U.S. federal law that normally require findings "beyond a reasonable doubt." Other authorities, such as the lawyer "grievance" committee in New York which regulates the licensing of attorneys, are now seeking to strip Donziger of his license to practice law based on this alleged criminal responsibility. The New York state court hearing the matter has preliminarily decided it can invoke "collateral estoppel," refusing to hear any of Donziger's evidence or claims of innocence on account of Judge Kaplan's decision, even though many of Kaplan's findings have been contradicted by four layers of Ecuadorian courts and effectively disproven in collateral proceedings.

"What seems to be happening to Steven Donziger, given evidence in the public domain, is a serious case of judicial harassment - a sham process, wrapped up by the gentile world of the New York Bar as legitimate," said Simon Taylor, a co-founder and director of Global Witness. "Instead, the attacks on Steven seem to have all the hallmarks of the kind of bullying and persecution we have documented and witnessed in countries around the world, where threats to corporate interests result in vicious counter-attacks.  I am particularly concerned about what appears to be a continuing effort, invoking collateral estoppel, to deny Mr Donziger a public hearing to defend himself and to provide evidence.

"Mr Donziger now appears to have joined a long list of the persecuted, and I am particularly shocked that this is taking place in New York—a jurisdiction with a proud reputation for its fight against corruption and the corrupt," Mr. Taylor added. "The fact that this is happening on the basis of highly suspect evidence, and possibly false witness testimony, raises the distinct possibility that Mr. Donziger is being framed.  It is critical that this 'process' be monitored by all concerned to protect the rule of law and the maintenance of free, open, and accountable societies - and that is precisely what we will be doing."

The central evidence in the racketeering trial against Donziger was testimony from a witness recruited by elite corporate espionage firms on behalf of Chevron. The witness had an acknowledged history of paying and receiving bribes and had actively sought to "sell" false testimony and corrupt outcomes to both parties in the Ecuadorian environmental lawsuit. Chevron has paid him in excess of $2 million, despite legal and ethical prohibitions on paying "fact"

witnesses. While Judge Kaplan credited the witness' testimony in the racketeering trial, the witness later admitted to intentionally lying on the stand in that trial, and the core of his testimony (claiming that a bribe was agreed to but never paid in the Ecuador case) was disproved by a forensic analysis of the Ecuadorian judge's courthouse hard drives.

Donziger presented the petition with the assistance of Forum Nobis PLLC, a human rights firm in Washington, D.C. that also represents the Ecuadorian communities that brought the environmental lawsuit in Ecuador. Aaron Marr Page, the managing attorney at the firm who also litigates cases involving the denial of human rights in U.S. state and federal courts, said that the case illustrated the critical role of the Inter-American Commission as regards national justice systems, especially in cases involving "important" domestic political and economic interests, situations of vast disparities of resources, and other factors involved in the Donziger case.

"Americans hate to hear this, but our court systems, including our appellate and other curative mechanisms, aren't flawless," said Page. "Just as in other systems in the hemisphere that we have no problem criticizing, cases in our own system do sometimes go off the rails. The involvement of 'a company of considerable importance to our economy,' as the courts characterized Steven's case, can in particular often lead to skewed results."

Page added that certain features of the U.S. justice system made it particularly vulnerable to abuse, including the availability of the "civil racketeering" action—called by one judicial critic "the litigation equivalent of a thermonuclear device"—as well as the enormous financial costs of litigating in a system distinguished by its elaborate document discovery protocols and motion practice burdens, which can make it impossible less well-resourced human rights defenders to fight off even the most bogus claims . "It all leads to the cynical aphorism all lawyers dislike but recognize: 'you get the justice you pay for,'" said Page. Chevron is reported to have spent well over $1 billion in legal fees and expert costs in its prosecution of the civil case against Donziger.

In the four years since the racketeering judgment, Chevron has kept up a steady press of discovery requests, contempt motions, and other legal harassment techniques to keep Donziger tied up in court. "I know this is all an attempt to silence legitimate advocacy and help Chevron escape from its responsibility for the hundreds of toxic waste pits abandoned at its former operations sites in Ecuador," Donziger said. "But that doesn't make it any easier to bear personally, especially when the attacks are starting to threaten my ability to provide for my wife and son."

A particularly disturbing feature of the racketeering trial was that Chevron, two weeks prior to trial, agreed to forfeit "all money damages claims" against Donziger because that allowed Judge Kaplan to refuse to seat a jury and instead decide the merits of Chevron's claims himself. It was widely reported at the time that mock juries assembled by Chevron's legal team were rejecting the company's claims. Despite having forfeited its money damages claims, Chevron later moved Kaplan to order $33 million in money judgments against Donziger. After Judge Kaplan began granting these requests, Chevron froze Donziger's bank accounts and has recently asked Kaplan to send Donziger to jail until he complies with certain requests to transfer his property to Chevron.

The Inter-American petition raises claims of denial of due process on multiple grounds, and violation of the rights to freedom of association, expression, privacy, and property, as guaranteed by the American Declaration of the Rights and Duties of Man and other international agreements.

Forum Nobis

The petition already has received significant attention from the leading civil society groups already mentioned, as well as leading First Amendment lawyers, environmentalists, and Indigenous leaders around the world.

The following media articles detail the treatment by Mr. Donziger by U.S. authorities over the last few years:

- Rex Weyler, Chevron's SLAPP suit against Ecuadorians (Greenpeace, 2018)
- Katie Redford, The New Corporate Playbook, Or What To Do When Environmentalists Stand In Your Way (Huffington Post, 2016)
- Alexander Zaitchek, Sludge Match: Inside Chevron's $9 Billion Legal Battle With Ecuadorean Villagers (Rolling Stone, 2014)

The following videos discuss the merits of the underlying environmental litigation that Mr. Donziger assisted with in Ecuador:

- A Cancer in the Amazon (TeleSUR, 2018)
- The true story of Chevron's Ecuador Disaster (Amazon Defense Coalition, 2012)
- The Chevron Tapes (Amazon Watch, 2015) (Chevron internal video produced by a whistle-blower showing Chevron technicians discovering oil contamination at inspections sites that the company's technicians later sought to hide from the Ecuadorian court)
- A documentary on Mr. Donziger from his website, http://stevendonziger.com/

For more information, contact:

Aaron Marr Page
 *Managing Attorney*
Forum Nobis PLLC
Tel. 202-618-2218
aaron@forumnobis.org

international law * human rights * the environment

*Forum Nobis* pllc

A PROFESSIONAL
LIMITED LIABILITY
COMPANY

Aaron Marr Page
*Managing Attorney*
Forum Nobis PLLC
1015 15th Street NW, Ste 1110
Washington, D.C. 20005
+1 202 618 2218
aaron@forumnobis.org

---

# HUMAN RIGHTS PETITION
## *of*
## STEVEN R. DONZIGER

---

### Briefing Memorandum

*U.S. attorney Steven Donziger, who has represented indigenous and other Ecuadorian Amazon communities in the historic environmental case against Chevron Corporation for over 25 years, is petitioning the Inter-American Commission on Human Rights, claiming that by embracing Chevron's retaliatory litigation and "demonization" campaign against him, U.S. judicial bodies and other public authorities have inflicted and enabled severe violations of his rights to due process, freedom of expression and association, privacy, and property under applicable international human rights instruments. This Briefing Memorandum serves to apprise the public of the content of the petition, the disturbing facts of the persecution suffered by Mr. Donziger, and the larger context of the threat that such attacks pose to human rights and environmental advocacy more broadly.*

## OVERVIEW & PURPOSE

American attorney Steven Donziger has been helping a group Indigenous peoples and subsistence farmers in Ecuador pursue environmental justice against Chevron Corporation for over 25 years. In 2009, as Chevron finally and imminently faced an environmental liability that would require it to remediate hundreds of ponds of toxic oil waste and provide other compensation, the company adopted what it called a "long term strategy" of response that would, they hoped, allow the company evade the environmental liability without facing severe public relations consequences. The strategy was designed to draw attention away from the humanitarian crisis caused by the contamination and its devastating cancerous effects on Ecuadorians living around Chevron's former operations sites and instead focus attention on Mr. Donziger, who Chevron would portray as a "greedy plaintiff's lawyer" (a stereotyped figure that business lobbying groups like the U.S. Chamber of Commerce have long coaxed the American public to despise). In the words used by Chevron strategists amongst themselves, the strategy was simple: "demonize Donziger."

To implement this strategy, Chevron prepared an unprecedented and extraordinarily aggressive "racketeering" lawsuit against Mr. Donziger. Chevron filed it just days before the issuance of a multi-billion dollar environmental judgment by an Ecuadorian trial court. While that judgment has worked its way through the Ecuadorian civil justice system, being unanimously affirmed three times on appeal by four layers of Ecuadorian courts, Chevron has used its overwhelming resources and a flagrantly biased U.S. federal judge (as evident from his public comments, reprinted below) to drag Donziger through a gruesomely one-sided and humiliating "trial" process resulting in a court finding that Mr. Donziger and his clients were guilty of "attempted extortion" of Chevron. The federal racketeering judgment was issued from the bench after the U.S. judge refused, two weeks before trial, to empanel a jury, and was decided under a minimally demanding standard of proof. It purported to find that Mr. Donziger and others had reached a corrupt agreement with the Ecuadorian judge who issued the environmental judgment, but so "found" by relying on the absurdly conflicted and utterly incredible testimony of a single Chevron witness who was recruited, coached, and paid millions of dollars in cash and benefits for his "fact" testimony (all in violation of ethical rules).

U.S. authorities, with the encouragement of Chevron and its lead strategists and lawyers at the law firm Gibson Dunn & Crutcher (GDC), are now seeking to destroy Mr. Donziger personally and financially by stripping him of his law license and forcing him to pay the costs of the egregious process they inflicted on him—everything from Chevron's attorneys fees to the meals and first-class travel expenses of its experts. Despite the fact that Mr. Donziger has never been subject to a single "grievance" by a client (as opposed to attacks by Chevron, an adversary) in his 25 years of law practice, an attorney grievance committee in Manhattan last year urged a New York state court to suspend his law license on an emergency basis, calling him a "threat to the public order." Mr. Donziger opposed with more than 70 pages of legal briefing in his defense, primarily insisting on his right to a hearing on the allegations of misconduct against him. In a perfunctory three-page order issued in August 2018, the state court suspended Mr. Donziger's license, refused to allow him a hearing, barred him from contesting the "facts" set out in the false and distorted racketeering judgment, and ordered the committee to proceed with imposing a permanent sanction.

The attacks on Mr. Donziger target him as a human rights defender and violate his rights as protected by international human rights instruments as well as the U.S. Constitution. They also represent a broader threat to basic freedoms of association, expression, and petition, for persons opposing the interests of powerful corporations. Until recently, the implications of the persecution of Mr. Donziger have been overlooked, despite Mr. Donziger's (and a few others'[1]) repeated warnings that the litigious methodologies being against him would soon be turned into a "playbook" for corporate attacks on human rights and environmental defenders generally. Only since other companies have started filing similar, almost copycat attacks against other more well-known defendants, like Greenpeace, has the public begun to pay closer attention.[2]

U.S. judicial institutions have proven not just unable to offer Mr. Donziger protection but indeed have served as instruments of the repression he has suffered. The U.S. judge in the racketeering case declared at the outset that Chevron was "a company of considerable importance to our economy" and castigated Mr. Donziger for his "imagination" in choosing to litigate the environmental case. As such, Mr. Donziger is filing a petition to the Inter-American Commission on Human Rights (IACHR) and potentially other human rights bodies in the future, to vindicate his own rights under international human rights treaties as well as to draw attention to *(1)* the human rights problems inherent in the embrace of Chevron's retaliatory litigation and "demonization" strategy by the U.S. judiciary and other institutions; *(2)* the abusiveness of Chevron's strategy and the need for a just resolution of the environmental and human rights situation in the Ecuadorian Amazon; and *(3)* the larger public policy implications of the new corporate playbook of attacking human rights and environmental defenders with well-financed litigation campaigns based on manufactured controversies, as a strategy to neutralize public pressure that companies otherwise face on substantive human rights and environmental issues.

---

[1]   *See, e.g.*, Report of the Special Rapporteur on the Situation of Human Rights Defenders, UN Doc. A/72/170 (19 July 2017), http://undocs.org/A/72/170 ("an increasing number of business enterprises are pursuing retaliatory lawsuits, commonly under the guise of strategic lawsuits against public participation [SLAPPs], against defenders. Such harassment takes a substantial financial and psychological toll on defenders and has a chilling effect, ultimately undermining their capacity and willingness to bring human rights abuses to light. . . . Judicial harassment against defenders is facilitated by State judicial mechanisms in both home and host States and, as such, it occurs with State complicity or disregard."). *See also* UN Doc. A/70/217 (15 July 2015), https://undocs.org/A/70/217; UN Doc. A/65/223 (4 Aug. 2010), http://undocs.org/A/65/223. The Business & Human Rights Resource Centre (BHRRC) tracks cases specifically of attacks against human rights defenders working on corporate accountability issues, compiling a database of 1252 cases thus far. By far the most common mode of attack is judicial harassment, as Mr. Donziger has suffered. *See* https://www.business-humanrights.org/en/bizhrds.

[2]   On September 5, 2018, Greenpeace USA, Human Rights Watch, Amnesty International, the American Civil Liberties Union (ACLU), the Electronic Frontier Foundation (EFF), the Center for International Environmental Law (CIEL), the Natural Resources Defense Council (NRDC), EarthRights International (ERI), the Center for Constitutional Rights (CCR), the Rainforest Action Network (RAN), and other leading civil society organizations launched a "Protect the Protest" campaign aimed at raising awareness of the threat posed by strategic retaliatory litigation, or SLAPPs, to human rights and public interest advocates generally. The Coalition highlights Chevron's decision "to go after the affected communities' American lawyer, Steven Donziger" as a progenitor of the recent wave of lawsuits, as it "seductively" illustrated the "potential use of civil RICO as a weapon against civil society organizations." History of SLAPPs, https://www.protecttheprotest.org/history/.

# TABLE OF CONTENTS

OVERVIEW & PURPOSE ................................................................................................ i

TABLE OF CONTENTS ................................................................................................ iii

SUBSTANCE OF THE PETITION ................................................................................ 4

I.     Facts Alleged ...................................................................................................... 4

    A.    Overview ................................................................................................ 4

    B.    Background ............................................................................................ 6

    C.    "Demonize Donziger" ......................................................................... 6

    D.    The Biased and Abusive Racketeering Trial ....................................... 8

    E.    Attacks on Mr. Donziger's Personal Finances and Livelihood .............. 10

II.    Authorities Allegedly Responsible .................................................................. 11

III.   Human Rights Allegedly Violated .................................................................. 11

    A.    Due Process Generally ......................................................................... 11

    B.    Due Process - Presumption of Innocence / Burden of Proof ................ 12

    C.    Due Process - Impartial and independent tribunal ............................. 13

    D.    Due Process - Inequality of arms ....................................................... 13

    E.    Freedom of Association and Expression ............................................. 14

    F.    Privacy ................................................................................................. 15

    G.    Property ................................................................................................ 16

IV.   Evidence ........................................................................................................... 16

V.    Witnesses .......................................................................................................... 18

VI.   Exhaustion of Remedies .................................................................................. 19

VII.  Request for Relief ............................................................................................. 19

CONCLUSION ............................................................................................................. 21

## SUBSTANCE OF THE PETITION

*The IACHR uses an online submission system for individual petitions. The following text represents the text submitted as part of the petition and is structured and drafted according to the requirements of the IACHR petition process. Documentary evidence in support of all the assertions and descriptions contained herein will be provided to the IACHR at the appropriate time in the petition process, but is available to interested members of the public upon request.*

## I.   Facts Alleged

### A. Overview

Petitioner Steven Donziger hereby challenges his persecution by judicial and administrative authorities in the United States, wherein, in summary:

(1) A quasi-criminal "extortion," "fraud," and "racketeering" lawsuit was filed against him by a financially-interested private party (Chevron Corp.) and accepted by the courts.

