J18QCHEo - corrected

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CHEVRON CORPORATION

             Plaintiff

        v.                              11 Civ. 691 (LAK)
                                        Conference
STEVEN DONZIGER, et al.

             Defendants
------------------------------x
                                        New York, N.Y.
                                        January 8, 2019
                                        2:10 p.m.

Before:

                    HON. LEWIS A. KAPLAN

                                        District Judge

                         APPEARANCES

GIBSON DUNN & CRUTCHER LLP
     Attorneys for Plaintiff
RANDY M. MASTRO
ANDREA NEUMAN
ANNE MARIE CHAMPION

STERN KILCULLEN RUFOLO LLC
     Attorney for Plaintiff
HERBERT J. STERN

ANDREW R. ROMERO-DELMASTRO, Supervising Counsel
     Attorney for Chevron Corporation

STEVEN ROBERT DONZIGER, Pro Se

1               (Case called)
2               DEPUTY CLERK:  Plaintiff, are you ready?
3               MR. MASTRO:  Ready, your Honor.  Happy New Year.
4               Randy Mastro here with my colleagues, Andrea Neuman
5     and Anne Champion.
6               DEPUTY CLERK:  Defendant, are you ready?
7               MR. DONZIGER:  Steve Donziger on behalf of myself.
8               THE COURT:  Good afternoon.
9               The main reason that I asked you to come in has to do
10    with the proposed protocol for the examination of the
11    defendant's electronic devices and storage media because I
12    think there's a problem, at least one problem, with what
13    Chevron has proposed.
14              Now, Mr. Mastro are you the person who is going to
15    address the details of this or is it going to be somebody else?
16              MR. MASTRO:  Yes.  Your Honor, this one is above my
17    pay grade, but Ms. Neuman is going to be --
18              THE COURT:  I didn't realize there were such things.
19              MR. MASTRO:  Andrea Neuman is going to address these
20    issues, your Honor.  She is most familiar with them.
21              THE COURT:  OK.  Ms. Neuman, as I understand what you
22    have proposed, it is that Mr. Donziger would produce his
23    devices and media.  They would be cloned by his proposed
24    neutral, which I gather is now something called LIFARS, and
25    then the cloned devices and storage media would be turned over

1   to a Chevron expert, right?

2              MS. NEUMAN:  That's correct, your Honor.

3              THE COURT:  And so the review to determine what, if
4   any, materials on these devices and storage media are
5   responsive to the requests with which I have ordered compliance
6   would be done by you.

7              MS. NEUMAN:  Correct, your Honor.

8              THE COURT:  Well, why should I do that?  I assume
9   there's stuff on this media that hasn't got anything to do with
10  the case.  It's at least a fair guess, right?

11             MS. NEUMAN:  I'm sure that's true, your Honor.

12             THE COURT:  So why should you rummage through all of
13  that?

14             MS. NEUMAN:  Well, we're not proposing to rummage
15  through, your Honor.  What we are proposing is to run a set of
16  search terms.  Now the search terms are in some cases words
17  that are broad because we are dealing with a challenging
18  environment of an individual who is engaged in deletion,
19  obfuscation, uses code words, all of these activities with
20  which the Court is familiar.

21             So this is not a straightforward exercise because we
22  don't know the current code words they may be using.  We don't
23  know their current tactics for hiding either assets or
24  investments or other relevant information.  We have found in
25  the discovery that we've been doing for the past six to nine

1    months that Mr. Donziger, for example, has pledged his interest
2    or what he still considers to be his interest in the judgment
3    to an executive coach, which we only discovered through a
4    third-party production, so very indirectly.  He's offered it to
5    a lawyer in Florida who is representing him in an unrelated
6    matter.  He's offered to switch loan aspects with family
7    members over to interest in the judgment.
8             So I bring those up as examples, your Honor, to show
9    you how his contempt of the Court's orders, including contrary
10   to what he's represented to the Court pledging his own
11   interest, what he himself calls his own interest in the
12   document pursuant to which he pledged it, shows up in very
13   unanticipated aspects of his life because he seems to be using
14   this judgment as collateral for anything and everything he
15   wants to do, which makes it a challenge to narrow the focus of
16   discovery as related to his use and misuse of the Ecquadorian
17   judgment and his contempt of the Court's orders.
18            So what we had proposed to do was run the search terms
19   and then use a predictive coding algorithm.  So what would
20   happen is we'd run the search terms, we'd get a responsive set
21   of documents, we'd review a certain percentage of those, code
22   them as relevant or irrelevant and add additional codes as
23   appropriate, and then have the computer learn from that and
24   rerun.
25            So we are only looking for relevant information, your

