**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHEVRON CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>STEVEN DONZIGER *et al.*,<br><br>Defendants. | 11 Civ. 0691 (LAK) |

**RSPONSE AND DECLARATION IN OPPOSITION TO CHEVRON'S MODIFIED MOTION FOR PERMISSION TO SEIZE AND SEARCH ALL OF DEFENDANT'S ELECTRONIC DEVICES AND ONLINE ACCOUNTS**

Undersigned Steven Donziger hereby opposes Chevron's "modified" motion for permission to seize, "image," and search all of his electronic devices and online accounts.[1] If granted, Chevron's request would result in a massive invasion of privacy and dignity in violation of my Constitutional rights that, as set out below, is entirely unjustified by the circumstances. My opposition remains as it has been: Chevron cannot be given permission to rifle through the privileged and confidential files of its key opponent (and adversarial counsel) on an issue of global public interest, with the lives of thousands of vulnerable Indigenous peoples and farmers in play, presumably seeking some evidence of wrongdoing when we do not know and cannot even know what would constitute wrongdoing under the Court's own facially-conflicted rulings related to the

---

1 Chevron of course seek this relief while an appeal is pending that on Constitutional and other grounds challenges the legitimacy of these post-judgment proceedings essentially from the start. Especially given the magnitude of the Constitutional harms that would result from coercing production of confidential and privileged documents from an avowed litigation adversary, the Court should deny the motion and stay these proceedings entirely for the reasons set forth in Dkt. 2067.

injunction I am alleged to have violated.

In the latest iteration of its decade-long attack campaign, Chevron has used post-judgment proceedings to aggressively conduct discovery and intimidate supporters and allies of the Ecuadorians and their counsel for nearly a year. It has required individuals who made perfectly legitimate and modest investments in the judgment, or offered assistance pro bono to help keep the corporate accountability campaign against Chevron alive, to expend tens or even hundreds of thousands of dollars of their personal funds on legal fees just to ***comply*** with—***not*** to resist—Chevron's overweening discovery demands and abusive litigation tactics. *See* Dkt. 2125 at 2-8 (describing the abuses heaped on Ms. Sullivan, including the insertion by Chevron counsel of false and misleading statements in her largely ghostwritten affidavit). Chevron's campaign already has roundly succeeded at its genuine aim, which, as I repeatedly have advised the Court, has always been to "intimidate and scare off the financial supporters of the case [against it]," Dkt. 1986 (April 2018), impose a "chilling effect on potential funders," Dkt. 2018 (May 2018), and "infiltrate itself into the First Amendment-protected political activities, associations, speech, operational practices, and strategic deliberations . . . [the] distinct interest and advocacy group focused on achieving environmental justice for the pollution left at Chevron's former operations sites in Ecuador," Dkt. 2026 (June 2018).

Chevron's sole basis for this extraordinary post-judgment discovery campaign is the allegation that I was in contempt of this Court's March 4, 2014 injunction for assisting my Ecuadorian clients, in particular the *Frente de Defensa de la Amazonia* (FDA), in its modestly successful efforts to finance ongoing litigation and advocacy against Chevron (including the

payment of a small portion of my own fees).[2] Chevron's claim is a wholly inadequate basis to conduct discovery on many levels. At the most basic level, Chevron's claim is only for civil contempt. The sole purpose of civil contempt, as the Court itself has explained, is to "coerce compliance with a judgment" on a future-going basis. Dkt. 2006 at 13. Thus, a simple order from the Court explaining what fundraising it thinks is or is not allowed would cure the issue and address Chevron's concerns to the maximum extent justified by its claims. The Court has declined to issue such an order, leading to a Kafkaesque situation where the undersigned has no idea what is or is not permissible as regards fundraising while Chevron is authorized to engage in a discovery rampage clearly designed to thwart the advocacy of me and my clients in enforcing the Ecuador judgment in other jurisdictions—enforcement that already has been determined to be legally permissible by this Court, the Second Circuit, Ecuador's Constitutional Court, and Canada's Supreme Court.

