# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                :
CHEVRON CORPORATION,                            :
                                                :
                           Plaintiff,           :
                                                :
          v.                                    :    11 Civ. 0691 (LAK)
                                                :
STEVEN DONZIGER, *et al.*,                      :
                                                :
                           Defendants.          :
                                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## CHEVRON CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO HOLD STEVEN DONZIGER IN CONTEMPT OF PARAGRAPHS 1 AND 5 OF THE RICO JUDGMENT BASED ON HIS TRANSACTIONS WITH DAVID ZELMAN

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

STERN, KILCULLEN & RUFOLO LLC
325 Columbia Tpke, Ste 110
P.O. Box 992
Florham Park, New Jersey 07932-0992
Telephone:  973.535.1900
Facsimile:  973.535.9664

*Attorneys for Plaintiff Chevron Corporation*

# TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT ...................................................................... 1

II.   FACTUAL BACKGROUND........................................................................... 4

III.  LEGAL STANDARD..................................................................................... 8

IV.   ARGUMENT ................................................................................................. 9

      A.    Donziger's Agreements with David Zelman Violated the Clear and
            Unambiguous Terms of the RICO Judgment............................................ 9

      B.    Donziger's Conduct Is Inconsistent With Even His Own Strained
            Interpretation of the RICO Judgment .................................................... 11

      C.    Donziger's Brazen Breaches of the Court's Order Underscores the Need
            for Contempt Sanctions......................................................................... 15

V.    CONCLUSION........................................................................................... 18

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Chambers v. NASCO,* Inc.,
   501 U.S. 32 (1991) ..................................................................................................8

*Chevron Corp. v. Donziger,*
   974 F. Supp. 2d 362 (S.D.N.Y. 2014), *aff'd,*
   833 F.3d 74 (2d Cir. 2016) ....................................................................................4

*Cordius Trust v. Kummerfeld Assocs., Inc.,*
   658 F. Supp. 2d 512 (S.D.N.Y. 2009) ................................................................17

*F.T.C. v. Verity Int'l, Ltd.,*
   140 F. Supp. 2d 313 (S.D.N.Y. 2001) ................................................................17

*N.A. Sales Co. v. Chapman Indus. Corp.,*
   736 F.2d 854 (2d Cir. 1984) ................................................................................15

*Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.,*
   369 F.3d 645 (2d Cir. 2004) ..................................................................................8

*Ex Parte Robinson,*
   86 U.S. 505 (1873) ................................................................................................8

*S.E.C. v. Princeton Econ. Int'l Ltd.,*
   152 F. Supp. 2d 456 (S.D.N.Y. 2001) ................................................................17

*United States v. City of Yonkers,*
   856 F.2d 444 (2d Cir. 1988), *rev'd on other grounds sub nom.*
   *Spallone v. United States*, 493 U.S. 265 (1990) ................................................16

*Weitzman v. Stein,*
   98 F.3d 717 (2d Cir. 1996) ..................................................................................17

**Statutes**

18 U.S.C. § 1621 ......................................................................................................12

## I.   PRELIMINARY STATEMENT

For months now, Steven Donziger has tried to avoid a finding of contempt by drawing a "distin[ction]" between selling "my clients['] . . . shares in the judgment to finance litigation expenses," which he has (incorrectly) argued is permissible, and "actually selling shares that I owned myself to profit personally," which even Donziger admits is forbidden.  Ex. 1 (May 8, 2018 Hr'g Tr. 17:15-20).[1]  In Donziger's warped view, "the only operative factual question at issue that could provide a basis for a contempt finding on the judgment compliance issue" is if "I have sold any of my interests in the Ecuador judgment."  Dkt. 2051 at 2.  On this, he has sworn: "I have never 'monetized' my contingency interest with an investor in any way."  Dkt. 2122-1 ¶ 8.  And he has represented to this Court that "[n]o documents or other evidence reflect any sort of bargaining related to the dilution of my interest."  Dkt. 2122 at 11.  But new evidence reveals that these statements were false when he made them and that Donziger knew it.  A non-party witness has now produced documents and given testimony proving that Donziger assigned part of his own interest in the Ecuadorian judgment in exchange for personal services that Donziger received in New York.  Donziger's contempt is now beyond any conceivable doubt.

