UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHEVRON CORPORATION,

               Plaintiff,

    v.

STEVEN DONZIGER *et al.*,

               Defendants.

11 Civ. 0691 (LAK)

**RESPONSE TO CONTEMPT MOTIONS (DKTS. 2176, 2179)**

      I prepare this limited response in the context of the Court's refusal to grant me, a contempt target defending myself pro se, the additional time I requested to respond to two simultaneously-filed contempt motions totaling nearly 40 pages of briefing, filed by one of the world's most powerful corporations, represented by a sizeable legal team from what is widely regarded as the country's most ruthless top-tier law firm, and expressly seeking that I be imprisoned. While I appreciate the Court's accommodation of three days, I have not been able to review and consider the substance of the motions, in the context of the egregiously bloated record in this case and in these post-judgment proceedings, with the care I would have liked.

      I do, however, agree with the Court that the burden of my response is mitigated by the fact that I have already made my position at this juncture very clear. *See, e.g.*, Dkt. 2118 ("I will be unable to comply with the [Court's] order"); Dkt. 2173-1; Dkt. 2151 at 17. My position arises from the extraordinarily unusual and disturbing—and in my view, patently abusive—context of these proceedings, in which the Court has refused for over a year to rule substantively on the merits of the main contempt motion and instead "held open" the motion as a way of allowing Chevron to

conduct a massive campaign of intrusive discovery on an array of otherwise irrelevant topics targeting core internal deliberations and associational activity of the team of human rights activists and funders seeking to hold Chevron accountable for its contamination in Ecuador. *See, e.g.*, Dkt. 2151 at 1-6; Dkts. 2125, 2118, 2051, 2042, 2034, 2026, 2018, 1986.

While the Court pretends that this abusive discovery is necessary to establish facts going to the merits of the main contempt motion, I have repeatedly explained why this is not the case. Under the interpretation of the RICO Injunction established by the Court's April 2014 Opinion, Dkt. 1901, until there is some sort of a "collection" generating "profits" or "proceeds" on the Ecuador Judgment, no funds are subject to the constructive trust or the anti-monetization provisions of the RICO Injunction (the purpose of which was to "prevent . . . avoid[ance] [of] the effect of the constructive trust"). Only thus could the Court have held, as it did, that nothing in the RICO Injunction "prevent[s] Donziger from being paid, just as he has been paid . . . over the past nine or ten years" and that all other interest-holders in the Ecuador Judgment are "virtually unconstrained by the NY Judgment in their ability to attempt to fund their litigation efforts against Chevron by continuing to sell shares in anything that may be recovered for whatever investors are willing to pay." Dkt. 1901.

I intentionally sought this clarification of the otherwise sweeping language in the RICO Injunction, concerned by Chevron's "boasts" at that time that the Injunction "will effectively block enforcement of the Ecuadorian judgment anywhere on the globe because it will prevent the defendants from 'continu[ing] their efforts' to enforce the judgment and from 'attempting to obtain additional financing' for those efforts." Dkt. 1898 (defendants' reply in support of stay, quoting Chevron's opposition). The Court obviously rejected Chevron's view, and once I received this clarification, I conformed my conduct accordingly. Chevron initiated its discovery process with

*zero* evidence to the contrary, and after a year of intrusive discovery and depositions of every single funder of the Ecuadorians and many other supporters, it can point only to the absurdly *de minimis* issue of my informal arrangement with a friend who helped me and my wife as life coach for a limited period of time. *See infra*. It remains the case that no funds ever have been received by me or my clients in the vein of a "collection" sufficient to trigger the force of the injunction, nor is there *any* evidence that my personal interest was "monetized" as part of any case financing effort. Accordingly, there is no basis to allow discovery—much less constitutionally problematic discovery—into these manufactured contempt claims.[1]

