UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHEVRON CORPORATION,<br><br>            Plaintiff,<br><br>    v.<br><br>STEVEN DONZIGER *et al.*,<br><br>            Defendants. | 11 Civ. 0691 (LAK) |

**OPPOSITION TO MOTIONS TO COMPEL (DKTS. 2187, 2196)
AND MOTION FOR PROTECTIVE ORDER**

The endless drumbeat of Chevron's retaliatory litigation continues. In 2007, when Chevron promised me and the Ecuadorian communities that we would be "sentenced" to "a lifetime of appellate and collateral litigation"[1] if we continued to pursue the environmental case against the company, this apparently is to what it referred. I have unfortunately always had to assume that Chevron ultimately would cross the rubicon and go after my family. Here we are.

This disturbing new litigation front opened against Laura, my wife, is rife with bad faith and ugly harassment. With a campaign of litigious sniping, slander, and falsehoods, Chevron and its "top tier" corporate lawyer bullies are going after my wife essentially for the "crime" of supporting me emotionally and personally for the sake of our family for many years.

The examples of bad faith in Chevron's filings abound, ranging from core deceptions to pointless little lies and distortions that serve no purpose other than demonstrating the company's

---

[1] Chevron Press Release: Chevron Calls for Dismissal of Ecuador Lawsuit, Oct. 8, 2007. See https://www.chevron.com/stories/chevron-calls-for-dismissal-of-ecuador-lawsuit. Note that this was long before Chevron had fully concocted its bogus fraud claims about Cabrera and "ghostwriting," etc.

lack of integrity. As a mere example of one of the little distortions, Chevron's recent filing asserts that "at 11:06 p.m. on April 9, Ms. Miller informed Chevron by email that she would not appear for her deposition [on April 10] as noticed." Dkt. 2196 at 1. Obviously, Ms. Neuman and Mr. Mastro would like the Court to believe that poor Chevron got sandbagged with a deposition cancellation at the very last minute. But in fact, Laura and I had been exchanged a dozen or more emails about the deposition date with Ms. Neuman, in the days prior to the single email Chevron cites for its wholly misleading "11:06 p.m." claim.[2]

I cannot in this motion compile the entirety of Chevron's and Gibson Dunn's harassing and deceptive behavior. I will focus on the tricked-up nature of the core claims in Chevron's motions to compel that it uses to support the proposition that it needs Laura to produce yet more private financial information and to sit for a deposition. Because these core claims are utterly false, and because Chevron has otherwise failed to argue or establish that it has a legitimate need for additional documents and/or testimony from Laura that outweighs the burden on her that providing the same would impose, the Court should deny the motions. I also herein assert spousal privilege over confidential communications made between Laura and I during our marriage, to the maximum extent allowed by law, and request a protective order staying or strictly limiting all discovery efforts against Laura.

Although the protective relief is sought to protect spousal privilege, under the unique circumstances of these post-judgment proceeding, I submit that *all discovery against Laura should be stayed* until the Court articulates whether the interpretations of terms and overall scope of the RICO Injunction dated March 4, 2014 (Dkt. 1875), as set out in the Court's Opinion dated April

---

[2] Most of the emails were sent by me primarily because I planned to attend the deposition just as I have attended (mostly telephonically) almost every other deposition Chevron has taken in the last year. I also communicated on behalf of Laura—as her husband, not as her lawyer. Laura was copied on all my emails and in fact she was either sitting next to me or nearby when I drafted the emails that were openly sent on behalf of us both.

25, 2014 (Dkt. 1901), continue to apply as they should under the law of the case doctrine, or whether a new RICO Injunction is actually being applied (and thus serving as the foundation for basic relevance determinations in ongoing discovery). The Court's decision on this issue—hopefully upholding the law of the case—will obviate most if not all of the objections Laura and I would otherwise need to make in the complex and burdensome context of asserting and defending spousal privilege.  It is simply unfair, and in my view an unconstitutional intrusion into First Amendment rights, for the Court to continue to forestall ruling on this critical issue while authorizing virtually unfettered and harassing third-party discovery by Chevron of almost anybody who has had contact with me or the Ecuadorians plaintiffs.

**Manufactured Claims in the Slavek Declaration and Chevron's Motions**

The "expert" analysis and declaration by Mr. Slavek, Dkt. 2188-1, is a case study in Chevron's and Gibson Dunn's tactics of distortion, obfuscation, and outright manufacture of false "evidence." The declaration provides Chevron with two "marquee" points which it recites repeatedly in its motions and other papers: first, that "Donziger has redirected over $440,000 of his income into Ms. Miller's accounts"; second, that Laura has made a number of transfers of funds from Citibank accounts as to which Chevron already has all the records to "unknown accounts" which, it claims, must be investigated in document discovery and at deposition. Both claims are not just false, but utterly manufactured by Mr. Slavek using obvious and implausible distortions. This is a sadly familiar Gibson Dunn *modus operandi*—the same one Mr. Mastro and his "rescue team" used to manufacture false evidence regarding bribery, "ghostwriting," and the like during the RICO trial.

