UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CHEVRON CORPORATION,

                    Plaintiff,

           -against-                                     11-cv-0691 (LAK)

STEVEN DONZIGER, et al.,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

Randy M. Mastro
Andrea E. Neuman
GIBSON, DUNN & CRUTCHER, LLP

Herbert J. Stern
Joel M. Silverstein
STERN, KILCULLEN & RUFALO, LLC

*Attorneys for Plaintiff Chevron Corporation*

Steven R. Donziger
Defendant *Pro Se*

**Table of Contents**

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    The RICO Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    Prior Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        The RICO Judgment Against Donziger and the LAP Representatives . . . . . . . . 4

        The First Pending Contempt Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        The Default Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        The Second Pending Contempt Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        The Third Pending Contempt Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        The Fourth Pending Contempt Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    Facts Concerning the Pending Motions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        Failure to Assign All Contingent Fee Rights to Chevron . . . . . . . . . . . . . . . . 11

        Monetization and Profiting From the Ecuador Judgment . . . . . . . . . . . . . . . . 16

            Sale of and Attempt to Sell Parts of Donziger's Contingent Fee Interest in

                Exchange for Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

            Sale of and Attempts to Sell Interests to Investors . . . . . . . . . . . . . . . . . 20

                The Role of the Lenczner Firm in Toronto . . . . . . . . . . . . . . . . . . . 25

                Mary Katherine Sullivan and the CWP Account . . . . . . . . . . . . . 26

                Commingling of Client, Personal, and PLLC Funds . . . . . . . . . 28

            Profiting From the Ecuador Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . 29

            The Restraining Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

            The March 5, 2019 Order   the Forensic Inspection Protocol . . . . . . . . . . . . . . 34


Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

    I.      Civil Contempt   General Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

    II.     Disobedience of Paragraph 1 of the RICO Judgment   the 2017 Retainer . . . . . . 36

    III.    Disobedience of the RICO Judgment   Monetizing and Profiting from the

        Ecuador Judgment and Failure to Transfer to Chevron Money Traceable to It . . 40

        A.     Monetization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

            1.     Direct and Attempted Sale of Donziger's Personal Contingent Fee

                Interest in Exchange for Services . . . . . . . . . . . . . . . . . . . . . . . . . 42

            2.     Donziger's Sales and Attempted Sales to Investors of Interests in

                the Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

                (a)    The Stay Opinion Had, and Could Have Had, No Legal

                      Effect on the Plain Text of the RICO Judgment . . . . . . . . 43

                (b)    The Stay Opinion Was Not Intended to Modify, Nor

                      Reasonably Could Have Been Understood as Modifying,

                      the RICO Judgment

                      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

        B.     Donziger Personally Profited from and Failed to Pay Chevron Money

            Traceable to the Ecuador Judgment in Violation of Paragraphs 1 and 5 of

            the RICO Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

    IV.   Disobedience of the Restraining Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

        A.     Legal Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

        B.     Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

V.      Disobedience of the March 5, 2019 Order   The Forensic Protocol ......... 62
VI.     Alleged Continuation of Pattern of Racketeering......................... 63
VII.    Relief.................................................................. 64
        A.      Coercive Sanctions for Disobedience of Orders Requiring Performance of
                Actions Not Yet Performed ................................... 65
        B.      Compensatory Sanctions for Injurious Disobedience............... 65
        C.      Sanctions to Promote Future Compliance....................... 67
        D.      Attorneys' Fees ............................................ 68

Conclusion ......................................................... 69

LEWIS A. KAPLAN, *District Judge.*

Steven Donziger, formerly a lawyer,[1] has led a corrupt effort to extort billions of dollars from Chevron Corporation ("Chevron"). One element of that scheme was the fraudulent procurement of a multibillion judgment from a provincial court in Ecuador (the "Ecuador Judgment"). Chevron brought this action against Donziger and others to enjoin enforcement of the Ecuador Judgment, to prevent Donziger from profiting from his actions, and for other relief. After a lengthy trial on the merits, the Court ruled in Chevron's favor. In consequence, Donziger is subject to a constructive trust and a permanent injunction (the "RICO Judgment") as well as a money judgment for more than $800,000 (the "Money Judgment").

The RICO Judgment has been affirmed on appeal. In the words of the Court of Appeals, "[t]he record in the present case reveals a parade of corrupt actions by the LAPs' [i.e., the Ecuadorian plaintiffs'] legal team, including coercion, fraud, and bribery, culminating in the promise to [Ecuadorian] Judge Zambrano of $500,000 from a judgment in favor of the [Ecuadorian plaintiffs, the] LAPs."[2] Donziger has exhausted all appellate avenues with respect to the RICO Judgment. And

---

[1]

Donziger has been suspended from the practice of law in the State of New York, *Matter of Donziger*, 163 A.D.3d 123, 80 N.Y.S.3d 269 (1st Dept. 2018), the District of Columbia, *Matter of Donziger*, No. 18-BG-967 (D.C. App. filed Sept. 20, 2018) [DI 2091-68, 2091-69], and by this Court. He therefore now represents only himself and no longer may represent the Donziger & Associates, PLLC or any other person or entity. *E.g., Lattanzio v. COMTA*, 481 F.3d 137, 139-40 (2d Cir. 2007).

[2]

*Chevron Corp. v. Donziger*, 833 F.3d 74, 126 (2d Cir. 2016), *cert. denied*, 137 S.Ct. 2268 (2017).

Nor is this the only tribunal to reach such conclusions. To mention one other, an arbitration tribunal under the auspices of the Permanent Court on Arbitration at the Hague, after extensive hearings, found, among many other things, the following:

• "This assessment starts with certain of the Lago Agrio Plaintiffs' representatives, especially Mr Donziger and Mr Fajardo. The evidence before this Tribunal points clearly to the conclusion that *they engaged in prolonged, malign conduct towards*

while the Money Judgment is on appeal, Donziger neither has paid it nor obtained a stay.  So both judgments are fully enforceable.  Accordingly, Chevron has undertaken supplementary proceedings to locate assets to satisfy the Money Judgment, to determine whether Donziger has complied with the RICO Judgment, and to obtain remedies for alleged non-compliance.

Donziger largely has stonewalled Chevron's efforts.  He has disobeyed explicit provisions of the RICO Judgment and defied court process compelling him to provide discovery and to take other actions.  He has ignored the fundamental "proposition that all orders and judgments of courts must be complied with promptly.  If a person to whom a court directs an order believes that order is incorrect the remedy is to appeal, but, absent a stay, he must comply promptly with the order

---

the Respondent's legal system generally and, particularly, the Lago Agrio Court in a manner that almost beggars belief in its arrogant contempt for elemental principles of truth and justice.  It is pointless here to characterise such conduct any further, because these individuals are not the object of the exercise required for this Award under the Treaty applying international law.  Such conduct, as related above, also speaks for itself.  Moreover, others unknown were also involved in the 'ghostwriting' exercise."

- The Ecuadorian "Judge Zambrano actively solicited a bribe from whichever side in the Lago Agrio Litigation would be willing to pay him for issuing a favourable judgment in the Lago Agrio Litigation.  Chevron refused his approaches; but certain of the Lago Agrio Plaintiffs' representatives did not.  It is not proven that Judge Zambrano did receive a monetary consideration actually paid to him before the issuance of the Lago Agrio Judgment.  On a balance of probabilities, however, it is proven that the consideration was a promise to reward him financially at a later date from proceeds to be recovered from the enforcement against Chevron of the Lago Agrio Judgment."

- "Judge Zambrano did not draft the entirety of the Lago Agrio Judgment by himself, as he falsely testified on oath in the RICO Litigation.  The Tribunal finds that Judge Zambrano, in return for his promised reward, allowed certain of the Lago Agrio Plaintiffs' representatives, corruptly, to 'ghostwrite' at least material parts of the Lago Agrio Judgment (with its Clarification).  These representatives included Mr Fajardo and Mr Donziger."  Matter of Chevron Corp. v. Republic of Ecuador, PCA No. 2009-23, Second Partial Award on Track 2 §§ 5.229-5.231 (Aug. 30, 2018) [DI 2082-1] (emphasis added).

3

pending appeal."[3]

The matter is before the Court on four motions by Chevron to hold Donziger in civil contempt.[4]

## Background

### The RICO Judgment

The RICO Judgment imposed a constructive trust on and contains a permanent injunction against Donziger[5] and the two of his former Ecuadorian clients who defended this case (the "LAP Representatives").[6]  Among other things, it (1) enjoins them from seeking to enforce the Ecuador Judgment in the United States, (2) requires Donziger to convey to Chevron all of his right, title and interest in, among other things, (a) shares of Amazonia Recovery Limited ("Amazonia"),

---

[3]

   *In re Payne*, 707 F.3d 195, 206 (2d Cir. 2013) (quoting *Maness v. Meyers*, 419 U.S. 449, 458 (1975) (internal quotation marks omitted)).

[4]

   A fifth contempt motion became moot when Donziger very belatedly executed documents that he had been required by the RICO Judgment to execute years earlier.  DI 2105.

[5]

   Also named as defendants and subject to the judgment are The Law Offices of Steven R. Donziger and Donziger Associates, PLLC.  For ease of convenience, references to "Donziger" include Steven Donziger and these additional defendants except where it is necessary to distinguish among them.  (A search on the New York Department of State Division of Corporations web site indicates that Donziger & Associates, PLLC, is the only New York corporation the name of which includes "Donziger."  Donziger has acknowledged that Donziger & Associates, PLLC is known also as Donziger Associates, PLLC.  DI 2085-1.)

[6]

   DI 1874, DI 1875.

   The LAP Representatives were two of the 47 Ecuadorian plaintiffs.  The other 45 Ecuadorian plaintiffs also were named as defendants in this case but they and most of the others defaulted.

4

a Gibraltar company formed to collect and distribute any proceeds of the Ecuador Judgment, and (b) any contingent fee interest which he has or may acquire with respect to the Chevron dispute, and (3) forbids Donziger and the LAP Representatives from doing any act to monetize or profit from the Ecuador Judgment, including by selling, assigning, pledging, transferring or encumbering any interest in it.  The Money Judgment was entered following the Court of Appeals' decision and reflected taxable court costs.

Three of the pending contempt motions involve Donziger's alleged violation of provisions of the RICO Judgment and a default judgment later entered against the LAPs and other defendants (the "Default Judgment") that foreclose all of them from doing any act to monetize or profit from the Ecuador Judgment or seeking to do so.  One of these three motions involves, in addition, Donziger's alleged contempt of a restraining notice by transferring assets that otherwise could have been used to satisfy the Money Judgment.  That motion seeks also a civil contempt adjudication with respect to Donziger's failure to comply with the requirement that he transfer and assign to Chevron any contingent fee interest that he may have.

The fourth motion arises by reason of Donziger's virtually categorical refusal to comply with court orders to produce documents to Chevron in relation to enforcement of the Money Judgment and investigating Donziger's compliance with equitable provisions of the RICO Judgment.

*Prior Proceedings Relevant to the Pending Motions*

　　　*The RICO Judgment Against Donziger and the LAP Representatives*

The RICO Judgment, in the words of the Court of Appeals in upholding the relief granted, "prohibit[s] Donziger and the LAP Representatives from profiting from the corrupt conduct

5

that led to the entry of the Judgment against Chevron . . . ."[7]  It contains three provisions pertinent here:

- Paragraph 1 imposes a constructive trust on all property that Donziger has "received, or hereafter may receive, directly or indirectly, or to which Donziger [as of the date of the RICO Judgment] now has, or hereafter obtains, any right, title or interest, directly or indirectly, that is traceable to the [Ecuador] Judgment or the enforcement of the [Ecuador] Judgment anywhere in the world."[8]  It requires also that he "transfer and forthwith assign to Chevron all such property that he now has or hereafter may obtain."[9]

- Paragraph 3 directed "Donziger [to] execute in favor of Chevron a stock power transferring to Chevron all of his right, title and interest in his shares of Amazonia," and directed both "Donziger and the LAP Representatives . . . [to] execute such other and further documents as Chevron reasonably may request or as the Court hereafter may order to effectuate the foregoing provisions of this Judgment."[10]

- Paragraph 5 enjoined both Donziger and the LAP Representatives "*from undertaking any acts to monetize or profit from the [Ecuador] Judgment . . . including without limitation by selling, assigning, pledging, transferring or*

---

[7]      *Chevron Corp.*, 833 F.3d at 151.

[8]      DI 1875 ¶ 1.

[9]      *Id*.

[10]      *Id.* ¶ 3.

6

*encumbering any interest therein*."[11]

The RICO Judgment named Donziger and the LAP Representatives.  It did not bind directly the 45 LAPs (i.e., those other than the two LAP Representatives) or the other defendants in this case who did not appear.

*The First Pending Contempt Motion*

Chevron made the first of the pending contempt motions on March 19, 2018.[12]  It there alleged, on the basis of evidence then in its possession, that Donziger was in contempt of paragraphs 3 and 5 of the RICO Judgment by (a) failing to comply with its paragraph 3 obligation to transfer his Amazonia shares to Chevron, and (b) seeking to sell an interest in the Ecuador Judgment to Elliott Management Corporation ("Elliott") and thus undertaking acts to monetize or profit from that judgment.  It contended also that Donziger likely was in contempt of paragraph 5 by other actions.  It therefore sought leave to conduct post-judgment discovery of Donziger and others as to all matters relevant to the enforcement of paragraphs 3 and 5 of the RICO Judgment in order to compile a full evidentiary record.[13]  It sought a civil contempt adjudication and appropriate relief on the basis of the evidence then in hand and anticipated the possibility of future applications as discovery revealed what had transpired.[14]  Its motion was supported in part by a declaration of Lee Grinberg, a portfolio

---

[11]     *Id.* ¶ 5.

[12]     DI 1968; *see also* DI 1966; DI 1967.

[13]     DI 1966 at 16.

[14]     *Id.* at 1, 4, 16.

manager at Elliott, who stated that he had met with Donziger on November 6, 2017, and that Donziger, on that occasion,

> "after informing us of his successful, ongoing efforts to raise millions of dollars from third-party investors to fund his efforts to enforce the judgment he had obtained against Chevron in Ecuador, . . . inquired whether Elliott would provide him with funds for that purpose in exchange for an interest in proceeds that may result from enforcement of the Ecuadorian judgment."[15]

The Court in due course denied the portion of the contempt motion that was based on paragraph 3 of the RICO Judgment in view of the need for further proceedings.[16]  It likewise granted leave to conduct discovery with respect to compliance with paragraph 5, the non-monetization provision.  But it ordered a hearing with respect to the contempt charge based on the Elliott events[17] in order to obtain a fuller understanding of what had occurred with respect to Elliott.  The facts concerning Elliott seemed likely to shed light not only on whether the Elliott approach had been contumacious but on what may have occurred with other possible targets of fund raising efforts.[18]

---

[15]

DI 1967-2 (Grinberg Decl.) ¶ 6.

[16]

DI 2006 at 5-13.

