UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHEVRON CORPORATION,<br><br>                      Plaintiff,<br><br>     v.<br><br>STEVEN DONZIGER *et al.*,<br><br>                      Defendants. | 11 Civ. 0691 (LAK) |

**EMERGENCY MOTION TO STAY FINES AND SANCTIONS
PENDING APPEAL OR IN THE ALTERNATIVE FOR AN
ADMINISTRATIVE STAY**

Undersigned moves the Court to stay (a) the draconian coercive fines imposed on me, a human rights advocate and sole practitioner, for making good-faith efforts to protect the core constitutional rights of me and my Ecuadorian clients, Indigenous peoples and farmer communities who are victims of extensive oil pollution in the Amazon rainforest; and (b) its recent order that I turn over my passport pending resolution of the pending motion to vacate (Dkt. 2221). I ask for a stay pending resolution of my appeal of the Court's May 23, 2019 contempt opinion ("Contempt Opinion") and potentially resolution of any forthcoming appeal of the Court's one-page "Paragraph 5" contempt finding (Dkt. 2219) ("Paragraph 5 Contempt Order") or two-page Passport Order (Dkt. 2232), depending on the outcome of the motion to vacate and whether I need to separately notice appeals of those orders. I further request an immediate administrative stay of all fines and coercive orders to allow for resolution of the instant motion and if necessary an emergency stay motion to the Second Circuit.  This matter implicates my fundamental constitutional rights and the fundamental rights of thousands of  Indigenous peoples in Ecuador,

whose lives truly hang in the balance. Utmost care and deference to these rights is warranted by the Court.

The requested stay is undeniably an emergency. While I have respectfully informed the Court on a regular basis for several months that I would be unable to comply with an order that I turn over massive amounts of privileged and First Amendment-protected materials to my adversary Chevron until I was able to assert my rights on appeal -- understanding that I would potentially have to bear a contempt sanction to establish the necessary appellate jurisdiction -- I have sought to proceed in an orderly and transparent manner. I have complied with orders of the Court, cooperated with Chevron, and made offers of compromise. But instead of allowing room for argument and due consideration, the Court inappropriately seems intent on whipping this matter into an urgent frenzy of purported non-compliance, outrage, and demonization of me personally.

The Court gave me only two days to comply with its patently *ultra vires* Paragraph 5 Contempt Order, and only one day (technically no days) to comply with its egregious Passport Order. It has thus far refused to stay any fines, despite the pending motion challenging the fundamental basis of the Paragraph 5 Contempt. Your Honor was utterly dismissive of my repeated attempts (drafting and submitting two separate declarations) to come into compliance with Paragraph 4 of the Protocol Order (Dkt. 2172). Instead Your Honor is ratcheting up the "additional coercive remedies," while Chevron gleefully references the "jailhouse" and deployment of the U.S. Marshals in its pleadings and argument. Dkt. 2228. This is a "sad pass" if there ever was one.

I urge the Court to shift to a more restrained approach. As I repeatedly have testified under oath and shown with evidence, I have consistently acted in good faith to comply with the Court's RICO Injunction as I understood it—from the Court's *plain words*—explained in the April 2014

Clarification Opinion (Dkt. 1901).[1] I only have had the Court's fundamentally revised interpretation of the RICO Injunction for two weeks. I believe I have powerful grounds to vacate everything the Court has done in the last 18 months on appeal, *see infra*, but I have assured the Court and will reassure it again today that if I do not prevail on appeal I will do what is necessary to come into compliance with all orders of the Court. Chevron has no conceivable claim of urgency: the Ecuador Judgment is being enforced in only one country, and it is a routine briefing schedule with no imminent threat of any action or decision adverse to Chevron and years before any sort of final resolution. There is no reason I cannot have my appellate rights respected before undertaking the severe unconstitutional harm apparent in the Court's various orders. Certainly there is no reason the Court cannot allow for an orderly process two weeks while it decides this motion and if necessary allows me time to seek an emergency appeal to the Circuit.

