## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHEVRON CORPORATION,

        Plaintiff,

    v.

                                    11 Civ. 0691 (LAK)

STEVEN R. DONZIGER, *et al.*,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## CHEVRON CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR ATTORNEYS' FEES

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

STERN, KILCULLEN & RUFOLO LLC
325 Columbia Tpke, Ste 110
P.O. Box 992
Florham Park, New Jersey 07932-0992
Telephone: 973.535.1900
Facsimile: 973.535.9664

*Attorneys for Plaintiff Chevron Corporation*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ...................................................................................................................... 1

ARGUMENT .............................................................................................................................. 2

I.      The Court Has Already Found That Chevron Is Entitled to an Award of
        Attorneys' Fees and Expert Costs ................................................................................. 2

II.     The Hours Expended in Connection With the Contempt Motions Were
        Reasonably Necessary to Obtain a Successful Outcome ................................................ 3

        1.    Chevron Seeks $1,623,750.75 for Attorneys' Fees Related to
              Contempt Motions and Hearings ........................................................................... 8

        2.    Chevron Seeks $1,569,144.55 for Attorneys' Fees Related to Post-
              Judgment Discovery and Discovery-Related Motion Practice Pertinent
              to the Contempt Motions ...................................................................................... 10

        3.    Chevron Seeks $240,489 for Expert Witness Fees ............................................... 12

III.    The Hourly Rates Claimed by Chevron's Counsel and Experts Are Reasonable
        Within the Relevant Market and Considering the Nature of the Work ........................... 13

CONCLUSION ........................................................................................................................... 18

# TABLE OF AUTHORITIES

**Cases**

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany,*
    522 F.3d 182 (2d Cir. 2008)................................................................3, 14

*Bergerson v. N.Y. State Office of Mental Health,*
    652 F.3d 277 (2d Cir. 2011)....................................................................3

*Chevron Corp. v. Donziger,*
    974 F. Supp. 2d 362 (S.D.N.Y. 2014).....................................................16

*Destefano v. Zynga, Inc.,*
    No. 12-CV-04007-JSC, 2016 WL 537946 (N.D. Cal. Feb. 11, 2016) ....................18

*Ebbert v. Nassau Cty.,*
    No. CV 05-5445 (AKT), 2011 WL 6826121 (E.D.N.Y. Dec. 22, 2011) ................15

*Grant v. Martinez,*
    973 F.2d 96 (2d Cir. 1992)......................................................................3

*Gucci Am., Inc. v. Rebecca Gold Enters., Inc.,*
    No. 89 Civ. 4736 (BN), 1993 WL 88270 (S.D.N.Y. Mar. 23, 1993) ................3

*Lenihan v. City of New York,*
    640 F. Supp. 822 (S.D.N.Y. 1986)............................................................4

*Lilly v. Cty. of Orange,*
    910 F. Supp. 945 (S.D.N.Y. 1996)...........................................................15

*Luciano v. Olsten Corp.,*
    109 F.3d 111 (2d Cir. 1997)....................................................................3

*Middleton v. Green Cycle Hous., Inc.,*
    No. 15MC0023, 2017 WL 715747 (S.D.N.Y. Feb. 23, 2017)...........................2, 13

*Miroglio S.P.A. v. Conway Stores, Inc.,*
    629 F. Supp. 2d 307 (S.D.N.Y. 2009)........................................................3

*Mt. Airy Ins. Co. v. Town of Orangetown,*
    22 F. Supp. 2d 57 (S.D.N.Y. 1998)...........................................................4

*N.Y. State Assoc. for Retarded Children, Inc. v. Carey,*
    711 F.2d 1136 (2d Cir. 1983)...................................................................3

*N.Y. State Nat. Org. for Women v. Terry,*
    952 F. Supp. 1033 (S.D.N.Y. 1997)...........................................................2

*Niles v. Palmer*,
   No. 97 Civ. 7573, 1999 WL 1419042 (S.D.N.Y. Oct. 22, 1999) ............................................13

*In re Payne*,
   707 F.3d 195 (2d Cir. 2013)...................................................................................................5

*Tran v. Tran*
   166 F. Supp. 2d 793 (S.D.N.Y. 2001)...................................................................................13

*Weitzman v. Stein*,
   98 F.3d 717 (2d Cir. 1996)......................................................................................................2

**Rules**

S.D.N.Y. Civ. R. 83.6(a)...............................................................................................................3

# INTRODUCTION

On May 23, 2019, the Court granted four motions by Chevron Corporation ("Chevron") to hold Steven Donziger in contempt of the RICO Judgment and related orders. Dkt. 2209. The Court based its opinion on the substantial evidence Chevron had amassed showing Donziger's monetizing of, and profiting from, the Ecuadorian judgment, in contravention of this Court's RICO Judgment prohibiting such activities. The contempt order followed extensive motion practice, numerous court conferences and hearings, and more than a year of post-judgment discovery. As part of that order, the Court awarded attorneys' fees to Chevron. Chevron now respectfully submits this motion to detail the fees to which the Court has found Chevron is entitled.

