## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

```
---------------------------------------------------------x
                                                         :
CHEVRON CORPORATION,                                     :
                                                         :
                      Plaintiff,                         :
                                                         :
         v.                                              :       11 Civ. 0691 (LAK)
                                                         :
STEVEN DONZIGER, et al.,                                 :
                                                         :
                      Defendants.                        :
                                                         :
                                                         :
---------------------------------------------------------x
```

## EXPERT REPORT BY NANCY J. MOORE

# TABLE OF CONTENTS

Page

I. Introduction and Summary of Opinions .......................................................................... 1

II. Qualifications .................................................................................................................. 4

III. Factual Basis of Opinions ............................................................................................... 4

IV. Mr. Donziger's Violations Related to His Use and Handling of Client Funds, and His Failure to Account for Client Funds ......................................................................... 4

    A. Mr. Donziger's Failure to Have a Written Fee Agreement is in Violation of N.Y. Rule 1.5(b) ..................................................................................................... 5

    B. Mr. Donziger's Violations of Rule 1.15 ................................................................... 5

        1. Mr. Donziger's Misappropriation: Using Client Funds to Pay Himself a Monthly Retainer and to Reimburse Himself for Litigation and Non-litigation Expenses Without Authorization from the FDA and/or Other Ecuadorian Clients ....................................... 5

        2. Mr. Donziger's Commingling of Client Funds ......................................... 8

        3. Mr. Donziger's Failure to Use Special Trust Account for Client Funds ............................................................................................... 10

        4. Mr. Donziger's Failure to Maintain Required Bookkeeping Records ..................................................................................................... 11

V. Mr. Donziger's Violations of 22 NYCRR 1240.15: Conduct of Disbarred or Suspended Attorneys ..................................................................................................... 14

    A. Mr. Donziger's Violation of the Prohibition Against Practicing Law Post-Suspension By Providing Both Legal Services and Nonlegal Services that are Not Distinct from Prior Legal Services .......................................................... 14

    B. Mr. Donziger's Violation of His Duty to Notify Clients of His Suspension(s) ............................................................................................................ 18

    C. Mr. Donziger's Violation of His Duty to Return Property and Files ................... 19

    D. Mr. Donziger's Violation of His Duty to Serve an Affidavit of Compliance ...... 19

    E. Mr. Donziger's Violation of the Prohibition Against Compensation for Legal and Nonlegal Services During His Period of Suspension ......................... 20

    F. Mr. Donziger's Violation of His Duty to Maintain Required Records ............... 21

VI. Violations Relating to Mr. Donziger's Conflict of Interests ......................................... 22

    A. Mr. Donziger's Continued Representation of the FDA is Materially Adverse to his Former Clients in the Same or a Substantially Related Matter ..................................................................................................................... 22

    B. Mr. Donziger Failed to Obtain Consent for His Conflict of Interests. ................ 23

VII. Violations Relating to Mr. Donziger's Deposition Misconduct ................................... 24

    A. Mr. Donziger's Impermissible Speaking Objections .......................................... 24

**TABLE OF CONTENTS**
(continued)

Page

B.     Mr. Donziger's Harassment of Opposing Counsel and Sexist Comments to
       Female Counsel.................................................................................................... 26

C.     Mr. Donziger's Obstructive Behavior During Laura Miller's Deposition .......... 27

## I.      Introduction and Summary of Opinions

On March 4, 2014, Judge Lewis Kaplan held that Steven R. Donziger violated the Racketeer Influenced and Corrupt Organizations Act (RICO) by committing multiple predicate acts including extortion, wire fraud, money laundering, obstruction of justice, witness tampering, and violations of the Travel Act through furtherance of a violation of the Foreign Corrupt Practices Act in connection with a judgment entered against Chevron in the Republic of Ecuador ("Ecuadorian Judgment").  *See Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362 (S.D.N.Y. 2014), *aff'd* 833 F.3d 74 (2d Cir. 2016) (the "RICO Judgment").  I have been retained by Gibson, Dunn & Crutcher LLP on behalf of Chevron Corporation ("Chevron") to render opinions as to whether Steven R. Donziger has violated any ethical or other rules of professional conduct since the time the RICO Judgment was entered in March 2014, including the period following Mr. Donziger's suspension from the practice of law in July 2018 by the Appellate Division of the Supreme Court of the State of New York.

A copy of my Curriculum Vitae, including a list of all of my publications, is attached as Exhibit 1.  A List of Expert Testimony from 2015 to 2019 is attached as Exhibit 2.  I am being paid at my regular hourly rate of $750 per hour.  In connection with rendering my opinions, I reviewed the pleadings and other documents related to this case as set forth in Exhibit 3.

My opinions are focused on the following four areas: (1) Violations Relating to Mr. Donziger's Use, Handling, and Accounting of Client Funds; (2) Violations of 22 NYCRR 1240.15, which governs suspended lawyers, including a prohibition against engaging in the unauthorized practice of law; (3) Violations Relating to Mr. Donziger's Conflict of Interests; and (4) Violations Relating to Mr. Donziger's Deposition Misconduct.  While my opinions are focused on these areas, some of the described conduct likely violates other ethical rules.  My opinion that the conduct violates one rule should therefore not be construed as an opinion that it does *not* violate some other rule (unless expressly stated).  In addition, while my opinions focus on the period post March 4, 2014, a number of Mr. Donziger's violations appear to be the continuation of pattern of improper conduct that preceded that date.  I provide these opinions without prejudice to providing additional opinions in the future, as needed, for supplementation.

In my opinion, for the reasons detailed below, Mr. Donziger violated the following New York Rules of Professional Conduct ("N.Y. Rules") and the NYCRR after March 4, 2014:

**(1) Mr. Donziger violated N.Y. Rule 1.5(b) and N.Y. Rule 1.15(a)-(d) by failing to have a written fee agreement, by failing to account for and maintain proper records of client funds, and by commingling and then misappropriating over a million dollars of client funds since March 4, 2014.**

**N.Y. Rule 1.5(b)**, in conjunction with 22 NYCRR 1215.1, requires that a lawyer communicate to his clients in writing regarding all fees and expenses.  Disregarding these obligations, Mr. Donziger obtained client funds by selling interests in the Ecuadorian judgment to investors and then retaining the investors' monies as purported compensation for his services. Specifically, between January 1, 2016 and June 30, 2018,  Donziger paid himself a significant portion of the $1,242,985.16 in client funds generated from investors, claiming these monies were due to him as the payment of a "monthly retainer" and as reimbursement of case-related

expenses, despite the absence of any written agreement with his clients authorizing either a "monthly retainer" or the unilateral payment of unsubstantiated expenses.

**N.Y. Rule 1.15(a)** prohibits misappropriation of client funds. Mr. Donziger misappropriated a significant portion of the $1,242,985.16 in client funds generated from investors when he expended those funds as his own without having any legal right to do so.

**N.Y. Rule 1.15(a)** also prohibits commingling client funds with the lawyer's own funds. But Mr. Donziger admitted, and expert accounting evidence confirmed, that he commingled all the client funds that came into his possession after March 4, 2014, with his personal and other law firm funds.

**N.Y. Rule 1.15(b)** requires that a separate, designated trust account be established for client funds received by an attorney. Mr. Donziger failed to establish such an account for any of the client funds he received post March 4, 2014, despite having received at least $1,242,985.16 across 13 different deposits.

**N.Y. Rule 1.15(c)** requires a lawyer to maintain contemporaneous and complete financial and bookkeeping records of client funds and render appropriate accounts to the client regarding them. Mr. Donziger admittedly maintained no such financial or bookkeeping records to account for the client funds he received post March 4, 2014.

**N.Y. Rule 1.15(d)** requires maintaining contemporaneous records of deposits and disbursements of client funds for seven years. Mr. Donziger failed to maintain such records post March 4, 2014.

**(2) Mr. Donziger violated 22 NYCRR 1240.15 by engaging in the unauthorized practice of law and taking compensation for legal services after his suspension from the practice of law.**

**22 NYCRR 1240.15(a)** prohibits a suspended lawyer from engaging in the unauthorized practice of law under N.Y. Jud. § 478. In violation of this rule, after his suspension, Mr. Donziger's continued working for his clients on matters related to the Ecuador judgment in the same roles he held prior to his suspension. He also violated **22 NYCRR 1240.15(f),** which prohibits a lawyer from receiving fees associated with legal services rendered during the period of suspension, excepting for compensation approved by a court on a *quantum meruit* basis for services rendered prior to the suspension, to the extent not forfeited due to misconduct; and a separate provision of **22 NYCRR 1240.15(f)**, which prohibits suspended attorneys from sharing in any fee for post-suspension legal services rendered by another attorney. Mr. Donziger has also violated 22 NYCRR 1240.15(f), which requires a suspended lawyer to file an affidavit of compliance. In addition, it is likely that Mr. Donziger has violated **22 NYCRR 1240.15(b)**, which requires Mr. Donziger to have notified his clients of his suspension and **22 NYCRR 1240.15(c)**, which requires suspended attorneys to return all property and files within 30 days of suspension.

**(3) Mr. Donziger continued representation of one client despite an undeniable conflict of interests with former jointly represented clients in violation of N.Y. Rule 1.9(a).**

N.Y. Rule 1.9(a) prohibits a lawyer from representing a client whose interests are materially adverse to a former client, unless the lawyer obtains the informed consent of the former client, confirmed in writing.  Mr. Donziger represented the 48 individual Lago Agrio plaintiffs, the UDAPT and the FDA at least as early as 2011 in *Maria Aguinda Salazar y Otros v. ChevronTexaco Corp.*, No. 002-2003-P-CSJML (Superior Court Nueva Loja) and related matters.  Yet beginning in or around 2013, he undertook to represent solely the FDA in the exact same matters without his other former clients' consent and while they were publicly objecting to his actions of selling of his interest in Ecuadorian Judgment and failing to account to them for his use of client funds.  In August 2016, his former clients went so far as to declare Mr. Donziger as a "persona non grata", passing a resolution declaring that Mr. Donziger "failed to defend the collective interest rights of the indigenous nationalities and peasants" and was motivated "solely by personal profit." (**Ex. 3-51**, Dkt. 1989-5, August 2016 UDAPT Declaration).  The dispute between Mr. Donziger's current (FDA) and former (UDAPT) clients includes competing claims over authority to enforce the Ecuadorian Judgment, the right to raise external funding from litigation funders, control the course of litigation, and instruct counsel of record in foreign proceedings. These substantive disputes show a conflict of interests, and Mr. Donziger's representation of his current client without authorization of his former clients violates **N.Y. Rule 1.9(a)**.

**(4) Mr. Donziger violated N.Y. Rule 8.4(d) and (h) with his deposition misconduct, including repeated speaking objections, harassment of opposing counsel, and sexist comments towards female opposing counsel.**

N.Y. Rule 8.4(d) prohibits a lawyer from engaging in conduct that is prejudicial to the administration of justice.

N.Y. Rule 8.4(h) prohibits a lawyer from engaging in conduct that adversely reflects on the lawyer's fitness as a lawyer.

Mr. Donziger violated both these rules when he engaged in a pattern of obstructive and abusive behavior—including the harassment of opposing counsel and the making of sexist comments towards female opposing counsel (including directing female opposing counsel to "chill, babe") — throughout the depositions taken pursuant to Chevron's efforts to establish whether Mr. Donziger receives fees or other payments in consequence of the Ecuadorian Judgment, in violation of this Court's order of March 4, 2014, and to collect its money judgment against Mr. Donziger.  Mr. Donziger's misconduct during these depositions extends to repeated lengthy speaking objections, coaching witnesses, secret photography during a deposition and then publicly posting the photos on Twitter with disparaging comments, coaching witnesses during breaks, and frivolous assertions of the marital privilege.

