# EXHIBIT 3-12

Page 1

1

2    UNITED STATES DISTRICT COURT

     SOUTHERN DISTRICT OF NEW YORK

3    Case No. 11 Civ. 0691 (LAK)

4    ---------------------------------------x

5    CHEVRON CORPORATION,

6                          Plaintiff,

7         - against -

8    STEVEN DONZIGER, et al.,

9                          Defendants.

10   ---------------------------------------x

11                   June 27, 2018

                     4:13 p.m.

12

13

14        DEPOSITION of JOSH RIZACK, held at

15   the offices of Gibson, Dunn & Crutcher LLP,

16   located at 200 Park Avenue, New York, New

17   York 10166, before Anthony Giarro, a

18   Registered Professional Reporter and a

19   Notary Public of the State of New York.

20

21

22

23

24

25

Page 2

1
2   A P P E A R A N C E S :
3
4   GIBSON, DUNN & CRUTCHER LLP
        Attorneys for Plaintiff
5   200 Park Avenue
        New York, New York 10166
6
    BY:  ANDREA E. NEUMAN, ESQ.
7        ALEJANDRO A. HERRERA, ESQ.
         ANNE CHAMPION, ESQ.
8
9
10  STERN & KILCULLEN, LLC
        Attorneys for Plaintiffs
11  325 Columbia Turnpike, Suite 110
        P.O. Box 992
12  Florham Park, New Jersey 07932
13  BY:  MICHAEL DINGER, ESQ.
         HERBERT STERN, ESQ.
14       JOEL SILVERSTEIN, ESQ.
15
16  STEVEN DONZIGER, ESQ.
        Pro Se
17  245 West 104th Street, Suite 7D
        New York, New York 10025
18
19
20  Also Present:
21       Jonathan Popham, Videographer
22       Andres Romero, Chevron
23
24
25

Page 3

1
2       S T I P U L A T I O N S
3
4       IT IS HEREBY STIPULATED AND AGREED,
5   by and among counsel for the respective
6   parties hereto, that the filing, sealing
7   and certification of the within deposition
8   shall be and the same are hereby waived;
9       IT IS FURTHER STIPULATED AND AGREED
10  that all objections, except as to form of
11  the question, shall be reserved to the time
12  of the trial;
13      IT IS FURTHER STIPULATED AND AGREED
14  that the within deposition may be signed
15  before any Notary Public with the same
16  force and effect as if signed and sworn to
17  before the Court.
18          *    *    *
19
20
21
22
23
24
25

Page 4

1
2           THE VIDEOGRAPHER:  Good
3   afternoon.  We are going on the
4   record at 4:13 p.m. on June 27th,
5   2018.  Please note that the
6   microphones are sensitive, and they
7   may pick up whispering, private
8   conversations and cellular
9   interference.  Please turn off all
10  cell phones or place them away from
11  the microphones as they can interfere
12  with the deposition audio.  Audio and
13  video recording will continue until
14  all parties agree to go off the
15  record.
16          This is Media No. 1 of the
17  video deposition of Josh Rizack,
18  taken by counsel for plaintiff, in
19  the matter of Chevron Corporation
20  versus Steven Donziger, et al. filed
21  in the United States District Court
22  for the Southern District of New
23  York, Case No. 11 Civ. 0691 (LAK).
24  This deposition is being held at
25  Gibson, Dunn & Crutcher, located at

Page 5

1
2   200 Park Avenue, New York, New York.
3           My name is Jonathan Popham
4   from Veritext.  And I'm the
5   videographer.  The court reporter is
6   Anthony Giarro, also from Veritext.
7           I'm not authorized to
8   administer an oath.  I'm not related
9   to any party in this action, nor am I
10  financially interested in the
11  outcome.
12          Counsel and all present and
13  those attending remotely will now
14  please state their appearances and
15  affiliations for the record.
16          MS. NEUMAN:  Andrea Neuman,
17  Gibson, Dunn, on behalf of Chevron
18  Corporation.
19          MR. HERRERA:  Alejandro
20  Herrera, of Gibson, Dunn, also on
21  behalf of Chevron Corporation.
22          MR. ROMERO:  Andres Romero
23  for Chevron Corporation.
24          THE VIDEOGRAPHER:  Counsel
25  on the phone, please.

2 (Pages 2 - 5)

Page 6

1
2        MS. NEUMAN:  Can you
3   identify yourself for the record?
4        MR. DONZIGER:  Sure.  It's
5   Steven Donziger, D-O-N-Z-I-G-E-R, on
6   behalf of myself and my law firm.
7        THE VIDEOGRAPHER:  Will the
8   court reporter please swear in the
9   witness.
10  J O S H   R I Z A C K, after having
11  first been duly sworn by a Notary Public
12  of the State of New York, was examined
13  and testified as follows:
14  EXAMINATION BY
15  MS. NEUMAN:
16     Q     Good afternoon, Mr. Rizack.
17       MS. NEUMAN:  I think before
18  we get started, in earnest,
19  Mr. Donziger wanted to make a
20  statement for the record.
21       MR. DONZIGER:  Yes.  Thank
22  you.  Steven Donziger here.  I want
23  to state a general objection.  And
24  just for context, I don't want to be
25  in a position, particularly from a

