# EXHIBIT 3-50

Page 1

1

2     UNITED STATES DISTRICT COURT

      SOUTHERN DISTRICT OF NEW YORK

3     Case No. 11 Civ. 0691 (LAK)

      ----------------------------------------x

4     CHEVRON CORPORATION,

5                          Plaintiff,

6          - against -

7     STEVEN DONZIGER, et al.,

8                          Defendants.

9     ----------------------------------------x

10                      June 6, 2019

                        9:45 a.m.

11

12                      200 Park Avenue

                        New York, New York

13

14

15         EXAMINATION BEFORE TRIAL of LAURA MILLER,

16     held at the offices of GIBSON DUNN & CRUTCHER LLP,

17     located at 200 Park Avenue, New York, New York

18     10166, before Anthony Giarro, a Registered

19     Professional Reporter, a Certified Realtime

20     Reporter and a Notary Public of the State of New

21     York.

22

23

24

25

1          LAURA MILLER
2   is it joint or is it joint with right of
3   survivorship or is there some other
4   aspect to the joint ownership that you're
5   aware of?
6       A    No.
7          MR. DONZIGER:  Just to be
8       clear, I'm not your lawyer.  Just to
9       state for the record, I'm here
10      representing myself.  If there are
11      technical things being said in
12      questions that you don't understand,
13      please tell Ms. Neuman that you don't
14      understand or repeat it or whatever.
15      You don't have to answer a question
16      if you don't know the answer.
17         THE WITNESS:  Okay.
18      Q    I'm always happy to clarify.
19      A    This is a joint ownership.
20      Q    You're not aware of anything
21  that impacts the way you hold these
22  shares, legally, other than what's on
23  this document that we've marked as
24  Exhibit 5648?
25      A    Yes.

1          LAURA MILLER
2       Q    And you haven't entered into
3   any separate written agreements about the
4   apartment?
5       A    No.
6       Q    With Mr. Donziger, I mean.
7          MS. NEUMAN:  Let's go off
8       the record.
9          THE VIDEOGRAPHER:  The time
10      on the video monitor is 9:58 a.m.
11      We're off the record.
12         (A short recess was taken.)
13         THE VIDEOGRAPHER:  We are
14      back on the record.  The time on the
15      video monitor is 10:01 a.m.
16         MS. NEUMAN:  I'm going to
17      hand the witness a document that I've
18      marked as Exhibit 5649.
19         (The above-referred-to
20      document was marked as Exhibit 5649
21      for identification, as of this date.)
22         MS. NEUMAN:  Which appears
23      to be a mortgage-related document in
24      connection with the purchase of the
25      apartment at 245 West 104th.

1          LAURA MILLER
2       Q    Have you seen this document
3   before, Ms. Miller?
4       A    Yes.
5       Q    And if you turn to the last
6   page, the document bears the Bates
7   numbers Donziger Co-Op 59 through 62.
8       If you turn to 62, is that
9   your signature?
10      A    Yes.
11      Q    Is this the mortgage that
12  you obtained in connection with
13  purchasing the apartment?
14      A    Yes.
15      Q    And when you purchased the
16  apartment, do you recall the purchase
17  price?
18      A    1,000,550, I think.
19         MR. DONZIGER:  If you don't
20      remember, you can just say I don't
21      remember.
22      A    No.  I think it was 1.5 or
23  something like that.
24         MR. DONZIGER:  If you don't
25      remember, say I don't remember.  You

1          LAURA MILLER
2   can say somewhere around.
3          THE WITNESS:  Somewhere
4       around.
5       Q    Just to clarify what
6   Mr. Donziger's saying, if you'd just be
7   speculating and making something up,
8   obviously, you shouldn't say it.  But if
9   you have a reasonable estimate, then you
10  can just clarify that you're giving an
11  estimate.
12      A    Okay.
13      Q    But we're entitled to your
14  best estimate if you have one.
15      A    Okay.  Best estimate, 1.55.
16      Q    The mortgage was 1 million,
17  and the down payment was slightly above
18  500,000; is that correct?
19      A    Yes.
20      Q    And have you refinanced this
21  mortgage since?
22      A    No.
23      Q    Since the purchase?
24      A    No.
25      Q    Do you know the current

5 (Pages 14 - 17)

LAURA MILLER

1
2  balance of the mortgage?
3      A    I'm going to estimate.
4  About 800,000 remaining.
5      Q    And is the mortgage
6  currently held by Wells Fargo?
7      A    No.
8      Q    Is that the same as Mortgage
9  IT?
10     A    I think Mortgage IT is the
11 company.  I don't know.
12     Q    Separate and apart from the
13 mortgage with Wells Fargo, are there any
14 other liens or encumbrances on the
15 apartment?
16     A    No.
17     Q    And have you had the
18 apartment appraised at any time in the
19 last two to four years?
20     A    No.
21     Q    Do you have a current --
22 would you have a current estimate as to
23 its current value?
24     A    No.
25     Q    Have you made any

LAURA MILLER

1
2  significant improvements to the apartment
3  since you bought it?
4      A    No.
5      Q    So you haven't remodeled or
6  done anything like that?
7      A    No.
8      Q    The payments that are made
9  on the mortgage, are they a joint
10 responsibility of yourself and
11 Mr. Donziger or does one or the other of
12 you normally make them?
13     A    Depends on the month.
14 Sometimes I do; sometimes he does.
15     Q    But you don't have any
16 agreement about who's going to pay the
17 mortgage?
18     A    No.
19     Q    Do you have any agreement
20 relating to who claims any tax deductions
21 related to mortgage payments?
22     A    No.
23     Q    And do you ordinarily make
24 those claims or does it depend on which
25 payment you make?

LAURA MILLER

1
2      MR. DONZIGER:  If you know.
3      A    No.
4      MR. DONZIGER:  No.  If you
5  know.
6      THE WITNESS:  No.  I don't
7  know.
8      Q    Do you have a person that
9  does your taxes?
10     A    Yes.
11     Q    And who is that?
12     A    Gary Greenberg.
13     Q    The same person that
14 Mr. Donziger uses?
15     A    Yes.
16     Q    And do you file taxes
17 jointly or separately?
18     A    Separately.
19     Q    And in your filings as an
20 individual, married, filing separately,
21 do you claim Mr. Donziger in any way as a
22 dependent?
23     A    No.
24     Q    Or reflect him on your
25 taxes?

LAURA MILLER

1
2      A    No.
3      Q    Do you ever reflect any of
4  his income on your taxes?
5      A    No.
6      Q    And that would include --
7  I'll withdraw that.  I'll just ask a new
8  question.
9      Mr. Donziger from time to
10 time has transferred money from his bank
11 accounts to your bank account; correct?
12     A    Yes.
13     Q    And are those transfers
14 reflected on your taxes, to the extent
15 you know?
16     A    No.
17     Q    No, they're not or no, you
18 don't know?
19     A    No, they're not.
20     Q    Can you tell me the current
21 square footage of the apartment?
22     A    Approximately 1500
23 square feet.
24     Q    Have you ever attempted to
25 sell the apartment?

