# 18-0855-cv(L)

## 18-2191-cv(CON)

# United States Court of Appeals

### for the

# Second Circuit

CHEVRON CORPORATION,

*Plaintiff-Counter-Defendant-Appellee,*

– v. –

DONZIGER & ASSOCIATES, PLLC, STEVEN DONZIGER,
THE LAW OFFICES OF STEVEN R. DONZIGER,

*Defendants-Counter-Claimants-Appellants.*

*(For Continuation of Caption See Reverse Side of Cover)*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-COUNTER-CLAIMANT-APPELLANT PRO SE

STEVEN R. DONZIGER
245 West 104th Street
New York, New York 10025
(917) 566-2526

*Defendant-Appellant Pro Se*

PABLO FAJARDO MENDOZA, LUIS YANZA, FRENTE DE DEFENSA DE LA
AMAZONIA, AKA AMAZON DEFENSE FRONT, SELVA VIVA SELVIVA CIA,
LTDA, MARIA AGUINDA SALAZAR, CARLOS GREFA HUATATOCA,
CATALINA ANTONIA AGUINDA SALAZAR, LIDIA ALEXANDRA AGUIN
AGUINDA, PATRICIO ALBERTO CHIMBO YUMBO, CLIDE RAMIRO AGUINDA
AGUINDA, LUIS ARMANDO CHIMBO YUMBO, BEATRIZ MERCEDES GRETA
TANGUILA, LUCIO ENRIQUE GREFA TANGUILA, PATRICIO WILSON
AGUINDA AGUINDA, CELIA IRENE VIVEROS CUSANGUA, FRANCISCO
MATIAS ALVARADO YUMBO, FRANCISCO ALVARADO YUMBO, OLGA
GLORIA GREFA CERDA, LORENZO JOSE ALVARADO YUMBO, NARCISA
AIDA TANGUILA NARVAEZ, BERTHA ANTONIA YUMBO TANGUILA, GLORIA
LUCRECIA TANGUI GREFA, FRANCISCO VICTOR TANGUILA GREFA, ROSA
TERESA CHIMBO TANGUILA, JOSE GABRIEL REVELO LLORE, MARIA
CLELIA REASCOS REVELO, MARIA MAGDALENA RODRI BARCENES, HUGO
GERARDO CAMACHO NARANJO, JOSE MIGUEL LPIALES CHICAIZA,
HELEODORO PATARON GUARACA, LUISA DELIA TANGUILA NARVAEZ,
LOURDES BEATRIZ CHIMBO TANGUIL, MARIA HORTENCIA VIVER
CUSANGUA, SEGUNDO ANGEL AMANTA MILAN, OCTAVIO ISMAEL
CORDOVA HUANCA, ELIAS ROBERTO PIYAHUA PAYAHUAJE, JAVIER
PIAGUAJE PAYAGUAJE, DANIEL CARLOS LUSITAND YAIGUAJE, BENANCIO
FREDY CHIMBO GREFA, GUILLERMO VICENTE PAYAGUA LUSITANTE,
DELFIN LEONIDAS PAYAGU PAYAGUAJE, ALFREDO DONALDO PAYAGUA
PAYAGUAJE, MIGUEL MARIO PAYAGUAJE PAYAGUAJE, TEODORO
GONZALOPIAGUAJE PAYAGUAJE, FERMIN PIAGUAJE PAYAGUAJE,
REINALDO LUSITANDE YAIGUAJE, LUIS AGUSTIN PAYAGUA PIAGUAJE,
EMILIO MARTIN LUSITAND YAIGUAJE, SIMON LUSITANDE YAIGUAJE,
ARMANDO WILMER PIAGUAJE PAYAGUAJE, ANGEL JUSTINO PIAGUAG
LUCITANT, KEMPERI BAIHUA HUANI, AHUA BAIHUA CAIGA, PENTIBO
BAIHUA MIIPO, DABOTA TEGA HUANI, AHUAME HUANI BAIHUA, APARA
QUEMPERI YATE, BAI BAIHUA MIIPO, BEBANCA TEGA HUANI, COMITA
HUANI YATE, COPE TEGA HUANI, EHUENGUINTO TEGA, GAWARE TEGA
HUANI, MARTIN BAIHUA MIIPO, MENCAY BAIHUA TEGA, MENEMO HUANI
BAIHUA, MIIPO YATEHUE KEMPERI, MINIHUA HUANI YATE, NAMA BAIHUA
HUANI, NAMO HUANI YATE, OMARI APICA HUANI, OMENE BAIHUA HUANI,
YEHUA TEGA HUANI, WAGUI COBA HUANI, WEICA APICA HUANI, TEPAA
QUIMONTARI WAIWA, NENQUIMO VENANCIO NIHUA, COMPA GUIQUITA,
CONTA NENQUIMO QUIMONTARI, DANIEL EHUENGEI, NANTOQUI
NENQUIMO, OKATA QUIPA NIHUA, CAI BAIHUA QUEMPERI, OMAYIHUE
BAIHUA, TAPARE AHUA YETE, TEWEYENE LUCIANA NAM TEGA, ABAMO
OMENE, ONENCA ENOMENGA, PEGO ENOMENGA, WANE IMA, WINA
ENOMENGA, CAHUIYA OMACA, MIRNA YETI,

*Defendants,*

*(For Continuation of Caption See Last Page of Cover)*

Case 1:62191, Document 48, 12/10/2018, 2432297, Page3 of 65

---

STRATUS CONSULTING, INC., DOUGLAS BELTMAN, ANN MAEST,

*Defendants-Counter-Claimants,*

ANDREW WOODS, LAURA J. GARR, H5,

*Respondents.*

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................. ii

PRELIMINARY STATEMENT ......................................................... 1

JURISDICTIONAL STATEMENT ..................................................... 9

STATEMENT OF THE ISSUES........................................................ 11

I.   STATEMENT OF THE CASE ................................................. 12

     A.   The "NY Judgment" and the District Court's Prompt
         Clarification Thereto ................................................ 16

     B.   This Court's Subsequent Reliance on the Limited Nature
         of the Injunctive Relief Granted in the NY Judgment ....................... 20

     C.   Chevron's Contempt Motion, Undersigned's Motion for
         Relief, the June 28 Hearing, and the District Court's
         Persistent Refusal to Rule ............................................ 22

     D.   Chevron's Subsequent Unconstitutional and Abusive
         Discovery Campaign ................................................ 26

II.  ARGUMENT .................................................................. 30

     A.   Standard of Review .................................................. 30

     B.   The District Court Improperly Modified the NY
         Judgment Injunction and Applied It To Authorize
         Otherwise Unwarranted and Abusive Discovery ............................. 32

     C.   The District Court Erred in Denying the Motion to
         Dismiss ........................................................... 41

     D.   The District Court's Error Is Compounded By the
         Flagrantly Unconstitutional Nature of Chevron's
         Discovery Campaign ................................................ 44

     E.   The District Court Abused Its Discretion by Looking Past
         Chevron's Misconduct and Other Equitable Factors to
         Issue an Astronomical Award of Costs ................................... 49

CONCLUSION.................................................................. 55

# TABLE OF AUTHORITIES

## Cases

*Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) ................................................................................45

*ARP Films, Inc. v. Marvel Entertainment Group, Inc.*, 952 F.2d 643 (2d Cir. 1991) ...............................................31

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................ 9, 34, 43

*AXA Versicherung AG v. New Hampshire Ins. Co.*, 769 F. Supp. 2d 623 (S.D.N.Y. 2011) ......................................50

*Bates v. Little Rock*, 361 U.S. 516 (1960) ....................................46

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ....................43

*Bernard v. County of Suffolk,* 356 F.3d 495 (2d Cir. 2004) .......................................................................... 10, 43

*Black Panther Party v. Smith*, 661 F.2d 1243 (D.C. Cir. 1981) .......................................................................................47

*Buckley v. Valeo*, 424 U.S. 1 (1976) ..........................................46

*Chevron Corp. v. Donziger*, 833 F.3d 74 (2016) ............................ passim

*Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362 (S.D.N.Y. 2014) ............................................................ passim

*Chiste v. Hotels.com L.P.*, 756 F. Supp. 2d 382 (S.D.N.Y. 2010) .......................................................................36

*Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197 (2d Cir. 2004) ...............................................45

*Citizens United v. Schneiderman*, 882 F.3d 374 (2d Cir. 2018) .........................................................................................47

*Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541 (1949) .......................................................................... 10, 43, 45

*Cont'l Cas. Co. v. Coastal Sav. Bank*, 977 F.2d 734 (2d Cir. 1992) .......................................................................35

*Drywall Tapers & Pointers v. Local 530*, 889 F.2d 389 (2d Cir.1989) .................................................................32

*Eilers v. Palmer*, 575 F. Supp. 1259 (D. Minn. 1984)...........................................46

*Gonzalez v. J.P. Morgan Chase Bank*, N.A., 228 F. Supp. 3d 277 (S.D.N.Y. 2017) ................................................35

*In re FCC*, 217 F.3d 125 (2d Cir. 2000) ........................................... 37, 39

*In re MidAmerican Energy Co.*, 286 F.3d 483 (8th Cir. 2002) ......................................................... 37, 39

*Int'l Bhd. of Teamsters v. E. Conference of Teamsters*, 160 F.R.D. 452 (S.D.N.Y. 1995) ..........................................36

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 1985 WL 315 (S.D.N.Y. Feb. 28, 1985)................................... 45, 46, 47, 48

*Int'l Union v. Nat'l Right to Work*, 590 F.2d 1139 (D.C. Cir. 1978) ..........................................................47

*L–3 Communications Corp. v. OSI Sys., Inc.*, 607 F.3d 24 (2d Cir. 2010)..........................................................50

*Local 1814 v. Waterfront Comm'n of New York Harbor*, 667 F.2d 267 (2d Cir. 1981) ............................................47

*Moore v. County of Delaware*, 586 F.3d 219 (2d Cir. 2009) ..........................................................50

*NAACP v. Alabama*, 357 U.S. 449 (1958)................................ 46, 48, 49

*Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542 (2010) .........................................50

*Rothstein v. Balboa Ins. Co.*, 794 F.3d 256 (2d Cir. 2015) ............................ 10, 31

*Sierra Club v. U.S. Army Corps of Engineers*, 732 F.2d 253 (2d Cir. 1984)................................................ 31, 34

*St. German of Alaska E. Orthodox Catholic Church v. United States*, 840 F.2d 1087 (2d Cir. 1988)......................................47

*Tomasino v. Estee Lauder Companies, Inc.*, 2015 WL 1470177 (E.D.N.Y. Mar. 31, 2015) .......................................37

*United States v. Quintieri*, 306 F.3d 1217 (2d Cir. 2002) .......................................37

*Wilder v. GL Bus Lines*, 258 F.3d 126 (2d Cir. 2001)................................49

*Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995) ...................................................36

*Woods v. Rondout Valley Cent. Sch. Dist. Bd of Educ.*,
466 F.3d 232 (2d Cir. 2006) .................................................................43

**Statutes**

28 U.S.C. § 1291 ...........................................................................................9

28 U.S.C. § 1292(a)(1) ...................................................................................8

28 U.S.C. § 2201(a) ............................................................................... 31, 33

**Rules**

Federal Rule of Civil Procedure 54(d)(1) ...................................... 46, 52