(2) The lawsuit was filed consistent with Chevron's self-acknowledged strategy of "demonizing" Mr. Donziger for his work as a human rights defender assisting certain impoverished communities in the Ecuadorian rainforest in obtaining a large environmental damages judgment against Chevron.

(3) The U.S. judge assigned to the case openly expressed contempt for Mr. Donziger, favoritism toward Chevron, and refused to empanel a jury as required by the U.S. Constitution.

(4) The U.S. court ordered Mr. Donziger to give Chevron unfettered access to his computer, all his email and online accounts, and all his legal files, after finding that Mr. Donziger forfeited all attorney-client privileges on account of a procedural error.

(5) The court refused to take any steps to address the prejudicial impacts of the gross disparity of resources between the parties and abusive litigation tactics of Chevron, forcing Mr. Donziger to represent himself during critical parts of the proceeding.

(6) The trial proceeding violated due process requirements in numerous respects, including by

(a) relying on testimony from a "fact" witness who was recruited by Chevron, coached for 53 days, and paid millions of dollars in exchange for his testimony;

(b) forcing Mr. Donziger to disclose years' worth of attorney-client privileged files and confidential material such as his own personal diary;

(c) barring the introduction of key contextual evidence, such as evidence of the environmental conditions driving Mr. Donziger's work in Ecuador;

(d) rejecting the application of U.S. Constitutional free expression (First Amendment) protections; and

(e) refusing to recognize findings by multiple layers of Ecuadorian courts that there was no "fraud" or misconduct under Ecuadorian law.

(7) The court, sitting without a jury, convicted Mr. Donziger of "racketeering" and related "predicate criminal acts" (extortion, fraud, obstruction of justice, witness tampering) under a civil standard of proof far less demanding than "beyond a reasonable doubt."

(8) Even though Chevron waived all damages claims against Mr. Donziger (in order to prevent a jury trial), it later sought two massive money judgments (over $34 million) against Mr. Donziger to compensate for its attorneys fees and court costs. Using unreviewed, attorney-issued "notices," Chevron has frozen Mr. Donziger's bank accounts. Chevron also successfully sought the U.S. court to order Mr. Donziger to transfer property Chevron, and when Mr. Donziger resisted by seeking to add a statement of background "understandings" to the transfer document, Chevron moved to hold Mr. Donziger in contempt and imprisoned.

(9) The U.S. trial court and Chevron together lobbied lawyer regulation authorities to get Mr. Donziger disbarred as a New York lawyer under a "collateral estoppel" theory in which Mr. Donziger never received a hearing.

(10) Throughout the time period of the above, Chevron has maintained a massive network of lawyers, lobbyists, private investigators, public relations firms, paid journalists, and bloggers (totaling over 2,000 individuals) to "demonize Donziger" (the words of a Chevron strategist) until he "gives up" (the words of Chevron' former CEO) on his advocacy on behalf of his Ecuadorian clients. The U.S. courts have refused to consider the relevance of this unapologetically abusive litigation strategy.

The persecution described above reflects numerous severe violations of Mr. Donziger's rights to due process, judicial protection, privacy, free expression, and property, as guaranteed by Articles XXVI, XVIII, XVII, V, XXIII, IV, XXI, and XXII of the American Declaration of the Rights and Duties of Man ("Declaration" or "Am. Decl."), and further elaborated in the provisions and

jurisprudence of Articles 8 and 25 of the American Convention on Human Rights ("Convention" or "Am. Conv.").

## B. Background

Mr. Donziger is a U.S. lawyer who has worked in the field of corporate accountability his entire career (with the exception of his work as a criminal justice public defender in his first years of practice).

The critical background to the current persecution of Mr. Donziger is the historic environmental lawsuit captioned *Aguinda v. Chevron Corp.*, in which a group of Ecuadorian claimants, representing over 30,000 indigenous and rural persons in the Sucumbíos and Orellana provinces of Ecuador, have for 25 years demanded that Chevron Corporation (then Texaco Inc.) remediate the massive contamination abandoned by the oil company at its former operations sites in and around their communities, lands, and territories. The contamination includes hundreds of open-air pits of oil sludge, rivers and streams laced with decades of oils waste, and as-yet-unknown quantities of groundwater contamination. The region affected by the contamination has suffered a statistically significant elevated rate of cancers and other illnesses, as confirmed by leading medical and epidemiology journals.

In 1993, Mr. Donziger was part of the original U.S./Ecuadorian legal team that first sued Chevron (then Texaco) in the United States. In 2003, Chevron successfully convinced the U.S. courts to transfer the case (under the *forum non conveniens* doctrine) to be litigated in Ecuador. In Ecuador, Chevron broke its promise not to contest jurisdiction, and resisted the progress of the environmental trial with a variety of abusive judicial and extrajudicial tactics. Nonetheless, in 2011, after eight years of scientifically-intensive environmental testing and multiple rounds of legal argument, the Ecuador trial court issued judgment in the communities' favor, commanding Chevron to pay $8.5 billion into a legal trust to be administered by a local registered non-profit organization for environmental and cultural remediation projects. While various corrections and amendments were made on appeal, the core integrity of the trial judgment was affirmed by an Ecuadorian intermediate appellate court in 2012, by Ecuador's National Court of Justice in 2013, and finally by Ecuador's Constitutional Court in 2018.

## C. "Demonize Donziger"

Chevron's immediate response to the Ecuadorian judgment was to declare that it would refuse to pay the judgment "until hell freezes over" (the company's own words). Instead, Chevron sought to "taint" the Ecuador judgment with allegations of "fraud" that it could use to resist efforts to enforce the judgment in other countries (it had already strategically removed all its assets from Ecuador). These efforts, dating back to at least 2008, are well-documented. By 2009, internal Chevron documents (produced in litigation), reveal that company strategists had expressly shifted the "taint" strategy to focus on Mr. Donziger in particular, likely because he could be portrayed as a "greedy plaintiff's lawyer," a notoriously demonized stereotype in contemporary U.S. public

affairs. One Chevron strategist expressly acknowledged that "our L-T [long-term] strategy is to demonize Donziger."

The key method for implementing this "demonize" strategy was through the filing of a lawsuit against Mr. Donziger under the federal Racketeer Influenced and Corrupt Organizations (RICO) Act. RICO was intended to allow prosecutors to bring criminal cases against the mafia, but has long been abused by well-resourced litigants to as the "litigation equivalent of a thermonuclear device," in the words of one the judge—a tool, if deployed with enough force, to slander an opponent as a criminal while pressing a civil claim. A non-government plaintiff under RICO must "prove" that its opponent committed "predicate criminal acts"—but, critically, is only required to do so under a civil, or "preponderance of the evidence" standard of proof, not the "beyond a reasonable doubt" standard that is required to prove exactly the same criminal acts in a regular criminal proceeding. Courts are typically required to empanel a jury in a RICO case because the U.S. Constitution requires a jury every time a plaintiff claims more than $20 in any civil case.

Chevron filed its RICO suit just two weeks before the Ecuador environmental judgment was issued. It used a procedural tactic to circumvent the federal court system's random assignment system and have the civil RICO lawsuit assigned to a particular judge, Lewis A. Kaplan, who had presided over an earlier related discovery case and who already had clearly expressed his animosity toward Mr. Donziger and his favoritism for Chevron. Among many other prejudicial comments, Judge Kaplan had already stated publicly (before he was assigned to the RICO case):

> "The imagination of American lawyers is just without parallel in the world. It is our one absolutely overwhelming comparative advantage against the rest of the world, apart from medicine. You know, we used to do a lot of other things. Now we cure people and we kill them with interrogatories. It's a sad pass. But that's where we are. And Mr. Donziger is trying to become the next big thing in fixing the balance of payments deficit. I got it from the beginning."

In the opening days of the RICO lawsuit, once it was assigned to him, Judge Kaplan continued to reveal his lack of impartiality, at one point stating from the bench:

> "[W]e are dealing here with a company of considerable importance to our economy that employs thousands all over the world, that supplies a group of commodities, gasoline, heating oil, other fuels and lubricants on which every one of us depends every single day. I don't think there is anybody in this courtroom who wants to pull his car into a gas station to fill up and finds that there isn't any gas there because these folks [the Ecuadorians] have attached it in Singapore or wherever else [as part of enforcing their judgment]."

### D.  The Biased and Abusive Racketeering Trial

The ensuing federal racketeering trial against Mr. Donziger was a travesty of justice on many levels. It is not possible for this petition to describe all the problematic and violative features of the proceeding; the following examples are the most important and illustrative.

*First,* Chevron deployed an extreme level of financial and other resources to aggressively litigate that case and overwhelm Mr. Donziger and his Ecuadorian clients who appeared as codefendants. Independent news sources estimated that Chevron at one point was spending $400 million per year in legal fees, and the company acknowledged that it had used over 2000 professionals and more than 60 law firms. Mr. Donziger took out loans and used his personal savings to help fund his defense. While he had counsel at certain points, Mr. Donziger was forced to represent himself at critical junctures in the proceeding, and relied significantly on pro bono help from law students to manage his defense. Judge Kaplan ignored Mr. Donziger's pleas for procedural modifications and generally refused to do anything to mitigate the effects of the extreme inequality of arms. Chevron used its army of lawyers to gain unfettered access to Mr. Donziger's computer, email and other online accounts, and legal files, and yet simultaneously to the defense any access to Chevron's own documentary materials that the defense needed. At the trial itself, Mr. Donziger's small, mostly *pro bono* team lacked sufficient funds to obtain transcripts, make sufficient copies of trial materials, and see to countless other trial expenses. In just one example, the U.S. court allowed Chevron to submit over 2,000 exhibits into evidence in a single day, and when the defense didn't object to each exhibit individually within in four days' time, the court found that all objections to use of the exhibits were waived.

*Second,* Chevron knowingly or recklessly manufactured and presented false testimony, and the U.S. court accepted it despite clear evidence of its falsity and corrupt origin. The facts here are shocking. Even though U.S. law prevents (indeed, criminalizes) payments to "fact" witnesses, Chevron paid millions of dollars to one such witness—the only witness who testified (falsely) that Mr. Donziger was involved in an alleged agreement to bribe the Ecuador trial judge. Chevron made the payments under the ludicrous justification that it was not paying for the testimony, but only for "information" related to the testimony. Chevron paid the witness in cash to secure his testimony, and has paid him a monthly "stipend" of $10,000—twenty times his pre-Chevron salary—for his cooperation since at least January 2013. The witness changed his story constantly, and his testimony was later disproven by a digital forensic analysis of the Ecuador trial judge's hard drive which showed that the key facts of the "bribe" described by the witness could not have occurred.

*Third,* Judge Kaplan dismissed all of Mr. Donziger's claims to attorney-client privilege and/or "opinion work product" for his work as a lawyer on the Ecuador matter for over 20 years. He forced Mr. Donziger to produce his entire hard drive and all his files to Chevron for examination. Chevron ultimately ended up relying heavily on snippets taken out of context from a personal diary of his work on the case that Mr. Donziger had kept for a period of time. Judge Kaplan also did nothing in response to documented claims that Mr. Donziger and others adverse to Chevron were routinely being followed, photographed, and spied on by private investigators—including lawyers

being spied on while meeting with clients. In addition, Judge Kaplan allowed Chevron to take and submit evidence in the pre-trial period from "John Doe" witnesses whose identities were never revealed to Mr. Donziger who could not be effectively cross-examined.

**Fourth,** the U.S. court severely restricted what evidence could be discovered and then presented at trial in ways that utterly undermined the ability of Mr. Donziger and his Ecuadorian clients to defend themselves. Most shockingly, the court barred any mention at trial of Chevron's contamination or the company's abusive tactics during the environmental trial in Ecuador, even though the good faith, non-wrongful basis of defendants conduct underlying Chevron allegations could not be understood without it. As a small example, Chevron placed great weight on the fact that, on occasion, Mr. Donziger and others used "code words" in emails, a fact which Chevron claimed showed consciousness of guilt. In reality, the use of code words was responsive to the fact that Mr. Donziger and his colleagues had reason to believe that Chevron's investigators were spying on them—but Mr. Donziger was not allowed to establish this fact at trial.

**Fifth,** the U.S. court accepted (and ultimately granted) claims that directly attacked Mr. Donziger's work as a human rights and environmental defender. Most shockingly, the court accepted the notion that the use of out-of-court advocacy in the media and in public protest campaigns amounted to "attempted extortion" of Chevron in violation of a federal criminal statute.

**Sixth,** the U.S. court allowed Chevron to proceed without having to prove its case to a jury, even though Mr. Donziger demanded one and the U.S. Constitution requires that a civil defendant be given a jury if the amount in controversy is more than $20. Even though the "amount" realistically in controversy was exponentially more than $20 in numerous ways, the U.S. court allowed Chevron (just two weeks ahead of trial) to drop all its money damages against Mr. Donziger and proceed solely on claims for injunctive relief, and thereupon denied Mr. Donziger's jury demand. Mr. Donziger argued at the time that he was still entitled to a jury because he still faced (1) the possibility of monetary penalties in other forms and (2) the stigmatization associated with the underlying criminal charges.

As expected, Judge Kaplan ruled in Chevron's favor in March 2014. Under a civil standard of proof, the court found that Mr. Donziger had committed felony fraud, attempted extortion, and bribery, as well as other felonies derivative of the fraud finding (money laundering, obstruction of justice). The court devoted literally hundreds of pages to articulating "factual findings" that adopted virtually all of Chevron's positions, struck out the bulk Mr. Donziger's sworn testimony, and largely ignored, without comment, Mr. Donziger's counter-positions and the numerous Ecuadorian court decisions rejecting Chevron's fraud claims. Because the false factual findings were too numerous to challenge individually, and because of his scarcity of resources, Mr. Donziger filed an appeal focusing on the egregious legal errors in the decision.

In August 2016, the U.S. Court of Appeals for the Second Circuit affirmed the March 2014 judgment. The primary basis was that the appeals court interpreted Mr. Donziger's focus on legal errors to mean that he had "conceded the facts," despite Mr. Donziger vigorous dispute to many parts of Chevron's false narrative in his appellate briefing. In July 2017, the U.S. Supreme Court

denied Mr. Donziger's petition for certiorari review of the Second Circuit affirmance. Links to amicus briefs in support of Mr. Donziger's petition for certiorari are included in the Evidence section of the petition.

### E.    Attacks on Mr. Donziger's Personal Finances and Livelihood

The same day that the Supreme Court denied certiorari, Chevron returned to Judge Kaplan, now with an unvarnished strategy to go after Mr. Donziger personally. Despite the fact that the company had "waived" all money damages claims to avoid seating a jury in the RICO case, it now filed an extraordinary $32 million attorney fees claim and a $1 million "costs" claim against Mr. Donziger. Judge Kaplan entered a $800,000 "supplemental judgment" on costs against Mr. Donziger on Feb. 28, 2018, and immediately gave Chevron permission to serve a dozens of new discovery requests targeting Mr. Donziger's bank accounts and other assets entirely unrelated to his work on the Ecuador case. Chevron subsequently used attorney-issued "notices" to freeze Mr. Donziger's bank accounts, leaving him faced with the prospect of being unable to fund not just his own human rights work but his child's schooling and other personal expenses. Judge Kaplan also ordered Mr. Donziger to execute documents transferring property to Chevron. When Mr. Donziger objected that he should be allowed to include a "statement of understandings" explaining the context of the execution of the documents, Judge Kaplan ordered that he execute the documents exactly as drafted by Chevron, without any changes or other expressions, and Chevron asked the court that Mr. Donziger be imprisoned until he did so to the company's satisfaction.