1    Honor, but I do think you have to have case-based experience in
2    order to be able to develop the right predictive coding in this
3    challenging environment that we're working with where we have
4    someone who is attempting to hide what they're doing and
5    they're using the judgment in what I would consider to be
6    unanticipated ways; for example, paying a life coach.
7        We would propose to use a Chevron's expert, just so
8    the Court is aware, Mr. Lynch from Stroz Friedburg, who has
9    in-depth knowledge of the case.  He examined Mr. Donziger's
10   2010 hard drive, he examined the Guerra hard drives, and he
11   examined the Zambrano hard drive that was used in the bit
12   proceeding.  So I think he is uniquely qualified to stay
13   focused eye on the ball of documents and files that relate to
14   this matter.
15       THE COURT:  Why couldn't this be accomplished after
16   suitable interaction with a neutral by the neutral?
17       MR. MASTRO:  I think we could, your Honor, have the
18   neutral supervise Mr. Lynch, if that would provide the right
19   level of protection, so he wouldn't be able to run any searches
20   without the neutral's sitting there watching him, making sure
21   he's not --
22       THE COURT:  Why can't the neutral interact with
23   Mr. Lynch and get suggestions as to what he ought to do and
24   why?
25       MS. NEUMAN:  That would be possible, your Honor.  I

1    think at some point Chevron would have to be involved in terms

2    of designating irrelevant and relevant and doing some level of

3    coding so that the predictive aspects of the computer learning

4    could work.

5             THE COURT: Why can't a neutral do predictive coding?

6             MS. NEUMAN: They can with input, but they're not

7    going to be able to review the documents and know that a

8    document that talks about "the guy" is necessarily relevant.

9    You know, in the abstract we would not have known that a

10   puppet, puppeteer, a cook waiter document, you know, were

11   necessarily responsive. And I think, in fairness, an

12   uninformed neutral is going to have a pretty big learning

13   curve. So I think it's important from a coding perspective

14   that we be able to review and code at least some of the

15   documents.

16            We are intending to incorporate the other productions

17   that we received to give the computer more information to work

18   with because we've pulled all the relevant documents from those

19   productions that we've gotten from third parties, which is

20   about 90,000 pages. So we would do our best to code and narrow

21   very efficiently, but I don't think it's realistic that someone

22   who has had no exposure to the case would really be able to

23   review the documents and catch all of the relevant ones given

24   the way the individuals involved in this matter operate.

25            THE COURT: Where is your list of search terms? Have

1    you submitted it to me?  You have, right?

2             MS. NEUMAN:  Yes, your Honor.  It's part of Docket
3    2120-1 at page 26 of 40, Exhibit C to the protocol.

4             THE COURT:  I see it.  Remind me also of the time
5    period that would be covered here.

6             MS. NEUMAN:  We have proposed starting in 2012.

7             THE COURT:  Because?

8             MS. NEUMAN:  Because that is six years -- a six year
9    statute of limitations on fraudulent transfers.

10            THE COURT:  Would it be practical to consider doing
11   this for a narrower time period first and seeing what comes of
12   that in order to formulate a more targeted approach to the rest
13   of the material?

14            MS. NEUMAN:  Yes, we could do that, your Honor.

15            THE COURT:  Tell me how.

16            MS. NEUMAN:  Well, we would start with a, let's say,
17   post-judgment time frame, which would cut off two years, so
18   that would reduce the volume by maybe 25 percent.  We'd run the
19   search terms.  We would de-dupe the documents that we received
20   when we ran the search terms against the other productions we
21   received to date post-judgment which has been for about 12
22   other individuals.  We would then review, depending on the
23   volume, a certain percentage of the de-duped population, code
24   them, and then have the forensic specialist work with a
25   computer to create the algorithm, see what other documents the