Second, for Chevron to prevail on its civil contempt claim the Court would have to find that I acted in violation of a command of the Court that was clear and unambiguous as to leave "no doubt in the minds of those to whom it was addressed [as to] precisely what acts are forbidden."

---

2 While this was Chevron's sole theory in its initial motion, the Court, perhaps sensing the weakness of Chevron's approach, spent the better part of 2018 pushing Chevron to pursue an additional theory, namely discovery in aid of collecting on the $813,000 money judgment the Court has ordered that undersigned, a sole practitioner, must pay to Chevron, which profited $9.1 billion in 2017. While Chevron indulged the Court by pursuing discovery on this theory to some extent, it was always far too limited for what Chevron was really after. The extent of undersigned's assets is uncomplicated and could be detailed and verified in an informal process, as undersigned offered to do in April and May of last year. *See, e.g.*, Dkt. 2002. As described below, what Chevron really wants is illustrated by the gruesomely overbroad scope of its proposed protocol, which would allow it search for and review any document or communication contained the words "Chevron," "Gibson Dunn," "Kaplan," "Mastro," "Lago Agrio," "indigenous," and over 1100 similar terms. To the extent the Court has any concern about the actual extent of my assets, it can deny Chevron's motion and direct Chevron to work with me on a discovery and verification process tailored to confirm the extent of my assets as I have described them.

*Drywall Tapers & Pointers v. Local 530*, 889 F.2d 389, 395 (2d Cir. 1989). As I have repeatedly explained in argument and under oath—all but pleading with the Court to rule on this issue for almost a year—there is no way the Court can make such a finding. Immediately after the original injunction issued in March 2014, the Ecuadorian codefendants and I filed a stay motion expressing our concern that that the broad terms of that injunction (*e.g.*, immediately imposing a constructive trust over everything "traceable to the [Lago Agrio] Judgment," enjoining efforts to "monetize" the Judgment) could be read as prohibiting or effectively blocking the ability to raise funds from investors to sustain the advocacy and litigation efforts against Chevron over its Ecuador contamination. Chevron's response confirmed that it read the injunction to do just that, *i.e*. it would "'prevent the defendants from 'continu[ing] their efforts' to enforce the judgment and from 'attempting to obtain additional financing' for those efforts." Dkt. 1898 at 2. The Court responded by publishing an opinion in which the scope of the key terms (traceable, monetize, etc.) were limited. Considering the operative scope of the term "traceable to the Lago Agrio Judgment," the Court clarified that enjoined funds must be received from a "collection" on the Judgment: "Thus, at least as long as no collections are made in respect of the Lago Agrio Judgment and funneled to Donziger as retainer payments, the NY Judgment would not prevent Donziger from being paid [regular retainer payments], just as he has been paid . . . over the past nine or ten years." Dkt. 1901 at 7-8. The Court at the time was intimately familiar with the financing of the Ecuador case and the fact that my retainer payments "over the past nine or ten years" had always been paid out of funds raised from litigation finance investors. *Id.* at 14 ("This case always has been financed on the movants' side by outside investors.").[3] Considering the scope to the prohibition against

[3] In August 2018, the Court suggested it was re-interpreting "traceability" as understood by the injunction and giving it a dramatically wider scope. Dkt. 2072 at 6. Whatever the merits (or lack thereof) of the Court's new interpretation, it is inarguable that the new interpretation is

"monetization," the Court clarified that "the point" of this term was to prevent defendants from "avoiding the effect of the constructive trust imposed on assets in their hands that otherwise would have been direct proceeds of the Judgment by selling, assigning, or borrowing on ***their interests*** in the Lago Agrio Judgment and thus at least confusing the issue of traceability." *Id.* at 10 (emphasis original). In other words, it too was limited to the context of a collection (wherein "traceability" would be a concern), and in any event it could only apply to the interests specifically held by the three defendants before the Court, not the interests of other beneficiaries of the Judgment, like the FDA. Such other beneficiaries or interest-holders were, the Court said, "virtually unconstrained by the [injunction] in their ability to attempt to fund their litigation efforts against Chevron by continuing to sell shares in anything that may be recovered for whatever investors are willing to pay."