This new evidence shows that Donziger signed over to his personal "performance coach," David Zelman, a specified percentage of what Donziger himself described as "my fees should they be collected."  Ex. 2 (Zelman Response) at 73; Ex. 8 (Zelman Dep. Tr. 66:7).  Zelman, who was introduced to Donziger by their mutual friend and Donziger investor John Van Merken-steijn, is no stranger to litigation around shadowy "investments."  Zelman is currently a defend-

---

[1] Unless otherwise indicated, all citations to Ex. __ are citations to exhibits to the Declaration of Anne Champion.

ant in five cases pending before this Court, in which the Danish tax authority alleges that Zelman, as representative of and the sole participant in certain entities purporting to be pension plans, fraudulently claimed approximately $40 million dollars in Danish tax refunds relating to tax withholdings on dividends from securities that the entities did not own. *See Skatteforvaltningen v. Bareroot Capital Investments LLC Roth 401(K) Plan, David Zelman & Michael Ben-Jacob*, Case No. 1:19-cv-01783-LAK (S.D.N.Y.), Dkt. 1 (Complaint) ¶¶ 13, 40 ($4.3 million); *Skatteforvaltningen v. Vanderlee Technologies Pension Plan, David Zelman & Michael Ben-Jacob*, Case No. 1:19-cv-01918-LAK (S.D.N.Y.), Dkt. 1 (Complaint) ¶ 13 ($14.5 million); *Skatteforvaltningen v. Cantata Industries LLC Roth 401(K) Plan, David Zelman & Michael Ben-Jacob*, Case No. 1:19-cv-01798-LAK (S.D.N.Y.), Dkt. 1 (Complaint) ¶ 13 ($7.4 million); *Skatteforvaltningen v. Battu Holdings LLC Roth 401(K) Plan, David Zelman & Michael Ben-Jacob*, Case No. 1:19-cv-01794-LAK (S.D.N.Y.), Dkt. 1 (Complaint) ¶ 13 ($10.5 million); and *Skatteforvaltningen v. Dicot Technologies LLC Roth 401(K) Plan, David Zelman & Michael Ben-Jacob*, Case No. 1:19-cv-01788-LAK (S.D.N.Y.), Dkt. 1 (Complaint) ¶ 13 ($4.2 million). Van Merkensteijn himself is also a defendant in related Danish tax fraud cases, allegedly participating in nine pension plans (six as the sole participant) that submitted fraudulent refund claims totaling more than $70 million. *See Skatteforvaltningen v. Benina Pension Plan, and John van Merkensteijn*, 1:19-cv-01865-LAK, Dkt. 1 (Complaint) ¶ 39.

Once introduced to Donziger, Zelman leapt at the chance to gain outsized returns, asking Donziger to confirm that "[i]n exchange for my services which would normally cost you $14,000, [y]ou agree to pay me .007% of the potential payout. For example, if the settlement amount was $10,000,000,000, I would collect $700,000." Ex. 3 (DZelman_PJD_0000066). Donziger confirmed this in December 2016—knowing that his claim to any fees stemming from

2

his personal interest in the Ecuadorian judgment belonged not to him but to Chevron.  Dkt. 1875

¶ 1 ("The Court hereby imposes a constructive trust for the benefit of Chevron on all property . . .

that Donziger has received, or hereafter may receive . . . that is traceable to the [Ecuadorian]

Judgment or the enforcement of the [Ecuadorian] Judgment anywhere in the world including,

without limitation, all rights to any contingent fee under the Retainer Agreement and all stock in

Amazonia.  Donziger shall transfer and forthwith assign to Chevron all such property that he

now has or hereafter may obtain.").  In 2017, when Zelman proposed that Donziger assign him a

second interest in the judgment, Donziger expressly warned Zelman that, although Donziger was

willing to proceed, the injunction prohibited this sort of transaction:  "Just to be clear, I am

barred by court order in the U.S. from collecting fees on the matter."  Ex. 4 (DZel-

man_PJD_0000054).

There can thus be no question that Donziger knowingly used his personal interest in the

Ecuadorian judgment to obtain personal services in contempt of Paragraphs 1 and 5 of the RICO

Judgment, even under Donziger's own erroneous interpretation of the Judgment, which he incor-

rectly claims this Court "clarified" in April 2014.  Donziger wrongly contends that this "clarifi-

cation" means that the "Judgment does not have any impact" if "the litigation finance agreements

do not involve Mr. Donziger pledging, assigning, committing, or otherwise collateralizing his

specific contingency interest."  Dkt. 2018 at 2.  But even taking as correct his erroneous interpre-

tation, the evidence shows Donziger has "pledg[ed]" and "assign[ed] . . . his specific contingency

interest" to obtain personal coaching services, breaching his own self-serving interpretation of

the RICO Judgment.

As a consequence, Donziger is in knowing, intentional contempt of this Court's RICO Judgment, and this Court should so hold.  This is but the latest, and perhaps the most brazen, example of Donziger's treatment of the Ecuadorian judgment as his personal cash cow, raising money off that judgment not to support foreign enforcement litigation, but rather to pay himself and his cronies.  He has also committed perjury in an attempt to prevent exposure of his wrongdoing.  Strong measures are needed to end to this abusive pattern.  In order to enforce its Judgment, the Court should hold that the purported transfer was invalid and impose coercive sanctions and damages to compensate Chevron for the losses it has incurred as a result of Donziger's misconduct.[2]

## II.    FACTUAL BACKGROUND

David Zelman is a self-described "performance coach" who created the "Transitions Institute," which offers a "Transitions" program designed to help people who wish to "reinvent" themselves:

> In the end, . . . people need to ask themselves the question, "If I was financially independent and didn't have to work, what would I do with my time?"  You have to have a sense of self-worth that extends beyond what you do for a living.  That's the real creation of wealth.