The Court also pretends that this is routine discovery between private parties. It is anything but. The Court seems to have blinded itself to the palpable reality that Chevron is using these post-judgment proceedings as a blank warrant to search the confidential communications of its opponents in a renowned global corporate accountability battle, in the hopes of finding "demonization" material—or to use the process of discovery as a weapon of intimidation targeting supporters and allies with egregious and expensive litigation tactics, as happened with Katie Sullivan and others who have abandoned the litigation as a result. *See, e.g.*, Dkt. 2026. I have clearly articulated the critical First Amendment rights at stake. While I recognize that the Court disagrees, the constitutionally required approach in this context, as I understand it, is for the Court

---

[1] As I have further explained:

> Even if the Court has improperly changed its position and now regards "traceable" as described in its August 15, 2018 Order . . . the Court cannot pretend that it has the ability to travel back in time and make "traceable" mean something different than what was described the April 2014 Opinion. As the Court knows, a finding of contempt against me is only possible if I knowingly and willfully disobeyed a clear and unambiguous order of the Court. In light of the Court's own words to me in its April 2014, it is impossible to maintain that a prohibition against litigation financing was so clear between April 2014 and August 2018 that I might lawfully be found in contempt. As such, the Court should have long ago ruled against Chevron on its original contempt motion.

Dkt. 2118 at 2; *see also* Dkt. 2125 at 8-10.

to allow me to go into voluntary contempt as a matter of principle in order to obtain appellate review of the Court's consequential decisions before critical associational rights are eviscerated. *See, e.g.*, *Vera v. Republic of Cuba*, 802 F.3d 242, 246 (2d Cir. 2015) ("To obtain immediate appellate review of such an order absent § 1292(b) certification, the subpoenaed party must typically 'defy the district court's enforcement order, be held in contempt, and then appeal the contempt order, which is regarded as final under § 1291.'") (quoting *In re Air Crash at Belle Harbor*, 490 F.3d 99, 104 (2d Cir. 2007)).[2] Given the larger context, as explained above and in countless filings, I believe in good faith that it is my ethical obligation to resist simply handing over my computer, phone, and online account passwords, as the Court has demanded, until such time as I can obtain appellate review of the legitimacy of the foundation of these proceedings and the availability of constitutional protection for the associational rights that I believe are at stake.

The foregoing is true despite the three "issues" that I expect the Court will highlight in its forthcoming order, namely: (1) the Court's "forensic" review protocol; (2) my informal email agreement with Mr. Zelman; and (3) my purported "scofflaw" history and attitude regarding discovery orders of the Court, a claim that couldn't be further from the truth. Each of these issues is addressed briefly below.

### 1. *The review protocol*

This has already been briefed to some extent, although as I have made clear, my responses have been limited by the fact that it is my intention to go into voluntary contempt as a matter of

---

[2] More precisely, once I have the benefit of an articulate explanation from the Court as to ***why*** the language from its April 2014 Opinion does not foreclose Chevron main contempt claims (and thus the discovery proceedings entirely), I can make articulate challenges or counter-arguments regarding the same in a motion for reconsideration or motion to vacate, the denial of which is equally appealable as contempt. *See, e.g.*, *First City, Texas-Houston, N.A. v. Rafidain Bank*, 131 F. Supp. 2d 540, 542-43 (S.D.N.Y. 2001) ("Rafidain [Bank] has sought to challenge [the subpoena], first, by going into contempt and, second, by moving to vacate"), *aff'd First City, Texas Houston, N.A. v. Rafidain Bank*, 281 F.3d 48, 52 (2d Cir. 2002) (finding denial of motion to vacate appealable).

principle rather than submit to the review process prior to achieving any appellate review. Accordingly, I have not dedicated my limited time and resources to articulating challenges to the bewilderingly and unnecessarily complex review protocol drafted by Chevron and ordered, in essentially the same form, by the Court. Nor can I dedicate much additional time to the issue here, in light of the limited time available to respond to the motions. I will nonetheless observe that, on account of a number of unavoidable facts, the review protocol, for all its supposed protections, merely disguises a *de facto* authorization for Chevron to rifle through my files largely as it wishes.