I already discussed the false nature of the $440,000 figure in an earlier filing. *See* Dkt.

2191.³ For sake of efficiency, I will simply refer to the substance of that filing. Chevron's motion offers no explanation as to why modest money transfers between a husband and wife years before a money judgment liability even existed can be relevant to a process aimed at discovering assets to satisfy the money judgment. Any inferred argument that the transfers are evidence of some hidden savings is defeated by the fact that Chevron has abundant evidence from Laura's accounts showing the funds were used for routine household and personal expenses for things like food, utilities, mortgage, schooling, etc.⁴

Slavek's second bogus "marquee" point recited in Chevron's motions is the claim that Laura has transferred money to various "unknown" bank accounts. Dkt. 2190 at ¶¶ 8-10. This false claim lies at the very heart of the Chevron motions. It goes directly to what is arguably the *least* controversial area of the present litigation: if indeed Laura did maintain additional bank accounts, Chevron would arguably be entitled to learn of their existence and balances as part of its efforts to enforce on the money judgment. Keep in mind that I openly offered to provide Chevron from the very inception of the money judgment enforcement process and in fact provided this kind of information as regards my own accounts almost a year about. But because Laura does *not* use other accounts that Chevron does not know about, Chevron simply hires Mr. Slavek to manufacture the desired allegation. Mr. Slavek did so by falsely claiming that transfers **between accounts that Mr.**

---

³ This filing appears not to have been "strike[n] from the record," as the Court initially ordered based on the invented pretense that I was somehow legally representing my wife when I filed a motion for extension of time to respond on my own behalf. After I made this point in a follow-up letter to the Court, the Court seems to have recognized its error by expressly granting me additional time to respond, but never rescinding its "strike it from the record" order. It appears that that plainly erroneous part of the Court's order will simply fade away. I provide this note simply to maintain my position that the filing (Dkt. 2191) is properly part of the record of these proceedings.

⁴ Nor is there any colorable argument that such use of funds is in any way problematic under the RICO Injunction. As argued in Dkt. 2191, the RICO Injunction as the Court described it shortly after it issued does not "prevent Donziger from being paid, just as he has been paid . . . over the past nine or ten years." Dkt. 1901. As such, I did get paid out of litigation finance funds, as expressly authorized by the Court, and naturally used my remuneration to cover household expenses by transferring some funds to Laura who typically paid many such expenses.

***Slavek acknowledges knowing about*** (and having complete account data for) were transfers to "unknown accounts." *Id.*[5] Perhaps Mr. Mastro and/or Mr. Slavek will offer some sort of "explanation" for this mistake, just as Mr. Mastro "explained" that his team's doctoring of video evidence during the RICO trial—in the Court's own words, "edit[ing] out [words and sentences], both of the clip and of the [provided] transcript right midstream," so professionally that unless "you're paying very close attention" a viewer wouldn't "realize it's been edited"—was a mere clerical error.[6] Unless there is a dramatically different element to the picture than presently appears, the Court, merely to protect its own integrity, should demand that Mr. Slavek, Mr. Mastro, and Ms. Neuman all submit declarations under oath fully explaining how such an obvious (and obviously self-interested) mistake could have come about innocently and why it shouldn't be considered a calculated attempt to deceive the Court subject to sanction.

Chevron's rank bad faith with respect to its two marquee points is more than enough reason for the Court to deny the motions out of hand. The rest of the "facts" that purport to support the Chevron motions largely just recite unexceptional details regarding our family finances (none of which challenge the fundamental fact that Laura has maintained financial independence throughout our marriage even though we of course interact to some degree financially to cover household expenses) and her incredibly limited role—or non-role—as regards my work on the Ecuador case (she was occasionally copied on "case update" emails to a group of family friends and assisted in logistics for a trip to Ecuador in which she and my son participated so that they could better understand the nature of my work and the depth of my commitment to the affected

---

[5]   Laura is also describing this apparent trickery for the Court in her filing in opposition to the motions, which is being sent to the Court via the Pro Se Intake Center as of today's date.

[6]   Unbelievably, despite recognizing the seriousness and obvious intention behind Gibson Dunn's deceptive editing, as captured in the quote provided, the Court went on to accept the "error" mistake and declined to impose any sanction whatsoever.

Ecuadorian communities).[7]

Because Chevron already has all of Laura's bank records from Citibank,[8] and because these records show that there are no significant assets or savings (and certainly no savings or assets traceable to me and potentially available to satisfy the judgment), the Court should not only deny the motions but further order Chevron to cease its money-judgment discovery efforts against Laura. Further, because the evidence offered by Chevron (which has received massive amounts of information from third-parties) only proves Laura's non-involvement in the Ecuador case, Chevron should be ordered to cease all discovery allegedly in service of its contempt motions, at least until the proper scope of discovery can be determined upon issuance of a decision by the Court on the question of whether the RICO Injunction applies as used under the law of the case or whether a new injunction of a new scope is being applied.