Further proceedings were necessary with respect to Donziger's obligation to transfer the Amazonia shares, *see, e.g.*, DI 2072 & DI 2079, but have been resolved.

[17]

The hearing took place on June 28, 2018 after having been postponed at Donziger's request for over a month.  *See* DI 2006 (setting May 22 hearing); DI 2012 (Donziger application for adjournment); DI 2013 (order adjourning hearing until June 27); DI 2017 (order adjourning hearing from June 27 to June 28 at Chevron's request).

[18]

For example, Chevron's moving papers included a copy of an email from Donziger to Elliott that referred to "a packet of materials that I generally send out to those doing due

*The Default Judgment*

On April 23, 2018   after the filing of the first contempt motion but before the filing of the second   the Court entered the Default Judgment against all of the remaining defendants in the case.   Those enjoined included, among others, all of the plaintiffs in the Ecuadorian litigation (collectively, the "Defaulted Defendants") save the LAP Representatives, who already were subject to the RICO Judgment.   Among other things, it enjoined the Defaulted Defendants "from undertaking any acts to monetize or profit from the [Ecuador] Judgment, . . . including without limitation by selling, assigning, pledging, transferring, or encumbering any interest therein."[19]

The Default Judgment binds the Defaulted Defendants as well as "their officers, agents, servants, employees, and attorneys; and other persons who are in active concert and participation with any of the foregoing."[20]  Donziger is an attorney-in-fact for the Frente de Defensa de la Amazonia (the "ADF"[21]), a Defaulted Defendant and the exclusive beneficiary of the Ecuador Judgment,[22] pursuant

---

diligence on the opportunity," DI 1967-2 at ECF p. 15, but not the materials.  It seemed likely that a hearing might result in production of those materials, which potentially could have had a significant bearing on the contempt motion.  As matters developed, the "packet of materials" was not given to Elliott, and Donziger failed to produce it in response to Chevron's subpoena.  Tr., June 28, 2018 [DI 2062], at 55:15-56:17.

[19]

DI 1985 ¶ 4.

[20]

DI 1985 ¶ 7.

[21]

The ADF is known also as the FDA, the Amazon Defense Front, and the Amazon Defense Coalition or ADC.

[22]

DI 2114-1 at ECF p. 411 (The ADF is "both the exclusive interest-holder of the 10% award made by the Ecuador Judgment . . . and the beneficiary of the environmental remediation award and related awards under the Ecuador Judgment and the Ecuador Trust.").

to a broad power of attorney and retainer agreement executed in November 2017 (the "2017 Retainer").[23]   He therefore is bound by the Default Judgment by virtue of his relationship to the ADF. He is bound by it also to whatever extent he is in active concert or participation with the ADF or any of the other Defaulted Defendants.[24]   And he was bound as well, until he was suspended from the practice of law, as an attorney at law for some Defaulted Defendants.

*The Second Pending Contempt Motion*

On October 1, 2018, Chevron again moved to hold Donziger in civil contempt.[25]  That motion rests on four principal contentions:

*First.*   Donziger is in continuing violation of paragraph 1 of the RICO Judgment in that he never has complied with its command that he "transfer and forthwith assign to Chevron" (a) the 6.3 percent interest in the Ecuador Judgment or any settlement with Chevron granted to him by the ADF in the 2017 Retainer, as well as (b) money paid to him out of funds raised from investors and those to whom he sold or otherwise disposed of interests in the Ecuador Judgment.

*Second.*   Donziger has violated paragraph 5 of the RICO Judgment by acting to monetize and profit from the Ecuador Judgment and paragraph 4 of the Default Judgment by actively participating with the ADF and other Defaulted Defendants in their monetization of that judgment.

---

[23]
       Moreover, as this Court found after trial, Donziger in fact controlled the ADF, at least up to that time. *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 392, 398-99, 423 (S.D.N.Y. 2014), *aff'd*, 833 F.3d 74 (2d Cir. 2016); *see also id.* at 443 (stating that Donziger had prepared a press release issued by the ADF).

[24]
       DI 1875 ¶ 8; Fᴇᴅ. R. Cɪᴠ. P. 65(d)(2).

[25]
       DI 2089; DI 2112.

He is likely to continue to do so.

*Third.*   Donziger has violated, and likely continues to violate, the restraining notice served by Chevron.  The violation of a restraining notice constitutes contempt of court.

*Fourth.*  Donziger is continuing to engage in the same pattern of racketeering activity that led to the RICO Judgment against him.

Chevron argues that civil contempt sanctions are necessary to ensure the cessation of his unlawful activities.

### The Third Pending Contempt Motion

The third contempt motion asserts that Donziger has continued to violate paragraph 1 of the RICO Judgment by failing to assign his rights to a contingent fee to Chevron.[26]  It asserts also that Donziger violated paragraph 5 of the RICO Judgment by treating "the Ecuadorian judgment as his personal cash cow"[27] and signing over to a "performance coach"[28] a share of Donziger's own personal interest in the Ecuador Judgment in exchange for the coach's services.[29]

### The Fourth Pending Contempt Motion

As is evident from prior rulings, Donziger has sought to frustrate Chevron's efforts

---

[26]  DI 2179 at 9-10.

[27]  *Id.* at 4.

[28]  *Id.* at 1.

[29]  *Id.* at 10.

to enforce its Money Judgment and to conduct discovery with respect to Donziger's compliance with the equitable provisions of the RICO Judgment at every turn.[30]   Ultimately, having been left with virtually no choice, the Court directed that Donziger's electronic devices, storage media, and email and other digital accounts be forensically imaged and examined in order to obtain responsive documents.  The history is spelled out in the Court's Memorandum re Forensic Inspection Protocol,[31] familiarity with which is assumed.

Donziger announced in advance that he would not comply with these provisions of the Protocol and has not done so.  The final contempt motion concerns Donziger's intentional disobedience of the Forensic Protocol.

*Facts Concerning the Pending Motions*

*Failure to Assign All Contingent Fee Rights to Chevron*

As detailed in the RICO opinion, Donziger entered into a written retainer agreement concerning the Ecuador case in January 2011 (the "2011 Retainer").[32]  Among other things, it gave

---

[30]

See, e.g., DI 2009; DI 2088; DI 2108.

[31]

DI 2171.

[32]

PX 558 (Retainer Agreement).

The agreement provided that the LAPs retained Donziger & Associates, PLLC.  The ADF and the Asamblea de Afectados por Texaco (the "Asamblea") are collectively defined as "Plaintiffs' Coordinators."  The President of the ADF signed the agreement on behalf of the ADF and Luis Yanza signed the agreement on behalf of the Asamblea.

The agreement provided Donziger's firm (not Donziger personally), "[a]s compensation for its services" in representing the LAPs, the right to a contingent fee determined as follows.  *Id.* ¶ 3(a).  Donziger's firm was entitled to 31.5 percent of The Total Contingency Fee

12

him a right to a contingent fee of 6.3 percent of any monies collected by or available to the LAPs in respect of the Ecuador case.[33]  It was signed on behalf of the LAPs by Pablo Fajardo, who then was Donziger's Ecuadorian counsel, as attorney-in-fact for the LAPs.[34]

In order to ensure that Donziger did not profit from his bribery, fraud and racketeering, paragraph 1 of the RICO Judgment imposed the constructive trust, previously described, on:

"all property, . . . tangible or intangible, vested or contingent, that Donziger has received, or hereafter may receive, directly or indirectly, or to which Donziger now has, or hereafter obtains, any right, title or interest, directly or indirectly, *that is traceable to the Judgment **or** the enforcement of the Judgment* anywhere in the world including, without limitation, all rights to any contingent fee under the [2011] Retainer Agreement."[35]

Moreover, it directed Donziger to "transfer and forthwith assign to Chevron all such property that he now has or hereafter may obtain."[36]

---

Payment ("TCFP").  *Id.*  The TCFP was defined as 20 percent of all Plaintiff Collection Monies ("PCM").  *Id.*  PCM in turn was defined in relevant part as any "amounts paid . . . from Chevron . . . in respect of the Litigation."  *Id.*  The "Litigation" was defined to include the Ecuador litigation, enforcement proceedings in Ecuador and elsewhere in the world, and settlement with Chevron.  *Id.* at 1.

[33]

*Id.* ¶ 3(a).

[34]

*Id.* at 12; *Chevron Corp.*, 974 F. Supp. 2d at 477-78.

[35]

DI 1875 ¶ 1 (emphasis added).

[36]

*Id.*

Donziger failed from 2014 until 2018 to comply with the direction that he "transfer and forthwith assign to Chevron" his contingent fee rights under the 2011 Retainer.  In September 2018, following extensive motion practice[37] and another explicit directive from this Court,[38] he finally did so.[39]  But that was not the end of this problem.

As previously mentioned, Donziger personally (as distinct from his PLLC) in November 2017 entered into the 2017 Retainer with the ADF   not the LAPs.  Thus, the 2017 Retainer differed from the 2011 Retainer both in respect of who was obligated to pay and who had a right to receive any contingent fee.  That 2017 Retainer contractually obligated the ADF (as opposed to the LAPs) to pay Donziger (as opposed to his firm) a contingent fee of 6.3 percent of any funds that the ADF might obtain in respect of the Ecuador litigation.[40]  Yet Donziger did not assign

---

[37]

*See, e.g.*, DI 2046; DI 2047; DI 2075; DI 2076.

[38]

DI 2072.

[39]

Champion Decl. Ex. 1 [DI 2085-1].

[40]

Champion Decl. Ex. 23 [DI 2091-23].

There is no direct evidence of exactly why this new document was executed, but there is abundant circumstantial evidence.

First, the circumstances of the 2017 Retainer were quite different from those of the 2011. At the time the 2011 Retainer was signed on January 5 of that year, no judgment had been entered in Ecuador and there was uncertainty as to who or what would be judgment creditors.  *Chevron Corp.*, 974 F. Supp. 2d at 528.  The Ecuador Judgment, which was entered on February 14, 2011, made the judgment payable 90 percent to a trust (the "Trust") to be established for the benefit of the ADF and 10 percent to the ADF.  PX 400 (Ecuador Judgment) at 186-87.  The purpose of the Trust *corpus* would be to pay the costs of remediation.  And the Trust would be controlled by a board consisting of representatives of the ADF or persons designated by the ADF.  *Id.* at 187.  Accordingly, Donziger stood to benefit from a new contingent fee agreement with the ADF, which is entitled in its own right to 10 percent of any recovery and not only is the sole beneficiary of the Trust, but is

his contingent fee interest under the 2017 Retainer as required by paragraph 1 of the RICO Judgment

entitled to designate its directors, *id.*, and thus to control all of the money, if any ever were realized. (In the past, the ADF, which was founded by Donziger and his close friend, Luis Yanza, was controlled by them. *Chevron Corp.*, 974 F. Supp. 2d at 398-99. No evidence suggests that this is not still the case.)

Second, Donziger and the ADF, on the one hand, and Fajardo, who had signed the original retainer on behalf of the LAPs, as well as organizations of indigenous people whom Donziger previously had claimed to represent, *see* Donziger Decl. [DI 2122-1] ¶ 3 n.1, had had a falling out as evidenced by at least two pieces of evidence.

As an initial matter, Pablo Fajardo, who was the attorney of record for plaintiffs in the Ecuadorian litigation, asserted in a letter to the ADF that (1) Donziger was not a lawyer for the LAPs in Ecuador, (2) neither he nor the ADF represents them, and (3) documents signed by the ADF, purportedly on behalf of the LAPs, including documents purporting to convey interests in the Ecuador Judgment in exchange for investments, were unauthorized. Champion Decl. Ex. 28 [DI 2114-3] at ECF pp. 442-46. While the letter is undated, it speaks in the past tense of an event that is said to have occurred in January 2016. *Id.* at ECF p. 443. Donziger confirms that he is no longer a colleague of Fajardo and indeed that their relationship has soured. Donziger Decl. [DI 2122-1] ¶ 3 n.1 ("My impression is that the UDAPT [a successor entity to the Asamblea] has been 'taken over' in recent years by my former colleague Pablo Fajardo, who often uses the organization as a vehicle to publicly attack me and thus regrettably serve the purposes of his supposed opponent, Chevron."). The 2017 Retainer is dated November 1, 2017, after Fajardo asserted that Donziger and the ADF do not represent the LAPs and that the ADF had no authority on behalf of the LAPs. *See* Champion Decl. Ex. 28 [DI 2114-3] at ECF p. 443.

To comparable effect is a declaration of the affected nationalities in the Province of Sucumbios, Ecuador. It asserts that Donziger and others, including Ermel Chavez, the President of the Administrative Board of the Trust, have acted maliciously and recklessly toward UDAPT and the Ecuadorian plaintiffs, that Donziger is not authorized to represent the nationalities, and that Donziger has failed to comply with a request by UDAPT for "detailed information about all of the money they have managed that belongs to the UDAPT." Champion Decl. Ex. 30 [DI 2114-3] at ECF pp. 455-57. The declaration asserts that Donziger and Luis Yanza "are hereby considered personae non gratae because they failed to defend the collective interest rights of the indigenous nationalities and peasants" in order "to advance their own private and personal interests." *Id.* at ECF p. 456.

In all the circumstances, the Court finds that Donziger obtained the 2017 Retainer from the ADF to ensure that he had a direct and personal contractual right to a contingent fee from it. This was especially desirable in view of the facts that (1) the LAPs had no legally protected right to share in any proceeds of the Ecuadorian litigation and thus no ability to pay any contingent fee, and (2) Donziger could not count on the acquiesence of the LAPs in any payments to Donziger given his falling out with Fajardo, who had represented the LAPs and, indeed, held their powers of attorney. *Chevron Corp.*, 974 F. Supp. 2d at 477 & n.704.

15

nor even disclose its existence in anything approaching a timely fashion.

Production of the 2017 Retainer was called for by several specifications of Chevron's post-judgment document subpoena.[41]  Donziger initially objected to each of those specifications on unsubstantiated and meritless boilerplate grounds and did not disclose the 2017 Retainer[42] although its disclosure was called for.  In due course, the Court ordered Donziger to produce some categories

---

[41]     As the Court pointed out previously, the 2017 Retainer was responsive to Chevron's document Request 26, which required production of "All DOCUMENTS evidencing or relating to any payment, proceeds, compensation, revenue, or any other thing of value YOU have . . . contracted to receive, or have been promised related to any aspect of YOUR involvement in the ECUADOR LITIGATION, ECUADOR JUDGMENT, and/or ECUADOR ENFORCEMENT ACTIONS," among other requests.  DI 1989-1.

[42]     These grounds included, *inter alia*:

- "***Timing.***  Discovery at this time is not appropriate in light of the fact that the supplemental judgment supposedly justifying discovery is currently on appeal," and, as a matter of "common sense," there is "no basis to rush ahead with discovery when there remains a reasonable chance that the underlying judgment will be vacated."

- "***Burdensome approach.***  The approach taken by Chevron . . . is unduly burdensome."