## ARGUMENT

The Court is intimately familiar with the procedural posture of the case and the orders I am challenging on appeal and seeking to stay in this motion. A stay of deeply prejudicial and draconian coercive fines and measures pending a contempt appeal appears to be the customary and responsible practice. I cited several cases on this point in my motion to vacate, *see* Dkt. 2221 at 4 (citing *In re Grand Jury Investigation of Possible Violations of 18 U.S.C. § 1956 and 50 U.S.C. § 1705*, No. MC 18-175, 2019 WL 2182436, at *5 (D.D.C. Apr. 10, 2019) (noting that both parties "agree [that] contempt sanctions should not accrue during the pendency of the banks' appeal") and *United States v. City of Yonkers*, 856 F.2d 444, 452 (2d Cir. 1988), *rev'd sub nom. Spallone v.*

---

[1] After scrutinizing millions of documents from almost every person I have interacted with professionally and personally in the last four years, Chevron and the Court can only point to one lapse, where I may have carelessly agreed to a monetization-type arrangement with a life coach—an agreement that is now null, if it ever was valid, and involved no investment of funds in the case.

*United States*, 493 U.S. 265 (1990) (noting that the Second Circuit had stayed the district court's coercive fines pending appeal)). Chevron provided no directly contrary authority in its opposition. In any event, "[t]he four factors to be considered in issuing a stay pending appeal are well known: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *In re World Trade Center Disaster Site Litigation,* 503 F.3d 167, 170 (2d Cir. 2007).

### I.  Likelihood of Success

A stay applicant must show "a substantial possibility, although less than a likelihood of success, on appeal." *Lopez Torres v. New York State Bd. of Elections*, 462 F.3d 161, 207 (2d Cir. 2006), *rev'd on other grounds*, 552 U.S. 196, 128 S. Ct. 791 (2008). "The probability of success that must be demonstrated [for the first factor] is inversely proportional to the amount of irreparable injury [the applicant] will suffer absent the stay. Simply stated, more of one excuses less of the other." *Mohammed v. Reno*, 309 F.3d 95, 101 (2d Cir. 2002). That is, "the necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other [stay] factors." Given the extraordinary injury that undersigned faces—million of dollars in fines, seizures of property, threat of imprisonment and financial ruin—undersigned need only a low likelihood of success. However, the probability of success is strong for at least the following reasons, and many more.

### A.  *Bait and switch*

My repeated arguments against the Court's approach throughout the last year can be applied wholesale against the Contempt Opinion as actually issued. The Court never came close in its Opinion to directly addressing and disposing of my objections. Now as before, it is impossible

4

for the Court to credibly maintain that by acting ***in careful compliance with the Court's own explanation***[2] of the meaning and scope of the RICO Injunction I can lawfully be held in contempt of the RICO Injunction. The Court claims that the legal effect of what I call the Clarification Opinion was only to deny a stay, and that the Clarification Opinion cannot have "modified" the RICO Injunction. But I have never claimed it modified it: I have claimed that in the Clarification Opinion, irrespective of the relief it afforded on the stay, the Court explained its view of the meaning and scope of various terms, such as "traceable," and chose to make *bald and unequivocal assertions* regarding what my clients and I could do under the RICO Injunction, including:

- "Nothing in the [RICO Injunction] prevents Donziger from continuing to work on the Lago Agrio case. Period. The pertinent question is whether and to what extent it affects ***his compensation***. . ." 37 F. Supp. 3d 653, 658 (S.D.N.Y. 2014) (emphasis added).

- The RICO Injunction does "not prevent Donziger from being paid, ***just as he has been paid*** . . . over the past nine or ten years," *id.* (emphasis added); *id.* at 665 ("This case always has been financed on the movants' side by outside investors").

- "The point of [the anti-monetization] paragraph [is] to prevent Donziger and the LAP Representatives from avoiding the effect of the constructive trust imposed on assets in their hands that otherwise would have been direct proceeds of the Judgment by selling, assigning, or borrowing on ***their*** interests in the Lago Agrio Judgment and thus at least confusing the issue of traceability." *Id.* at 659-60 (emphasis original).