Especially in light of Donziger's own tactics over the past two years, which compounded Chevron's legal costs, Chevron's claimed fees are reasonable. Indeed, Donziger's bad faith, delay, and disregard of this Court's RICO Judgment and related orders are what necessitated the contempt motions in the first place. Donziger's behavior during the prosecution of the contempt motions—rife with subterfuge, defiance, and obstruction—added substantially to the time and resources that Chevron (and this Court) were forced to expend.

In accordance with the Court's order (Dkt. 2209), Chevron does not seek attorneys' fees for all of the work it performed in connection with these post-judgment proceedings, such as responding to Donziger's nonsensical motions like his "motion to dismiss" Chevron's contempt motion (Dkt. 2018), or fees related to Donziger's jurisdictionally-improper appeals (*see* 2d Cir., Nos. 18-855-cv (L), 18-2191-cv (Con)). Instead, Chevron has limited its request for fees to those activities directly related to the contempt motions that the Court granted in the May 23, 2019 order—specifically, preparing and litigating the contempt motions, engaging in discovery to obtain evidence of Donziger's contempt, working with experts to analyze the evidence, and attending court hearings and depositions.

As a consequence, Chevron seeks an award of $3,433,384.30 for attorneys' fees incurred in these activities, reflecting over 3,600 hours billed by Chevron's outside counsel at Gibson, Dunn & Crutcher LLP and Stern, Kilcullen & Rufolo LLC, and over 680 hours billed to Chevron by the expert forensic accountant team of John Slavek from Kroll. Mr. Slavek's work in particular was crucial to understanding how the funds Donziger raised were moved around between accounts in an attempt to conceal them. This amount is based on reasonable hourly rates—commensurate with those charged by comparable firms in the Southern District of New York—and an appropriate number of hours worked in light of the scope and extent of Donziger's contempt, as well as his obstruction in these post-judgment proceedings.

## ARGUMENT

### I.    The Court Has Already Found That Chevron Is Entitled to an Award of Attorneys' Fees and Expert Costs

The Court found that "Donziger's contempts as specifically enumerated" in the order "were willful" and that "Chevron is entitled to recover its reasonable attorneys['] fees, disbursements, and expert witness fees with respect to the discovery and litigation of those civil contempts." Dkt. 2209 at 68. This award was well grounded in Second Circuit precedent. In fact, the Second Circuit has held that "a district court, having found willful contempt, would need to articulate persuasive grounds for any denial of compensation for the reasonable legal costs of the victim of contempt." *Weitzman v. Stein*, 98 F.3d 717, 719 (2d Cir. 1996).

Courts in this Circuit regularly award attorneys' fees arising from contempt proceedings. *See, e.g.*, *Middleton v. Green Cycle Hous., Inc.*, No. 15MC0023, 2017 WL 715747, at *7–*10 (S.D.N.Y. Feb. 23, 2017) (awarding attorneys' fees and costs for willfully contemptuous violations of restraining order and related court orders); *N.Y. State Nat. Org. for Women v. Terry*, 952 F. Supp. 1033, 1044–45 (S.D.N.Y. 1997) (reinstating attorneys' fee award against contemnors);

*see also* S.D.N.Y. Civ. R. 83.6(a) ("A reasonable counsel fee, necessitated by the contempt proceedings, may be included as an item of damage" for civil contempt).

## II. The Hours Expended in Connection With the Contempt Motions Were Reasonably Necessary to Obtain a Successful Outcome

As Chevron detailed in its prior fee application in this Court (Dkt. 1890), the rule is that "[a]ttorneys' fees are awarded by determining a *presumptively reasonable fee*, reached by multiplying a reasonable hourly rate by the number of reasonably expended hours." *Bergerson v. N.Y. State Office of Mental Health*, 652 F.3d 277, 289 (2d Cir. 2011) (emphasis added). The Second Circuit adopted this "presumptively reasonable fee" approach in *Arbor Hill Concerned Citizens Neighborhood Association v. County of Albany*, 522 F.3d 182, 186–93 (2d Cir. 2008).

The Second Circuit has held that "[i]n reviewing a fee application, the district court examines the particular hours expended by counsel with a view to the value of the work product of the specific expenditures to the client's case." *Luciano v. Olsten Corp.*, 109 F.3d 111, 116 (2d Cir. 1997). "The critical inquiry is 'whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures.'" *Miroglio S.P.A. v. Conway Stores, Inc.*, 629 F. Supp. 2d 307, 312 (S.D.N.Y. 2009) (quoting *Grant v. Martinez,* 973 F.2d 96, 99 (2d Cir. 1992)).