## II.     Qualifications

I am Professor of Law and Nancy Barton Scholar at Boston University School of Law ("BU").  I have been a tenured full professor at BU since January 1999. From 1976 through December 1998, I was employed at Rutgers School of Law-Camden ("Rutgers") as an assistant professor, tenured associate professor, associate dean for academic affairs, and tenured full professor.  I am a Member and former Chair of the Multistate Professional Responsibility Test Drafting Committee.  In addition, I was Chief Reporter to the American Bar Association's Commission on Evaluation of Professional Rules of Conduct ("Ethics 2000 Commission").  I also served as an adviser to the American Institute's *Restatement of the Law (Third) Governing Lawyers*, and I served twice as Chair of the Professional Responsibility Section of the Association of American Law Schools.  I have authored numerous articles on legal ethics. *See* **Ex. 1.**

I have testified as an expert on legal ethics via deposition, declaration, and in various state and federal tribunals, including testimony in courts in Connecticut, Florida, Maine, Maryland, Massachusetts, New Jersey, New York, and Pennsylvania.  I am currently licensed to practice law in the Commonwealth of Massachusetts (active) and the Commonwealth of Pennsylvania (inactive).  I have spoken on topics in legal ethics numerous times in the last thirty years at continuing legal education seminars and professional conferences, including national bar conferences.  I have regularly taught courses in legal ethics since 1978.  In addition to regularly teaching the basic course in Professional Responsibility (formerly at Rutgers and now at BU), I teach a seminar on Professional Responsibility for Business Lawyers. *See* **Ex. 2.**

## III.     Factual Basis of Opinions

My opinions are based on my review of the documents and testimony detailed in Exhibit 3 and, where indicated, on the expert accounting opinions of John A. Slavek ("Slavek").  I have not reviewed the source documents underlying Slavek's opinions and take those opinions and the accounting-related factual statements contained therein to be true and accurate for the purposes of my opinions.  The extent of my reliance on other testimony and documents is set forth below.

## IV.     Mr. Donziger's Violations Related to His Use and Handling of Client Funds, and His Failure to Account for Client Funds

Since the entry of the RICO Judgment, Mr. Donziger has actively sought to raise money by offering investors an interest in the Ecuadorian Judgment in return for monetary investments ostensibly to be used to assist his clients in their efforts to enforce that judgment outside the United States.  (*See, e.g.,* **Ex. 3-31**, Dkt. 2115, Declaration of John A. Slavek (Oct. 24, 2018) ("Slavek Decl.") and **Ex. 3-24**, Slavek Decl., Ex. 2.)  Between January 1, 2016 and June 30, 2018, Mr. Donziger received a total of $1,242,985.16 from various investors on behalf of his clients ("the Client Funds"). (*See* **Ex. 3-31**, Slavek Decl., ¶ 22.)  In this section, I address Mr. Donziger's ethical failures in his use, handling and accounting of these Client Funds.

A. Mr. Donziger's Failure to Have a Written Fee Agreement is in Violation of N.Y. Rule 1.5(b)

Rule 1.5(b) of the New York Rules of Professional Conduct requires that a lawyer communicate "the basis or rate of the fee and expenses for which the client will be responsible" and that such communication "***shall be in writing*** where required by statute or court rule" (emphasis added).  A court rule adopted in 2002 requires a "Written Letter of Engagement" explaining both "the scope of the legal services to be provided" and the "attorney's fees to be charged," as well as "expenses and billing practices."  22 NYCRR 1215.1.

Until his suspension in July 2018, Mr. Donziger was a practicing attorney licensed in New York, with his principal place of business in New York.  He was a sole practitioner. Since the early 1990s he has described himself as working "as an attorney and an advocate for Indigenous and farmer communities" in Ecuador.  (**Ex. 3-32**, Dkt. 2122-1, Declaration of Steven Donziger ¶ 2 (Oct. 31, 2018) ("Donziger Decl.").)  He represented the Frente de Defensa de la Amazonia ("the FDA") as both "attorney" and "advocate" (**Ex. 3-32**, Donziger Decl., ¶ 5) for "all of the years following the imposition of the RICO judgment issue[d] in 2014 by the U.S. district court in the Chevron v. Donziger case."  (**Ex. 3-32**, Donziger Decl., ¶ 3.)

According to Mr. Donziger, in addition to his 6.5% contingent fee, the FDA committed to compensate him "at a fixed rate of $25,000 [per month] for [his] work on all the responsibilities" with respect to the enforcement of the Ecuadorian Judgment.[1] (**Ex. 3-32**, Donziger Decl., ¶ 11.) As set forth more fully below, upon receiving Client Funds from investors, Mr. Donziger immediately made substantial payments to himself, ostensibly as both legal fees, pursuant to his claimed monthly retainer agreement with the FDA, and as reimbursement for claimed expenses. *See infra* at IV.B.1.  To my knowledge, Mr. Donziger has neither produced nor referenced any writing evidencing a commitment by the FDA or any other client to pay him a specific monthly legal fee in addition to his contingent fee.  Mr. Donziger's failure to obtain a written letter of engagement detailing the legal fees to be charged constitutes a violation of Rule 1.5(b) of the New York Rules of Professional Conduct.[2]

B. Mr. Donziger's Violations of Rule 1.15

1. Mr. Donziger's Misappropriation: Using Client Funds to Pay Himself a Monthly Retainer and to Reimburse Himself for Litigation and Non-litigation Expenses Without Authorization from the FDA and/or Other Ecuadorian Clients

Rule 1.15(a) of the New York Rules of Professional Conduct provides that "[a] lawyer in possession of any funds or other property belonging to another person, where such possession is incident to his or her practice of law, is a fiduciary, and must not *misappropriate* such funds or

---

[1]  Mr. Donziger testified that the amount of the monthly retainer has varied over the years, but that the most recent iteration was $25,000. (*See* **Ex. 3-11**, Donziger Dep., at 62 (June 25, 2018).) He said he did not know whether there was any document confirming that amount. (*See id.*)

[2]  None of the stated exceptions requirement apply here. *See* 22 NYCRR 1215.2.

property or commingle such funds or property with his or her own." N.Y. Rule 1.15(a) (emphasis added).

From 2004 through 2013 Mr. Donziger received 89 deposits of client funds from investors totaling $7,881,731.64. (**Ex. 3-26**, Slavek Decl., Ex. 3-B.) Of those deposits, the highest were in 2010 and 2007, totaling $2,550,000.00 and $1,999,911.36 respectively. (**Ex. 3-31**, Slavek Decl., ¶ 24.) Between January 1, 2016 and June 30, 2018, Mr. Donziger received 13 deposits of client funds from investors into seven TD Bank accounts, either directly or through Lenczner Slaght, CWP Associates or Forum Nobis, totaling $1,242,985.16 ("Client Funds"). (**Ex. 3-25**, Slavek Decl., Ex. 3-A.) According to Mr. Donziger, these Client Funds were raised by him on behalf of his client, the FDA, to "continue the enforcement litigation [of the Ecuadorean judgment in the *Aguinda* case] and overall corporate accountability campaign against Chevron." (**Ex. 3-32**, Donziger Decl., ¶ 9; *see also* Donziger Decl., ¶ 5 (reference to his services as both "legal case manager and social justice campaign manager").) He concedes that the funds were "client funds," i.e., "FDA funds." (**Ex. 3-11**, Donziger Dep., at 77 (June 25, 2018).) The Client Funds were never segregated with regard to their purpose to support either the litigation or the "social justice campaign." (*See* **Ex. 3-27**, Slavek Decl., Ex 4-A.) In my opinion, when Mr. Donziger received and possessed the Client Funds, all of these funds were property belonging to another person[3] that he possessed "incident to" his practice of law, as a fiduciary.[4]

The Retention Agreement dated January 5, 2011, **Ex. 3-17**, (the "2011 Retention Agreement"), among the individual *Aguinda* plaintiffs (through Ecuadorian attorney Pablo Fajardo), the FDA ("as beneficiary of any judicial or settlement award granted to the Plaintiffs"), the Assembly of Communities Affected by Texaco (which subsequently became UDAPT)[5] and Mr. Donziger's law firm, provided that "the Plaintiffs" will pay Mr. Donziger's firm "a monthly retainer in accordance with a budget to be provided by the firm to the Chairman [defined as the yet-to-be-designated chairman of a yet-to-exist "Master Agreement"] from time to time." (**Ex. 3-17**, Dkt. 2114-2, Declaration of Anne Champion, Ex. 21 (Oct. 24, 2018).) The preliminary budget was to be attached to the Master Agreement as an exhibit; thus, it was explicitly anticipated that the budget containing the amount of the requested monthly fee would be in writing. As noted above, consistent with his testimony, Mr. Donziger has not produced or

---

[3] Mr. Donziger refers to the funds as belonging to his current client, the FDA. (**Ex. 3-11**, Donziger Dep., at 14, 65. There is a dispute between the FDA and other organizations and individuals as to the ownership and/or control of any funds raised to support the Canadian enforcement litigation, *see* Section VI, *infra*; however, regardless of which group was entitled to direct the use of these funds, it is clear that the funds belonged not to Mr. Donziger personally but to "another person" within the meaning of N.Y. Rule 1.15(a).

[4] *See* N.Y. Rule 5.7: "A lawyer or law firm that provides nonlegal services to a person that are not distinct from legal services being provided to that person by the lawyer or law firm is subject to these Rules with respect to the provision of both legal and nonlegal services." *See also infra* note 24 (citing and discussing authorities for my conclusion that Mr. Donziger's provision of legal and nonlegal services was clearly "not distinct" under this rule).

[5] *See* **Ex. 3-09**, UDAPT Draft Letter (Mar. 2, 2018). Mr. Donziger confirmed that his clients under the 2011 Retention Agreement were "the individual Lago Agrio plaintiffs, the FDA, and the UPADT." (**Ex. 3-11**, Donziger Dep., at 29.)

referenced any written budget provided pursuant to this Agreement or any other writing evidencing any client's commitment to pay Mr. Donziger $25,000 a month.  (*See* IV.A *supra*.)

Even assuming that an oral agreement to pay Mr. Donziger a fixed fee of $25,000 would be sufficient authorization under Rule 1.15(a), which it is not, the 2011 Retention Agreement did not authorize the FDA alone to enter into such an oral agreement.  The FDA was but one of several parties to the 2011 Retention Agreement, and the other parties included both the individual *Aguinda* plaintiffs (defined as "the Plaintiffs," *see* **Ex. 3-17**, Dkt. 2114-2, at p. 1) and the predecessor organization to UDAPT.  To my knowledge, Mr. Donziger has not produced or referenced any agreement by the other parties to the 2011 Retention Agreement to pay Mr. Donziger a fixed fee of $25,000 or any other amount.

The 2011 Retention Agreement further provided that Mr. Donziger's firm was "entitled to reimbursement for any reasonable out of pocket expenses or other costs incurred by the [law f]irm in connection with its representation of the Plaintiffs in the Litigation" (**Ex. 3-17**, Dkt. 2114-2 ¶ (3)(d)), but that his law firm was required to "*submit a bill to the Plaintiffs for reimbursement of its Expenses for such month setting forth in reasonable detail the Expenses that it incurred during the preceding month in connection with its representation of the Plaintiffs in the Litigation*" (**Ex. 3-17**, Dkt. 2114-2 ¶ (3)(f) (emphasis added).)  Bills for expenses were to be sent for approval to Mr. Donziger and to the yet-to-be-designated Chairman and "[n]o amount will be paid with respect to a bill for expenses absent the approval of each of the Chairman and [Donziger]."  (**Ex. 3-17**, Dkt. 2114-2 ¶ (3)(e).)

The 2011 Retention Agreement contemplated that the Plaintiffs would seek "Additional Funders," but it specifically provided that in order to do so, both Mr. Donziger and the Chairman would have to agree "to reduce the Active Lawyer Percentages of each lawyer engaged by the Plaintiffs on a contingent fee basis in respect of the litigation . . . on a pro rata basis."  (**Ex. 3-17**, Dkt. 2114-2 ¶ (3)(j)(1).)  If such an agreement was approved, *the Plaintiffs* could thereafter enter into a funding agreement.  (**Ex. 3-17**, Dkt. 2114-2 ¶ (3)(j)(ii) (emphasis added).)

Nothing in the 2011 Retention Agreement provided that Mr. Donziger could unilaterally approve the payment of any monthly fee from funds obtained from investors; rather, the agreement explicitly provided that payment would come from the Plaintiffs, who were to control all payments in connection with the litigation.  Similarly, nothing in the 2011 Retention Agreement provided that Mr. Donziger could unilaterally approve reimbursement of any of his litigation expenses from funds obtained from investors; rather, the agreement required that Mr. Donziger's firm "submit a [monthly] bill to the Plaintiffs for reimbursement of its Expenses for such month setting forth in reasonable detail the Expenses that it incurred during the preceding month."  (**Ex. 3-17**, Dkt. 2114-2 ¶ (3)(f).)