Page 7

1              JOSH RIZACK
2   remote location, of regularly
3   interrupting the deposition to state
4   objections.  So I'm going to state a
5   couple of general objections that
6   apply to the entirety of the
7   deposition.
8        Number One is I generally
9   continue to assert the objections to
10  this proceeding and my motion for
11  declaratory relief and to dismiss.
12  And my motion for a protective order
13  on First Amendment grounds cover the
14  entirety of the deposition.  The
15  First Amendment motion seeks a
16  protective order, quote, forbidding
17  the disclosure of or any inquiry into
18  matters that would tend to reveal the
19  identity of any funder or other
20  materials supported in the Ecuador
21  litigation and/or the internal
22  operational, organizational,
23  administrative or financial
24  management practices of individuals
25  and organizations who directly or

Page 8

1              JOSH RIZACK
2   indirectly oppose Chevron Corporation
3   as regards, the Ecuador litigation,
4   or otherwise support the Ecuador
5   litigation and/or Ecuador
6   environmental cause.
7        I generally object to
8   proceeding now with the deposition.
9   Before, I have been given reasons for
10  the denial of my motions for relief
11  by the court and before I can
12  consider appellate review remedies
13  and before I can understand the
14  precise scope of protections still
15  available or deemed denied by the
16  court.
17       It is my view that we are
18  effectually proceeding to this
19  hearing tomorrow on Chevron's motion
20  to hold me in contempt of court
21  without the law being clear in effect
22  by a secret law.  And that violates
23  my rights and Mr. Rizack's rights.
24       Finally, I want to deal with
25  the 502(b) order.  I take the

Page 9

1              JOSH RIZACK
2   position that discovery and the
3   testimony of Mr. Rizack today is
4   covered by the 502(b) order
5   stipulated by me and also, I believe,
6   by Ms. Sullivan, among other reasons,
7   Mr. Rizack's production and
8   testimony, I believe, will be mostly
9   redundant after the Sullivan
10  discovery and deposition.
11       So that is the entirety of
12  my general objections.  And I'm ready
13  to listen and make specific
14  objections as wanted.
15       MS. NEUMAN:  Chevron does
16  not agree with Mr. Donziger's
17  positions or statements or
18  objections.  And we'll proceed with
19  the deposition of Mr. Rizack at this
20  time.
21     Q     Mr. Rizack, where were you
22  born?
23     A     New York.
24     Q     What year?
25     A     1966.

3 (Pages 6 - 9)

JOSH RIZACK

1
2     Q      And could you describe
3  briefly for me your educational
4  background?
5     A      My last --
6     Q      You could start with
7  college. How about that?
8     A      I went to New York
9  University, got a degree in economics.
10    Q      What year did you graduate
11 NYU?
12    A      1988.
13    Q      Have you had any studies
14 after graduating NYU in 1988?
15    A      Not at a university, no.
16    Q      Any studies relevant to your
17 practice as an accountant?
18    A      I'm not an accountant.
19    Q      Any studies relevant to your
20 professional practice?
21    A      I've attended conferences
22 and, you know, workshops and so forth.
23    Q      Any other degrees other than
24 your degree in economics?
25    A      No.

JOSH RIZACK

1
2     Q      What is -- can you briefly
3  describe for me your professional history
4  since graduating from NYU in 1988?
5     A      I briefly worked at UBS as a
6  precious metal trader, and then I worked
7  for Buccino & Associates as a consultant.
8     Q      What was the first name?
9     A      B-U-C-C-I-N-O & Associates
10 as a financial consultant, doing workouts
11 of troubled companies.  And then from
12 there, I was self-employed.  And for a
13 short period, I worked for Zolfo Cooper.
14    Q      What years were you at UBS?
15    A      That would have been 1988, I
16 believe.
17    Q      Until or just the one year?
18    A      Just the one year.
19    Q      And then Buccino?
20    A      Buccino was like shortly
21 after that.  And I think I was there for
22 like three years.
23    Q      So you became self-employed
24 around 1991, 1992?
25    A      Yeah, about that.

JOSH RIZACK

1
2     Q      When did you create The
3  Rising Group?
4     A      I don't recall.  It was a
5  while ago, though.
6     Q      Is that the name of your own
7  company pursuant to which you're
8  self-employed?
9     A      Correct.
10    Q      You know what, I forgot.
11        Have you been deposed
12 before?
13    A      Yes.
14    Q      Do you want me to run back
15 through the rules or do you feel that
16 you're comfortable?
17    A      I'm comfortable.
18    Q      The only thing I would
19 mention is you would need to let me
20 finish so the court reporter can get it
21 down, even though you are anticipating
22 what I'm going to say; is that fair?
23    A      Never anticipate.
24    Q      Obviously, if you need a
25 break for any reason, let us know.  If