6 (Pages 18 - 21)

Page 22

1          LAURA MILLER
2     A     No.
3     Q     Expenses related to the
4  apartment, like co-op fees, utilities,
5  those sorts of things, whose
6  responsibilities are those?
7     A     Shared.
8     Q     Joint?
9     A     Joint.
10    Q     Whenever you say "joint,"
11  you're referring to yourself and
12  Mr. Donziger; correct?
13        MS. NEUMAN:  Off the record.
14        THE VIDEOGRAPHER:  The time
15  on the video monitor is 10:07 a.m.
16  We're off the record.
17        (A short recess was taken.)
18        THE VIDEOGRAPHER:  We are
19  back on the record.  The time on the
20  video monitor is 10:08 a.m.
21        (The requested portion was
22  read back by the court reporter.)
23    A     Yes.
24        MS. NEUMAN:  I'm going to
25  hand the witness a document that I'm

Page 23

1          LAURA MILLER
2  marking as Exhibit 5650.  It's
3  entitled "Chevron Corporation's First
4  Information Subpoena in Aid of
5  Supplemental Judgment and Restraining
6  Notice to Defendant Steven Donziger,
7  The Law Offices of Steven Donziger
8  and Donziger & Associates PLLC."
9        (The above-referred-to
10  document was marked as Exhibit 5650
11  for identification, as of this date.)
12    Q     Have you seen this document
13  before, Ms. Miller?
14    A     No.
15    Q     On the second page under the
16  heading Restraining Notice, do you see
17  where it says "take notice that pursuant
18  to CPLR 5222(b), which is set forth in
19  full herein, you -- referring to
20  Mr. Donziger -- are hereby forbidden to
21  make or suffer any sale, assignment,
22  transfer, inference with any property in
23  which you have an interest to pay over or
24  otherwise dispose of any debt owed to
25  you, except as provided in 5222."  Do you

Page 24

1          LAURA MILLER
2  see that?
3     A     Yes.
4     Q     Did Mr. Donziger ever
5  discuss the receipt of this restraining
6  notice with you?
7     A     No.
8     Q     Do you know of any -- so
9  this is dated April 16th of 2008.
10    A     Okay.
11    Q     Are you aware of transfers
12  that Mr. Donziger has made of property
13  since April of 2018?
14    A     No.
15        MR. DONZIGER:  Can we take a
16  break?
17        MS. NEUMAN:  Sure.  How long
18  of a break do you want to take?
19        MR. DONZIGER:  Short.  Like
20  five minutes.
21        THE VIDEOGRAPHER:  The time
22  on the video monitor is 10:10 a.m.
23  We're off the record.
24        (A short recess was taken.)
25        THE VIDEOGRAPHER:  We are

Page 25

1          LAURA MILLER
2  back on the record.  The time on the
3  video monitor is 10:14 a.m.
4     Q     You understand you're still
5  under oath?
6     A     Yes.
7     Q     Did you have any
8  conversation relating to your deposition
9  during the break?
10    A     What was just discussed, is
11  that I need to be able to just answer the
12  questions as best I possibly can.
13    Q     You mean discussed with
14  Mr. Donziger?
15    A     Yes.
16    Q     Did he say anything else
17  relating to your deposition?
18    A     No.
19    Q     With regard to shared
20  expenses, the ones that you and
21  Mr. Donziger shared, do you have a budget
22  that you go by or do you just generally
23  share?
24    A     Just generally share.
25    Q     So you don't keep track, for

7 (Pages 22 - 25)

LAURA MILLER

1
2 any access rights to those accounts?
3    A    No.
4    Q    He's not an authorized user
5 or beneficiary?
6    A    Nothing.
7    Q    Is there a beneficiary on
8 these accounts other than Mr. Donziger?
9 And I'm not asking you who it is. I'm
10 just asking if there is one.
11    A    Yes.
12    Q    And it's someone else?
13    A    Yes.
14    Q    You mentioned a financial
15 advisor.
16        Who is that?
17    A    Her name --
18        MR. DONZIGER:  Wait.
19 Objection.
20    A    This is ridiculous.
21        MR. DONZIGER:  Why is that
22 relevant?  The name of the financial
23 advisor?
24        MS. NEUMAN:  To the extent
25 they have responsive documents.

LAURA MILLER

1
2        MR. DONZIGER:  Did you ask
3 for those in your request?
4        MS. NEUMAN:  This is ongoing
5 discovery, Mr. Donziger.  If
6 Ms. Miller declines to provide the
7 information, she can do that.  But
8 I've asked the question.
9        MR. DONZIGER:  Well, I don't
10 think you need to know the name.
11        MS. NEUMAN:  I appreciate we
12 have a difference of opinion.  So the
13 witness can either answer the
14 question or not.
15        MR. DONZIGER:  I'm objecting
16 to that.  And I'm going to object to
17 that on marital privilege, given the
18 sensitivities involved in the way we
19 spend money.
20        So I would direct you not to
21 give the name of your financial
22 advisor.  Just go to the next
23 question.
24        THE WITNESS:  I agree.
25    Q    Are you choosing not to

LAURA MILLER

1
2 answer, Ms. Miller?
3    A    I'm choosing not to answer.
4        MS. NEUMAN:  You understand
5 you can't direct the witness not to
6 answer?
7        MR. DONZIGER:  I'm not so
8 sure about that.  I'm not her lawyer.
9 But it's my view based on research
10 I've done that if there's a marital
11 privilege issue, even if she
12 disagrees, I'm going to ask her to
13 respect my marital privilege.
14        And to the extent we need to
15 deal with it post-today, we can.  I
16 mean, write an e-mail.  And maybe
17 I'll reconsider, whatever.  I'm not
18 really looking for more information
19 here.  But I do want to protect my
20 privileges.
21    Q    I'm going to ask you to turn
22 to page 2 of Exhibit 5651.
23        Do you see the first
24 depositor into your accounts is
25 Mr. Donziger?

LAURA MILLER

1
2    A    Yes.
3        MR. DONZIGER:  I'm going to
4 object on the following grounds to
5 questions based on this document.  A:
6 This is a Gibson, Dunn work document.
7 Ask questions relevant to my previous
8 objection.  I have no problem with
9 that.
10        But let's just be clear that
11 we have an understanding that the
12 amounts reflected here were prepared
13 by a Gibson, Dunn expert and are not
14 necessarily accurate.
15    Q    Do you see in the first
16 entry on page 2 of Exhibit 5651,
17 Ms. Miller, that it indicates that "per
18 our calculations, Mr. Donziger has
19 deposited $432,43.65 into your accounts
20 since 5/15/2012"?
21    A    Yes.
22    Q    This is not including
23 amounts deposited after June 11th of
24 2018.
25        Are you aware of any

12 (Pages 42 - 45)

LAURA MILLER

1
2 deposits that Mr. Donziger has made into
3 your accounts since June of 2018?
4     A     He has no access to my
5 account.  He cannot deposit into my
6 account.
7     Q     But he has transferred money
8 into your account?
9     A     I don't know.
10         MR. DONZIGER:  You mean
11 since that date?
12     A     Since 2018?
13         MR. DONZIGER:  Well, the
14 question is, if you look at the last
15 deposit, 6/11, is June 11th of last
16 year, 2018?
17         THE WITNESS:  Yes.
18         MR. DONZIGER:  You state the
19 question.  I want to make sure it's
20 clear to the witness.
21         MS. NEUMAN:  She already
22 answered my question.
23         THE WITNESS:  So can I --
24         MR. DONZIGER:  No.
25 Actually, I'm going to call for a

LAURA MILLER

1
2 break.  Just five minutes.
3         MS. NEUMAN:  Sure.  There's
4 no question pending.
5         THE VIDEOGRAPHER:  The time
6 on the video monitor is 10:36 a.m.
7 We're off the record.
8         (A short recess was taken.)
9         THE VIDEOGRAPHER:  We are
10 back on the record.  The time on the
11 video monitor is 10:41 a.m.
12     Q     Ms. Miller, did you have any
13 conversations related to your deposition
14 during the break?
15     A     Yes.
16     Q     Did you have a conversation
17 with Mr. Donziger?
18     A     Yes.
19     Q     What was the substance of
20 that conversation?
21     A     That I need to listen to the
22 questions carefully.
23     Q     Anything else?
24     A     No.
25     Q     You're aware that your

LAURA MILLER

1
2 husband was a beneficiary to the Donziger
3 Family Trust; correct?
4     A     To the best of my knowledge,
5 yes.
6     Q     Did you ever borrow money
7 from that trust?
8     A     No.  Can I take that back?
9     Q     Sure.
10         You can always correct
11 something if you remember something
12 different.
13     A     My father-in-law gave money,
14 gave me a check for my son for his school
15 many, many years ago.
16     Q     I take it since you were
17 correcting the prior answer, he was
18 treating the check as a loan as opposed
19 to a gift?
20     A     Yes.
21     Q     Is that fair?
22     A     Yes.
23     Q     And do you remember the
24 amount of that check?
25     A     No, I don't.