Federal Rule of Civil Procedures 12(b)(6) ..........................................28

**Other Authorities**

Alexander Zaitchik, *Sludge Match: Inside Chevron's $9
Billion Legal Battle With Ecuadorean Villagers*,
Rolling Stone, Aug. 28, 2014, at https://bit.ly/1vSVlOU ...................12

*Brief for Amici Curiae Amazon Watch and Rainforest
Action Network in Support of Petitioners*, No. 16-1178
(U.S. May 1, 2017), 2017 WL 1735884, at
https://bit.ly/2RILJHE.........................................................................3

David Feige, *Pursuing the polluters: An environmental
lawsuit may open the door for small countries to take
on the multinationals*, L.A. Times, Apr. 20, 2008, at
https://lat.ms/2rsBE6d.......................................................................11

James North, *Ecuador's Battle for Environmental Justice
Against Chevron*, The Nation, June 2, 2015, at
https://bit.ly/2cyWXOc......................................................................12

*Legendary Ecuadorian Nurse Who Hosted Celebrities
and Battled Chevron Over Pollution Tragically Dies of
Cancer*, CSRwire, Jan. 4, 2017, at
https://bit.ly/2QqlCsw.......................................................................12

Marco Simons, *What You Think You Know About
Chevron and Steven Donziger Is Wrong*, EarthRights
Blog, Oct. 30, 2015, at https://bit.ly/2EolFyD ......................................................12

*New Study Confirms Chevron Caused "Widespread"
Pollution and Health Problems in Ecuador, Validating
Historic Court Judgment*, CSRwire, Jun. 18, 2014, at
https://bit.ly/1lFtSih ...............................................................................................12

Open Letter from Environmental Groups, Jan. 23, 2014,
at https://bit.ly/2QtgHqU .......................................................................................23

Rex Weyler, *Chevron's SLAPP suit against
Ecuadorians: corporate intimidation*, Greenpeace
International, May 11, 2018, at https://bit.ly/2Gfvb3i............................................12

Simon Romero and Clifford Krauss, *Ecuador Judge
Orders Chevron to Pay $9 Billion*, New York Times,
Feb. 14, 2011, at https://nyti.ms/2L8Uubw ..........................................................11

Simon Romero and Clifford Krauss, *In Ecuador,
Resentment of an Oil Company Oozes*, The New York
Times, 15 May 2009, at https://nyti.ms/2SK3hDB ................................................11

Steven Mufson, *Chevron, Patton Boggs settle their epic
legal battle over jungle oil pits in Ecuador*, Wash. Post,
May 7, 2014, at  https://wapo.st/2Pt1K2l .............................................................25

## PRELIMINARY STATEMENT

Two years ago this Court affirmed the district court's judgment on the merits in this action. *Chevron Corp. v. Donziger*, 833 F.3d 74 (2016) ("RICO Affirmance"); *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362 (S.D.N.Y. 2014) ("RICO Opinion"). In its decision, this Court repeatedly made clear that its affirmance was predicated on the fact that the district court issued only narrow and "confine[d]" injunctive relief (called the "NY Judgment" by the district court and here, *see* SPA1) alongside its findings, relief that prevented only undersigned (now litigating this appeal *pro se*) and two of the 47 named Ecuadorian plaintiffs who won the Ecuador pollution judgment against Chevron (called the "Lago Agrio Judgment" or "Judgment" by the district court and here) from "profiting" from a collection on the Judgment. Citing comity concerns, this Court found essential the fact that the district court's relief would not "disturb," much less "invalidate," the Lago Agrio Judgment or the processes underway to enforce that judgment in non-U.S. courts. *Infra* I.B. The district court itself, when confronted with evidence that Chevron hoped to use the NY Judgment to block undersigned from continuing to raise funds and advocate for his clients, issued a memorandum opinion, published at 37 F. Supp. 3d 653 ("Clarification/Stay Opinion"), SPA6, that made clear that undersigned could continue his work as long as he did not collect on his contingent fee. Specifically:

> [While] payments of a Contingent Fee [to Donziger]
> would be 'traceable to the [Lago Agrio] Judgment,' and

Case 19-2191, Document 49, 12/10/2019, 2732298, Page10 of 95

> thus subject to the constructive trust imposed by paragraph
> 1, the same would not be true of Monthly Retainer
> payments unless those payments were traceable to the
> Lago Agrio Judgment. Thus, at least **as long as no
> collections are made** in respect of the Lago Agrio
> Judgment and funneled to Donziger as retainer payments,
> **the NY Judgment would not prevent Donziger from
> being paid, just as he has been paid at least $958,000 and
> likely considerably more over the past nine or ten years**.

SPA13-14. The district court, Hon. Lewis A. Kaplan, all but pounded the table on

the limited nature of his injunctive relief, dismissing all of defendants' argued

concerns about the potential breadth of the language in the NY Judgment as

"fanciful", "far-fetched", and "border[ing] on the irresponsible." *Infra* I.A.

With these clear assurances in mind, undersigned proceeded to raise a modest

amount of funds, although a pittance compared to Chevron's massive expenditures

on 60 law firms and a litigation staff of over 2,000 people in this matter. The funds

were used for legal fees and spending on an array of advocacy, including shareholder

activism and a press strategy. Those donating or investing were mostly individuals

of means and conscience. Most had visited the affected region in the Amazon and

bonded with the people poisoned by Chevron's abandoned oil waste pits. The push

and pull of advocacy on the case continued, with allies and supporters of the

Ecuadorians continuing to show up around the world to confront Chevron

representatives in enforcement courts in Canada, human rights forums in Geneva, in

Chevron's annual shareholder meetings, and on social media. The Ecuadorians have

made particular progress in enforcing their judgment in an enforcement action in Canada, despite Judge Kaplan's supposedly iron-clad findings of "fraud." As collateral proceedings have progressed, many of the district court's key RICO findings have been undermined or disproven in Canadian and other collateral proceedings—most spectacularly, the district court's "bribery" finding is factually a dead letter. *See, e.g.*, A126, ECF No. 1936 at 6-10.[1]

Chevron's response has been to restart the RICO "demonization" process as a SLAPP-style and wholly unconstitutional harassment effort directed at undersigned and various funders and supporters of the affected Ecuadorians communities. Those targeted by Chevron in its latest round of subpoenas include environmental activists, a noted human rights lawyer, six separate funders, one of the nation's leading shareholder rights experts, a public relations company that posts press releases about the case, the former press spokesperson for New York City Mayor Bill DeBlasio who assists the Ecuadorians, undersigned's wife and undersigned's brother-in-law, who had the courage to make a personal loan to undersigned in 2012 to help fund legal expenses on this very case. Once again, Chevron's goal is to use its command with the district court to win by pure might

---

[1] *See also Brief for Amici Curiae Amazon Watch and Rainforest Action Network in Support of Petitioners*, No. 16-1178 (U.S. May 1, 2017), 2017 WL 1735884, at https://bit.ly/2RILJHE ("Cert. Amicus").

what it knows it is not entitled to by merit.[2]

All of these attacks have come under the umbrella of a Chevron motion seeking to hold undersigned in contempt for allegedly not complying with the terms of RICO injunctive relief in the NY Judgment. SPA137 ("Contempt Motion"). But as noted, the district court had already made clear that the NY Judgment *only prevented profiting on a collection, not financing and advocacy*. As such, the alleged "non-compliance" claims should have been dismissed out of hand. Instead, the district court—in the conduct at the heart of this appeal—implicitly modified the NY Judgment injunction and in a Kafkaesque move allowed Chevron's intrusive and harassing discovery to develop a theory of non-compliance with the as-yet unknown terms of the modified injunction. This discovery is not only improperly authorized,

---

[2] It bears mention that the district court's findings (which remain contested) are being questioned in the context of a New York bar disciplinary proceeding and in the Canadian enforcement action. Attorney John Horan, the referee in my post-suspension bar hearing, ruled in November that there is evidence I did not get a fair trial before Judge Kaplan and that I therefore have a right to present evidence challenging the district court's findings. The bar disciplinary procedure began with a referral letter from the SDNY Grievance Committee that suggested my disbarment without a hearing based on the Kaplan findings. Subsequently, the First Department suspended me without a hearing after I was designated "an immediate threat" to the public even though I have not had a single client complaint in 25 years of practice. Lawyers for the Attorney Grievance Committee subsequently procured a stay of my post-suspension hearing in what appears to be an unprecedented effort to seek a reversal from the First Department of a procedural decision by the referee allowing me to contest the district court's findings.

but in substance plainly violates undersigned's and others' First Amendment associational rights. The district court has refused to rule on the merits of undersigned's alleged non-compliance with the NY Judgment, despite undersigned's frequent filings asking the court to do so. *See* A273 (citing ECF Nos. 1986, 2018, 2026, 2032, 2034, 2042, 2051, and 2118). Meanwhile, Chevron not only has gained through this process a wholly improper and unconstitutional access to discovery, but it is also seeking to apply the modified injunction to gain "disgorgement" of over $2 million in legitimately raised litigation and advocacy funds (which of course undersigned no longer has possession of anyway). It is also using the process to try to seize undersigned's personal computer and cell phone, to gain access to undersigned's email accounts, and to imprison undersigned for any non-compliance with the foregoing. Undersigned has responded by taking the principled position that the district court must publicly articulate the terms of its newly modified injunction—and allow me to appeal the same—before such aggressively intrusive discovery can be allowed. Undersigned has indicated his willingness to respectfully go into civil contempt as necessary to achieve an appeal on the merits of any alleged non-compliance with the modified injunction.[3]

On a similarly disturbing track, the district court has steamrolled past

---

[3]   This appeal, however, remains necessary to challenge the district court's refusal to apply the original injunction as articulated in the Clarification/Stay Opinion. *Infra* II.B.

5

numerous valid objections as it has complied with Chevron's egregious application for nearly $1 million in court costs and appears poised to do the same on an application for $32 million in attorneys' fees. Of course, Chevron itself is to blame for the almost comic bloat of the RICO proceeding, at which the company deployed more than 100 lawyers and hundreds of utterly unnecessary experts and witnesses. Chevron at one point hired and flew to New York via business class a retired Australian Supreme Court justice to testify to the existence of a phrase in one of his judgments that any person could simply read in the judgment. ECF No. 1923. Despite numerous legal and equitable problems with the demands for costs, including the basic fact that they represent a calculated attempt to circumvent undersigned's Seventh Amendment rights by seeking what are effectively money damages without Chevron having to put its case on the merits in front an impartial jury, the district court entered a Supplemental Judgment on the costs application on February 28, 2018. SPA-39. The court ordered undersigned, a sole practitioner who works from the kitchen table of his two-bedroom apartment, to pay $813,602.71 to one of the world's wealthiest corporations. Chevron later froze undersigned's bank accounts when he could not come up with the funds to post bond pending appeal.