In yet another avenue of personal attack, the New York federal court aggressively lobbied the purportedly independent professional discipline authorities in New York (the "Attorney Grievance Committee" or AGM) to initiate proceedings to strip Mr. Donziger of his legal license—his basic means of earning a living. Chevron has engaged in similar lobbying efforts to get Mr. Donziger disbarred from the federal court system (where he is defending himself *pro se* against the money judgments), and may have also coordinated with the AGM (the AGM has repeatedly declined demands that it acknowledge any coordination, and it is unclear whether there are any prohibitions on such private coordination or even procedural rules requiring transparency). Despite the fact that no client has ever filed a "grievance" against Mr. Donziger in his nearly 30 years of legal practice, and despite a policy supposedly disfavoring the initiation of discipline at the behest of adversary counsel in ongoing litigation, the AGM has proceeded to seek to disbar Mr. Donziger.

It has done so in a "blitzkrieg" style, first ignoring Mr. Donziger's repeated requests for a meeting or interview to explain the larger context of the lawsuit against him; second, initiating disbarment proceedings under a rarely-used emergency provision of the rules that allow the AGM to seek disbarment of an attorney who constitutes "an immediate threat to the public order" and allows for interim suspension <u>without any hearing or argument</u>; and third, seeking permanent disbarment on a "collateral estoppel" theory which would prevent Mr. Donziger from challenging or even explaining or contextualizing any of the false "findings" in Judge Kaplan's 500-page RICO judgment. Mr. Donziger was allowed to oppose in writing, and filed 70 pages of briefing and reply briefing opposing the use of this procedure. On July 10, 2018, the relevant disciplinary authority (the Appellate Division of the First Department of the New York State court system) invoked

collateral estoppel in a four-page summary order, declining to respond to any of Mr. Donziger's arguments and suspending his license pending a hearing exclusively addressed what "sanction" Mr. Donziger should receive. The only appeal available is a petition for discretionary review to the New York Court of Appeal (New York's highest court), a rarely granted form of review in attorney discipline cases.

## II.   Authorities Allegedly Responsible

The violations set forth in this petition are the product of systemic interest group protection biases deeply embedded in U.S. judicial institutions and legal and political culture generally. The particular authorities responsible for the violations alleged above include:

- U.S. judicial authorities, specifically federal district judge Lewis A. Kaplan.
- Attorney Grievance Committee for the First Appellate Division of the Supreme Court of the State of New York.
- First Appellate Division of the Supreme Court of the State of New York.
- Chevron Corporation, to the extent it has been able to use its influence with legal institutions and the political process to advance its private agenda under color of law.

## III.   Human Rights Allegedly Violated

Mr. Donziger's treatment by judicial and lawyer regulation authorities in the United States has severely violated his rights to **due process** and **judicial protection** as guaranteed by Articles XXVI, XVIII, and XVII of the American Declaration (as further elaborated in Articles 8 and 25 of the American Convention and the jurisprudence thereto), as well as rights to **freedom of association and expression** under Am. Decl. Articles XXII and IV, **privacy** under Am. Decl. Article V, and **property** under Am. Decl. Article XXIII (as further elaborated by Am. Conv. Articles 16, 13, 22, and 21).

### A.  Due Process Generally

The right to due process of law—the "right to Justice"—lies at the heart of a range of provisions of the American Declaration and Convention, and infuses the spirit of both instruments. *See, e.g.*, *Zambrano Vélez et al. v. Ecuador*, Ser. C No. 166, July 4, 2007 (Separate Opinion of Judge Ventura Robles). It serves "as an 'access key' to the national and international protection of the rights" under the American system instruments. *Lopez Alvarez v. Honduras*, Inter-Am. Ct. H.R., Series C No. 141, Feb. 1, 2006 (Separate Opinion of Judge Sergio Garcia Ramírez). At heart, "'due process of law' [in the Inter-American system requires that] a defendant must be able to exercise his rights and defend his interests effectively." *The Right to Information on Consular Assistance in the Framework of the Guarantees of the Due Process of Law*, Ser. A No. 16, Oct. 1, 1999, ¶ 119.

Specifically, Article XXVI of the Declaration provides that "[e]very person accused of an offense has the right to be given an impartial and public hearing" and "[e]very accused person is presumed to be innocent until proved guilty." Article XVIII requires that court procedures be available to

"ensure respect for [a person's] legal rights" and to "protect [the person] from acts of authority that, to his prejudice, violate any fundamental constitutional rights." The American Convention—"an authoritative expression" of the rights articulated in the Declaration that can be used along with its jurisprudence in interpreting and applying the Declaration's provisions, *see, e.g.*, *Case of Grand Chief Michael Mitchell v. Canada*, Case 12.435, Inter-Am. Comm. H.R., Report No. 61/08, OEA/Ser.L/V/II.118, doc. 70 rev. 2, Jul. 25, 2008, at ¶ 64—further provides at Article 8 that "[e]very person has the right to a hearing, with due guarantees and within a reasonable time, by a competent, independent, and impartial tribunal, previously established by law, in the substantiation of any accusation of a criminal nature made against him or for the determination of his rights and obligations of a civil, labor, fiscal, or any other nature." Article 8 also articulates "the right to be presumed innocent" and the right to "adequate time and means" and legal counsel as regards an accused's defense. Additionally, Am. Conv. Article 25 articulates a right to "effective recourse" by "a competent court or tribunal for protection against acts that violate [a person's] fundamental rights."

### B.  Due Process - Presumption of Innocence / Burden of Proof

The presumption of innocence is a foundational right of due process. A key component of the presumption of innocence is the requirement that "accusations of a criminal nature" be proven against the accused by a high standard of proof, equivalent to the "beyond a reasonable doubt" standard used in common law jurisdictions. *See, e.g.*, Rome Statute of the International Criminal Court, art. 66 ("Presumption of Innocence") ("the Court must be convinced of the guilt of the accused beyond reasonable doubt"); *In re Winship*, 397 U.S. 358, 361 (U.S. Supreme Court 1970) ("the Due Process Clause [of the U.S. Constitution protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."). The presumption and the high standard of proof are required for any "accusations of a criminal nature," regardless of the sometimes complex categories of criminal, civil, or administrative that national justice systems sometimes use. Am. Conv., art. 8; *In re Winship*. Another key component of the presumption is to require that States not "contribute to forming public opinion" on the guilt of the accused "while the criminal responsibility of that individual has not been proven." *Lori Berenson Mejía v. Peru*, Ser. C No. 119, Nov. 25, 2004, ¶ 160.

In this case, Mr. Donziger was found guilty of violating U.S. federal criminal laws on fraud, extortion, obstruction, and witness tampering, yet Judge Kaplan refused to seat a jury as required by the U.S. Constitution and applied a standard of proof far less rigorous than "beyond a reasonable doubt." To the extent U.S. jurisprudence currently authorizes "convictions" on such terms, it stands in contradiction to the due process requirements of the American Declaration. Mr. Donziger will also show that Judge Kaplan allowed Chevron to use his courtroom to aggressively "demonize" Mr. Donziger in public opinion by, *inter alia*, broadly ordering the disclosure of materials such as outtakes from a documentary film and Mr. Donziger's personal documents, failing to take action when Chevron manipulated this material and released it publicly to demonize Mr. Donziger, and by taking a number of steps to block Mr. Donziger from factually developing and publicizing a response to Chevron's attacks. Indeed, Judge Kaplan went further by actively encouraging

Chevron to take more aggressive actions against Mr. Donziger and even demonizing Mr. Donziger personally from the bench, as reflected in the comment set forth in the Facts section of this Petition.

### C.  Due Process - Impartial and independent tribunal

Due process under the American Declaration requires rigorous impartiality by the tribunal in judicial proceedings, at both the subjective level (looking at whether the tribunal is actually partial or not to one of the parties) and the objective level ("whether, quite apart from the judges' personal conduct, there are ascertainable facts which may raise doubts as to their impartiality"). *Herrera Ulloa v. Costa Rica*, Ser. C No. 107, Jul. 2, 2004, ¶ 170; *see also Apitz Barbera et al. v. Venezuela*, Ser. C No. 182, Aug. 5, 2008, ¶ 56-65. In *Palamara Iribarne v. Chile*, the Inter-American Court observed that "the impartiality of a court implies that its members have no direct interest in, a pre-established viewpoint on, or a preference for one of the parties, and that they are not involved in the controversy," and stated strongly that a judge "must withdraw from a case being heard thereby where there is some reason or doubt which is in detriment to the integrity of the court as an impartial body. For the sake of safeguarding the administration of justice, it must be ensured that the judge is free from any prejudices and that no doubts whatsoever may be cast on the exercise of jurisdictional functions." Ser. C No. 135, Nov. 22, 2005, at ¶¶ 145-47.

Under this standard, it was flagrantly inappropriate for Judge Kaplan to preside in the civil RICO case, and certainly for Judge Kaplan to assume the sole fact-finding and decision-making function by refusing, at the last minute, to empanel a jury. Mr. Donziger can and will make a strong case of partiality at the subjective level by Judge Kaplan, as reflected not just in the judge's comments and orders but in a number of improper and strategically debilitating steps taken by the court that prejudiced Mr. Donziger. But even clearer is the inappropriateness of Judge Kaplan's role at the objective level: the judge's public comments—mocking Mr. Donziger for the "imagination" of his advocacy while calling Chevron "a company of considerable importance to our economy" and worrying about the effect of the Ecuadorian judgment on the availability of petrol for U.S. consumers—unquestionably "raise doubts" as to the judge's impartiality.

### D.  Due Process - Inequality of arms

Due process requires "full procedural equality" between the parties in an adversarial proceeding affecting an individual's rights. *The Right to Information on Consular Assistance in the Framework of the Guarantees of the Due Process of Law*, Ser. A No. 16, Oct. 1, 1999, ¶ 117. This, in turn, requires rigorous attention to any possible "real disadvantages" born by one party or linked to resource disparity or "inequality of arms" between the parties, as well as the taking of appropriate steps to mitigate any such disadvantage or prejudice. *Id.* at ¶ 119 ("The presence of real disadvantages necessitates countervailing measures that help to reduce or eliminate the obstacles and deficiencies that impair or diminish an effective defense of one's interests."); *Ivcher Bronstein v. Peru*, Ser. C No. 74, ¶ 107; *cf. Dombo Baheer BV v. Netherlands*, ECHR, Oct. 27, 1993 ("Equality of arms implies that each party must be afforded a reasonable opportunity to present his case—including his evidence—under conditions that do not place him at a substantial disadvantage vis-á-vis his opponent").

As described briefly in the Facts Section, and as Mr. Donziger will fully demonstrate at the appropriate time, the massive disparity of resources between him and Chevron Corp. could not have been more pronounced nor more prejudicial. Furthermore, far from taking steps to mitigate any prejudice, Judge Kaplan repeatedly took steps to exacerbate the prejudice, such as piling unnecessary briefing and "document discovery" obligations on Mr. Donziger's counsel until that counsel was effectively forced to withdraw; refusing to provide any meaningful procedural accommodations to Mr. Donziger when he was defending himself *pro se* on the theory that because he was a lawyer, he was on "equal" footing with Chevron's massive legal team; refusing any accommodations at trial resulting in the waiver of objections, the inability to effectively cross-examine witnesses, and other prejudice; and the continued use of technical errors by Mr. Donziger in his *pro se* representation (e.g. the form of pleadings) to justify the denial of substantive relief.

### E.  Freedom of Association and Expression

The RICO lawsuit, in its overall essence and in various particular aspects, has also violated Mr. Donziger's rights to investigation, opinion, and expression under Am. Decl. Article IV, and to association under Am. Decl. Article XXII, as further elaborated in Am. Conv. Articles 13 and 16 and the jurisprudence thereto.

Chevron's central RICO claim was that Mr. Donziger's expressive activity in publicly challenging Chevron for its environmental record and in openly "pressuring" the company to settle the lawsuit and clean-up its former sites was tantamount to "extortion" prohibited by U.S. federal criminal laws. Despite principles U.S. jurisprudence designed to protect "petitioning activity" in court and limiting "extortion" claims to cases where the defendant is proven to have deployed both "wrongful means" and demonstrated a "wrongful objective," Judge Kaplan found Mr. Donziger guilty of extortion (under a civil "preponderance of the evidence" standard of proof). Kaplan ignored Mr. Donziger's sworn testimony that his fundamental objective in his advocacy was not "wrongful," but rather to achieve a clean-up for his clients. Instead, Kaplan held that Mr. Donziger's methods were so "inherently wrongful" that there could be no "nexus to any plausible" non-wrongful objective. But what was so inherently wrongful? Kaplan stated it in a heading: "Donziger Repeatedly Used Damages Estimates [in his advocacy against Chevron that] He Knew Were False or the Truth of Which He Doubted." Mr. Donziger has unequivocally rejected this claim in his own testimony and provided documentary evidence to corroborate his good faith belief in the referenced estimates. But even apart from the truth of the matter, Judge Kaplan's holding that the use of exaggerated or inflated damages estimates is sufficient to impose *criminal* liability for extortion is flagrantly at odds with the scope of expressive liberty protected by the Declaration and Convention.

The RICO lawsuit also targeted Mr. Donziger's "right to associate with others to promote, exercise and protect his legitimate interests of a political, economic, religious, social, cultural, professional, labor union or other nature"—in this case, Mr. Donziger's professional and social-justice interest in imposing accountability on Chevron for its contamination. The RICO lawsuit expressly targeted this associational activity as unlawful "conspiracy" and "racketeering," merely by claiming that

the environmental claims pursued by the association activity were, in Chevron's eyes, unfounded or even a "sham." (Chevron was forced to withdraw the "sham" claim before trial in order to prevent Mr. Donziger from introducing evidence going to the merits of the environmental claims in Ecuador. However, Judge Kaplan held that this withdrawal did not otherwise affect Chevron's ability to proceed to trial.)

The procedure of the RICO lawsuit also violated Mr. Donziger's right to association by allowing Chevron—an avowed opponent of Mr. Donziger and his politics—to access privileged legal information and confidential information about the identity of supporters of the Ecuadorian environmental cause, who Chevron then predictably sought to intimidate with additional lawsuits, effectively freezing up financial and other support. Chevron has also aggressively pursued this strategy *after* the issuance of Judge Kaplan's RICO Judgment, using discovery purportedly in service of its money judgments against Steven as the vehicle, and ultimately aiming to shut down all financial support for the Ecuadorian cause and end the accountability efforts against it once and for all. The tragedy is that the United States actually has very strong case law blocking such strategies on constitutional First Amendment grounds. *See NAACP v. Alabama*, 357 U.S. 449 (1958). But Judge Kaplan has refused to apply this law, citing various technicalities ("Waiver, Forfeiture and [lack of] Standing"), and for a lack of "good cause" because, in the judge's view, Chevron's retaliatory lawsuits against funders and supporters were merely legitimate efforts by Chevron "to seek legal redress against anyone whom it may allege is complicit in Donziger's tortious activities—in other words, by exercising its [Chevron's] rights under the law." While this is bad law in the United States, it is deeply repugnant to the scope of associational liberty protected by the American Declaration and Convention.

## F. Privacy

Article V of the Declaration, as elaborated by Article 11 of the Convention, protects against "abusive interference with [an individual's] private life," including "his correspondence," and grants a right "to the protection of the law against such interference or attacks." As Mr. Donziger will show with evidence at the appropriate time, the RICO proceeding relied on discovery orders issued by Judge Kaplan requiring Mr. Donziger to give Chevron unfettered access to all his computers, phones, and online accounts, including access to decades' worth of attorney-client privileged legal files and communications. Chevron subsequently used countless items of confidential and private material in its attacks on Mr. Donziger, including in public filings and in leaks to the press. Indeed, perhaps the most used piece of evidence in the RICO case was a "diary" that Mr. Donziger kept for years, recording his thoughts and mental impressions on developments in the case and in his life generally. Chevron used decontextualized snippets from the diary against Mr. Donziger constantly at trial.