1  computer says meet the relevant parameters that the documents
2  coded relevant speak to it about.
3       So, for example, if Mr. Donziger and Mr. Paige, for
4  example, used the word "pineapple" in a certain context that
5  indicates that it's relevant, the computer would then go back
6  and search for "pineapple" in that context and might pull
7  documents that we couldn't have anticipated because we didn't
8  know that was a code word, for example.  And so we could do
9  that for the post-judgment time frame.  And once the computer
10 had learned what it was going to learn from the documents
11 available, you could run that algorithm against the prior time
12 frame without having to start with the search terms.
13      THE COURT:  The same would be true if you started with
14 a period of year or two years.
15      MS. NEUMAN:  Yes, your Honor, although I'm not sure
16 when you want to hide your assets once you've had a judgment
17 entered against you.  If you're going to be prompt about it,
18 you would have done it earlier and maybe you're done doing it
19 after a year or two.
20      THE COURT:  Well, you certainly found what you say is
21 evidence of some of this behavior post March of 2014, right?
22      MS. NEUMAN:  Yes, your Honor.
23      THE COURT:  Mr. Donziger, if you have anything to say
24 about this, I'll hear it.
25      MR. DONZIGER:  Your Honor, first of all, good

1    afternoon.

2           THE COURT:  Good afternoon.

3           MR. DONZIGER:  I think that once you look beneath what
4    I will call the technological patina of what Ms. Neuman just
5    talked about what Chevron is really looking for is for me to
6    turn over my entire digital life for several years.  We've
7    already been down this road.

8           THE COURT:  You don't have to look beneath the patina
9    to know that.

10          MR. DONZIGER:  Well, you can talk about it from a
11   technical or protocol standpoint, but I'm just pointing out to
12   me there's a larger issue, and I think this Court and all of us
13   are entering very dangerous territory, and I would urge caution
14   and I want to explain why.

15          This post-judgment RICO proceeding began last March.
16   It's now almost ten months ago with a contempt motion.  And you
17   might remember, we were here in May for a hearing and then
18   later in June --

19          THE COURT:  Mr. Donziger, I'm going to stop you right
20   there.  You have made yourself very clear on the subject of the
21   contempt motions, and, in due course, they are going to get
22   decided, but I'm not here for the purpose of having you go
23   through all of that again.

24          MR. DONZIGER:  I'd like to make my argument, if I may.
25          THE COURT:  Well, then, Mr. Donziger, you're either

1  going to respond to the subject for which we came here today;
2  that is to say, the proposed protocol for getting at relevant
3  materials within your digital life or you're not.  But the rest
4  of it I'm not going to hear today.
5           MR. DONZIGER:  I'm in the process of doing precisely
6  that, sir.
7           THE COURT:  Well, get to it right away.
8           MR. DONZIGER:  This is the problem:  You have not
9  ruled on the key issue in this post-judgment proceeding, which
10 is what is the scope of the Court's order with regard --
11          THE COURT:  Mr. Donziger.  Mr. Donziger.
12          MR. DONZIGER:  What?
13          THE COURT:  You know that.  I know that.  Mr. Mastro
14 knows that, and everybody else does.  Now, get to the subject
15 of the terms of this protocol, or don't.
16          MR. DONZIGER:  I have a foundational objection which I
17 reiterate right now.  In terms of the specifics of the
18 protocol, what I would ask this Court to do is to hold off
19 until this issue can be decided by the Appellate Court.
20          THE COURT:  Denied.
21          MR. DONZIGER:  OK.  Well, hold off at least until you
22 can rule so we know what the precise scope of whatever the
23 post-judgment RICO injunction is.
24          THE COURT:  Mr. Donziger, I'm not delaying it.  I'm
25 acting deliberately.  It's taking some time.  I'm doing that in

an effort to be sensitive to concerns you've raised.  I am not putting everything on hold.  No way.  No how.  I've made that clear over and over again.  Now, either address the protocol or don't.

MR. DONZIGER:  Is there a sense from the Court as to when we might see a ruling in this?

THE COURT:  When it's ready, you'll be among the first to know.

MR. DONZIGER:  Because while this issue has been pending decision, Chevron has subpoenaed many people, I'd say 20 people, I've lost track, and conducted a series of depositions that I think, as you know, I've made myself clear, are entirely inappropriate and are designed to dry up funding for legitimate advocacy and dry up our ability to advocate.