In the context of such emphatic and unambiguous assurances, it cannot possibly be unreasonable for me to have assisted the FDA in raising funds for critical litigation and advocacy work by financing its own interest to investors and by "being paid . . . just as [I] ha[d] been paid . . . over the past nine or ten years." Even if there were a colorable argument (and there is not) that the fund-raising and fee payments to me were improper under the injunction, it cannot be said that the injunction, in light of the Court's words in the April 2014 opinion, left "no doubt in the mind" that such fund-raising and payments were prohibited.

In short, there is no plausible basis for the sole claim that serves as the foundation for this entire discovery misadventure. I have appropriately stood on this objection, especially in light of the unconstitutional harm overtly and intentionally worked by the Court's increasingly absurd

---

impossible to reconcile with the earlier one. If "traceable to the Lago Agrio Judgment" was understood as broadly as the Court now suggests in Dkt. 2072, it would have necessarily applied to the "retainer payments" that the Court expressly authorized in Dkt. 1901.

refusal to rule and explain its views on Chevron's sole underlying claim. My primary response to Chevron's egregious new motion to seize, image, and search all of my devices and online accounts is to maintain this position.[4] Even though Chevron has already improperly obtained mountains of privileged and confidential material through its unfettered discovery against third parties, it cannot be right, and would not be ethical, for me to relinquish yet more information that Chevron is plainly not entitled to, and that would further damage the important associational and other rights not just of myself but of my clients and so many others.

Without desisting in any respect from the foregoing objections, I write further on two points. First, I highlight just a few of the many reasons that Chevron's proposal to seize my devices and its proposed protocol for searching them are abusive, disturbing, and run afoul of the First Amendment and this Court's own instructions as expressed in the hearing of January 8, 2018. Second, I respond briefly to some of the numerous falsehoods and exaggerations that Chevron uses to justify its proposal.

---

4 Moreover, it is as a practical matter impossible to apply the basic requirements of relevance and undue burden without knowing the basic scope of the applicable injunction and its critical terms. For example, if the Court's original understanding of the "traceable to the Lago Agrio Judgment" as only applicable to "direct proceeds" on a "collection" on the judgment remains law of the case, as it should, a tremendous amount of Chevron's discovery is obviously irrelevant because there has been no collection on the Judgment.

The same need to understand the basic contours of what is prohibited by the injunction precedes any ability to consider discovery in the vein of Chevron's more newly-minted and disturbing suggestion that any activity that it thinks amounts to "pressure" on Chevron is independently prohibited by the injunction, even though the injunction says nothing of the sort and the implications of such an effect would be deeply unconstitutional. *See, e.g.*, Dkt. 2125 at 20-24 ("Chevron essentially pretends that the RICO Opinion should be read as a 500-page injunction prohibiting any and all conduct that the Court and/or Chevron found (incorrectly, I still maintain) to be illegal or improper."). Chevron cannot be allowed to collect sweeping discovery on this theory before the Court has ruled whether the injunction generally prohibits "pressure" the way Chevron seems to think.

The Protocol

As already noted, any claim that Chevron's proposal is in any way limited or tailored to only seek information related to my compliance with the Court's injunction (whatever the precise scope may be) is nothing short of laughable. I raise the following objections, while reserving the right to contest the protocol in more detailed terms if my preliminary objections are addressed and an actual production of devices and accounts appears imminent:

- Under the terms of its protocol, Chevron does not even try to hide that it arguably would have direct access to every document on my devices whether related to the Ecuador matter or not—not even close to the "Michael Cohen" model that the Court requested in the January 8, 2018 hearing. Chevron and its expert (along with a supposed "third-party" neutral that under Chevron's proposal would have no screening ability independent of the Chevron expert) would ultimately be able to view any document, including all those containing any of over one thousand terms many of which are ridiculously overbroad in light of my professional life—terms such as "Chevron," "FDA," "Frente," "Aguinda," "Lago Agrio," "indigenous," "court," and the like. It's hard to imagine any document generated by my work on this case that would not contain at least one of the terms in the Chevron list. The intentional overbreadth—which Chevron has failed to cure despite the Court's urging at the recent hearing—reveals this exercise for what it is: a request for permission to range freely through all of my files and communications.
- Chevron and its counsel also propose to review any document containing the terms Gibson Dunn, Kaplan, and even "Mastro." While such review clearly serves Mr. Mastro's prurient interest in learning what I might have said about him in private,

it just as clearly does not serve any legitimate inquiry into whether my fund-raising activities ran afoul of the Court's injunction or not.

- Chevron would search for and could view any document to, from, or containing the name of any of my clients, including the FDA and the named individual plaintiffs and community leaders I have worked with for decades, see Dkt. 2122-1, without the slightest attempt to institute any protection against the production of core privileged attorney-client communications.
- Chevron would search for and view any document to, from, or containing the name of my legal counsel and co-counsel at various stages of this litigation (including Deepak Gupta, Rick Friedman, Aaron Page, Martin Garbus, Alan Lenczner, etc.) without the slightest attempt to institute any protection against the production of core privileged attorney-client communications.
- Further laying bare the extent of its use of this court's discovery order to engage in an intimidation campaign against its adversaries, Chevron would search for information about individuals and advocacy organizations with no connection to the Court's injunction or its alleged violation, but who otherwise advocate for legal accountability for Chevron and other multinationals (*e.g.*, Oil Change International, Simon Taylor (founder of Global Witness), Friends of the Earth), likely in the hopes of digging up "dirt" that it can use in separate attacks on those individuals and organizations. Chevron even has the audacity to propose searching for documents containing "ELAW", an Oregon-based non-profit organization that Chevron targeted in discovery in 2011 despite the utter lack of any evidence of wrongdoing or even of a substantive connection to the case. The earlier attack was considered

so abusive that a federal court issued sanctions and ordered Chevron to pay ELAW's legal fees.

- The Court should be insulted that Chevron continues to insist on Spencer Lynch and Stroz Friedberg to serve as experts for its proposed protocol. Lynch's previous work, far from validating his expertise, puts him at the heart of the egregious fraud that Chevron and Gibson Dunn appear to have worked with Alberto Guerra in the RICO proceeding. This has been explained elsewhere *see, e.g.*, Dkt. 1936, *see also* Dkt. 1941-2, and cannot be fully elaborated here. But in brief, Mr. Lynch was at the center of Gibson Dunn's perhaps unprecedentedly detailed efforts to "prepare" Mr. Guerra for his RICO testimony with at least 53 days of coaching and to scrutinize all his devices, accounts, and records for evidence supporting the truthfulness of his testimony. It is now abundantly clear that Guerra completely fabricated his bribery story, so much so that the Court has gone out of its way to try to bolster its RICO judgment even accepting the falsity of Guerra, emphasizing that "the testimony of Guerra was far from indispensable to the judgment rendered in this case." Dkt. 1959 at 12.[5] The notion that Guerra was such a sophisticated schemer that he could have completely hid every shred of evidence from the lawyers and experts who were combing through his testimony and records is absurd. It is far more likely that Mr. Lynch encountered substantial evidence that disproved or at least challenged Guerra's invented story, but that he and the Gibson

[5] A proper response would have involved the Court formally striking its bribery findings, or at least demanding that Chevron and Gibson Dunn produce Guerra for further questioning and otherwise explain their conduct. The Court seems content with the fact that is has issued a false bribery finding against a New York attorney who is now facing disbarment proceedings based centrally on that finding.

Dunn team withheld this information from the Court (as well as from the undersigned and his counsel), ultimately resulting in this Court's endorsing fabrication as fact at the heart of its RICO judgment. Mr. Lynch also engaged in highly irregular and unprofessional conduct during the investor-state arbitration between Chevron and the Republic of Ecuador, "forgetting" to list the serial numbers of five UBS flash drives used by the Ecuador trial judge that undermined the Guerra testimony about a flash drive being used to transfer the trial judgment. The Court should refuse to entertain Mr. Lynch's participation as an expert in any capacity in this matter.