---

[2]  Donziger's real goal—to personally enrich himself and his associates, not to solve any purported environmental issues in Ecuador—was once again laid bare in recent weeks when his "client" the Amazon Defense Front, an entity created "to support the case" and controlled by Donziger, protested the Republic of Ecuador's decision to (finally) authorize its state-owned oil company to conduct environmental remediation, demanding that "Ecuador refrain from cleaning up" the alleged pollution.  Ex. 7 (*Ecuador Should Not Clean Chevron Spills, Indigenous People Say*, teleSur, Feb. 28, 2019) at 1; *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 399 (S.D.N.Y. 2014), *aff'd*, 833 F.3d 74 (2d Cir. 2016).  This is not the first time Donziger has attempted to stop the Republic of Ecuador's remediation plans.  In response to a report in June 2009 that Ecuador was planning to spend $96 million on remediation, Donziger told the LAPs' Ecuadorian lawyers that they "have to go to Correa to put an end to this shit once and for all."  Dkt. 30-23 at 1–2.  What Donziger and the Amazon Defense Front want is not environmental remediation, but further support from Ecuador "to collect" the fraudulent judgment against Chevron.  Ex. 7 at 2.

Ex. 5 (http://www.transitionsinstitute.com/bio/) (quoting Zelman's book *If I Can, You Can: Transformation Made Easy*); Ex. 8 (Zelman Dep. Tr. 66:7).

Zelman's Transitions program consists of four half-day sessions focusing on different topics (Assessment, Acceptance, Possibility, and Structure), as well as assignments such as conducting interviews about the participants' strengths and weaknesses and answering introspective questions. Ex. 6 (http://www.transitionsinstitute.com/the-format/); Ex. 2 (Zelman Response) at 1, 31-69. The brochure states that the goals of the Transitions program include: "[t]o give a client access to themselves" and "[t]o give a client access to their personal gift." Ex. 2 (Zelman Response at 33).

Donziger and Zelman became acquainted in the fall of 2016 through their mutual friend and Donziger funder, John Van Merkensteijn. Ex. 2 (Zelman Response) at 1. Van Merkensteijn recommended both that Donziger participate in the Transitions program and that Zelman receive a financial stake in Donziger's "outcome." Ex. 8 (Zelman Dep. Tr. at 47:7-20) (Van Merkensteijn was "supporting Mr. Donziger and felt that perhaps [Zelman] could also be of support"); Ex. 9 (JVM 008898).

Zelman, in turn, was focused on the compensation he would receive for his services. Van Merkensteijn sent Zelman a chart from Donziger that showed the agreed contingent return Zelman would receive in exchange for his services. Ex. 3 (DZelman_PJD_0000066-67) (Zelman forwarding chart to Donziger to "clarify our financial agreement"); Ex. 8 (Zelman Dep. Tr. at 61:21-62:1) ("Q. And is the handwriting yours? A. No. Q. Whose handwriting is that? A. John's. Q. And the calculations to the right, those are calculations that Mr. van Merkensteijn sent you? A. Yes."). Under this agreement, Zelman would receive, for example, $700,000 for $14,000 in services if $10 billion were collected. Ex. 3 (DZelman_PJD_0000066). Zelman also

enlisted Van Merkensteijn's assistance in getting Donziger to "focus" on entering into a written agreement and even provided Donziger with an email outlining the terms of the deal in order to "clarify our financial agreement." Ex. 10 (DZelman_PJD_0000068); Ex. 3 (DZelman_PJD_0000066).

On December 23, 2016, Donziger wrote to Zelman to confirm their agreement regarding payment for his services:  In exchange for $14,000 worth of coaching services from Zelman, Donziger would pledge Zelman an interest in the Ecuadorian judgment "from my fees should they be collected." Ex. 2 (Zelman Response) at 73; *see also* Ex. 8 (Zelman Dep. Tr. 95:23-24 ("if he [Donziger] collected fees, I would be compensated"). Zelman's interest was calculated "based on a pro rata proportion of the latest investment round in the case, which values a $250,000 investment as one-eighth of a point in the total claim won by villagers against Chevron," i.e., Zelman would receive 14/250 of one-eighth point. Ex. 2 (Zelman Response) at 73. Donziger explained in no uncertain terms:

> ***Note that I am pledging this amount out of my personal fees from this litigation.***
> Should my personal fees not be recovered from the Ecuador case, you will not be entitled to any recovery of the $14,000. Should a proportion of my fees be recovered, but not the full amount, your recovery will be decreased on a pro rata basis equal to the overall decrease affecting my fees.