The main problem, as I have argued to the Court for months, is the extreme overbreadth of the subpoena requests and the search terms Chevron proposes to use to generate "potentially responsive" documents. The search terms will pull in everything even marginally related to the Ecuador case (*e.g.*, "Chevron," "FDA," "Lago Agrio," "Indigenous," etc.), and specifically target my communications with civil society allies (*e.g.*, "Global Witness," "Earth Rights International," "Pachamama"), my clients (*e.g.*, "Lago Agrio Plaintiffs (collectively, or individually by name)"), my colleagues (*e.g.* "Patricio Salazar," "Alan Lenczner"), and my personal legal counsel in related and unrelated matters (*e.g.*, "Deepak Gupta," "Friedman Rubin," "Martin Garbus," "Gerald Lefcourt"). This will sweep up my entire case file, even material related to my pending bar proceeding, the Canadian enforcement litigation, and strategic plans for other actions designed to impose greater accountability on Chevron for its admitted environmental contamination in Ecuador—the very essence of First Amendment advocacy.

The Court's only response is to say that my concerns are unfounded because "the presence of one or more search terms in any document . . . would result only in that document being subjected to further analysis" and that all documents "would be further screened to determine whether they in fact are responsive and thus subject to production." Dkt. 2171 at 5 n.13. But it

5

appears that under the protocol, these documents would be "screened" *not* by the "neutral expert," whose presence in the process is supposed to appear as a balm for the serious due process violations outlined, but rather by *the very same Gibson Dunn attorneys* who have concocted attacks against me for nearly a decade now, including by effectively manufacturing Alberto Guerra's false testimony in the RICO proceeding, currently the subject of two criminal referral letters to the U.S. Department of Justice. *See, e.g.*, Dkt. 2182. As I understand it, these attorneys will review 10% of the documents directly, and the independent expert will then use the scope of that review to "teach" the computer to review the other documents in a similar fashion. Under the Court's protocol, all "relevant" documents, as that scope is defined by Gibson Dunn attorneys and the Gibson Dunn-taught computer, *will be produced directly to Chevron without any review by the "neutral expert,"* rendering his role utterly meaningless. The overbreadth of the subpoenas themselves give the Gibson Dunn team all they need to mark any document they wish as "relevant" to one or more request. For example, Request No. 21 demands "All DOCUMENTS evidencing or relating to any communication between YOU and any PERSON or ENTITY since March 4, 2014 concerning the ECUADOR JUDGMENT." Close to 100% of my job is arguably somehow "related" to communications "concerning" the Ecuador Judgment. The Court's protocol is designed to look protective, but in reality just flings open the doors for Chevron to explore my files as it wishes.

   2. The Zelman agreement

Chevron has conducted almost a year of scorched-earth discovery against every single funder of the Ecuadorian cause in the last several years, as well as numerous close allies and the individual most closely linked with financing efforts (Ms. Sullivan), to whom I literally turned over everything I had concerning financial matters as part of her job to help re-organize this aspect of the case infrastructure. Despite all this, the only thing Chevron can point to as a result of all this

access (and the millions of dollars it surely has spent on legal fees) is the informal agreement with Mr. Zelman, a friend of a friend, to provide me and my wife with his "life transition" coaching/consulting services and to waive his usual fees in exchange for later compensation in the event that I ever obtained a monetary recovery from my lifelong work on the Ecuador case. To be clear, Mr. Zelman was not and never has been an investor in the case.

This agreement is not in violation of the RICO Judgment for the reasons set out above and repeatedly briefed to the Court: under the April 2014 Opinion, the constructive trust only applies to "profits" or "proceeds" on a "collection," while the anti-monetization provision, the Court itself has explained, is designed to "prevent . . . avoid[ance] [of] the effect of the constructive trust," such that it would not seem to be implicated if the trust is not implicated. Nonetheless, given that the Court's explanation regarding the anti-monetization provision in its April 2014 Opinion was not as clear as its explanation of the limited nature of the constructive trust, I was careful to avoid "monetizing" my own contingency interest in the Ecuador Judgment as part of any litigation financing deal, as I have repeatedly assured the Court.