**Motion for a Protective Order**

The marital privilege is recognized in New York Civil Practice Law and Rules § 4502(b), which provides: "A husband or wife shall not be required, or, without consent of the other if living, allowed, to disclose a confidential communication made by one to the other during the marriage." Neither husband nor wife can be compelled to disclose a confidential communication made by one

---

[7] Regarding the loan from Roger Waters to Laura, that loan was provided on account of his sympathies for the situation of financial hardship she faced in keeping our family afloat given Chevron's recent attacks on me and my ability to earn a living. While Roger learned of this situation through me and while the loan was no doubt motivated by our friendship, the loan was intentionally and meaningfully provided to Laura, who has made her own decisions regarding how to use the loan proceeds.

[8] If for some reason Chevron does not have records for all of Laura's Citibank accounts, that must be on account of something having to do with the scope of its subpoenas to Citibank or how its attorneys took possession of the records—things over which Laura has no control. As Laura makes clear in her own submission, she has done nothing to block the subpoenas for records to Citibank. While Chevron may claim that it is Laura's burden to produce bank records, the reality is that getting records dating back years is extremely burdensome and costly. Because Chevron has shown that it is able to obtain the records directly from Citibank, and because Chevron would probably seek to obtain bank-produced copies of the records anyway, the Court should require Chevron to bear the burden of obtaining any additional records it thinks it needs.

to the other during their marriage. *People v. McCormack*, 278 A.D. 191, 104 N.Y.S.2d 139, 143 (1st Dept. 1951). Only those communications "which would not have been made but for the absolute confidence in, and induced by, the marital relationship" are privileged. *Atlantic Richfield Company v. Triad Petroleum, Inc*., 113 F.R.D. 686, 687 (S.D.N.Y.1987). "The test is whether the intent exists to rely on the confidence and intimacy of the marital relation in making the disclosure to the partner of the marriage." *McCormack*, 104 N.Y.S.2d at 144.

A significant part of my work on the Ecuador case has involved raising funds to support the litigation—something I have done since 2014 with the express authorization of the Court as provided by the terms of Dkt. 1901. Obviously, as husband and wife, Laura and I have occasionally and casually discussed my work on the case, likely including the fund-raising aspects. Such occasional and casual discussions do not in any way suggest that she is substantively "involved" in fund-raising, nor that she has any particular degree of confidential information. (In any event, there appears to be no confidential information left after Chevron's discovery blitzkrieg against every individual who has invested in the case in recent years.) Nonetheless, the communications between Laura and I would still be confidential and potentially covered by the spousal privilege as set out above. Chevron has repeatedly made clear that it would pursue such communications without regard to spousal privilege.

In the unusual context of the proceedings at this juncture, the Court, in the interest of efficiency, should first decide the preliminary issue of the status of the April 25, 2014 Opinion as law of the case, as this should (as I have repeatedly argued) dispense with the contempt motions entirely, or at least narrow them to far more specific issues of alleged violations of the old or new/implied RICO Injunction, which can then be explored in discovery more precisely, perhaps without needing to wade into spousal privilege issues at all. Under Fed. R. Civ. P. 26(c)(1), "[t]he

court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (A) forbidding the disclosure or discovery; . . . (D) forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters." Courts have considerable discretion in crafting relief under Rule 26(c). In order to guard against the possibility of intrusion into areas covered by spousal privilege, I request that the court issue relief suspending all discovery against Laura until law-of-the-case issue has been decided, or alternatively making clear that only discovery into the most narrow relevant areas of discovery not impacted by spousal privilege be allowed.

**Violation of Fed. R. Civ. P. 5.2**

Finally, I observe for the Court that Mr. Mastro appears to have violated Fed. R. Civ. P. 5.2(a) by filing a document (the Slavek Declaration) that contains the full name of my minor son. Mr. Mastro, like all ECF filers, is warned not to make such a filing, and is required to check a box indicating his notice and consent, each and every time he logs into the ECF system. Courts routinely impose sanctions and monetary fines for Rule 5 privacy violations. *Reed v. AMCO Ins. Co.*, No. 3:09-CV-0328-LRH-RAM, 2012 WL 1964094, at *1 (D. Nev. May 31, 2012); *Weakley v. Redline Recovery Servs., LLC*, No. 09-CV-1423 (BEN) (WMC), at *2 (S.D. Cal. Apr. 20, 2011); *Engeseth v. Cty. of Isanti, Minn.*, 665 F. Supp. 2d 1047, 1048 (D. Minn. 2009). Gibson Dunn can hardly complain of a lack of resources to proof-read its filings for compliance with the rule. I ask the Court to order Chevron to withdraw and redact the filing, and encourage the Court to consider an appropriate sanction.

I hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that all the foregoing statements of fact are true and correct.

DATED: May 7, 2019   Respectfully submitted,

*s/ Steven R. Donziger*
Steven R. Donziger
245 W. 104th Street, #7D
New York, NY 10025
Tel: (917) 678-3943
Fax: (212) 409-8628
Email: sdonziger@donzigerandassociates.com

*Pro se*