- "***Overbroad and irrelevant.***  Chevron's requests . . . reveal themselves to be a fishing expedition to learn information about the financing of the process of enforcing the [Ecuador Judgment] . . . ."

- "***Privilege.***  Many of the requests are objectionable because they appear to call for the production of information subject to attorney-client privilege, work product doctrine, or common interest doctrine privileges, or that otherwise may reflect the opinions, conclusions, legal theories, mental impressions, or strategic thinking of myself, other counsel, or other individuals whose assistance was required for the development and provision of informed advice protected by the attorney-client privilege."

- "***Logistical burden.***  . . . I have limited capacity to undertake the necessary effort and expense [to produce the required documents]."  DI 1989-2 at 1-3.

of responsive documents, categories that included the 2017 Retainer, by June 15, 2018.[43]  But Donziger failed to produce the 2017 Retainer (or any other documents) as required by the Court's order.  The 2017 Retainer first was mentioned during a deposition of Donziger on or about June 25, 2018.[44]  Chevron brought its existence to the Court's attention in open court on June 28, 2018.[45]  Only shortly thereafter was the 2017 Retainer first produced.  And even then, Donziger failed to assign and transfer his contingent fee rights under that agreement to Chevron as required by paragraph 1 of the RICO Judgment.

*Monetization and Profiting From the Ecuador Judgment*

The pending contempt motions were made at different times.  The information concerning Donziger's activities that Chevron had obtained, principally from non-parties, was greater when the second motion was made.  Some relevant events   for example, the entry of the Default Judgment and a hearing on certain events relevant to the first of the two motions intervened between them.[46]  Nevertheless, to the extent that the pending motions allege that Donziger

---

[43]

DI 2009.

[44]

*See* Champion Decl. Ex. 2 [DI 2121-2] (Donziger Dep.) at 29:2-20, 58:15-60:9.

[45]

*See* Tr., June 28, 2018 [DI 2062], at 70:14-22.

[46]

As will appear, the Default Judgment materially changed the landscape.  *Chevron Corp. v. Donziger*, 37 F. Supp. 3d 653, 661 (S.D.N.Y. 2014) ("Nothing in the [RICO] Judgment prevents the LAPS (*other than the two LAP Representatives who are named in the* [*RICO*] *Judgment*) and their allies from continuing to raise money in the same fashion" as before – i.e., selling shares in any recovery.).  That changed, however, with the entry of the Default Judgment, which bound all of the LAPs, the ADF and others, depending upon circumstances, from such activities.  Donziger has admitted as much.  *Compare* Tr., June 28, 2018 [DI 2062], at 71:5-21, *with* Donziger Dep., June 25, 2018 [DI 2207-1], at 19:8-12

has acted to monetize and profit from the Ecuador Judgment in violation of this Court's decrees, it is convenient to set out the facts, to the extent they are of record, in a single section. The logical starting point is the RICO Judgment itself.

The RICO Judgment, as noted, enjoined Donziger and the LAP Representatives from undertaking any act to monetize or profit from the Ecuador Judgment or seeking to do so.[47] As this Court made clear long ago, it did not constrain the LAPs (other than the two LAP Representatives) or the ADF from doing so,[48] subject only to the Rule 65(d)(2) caveat noted above. Thus, the LAPs and perhaps even the ADF enjoyed broad latitude to seek third party financing in exchange for interests in any recovery. They and their supporters in Ecuador and elsewhere, could have approached established third-party funders, private investors, and others. But Donziger and the LAP Representatives were enjoined from engaging in such efforts. Nevertheless, following entry of the RICO Judgment, Donziger exchanged and sought to exchange portions of the contingent fee interest for services rendered to him and his wife. He resumed selling interests in the Ecuador Judgment and any proceeds thereof to "investors." Moreover, quite a significant amount of the money he thus

---

.

[47]

DI 1875 ¶ 5.

[48]

*Chevron Corp.*, 37 F. Supp.3d at 661 ("Nothing in the [RICO] Judgment prevents the LAPs (*other than the two LAP Representatives who are named in the* [*RICO*] *Judgment*) and their allies from raising money in the same fashion [as previously]." (emphasis added)). That passage was written in response to an argument raised by the LAP Representatives and therefore mentioned only them in the "other than" clause. But the RICO Judgment put Donziger in exactly the same position as the LAP Representatives with respect to monetization of or profiting from the Ecuador Judgment. DI 1875 ¶ 5. In other words, the LAPs who did not appear in this action were free (prior to entry of the Default Judgment) to raise money by monetizing or profiting from the Ecuador Judgment, but the LAP Representatives and Donziger were enjoined from doing so.

raised after he was enjoined wound up in his pocket.

Given Donziger's resistance to discovery that would reveal information about his compliance or non-compliance with the provisions of the RICO Judgment here at issue, it is doubtful that the full extent of Donziger's efforts to monetize and profit from the Ecuador Judgment   or even the full extent of the funds thus raised   is before the Court.  Nevertheless, the following is clear.

*Sale of and Attempt to Sell Parts of Donziger's Contingent Fee Interest in Exchange for Services*

In the fall of 2016, Donziger was introduced to one David Zelman,[49] a self-styled "executive coach."[50]  Donziger began Zelman's "Transitions" program in late 2016 and completed it in 2017.[51]  The program cost $14,000.[52]  Donziger and Zelman agreed that Donziger would pay for the program by granting Zelman "an interest in the Ecuador judgment from [Donziger's] fees should they be collected."[53]  Specifically, they agreed to "14/250 of an eighth of a point" of the total

---

[49]

Champion Decl. Ex. 2 [DI 2180-2] at ECF p. 2.

[50]

*Id.*

[51]

*Id.*

[52]

*Id.* at ECF p. 74.

[53]

*Id.*

Donziger had an assignable and transferable right to a contingent fee from the moment the Ecuador Judgment was entered.  *Chevron Corp.*, 974 F. Supp. 2d at 640 & n.1820.  That right was subject to the constructive trust from March 4, 2014, the date the RICO Judgment was entered, onward.  He conveyed his right under the 2011 Retainer to Chevron in 2018. Champion Decl. Ex. 1 [DI 2085-1].  His failure to convey his rights under the 2017 Retainer is a subject of these motions.  To the extent, if any, that any right to any contingent

recovered.[54]  As Donziger wrote, " I am pledging this amount out of my personal fees from this litigation."[55]  Additionally, Donziger paid Zelman either $2,000 or $3,000 in cash, the record is unclear as to which it was.[56]

In December 2016, Donziger asked Zelman if he could "fold another person ([]my wife) into the same deal."[57]  Zelman charged Donziger's wife, Laura Miller, $11,000 for the program and originally agreed to compensation in the form of another interest in the Ecuador Judgment.[58]  Zelman, however, did not receive this second interest and instead was compensated with $2,000 or $3,000[59] in cash and services provided by Ms. Miller related to preparation for a TED Talk.[60]

---

fee remains in Donziger, it remains subject to the constructive trust and to his other obligations under the RICO Judgment.  Nonetheless, the Court refers to his contingent fee interest and to his interest in the Ecuador Judgment for ease of expression without implying that he actually still has any such interest.

[54]  Champion Decl. Ex. 2 [DI 2180-2] at ECF p. 74.

[55]  *Id.*

[56]  *Compare id.* at ECF p. 2, *with* Champion Decl. Ex. 8 [2180-8] at 79:18-24.

[57]  Champion Decl. Ex. 11 [DI 2180-11].

[58]  Champion Decl. Ex. 8 [DI 2180-8] at 87:2-89:7.

[59]  *Compare* Champion Decl. Ex. 2 [DI 2180-2] at ECF p. 2, *with* Champion Decl. Ex. 8 [DI 2180-8] at 88:2-12.

[60]  Champion Decl. Ex. 8 [DI 2180-8] at 91:1-22.

*Sale of and Attempts to Sell Interests to Investors*

Following the entry of the RICO Judgment, Donziger engaged in persistent efforts to raise money by selling interests in the Ecuador Judgment which, in an effort to avoid contempt liability, he characterizes as assisting his clients to sell their interests in it.[61]  These included: (1) creating an investment opportunity memorandum with the help of Donziger's partner, Aaron Marr Page,[62] that directed all inquiries regarding potential investments to Donziger's attention,[63] (2) instructing Mary Katherine Sullivan to seek out investors by pitching them "a one-eigth [*sic*] of a point in a 12b[illion] judgment," or a "50x multiple," on a $250,000 investment,[64] (3) arranging an "Ecuador Investor Call" to discuss his "commitment to source funding from a significant capital partner or partners who will give our team the ability to put additional pressure on Chevron in and out of the courtroom," and "raising a round of $500k to $1m to bridge us to the larger capital

---

[61]

Tr., June 28, 2018 [DI 2062], at 33:15-34:24.

[62]

Champion Decl. Ex. 92 [DI 2091-92] at ECF p. 2.

Some aspects of Page's involvement with Donziger were discussed previously in the opinion after trial, 974 F. Supp. 2d at 410 n.198, 421, in an opinion before trial, 970 F. Supp. 2d  214, 225, 232 n.89 (S.D.N.Y. 2013), in an opinion before trial concerning non-party discovery, No. 11-cv-691 (LAK), 2013 WL 1087236, at *18 n.161, and in *In re Naranjo*, 768 F.3d 332, 345-46 (4th Cir. 2014).

[63]

Sullivan Decl. [DI 2116] ¶ 16; Champion Decl. Ex. 14 [DI 2114-2] at ECF pp. 18-23.

[64]

Champion Decl. Ex. 13 [DI 2114-2] at ECF p. 16; *see also* Sullivan Decl. [DI 2116] ¶ 15.

raise,"[65] and (4) communicating directly with investors[66] to flog his "investment opportunity"[67] shares of any recovery in the Ecuador case in exchange for cash.  As he explained to one potential investor in response to an inquiry as to exactly what he was selling, Donziger wrote that "[s]hares are a percentage of the total claim owed which is now a little over $11b," with "[e]xpenses [to] come off the top."[68]

These efforts included also an approach to Elliott Management that took place as a result of Mary Katherine Sullivan, who met Donziger and became involved in some of his efforts. In October 2017, Ms. Sullivan suggested to Donziger that he approach Elliott Management, a well known hedge fund, regarding a possible investment.  Donziger responded enthusiastically, whereupon Sullivan approached someone with whom she previously dealt, Jonathan Bush, as a means of getting to Elliott.  Donziger and Sullivan met with two Elliott portfolio managers.

Donziger offered to sell Elliott an interest in the Ecuador Judgment in exchange for an "investment" by Elliott of an unspecified amount of money, adding that he had raised about $33

---

[65]

Champion Decl. Ex. 15 [DI 2114-2] at ECF pp. 25-26.

[66]

*Id.* Ex. 12 [DI 2114-2] at ECF pp. 7-8.

[67]

*Id*. at ECF pp. 9-14.

[68]

*Id.* at ECF p. 7.

million in that way,[69] part of which he had used to pay himself.[70]  Donziger told Elliott that he had

a 6.3 percent interest in the Ecuador Judgment himself,[71] this notwithstanding that the RICO

Judgment ordered — and still requires — him to transfer that interest to Chevron.[72]

     We now know that Donziger's post-RICO Judgment efforts succeeded to the extent

of raising a minimum $2,367,500 from at least seven people or entities.[73]  Of that total, $791,500

went directly to and remained with Canadian counsel seeking to enforce the Ecuador Judgment

there,[74] $1,525,940 went directly or indirectly to Donziger or Donziger-related bank accounts (i.e.,

---

[69]

Donziger claimed that the $33 million figure he mentioned at the meeting referred to the amount he had raised over the whole course of the Chevron litigation, Tr., June 28, 2018 [DI 2062], at 35:7-12, whereas Grinberg understood him to say that he had raised $33 million "to facilitate enforcement of the judgment." *Id.* at 12:5-13:3.  Donziger claimed also that the figure was high. *Id.* at 35:7-22.

[70]

*Id.* at 33:15-25.

[71]

*Id.* at 21:5-14 (Grinberg), 37:18-24 (Donziger); Champion Decl. Ex. 3 (Grinberg meeting notes) [DI 2058-11].

[72]

In the last analysis, it turned out that Elliott had had little or no interest in Donziger's proposition from the outset.  Indeed, it had agreed to the meeting principally as a favor to Jonathan Bush, Sullivan's associate who had reached out to Elliott. Tr., June 28, 2018 [DI 2062], at 27:25-28:8.

[73]

Slavek Decl. Ex. 2 [DI 2115-1].

[74]

The LAPs have sued to enforce the Ecuador Judgment in Argentina, Brazil and Canada.  They have lost the Argentine and Brazilian cases entirely.  In Canada, they sued both Chevron and Chevron Canada, a seventh tier subsidiary.  As to Chevron Canada, which was not a party to the Ecuador litigation, the LAPs sought a determination that the Ecuador Judgment could be enforced against its stock or assets. The Ontario Court of Appeal upheld a grant of summary judgment dismissing as to Chevron Canada. *Yiaguaje v. Chevron Corp.*, 2018 CarswellOnt 7942 (Can. Ont. C.A.) (WL).  The Supreme Court of Canada recently denied leave to appeal. *Yiaguaje v. Chevron Corp.*, 2019 CarswellOnt 5162 (Can. S.C.C.) (WL); *Yiaguaje v. Chevron Corp.*, 2019 CarswellOnt 5163 (Can. S.C.C.) (WL). Accordingly, the case against Chevron Canada has been concluded.  This Court is not

23

the CWP account, discussed below), and $50,600 appears to be unaccounted for, all as shown on Table 1.  And a few more words are appropriate regarding the manner in which these transactions were structured and the flow of funds before passing on to what happened to the money that went into Donziger's personal and business accounts.

[balance of page left blank]

---

informed about the current status, if any, of the case against Chevron Corporation, although a prior Canadian decision made clear that Chevron itself has no assets in Canada.  *Yaiguaje v. Chevron Corp.*, 2017 ONSC 135 [DI 2114-8 at ECF pp. 93-94, 108].