- Other interest-holders in the Ecuador Judgment "are virtually unconstrained by the [RICO Injunction] in their ability to attempt to fund their litigation efforts against Chevron by continuing to sell shares in anything that may be recovered for whatever investors are willing to pay." *Id.* at 665.

Guided by this unambiguous language, I continued to "work on the Lago Agrio case." "Period." I never made any pretense otherwise. I continued to be paid for my exhaustive, full-time efforts "just as I had been paid" in the past—out of litigation finance funds raised to support the case. Those litigation finance deals were carefully constructed only to "monetize" interests other than my

---

[2] *Schering Corp. v. Illinois Antibiotics Co.*, 62 F.3d 903, 908 (7th Cir. 1995) (it is appropriate to give "particularly heavy weight" to the interpretation of an injunction by "the same judge who entered it and is thus familiar with its history") (Posner, J.).

own—"unconstrained" interests—in the Ecuador Judgment, specifically the entirely separate interest of the *Frente de Defensa de la Amazonía* in both the Ecuador Judgment and the separate incentive award.

Absolutely nothing in the RICO Injunction or the Clarification Opinion suggests that my *work*—my efforts, my activity, my time, my conversations—is somehow constrained by the "anti-monetization" paragraph. Nor is any such constraint workable. The paragraph enjoins me from monetizing my legal interest in the case; that at least is a clear, comprehensible bright line. The Court now seems to think the RICO Injunction enjoins me from making any *efforts* to monetize *any* interest, even the interest of others who may seek my assistance in various ways.[3] How can I possibly understand what is and is not allowed under this prohibition? If I have lunch with a wealthy individual interested in social justice, and pass his name along to another person working on the Ecuador case, have I violated the Court's newly-expanded anti-monetization provision? The new provision is incomprehensible and flagrantly unconstitutional.

In any event, the standard for contempt does not allow me to be held in contempt for legitimately and in good faith misunderstanding the limits of the RICO Injunction. This is not a question of whether I acted in good faith—although the fact that I *did* act in good faith is an

---

[3]  The best the Court can do to justify this new interpretation is to play games with italics. It reprints the key quote from the Clarification Opinion limiting the anti-monetization injunction to "their interests" (Donziger and Mssrs. Camacho and Piaguaje) but strips away the original italics it placed on the words "their interests." Dkt. 2209 at 51. Then it reprints the phrase "any interest" from the RICO Injunction and applies italics to the word "any." *Id.* Presto change-o.

Even worse, the Court tries to dodge the effect of its own words—which, again, assured me that "The point of [the anti-monetization] paragraph [is] to prevent Donziger and the LAP Representatives from avoiding the effect of the constructive trust imposed on assets in their hands"—with the following claim: "nothing in the passage [says] that [this was] the *only* point of paragraph 5 . . ." *Id.* at 52. The Court might as well just argue that it had its fingers crossed behind its back, or that Donziger never said "no backsies."

6

important fact. The question, as the Court acknowledges, is whether the injunction with which I allegedly "failed to comply was clear and unambiguous." Dkt. 2209 at 35. In light of the Court's own words as stated above—and indeed even the RICO Injunction on its face—the substance and scope of the RICO Injunction is nowhere near the level of "clear and ambiguous" that courts have found necessary to justify a finding of contempt. *See, e.g.*, *Drywall Tapers & Pointers v. Local 530*, 889 F.2d 389, 395 (2d Cir. 1989) (the order must be so clear and unambiguous as to leave "no doubt in the minds of those to whom it was addressed [as to] precisely what acts are forbidden"). This fact has been at the core of these post-judgment proceedings from Day One. It was the basis for my motion to dismiss over a year ago, and my principled resistance to handing over reams of First Amendment-protected information as part of a patently unjustified chimera of a contempt claim.