In support of a request for attorneys' fees, the party seeking fees "must document the application with contemporaneous time records . . . specify[ing], for each attorney, the date, the hours expended, and the nature of the work done." *N.Y. State Assoc. for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983). "[W]here the record is substantial, it is permissible to file an application in the form of an affidavit, appending in computer printout form a copy of the relevant portions of the contemporaneous time records." *Gucci Am., Inc. v. Rebecca Gold Enters., Inc.*, No. 89 Civ. 4736 (BN), 1993 WL 88270, at *3 (S.D.N.Y. Mar. 23, 1993). A party

seeking fees may transfer information from "contemporaneous records [to] a form convenient for the Court"—submission of the actual physical records is not required. *Lenihan v. City of New York*, 640 F. Supp. 822, 824 (S.D.N.Y. 1986). The ultimate purpose of any submission is to permit the district court to evaluate whether the hours were "usefully and reasonably expended." *Mt. Airy Ins. Co. v. Town of Orangetown*, 22 F. Supp. 2d 57, 59 (S.D.N.Y. 1998).

Chevron seeks fees it incurred for the legal and expert work necessary to bring the contempt motions and related discovery. Uncovering Donziger's contempt, and pursuing the four successful contempt motions, required a substantial amount of attorney and expert time. This time reflected the extensive evidence offered in support of the contempt motions and Donziger's determined efforts to conceal, delay, and obstruct at every turn.

In early 2018, Chevron learned about Donziger's attempt to obtain funding from Elliott Management Corporation. In the nearly fifteen months from when Chevron initially sought leave of court to conduct post-judgment discovery to when the Court issued its contempt decision, *see* Dkts. 1966, 2209, Chevron engaged in extensive efforts to uncover Donziger's misconduct. A chronology of relevant motions, hearings and discovery is attached hereto as Exhibit B to the Declaration of Anne Champion submitted with Chevron's Application for Attorneys' Fees ("Champion Decl.").

After learning about Donziger's solicitation of Elliott Management, Chevron began investigating Donziger's misconduct, and ultimately filed on March 19, 2018 an *ex parte* application by order to show cause seeking post-judgment discovery, thus kicking off a fifteen-month effort to discover the truth regarding Donziger's violations of the RICO Judgment. *See* Champion Decl., Ex. B at 1; Dkt. 1965. Soon thereafter, Chevron served a request for production and an information subpoena on Donziger.

In typical fashion, Donziger obstructed the process throughout, and his willful behavior increased Chevron's fees. No doubt this was part of his objective. For example, he refused to comply with the information subpoena, which forced Chevron to move to compel his coopera-tion and required Chevron to prepare additional briefing after having spent valuable time on meet and confers with Donziger. This Court recognized Donziger's "stonewall[ing]" efforts, noting that Donziger "defied court process compelling him to provide discovery and to take other ac-tions" and "ignored the fundamental 'proposition that all orders and judgments of courts must be complied with promptly.'" Dkt. 2209 at 2 (quoting *In re Payne*, 707 F.3d 195, 206 (2d Cir. 2013)).

As part of its efforts to uncover the truth, Chevron also served a number of subpoenas on third parties, including Mary Katherine Sullivan, Joshua Rizack, David Zelman, Aaron Marr Page, Forum Nobis PLLC (Aaron Page's law firm), Laura Miller (Donziger's wife), Cliff Eisler, Glenn Krevlin, John Van Merkensteijn, Tony Abbiati, Wellbeck Partners, Gary Greenberg, JP Morgan Chase Bank, TD Bank, and American Express. *See* Champion Decl., Ex. B at 1–7, 10–11. These subpoenas required Chevron's counsel to engage in meet-and-confer negotiations with dozens of individuals and entities, to analyze their document productions, and to prepare for their deposition when a deposition was had. In certain instances, such as with Ms. Sullivan, Chevron incurred substantial fees also engaging with Donziger as he tried to prevent incriminat-ing evidence in Ms. Sullivan's possession from being revealed. For example, Chevron was forced to oppose Donziger's attempt to designate every document in Ms. Sullivan's production as confidential. Champion Decl., Ex. B at 7; Dkt. 2107. Throughout this process, Chevron's counsel conducted legal research, drafted motions and responses to motions, and conducted ex-tensive analysis of the evidence obtained, together with Kroll's forensic accounting experts,

whose fees Chevron also seeks with this fee application.

Ultimately, Chevron was forced to pursue extensive discovery to uncover Donziger's contemptuous behavior. Although Chevron is not seeking fees for all discovery conducted, it is important to understand the full scope of discovery to put into perspective the extensive amount of work required to develop the record that the Court had before it when it ruled on the contempt motions. Over the past fifteen months, Chevron served over 70 subpoenas, deposed 15 witnesses for more than 60 collective hours of testimony and introducing more than a combined 400 new exhibits, and collected and reviewed approximately 106,000 pages of documents. *See* Champion Decl., Ex. B. In support of discovery efforts and enforcement of this Court's orders, Chevron also brought eight formal motions during that same period for which Chevron now seeks attorneys' fees, including multiple motions to compel against Donziger. *See* Dkts. 1966, 1989, 2050, 2073, 2089, 2112, 2175, 2178.[1] Chevron's briefs on these filings alone exceeded 160 pages of substantive argument, with at least 10 supporting declarations and over 175 cumulative supporting exhibits. Chevron also had to respond to multiple motions and requests for relief by Donziger and other discovery targets, from repeated efforts to delay and continue to motions designed to prevent discovery, and, although Chevron is not claiming fees for all of that work, it was essential to establishing Donziger's contempt. *E.g.*, Dkt. 2067 (Donziger motion to stay discovery pending appeal); Champion Decl., Ex. B at 4.