Any "modification, amendment, waiver or release" of any provision of the 2011 Retention Agreement was required to be "in writing and duly executed by the party against whom same is asserted."  (**Ex. 3-17**, Dkt. 2114-2 ¶ (13).)  To my knowledge, Mr. Donziger has not produced any such "modification, amendment, waiver or release" of the 2011 Retention Agreement.  *See* **Ex. 3-05**, Donziger Dep., at 171:22-172:8 (June 24, 2013).  Rather, all he has produced is a written agreement between the FDA and himself, signed November 1, 2017, which purported to grant Mr. Donziger a broad power of attorney "to direct and manage all current and

future legal political, and public relations efforts in connection with the enforcement of the Aguinda JUDGMENT." (**Ex. 3-18**, Dkt. 2114-2, Declaration of Anne Champion, Ex. 23 at p. 2 (Oct. 24, 2018).)  Notably, it was not signed by either the individual plaintiffs (through Fajardo or otherwise) or UDAPT, who were the other parties to the 2011 Retention Agreement.

Given the requirements of the 2011 Retention Agreement and the lack of any other valid authorization for Mr. Donziger to use funds from investors to pay himself a $25,000 monthly fee or to unilaterally reimburse himself for any past litigation or other non-litigation expenses, it is my opinion that in using the Client Funds to pay his claimed fees and expenses past March 4, 2014, which constituted a significant portion of $1,242,985.16 in client funds generated from investors, without prior valid authorization, Mr. Donziger misappropriated funds belonging to either the FDA or another person, in violation of N.Y. Rule 1.15(a).

### 2.  Mr. Donziger's Commingling of Client Funds

Rule 1.15(a) of the New York Rules of Professional Conduct provides that "[a] lawyer in possession of any funds or other property belonging to another person, where such possession is incident to his or her practice of law, is a fiduciary, and must not misappropriate such funds or property *or commingle* such funds or property with his or her own."  N.Y. Rule 1.15(a) (emphasis added).

From January 2010 through January 2013, Mr. Donziger maintained seven Chase Bank accounts consisting of three personal savings or checking accounts, one law firm account, one Ecuador case account, and two IOLA Trust accounts.  (**Ex. 3-28**, Slavek Decl., Ex. 4-C.)  From January 1, 2016 through June 30, 2018, the period in which the Client Funds were received past March 4, 2014, Mr. Donziger maintained seven TD Bank accounts consisting of five personal savings or checking accounts and two law firm accounts.  (**Ex. 3-27**, Slavek Decl., Ex. 4-A.)  As discussed in Section IV.B.3 below, none of these accounts was designated as a special attorney trust account, as required by N.Y. Rule 1.15(b).[6]  Aside from the requirements of Rule 1.15(b), Rule 1.15(a) also required that Mr. Donziger avoid commingling the Client Funds, which were funds of "another person," with his own personal or law firm funds.  (*See* N.Y. Rule 1.15, cmt [1] ("All property that is property of clients or third persons . . . must be kept separate from the lawyer's business and personal property . . . .").)[7]

Analyses prepared by forensic accountant Slavek confirm that Mr. Donziger commingled the Client Funds with his personal and law firm funds in all of the seven TD Bank accounts into which the Client Funds were received.  (*See* **Ex. 3-31**, Slavek Decl., ¶¶ 25-53.)  As Slavek concludes, money is fungible, but because the Client Funds represented 94.5% of the total deposits into these accounts, his analyses demonstrates that the Client Funds were commingled

---

[6]  *See* N.Y. Rule 1.15(b) (requiring such funds to be held "in a special account or accounts, separate from any business or personal accounts of the lawyer or lawyer's firm" and to be designated as an "'Attorney Special Account,' 'Attorney Trust Account,' or 'Attorney Escrow Account'").

[7]  The New York courts adopted only the black-letter Rules; the Comments were adopted by the New York State Bar Association. Roy D. Simon & Nicole Hyland, SIMON'S NEW YORK RULES OF PROFESSIONAL CONDUCT ANNOTATED 3 (2017). All comments referenced in this memorandum are based on this edition of Simon's New York Rules of Professional Conduct Annotated.

with Mr. Donziger's personal and business funds.  (*See* **Ex. 3-31**, Slavek Decl., ¶ 51.) Two of the 13 deposits from investors were deposited directly into Mr. Donziger's personal checking accounts (**Ex. 3-31**, Slavek Decl., ¶ 23), from which he paid both personal and case-related expenses.[8] Indeed, 53.5 percent of the total $1,012,065.54 in Client Funds that Slavek was able to trace through Mr. Donziger's TD Bank Accounts was spent from these personal accounts. (**Ex. 3-31**, Slavek Decl., ¶ 53.)

As for the remaining 11 investor payments that were initially deposited into a Donziger law firm account, Slavek's analyses demonstrate that, in most cases, a substantial percentage of the deposited funds were quickly transferred into a personal account (*see* **Exs. 3-31 & 3-27**, Slavek Decl., ¶¶ 25-36 and Ex. 4-A),[9] where they were then commingled with Mr. Donziger personal and business funds (*see supra* note 8).  Moreover, during the time that the Client Funds were in the law firm accounts, they were commingled with Mr. Donziger's personal funds, as Mr. Donziger used his law firm accounts (as well as his personal accounts) to make both personal and case-related payments.[10]  For example, Mr. Donziger used his law firm as well as his personal accounts to make substantial payments to his wife Laura Miller and to TD Bank for his bank credit card (*see* **Ex. 3-29**, Slavek Ex. 5-B), which was used to pay for both personal and case-related expenses.  (*See* **Ex. 3-30**, Slavek Ex. 7-A (top payees of the TD Bank Visa Card included airlines, hotels, Gym Precision, Time Warner Cable, and Acme Fine Wines).)

This pattern of transferring substantial funds between different Donziger accounts, as well as the commingling of client investment funds with Mr. Donziger's personal and business funds was not new.  Slavek analyzed transfers between Mr. Donziger's Chase Bank accounts during the pre-RICO Judgment period of January 2010 through January 2013 and concluded that "almost $6 million was transferred between the various accounts in the less than three years represented."  (**Ex. 3-31 & 3-28,** Slavek Decl., ¶ 33 and Ex. 4-C.)

---

[8]  Slavek identified the recipients of all payments from both the personal and law firm accounts from January 1, 2016 through June 30, 2018. 64.2% of the payments from the total deposits (keeping in mind that 94.5% of the total deposits were Client Funds) were paid out of the personal checking and savings accounts. (*See* **Ex. 3-31**, Slavek Decl., ¶ 41.)  These payments were for both personal expenses, such as to his wife Laura Miller, Wells Fargo Home Mortgage and Congregation Rodeph Sholom, and for apparent business expenses, including substantial airline, hotel and meals.  (*See* **Exs. 3-31, 3-29, & 3-11**, Slavek Decl., Ex. 5-B; *see also* Donziger Dep., at 187 (June 25, 2018) (during period from September 2014-April 2016, disbursements from TD account #2265, a personal checking account, were used mostly, but not entirely, for "case related" purposes).)

[9]  Between May 13, 2016 and June 4, 2018, Mr. Donziger transferred $510,000 from the law firm accounts to his personal checking and savings accounts. **Ex. 3-31**, Slavek Decl., ¶ 27.

[10]  Mr. Donziger testified that he had a newly opened separate account—#8132—that was used exclusively for the Ecuador case funds. (*See* **Ex. 3-11**, Donziger Dep., at 75 (June 25, 2018).)  However, as Slavek determined, 11 of the deposits of Client Funds from investors were initially deposited into a different, long-standing law firm account (Account # 8783).  *See* **Ex. 3-31**, Slavek Decl., ¶ 25.  Moreover, the $342,045.16 that was initially deposited into Account #8132 was transferred only two days later to a newly created law firm checking account, Account #8174, whereupon that very same day, $125,000 of that amount was transferred to the long-standing law firm checking account (#8783) and $35,000 was transferred back into the newly created #8132 account. *See* **Ex. 3-27**, Slavek Decl., Ex. 4-A.  The law firm checking account to which the $342,045.16 was transferred, Account #8174, is also an account that was used to pay both personal and case-related expenses.  *See* Slavek, "Transactional History of Donziger Law Firm Acct X8174" (payment recipients included his wife Laura Miller).

In his Declaration, Mr. Donziger concedes that Client Funds that were deposited into personal accounts and that Client Funds were commingled with personal funds, but seeks to excuse these events.[11]  He first addresses the initial $50,000 payment by Roger Waters, which Mr. Donziger claims was "initially characterized as a personal gift and later converted by [him] to equity as part of an agreement approved by the FDA."  (**Ex. 3-32**, Donziger Decl., ¶ 17.)  However, the investor agreement produced for this investment was dated January 22, 2016 (**Ex. 3-24**, Slavek Decl., Ex. 2), and the payment was deposited into Mr. Donziger's personal account on January 25, 2016 (**Ex. 3-27**, Slavek Decl., Ex. 4-A), thereby contradicting Mr. Donziger's account.  Moreover, if a personal gift to Mr. Donziger had been converted to an investor equity interest, it would then be subject to Rule 1.15(a) and would have to have been immediately transferred to a separate account.  None of the initial Waters investment was ever transferred to a Donziger law firm account.  (**Ex. 3-27**, Slavek Decl., Ex. 4-A.)  Indeed, the only Donziger law firm account that was open at that time was an account in which Mr. Donziger was already commingling business and personal funds.  (*See* **Ex. 3-27**, Slavek Ex. 4-A and above discussion.)

Mr. Donziger also seeks to excuse "the transfer of case funds from Ms. Sullivan to [him] by Mr. Page, once Ms. Sullivan had made the decision to withdraw."  (**Ex. 3-32**, Donziger Decl., ¶ 17.)  He claims that "the funds sent by Mr. Page were accidentally wired to a personal account" and that "once received by [Donziger, he] immediately opened a new business checking account at the suggestion of an employee in [his] bank for purposes of administrative convenience."  (*Id.*)  This is presumably a reference to the $342,045.16 payment on May 8, 2018 from Forum Nobis into a Donziger personal checking account[12] that was then transferred two days later into a newly opened law firm account.  (**Ex. 3-27**, Slavek Decl., Ex. 4-A.)  One problem with this explanation is that the account into which the payment was supposed to be wired was presumably the pre-existing law firm account that had been utilized for both business and personal purposes (because there was no other law firm account at the time); thus, even if there had been no mistake, the funds would not have been paid into the type of separate account required by N.Y. Rule 1.15(a).  Another problem with the explanation is that the same day that the payment was transferred to the newly opened law firm account, $125,000 of those funds was transferred into the pre-existing law firm account (**Ex. 3-27**, Slavek Decl., Ex. 4-A), where it was then commingled with other business and personal funds of Mr. Donziger, in violation of N.Y. Rule 1.15(a).  Of course, "administrative convenience" is never a justification for violating N.Y. Rule 1.15(a).

Given his admissions and the account evidence, it is my opinion that Mr. Donziger has violated N.Y. Rule 1.15(a) by commingling Client Funds with his personal and other business funds.

3.  <u>Mr. Donziger's Failure to Use Special Trust Account for Client Funds</u>

---

[11]  By this testimony, Mr. Donziger apparently concedes that he should not have deposited the Client Funds into a personal account; however, his argument implies that depositing these into a law firm business account would have been appropriate.  However, any law firm business account used to deposit investor funds would have to have been a *separate* account that did not also contain either personal or other business funds.  *See supra* note 6.

[12]  Interestingly, the personal checking account into which Mr. Donziger claims the deposits were accidently deposited is Account #8132, which Mr. Donziger elsewhere testified was an account used exclusively for Ecuador case funds. *See supra* note 10.

N.Y. Rule 1.15(b) provides that "[a] lawyer who is in possession of funds belonging to another person incident to the lawyer's practice of law shall maintain such funds…in a special account or accounts, separate from any business or personal accounts of the lawyer or lawyer's firm" (N.Y. Rule 1.15(b)(1)), and further that "[a] lawyer or the lawyer's firm shall identify the special bank account or accounts . . . as an 'Attorney Special Account,' 'Attorney Trust Account,' or 'Attorney Escrow Account,' and shall obtain checks and deposit slips that bear such title" (Rule 1.15(b)(2)).

None of Mr. Donziger's personal or law firm accounts into which the Client Funds were deposited constituted a "special account or accounts, separate from any business or personal accounts of the lawyer or the lawyer's firm." *See supra* IV.B.3. Moreover, none of these accounts was designated as an "Attorney Special Account," "Attorney Trust Account," or "Attorney Escrow Account." Indeed, contrary to the requirements of N.Y. Rule 1.15(b), after May, 2012, when he closed two IOLA Trust Accounts maintained at Chase, Mr. Donziger failed to maintain any separate attorney trust account throughout the time period of Slavek's post-RICO analysis, ending June 30, 2018. (**Ex. 3-23**, Slavek Decl., Ex. 1.)