JOSH RIZACK

1
2  you don't understand my question, ask me
3  to clarify.
4        Are you currently
5  self-employed?
6     A      Yes.
7     Q      And is The Rising Group
8  currently a going concern?
9     A      Yes.
10    Q      What type of entity is it?
11    A      It's a corporation.
12    Q      LLC?
13    A      It's an S Corporation.
14    Q      When did you first meet
15 Mr. Donziger?
16    A      I don't recall but a long
17 time ago.
18    Q      Can you give me your best
19 estimate?  Not a wild guess but an
20 estimate is appropriate.
21    A      I don't know if it was 15
22 years ago or 20 years ago.  It's a guess.
23    Q      Where did you meet?
24    A      I don't recall the first
25 time we met.  I believe it was at a law

4 (Pages 10 - 13)

Page 14

JOSH RIZACK

1
2  firm.  I don't recall precisely.
3      Q      Can you estimate when you
4  started working for Mr. Donziger?
5      A      It was about approximately
6  five years ago; five, six years ago.
7      Q      And what were you retained
8  to do?
9      A      I was retained to help
10 them -- to help him with -- with putting
11 the records, you know, to help with the
12 payments and expenses and, you know, the
13 case expenses and so forth.
14     Q      Anything else you were hired
15 to do?
16     A      Those are the main things I
17 did.
18     Q      And you mentioned that
19 you're not an accountant?
20     A      No.
21     Q      You're not trained in GAAP?
22     A      No.
23     Q      When you would do work for
24 Mr. Donziger in putting these
25 accountings -- well, let me withdraw

Page 15

JOSH RIZACK

1
2  that.
3          Do you consider what you
4  produced to be accountings?
5      A      No.  I mean I didn't produce
6  in the formal sense any income statements
7  or balance sheets or formal GAAP
8  accounting.  It was more putting together
9  what bills needed to be paid, what was
10 outstanding and putting together the
11 expenses of the case and Steven
12 Donziger's expenses related to the case.
13     Q      In doing so -- when you say
14 the case, you mean the Ecuador case?
15     A      Correct.
16     Q      In doing this work for
17 Mr. Donziger related to the case, did you
18 work with anyone other than Mr. Donziger?
19     A      I would say predominantly,
20 the work was with Mr. Donziger.  On other
21 occasions, I know there was -- and I
22 don't recall her name and when.  But
23 there was a woman that helped put a lot
24 of this data together; you know, I think
25 she was a, you know, temp that would, you

Page 16

JOSH RIZACK

1
2  know, look at the expenses and put them
3  in Excel and list them in Excel.
4      Q      And did she do that work at
5  your office or somewhere else?
6      A      No.  Somewhere else.
7      Q      And she would send it to
8  you?
9      A      Yeah.  Or Steven Donziger
10 would have it.  And I would get it from
11 him.
12     Q      Electronically or in hard
13 copy?
14     A      No.  This was hard copy.
15     Q      So hard-copy Excel sheets?
16     A      Yeah.  It would be excel
17 with the backup of bills, of the
18 invoices.
19     Q      In what time frame was this
20 woman involved?
21     A      This was when I -- I think
22 it was at the beginning when I started
23 helping them out, working with them.
24     Q      Would you estimate it to be
25 in 2012?

Page 17

JOSH RIZACK

1
2      A      You know what --
3      Q      I'm just trying to do the
4  math.
5      A      I don't really recall the
6  dates, to be honest.
7      Q      Other than the temporary
8  woman whose name we don't recall --
9      A      Right.
10     Q      -- and Mr. Donziger, anybody
11 else you would work with on this matter?
12     A      I'm sure there was other
13 people.  My main contact was Steven
14 Donziger.
15     Q      Anyone else you recall?
16     A      I mean there was always
17 people.  But that's who -- that's who I
18 dealt with.
19     Q      When you say there were
20 always people, were these people who were
21 calling you and asking you for things?
22     A      No; you know, he had other
23 people that helped him along the way that
24 assisted him.
25     Q      But to the extent you did

5 (Pages 14 - 17)

Page 18

JOSH RIZACK

1
2  work in the matter, you took your
3  direction from Mr. Donziger?
4      A    Correct.
5      Q    Did there come a time when
6  you stopped working for Mr. Donziger?
7      A    Yes.
8      Q    When was that?
9      A    I think -- I think, you
10 know, during and pretty much after the
11 Rico trial, I was still involved.  But it
12 was -- it was very little work.  It would
13 be -- he would call me and ask for
14 something or, you know, could you put a
15 little Excel sheet together, you know, it
16 was very little.
17     Q    Did there come a time when
18 either of you terminated the
19 relationship, the professional
20 relationship?
21     A    Right; you know, I don't
22 think it was ever so formal.  It just --
23 you know, I just wasn't doing things, you
24 know.  They didn't call on me to do
25 things, you know.