LAURA MILLER

1
2     Q     I'm going to give you a
3 document that we've marked as
4 Exhibit 5652.
5         (The above-referred-to
6     document was marked as Exhibit 5652
7     for identification, as of this date.)
8     Q     This is a consent order,
9 terminating the trust in the estate of
10 Leon S. Donziger.
11         Leon S. Donziger is
12 Mr. Donziger's grandfather?
13     A     Yes.
14         MR. DONZIGER:  If you know,
15     if you know.
16     A     Yes.
17     Q     Are you generally aware that
18 in 2012, Mr. Donziger received the
19 distribution of the corpus of the trust
20 created in the state of Leon S Donziger?
21     A     Not to my recollection, no.
22     Q     You don't recall that, one
23 way or the other?
24     A     No.
25     Q     Can you look at page 2 of

13 (Pages 46 - 49)

LAURA MILLER

1
2   being deposited.
3       Q      Do you know how they're
4   being used if they're not being signed
5   over to you?
6       A      Not to my knowledge, no.
7           MR. DONZIGER:  Objection to
8       the question.  It presumes a fact
9       that may or may not be in existence,
10      the fact being that they're just
11      sitting out there, that they exist
12      even.  So I think that --
13          MS. NEUMAN:  By "they," you
14      mean the checks?
15          MR. DONZIGER:  Yeah.  So I
16      think --
17          MS. NEUMAN:  I'm entitled to
18      explore this witness's knowledge.
19          MR. DONZIGER:  That's fair.
20      But I want everyone to be clear about
21      her answers because it seems to me
22      that there's a presumption in your
23      question based on facts that haven't
24      been proven or demonstrated to be
25      true because this only goes up to

LAURA MILLER

1
2       March.  So obviously, if she knows
3       about other checks since March, she
4       should answer.  I think she just
5       testified she doesn't.
6       Q      Ms. Miller, do you know
7   whether Mr. Donziger has liquidated his
8   interest in Argyle Knoxville since March
9   of 2019?
10      A      I have no knowledge.
11      Q      And do you know whether he's
12  signed over that interest in Argyle
13  Knoxville to anyone for any purpose?
14      A      I have no knowledge.
15      Q      On a month-to-month basis on
16  this financial issue, do you discuss with
17  Mr. Donziger how much he's going to
18  provide you towards expenses?
19      A      No.
20      Q      How does that work, just
21  financially?
22          MR. DONZIGER:  Objection.
23      I'm asserting marital privilege here.
24          Can you read back the
25      question?

LAURA MILLER

1
2           (The requested portion was
3       read back by the court reporter.)
4           MR. DONZIGER:  I would ask
5       you not to answer that.  That's our
6       personal stuff.  She already
7       testified that there's no budget,
8       there's no agreement.  So I would ask
9       you not to answer that.  It's very
10      personal.  And I'm asserting marital
11      privilege.
12          MS. NEUMAN:  On a financial
13      issue?
14          MR. DONZIGER:  Yes.  That
15      goes to our marriage.
16          THE WITNESS:  I agree.
17      Q      You're declining to answer,
18  Ms. Miller?
19      A      I'm declining to answer.
20          MS. NEUMAN:  I'm going to
21      mark as Exhibit 5654 a coversheet
22      Schedule LBM-2.  Attached are deposit
23      slips from Citibank, starting with
24      the Bates number Citi 2108.
25          (The above-referred-to

LAURA MILLER

1
2       document was marked as Exhibit 5654
3       for identification, as of this date.)
4       Q      Are you familiar with
5   Montecito Bank, Ms. Miller?
6       A      Yes.
7       Q      The deposits into your
8   accounts from Montecito Bank, what were
9   the source of those funds?
10      A      It was a client.
11      Q      And these are all client
12  payments for services you performed?
13      A      Yes.
14          MS. NEUMAN:  I'm going to
15      mark as Exhibit 5655, a Schedule
16      LBM-4, supporting documents produced
17      by Chase and Citibank.  The first
18      document bears the Bates number Chase
19      BJD187.
20          (The above-referred-to
21      document was marked as Exhibit 5655
22      for identification, as of this date.)
23      Q      So Exhibit 5655, Ms. Miller,
24  relates to transfers made from
25  Mr. Donziger's accounts into your

16 (Pages 58 - 61)

LAURA MILLER

1
2  increase in the household expenses you've
3  been talking about in that year?
4    A    Not to my knowledge.
5        MS. NEUMAN:  I'm going to
6  mark as Exhibit 5656, a summary sheet
7  we prepared.
8        (The above-referred-to
9  document was marked as Exhibit 5656
10  for identification, as of this date.)
11        MS. NEUMAN:  Labeled
12  Schedule LBM 5.1, followed by the
13  documents produced by Citibank,
14  starting with the Bates number Citi
15  4607.
16    Q    These are payments made,
17  Ms. Miller, according to Citibank's
18  records, from your interest checking
19  account to TD Bank.  Do you see that?
20    A    Yes, I do.
21    Q    Are these payments that you
22  were making on Mr. Donziger's TD credit
23  card?
24    A    Yes, they are.
25    Q    Is that a credit card that

LAURA MILLER

1
2  Mr. Donziger still has, to your
3  knowledge?
4    A    To my knowledge, yes.
5    Q    And do you continue to make
6  payments on it from your account?
7    A    Yes, I do.
8        MS. NEUMAN:  I'm going to
9  show the witness a document I'm going
10  to mark as 5657.  The first page is a
11  schedule recreated, labeled Schedule
12  LBM 5.2.  The backup Citibank
13  documents are attached, starting with
14  the Bates Number 4607.
15        (The above-referred-to
16  document was marked as Exhibit 5657
17  for identification, as of this date.)
18    Q    Ms. Miller, Exhibit 5657 are
19  payments from your Citibank account to
20  something called Citibank payment.
21  Do you know what that is?
22    A    I'm assuming this is what I
23  paid statements credit card.
24    Q    Does Mr. Donziger have a
25  Citibank credit card, to your knowledge?

LAURA MILLER

1
2    A    To my knowledge, he did,
3  yes.
4    Q    At this time, 2018 to 2019?
5    A    Yes.
6    Q    But his Citibank credit card
7  is separate and a separate number from
8  your Citibank credit card; is that right?
9    A    Yes, absolutely.
10    Q    Do you know when he first
11  obtained the Citibank credit card?
12    A    I have no knowledge.
13    Q    But to the extent he's
14  currently making payments on that card,
15  they're being made from your account?
16    A    Yes.  Can I just add
17  something?
18        MR. DONZIGER:  No.  Let me
19  just object to --
20    Q    My answer to that is, yes,
21  you can add anything you want to add.
22        What did you want to add?
23    A    I want to add that his
24  accounts are frozen.  So I'm responsible
25  for paying bills, everything.  That's

LAURA MILLER

1
2  all.
3        MR. DONZIGER:  No objection.
4    Q    I'm going to ask you some
5  questions about a loan that you indicated
6  you received from George Waters.
7    A    Okay.
8    Q    When did you first meet
9  Mr. Waters?
10        MR. DONZIGER:  Objection.
11  Assumes fact not in evidence.  Just
12  rephrase, please.
13    Q    You can answer the question.
14    A    I'm objecting.
15    Q    You're objecting?
16    A    I agree.
17    Q    So you're refusing to
18  answer?  I just need to clarify that for
19  the record.
20        MR. DONZIGER:  Maybe ask if
21  she's ever met George Waters.  Start
22  with that question.
23        MS. NEUMAN:  When you
24  question her, you can do it however
25  you want.