This Court must face the realities of the proceedings below. Sadly, the proceedings continue to reflect the mentality of a district court judge who, in the opening days of the proceeding, called Chevron "a company of considerable

importance to our economy" while dismissing the Ecuador environmental case as a product of undersigned's "imagination."[4] In flagrant violation of the supposedly "confine[d]" nature of injunctive relief in the NY Judgment, Chevron has been allowed to deploy aggressive discovery tools to drive away funders, block legitimate advocacy, and win by might what it is slowly losing on the merits in enforcement proceedings and public opinion dialogue around the world. Katie Sullivan, a small business owner in Boston who was so moved by the devastation wrought by Chevron in Ecuador that she volunteered to help fundraise and organize documents, recently testified that she has had to personally spend at least $170,000 in legal fees trying to comply with Chevron's overbearing subpoena. She has had to endure Chevron's harassment of her business clients as well as false allegations made against her in Chevron's public court filings.

---

[4] Hearing Tr. at 49-50, No. 11-cv-691 (LAK) (S.D.N.Y. Feb. 8, 2011) ("[THE COURT]: [W]e are dealing here with a company of considerable importance to our economy that employs thousands all over the world, that supplies a group of commodities, gasoline, heating oil, other fuels and lubricants on which every one of us depends every single day. *I don't think there is anybody in this courtroom who wants to pull his car into a gas station to fill up and finds that there isn't any gas there because these folks [Steven Donziger and the Ecuadorian plaintiffs] have attached it in Singapore* or wherever else."); Hearing Tr. at 77-78, *In re Chevron*, 10-MC-002 (LAK) (S.D.N.Y. Sept. 23, 2010) ("*The imagination of American lawyers is just without parallel in the world.* It is our one absolutely overwhelming comparative advantage against the rest of the world, apart from medicine. You know, we used to do a lot of other things. Now we cure people and we kill them with interrogatories. It's a sad pass. But that's where we are. And Mr. Donziger is trying to become the next big thing in fixing the balance of payments deficit. *I got it from the beginning.*").

   In sum, the post-judgment proceedings below have turned into a disturbing three-ring circus of litigation attacks that are clearly unlawful. This Court must issue relief sufficient to ensure compliance with its own mandate, correct the district court's abuses of discretion, and put an end to Chevron's entirely inappropriate and unconstitutional revenge-seeking in the Southern District of New York.

# JURISDICTIONAL STATEMENT

This Court has jurisdiction to hear appeals from interlocutory orders of the district court "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions." 28 U.S.C. § 1292(a)(1). In its management of the post-judgment proceedings below, the district court has recently applied a fundamentally modified and broadened version of the injunctive relief that originally issued and was explicated by the district court at 37 F. Supp. 3d 653. The district court has enforced the modified injunction in the proceedings, in particular by authorizing extraordinary discovery that would be foreclosed by application of the original injunction.

Undersigned also challenges the district court's refusal to dismiss the non-compliance contempt claims despite their invalidity as a matter of law and the absence of any "factual content that [would] allow the court to draw the reasonable inference that the defendant is liable for [any] misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The district court's refusal to dismiss combined with its authorization of broad and intrusive discovery has conclusively determined the expiration of the original injunction, an important issue separate from the merits of whether the district court ultimately finds contempt under the modified injunction. This determination and its consequences are unreviewable on appeal from a final judgment because of the constitutional nature of the violations worked by the

unwarranted discovery. As such, the district court's denial of the motion to dismiss is a 'collateral order' under *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 545-46 (1949), *see Bernard v. County of Suffolk,* 356 F.3d 495, 501 (2d Cir. 2004), and is reviewable in this appeal *de novo*, see *Rothstein v. Balboa Ins. Co.*, 794 F.3d 256, 261 (2d Cir. 2015).

Finally, this Court has jurisdiction under 28 U.S.C. § 1291 over the Supplemental Judgment ordering undersigned to pay $813,602.71 in court costs to Chevron.

## STATEMENT OF THE ISSUES

1.     Where this Court affirmed the district court's RICO Opinion based on the "confine[d]" nature of its injunctive relief, which "d[id] not invalidate the [Lago Agrio] judgment and does not prohibit any of the [judgment-holders] from seeking enforcement of that judgment anywhere outside of the United States," does the district court's subsequent modification and radical expansion of the injunctive relief, contrary to the district court's prior published opinion on the same, constitute an abuse of discretion and a violation of the law of the case doctrine?

2.     Did the district court err in refusing to dismiss Chevron's claims of non-compliance with the injunction where the prior published interpretation of the injunction foreclosed those claims as a matter of law, where no evidence whatsoever supported the claims, and where denial of the motion allowed Chevron to proceed to take discovery in violation of First Amendment associational rights, despite detailed warnings from undersigned that First Amendment harm was likely?

3.     Did the district court abuse its discretion in ordering undersigned, a sole practitioner and human rights advocate, to pay Chevron Corp. $813,602.71 in court costs without considering fairness and equitable factors including Chevron's misconduct at trial, its forfeiture of certain costs during trial, its abuse of procedures leading to excess costs, and its strategic evasion of undersigned's Seventh Amendment rights?

11

# I.   STATEMENT OF THE CASE

This Court is no stranger to the historic *Aguinda v. Chevron* case. Indeed, it was this Court that started what has now become a 25-year journey. This Court's decision in 2001 to dismiss the environmental claims of the affected communities to the more "convenient" forum of Ecuador led undersigned, a fluent Spanish speaker with extensive experience working in Latin America, to take a more pronounced leadership role on the legal team pursuing the case. The path led to undersigned facing the myriad difficulties and uncertainties that came with litigating a complex and bitterly-fought matter in a small Amazon town totally unaccustomed to such litigation.[5] But, that decision also allowed the undersigned to continue to bear witness, for many years now, to one of the most remarkable social justice struggles in modern history—one led by inspiring figures like Goldman Prize winner Luis Yanza, legendary nurse Rosa Moreno, and the indomitable leader from Sacha, Alejandro Soto. Many of these people are now sick or have died from cancer, along with others in the area of Chevron's former operations.[6]

---

[5]   *See, e.g.,* Simon Romero and Clifford Krauss, *Ecuador Judge Orders Chevron to Pay $9 Billion*, New York Times, Feb. 14, 2011, at https://nyti.ms/2L8Uubw; Simon Romero and Clifford Krauss, *In Ecuador, Resentment of an Oil Company Oozes*, The New York Times, 15 May 2009, at https://nyti.ms/2SK3hDB; David Feige, *Pursuing the polluters: An environmental lawsuit may open the door for small countries to take on the multinationals*, L.A. Times, Apr. 20, 2008, at https://lat.ms/2rsBE6d.

[6]   *Legendary Ecuadorian Nurse Who Hosted Celebrities and Battled Chevron Over Pollution Tragically Dies of Cancer*, CSRwire, Jan. 4, 2017, at

The RICO Affirmance recites in great detail facts found by Judge Kaplan in

his RICO Opinion.[7] Undersigned maintains that the vast majority of relevant facts

---

https://bit.ly/2QqlCsw;   Alejandro   Soto,   Forum   Nobis,   at
http://forumnobis.org/3328-2/;   *New Study Confirms Chevron Caused
"Widespread" Pollution and Health Problems in Ecuador, Validating Historic
Court Judgment*, CSRwire, Jun. 18, 2014, at https://bit.ly/1lFtSih.

[7]   Undersigned is not, of course, allowed to challenge Judge Kaplan's findings in
this post-judgment appeal even though he contests those findings in other fora.
Nonetheless, it is important to observe that those findings continue to be
contested in the Canadian enforcement action, in my ongoing bar disciplinary
proceeding, and in a human rights proceeding before the Inter-American
Commission on Human Rights challenging the conduct of the U.S. court system
in this case. Moreover, much has changed in the evidentiary landscape since the
record closed in 2013 in the Chevron RICO proceeding. Undersigned will recount
some of the most important elements here.

On June 27, 2018, Ecuador's Constitutional Court–which had access to a far
broader universe of evidence than Judge Kaplan—ruled in an 8-0 decision to
affirm the Ecuador trial court judgment. The decision rejected all of Chevron's
claims of fraud. In all, Judge Kaplan's findings now have been rejected by 17
separate appellate judges in Ecuador from three separate courts, including in
decisions by both the country's National Court of Justice (court of Cassation) and
the aforementioned Constitutional Court. Aspects of Judge Kaplan's RICO
decision also have been rejected or ignored by 12 appellate judges in Canada in
two unanimous opinions in favor of the Ecuadorian plaintiffs from the Ontario
Court of Appeal and one unanimous decision in favor of the same from the
Canada Supreme Court, the latter after an attempt by Chevron to cite the Kaplan
findings in a jurisdictional challenge. Indeed, it cannot be denied that the highest
courts of both Ecuador and Canada—in separate unanimous opinions—have
affirmed the validity of the Ecuador judgment against Chevron in whole or in
part. The reasons for this are many, but one cannot deny that Judge Kaplan's
decision is an outlier in a global context.

This can be understood by recognizing that the underlying Ecuador judgment is
based on voluminous objective scientific evidence and extensive testimonial
evidence, all of which was excluded by Judge Kaplan in the RICO matter. The
scientific evidence includes 105 expert technical reports submitted by the parties
aggregating 64,000 chemical sampling results lifted from soils and waterways at

13

93 Chevron oil production sites in Ecuador's Amazon. Unfortunately for Chevron, this evidence was devastating to the company. Fully 99% of the company's oil production sites inspected during the Ecuador trial in its preferred forum of Ecuador evidenced levels of Total Petroleum Hydrocarbons (TPH) above the Ecuadorian norm of 1,000 ppm. Chevron's scientific evidence and that of the plaintiffs was mutually corroborating at the vast majority of sites inspected. The evidence rendered the company's entire pump-and-dump operation in Ecuador patently illegal.

Health evaluations not surprisingly show skyrocketing rates of cancer in the affected area that have intensified as of late given the long latency period of this deadly disease. Many Amazon community leaders who brought the lawsuit against Chevron (including internationally-respected nurse Rosa Moreno, supra note 6, and Alejandro Soto) have died of cancer just in the brief period of time since this Court affirmed in August 2016. Thousands of other Ecuadorians in the affected area either have died from cancer related to oil pollution in Chevron's former operational area or face a grave risk of death in the coming years, according to a study by Dr. Daniel Rourke submitted as evidence in the Ecuador proceeding. In just one example of the procedural problems in the RICO trial, the district court refused to consider the Rourke study, any of the voluminous scientific evidence pointing to Chevron's culpability, or the evidence of fraud committed by Chevron and its counsel. These facts are documented in the fact section of my direct appeal, *supra* note 8, a summary of the evidence available at https://bit.ly/2QJLcIl, the 105 technical evidentiary reports which Judge Kaplan refused to allow into evidence, a detailed affidavit by Ecuadorian lawyer Juan Pablo Saenz available at ECF No. 152, outlining Chevron's fraud and intimidation tactics, a detailed public rebuttal of Judge Kaplan's available at https://bit.ly/2uPnahP, and the letter at A126, referring the U.S. Department of Justice to the facts of Chevron's and its counsel's witness-tampering, obstruction of justice, and fraud regarding the paid witness, Alberto Guerra.