The right to privacy under the Declaration, as expounded in Article 11 of the Convention, also requires respect for an individual's dignity and prohibits "unlawful attacks on his honor or reputation." Chevron's express "demonization" campaign flagrantly violated Mr. Donziger's rights under these provisions, and did so by leveraging the prestige and power of the U.S. legal

system and the RICO lawsuit to drive the demonization campaign much farther than it could have accomplished by direct media efforts alone.

### G. Property

Chevron's more recent use of the RICO lawsuit to obtain a money judgment of nearly $1 million, and likely soon a money judgment of $32 million (all to pay for the very same prejudicial trial Mr. Donziger was forced to endure), and its ongoing and forthcoming efforts to enforce those judgments against Mr. Donziger's personal property, stand in violation of Am. Decl. Article XXIII, as elaborated by Am. Conv. Article 21. Deprivation of property under these provisions is only lawful where it is pursuant to established law, necessary, proportional, and in service to a legitimate goal in a democratic society. *See, e.g.*, *Ivcher Bronstein*, *supra*, at ¶ 155. As set out above, the RICO lawsuit did not adhere to the established requirements of due process. Furthermore, an award of $1 million (much less $32 million) to a wealthy corporate defendant to be paid by an individual human rights defender to "compensate" the corporation for its expenses in attacking the defender is utterly contrary to the legitimate goals of a democratic society, including those related to free expression and the pursuit of social justice.

## IV.    Evidence

This is not a simple case. The evidence in support of the rights violations described in preceding sections is both extremely voluminous and often highly technical. Indeed, the litigation abuse described herein has often been accomplished because many allegations are so shrouded in technical jargon from elite litigation consultants that they are incomprehensible to observers trying to understand the allegations in common sense terms.

Mr. Donziger is prepared to provide evidence fully supporting each of the facts set forth in the preceding sections. For purposes of this petition, Mr. Donziger provides the following list of publicly available materials (some developed by Mr. Donziger, some prepared independently) that substantiate the facts alleged.

- ***BIT Arbitration Briefing.*** In a collateral litigation entirely separate from the RICO lawsuit but similarly aimed to "taint" the Ecuador judgment, Chevron initiated an investor-state Bilateral Investment Treaty (BIT) arbitration directly against the Republic of Ecuador (ROE) in 2009. (Chevron claimed that the ROE's decision ***not*** to quash the communities' private lawsuit against Chevron was a "denial of justice" causing billions of dollars in damage to Chevron.) Unlike Mr. Donziger, the ROE had sufficient resources to engage adequate legal counsel—U.S. law firm Winston & Strawn (W&S)—and to fund more serious investigation into Chevron's various allegations. In multiple rounds of highly-detailed briefing, W&S has deconstructed and fully rebutted each of Chevron allegations regarding the Ecuador trial and Mr. Donziger's alleged conduct. W&S also commissioned experts to independently validate all the scientific field-testing results from the Ecuador trial. The last publicly available brief from the BIT Arbitration (dated March 2015) is

particularly useful. *See* http://chevrontoxico.com/assets/docs/2015-03-17-respondents-track-2-supplemental-rejoinder.pdf. Specifically:

- o At pages 80-104, the brief explain how the environmental evidence produced in the Ecuador proceeding was valid and not a "sham" as Chevron claims. The W&S team scrutinized all of the evidence in the Ecuador trial record and scientifically replicated the soil and water samples in the Ecuador trial judgment with an extensive field sampling operation conducted by a one of the world's most prestigious environmental firms, The Louis Berger Group.

- o At pages 117-140, the brief reviews the profound credibility flaws of Chevron's star witness, Alberto Guerra—whose testimony constitutes the only direct evidence claiming there was a corrupt "bribe" agreement in the Ecuador trial. The analysis extends to point out the uselessness of the "documentary evidence" that Chevron has claimed circumstantially supports Guerra's testimony despite his credibility flaws.

- o Pages 143-156 review the forensic analysis by leading authority J. Christopher Racich of the hard drives taken from the computers of the Ecuador trial judge. The Racich examination demonstrates that Guerra's "bribe" story, which lies at the heart of Judge Kaplan's RICO judgment, is unequivocally false. The brief also rebuts Chevron's various desperate attempts to minimize the impact of this groundbreaking evidence, which never was considered by Judge Kaplan nor the U.S. appellate court that affirmed Kaplan's judgment. (Pages 140-43 and 156-67 provide additional reasons why Chevron's "bribe" and "ghostwriting" claims are unconvincing.)

- An amicus brief dated May 1, 2017, filed on behalf of environmental organizations and prepared by lawyers at Earthrights International, details the corrupt nature of Chevron's multiple attempts to "taint" the Ecuadorian environmental judgment as a fraud, including by paying Guerra for false testimony. http://chevrontoxico.com/assets/docs/2017-05-01-aw-ran-amicus-brief.pdf

- Mr. Donziger's written direct testimony in the RICO case is available at http://stevendonziger.com/wp-content/uploads/2013/11/Donziger-Witness-Statement-Final.pdf. An overview of Mr. Donziger challenges to the RICO Judgment and its affirmance, containing extensive links to independent source materials, is available at http://stevendonziger.com/wp-content/uploads/2017/05/KaplanRebuttal.pdf.

- *Video*. Documentary films and other video evidence are useful to rebut Chevron's baseline claim that the claims in the environmental case were a "sham"—a claim necessary to the company's argument that the litigation pursued by Mr. Donziger and others was tantamount to "extortion."

- o A recent TeleSUR documentary on the status of the Ecuador contamination and the affected communities' ongoing struggle for justice is available at https://www.youtube.com/watch?v=umYqYmU7xxI.

- o A more detailed 15-minute video explaining the technical aspects of Chevron's contamination is available at https://chevrontoxico.com/news-and-multimedia/2012/0208-the-true-story-of-chevrons-ecuador-disaster.

- o A compilation of Chevron internal video (given to civil society groups by a whistle-blower) showing Chevron technicians discovering oil contamination at inspections sites that the company's technicians later sought to hide from the Ecuadorian court is available at http://amazonwatch.org/news/2015/0408-the-chevron-tapes.

- o A short documentary and commentary by Mr. Donziger is available at https://vimeo.com/75415296.

- **News articles.** Thousands of news reports have been filed on the Ecuador environmental case and Chevron's retaliatory litigation. Articles focusing in particular on Chevron's campaign to "demonize" Mr. Donziger and avoid liability by tainting the Ecuadorian Judgment with "fraud" claims include:

- o Rex Weyler, *Chevron's SLAPP suit against Ecuadorians* (Greenpeace, 2018), at https://www.greenpeace.org/international/story/16448/chevrons-slapp-suit-against-ecuadorians-corporate-intimidation/,

- o James North, *Ecuador's Battle for Environmental Justice Against Chevron* (The Nation, 2015), at https://www.thenation.com/article/ecuadors-battle-environmental-justice-against-chevron/

- o Alexander Zaitchek, *Sludge Match: Inside Chevron's $9 Billion Legal Battle With Ecuadorean Villagers* (Rolling Stone, 2014), at https://www.rollingstone.com/politics/news/sludge-match-chevron-legal-battle-ecuador-steven-donziger-20140828.

- o Katie Redford (EarthRights International), *The New Corporate Playbook, Or What To Do When Environmentalists Stand In Your Way* (Huffington Post, 2016), at https://www.huffingtonpost.com/katie-redford/the-new-corporate-playboo_b_10599544.html.

## V. Witnesses

A preliminary list of potentially useful witnesses will be provided to the IACHR as part of the Petition.

## VI.    Exhaustion of Remedies

As noted above, the means available to challenge the primary vehicle for the attacks on Mr. Donziger (the RICO case) have been fully exhausted all the way to denial of *certiorari* review by the U.S. Supreme Court. Other components of the persecution, such as the issuance of money judgments against Mr. Donziger and the authorization of execution procedures and related discovery, is final in the first instance and the possibility of further relief from the same authorities that authorized the RICO lawsuit itself is sufficiently remote as to be futile under Rule of Procedure 31(2)(b) and the applicable jurisprudential standards. Other components, such as proceedings before the lawyer disciplines authorities and the New York state courts, are also final to the extent that interim suspension has been imposed, and while the possibility of remedy to the New York Court of Appeals is perhaps not futile (although certain remote), the seriousness of the prejudice currently being suffered by Mr. Donziger as a result of the suspension is sufficient to justify consideration by the Commission at the current stage, supplemental to the remainder of the petition.

Chevron has initiated a wide-ranging campaign of efforts to attack the Ecuador Judgment, such as the BIT arbitration noted above. Some of those proceedings are ongoing. Additionally, the affected Ecuadorian communities have initiated proceedings to enforce the Ecuadorian environmental judgment against Chevron's assets in Canada, and Chevron has responded by trying to use Judge Kaplan's RICO decision to control the outcome in Chevron's favor in those proceedings. None of these proceedings, however, raise, much less duplicate, the issues of the legitimacy of the use civil RICO and the fairness of the RICO trial under the human rights standards of the Declaration, nor are any of them capable of leading to an effective settlement of such issues under Rule 33.

## VII.    Request for Relief

For all the foregoing reasons, Mr. Donziger respectfully requests that the Commission:

1. Register this petition according to Articles 51-52 and 29 of the Commission's Rules of Procedure, or notify Mr. Donziger through his undersigned representative of any concerns as to the requirements of the Rule 28 or any other Rules.

2. Request an appropriate response pursuant to Article 30 of the Rules, declare the petition admissible pursuant to Article 36, and initiate proceedings on the merits under Rule 37-39, including public hearings pursuant to Rule 61-70.

3. With respect to the ongoing proceedings to permanently strip Mr. Donziger of his New York law license without an evidentiary hearing, *supra* at Part I.E, Part IV, Mr. Donziger plans to request precautionary measures limited to a request that the appropriate authorities in New York allow Mr. Donziger to contest the facts of the allegations against him with evidence at a public hearing, consistent with due process.

4. Declare that the authorities indicated in Part II are responsible for violation of Mr. Donziger's rights under Articles XXVI, XVIII, XVII, V, XXIII, IV, XXI, and XXII of the Declaration.

5. Recommend such remedies as the Commission considers adequate and effective to address the violations, including, *inter alia*, reconsideration, by an impartial tribunal, of the legitimacy of the use of civil RICO procedures in Mr. Donziger's case and the substance of the underlying claims against him; a public acknowledgment of violation and apology; the taking of appropriate steps to sanction unethical conduct by Chevron, Gibson Dunn, and other entities involved in the presentation of false evidence in the RICO case; the taking of measures sufficient to protect Mr. Donziger's property and livelihood; the issuance of appropriate compensation for Mr. Donziger; and the establishment of an independent public body to investigate the broader threats posed by the use of civil RICO and other litigation by corporations against human rights defenders.

## CONCLUSION

Mr. Donziger has been widely celebrated for his tenacity in advocating for the Ecuadorian communities affected by Chevron's contamination for the last 25 years. But the public has been all too willing to accept that he will be required to bear an enormous personal cost for his advocacy. Journalists who cover Chevron's attacks on Mr. Donziger often celebrate Chevron's "creativity" and refer to the case as a "giant game"; one journalist who has written extensively on human rights issues compared it to a television show, wondering what Chevron's "showrunners" would come up with next.

This glibness masks the real and painful consequences of Chevron's abusive tactics. While Mr. Donziger has been able to continue his advocacy long past when most defenders would have been forced to abandon their clients, and is grateful for the support he has received, the reality is that Chevron's cynical deployment of the politics of personal destruction and "demonization" have put enormous emotional strain on him, and now threaten to bankrupt him, destroy his livelihood, and hurt his family's future. This cannot be accepted as the "cost of doing business" in the area of human rights advocacy against powerful corporations.

U.S. judicial and lawyer discipline authorities have utterly failed to appreciate the most fundamental fact about the attacks on Mr. Donziger: they are a response to Mr. Donziger's advocacy on a plainly legitimate public interest and human rights matter. They are designed to serve Chevron's interest in avoiding liability. Until this fact gets put at the center of institutional responses to attacks on Mr. Donziger—and at the center of any self-serving corporate litigation against *any* human rights defender—legitimate processes of law will far too easily be abused by powerful litigants to the detriment of human rights defenders, their respective causes, and global respect for human rights.

The principles to which the United States has committed itself demand both that Mr. Donziger be treated consistently with the due process and free expression requirements of the Declaration and that a human rights perspective be taken into account in the U.S. judiciary's appreciation corporate litigation against human rights defenders generally. In particular, the use of quasi-criminal RICO claims against human rights defenders by corporations appears difficult to justify in any circumstances in light of the profound free expression, free association, and due process problems it raises under hemispheric human rights standards.[3]

In light of the utter failure of U.S. judicial and other public authorities to address these issues— and indeed, the complicity of those authorities in the attendant human rights violations—the Commission can and must initiate a rights-respecting process for Mr. Donziger to seek justice. The Commission must act to begin changing the larger conversation, redirecting it from imagined threats to U.S. consumers and "compan[ies] of considerable importance to our economy" back to

---

[3]   In coalition with other human rights and environmental defenders, Mr. Donziger expects to raise the particular issue of the use of civil RICO by corporations against defenders as part of a request for a thematic hearing before the Commission.

the core human rights principles to which the United States has committed itself. While developments such as the aforementioned "Protect the Protest" coalition are encouraging,[4] the bulwark of public opinion needs the support and expertise of human rights institutions in order to grow in a direction that will ensure better respect for human rights in the future and demand accountability for existing victims of human rights violations.

---

[4]    *See, e.g.*, https://twitter.com/SLAPPtaskforce/status/1037419903102447617.

# EXHIBIT 99

| | |
|---|---|
| **From:** | Stead, Meredith <Meredith.Stead@kayescholer.com> |
| **Sent:** | Wednesday, September 28, 2016 1:57 PM |
| **To:** | 'Steven Donziger'; 'Stoldt, Derek'; 'John van Merkensteijn' |
| **Cc:** | 'alenczner@litigate.com'; 'aaron@forumnobis.org' |
| **Subject:** | Closing:  Copies of all documents with executed signature pages |
| **Attachments:** | appendix 3, executed by all.PDF; appendix 2, executed by all.PDF; ecuador judgment investment agreement signed by all.PDF; funding escrow agr executed by all including ltr of direction.PDF; executed letter re funding contingency.PDF |
| | |
| **Categories:** | KF2 |

Good morning,

I attach the following documents for your records, each of which includes signature pages executed by all parties:

- Ecuador Judgment Investment Agreement (English)
- Appendix 2 to the Ecuador Judgment Investment Agreement
- Appendix 3 to the Ecuador Judgment Investment Agreement
- Escrow funding agreement, including letter of direction
- Side letter regarding funding

I will instruct the bank to release the funds as per the letter of direction.

Please let me know if you require anything else, or if any other person should receive these documents.