What I'm trying to point out is the fact the Court hasn't ruled -- and I recognize you have whatever concerns you have and to the extent you're being careful, I appreciate it, but the fact the Court hasn't ruled --

THE COURT:  And surprising as this may be to you, Mr. Donziger, this isn't my only professional responsibility.

MR. DONZIGER:  I know.  Well, I -- let me just say this:  For this team here, it's the majority of their work and they have been deposing dozens of people and damaging the case, and there's no -- in my opinion, there's no legal basis because the Court has yet to rule --

1          THE COURT:  I know in your opinion there's no legal
2    basis.  You are mistaken.  That's my ruling.  I know you don't
3    like it.
4          MR. DONZIGER:  Well, for there to be discovery in this
5    context, I'm talking about the discovery that's going on as
6    well as what I would call the big enchilada, which is asking me
7    to turn over my entire digital life to them, there has to be a
8    plausible basis, legal basis, from which the Court can hold me
9    in contempt, and in light of the April 2014 order, the
10   clarification order --
11         THE COURT:  There is no clarification order.
12         MR. DONZIGER:  Well, whatever you want to call what
13   you issued on April 25, 2014 which laid out the terms of
14   fundraising for this case.
15         THE COURT:  I disagree with you.
16         MR. DONZIGER:  There's no -- in my opinion, there's no
17   legitimate basis for which to find me in contempt.  Therefore,
18   there's no legitimate basis for discovery.
19         THE COURT:  Mr. Donziger, I know your opinion.  I
20   know your opinion.  I know.  I've ruled on your opinion.  You
21   lost.
22         MR. DONZIGER:  Well, that's why I'm appealing.
23         THE COURT:  Well, it's a free country.
24         MR. DONZIGER:  In terms of the specifics of the
25   protocol, I have numerous objections.  My main objection is

1  foundational.  In terms of specifics, the time -- can I state
2  my specific objection?
3           THE COURT:  Look, Mr. Donziger, I understand that --
4  well, I won't even say what I understand.  I am not here to
5  provide a forum to you except on the point that I want to hear
6  about actually in your interest.  Now, if you don't really want
7  to address that, that's OK.  I'll decide it without anything
8  coherent that you have to say.
9           MR. DONZIGER:  In terms of the specifics of the
10  protocol, may I?
11           THE COURT:  To the extent you've not raised it before,
12  yes.
13           MR. DONZIGER:  So I refer you to a letter I wrote
14  November 8 of last year, Docket 2131, it outlines some of my
15  position.  My main concerns are the search terms are way
16  overbroad.  You know, there's a certain issue --
17           THE COURT:  You were supposed to have met and
18  conferred about search terms, were you not?
19           MR. DONZIGER:  Well, I have a foundational objection.
20           THE COURT:  I don't care about your foundational
21  objection.  You don't in this court.  The foundational
22  objection I have ruled against.  They have a right to conduct
23  appropriate discovery as far as I'm concerned.
24           I know you have an appeal pending in the Second
25  Circuit.  I know their brief is due sometime in March.  That's

J18QCHEo - corrected

1    the way it goes.  You don't have a stay.
2            MR. DONZIGER:  Do you want me to articulate some of my
3    concerns about the protocol or just let it rest on the letter?
4            THE COURT:  It's up to you, but I don't want to hear
5    about this foundational objection any more.
6            MR. DONZIGER:  Aside from that, I have other
7    objections to the protocol.
8            Search terms are way too broad.  The issue with some
9    of these search terms is they're clearly trying to pry into
10   everything I do.  They want to know everything about the case.
11   They want to know what's going on in Canada with our
12   enforcement action.  They want to pry into privileged
13   communications between me and Canadian counsel me and
14   Ecquadorian counsel, me and NGOs that help the Ecquadorians try
15   to execute on their judgment, and this is not appropriate.
16           There might be a narrow area, assuming my foundational
17   objection is not accepted --
18           THE COURT:  Isn't it the case --
19           MR. DONZIGER:  Yes.
20           THE COURT:  -- just remind me, haven't I ruled that
21   you waived any privilege you had here?
22           MR. DONZIGER:  You have ruled that.
23           THE COURT:  OK.
24           MR. DONZIGER:  But I am contesting that.
25           THE COURT:  That's a foundational fact.