- Chevron claims that despite his ethical failings with regard to the Guerra situation, Mr. Lynch's participation is required because "a high level of expertise and case-specific knowledge are required" to avoid the "risk that potentially relevant material is missed." Mot. at 5. The alleged "complexity" of the discovery challenges here is completely manufactured as part of Chevron's scheme to sidestep the court's limiting instructions. We are talking here about a discovery process that should be linked to a few factual claims on a *motion*, not even an entire complaint. A reviewer does not need to understand the entire history of this case, and even if she or he did, there is no reason why the relevant understanding could not be obtained merely by reading this Court's highly-detailed RICO judgment or a memo drafted by Chevron. In Chevron's imagination, young Spencer Lynch is the only person on the planet capable of handling the factual complexity of this case. Chevron also seems to believe he is also the only litigation technologist capable of handling the advanced technologies that Chevron—with no good reason—wants to use. But

there are literally dozens of firms in the United States that possess the same technical expertise as Stroz Friedberg but would come without the rank conflicts that Mr. Lynch's participation raises. Any of these firms would be genuinely independent. Chevron wants Mr. Lynch precisely because he is *not* independent. Rather he has repeatedly demonstrated his willingness to subordinate himself fully to Chevron's Guerra fraud and larger litigation attack strategy.

- The limited added "protection" of a having a genuinely independent professional basically sitting in the room while Mr. Lynch would review all my devices and accounts is meaningless and wasteful: if a genuinely independent professional is being retained, that person could simply perform the work and avoid all of the issues raised by Mr. Lynch's glaring conflicts and problematic history. In practice, Mr. Lynch would use his supposed expertise (especially if this Court were to endorse his appointment as "necessary" despite his conflicts and ethical shortcomings) to take control of the process and run it precisely according to Chevron's wishes. The proposed protocol also fails because it exposes Mr. Lynch—a long-time dedicated agent of Chevron—to *all* the documents, effectively exposing them all to Chevron. This Court and certainly undersigned can have no confidence that even if the genuinely independent expert raised an objection to the production of some irrelevant document, and even if the independent expert ultimately prevailed and the document was not produced, that Chevron would not otherwise come to know of the document by way of its relationship to Mr. Lynch.
- Despite this Court's clear instructions, Chevron refuses to adjust the relevant time period and still openly seeks to leverage its motion, claiming contemptuous conduct

from 2014-2018, in order to access documents back to 2012. Why? Chevron claims it is "necessary" due to the requirements of machine learning. The reason itself is non-responsive nonsense,[6] but also obscures the larger issue, which is that AI/computer-based document review is wholly unnecessary here—or only "necessary" in light of the problem Chevron itself created by serving wildly overbroad discovery requests to expand what should be a limited investigation into discrete allegations into a free-flowing intrusion into all aspects of my and others' advocacy in opposition to Chevron. The number of documents actually relevant to Chevron's narrow contempt claims are limited, appear to have already been produced by Ms. Sullivan, and could easily be reviewed by hand (by independent reviewers) without any need for complex technology assistance and at far less expense.

Other Falsehoods and Exaggerations

Chevron supports its claim that its protocol (and the use of Mr. Lynch) is necessary with a continuous flow of falsehoods, exaggerations, and demonizations of my character. As I have said before, if I responded in full to every attack from Chevron, my life and my professional work would involve nothing else—Chevron has been paying to generate these attacks and drown me in them for over a decade. As usual, I will only address a few but for the record I reject all of

---

6 Chevron states that "In [Mr. Lynch's] opinion, machine learning engines (such as predictive coding or concept clustering) trained with one set of documents from one timeframe (for example, the last two years) cannot be effectively used to search documents from another timeframe (for example, prior years), as the machine will have learned only the terms, persons or groupings, etc., from the timeframe studied." Mot. at 8. But the point is not to train "the machine" on a limited time frame in order to have it review the whole timeframe, but to limit to the time frame in toto. Obviously whatever technology Mr. Lynch wants to use can be applied to a selected time frame and produce results from that time frame.