*Id.* (emphasis added). Zelman also understood that he would be compensated only if Donziger recovered his personal fees. Ex. 8 (Zelman Dep. Tr. at 95:23-25) ("Again, I – as I understood, if he collected fees, I would be compensated. That was the bottom line."). Zelman accepted these terms the same day. Ex. 2 (Zelman Response) at 73.

Zelman ultimately received from Donziger both this interest in the judgment and an additional $2,000 by check. Ex. 8 (Zelman Dep. Tr. at 80:25-81:11 (Q. To clarify, were you providing 16,000 in total services, 14 of which -- A. 14,000. Q. 14 total? A. Yes. Q. For which you re-

ceived $2,000 via check? A. Yes.  Q. And 14/250th of an eighth of a point in the Ecuador judgment from Mr. Donziger's personal interest? A. I believe that's correct.").  Donziger began the Transitions program in late 2016 while this contingency agreement was being negotiated and completed the program in early 2017 after finalizing the agreement. Ex. 2 (Zelman Response) at 1.  Donziger attended the four sessions of the program at Zelman's office in midtown Manhattan, New York. Ex. 8 (Zelman Dep. Tr. 75:9-75:23) ("Q. And did he engage in the program in the typical fashion, the four separate four-hour sessions?  A. Yes . . . . Q. And where did the sessions take place?  A. In an office that I use in Midtown Manhattan.  Q. So in New York?  A. Yes.).[3]

　　While negotiating these terms with Zelman, Donziger asked on December 21, 2016 if he could "fold another person (thinking my wife) into the same deal?" Ex. 11 (DZelman_PJD_0000051).  On March 2, 2017, Zelman wrote to confirm his compensation for $11,000 in services provided to Donziger's wife, Laura Miller, through an investment in the Ecuadorian judgment on the same terms as before.  Ex. 2 (Zelman Response) at 1, 79.  Zelman understood that these terms had been agreed in principle, though he ultimately accepted $2,000 in cash and Miller's services in connection with preparing a TED Talk as compensation for her Transitions program.  Ex. 8 (Zelman Dep. Tr. 88:21-89:7 ("my understanding was that we agreed in principle"); 90:22-91:22 (Miller ultimately provided services in connection with preparing a TED Talk)).  Miller completed the Transitions program as well.  Ex. 2 (Zelman Response) at 1.

　　Zelman provided further coaching services to Donziger in New York "over lunches" after Donziger completed the Transitions program and sought an additional interest in Donziger's Ecuadorian judgment fees in exchange for these additional services.  Ex. 8 (Zelman Dep. Tr. at

---

[3]　Zelman has also maintained a New York residence through an ownership interest in the Phillips Club for the past seven years.  Ex. 8 (Zelman Dep. Tr. 118:1-15).

92:11-93:7 ("Q. And this $2,000 worth of consulting certificates that you're referring to, what did those relate to?  A. Coaching conversations we had over lunch.  Q. You go on to say, 'It is noted that you [Donziger] are pledging this amount out of your personal fees from the litigation.'  Is that accurate?  A. Yes.")); Ex. 12 (DZelman_PJD_0000424).  Specifically, Zelman proposed a further interest of 2/250 of an eighth of a point in the Ecuadorian judgment out of Donziger's personal fees from the litigation in exchange for $2,000 in additional consulting services.  Ex. 12 (DZelman_PJD_0000424).  Donziger replied that he needed to "confirm the calculation," but stated that he "[a]gree[d] in concept."  *Id.*  In response to this request for a second assignment of a portion of Donziger's fee claim, and when Chevron's first contempt motion was pending [Dkt. 1966], Donziger informed Zelman that he was "barred by Court order" from collecting his fees, stating: "Just to be clear, I am barred by court order in the U.S. from collecting fees on the matter.  It is possible that the situation in that respect could change in a settlement context, but you need to be aware of the risk to you which is high."  Ex. 4 (DZelman_PJD_0000054).  In the end, Donziger agreed to pay Zelman an additional $2,000.  Ex. 8 (Zelman Dep. Tr. at 93:20:25); Ex. 2 (Zelman Response) at 1 (Donziger "agreed to pay [Zelman] an additional $2,000 for ongoing coaching after completing the Transitions Program").  Zelman continues to provide Donziger with coaching services today.  Ex. 2 (Zelman Response) at 1.