I understand how the agreement with Mr. Zelman can be seen as a monetization of my interest in the Ecuador Judgment arguably in conflict with the Court's interpretation of the terms of the RICO Judgment, although to be clear I do not concede that it is in conflict. I did not fully appreciate this at the time these services were provided, for reasons I do not specifically recall— although I assume it was because I thought the restrictions of the RICO Injunction were linked, per the April 2014 Opinion, to the context of a collection or recovery. Additionally, my recollection and understanding is that neither Mr. Zelman nor I ever understood the agreement to be legally binding, but rather an expression of the sentiment that his generosity in providing services to me pro bono at a critical transition point in my professional life would be matched with generosity by

me in the event I received a significant monetary recovery.

The Zelman issue is obviously *de minimis*. Rather than waste additional resources litigating the propriety of the agreement (especially in the context of the reigning uncertainty of the scope of RICO Injunction), I believe the wiser course of action is to remove the issue for purposes of the contempt motions by way of an agreement with Mr. Zelman that will make clear that he never had, and/or forfeits and relinquishes, any right, interest, or entitlement he might have, in the Ecuador Judgment. This agreement is being prepared and I believe will be filed with the Court shortly. As both Chevron and the Court have acknowledged, civil contempt is a tool for achieving "compliance with a judgment or order," such that the imposition of contempt where the alleged non-compliance has been cured would be "inappropriate." Dkt. 2006 at 13. Thus, once executed, the Zelman agreement should remove this single shred of arguable non-compliance with the RICO Judgment—the only shred, again, that Chevron has after a years of aggressive discovery—and defeat the motion for contempt on this particular ground.[3]

### 3. *My purported non-compliance with discovery processes*

Finally, I expect that in finally granting Chevron's contempt motion regarding my principled refusal to produce my devices and online account passwords until receiving some measure of appellate review (or articulate explanation from this Court), the Court will continue to seek to cast me as a scofflaw regarding discovery obligations generally, as it did in in a recent Memorandum Opinion. Dkt. 2171. The Court's characterizations in this regard are, in my view,

---

[3] The situation is unusual, of course, given that I am seeking a contempt finding in order to fully appeal the Court's re-interpretation of its April 2014 Opinion. The Zelman agreement, when filed, will obviate this particular ground but leave in place the claim for contempt on the ground that I am refusing to produce by devices and online passwords—which indeed I am, as explained herein. With regard to the value of Mr. Zelman's services, I am willing to negotiate with Chevron to have that amount added to the quantum of the outstanding money judgment they have against me, which I am already unable to pay.

extremely distorted and unfair. The reality is that the massive quantum of confidential, privileged, and personal material that I have produced to Chevron over the years under order of this Court is epic and I would assert unprecedented in the history of civil discovery for a individual. The material encompasses roughly two decades of intensive work and includes extremely private matters such as drafts of the eulogy for the funeral of my mother. Chevron has relentlessly used my personal diary—also turned over by me in discovery—as perhaps the central document in its distorted attacks in the RICO trial and its larger public "demonization" processes over the years. I have sat for deposition by the Gibson Dunn team no less than *19 times*. In the present proceeding, Chevron has complete records from all my bank accounts, has complete records and testimony from all the funders I have worked with over the last few years, and has refused to work with me on narrowing its strategically overbroad requests to a legitimate scope that would allow me to comply consistent with the principled positions I have taken regarding my rights and the rights of the affected Ecuadorian communities.

I must very briefly correct the extremely distorted record of the discovery process in the Section 1782 and RICO proceedings that the Court presented in a recent order. Dkt. 2171. The discovery procedures in those cases were highly oppressive, justified only by a purported urgency to protect certain Chevron individuals that, like so much else, was pure invention. Specifically, when Chevron first sought discovery against me in 2010, my lawyers sought to quash the subpoena on principled grounds. When this motion was denied, my counsel promptly assembled a team of 17 bilingual document reviewers who worked overtime to compile a massive privilege log, simultaneously producing thousands of other non-privileged documents. The Court found that somehow this wasn't enough and issued an order waiving all privilege and work product protection over a career worth of material because my efforts were apparently insufficient under a local civil

rule that had never in history been enforced in such a draconian manner.