24

TABLE 1[75]

| Invest. No. | Investor | Agreement Date | Equity Interest | Agreement | | Remained with Canadian counsel | Deposited into Donziger or Donziger-Related Account | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Amount | After Fees | | Amount | Date | Bank | Account Name |
| I | Glenn Krevlin | 5/2/16 | 0.125% | $250,000 | $250,000 | $175,000 | $74,990 | 5/10/2016 | TD | Donziger & Assoc. |
| I | Glenn Krevlin | 7/11/16 | 0.050% | $100,000 | $100,000 | $100,000 | - | | | |
| II | Cliff Eisler | 7/11/16 | 0.125% | $250,000 | $250,000 | $145,000 | $104,990 | 7/19/16 | TD | Donziger & Assoc. |
| III | WDIS Finance LLC | 8/24/16 | 0.165% | $300,000 | $285,000 | $141,500 | $143,490 | 10/6/16 | TD | Donziger & Assoc. |
| IV | Wellbeck Partners | 8/24/16 | 0.110% | $200,000 | $200,000 | $100,000 | $99,990 | 10/21/16 | TD | Donziger & Assoc. |
| III | WDIS Finance LLC | 11/10/16 | 0.055% | $100,000 | $95,000 | $30,000 | $64,990 | 12/19/16 | TD | Donziger & Assoc. |
| V | Indigenous People Ltd. | 11/24/16 | 0.1375% | $250,000 | $237,500 | $100,000 | $137,490 | 2/21/17 | TD | Donziger & Assoc. |
| **Total to or through Canadian Counsel** | | | | **$1,450,000** | **$1,417,500** | **$791,500** | **$625,940** | | | |
| VI | Fenwick (Geo. Waters) | 1/22/16 | 0 | $102,000 | $100,000 | N/A | $50,000 | 1/25/16 | TD | Steven Donziger |
| VI | Fenwick (Geo. Waters) | 2/3/17 | 0.076% | $50,000 | $50,000 | N/A | $50,000 | 2/14/17 | TD | Donziger & Assoc. |
| VI | Fenwick (Geo. Waters) | 12/17/17 | 0.025% | $50,000 | $50,000 | N/A | $50,000 | 12/11/17 | TD | Donziger & Assoc. |
| **Total Fenwick** | | | | **$202,000** | **$200,000** | | **$150,000** | | | |
| VII | CHC LLC (Tony Abiatti and client) | 12/20/17 | 0.25% | $500,000 | $500,000 | N/A | | 1/2/18 | $250,000 | BoA | CWP Assoc. |
| | | | | | | | | 1/5/18 | $250,000 | |
| I | Glenn Kervlin | 1/2/18 | 0.16675% | $250,000 | $250,000 | N/A | | 1/18/18 | $250,000 | BoA | CWP Assoc. |
| **Total CWP** | | | | **$750,000** | **$750,000** | | **$750,000** | | | |
| **GRAND TOTALS** | | | | **$2,402,000** | **$2,367,500** | **$791,500** | **$1,525,940** | | | |

[75] Extracted from Slavek Decl. Ex. 2 [DI 2115-1].

*The Role of the Lenczner Firm in Toronto*

The entry of the RICO Judgment in March 2014 appears to have impacted the structuring of the investment opportunities Donziger was selling.  There is no evidence that the LAPs' Canadian counsel,[76] the Lenczner firm in Toronto, had anything to do with handling or otherwise being involved with money raised from investors before the RICO Judgment was rendered.[77]  Following the entry of the RICO Judgment, that changed.

In early 2016, Donziger began using a form of investment agreement between and among each investor, the Lenczner firm, the ADF, and the Trust and Trust Board President (together with the ADF, the "Ecuador Parties").[78]  The form of agreement names Donziger as the "U.S.

---

[76]

The Canadian action is a suit by the LAPs for recognition and enforcement of the Ecuador Judgment.  The LAPs, including the LAP Representatives, are the only plaintiffs in that action.  *See, e.g.*, Champion Decl. Exs. 81-84 [DI 2114-8] at ECF pp. 87-170 (various Canadian court papers and decisions listing the parties).  Neither the Trust nor the ADF is a party notwithstanding that the Ecuador Judgment purports to be payable 90 percent to the Trust and 10 percent to the ADF, requires that the trustees of the Trust be designees of the ADF, and provides that the ADF is the beneficiary of the Trust.  The LAPs are not judgment creditors.  The question whether the LAPs have standing to pursue the Canadian action is immaterial here.

[77]

Indeed, such evidence as there is, although incomplete, all confirms that it had no such role.  *E.g.*, DeLeon Investment Agreement [PX 543]; Burford Funding Agreement [PX 552]; Bogart Witness Statement [PX 3100] at 2-3 (stating that PX 552 is a true and correct copy of the Funding Agreement entered into and signed by Burford through an indirect subsidiary related to financing counsel in connection with representation of the Lago Agrio plaintiffs).  The Court notes parenthetically that there is no evidence that any money was raised in 2014 and 2015.  *See* Slavek Decl. [DI 2115] ¶ 24.

[78]

Champion Decl. Ex. 6 [DI 2114-1] at ECF p. 411.

Two points about the Trust bear mention.

First, it is difficult to understand how the individual claimants in the Ecuadorian case could have placed their "individual interests" into a trust in 2012 as, at that time, they had none.  *Chevron Corp.*, 37 F. Supp. 3d at 662 & n.39.

Representative" of the Ecuador Parties.[79]  It purports to grant the investor a percentage interest of "any and all funds actually collected by the Ecuador Parties" or related persons by settlement or otherwise in relation to the Ecuador Judgment.[80]  And it stipulates that the Lenczner firm would collect any judgment proceeds obtained anywhere in the world and distribute them per the agreement.[81]  From that point onward, all investor money that was raised until December 2017, to the extent reflected in this record, went into a Lenczner firm account in Canada, which disbursed a good deal of it to Donziger while retaining some, presumably in whole or in part for payment of its own fees.

### Mary Katherine Sullivan and the CWP Account

In December 2017, shortly after the Elliott approach failed, Donziger decided "that Lenczner's firm had been sufficiently compensated and . . . would ask for more money if Lenczner knew that there were new investors."[82]  Thus, in Donziger's view, it was time to keep the Lenczner firm in the dark about Donziger's funds.  Accordingly, Donziger asked Ms. Sullivan to take over managing the investor money.[83]

---

Second, the Trust is controlled by the ADF which, under the Ecuador Judgment, is entitled to designate its directors.  PX 400 at 186-87.

[79]

Champion Decl. Ex. 6 [DI 2114-1] at ECF pp. 411, 421.

[80]

*Id.* at ECF p. 412.

[81]

*Id.* at ECF pp. 413-14.

[82]

Sullivan Decl. [DI 2116] ¶ 48.

[83]

*Id.* ¶¶ 48-49.

Ms. Sullivan, at Donziger's direction, caused Streamline Family Office Inc., a corporation she owned and operated,[84] to open a d/b/a account at Bank of America ("BoA") under the name "CWP Account."[85]  The purpose of the account was "to receive and disburse investor monies at [Donziger]'s direction."[86]

Ms. Sullivan used the CWP account just as it had been intended.  In early 2018, investors solicited by Donziger put up $750,000 in exchange for interests in the Ecuador Judgment. Per Donziger's direction, they transferred those funds to the CWP account.[87]  In March 2018, however, Ms. Sullivan decided to terminate her arrangement with Donziger.

At that time, the CWP account balance was $356,421.[88]  Ms. Sullivan then paid a Donziger American Express bill of $11,796 and herself $2,580 for her out-of-pocket expenses out of the CWP account.[89]  After a demand by Aaron Marr Page, Donziger's partner,[90] and a threat of litigation against Sullivan by Donziger and Page, she closed the CWP account by sending Page two cashier's checks, dated May 3, 2018, totaling $342,015.16, and payable per Page's instructions to

---

[84]

      *Id.* ¶ 2

[85]

      *Id.* ¶ 49.  CWP was an acronym for "Chevron Will Pay."

[86]

      *Id.* ¶ 50.

[87]

      *Id.* ¶¶ 48, 51.

[88]

      *Id.* ¶¶ 56-60; *see also Id.* Ex. 35.

[89]

      *Id.* ¶ 60.

[90]

      Champion Decl. Ex. 92 [DI 2091-92] at ECF p. 2.

"Aaron M Page fbo FDA."[91]

*Commingling of Client, Personal, and PLLC Funds*

There is another interesting phenomenon related to the manner in which Donziger received and maintained purportedly client-owned funds. It is his apparent failure or refusal to maintain the funds in a separate account or otherwise as the rules of professional conduct require.[92]

The evidence of record demonstrates that Donziger raised $50,000 from an investor in January 2016 that went directly into his personal account at TD Bank. The funds raised in the period February 2017 through December 17, 2017 ($100,000) went directly into a Donziger & Associates account. Almost half of the money raised during the intervening period from May 2016 through November 2016 ($625,940 of $1,417,500) went first from investors to the Lenczner firm and then from the Lenczner firm to a Donziger & Associates account. And a significant portion of the money raised during the period December 2017 through January 2018 ($342,045 of $750,000) went first to the CWP account in a bank located in Massachusetts, where Ms. Sullivan dealt with it

---

[91] Sullivan Decl. [DI 2116] ¶¶ 56-59 & Ex. 39.

[92] This is strictly prohibited by the New York Rules of Professional Conduct. 22 N.Y.C.R.R. 1200.15, Rule 1.15.

There is no indication in the record that any of the client funds that have reached Donziger and his PLLC in recent years have been held in an "Attorney Special Account," "Attorney Trust Account," or "Attorney Escrow Account" as the professional conduct rules require. Inasmuch as the question whether Donziger has engaged in professional misconduct in this regard is not material to the determination of the issues before it, the Court makes no determination with respect to professional conduct.

pursuant to Donziger's instructions,[93] and thence into Donziger's personal account or a Donziger & Associates account.

### Profiting From the Ecuador Judgment

As Table 1 and the preceding discussion reflect, Chevron has proved that Donziger raised at least $2.3 million from January 2016 through the beginning of 2018, all of it by selling interests in the Ecuador Judgment. As the following discussion will make clear, Chevron has proved also that Donziger personally profited from this money that he raised, allegedly on behalf of his clients.

Approximately $1,242,985 in investor funds was deposited into Donziger's personal and business accounts from May 2016 to May 2018 as follows.

As shown by Table 1 above, $775,940 was deposited directly or indirectly into Donziger's accounts and $750,000 was deposited into the CWP account. Before closing the CWP account, Ms. Sullivan wired a total of $125,000 from the account to one of Donziger's accounts.[94] Then, on May 3, 2018, she transferred approximately $342,045 to Aaron Marr Page fbo the ADF by cashier's checks and closed the account.[95] Five days later, Forum Nobis, Page's law firm, wire

---

93

 Sullivan Decl. [DI 2116] ¶¶ 49-50 ("The purpose of the CWP Account was to receive and disburse investor monies at Steven's direction. As far as I could tell, Steven had complete control and discretion over how this money, which belonged to the FDA, was spent.").

94

 *Id.* ¶ 52; Slavek Decl. Ex. 3A [DI 2115-1].

95

 Sullivan Decl. [DI 2116] ¶¶ 57-60, Exs. 38-39.

transferred the same amount into a Donziger personal account.[96]   The total   approximately
$1,242,985   made up nearly all of the money deposited into the Donziger accounts from January
2016 to June 2018.[97]   Only $72,988.15 in deposits came from other sources.[98]

In broad strokes, here is what Donziger did with that money.  From January 2016 to
June 2018, he spent $1,343,028.57   just north of the amount deposited into his accounts from
investors or traceable to them.[99]   Of that money, $862,401.94, or 64.2 percent, came out of his
personal accounts.[100]   The most significant payments from those personal accounts totaled
approximately $531,475 and were made to cover personal expenses including Donziger's credit
cards, his home mortgage, and payments made directly to his wife.[101]   Specifically, Donziger
transferred from personal accounts: (1) $83,368.49 to payments on his home mortgage, (2)
$163,831.73 to pay his American Express bills, (3) $72,276.12 to pay his TD Bank credit card bills,
and (4) $212,000.00 directly to his wife.[102]   Donziger transferred an additional $135,000.00 from a

---

[96]

Slavek Decl. [DI 2115] ¶¶ 18-19.

[97]

*Id.* ¶ 22.

[98]

*Id.*

[99]

*Id.* ¶ 41.

[100]

*Id.*

[101]

*Id.* Ex. 5B.

[102]

*Id.*

business account or accounts to his wife.[103]  These five transfers total $666,476.34.

Donziger claims that any money spent from his accounts was client funds either used to pay appropriate disbursements for the benefit of clients or to pay him a monthly retainer or arrearages thereof.[104]  These claims are addressed in a subsequent section.  For present purposes, however, it is sufficient to note that: (1) Donziger co-mingled investor funds with personal funds in his various accounts,[105] (2) Donziger spent all or nearly all of the money that he received directly or indirectly from investors,[106] (3) a majority of his disbursements came out of his personal rather than business accounts,[107] and (4) the evidence suggests that a majority of those disbursements were payments for personal expenses.[108]

*The Restraining Notice*

On April 16, 2018    seventeen days before Ms. Sulllivan sent the $342,015 to Page   Chevron served a restraining notice on Donziger, the Law Offices of Steven R. Donziger, and Donziger and Associates, PLLC, in an effort to collect the unpaid Money Judgment.[109]  The

---

[103]

*Id.*

[104]

Donziger Decl. [DI 2122-1] ¶¶ 11-12; Donziger Opposition Br. [DI 2125] at 16-18.

[105]

*See, e.g.*, Slavek Decl. [DI 2115] ¶¶ 18, 19.

[106]

*Id.* ¶¶ 22, 41.

[107]

*Id.* ¶ 41.

[108]

*Id.* Ex. 5B.

[109]

Champion Decl. Ex. 70 [DI 2114-8] at ECF pp. 39-57.

restraining notice forbids each of Donziger and his firms from making or suffering any "sale, assignment, transfer or interference with any property in which [he or it has] an interest"[110] until the Money Judgment is paid.

As we have seen, it is undisputed that Donziger opened a new personal checking account at TD Bank (xxxx8132) on May 7, 2018.[111]  On the very next day, May 8, 2018, Forum Nobis — of which Aaron Marr Page is managing attorney — transferred the $342,045.16 that Page had received from Sullivan's CWP account just a few days before into Donziger's new personal account.[112]  Two days later, May 10, 2018, Donziger caused his PLLC to open a new business checking account (xxxx8174) at the same bank.[113]  The opening deposit was the $342,015.16, which came from Donziger's personal checking account (xxxx8132).[114]  He then transferred $50,000 out

---

110

        *Id.* at ECF p. 41 (emphasis omitted).

111

        *See, e.g.*, Slavek Decl. Ex. 1 [DI 2115-1].

112

        Slavek Decl. [DI 2115] ¶¶ 17-20.

        Donziger claims that the wiring of the money to his personal account was accidental.  Donziger Decl. [DI 2122-1] ¶ 17.  He does not elaborate on the nature of the alleged accident.  But the claim rings hollow.

        Donziger opened the personal account on May 7.  Page wired the money into that account on May 8.  Donziger did not open the new law firm account until May 10.  In the absence of any explanation of how or why Donziger gave Page the number of the new personal account between its opening of May 7 and Page's dispatch of the money to that account on May 8, the only or at least most logical explanation is, and the Court finds, that Donziger opened the new personal account for the precise purpose of receiving the wire transfer and gave Page the number to permit him to send it there.

113

        Slavek Decl. [DI 2115] ¶ 20.