It is highly likely that the Second Circuit will agree with me and will vacate the findings, orders, and all other consequences of these post-judgment proceedings *en toto*. I urge the Court to demonstrate the humility necessary to recognize that the appellate court is likely to have a dramatically different view of the legitimacy of these proceedings and allow me the necessary time to pursue my appellate rights in an orderly fashion without imposing any penalties—much less draconian fines which the court knows that I do not have the resources to pay.

B.   *End run around the Second Circuit affirmance of the Court's RICO Opinion*

Another key reason why the Second Circuit will reverse the Court's Contempt Opinion and post-judgment orders generally is that I trust the appellate court to recognize that the Court is effectively making an end-run around the Second Circuit's carefully limited affirmance of the Court's March 2014 RICO opinion. The Second Circuit repeatedly emphasized that the only thing that the RICO Injunction did was (a) "prohibit[] Donziger and the LAP Representatives from

7

seeking enforcement of the Ecuadorian judgment *in the United States*" and (b) "prohibit Donziger and the LAP Representatives from profiting" on the Ecuador Judgment. 833 F.3d 74, 151 (2d Cir. 2016) (emphasis added). The appellate court also repeatedly emphasized that the Court's "confine[d]" relief would not even "disturb the Ecuadorian judgment." *Id.* at 81. The Contempt Opinion and its dramatic recasting of the RICO Injunction fundamentally changes the nature of the relief in ways directly contrary to the "confined" nature of the relief the appellate court affirmed. As discussed briefly above, the Court under its revised Injunction is now purporting to enjoin my efforts to seek enforcement of the Ecuadorian judgment *outside of the United States* and further to enjoin my ability to work on the case (and get paid for my work) entirely.

The Court's disturbingly unfounded Passport Order, *see infra*, also demonstrates that the Court will do whatever it can to undermine, at a practical level, my ability to continue my advocacy for the affected Ecuadorian communities generally—even outright blocking my ability to meet with them. The record in this case easily demonstrates that my continued work on the case is absolutely critical to the continued vitality of the Ecuador case generally, for a host of reasons. By seeking to shut down my international travel entirely, the Court is transparently seeking to "disturb" the Ecuador Judgment in ways that the Second Circuit has repeatedly said are inappropriate. The Court's actions thus flagrantly violate the mandate rule of the law of the case doctrine, *see, e.g.*, *In re FCC*, 217 F.3d 125, 133 (2d Cir. 2000) ("the terms of the mandate [must be] scrupulously and fully carried out and [] the inferior court's actions on remand [must] not [be] inconsistent with either the express terms or the spirit of the mandate.") as well as seeking to accomplish a deeply illegitimate and unjust "termination" to the historic advocacy effort seeking accountability for Chevron's crimes in Ecuador.

C. *Transparent strategy to infiltrate and shut down constitutionally-protected activity*

The Second Circuit is also likely to vacate the Contempt Opinion and all the Court's post-judgment orders based on its rejection of the broader strategy that is so evident underneath all these post-judgment proceedings. The Court held Chevron's initial contempt motion open for over a year, allowing wide-ranging and intrusive discovery that in the end proved entirely unnecessary to decide the discrete legal issues regarding the scope of the RICO Injunction. The Court has turned a blind eye to the well-established pattern of Chevron's abusive conduct in misusing discovery material and launching vicious attacks on its adversaries, dragging them into litigation to intimidate them into distancing themselves from the Ecuador case solely so that Chevron's vicious, unfounded attacks will, in the words of Boston mother and businesswoman Katie Sullivan, "be over as quickly as possible." Dkt. 2026 at 5-12; Dkt. 2122 at 3, 2-8. The Court has repeatedly dismissed and outright sneered at the fundamental associational rights at stake in these proceedings—"fancy" constitutional rights, it called them at the recent hearing. The Second Circuit will take a different view of whether these rights deserve to be respected, as it has in the numerous right-of-association cases I cited in my briefing. These entire post-judgment proceedings are fairly seen as SLAPP-style attack on public interest advocacy, an effort to protect a "company of considerable importance to our economy" from the consequences for its actions at the expense of the company's victims, and perhaps even an effort to crush me as an example to the human rights community generally of what will happen if an advocates threatens powerful corporate interests too effectively.