---

[1] Chevron also filed several other motions during this time period for which it is not here seeking fees. *See* Champion Decl., Ex. B; Dkt. 1976 (motion for default judgment as to non-appearing defendants); Dkts. 1980 and 1982 (request to enter default judgment); Dkt. 1994 (motion for attorneys' fees as to the defaulted RICO defendants); Dkt. 2016 (letter motion to adjourn conference and request for date certain for Donziger to respond to judgment compliance discovery requests); Dkt. 2046 (motion to compel Donziger to execute an unqualified transfer of Amazonia shares); Dkt. 2083 (motion to hold Donziger in contempt for failure to comply with August 15 and August 21, 2018 orders); Dkt. 2138 (motion to compel Gary Greenberg to respond to post-judgment discovery).

Discovery also revealed that Donziger had instructed third parties to withhold documents from Chevron, despite those documents being responsive. *See, e.g.*, Champion Decl. at Ex. E (J. Rizack Dep. Tr. at 28:2 – 29:13 (June 26, 2018)). And in one instance, Donziger had Aaron Marr Page withhold three boxes of responsive documents from production to Chevron, while instructing Page to send the boxes to Donziger in New York, which effectively took them out of Page's—and Chevron's—reach. Champion Decl. at Ex. F.

Notwithstanding Donziger's efforts to obstruct these proceedings, Chevron's effort culminated in a 71-page opinion from this Court which laid forth Donziger's multiple acts of contempt in extensive detail. Dkt. 2209. The Court's opinion was thorough and well-supported by the record that Chevron developed, including incontrovertible evidence showing the money transfers to Donziger by way of bank account records. The hours expended by Chevron to achieve this result were both necessary and reasonable.

The amount of time that Chevron expended on these motions and the discovery related to them was more than reasonable. And Chevron has supported its work by submitting with this fee application records of the attorney and expert time for which Chevron seeks reimbursement. *See* Champion Decl. Exs. A, C; Exhibit A of Declaration of Joel Silverstein submitted with Chevron's Application for Attorneys' Fees ("Silverstein Decl.").

Chevron's $3,433,384.30 fee request is only a portion of the full cost of its fees and expenditures related to the contempt motions. Chevron also has not included time billed by its in-house attorneys or from other law firms that it consulted in connection with specific aspects of the motions. Chevron has not included these and other fees in order to streamline the Court's consideration of this fee request.

### 1. Chevron Seeks $1,623,750.75 for Attorneys' Fees Related to Contempt Motions and Hearings

Chevron seeks $1,623,750.75 in attorneys' fees related to contempt motions and hearings. *See* Champion Decl., Ex. A-1 (Gibson Dunn fees of $1,562,576); Silverstein Decl., Ex. A-1 (Stern Kilcullen fees of $61,174.75).

Chevron does not seek attorneys' fees and expert expenses for all time related to post-judgment discovery and motions practice, but, in addition to the scope enumerated by the Court and in an effort to streamline this petition for the Court, Chevron also is excluding from the application certain categories of time entries despite the fact that they relate to the preparation and litigation of the actual contempt motions that are the subject of the Court's opinion.

For example, although it would be well within its rights to do so, Chevron is not seeking fees for responding to a number of Donziger's meritless motions, including a number of letter motions, his nonsensical "motion to dismiss" Chevron's contempt motion (Dkt. 2018), his "motion for a protective order to protect First Amendment rights " (Dkt. 2026), or for letter motions whose goal was to delay the proceedings, such as his "emergency" motion to stay (Dkt. 2028), or his letter motion to continue the June 28, 2018 hearing (Dkt. 2039). And Chevron is not seeking fees related to motions filed in connection with third-party discovery, such as Chevron's motion to compel Gary Greenberg to respond to the post-judgment subpoena issued to him (Dkt. 2138). Finally, Chevron also is not seeking reimbursement for fees incurred on the contempt motions and related discovery by non-attorneys, such as paralegals, or for fees incurred after April 15, 2019—the day that briefing closed on the contempt motions filed on March 20, 2019.

The contempt motions for which Chevron does seeks fees are as follows.