Given the foregoing accounting evidence, it is my opinion that Mr. Donziger has violated N.Y. Rule 1.15(b) due to his failure to maintain any separate attorney trust accounts during the relevant period discussed.

4. <u>Mr. Donziger's Failure to Maintain Required Bookkeeping Records</u>

N.Y. Rule 1.15(c)(3) requires that a lawyer shall "maintain complete records of all funds, securities, and other property of a client or third person coming into the possession of the lawyer and render appropriate accounts to the client or third person regarding them." N.Y. Rule 1.15(d) further requires that a lawyer "shall maintain for seven years after the events that they record: (i) the records of all deposits in and withdrawal from the accounts specified in N.Y. Rule 1.15(b) and of any other bank account that concerns or affects the lawyer's practice of law [and that] these records shall specifically identify the date, source and description of each item deposited, as well as the date, payee and purpose of each withdrawal or disbursement; [and] (ii) a record for special accounts, showing the source of all funds deposited in such accounts, the names of all persons for whom the funds are or were held, the amount of such funds, the description and amounts, and the names of all persons to whom such funds were disbursed . . . ."

Mr. Donziger failed to maintain any such detailed records of the deposits and withdrawals of any of the TD accounts analyzed by Slavek, which consisted of accounts into which Client Funds were deposited and accounts that otherwise "concern[ed] or affect[ed]" his practice of law. Indeed, Mr. Donziger admits the lack of any detailed, contemporaneous accounting with respect to the receipt and disbursement of Client Funds. (*See* **Ex. 3-32**, Donziger Decl., ¶¶ 11-12, 14-15.)

In his Declaration, Mr. Donziger suggests various explanations and possible excuses for his failure to maintain detailed records of deposits and expenditures. First, he says that he did not fully document the payment to him of fees and expense reimbursements "because the FDA leaders not only did not request them, but in fact repeatedly expressed a preference that all of my past invoices be resolved essentially by way of settlement when sufficient funds might be

available." (**Ex. 3-32**, Donziger Decl., ¶ 11.)  This is no excuse.  N.Y. Rule 1.15 does not require that accurate records be maintained only at the request of a client or third person.  Nor does it permit the lawyer to fail to maintain such records with the client's consent.

Second, Mr. Donziger suggests that "disarray in the bookkeeping" was attributable to his effort to "reduce overhead by administering funds [himself] and with help from colleagues like Mr. Josh Rizack rather than engaging costly outside professionals." (**Ex. 3-32**, Donziger Decl., ¶ 14.)  Yet, Slavek determined that Rizack was paid at least $175,881.82 by Mr. Donziger from the client and/or commingled funds.  (**Ex. 3-38**, Declaration of John A. Slavek on May 16, 2019 ¶ 7 (May 16, 2019) ("Slavek May 2019 Decl.").)  In addition, although Mr. Donziger characterizes Slavek's assessment of Rizack's work as "harsh," he does not deny that Slavek was correct in concluding that "Rizack's files lacked consistency and organization," that "[f]inancial records appeared to be prepared for ad hoc purposes and there were no uniform year-over-year analyses," that "[t]here was also a clear absence of supporting documentation or workpapers maintained in an organized and 'easy to follow' format," that "Rizack did not follow any commonly accepted accounting methodology in either creating or verifying the information on his spreadsheets," and that Rizack's "documents should not be relied upon for any financial or accounting purpose, including but not limited to presenting an accurate depiction of case funds received and/or disbursed by Donziger." (**Ex. 3-31**, Slavek Decl., ¶¶ 60-61.)  Rizack himself testified that he was not doing any formal accounting, and that all he was doing was putting together what bills needed to be paid (*see* **Ex. 3-12**, Rizack Dep., at 14-15 (June 26, 2018)), and attempting to identify "categories" of expenses paid (*see id.* at 67).  Indeed, with respect to the post-RICO Judgment period, Rizack testified that he "did very little work" (*id.* at 18, 102, and **Ex. 3-52**, Rizack Dep., at 214 (October 5, 2018),[13] despite having been paid $175,881.82 from client funds for financial and organization work.  Declaration of John A. Slavek ¶¶ 7, 9-12 (May 16, 2019).  Based on Rizack's document production, his last draft attempted "accounting" for Mr. Donziger's use of client funds was for the year 2016.  (**Ex. 3-31**, Slavek Decl., ¶¶ 55-58.)  Given the amount that Rizack was paid, it is clear that Donziger's failure to keep proper bookkeeping was not due to a lack of funding availability.

Any effort to shift all or even part of the blame for Mr. Donziger's failure to comply with his ethical and other obligations as his client's fiduciary to Rizack for any time period is meritless.  First, it was Mr. Donziger, not Rizack, who opened the bank accounts that Mr. Donziger used for personal and business purposes and who therefore failed to establish a separate attorney trust account in which client funds would be deposited and thereafter tracked.[14] It was also Mr. Donziger who determined where Client Funds would be deposited and to which accounts they would be transferred.[15]  Mr. Donziger was also responsible for deciding which

---

[13] *See also id.* at 138 (Rizack testified, "I don't know where the money, post-funding, where it went").  During the course of Rizack's deposition, Mr. Donziger himself stated that Rizack was "not doing accounting" but rather was "doing compilations of expense summaries," that is, "efforts to compile expenditures and flows, that kind of stuff."  *Id.* at 136.  *See also id.* at 137 (Mr. Donziger further stated that Rizack's documents "aren't like official accounting an accountant would do.")  Mr. Donziger also stated that when he at one time claimed that there was "a substantially complete accounting" he was referring to Rizack's work, *id.* at 137-138.

[14] *See, e.g.,* **Ex. 3-12**, Rizack Dep., at 21 (June 26, 2018) (he did not have any direct access to Mr. Donziger's bank accounts).

[15] *See id.* at 138 (Rizack did not know where the post-funding money went).

accounts to use to pay various personal and business expenses.[16]  Mr. Rizack's role was apparently to create post hoc accounting after Mr. Donziger had intentionally failed to segregate and extensively commingle Client Funds. Second, under N.Y. Rule 5.3(b) a lawyer who has "direct supervisory authority over [a] nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer."  Mr. Donziger clearly failed in his duty of supervision in that he knowingly used a person with no accounting or bookkeeping training or experience[17] to attempt to maintain his financial records, failed to instruct Rizack in what was required to maintain accurate records, and failed to perform any of the basic requirements of proper supervision, such as regular review and oversight.  _See In re Galasso_, 105 A.D. 103, 961 N.Y.S.2d 975 (2d Dept. 2013) (on remand), leave to appeal denied, 20 N.Y.3d 1055, 985 N.E.2d 426 (Mem.) (2013).[18]

Finally, Mr. Donziger explains that he "knew that all transactions taking place were accounted for electronically and would be reconciled as soon as we got the resources to hire an appropriate entity to do so."[19]  (**Ex. 3-31**, Donziger Decl., ¶ 14.)  This last excuse is also entirely meritless and unsupportable.  First, it is not true that the "transactions were accounted for electronically": given the commingling of Client Funds with Mr. Donziger's personal and law firm funds, there is no precise record of the disposition of these funds once they were deposited in Mr. Donziger accounts.[20]  Second, and perhaps more important, N.Y. Rule 1.15(d) requires that the records be made contemporaneously with the transactions in question.  _See_ N.Y. Rule 1.15(d)(2): "lawyers shall make accurate entries of all financial transactions in their records of receipts and disbursements, in their special accounts, in their ledger books or similar records, and in any other books of account kept by them in the regular course of their practice, _which entries_

---

[16]  _See id._ at 123-124 (Rizack occasionally cut checks for Mr. Donziger to sign, but he did not have access to Mr. Donziger's checkbooks).

[17]  _See id._ at 10-11 (Rizack's background did not include any study or experience in accounting or bookkeeping).

[18]  Mr. Donziger also defends Rizack by noting "that it appears he was paid a total of $12,566.33 over a period of more than five years…that is, just over $2,000 per year." (**Ex. 3-31**, Donziger Decl., ¶ 14.)  Of course, it was Mr. Donziger who refused to engage "costly outside professionals" but rather to rely on himself and Rizack. (**Ex. 3-31**, Donziger Decl., ¶ 14.)  In any event, Rizack was also given a 1/8-1/4% contingent interest in the Ecuadorian Judgment as part of his compensation.  _See_ **Ex. 3-12**, Rizack Dep., at 74 (June 26-27, 2018). Moreover, lack of funds is not a justification for failing to maintain accurate records as required by N.Y. Rule 1.15(c)(3).  If a lawyer cannot practice law in an ethical manner, that lawyer should not be practicing law at all.

[19]  Given that Mr. Donziger paid himself substantial amounts in legal fees from the Client Funds, it is not accurate to say that he did not have the resources to pay for a detailed, accurate and contemporaneous accounting of the Client Funds.  _See_ **Ex. 3-31**, Donziger Decl., ¶¶ 11-13 (explaining and attempting to justify his continuing to pay himself for legal fees from Client Funds post-RICO).  There is no way of knowing how much he took for himself (either in legal fees or for expense reimbursements), as opposed to paying others for their expenses, since he did not maintain any contemporaneous records.  Finally, Mr. Donziger increased the cost of any accounting by intentionally commingling personal and case funds, including using the same credit cards for both personal and case fund expenses.

[20]  Slavek was able to identify the recipients of payments from both the law firm and personal accounts, but he did not have access to any record of the "purpose" of such payments, as required by N.Y. Rule 1.15(d).  Moreover, because the Client Funds were commingled with other personal and law firm funds, Slavek is able to render an opinion linking the receipt of the Client Funds with the multiple recipients only because those funds totaled 94.5% of the total deposits into these accounts during the relevant time period, as well as the fact that the total funds in the account prior to the Investor deposits was $277,152.34.  _See_ IV.B.2 _supra_.

13

*shall be made at or near the time of the act, condition or event recorded*" (emphasis added). Indeed, Mr. Donziger's failure to maintain contemporaneous records of disbursements from Client Funds is what necessitated his retention of Rizack, whose primary purpose was to create schedules years later of what fees and expenses had been paid and for what purposes based exclusively on Mr. Donziger's instructions.[21]

Mr. Donziger's failure to maintain accurate, detailed, and contemporaneous records of the receipt and disbursements of the Client Funds is significant not only because of the blatant violation of his ethical obligations under New York law, but also because it undermines his contention that his work with respect to the raising and spending of the Client Funds was "subject to regular oversight from the leadership of the FDA." (**Ex. 3-32**, Donziger Decl., ¶ 7. *See also id.* ¶ 9 ("[m]y work and that of others in this regard and others is subject to FDA oversight which takes place on a regular basis").)  If Mr. Donziger did not maintain detailed contemporaneous records of how he was spending the Client Funds, then his payments to himself and others could not possibly be subject to any meaningful oversight by the FDA or anyone else.[22]

Based on the foregoing, it is my opinion that Mr. Donziger has violated N.Y. Rule 1.15(c)(3) by failing to maintain the required bookkeeping records.

## V.   Mr. Donziger's Violations of 22 NYCRR 1240.15: Conduct of Disbarred or Suspended Attorneys

### A.   Mr. Donziger's Violation of the Prohibition Against Practicing Law Post-Suspension By Providing Both Legal Services and Nonlegal Services that are Not Distinct from Prior Legal Services

Under 22 NYCRR 1240.15(a), attorneys who are disbarred or suspended must comply with Judiciary Law §§ 478, 479, 484 and 486.  After the entry or order of disbarment or suspension, the attorney may not accept any new retainer or engage in any new case or legal matter of any nature as attorney for another.  During the period between entry date of the order and the effective date, the attorney "may wind up and complete, on behalf of any client, all matters which were pending on the entry date."  22 NYCRR 1240.15(a). Section 478 of the Judiciary Law provides that it is unlawful for an unadmitted person to practice as an attorney "for a person other than himself or herself" either in court or "to render legal services."  (N.Y. Jud. § 478.)  It further provides that it is unlawful for an unadmitted person "to hold himself or herself out to the public as being entitled to practice law" or "to assume, use or advertise the title of lawyer . . . or attorney . . . or equivalent terms."  (*Id.*)  Evidence of the continuing practice of law, in violation of an order of suspension, includes communicating with other lawyers regarding pending litigation (*see In re Herzberg*, 163 A.D.3d 220, 225 225 (2018)), continuing to seek installment payments of legal fees (*see In re Thomas*, 162 A.D.3d 1 (2018)), continuing use of escrow funds and accounts (*see In re Herzberg, supra*; *In re Abbott*, 175 A.D.2d 396 (1991)),

---

[21]  *See supra* note 13.