Page 19

JOSH RIZACK

1
2      Q    The phone stopped ringing?
3      A    He called me when he would
4  need something.  And, you know, I had
5  other work also, you know.  This was
6  never a full-time job.  I always had
7  other work.
8      Q    Were you retained pursuant
9  to any kind of written agreement?
10     A    No.  I don't believe we
11 had -- no.  We didn't have -- did we have
12 a -- I honestly don't recall if we had a
13 written agreement.
14     Q    Did you hire anybody else to
15 help you in your work on the Ecuador
16 case?
17     A    No.
18     Q    I believe you mentioned at
19 one point in time prior to your
20 deposition that you have boxes of
21 Mr. Donziger's documents in your offices.
22 Do you recall that?
23     A    That's incorrect.  I
24 mentioned that I had boxes.  But I no
25 longer had those boxes.

Page 20

JOSH RIZACK

1
2      Q    Right.  Had.
3      A    Had, correct.
4      Q    How many boxes did you have?
5      A    I don't know.  Three to
6  five, I'm guessing.  I'm not 100 percent
7  sure.
8      Q    And these were boxes of
9  documents that previously belonged to
10 Mr. Donziger that he had brought to you
11 in connection with your work; is that
12 right?
13     A    Correct.
14     Q    And are these documents --
15 let me withdraw that.
16          Are these boxes of documents
17 that you had been through or that you
18 needed to go through?
19     A    I think I've been through
20 most of the documents in those boxes.
21 But there might have been stuff that I
22 still needed to go through.
23     Q    And just generally, what
24 type of documents did the boxes contain?
25     A    Mostly backup receipts and

Page 21

JOSH RIZACK

1
2  American Express bills and bank
3  statements and so forth.
4      Q    When you were doing work for
5  Mr. Donziger, did you ever get the
6  documents directly from the provider,
7  i.e., either the bank or AMEX or did you
8  always get copies of the documents from
9  Mr. Donziger?
10     A    They would be copies from
11 Mr. Donziger, like I did not have direct
12 access --
13     Q    -- to his accounts?
14     A    Right.
15     Q    The three to five boxes that
16 you no longer have --
17     A    Right.
18     Q    -- where are they?
19     A    I don't know.  Last I saw
20 them, Katie Sullivan took them.
21     Q    She came to your offices and
22 picked them up?
23     A    Correct.
24     Q    Do you recall roughly when
25 that was?

6 (Pages 18 - 21)

JOSH RIZACK

1
2  grounds of privilege, attorney-client
3  privilege.  I'm somewhat handicapped.
4  Is this a pie chart?  I don't see it.
5       THE WITNESS:  Yes.
6       MS. NEUMAN:  There's a pie
7  chart on the exhibit, yes.
8       MR. DONZIGER:  Okay.  So I'm
9  objecting on the grounds that this is
10  subject to various privileges,
11  attorney-client work product.
12  Andrea, I assume you're going to just
13  respect my objection.  You're going
14  to keep going?
15       MS. NEUMAN:  I don't know
16  what you mean.  Are you instructing
17  the witness not to answer?
18       MR. DONZIGER:  No, I'm not.
19  I'm just making the objection.  I
20  think he can describe what it says.
21  I don't want him to answer if you're
22  going to get into what it means in
23  terms of strategy, this, that and the
24  other thing.  I don't know where
25  you're going with it.  Keep going.

JOSH RIZACK

1
2   Q     Mr. Rizack, without giving
3  me names, did you provide your expense
4  statements to anyone other than
5  Mr. Donziger?
6   A     I provided this to
7  Mr. Donziger.  I believe -- I don't
8  recall who else.  I mean this was a while
9  ago.  This is years ago.  So I don't
10  recall if we presented this to other
11  people or I presented it to Mr. Donziger.
12  And he presented it.  I just don't
13  remember.  I remember putting the
14  document together, though.
15   Q     Were you putting this
16  document together for some particular
17  purpose?
18   A     I think we were just
19  looking.  I don't know if somebody had
20  requested.  I don't recall, honestly.
21  But I'm sure either he wanted to know or
22  other people wanted to know where the
23  funds had gone, into what categories.
24   Q     So on Exhibit 5335, the
25  first category is miscellaneous for

JOSH RIZACK

1
2  1.1 million plus.
3   A     Correct.
4   Q     Is that the same
5  miscellaneous you previously described?
6   A     I mean I'm sure there's --
7  all these buckets had detailed --
8  detailed -- you know, detailed either
9  bank statements receipts or so forth.
10  Most of the expenses that were paid were
11  paid through checks and wires.  So it was
12  not hard to go back to the bank
13  statements to get most of these expenses.
14   Q     So there's a backup schedule
15  for the miscellaneous?
16   A     There, I'm sure, is a file
17  with -- with the backup for that, yes.
18   Q     And you would have produced
19  that?
20   A     Yes.  It would have been --
21  you know, it would have been in all those
22  boxes.
23   Q     You have on here over
24  1.5 million for Ecuador Legal.  Do you
25  see that?