18 (Pages 66 - 69)

LAURA MILLER

2    Q    Ms. Miller, there are
3  deposits into your accounts from a
4  Fidelity Brokerage Services account.
5        Are you familiar with that
6  account?
7    A    Yes, I am.
8    Q    Whose account is the
9  Fidelity Brokerage?
10    A    My deceased father.
11    Q    Is that account, the
12  Fidelity Brokerage Services account, an
13  account to which Mr. Donziger has any
14  access?
15    A    No.
16    Q    And is it an account into
17  which you or he have ever transferred any
18  money?
19    A    No.
20    Q    So it's just an account from
21  which you receive money?
22    A    Yes.
23    Q    And the source of all the
24  money in that account is your parents; is
25  that right?

LAURA MILLER

2    A    Yes.
3        MS. NEUMAN:  Go off the
4  record for about five minutes.
5        THE VIDEOGRAPHER:  The time
6  on the video monitor is 11:19 a.m.
7  We're off the record.  This ends
8  Media 1.
9        (A short recess was taken.)
10        THE VIDEOGRAPHER:  We are
11  back on the record.  The time on the
12  video monitor is 11:37 a.m.  This
13  starts Media 2.
14        MS. NEUMAN:  Mr. Donziger, I
15  neglected to note at the beginning of
16  the deposition, we've noted in prior
17  discussions that you've taken
18  pictures of people without their
19  consent.
20        So we ask you not to do
21  that.  If you need to take a picture
22  of someone, you need to ask their
23  consent.
24        MR. DONZIGER:  Can I take a
25  picture of you?

LAURA MILLER

2        MS. NEUMAN:  No.
3    Q    Ms. Miller, did you have any
4  conversations related to your depo during
5  the break?
6    A    We just discussed that I
7  need to take it slow.
8    Q    With Mr. Donziger?
9    A    Yes.
10    Q    I'll ask you some questions
11  about electronics.
12        So in your household
13  currently, how many computers are there?
14    A    Three.
15    Q    And who do they belong to?
16    A    Steven has one, I have one,
17  and our son has one.
18    Q    Does Mr. Donziger have any
19  access to your computer?
20    A    No.
21    Q    Does he have any access to
22  your son's computer?
23    A    No.
24    Q    You've never seen him use
25  your computer or your son's computer?

LAURA MILLER

2    A    No.
3    Q    The computer that you have,
4  was that a computer that you purchased?
5    A    Yes.
6    Q    And the computer that your
7  son has, who purchased that?
8    A    I don't recall.
9    Q    The computer that
10  Mr. Donziger has, do you know what kind
11  of computer it is?
12    A    I think it's an Apple.  I'm
13  not sure what kind.
14    Q    Do you ever use that
15  computer?
16    A    No.
17    Q    Never?
18    A    No.
19    Q    In terms of iPads, do you
20  have any iPads in your apartment?
21    A    We used to.  But we don't
22  any longer.
23    Q    How many did you used to
24  have?
25    A    One.

LAURA MILLER

1
2  me.
3     A     Mm-hmm.
4     Q     Were you on the
5  Denver-Colorado trip?
6     A     No.
7     Q     The Washington, D.C. trip?
8     A     No.
9     Q     The May 2016 Amelia Island?
10    A     Yes.
11    Q     Was anyone other than
12 yourself and Mr. Donziger on that trip or
13 your son?
14    A     Our son.  That's it.
15    Q     No one else?
16    A     No.
17    Q     Did that trip have any
18 business purpose that you're aware of?
19    A     No.
20    Q     The Washington, D.C. trip in
21 June, were you involved in that?
22    A     In June, no.
23    Q     On page 3, the August trip
24 to Portugal, were you involved in that?
25    MR. DONZIGER:  I'm going to

LAURA MILLER

1
2  object.  I'm going to assert marital
3  privilege over the rest of this,
4  unless you can actually figure out
5  some nexus between a trip and my
6  assets or money.  She's already
7  testified she was not involved in
8  investor activity as a general
9  matter.  And I just think this is
10 redundant and harassing.
11    So I'm asserting marital
12 privilege.  If you feel like out of
13 all these things remaining you can
14 find something that really hones in
15 on what you're properly entitled to
16 question her about, please do so.
17    But if you're going to go
18 through this generally, I'm going to
19 assert marital privilege and ask the
20 witness to please respect my marital
21 privilege and not answer.
22    Q     The August trip to Portugal,
23 were you involved in that trip?
24    A     Yes.
25    Q     Did that trip relate in any

LAURA MILLER

1
2  way to business?
3     A     No.
4     Q     That you're aware of?
5     A     It did not relate to any
6  business.
7     Q     Was there any non-family
8  members with you on that trip?
9     MR. DONZIGER:  Objection.
10 This is marital privilege.
11    A     Okay.
12    Q     What was your answer?
13    A     It's marital privilege.  I
14 agree.  This is -- it was a family
15 vacation.
16    MR. DONZIGER:  Listen, it's
17 a marital privilege.  I'm asserting
18 marital privilege.
19    A     Okay.  I'm asserting marital
20 privilege for me.
21    MR. DONZIGER:  Do not
22 answers the questions as long as I'm
23 asserting marital privilege.
24    MS. NEUMAN:  Mr. Donziger,
25 you can't properly instruct the

LAURA MILLER

1
2  witness not to answer.  I'll state
3  that for the record.
4     MR. DONZIGER:  Okay.  But
5  I'm asking her to respect my marital
6  privilege.
7     A     I respect it.  Okay.
8     Q     On any of the trips that
9  you've taken abroad with Mr. Donziger
10 since 2014, has he taken any devices and
11 left them in any foreign location?
12    MR. DONZIGER:  That's fine.
13 You can ask that question.  But I
14 object to the phrasing of the
15 question.  If you know, lay a
16 foundation, if you know, has he taken
17 devices.
18    MS. NEUMAN:  You have to put
19 if you know in front of a witness.
20 It's obviously based on their
21 personal knowledge.  You can ask
22 other questions if you think some of
23 my questions need clarifying.
24    Can you read the question
25 back to the witness, please?

27 (Pages 102 - 105)

1          LAURA MILLER
2          (The requested portion was
3     read back by the court reporter.)
4     A      He lost his phone last --
5  last August.
6     Q      In what location?
7     A      In France.
8     Q      In any trip that you've been
9  on with Mr. Donziger since 2014, has he
10  taken any money or other assets with him
11  and deposited it in a foreign location or
12  left it?
13     A      Not to my knowledge.
14     Q      Other than the trip to
15  Portugal, were you involved in any of the
16  other trips shown on page 3?
17     A      No.
18     Q      Looking at page 4 of Exhibit
19  5660, can you take a minute to read each
20  of those dates and locations and let me
21  know if you were involved in any of those
22  trips?
23          MR. DONZIGER:  I'm going to
24     object.  I mean first of all, the
25     time frame of these trips, 2016, was

1          LAURA MILLER
2     prior to the entrance of the
3     judgment.
4          MS. NEUMAN:  Again, he's
5     already ruled on the relevant time
6     frame which is not the date of the
7     money judgment.
8     Q      I see you're jumping ahead.
9     A      No.  It's pretty obvious.
10  It's a school vacation in December.
11     Q      Were you involved in any of
12  the other trips?
13     A      No.
14     Q      On page 5, can you read the
15  dates and locations and let me know if
16  you participated in any of those trips?
17     A      February 17th to the 21st, I
18  was with Steven and my son.
19     Q      In Ecuador?
20     A      No.  In Savannah, Georgia.
21     Q      And did that trip have any
22  business purpose, to your knowledge?
23     A      No.
24     Q      Were you involved in any of
25  the other trips?