This Court should be aware that Chevron's entire "fraud" narrative about the Ecuador judgment—and the vast cover-up of its malfeasance in Ecuador to evade paying the pollution judgment—will be challenged with extensive evidence in the Canadian enforcement proceeding, before the Inter-American Commission, in undersigned's bar proceeding if allowed, and possibly via other fora. In my view, this evidence renders all of district court's "findings" either erroneous or utterly decontextualized from practice and procedure in Ecuador. This evidence is nevertheless relevant to this appeal in that it helps explain why Chevron and the Gibson Dunn lawyers suddenly, four years after the RICO judgment issued,

in the RICO Opinion are either false, distorted, or unmoored from their Ecuador law

context. They are the product of Chevron's army of lawyers and strategists—and of

course the paid "fact" witness testimony of the notoriously corrupt Chevron witness

Alberto Guerra, who has since recanted core parts of his testimony and

acknowledged that he consciously lied on the stand in front of Judge Kaplan. For

my position on at least some of these facts, undersigned would direct the Court to

the appellate briefing to the RICO Affirmance panel, No. 14-826, Docs. 150 and

317,[8] certiorari petitions and amici thereto to the U.S. Supreme Court,[9] and to news

articles and analyses that have sought to describe the larger strategic picture behind

Chevron's avowed, decade-old campaign to "demonize Donziger."[10]

---

sought a radical expansion of Judge Kaplan's original injunction in an obvious
11th-hour attempt to shut down advocacy in light of the progress made by the
Ecuadorian plaintiffs in other fora.

[8]   Available online at https://bit.ly/2RPgTwW and https://bit.ly/2RVSS7q.

[9]   Cert. Amicus, *supra* note 1; *see also* Marco Simons, *What You Think You Know
About Chevron and Steven Donziger Is Wrong*, EarthRights Blog, Oct. 30, 2015,
at https://bit.ly/2EolFyD.

[10]  *See, e.g.*, James North, *Ecuador's Battle for Environmental Justice Against
Chevron*, The Nation, June 2, 2015, at https://bit.ly/2cyWXOc; Alexander
Zaitchik, *Sludge Match: Inside Chevron's $9 Billion Legal Battle With
Ecuadorean Villagers*, Rolling Stone, Aug. 28, 2014, at https://bit.ly/1vSVlOU;
Rex Weyler, *Chevron's SLAPP suit against Ecuadorians: corporate
intimidation*, Greenpeace International, May 11, 2018, at https://bit.ly/2Gfvb3i.

## A.   The "NY Judgment" and the District Court's Prompt Clarification Thereto

On March 4, 2018, the district court entered the NY Judgment along with its RICO Opinion. Paragraph 6 of the NY Judgment expressly provided that "nothing herein enjoins, restrains or otherwise prohibits Donziger, [co-defendants Camacho and Piaguaje], or any of them, from (a) filing or prosecuting any action for recognition or enforcement of the [Lago Agrio] Judgment . . . or (b) litigating this action or any appeal of any order or judgment issued in this action." SPA3. However, this clear authorization sat uneasily with Paragraph 5, which "enjoined [Donziger, Camacho, and Piaguaje] from undertaking any acts to monetize or profit from the [Ecuador Environmental] Judgment . . . including without limitation by selling, assigning, pledging, transferring or encumbering any interest therein," SPA3, and Paragraphs 1-2, which imposed a constructive trust over all property of undersigned, Camacho, or Piaguaje "that is traceable to the [Lago Agrio] Judgment." SPA1-2. How else would undersigned or especially Mssrs. Camacho or Piaguaje who are not lawyers, but who were authorized by name to "prosecute" enforcement and appeals, accomplish this without hiring lawyers and using litigation funds to do so?

As counsel for Camacho/Piaguaje noted at the time Paragraph 6 suggested that Paragraph 5 must "be read to permit monetizing the Ecuadorian Judgment for the limited purpose of continuing to litigate this action or an appeal (or a foreign enforcement action)". SPA123. But given Chevron's litigation practices, relying on

16

this interpretation presented some risk. The practical answer was to seek clarification from the district court and to seek emergency stay relief pending resolution of the motion and the larger appeal. Indeed, Paragraph 5, if read broadly, posed a dire threat not just to defendants' ability to mount an appeal in the RICO matter but also with respect to the funding needed to sustain and grow advocacy efforts ongoing around the world, including foreign enforcement actions, constitutional appellate litigation in Ecuador, and activity in a variety of in human rights, corporate accountability, and academic forums.

Undersigned and codefendants filed for stay on March 18, 2014. SPA82. They argued, among other points, that the NY Judgment threatened their "ability to raise funds to litigate this action, any appeal of this action, and foreign enforcement actions." Chevron's response confirmed these fears. The company "boast[ed]," as defendants noted in reply, "that the relief granted by this Court will effectively block enforcement of the Ecuadorian judgment anywhere on the globe because it will prevent the defendants from 'continu[ing] their efforts' to enforce the judgment and from 'attempting to obtain additional financing' for those efforts." A113, A110-111.

The district court responded to defendants' with its Clarification/Stay Opinion, published at 37 F. Supp. 3d 653. This decision interpreted and explained at length the operation of the key terms of the NY Judgment. It plainly ***rejected Chevron's view*** of the NY Judgment as prohibiting undersigned from "attempting

17

to obtain additional financing." To the contrary, the district court denied a stay on

the theory that the NY Judgment as properly understood posed no threat to the ability

of undersigned or codefendants to raise financing by selling equity in the Judgment.

The "conten[tion] that the prohibition of the monetization of any interest

[defendants'] may have in the Lago Agrio Judgment would render them unable to

finance their appeal unless the judgment of this Court were stayed," the district court

opined, "cannot be squared with the record in this case, the terms of the NY

Judgment, common sense, or all three." SPA12.

　　The district court explained that the scope of property "traceable to the [Lago

Agrio] Judgment" was limited to "proceeds" or "profit" on the Judgment. SPA8, 9.

Proceeds were such as would come from a "collection" or a settlement on the

Judgment. As such, Judge Kaplan wrote that the injunction "is quite unlikely to have

any effect on Donziger's law practice or compensation," because while

> payments of a Contingent Fee [to Donziger] would be
> 'traceable to the [Lago Agrio] Judgment,' and thus subject
> to the constructive trust imposed by paragraph 1, the same
> would not be true of Monthly Retainer payments unless
> those payments were traceable to the Lago Agrio
> Judgment. Thus, at least *as long as no collections are
> made* in respect of the Lago Agrio Judgment and funneled
> to Donziger as retainer payments, *the NY Judgment
> would not prevent Donziger from being paid, just as he
> has been paid at least $958,000 and likely considerably
> more over the past nine or ten years*.

SPA13-14. Having just presided over a trial that scrutinized undersigned's finances,

18

Judge Kaplan was intimately familiar with how undersigned "ha[d] been paid . . . over the past nine or ten years." "This case always has been financed on the movants' side by outside investors," the court noted. *Id.* at 665. Limiting the scope of "traceable" property to collections proceeds left no threat of harm because "Donziger has been litigating the case, making a living, and conducting his professional and business activities for years without receiving any contingent fees." *Id.* at 659.

Turning next to the concern that the "anti-monetization" provision in Paragraph 5 would block litigation financing necessary to fund the work of undersigned and the broader advocacy campaign, the district court again rejected any such interpretation as "wrong." *Id.* at 659. The court explained:

> The point of paragraph 5 . . . was to prevent Donziger and the LAP Representatives from avoiding the effect of the constructive trust imposed on assets in their hands that otherwise would have been direct proceeds of the Judgment by selling, assigning, or borrowing on ***their*** interests in the Lago Agrio Judgment and thus at least confusing the issue of traceability.

SPA16 (emphasis in original). The district court thus reaffirmed that the injunction in Paragraph 5 only applied to a collection or other "proceeds" or "profits" on the Lago Agrio Judgment and added a second reason why NY Judgment's effect was limited: it only applied to judgment interests specific to undersigned, Camacho, and Piaguaje. All other interest-holders, the court made clear, were "virtually

19

*unconstrained* by the NY Judgment in their ability to attempt to fund their litigation efforts against Chevron by continuing to sell shares in anything that may be recovered for whatever investors are willing to pay." SPA26 (emphasis added). The district court meant to leave no doubt, repeatedly characterizing concerns about a wider impact of the NY Judgment as "fanciful," "far fetched," and "border[ing] on the irresponsible." *Id.* at 665, 660.

No doubt was left by the district court. As undersigned has explained under oath to the district court, "the language of the April 2014 Opinion assured me and others that the scope of the RICO injunction was limited to proceeds on a collection on a judgment, meaning I could continue to assist my clients in raising funds to finance the RICO appeal, the enforcement litigation in Canada, the broader corporate accountability campaign, and specifically that I could continue to pay my own fees 'just as [I had] been paid . . . over the past nine or ten years.'" A265-66.

## B. This Court's Subsequent Reliance on the Limited Nature of the Injunctive Relief Granted in the NY Judgment

Following the district court's issuance of the Clarification/Stay Opinion, appellate proceedings commenced. Critically, undersigned and Mssrs. Camacho and Piaguaje, separately represented, did *not* challenge the overbreadth of the NY Judgment. They did not assert on appeal that it was an existential threat to the Lago Agrio Judgment. They did not challenge the decision on the grounds that it would

illegally starve funding for foreign enforcement and Ecuadorian Constitutional Court proceedings, or on the grounds that it was repugnant to the First Amendment or that it would gag undersigned from participating in speech and other advocacy contrary to the district court's views.

In turn, this Court affirmed the RICO Opinion while repeatedly emphasizing the limited nature of the relief issued by the district court:

- "The relief tailored by [this Court] . . . *does not invalidate the Ecuadorian judgment and does not prohibit any of the LAPs from seeking enforcement of that judgment* anywhere outside of the United States." RICO Affirmance at 151.

- "The district court "granted equitable *in personam* relief *that does not invalidate the Ecuadorian judgment*." *Id.* at 145 (emphasis added).

- "[T]he district court *confine[d] its injunction* to a grant of in personam relief against the three defendants-appellants *without disturbing the Ecuadorian judgment*." *Id.* at 81 (emphasis added).

- The district court granted only "limited, non-global equitable relief." *Id.* at 144.

These emphases reflect both approaches used by the district court to ensure the "confinement" of the RICO injunctive relief. First, that the NY Judgment would not "disturb" much less "invalidate" efforts to enforce the Judgment because it only applied to proceeds on a collection, which would occur only *after* the Judgment was validated by a foreign court. Second, it at most applied only to the interests of the three individuals before the district court, leaving all other interest holders "virtually

unconstrained . . . to sell shares in anything that may be recovered for whatever investors are willing to pay." 37 F. Supp. 3d at 665.

### C.    Chevron's Contempt Motion, Undersigned's Motion for Relief, the June 28 Hearing, and the District Court's Persistent Refusal to Rule

In the years that followed the district court's issuance of the NY Judgment, efforts by undersigned and the many advocates for the Ecuadorian communities continued apace: litigation of the appeal and a petition for *certiorari* to the U.S. Supreme Court; extensive trial-level and appellate enforcement litigation in Canada, resulting in favorable decisions by the Ontario Court of Appeals and the Canada Supreme Court; litigation before the Ecuador Constitutional Court, resulting in a favorable decision affirming the Lago Agrio Judgment in June 2018; advocacy around the world including "name and shame" events at Chevron's annual shareholder meetings and other public fora; community forums and advocacy events in Ecuador; and continuous public relations advocacy in the form of regular press releases highlighting important developments in the case. Chevron cannot seriously have believed that all this effort was occurring without any underlying financing. Persons on the Ecuadorian side of the case may not charge anything close to the hourly rates of Chevron's counsel, but they don't and shouldn't work for free. Until it became obvious the company was under threat in the Canadian enforcement litigation, Chevron took no steps to question or challenge the obvious continued

22

underlying financing of the litigation and associated corporate accountability campaign.