Best,

Meredith Stead


Meredith Stead
Kaye Scholer LLP
250 West 55th Street | New York, New York 10019-9710
T: (212) 836-7413 | F: (212) 836-6595
meredith.stead@kayescholer.com | www.kayescholer.com

JVM 000991

**DISTRIBUTION APPENDIX**
**(APPENDIX 3)**

This is Appendix 3 referred to in the **Ecuador Judgment Investment Agreement**, dated as of August 24, 2016 among the Funder (as identified in such agreement) to help fund the collection of the Ecuador Judgment (as defined in such agreement) against Chevron and/or its subsidiaries, by the Frente de Defensa de la Amazonia ("FDA"), in its capacity as both the exclusive interest-holder of the 10% award made by the Ecuador Judgment under Ecuador's Environmental Management Law and the beneficiary of the environmental remediation award and related awards under the Ecuador Judgment and the Ecuador Trust (defined in such agreement), together with the President of the Board of the Ecuador Trust (defined in such agreement). In accordance with and subject to the terms and of Section 4 of such agreement, the FDA identifies that it has previously allocated the following interests:

| Name | Interest† |
|---|---|
| Funder I | 0.125% |
| Funder II | 0.050% |
| Funder IV | 0.110% |
| Funder V | 0.165% |

† *Percentage of Ecuador Judgment Gross Proceeds*

1 / 2

JVM 000992

DISTRIBUTION APPENDIX | APPENDIX 3

DATED: _16 - 09 - 2016_  _____
Carlos Guaman Gaibor
President, FDA

DATED: _16 - 09 - 2016_  _____
Ermel Gabriel Chávez Parra
President of the Board, ECUADOR TRUST

DATED: _____  _____
Alan Lenczner
Lenczner Slaght Royce Smith Griffin LLP
*Acknowledged and Accepted*

2 / 2

JVM 000993

DISTRIBUTION APPENDIX | APPENDIX 3

DATED: _____                _____

                                           Carlos Guaman Gaibor
                                           President, FDA

DATED: _____                _____

                                           Ermel Gabriel Chávez Parra
                                           President of the Board, ECUADOR TRUST

DATED: *September 16, 2016*                _____

                                           Alan Lenczner
                                           Lenczner Slaght Royce Smith Griffin LLP
                                           *Acknowledged and Accepted*

JVM 000994

## APPENDIX 2

### Ecuador Judgment Investment Agreement

WHEREAS an Investment Agreement for the investment of $300,000 to help fund the collection of the Ecuador Judgment against Chevron Corp. and/or its subsidiaries was agreed to August 24, 2016, by and between, on the one hand, the Frente de Defensa de la Amazonia ("FDA"), in its capacity as both the exclusive interest-holder of the 10% award made by the Ecuador Judgment under Ecuador's Environmental Management Law and the beneficiary of the environmental remediation award and related awards under the Ecuador Judgment and the Ecuador Trust, and the President of the Board of the Ecuador Trust, and on the other hand, the Funder, as set forth herein;

WITH REFERENCE TO that Investment Agreement, the following terms shall apply to its understanding and interpretation as if such terms were incorporated expressly into that Agreement and made a part thereof:

1. Funder means:          WDIS Finance LLC.

2. U.S. Representative means:    Steven R. Donziger
                                   245 W. 104th St., #7D
                                   New York, New York 10025.

DATED: _____

_____
Carlos Guaman Gaibor
President, FDA

DATED: _____

_____
Ermel Gabriel Chávez Parra
BOARD PRESIDENT, ECUADOR TRUST

DATED: _9/12/16_

_Solely as Trustee of Managing Member_
FUNDER _and not in an Individual Capacity_

DATED: _____

_____
Alan Lenczner
Lenczner Slaght Royce Smith Griffin LLP
*All Instructions Acknowledged and Accepted*

JVM 000995

**APPENDIX 2**

**Ecuador Judgment Investment Agreement**

WHEREAS an Investment Agreement for the investment of $300,000 to help fund the collection of the Ecuador Judgment against Chevron Corp. and/or its subsidiaries was agreed to August 24, 2016, by and between, on the one hand, the Frente de Defensa de la Amazonia ("FDA"), in its capacity as both the exclusive interest-holder of the 10% award made by the Ecuador Judgment under Ecuador's Environmental Management Law and the beneficiary of the environmental remediation award and related awards under the Ecuador Judgment and the Ecuador Trust, and the President of the Board of the Ecuador Trust, and on the other hand, the Funder, as set forth herein;

WITH REFERENCE TO that Investment Agreement, the following terms shall apply to its understanding and interpretation as if such terms were incorporated expressly into that Agreement and made a part thereof:

1. <u>Funder</u> means:                     WDIS Finance LLC.

2. <u>U.S. Representative</u> means:      Steven R. Donziger
                                          245 W. 104th St., #7D
                                          New York, New York 10025.


DATED: _16 - 09 - 2016_      *Carlos Guaman*
                             Carlos Guaman Gaibor
                             President, FDA


DATED: _16 - 09 - 2016_      _____
                             Ermel Gabriel Chavez Parra
                             BOARD PRESIDENT, ECUADOR TRUST


DATED: _____      _____
                             FUNDER


DATED: _____      _____
                             Alan Lenczner
                             Lenczner Slaght Royce Smith Griffin LLP
                             *All Instructions Acknowledged and Accepted*

**APPENDIX 2**

**Ecuador Judgment Investment Agreement**

WHEREAS an Investment Agreement for the investment of $300,000 to help fund the collection of the Ecuador Judgment against Chevron Corp. and/or its subsidiaries was agreed to August 24, 2016, by and between, on the one hand, the Frente de Defensa de la Amazonia ("FDA"), in its capacity as both the exclusive interest-holder of the 10% award made by the Ecuador Judgment under Ecuador's Environmental Management Law and the beneficiary of the environmental remediation award and related awards under the Ecuador Judgment and the Ecuador Trust, and the President of the Board of the Ecuador Trust, and on the other hand, the Funder, as set forth herein;

WITH REFERENCE TO that Investment Agreement, the following terms shall apply to its understanding and interpretation as if such terms were incorporated expressly into that Agreement and made a part thereof:

1. Funder means:         WDIS Finance LLC.

2. U.S. Representative means:    Steven R. Donziger
                             245 W. 104th St., #7D
                             New York, New York 10025.


DATED: _____

_____
Carlos Guaman Gaibor
President, FDA


DATED: _____

_____
Ermel Gabriel Chávez Parra
BOARD PRESIDENT, ECUADOR TRUST


DATED: _____

_____
FUNDER


DATED: _September 16, 2016_

_____
Alan Lenczner
Lenczner Slaght Royce Smith Griffin LLP
*All Instructions Acknowledged and Accepted*

JVM 000997

**Ecuador Judgment Investment Agreement**

In consideration of an Investment of $300,000 from the Funder (defined below) to help fund the collection of the Ecuador Judgment (defined below) against Chevron and/or its subsidiaries ("Chevron"), the Frente de Defensa de la Amazonia ("FDA"), in its capacity as both the exclusive interest-holder of the 10% award made by the Ecuador Judgment under Ecuador's Environmental Management Law ("the 10% Award") and the beneficiary of the environmental remediation award and related awards under the Ecuador Judgment and the Ecuador Trust (defined below), together with the President of the Board of the Ecuador Trust (defined below), and the Funder, hereby agree as follows:

1. Definitions:

    a. Ecuador Judgment: The final judgment and award in the case of *Maria Aguinda et al. v. Chevron Corp.*, rendered in the first instance by the Provincial Court of Justice of Sucumbíos, 14 Feb. 2011, affirmed on appeal by the Sole Chamber of the Provincial Court of Justice of Sucumbíos, 3 Jan. 2012, certified for enforcement on 17 Feb. 2012, and affirmed by the National Court of Justice, 12 Nov. 2013. "Ecuador Judgment" in this Agreement refers to the legal obligation imposed on Chevron by the Ecuadorian courts as reflected in the aforementioned decisions (attached in Appendix 1) collectively.

    b. Ecuador Trust: "FIDEICOMISO MERCANTIL DE ADMINISTRACIÓN DE FLUJOS ADAT," created 1 March 2012 in Quito, Ecuador, pursuant to instructions in the Ecuador Judgments, in which the individual claimants in the *Aguinda* case placed the entirety of their interest in trust for the implementation of remediation and payment of related expenses, naming the Frente de Defensa de la Amazonia (FDA) as the sole beneficiary. Attached in Appendix 1.

2. Parties and Agents:

    a. "FDA": Frente de Defensa de la Amazonia

    b. "Trust Board President": Mr. Ermel Gabriel Chávez Parra, duly appointed President of the Board of the Ecuador Trust.

    c. "Ecuador Parties": The FDA and the Trust Board President.

    d. "Canadian Counsel": Lenczner Slaght Royce Smith Griffin LLP.

    e. "Funder": As identified in Appendix 2, in the possession of Canadian Counsel.

    f. "Funding Escrow Agent": Beard Winter LLP

    g. "U.S. Representative": As identified in Appendix 2, in the possession of Canadian Counsel.

1

3. Grant of Interest:

   a. Grant: The FDA and the Trust President hereby grant the Funder an Interest ("Funder's Interest") of 0.165% of the total amount of the Ecuador Judgment and the Ecuador Judgment Gross Proceeds (defined below) as further set forth herein.

   b. Definition of Ecuador Judgment Gross Proceeds: "Ecuador Judgment Gross Proceeds" means the total amount of any and all funds actually collected by the Ecuador Parties or any of their agents or related parties related to the Ecuador Judgment, including, without limitation, any settlement monies paid by Chevron; any judicial orders obtained by claimants against Chevron that result in the recovery of funds, non-monetary assets, or anything of value; the 10% Award to the FDA; any post-judgment interest payments or penalties awarded by the Canadian courts or any court, and any additional award of fees or expenses by the Ecuadorian, Canadian, or any other court. Ecuador Judgment Gross Proceeds includes, without limitation, any interest payments on the pending judgment, fees, penalties, and the 10% Award.

4. Ecuador Parties' Guarantee of Obligations: The FDA warrants that it is the sole beneficiary of the Ecuador Judgment in trust and FDA hereby irrevocably warrants that the Funder is legally entitled to receive, and will receive, its Interest in accordance with this Agreement. Other than the Parties to this Agreement, as defined above, the Funder will have no obligations to third parties. Notwithstanding that the Ecuador Parties acknowledge that over the course of the litigation against Chevron, they have entered into various contracts with funders, lawyers, and other service providers (including the Priority Existing Equity Holders identified by the Ecuador Parties in Appendix 3 to this Agreement and the Distribution Escrow Agreement), which also provide a grant of interest in the Ecuador Judgment Gross Proceeds, the Ecuador Parties guarantee to the Funder that the Funder's Interest does not infringe directly and/or indirectly on those contracts and that its Interest will absolutely be honored out of the Gross Proceeds recovered.

5. Co-ownership of Ecuador Judgment: As per this Agreement, the Funder will be a co-owner of the Ecuador Judgment up to the amount of his Interest in the Judgment. The Funder will not have the independent power to enforce his ownership Interest against Chevron or its subsidiaries. The Ecuador Parties, together with the *Aguinda* claimants and the communities affected by Chevron's contamination, retain ultimate authority over settlement and disposition of the dispute.

6. Investment Deemed to be Made: Once Funder transfers and clears the full amount of the investment to the Funding Escrow Account, the investment will have been deemed to be made and the Funder will be absolutely and irrevocably entitled to the Funder's Interest as defined above and will immediately become the co-owner of the Ecuador Judgment as also defined above, subject only to the conditions and limitations outlined herein.

7. Agreements of Ecuador Parties: The Ecuador Parties hereby agree with Funder as follows:

2

JVM 000999

a. Settlement Process: The FDA will lead the establishment of a Settlement Oversight Committee to facilitate and advise on any settlement opportunities. Members will include Canadian Counsel, two representatives appointed by the FDA, and the U.S. Representative.

b. Additional Representations: The Ecuador Parties hereby represent, warrant and confirm that:

    i. they have (A) full power and authority to enter into and perform their obligations under this Agreement, (B) duly authorised the execution, delivery and performance of their obligations under this Agreement, and (C) obtained all necessary registrations, consents and approvals related to their execution, delivery and performance of their obligations under this Agreement;

    ii. the execution and the delivery of this Agreement does not in any way contravene any laws, rulings, or public policies whether in Ecuador or Canada, nor contravene any of the Ecuador Parties' constituent or other governing documents or another contracts, commitments, or obligations of the Ecuador Parties or their affiliates or representatives (on their behalf) with any third parties; and

    iii. the Ecuador Parties make to the Funder each of the representations and warranties set forth in clauses 10.2(a) through and including (p) of the Funding Agreement between Treca Financial Solutions, the FDA and the Claimants (as defined therein), in the form delivered by FDA to Funder, as if such representations and warranties were incorporated into this Agreement and made a part hereof and were made to Funder *mutatis mutandis* with application to this Agreement and the obligations of the Ecuador Parties and the transactions contemplated by this Agreement.

c. The Ecuador Parties agree and confirm that upon the receipt of the Ecuador Judgment Gross Proceeds the Funder will be entitled to and will receive promptly the Funder's Interest in accordance with the "Grant of Interest" provision of this Agreement.

d. Escrow Agent Provisions:

    i. The Ecuador Parties irrevocably authorize Canadian Counsel to be the Exclusive Distribution Escrow Agent to collect any of the Ecuador Judgment Gross Proceeds and to distribute said proceeds in accordance with this Agreement.

    ii. Canadian Counsel hereby confirms that the execution and the delivery of this Agreement does not contravene any laws, rulings and public policies in Canada.



3

JVM 001000

iii. The Canadian Counsel confirms, as the Exclusive Distribution Escrow Agent, that upon collection of any of the Ecuador Judgment Gross Proceeds, the Funder will receive the Funder's Interest in accordance with this Agreement and in accordance with the Distribution Escrow Agreement (defined below) that shall be approved and executed by the Funder and the Ecuador Parties no later than three (3) weeks from the Notice to Fund.

8. Conditions to Requirement to Transfer Funds: The investment will be in the amount of $300,000. In satisfaction of the investment amount, the Funder shall cause an amount equal to $300,000 less up to $15,000 for legal fees in connection with this Agreement and advice related to the transactions contemplated hereby, to be paid to Funding Escrow Agent. The transfer of the investment by the Funder is subject to: (i) the Notice to Fund; (ii) delivery of a certificate by the Ecuador Parties certifying that this Agreement has been approved by the FDA Executive Committee the Trust, and each other governing body of an Ecuador Party and that all other representations and warranties made by the Ecuador Parties made in or incorporated into this Agreement remain true, correct and complete as of the date of the funding; (iii) the approval and execution of the Funding Escrow Agreement by the Funding Escrow Agent and all the relevant parties and stakeholders sufficient for the establishment of the Funding Escrow Account set forth below; and (iv) confirmation given by Canadian Counsel as articulated in this Agreement.

9. Escrow Accounts: Two escrow accounts will be created by Canadian Counsel, as follows:

   a. The first escrow account ("Funding Escrow Account") will be created by the Funding Escrow Agent to hold investment monies transferred under this Agreement in escrow to be distributed per the instructions of the U.S. Representative, the Funder, and a representative to be appointed by the FDA. Upon due consultation, final authority over distribution of said funds will rest with the U.S. Representative.

   b. The second escrow account ("Distribution Escrow Account") will be created by Canadian Counsel to collect the Ecuador Judgment Gross Proceeds and distribute said proceeds to satisfy the Funder's Interest and other equity holders as set forth above and then distribute funds to the Ecuador Trust for environmental remediation and/or to otherwise implement the remediation ordered by the Ecuador Judgment.

10. No Further Funding Requirement: Canadian Counsel, the Ecuador Parties, and the US Representative hereby confirm to the Funder that upon the Investment being made, under no circumstances, will there be a requirement for further funding from the Funder in order to conclude all of the procedures in Canada related to the enforcement of the Ecuador Judgment and the collection of the Ecuador Judgment Gross Proceeds.

11. Use of funds: From time to time, and in order to determine how the Investment will be spent, a budget shall be agreed upon and approved by the US Representative and the Funder, with the US Representative having final authority in the event of a conflict. The Investment shall be used to fund litigation and other expenses dedicated to securing collection of the Ecuador Judgment in Canada and other jurisdictions as may be determined.

4

12. Obligations of the Funder: Once the Funder has made its investment, the Funder will be under no other obligation whatsoever as per this Agreement.

13. No Dilution: The Funder will not be subject to any dilution of Funder's Interest as defined above.

14. No responsibility for environmental remediation: The Funder will have no responsibility whatsoever for environmental remediation in the area of Ecuador affected by the Ecuador Judgment.