1  MR. DONZIGER: Well, I would argue there's no basis
2  for that given that there was never any precise scope of what
3  the post-judgment RICO injunction is, and there's no ruling.
4  THE COURT: I think I have your point.
5  MR. DONZIGER: Do you have any questions or are we
6  good?
7  THE COURT: I have no further questions.
8  I would like to see an alternative proposal if you
9  care to make an alternative proposal. If you don't, I'll deal
10  with what I had, but I want an evidentiary record from a
11  qualified professional so that I can decide this appropriately.
12  I want an affidavit. I'm not questioning your veracity at all,
13  Ms. Neuman, but I want to have a record because you're asking
14  for something that is pretty unusual.
15  I had in mind the possibility of doing something more
16  or less along the lines, though the problem was a different
17  one, of what Judge Wood did in the Michael Cohen matter, in
18  which the special master, Judge Jones, first had the parties,
19  after the search warrant materials were made available to both
20  sides, eliminate from consideration and have produced
21  immediately everything to which there was no objection. I
22  don't see any reason why that can't be done here. And
23  thereafter set up a procedure for handling what in that case
24  were privileged objections. And it worked reasonably
25  effectively, I thought as a spectator.

Case 1:11-cv-00691-LAK-RWL   Document 2149   Filed 01/29/19   Page 16 of 18   16

J18QCHEo - corrected

        But it may be for reasons you've articulated something like that may be problematic here, but I'm not going to reach that conclusion till I have more of a basis to reach such a conclusion than I have today.

        How much time do you need to do that?

        MR. MASTRO:  A week would be plenty of time, your Honor.

        THE COURT:  Fine.

        Then, Mr. Donziger, you can have a week to respond to that.

        OK.  That takes care of my agenda for today.  Thank you, folks.

        MS. NEUMAN:  Thank you, your Honor.

        MR. MASTRO:  Your Honor, I'm sorry.  May I just be heard on one brief point?

        THE COURT:  Yes.

        MR. MASTRO:  As Ms. Neuman pointed out, some of the discovery including from Mr. Zelman, a life coach to Mr. Donziger and his wife, have now confirmed that they received -- that Mr. Zelman, for example, as a life coach received from Mr. Donziger basically a share of his interest in the judgment in exchange for life coach services.  This is directly contrary to the judgment in this case and representations that Mr. Donziger made that, "Oh, I never gave any of my personal interest to anybody."

(212) 805-0300

1          Your Honor, we would like to be able to, based on this
2     new discovery, make at least a supplemental submission to the
3     Court of that discovery because it goes to a blatant and clear
4     violation of the injunction in the judgment and directly
5     contradicts what Mr. Donziger has said to this Court and
6     represented to this Court.
7          THE COURT:  If you have another motion to make, you
8     can make another motion.
9          MR. MASTRO:  This is --
10         THE COURT:  I don't want any supplement.
11         MR. MASTRO:  It's separate --
12         THE COURT:  What I have pending is now fully
13    submitted.  For a variety of reasons, extension to
14    Mr. Donziger, extensions to you.  It took awhile to accomplish
15    that.  Postponement of a hearing.  Mr. Donziger wanted the
16    hearing postponed.  You wanted the hearing postponed, if I
17    remember, at some point.  Things take time.
18         MR. MASTRO:  Understood, your Honor.  And we could
19    proceed in that way.  This is simply a newly discovered --
20         THE COURT:  I understand that, but if you supplement
21    what's already pending, what's already pending is no longer
22    ripe for decision, and I don't want to do that.
23         MR. MASTRO:  I understand, your Honor.
24         THE COURT:  And there are technical requirements about
25    notice.

J18QCHEo - corrected

1    MR. MASTRO:  Understood, your Honor.  Then we'll
2 consult and determine whether to make a very targeted separate
3 motion on this new evidence, but I appreciate the Court's
4 consideration.
5    THE COURT:  OK.  Thank you.
6    MR. MASTRO:  Thank you, your Honor.
7    (Adjourned)

9    I hereby certify that the foregoing is a true and
10 accurate transcript, to the best of my skill and ability, from
11 my stenographic notes.

_____
Official Court Reporter
U.S. District Court