Chevron's attacks as false and distorted and reserve the right to elaborate my objections to them more fully if it becomes necessary and if the necessary time and resources become available. Chevron lumps its own attacks on me into four categories. Mot. 1-2.

- **"[T]he sheer pervasiveness of Donziger's Chevron-related activities as an aspect of his daily activities."** This allegation, at the top of Chevron's list, is wonderfully revealing. It is strikingly obvious that to Chevron this is the true "crime" for which it has attacked me so relentlessly for over a decade. I highlight it here also because it neatly reveals how blind Chevron and Gibson Dunn have become to the limited scope that should prevail in this discovery process on a motion of limited scope. The proper scope is not *all* my Chevron-related activities, but rather the *discrete litigation funding deals* which I have candidly acknowledged from the very beginning of this process and about which Chevron now already has complete information from Ms. Sullivan (who was intentionally provided with all information related to all deals) and from the litigation funders themselves. ***Chevron has what it needs*** to make out any claim of non-compliance with the injunction. If it needs more, it can specify what it needs and work with me to get sufficient information or confirmation to alleviate its concerns. If it can articulate a genuine basis for concern about any hidden deal or hidden assets (there are none), it could propose narrow searches targeted at such concerns. Instead, Chevron reveals that it is dealing with a "universe of potentially responsive documents" that includes all of my "Chevron-related activities"—and then claims it must use Mr. Lynch and all sorts of intrusive protocols and technologies to be able to comb through such a vast universe. This is offensive to me personally, offensive to my

clients in Ecuador, offensive to the Constitution, and even offensive to this Court given its clear instructions at the January hearing.

- **"Donziger's strategy of obstruction, recalcitrance, and express disregard for this Court's Judgments and orders."** Chevron further claims that I have "refused to meet-and-confer." Again, this is false. I have repeatedly offered to engage with Chevron to get it documents it might legitimately need to address the discovery demands as to my assets or alleged non-compliance with the injunction. *See, e.g.*, Dkt. 2002 (opposing Chevron's first motion to compel by arguing that "the parties should first seek resolution of these objections through the meet-and-confer process rather than seek a resolution from the Court in the abstract" and proposing "to provide Chevron with a descriptive summary or guidance as to my relatively simple financial condition, backed up by documentation"). It is only when Chevron makes the absurdly overbroad discovery demands reflected in its protocol—all documents related to "Chevron," "FDA," "indigenous," "court," "press release," etc.—that the meet-an-confer process has broken down, always by Chevron and always by rushing to this Court for an order to coerce undersigned rather than accept any compromise. Throughout its motion, Chevron desperately attempts to paint my principled objections to the legitimacy of this proceeding—carefully explained by me in countless filings and now articulated on appeal—as "obstruction." The reality is that I am not simply rolling over and doing what Chevron wants: exercising my legal rights and putting forth valid objections, in Chevron's view, is obstruction.
- **"Donziger's efforts to conceal his misconduct through the use of code names, elliptical emails, deletion of documents, and use of applications (such as**

**WhatsApp) intended to minimize email traffic."** This is a tired, pathetic, dated, and worn-out argument. The issue of the occasional use of non-specific descriptors (hardly "code names") arises from the fact that Chevron admits to deploying a virtual army of private investigators and "solutions" providers—spies—against me and others in its counterinsurgency operations against the Ecuadorians and their counsel in this case. Some of these investigators wear suits and work in corporate offices, like those from Kroll; others are intentionally located in Mexico and elsewhere, in order to beyond the reach of U.S. law and not bound by U.S. prohibitions on wire-tapping and other activities. In short, those working for the Ecuadorians have for a long time had plenty of reason to believe that their communications are being monitored by Chevron agents; the refusal of this Court to order Kroll to turn over the "20 to 30" reports commissioned by Chevron covering most all aspects of my life and associations, as well as Chevron's outright surveillance of me and my family in the run-up to the RICO trial, explains a lot of the good-faith basis for this belief. Further, Chevron has an egregious history of abusing individuals and organizations who have assisted or offered to assist the Ecuadorians, especially funders, as a means of intimidating them into withdrawing their support and even joining Chevron's demonization campaign against me as the only way, in the recent words of Ms. Sullivan (after spending $170,000 of her personal savings on lawyers) for Chevron's attacks "to be over as quickly as possible." Dkt. 2125 at 2-8; see generally Dkt. 2026 at 5-12 (describing Chevron's history of abuses). Thus it is entirely unsurprising—and unproblematic—that I (and others) would take precautions to avoid Chevron learning about the identities of