## III.    LEGAL STANDARD

Chevron has outlined the standard for contempt elsewhere (*see* Dkt. 2113 at 20), but "[i]t is firmly established that '[t]he power to punish for contempts is inherent in all courts.'"  *Chambers v. NASCO,* Inc., 501 U.S. 32, 44 (1991) (quoting *Ex Parte Robinson*, 86 U.S. 505, 510 (1873)).  "A party may be held in civil contempt for failure to comply with a court order if (1)

the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of non-compliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004) (quotation marks and citation omitted).

## IV.   ARGUMENT

### A.   Donziger's Agreements with David Zelman Violated the Clear and Unambiguous Terms of the RICO Judgment

By using his personal interest in the Ecuadorian judgment to pay for personal services from David Zelman, Donziger violated the clear and unambiguous language of both Paragraph 1 and Paragraph 5 of the RICO Judgment.

Paragraph 1 of the RICO Judgment provides:

> The Court hereby imposes a constructive trust for the benefit of Chevron on ***all property***, whether personal or real, tangible or intangible, vested or contingent, that Donziger has received, or hereafter may receive, directly or indirectly, or to which Donziger now has, or hereafter obtains, any right, title or interest, directly or indirectly, that is traceable to the Judgment or the enforcement of the Judgment anywhere in the world ***including, without limitation, all rights to any contingent fee under the Retainer Agreement*** and all stock in Amazonia. Donziger shall transfer and forthwith assign to Chevron all such property that he now has or hereafter may obtain.

Dkt. 1875 ¶ 1 (emphasis added).  The express language of Paragraph 1 encompasses "all property," including "all rights to any contingent fee under the Retainer Agreement" and requires that Donziger "transfer and forthwith assign" such property to Chevron.  The Court subsequently confirmed what was already clear from the plain language of Paragraph 1:  that "the right to a contingent fee and the fee itself are property" and "were and remain immediately assignable." Dkt. 2072 at 7; Dkt. 2113 at 22.

Instead of transferring and assigning his right to a contingent fee to Chevron, Donziger did the opposite:  He pledged a portion of his contingent fee to a third party as payment for personal services.  As Donziger himself wrote, "I am pledging this amount out of my personal fees from this litigation."  Ex. 2 (Zelman Response) at 73.  Donziger's use of his personal interest in the Ecuadorian judgment—which he himself has acknowledged is subject to the constructive trust—to obtain personal services from Zelman violated Paragraph 1 of the RICO Judgment.  *See* Dkt. 1875 ¶ 1; Dkt. 2125 at 10 (Donziger acknowledging that he "legally didn't own" his interest in the Ecuadorian judgment "as it was subject to the constructive trust").

Donziger has also violated Paragraph 5, which prohibits Donziger from "***undertaking any acts to monetize or profit from*** the [Ecuadorian] Judgment, as modified or amended, or any New Judgment, ***including without limitation by*** selling, assigning, ***pledging***, transferring or encumbering any interest therein."  Dkt. 1875 ¶ 5 (emphasis added).  This prohibition is clear and unambiguous in prohibiting Donziger from profiting in any way from the Ecuadorian judgment, including by "pledging . . . any interest therein."  *Id.*  Here, too, Donziger's own words make clear that he did not comply with the RICO Judgment:  he "pledge[d]" interests in the Ecuadorian judgment to Zelman.  Ex. 2 (Zelman Response) at 73.  In exchange, Donziger received $14,000 in valuable personal services.  *Id.*  Donziger's own use of the term "pledge[d]"—one of the specific activities expressly prohibited by Paragraph 5 of the RICO Judgment—in an agreement monetizing his interest in the Ecuadorian judgment highlights the brazenness of his contempt of this Court's order.

**B.    Donziger's Conduct Is Inconsistent With Even His Own Strained Interpretation of the RICO Judgment**

In response to Chevron's pending contempt motions, Donziger has attempted to defend himself by arguing that paragraph 5 of the RICO Judgment prohibited selling only his own interest in the Ecuadorian judgment (and the interests of the LAP Representatives), and denying that he has sold or monetized his personal interest in the judgment.  Instead, Donziger has represented that the interests in the Ecuadorian judgment that he has sold belong to his client (the Frente de Defensa de la Amazonia).  *E.g.*, Ex. 1 (May 8, 2018 Hr'g Tr. 17:14-18:3, 30:24-31:15); Dkt. 2018 at 2; Dkt. 2125 at 9-10.  In fact, Donziger represented multiple times to this Court that he had never sold his own interest in the Ecuadorian judgment.  Ex. 1 (May 8, 2018 Hr'g Tr. 31:5-7 ("Well, I'm a lawyer and I'm representing to you as an officer of the court right now I have not sold my own shares."); Dkt. 2051 at 2 ("It remains that Chevron has not presented even a scintilla of evidence that I have sold any of my interests in the Ecuador judgment—the only operative factual question at issue that could provide a basis for a contempt finding on the judgment compliance issue.") (July 9, 2018); Dkt. 2125 at 11 ("[T]he documents reflect, just as I have told the Court over and over again, that the finance agreements were careful to pledge only the FDA's interest in the judgment, not mine.") (Nov. 2, 2018).  Donziger has further claimed that under paragraph 1 of the RICO Judgment he is permitted to be paid for legal services out of funds traceable to the Ecuadorian judgment, provided that the funds do not result from a "collection[]" of the Ecuadorian judgment.  *E.g.*, Ex. 1 (May 8, 2018 Hr'g Tr. 18:3-11); Dkt. 2125 at 9.  As Chevron has briefed extensively, Donziger's arguments arise from a misreading of this Court's April 2014 stay order, which did not modify the plain language of the RICO Judgment requiring Donziger to transfer "***all property*** . . . traceable to the Judgment" to Chevron and prohibiting him from "monetize[ing] or profit[ing] from the [Ecuadorian] Judgment . . . by selling,