As the Court acknowledges, the Second Circuit's affirmance of this outrageous order, which so severely violated the rights and privileges not just of me but of my Ecuadorian clients, was based *exclusively* on the purported urgency of the situation given what Chevron pretended was a quickly moving prosecution of certain Chevron executives for fraud in Ecuador. In fact, as Chevron's top-flight Ecuadorian defense attorneys surely knew, the "prosecution" at the time was effectively a routine request for information that could not have been expected to lead to any action in months or years of time, and in fact has led to no action whatsoever. Similar procedures were initiated against me and countless others, and have not gone anywhere. The "urgency" was yet another falsehood, manufactured by Chevron and cunningly put to use by the Court.

Regarding the present procedure, I have maintained a simple, principled legal objection to the pursuit of discovery without some clarification of the status of the Court's April 2014 Opinion. Until the Court "revisits" or revises this Opinion, there is no basis for any claim for contempt Chevron has or could make, as set forth herein. Regarding the substance of the discovery, my fundamental issue with Chevron's document requests, as I stated in my initial objections, has been their strategic overbreadth. They clearly target internal, confidential documents and communications that are protected by constitutional associational rights. Chevron has never agreed to simply sit down and narrow the requests to information tailored to the few legitimate topics at issue in these proceedings.

## Conclusion

The reality is that my maintenance of principled positions regarding the legitimate scope of discovery and the associational rights at stake here does not amount to contempt of this Court's authority. Obviously I object to the Court's approach, and I honestly do feel that I am being deeply

abused in these post-judgment proceedings. I have relentlessly sought appellate review and will continue to do so. But I acknowledge the authority of the courts and have never suggested that I would not ultimately comply with the Court's orders if my objections are rejected on appeal, just as I have sincerely sought to respect the authority and limits of the Court's RICO decision and injunction even while expressing my views on the illegitimacy and false foundations of the decision, in exercise of my First Amendment rights.

However, the Court has structured these proceedings to effectively block me from obtaining appellate review regarding the lawful scope of the RICO Injunction (and the propriety of the Court suddenly reinterpreting the Injunction four years after its issuance). I cannot defend my rights (in motion practice or in a discovery process) if I literally am not allowed to know what law is being applied to me. My only option, as I understand it, is to defy the Court's order and seek appellate review of any contempt sanction. My understanding is that this process, while involving a contempt finding, can be conducted in a respectful and timely fashion. Chevron obviously wishes otherwise: it requests that the Court impose "significant monetary sanctions" and then order me thrown in jail.

I can only imagine the glee that the image of my imprisonment brings to Chevron executives and certain partners at Gibson Dunn. These individuals also surely consider such an approach to be of no consequence, because they have so fully convinced themselves that I am a criminal, a greedy "plaintiffs lawyer," a "sham artist," what have you. In their vehemence, they seek to drown out the voices of the many people who see things differently. Who, for example, see my decision to use my Harvard Law degree to pursue this case rather than a lucrative corporate career as having something to do with my deep connection with my clients and my long-standing commitment to social justice. Who recognize the critical importance of the energy and strategic

11

insight that I have brought to the Ecuador case in the last 25 years, and who, most importantly, recognize the utterly critical nature of the Ecuador case itself to the dignity and survival of tens of thousands of Ecuadorian indigenous persons and farmers whose lives Chevron has utterly destroyed. If the Court is willing imprison me for standing up to Chevron in the context of the unquestionably disturbing context of these proceedings, it will join Chevron's and Gibson Dunn's merry toast to my total annihilation and humiliation—as they see it. But I will see it differently, and so will many, many others.

I hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that all the foregoing statements of fact are true and correct.

DATED:	April 8, 2019	Respectfully submitted,

*s/ Steven R. Donziger*
Steven R. Donziger
245 W. 104th Street, #7D
New York, NY 10025
Tel: (917) 678-3943
Fax: (212) 409-8628
Email: sdonziger@donzigerandassociates.com

*Pro se*