114

        *Id.*

of the new business checking account back to Forum Nobis, $35,000 back into his own personal checking account (xxxx8132), and $125,000 into yet another Donziger business checking account (xxxx8783).[115]

Additionally, in June 2018, Donziger made a personal credit card payment or payments in the amount of $3,620.43 from an unspecified Donziger personal account or accounts at TD Bank.[116]  And on June 11, 2018, Donziger transferred $15,000 from a Donziger law firm business account to the personal account of Donziger's wife, Laura Miller.[117]

The restraining notice served in April 2018 is the subject of the second contempt motion filed October 1, 2018,[118] which was fully briefed by November 7, 2018.[119]  Naturally, that motion focuses exclusively on transfers made prior to those dates.  The Court accordingly will not consider subsequent transfers that have come to light as subjects of possible contempt adjudications on the present motions.[120]

As the record makes clear, Donziger has transferred over $440,000 to his wife, Laura Miller, over the past seven years.  All of those transfers were by wire transfer from Donziger's

---

[115]

   *Id.* ¶¶ 19-21.

[116]

   *Id.* Ex. 7-B.

[117]

   Slavek Reply Decl. [DI 2129] ¶ 10.

[118]

   DI 2089; DI 2112.

[119]

   DI 2127.

[120]

   This is without prejudice to any subsequent motion charging contempt based on later transfers.

accounts to those of his wife until June 11, 2018,[121] shortly after the service of the restraining notice. Subsequently, however, Donziger has made at least six additional transfers to his wife totaling at least $66,086.75.[122]   And what is especially interesting about these additional transfers is that the money came to Donziger in checks from third parties payable to himself and that Donziger transferred those funds to his wife by endorsing each check to her order.[123]   Thus, although Donziger was the payee in each case, the funds presumably bypassed his bank accounts and were transferred directly to Laura Miller.   As the restraining notice barred Donziger from transferring "any property in which [he had] an interest,"[124] the fact that he endorsed the checks to his wife and thereby apparently sought to avoid discovery of those transfers by keeping them out of his bank accounts bears on the scope of the relief that should be granted if the early transfers were contumacious.

*The March 5, 2019 Order    the Forensic Inspection Protocol*

The Forensic Inspection Protocol (the "Protocol") required Donziger to (a) identify and provide certain additional information with regard to his electronic devices, media, and web-based accounts in writing on or before March 8, 2019, and (b) surrender his devices and give access to his accounts the Neutral Forensic Expert on March 18, 2019 for forensic imaging.[125]   The Protocol

---

[121]

Slavek Decl. [DI 2198] ¶ 5.

[122]

*Id.* ¶ 6.

[123]

*Id.*

[124]

Champion Decl. Ex. 70 [DI 2114-8] at ECF p. 41.

[125]

Forensic Inspection Protocol [DI 2172] ¶¶ 4-10.

specifies a procedure for identifying responsive documents on the images and producing them to Chevron.

Donziger quite intentionally has not complied with the requirements set out in the preceding paragraph.  Indeed, he explicitly has invited a contempt finding in this regard.

*Discussion*

I.    *Civil Contempt    General Principles*

The purpose of civil contempt is not to punish but to compensate for injury caused by any violation of a court order or process, to coerce compliance, or both.[126]  In order to prevail on a civil contempt motion, the moving party must establish that (1) the court order with which the alleged contemnor failed to comply was clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the alleged contemnor has not diligently attempted to comply in a reasonable manner.[127]  Contrary to Donziger's frequent assertions to the contrary,[128] no proof of bad faith or wilfulness is required in order to establish civil contempt.[129]

---

126

*Hess v. New Jersey Transit Rail Operations, Inc.*, 846 F.2d 114, 115 (2d Cir. 1988).

127

*See King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995) (citing *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1351 (2d Cir. 1989)).

128

*E.g.*, Donziger Opposition Br. [DI 2184] at 3 n.1 (stating that "a finding of contempt against me is only possible if I knowingly and willfully disobeyed a clear and unambiguous order").

129

*McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949) ("The absence of wilfulness does not relieve from civil contempt."); *Utica College v. Gordon*, 389 Fed. App'x 71, 73 (2d Cir. 2010) (summary order); *Canterbury Belts Ltd. v. Lane Walker Rudkin, Ltd.*, 869 F.2d 34, 39 (2d Cir. 1989); 7 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 37.51[7][b], at 37-110 (3d ed. 2018).

A court order is clear and unambiguous when it "leaves no uncertainty in the minds of those to whom it is addressed."[130]  Those parties must be able to "ascertain from the four corners of the order precisely what acts are forbidden."[131]  That said, a court retains discretion as to whether to impose civil contempt sanctions.[132]

## II.     Disobedience of Paragraph 1 of the RICO Judgment    the 2017 Retainer

As set forth above, it is abundantly clear that Donziger violated, and continues to violate, paragraph 1 of the RICO Judgment by failing to transfer and assign his contractual right from the ADF to a contingent fee of 6.3 percent of any moneys obtained in respect of the Ecuador Judgment, whether by its enforcement or otherwise.

First, paragraph 1 of the RICO Judgment is clear and unambiguous.  It provides in relevant part that a constructive trust was imposed:

> "for the benefit of Chevron on all property, whether personal or real, tangible or
> *intangible*, vested or *contingent*, that Donziger has received, or hereafter may receive,
> directly or indirectly, or to which Donziger now has, or hereafter obtains, any right,
> title or interest, directly or indirectly, that is *traceable to the Judgment* or the
> enforcement of the Judgment anywhere in the world *including, without limitation,*

---

[130]

> *Hess*, 846 F.2d at116 (citing *Int'l Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967)).

[131]

> *Fonar Corp. v. Deccaid Services, Inc.*, 983 F.2d 427, 430 (2d Cir. 1993) (quoting *Sanders v. Air Line Pilots Ass'n, Int'l*, 473 F.2d 244, 247 (2d Cir. 1972)).

[132]

> *Terry*, 886 F.2d at 1351, 1353.

> all rights to any contingent fee under the [2011] Retainer Agreement . . . .  Donziger
>
> shall transfer and forthwith assign to Chevron all such property that he now has or
>
> hereafter may obtain."[133]

As the RICO opinion said, Donziger's contractual rights to contingent fees are assignable and subject
to the constructive trust imposed by the RICO Judgment.[134]  Indeed, the Court previously ordered
Donziger to assign his rights under the 2011 Retainer, an order with which he grudgingly complied,
albeit only years after compliance was required.

Second, it is undisputed that Donziger has not complied with his obligation to assign
his rights under the 2017 Retainer.

Finally, Donziger has made no attempt to comply with paragraph 1 of the RICO
Judgment in this respect.  Rather than do so, he failed to disclose the 2017 Retainer, even when
ordered to produce documents that unmistakably required its production.  And he now continues in
his refusal to comply.

Donziger's principal response to this aspect of Chevron's contempt motions is a
single paragraph:

> "The contingency interest stated in the updated power of attorney signed by FDA
>
> leadership in November 2017 was not intended to grant a new interest, but to
>
> recognize my existing interest in any *Aguinda* recovery.  The Court has now coerced
>
> me into signing what I understand to be the entirety of my contingency interest over

---

[133]  DI 1875 ¶ 1 (emphasis added).

[134]  *Chevron Corp.*, 974 F. Supp.2d at 640 & n.1820.

to Chevron.  I am not taking the position that the November 2017 contract is protected or separable from the Court's other orders with respect to my contingency interest.  If Chevron feels like it needs some additional documentation with respect to the November 2017 power, it should just ask me rather than rush to file for contempt."[135]

This is no defense at all:

- The 2017 Retainer, contrary to Donziger's claim as to its intention, in fact did grant Donziger a new interest.  That is exactly what it says:

    "*In consideration of Mr. DONZIGER's leadership, investment, professional and collection services, as set forth above, both in the past and in the future, the FDA* hereby acknowledges, confirms, and undertakes to support Mr. DONZIGER's existing contractual INTEREST or, alternatively, to the extent it is necessary or useful, *hereby grants Mr. DONZIGER an INTEREST in his own right equal to Mr. DONZIGER's existing contractual INTEREST.   Such INTEREST, in any case, shall be understood to entitle Mr. DONZIGER to 6.3% of any FUNDS RECOVERED . . . .*"[136]

- Donziger's claim that this 2017 Retainer was intended only to recognize an

---

[135]   Donziger Decl. [DI 2122-1] ¶ 21.

[136]   Champion Decl. Ex. 23 [DI 2091-23] at ECF p. 4 (emphasis added).

The fact that the interest perhaps might be considered contingent is immaterial.  Paragraph 1 of the RICO Judgment explicitly applies to contingent interests.

existing interest (a reference to the 2011 Retainer) is nonsense.  The 2017 Retainer created an obligation on the part of the ADF, which controls the Trust and itself is a judgment creditor on and the exclusive beneficiary of the Ecuador Judgment.  The 2011 Retainer was quite different.  It obligated only the LAPs, who have no rights in the Ecuador Judgment, to pay a contingent fee.  In other words, the 2017 Retainer replaced the evidently impecunious LAPs, the obligors on the 2011 Retainer and from whom Donziger now apparently is estranged, with the ADF, a judgment creditor and the exclusive beneficiary of the Ecuador Judgment.

• Finally, the suggestion that Chevron somehow should be faulted for seeking contempt rather than "just ask[ing]" Donziger if it felt it needed additional documentation is risible.  Donziger was obliged by the plain terms of paragraph 1 of the RICO Judgment to assign and transfer his contingent fee interest under the 2017 Retainer from the moment it came into existence regardless of whether Chevron asked him to do so.  And, in fact, Chevron last October provided Donziger with a form of assignment for that purpose.[137] That form remains unsigned.

In sum, Donziger's contingent fee interest is property.  It is traceable to the Ecuador Judgment, which "is the indispensable predicate of his right to collect [any] contingent fee."[138]  And,

---

[137]       Champion Decl. Ex. 88 [DI 2114-9] at ECF pp. 70-72.

[138]       *Chevron Corp.*, 974 F. Supp. 2d at 640.  As the Court has made clear before, contingent fee interests such as this are assignable and transferable property.  *Id.* at 640-41 & n.1820.  And they most assuredly are traceable to the Ecuador Judgment under the everyday and legal

perhaps most important of all, paragraph 1 of the RICO Judgment specifically required Donziger to transfer and assign to Chevron his continent fee interest under the 2011 Retainer, making unmistakable the fact that the RICO Judgment regarded it — and therefore any other instrument or arrangement giving Donziger a contingent fee interest — as traceable to the Ecuador Judgment.

Clear and convincing evidence establishes that Donziger is in civil contempt by disobeying its command that he transfer all of his right, title and interest to a contingent fee under the 2017 Retainer.

III.   *Disobedience of the RICO Judgment — Monetizing and Profiting from the Ecuador Judgment and Failure to Transfer to Chevron Money Traceable to It*

Chevron moves to hold that Donziger is in civil contempt by (a) engaging in fund raising activities to monetize the Ecuador Judgment in violation of paragraph 5 of the RICO Judgment, (b) profiting from it, and (c) failing to transfer to Chevron, as required by paragraph 1, investor funds traceable to the Ecuador Judgment that came into Donziger's possession.[139]

---

definitions of the word "traceable." *Chevron Corp.*, No. 11-cv-691 (LAK), 2018 WL 4360770, at *2 (citing *United States v. Gordon*, 710 F.3d 1124, 1135 n.13 (10th Cir. 2013); *United States v. Bornfield*, 145 F.3d 1123, 1135 n.13 (10th Cir. 1998)); *see also United States v. Torres*, 703 F.3d 194, 196 (2d Cir. 2012); *United States v. Marimon*, 507 Fed. App'x 5, 7 (2d Cir. 2012) (summary order).

[139]   DI 2113 at 23-27.

According to Chevron, Donziger's fund raising activities, ostensibly on behalf of the ADF and other Defaulted Defendants, violated paragraph 4 of the Default Judgment as well to the extent that they occurred after its entry on April 23, 2018.   DI 2113 at 26-27.   The theory seems to be that Donziger's actions were in active concert and participation with the ADF in its sale of interests in the Ecuador Judgment.   But there is no evidence of any such activities after the entry of the Default Judgment.   Accordingly, that piece of Chevron's motion requires no further discussion.

A.      *Monetization*

Paragraph 5 of the Judgment, quoted in full above, prohibits "undertaking *any* acts to monetize or profit from the [Ecuador] Judgment . . . including without limitation by selling, assigning, pledging, transferring or encumbering *any* interest therein."[140]

Donziger admitted that he has arranged for sales of shares in the Ecuador Judgment to at least six investors since March 2014.[141]  He seeks to defend those actions by claiming that the Court's April 25, 2014 order, which largely denied a stay pending appeal from the RICO Judgment (the "Stay Opinion"), "permitted [Donziger] [to] sell interests in the Ecuadorian judgment, as long as he did not sell his 'own' shares or the shares of the two named LAPs."[142]  In contrast, he repeatedly denied that he ever had sold any part of his own interest in that judgment.[143]

The evidence clearly and convincingly establishes that Donziger, contrary to his denials, in fact monetized his own interest in the Ecuador Judgment by pledging or selling part of his contingent fee interest to someone else in exchange for services.  Moreover, the Stay Opinion

---

[140]

DI 1875 ¶ 5 (emphasis added).

[141]

Tr., June 28, 2018 [DI 2062], at 33:16-21, 34:21-24.  The record establishes that the number is at least seven and that sales to them have been made on at least ten different occasions.  Slavek Decl. [DI 2115] ¶ 13, Ex. 2.

[142]

DI 2113 at 26 (citing DI 1985 at 6-7).  *Accord*, Tr., May 8, 2018 [DI 2010], at 17:13-19 ("[M]y clients in Ecuador were allowed to sell their shares in the judgment to finance litigation expenses, that is, to sell shares to investors in anticipation of some sort of future collection, and you distinguished between doing that and actually selling shares that I owned myself to profit personally.").

[143]

*See, e.g.*, Tr., June 28, 2018 [DI 2062], at 34:12-14, 39:11-15; Tr., May 8, 2018 [DI 2010], at 17:22-18:2 ("There is no evidence . . . that I ever have attempted or ever have sold my shares."); *Id.* at 18:23-19:1 ("I am not selling my own shares.").

could not and did not alter the terms of the RICO Judgment.  In any case, the evidence clearly and convincingly establishes that Donziger violated the RICO Judgment by profiting from the Ecuador Judgment.  He raised money in exchange for shares of his ostensible client's interest in it and then used a substantial share of the money thus raised for his personal benefit.  It establishes also that Donziger disregarded his obligation to pay over to Chevron any funds traceable to the Ecuador Judgment in which he had an interest.