D. *Excessive and abusive sanctions*

The ways in which the Court's treatment of me in these post-judgment proceedings has been excessively harsh, abusive, and lacking in due process are too numerous to even list

9

…

exhaustively here. The Court is intimately familiar with these proceedings and knows fully each of these excesses and abuses. Merely the most recent ones are illustrative.

1. The Court's purported amendment of the Contempt Opinion

The Court's Paragraph 5 Contempt Order is in plain violation of core the principle of appellate jurisdiction, based at most on the pretense that a finding of contempt under Paragraph 5 of the Protocol Opinion is not part of the "same aspect of the case" as the Court's finding of contempt under Paragraph 4 of the Contempt Opinion. My arguments on this are set out in the motion to vacate (Dkt. 2221) and my reply in support thereof (Dkt. 2231). The Paragraph 5 Contempt Order simply thumbs its nose at the fundamental principle that the act of filing a notice of appeal "divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982).

2. The Passport Order

This was issued yesterday. The Court has given me barely 24 hours to comply with a "coercive" sanction that directly targets a fundamental aspect of personal liberty protected by the Due Process clause of the Constitution. *See Kent v. Dulles,* 357 U.S. 116, (1958) ("Travel abroad, like travel within the country, may be necessary for a livelihood. It may be as close to the heart of the individual as the choice of what he eats, or wears, or reads. Freedom of movement is basic in our scheme of values."); *Omar v. Kerry*, 2015 WL 5964901, at *6 (N.D. Cal. Oct. 13, 2015) (citing *Vartelas v. Holder*, 132 S. Ct. 1479, 1488 (2012) ("Loss of the ability to travel abroad is itself a harsh penalty, made all the more devastating if it means enduring separation from close family members living abroad.") and *Eunique v. Powell*, 302 F.3d 971, 973 (9th Cir. 2002) ("It is undoubtedly true that there is a constitutional right to international travel.")). I have not had time to fully research the issue, much less move the Court for appropriate relief.

…

On a preliminary investigation, it appears that the Court's order is thoroughly unfounded. The Court cites a single case from the Seventh Circuit, *Herbstein v. Bruetman*, 241 F.3d 586 (7th Cir. 2001), presumably indicating that authority from the Second Circuit is unavailable. The key fact in *Herbstein* was that the targeted defendant in that case has repeatedly "left for Argentina" "without warning" in order to avoid judgment enforcement procedures. *Id.* at 587 ("Bruetman has demonstrated a propensity to leave the country when the heat is turned up"). It was this directly on-point fact that justified to district court's order seizing the defendant's passport for the specific purpose of preventing him from leaving the country to avoid paying a judgment. The Court's Passport Order doesn't even suggest that the ordered seizure of my passport is for the same purpose. It merely characterizes the seizure as an "additional coercive remed[y]"—an increase in pain, pressure, or inconvenience—without reference to any specific purpose as in *Herbstein*. Nor would the Court's application of the *Herbstein* rationale in this context be tolerable: there is ***no record whatsoever*** of me leaving the country for strategic purposes. By contrast, the record is that I have stayed in New York, where my wife is employed and my son goes to school, despite over a decade of egregious and abusive attacks by this Court based on its jurisdiction over me as a New York resident. The *Herbstein* case is entirely inapposite.