Chevron filed its first motion for contempt against Donziger on March 19, 2018. Dkts. 1965–68. That motion alleged that Donziger was in contempt of Paragraphs 3 and 5 of the RICO

Judgment because he both failed to transfer his Amazonia shares to Chevron and sought to sell an interest in the Ecuadorian judgment to Elliott Management in order to profit from that judgment. Dkt. 1966 at 12–16. This motion further asked for post-judgment discovery in order to compile a complete evidentiary record. *Id.* at 19–20. The Court subsequently allowed post-judgment discovery to proceed with respect to compliance with Paragraph 5 but ordered a hearing with regard to what had occurred with Elliott Management. Dkt. 2209 at 7. The hearing took place on May 8, 2018, and subsequently, the Court granted Chevron additional leave to conduct post judgment discovery. *See* Dkts. 2006, 2009 (granting Chevron leave to conduct discovery but reserving decision on timing); Dkt. 2020 (granting Chevron's request for Paragraph 5 discovery against Donziger); Dkt. 2022 (granting Chevron leave to conduct discovery against third-party witnesses); Dkt. 2056 (granting Chevron further leave to conduct discovery). This initial motion was crucial to establishing Donziger's contempt as it led to the discovery that, in turn, developed evidence supporting Chevron's subsequent contempt motions.

Chevron filed a second motion for contempt on October 1, 2018 (Dkts. 2089, 2112) asserting four separate bases for contempt: (1) Donziger was in contempt of Paragraph 1 of the RICO Judgment for failing to assign to Chevron his interest in the Ecuadorian judgment as well as investor funds he received; (2) Donziger had violated Paragraph 5 of the RICO Judgment by acting to monetize and profit from the Ecuadorian judgment and Paragraph 4 of the Default Judgment by actively participating with the Amazon Defense Front and other defaulted defendants in their monetization of that judgment; (3) Donziger violated the restraining notice served by Chevron; and (4) Donziger continued to engage in the same pattern of racketeering activity that led to the RICO Judgment against him. Dkts. 2090, 2113.

On March 20, 2019, Chevron filed two more motions to hold Donziger in contempt.

Dkts. 2175, 2178.  One motion contended both that Donziger continued to violate Paragraph 1 of the RICO Judgment by failing to assign his rights to a contingent fee to Chevron and that Donziger had violated Paragraph 5 of the RICO Judgment by signing over to David Zelman, a "performance coach," a share of Donziger's personal interest in the judgment in exchange for Mr. Zelman's services.  Dkt. 2178.  The second contempt motion related to Donziger's failure to turn over his electronic media for imaging, as required by this Court's Forensic Inspection Protocol (*see* Dkt. 2171).  Dkt. 2175.

> **2.  Chevron Seeks $1,569,144.55 for Attorneys' Fees Related to Post-Judgment Discovery and Discovery-Related Motion Practice Pertinent to the Contempt Motions**

Chevron seeks $1,569,144.55 in attorneys' fees related to post-judgment discovery.  *See* Champion Decl., Exs. A-2 (Gibson Dunn: $807,544.70), A-3 ($149,804.20), A-4 ($509,443.40); Silverstein Decl., Ex. A-2 (Stern Kilcullen: $86,611.25), A-3 ($15,754).  First, Chevron seeks $1,419,340.35 in attorneys' fees relating to discovery itself.  *See* Champion Decl., Exs. A-2 and A-4.  This amount comprises $894,155.95 in fees related to drafting discovery requests (*id.* at Ex. A-2), conducting legal research, and ongoing discovery expenses such as meet-and-confers, and $525,184.40 in fees related to preparing for and taking depositions (*id.* at Ex. A-4).

Chevron sought discovery from Donziger as well as from a number of third parties, including Mary Katherine Sullivan, who helped to coordinate the meeting with Elliott Management, and David Zelman, to whom Donziger granted an interest in the judgment in exchange for Zelman's services.  Chevron also sought discovery from banks to obtain records to show Donziger's fraudulent transfers, as well as from investors, to determine to what extent Donziger had sought to profit from the Ecuadorian judgment or assisted others in doing so.  These efforts required Chevron to propound discovery requests, including issuing more than 70 subpoenas and deposing 15 witnesses, to engage in numerous meet-and-confer discussions to resolve disputes,

even when the discovery target was not allied with Donziger, and to review documents produced in response to Chevron's discovery requests. All of this discovery helped build the record that supports Chevron's motions for contempt.

Chevron also seeks $149,804.20 stemming from discovery-related motion practice necessitated primarily by Donziger's intransigence and obstruction. Champion Decl., Ex. A-3. The Court noted in its contempt decision that, "[a]s is evident from prior rulings, Donziger has sought to frustrate Chevron's efforts to . . . conduct discovery with respect to Donziger's compliance with the equitable provisions of the RICO Judgment at every turn." Dkt. 2209 at 10–11; *see also* Dkt. 2171 at 2 (Donziger engaged in an "obdurate refusal to make any serious, good faith effort to produce the documents he has been ordered to produce"); Dkt. 2108 at 2 (noting "Donziger's stonewalling of post-judgment discovery"). Indeed, Donziger's conduct was such a hindrance to discovery that Chevron was forced to bring motions to compel to obtain his cooperation with regard to post-judgment discovery. Dkt. 1989, 2073.