[22]  In 2018, UDAPT explained that one reason it dismissed Mr. Donziger in January 2013 was that "Donziger has repeatedly refused to give an accounting on the use of more than US $20 million that 'he raised' on behalf of his clients." **Ex. 3-10**, UDAPT Draft Letter (Mar. 21, 2018).

and failure to return escrow funds (*see id.*).  Evidence of the impermissible holding oneself out as a lawyer includes giving the appearance of practicing law or being entitled to practice law, as when discussing the substantive and procedural aspects of a legal matter on a client's behalf.  *See In re Abbott, supra; In re Veski*, 42 A.D.3d 122 (2007) (although suspended lawyer did not identify himself as an attorney or use the designation "Esq.," the tone and content of the communication was legal in nature, including giving an opinion as to the law or its application and advice in relation thereto).

Mr. Donziger has said that he has an attorney-client relationship with the FDA and that he has served as both "legal case manager and social justice campaign manager" for his clients. (**Ex. 3-31**, Donziger Decl., ¶¶ 3, 5.)  His self-described work as "legal case manager" necessarily entails an attorney-client relationship with the FDA, in which he was providing legal services. This is confirmed by his original 2006 retention agreement, which refers to "legal compensation to the attorneys involved in the litigation."  (Agreement to Dispute a Case Against Chevron Texaco, Now Chevron, in Ecuador, **Ex. 3-16**, Dkt. 2114-2, Champion Decl., Ex. 20.)  Mr. Donziger signed that agreement as "Attorney," on behalf of "the law offices of Steven R. Donziger," which was a party to the agreement.  (*Id.*)  Similarly, the 2011 Retention Agreement governs Mr. Donziger's firm's continued services "as legal counsel to the Plaintiffs."  (**Ex. 3-17**, Dkt. 2114-2.)[23]

It is my opinion that after his suspension, any continued work as "legal case manager" for the Canadian enforcement action (or any other enforcement action) would violate Mr. Donziger's obligation to "wind up and complete, on behalf of any client, all [legal] matters which were pending on the entry date." 22 NYCRR 1240.15(a).

It is also my opinion Mr. Donziger was obligated to cease *all* activity —whether legal or nonlegal— on behalf of the FDA and his other clients, in connection with efforts to enforce the Ecuadorian Judgment, particularly with respect to any activity for which he is being compensated from Client Funds.  N.Y. Rule 5.7 provides that an attorney who renders nonlegal services that are not distinct from the legal services provided is to be governed by the Rules of Professional Conduct with respect to the provision of the nonlegal services.  Because Mr. Donziger's activity as "social justice campaign manager" was not distinct from his provision of legal services as "case manager,"[24] he was required to "wind up and complete" all such activity

---

[23]  The October 2017 "Agreement for the Continuous Investment of Professional Services" does not purport to supersede the 2011 Retention Agreement, but rather is limited to granting Mr. Donziger a broad power of attorney to act on the FDA's behalf, supporting his existing "contractual INTEREST," and granting him an "INTEREST in his own right equal to his "existing contractual INTEREST."  (**Ex. 3-18**, Dkt. 2114-2, Champion Decl., Ex. 23.)  Mr. Donziger's "contractual interest" is clearly a reference to the contingent fee interest granted to his law firm under the 2011 Retention Agreement.

[24]  According to the comment to N.Y. Rule 5.7, the risk of confusion on the part of the client is "especially acute when the lawyer renders both legal and nonlegal services with respect to the same matter."  N.Y. Rule 5.7, cmt [1].  As a result, one commentary concludes that "a good rule of thumb is to consider both legal and nonlegal services 'not distinct' whenever they are provided to the same client in the same matter."  SIMON'S NEW YORK RULES OF PROFESSIONAL CONDUCT ANNOTATED, *supra* note 7, at 1528.  Other factors to consider in determining when legal and nonlegal services are provided in a manner that is "not distinct" are: whether the nonlegal services are commonly provided by lawyers, whether the client will communicate with the lawyer in the same way and perhaps in the same conversations, and whether the services were constructed such as to keep

in July 2018, particularly any activity for which he is now being compensated or expects to be compensated from Client Funds.

Perhaps Mr. Donziger could have permissibly provided nonlegal "social justice campaign manager" services for other clients in other matters, if he did so in a manner that made clear that these were not legal services. However, by continuing to provide the same nonlegal services to the same Ecuadorian clients, in the same matter in which he had been providing legal services, and in a manner that was not distinct from the provision of legal services, Mr. Donziger engaged in the unauthorized practice of law. *See In re Rost*, 289 Kan. 290, 305 (2009) (citing state rule similar to N.Y. Rule 5.7, court rejected retired lawyer's argument "that he was not practicing law because he was merely doing things that a person who is not an attorney might do," on the ground that he continued to perform "the same law-related services, for the same clients, from the same staff as was done when those services were not distinct from the attorney's provision of legal services," without meeting the onerous burden of demonstrating client understanding that the protections of the attorney-client relationship had ceased"). *Cf. State v. Schumacher*, 214 Kan. 1, 15 (1974) ("some actions which may be taken with impunity by persons who have never been admitted to the practice of law, will be found to be in contempt if undertaken by a suspended or disbarred attorney"); *Application of Christianson*, 215 N.W.2d 920, 925 (N.D. 1974) ("A suspended lawyer is not the same as a layman. The public knows that he has a legal education, that he has engaged in the practice of law, and that his work and his opinions are presumably more valuable on that account. We cannot accept the argument that a disbarred or suspended lawyer may engage in all activities which nonlawyers perform.").

Mr. Donziger has not ceased his activity as either legal case manager or social justice campaign manager with respect to the enforcement of the Ecuadorian Judgment. He has continued to serve as the liaison between the FDA and the investors, including controlling the receipt and disbursement of the Client Funds[25] and communicating directly with the investors, for example, by responding to a request for an explanation of the "legal basis for funding [the] Ecuador case." (*See* **Ex. 3-20**, RIZACKPJD-0001132 (email from Donziger responding to Sharon L. McCarthy dated Oct. 8, 2018).)[26] Mr. Donziger has also continued his activities, on behalf of the FDA, to generate favorable publicity for his efforts to enforce the Ecuadorian

---

them separate. *See* N.Y. St. Bar Ass'n Committee on Prof. Ethics Opinion 1015 (2014) ("N.Y. State Op."). All these factors weigh in favor of finding that Mr. Donziger personally provided both legal case management and nonlegal social justice campaign services to his Ecuadorian clients in a manner that was clearly "not distinct," and therefore that the rules of professional conduct apply to the nonlegal as well as the legal services. For examples of similar circumstances where a "not distinct" finding was made, *see, e.g., id.* (lawyer providing both legal and real estate brokerage services in the same real estate matters); N.Y. State Op. 1026 (2014) (matrimonial lawyer providing both legal and mediation services in the same matters); N.Y. State Op. 860 (2011) (law firm providing both grant writing services and tax advice and other legal services related to grant application).

[25]  *See* **Ex. 3-21**, RIZACKPJD-0001130 (email exchange between Michael Delgass, lawyer for investor Wellbeck Partners, LLC, and Josh Rizack, dated Oct. 3 - Oct. 9, 2018, concerning Wellbeck's request for an accounting and Rizack's confirmation that he had spoken to Mr. Donziger, who was going to provide an accounting of "all of the funds received and disbursed from the time of the investment *to current*") (emphasis added). This email exchange confirms that Mr. Donziger was continuing to maintain control the Client Funds, including making disbursements, after the order of suspension in July 2018.

[26]  In that email, Mr. Donziger explains his view of "the legal justification from Judge Kaplan's order dated April 25, 2014 for fundraising from outside investors such as your client."

Judgment and unfavorable publicity for Chevron's efforts to defend against such enforcement, and in doing so, he has portrayed himself as a lawyer in support of those efforts.

In his communication with members of the press, Mr. Donziger has continued to portray himself as a leading member of the legal team representing the Ecuadorian plaintiffs in the Canadian enforcement action.  For example, in an August 2018 email to an AP correspondent, Mr. Donziger refers to "my clients" and to Chevron's efforts "to silence me (and other lawyers) and to try to drive all of us off the case."  (*See* **Ex. 3-14**, Hinton PJD_0000763 (email from Donziger to Frank Bajak dated Aug. 29, 2018).)  In that same email, he describes himself as "continu[ing] to lead the Ecuadorians in efforts to seize company assets," and as "a sole practitioner," along with "our high-level legal team in Canada."  (*Id.*)  Forwarding that email to publicist Karen Hinton, Mr. Donziger refers to "our in-court action," stating that "we continue to do legal things in court, even if the chances of winning (in the U.S.) is low---because via the process of putting these materials together, filing them, and publicizing them, we highlight Chev's and Kaplan's corruption and we lift the morale of everybody involved and we increase our chances in Canada . . . ."  (**Ex. 3-14**, Hinton PJD_0000763, email from Donziger to Hinton dated Aug. 30, 2018.)  Indeed, the day after Mr. Donziger was suspended from the practice of law in New York, he stated that while he found "the NY decision extremely unjust and upsetting, *I can assure it will not affect my work on the case*," thus conceding that the suspension would not cause him to cease any of his ongoing efforts, legal or otherwise, to enforce the Ecuadorian Judgment.  (*See* **Ex. 3-13**, RIZACKPJD-0000181 (email from Donziger addressed to "Friends," dated July 11, 2018)) (emphasis added).

As recently as May 28, 2019, Mr. Donziger characterized Judge Kaplan's May 23, 2019 decision holding him in contempt[27] as supporting Chevron's efforts to spy on "the activities of *adversary counsel* as this case proceeds in enforcement courts," with the goal of "pressur[ing] me financially to such a degree that I abandon *my clients* in Ecuador so Chevron will have a better chance of winning by might what it clearly has lost on the merits."  (**Ex. 3-40**, Dkt 2215-2, Statement of Steven Donziger dated May 28, 2019, at 2) (emphasis added).

As of July 2019, Mr. Donziger was still allowing his clients to present him to the press as an attorney. In an article published by the FDA on July 11, 2019, Mr. Donziger is described as the FDA's "longtime U.S. lawyer." (**Ex. 3-49**, FDA Press Release (July 11, 2019).)[28]

While Mr. Donziger acknowledged in some of his emails to investors and friends, including John van Merkensteijn, Joshua Rizack, Tony Abbiati, and David Sherman, that he had been suspended from the practice of law in New York, he attempted to justify his continuing role in the Canadian enforcement action by noting that he had not been suspended from the practice of law in D.C.  (*See, e.g.,* **Exs. 3-42, 3-43, 3-44, & 3-45**,  JVM 006324; RIZACKPJD-0001202; CHV-00042; Sherman00000849 ("Note that I am still a member of the District of Columbia

---

[27]  *See* **Ex. 3-39**, Dkt. 2209 (May 23, 2019).

[28]  *See also* **Ex. 3-53**, teleSur English Youtube Page of Donziger Interview (November 3, 2018), *available at* *https://www.youtube.com/watch?v=lCudgAmCX-k* (last accessed July 15, 2019) ("teleSUR English brings you an exclusive interview with Steven Donziger, lawyer of the Affected Communities in the Ecuadorean Amazon", with Mr. Donziger still characterizing himself as a "human rights lawyer" at the very beginning of the video, despite mentioning his suspension status much later in the video.)

bar.").)  In my opinion, the fact that his license to practice was not suspended in D.C. until September 19, 2018 (*see* **Ex. 3-48**, Dkt. 2114-8, Declaration of Anne Champion, Ex. 69 (Oct. 24, 2018)), did not justify his continuing as both legal case manager and social justice campaign manager after his suspension in New York, as well as his continuing to hold himself out as a lawyer actively involved in the legal effort to enforce the Ecuadorian Judgment in Canada.  Mr. Donziger did not maintain an office for the practice of law in D.C.  His only office is in his home in New York, and it is in New York where he has been receiving and disbursing the Client Funds from his TD bank accounts.  It is my opinion that his license to practice in D.C. did not authorize him to continue providing legal and law-related services from his office in New York.

In any event, Mr. Donziger continued his legal and law-related activities even after D.C. also suspended his license.  For example, In October 2018, one month after his D.C. suspension, he was continuing to act as the liaison between the FDA and the investors, including agreeing to provide a "current" accounting of the receipt and disbursement of Client Funds, and providing an explanation of the legal basis for raising funds after Judge Kaplan's order.  Moreover, although his current website notes his suspension from the practice of law in New York, it does not note his suspension from the practice of law in D.C.,[29] even though he had previously stated to members of the public that although he had been suspended in New York, he continued to be authorized to practice law in D.C.  (*See* **Ex. 3-14**, Hinton PJD_0000763 (forwarding email from Donziger to Frank Bajak dated Aug. 29, 2018).)