JOSH RIZACK

1
2   A     Correct.
3   Q     Do you recall how you
4  determined if something was being paid
5  for Ecuador Legal?
6   A     It would have been a wire --
7  it would have been a wire sent to a law
8  firm.
9   Q     In Ecuador?
10   A     Correct.
11   Q     And would you know -- would
12  the law firm then account for how they
13  spent the 1.5 million or that's where
14  your inquiry ended?
15   A     No.  The expenses were the
16  legal fees.  And expenses and so forth
17  were always backed by receipts.
18   Q     So you had invoices from
19  Ecuador law firms for over 1.5 million?
20   A     I believe so.  When we would
21  send out wires, we had receipt -- we had
22  invoices.
23       MR. DONZIGER:  Is there a
24  question pending?
25       MS. NEUMAN:  No.  There was

18 (Pages 66 - 69)

Page 74

JOSH RIZACK

1
2    A    Restate the question.
3    Q    Did you ever have or do you
4    have a contingent interest in the Ecuador
5    judgment?
6    A    Yes.
7    Q    Could you describe that
8    interest for me, please, sir?
9    A    I believe it's either an
10   eighth or a quarter percent of
11   recoveries.
12   Q    But you don't know which:
13   An eighth or a quarter?
14   A    No.  I would have to check.
15   Q    Do you have a document?
16   A    Yes.
17   Q    Did you produce that
18   document?
19   A    I don't believe so.
20       MR. DONZIGER:  I'm going to
21       object to the production of that,
22       which we'll deal with later,
23       obviously, because he doesn't have
24       it.  But getting into issues of who,
25       you know, owns what other than like a

Page 75

JOSH RIZACK

1
2    general structure, in my mind, would
3    violate the associational rights of
4    the folks working on this Ecuador
5    environmental litigation and advocacy
6    effort.
7    Q    When did you obtain the
8    interest and the judgment you just
9    described?
10   A    It was -- it was -- you
11   know, it was promised, you know,
12   throughout the case when it was actually
13   memorialized.  I don't remember the exact
14   date.  I would have to look in the file.
15   Q    Can you give me an estimate?
16   A    I don't recall.
17   Q    Was it before or after the
18   RICO judgment was issued?
19   A    It was discussed before.
20   But I think it was memorialized after.
21   Q    And did your percentage come
22   out of Mr. Donziger's percentage or from
23   some other source?
24   A    I believe from some other
25   source.

Page 76

JOSH RIZACK

1
2    Q    And the agreement you
3    signed, was it with anybody other than
4    Mr. Donziger?
5    A    Yes.
6    Q    And who was it with?
7    A    It was the -- I don't
8    recall.  But I believe it was -- it's on
9    the agreement.  The official -- I don't
10   remember the official group in Ecuador.
11   But they were on that.
12   Q    And did you meet with them
13   in negotiating this agreement?
14   A    I had been with -- I had met
15   with several people.  And I believe it
16   was agreed upon, presented on numerous
17   occasion to numerous people.
18   Q    Can you tell me the names of
19   any of these people?
20   A    I don't recall offhand.
21   Q    But you do have this
22   agreement?
23   A    Yes.
24   Q    What were you giving in
25   exchange for your either 1/8th or 1

Page 77

JOSH RIZACK

1
2    quarter percent interest in the
3    recoveries under the Ecuador judgment?
4    A    For work that I had done
5    putting things together or the work
6    product that you've seen here, some of
7    this work product.
8    Q    Anything other than your
9    services?
10   A    I don't understand the
11   question.
12   Q    In exchange for your
13   interest in the Ecuador judgment --
14   A    Right.
15   Q     -- did you give the
16   official Ecuador group anything other
17   than your services?  Did you give them
18   any money?
19   A    No.
20   Q    Did you provide anything of
21   value to them other than the financial
22   statements, services you had provided to
23   Mr. Donziger?
24   A    Yeah.  I gave them work
25   product of, you know, where money went,

20 (Pages 74 - 77)

Page 102

JOSH RIZACK

1
2  money that came in after the RICO
3  judgment be put into Mr. Donziger's
4  personal accounts?
5      A    I was not.  Post-RICO, I was
6  not working on his expenses.
7      Q    But some of these
8  spreadsheets are --
9      A    Are they?
10     Q    -- dated 2017.
11     A    A lot of this stuff are dated.
12  But most of this stuff was put in -- when
13  was the --
14     Q    2014.
15     A    2014 was the RICO.  So --
16  so, yeah.  I might have put some of this
17  stuff in, or it was provided by -- by
18  Mr. Donziger.  And I popped it into the
19  chart.  But I was -- you know, this
20  was -- to the extent I was working on it
21  prior, afterwards was very Limited.
22     Q    So setting aside the general
23  extent of your work, post-RICO, are you
24  aware of occasions where funder money
25  went into Mr. Donziger's accounts?