1          LAURA MILLER
2     A      No.
3     Q      The trips on page 6, did you
4  have any involvement in any of those
5  trips?
6     A      May 28th to 30th in
7  Jacksonville, Florida.
8     Q      Did that trip have any
9  business purpose that you're aware of?
10     A      No business purpose.
11     Q      As to the trips that you
12  weren't involved in, do you have any
13  knowledge about the purposes of those
14  trips?
15     A      No.
16     Q      On page 7, there's six trips
17  shown.
18          Were you involved in any of
19  the trips?
20     A      Yes, I was.  The June 27th
21  to July 5th trip, the July 8th to 10th
22  trip and the July 27th to August 3rd
23  trip.
24     Q      Did any of those trips have
25  any business purpose that you're aware

1          LAURA MILLER
2  of?
3     A      No.
4          MR. DONZIGER:  I'm going to
5     ask for a break.
6          MS. NEUMAN:  Okay.  Go off
7     the record.
8          THE VIDEOGRAPHER:  The time
9     on the video monitor is 12:08 p.m.
10  We're off the record.
11          (A short recess was taken.)
12          THE VIDEOGRAPHER:  We are
13     back on the record.  The time on the
14     video monitor is 12:12 p.m.
15     Q      Ms. Miller, did you have any
16  conversations related to your depo during
17  the break?
18     A      Yes.  I'm reading too fast.
19  And I made a mistake.
20     Q      And do you want to correct
21  something?
22     A      Yes.  In Deauville, Steven
23  did have some meetings.  I was not
24  involved with them.
25     Q      You're referring to the trip

28 (Pages 106 - 109)

LAURA MILLER

1
2  the funds for Mr. Donziger's travels?
3      A    No.  Not to my knowledge,
4  no.
5      Q    Do you ever pay for his
6  travel expenses out of your accounts for
7  non-family trips?
8      A    No.
9      Q    Since 2012, what have been
10 Mr. Donziger's sources of income, to your
11 knowledge?
12     A    Just the work that he does
13 on the case.  Since 2012, outside
14 clients, other clients he's had.
15     Q    What's your understanding as
16 to Mr. Donziger's other clients in that
17 time frame?
18         MR. DONZIGER:  Objection.
19     Sorry.  It has nothing to do with
20     Ecuador.
21         MS. CHAMPION:  It has to do
22     with income.
23         MR. DONZIGER:  In 2012?  I
24     don't think so.
25     Q    That is the relevant time

LAURA MILLER

1
2  frame.
3         Are you declining to answer?
4      A    I'm declining to answer.
5      Q    Without regard to their
6  identities, which you declined to
7  provide, do you know the amount of income
8  Mr. Donziger has made from non-Ecuador
9  clients since 2012?
10     A    I have no knowledge.
11     Q    Other than legal work that
12 he's performed for clients, are you aware
13 of any other sources of income from
14 Mr. Donziger since 2012?
15     A    I have no knowledge.
16     Q    Do you have any knowledge as
17 to whether Mr. Donziger is currently
18 financially able to pay the judgments
19 against him?
20     A    I have no knowledge.
21     Q    Has he discussed with you
22 why he has not paid those judgments?
23     A    As far as I know, they were
24 under appeal, no.  I have no knowledge.
25         THE VIDEOGRAPHER:  The time

LAURA MILLER

1
2  on the video monitor is 12:29 p.m.
3  We're off the record.
4         (A lunch recess was taken.)
5         THE VIDEOGRAPHER:  We are
6  back on the record.  The time on the
7  video monitor is 1:35 p.m.  This
8  starts Media 3.
9      Q    Good afternoon, Ms. Moral.
10     A    Hi.
11     Q    You understand you're still
12 under oath?
13     A    Yes.
14     Q    Did you have any discussions
15 over the lunch break related to your
16 deposition testimony?
17     A    Just what I had said before.
18 I have to read carefully, continue to
19 tell the truth.
20     Q    More lecturing?
21     A    Yes.
22     Q    So I wanted to do a few
23 follow-up questions related to phones.
24     A    Okay.
25     Q    You testified earlier that

LAURA MILLER

1
2  your son's number was (929)392-4656?
3      A    Can I check?
4      Q    Sure.
5         Well, my question is going
6  to be, has he ever had any other phone
7  numbers?
8      A    No.
9      Q    Do you want to check if that
10 number's right?
11     A    Yes.  His number is
12 (929)392-4656?
13     Q    Yes.  That's the one you
14 gave earlier.
15     A    Okay.
16     Q    And that's the only phone
17 he's ever had?
18     A    Yes.
19     Q    Earlier, you also mentioned
20 giving an old phone to a nanny?
21     A    Yeah.
22     Q    And I wanted to clarify.
23         Did you just give her the
24 physical phone or did you get her cell
25 phone account?

32 (Pages 122 - 125)

LAURA MILLER

2   A    No.  I just gave her the
3   physical phone.  Can I clarify something?
4   Q    Sure.
5   A    Okay.  Sometimes -- and
6   we've never used them -- when you get the
7   phones, sometimes you'll get like a
8   little video thing with your phone, like
9   a gift or something.  Do you ever get
10  those?  I forget what they're called.  I
11  don't even know.  Like a minipad or
12  something.  We never use them.
13          But I'm just wondering if
14  some of those numbers might be connected
15  with it.  I just don't know what all
16  those numbers are.  I'm just trying to
17  figure out where they all are from.
18  A    I'm not familiar with what
19  you're referring to.
20          Can you describe it?
21  A    I don't want to say it's
22  like an iPad.  But it's like an iPad.
23  But it's not through Apple or anything
24  like that.  I don't know.
25  Q    Do you have a landline in

LAURA MILLER

2   your apartment?
3   A    No.  We used to years ago
4   but not anymore.
5   Q    Do you know when you stopped
6   having a landline?
7   A    Probably at least four years
8   ago or so, five years ago.  I don't even
9   remember.
10      MS. NEUMAN:  I'm going to
11  mark as Exhibit 5661, a picture of a
12  Nokia 2610 phone.
13      (The above-referred-to
14  document was marked as Exhibit 5661
15  for identification, as of this date.)
16  Q    Have you ever seen
17  Mr. Donziger use a phone that looks like
18  that?
19  A    I have no recollection.
20      MR. DONZIGER:  Objection.
21  Can you give some sort of time frame
22  or just forever and forever since
23  we've known each other?
24  Q    Since 2012, have you ever
25  seen him use a phone like that?

LAURA MILLER

2   A    No.
3   Q    I'll give you a picture of a
4   BlackBerry which I've marked as
5   Exhibit 5662.
6       (The above-referred-to
7   document was marked as Exhibit 5662
8   for identification, as of this date.)
9   Q    Have you ever seen
10  Mr. Donziger use a phone like this?
11  A    When we were first married,
12  yes, 13 years ago or so.
13  Q    And since then?
14  A    No.
15      MS. NEUMAN:  I'm going to
16  mark as 5663, a picture of an AT&T
17  phone.
18      (The above-referred-to
19  document was marked as Exhibit 5663
20  for identification, as of this date.)
21  Q    Have you ever seen
22  Mr. Donziger use a phone like
23  Exhibit 5663?
24  A    Not to my recollection.
25  Q    The loan that you got

LAURA MILLER

2   Mr. Waters, did you discuss with
3   Mr. Donziger why you were signing the
4   loan documents as opposed to him?
5   A    We discussed it, yes.
6   Q    And what was the reason the
7   loan was being made to you instead of
8   Mr. Donziger?
9   A    Because I am now the one
10  who's financially responsible to pay all
11  the bills for our family and to keep our
12  family alive.  And he -- he knew this.
13  So he sent it to me.
14  Q    And you've taken on that
15  responsibility because of the judgments
16  against Mr. Donziger or for some other
17  reason?
18  A    Because his accounts are
19  frozen.
20  Q    Is it your understanding
21  that he can't open new accounts or just
22  that he hasn't or do you have an
23  understanding?
24      MR. DONZIGER:  Objection.
25  Please move on.  That calls for

33 (Pages 126 - 129)

Page 130

LAURA MILLER

1
2  speculation.
3     Q    You can answer.
4     A    I agree with the objection.
5     Q    So you're declining to
6  answer?
7     A    I'm declining to answer,
8  yes.
9        MS. NEUMAN:  I'm going to
10  hand the witness a document that I'm
11  marking as Exhibit 5600, the subpoena
12  that was served on you in this
13  matter.
14     Q    I want to turn to -- let me
15  ask you first.
16        Did you read this document
17  when you received it?
18     A    Yes.
19     Q    And prior to receiving this
20  document, had you previously read the
21  court's judgment from the RICO case?
22     A    No, I had not.
23     Q    Did you receive any advice
24  regarding responding to the subpoena from
25  anyone other than Mr. Donziger?