When Chevron initially filed its "non-compliance" contempt claims in March 2018, there had not been any collection on the Lago Agrio Judgment (nor has there been since). This meant that there were no "proceeds" subject to either the constructive trust or the anti-monetization provisions of the NY Judgment. Furthermore, Chevron sought a finding of non-compliance without even trying to allege that undersigned's specific interest in the Lago Agrio Judgment was being "monetized," as would be required to show a violation of Paragraph 5 even in a collections context. Instead of claiming that any defendants had pledged "*their* interests in the Lago Agrio Judgment," 37 F. Supp. 3d at 660 (emphasis original), Chevron alleged that undersigned had violated the injunction "by offering *an* interest in proceeds from the judgment to at least one New York City hedge fund." A129 (emphasis added).

Undersigned highlighted these fatal defects in Chevron's pleading in an opposition dated April 24, 2018. ECF No. 1986. On May 16, 2018, the district court issued an opinion in which it "concluded that an evidentiary hearing is appropriate with respect to" the non-compliance claims, without providing any explanation of why the interpretation of the NY Judgment in the Clarification/Stay Opinion did not foreclose contempt as a matter of law. SPA102-03. Undersigned, shocked that the

clear language of the Clarification/Stay Opinion had not immediately dispensed with the claims, promptly moved to dismiss. Undersigned argued that because no collection existed and there was no evidence of any monetization of any interest specific to the three enjoined individuals, no plausible showing had been made to allow the Chevron claims to proceed. In addition, undersigned sought declaratory relief establishing that the prior interpretation of the NY Judgment issued by the district court was indeed the law governing undersigned's conduct and would serve to adjudicate the Contempt Motion. ECF No. 1986. Undersigned then sought emergency relief because he did not feel comfortable appearing at an evidentiary hearing without certainty from Judge Kaplan as to the precise scope of the applicable injunction. *See, e.g.*, ECF No. 2032 at 2-3. The district court denied emergency relief. The day before the scheduled hearing, the court also denied the motions to dismiss and for declaratory relief on technical grounds. SPA105. Notably, the district court *still* did not explain why the clear terms of the NY Judgment did not foreclose the non-compliance claims.

As such, the evidentiary hearing proceeded on June 28, 2018. A184. Undersigned participated in various roles: as defendant, *pro se* counsel, and witness. He directed his own testimony while sitting in the witness box. The only other witness was the single evidentiary source Chevron had provided: Lee Grinburg, a portfolio manager at Elliott Management Corporation. Undersigned had met with

Mr. Grinburg on one occasion in the fall of 2017 to explore possible financing for the enforcement action in Canada. Even though Chevron called Mr. Grinburg in support of its allegations, Mr. Grinburg wholly undermined them by making clear that undersigned had never suggested using his specific interest in the Judgment as part of any financing arrangement:

> Q. Now, just turning to the substance of the meeting that Katie Sullivan and myself had with you and Jesse Cohen you don't have any recollection of me offering to sell my particular interests as an investment opportunity for Elliott, do you?
>
> A. No, you did not.

A209. Mr. Grinburg further testified he understood the term "monetize" to be limited just as the district court had set out in the Clarification/Stay Opinion, drawing a distinction between proceeds "to pay existing plaintiffs" and funds raised to be "used in an enforcement." A205. Mr. Grinburg's testimony revealed other aspects of Chevron's bad faith manipulation of his declaration.[11] The district court, however,

---

[11] For example, prior to the hearing, Chevron used a single reference in Mr. Grinburg's notes to undersigned's personal interest in order to speculate that undersigned's interest was involved in a proposed deal. *See, e.g.*, Dkt. 1987 at 8 (Chevron reply) ("Even if this reference to Donziger's interest did not alone establish that Donziger was attempting to cash in his personal stake in the Ecuadorian judgment, at a minimum it justifies the discovery Chevron seeks into Donziger's monetization efforts."). But Mr. Grinburg was Chevron's witness—it could have asked him. Mr. Grinburg ultimately testified quite clearly that the reference came only from "a brief summary of the amount of points, as it were, in terms of who or what portion of recoveries different parties would receive to the extent there was successful enforcement proceedings." A204. Chevron's speculation—to try to gain broader discovery—was knowingly in bad faith.

responded to these clearly exculpating developments not by doing what a neutral court would do and reconsidering the plausibility of Chevron's claims, but instead by issuing another inscrutable two-page order stating only that "[the] hearing now has been concluded" and without explanation authorizing Chevron to commence "non-compliance" discovery against undersigned and "any non-parties." SPA140. With a discovery mandate unconstrained by any limitation as to what was or was not proper in light of an injunction of unknown scope, Chevron proceeded to launch the abusive, intrusive, and burdensome discovery campaign described herein.

### D.     Chevron's Subsequent Unconstitutional and Abusive Discovery Campaign

Apart from the fact that *no* discovery was proper pursuant to the Contempt Motion, it is an important fact that the discovery that the district court authorized is in flagrant violation of the associational rights of undersigned and others under the First Amendment and Circuit precedent.

As noted, the *Aguinda* case and its surrounding social advocacy are widely considered to be of critical importance in the constellation of modern corporate accountability efforts. A wide range of environmental, indigenous, human rights, and other groups have supported the case and the communities affected by

Chevron's contamination.[12] Grants from philanthropic institutions are insufficient to support the kind of robust action in complex litigation across countries, continents, and diverse forums that the *Aguinda* plaintiffs have required over the years. Thus, as the district court was keenly aware, "[t]his case always has been financed . . . by outside investors," "in exchange for shares of any eventual recovery." SPA20, 17. No apology needs to be made for a financing model which is increasingly common throughout commercial litigation in the United States, England, Canada, Australia, and other countries. Litigation finance is recognized as essential to foster access to justice in circumstances where marginalized peoples are not otherwise empowered to bring and sustain their valid claims. In recent years, investors in the Ecuador pollution matter have largely been wealthy individuals of conscience who have been personally moved to provide support. Their acts of funding the enforcement action in Canada and other parts of the *Aguinda* advocacy are not just investment decisions but also expressions of the heartfelt political and social views of the funders themselves.

Chevron, too, is keenly aware that the *Aguinda* case has been funded by outside investors and donors. A long-time centerpiece of Chevron's retaliation strategy has been to inflict particularly vicious reprisals on actual and potential

---

[12] *See, e.g.*, Open Letter from Environmental Groups, Jan. 23, 2014, at https://bit.ly/2QtgHqU.

funders. Chevron's extreme, ugly, and unethical efforts to tortiously interfere with relations between the affected communities and their funders is well-documented. The company's massive infliction of pressure on one of the first major outside funders, Burford Capital, was detailed in pre-trial motion practice in this case.[13] Chevron has taken this strategy almost literally to the ends of the earth, for example by initiating overwhelming litigations in the tiny territory of Gibraltar (pop. 34,000) against funders Russ Deleon (a Harvard Law classmate of the undersigned) and London-based Woodsford Litigation Funding. Chevron also forced the firm Patton Boggs, a major in-kind supporter in past years, to succumb to its demands by litigating subpoenas requiring a massively expensive privilege review process,[14] and by putting intense pressure on the firm during a critical juncture when its partners were finalizing a merger with another firm.[15]

Chevron has also reveled in the success of a particularly ugly tactic: using its

---

[13] See, e.g. ECF No. 1329 at 16-18 (describing Chevron's elaborate efforts to "blackball" not only Burford in retaliation for its work on the Ecuador Litigation but also the firm Latham & Watkins because one of its retiring partners had joined Burford).

[14] See, e.g., ECF No. 1336 (declaration that Patton Boggs had incurred over $1.1 million in legal fees and vendor costs relating to Chevron's document and deposition subpoenas).

[15] See, e.g., Steven Mufson, *Chevron, Patton Boggs settle their epic legal battle over jungle oil pits in Ecuador*, Wash. Post, May 7, 2014, at https://wapo.st/2Pt1K2l (quoting source: "There's no way anybody is going to merge with that firm with that liability hanging over it.").

knowledge of a target's unrelated business interests to threaten it with financial ruin until it agreed to comply with Chevron's demands. As described by one victim of this tactic, Boulder-based Stratus Consulting, Chevron "concocted and executed a scheme to destroy Stratus" by "widely and publicly disseminating lurid allegations," "concocted from lies and inappropriate manipulation of documentary, visual, and testimonial evidence," that specifically targeting Stratus clients and openly urged Stratus clients "to fire Stratus." ECF No. 768 at 95-97. Undersigned highlighted these and other deeply disturbing aspects of Chevron's history in this case to the district court in a motion for protective relief. A164-71. Combined with the early indications of how Chevron was conducting itself in the post-judgment proceedings, the history was more than sufficient to establish a threat of reprisal that should have led to a significant degree of protection against compelled disclosure of identities and information concerning sources or uses of funds. *Infra* at II.D.

Instead, rather than take note of this history of Chevron blackmail and abuse, the district court flung the doors open wider for Chevron to engage in even greater abuse. In rejecting the motion, the court characterized Chevron's discovery efforts as "appropriate litigation activity," merely "exercising its rights under the law." SPA129, 131. Undersigned cannot here unravel just how distorted that characterization is, but urges the Court to review the summary at A274-80 describing what Chevron did to Ms. Sullivan, an independent financial adviser and mother of

three whose first-hand view of Chevron's contamination moved her to help the Ecuadorians by volunteering her considerable organizational and fund-raising skills. Chevron subpoenaed Ms. Sullivan and one of her key business clients; called her a "co-conspirator" and dragged her name through the mud in hysterical court filings; broke her will by forcing her to spend $170,000 of her own money trying to respond to the subpoenas, and then struck a deal for "this to be over as quickly as possible," which involved Sullivan signing a declaration attacking undersigned that was totally ghost-written by Chevron attorneys from Gibson Dunn. A274-80. The declaration contained a series of false statements about undersigned and his role in the case that Sullivan admitted on cross-examination were false or unproven. *Id.* Chevron's subsequent protests that the draft nonetheless represented Sullivan's own words were rendered laughable at Sullivan's deposition. *See* A278. This spectacle of abuse has been repeated over and over again in the past few months against people supporting the Ecuadorians. The district court's failure to provide protective relief despite the evidence that Chevron sought to suppress protected associational speech, and indeed its outright encouragement of these extremist discovery tactics, must be taken into account by this Court.

## II.   ARGUMENT

### A.   Standard of Review

"A district court's modification of an injunctive decree will not be disturbed

on appeal, absent a showing that the court abused its discretion." *Sierra Club v. U.S. Army Corps of Engineers*, 732 F.2d 253, 257 (2d Cir. 1984). However, whereas modification of preliminary injunctions allows for "exercise of the same discretion [the court] exercised in granting or denying injunctive relief in the first place," modification of final or permanent injunctions involves considerations of *res judicata* such that "a court may modify a final or permanent injunction only where conditions have so changed as to make such relief equitable, *i.e.*, a significant change in the law or facts." *Id.* "Thus . . . in the case of a final or permanent injunction, the inquiry on appeal is whether there has been such a change in the circumstances as to make modification of the decree equitable." *Id.* The Court in this case should look to whether the district court abused its discretion in modifying the injunction in light of the claimed change in circumstances. Because *no* change in circumstances were articulated much less established below, the district court arguably had no discretion to effect its modification. In any event, the means by which it did so demonstrates a clear abuse of discretion.