15. Obligations towards the Funder: The Ecuador Parties hereby irrevocably warrant that all obligations towards the Funder will be satisfied in accordance with this Agreement and the Distribution Escrow Agreement prior to any distributions to the Ecuador Parties, the Ecuador Trust, or any Claimants, based on its Interest in the total amount collected from the Ecuador Judgment Gross Proceeds by the Canadian Counsel or any other Counsel for and on behalf of the Ecuador Parties anywhere in the world.

16. Partial Recovery in Non-Settlement Scenario: To the extent the collection of funds from the Ecuador Judgment takes place without a settlement and on a partial or incremental basis, the Ecuador Parties hereby irrevocably warrant that the Funder (along with other Priority Existing Equity Holders as listed in Appendix 3) will be compensated a percentage of funds corresponding to their respective interests assuming a full recovery, prior to any payments to the Ecuador Parties or any other party or stake-holder receiving any interest with respect to such funds. Such payments shall be made forthwith upon receipt of any funds recovered under the terms of this Agreement.

17. Collection of Judgment Funds Outside Canada: Should any part of the Ecuador Judgment Gross Proceeds be collected from Chevron from any jurisdiction outside Canada, Canadian Counsel as the Exclusive Distribution Escrow Agent will collect and distribute any such funds to the Funder and any Priority Existing Equity Holders as listed in Appendix 3 in accordance with their respective interests and in accordance with the Distribution Escrow Agreement.

18. Obligations of the FDA: The FDA hereby irrevocably warrants that the full amount of its 10% award due under the judgment against Chevron plus any interest on the judgment collected in any enforcement jurisdiction, shall be used to guarantee full payment to the Funder and any Priority Existing Equity Holders as listed in Appendix 3 until all have fully received their Interests as per this Agreement and others referenced in the Appendix.

19. Obligations of Canadian Counsel: Canadian Counsel hereby accepts irrevocable instructions to adhere to all of the terms of this Agreement and will abide by those instructions.

20. Binding and Irrevocable Authority of the FDA: The signatory of the FDA to this Agreement (upon ratification of the FDA Executive Committee) affirms he has the authority to bind the organization.

5

21. Instructions: The FDA and its representatives will, in a timely fashion and as frequently as necessary, instruct the Canadian Counsel in Canada and other Counsels elsewhere involved in the collection of the Ecuador Judgment of the obligations under this Agreement, so that its terms will be effectuated forthwith upon collection of any funds under the Ecuador Judgment. In any event, the Ecuador Parties agree that any payments due to the Funder from any recovery under the Ecuador Judgment will be transferred in full within one week of the final receipt of any funds in accordance with this Agreement and the Distribution Escrow Agreement.

22. Information: Investor will be kept apprised on a regular basis of all material developments in the litigation and shall provide all documents or others information as are reasonably requested by Funder.

23. Common Legal Interest: The FDA, Trust and Funder have a "common legal interest" in the Claim, this Agreement and any discussion, evaluation and negotiation or other communications and exchanges of information relating thereto.

24. Counterparts: This Agreement may be signed in multiple counterparts. Each counterpart shall be considered an original instrument, but all of them in the aggregate shall constitute one Agreement.

25. Confidentiality: The Parties agree that the details of this Agreement, and all related communications, will be kept confidential as between the Parties and will not be divulged to third Parties.

26. Conflict of Languages: To the extent there is a conflict between the English and Spanish versions of this Agreement, the English version shall apply.

27. Assignment: This Agreement shall inure to the benefit of, and shall be binding upon the parties hereto and their respective assignees, transferees and successors-in-title or interest. References to the parties include their assignees, transferees and successors-in-title or interest, and shall include both corporate and unincorporated associations, partnerships, and individuals. Neither this Agreement, nor any rights, interests, obligations and duties arising hereunder may be assigned or conveyed; provided, however, that nothing in this agreement can be construed to block the Funder from assigning all or part of his interest to a member of his immediate family, or to a trust, pension plan or other entity for the benefit of the Funder or one or more individuals in his immediate family.

28. Severability & Invalidity: If any term or provision in this Agreement will in whole or in part be held to any extent to be illegal or unenforceable under any enactment or rule of law, that term or provision or part shall to that extent be deemed not to form part of this Agreement and the enforceability of the remainder of this Agreement will not be affected.

6

JVM 001003

29. Other Third-party commitments: The Parties warrant to each other that the execution and the delivery of this Agreement are not against any commitments, contracts and / or other obligations that they have with other third Parties.

30. Authority: Canadian Counsel confirms that the Ecuador Parties have the authority to enter into this Agreement and that it is binding and enforceable against them.

31. Entire Agreement: This Agreement shall constitute the entire agreement between the parties hereto, and shall supersede all prior agreements, understandings and negotiations between the parties with respect to the subject matter of this Agreement.

32. Governing law: This Agreement shall be governed by the law of Ontario, Canada. The courts of Ontario shall have exclusive jurisdiction to hear any claim or dispute related to this Agreement.

Dated: 24 August 2016

DATED: 24/08/2016

Carlos Guaman Gaibor
President, FDA

DATED: 24/08/2016

Ermel Gabriel Chávez Parra
BOARD PRESIDENT, ECUADOR TRUST

DATED: _____

FUNDER

DATED: _____

Alan Lenczner
Lenczner Slaght Royce Smith Griffin LLP
*All Instructions Acknowledged and Accepted*

7

29. Other Third-party commitments: The Parties warrant to each other that the execution and the delivery of this Agreement are not against any commitments, contracts and / or other obligations that they have with other third Parties.

30. Authority: Canadian Counsel confirms that the Ecuador Parties have the authority to enter into this Agreement and that it is binding and enforceable against them.

31. Entire Agreement: This Agreement shall constitute the entire agreement between the parties hereto, and shall supersede all prior agreements, understandings and negotiations between the parties with respect to the subject matter of this Agreement.

32. Governing law: This Agreement shall be governed by the law of Ontario, Canada. The courts of Ontario shall have exclusive jurisdiction to hear any claim or dispute related to this Agreement.

Dated: 24 August 2016

DATED: 24/08/2016

Carlos Guaman-Gaibor
President, FDA

DATED: 24/08/2016

Carmel Gabriel Chávez Parra
BOARD PRESIDENT, ECUADOR TRUST

DATED: _____

Solely as Trustee of Managing Member
FUNDER  and Not in an Individual Capacity

DATED: _____

Alan Lenczner
Lenczner Slaght Royce Smith Griffin LLP
*All Instructions Acknowledged and Accepted*

JVM 001005

30. <u>Authority</u>: Canadian Counsel confirms that the Ecuador Parties have the authority to enter into this Agreement and that it is binding and enforceable against them.

31. <u>Entire Agreement</u>: This Agreement shall constitute the entire agreement between the parties hereto, and shall supersede all prior agreements, understandings and negotiations between the parties with respect to the subject matter of this Agreement.

32. <u>Governing law</u>: This Agreement shall be governed by the law of Ontario, Canada. The courts of Ontario shall have exclusive jurisdiction to hear any claim or dispute related to this Agreement.

Dated: 24 August 2016

DATED: _____   _____
                               Carlos Guaman Gaibor
                               President, FDA

DATED: _____   _____
                               Ermel Gabriel Chávez Parra
                               BOARD PRESIDENT, ECUADOR TRUST

DATED: _____   _____
                               FUNDER

DATED: _September 16,_         _____
        2016                   Alan Lenczner
                               Lenczner Slaght Royce Smith Griffin LLP
                               *All Instructions Acknowledged and Accepted*

7

JVM 001006

## FUNDING ESCROW AGREEMENT

Funding Escrow Agreement dated August 25, 2016, between WDIS Finance LLC (the "**Client**") and Beard Winter LLP (the "**Escrow Agent**").

**RECITALS:**

(a)     Certain sums of monies (the "**Escrow Funds**") will be delivered to the Escrow Agent by the Client from time to time; and

(b)     The Escrow Agent has agreed to act as escrow agent for the purpose of holding and disbursing the Escrow Funds pursuant to the terms of this Funding Escrow Agreement and in accordance with the instructions from the Client.

In consideration of the foregoing and the mutual agreements contained herein (the receipt and adequacy of which are acknowledged), the parties agree as follows:

**Section 2     Delivery of Escrow Funds**

The Client will deliver or cause to be delivered Escrow Funds from time to time to the Escrow Agent by way of certified cheque payable to the Escrow Agent or a wire transfer of immediately available funds to the Escrow Agent, which amount, together with all interest earned thereon as contemplated by Section 3, shall be held and dealt with by the Escrow Agent in accordance with terms of this Funding Escrow Agreement.

**Section 3     Investment of Escrow Funds**

The Escrow Agent is hereby authorized and directed to cause the Escrow Funds to be invested and reinvested from time to time with the Royal Bank of Canada in an interest bearing instrument with a maturity of not more than thirty (30) days more or less. Interest earned and paid on such investments shall be added to and form part of the Escrow Funds and shall be invested and reinvested from time to time in accordance with this section. Interest earned on the Escrow Funds will be for the benefit of the Client.

**Section 4     Purpose of the Escrow Funds**

The Escrow Funds are to be used to make an investment, to pay certain legal fees and other expenses that the Client has agreed to assume responsibility for and for such other purposes as the Client may direct in writing to the Escrow Agent. The Escrow Funds shall be released by the Escrow Agent only when the Client provides the Escrow Agent with a written Direction (as such term is defined below).

**Section 5     Payment Notices, No Requirement to Act, Funds Received on Behalf of the Client**

(1)     At any time after the date hereof the Client shall be entitled to deliver a direction to the Escrow Agent substantially in the form attached hereto as Schedule "A" (a

"**Direction**") setting out what portion, if any, of the Escrow Funds are to be released and the name of the payee.

(2)    The Escrow Agent has the right not to act and will not be held liable for refusing to act unless it has received clear and reasonable documentation which complies with the terms of this Agreement. Such documentation must not require the exercise of any discretion or independent judgment on the part of the Escrow Agent.

(3)    Furthermore, the Escrow Agent agrees to hold in trust for the Client any amounts received for the benefit of the Client relative to the settlement of any legal proceedings. The Escrow Agent agrees to hold such funds in trust for the Client and shall release such funds as the Client may direct in writing to the Escrow Agent, provided first, that the Escrow Agent withholds from such funds any Canada Revenue Agency withholding tax obligations that would be the responsibility of the Client.

**Section 6**    **Duties and Liabilities of the Escrow Agent.**

(1)    The Escrow Agent shall have no duties or responsibilities other than those existing at law or under rules of professional responsibility and those expressly set forth in this Funding Escrow Agreement, which the parties agree are purely administrative in nature, and no implied duties or obligations shall be read into this Funding Escrow Agreement against the Escrow Agent. For greater certainty, the Escrow Agent is not bound by any agreement, arrangement or understanding relating to or arising out of the matters provided for in this Agreement, except as expressly set forth in this Agreement, and the Escrow Agent shall have no duty to enforce any obligation of any person, other than as provided herein.

(2)    The Escrow Agent shall not be liable for any action taken or omitted by it, or any action suffered by it to be taken or omitted, in good faith, and in the exercise of its own best judgment, and shall not be held liable for any error in judgment made in good faith, unless it shall be proved that the Escrow Agent was grossly negligent in ascertaining the pertinent facts or acted intentionally in bad faith.

(3)    The Escrow Agent may rely, and shall be protected in acting, upon any judgment, order, notice, demand, direction, certificate, or other instrument, paper or document which may be submitted to it in connection with its duties hereunder and the directions incorporated therein and which is believed by the Escrow Agent to be genuine and signed or presented by the proper person(s), and may accept the same as sufficient evidence of the facts stated therein. The Escrow Agent shall in no way be bound to enquire as to the veracity, accuracy or adequacy thereof or call for further evidence (whether as to due execution, validity or effectiveness, or the jurisdiction of any court, or as to the truth of any fact), and shall not be responsible for any loss that may be occasioned by its failing to do so.

(4)     In the event that the Escrow Agent shall become involved in any arbitration or litigation relating to the Escrow Funds, the Escrow Agent is authorized to comply with any decision reached through such arbitration or litigation.

(5)     In the following circumstances, the Escrow Agent may (i) refrain from taking any action under this Agreement until it is authorized or directed otherwise in writing by the Client, or by an order of a court of competent jurisdiction from which no further appeal may be taken or (ii) deposit the Escrow Funds with a court of competent jurisdiction in the City of Toronto, in the Province of Ontario:

        (a)     The Escrow Agent is uncertain as to its duties or rights hereunder,

        (b)     The Escrow Agent receives instructions, claims or demands from the Client or from a third person with respect to any matter arising pursuant to this Funding Escrow Agreement which, in its opinion, are in conflict with any provision of this Funding Escrow Agreement, or

        (c)     The parties to this Agreement disagree about the interpretation of this Agreement or about the rights and obligations of the Escrow Agent or the propriety of an action contemplated by the Escrow Agent under this Agreement.

(6)     Upon the Escrow Agent depositing the Escrow Funds with a court in accordance with Section 6(5), the Escrow Agent will be released from its duties and obligations under this Agreement. Section 7 and Section 8 and the provisions of this Agreement relating to the protection of the Escrow Agent survive such release of the Escrow Agent.

**Section 7     Escrow Agent's Fees, Costs and Expenses**

        The Client agrees to pay, upon request, the reasonable fees, expenses and disbursements incurred by the Escrow Agent in connection with the performance of its obligations hereunder.

**Section 8     Indemnification of Escrow Agent**

        The Client hereby indemnifies and save harmless the Escrow Agent at all times against all actions, proceedings, losses, liabilities, costs, claims and demands incurred or sustained by the Escrow Agent in respect of any matter or thing done by it under, pursuant to or in connection with this Funding Escrow Agreement, or otherwise arising in connection with its office as Escrow Agent hereunder, except in so far as the same arose through the gross negligence or wilful misconduct on the part of the Escrow Agent or otherwise arose from any breach by it of its obligations under this Funding Escrow Agreement. Without limiting the generality of the foregoing, the Client will indemnify and save harmless the Escrow Agent against all legal or other fees arising out of or in connection with its entering into this Funding Escrow Agreement and carrying out its duties hereunder, including without limitation the costs and expenses of defending itself against any claim of liability or any

- 4 -

action for interpleader. This indemnity shall survive the termination or discharge of this Funding Escrow Agreement or the resignation of the Escrow Agent.

**Section 9        Resignation, Removal of Escrow Agent**

(1)    The Escrow Agent may resign its trust and be discharged from all further duties and liabilities hereunder after giving thirty (30) days' written notice to the Client or such shorter notice as the Client may accept as sufficient, and may be removed from its office as such Escrow Agent by the Client at any time by not less than five (5) business days' written notice given to the Escrow Agent. Upon discharge or removal, the Escrow Agent shall deliver the Escrow Funds and all interest accrued thereon, subject to any Canada Revenue Agency withholding obligations, by certified cheque or a wire transfer as directed by the Client.

(2)    In the event of the resignation of the Escrow Agent or its removal from office, the Client shall appoint a successor.

(3)    The Escrow Agent which resigns or is removed shall execute such further assurances or documents as, in the opinion of the Escrow Agent and the Client, may be necessary or desirable to vest in the new Escrow Agent the same powers, rights, duties and responsibilities as if the new Escrow Agent had been originally named as Escrow Agent.

**Section 10        Termination of Funding Escrow Agreement**

This Funding Escrow Agreement shall terminate and cease to be of any further force and effect (except for the provisions of this Funding Escrow Agreement relating to protection of the Escrow Agent which shall survive any termination of this Funding Escrow Agreement) on the date on which the Escrow Agent shall have disbursed the Escrow Funds in full in accordance with the provisions of this Funding Escrow Agreement.