individuals interested in assisting the Ecuadorians. The same logic applies to the notion of deleting sensitive information that might be improperly obtained and viciously distorted by Chevron, as Chevron has proven so eager to do over the years. Until March 2018 there was no preservation order in place and no prohibition on deleting or otherwise managing sensitive material—it would have been *an entirely reasonable and legitimate choice* for me and others to delete most if not all of our communications, as many individuals choose to do. Thus the striking fact about Chevron's allegations regarding "deletion" or "spoliation"—apart from its failure to mention that it would not have been wrong for me to delete any or even all of my documents prior to March 2018—is that it points to only a ***single*** instance of the ***discussion*** of the deletion of a ***single*** email. That email was deemed sufficiently sensitive for deletion by another individual, not by the undersigned. The reason for the sensitivity was obviously not any wrongdoing but rather the concern that if Chevron learned of the potential financial deal with Elliot Capital Management, discussed in the email, it would quickly move to kill it off through its usual techniques which is indeed precisely what happened. Chevron has no basis to claim any other deletion or pattern of deletion (although, comically, in its desperate search Chevron goes all the way back to totally unproven (and false) allegations of deletion or "missing" material from an expert report apparently filed in the 1782 action against me *more than eight years ago in 2010*). Despite the utter lack of basis, the claim of deletion lies at the heart of Chevron's latest motion and protocol and its insistence on using Mr. Lynch. Mot. at 2, 5, 6, 7, 8, 9. The issue is a complete red herring now that the all potential and actual funders have been

identified.

- **"Donziger's repeated misrepresentations and other discovery misconduct."** As noted above, the fact I have taken well-founded and principled positions in resistance to Chevron's illegitimate and unconstitutional attempt to obtain discovery is not "misconduct." Even if it requires disobeying the Court's order, I have openly told the Court I am willing to do so and undertake a civil contempt finding if it is the only way I can achieve full appellate review of what I believe to be an unlawful course of conduct by Chevron and this Court. Chevron—and the Court—may not like what I have to say, and may wish I did not defend myself and my clients so vigorously. But most people would agree that what is going on here is at the very least extraordinarily unusual: a federal court ordering a solo human rights attorney to turn over all his assets, financial information, emails, text messages, and documents, irrespective of privilege—and to subject himself to a lifetime of monitoring and supervision—*not* to the government, and *not* upon any finding of guilt beyond a reasonable doubt, but rather to the multinational oil corporation that the attorney has opposed as part of a broad social justice campaign, a corporation that has a long history of inflicting reprisals on its social and political enemies. This deeply disturbing situation emerges from a *civil* proceeding in which the Court refused to empanel a jury and produced factual findings which are now acknowledged by almost everyone—including the Court—as being in significant doubt. In these extraordinary and high stakes circumstances, it is right and necessary that I obtain some measure of appellate review before complying with the astonishingly coercive, intrusive, and I would submit historically unprecedented

demands of Chevron and the Court.

I hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that all the foregoing statements of fact are true and correct to the best of my present recollection and understanding.

DATED: January 29, 2019

Respectfully submitted,

*s/ Steven R. Donziger*

Steven R. Donziger
245 W. 104th Street, #7D
New York, NY 10025
Tel: (917) 678-3943
Fax: (212) 409-8628
Email: sdonziger@donzigerandassociates.com

*Pro se*