assigning, pledging, transferring or encumbering *any interest* therein."  Dkt. 1875 ¶¶ 1, 5; Dkt. 2113 at 27-32; Dkt. 2127 at 4-5.

The new evidence Chevron has obtained shows beyond dispute that Donziger did not conform his conduct even to his own unreasonable interpretation of the RICO Judgment and that he lied about it, including under oath, to attempt to prevent this Court from learning about his misconduct.  Contrary to his representations to this Court, Donziger's own interest in the Ecuadorian judgment is exactly what Donziger had pledged to Zelman many months earlier.  Ex. 2 (Zelman Response) at 73 ("I am pledging this amount out of my personal fees from this litigation.") (email dated Dec. 23, 2016).  And Donziger was well aware that the interests he pledged to Zelman were to be paid from fees that he was "barred by a court order in the U.S. from collecting."  Ex. 4 (DZelman_PJD_0000054) (Mar. 27, 2018).

Donziger's clear admissions that the interests he was pledging were derived from his own contingent fees and subject to the RICO Judgment cannot be squared with his sworn declaration to this Court stating that he had pledged only interests belonging to the FDA and never monetized his own interest, establishing both his contempt of the RICO Judgment and perjury.  *See* Dkt. 2122-1 (Donziger Decl.) (Nov. 2, 2018) ¶ 8 ("To the best of my understanding of the relevant transactions, I have never "monetized" my contingency interest with an investor in any way."); 18 U.S.C. § 1621.  And the fact that Donziger perjured himself to try to prevent this Court from apprehending the true facts confirms that he knew he had acted in contempt of this Court's RICO judgment.

Furthermore, Donziger's use of the Ecuadorian judgment to pay for Zelman's personal services to Donziger also contravenes Donziger's other erroneous contention about Paragraph 1 of the RICO Judgment, pursuant to which he claims to be permitted to monetize the Lago Agrio

judgment to fund foreign enforcement litigation despite the constructive trust.[4]  Donziger's obtaining coaching services from a third party to improve his "performance" is by definition not part of any legal service that he was purportedly providing to any client in connection with the Ecuador litigation.  The contents of the Transitions program are purported self-improvement guidelines and bear no relation to the direct provision of legal services in any Ecuador-related matter or otherwise.[5]  Ex. 6 (http://www.transitionsinstitute.com/the-format/); Ex. 2 (Zelman Response) at 31-69); Ex. 2 (Zelman Response) at 1.

For this reason, during Zelman's deposition Donziger objected to the disclosure of the contents of his sessions with Zelman because those sessions involved "really intimate stuff, personal stuff, family stuff, [and] litigation strategy."  Ex. 8 (Zelman Dep. Tr. at 26:10-12).  And since the Zelman deposition, Donziger has claimed that Zelman was his "therapist"—clearly a personal role, albeit one Zelman denied.  *See* Dkt. 2169 at 2; (Zelman Dep. Tr. at 20:19-21:4) (Donziger objecting "I am uncomfortable with those being turned over and I object to them being turned over and I would ask you not to turn them over until we can sort of resolve these issues.  My concern is this goes directly to a privilege we have between us, you being, however you want to describe it, my psychologist, therapist, life coach."); (Zelman Dep. Tr. at 65:23-

---

[4]  There cannot be even a colorable argument that such a distinction could have any relevance under Paragraph 5, which prevents Donziger, without exception, from "undertaking any acts to monetize or profit from the [Ecuadorian] Judgment . . . including without limitation by selling, assigning, pledging, transferring or encumbering any interest therein."  Dkt. 1875 ¶ 5.