1. *Direct and Attempted Sale of Donziger's Personal Contingent Fee Interest in Exchange for Services*

Under the 2011 and 2017 Retainers, Donziger was entitled to 6.3 percent of any proceeds related to the Ecuador Judgment.  He concedes that any act to monetize the Ecuador Judgment, including by attempting to transfer, sell, pledge or assign any part of that 6.3 percent interest, violated paragraph 5 of the RICO Judgment.[144]  Thus, even on Donziger's own view concerning the effect and meaning of the Stay Opinion, he is in contempt of paragraph 5 by virtue of his commitment to pay Zelman "14/250 of an eighth of a point of whatever is recovered on the total claim" out of Donziger's "personal fees from this litigation."[145]

2. *Donziger's Sales and Attempted Sales to Investors of Interests in the Judgment*

Donziger attempts to defend his sales of interests in the Ecuador Judgment to

---

[144]

Tr., May 8, 2018 [DI 2010], at 18:23-19:1.

[145]

Champion Decl. Ex. 2 [DI 2180-2] at ECF p. 74.

investors on two grounds.  First, he argues that the Stay Opinion changed the terms of the RICO Judgment and limited the prohibitions in paragraphs 1 and 5 to acts related to money obtained as a result of a collection on the Ecuador Judgment.  Second, he submits that sales of shares of the interests of his client, the ADF, were unobjectionable because the ADF was not subject to the RICO Judgment at the time of the sales.[146]

> (a)  *The Stay Opinion Had, and Could Have Had, No Legal Effect on the Plain Text of the RICO Judgment*

Donziger contends that he "moved for relief from the 'monetize or profit from' portions of the original RICO judgment," that "the Court granted relief," and that the Stay Opinion "is effectively the applicable order of the Court."[147]  Those contentions, however, are incorrect.

As an initial matter, Donziger never made any such motion.  He merely sought a stay pending appeal from this Court.  Nor did the Court grant any relief from the "monetize or profit" portions of the judgment. It denied Donziger's motion in all material respects.  There is not a single word in the Stay Opinion that even suggests that the Court intended to modify the RICO Judgment.  And the Stay Opinion most assuredly is not "the applicable order of the Court," "effectively" or otherwise.  Indeed, this Court lacked the power to modify or alter the terms of the RICO Judgment at the time the Stay Opinion was entered because Donziger and the LAP Representatives had appealed the RICO Judgment to the Court of Appeals on March 18, 2014, over a month before the Stay Opinion was issued.  Moreover, it was the RICO Judgment that was affirmed by the Court of

---

[146]

As noted, the ADF now is subject to the Default Judgment, which parallels the RICO Judgment.

[147]

Donziger Opposition Br. [DI 1986] at 5.

Appeals and that is embodied in its mandate, not the Court's rationale for denying a stay pending appeal.[148]

      As the Supreme Court has held — in language quoted by this Court in a closely related case to which Donziger was a party and of which he therefore was quite aware — "the filing of a notice of appeal is an event of jurisdictional significance — it confers jurisdiction on the court of appeals *and divests the district court of its control over those aspects of the case involved in the appeal.*"[149]  In consequence, this Court could not have modified, altered or otherwise changed the RICO Judgment during the pendency of the appeal even if it had wished to do so.  Donziger's suggestion to the contrary simply is not correct.

      *(b)*      *The Stay Opinion Was Not Intended to Modify, Nor Reasonably Could Have Been Understood as Modifying, the RICO Judgment*

      *(1)*      *The Crafting of the RICO Judgment Provisions*

      The genesis of paragraphs 1 and 5 of the RICO Judgment is an appropriate starting point.

      In its post-trial brief, Chevron specifically sought an injunction barring Donziger and the LAP Representatives from "[u]ndertaking *any* acts to monetize or profit from the [Ecuador

---

[148]

      *Chevron Corp.*, 833 F.3d at 150-51.

[149]

      *In re Chevron Corp.*, 749 F. Supp. 2d 170, 177 n.27 (S.D.N.Y.  2014) (quoting *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982)), *aff'd*, 409 Fed. App'x 393 (2d Cir. 2010).  *Accord*, *Federal Ins. Co. v. United States*, 882 F.3d 348, 361 (2d Cir. 2018) (quoting *United States v. Rodgers*, 101 F.3d 247, 251 (2d Cir. 1996)).

J]udgment,"[150] the concept ultimately embodied in paragraph 5 of the RICO Judgment.  It sought also the imposition "of a constructive trust for the benefit of Chevron, [on] *any* interest, direct or indirect, in . . . *any* proceeds from the 2011 [Ecuador] Judgment or any subsequent Judgment or Enforcement Judgment,"[151] a proposal that in substance is embodied in paragraph 1 of the RICO Judgment.

Donziger resisted these provisions in his own post-trial brief.  He complained that they would foreclose any acts to monetize or profit from the Ecuador Judgment and require those to whom the RICO Judgment applies    including Donziger    to pay any proceeds from the Ecuador Judgment over to Chevron.[152]

As the RICO Judgment reflects, this Court rejected Donziger's arguments.  It adopted the core of these two Chevron proposals.  Thus, when this Court entered the RICO Judgment, Donziger understood that the RICO Judgment barred him from *any* conduct to monetize or profit from the Ecuador Judgment and required him to turn over to Chevron any money or other property traceable to the Ecuador Judgment.

(2)     *The Stay Motions*

Following entry of the RICO Judgment, and contrary to Donziger's present claims, neither Donziger nor the LAP Representatives sought any modification or clarification.  Instead, they

---

[150]
Chevron Post-Trial Br. [DI 1847] at 348 (emphasis added).

[151]
*Id.* at 341 (emphasis added).

[152]
Donziger Post-Trial Reply Br. [DI 1857] at 12-13.

separately moved for stays pending appeal.  The focus of those motions was whether the appellants were threatened with imminent and irreparable injury absent a stay and whether they had demonstrated a likelihood of success on appeal.  The Court concluded that neither was the case and denied the motions in all relevant respects.[153]

In his attempt to establish irreparable injury, Donziger claimed in his motion, among other things not relevant here, that the prohibition on his selling, assigning, pledging, transferring or encumbering any interest in the Ecuador Judgment and the requirement that he transfer his interest in that judgment to Chevron would prevent Donziger from continuing to work on the Ecuador matter, destroy his law practice, and leave him no means of earning a living unless the RICO Judgment were stayed pending appeal.[154]  This Court rejected that argument because nothing in the judgment prevented Donziger from working on the Lago Agrio case.[155]  Nor, in the Court's view, was his compensation likely to be so affected before his appeal was decided as to constitute irreparable injury.[156]

Donziger's compensation was governed by the 2011 Retainer, which provided for a monthly retainer and a contingent fee of 6.3 percent of any recovery.[157]  Donziger's right to a

---

[153]

    *Chevron Corp.*, 37 F. Supp. 3d 653.

    Neither Donziger nor the LAP Representatives sought a stay from the Court of Appeals.

[154]

    DI 1888 at 16.

[155]

    *Chevron*, 37 F. Supp. 3d at 658.

[156]

    *Id.* at 658-60.

[157]

    *Id.* at 658 (citing PX 558).

contingent fee, the Court wrote, is subject to the constructive trust imposed by paragraph 1 of the Judgment.  But the monthly retainer payments, the Court said, would not be subject to it unless they somehow were "traceable to the Lago Agrio [Ecuador] Judgment."[158]  As one example of how retainer payments could fall within the Judgment's prohibitions, the Court noted that "as long as no collections are made in respect of the Lago Agrio Judgment and funneled to Donziger as retainer payments, the [RICO] Judgment would not prevent Donziger from being paid [a monthly retainer], just as he has been paid . . . over the past nine or ten years."[159]

Donziger now claims that the use of the word "collections" in the quoted sentence in substance defined the word "traceable" in such a way as to limit paragraphs 1 and 5 of the RICO Judgment to money or other property obtained "*as a result of enforcement and then executing*" on the Ecuador Judgment as opposed to the sale or monetization of all or part of it.[160]  But that argument flies in the face of the plain meaning of the term "traceable."  And it misrepresents and conflicts with other statements in the Stay Opinion.  Indeed, it is inconsistent with other statements by Donziger.

---

[158]

    *Id.*

    The effect of paragraph 5, it wrote, "is to prevent him from benefitting personally, at Chevron's expense, from property traceable to that fraudulent [Ecuador] Judgment."  *Id.* at 660.

[159]

    *Id.* at 658.

    In addition, the Court noted that Donziger would not have been harmed irreparably if the portions of the RICO Judgment that affected his ability to collect a contingent fee remained in effect pending appeal.  He never had received any contingent fee in the past and would not be harmed beyond repair, even if a contingent fee became payable while the appeals were pending.  The worst that would happen in that unlikely case would have been only that his ability to collect such a fee would have been delayed.  *Id.* at 658-59.

[160]

    Tr., May 8, 2018 [DI 2010],  at 19:21-25 (emphasis added); *see also* Donziger Resp. Br. [DI 2184] at 2.

1.      The word "traceable" has an established meaning.  As this Court has written:
"Money or other property is 'traceable' to a given source, event, or activity if its
'acquisition is attributable to' that source, event, or activity.  To put it another way,
'proof that the proceeds of the' event or activity . . . 'enabled the defendant to acquire
the property' makes that property 'traceable to the' event or activity.  So any property
(1) that Donziger (a) had as of the date of the judgment in this case, or (b) acquired
from the date of the judgment until now, or (c) hereafter may acquire *and* (2) that
Donziger was 'enabled to acquire' by the Ecuadorian Judgment or its enforcement
is traceable to that Judgment."[161]

That is the plain meaning of the English word "traceable."[162]

2.      Donziger ignores also the text of paragraph 1 of the RICO Judgment, which
is inconsistent with the argument he now makes.

The precisely relevant portion of paragraph 1 of the RICO Judgment reads "The Court

---

[161]
     *Chevron Corp.*, No. 11-cv-0691 (LAK), 2018 WL 4360770, at *2 (emphasis in original)
(footnotes and citations omitted).

[162]
     The Oxford Dictionaries define "traceable" as "[a]ble to be followed on its course or to its
origin."  OXFORD  DICTIONARIES  (available  at
https://premium.oxforddictionaries.com/us/definition/american english/traceable)  (last
visited May 21, 2019).  The OED likewise defines "traceable" as "[c]apable of being traced
(in various senses of the verb)."  OXFORD ENGLISH DICTIONARY (available at
http://www.oed.com/view/Entry/204180?redirectedFrom=traceable#eid) (last visited May
21, 2019).  Among the definitions of the verb form of "trace" is "[t]o follow the course,
development, or history of.  Also with the course, etc. as object."  *Id.*  (available at
http://www.oed.com/view/Entry/204177?rskey=1QAYF6&result=4#eid) (last visited May
21, 2019).  The OED's examples of the use of "trace" in that sense include Blackstone's
use of the term in this phrase: "[t]he tracing the inheritance back through the male line of
ancestors must at least have inevitably brought us up to the first purchasor . . . " II WILLIAM
BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 236 (1766).  *See also, e.g.*,
RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 58 cmt. a (2011).

49

hereby imposes a constructive trust for the benefit of Chevron on all property, whether personal or real, tangible or intangible, vested or contingent, that Donziger has received, or hereafter may receive, directly or indirectly, . . . *that is traceable to the Judgment **or** the enforcement of the Judgment* anywhere in the world."[163]  Donziger's argument   that the constructive trust reaches only money obtained by enforcement of and execution on the Ecuador Judgment   would render the words "to the Judgment or" entirely superfluous.  Paragraph 1 specifically and explicitly reaches not only money or property traceable to enforcement of the Ecuador Judgment, but money or property traceable *to the Judgment itself* quite apart from whether the Judgment ever is enforced or executed upon.

3.      Finally, Donziger himself has recognized that the realization of money or other value that is traceable to the Ecuador Judgment need not be obtained by "collection" in Donziger's cramped meaning of that term   enforcement and execution   in order to come within the constructive trust and non-monetization provisions.  He conceded in open court that a settlement payment   which would not be a result of "enforcement" or "execution" of the Ecuador Judgment   nevertheless would be traceable to that judgment and therefore a collection within the meaning of the Stay Opinion.[164]

Thus, Donziger's contention that paragraphs 1 and 5 of the RICO Judgment apply only to collections in the sense of realization of value "as a result of enforcement and then

---

[163]

DI 1875 ¶ 1 (emphasis added).

[164]

Tr., May 8, 2018 [DI 2010], at 20:7-11.

executing"[165] on the Ecuador Judgment is simply wrong. Donziger instead has interpolated the phrase "as a result of enforcement and then executing" where it is not to be found and ignores portions of the RICO Judgment and the Stay Opinion that are inconsistent with his contention.

Donziger makes an additional argument based on part of the Court's response in the Stay Opinion to an argument made only by the LAP Representatives and not by Donziger. The LAP Representatives contended that paragraph 5 of the Judgment, unless stayed, would have prevented them from financing their appeal.[166] Donziger then focuses on language in the Stay Opinion that said that "all other interest-holders in the Ecuador Judgment are 'virtually unconstrained by the NY Judgment in their ability to attempt to fund their litigation efforts against Chevron by continuing to sell shares in anything that may be recovered for whatever investors are willing to pay.'"[167] From this he would draw the conclusion that the non-appearing LAPs were free to sell interests in the judgment and that he was free to do it for them.

The Stay Opinion actually said that "[n]othing in the N.Y. Judgment prevents the LAPs (*other than the two Representatives who are named in the N.Y. Judgment*) and their allies from continuing to raise money" by selling interests in any eventual recovery.[168] In other words, the LAP Representatives — as distinguished from the defaulting LAPs — were prevented by the RICO Judgment from selling interests in any eventual recovery. They were prevented from doing so at

---

[165]

    *Id.* at 19:22-23.

[166]

    *Chevron Corp.*, 73 F. Supp. 3d at 660.

[167]

    Donziger Resp. Br. [DI 2184] at 2 (quoting the Stay Opinion [DI 1901] at 20).

[168]

    *Chevron Corp.*, 37 F. Supp. 3d at 661 (emphasis added).

least because that would have constituted monetization of the Ecuador Judgment in violation of paragraph 5 of the RICO Judgment.  Moreover, as Donziger also is subject to paragraph 5, he too is prevented from selling *any* interest in the Ecuador Judgment.  His name did not appear in the quoted passage of the Stay Opinion only because that passage was addressed to an argument made only by the LAP Representatives.

Finally, Donziger's contention that the Stay Opinion modified the RICO Judgment so as to enjoin him only from selling *his* interest in the Ecuador Judgment would be misguided even if the Stay Opinion could have done so despite the Court's lack of jurisdiction over the injunction at the time that opinion was issued.

Donziger's argument seizes on the following language:

"The point of paragraph 5 . . . was to prevent Donziger . . . from avoiding the effect of the constructive trust imposed on assets in [his] hands that otherwise would have been direct proceeds of the Judgment by selling, assigning, or borrowing on [his] interest[] in the Lago Agrio Judgment and thus at least confusing the issue of traceability."[169]

He argues that this statement meant that he was free to sell interests in the Ecuador Judgment as long as the interests sold were not personally owned by him.  But there are two straightforward answers to that argument.