**II.   Irreparable Harm Absent a Stay**

As to the coercive fines, which the Court maintains are now in excess of $1 million and will soon be vastly more than that, imposed on a life-long human rights advocate and sole practitioner, they are by themselves severe harm sufficient to satisfy this factor. And to the extent the Court is able to leverage these brutal fines and other sanctions—*see infra* re the passport order—to force me to turn over constitutionally-protected materials before I can seek any relief at the Second Circuit, I would obviously suffer devastating and irreparable harm. Of course, the

dissemination of my private information to Chevron would be unconstitutional harm, as described above. And it would be irreparable: even if a future order of the Second Circuit directed Chevron to delete improperly received materials, no such order would be able to force Chevron's vast team of hundreds of lawyers, investigators, and public relations operatives working on this case to "unlearn" what they might have gleaned from reading unlawfully compelled materials.[4]

Worse, the forced production of massive amounts of material from my devices and the forced disgorgement of my account information could also effectively moot my pending appeal. "[L]oss of appellate rights is quintessential form of prejudice. Thus, where the denial of a stay pending appeal risks mooting any appeal of significant claims of error, the irreparable harm requirement is satisfied." *In re Adelphia Communs. Corp.*, 361 B.R. 337, 347-48 (S.D.N.Y. 2007); *see also In re St. Johnsbury Trucking Co.*, 185 B.R. 687, 690 (S.D.N.Y. 1995) ("[T]he government is correct that there is a risk that its appeal will be mooted absent a stay. . . . The government thus is threatened with irreparable injury."); *In re von Bulow*, 828 F.2d 94, 98 (2d Cir. 1987) ("[A]n order that information be produced that brushes aside a litigant's claim of a privilege not to disclose, leaves only an appeal after judgment as a remedy. Such a remedy is inadequate at best. Compliance with the order destroys the right sought to be protected . . . . Often, to deny review is

---

[4] As I have repeatedly explained, the notion that the harm of disclosure would be at all mitigated by the terms and procedures of the Forensic Inspection Protocol is a fantasy. *See, e.g.*, Dkt. 2151, 2184 at 4-6; *cf.* Dkt. 2230-4. The Protocol relies on Chevron's wildly overbroad search terms, which would sweep in basically all privileged and confidential documents related to, inter alia, by upcoming bar hearing, communications with counsel during the RICO trial and the prior appeal to the Second Circuit, communications regarding the enforcement proceedings in Canada, communications with my clients, communications with civil society allies, and more. Ten percent of these documents would be provided directly to Chevron lawyers. By broadly coding this 10%, Chevron could ensure that any and all other documents it wishes will be part of a subsequent production to Chevron itself—a production that would occur without any additional review or oversight by the "neutral" or myself. While I could theoretically seek to claw back documents at that point, it would be impossible to force Chevron operatives to "unlearn" anything they should not have been exposed to.

to deny the privilege.").

Seizure of my passport also threatens irreparable injury. The case against Chevron is part of, and relies on, a larger global effort by numerous groups of advocates, lawyers, Indigenous peoples, and other communities who all share a commitment to seeing Chevron held accountable for its crimes in Ecuador. The case's reliance on these networks depends significantly on personal relationships I have with individuals and groups all over the world. My inability to continue to cultivate and advance these interests in person while the Court is holding my passport—for how long, I have no idea, *see infra* note 6—threatens irreparable harm to those relationships and thus the case and the impacted Ecuadorian communities.

**III.     No Injury to Chevron**

There is no conceivable harm to Chevron in granting the requested stay. If the appellate court agrees that it has a right to access information on my devices and in my accounts, it will gain such access subsequent to the resolution of my appeal, as I have repeatedly assured the Court. Its rights to discovery for money-judgment enforcement purposes present no basis for urgency. Money judgment enforcement typically takes time, and Chevron is presumably entitled to recovery of interest. There is no evidence that any activity arguably subject to the RICO Injunction (collection, monetization) is imminent, and in fact no such activity is imminent. In any event, the Court should grant the requested administrative stay to hear if Chevron even pretends that it would face any injury from a stay pending appeal, and I will respond to any such claim by Chevron in due course in reply.