The discovery-related fees Chevron seeks are reasonable because they are narrowly tailored and tie in directly to these contempt motions. This is especially true because Chevron is not seeking here fees related to all its post-judgment discovery efforts, such as depositions that occurred *after* the contempt motion briefing was completed on April 15, 2019 (such as Aaron Marr Page's April 18, 2019 deposition), or motions filed after that date (such as the motion to compel Laura Miller to respond to post-judgment discovery requests, filed on April 19, 2019). Dkt. 2187. For example, Chevron seeks fees for the work it was forced to undertake to obtain discovery from Ms. Sullivan, including a sworn declaration detailing Donziger's efforts to monetize the Ecuadorian judgment in violation of the Court's orders. The Court relied on this testimony and evidence in holding Donziger in contempt. *See* Dkt. 2209 at 20, 26–29, 56. Obtaining

the declaration required extensive effort and expense, including two separate depositions and multiple rounds of meet-and-confers and document productions. It is worth noting that part of the fees Chevron had to incur with regard to Ms. Sullivan were a result of efforts by Donziger and his cohort, Aaron Marr Page, to obstruct and conceal evidence, including documents that Josh Rizack transferred to Ms. Sullivan which Donziger has yet to produce.

Post-judgment discovery also led Chevron to David Zelman, who provided responses to information requests, documents and deposition testimony. The Court relied on this discovery in holding Donziger in contempt, finding that Zelman and Donziger had entered into an agreement whereby "Donziger would pay for [Zelman's services] by granting Zelman 'an interest in the Ecuador judgment from [Donziger's] fees should they be collected.'" *Id.* at 18.

And post-judgment discovery played a key role in revealing the 2017 retainer agreement between Donziger and the FDA (the "2017 Retainer"). This agreement, which purported to grant to Donziger personally an additional 6.3% interest in the Ecuadorian judgment, was concealed by Donziger until he was forced to produce it at the Elliott contempt hearing. *Id.* at 16. The Court also relied on this evidence, finding that Donziger's 2017 Retainer and failure to assign his contractual rights to Chevron violated Paragraph 1 of the RICO Judgment. *Id.* at 36.

### 3. Chevron Seeks $240,489 for Expert Witness Fees

Chevron seeks $240,489 in expert witness fees for forensic accountant John Slavek's work. Champion Decl., Ex. C. To streamline the Court's review of this application, Chevron is not seeking fees for Ecuadorian law expert Dr. Santiago Velazquez Coello.[2]

A key part of Chevron's work in these contempt proceedings required a detailed expert

---

[2] Chevron consulted with Dr. Velazquez on issues of Ecuadorian law. Dr. Velazquez provided Chevron with a declaration filed in support of Chevron's motion to hold Donziger in contempt on the basis of multiple agreements in which Donziger pledged interests in the Ecuadorian judgment to investors. Dkt. 2113 at 14; Dkt. 2117.

analysis to follow the money. Chevron retained expert forensic accountant John Slavek and his team at Kroll to review and analyze records from Donziger's numerous bank accounts, credit cards, and other financial assets, in addition to other financial records produced by third parties. Kroll tracked funds deposited with Donziger by investors in the Ecuadorian judgment and then used by Donziger for his personal profit.

Kroll's work culminated in three expert declarations, with exhibits, submitted by Mr. Slavek (Dkts. 2059, 2115, 2129), each of which helped Chevron demonstrate Donziger's contempt of the RICO Judgment and restraining notice. Mr. Slavek's September 30, 2018 declaration identified $1,242,985.16 in investor funds received into Donziger's accounts. Dkt. 2115 ¶ 22. Mr. Slavek also identified the $666,476.34 in investor funds that Donziger "received in his personal capacity," which resulted in the second supplemental judgment against Donziger. Dkt. 2209 at 56–57 & nn.184–185 (citing Slavek Decl., Dkt. 2115, Ex. 5-B). The September 30, 2018 declaration also outlined the rampant commingling of client funds in Donziger's accounts and showed that Donziger violated the restraining notice by transferring funds from his restrained accounts. Dkt. 2115 ¶¶ 25–36, 62. The Court made repeated use of Mr. Slavek's expert testimony in its contempt opinion. Dkt. 2209 at 22, 24–25, 29–34, 41, 53, 56, 59. The expert fees for the work of Mr. Slavek and his team at Kroll total $240,489.00. *See* Champion Decl. at Ex. C.

## III.    The Hourly Rates Claimed by Chevron's Counsel and Experts Are Reasonable Within the Relevant Market and Considering the Nature of the Work

"When fixing a reasonable rate for attorneys' fees, it is appropriate for a court to consider and to apply the prevailing market rates in the relevant community for similar legal work of lawyers of reasonably comparable skill, experience and reputation." *Niles v. Palmer,* No. 97 Civ. 7573, 1999 WL 1419042, at *17 (S.D.N.Y. Oct. 22, 1999); *see also Tran v. Tran* 166 F. Supp. 2d 793, 803 (S.D.N.Y. 2001). The Court should also take into account, among other things, the

time and labor required, the skill requisite to perform the legal service properly, the difficulty of the matter, and the results achieved. *See Middleton*, 2017 WL 715747, at *8.