Given his continuing activities as both legal case manager and social justice campaign manager, including his presenting himself to the press as a lawyer actively involved in the legal effort to enforce the Ecuadorian Judgment in Canada, it is my opinion that Mr. Donziger has continued to practice law, to hold himself out to the public as being entitled to practice law, and to assume, use and advertise the title of lawyer or attorney, all of which are in violation of 22 NYCRR 1240.15(a) and N.Y. Jud. Law § 478.

B. Mr. Donziger's Violation of His Duty to Notify Clients of His Suspension(s)

Under 22 NYCRR 1240.15(b), attorneys who are disbarred or suspended are required, within 10 days of the entry of the order of disbarment or suspension, "to notify by certified mail and, where practical, electronic mail, each client of the [attorney]."  The "notice shall state that the [attorney] is unable to act as counsel due to disbarment or suspension" and "shall advise the client to obtain new counsel."

At the time of his suspension, Mr. Donziger was representing the FDA and the other "affected community members and constituent community organizations" with whom he says he had an attorney-client relationship.  (**Ex. 3-31**, Donziger Decl., ¶ 3.)  Because Mr. Donziger has not served an affidavit of compliance, as required by Section 1240.15(f) (*see infra* at V.D.), it is unknown whether or not he adequately noticed each client of his suspension as required.  There is good reason to believe that he has not so notified his clients, including his continuing to act as

---

[29]  *See* **Ex. 3-04**, "About Steven," *available at* http://stevendonziger.com/about-steve/ (last visited on May 21, 2019) ("*Note: In July 2018, consistent with the retaliatory litigation campaign described in the accompanying video, New York bar authorities suspended Steven's license to practice law in New York. Steven is not currently practicing law in New York.*").

liaison between the FDA and the investors after his suspension in both New York and D.C., which left him without a license to practice law in any jurisdiction.

Based on the foregoing, it is my opinion that it is likely that Mr. Donziger has violated 22 NYCRR 1240.15(b) by not notifying his clients of his suspension.

C.   Mr. Donziger's Violation of His Duty to Return Property and Files

Under 22 NYCRR 1240.15(c), attorneys who are disbarred or suspended are required, within 30 days of date of entry of the order of disbarment or suspension, "to deliver to all the attorney]'s client or third parties, or to a successor attorney designated by such clients or third parties . . . all money and property (including legal files) in the possession of [the attorney] to which such clients or third parties are entitled."  This section clearly required Mr. Donziger to return all Client Funds, as well as any records of the receipt or disbursement of these funds, to their owner, whether that be the FDA or other persons or organizations.  *See In re Abbott*, *supra* (lawyer violated terms of suspension by continuing to hold estate funds in escrow account).

According to Mr. Donziger, the Client Funds were entitled to be spent for both legal case management and social justice campaign; however, the Client Funds were never segregated with respect to legal versus nonlegal purposes.  (*See supra* IV.B.2.)  Moreover, under N.Y. Rule 5.7, [a] lawyer or law firm that provides nonlegal services to a person that are not distinct from legal services being provided to that person by the lawyer or law firm is subject to [the New York Rules of Professional Conduct] with respect to the provision of both legal and nonlegal services." Therefore, it is my opinion that Mr. Donziger was required to return *all* Client Funds and records concerning those funds in his possession by July 2018, even if a portion of those funds were being used for nonlegal purposes.

Because Mr. Donziger has not served an affidavit of compliance, as further required by Section 1240.15(f) (*see infra* V.D), it is unknown whether or not he returned any of the Client Funds or records concerning those funds.  However, there is good reason to believe that he has not complied with his obligation, including the fact that investors continued to look to him to provide a complete (and current) accounting of the receipt and use of these funds, and his agreement to provide such an accounting.

Based on the foregoing, it is my opinion that it is likely that Mr. Donziger has violated 22 NYCRR 1240.15(c) by not returning client property and files.

D.   Mr. Donziger's Violation of His Duty to Serve an Affidavit of Compliance

Under 22 NYCRR 1240.15(f), attorneys who are disbarred or suspended are required, within 45 days of date of entry of the order of disbarment or suspension, to "file with the Court, together with proof of service upon the Committee, an affidavit in the form in Appendix B to these Rules showing a current mailing address for the respondent and that the respondent has complied with the order and these Rules."  As of June 2019, it is my understanding that, based upon a review of the disciplinary file, which Mr. Donziger successfully petitioned to make public, by Chevron's outside counsel, Mr. Donziger does not appear to have filed the required affidavit of compliance. Because of the foregoing, it is my opinion that Mr. Donziger has violated 22 NYCRR 1240.15(f).

E.   Mr. Donziger's Violation of the Prohibition Against Compensation for Legal and Nonlegal Services During His Period of Suspension

According to the RICO Judgment, Mr. Donziger is required to "pay over and assign to Chevron all fees and other payments, property, and other benefits that they have received or hereafter receive, directly or indirectly, in consequence of the Judgment." *Chevron,* 974 F. Supp. 2d, at 641.  The stated goal of this order is to prevent Mr. Donziger from "benefit[ing] in any material way from the Judgement in the Lago Agrio case." *Id.*  Separate and apart from the RICO injunction, however, Mr. Donziger is required to follow New York law concerning the responsibilities of a suspended lawyer.

Under 22 NYCRR 1240.15(f), attorneys who are disbarred or suspended "may not share in any fee for legal services rendered by another attorney during the period of disbarment or suspension but may be compensated on a *quantum meruit* basis for services rendered prior to the effective date of the disbarment or suspension."

This rule applies to any contingent fee that Mr. Donziger might receive if the Ecuadorian Judgment is enforced in any jurisdiction.  Mr. Donziger is prohibited under this rule from sharing in legal fees with the attorneys of record for the plaintiffs.  Mr. Donziger would have to apply to the court for a determination of what compensation, if any, he is entitled to on a *quantum meruit* basis for services he rendered prior to his suspension or disbarment to the extent he has not forfeited it due to his misconduct.[30]

In my opinion, the rule also prohibits Mr. Donziger from continuing to pay himself (or otherwise receive) all or part of any monthly retainer out of Client Funds[31] or any other funds.[32] He is not permitted to receive compensation for any legal services he performed or is performing subsequent to his suspension (or reimbursement for expenses incurred in rendering such services), because he is prohibited from performing any such services.  (*See* V.A. *supra.*)  Mr. Donziger may argue that he is entitled to be compensated for performing nonlegal services, such

---

[30]  Because his misconduct occurred in this same matter—obtaining the Ecuadorian Judgment—Mr. Donziger is likely to have forfeited his right to any compensation.  *See Decolater, Cohen & DiPrisco, LLP v. Lysaight, Lysaght & Kramer*, 304 A.D.2d 86 (1st Dept. 2003) ( "A lawyer forfeits his entire fee due to misconduct only where the misconduct relates to the representation for which the fees are sought."); *Greenberg v. Cohn*, 152 Misc. 2d 495 (1992) (citing and quoting N.Y. St. Bar Assn. Ethics Op. No. 609 (1989), to the effect that "as long as the disbarment was unrelated to the matter in which the fees were earned, an attorney may properly share in fees for work performed or responsibility assumed until the time of disbarment, but not for services performed or responsibility assumed after the time of disbarment").

[31]  Of course, the RICO injunction itself bars Mr. Donziger from paying himself any legal fees from funds traceable to the Ecuadorian Judgment.  Here I address only what is required under the New York law governing suspended lawyers.

[32]  Although the first part of the rule refers specifically to disbarred or suspended lawyers sharing in fees for legal services rendered "by another attorney," this is because the rule assumes that the discharged or suspended lawyer is complying with the obligation not to continue to perform legal services and therefore could only be compensated by sharing in the legal fees paid another attorney for completing the work.  It would defy logic to interpret the rule as permitting a suspended lawyer to receive compensation directly from a client, or from client funds, for legal work performed either before the suspension or impermissibly performed by the suspended lawyer after the suspension.  Rather, the rule contemplates that only a court can determine whether and in what amount the suspended attorney is entitled to be compensated.

as his services as a "social justice campaign manager."  However, as described above, because those services were never distinct from his provision of legal services as "legal case manager," including the absence of any allocation in his monthly retainer between legal and nonlegal services, it is my opinion that Mr. Donziger is prohibited from continuing to perform such services (*see id.*), and, therefore, is not entitled to any compensation for providing them.[33]

Because Mr. Donziger did not regularly submit invoices for his monthly retainer, and does not have detailed records of when he has paid himself a monthly retainer or reimbursed himself for legal expenses, he may argue that any post-suspension payments to himself are payments for services provided and/or expenses incurred prior to his suspension.  The New York rule, however, permits him to be compensated for past services only on a *quantum meruit* basis, if at all.[34]  Because he was suspended for misconduct in the very case in which his misconduct occurred, i.e., the Ecuadorian litigation, he is likely to have forfeited his right to any compensation in the matter.[35]  Moreover, the rule requires that he apply to the court for a determination of what amount he is entitled to recover, if any.  And while he might be entitled to reimbursement for expenses incurred prior to his suspension, because he has not maintained adequate records of those expenses, including those for which he has already been reimbursed, he cannot be permitted to make unilateral determinations that payments to him subsequent to his suspension are valid reimbursements for past expenses.  *Cf. In re Herzberg*, *supra* (suspended lawyer's drawing of legal fee ostensibly earned and paid prior to suspension was contrary to representation in affidavit of compliance that he would apply to appropriate court for determination of any fees claimed to be owed).

F.  Mr. Donziger's Violation of His Duty to Maintain Required Records

Under 22 NYCRR 1240.15(f), attorneys who are disbarred or suspended are required to "keep and maintain records of the [attorney's] compliance with this rule so that, upon any subsequent proceeding instituted by or against the [attorney], proof of compliance with this rule and with the disbarment or suspension order or with the order accepting resignation will be available."

Because Mr. Donziger has not filed an affidavit of compliance, as required by Section 1240.15(f) (*see supra* V.D.), it is unknown whether or not he has maintained the records required under 22 NYCRR 1240.15(f).

---

[33]  *See In re Rost*, 289 Kan. 290 (2009) (citing state rule similar to N.Y. Rule 5.7, court rejected retired lawyer's argument "that he was not practicing law because he was merely doing things that a person who is not an attorney might do," on ground that the lawyer was providing virtually the same services that he provided prior to retirement, and that he provided law-related services without taking reasonable measures to assure that clients understood that the services were not legal services and that the protections of the client-lawyer relationship did not exist)

[34]  *See, e.g., Padilla v. Sansivieri*, 31 A.D.3d 64, 65 (2d Dept. 2006) ("a disbarred attorney may recover legal fees for services rendered prior to disbarment…[; h]owever, such fees are capped by the rule of quantum meruit, and no private agreement as to compensation is binding on the court").

[35]  *See supra* note 29.

## VI.    Violations Relating to Mr. Donziger's Conflict of Interests

N.Y. Rule 1.9(a) provides that "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing."  This prohibition includes a lawyer who previously represented multiple clients in a matter who now represents one of the clients against another, after a dispute arose among the clients.  (*See* N.Y. Rule 1.9, cmt [1]; *cf.* N.Y. State Op. 903 (2012) (Rule 1.9(a) applies when a jointly represented client revokes consent and one of the clients becomes a former client).)

**Mr. Donziger's prior representation of UDAPT and the 48 individual *Aguinda* plaintiffs**

Pursuant to the 2011 Retention Agreement, Mr. Donziger's firm represented the 48 individual *Aguinda* plaintiffs (by Pablo Fajardo), the FDA, and the Assembly of Communities Affected by Texaco.  (*See* **Ex. 3-17**, Dkt. 2114-2.)  The Assembly of Communities Affected by Texaco later became the UDAPT.  (**Ex. 3-10**, UDAPT Draft Letter at 1.)[36]  The purpose of the retention was to secure Mr. Donziger's services "as legal counsel to the Plaintiffs in connection with the Litigation" (**Ex. 3-17**, Dkt. 2114-2 ¶ 1), which was defined as actions "necessary to enforce a judgment against Chevron or its subsidiaries in Ecuador, the United States and/or other countries and pursue or defend any appeals therefrom and conducting possible settlement negotiations with Chevron and its representatives." (*Id.* at p. 1.)  Pursuant to that agreement, Mr. Donziger's firm agreed to submit a budget and to "submit a [monthly] bill to the Plaintiffs for reimbursement of its Expenses for such month setting forth in reasonable detail the Expenses that it incurred during the preceding month in connection with its representation of the Plaintiffs in the Litigation." (*Id.* ¶ (3)(f).)  The agreement specifically contemplated that the Plaintiffs would "seek additional funding for the Litigation from one or more additional funders" (*Id.* ¶ (3)(j)(i)) and that, after approval by both Mr. Donziger and the Chairman, the Plaintiffs "may…enter into a funding agreement with Additional Funders" (*Id.* ¶ 3(j)(ii)).