Page 103

JOSH RIZACK

1
2        MR. DONZIGER:  I'm sorry.
3  Just to understand the question, is
4  that limited by any date, your
5  question?
6        MS. NEUMAN:  Since RICO.
7        MR. DONZIGER:  Since the
8  RICO judgment?
9        MS. NEUMAN:  Yes.
10       MR. DONZIGER:  Okay.
11     A    I don't know where -- which
12  account the investor moneys went into.
13     Q    The three to four post-RICO
14  investors with whom you're familiar or
15  know of --
16     A    Right.
17     Q    -- are you familiar with
18  the terms on which they made their
19  investments?
20     A    I don't recall.
21     Q    Do you recall anything?
22     A    I just -- I recall --
23        MR. DONZIGER:  I'm going to
24  object again.  That goes right to the
25  core of our internal operations and

Page 104

JOSH RIZACK

1
2  organizational structure.  He could
3  speak to his particular terms.  But I
4  would instruct him not to speak to
5  the terms of others if he knows about
6  them.  I don't even know if he does.
7      Q    Do you intend to follow that
8  instruction?
9      A    What's your question?
10     Q    Do you know any of the terms
11  on which funders who invested in the
12  judgment after RICO made those
13  investments?
14     A    I don't recall the details
15  of any of those investors.
16     Q    Do you recall anything?
17     A    Yes.
18     Q    What do you recall?
19     A    I mean I recall Steven
20  asking questions, asking me to build
21  these charts for him but no specific.
22  This is not stuff I worked on recently.
23     Q    You said that you're aware
24  that some people invested, post-RICO?
25     A    Correct.

Page 105

JOSH RIZACK

1
2      Q    Do you have any knowledge as
3  to whether they were investing in
4  exchange for a percentage interest in the
5  judgment?
6      A    I would assume that.
7      Q    But do you know, one way or
8  the other?  Were you in meetings where
9  that was discussed?
10     A    I don't recall being in any
11  meetings.  I would recall that Steven
12  would call and ask for, you know, these
13  charts, or he would ask a question.  But
14  I was not the main person dealing with
15  these kind of issues.
16     Q    So the meeting in Brussels
17  that you do recall --
18     A    Yes.
19     Q    -- with a funder --
20     A    Yes.
21     Q    -- do you recall the terms?
22        Let me withdraw that.
23        Did that funder invest?
24     A    No.
25     Q    Do you recall the terms that

27 (Pages 102 - 105)

JOSH RIZACK

1
2  talk about any positions you would or you
3  wouldn't take at your deposition?
4      A    No.
5      Q    Did you and Mr. Donziger
6  talk about the documents that you had
7  withheld and then subsequently produced?
8      A    Not that I recall.
9      Q    Can you tell me, generally,
10  what the topics of your conversations
11  with Mr. Donziger were this week?
12      A    Just in general, when the
13  deposition would be, if I was going to
14  agree to a deposition, what the timing
15  would be, just general questions like
16  that.
17      Q    Did Mr. Donziger discourage
18  you in any way from agreeing to a
19  deposition?
20      A    No.
21      Q    When you were working with
22  Mr. Donziger and working on these
23  financial accountings, what were his
24  sources of income?
25      MR. DONZIGER:  Hold on.  Can

JOSH RIZACK

1
2  you limit that question by date?
3      MS. NEUMAN:  I did.  While
4  Mr. Rizack was working with you.
5      MR. DONZIGER:  Well, can you
6  limit it then by post-RICO, please?
7      MS. NEUMAN:  No.
8      A    Repeat the question, please.
9      Q    What were Mr. Donziger's
10  sources of income of which you were
11  aware?
12      A    You're asking post-RICO?
13      Q    No.  While you were working
14  with him.
15      A    At any time.  You know, I
16  don't know all of his financing, all of
17  his -- where his income came from.  I
18  didn't deal with that.  That wasn't what
19  I dealt with.  I dealt with paying bills,
20  putting documents together and going
21  through mail, and I would -- I would put
22  together that -- you know, these personal
23  bills need to be paid.  Occasionally, I
24  would cut checks and say you need to sign
25  these.  But I didn't deal with his

JOSH RIZACK

1
2  personal finances beyond that.
3      Q    So you had a checkbook for
4  one or more of Mr. Donziger's accounts?
5      A    No.  He would give it to me.
6  And I would literally -- here's your
7  mortgage, here's your whatever bill that
8  needs to be paid, AT&T.  And I might
9  write out those bills for him.
10      Q    Were you aware of any of
11  Mr. Donziger's sources of income while
12  you were working with him?
13      A    No.  I mean there was, you
14  know, case money that came in that we
15  discussed.  But beyond that, I didn't
16  deal with his personal sources, whether
17  they were from him, his wife or whatever.
18      Q    On Exhibit 5314,
19  Plaintiff's, the firm Lenczner, Slaght,
20  Royce & Smith, paid the 488,000 in 2016,
21  are you aware of any other moneys coming
22  from that firm to Mr. Donziger?
23      A    No.
24      Q    Are you aware of any
25  payments going from Mr. Donziger to the

JOSH RIZACK

1
2  Lenczner Firm?
3      A    No.
4      Q    Are you aware of any reason
5  why the Lenczner Firm would be wiring
6  money to Mr. Donziger?
7      A    I can only make assumptions.
8      MR. DONZIGER:  Well, I would
9  object.  If you know, answer.  If you
10  don't know, don't answer.
11      A    I can only speculate.
12      Q    Is it informed speculation?
13      A    No, it's not informed.
14      MR. DONZIGER:  Objection.
15  Informed speculation, I never heard
16  of that one.  That's good, a good
17  one.  Informed speculation.  You mean
18  like based on something, some
19  information?
20      A    No.  I was not privy to the
21  wires going in and out.
22      Q    Are you aware of whether or
23  not this -- the money that came from the
24  Lenczner Firm originated with a funder
25  that bought an interest in the judgment?