Page 131

LAURA MILLER

1
2     A    Yes, I had.
3     Q    Was that advice from legal
4  counsel or someone else?
5     A    Not legal counsel that I
6  retained.
7     Q    But legal counsel that you
8  consulted other than Mr. Donziger?
9     A    Yes.
10     Q    And who would that have
11  been?
12     A    Aaron Page.
13     Q    And you didn't retain
14  Mr. Page to give you advice, but you
15  discussed the subpoena with him; is that
16  fair?
17     A    Yes.
18     Q    So if we look at page 18,
19  numbered 18, I don't think it's literally
20  18, Question 24, do you have
21  communications independent from
22  Ecuador-related communications with any
23  of the persons listed?
24        MR. DONZIGER:  Objection or
25  clarification.  You mean

Page 132

LAURA MILLER

1
2  communications unrelated to Ecuador
3  with these people or related to
4  Ecuador?  Because I thought you just
5  said -- maybe I misunderstood --
6  unrelated to Ecuador.
7        MS. NEUMAN:  Right.  So that
8  we can establish.
9        MR. DONZIGER:  Okay.  That's
10  fine.  I just wanted to be clear.
11     A    When you say
12  "communications," e-mail communications?
13     Q    Yes.
14        Would you rather do them one
15  by one?
16     A    I don't know most of them.
17  I don't know.
18        MR. DONZIGER:  Respond to
19  questions.  Go ahead.
20     A    Can I ask you a question?
21  So this is non-Ecuador-related?
22     Q    I'll ask a new question so
23  we'll be more on the same page.  How
24  about that?
25     A    Sure.

Page 133

LAURA MILLER

1
2     Q    So of the people listed
3  under 24, can you identify the ones for
4  me who you actually know?
5     A    Who I know?  Okay.  I know
6  Juan Aulestia, Ben Barnes, Cliff Eisler,
7  I know Phil Fontaine, I know Richard
8  Friedman, I know Peter Grant, I know
9  Karen Hinton, I know Glenn Krevlin, I
10  know John van Merkensteijn, I know
11  Cristina Munoz, and I know Aaron Page.
12     Q    There's a few more on the
13  next page.
14     A    I know John Phillips, I know
15  Patricio and Augustin Salazar, I know
16  David Sherman, I know Susan Sherman, I
17  know Anton, I know Roger Waters, I know
18  Ian Watson, and I know Luis Yanza.
19     Q    Other than Mr. Rogers, who
20  you indicated earlier you had never met,
21  are there any other people that you
22  indicated you know but haven't met?
23     A    I know of but just through,
24  you know, conversation or something.  But
25  I've never met them.  I mean I've heard

34 (Pages 130 - 133)

Page 146

LAURA MILLER

1   just CC'd on it. I just don't have it.
2   So I was worried about that. You kept
3   asking in every single subpoena, this one
4   specific e-mail that Katie put me on.
5   And I don't have it. That's all. And I
6   was worried about that. So I spoke to
7   Aaron. And he said they obviously have
8   it.
9       Q    I'm going to show you a
10  document that was marked as Exhibit 9 in
11  Ms. Sullivan's deposition.
12          Is this the e-mail you're
13  talking about?
14      A    I guess so.
15          MR. DONZIGER: No I guess
16  so. If you don't know, just say I
17  don't know.
18          THE WITNESS: I don't.
19          MR. DONZIGER: I think, if I
20  may --
21          MS. NEUMAN: It's not going
22  to be a speaking objection?
23          MR. DONZIGER: No. I'm
24  trying to be helpful. I think -- in

Page 147

LAURA MILLER

1   your correspondence with Ms. Miller,
2   you kept saying she had not produced
3   an e-mail related to Katie Sullivan.
4   And I don't think it's this e-mail.
5           THE WITNESS: It's not that
6   e-mail, I don't think, because it was
7   from Katie, not Aaron.
8       Q    Well, if you look at the
9   last page, next-to-last page of Exhibit 9
10  to Sullivan with the Document Number
11  MKS93, do you have that page in front of
12  you?
13      A    Yes.
14      Q    You see the original e-mail
15  on this chain was from Katie Sullivan?
16      A    Yeah. You kept asking about
17  it. I don't have it.
18      Q    You'll see on the first page
19  of this exhibit -- well, let's turn to
20  the second page.
21          Mr. Grant writes, "I give
22  you very best wishes on this and will now
23  delete all e-mails relating to this. I
24  recommend others do as well after what I

Page 148

LAURA MILLER

1   saw the opposition acquired." Do you see
2   that?
3       A    Yes.
4       Q    Do you recall getting that
5   e-mail?
6       A    I can't recall.
7       Q    Then Mr. Donziger
8   responds, "I second that. Please delete
9   all e-mails related to this. And again,
10  keep this info confidential." Do you see
11  that? The bottom of the first page.
12      A    I see that.
13          MR. DONZIGER: Are you
14  trying to refresh her recollection
15  about this e-mail? Because she said
16  she doesn't remember.
17      A    I don't have it. I don't
18  recall it. I don't have it. And I don't
19  recall it. You kept asking for it. And
20  that's why I was like, I did not see it
21  anywhere.
22      Q    I understand that.
23      A    Okay.
24      Q    I'm just noting to you that

Page 149

LAURA MILLER

1   you were requested in this chain to
2   delete it.
3           My follow-up question is, do
4   you recall deleting it in response?
5       A    I don't recall.
6       Q    You don't recall, one way or
7   the other?
8       A    No.
9       Q    But you have searched for
10  it, in particular, and have been unable
11  to find it?
12      A    Yes.
13      Q    Could you rule out the
14  possibility that you deleted it?
15      A    I can't rule out the
16  possibility. But I don't recall this at
17  all.
18      Q    Do you recall deleting other
19  e-mails that related to investments or
20  potential investments in the Ecuador
21  judgment?
22      A    I have never been given an
23  e-mail about investments or potential
24  investments. I'm not -- I'm not part of

38 (Pages 146 - 149)

Page 150

LAURA MILLER

1
2    it. I am not a part of this. This is
3    getting crazy.
4        Q    So in terms of your
5    consultation with Mr. Page, is that a
6    consultation -- you mentioned you don't
7    have a formal retainer with him; correct?
8        A    Correct.
9        Q    Did you ever pay him for his
10   advice?
11       A    No.
12       Q    Did he ever bill you for his
13   advice?
14       A    No.
15       Q    Did he ever discuss the
16   topic of conflicts with you before he
17   gave you advice?
18       A    Could you explain a little
19   bit more?
20       Q    Did he ever tell you that he
21   represents Mr. Donziger?
22       A    Yes, he did.
23       Q    And did he ever say anything
24   to you about the fact that he might have
25   a conflict with giving you advice since

Page 151

LAURA MILLER

1
2    he already represents Mr. Donziger?
3        A    Not that I recall.
4        Q    Do you know if Mr. Page and
5    Mr. Donziger discussed any of the advice
6    that Mr. Page would give you?
7            MR. DONZIGER: That was a
8    complicated question.
9            Can you read it back?
10           (The requested portion was
11       read back by the court reporter.)
12       A    They discussed that this was
13   happening and that I was going in there.
14   And that was about all I was privy to.
15           MR. DONZIGER: I need to
16       take a quick break. Do you have a
17       lot more questions? Is there a
18       natural break coming up?
19           MS. NEUMAN: We can take a
20       break now. There's no pending
21       question.
22           THE VIDEOGRAPHER: The time
23       on the video monitor is 2:05 p.m. We
24       are off the record.
25           (A short recess was taken.)