The Court "review[s] *de novo* the denial of a motion to dismiss under Rule 12(b)(6)." *Rothstein v. Balboa Ins. Co.*, 794 F.3d 256, 261 (2d Cir. 2015). With respect to the Supplemental Judgment, this Court "reviews a district court's order taxing costs for abuse of discretion." *ARP Films, Inc. v. Marvel Entertainment Group, Inc.*, 952 F.2d 643, 651 (2d Cir. 1991).

**B.     The District Court Improperly Modified the NY Judgment Injunction and Applied It To Authorize Otherwise Unwarranted and Abusive Discovery**

The district court clearly recognizes that it cannot find undersigned in contempt of the NY Judgment, given the clear authorization to continue financing efforts provided by the district court itself in the Clarification/Stay Opinion. In the nine months since Chevron filed its Contempt Motion, undersigned has repeatedly urged—begged even—the district court to rule on the merits under the original injunction. *See* A273 (citing to ECT Nos. 1986, 2018, 2026, 2032, 2034, 2042, 2051, and 2118). The district court has implicitly conceded that undersigned's appreciation of the authorization provided by the Clarification/Stay Opinion was reasonable.[16] This means that *contempt*, which requires an injunction sufficiently clear and unambiguous as to leave "no doubt in the minds of those to whom it was addressed [as to] precisely what acts are forbidden," *Drywall Tapers & Pointers v. Local 530*, 889 F.2d 389, 395 (2d Cir.1989), is plainly unavailable. The key consequence of this

---

[16]   *See, e.g.*, A252-53 ("THE COURT: . . . I understand what you think, Mr. Donziger, of the April 25th document said. I wrote it. I can read it. I think we may well have or there may well be a disagreement about what its significance is. I am sure there is. Certainly I know Mr. Mastro has a different view whatever it says and whatever it was could be construed as. I understand that."); SPA123 ("even if Donziger were correct that paragraph 5 of the 2014 injunction restrained him only from seeking to monetize or profit from his own interest in the Ecuadorian judgment," this "arguably has become academic in consequence of the default judgment [the district court has now entered against] the non-appearing defendants").

central fact is that the non-compliance contempt claims should have been rejected out of hand or dismissed on undersigned's motion, such that the entire discovery process that has unfolded while the district court is refusing to rule is ill-founded, as well as being abusive and constitutionally problematic.

By allowing discovery purportedly to investigate contempt claims that are wholly unsupported by the original injunction, what the district court has really done is to modify that injunction such that the non-compliance claims are plausible enough to pursue in discovery. The constructive trust and anti-monetization terms of the original injunction as understood by the Clarification/Stay Opinion can only apply to proceeds on a collection; Chevron's non-compliance claims, filed before any collection, fail as a matter of law, full stop. There is no basis for discovery into "whether the evidence ultimately will warrant a finding of contempt," SPA120, if contempt is not possible absent a non-existent collection. While the district court continues to withhold the substance of its modified injunction for plainly strategic reasons—Chevron's discovery campaign against undersigned and other allies moves ahead—the fact of the modification is undeniable.

Similarly, the original injunction strictly applied the anti-monetization provision only to the specific interests personal to undersigned or Camacho/Piaguaje—"*their* interests," with emphasis by the district court. Other interests remained "virtually unconstrained." The lack of ***any*** evidence in the

Contempt Motion that any enjoined interest was part of any actual or attempted monetization should have been fatal to the motion, as it left the district court without the baseline "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. But especially after the improper hearing only produced crystal clear evidence from Chevron's own witness that undersigned had never suggested involving his own interest, *supra* at I.C; A209, the compliance claims should have been dismissed. Instead, the district court flung open the doors for more wide-ranging and intrusive discovery without a single word of explanation. *Supra* at I.C; SPA140. While the district court's failure to dismiss the contempt claims on this record was clearly erroneous, *infra* at II.C, it also provides more evidence for the fact that the district court had as a practical matter modified the injunction in the NY Judgment and was authorizing discovery to investigate violations of something different than the injunction interpreted in the Clarification/Stay Opinion.

The district court's modification of the injunction—even apart from the unlawfulness that the modification achieves, *see infra*—was improper. Again, the relevant inquiry here "is whether there has been such a change in the circumstances as to make modification of the decree equitable." *Sierra Club*, 732 F.2d at 257. The district court effected the modification in secret through summary orders allowing otherwise unwarranted discovery. It has articulated *no* basis whatsoever for a change

34

in circumstances and its modification is a clear abuse of discretion.

Once the modification was made evident by the district court's authorization of a hearing on Chevron's "non-compliance" claims, undersigned was left in a deeply precarious position. He was unable to ascertain whether both his prior conduct and any ongoing conduct could reasonably be considered in violation of the district court's new but secret modified injunction. Under 28 U.S.C. § 2201(a), a court may "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." In this Circuit, "federal district courts *must* entertain declaratory judgment actions when the judgment 'will serve a useful purpose in clarifying and settling the legal relations in issue' or 'when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *Gonzalez v. J.P. Morgan Chase Bank*, N.A., 228 F. Supp. 3d 277, 286 (S.D.N.Y. 2017) (quoting *Cont'l Cas. Co. v. Coastal Sav. Bank*, 977 F.2d 734, 737 (2d Cir. 1992)) (emphasis added).

Undersigned's need for declaratory relief was evident. The district court's new injunction allowed it to authorize wide-ranging discovery not only against undersigned but also against any and all "non-parties" on the wide-open subject of "compliance or non-compliance" with the still-unexplained new injunction. SPA141. That discovery immediately began having the deleterious effects outlined in Section I.D: harassment and intimidation of funders and supporters, the disclosure

35

of information protected by associational rights under the First Amendment, a chilling effect on protected speech and advocacy more broadly, and a massive theft of time and effort from undersigned and others that should have been used to continue to hold Chevron accountable and pursue justice for the Ecuadorian communities in Canada and elsewhere. Whereas a finding of contempt or articulate ruling on plausibility of the contempt claims would have opened a clear path for appeal, the district court's approach would allow Chevron to pursue its aims— further demonization of undersigned and other advocates, with an ultimate objective of forcing me quit my role as advocate on this matter—while inoculating the process from appeal by hiding it under the rubric of ongoing "discovery" management. The district court's refusal to issue declaratory relief under these circumstances was a clear abuse of discretion.[17]

The district court's modification was also an abuse of discretion because it

---

[17] Although the district court highlighted procedural objections to the claim for declaratory relief, it was not without power to grant the relief. Federal courts have "unique and substantial discretion" concerning claims for declaratory relief. *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995). "Declaratory judgments and injunctions are remedies, not causes of action," *Chiste v. Hotels.com L.P.*, 756 F. Supp. 2d 382, 406 (S.D.N.Y. 2010). Where the court already has jurisdiction, 28 U.S.C.A. § 2201 requires only "the filing of an appropriate pleading." The determination of what sort of pleading is appropriate lies squarely within the "unique breadth" of the Court's discretion. *Wilton*, *supra*. Indeed, the district court had the power to construe undersigned's declaratory relief claim as action for a declaratory judgment or as a motion for summary judgment on the contempt claim. *Int'l Bhd. of Teamsters v. E. Conference of Teamsters*, 160 F.R.D. 452, 456 (S.D.N.Y. 1995).

was in violation of the law of the case doctrine, stated as follows:

> The law of the case doctrine is usually considered to have
> two branches. The first—the so-called mandate rule—
> requires trial courts to follow an appellate court's ruling
> on an issue in the same case. The second branch is more
> flexible but generally holds that a court should adhere to
> its earlier decisions in subsequent stages of litigation
> unless compelling reasons counsel otherwise.

*Tomasino v. Estee Lauder Companies, Inc.*, 2015 WL 1470177, at *1 (E.D.N.Y.

Mar. 31, 2015). *See also United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir.

2002) ("when a court has ruled on an issue, that decision should generally be adhered

to by that court in subsequent stages in the same case" unless "cogent and compelling

reasons militate otherwise"); *In re FCC*, 217 F.3d 125, 133 (2d Cir. 2000) ("the

terms of the mandate [must be] scrupulously and fully carried out and [] the inferior

court's actions on remand [must] not [be] inconsistent with either the express terms

or the spirit of the mandate."). A modification of the injunction by the district court

at this point in time violates both branches of the doctrine. First, the district court's

narrow "confinement" of its injunctive relief clearly is a key part of the RICO

Affirmance and thus the mandate of that decision. *Supra* at I.B; *cf. In re

MidAmerican Energy Co.*, 286 F.3d 483, 487 (8th Cir. 2002) (mandate

"encompasses everything decided, either expressly or by necessary implication" on

appeal). In their stay motion to the district court in response to the original

injunction, defendants argued powerfully that the NY Judgment's effect swept far

beyond the "confined" bounds the Second Circuit ultimately found to be so critical. Defendants specifically argued that shutting down the litigation financing necessary for enforcement actions would indeed "disturb[]" and effectively "invalidate" the Ecuadorian Judgment. *See, e.g.,* A91, A97, A99 ("Court's order also immediately enjoins defendants Camacho and Piaguaje from seeking to monetize the Ecuadorian judgment-activity critical to their Ecuadorian counsel's ability to raise funds to litigate this action, any appeal of this action, and foreign enforcement actions"); A113, A116; A123 (while the NY Judgment can "be read to permit monetizing the Ecuadorian Judgment for the limited purpose of continuing to litigate this action or an appeal ( or a foreign enforcement action) . . . the Ecuadorian Defendants are not in a position to gamble on the correct interpretation of this Court's Judgment"). Had defendants not received the Clarification/Stay Opinion, they most certainly would have made the same arguments on appeal and the RICO Affirmance panel would not have been able to rely on "confine[d]" nature of the NY Judgment as it did.[18] By

---

[18] The district court also entered a "default judgment" on April 23, 2018, purporting to enjoin several dozen Ecuadorian non-parties, including all the Ecuadorian named plaintiffs who had not volunteered, in exactly the same fashion as undersigned and Camacho/Piaguaje. ECF No. 1985. The entirety of the district court's personal jurisdiction analysis consisted of dropping a footnote stating that the court "has personal jurisdiction over all of the Defaulted Defendants, substantially for the reasons stated in [Dkt.] 1977" (an incorrectly docketed Chevron brief). While the default judgment is plainly illegal and will only serve to continue the district court's apparent mission of making U.S. courts appear arrogant and freewheeling in the eyes of other legal systems, it is not at issue in this appeal, nor would undersigned necessarily have standing to challenge it

only now releasing the NY Judgment from its "confinement," after affirmance, the district court has undermined a premise foundational to the affirmance and thus violate the command that a district court's "actions on remand [must] not [be] inconsistent with either the express terms or the spirit of the mandate." *In re FCC*, *supra*; *In re MidAmerican Energy Co.*, *supra*.[19]

Finally, the substance of the district court's modification dramatically transforms the nature of the relief and in this case and renders it unacceptable and unconstitutional. Funds raised through contingency interests support the work on the litigation and advocacy campaign in essentially three tracks: foreign enforcement litigation; public advocacy, including in "soft law" human rights forums; and local

---

given that it does not apply to him, nor has he been authorized by any of the supposedly enjoined defaulting parties to challenge it. Nonetheless, it is worth noting that the injunction in the default judgment, similar to the NY Judgment, poses no immediate threat of harm under the interpretation of the relevant terms as set out in the Clarification/Stay Opinion, because it would only apply to proceeds on a collection which has not happened yet. However, if the district court's new and radically broader injunction were allowed to stand, the default judgment too would suddenly become an immediate threat that clearly "disturbs" and "invalidates" the Lago Agrio Judgment in violation of this Court's mandate. This is another reason for this Court to insist that the district court adhere to its original interpretation of the NY Judgment.