**Section 11        Determination**

The parties hereto agree that the Escrow Agent shall not be required to make any determination or decision with respect to the validity of any claim made by any party, or of any denial thereof, but shall be entitled to rely conclusively on the terms hereof and the documents tendered to it in accordance with the terms hereof.

**Section 12        Solicitor/Client Relationship**

The Escrow Agent and the Client acknowledge that a solicitor/client relationship exists.  As such, the Escrow Agent agrees to keep in confidence all information made available to it by the Client.  Furthermore, it is understood that the Escrow Agent will provide legal advice to the Client from time to time in connection with matters that are the subject of this Funding Escrow Agreement.

**Section 13        Notices**

Any notice, direction or other communication to be given under this Funding Escrow Agreement shall be in writing and given by delivering it or sending it by facsimile, e-mail or other similar form of recorded communication addressed:

(a)     If to the Escrow Agent, to:

Beard Winter LLP
Suite 701 - 130 Adelaide Street West
Toronto, ON   M5H 3V1

| | |
|---|---|
| Attention: | George D. Crossman |
| Facsimile: | 416-593-7760 |
| E-mail: | crossman@beardwinter.com |

(b)     If to the Client, to:

WDIS Finance LLC
c/o Michael Ben-Jacob
Kaye Scholer LLP
New York, NY   10019

| | |
|---|---|
| Facsimile: | 212-836-8565 |
| E-mail: | Michael.Ben-Jacob@kayescholer.com |

A Notice is deemed to be given and received (i) if sent by personal delivery or same day courier, on the date of delivery if it is a business day and the delivery was made prior to 4:00 p.m. (local time in place of receipt) and otherwise on the next business day, (ii) if sent by overnight courier, on the next business day, or (iii) if sent by facsimile or e-mail, on the business day following the date of confirmation of transmission by the originating facsimile or e-mail.  A party may change its address for service from time to time by providing a Notice in accordance with the foregoing.  Any subsequent Notice must be sent to the party at its changed address.  Any element of a party's address that is not specifically changed in a Notice will be assumed not to be changed.

**Section 14     Entire Agreement**

This Funding Escrow Agreement sets forth the entire agreement among the parties hereto with respect to the matters contained herein.

**Section 15     Enurement and Assignment**

This Funding Escrow Agreement shall enure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.

**Section 16     Severability**

If any provision of this Funding Escrow Agreement is deemed by any court of competent jurisdiction to be invalid or void, the remaining provisions shall remain in full force and effect.

**Section 17      Waiver**

No failure or delay of the Escrow Agent in exercising any right, power or remedy may be, or may be deemed to be, a waiver thereof; nor may any single or partial exercise of any right, power or remedy preclude any other or further exercise of any right, power or remedy.

**Section 18      Further Assurance**

Each party shall, at the request of the other party, deliver to the requesting party all further documents or other assurances as may reasonably be necessary or desirable to give effect to this Funding Escrow Agreement.

**Section 19      Time**

Time shall be of the essence in respect of this Funding Escrow Agreement.

**Section 20      Governing Law**

This Funding Escrow Agreement shall be governed by and interpreted and enforced in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein.

**Section 21      Counterparts**

This Funding Escrow Agreement may be executed in several counterparts, each of which so executed shall be deemed an original, and all of which shall constitute one and the same instrument.

*[Remainder of this page intentionally left blank]*

**IN WITNESS WHEREOF** the parties have executed this Funding Escrow Agreement.

<div align="right">

**WDIS FINANCE LLC**

Per: _____

       Name:

       Title:

I have the authority to bind the above-referenced company

**BEARD WINTER LLP**

By: _____

       George D. Crossman

       Managing Partner

</div>

- 7 -

**IN WITNESS WHEREOF** the parties have executed this Funding Escrow Agreement.

**WDIS FINANCE LLC**

Per:

Name: _Michael Ben-JACOB_

Title: _Trustee of Managing Member_

I have the authority to bind the above-referenced company

**BEARD WINTER LLP**

By:

George D. Clossman
Managing Partner

JVM 001014

## SCHEDULE "A"

## FORM OF DIRECTION

**TO:**     **BEARD WINTER LLP**

**RE:**     **FUNDING ESCROW AGREEMENT** dated _____, made among WDIS
Finance LLC and Beard Winter LLP (the "**Funding Escrow Agreement**")

---

The undersigned hereby directs **BEARD WINTER LLP** in its capacity as Escrow
Agent under and pursuant to the Funding Escrow Agreement to hereby pay the sum of $● to
**[insert name of third party recipient]** at the address for notice or wire transfer coordinates
as set forth below:

    **[Insert address for notice / wire transfer instructions]**

    **DATED** this _____ day of _____, 2016.

●_____

## DIRECTION

**TO:**  **BEARD WINTER LLP**

**RE:**  **FUNDING ESCROW AGREEMENT** dated August 25, 2016, made between WDIS Finance LLC and Beard Winter LLP (the "**Funding Escrow Agreement**")

---

The undersigned hereby directs **BEARD WINTER LLP** in its capacity as Escrow Agent under and pursuant to the Funding Escrow Agreement to hereby pay the sum of **TWO HUNDRED AND EIGHTY-FIVE THOUSAND ($285,000.00) DOLLARS U.S.** to **LENCZNER SLAGHT ROYCE SMITH GRIFFIN LLP** upon receipt of such funds that will be directed to the wire transfer coordinates as set forth below:

### ROYAL BANK OF CANADA  – U.S. ACCOUNT

| | |
|---|---|
| **Bank Address:** | 20 King Street West, Toronto, ON   M5H 1C4 |
| **Bank Number:** | 003 |
| **Transit Number:** | 06012 |
| **Account Number:** | 6797 |
| **Account Name:** | Beard Winter LLP |
| | Suite 701, 130 Adelaide Street West, Toronto, ON   M5H 2K4 |
| **ABA Number:** | 021 0000 21 |
| **Swift Code:** | ROYCCAT2 |

**DATED** this _____ day of August, 2016.

WDIS FINANCE LLC

Per: _____

Name: _Michael Ben-Jacob_

Title: _Trustee of Managing Member_

I have the authority to bind the above-referenced company

JVM 001016

September 22, 2016

Alan Lenczner
Lenczner Slaght Royce Smith Griffin LLP
130 Adelaide St. W
Suite 2600
Toronto, ON
Canada M5H 3P5

Dear Alan,

Reference is made to the Ecuador Judgment Investment Agreement (the "Investment Agreement") from the Funder executing this letter, to help fund the collection of the Ecuador Judgment (as defined in such agreement) against Chevron and/or its subsidiaries by the Frente de DeFensa de la Amazonia.

This letter serves to memorialize our acknowledgment and agreement that notwithstanding paragraph 10 of the Investment Agreement, that your firm is not required to carry on its work on the enforcement of the Ecuador Judgment unless your firm is being paid to do so.

Sincerely,

_Solely as Trustee of Managing Member of Funder_

Funder

63787332_1

# EXHIBIT 100

i582che1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CHEVRON CORPORATION,

                  Plaintiff,           New York, N.Y.

         v.                  11 Civ. 691(LAK)

STEVEN DONZIGER, *et al.*,

               Defendants.

------------------------------x      Argument

                              May 8, 2018
                              4:40 p.m.

Before:

                  HON. LEWIS A. KAPLAN,

                              District Judge


                     APPEARANCES


GIBSON, DUNN & CRUTCHER, LLP
     Attorneys for Plaintiff
BY:  RANDY M. MASTRO
     ANDREA E. NEUMAN
     ANNE CHAMPION
     ALEJANDRO A. HERRERA


STERN & KILCULLEN, LLC
     Attorneys for Plaintiff
BY:  HERBERT J. STERN


STEVEN R. DONZIGER
     Pro Se Defendant

1   other jurisdictions, which you yourself said was valid and,

2   obviously, the Second Circuit said was valid and permissible.

3   This is why you wrote, if you think back to four years ago when

4   I raised this issue, you said:  At least as long as no

5   collections, that is, collections from enforcing the judgment,

6   are made in respect to the Lago Agrio judgment and funneled

7   to --

8           THE COURT:  Suppose you settle the case for

9   $20 billion.  You think that might be a collection within the

10   meaning of what I wrote?

11          MR. DONZINGER:  Yes.  But there's no settlement.

12   There's no collection.

13          THE COURT:  So it doesn't have to be by execution?

14          MR. DONZINGER:  I haven't really thought that issue

15   through.  All I'll say is there has been no collection on the

16   judgment.  There might not ever be a collection on the

17   judgment.  You have ruled in the RICO judgment that this

18   judgment can be enforced anywhere in the world except in the

19   United States by me and two other people.  That was your

20   ruling.

21          THE COURT:  Well, that's your version.

22          MR. DONZINGER:  Well, I believe that's your ruling.

23   And then you said the New York judgment would not permit

24   Donzinger from being paid, just as he has been paid at least

25   $958,000 and likely considerably more over the last nine or ten

# EXHIBIT 101

| | |
|---|---|
| **From:** | John van Merkensteijn <jhvm@rossteq.com> |
| **Sent:** | Wednesday, January 11, 2017 3:03 PM |
| **To:** | Steven Donziger |
| **Subject:** | Fwd: Alan |

Steven here is the message from Ian please keep it confidential and don't tell Allen or Ian that I showed it to you

John H. van Merkensteijn lll
Managing Director
Rossi Technologies LLC
60 Riverside Boulevard
Suite 2101
New York, NY. 10069
Phone (212) 769-4055
jhvm@rossteq.com

Begin forwarded message:

> **From:** "Ian Watson" <iw@genagro.net>
> **Date:** January 11, 2017 at 7:43:39 AM EST
> **To:** "'John van Merkensteijn'" <jhvm@rossteq.com>
> **Subject: RE: Alan**
>
> John,
>
> Alan is very personable and it is encouraging to see he is optimistic on the
> final outcome of the case.
>
> He did mention that Steven did some silly things that's that were brought
> out in the NY Court Case. He asked about my investment being paid to him and
> he, in turn paying part of it to Steven. He has advised Steven that has been
> a irregular way in Alan's view to handle the distribution of funds. He said
> that he asked Steven to give either Tony Gordon or I a ring to clarify the
> situation.
>
> Have you heard anything further on additional funds being raised? Alan did
> say that he is meeting with Steven's potential $10 million investor in
> France next week.
>
> Best wishes,
>
> Ian
>
> -----Original Message-----
> From: John van Merkensteijn [mailto:jhvm@rossteq.com]
> Sent: 10 January 2017 21:34

1

JVM 011239

To: Ian Watson
Subject: Alan

Ian. How was your meeting with Alan?


John H van Merkensteijn,III
Rossi Technologies LLC
60 Riverside Boulevard
Suite 2101
New York, N.Y. 10069
1 212 769 4055
JHvM@rossteq.com

Sent from my iPhone


--

------------------------------

Genagro Services Ltd
Registered Office: 24 Old Burlington Street, London W1S 3AW
Registered in England. Company Number: 6433022

This email and any files transmitted with it are confidential and intended
solely for the use of the individual or entity to whom they are addressed.
Please note that any views or opinions presented in this email are solely
those of the author and do not necessarily represent those of Genagro
Services Ltd and associated companies. The recipient should check this
email and any attachments for the presence of viruses. Genagro Services Ltd
and associated companies accept no liability for any damage caused by any
virus transmitted by this email. If you have received this email in error
please notify mailto:administrator@genagro.net
------------------------------

JVM 011240

# EXHIBIT 102

SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CHEVRON CORPORATION,

                Plaintiff,

            v.                          11 Cv. 0691 (LAK)

STEVEN R. DONZIGER, et al.,

                Defendants.

------------------------------x

                                    November 18, 2013
                                    9:35 a.m.

Before:

                    HON. LEWIS A. KAPLAN

                                    District Judge

                        APPEARANCES

GIBSON, DUNN & CRUTCHER LLP
        Attorneys for Plaintiff
BY:    RANDY M. MASTRO
        ANDREA E. NEUMAN
        REED M. BRODSKY
        JEFFERSON E. BELL
        ANNE CHAMPION

FRIEDMAN RUBIN
        Attorneys for Donziger Defendants
BY:    RICHARD H. FRIEDMAN
        DEE TAYLOR

LITTLEPAGE BOOTH
        Attorneys for Donziger Defendants
BY:    ZOE LITTLEPAGE
        RAINEY BOOTH

GOMEZ LLC
        Attorneys for Defendants Hugo Camacho, Javier Piaguaje
BY:    JULIO C. GOMEZ

Page 2488

1    there about your case, didn't you say that?

2    A.  It's possible.  I don't know if I said it.

3    Q.  We'll come back to it, sir.

4           Am I correct that between 2003 and 2009, Joseph Kohn

5    was funding the litigation?

6    A.  During those years he was the primary funder, but not the

7    only funder.

8    Q.  And am I also correct, sir, that over that period of time,

9    2003 to 2009, Mr. Kohn paid you over $1 million in connection

10   with this case, the Lago Agrio Chevron case?

11   A.  It sounds about right.  I don't know exactly.

12   Q.  And, sir, isn't it also the case that in 2007 and 2008 --

13   strike that.

14          Isn't it also the case that in late aughts Russ DeLeon

15   also became a funder on the Lago Agrio Chevron case?

16   A.  That is correct, yes.

17   Q.  And Mr. DeLeon is someone you know from school days?

18   A.  Yes.

19   Q.  And Mr. DeLeon now lives on Gibraltar, correct?

20   A.  No.

21   Q.  He's a fugitive from U.S. justice, isn't he, sir?

22   A.  No.

23   Q.  Isn't it a fact, sir, that in 2007 and 2008, Mr. DeLeon

24   also paid you over $800,000?

25   A.  For --

# EXHIBIT 103

| | |
|---|---|
| **From:** | Steven Donziger <sdonziger@donzigerandassociates.com> |
| **Sent:** | Wednesday, August 31, 2016 10:27 PM |
| **To:** | 'John van Merkensteijn'; 'Derek.Stoldt@kayescholer.com' |
| **Subject:** | Resolution from FDA approving investment |
| **Attachments:** | Certificación 300.000.pdf |
| | |
| **Categories:** | KF2 |

Let me know if you need me to get it translated. Best, Steven

_____

**From:** Frente de Defensa de la Amazonia
**Sent:** Tuesday, August 30, 2016 11:58 AM
**To:** Steven Donziger; Steven Donziger; Patricio Salazar Cordova

Subject: Resolutions

Dear Steven and Patricio,

I attach the resolutions from the executive council regarding approval for the investments.


Regards,
Gladys Solana
ADF SECRETARY


Contact:
Carlos Guamán Gaibor: 0959092492
ADF PRESIDENT

CERT. ULG VER: JD



Amazon Defense Front

## CERTIFICATION

In my capacity as Secretary of the Amazon Defense Front (ADF), I hereby provide the resolution issued by the Executive Council at an extraordinary meeting held on August 29 of this year. The resolution states:

1. *Based on Article 32(h) of the bylaws of the Amazon Defense Front, the Executive Council authorizes member Carlos Humberto Guamán Gaibor, legal representative of the ADF, to sign the financing agreement for US$ 300,000, which will be used for expenses incurred to enforce the "Aguinda v. Chevron" judgment in Canada.*

Issued and signed in Nueva Loja, on August 29, 2016.

[signed]

Ms. Gladys Solano

**SECRETARY - ADF**



ADF
Amazon Defense Front

Address: Calles Eloy Alfaro No. 801 and Progreso – Telefax 593 (06) 2831 930 – Lago Agrio, Nueva Loja
frentededefensadelaamazonia@gmail.com
[illegible]

JVM 003763

CERT. ULG VER: JD



**United Language Group**

433 Broadway

New York, NY 10013

+1 888.601.9814

**legaltranslations@ulgroup.com**

State of New York                              )
Estado de Nueva York

                                                       )                    ss:
                                                       )          a saber:
County of New York                          )
Condado de Nueva York

**Certificate of Accuracy**
**Certificado de Exactitud**

This is to certify that the attached translation is, to the best of our knowledge and belief, a true and accurate translation from Spanish into English of the attached document.