[5]  The Transitions Program focuses on a number of aspects of personal development including identifying "important areas of your life; i.e., family, relationships, career, health, finances, etc." and the "goals and dreams for each of these areas."  Ex. 2 (Zelman Response at 57); *id.* at 55 (directing the participant to ask "Who You Are For Others versus Who You Are For Yourself"); *id.* at 45 (asking the participant to identify "Life Determining Events" including "successes," "failures," "family events/relationships," and "major decisions that have shaped your life.").

66:15 ("Q. Are you Mr. Donziger's psychologist?  A. No.  Q. You're not treating him as a psy-chologist?  A. Absolutely not.  Q. Are you Mr. Donziger's life coach?  A. I don't know what you would call a life coach. I'm a transitions coach.  That's what I call myself.  I'm a performance coach. . . .   Q. Okay. And to clarify for the record, you are not Mr. Donziger's treating physician in any sense of the word?  A. Correct."); 117:9-14 ("Q. Are you a licensed psychologist in New York?  A. No.  Q. Do you hold any New York licenses or certifications?  A. No."). Donziger thus pledged his interest in the Ecuadorian judgment to pursue a personal expenditure, not legal activities on his client's behalf.

Donziger's knowledge that such transactions are prohibited by the RICO Judgment is fur-ther confirmed by the fact that this was not the first time that Donziger tried to arrange such a transaction, and that in those earlier efforts he also went to great lengths to disguise its true char-acter.  Donziger attempted to use his interest in the judgment to pay for personal services when he sought to settle his outstanding bill with P. Campbell Ford, a Florida attorney who represented him in probate proceedings relating to a trust established by Donziger's grandfather.  *See* Ex. 13 (PCFord_00020); *see also In Re: Estate of Leon Donziger*, Duval County Docket No. 16-1989-CP-001102-XXX-MA and *Steven Donziger v. Michael Schneider and Ansbacher & Schneider, P.A.*, Duval County Docket No. 16-2013-CA-3792.  In 2014, Donziger owed Ford's firm $124,445 in legal fees. Ex. 13.  Donziger proposed that Ford reduce the debt to a total of $40,000 in exchange for Donziger paying a portion of Ford's outstanding invoice, along with a discretionary bonus to be derived from a collection on Donziger's interest in the judgment:

> In recognition of your good faith and hard work, I will offer you a back-up plan.
> If I get a recovery from the Ecuador matter – and I hope this happens soon but as
> you know there are no guarantees – I will pay you something toward your existing
> invoice.
>
> Along those lines, I would propose that you lower your outstanding invoice by
> one-third (to around $40,000 as I understand it) and hold the amount frozen and in

abeyance.  If I get a recovery from the Ecuador matter, I will pay you that amount outstanding at that time.   If I get a windfall from that matter, I would consider paying you a bonus in my complete discretion.  If I don't get a recovery from the Ecuador matter, we will agree I will have no obligation in that respect.

Ex. 14 (PCFORD_000018).  Ford did not accept Donziger's 2014 offer and in 2017 and 2018, Donziger and Ford were negotiating potential agreements to cancel Donziger's debt to Ford in return for the granting to Ford of a direct interest in the Ecuadorian judgment.  Ex. 15 (Ford Dep. Exhibit 5568); Ex. 16 (Ford Dep. Tr. 61:13-63:24; 78:9-81:4).

That Donziger knew that such a transaction would violate even his own self-serving interpretation of the RICO judgment is confirmed by the fact that he attempted to conceal his improper use of the Ecuadorian judgment to settle his personal debts by proposing that the FDA retain Ford to "advise" Donziger.  *See* Ex. 15 (Ford Dep. Exhibit 5568); Ex. 17 (PCFORD_000023).  Donziger sent Ford a term sheet calling for Ford to cancel Donziger's personal debt in return for entering into the "professional services" agreement with the FDA and receiving an interest in the FDA's share of the Ecuadorian judgment.  Ex. 15 (Ford Dep. Exhibit 5568) (requiring Ford to "Release all fee claims against Donziger and his law firm entities over any and all past work, including the Schneider litigation" in return for an interest in the FDA's share of the Ecuadorian judgment).  Donziger has thus engaged in a knowing and intentional pattern of contempt.

## C.   Donziger's Brazen Breaches of the Court's Order Underscores the Need for Contempt Sanctions

Donziger has made no attempt to comply with the RICO Judgment.  He has failed to comply with the plain text of the Court's order.  And he has committed perjury to try to prevent the evidence of his contempt from being exposed to this Court.  His utter lack of good faith is further underscored by the fact that he also failed to comply with his own claimed (erroneous) "interpretation" of the Court's order—a fact he admitted when he warned Zelman that the fees

out of which Donziger was pledging these interests were subject to a U.S. court order that barred

their collection. Ex. 4 (DZelman_PJD_0000054).  This blatant failure to comply with the

Court's order is the latest instance in an ongoing pattern of disregard for the RICO Judgment and

refusal to stop the underlying racketeering conduct that led to it.  *See* Dkt. 2113 at 33-38.