First, the language of paragraph 5, which controls here, enjoins Donziger from "undertaking *any* acts to monetize or profit from the [Ecuador] Judgment . . . including without

---

[169]     *Id.* at 659-60 (emphasis omitted).

limitation by selling, assigning, pledging, transferring or encumbering *any* interest therein."[170]  It thus applies to "any" interest, not merely interests owned by Donziger.  Moreover, nothing in the passage upon which Donziger relies said that the *only* point of paragraph 5 was to foreclose sales by Donziger of personal interests in the Ecuador Judgment.

Second, Donziger conspicuously ignores the very next paragraph of the Stay Opinion, which in relevant part states that "[t]he N.Y. Judgment, including paragraph 5, in fact would deprive Donziger of the ability to profit from the Lago Agrio Judgment that he obtained by fraud."[171]  Permitting Donziger to sell interests in the Ecuador Judgment to investors, even if those interests belonged to the ADF or the Trust, in order to generate money to pay himself certainly would not deprive him of that ability.  And the object of paragraph 5 and other provisions of the RICO Judgment was to do just that.

Accordingly, the Court rejects Donziger's proposed arguments based on the Stay Opinion.  The RICO Judgment stands unmodified.  It bars any and all acts to monetize or profit from the Ecuador Judgment, including without limitation sale, assignment, pledge, transfer or encumbrance of any interest therein.  Donziger, in the Court's view, violated paragraph 5 via his sales and efforts to sell interests in the Ecuador Judgment irrespective of whether the interests sold were in Donziger's contingent fee interest or the Ecuador Parties' interests in the Ecuador Judgment itself.[172]  In the last analysis, however, it is unnecessary to decide these motions on that basis.  The

---

[170]

DI 1875 ¶ 5 (emphasis added).

[171]

*Chevron Corp.*, 37 F. Supp.3d at 660.

[172]

As Judge Posner has written, appellate courts give "particularly heavy weight" to the interpretation of an injunction by "the same judge who entered it and is thus familiar with

53

fact of the matter is that Donziger, in consequence of his sales, has profited extensively from the Ecuador Judgment in violation of the RICO Judgment. He has done so to Chevron's detriment. And the Court elects to rest its decision on that ground.

> B.    *Donziger Personally Profited from and Failed to Pay Chevron Money Traceable to the Ecuador Judgment in Violation of Paragraphs 1 and 5 of the RICO Judgment*

Chevron has proved that Donziger raised over $2.4 million from investors in exchange for interests in the Ecuador Judgment totaling at least 1.28525 percent from at least May 2016 through 2018.[173] Indeed, Donziger states that he is "proud of that fact."[174]

At least $1,242,985 of invested money was deposited, either directly or indirectly, into personal checking accounts owned by Donziger or business checking accounts nominally owned by his PLLC. All of it was traceable to the Ecuador Judgment as it reflected investments made in exchange for interests in that judgment. The total then would be subject to the constructive trust if it were "received" by Donziger or if he had "any right" to or "interest" in it. Assuming for purposes of this analysis that the funds Donziger raised and received initially belonged to the ADF, the only remaining issue is the extent to which Donziger or his PLLC had any right to or interest in them.

Donziger's own descriptions of his rights and responsibilities with respect to client

---

its history, or when interpretation . . . involves the taking of testimony or a piecing together of documents." *Schering Corp. v. Illinois Antibiotics Co.*, 62 F.3d 903, 908 (7th Cir. 1995).

[173]    DI 2113 at 15-16 (citing Slavek Decl. Ex. 2 [DI 2115-1].

[174]    Donziger Opposition Br. [DI 2125] at 16.

54

and investor funds provides an ample basis for findings.  In his own words:[175]

> "11.    The FDA has committed to compensate me at a fixed rate of $25,000 per
> month for my work on all the responsibilities described above . . . .  It is often the
> case that there are not funds available to pay me and meet other critical case
> expenses.  Often, I insist that certain other critical expenses (such as legal fees in
> enforcement jurisdictions) are covered first.  Although it is understood that *any*
> *unpaid monthly fee gets rolled into arrears*, non-payment has occurred frequently
> enough over the course of many years (including long stretches without any
> compensation) that full payment of my arrears has become highly unlikely, a
> situation that FDA leadership has explicitly recognized in discussions with me.
> Accordingly, again in light of the long-standing and trusting relationship I have with
> my clients, *the FDA has authorized me to pay down my arrears to the extent*
> *possible, at my discretion* and in light of other demands on available funds.  *    *
>   *
>
> "12.    Similarly, *the FDA*, through its representatives and after extensive
> consultation, *has been apprised of the substantial outstanding debts I am owed* by
> the case arising from times when I was forced to rely on personal funds to keep case
> operations going.  Again, *the FDA though* [*sic*] *its representatives has agreed that*
> *investor-provided funds should be used to pay down such debt to the extent possible*
> *given the availability of funds and the exigency of other funding needs.*  The FDA,

---

175    The Court makes no finding as to whether or not the quoted account is credible.  It assumes
its truth for purposes of this motion.  It notes, however, that there is no evidence other than
Donziger's assertions as to a good deal of it.

through its representatives and after extensive consultation, also has agreed that all of my legal expenses incurred in responding to Chevron's SLAPP-style and other attacks on me (including the RICO case itself, appeals thereto, and post-judgment proceedings) are properly considered expenses owing to the overall litigation that should be paid from investor-provided funds as they become available and in light of other funding needs.

"13. Even though *I often was legally entitled draw down funds to satisfy the debts and arrears discussed above as soon as funds were raised*, I typically chose to pay other members of our team prior to reimbursing myself for expenditures. Other times, I would pay myself as appropriate, but later, as funds became tight once again, I would pay other individuals and case expenses from my personal accounts so that necessary efforts could continue with minimal interruption."[176]

Accordingly, it may be that Donziger had a right to or an interest in the entire $1,242,985. Assuming the truth of his assertions, he had substantially unfettered control over the funds in his hands, including the discretion to pay himself with that money whenever he wished to do so. That control and discretion, in the extraordinary circumstances of this case,[177] arguably means that Donziger and his PLLC was entitled to, or at least had "an interest" in, every penny. And such a finding finds support in New York law, which states:

"the party who possesses property is presumed to be the party who owns it. When

---

[176]

    Donziger Decl. [DI 2122-1] ¶¶ 11-13 (emphasis added).

[177]

    Certainly one hopes that the commingling of client and personal funds and the apparent disregard of Rule 1.15 of the professional conduct rules that seems to have gone on here is extraordinary.

a party holds funds in a bank account, possession is established, and the presumption

of ownership follows."[178]

But it is unnecessary to decide the issue in order to resolve these motions.

Donziger has stated multiple times that he paid himself from investment funds.[179]

The evidence shows the same.  For example, Sullivan stated that she paid Donziger $125,000 from

January to March 2018 from "investor money [that] had been deposited" into the CWP account.[180]

She did so at Donziger's direction without back-up documents for three invoices that he submitted.[181]

Additionally, Donziger "paid himself" from investor funds held in his accounts by using that money

to pay bills and cover personal expenses.  The evidence shows that from January 1, 2016 to June 30,

2018, $1,315,973.31 was deposited into Donziger's accounts from external sources.[182]

Approximately $1,242,985.00 of that amount came from investors.[183]  Over the same time period,

Donziger made $72,276.12 in payments from his personal accounts to cover his TD Bank credit card

---

[178]

*EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 474 (2d Cir. 2007) (internal quotation marks omitted) (quoting *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 86 (2d Cir. 2002)); *see also United States v. $79,000 in Account Number, etc.*, No. 96-cv-3493 (MBM), 1996 WL 648934, at *4 (S.D.N.Y. Nov. 7, 1996).

[179]

*See, e.g.*, Donziger Opposition Br. [DI 2125] at 10 (arguing that Donziger's conduct raising and spending investor funds on "[his] own fees" was proper).

[180]

Sullivan Decl. [DI 2116] ¶ 52.

[181]

*Id.*

[182]

Slavek Decl. [DI 2115] ¶ 12.

[183]

*Id.* ¶ 22.

57

bills, $163,831.73 in payments from his personal accounts to cover his American Express credit card bills, and $83,368.49 from his personal accounts to make payments on his home mortgage.[184]   He transferred $347,000 from his personal and business accounts to his wife, Laura Miller.[185]   Donziger therefore received in his personal capacity   either through direct payments of invoices or through payments to cover personal expenses   at least $666,476.34 of investor funds traceable to the Ecuador Judgment in violation of paragraphs 1 and 5 of the RICO Judgment.

As mentioned previously, Donziger makes two arguments in support of the propriety of these payments and disbursements.   He argues that the money consisted of his monthly retainer, or payments on previously unpaid monthly fees that had gone into arrears, and client funds that were used to pay appropriate disbursements for the benefit of clients.[186]   To be sure, it may well be that part of the $236,107.85 that Donziger paid on his credit cards reflected payments for expenses Donziger incurred on behalf of the ADF that were not personal in nature.   But he has offered no credible evidence to rebut the most probable and logical inference   that the credit card bills paid with funds from personal bank accounts were for Donziger's personal benefit.

The argument that the funds were payments of monthly retainers or retainer arrearages does not improve Donziger's position.   If anything, it is a concession that Donziger had a right to or interest in the money.   It is obvious also that the money was traceable to the Ecuador Judgment, as Donziger raised it himself by selling interests in that judgment to investors.   He then controlled the

---

[184]     *Id.* Ex. 5B.

[185]     *Id.*

[186]     Donziger Opposition Br. [DI 2125] at 11, 16-18.

flow of those funds, for example, by directing them either through Lenczner or the CWP account, or receiving them directly into his own business or personal accounts.

Accordingly, the Court finds by clear and convincing evidence that Donziger used at least $666,476.34 of investment funds for personal expenses, that those funds were traceable to the Ecuador Judgment, and that he had a personal right to or an interest in those funds. Donziger and his PLLC therefore are in contempt of paragraphs 1 and 5 of the RICO Judgment by profiting from and failing to assign to Chevron funds traceable to the Ecuador Judgment.

## IV.   Disobedience of the Restraining Notice

### A.   Legal Principles

CPLR Section 5222, which applies to Chevron's efforts to collect the Money Judgment by virtue of Federal Rule 69(a), allows a judgment creditor to serve a judgment debtor with a restraining notice that prohibits the judgment debtor from transferring or assigning any property in which the debtor has an interest. Violation of a restraining order is "punishable by contempt"[187] including by a federal court where, as here, the restraining notice was served to enforce a federal judgment.[188]

---

[187]

*Cordius Tr. v. Kummerfeld Assocs., Inc.*, 658 F. Supp.2d 512, 517 (S.D.N.Y. 2009); *see also* CPLR § 5251.

[188]

*Cordius,* 658 F. Supp. 2d at 518 (citing *Vinos Argentinos Imports USA, Inc. v. Los Andes Imports, Inc.*, No. 91-cv-2587 (JSM), 1993 WL 465353, at *1 (S.D.N.Y. Nov. 8, 1993); *Adidas Sportschufabriken v. New Generation*, No. 88-cv-5519 (PKL), 1995 WL 646213, at *3 (S.D.N.Y. Nov. 3, 1995).

The Court notes also that a restraining notice is issued by an attorney "as officer of the court." *E.g.*, CPLR § 5222; *CSX Transportation, Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462,  470 (2d Cir. 2018).  Violation of a restraining notice issued in a federal action

59

B.      *Analysis*

Donziger has not denied either the service of the restraining notice on April 16, 2018 or any of the transactions described above.  It is undisputed also that Donziger and his PLLC, both of which were subject to the restraining notice, made at least the following transfers after that notice became effective:

TABLE 2[189]

| From Donziger Personal Account (TDxxxx8132) | | |
|---|---|---|
| **Date** | **Amount** | **Transferee** |
| May 10, 2018 | $342,045.16 | Donziger PLLC business account (TDxxxx8174) |
|  |  |  |
| **From Unspecified Donziger Personal Account at TD Bank** | | |
| June __, 2018 | $3,620.43 | American Express (Donziger account payment) |
|  |  |  |
| **From Donziger PLLC Business Account (TDxxxx8174)** | | |
| May 10, 2018 | $50,000.00 | Forum Nobis |
| May 10, 2018 | $35,000.00 | Steven Donziger personal account (TDxxxx8132) |
| May 10, 2018 | $125,000.00 | Donziger PLLC business account (TDxxxx8783) |
|  |  |  |
| **From Unspecified Donziger PLLC Business Account at TD Bank** | | |
| June 11, 2018 | $15,000.00 | Laura Miller Donziger |

The restraining notice barred each of these transfers as long as the transferor

---

therefore is punishable by fine or imprisonment or both, as it constitutes "[d]isobedience or resistance to its [i.e., the federal court's] lawful writ, process, order, rule, decree, or command."  18 U.S.C. § 401(3); *see also Adidas Sportschufabriken*, No. 88-cv-5519 (PKL), 1995 WL 646213, at *3 ("Refusal or willful neglect by any person to obey a restraining notice shall . . . be punishable as a contempt of court." (internal quotations and citation omitted)); *Vinos Argentinos*, No. 91-cv-2587 (JSM), 1993 WL 465353, at *1-2.

[189]     Slavek Decl. Exs. 4-A, 7-B [DI 2115-1]; Slavek Reply Decl. [DI 2129] ¶ 10.

60

Donziger and, in some instances, his PLLC   had "an interest" in the money transferred.[190]   Neither Chevron nor Donziger has addressed that question.   Nevertheless, the record permits that determination with respect to at least some of these transfers to an extent sufficient to determine the motions.

As discussed above, Donziger claims that he had the authority, in his discretion, to use investor funds that came into his hands to pay his client's alleged debts to him.   This view is reinforced by the 2017 Retainer, which contains a virtually boundless power of attorney that provides that "Mr.DONZIGER has the broadest powers and attributions awarded by the law to representatives."[191]   For the same reasons the Court would be permitted to find that Donziger had an interest in the entire amount of investment funds deposited into his personal and business accounts, the Court would be permitted to find that Donziger had an interest in all of the funds described in Table 2.   The Court, however, is not obliged to do so and considers the following relevant to the analysis.

On May 8, 2018, Page transferred $342.045.16 into Donziger's personal checking account.   That money at least nominally belonged to the ADF, as it was raised by investment agreements nominally executed by the ADF and signed by investors.   While the fact that the money was wired into Donziger's personal bank account gave rise to a presumption that the money belonged to Donziger,[192] the presumption is rebuttable.   In view of the apparent source of the funds,

---

[190]

CPLR § 5222(b).

[191]

Champion Decl. Ex. 23 [DI 2091-23] at ECF p. 4.

[192]

*See supra*, III.B.

the Court assumes that the money was ADF property when it was deposited into that account.