**IV.     The Public Interest**

To satisfy the fourth factor, an applicant need only show that the granting of the motion will not harm the public interest. *See In re Albicocco*, No. 06-CV-3409, 2006 WL 2620464, at *5

13

(E.D.N.Y. Sept. 13, 2006). No public interest will be undermined by the grant of a stay. To the contrary, the public interest overwhelmingly favors allowing potentially meritorious claims to be fully heard on appeal rather than rapid-fire deployment of brutally "coercive" measures to force compliance with potentially unconstitutional measures, at a risk of extinguishing constitutional rights and wide-reaching constitutional harm. There is no denying that the issue of Chevron's accountability for its contamination in Ecuador is an issue of global public significance. Tens of thousands of Ecuadorian lives are at stake, and organizations including Amazon Watch, Greenpeace, Human Rights Watch, Global Witness, Amnesty International, and countless others have for decades, and continue to this day, to aggressively push (and yes, pressure) Chevron to account for bot hits contamination and its strategic decision-making in response to the Ecuador Judgment, namely, litigating the RICO case and bearing down on me personally in these post-judgment proceedings.[5] As I have repeatedly articulated, forcing me to disclose confidential First Amendment-protected information prior to exhaustion of my appeal rights would not just harm me and my clients, but would impinge the associational rights of the entire coalition engaged in social justice efforts on behalf of the Ecuadorian cause. *See, e.g.*, Dkt. 2026. Again, Chevron has repeatedly demonstrated its propensity to use any information about its opponents to attack them, drag them into litigation, and improperly intimidate them into distancing themselves from the Ecuador case for illegitimate reasons. *See supra*. Furthering all this abusive conduct by not granting a stay is distinctly opposed to the public interest. Again, I urge the Court to simply restrain itself sufficient to allow for an orderly process for my claims of right to be heard on appeal.

---

[5] *See, e.g.*, "The First Annual SLAPP Awards 2018," Protect the Protest Coalition, at https://www.protecttheprotest.org/2019/02/25/the-first-annual-slapp-awards-2018/ (naming Chevron "Corporate Bully of the Year" and noting that "Chevron has only ramped up its bully tactics in what has been described as the 'vengeance stage' of its 25-year long legal effort to avoid accountability for oil-spilling in Ecuador.")

## CONCLUSION

For the foregoing reasons, undersigned requests that the Court administratively stay all fines and coercive orders to allow for resolution of the instant motion and grant the motion to stay all of its coercive fines and sanctions pending my current appeal and any forthcoming appeal of Dkts. 2219 and/or 2232. In the alternative, if the Court is unwilling to issue the full stay, undersigned requests that the Court administratively stay of all fines and coercive orders until the Second Circuit is able to resolve a forthcoming emergency motion to stay under Rule 8 of the Federal Rules of Appellate Procedure.[6]

DATED:      June 12, 2019             Respectfully submitted,

*s/ Steven R. Donziger*
Steven R. Donziger
245 W. 104th Street, #7D
New York, NY 10025
Tel: (917) 678-3943
Fax: (212) 409-8628
Email: sdonziger@donzigerandassociates.com

*Pro se*

---

[6] I am not able to comply with the Court's deadline of 4 p.m. today in the Passport Order on account of this pending motion for emergency relief and the severe and irreparable harm as articulated in this motion. Indeed, I am still working to understand the nature and scope of the harm potentially imposed by the Passport Order, which issued just 24 hours ago. In particular, I am trying to understand the extent of the potential threat that the Court could permanently refuse to return my passport until I pay the millions of dollars it has ordered me to pay to Chevron. Given that I have no basis to expect to be able to pay those debts *ever*, I am concerned that the seizure of my passport could be permanent—I could never be allowed to travel out the country for any purpose for the rest of my life. I do not yet know if this is a genuine threat—I am struggling *pro se* to understand this question and what the consequences would and should be for my actions. In the last 24 hours I have prepared this emergency stay motion to Your Honor, and I am immediately turning to the task of preparing an emergency stay to the Circuit in the event Your Honor denies this motion. I will also continue to try to understand the present situation I am in and make considered decisions about the necessary next steps.