The rates claimed by Chevron are reasonable. The contempt motions were a major component of Chevron's defense against an ongoing multi-billion dollar extortion scheme perpetrated by Donziger and his allies. It has become quite clear—even after this Court found Donziger was leading a racketeering scheme—that he remains undeterred in pursuing his fraudulent plan to extort Chevron, notwithstanding the express prohibitions in the RICO Judgment and related orders. Moreover, Donziger resides in the Southern District of New York, where the prevailing rates for legal services are higher than in many other jurisdictions. Accordingly, it was reasonable—indeed necessary—for Chevron to use experienced, capable counsel, and for that counsel to devote many hours to the pursuit of the contempt motions. And the result was multiple findings of contempt and some measure of compensatory relief for Chevron.

The fees Chevron seeks are not hypothetical. They are actual fees incurred by Chevron. Champion Decl. ¶ 6. Chevron is a sophisticated buyer of legal services and requires detailed invoices in support of bills for legal fees, and monitors the tasks done by its outside counsel to ensure that its legal work is being carried out in an efficient manner. Consequently, this Court need not "bear[] the burden of disciplining the market, stepping into the shoes of the reasonable, paying client, who wishes to pay the least amount necessary to litigate the case effectively." *Arbor Hill*, 522 F.3d at 184. Those shoes are already filled, and the fees incurred by Chevron in this case define what "a reasonable, paying client would be willing to pay[.]" *Id.*

The rates Chevron requests are reasonable. A 2016 National Law Journal survey—the most recent survey available—determined that the market for partner hourly rates in New York City for peer New York firms ranges from an average of $800 to $1,350 per hour. Champion

Decl., Ex. D.  The average 2018 hourly rate paid by Chevron for partners included in this fee application was $1,067.60 for Gibson Dunn partners and $690 for Stern Kilcullen partners.  These averages rates are below the *2016* average partner rate at several of Gibson Dunn's peer firms.  *See id.* (Paul Weiss average $1,240; Quinn Emmanuel average $1,103; Wilkie Farr average $1,350).  Moreover, the rates paid by Chevron are similar to those regularly charged to and paid by Gibson Dunn's clients—including Chevron.  Champion Decl. Ex. D; *Lilly v. Cty. of Orange*, 910 F. Supp. 945, 949 (S.D.N.Y. 1996) ("The actual rate that counsel can command in the market place is evidence of the prevailing market rate.").[3]

Chevron's contempt motions were hard fought and required investigating Donziger's financing in order to uncover his willful disregard and contempt for the Court's orders and March 4, 2014 opinion.  Chevron's outside counsel had to fight every step of the way with Donziger in the post-judgment period leading to the contempt motions and resulting contempt order.  The requested rates are appropriate given the experience and special expertise that Chevron's counsel at Gibson Dunn brought to the contempt motions.  *See Ebbert v. Nassau Cty.*, No. CV 05-5445 (AKT), 2011 WL 6826121, at *18 (E.D.N.Y. Dec. 22, 2011) (approving rates based in part on the attorneys' "special expertise" they brought to the case).

Gibson Dunn was eminently qualified to continue to represent Chevron with regard to these motions.  Gibson Dunn is a leading international law firm with more than 1,300 attorneys

---

[3]  Having failed to object to the rates Chevron paid to its counsel throughout this litigation, Donziger is hard pressed to object to the reasonableness of the rates now.  After the RICO trial, Chevron filed an attorneys' fee motion and provided detailed evidence to support the rates charged by its counsel.  Dkts. 1889–1891.  Yet despite having been given repeated opportunities to challenge the reasonableness of Chevron's rates (*see* Dkt. 1923), Donziger never challenged them (Dkt. 1927), a fact the Court recognized in an October 5, 2017 order.  *See* Dkt. 1937.

worldwide, including 300 in its New York office. Among other accolades, *The American Lawyer* named Gibson Dunn a Finalist in its 2018 Litigation Department of the Year competition, an award following the firm's unprecedented three wins in this biennial competition—as the 2016, 2012, and 2010 Litigation Department of the Year—and 2014 Finalist honors. The firm has represented Chevron before this Court for nearly a decade and its expertise, high caliber of lawyering, knowledge of the case, and experience with Donziger and his tactics made this counsel an appropriate choice for Chevron.