Several years later, a schism developed between the UDAPT and FDA over the right to control the plaintiffs' efforts to enforce the Ecuadorian Judgment, including fundraising related thereto.  According to the UDAPT, it discharged Mr. Donziger as its attorney in January 2013. (**Ex. 3-10**, UDAPT Draft Letter at 1; **Ex. 3-47**, Schism Timeline.)  Although the FDA is not a party to any lawsuit, it continues to assert the right to control litigation seeking to enforce the Ecuadorian Judgment and to enter into investment agreements selling interests in the Ecuadorian Judgment.

A.   Mr. Donziger's Continued Representation of the FDA is Materially Adverse to his Former Clients in the Same or a Substantially Related Matter

The schism between the UDAPT and the FDA has manifested itself in numerous competing claims, often expressed in public documents, concerning who has the authority to

---

[36] Mr. Donziger admits that he formerly represented the UDAPT. *See* **Ex. 3-11**, Donziger Dep., at 14. *See also id.* at 28-29 (admitting that in the 2011 Retention Agreement, his clients consisted of "the individual Lago Agrio plaintiffs, the FDA, and the UDAPT"). He refused to say when he had stopped representing the UDAPT.

enforce the Ecuadorian Judgment, including the ability to raise external funding and to control the litigation and instruct counsel of record, all of which were matters included within the scope of representation under the 2011 Retention Agreement.  For example, in the summer of 2016, the FDA suspended its ties to Fajardo because, on behalf of the *Aguinda* plaintiffs, Fajardo had filed a petition with the Provincial Court of Justice of Sucumbios requesting the court to vacate a 2012 attachment order against US $96 million owed by the Republic of Ecuador to Chevron.  (**Ex. 3-07**, CSRWire press release dated July 29, 2016.)  The two organizations have disputed whether Fajardo had the authority to vacate the attachment.  (*See* **Ex. 3-08**, UDAPT press release dated Aug. 5, 2016.)  They have also disputed whether FDA has the authority to sign funding agreements on behalf of itself and the plaintiffs and to otherwise "play a role in the court proceeding" in Canada.  (*Compare* **Ex. 3-41**, Radiosucumbios.org, Aug. 17, 2016 (FDA press conference) *with* **Ex. 3-09**, Mar. 2, 2018 UDAPT Letter ("[t]he FDA does not represent the affected people in court because the FDA is not now and never has been a party to any lawsuit").)  According to the UDAPT, it dismissed Mr. Donziger because he "has repeatedly refused to give an accounting on the use of more than US$20 million that 'he raised' on behalf of his clients" and because "the UDAPT became aware through different sources published during the RICO trial that Mr. Donziger acted in his own interest and against the interest of the affected Ecuadorians."  (**Ex. 3-10**, UDAPT Draft Letter at 1.)

Mr. Donziger continued to represent the FDA throughout these disputes, supporting the positions taken by the FDA in opposition to those of his former clients.  (*See, e.g.,* **Ex. 3-19**, FDA Press Conference, at 14 (Aug. 10, 2016) (Mr. Donziger publicly criticized Fajardo for lifting the 2012 attachment); *see also* **Ex. 3-32**, Donziger Decl. ¶ 3 (the FDA is responsible for the execution of the judgment against Chevron); ¶ 7 (Donziger has authority from the FDA "to undertake efforts to raise funds necessary to continue the enforcement of the Aguinda judgment and the overall corporate accountability campaign against Chevron"); ¶ 9 (he has authority from the FDA "to spend and direct the distribution of funds from investors"); ¶¶ 11-12 (the FDA has authority to agree to compensate him at a rate of $25,000 per month from investor funds and to reimburse him for expenses for past and future expenses from investor funds)).)  He represented the FDA in seeking and obtaining funding for the enforcement litigation in Canada (*see supra* IV.B.1), despite the UDAPT's contention that the FDA had no authority to do so.  Moreover, he considered himself, on behalf of the FDA, to be the "legal case manager" for the Canadian enforcement litigation (*see id.*), despite the UDAPT's claim that only it has the authority to participate in that litigation as the plaintiffs' representative.  Mr. Donziger also sought, without UDAPT's authorization, to change Lenczner Slaght's retainer agreement to ensure that Lenczner Slaght would follow only the instructions of the FDA.  (**Ex. 3-22**, Dkt. 2114-3, "Superseding Retainer Agreement", at 1-2 (unsigned by Lenczner).)

In my opinion, Mr. Donziger's continued representation of FDA was materially adverse to his former clients—UDAPT and the individual *Aguinda* plaintiffs—in the same or a substantially related matter.  As such, the representation was prohibited under Rule 1.9(a) unless the former clients gave their informed consent.

B.  <u>Mr. Donziger Failed to Obtain Consent for His Conflict of Interests.</u>

Mr. Donziger testified that he had no direct consent from the individual *Aguinda* plaintiffs, either from the individuals themselves or from Fajardo, to continue representing the

FDA, and that the only consent he has is from the FDA.  (**Ex. 3-11**, Donziger Dep., at 30-31 (June 25, 2018).)  Given the lack of consent from both the individual plaintiffs and from the UDAPT, it is my opinion that Mr. Donziger's continued representation of the FDA in the same or a substantially related matter was in clear violation of N.Y. Rule 1.9(a).

**VII.**   **Violations Relating to Mr. Donziger's Deposition Misconduct**

N.Y. Rule 8.4(d) provides that a lawyer shall not "engage in conduct that is prejudicial to the administration of justice."  This includes "repeatedly disrupting a proceeding" and other conduct that is "seriously inconsistent with a lawyer's responsibility as an officer of the court." (*See* N.Y. Rule 8.4, cmt [3].  Rule 8.4(h) of the New York Rules of Professional Conduct provides that a lawyer shall not "engage in any other conduct that adversely reflects on the lawyer's fitness as a lawyer.")

As a lawyer-litigant, Mr. Donziger has exhibited a pattern of obstructive and abusive behavior throughout the depositions taken pursuant to Chevron's efforts to establish whether Mr. Donziger received fees or other payments in consequence of the Ecuadorian Judgment, in violation of Judge Kaplan's order of March 4, 2014.  Mr. Donziger's inexcusable behavior includes: repeated use of lengthy speaking objections, in violation of Fed. R. Civ. P. 30(c)(2); repeated harassment of opposing counsel by interrupting their questions, yelling at them, and making derogatory, even sexist comments; and harassing opposing counsel by secretly photographing them during a deposition and then posting the photos on Twitter with disparaging comments.  In the recent deposition of Laura Miller, Mr. Donziger continued his pattern of obstructive and abuse behavior, including making improper speaking objections, interfering with questions, blatant coaching of Ms. Miller to change her answers and refuse to answer Chevron counsel's questions, asking for excessive breaks to instruct the witness about her testimony, and making repeated frivolous assertions of marital privilege.

A.   Mr. Donziger's Impermissible Speaking Objections

Speaking objections are prohibited under Federal Rule of Civil Procedure 30(c)(2), which provides that "[a]n objection must be stated concisely in a nonargumentative and nonsuggestive manner."  Mr. Donziger has made numerous speaking objections throughout the depositions taken in these proceedings.

An example of an impermissible speaking objection occurred during Chevron's deposition of Antony Abbiati on November 26, 2018.  Mr. Donziger interrupted opposing counsel before her question was finished, ignoring counsel's request to permit her to finish her question.  He then stated the following: "You ask a question and the witness proceeds to answer very quickly, and I want to get my objection in, so hold on a second.  You can continue with your questions after I lodge my objection, which is: This line of questioning is irrelevant.  He's already testified that he doesn't know who Pablo Fajardo is.  You're testifying to him by asking questions in this fashion.  You're reading letters he's never seen before, he's never had a chance to review in their complete form, and trying to elicit answers.  Obviously he's never seen the letter.  Obviously he knows nothing about the dispute between Fajardo and the FDA, and you're just manipulating this whole situation to cause confusion.  Okay?  It's irrelevant.  Move on. Respect the witness.  I have questions I want to ask."  (**Ex. 3-35**, Antony Abbiati Dep., at 114-

115 (Nov. 26, 2018). For other examples of Mr. Donziger's lengthy speaking objections, *see* **Ex. 3-01**, (Excerpts of Deposition Transcripts).) These objections are prohibited because they frequently signal to the witness how the objecting lawyer wants the witness to respond. *See, e.g., Fort Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*, 2013 WL 6439069, at *4 (S.D.N.Y. Dec. 9, 2013). They also disrupt the flow of the opponent's questioning. *See, e.g., Morales v. Zondo, Inc.*, 204 F.R.D. 50, 54 (S.D.N.Y. 2001) (pervasive interruptions clearly intended to cause problems for questioner in his examination).

Mr. Donziger has repeatedly interrupted opposing counsel's questions. This occurred not only in Abbiati's deposition, as quoted above,[37] but in many others. This behavior is most clearly illustrated in the video segments filed as **Ex. 3-02**. The video also illustrates the manner in which Mr. Donziger harasses opposing counsel by yelling at them, accusing them of misconduct,[38] and otherwise criticizing the manner in which they ask their questions.[39] In the video, Mr. Donziger even admits himself that he is making speaking objections, "I'll stop making speaking objections when you stop harassing witnesses." (**Ex. 3-02**, at 5:03.)

Rule 8.4(d) clearly encompasses abusive, uncivil, and intimidating behavior toward opposing counsel. *See, e.g., In re Abbott*, 925 A.2d 482 (Del. 2007) (brief containing personal attacks against opposing counsel); *Fla. Bar v. Norkin*, 132 So. 3d 77 (Fla. 2014) (letters, e-mails and public insults intended to disparage and humiliate opposing counsel); *In re Vincenti*, 704

---

[37] Mr. Donziger stated then that he interrupted opposing counsel's question because the witness was answering too quickly, without giving him a chance to object. Of course, the proper way to prevent this problem is to wait until the witness has finished answering and then request the witness to wait before answering future questions in order to give him an opportunity to briefly state his objection. In any event, such a problem would not justify the extent to which Mr. Donziger has repeatedly interrupted opposing counsel's questions in order to interpose lengthy speaking objections and otherwise harass opposing counsel.

[38] *See, e.g.,* **Ex. 3-37**, P. Campbell Ford Dep., at 89-90: "I'll stop making speaking objections when you stop harassing witnesses from trying to help the people of Ecuador. Okay? We have a fundamental disagreement about the purpose of these depositions. I've been enormously tolerant of this. Okay? You've harassed everyone who's tried to help me and my clients in Ecuador, 20 people. You flew all the way to Jacksonville, Florida, for this ridiculousness when he would have given you the information on the phone anyway. You're wasting my time, his time. Even though I know you and your colleague from Miami are making huge sums of money billing for this charade." *See also id.* at 113 ("Objection. Objection to this crap. Okay? I've had it. This is so misleading. Why don't you read from the April 25th clarification order that specifically authorizes me and anyone else in the case to raise money and be paid from the money raised. I mean, you're just---it's just terrible. You're---you're so unethical the way you ask questions."); *id.* at 129 ("[T]his is harassment . . . . This is harassment. Come on, Anne.)

[39] *See, e.g.,* **Ex. 3-36**, Glenn Krevlin Dep., at 231-232 (December 18, 2018) ("Objection. Quit testifying or reading a decision. You gave it to him. He could read it on his own. If you have a question for the witness, ask him. This is so abusive."); **Ex. 3-33**, John van Merkensteijn Dep., at 152-153 (Oct. 31, 2018) ("Objection, objection. Stop it. This is so beyond the scope. There's no way he knows whether Weyler was paid or not. Establish a foundation before you ask that kind of question; okay? And it's irrelevant anyway. And I'll remind counsel for the witness that to the extent that Ms. Neuman continues to go beyond the scope, you have every right to shut down the deposition. I'm not advising that you do that. But you do have that right. This is outrageous. Stick to the issue ordered by Judge Kaplan and stop harassing the witness."); **Ex. 3-37**, P. Campbell Ford Dep., at 89-90 ("First of all objection . . . lack of foundation. Why don't you ask him what his understanding was at the time he read it or if he even has one that he remembers? [After opposing counsel states that this is what she asked,] "No, you didn't. You said what was your understanding. Ask him if he even has a recollection of what it might have been.").