32 (Pages 122 - 125)

Page 134

JOSH RIZACK

1
2     A     Yes.
3     Q     Can you tell me what those
4  are?
5     A     I don't recall.
6     Q     What about the number that's
7  over on the right-hand margin?  Looks
8  like a stray number.
9     A     I don't recall.  But, you
10 know, without quickly highlighting it,
11 could this be a total.
12    Q     But you don't know, as you
13 sit here today?
14    A     No.  I mean if I pull up the
15 worksheet, I could quickly figure it out
16 or if I got a calculator and added those
17 numbers and see if they added up to that
18 number.
19    Q     Oh.  The numbers in the row?
20    A     Yeah.  It looks like they
21 might add up to that.
22          MS. NEUMAN:  I'm going to
23    mark a document bearing the Bates
24    numbers --
25    A     They did.  That's my guess,

Page 135

JOSH RIZACK

1
2  yeah.
3          MS. NEUMAN:  -- J Rizack 43
4    through 44, the heading Total Case
5    Expenditures by Entity.
6          (The above-referred-to
7    document was marked as Plaintiff's
8    Exhibit 5343 for identification, as
9    of this date.)
10         MS. NEUMAN:  5343.
11    Q     This is a document you
12 prepared, Mr. Rizack?
13    A     I believe so.
14    Q     And this is -- when you
15 organize the expenses into these
16 categories, is that something you did or
17 somebody else did?
18    A     No.  I believe I did.
19    Q     So you decided who went into
20 which category?
21    A     Yes.
22    Q     Have you ever for backup
23 compared the cost and fee claim that was
24 submitted in Ecuador in the Ecuador case
25 to the amount of expenses that you

Page 136

JOSH RIZACK

1
2  charged to Ecuador Legal?
3     A     No.
4     Q     In your accountings, did you
5  treat all the expenses shown on
6  Exhibit 5343 as case expenses?
7          MR. DONZIGER:  I object to
8    the form in this sense.  I think he
9    testified he's not doing accounting.
10   He's doing compilations of expense
11   summaries.  I know that's kind of a
12   subtle distinction because that's
13   probably not what you mean.  Just to
14   be clear, these aren't accountings.
15   They're efforts to compile
16   expenditures and flows, that kind of
17   stuff.
18    Q     To clarify further, when you
19 testified you had a substantially
20 complete accounting, this document that
21 Mr. Rizack produced is not what you were
22 referring to?
23         MR. DONZIGER:  I can't see
24   the document.  My apologies.  And I
25   know that's on me because I'm not

Page 137

JOSH RIZACK

1
2  physically there.  But generally,
3  I've seen -- you know, obviously,
4  I've seen his summary.  And if I --
5  if I testify that it was accounting,
6  I'm probably misusing the word a bit
7  myself because it depends on how you
8  define it, obviously.  These aren't
9  like official accounting an
10 accountant would do.  The witness
11 testified he's not an accountant.  He
12 does have professional skill, though,
13 in this kind of work in terms of
14 numbers and, you know, trying to
15 reconcile accounts and all that
16 stuff.  But I just think we need to
17 be clear about what this is.  I don't
18 think it's an official accounting.
19         MS. NEUMAN:  Okay.  But when
20   you referred to a substantially
21   complete accounting, even if you
22   slightly misused the word, you were
23   referring to Mr. Rizack's work?
24         MR. DONZIGER:  That is not
25   my deposition.  But I will give you

35 (Pages 134 - 137)

Page 138

JOSH RIZACK

1
2     the courtesy of an answer.  Yes, I
3     was, and also Ms. Sullivan subsequent
4     to that.
5          MS. NEUMAN:  Oh.  Her work.
6     Sorry.  I was thinking about her
7     testimony.  And I was confused.
8          MR. DONZIGER:  Yes.
9          MS. NEUMAN:  I understand
10    what you're saying.
11         MR. DONZIGER:  Yeah.
12    Q     Mr. Rizack, are you aware of
13    any occasions on which post the RICO
14    judgment where there was funder money
15    that had been obtained but it was
16    directed into someone else's account for
17    the benefit of Mr. Donziger as opposed to
18    one of his TD accounts, say to his wife's
19    account, for example?  Anything like
20    that?
21    A     I don't know where the
22    money, post-funding, where it went to.
23    Q     Do you know how much it was?
24    A     No.
25    Q     Do you have any information

Page 139

JOSH RIZACK

1
2     on that?
3          MR. DONZIGER:  Correct me if
4     I'm wrong, I think the witness
5     testified he really wasn't involved
6     in post-RICO inflows from investors.
7     I know he was helping -- he testified
8     he was helping --
9          MS. NEUMAN:  Mr. Donziger,
10    you can't really make speaking
11    objections.  They're giving the
12    impression you're trying to coach the
13    witness.
14         MR. DONZIGER:  I withdraw
15    that.  But the objection is related
16    to the question being confusing, I
17    think.  So I'm just trying to help
18    but go ahead.
19         MS. NEUMAN:  Can you read
20    the question back to the witness,
21    please?
22         (The requested portion was
23    read back by the court reporter.)
24         MS. NEUMAN:  The total
25    amount post-RICO.