Page 152

LAURA MILLER

1
2            THE VIDEOGRAPHER: We are
3        back on the record. The time on the
4        video monitor is 2:15 p.m.
5        Q    Ms. Miller, did you have any
6    conversations related to your depo during
7    the break?
8        A    Yes. Same as we talked
9    about before.
10       Q    Did you have any discussions
11   related to substantive answers as opposed
12   to your testifying method?
13       A    No.
14       Q    Now, you mentioned a couple
15   of times during the day that you sort of
16   changed the way that you do your finances
17   because Mr. Donziger's accounts were
18   frozen?
19       A    Mm-hmm.
20       Q    Was it or is it your
21   understanding that the accounts were
22   frozen because Chevron was trying to
23   collect the money that was owed on the
24   judgment it has against Mr. Donziger?
25           MR. DONZIGER: I'm going to

Page 153

LAURA MILLER

1
2        object.
3        A    I'm not really sure how to
4    answer that.
5            MR. DONZIGER: Why does that
6        matter? She testified --
7            MS. NEUMAN: I'm not going
8        to discuss this with you,
9        Mr. Donziger.
10           MR. DONZIGER: Well, it's
11       relevant because we have a time
12       limitation. And this deposition has
13       gone on a lot of hours now. The
14       question is this -- she's already
15       testified that she knew that the
16       accounts were frozen. And that was
17       the reason why she was --
18           MS. NEUMAN: I'm asking her
19       a different question.
20           MR. DONZIGER: But what does
21       it matter --
22           MS. NEUMAN: I'm not going
23       to discuss with you why I want to ask
24       a certain question.
25           MR. DONZIGER: Let's move

39 (Pages 150 - 153)

Page 154

LAURA MILLER

1
2   on. I'm going to assert privilege.
3   Don't answer that.
4        THE WITNESS:  I agree.
5    Q    You're refusing to answer
6   your understanding as to why the accounts
7   are frozen?
8        MR. DONZIGER:  It's totally
9   irrelevant.  Get back to the
10  essence --
11       MS. NEUMAN:  Mr. Donziger,
12  these are relevant questions.  I'm
13  going to ask you not to make speaking
14  objections.
15   A    I don't know.
16   Q    Let's go back to the issue
17  of your production.  So I'm going to mark
18  as Exhibit 5664, a document bearing the
19  Bates numbers LB Miller 169.
20       (The above-referred-to
21  document was marked as Exhibit 5664
22  for identification, as of this date.)
23   Q    Is that a document you
24  produced, Ms. Miller?
25   A    Yes.  I did by mistake.

Page 155

LAURA MILLER

1
2    Q    Whose handwriting is on the
3   document?
4    A    Mine.
5    Q    The notes that say "don't
6   produce, not relevant to the case"?
7    A    This got into the pile by
8   mistake.  It's not relevant.
9    Q    And who made that
10  determination?
11   A    I did.  I realized that this
12  has nothing to do with -- what you're
13  asking for.  And it's irrelevant.
14   Q    What is the reference on
15  Exhibit 5664 to the Peter Grant e-mail?
16   A    I was making notes.  This
17  was why it was a scrap paper to me.  And
18  it should not have gotten in the pile.
19  It was my own.
20   Q    Different question.
21   A    Okay.
22   Q    What is your note to
23  yourself that says "Peter Grant e-mail"
24  about?
25   A    I can't even remember.

Page 156

LAURA MILLER

1
2    Q    You don't recall?
3    A    No.
4    Q    Did the attachment -- and
5   you didn't produce the attachment to this
6   e-mail?
7    A    No, because it was
8   irrelevant.
9    Q    Is the Bill being referred
10  to a Bill Guttentag?
11       MR. DONZIGER:  Objection.
12  She said she would not have produced
13  it.  And I would ask that you respect
14  that and ask questions about
15  something else.  If you disagree with
16  that, we could litigate.
17       MS. NEUMAN:  I disagree with
18  that.
19   Q    Can you answer the question,
20  please?
21       MR. DONZIGER:  Don't answer
22  the question.
23   A    I'm not going to answer the
24  question.  I'm not answering it.  It's
25  irrelevant.

Page 157

LAURA MILLER

1
2        MR. DONZIGER:  I need to
3   correct something for the record.  My
4   last direction to Ms. Miller might
5   make it appear like I think I'm
6   representing her.  I want to
7   reiterate that I'm not her lawyer.  I
8   do -- it is my position that marital
9   privilege entitles me when I assert
10  it to direct her not to answer a
11  question if I assert it on behalf of
12  myself and if she doesn't assert it
13  on behalf of herself.  So that was
14  the basis for my direction to not
15  answer the question.
16       MS. NEUMAN:  I'm going to
17  hand the witness a document we've
18  marked as Exhibit 5665, bearing the
19  Bates numbers GKrevlin 294 through
20  299.
21       (The above-referred-to
22  document was marked as Exhibit 5665
23  for identification, as of this date.)
24   Q    Ms. Miller, is this the
25  attachment -- although produced by a

40 (Pages 154 - 157)

LAURA MILLER

1
2    Q    In response to Question 19
3    about domestic assets that Mr. Donziger
4    owns --
5    A    I have no knowledge.
6    Q    -- this would include your
7    apartment which you have told us about
8    separately.  But since you didn't put it
9    here, how are you interpreting asset?
10   Because it's meant, quite broadly, money,
11   property, art, jewelry, coin collections.
12   A    The only thing we own
13   together is the apartment which I
14   actually own more of the apartment than
15   he does.
16   Q    Can you explain that to me?
17   A    I put down a larger deposit
18   than he did when we initially bought the
19   apartment.
20   Q    And how much did you put
21   down versus how much he put down?
22   A    I think I put down like
23   $100,000 more.  He put down 200,000.  And
24   I put down 300.
25   Q    And how does that impact

LAURA MILLER

1
2    your respective ownership of the asset?
3         MR. DONZIGER:  I'm going to
4    object on marital privilege grounds.
5         MS. NEUMAN:  About asset
6    ownership?
7         MR. DONZIGER:  Yeah.
8    Q    Do you decline to answer?
9    A    I decline to answer.
10        MR. DONZIGER:  She's already
11   answered how that apartment is held.
12   Q    So setting aside things that
13   you own jointly, do you have other
14   knowledge of things that Mr. Donziger
15   owns that you didn't list here?
16   A    I have no knowledge.
17   Q    Reading 19, can you clarify
18   why you didn't think to list the
19   apartment?  I just want to understand how
20   you were thinking of the question.
21   A    I'm not a lawyer.  I didn't
22   realize I did this on my own.  I didn't
23   realize.
24        MS. NEUMAN:  I'm going to
25   hand the witness a document that was

LAURA MILLER

1
2    previously marked as Exhibit 5435, a
3    declaration of John Slavek, Docket
4    No. 2115.
5    Q    Have you seen this document
6    before, Ms. Miller?
7    A    Yes.
8    Q    Can you turn with me to the
9    first tabbed page.
10        This lists persons known to
11   have invested in the judgment since the
12   RICO case judgment was issued.  Did that
13   make sense to you?
14   A    Yes.
15   Q    Do you know of investors in
16   the judgment since RICO that aren't
17   listed here?
18   A    I have no knowledge of any,
19   no knowledge.
20   Q    The moneys -- Mr. Donziger
21   noted in connection with the Elliot pitch
22   that he had raised approximately
23   $30 million for the Ecuador case.
24        Do you know the current
25   whereabouts of any of those funds?