[19] Because the Clarification/Stay Opinion fundamentally shaped the briefing in the case, whether or not the RICO Affirmance panel actually relied on opinion in shaping its view of the injunction's "confinement" is irrelevant. However it is notable that Chevron itself cited to the docket and Westlaw versions of Clarification/Stay Opinion in its brief. No. 14-826, Doc. 215 (Oct. 1, 2014), at 62.

and global political organizing. This Court already has mandated that the district court may not, however so much it wishes, enjoin foreign enforcement actions. That being true, it would be a mockery of formalism to say the district court can still seize every penny that would be used to pay for the counsel and costs necessary for such an action. Everyone reading this brief—especially Chevron and its lawyers at Gibson Dunn—knows that legal work doesn't happen for free. Nor can the district court constitutionally enjoin advocacy and organizing, even in support of what the district court believes, contrary to four layers of Ecuadorian courts, to be a "fraudulent" judgment. Having rendered its findings, the district court's view is distressingly reductionist: "the Ecuadorian judgment is a fraud and Donziger's activities extortionate." SPA119. This leans perilously close to a worldview where courts, as a matter of course in issuing their judgments, enjoin the losing party from ever-after disagreeing or speaking out in dissent as to the court's conclusion.

Perhaps the reason courts are rarely as tempted as the district court to issue "no public disagreement" injunctions stems not only from the district court's ire but from the fact that losing litigants rarely receive broad public support when they complain openly about injustice delivered by U.S. courts. Society actually has a fairly low tolerance for "sore losing." But here, challenges to what U.S. courts have done with the RICO case has been generating broad public support, with more people than ever flocking to support the cause of the affected communities against

Chevron. When average people see the abandoned oil pits in Ecuador and hear Chevron say there is "no risk" to the surrounding communities, they get angry. When they hear that Chevron merged of all Texaco's assets into its upstream and downstream operations but purported to dump all its liabilities into a shell company via a "reverse triangular merger," they get angrier. When they hear Chevron say that *it*, not the sick and dying Ecuadorians, is the real hapless abused victim here, and that its only remedy was to launch a two-billion dollar collateral *ad hominem* attack on the lawyers in its home country courts, they get angrier still. When they hear that Chevron's chosen court decided it was okay to rely on testimony from an admittedly corrupt "fact" witness to whom Chevron has improperly paid huge sums as the sole direct evidence to support a "bribery" allegation, they tend to just write off the district court's actions in this case entirely. All this public reaction is probably deeply disturbing to the district court, as it should be. But the Constitution prevents the district court from seeking to "solve" its problem by stuffing a gag in undersigned's or anyone else's mouth.

## C.    The District Court Erred in Denying the Motion to Dismiss

The task facing the district court on undersigned's motion to dismiss was simple. In the Clarification/Stay Opinion, the district court had worked hard to assure defendants' that their concern that the NY Judgment would have prohibit financing appellate and collateral litigation was a non-starter. The NY Judgment only applied

to proceeds on a collection; thus there was no threat to undersigned's ability to be paid non-contingency fees (notwithstanding the constructive trust placed over all his assets "traceable" to the Judgment), nor the ability to raise funds from any interest in the Judgment other than the interests of the three defendants. Indeed, the anti-monetization provision in Paragraph 5 generally was intended only "to prevent Donziger and [Camacho/Piaguaje] from avoiding the effect of the constructive trust . . . [over] direct proceeds" set out in Paragraphs 1 and 2. *Supra* at I.A. While the term "proceeds" was not defined, it could not be understood to include fees and expenses paid to undersigned because undersigned was authorized to continue being paid "just as he ha[d] been paid" in previous years. *Id.* "[A]s long as no collections are made in respect of the Lago Agrio Judgment," *id.*, there are no "proceeds" subject to the constructive trust, there is no basis to invoke the anti-monetization injunction in Paragraph 5, and Chevron's non-compliance allegations fail as a matter of law. Similarly, the Clarification/Stay Opinion made clear that even when Paragraph 5 applies, it applies only to "interests" specific to undersigned or Camacho or Piaguaje. Chevron produced zero evidence that such interests were ever involved in any financing of judgment interests. *Supra* I.C. Its bad faith speculation that such interests might have been involved was shot down by its own witness at the June 28 evidentiary hearing. *Id.* Under the familiar pleading standards, the district court was left without "factual content [that would] allow [it] to draw the reasonable inference

that [undersigned was] liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678 (2009), because Chevron has failed to provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The district court's denial of the motion to dismiss the non-compliance contempt claims was plainly in error.

The Court should find this error now in this appeal because in the circumstances, the district court's denial "satisfies the 'collateral order' exception articulated in *Cohen*." *Bernard v. County of Suffolk*, 356 F.3d 495, 501 (2d Cir. 2004); *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 545-46 (1949). "Under the collateral order doctrine, a non-final order is appealable only if it conclusively determines the disputed question, resolves an important issue completely separate from the merits of the action, and is effectively unreviewable on appeal from a final judgment." *Woods v. Rondout Valley Cent. Sch. Dist. Bd of Educ.*, 466 F.3d 232, 235 (2d Cir. 2006). As set out above, the "merits" of the contempt proceeding still ongoing below concern whether undersigned will be found liable for violating a new, modified interpretation of the NY Judgment under which the anti-monetization provision in Paragraph 5 potentially applies to transactions involving interests in the Lago Agrio Judgment other than those of undersigned, Camacho, and Piaguaje. Presumably undersigned will learn about the contours of this new injunction when the district court finds him in contempt, or not, based on

how his conduct aligns with the contours of the as-yet unknown new injunction. But undersigned's right to have his conduct assessed under the original injunction, as set out in the Clarification/Stay Opinion, has been conclusively decided by the denial of the motion and by the district court subjecting undersigned (and non-parties) to a barrage of discovery that would not be warranted under a proper application of the original injunction. The same right is also effectively unreviewable on a later appeal, because undersigned will have already been subject to the discovery under circumstances in which the discovery is not burdensome and distracting but effects a violation of undersigned's (and others') First Amendment associational rights.

### D. The District Court's Error Is Compounded By the Flagrantly Unconstitutional Nature of Chevron's Discovery Campaign

The constitutional problems with the discovery demanded by Chevron were argued to the district court in a motion for protective relief filed. A160. The district court denied the motion on June 27, 2018, SPA105, largely on the basis of yet more *ad hominem* attacks on undersigned, *see, e.g.*, SPA119 ("In short, the Ecuadorian judgment is a fraud and Donziger's activities extortionate."), combined with characterizing Chevron's established practice of discovery-based intrusion and intimidation as Chevron merely "exercising its rights under the law." SPA131. In so deciding, the district court abused its discretion by ignoring critical factual background and Circuit constitutional precedent. The constitutional violations that

were utterly predictable under the circumstances but ignored by the district court also underscore the importance of appreciating the district court's refusal to dismiss the non-compliance contempt claims as a *Cohen* collateral order that must be reviewed in this appeal.

"Supreme Court decisions establish that the First Amendment is implicated by government efforts to compel disclosure of names in numerous speech-related settings, whether the names of an organization's members, the names of campaign contributors, the names of producers of political leaflets, or the names of persons who circulate petitions." *Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 202 (2d Cir. 2004). The use of court authority and discovery procedures by a private litigant in a civil case to compel disclosure implicates the same concerns. *See, e.g.*, *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 118 (2d Cir. 2010); *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, No. 75 CIV. 5388, 1985 WL 315, at *8 (S.D.N.Y. Feb. 28, 1985) ("Defendants' interrogatories entail an extensive inquiry into plaintiffs' associations and their finances, and there is a strong interest in maintaining the privacy of this information, particularly when the group's causes are unpopular.")

The associational rights at stake were first addressed in the seminal case of *NAACP v. Alabama*, in which the Supreme Court held that disclosure could violate First Amendment rights, at least where a party could show that "revelation of the

identity of its [] members [could] expose[] these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility," because "compelled disclosure [would be] likely to affect adversely the ability of [the party] and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate." 357 U.S. 449, 462-62 (1958) ("*NAACP v. Alabama*"); *cf. id.* at 462 ("Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs."). From this constitutional origin "has been derived a qualified privilege, which applies to compelled disclosure of the identity of an association's members or sympathizers." *Krishna Consciousness*, 1985 WL 315, at *8 (citing, *inter alia*, *Gibson v. Florida Legislative Committee*, 372 U.S. 539, 544 (1963); *Bates v. Little Rock*, 361 U.S. 516, 523–24 (1960); *Eilers v. Palmer*, 575 F. Supp. 1259, 1261 (D. Minn. 1984). The privilege applies equally to "compelled disclosure of the sources or uses of an organization's funds." *Id.* (citing, *inter alia*, *Buckley v. Valeo*, 424 U.S. 1, 66 (1976) ("the invasion of privacy of belief may be as great when the information sought concerns the giving and spending of money as when it concerns the joining of organizations, for [f]inancial transactions can reveal much about a person's activities, associations, and beliefs.")). "Such chilling of expression is repugnant to the First Amendment." *Citizens United v. Schneiderman*, 882 F.3d 374, 381 (2d Cir.

2018).

Where the First Amendment rights and applicable privileges are implicated, disclosure "should not be ordered unless it is substantially related to a compelling governmental interest." *St. German of Alaska E. Orthodox Catholic Church v. United States*, 840 F.2d 1087, 1094 (2d Cir. 1988). In the case of private litigant discovery requests proceeding under the authorization of the court, this means, at minimum, that a "party must show that the information sought 'is crucial to the party's case, or that it goes to the 'heart of the claims.'" *Krishna Consciousness*, 1985 WL 315, at *8 (quoting *Black Panther Party v. Smith*, 661 F.2d 1243, 1268 (D.C. Cir. 1981), and *Int'l Union v. Nat'l Right to Work*, 590 F.2d 1139, 1152-53 (D.C. Cir. 1978)). *See also id.* (noting that "the courts have phrased the applicable standard in different ways" but "have consistently emphasized the strictness of the showing that the inquiring party must make"). First Amendment concerns may also be addressed by narrowly tailoring discovery requests to eliminate or mitigate the threat to associational rights. *See, e.g.*, *Local 1814 v. Waterfront Comm'n of New York Harbor*, 667 F.2d 267, 274 (2d Cir. 1981) ("[w]e approve the District Court's modification of the subpoena to permit disclosure on a random basis of only 10%" of the requested discovery).