Por el presente certifico que la traducción adjunta es, según mi leal saber y entender, traducción fiel y completa del idioma español al idioma inglés del documento adjunto.

Dated: November 2, 2018
Fecha: 2 de noviembre de 2018

Yasushi Sasaki
Senior Project Manager– Legal Translations
United Language Group
_____[firmado]_____
Yasushi Sasaki
Gerente de Proyeto Senior – Traducciones Legales
United Language Group

Sworn to and signed before
Jurado y firmado ante
Me, this _____2nd_____ day of
mí, a los _____2_____ días del
_____November_____ 2018
mes de ____noviembre____ de 2018

Notary Public
Notario Público

                                                                    [firmado]
                                                                    [sello]

GINA MARIE ST.LAURENT
Notary Public, State of New York
No. 01ST6148442
Qualified in New York County
Commission Expires May 15, 2022

| | |
|---|---|
| **From:** | Steven Donziger <sdonziger@donzigerandassociates.com> |
| **Sent:** | Wednesday, August 31, 2016 10:27 PM |
| **To:** | 'John van Merkensteijn'; 'Derek.Stoldt@kayescholer.com' |
| **Subject:** | Resolution from FDA approving investment |
| **Attachments:** | Certificación 300.000.pdf |
| | |
| **Categories:** | KF2 |

Let me know if you need me to get it translated. Best, Steven

---

**From:** Frente de Defensa de la Amazonia
**Sent:** Tuesday, August 30, 2016 11:58 AM
**To:** Steven Donziger; Steven Donziger; Patricio Salazar Cordova
**Subject:** Resoluciones

Estimado Steven y Patricio

Adjunto las resoluciones del concejo ejecutivo sobre la aprobación para las inversiones

Cordialmente,
Gladys Solano
SECRETARIA FDA

--
Contacto:
Carlos Guamán Gaibor: 0959092492
Presidente F.D.A.

1

JVM 003762



www.fda.org.ec
Sucumbios -Ecuador

# CERTIFICACIÓN

En calidad de Secretaria General del Frente de Defensa de la Amazonía –FDA–, doy a conocer la resolución emitida en la reunión extraordinaria del Concejo Ejecutivo el día 29 de agosto del presente año. Dicha resolución dice lo siguiente:

1. *Que el concejo ejecutivo, fundamentado en el artículo 32 literal h del estatuto del Frente de Defensa de la Amazonía, autoriza al compañero Carlos Humberto Guamán Gaibor, representante legal del FDA, la suscripción del contrato de financiamiento de 300.000 dólares americanos que serán destinados para los gastos de ejecución de la sentencia "Aguinda vs Chevron" en Canadá.*

Dado y firmado en Nueva Loja, el 29 de Agosto de 2016.

Srta. Gladys Solano
**SECRETARIA GENERAL FDA**





Dirección: Calles Eloy Alfaro N° 801 y Progreso - Telefax 593(06) 2831 930 - Lago Agrio, Nueva Loja
frentededefensadelaamazonia@gmail.com

JVM 003763

# EXHIBIT 104



**Amazon Defense Front**

www.fda.org.ec
Sucumbíos - Ecuador

## CERTIFICATION

In my capacity as Secretary of the Amazon Defense Front (ADF), I hereby provide the resolution issued by the Executive Council at the extraordinary meeting held on July 4 of this year. The resolution states as follows:

1. *Based on Article 32(h) of the bylaws of the Amazon Defense Front, the Executive Council authorizes member Carlos Humberto Guamán Gaibor, legal representative of the ADF, to sign the financing agreement in the amount of US$ 250,000, which will be used exclusively for enforcement of the "Aguinda v. Chevron" judgment in Canada.*

Issued and signed in Nueva Loja on July 4, 2016.

[signed]

Ms. Gladys Solano

**SECRETARY OF THE ADF**



ADF
Amazon Defense Front

Address: Eloy Alfaro No. 801 and Progreso Street - Telefax 593 (06) 2831 930 - Lago Agrio, Nueva Loja
frentededefensadelaamazonia@gmail.com

JVM 003929

CERT. ULG VER: JD



**United Language Group**

433 Broadway

New York, NY 10013

+1 888.601.9814

**legaltranslations@ulgroup.com**

State of New York                    )
Estado de Nueva York

                                     )                    ss:
                                     )              a saber:
County of New York                   )
Condado de Nueva York

### Certificate of Accuracy
### Certificado de Exactitud

This is to certify that the attached translation is, to the best of our knowledge and belief, a true and accurate translation from Spanish into English of the attached document.

Por el presente certifico que la traducción adjunta es, según mi leal saber y entender, traducción fiel y completa del idioma español al idioma inglés del documento adjunto.

Dated: November 7, 2018
Fecha: 7 de noviembre 2018

*[signature]*

Yasushi Sasaki
Senior Project Manager– Legal Translations
United Language Group
_____[firmado]_____
Yasushi Sasaki
Gerente de Proyeto Senior – Traducciones Legales
United Language Group

Sworn to and signed before
Jurado y firmado ante
Me, this _____7th_____ day of
mí, a los _____7_____ días del
_____November_____ 2018
mes de) ___noviembre___ de 2018

_____
Notary Public
Notario Público

                                              [firmado]
                                              [sello]

GINA MARIE STLAURENT
Notary Public, State of New York
No. 01ST6146442
Qualified in New York County
Commission Expires May 15, 2022



www.fda.org.ec
Sucumbíos -Ecuador

# CERTIFICACIÓN

En calidad de Secretaria General del Frente de Defensa de la Amazonía – FDA, doy a conocer acerca de la resolución emitida en la reunión extraordinaria del Concejo Ejecutivo el día 04 de Julio del presente año. Dicha resolución dice lo siguiente:

1. *Que el concejo ejecutivo, en el artículo 32 literal h del estatuto del Frente de Defensa de la Amazonía; autoriza al compañero Carlos Humberto Guamán Gaibor, representante legal del FDA la suscripción del contrato de financiamiento de 250.000 dólares americanos que serán destinados exclusivamente para la ejecución de la sentencia "Aguinda vs Chevron" en Canadá.*

Dado y firmado en Nueva Loja, el 04 de Julio de 2016.



Srta. Gladys Solano

**SECRETARIA GENERAL FDA**



Dirección: Calles Eloy Alfaro N° 801 y Progreso - Telefax 593(06) 2831 930 - Lago Agrio, Nueva Loja
frentedefensadelaamazonia@gmail.com

JVM 003929

# EXHIBIT 105



**Amazon Defense Front**

www.fda.org.ec
Sucumbíos - Ecuador

## CERTIFICATION

In my capacity as Secretary of the Amazon Defense Front (ADF), I hereby provide the resolution issued by the Executive Council at the extraordinary meeting held on April 25 of this year. The resolution states as follows:

*1. Based on Article 32(h) of the bylaws of the Amazon Defense Front, the Executive Council authorizes member Carlos Humberto Guamán Gaibor, legal representative of the ADF, to sign the financing agreement in the amount of US$ 250,000, which will be used exclusively for enforcement of the "Aguinda v. Chevron" judgment in Canada.*

Issued and signed in Nueva Loja on April 25, 2016.


[signed]

Ms. Gladys Solano
**SECRETARY OF THE ADF**



ADF
Amazon Defense Front

Address: Eloy Alfaro No. 801 and Progreso Street - Telefax 593 (06) 2831 930 - Lago Agrio, Nueva Loja
frentededefensadelaamazonia@gmail.com

MKS-0007999

CERT. ULG VER: JD

Cumbayá, May 1, 2016

Mr. Carlos Guamán
President
Amazon Defense Front
C/O ADF Advisors
Francisco de Orellana.

Ref.: Legal opinion on the Investor Agreement between the ADF and an undisclosed investor for USD $250,000.00.

Dear Carlos:

Regarding the above-referenced matter and at your express request in the message dated April 29, 2016, I am writing you to submit for your consideration my legal opinion on the suggestion of executing the above agreement, which you, as the Front's legal representative, would sign.

**Clarifications**

1. I refer to the text you sent in the above-referenced email.

2. I have not received the authorizing documents required for the agreement, such as: identifications, powers of attorney, appointments or certificates of appearance.

Consequently, this is my opinion about what has been provided to me and the explanations that Steven Dozinger has given me about the background on signing the agreement.

I offer no opinion about whether or not it is advisable to execute the agreement or about the agreement's conditions because the Front is responsible for that decision and, therefore, my opinion is strictly legal.

**The parties**

1. The investor's identity should be known. As Steven has explained to me, it has been requested that that information be kept confidential, but it will be provided. The purpose of this is to ensure that it does not become a potential problem. It is my understanding that Steven has also taken care of this matter.

2. At the signing of the agreement, the meeting minutes, allowing and authorizing you to sign the agreement, should be included.

3. The meeting announcement for the meeting where you receive authorization to sign the agreement should expressly include an agenda item about your authorization to sign the agreement.

MKS-0008000

CERT. ULG VER: JD

**Regarding the Agreement's Content**

1. I recommended that the contractual jurisdiction be a court of arbitration, which could be in Canada. However, since it is an unrelated jurisdiction with an expeditious judicial system, I don't think this point is vital.

2. The text about the investor's Escrow Agent being the one who will manage the money from the recovery should be clarified. I understood it this way, but Steven explained that this is not what the agreement says and that this Escrow Agent mentioned in the agreement is only responsible for managing the investments made by the investor and funneling those payments.

3. Whether the investor has a right to re-invest a similar amount in each round with a 25% discount should be clarified. Steven explained to me that the intention, in fact, is for the investor to have the option of making that additional investment only when the ADF asks another investor to contribute. So this would need to be clarified, stating how many times the investor can do this or whether it is available one time only.

4. Requiring the receiver of the money to guarantee the investor priority payment is logical. But the fact that this obligation extends to anyone who has an interest is unrelated to the agreement itself. However, I have been told that the investor is imposing this requirement.

5. To clarify, the Latin term *"pari-passu"* means on equal footing.


Sincerely,

Dr. Patricio Salazar Córdova

MKS-0008001



**United Language Group**

433 Broadway

New York, NY 10013

+1 888.601.9814

**legaltranslations@ulgroup.com**

State of New York                    )
Estado de Nueva York

                                     )                    ss:
                                     )              a saber:
County of New York                   )
Condado de Nueva York

## Certificate of Accuracy
## Certificado de Exactitud

This is to certify that the attached translation is, to the best of our knowledge and belief, a true and accurate translation from Spanish into English of the attached document.

Por el presente certifico que la traducción adjunta es, según mi leal saber y entender, traducción fiel y completa del idioma español al idioma inglés del documento adjunto.

Dated: November 7, 2018
Fecha: 7 de noviembre 2018

Yasushi Sasaki
Senior Project Manager– Legal Translations
United Language Group
_____[firmado]_____
Yasushi Sasaki
Gerente de Proyeto Senior – Traducciones Legales
United Language Group

Sworn to and signed before
Jurado y firmado ante
Me, this _____7th_____ day of
mí, a los _____7_____ días del
_____November_____ 2018
mes de) _____noviembre_____ de 2018

Notary Public
Notario Público

[firmado]
[sello]

GINA MARIE STLAURENT
Notary Public, State of New York
No. 01ST6146442
Qualified in New York County
Commission Expires May 15, 2022



www.fda.org.ec
Sucumbios -Ecuador

## CERTIFICACIÓN

En calidad de Secretaria General del Frente de Defensa de la Amazonía –
FDA, doy a conocer acerca de la resolución emitida en la reunión extra
ordinaria del Concejo Ejecutivo el día 25 de Abril del presente año. Dicha
resolución dice lo siguiente:

1. *Que el concejo ejecutivo, en el artículo 32 literal h del estatuto del Frente
   de Defensa de la Amazonía; autoriza al compañero Carlos Humberto
   Guamán Gaibor, representante legal del FDA la suscripción del contrato
   de financiamiento de 250.000 dólares americanos que serán destinados
   exclusivamente para la ejecución de la sentencia "Aguinda vs Chevron"
   en Canadá.*

Dado y firmado en Nueva Loja, el 25 de abril de 2016.

Srta. Gladys Solano
**SECRETARIA GENERAL FDA**




Dirección: Calles Eloy Alfaro Nº 801 y Progreso - Telefax 593(06) 2831 930 - Lago Agrio, Nueva Loja
frentededefensadelaamazonia@gmail.com

MKS-0007999

Cumbayá, 1 de Mayo de 2016

Señor
Carlos Guamán
Presidente
Frente de Defensa de la Amazonía
C.C. Asesores FDA
Francisco de Orellana.-

Ref: opinión legal sobre acuerdo con Inversionista por USD $ 250.000.00 entre FDA e inversionista incógnito.

Estimado Carlos:
En relación con el asunto de la referencia y por el expreso pedido de su parte, según mensaje de 29 de Abril de 2016, me dirijo a Usted con el propósito de remitir para su consideración mi opinión legal respecto de la sugerencia de la firma del contrato aludido a suscribirse por usted en calidad de representante legal del Frente.

**Aclaraciones**

1.- Me refiero al texto enviado por Usted en el email aludido
2.- No he recibido los habilitantes del contrato, como son: identificaciones, poderes, nombramientos o actas de los comparecientes.
En consecuencia, me pronuncio respecto de lo que se me ha proporcionado y las explicaciones que me ha proporcionado Steven Dozinger respecto de los antecedentes de la firma del contrato
Tampoco me pronuncio sobre la conveniencia o no de celebrar el contrato o sus condiciones porque eso les corresponde decidir al Frente y por lo tanto mi criterio es estrictamente jurídico.

**De la Comparecencia**

1.- Se debe conocer quién es el inversionista. Según me ha explicado Steven ese dato se ha pedido mantener en confidencialidad pero será proporcionado. El objeto de esto es asegurarse que no pueda presentar un potencial problema. Entiendo que este asunto también ha sido evacuado por Steven.
2.- A la firma de este contrato se debe incluir el Acta de la sesión que le permite y autoriza a Usted a la firma del Contrato.
3.- La convocatoria de la sesión en la que resuelve autorizarle a Usted a firmar el contrato, debe tener expresamente el punto de la autorización para la firma del contrato.

MKS-0008000

**Respecto del Contenido del Contrato**

1.- Sugerí que la jurisdicción convencional sea la de un Tribunal Arbitral que podría ser en Canadá. Sin embargo, al ser una tercera jurisdicción en un sistema judicial expedito, creo que no habría inconveniente en ceder este punto.

2. Se deberá aclarar el texto respecto de que el Escrow Agent del inversionista sea quién maneje el dinero de la recuperación. Yo lo he entendido así pero Steven me ha sabido indicar que no es el sentido del contrato y que este Escrow Agent del que se habla en el contrato solamente se encarga de administrar los valores de la inversión realizada por el inversionista y canalizar esos pagos.

3. Se debe aclarar el derecho del inversionista respecto de su facultad de invertir nuevamente, en cada ronda, un monto similar con 25 % de descuento. Pues en efecto, Steven me ha explicado que la intencionalidad es que el inversionista tenga la opción de esa inversión adicional, solamente cuando el FDA haya solicitado la intervención de otro inversionista, entonces eso habría que esclarecer y determinar el número de veces que esta facultad existe o si solamente es por una sola vez.

4. La obligación del receptor del dinero de asegurar al inversionista que le pague con prioridad es lógica. Sin embargo, el hecho de que esta obligación sea extensiva a favor de todos quienes tengan interés no tiene relación con el contrato mismo. Sin embargo, se me ha explicado que esta es una exigencia del inversionista.

5. Les aclaro que el latinajo ¨pari passu¨ significa en igualdad de condiciones.

Muy atentamente,


Dr. Patricio Salazar Córdova

MKS-0008001