Donziger's "continuous and obviously willful violation" of court orders provide "ample reason

to conclude that only a stiff remedy would suffice to coerce compliance."  *N.A. Sales Co. v.*

*Chapman Indus. Corp.*, 736 F.2d 854, 857–58 (2d Cir. 1984).

To bring Donziger into compliance with the RICO Judgment, Chevron requests that

Donziger be ordered to pay to Chevron the value of the services he received ($14,000) from Zel-

man in exchange for portions of his interest in the Ecuadorian judgment.  The Court also should

rule that, as an act of contempt in violation of the Court's RICO Judgment, the purported transfer

of Donziger's interest to Zelman is invalid and void, and order Donziger to take steps to rescind

the transfer of his interest to Zelman and to provide Chevron and this Court with a sworn affida-

vit that complies with the requirements outlined in 28 U.S.C. § 1746, without any amendments

thereto, that details all steps taken by Donziger in this regard.

In addition, Donziger should be required to provide Chevron and this Court with a sworn

affidavit that lists any agreements he has entered, discussed or facilitated that allow him to profit

from or monetize the Ecuadorian judgment since entry of the RICO Judgment.  This affidavit,

too, should comply with the requirements outlined in 28 U.S.C. § 1746, without any amendments

thereto.  And to ensure Donziger's continued compliance on an ongoing basis, Donziger should

also be required to submit quarterly reports to Chevron and this Court identifying any other new

or amended agreements he has entered or facilitated that allow him to profit from or monetize the

Ecuadorian judgment and any offers, discussions or negotiations to do so, even if they did not or

do not materialize in a final agreement.  Donziger should further be required to provide to Chevron and this Court a sworn affidavit that complies with the requirements outlined in 28 U.S.C. § 1746, without any amendments thereto, verifying that the information provided in the quarterly reports is complete and accurate and certifying that he has complied with paragraphs 1 and 5 of the RICO Judgment.

To the extent that Donziger fails to comply with these requirements, the Court should impose coercive sanctions until he fully complies.  *See, e.g.*, *United States v. City of Yonkers*, 856 F.2d 444, 459–60 (2d Cir. 1988) (coercive fine of $100 per day, doubling each day to a maximum of $1 million per day), *rev'd on other grounds sub nom. Spallone v. United States*, 493 U.S. 265 (1990); *F.T.C. v. Verity Int'l, Ltd.*, 140 F. Supp. 2d 313, 317–19 (S.D.N.Y. 2001) (Kaplan, J.) (civil contempt sanction of $5,000 per day, increasing to $10,000 per day beyond stated deadline); *S.E.C. v. Princeton Econ. Int'l Ltd.*, 152 F. Supp. 2d 456, 463 (S.D.N.Y. 2001) (ordering continued "confinement [of contemnor] in the Metropolitan Correctional Center on an order of civil contempt" until he turned over assets in compliance with court's order); *Cordius Trust v. Kummerfeld Assocs., Inc.*, 658 F. Supp. 2d 512, 525 (S.D.N.Y. 2009) ("Arrest is an appropriate coercive sanction for civil contempt, so long as its purpose is not punitive but is instead to compel the contemnor to perform the required act." (citation and quotation marks omitted)).

Given Donziger's willful violations of this Court's orders, Chevron also seeks a reasonable award of attorneys' fees and costs it has incurred litigating this motion and uncovering the evidence of contempt. *See, e.g.*, *Weitzman v. Stein*, 98 F.3d 717, 719–21 (2d Cir. 1996).  If this request for relief is granted, Chevron will file a separate motion substantiating the amount of fees and costs.

## V.    CONCLUSION

Chevron respectfully requests that the Court hold Donziger in contempt and enter coercive sanctions to prevent further contempt of this Court's RICO Judgment.

Dated: March 20, 2019                                      Respectfully submitted,

New York, New York                                      GIBSON, DUNN & CRUTCHER LLP

/s/ Randy M. Mastro

Randy M. Mastro
Andrea E. Neuman
200 Park Avenue
New York, New York 10166
Telephone: 212.351.4000
Facsimile: 212.351.4035
Email: RMastro@gibsondunn.com
Email: ANeuman@gibsondunn.com

William E. Thomson
333 South Grand Avenue
Los Angeles, California 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520
Email: WThomson@gibsondunn.com

STERN, KILCULLEN & RUFOLO LLC
Herbert J. Stern
Joel M. Silverstein
325 Columbia Tpke, Ste 110
P.O. Box 992
Florham Park, New Jersey 07932-0992
Telephone:  973.535.1900
Facsimile:  973.535.9664
Email: hstern@sgklaw.com
Email: jsilverstein@sgklaw.com

*Attorneys for Chevron Corporation*