Donziger then transferred the money to one of his law firm accounts.  At the moment of that transfer, the funds presumably remained property of the ADF despite the funds' presence in the law firm account.[193]  But shortly thereafter, Donziger transferred $35,000 back to his personal account, $15,000 to his wife, and $3,620.43 from a personal account or accounts to American Express to cover his credit card bill.  One of two things necessarily is true as to each of these transfers.  The first option is that Donziger exercised his discretion to use his alleged ADF-granted authority to make the payment.  The second is that he decided to take those ostensibly client funds for himself or his own benefit.  In either case, Donziger had a right to or at least an interest in the funds no later than the moment at which he made the decision to make each of these three transfers.  Accordingly, each of those three transfers violated the restraining notice.

The Court finds that the restraining notice was clear and unambiguous.  The proof that Donziger and his law firm both failed to comply with the restraining notice by transferring property in which he had an interest is clear and convincing.  It further finds that he has not diligently sought to comply with the restraining notice, not least because Donziger commingled client funds with his personal and law firm assets and failed to keep client funds in properly designated accounts.  Accordingly, the Court finds, by clear and convincing evidence, that both Donziger and his law firm are in contempt of the restraining notice.

---

[193]  As noted previously, it appears that the law firm account in question was not a special account for client funds required by the New York Rules of Professional Conduct.

V.      *Disobedience of the March 5, 2019 Order    The Forensic Protocol*

      Paragraph 4 of the Protocol provides in relevant part:

> "Within three (3) business days of entry of this Protocol, defendant Steven Donziger . . . shall provide to both the Neutral and Chevron's Forensic Experts via email a representation listing under penalty of perjury all devices he has used to access or store information or for communication since March 4, 2012    including, but not limited to, personal computers, tablets, phones, and external storage devices, such as external hard drives and thumb drives    (the "Devices"), indicating for each of the Devices whether he has possession, custody, or control of the Devices and, if not, stating the reasons why that is so, i.e., whether they were destroyed, lost, etc. and the present location of the Devices.  Additionally, Donziger shall produce under penalty of perjury a list of all accounts    including, but not limited to, email accounts (including web-based email accounts); accounts (including web- or cloud-based) related to any document management services, such as Dropbox; and accounts related to any messaging services, such as WhatsApp, Facebook Messenger, instant messages, etc.    Donziger has used since March 4, 2012 (the "Media"), indicating whether he presently has the ability to access those accounts and, if not, stating the reasons why that is so."[194]

Compliance was required on or before March 8, 2019, as the Protocol was entered on March 5.

      Paragraph 5 provides in relevant part:

> "The Neutral Forensic Expert shall take possession of Donziger's Devices

---

[194]      Forensic Inspection Protocol [DI 2172] ¶ 4.

and have access to his Media for the purposes of making a mirror image of those Devices and Media.  The Devices shall be surrendered to the Neutral Forensic Expert at Donziger's address at 245 West 104th Street, #7D, New York, NY 10025.  *   *   *  The devices shall be surrendered to the Neutral Forensic Expert at 12:00 pm at 245 West 104th Street, #7D, New York, NY 10025 on March 18, 2019."[195]

These provisions of the Protocol are as clear as a bell.  Donziger's non-compliance is not only clear and convincing   it is admitted.  And he has made no effort whatever to comply, as is evident from his anticipatory refusal to do so.[196]

## VI.    *Alleged Continuation of Pattern of Racketeering*

Chevron's October 1, 2018 contempt motion complains that Donziger's pattern of racketeering activity that was identified in the Court's RICO opinion continues unabated.  It asks for the imposition of severe sanctions.[197]

It is unclear whether Chevron seeks a contempt adjudication based on post-judgment tortious behavior or, instead, offers this argument in support of a position that severe sanctions should be imposed for any violations of the RICO Judgment or other court orders or process that may be found.  To whatever extent it suggests the former, the suggestion is without merit.

Rule 65(d)(1) requires that injunctions state their terms specifically and describe in

---

[195]    *Id.* ¶ 5.

[196]    *See, e.g.*, DI 2173-1 at ECF p. 2.

[197]    DI 2113 at 33-38.

64

reasonable detail the act or acts restrained or required.  In other words, any continuation of the pattern of racketeering activity is remediable by civil contempt only to the extent, if any, that all or parts of it are prohibited by explicit terms of the RICO Judgment or other court process.  The RICO Judgment here does not include the sort of general "go and sin no more" language often found in some consent decrees.  Thus, to whatever extent Chevron's argument is that Donziger is in contempt simply because he has continued the sorts of activities that resulted in the entry of the RICO Judgment, the argument is without merit.

## VII.    Relief

The law governing relief is clear:

"[T]he sanctions for civil contempt serve two purposes: to coerce future compliance and to remedy any harm past noncompliance caused the other party. *United States v. United Mine Workers of America*, 330 U.S. 258, 302-04, 67 S.Ct. 677, 700-01, 91 L.Ed. 884 (1947).  This court has commented that, '[s]o far as the first of these functions is concerned, the district judge, sitting in equity, is vested with wide discretion in fashioning a remedy.'  *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir.1979) (citing *United Mine Workers* ).  The compensatory goal, by contrast, can only be met by awarding to the plaintiff any proven damages. *See id.*  The district court in either case may award appropriate attorney fees and costs to a victim of contempt."[198]

The civil contempts found here fall into two categories.  The first involves

---

[198]    *Weitzman v. Stein*, 98 F.3d 717, 719 (2d Cir. 1996).

disobedience of court directions to perform acts that have not yet been performed.[199]  The second involves actions that violated court-imposed prohibitions.[200]  These two categories warrant somewhat different treatment.

A.    *Coercive Sanctions for Disobedience of Orders Requiring Performance of Actions Not Yet Performed*

Donziger's failure to perform required acts that have not been performed warrant sanctions for the purpose of coercing compliance.  Accordingly, the Court will afford a brief period before the commencement of coercive monetary sanctions during which Donziger may comply fully with the relevant orders.  It imposes escalating fines for each day of continued non-compliance after the expiration of that brief period while reserving the possibility of increasing those fines and/or resorting to other remedies in the event Donziger does not swiftly comply.  As with all such remedies, Donziger will have the option of purging himself of these contempts.

B.    *Compensatory Sanctions for Injurious Disobedience*

Chevron is entitled to recover any damages it sustained by reason of Donziger's contempts, including both those discussed in the preceding paragraph and the violations of the injunctive portions of the RICO Judgment and the restraining notice.  The question is whether the

---

[199]    These are the failure to assign Donziger's rights under the 2017 Retainer, the failure to comply with several specific provisions of the March 5, 2019 order (the Protocol), and the failure to transfer to Chevron all funds received by Donziger that are traceable to the Ecuador Judgment.

[200]    These are the sale and attempt to sell portions of Donziger's personal interest in a contingent fee with respect to the Ecuador Judgment, the profiting from the sale of interests in the Ecuador Judgment to investors, and transfers in violation of the restraining notice.

evidence supports any such award.

Chevron has established no economic damages that yet have flowed from Donziger's failure to assign to Chevron his contingent fee interest under the 2017 Retainer, his failure to comply with the Forensic Protocol, and his sale and attempted sale of portions of his contingent fee claim with respect to and interests in the Ecuador Judgment.

That leaves two other matters   the disobedience to the restraining notice and the violation of so much of paragraphs 1 and 5 of the RICO Judgment as prohibited Donziger from profiting from the Ecuador Judgment and imposed a constructive trust on and required Donziger to pay over to Chevron all property received by him that was traceable to the Ecuador Judgment.

As discussed above, Donziger made at least three transfers after the service of the restraining notice totaling at least $53,620.43 in which he had an interest.[201]  Each of those transfers constituted a separate contempt.  The question is whether and to what extent they caused economic loss to Chevron.

In considering this issue, it is relevant that the restraining notice is only a device for enforcing Chevron's Money Judgment of more than $800,000.  Chevron thus already has a judgment larger than the sum of these three transfers.  The award of another judgment for the transfers *per se* would result in a duplicative recovery.  Accordingly, a compensatory damages award is not warranted in these circumstances.

Donziger's failure to respect the prohibitions of paragraph 5 and the requirement in paragraph 1 that he "transfer and forthwith assign to Chevron all . . . property" that is "traceable to

---

[201]

As noted, the Court does not here consider subsequent transfers in possible violation of the restraining notice as those are not subjects of the contempt motions now before it.

the Ecuador Judgment" is another matter.  As the findings above make clear, Donziger raised at least

$2.4 million from investors in exchange for interests in the Ecuador Judgment.  All of that money

was traceable to the Judgment.  Donziger had a personal right to or at least a personal interest in

and profited from    at least $666,476.34 of those funds.  He was obliged to turn over at least that

amount to Chevron.  Accordingly, the Court will enter a supplemental judgment in favor of Chevron

and against Donziger for that sum.  This is perfectly consistent with the overall purposes of

paragraphs 1 and 5 of the RICO Judgment, which in part were designed to prevent Donziger from

benefitting from the outrageous fraud he perpetrated.[202]

### C.  Sanctions to Promote Future Compliance

The foregoing demonstrates that Donziger has not complied with paragraphs 1 and

5 of the RICO Judgment in that he has sold and attempted to sell parts of his interest in a contingent

fee, profited from the sale of interests in the Ecuador Judgment to investors, failed to comply with

the constructive trust and the requirement that he turn over to Chevron all property traceable to the

Ecuador Judgment that he has a right to or interest in, and the restraining notice.  He has behaved

as if the RICO Judgment and the restraining notice do not exist.  He has disregarded his obligations

under the Protocol.  The likelihood that he will continue to do so is high.  Accordingly, Chevron

urges the Court to grant additional relief in order to coerce future compliance.[203]  Specifically, it

would have the Court impose periodic disclosure and reporting requirements on Donziger.

---

[202]

*See, e.g.*, *Chevron Corp.*, 833 F.3d at 151.

[203]

DI 2113 at 39.

68

"There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt."[204]  They have "'broad discretion to design a remedy that will bring about compliance.'"[205]  Nevertheless, the relief Chevron has proposed is unnecessary. Chevron already has the right to conduct very broad discovery of Donziger and others in order to collect the Money Judgment and ensure compliance with the RICO Judgment.[206]

### D.    Attorneys' Fees

Attorneys' fees may be awarded with respect to civil contempt regardless of whether the other relief granted is coercive, compensatory or both.  As the Second Circuit has stated:  "The district court in either case may award appropriate attorney fees and costs to a victim of contempt."[207] Moreover, a finding of wilfulness is not an indispensable prerequisite to such an award although it is a relevant consideration.[208]  In all the circumstances, the Court finds, by clear and convincing evidence, that Donziger's contempts as specifically enumerated below were wilful.  Accordingly, Chevron is entitled to recover its reasonable attorneys fees, disbursements, and expert witness fees with respect to the discovery and litigation of those civil contempts that the Court has found to have

---

[204]
> *Shillitani v. United States*,  384 U.S. 364, 370 (1966).

[205]
> *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 657 (2d Cir. 2004) (quoting *Perfect Fit Indus. v. Acme Quilting Co.*, 673 F.2d 53, 57 (2d Cir.1982)).

[206]
> FED. R. CIV. P. 69(a); CPLR § 5223; *State of N. Y. v. Shore Realty Corp.*, 763 F.2d 49, 53 (2d Cir. 1985).

[207]
> *Weitzman*, 98 F.3d at 719.

[208]
> *Id.*

been wilful, but not with respect to other issues that may have been litigated on these motions. Any application for attorneys' fees shall be filed no later than June 18, 2019.

*Conclusion*

Chevron's motions to hold Donziger and Donziger & Associates, PLLC, in civil contempt of court [DI 1968, DI 2089 and DI 2112, DI 2175, and DI 2178] all are granted to the extent hereafter set forth.

1. With respect to Chevron's October 1, 2018 motion [DI 2089, DI 2112]:

a. Donziger is in wilful civil contempt of paragraph 1 of the RICO Judgment by virtue of his failure to assign and transfer to Chevron all rights to any contingent fee that he now has or hereafter may obtain including without limitation all such rights under the 2017 Retainer.

b. Unless Donziger previously shall have executed, acknowledged, and delivered to Chevron's counsel the form of assignment attached as Exhibit 88 to DI 2091 without any additions, alterations, attachments or addenda (other than to reflect accurately the year in which the document was signed), he shall pay a coercive civil fine to the Clerk of Court with respect to May 28, 2019 and each subsequent day from that date until the date on which he fully purges himself of this contempt by doing so. The amount of the coercive fine shall begin at $2,000 for May 28, 2019 and shall double for each subsequent day during which Donziger fails fully to purge himself of this contempt.

c. Donziger is in wilful contempt of paragraph 1 of the RICO Judgment by virtue of his profiting in the amount of $666,476.34 from the sale of interests in the Ecuador

Judgment and his failure to assign and transfer to Chevron that profit, which constitutes property that Donziger has received, or to which he had a right, title or interest, that is traceable to the Ecuador Judgment. The Clerk shall enter a second supplemental judgment awarding that sum to Chevron and against Steven Donziger and Donziger & Associates, PLLC, jointly and severally.

       2       With respect to the first of Chevron's two motions filed March 20, 2019 [DI 2175]:

       a.       Donziger is in wilful civil contempt of paragraph 4 of the March 5, 2019 order [DI 2172].

       b.       Unless Donziger previously shall have complied fully with each duty imposed upon him by paragraph 4 of the March 5, 2019 order, he shall pay a coercive civil fine to the Clerk of Court with respect to May 28, 2019 and each subsequent day from that date until the date on which he fully purges himself of this contempt by doing so. The amount of the coercive fine shall begin at $2,000 for May 28, 2019 and shall double for each subsequent day during which Donziger fails fully to purge himself of this contempt.

       3.       With respect to the Chevron's second motion filed March 20, 2019 [DI 2178]:

       a.       Donziger is in wilful civil contempt of paragraph 5 of the RICO Judgment by virtue of his selling, assigning, pledging, transferring or encumbering part of his putative contingent fee interest to David Zelman in exchange for approximately $11,000 worth of personal services.

       4.       With respect to each of the wilful civil contempts adjudicated herein (paragraphs 1(a), 1(c), 2(a), and 3(a)), plaintiff shall recover of Donziger and Donziger & Associates,

71

PLLC their reasonable attorneys' fees in prosecuting these applications.[209]

      5.     The parties each shall file, on or before May 29, 2019 at 1:00 pm, an affidavit or declaration stating whether each of Donziger and Donziger & Associates, PLLC has fully purged him- or itself of each of the civil contempts enumerated in paragraphs 1(a), 1(c), and 2, and if not, each respect in which he or it has not done so.

      6.     Nothing herein forecloses the possibility of the Court granting additional coercive relief, including increased fines and other measures, in the event the civil contempts herein are not fully purged.

      The foregoing constitute the Court's findings of fact and conclusions of law.

      SO ORDERED.

Dated:     May 23, 2019

Lewis A. Kaplan
United States District Judge

---

[209]

    *E.g.*, *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258–59 (1975); *Herman v. Davis Acoustical Corp.*, 196 F.3d 354, 357 (2d Cir. 1999); *Terry*, 886 F.2d at 1345 n.1, 1364.