Finally, the fact that Gibson Dunn has represented Chevron in this action since 2011 and has substantial familiarity with Donziger's past misconduct was of critical importance in continuing to use the firm as counsel for the post-judgment portion of this litigation. Chevron leveraged Gibson Dunn's familiarity with Donziger's tactics to prevent further delay in obtaining discovery. Although Donziger still did everything in his power to prevent Chevron from discovering the truth, this approach helped to keep the discovery moving apace given the Court's involvement from the start. Gibson Dunn's experience with Donziger's tactics also helped Chevron inform Kroll's forensic accounting expert about how Donziger operates, including his penchant for actively concealing evidence,[4] thereby ensuring that Kroll would be able to draw most effectively and efficiently upon Gibson Dunn's expertise from the beginning about how to uncover Donziger's concealment of investor funds.

Stern, Kilcullen & Rufolo was also highly qualified to continue to represent Chevron with regard to these motions. The firm is led by Herbert J. Stern, a former federal district court judge and United States Attorney for the District of New Jersey, and has been selected by major

---

[4] *See, e.g.*, *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 432–435 (S.D.N.Y. 2014) (describing secret account used by Donziger and his co-conspirators to pay Richard Cabrera outside the court process).

corporations and individuals to represent them in high-profile, high-stakes civil and criminal litigation nationwide for almost three decades.  Mr. Stern has been Co-Director of the Advocacy Institute at the University of Virginia School of Law, from 1980 to 2001.  He has taught as an Adjunct Professor at the Seton Hall Law School from 1976-1986, and at the Rutgers School of Law from 1980-1986.  The firm specializes in civil litigation, criminal defense, taxation, estate planning, business planning and transactions, real estate structuring, and legislative and regulatory matters.  The firm is known for giving abundant attention to each client and relentlessly seeking the best, most efficient way to realize the client's needs.

The requested rates are also appropriate for the experts Chevron employed.  Kroll, a division of Duff & Phelps, is a leading global provider of risk solutions that provided forensic accounting services in Chevron's discovery of Donziger's contempt.  John Slavek is the Managing Director of Business Intelligence and Investigations at Kroll, and was the leader of the forensic accounting team.  Since joining Kroll in 1998, Mr. Slavek has assisted clients in assessing a wide range of finance and accounting issues, including corporate fraud, embezzlement, business income losses, bankruptcy, contractual disputes, and internal control evaluation.  His expert work proved invaluable in the Court's ultimate contempt findings and was relied upon by this Court in formulating its opinion.  For example, Mr. Slavek's declaration supports the finding that Donziger raised at least $2,367,500 through post-judgment efforts.  Dkt. 2209 at 22 (citing Slavek Decl., Ex. 2, Dkt. 2115-1).  The Court detailed this finding in Table 1 of its opinion, which traced the funds received by Donziger in detail and tracked them to Donziger's various bank accounts.  *Id.* at 24.  And, more importantly, Mr. Slavek's declaration supports the Court's holding that "Donziger personally profited from this money that he raised[.]"  *Id.* at 29.  Mr. Slavek's declaration also supports the Court's finding that Donziger made several transfers of

funds in violation of the restraining notice as well as the Court's finding that Donziger made three contemptuous transfers in violation of the restraining notice: "$35,000 back to his personal account, $15,000 to his wife, and $3,620.43 from a personal account or accounts to American Express to cover his credit card bill." *Id.* at 59–61. Relying on these findings from Mr. Slavek's declaration, the Court then went on to hold "that both Donziger and his law firm are in contempt of the restraining notice." *Id.* at 61.

Kroll's rates were reasonable. Kroll's hourly rates ranged from $100 to $525 per hour—rates objectively reasonable for a forensic accountant of Mr. Slavek's caliber. Indeed, rates higher than Kroll's rates have been deemed reasonable by courts in connection with forensic accounting work. *See Destefano v. Zynga, Inc.*, No. 12-CV-04007-JSC, 2016 WL 537946, at *19 (N.D. Cal. Feb. 11, 2016) (finding that "rates ranging from $300 to 615 for forensic accountants" were reasonable).

## CONCLUSION

For the foregoing reasons, Chevron respectfully requests that this Court order Donziger and Donziger & Associates PLLC to pay, within fourteen days of this Court's order, Chevron's attorneys' fees in the total amount of $3,433,384,30.

Dated: June 18, 2019
New York, New York

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

*/s/ Randy M. Mastro*

Randy M. Mastro
Andrea E. Neuman
200 Park Avenue
New York, New York 10166
Telephone: 212.351.4000
Facsimile: 212.351.4035
Email: rmastro@gibsondunn.com

Email: aneuman@gibsondunn.com

William E. Thomson
333 South Grand Avenue
Los Angeles, California 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520
Email: wthomson@gibsondunn.com

STERN, KILCULLEN & RUFOLO LLC
Herbert J. Stern
Joel M. Silverstein
325 Columbia Turnpike, Suite 110
P.O. Box 992
Florham Park, New Jersey 07932-0992
Telephone:  973.535.1900
Facsimile:  973.535.9664
E-mail: hstern@sgklaw.com
E-mail: jsilverstein@sgklaw.com

*Attorneys for Plaintiff Chevron Corporation*