A.2d 927 (N.J. 1998) (pattern of abuse, intimidation, and contempt toward judges, witnesses, and opposing counsel).

B.  Mr. Donziger's Harassment of Opposing Counsel and Sexist Comments to Female Counsel

On at least one occasion, Mr. Donziger harassed a female opposing counsel by making an overtly sexist remark.[40]  *See* **Ex. 3-15**, Katie Sullivan Dep., at 342 (Sept. 28, 2018) ("[Donziger]: You understand that I told you that Chevron had paid people to follow me around Manhattan at one point, correct?  MS. CHAMPION: Objection.  Outside the scope.  Where are you going with this?  Are you testifying or is she?  MR. DONZIGER: Anne, chill, babe.").  Sexist conduct toward opposing counsel has been characterized as "inexcusable and intolerable," and it may subject the offending lawyer to discipline "in that it reflects adversely on [the lawyer's] fitness to practice law.  *In re Schiff*, 190 A.D.2d 293 (1st Dept. 1993).  According to one court, "[a] sexist remark is not just a professional discourtesy, although that in itself is regrettable and all too common.  The bigger issue is that comments like [this] reflect and reinforce the male-dominated attitude of our profession."  *Claypole v. County of Monterey*, 2016 WL 145557, * 5 (N.D. Cal. Jan. 12, 2016) (at deposition, lawyer said to opposing counsel, "[D]on't raise your voice at me. It's not becoming of a woman . . . .").[41]

Finally, Mr. Donziger on more than one occasion surreptitiously photographed opposing counsel at a deposition and posted the photos on Twitter.  On the Twitter posts, he named opposing counsel (the same counsel to whom he had previously directed sexist remarks), and personally disparaged her for deposing a man "regarding my father's recent death.  That's gross.  (*See* **Ex. 3-03**, Excerpts of Personal Attacks from Deposition Transcripts) and as having "harassed another supporter of Ecuador's indigenous peoples with a SLAPP-style deposition this week."  *Id.*  The comments were not only disparaging, but were misleading, as Chevron clearly had good reason to depose Mr. Donziger's probate attorney, P. Campbell Ford, whom Mr. Donziger had attempted to, in direct violation of Judge Kaplan's order, compensate for personal services with a percentage of Mr. Donziger's own contingent fee.  (**Ex. 3-06**, PCFord_000018 (email from Donziger to C. Ford dated Dec. 18, 2014).)  The deposition did not concern the circumstances surrounding the death of Mr. Donziger's father (who had died not "recently," but in 2012, six years before the deposition), but rather Mr. Donziger's attempt to pay Ford with an interest in the Ecuadorian Judgment, including Mr. Donziger's potential misrepresentations in connection with that attempt.  (**Ex. 3-37**, Campbell Ford Dep., (Feb. 11, 2019).)  The surreptitious photographing of opposing counsel is itself in violation of Fed. R. Civ. P. 30(b)(3)(B), which prohibits the private recording of a deposition except with prior notice.  *See Hylton v. Anytime Towing*, 2012 WL 1564527, at *3 (S.D. Cal. 2012).  Even more disturbing, however, was the use of social media to "knowingly, or through callous indifference, disparage,

---

[40]  *See also* **Ex. 3-34**, Cliff Eisler Dep. at 209:22-24 (Nov. 5, 2018) (Donziger referring to opposing counsel Anne Champion's objection as "cute").

[41]  The court went on to state: "A recent ABA report found that 'inappropriate or stereotypical comments' toward women attorneys are among the more overt signifiers of the discrimination, both stated and implicit, that contributes to their underrepresentation in the legal field.  When an attorney makes these kinds of comments, 'it reflects not only on the attorney's lack of professionalism but also tarnishes the image of the entire legal profession and disgraces our system of justice.'"  *Id.* (footnotes omitted).

humiliate or discriminate against, litigants, witnesses or other lawyers on any basis." *Lehigh v. Avossa*, 2017 WL 2799617, at *2 (S.D. Fla. June 28, 2017) (finding that social media posts, including posts about other lawyers, were prejudicial to the administration of justice); *cf. The Florida Bar v. Norkin*, 132 So. 3d at 86 (finding that lawyer's private and public insults "disparaged and humiliated" opposing counsel and were prejudicial to the administration of justice). Mr. Donziger also engages in this practice of online disparaging more generally. (*See* **Ex. 3-46**, Twitter Post of Chevron's in-house Supervising Counsel's picture in connection with the Zelman deposition.)

C.   Mr. Donziger's Obstructive Behavior During Laura Miller's Deposition

On May 13, 2019, over Donziger's and Miller's objections, Judge Kaplan granted Chevron's motions, compelling Laura Miller to testify at a deposition. Dkt. 2202. Additional examples of impermissible and obstructive behavior occurred during Chevron's deposition of Laura Miller on June 6, 2019. At multiple times during the deposition, Mr. Donziger improperly made speaking objections, interfered with questions, coached Ms. Miller to decline to answer Chevron counsel's questions, and improperly asserted marital privilege objections. *See, e.g.,* **Ex. 3-50**, Laura Miller Dep., at 43:15-24; 60:4-16; 129:24-130:8; 153:10-154:4; 167:3-9; 173:25-174:5.

An example of an improper speaking objection, including blatant coaching of the witness, occurred when Mr. Donziger interrupted questioning to correct Ms. Miller's answer, and she then parroted back his answer:

> Q       And do you ordinarily make those claims or does it depend
> on which payment you make?
> MR. DONZIGER: If you know.
> A       No.
> MR. DONZIGER: No. If you know.
> THE WITNESS: No. I don't know.

(**Ex. 3-50**, Laura Miller Dep., at 19:23-20:7.)[42]

---

[42] *See also* **Ex. 3-50**, Laura Miller Dep., at 16:15-17:4:
> Q       And when you purchased the apartment, do you recall the purchase
> price?
> A       1,000,550, I think.
> MR. DONZIGER: If you don't remember, you can just say I don't remember.
> A       No, I think it was 1.5 or something like that.
> MR. DONZIGER: If you don't remember, say I don't remember. You can say
> somewhere around.
> A       Somewhere around.
> This type of coaching the witness to answer "I don't know" or "I don't
> remember" occurred throughout the deposition. For another similar example,
> *see* Laura Miller Dep., at 146:13-19:
> Q       I'm going to show you a document that was marked as Exhibit 9 in Ms.
> Sullivan's deposition. Is this the e-mail you're talking about?
> A       I guess so.

On another occasion, Mr. Donziger's speaking objection caused the witness to refuse to answer a question:

> Q       Is it your understanding that he can't open new accounts or just that he hasn't or do you have an understanding?
> MR. DONZIGER: Objection.  Please move on.  That calls for speculation.
> Q       You can answer.
> A       I agree with the objection.
> Q       So you're declining to answer?
> A       I'm declining to answer, yes.[43]

Mr. Donziger continued to interfere throughout the entirety of the deposition, asking for four separate breaks on top of the hour-long lunch break and a separate break. (**Ex. 3-50**, Laura Miller Dep., at 24:15-16, 46:24-47:2, 109:4-5, 151:15-18.) In total, six breaks were taken during less than five hours of deposition time. After each of the six separate breaks, the witness confirmed that Mr. Donziger had given her instructions on her method of testifying.  **Ex. 3-50**, Laura Miller Dep., at 25:7-15, 47:12-22, 80:3-9, 109:15-24, 124:14-21, 152:5-13.

In my opinion Mr. Donziger's persistent pattern of obstructive conduct, including impermissible speaking objections, coaching the witness, and disrupting the deposition on numerous occasions to confer with the witness, violated Federal Rule of Civil Procedure 30(c)(2).  *See, e.g., Pritchard v. Cty. Of Erie*, No. 04CV534C, 2006 WL 2927852, at *5 (W.D.N.Y. Oct. 12, 2006); *Jones v. J.C. Penney's Dep't Stores, Inc.*, 228 F.R.D. 190, 198 (W.D.N.Y. 2005) (citing predecessor Rule 30(d)(1)); *Morales v. Zondo, Inc.*, 204 F.R.D. 50, 53 (S.D.N.Y. 2001) (same).

Finally, Mr. Donziger asserted marital privilege as a basis for either requesting or instructing the witness not to answer numerous questions, most of which did not apparently involve a confidential communication between spouses.  For example, after the witness was asked for the name of her financial advisor, Mr. Donziger impermissibly told Ms. Miller to not answer counsel's questions during the deposition by stating, "[w]ell, I don't think you need to know the name . . . I'm objecting to that.  And I'm going to object to that on marital privilege, given the sensitivities involved in the way we spend money.  So I would direct you to not to give the name of your financial advisor.  Just go to the next question."  Ms. Miller immediately states, "I agree," then states "I'm choosing not to answer."  (**Ex. 3-50**, Laura Miller Dep., at 43:9-44:3.)

---

> MR. DONZIGER: No I guess so. If you don't know, just say I don't know.
> A       I don't.

[43]*See also* **Ex. 3-50**, Laura Miller Dep., at 69: 8-16:
> Q       When did you first met Mr. Waters?
> MR. DONZIGER: Objection. Assumes fact not in evidence. Just rephrase, please.
> Q        You can answer the question.
> A       I'm objecting.
> Q        You're objecting?
> A       I agree.

Similarly, when Ms. Miller was asked about trips that she was or was not on, Mr. Donziger interjected several times during Ms. Miller's answers until she stopped answering the questions:

> Q        Did that trip relate in any way to business?
> A        No.
> Q        That you're aware of?
> A        It did not relate to any business.
> Q        Was there any non-family members with you on that trip?
> MR. DONZIGER: Objection.  This is marital privilege.
> A        Okay.
> Q        What was your answer?
> A        It's marital privilege. I agree. This is -- it was a family vacation.
> MR. DONZIGER: Listen, it's a marital privilege. I'm asserting marital privilege.
> A        Okay. I'm asserting marital privilege for me.
> MR. DONZIGER: Do not answers [sic] the questions as long as I'm asserting marital privilege.
> MS. NEUMAN: Mr. Donziger, you can't properly instruct the witness not to answer. I'll state that for the record.
> MR. DONZIGER: Okay. But I'm asking her to respect my marital privilege.
> A        I respect it. Okay.

(**Ex. 3-50**, Laura Miller Dep., at 103:25-105:7.)

Federal Rule of Civil Procedure 30(c)(2) further provides that "[a] person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3)."  Objections based on marital privilege must be based on confidential communications between spouses.  *See, e.g., Saint Annes Dev. Co., LLC v. Travbich*, No. CIV. WDQ-07-1056, 2010 WL 457549, at *3 (D. Md. Feb. 3, 2010) (objector asserting overly broad position that any communication between spouses is privileged, without distinguishing between confidential and non-confidential communications). Moreover, marital privilege does not protect testimony referring to acts or facts.  *See, e.g., Kasparov v. Ambit Texas, LLC*, No. 3:16-CV-3206-G-BN, 2017 WL 4842350, at *9 (N.D. Tex. Oct. 26, 2017) (impermissible to instruct witness not to answer facts such as where she lived). Questions such as those seeking the name of Ms. Miller's financial advisor or whether non-family members had accompanied her and her husband on a trip do not appear to refer to confidential communications, nor did Mr. Donziger make any attempt to establish a basis for the privilege.  Therefore, it is my opinion that Mr. Donziger also violated Federal Rule of Civil Procedure 30(c)(2) when he repeatedly requested or instructed the witness not to answer based on an overly broad assertion of marital privilege.

Attorneys have an obligation to the court to ensure the integrity of the discovery process, including avoiding coaching the witness and other forms of deposition misconduct.  *See, e.g., State v. Mumford*, 731 A.2d 831 (Del. Super. Ct. 1999) (revoking attorney's *pro hac vice*

admission). Such behavior constitutes conduct prejudicial to the administration of justice, in violation of Rule 8.4(d). *See, e.g., N. Carolina State Bar v. Sutton*, 791 S.E.2d 881, 897 (N.C. Ct. App. 2016) (disciplining attorney under state rule identical to New York Rule 8.4(d).)  For the reasons set forth above, it is my opinion that Mr. Donziger engaged in extensive deposition misconduct, in violation of Rule 8.4(d) and Rule 8.4(h).

I reserve the right to modify or supplement my opinions in light of any additional information presented to me.

July 14, 2019

_____        _____
Date                                    Nancy J. Moore