Page 140

JOSH RIZACK

1
2     A     Yeah.  No.
3     Q     You said that there were
4     three or four successful fundings after
5     RICO.
6          How do you know that?
7     A     I was told.
8     Q     By?
9     A     By Steven Donziger.
10    Q     And did you review any
11    documents related to those fundings,
12    funding agreements, deposits, anything?
13    A     I might have seen some of
14    that stuff and put it in folders.  But,
15    you know, I don't have any intimate
16    knowledge of them.
17    Q     And you have no
18    recollection, as you sit here today?
19    A     I know that there was.  But
20    I don't know amounts, people, that kind
21    of thing.
22    Q     And you don't even know the
23    range of amounts?
24    A     No.
25    Q     Have you ever deleted or

Page 141

JOSH RIZACK

1
2     disposed of any documents related to your
3     work for Mr. Donziger?
4     A     Have I ever deleted -- I
5     mean not that -- not on purpose, not to
6     hide anything, if that's what you're
7     looking for.  Might I have gotten rid of
8     a worksheet that was no longer used or
9     something, that's possible.
10    Q     Can you recall specifically
11    whether you've deleted or disposed of any
12    documents related to your work on this
13    matter?
14    A     No.
15    Q     Has anyone ever asked you to
16    delete or destroy any documents related
17    to your work on this matter?
18    A     No.
19         MS. NEUMAN:  Mr. Donziger,
20    setting aside the areas that we
21    didn't get into -- so we leave the
22    deposition open for that purpose --
23    do you have questions for the witness
24    at this time?
25         MR. DONZIGER:  I'll ask a

36 (Pages 138 - 141)

Page 178

```
1
2                INDEX (Cont.)
3
4   Plaintiff's Exhibit 5334 Funds put    50
             into Steven
5            Donziger's
             Attorney
6            Escrow Account
7   Plaintiff's Exhibit 5335 Various      65
             buckets of
8            expenses
9   Plaintiff's Exhibit 5336 AP as of     78
             3-1-12
10
    Plaintiff's Exhibit 5337 Summary of   84
11           debit card
             transactions
12
    Plaintiff's Exhibit 5338 Worksheet    87
13           summary
14  Plaintiff's Exhibit 5339 Summary of   92
             a 2010 to 2011
15           attorney set
             of bank
16           accounts
17  Plaintiff's Exhibit 5340 Document     95
             entitled TD
18           Bank Debit
             Card Purchases
19
    Plaintiff's Exhibit 5341 Folio       109
20
    Plaintiff's Exhibit 5342 Worksheet   133
21           summary
22  Plaintiff's Exhibit 5343 Total Case  135
             Expenditures
23           by Entity
             2007-2013
24
25
```

Page 180

```
1
2              ERRATA SHEET
          VERITEXT/NEW YORK REPORTING, LLC
3         1-800-727-6396
4   330 Old Country Road   1250 Broadway
    Mineola, NY 11501    New York, New York
5   10001
6   NAME OF CASE:  Chevron versus Donziger, et
    al.
7   DATE OF DEPOSITION: June 27, 2018
    NAME OF DEPONENT:  Josh Rizack
8
9   PAGE LINE (S)  CHANGE       REASON
10  ____|____|_____|_____
11  ____|____|_____|_____
12  ____|____|_____|_____
13  ____|____|_____|_____
14  ____|____|_____|_____
15  ____|____|_____|_____
16  ____|____|_____|_____
17  ____|____|_____|_____
18  ____|____|_____|_____
19  ____|____|_____|_____
20  ____|____|_____|_____
21  ____|____|_____|_____
22          _____
            JOSH RIZACK
23
    SUBSCRIBED AND SWORN TO BEFORE ME
24  THIS ____ DAY OF _____, 2018.
25   (NOTARY PUBLIC)  MY COMMISSION EXPIRES:
```

Page 179

```
1
2           C E R T I F I C A T I O N
3
4
5       I, ANTHONY GIARRO, a Shorthand
6   Reporter and a Notary Public, do hereby
7   certify that the foregoing witness, JOSH
8   RIZACK, was duly sworn on the date
9   indicated, and that the foregoing, to the
10  best of my ability, is a true and accurate
11  transcription of my stenographic notes.
12      I further certify that I am not
13  employed by nor related to any party to
14  this action.
15
16
17
        _____
18          ANTHONY GIARRO
19
20
21
22
23
24
25
```

46 (Pages 178 - 180)