LAURA MILLER

1
2    A    I'm not aware of any of
3    this.
4    Q    Do you ever assist
5    Mr. Donziger in preparing investor
6    updates?
7    A    No.
8    Q    Do you ever assist in
9    investor pitches or presentations?
10   A    No.
11   Q    Are you ever involved in any
12   fundraising activities related to the
13   Ecuador case?
14   A    No.
15        MR. DONZIGER:  Objection.
16   Asked and answered earlier in the
17   deposition.  But you can answer
18   again.
19   A    No.
20   Q    Were you aware that Mr. Page
21   has an interest in the Ecuador judgment?
22   A    No, I was not.
23   Q    Are you aware of whether
24   Ms. Hinton has an interest in the Ecuador
25   judgment?

43 (Pages 166 - 169)

LAURA MILLER

1
2    A    No, I'm not.
3         MS. NEUMAN:  I'm going to
4    mark as Exhibit 5668, a document
5    bearing the Bates number LB Miller
6    112 through 113.
7         (The above-referred-to
8    document was marked as Exhibit 5668
9    for identification, as of this date.)
10   Q    It's a document you
11   produced, Ms. Miller?
12   A    Yes.
13   Q    In the top, are you
14   commenting on a letter that Mr. Donziger
15   is sending to the Wall Street Journal
16   related to the case?
17        MR. DONZIGER:  Objection.
18   Please give her a chance to read the
19   e-mail before you ask her a question
20   about it.  So I want to be sure the
21   witness has a chance to read the
22   e-mail before answering any questions
23   about it.
24   Q    Ms. Miller, you want to let
25   us know when you've read the e-mail?

LAURA MILLER

1
2    A    I've read it.
3    Q    Were you commenting on the
4    below e-mail before it was sent out?
5    A    Yes.
6    Q    In your comment, you
7    say, "This looks very good.  My only
8    suggestion is to add a bit more to the
9    paragraph where you talk about Chevron
10   hiding the evidence that the judge lied.
11   I would say that an expert did a forensic
12   study on his computer and found that the
13   judge did write the final judgment and
14   that Chevron had the expert's testimony
15   redacted."  Do you see that?
16   A    Mm-hmm.
17   Q    Yes?
18   A    Yes.
19   Q    And what are you referring
20   to when you say "Chevron had the expert's
21   testimony redacted"?
22        MR. DONZIGER:  Objection.
23        THE WITNESS:  I agree.  This
24   was 2015.
25        MR. DONZIGER:  This is not

LAURA MILLER

1
2    related to money, investors.  This is
3    just wasting time.
4    Q    Can you substantively answer
5    the question?
6    A    No.
7    Q    Are you refusing to answer
8    or you don't know the answer?
9    A    No.  I honestly can't
10   remember 2015.  I don't remember even
11   what the article was about.
12   Q    Other than for the provision
13   of services from Mr. Zelman, are you
14   aware of Mr. Donziger using his interest
15   in the judgment for any purpose to obtain
16   anything?
17   A    I'm not aware.
18   Q    And are you aware of
19   Mr. Donziger disposing of any assets
20   since 2014?
21   A    I'm not aware.
22        MS. NEUMAN:  Marking as
23   Exhibit 5669, a document summarizing
24   the amounts related to Judge Kaplan's
25   issuance of a new judgment in the

LAURA MILLER

1
2    amount of $666,476.34.
3         (The above-referred-to
4    document was marked as Exhibit 5669
5    for identification, as of this date.)
6    Q    Were you aware, Ms. Miller,
7    that the court had recently issued a
8    judgment against Mr. Donziger for an
9    additional $666,000?
10   A    I was aware, yes.
11   Q    If you look on page 2,
12   347,000 of that judgment is based on
13   transfers that were made of moneys into
14   your accounts.  Do you see that?
15   A    I see that.
16   Q    And were you aware that
17   that's the case?
18   A    No.  I was not aware.
19   Q    And to the extent this
20   judgment is based on transfers made into
21   your accounts that the court has found
22   Chevron has a constructive trust over,
23   are you willing to voluntarily return
24   those funds to Chevron?
25        MR. DONZIGER:  Objection.

44 (Pages 170 - 173)

LAURA MILLER

1
2     Marital privilege.  Don't answer the
3     question.
4        A     I'm not going to answer the
5     question.
6             MS. NEUMAN:  Go off the
7     record.
8             THE VIDEOGRAPHER:  The time
9     on the video monitor is 2:44 p.m.
10    We're off the record.
11            (A short recess was taken.)
12            THE VIDEOGRAPHER:  We are
13    back on the record.  The time on the
14    video monitor is 3 p.m.  This starts
15    Media 4.
16            MR. DONZIGER:  Before we
17    proceed, I just want to state
18    something for the record with regard
19    to your last question.  I think that
20    last question asking Ms. Miller if
21    she'd be willing to disgorge that
22    amount of money to Chevron was
23    inappropriate.  And I think it was an
24    attempt to intimidate Ms. Miller and
25    to interfere in her marital relations

LAURA MILLER

1
2     and cause division in our marriage.
3     So I think that it should
4     not have been asked.  There's no
5     judgment against her.  There's no
6     action against her.  Judge Kaplan
7     issued that judgment against me, not
8     her.  I want to be very clear about
9     that.  That question was entirely
10    inappropriate and, again, I believe
11    an attempt to intimidate the witness.
12            MS. NEUMAN:  That's
13    absolutely untrue.  Everything you
14    just said is untrue.  So we'll get
15    back to the deposition.
16       Q     Ms. Miller, have you and
17    Mr. Donziger created any trusts since
18    2012?
19       A     No.
20       Q     Has Mr. Donziger created any
21    trusts since 2012 that you know of?
22       A     I have no knowledge.
23       Q     To your knowledge, is
24    Mr. Donziger currently the trustor or
25    trustee of any trust?

LAURA MILLER

1
2        A     I have no knowledge.
3        Q     To your knowledge, has he
4     ever been a trust beneficiary?
5        A     I have no knowledge.
6        Q     Has Mr. Donziger opened any
7     type of financial account abroad, to your
8     knowledge, since 2012?
9        A     I have no knowledge.
10       Q     We discussed earlier two
11    credit cards that Mr. Donziger holds:
12    Citibank and TD.
13       A     Mm-hmm.
14       Q     Does he have any other
15    credit cards that you're aware of?
16       A     Not that I'm aware of.
17       Q     Since he closed the TD Bank
18    accounts, I believe you said you're not
19    aware of any new domestic accounts he's
20    opened; is that right?
21       A     That's correct.
22       Q     Are you aware of any other
23    payments made by Mr. Waters at
24    Mr. Donziger's request other than the
25    loan to you that we talked about earlier?

LAURA MILLER

1
2        A     I have no knowledge.
3        Q     Have you ever been involved
4     in any shareholder or activism type
5     activities against Chevron?
6             MR. DONZIGER:  Objection.
7     Irrelevant.
8             THE WITNESS:  I object also.
9        Q     So you decline to answer?
10       A     I decline to answer.
11       Q     Would you have -- when
12    Mr. Page was advising you, could you
13    estimate about how much time he spent
14    doing that?
15       A     Just a few hours.
16       Q     And do you know what he
17    normally charges for his services?
18       A     I have no idea.
19            MS. NEUMAN:  So we've
20    discussed briefly off the record that
21    Ms. Miller and Mr. Donziger need to
22    leave by 3:30, that we aren't in
23    agreement about the questions that
24    the witness has declined to answer.
25            So we're going to address

45 (Pages 174 - 177)

Page 198

1

2                   C E R T I F I C A T I O N

3

4

5        I, ANTHONY GIARRO, a Shorthand Reporter and a

6    Notary Public, do hereby certify that the foregoing

7    witness, LAURA MILLER, was duly sworn on the date

8    indicated, and that the foregoing, to the best of

9    my ability, is a true and accurate transcription of

10   my stenographic notes.

11        I further certify that I am not employed by

12   nor related to any party to this action.

13

14

15

     _____

16                   ANTHONY GIARRO

17

18

19

20

21

22

23

24

25