Undersigned and funders, supporters, and allies of the affected Ecuadorian communities are all clearly "pursu[ing] [a] collective effort to foster beliefs which

47

[they] admittedly have the right to advocate," *NAACP v. Alabama* at 463. These beliefs include not just the conviction of funders and supporters in the importance of remediating the extant contamination at Chevron's former operations sites in the Ecuadorian Amazon, but their belief in the necessity of confronting certain root causes—international and cross-cultural double standards, restrictive views of corporate obligations, and a perceived lack of accountability within larger political, legal, and economic structures—that allowed the contamination to happen in the first place. As described in Section I.D and as detailed to the district court, A164-71, Chevron has responded to this exercise of associational rights with a vicious campaign of reprisals in the form of collateral litigation, public relations pressure including outright "demonization," and other judicial and extrajudicial retaliation and harassment aimed directly at suppressing the protected associational speech of funding, organizing, and spending. These reprisals were plainly aimed at "drying up" support for the *Aguinda* case from specific funders, potential future funders, and other types of supporters in the public discourse generally.

Given Chevron's history of reprisals, current and future allies and supporters of the *Aguinda* case who have chosen to maintain their anonymity are properly protected by the "qualified privilege which applies to compelled disclosure of the identity of an association's members or sympathizers." *Krishna Consciousness*, 1985 WL 315, at *8. "[P]rivacy [of] group association" for such allies is truly

48

"indispensable to preservation of [their] freedom of association," *NAACP v. Alabama* at 462. Chevron's 'non-compliance" discovery must be seen as what it is: the immediate delivery of a new disincentivizing blow to dissuade current and potential supporters from associating with undersigned and the *Aguinda* case generally, and the platform for a potential new round of reprisals targeting the loose coalition of advocates who have sought to hold Chevron accountable. The actual and threatened harm is significant, concrete, and imminent. At one level, the harm of Chevrons' discovery campaign is its mere existence, because investors, philanthropists, activists, service-providers, and other supporters are less likely to associate with the *Aguinda* litigation and the larger Ecuadorian cause. While this already-inflicted harm is partially irreparable, it can also be significantly mitigated if this Court properly recognizes the First Amendment protections at stake, and makes clear that future efforts to chill association rights with improper discovery requests will not be tolerated.

**E.  The District Court Abused Its Discretion by Looking Past Chevron's Misconduct and Other Equitable Factors to Issue an Astronomical Award of Costs**

"Rule 54(d)(1) is phrased permissively . . . because it permits a court to refuse to impose costs on the losing party at all." *Wilder v. GL Bus Lines*, 258 F.3d 126, 129 (2d Cir. 2001). "Courts in this Circuit have recognized several grounds upon which it is appropriate to deny costs to the prevailing party in an action." *AXA*

49

*Versicherung AG v. New Hampshire Ins. Co.*, 769 F. Supp. 2d 623, 625 (S.D.N.Y. 2011) (citing *Moore v. County of Delaware*, 586 F.3d 219, 221 (2d Cir. 2009)). The district court must consider "whether awarding costs would be 'inequitable' or 'unfair.'" *Id.* But many of the "key" grounds identified by the Court in this regard were utterly disregarded, distorted, or misapplied by the district court. While the district court "has broad discretion in awarding costs," *L–3 Communications Corp. v. OSI Sys., Inc.*, 607 F.3d 24, 30 (2d Cir. 2010), that discretion, like any other, "is not unlimited." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 558 (2010). Among many other reasons, forcing a sole practitioner and human rights advocate to empty out his life savings to an oil company that grosses $250 billion per year is an outrage on its face and a clear abuse of discretion. The Court should vacate the district court's award of costs and the Supplemental Judgment.

A "key" ground identified by the Court for potential unfairness that would lead to not awarding costs is where "the losing party can demonstrate misconduct on the part of the prevailing party." *AXA Versicherung*, 769 F. Supp. 2d at 625. In opposing the taxation of costs, undersigned focused in particular on the fact that Chevron and its counsel had engaged in significant misconduct in the RICO proceedings. While examples abound, undersigned focused on the excessive payments made and benefits provided to "fact" witness Alberto Guerra, who was the only witness at trial who testified to the existence of a "bribe" arrangement to

"ghostwrite" the Lago Agrio Judgment. Undersigned cited materials indicating that Guerra's testimony had been forensically disproven by a digital analysis of the issuing judge's computers in chambers. ECF Nos. 1925, 1931, 1941. Although in undersigned's view Chevron and its counsel had committed misconduct just in making the payments, *see* A126, Cert. Amicus, *supra* note 1 the now-proven falsity of the testimony raises the possibility that Chevron and counsel knew that Guerra's testimony was false all along. In fact, such knowledge seems not just possible but likely, given the record of how extensively and carefully Chevron lawyers and investigators from Kroll, Stroz Friedburg, and other specialists all scrutinized Guerra's digital media, online accounts, and financial and other records, and **prepared him for 53 days** for his RICO testimony.[20] Undersigned argued that this misconduct precluded an award of costs, or in the alternative, that the court must at least allow undersigned to conduct a limited amount of discovery into what Chevron knew and when regarding the Guerra perjury, in order "to make a record on the factors that the law requires [the district court] to apply in exercise of its otherwise broad discretion." ECF No. 1931 at 3.

The district court's response was to dismiss this entire argument on purported waiver grounds as follows:

> [A]lthough [undersigned] referred to Chevron's payments
> to Guerra in his appellate briefs, he never made in the

---

[20] No. 14-826, Doc. 461-1 at 8.

> Court of Appeals the argument that he now makes here –
> *viz.* that costs should be denied to Chevron because its
> actions with respect to Guerra were improper – although
> that argument too was available to him on direct appeal.

SPA56. Thus, the district court concluded, undersigned had "waived" the right to

argue the misconduct factor in his opposition to taxation.

The district court's conclusion is brutally unfair. The merits appeal in this

action was extraordinarily complex and overburdened, arising from a seven-week

trial with dozens of witnesses and thousands of exhibits, in the context of a litigation

marked by decades of prior and collateral proceedings. Appellant counsel identified

19 viable legal issues—so many that it prepared charts to try to guide the RICO

Affirmance panel in counsel's reply. 14-826, Doc. 317 at 3-4. It was due to the

limited space available to properly address these strong legal arguments that

appellant counsel chose not to formally challenge the district court's "fortress of

hundreds of pages of alternative findings and drive-by credibility determinations,"

14-826, Doc. 501-1 at 1 (although, as even the district court acknowledges,

undersigned also argued "at length" against the veracity of the district court's

findings). Now the district court would hold that undersigned's failure to add an

argument on the factors involved in a future costs application to that already

overburdened brief results in waiver. This is unreasonable, and in any event the

fairness that the district court must seek with its use of its discretion should confront

the circumstances at the time the award is sought. The district court should have

seriously considered the misconduct allegations and either not awarded costs on account thereof or allowed undersigned to take discovery sufficient to establish his misconduct allegations.[21]

The district court completely ignored a number of other arguments made by undersigned in opposition to the taxation of costs. In particular, undersigned explained in detail how Chevron had forfeited its right to certain special master fees as costs, at least as an equitable and fairness matter, when it failed to timely seek allocation of those fees under a very specific district court order requiring that Chevron move for allocation "[w]ithin 14 days after the later of (a) the submission of the special masters' final billings and (b) the determination of any objections thereto by Chevron." ECF Nos. 1925, 1931, 1941 at 8-9. Chevron's decision not to move for allocation was strategic and not holding Chevron to account for its decision at this point in time is unfair and prejudicial to undersigned, as argued in the pleadings below. Undersigned also made highly detailed arguments regarding the

---

[21] There is no apparent limitation on where and when misconduct relevant to the equitable analysis must have occurred. Thus as argued below, the district court should have considered Chevron's epic misconduct in Ecuador as yet another reason to avoid awarding costs to such a wrongdoer. While the district court excluded all environmental evidence and arguments from the RICO trial, the fact remains that Chevron is responsible for an horrific environmental and humanitarian catastrophe that and continues to inflict illness and death on the people of Ecuador to this day. Ecuadorian trial and appellate courts have also found that Chevron engaged in significant litigation misconduct in the Ecuador proceedings. The district court completely ignored this argument below, which constituted an abuse of discretion.

relevance, for the required fairness and equitability analysis, of the clear evidence of the bias of the special masters against undersigned in the conduct of their work and Chevron's broader abuse of the discovery process. ECF Nos. 1941 at 4-8. None of the foregoing arguments were even mentioned in the district court's cursory analysis. The district court's failure to even consider these arguments constituted an abuse of discretion and require this Court to vacate the Supplemental Judgment.

Finally, it is an abuse of discretion and a violation of undersigned's Seventh Amendment rights to order the undersigned, a sole practitioner who works out of the kitchen of his two-bedroom apartment, to reimburse one of the world's wealthiest corporations nearly a million dollars in court costs incurred as part of the corporation's strategic collateral attack on undersigned's work on an important corporate accountability case. It just is, and any average person encountering the facts of the situation, or this Court's forthcoming decision in this appeal, knows it in their bones. Certainly no jury would ever make such an award, and the Seventh Amendment guarantees a jury to a defendant in a civil case so long as "the amount in controversy shall exceed twenty dollars." It may be that the law doesn't typically provide for jury consideration of costs because they are "equitable," but costs are supposed to be "limited to relatively minor, incidental expenses." *Taniguchi v. Kan Pac. Saipan*, 566 U.S. 560 (2012). Undersigned is unaware of any case where as party sought costs of such magnitude as Chevron seeks here. There is also relevance

54

in the fact that undersigned was denied a jury in this matter as a result of a strategic gambit by Chevron two weeks prior to trial, in which it waived all damages against undersigned to secure a bench trial in front of the judge who had been castigating undersigned publicly since before the RICO proceeding even began. *Supra* note 4. Chevron's waiver was richly rewarded, ultimately with the RICO Opinion itself. In fairness and equitability, Chevron must now face at least the minimal consequence of not being able to pursue undersigned for damages effectively recast as claims for fees and costs.

## CONCLUSION

For the foregoing reasons, the district court's Supplemental Judgment should be vacated and the case should be remanded with instructions to dismiss Chevron's non-compliance contempt claims and to enforce the NY Judgment only as consistent with the district court's prior interpretation and this Court's decision.

Dated: December 10, 2018         Respectfully submitted,

                              s/    Steven R. Donziger

                          Steven R. Donziger
                          245 W. 104th Street, #7D
                          New York, NY 10025
                          (917) 566-2526
                          sdonziger@donigerandassociates.com

                          *Pro se*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)

I hereby certify that my word processing program, Microsoft Word, counted 13,921 words in the foregoing brief, exclusive of the portions excluded by Rule 32(a)(7)(B)(iii).

Dated: December 10, 2018                        s/    Steven R. Donziger

                                                    Steven R. Donziger

## CERTIFICATE OF SERVICE

I hereby certify that on December 10, 2018, I electronically filed the foregoing Brief for Defendants-Appellant Steven Donziger with the Clerk of the Court of the U.S. Court of Appeals for the Second Circuit by using the Appellate CM/ECF system. All participants are registered CM/ECF users, and will be served by the Appellate CM/ECF system.

Dated: December 10, 2018                     s/    Steven R. Donziger

Steven R. Donziger