## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

```
--------------------------------------------------------x
                                                        :
CHEVRON CORPORATION,                                    :
                                                        :
                      Plaintiff,                        :
                                                        :
            v.                                          :    Case No. 11 Civ. 0691 (LAK)
                                                        :
STEVEN DONZIGER, et al.,                                :
                                                        :
                      Defendants.                       :
                                                        :
--------------------------------------------------------x
```

## MEMORANDUM OF LAW IN SUPPORT OF CHEVRON CORPORATION'S MOTION TO HOLD AARON MARR PAGE AND FORUM NOBIS PLLC IN CONTEMPT OF COURT FOR THEIR VIOLATION OF THE RICO AND DEFAULT JUDGMENTS

# TABLE OF CONTENTS

Page

I.  PRELIMINARY STATEMENT ............................................................. 1

II. BACKGROUND ............................................................................ 4

    A.  The RICO and Default Judgments ........................................... 4

    B.  Page Has Assisted Donziger in His Unlawful Conduct Since 2005 ...................... 6

    C.  Page Assisted Donziger's Efforts to Corrupt the Ecuador Litigation and His Extortionate and Fraudulent Scheme Against Chevron ........................................... 7

    D.  Page Assisted Donziger in Obstructing the Section 1782 Actions ...................... 10

    E.  Page Had Actual Knowledge of the RICO Judgment and the Default Judgment ........................................................................... 10

    F.  The Court Held Donziger in Contempt of Paragraphs 1 and 5 of the RICO Judgment ............................................................................. 12

    G.  Page Aided-and-Abetted Donziger's Contemptuous Acts ................................. 13

        1.  Page Drafted and Managed Donziger's Investment Agreements, in Contempt of the RICO Judgment ............................................. 14

        2.  Page Assisted Donziger in Responding to Investor Inquiries, in Contempt of the RICO Judgment ............................................. 17

        3.  Page Played a Key Role in the Monetization of the Ecuadorian Judgment to Compensate Himself, Donziger, and Others, in Contempt of the RICO Judgment ............................................. 18

        4.  Page Transferred Investor Funds to Donziger's Personal Account, in Violation of the RICO Judgment ......................................... 20

III. ARGUMENT ................................................................................. 22

    A.  The Court Can Hold Nonparties Like Page in Contempt for Violating an Injunction as an Agent or Attorney of, or by Working in Active Concert or Participation With, a Party Bound by the Injunction ............................................ 22

    B.  The Court Found Donziger Was in Contempt of Paragraphs 1 and 5 of the RICO Judgment, Among Other Things, by Monetizing and Personally Profiting from the Ecuadorian Judgment ........................................... 23

    C.  Page Is in Contempt of Paragraphs 1 and 5 of the RICO Judgment by Helping Donziger Monetize and Personally Profit From the Ecuadorian Judgment .............................................................................. 24

i

## TABLE OF CONTENTS
(continued)

Page

D.    Page Is in Contempt of the RICO and Default Judgments as a Result of His May 2018 Transfer of Funds to Donziger, Even If Those Funds Belonged to the FDA ............................................................................................................ 27

E.    Page's Contempts Should Also Be Attributed to His Law Firm, Forum Nobis .................................................................................................................... 29

F.    This Court Has Jurisdiction to Hold Page and Forum Nobis in Contempt.......... 30

G.    The Court Should Order Page to Remedy Chevron's Losses Caused by His Contempt, Hold Him Jointly and Severally Liable for the Contempt Money Judgments Against Donziger, and Assign His Interest in the Ecuadorian Judgment to Chevron ....................................................................................... 31

IV.    CONCLUSION ............................................................................................................ 35

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alemite Mfg. Corp. v. Staff*,
　42 F.2d 832 (2d Cir. 1930)...................................................................................22

*Aviv v. Brainard*,
　18-cv-5088 (PKC) (S.D.N.Y. Apr. 18, 2019) ........................................................33

*Aviv v. Brainard*,
　No. 18-cv-5088 (PKC), 2018 WL 4927912 (S.D.N.Y. Oct. 11, 2018) ...........22, 24, 25, 30, 33

*Bear U.S.A., Inc. v. Kim*,
　71 F. Supp. 2d 237 (S.D.N.Y. 1999)..............................................22, 24, 26, 29, 33

*Chevron Corp. v. Donziger*,
　974 F. Supp. 2d 362 (S.D.N.Y. 2014).......................................1, 4, 8, 9, 10, 21, 32

*Cohen v. Maher*,
　No. 16 CV 265 (VB), 2017 WL 663553 (S.D.N.Y. Feb. 17, 2017) .......................31

*Eli Lilly & Co. v. Gottstein*,
　617 F.3d 186 (2d Cir. 2010)...........................................................................22, 30

*Gucci Am., Inc. v. Weixing Li*,
　768 F.3d 122 (2d Cir. 2014)................................................................................30

*Inst. of Cetacean Research v. Sea Shepherd Conservations Soc'y*,
　774 F.3d 935 (9th Cir. 2014) ..............................................................................26

*Milburn v. Coughlin*,
　83 F. App'x 378 (2d Cir. 2003) ...........................................................................31

*N.Y. State Nat. Org. for Women v. Terry*,
　886 F.2d 1339 (2d Cir. 1989)..............................................................................32

*New York City Dist. Council of Carpenters Pension Fund v.*
　*G & M Drywall Sys. Inc.*, No. 07 CIV. 1969 (CM), 2010 WL 2291490
　(S.D.N.Y. June 1, 2010)......................................................................................33

*People of State of N.Y. by Vacco v. Operation Rescue Nat.*,
　80 F.3d 64 (2d Cir. 1996)....................................................................................27

*Shady Records, Inc. v. Source Enterprises, Inc.*,
　351 F. Supp. 2d 64 (S.D.N.Y. 2004)....................................................................34

*In re SkyPort Glob. Commc'ns, Inc.*,
　No. 08-36737-H4-11, 2013 WL 4046397 (Bankr. S.D. Tex. Aug. 7, 2013)..........25

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Spectacular Venture, L.P. v. World Star Int'l, Inc.,*
  927 F. Supp. 683 (S.D.N.Y. 1996) ........................................................29

*Telenor Mobile Commc'ns AS v. Storm LLC,*
  351 F. App'x 467 (2d Cir. 2009) ..........................................................29

*Telenor Mobile Commc'ns AS v. Storm LLC,*
  587 F. Supp. 2d 594 (S.D.N.Y. 2008)...................................................29

*Tenn. Ass'n of Health Maint. Orgs., Inc. v. Grier,*
  262 F.3d 559 (6th Cir. 2001) ................................................................25

*United States v. Paccione,*
  964 F.2d 1269 (2d Cir. 1992)................................................................22

*Vuitton et Fils S. A. v. Carousel Handbags,*
  592 F.2d 126 (2d Cir. 1979)..................................................................31

*Weitzman v. Stein,*
  98 F.3d 717 (2d Cir. 1996)..............................................................31, 33

*Weston Capital Advisors, Inc. v. PT Bank Mutiara,*
  667 F. App'x 15 (2d Cir. 2016) .......................................................32, 33

**Statutes**

28 U.S.C. § 1782.........................................................................................10

**Rules**

Fed. R. Civ. P. 65(d)(2)...............................................................................22

Local Civil Rule 83.6(a) ........................................................................33, 34

New York Rule of Professional Conduct 1.9(a) .........................................28

New York Rule of Professional Conduct 1.15(a) .......................................24

**Treatises**

Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2956 (3d ed.) ..................22

## I.      PRELIMINARY STATEMENT

For more than a decade, Aaron Marr Page has played a critical role in Steven Donziger's efforts to extort billions of dollars from Chevron Corporation ("Chevron").  This Court previously found that Page was working under Donziger's direction in 2006 when he prepared baseless remediation cost estimates that were submitted under the signature of an Ecuadorian court expert and were designed to incite investigations by U.S. authorities and to "make media/court/CVX [Chevron] itself start thinking in terms of billions." *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 410, nn.198–200 (S.D.N.Y. 2014).  Outtakes from the film *Crude* show that Page was present at the Ecuadorian courthouse when Richard Cabrera—the supposedly independent Ecuadorian court expert—delivered, unannounced, the fraudulent, multi-billion dollar "global damages assessment" that Donziger's team secretly wrote.  *See* Ex. 1.[1]  And Page helped draft the "highly misleading" Fajardo Declaration that was filed in this Court (and other federal courts), falsely attesting to the bona fides of the Cabrera Report while concealing its corrupt origins.  *See Donziger*, 974 F. Supp. 2d at 462; Ex. 31.

Even after this Court found that Donziger had violated RICO and enjoined him and all persons working in concert with him from attempting to monetize or profit from the Ecuadorian judgment, Page continued to assist Donziger in his wrongful acts in violation of the RICO Judgment.  Page worked hand-in-glove with Donziger to sell more shares in the Ecuadorian judgment and thereby to obtain millions of dollars, the bulk of which went into Donziger's pockets, despite Page's actual knowledge of this Court's RICO Judgment.  For these post-RICO Judgment efforts, Donziger paid Page almost $175,000 and awarded him a new interest in the Ecuadorian

---

[1]  Unless otherwise noted, all exhibit references are to the Declaration of Anne Champion, filed concurrently herewith.

judgment.  And although Page is currently a licensed lawyer, he has obstructed discovery in these enforcement proceedings, including by directing other illicit fundraising conspirators to destroy evidence in order to keep it from Chevron.  *See* Ex. 2.  Page's participation has been essential to Donziger's post-RICO Judgment moneymaking scheme, with Donziger confessing that he "cannot do this alone" (Ex. 3) and referring to Page as his "right hand person" (Ex. 4).  The Court has already found that Donziger's actions constitute contempt of the RICO Judgment, and Page is also in contempt for his own actions in concert and participation with Donziger.

Paragraph 8 of the RICO Judgment and Federal Rule of Civil Procedure 65 make Page just as liable as Donziger for violations of the RICO Judgment, because Page was Donziger's agent and attorney, and because Page was acting in concert and participation with Donziger to commit the contemptuous acts.  Under Rule 65(d)(2), an injunction binds a party's "agents, servants, employees, and attorneys" as well as "other persons who are in active concert or participation" with them, so long as those persons have "actual notice of it by personal service or otherwise."  It is beyond dispute that Page had actual knowledge of the RICO Judgment.  Chevron served Page with the RICO Judgment just days after it was issued, in a Maryland federal court action in which Page was a party.  Ex. 35.  And emails and other documents show that Page was intimately familiar with the RICO Judgment and its injunction.  *E.g.*, Ex. 5 (Feb. 20, 2018 email from Page attaching the RICO opinion, the Second Circuit's affirmance, and a document titled "KaplanRebuttal" purporting to respond to the Court's factual findings); Ex. 6 (March 4, 2014 and March 6, 2014 Page tweets and re-tweets criticizing the RICO Judgment).  Page testified that he has read the RICO injunction.  *See* Ex. 7 at 138:17–19.

Direct documentary evidence confirms that Page both acted as Donziger's agent and aided and abetted Donziger's contempt of the RICO Judgment and the Default Judgment.  As this Court

has already found, Page acted as "Donziger's partner" and helped him create "an investment op-portunity memorandum" that Donziger used to solicit investments in the Ecuadorian judgment. Dkt. 2209 at 20.  Page demanded that Mary Katherine Sullivan transfer $342,045.16 in investor funds to his own account, threatening to sue her if she refused, and, soon after receiving the funds from Sullivan, Page in May 2018 transferred the funds to Donziger in exchange for a $50,000 kickback.  *Id.* at 27, 31–32 (citing Sullivan Decl. (Dkt. 2116) ¶¶ 56–59 & Ex. 39).  And Page did much more to aid Donziger's contemptuous acts.  Page drafted, revised, and translated many of the agreements that Donziger used post-RICO to bring in "2.4 million from investors in exchange for interests in the Ecuadorian judgment totaling at least 1.28525 percent . . . ."  Dkt. 2209 at 53. Page answered investors' and potential investors' questions—sometimes even drafting responses for Donziger or others to send—in ways that intentionally misled investors about Donziger's (and his own) fraud and this Court's findings in this action.  And Page advised Donziger on related matters, such as Donziger's purported authority to receive and direct investor funds.

Page also had actual notice of the Court's April 23, 2018 Default Judgment against the Amazon Defense Front ("FDA") and the other defendants who defaulted in this action.  Dkt. 1985. On May 7, 2018—two weeks after the Default Judgment issued—Page wrote an email to Donziger admitting that he (Page) was "aware that Judge Kaplan recently issued a Default Judgment against the FDA and others (Dkt. 1985) that purports to apply the same terms of the Operative Judgment to the FDA and others."  Ex. 8.  Paragraph 1 of this Judgment required the FDA, its agents, and attorneys to transfer and assign to Chevron any property traceable to the fraudulent Ecuadorian judgment.  Yet Page received $342,045 of investor funds purportedly for the FDA and, as an at-torney and agent for both the FDA (bound by the Default Judgment) and Donziger (bound by the

RICO Judgment), transferred them to Donziger instead of to Chevron, in violation of both judgments. Dkt. 2209 at 27–30.  That, too, was an act of contempt.

Many, if not all, of Page's acts of contempt were carried out through and on behalf of his one-man law firm, Forum Nobis PLLC, which Page completely dominates.  Accordingly, Forum Nobis is liable for and equally chargeable with Page's numerous contempts.

For these reasons, the Court should find Page and Forum Nobis in contempt of Paragraphs 1 and 5 of the RICO Judgment (and/or Paragraph 1 of the Default Judgment); hold them jointly and severally liable with Donziger for the judgments this Court has entered against Donziger in the amounts of $666,476.34 and $3,433,384.30; enter a judgment against Page and Forum Nobis for the $342,045.16 that they transferred to Donziger (taking into account that a small portion of this $342,045.16 overlaps with the judgment for $666,476.34); and order Page and Forum Nobis to assign any and all interests in the Ecuadorian judgment to Chevron, whether held directly or through any corporate vehicle.  Finally, the Court should make Chevron whole by awarding Chevron its attorneys' fees incurred in bringing the present motion.

## II.        BACKGROUND

### A.        The RICO and Default Judgments

As the Court has explained in great detail, *see generally Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362 (S.D.N.Y. 2014), Donziger, Page, and various other U.S. and Ecuadorian lawyers procured a multi-billion-dollar judgment against Chevron in Ecuador using corrupt means, including bribery of judges and a supposedly neutral court expert.  Based on this misconduct and other illegal actions, Chevron brought this action against Donziger, his law firms, his Ecuadorian clients (including the FDA), and certain Ecuadorian attorneys, among others.  After a lengthy trial, this Court found Donziger liable under RICO and New York common law.  *See id.*  The Court entered judgment in favor of Chevron on March 4, 2014 against Donziger and his law firms, as well as the

two Ecuadorian plaintiffs who appeared in this action (the "RICO Judgment").  Dkt. 1875.

The RICO Judgment "impose[d] a constructive trust for the benefit of Chevron on all prop-

erty, whether personal or real, tangible or intangible, vested or contingent, that Donziger has re-

ceived, or hereafter may receive, directly or indirectly, or to which Donziger now has, or hereafter

obtains, any right, title or interest, directly or indirectly, that is traceable to the Judgment or the

enforcement of the Judgment anywhere in the world . . . ."  *Id.* ¶ 1.  The RICO Judgment also

ordered that "Donziger . . . is hereby further enjoined and restrained from undertaking any acts to

monetize or profit from the [Ecuador] Judgment . . . , including without limitation by selling, as-

signing, pledging, transferring or encumbering any interest therein."  *Id.* ¶ 5.  Citing Federal Rule

of Civil Procedure 65(d)(2), the RICO Judgment expressly was made "binding upon the parties;

their officers, agents, servants, employees, and attorneys; and other persons who are in active con-

cert and participation with any of the foregoing."  *Id.* ¶ 8.

The FDA and a number of other Ecuadorian defendants did not appear, and on April 23,

2018, the Court entered a judgment of default against those defendants and in favor of Chevron.

Dkt. 1985.  This Default Judgment "impose[d] a constructive trust for the benefit of Chevron on

all property, whether personal or real, tangible or intangible, vested or contingent, that the De-

faulted Defendants have received, or hereafter may receive, directly or indirectly, or to which the

Defaulted Defendants now have, or hereafter obtain, any right, title or interest, directly or indi-

rectly, that is traceable to the Judgment or the enforcement of the Judgment anywhere in the

world . . . ."  *Id.* ¶ 1.  The Default Judgment also provided that "[t]he Defaulted Defendants . . . are

hereby further enjoined and restrained from undertaking any acts to monetize or profit from the

[Ecuador] Judgment . . . , including without limitation by selling, assigning, pledging, transferring,

or encumbering any interest therein."  *Id.* ¶ 4.

**B.      Page Has Assisted Donziger in His Unlawful Conduct Since 2005**

Page presently is an attorney licensed to practice in Washington, D.C. and Iowa.  Exs. 9, 10.  Page first met Donziger while in law school, when Page organized an international law symposium to which Donziger was invited.  Ex. 11 at 1.  By 2004, as a law student, Page started doing legal research for Donziger related to the Ecuadorian litigation (Ex. 12 at 33:4–13), and began working full time for Donziger in 2005, after graduating from law school (*see* Ex. 11 at 1 (August 2005 email summarizing Page's assistance to Donziger)).

Page worked for Donziger until March 2007, when Page joined Cleary Gottlieb Steen & Hamilton as an associate attorney.  Ex. 12 at 274:7–9.  But even after joining Cleary, Page continued to assist Donziger.  On at least one occasion, Page provided Donziger with legal research and analysis related to the Ecuadorian litigation, even though Donziger and the LAPs were not Cleary's clients.  Ex. 13 at 1; Ex. 12 at 274:22–275:10.  Although Page included an obviously self-serving "disclaimer" in his letter to Donziger stating it was not legal advice, the letter reflects substantial legal research and analysis.  *See* Ex. 13 at 1–5.

Since March 2012, Page and Donziger have stayed in constant contact, exchanging a total of at least 8,057 phone calls and SMS text messages in that time period.  Declaration of Spencer Lynch, ¶ 6.  Page also was a crucial element of Donziger's trial team in this action.  *See* Ex. 15 at 2858:15-17 (Chevron's counsel noting that Page "sat in this courtroom every day"); Ex. 16 ¶ 4 (Donziger's counsel stating that Page "has played a key advisory role in assisting Mr. Donziger [to] meet his obligations in the RICO case as a *pro se* litigant").

Page is "managing attorney" of Forum Nobis PLLC (Dkt. 2209 at 32), which appears to have no other employees.  Ex. 17 (Forum Nobis "firm principals" webpage); Ex. 12 at 6:10–7:2; 11:14–17.  Page has testified that, through Forum Nobis, he has two clients.  The first is Donziger,

whom Forum Nobis has represented since 2010.  Ex. 7 at 9:17–10:5.  Page claims this representa-tion is "limited" but "not subject to a precisely defined scope"; instead, its scope "evolves . . . by oral agreement" and is not governed by any "written limitation."  Ex. 7 at 15:19–16:15, 17:1–14. Page's representation has included, *inter alia*, filing a petition on Forum Nobis letterhead with the Inter-American Commission on Human Rights claiming that this Court's trial violated Donziger's human rights and that this Court was biased against Donziger.  *See, e.g.*, Ex. 18 at 7 ("Judge Kaplan continued to reveal his lack of impartiality . . . ."); *id.* at 12–13 ("Judge Kaplan allowed Chevron to use his courtroom to aggressively "demonize" Mr. Donziger in public opinion . . . ."); *id.* at 13 ("[T]he judge's public comments . . . 'raise doubts' as to the judge's impartiality.").  The second client is the FDA, *see* Ex. 7 at 10:11–21, a defaulted defendant, *see* Dkt. 1985 ¶ 6.3.

Page has also claimed to represent "some" of the LAPs in the Ecuadorian litigation, a sit-uation he has described as "complicated."  Ex. 7 at 10:17–19.  Page has testified that he is "entitled to a retainer" for his work for the LAPs based on Donziger's "oral authorization."  *Id.* at 77:3–7, 77:12–23; *see also id.* 50:15–18 ("I'm entitled to a retainer, so again, the compensation at this point with longstanding clients is agreed, can be agreed to and has been agreed to orally.").  Over the years Page has worked with Donziger, Page has received payments totaling more than $514,000 from Donziger (including from an account containing investor funds that he controlled) and Donziger's investors.  *See* Declaration of John Slavek, Ex. 1.

## C.    Page Assisted Donziger's Efforts to Corrupt the Ecuador Litigation and His Extortionate and Fraudulent Scheme Against Chevron

Outtakes from the film *Crude* and documents produced by Donziger and others demon-strate Page's extensive involvement in Donziger's efforts to corrupt the Ecuadorian litigation and to exert extortionate pressure on Chevron.

Page conspired with Donziger to replace the Ecuadorian court's judicial inspections (a process for gathering environmental evidence involving opposing experts selected by both parties) with the appointment of a purportedly independent global damages expert who would "totally play ball" with Donziger and his team (ultimately, Richard Cabrera). *Donziger*, 974 F. Supp. 2d at 411–412, 421–24. In June 2006, Donziger detailed for Page his plans for securing the appointment of such a global expert and asked for Page's input. Ex. 19. In early 2007, before Cabrera was appointed, Page told Donziger, "[O]ur team's overconfidence on naming our own perito [expert] has been one of my biggest concerns . . . but Pablo[] [Fajardo is] a clever character and is pretty in with the judge, right, so I'm sure some solution will come up." Ex. 20 at 1; *see also Donziger*, 974 F. Supp. 2d at 421. Donziger's team succeeded in blackmailing the Ecuadorian judge to cancel the judicial inspections and appoint Cabrera, who did, in fact, "play ball." *See id.* at 421–22, 431–43. And when Cabrera's report—which was "not written by Cabrera" (*id.* at 443)—was filed, Page was present at the clerk's office in Ecuador, as captured on film, even though Cabrera's visit had not been announced in advance. *See* Ex. 1.

Page was also involved in drafting at least some of the undisclosed LAP work product that appears verbatim in the Ecuadorian judgment, including a draft brief (the "Draft Alegato") and a memorandum on the Chevron-Texaco so-called merger (the "Fusion Memo"). *See, e.g.*, Ex. 21 at 1 (September 2005 email from Donziger providing Page "[t]he key to finishing the fusion project"); Ex. 22 at 1 (Page explaining, "For the alegato I basically intend to wholly plagiarize Winston's stuff on the Chev/Tex merger, which is awesome, and add a few block quotes from Juampa/Julio's stuff"); Ex. 23 (Page to Donziger: "I would be curious to hear your comments on the fusion strategy email and documents I just sent out."). Portions of these documents that Page worked on appear in the Ecuadorian judgment, and there is "no plausible explanation for their

presence . . . except that whoever wrote the Judgment copied parts of them." *Donziger*, 974 F. Supp. 2d at 493.

Page also played a critical role in Donziger's extortionate pressure campaign against Chevron. *See id.* at 577–80.  For example, Page was responsible for making up an unfounded $20 billion remediation "estimate" whose "sole objective—in Page's words—was 'to exceed the $6 billion figure, while still passing the laugh test.'" *Id.* at 410, n.198.  Even after Donziger expressed reservations at such a high (unfounded) figure (Ex. 24 at 1), Page encouraged Donziger to include it in his communications to the U.S. Securities and Exchange Commission:  "I also think the remediation estimate is strong enough to move out the door … It gives our SEC attack a huge added boost . . . ."  Ex. 25 at 1.

In a similar vein, Page assisted Donziger with editing a press release which claimed that the environmental impact of Texaco's actions have caused "the disappearance of one indigenous group (the Tetetes) and the near extinction of two others (the Cofan and Secoya), as well as causing an array of cancers, miscarriages, and other health problems for thousands of local residents."  Ex. 26 at 1.  Page also worked with Donziger to draft a letter to the U.S. Department of Justice and the Securities and Exchange Commission requesting that these agencies "investigate" Chevron for purported violations of the Foreign Corrupt Practices Act.  *See* Ex. 27; Ex. 28 at 496:7–497:2 (Page worked with Donziger to draft Ex. 27).  The letter included flagrant misrepresentations, such as the "hyperbolic and highly misleading" allegation that Texaco caused contamination in Ecuador that exceeded the Exxon Valdez spill by a factor of thirty, which this Court has already found reflect "Donziger's willingness to disregard the truth."  *Donziger*, 974 F. Supp. 2d at 584.  And Page drafted a "Brief Guide for Interested Shareholders and Journalists" with the now-discredited comparison of the conditions in Ecuador to Chernobyl, Ex. 29 at 1, which was based on David

Russell's $6 billion cleanup cost estimate that Russell later called "wildly inaccurate," *Donziger*, 974 F. Supp. 2d at 407 & nn.179, 184.

Page also actively participated in Donziger's collusion with the Republic of Ecuador.  On June 13, 2006, Page updated Donziger on the time he had spent with one of the attorneys for Ecuador, who, according to Page, "listened politely to my various schpiels [sic] on the fraud theory, on considerations for selecting and approaching witnesses, on all the theories."  Ex. 30 at 2.

**D.     Page Assisted Donziger in Obstructing the Section 1782 Actions**

When Chevron initiated discovery proceedings under 28 U.S.C. § 1782, Page worked with Donziger to try to conceal the truth about their corrupt actions in Ecuador.  In the Section 1782 action against Stratus Consulting—the consultant that secretly wrote large parts of the Cabrera report (with the LAPs' counsel drafting the rest), *see Donziger*, 974 F. Supp. 2d at 425, 439–43— Page helped draft a declaration from the LAPs' Ecuadorian counsel Pablo Fajardo that was "highly misleading" because it did not "reveal that Stratus and the LAPs' counsel in fact had written most of the Cabrera Report," and "failed to disclose that the LAPs had made secret payments to Cabrera outside the court process."  *Id.* at 462; *see* Ex. 31 at 1 (email explaining "AMP [Aaron Marr Page] is editing the Pablo Affidavit").  The LAPs' team filed the Fajardo Declaration in "fifteen Section 1782 proceedings in courts across the United States."  *Donziger*, 974 F. Supp. 2d at 464.  As this Court put it, "Donziger's conduct with respect to the Fajardo Declaration was obstruction of justice, plain and simple."  *Id.* at 594.  Page's own conduct was just as plainly obstruction of justice.

**E.     Page Had Actual Knowledge of the RICO Judgment and the Default Judgment**

The RICO Judgment issued on March 4, 2014 (Dkt. 1875), together with the Court's opinion finding Donziger liable under RICO and New York common law for undertaking corrupt and fraudulent acts.  *See Donziger*, 974 F. Supp. 2d at 555, 566–67, 600–602.  The RICO Judgment imposed specific and unambiguous limitations on what Donziger and his agents could do with

regard to funds or interests relating to the Ecuadorian judgment, described in Section II.A above.

There is no question that Page had notice of the RICO Judgment the same day it issued. Page and Donziger spoke on the phone five separate times, for a total of more than twenty minutes, on that date (Ex. 32),[2] and Page tweeted about it on both that date and March 6, 2014 (Ex. 6). Page's prompt knowledge of the RICO Judgment is not surprising; court filings have described Page as "an 'essential' member of the defense team in the RICO case" (Ex. 33 at 4) and "critically needed by the defense in the RICO [case] … to complete [post-trial] briefing (Ex. 34 at 1). Donziger's counsel, Richard Friedman, attested that "Mr. Page is at the hub of most of the critical work getting done" and "has played a key advisory role in assisting Mr. Donziger meet [sic] his obligations in the RICO case as a *pro se* litigant." Ex. 16 ¶ 4. "Although Mr. Page has not appeared *pro hac vice* in the RICO action," Friedman said, "he is, as a practical matter, truly indispensable to any competent management of [the] RICO case on the defense side." *Id.*[3]

There is also no doubt that Page had actual notice of the Default Judgment, which applies to those Ecuadorian defendants who failed to appear in the RICO case and was issued on April 23, 2018. Dkt. 1985. That same day, Page called Donziger and spoke with him for over 26 minutes. Ex. 32.[4] Two weeks later, on May 7, Page wrote to Donziger that he was "aware that Judge Kaplan

---

[2]   The phone number Page used on March 4, 2014 ends in 2218.  *See* Ex. 32 (Item Nos. 32125, 32142, 32148, 32171, and 32172); Lynch Decl. ¶ 5.

[3]   Further, on March 13, 2014, Chevron filed a notice of the RICO Judgment and the accompanying opinion in a then-pending action against Page seeking discovery from him.  *See* Ex. 35.  On June 4, 2014, Page filed a motion in that proceeding and acknowledged that this Court had "rendered judgment" "three months ago."  Ex. 36 at 1.  Emails and other documents confirm Page's actual knowledge of the RICO Judgment.  *See, e.g.*, Ex. 37 (email in which Donziger quotes and edits a memo from Page discussing "the main basis of the RICO finding against the plaintiffs"); Ex. 5 (email from Page attaching "a rebuttal that has been prepared to help the wider public understand the strategic collateral 'RICO' case against Steven and the Ecuadorians in US court and how deeply corrupt, biased and distorted it was.").  Page testified that he has read the RICO Judgment.  *See* Ex. 7 at 138:17–19.

[4]   The phone number Page used on April 23, 2018 ends in 2218.  *See* Ex. 32 (Item No. 84647);

recently issued a Default Judgment against the FDA and others (Dkt. 1985) that purports to apply the same terms of the Operative Judgment to the FDA and others." Ex. 8.

### F.    The Court Held Donziger in Contempt of Paragraphs 1 and 5 of the RICO Judgment

On May 23, 2019, this Court found Donziger in willful contempt of Paragraphs 1 and 5 of the RICO Judgment.  First, the Court found that Paragraph 1 of the RICO Judgment is clear and unambiguous and that Donziger had not complied with it by transferring to Chevron his interest in the Ecuadorian judgment pursuant to a 2017 retainer agreement with the FDA.  Dkt. 2209 at 36–40.  Donziger subsequently purged himself of this contempt.  Dkt. 2216 ¶ 4.  Second, the Court found that even under *Donziger's* own interpretation of the RICO Judgment, his commitment to pay David Zelman, a life coach, "14/250 of an eighth of a point of whatever is recovered on the total claim' out of Donziger's 'personal fees from this litigation'" constituted monetization of the Ecuadorian judgment in violation of Paragraph 5 of the RICO Judgment.  *Dkt*. 2209 at 42.  Third, the Court found that Donziger admitted to arranging "sales of shares in the Ecuador Judgment to at least six investors since March 2014," (*id.* at 41) and in fact was "proud" that he had "raised over $2.4 million from investors in exchange for interests in the Ecuador Judgment totaling at least 1.28525 percent from at least May 2016 through 2018" (*id.* at 53).  The Court found that "Donziger used at least $666,476.34 of investment funds for personal expenses, that those funds were traceable to the Ecuador Judgment, and that he had a personal right to or interest in those funds."  *Id.* at 58.  In doing so, Donziger "profit[ed] from and fail[ed] to assign to Chevron funds traceable to the Ecuador Judgment," in violation of Paragraphs 1 and 5 of the RICO Judgment.  *Id.*[5]

---

Lynch Decl. ¶ 5.

[5]  The Court rejected Donziger's argument, based on an April 25, 2014 order denying a stay pending appeal, that Paragraph 5 of the RICO Judgment did not prohibit Donziger from selling the FDA's interest in the Ecuadorian judgment, instead holding that the RICO Judgment "bars any and all acts to monetize or profit from the Ecuador Judgment, including without limitation sale,

### G.    Page Aided-and-Abetted Donziger's Contemptuous Acts

The Court has already observed that Page assisted Donziger in his contemptuous conduct. Specifically, the Court found that Page helped Donziger engage "in persistent efforts to raise money by selling interests in the Ecuador Judgment," and that Donziger created "an investment opportunity memorandum with the help of Donziger's partner, Aaron Marr Page, that directed all inquiries regarding potential investments to Donziger's attention." *Id.* at 20.   The Court further found that Page received $342,045 in investor funds and transferred them promptly to Donziger rather than to Chevron. *Id.* at 29–30.

The Court's findings likely represent just the tip of the iceberg of Page's contempt: Like Donziger, Page has repeatedly frustrated discovery in this case.   For example, although it is certain that Page's involvement in the case continued beyond July 2018, his production does not include any documents after July 5, 2018.   And Page has gone so far as to advocate the destruction of relevant evidence in order to prevent Chevron from obtaining it. *See* Ex. 2.   For that reason, there is likely even more evidence of Page's contempt that has not yet been uncovered or has been destroyed. *Cf.* Dkt. 2209 at 18 ("Given Donziger's resistance to discovery that would reveal information about his compliance or non-compliance with the provisions of the RICO Judgment here at issue, it is doubtful that the full extent of Donziger's efforts to monetize and profit from the Ecuador Judgment or even the full extent of the funds thus raised is before the Court.").   What evidence does exist, however, is more than sufficient to hold Page in contempt.

---

assignment, pledge, transfer or encumbrance of any interest therein." *Id.* at 52.   The Court, however, did not base its opinion on this ground but rather on the fact that "Donziger, in consequence of his sales, has profited extensively from the Ecuador Judgment in violation of the RICO Judgment." *Id.* at 52–53.

### 1.   Page Drafted and Managed Donziger's Investment Agreements, in Contempt of the RICO Judgment

Page has been instrumental in Donziger's post-RICO Judgment efforts to enter into investment contracts by which Donziger and Page have monetized and profited from the fraudulent Ecuadorian judgment.  Page has done so by revising form investor agreements, drafting agreements for particular investors, managing Donziger's portfolio of contracts, and advising Donziger on issues regarding the investor contracts—all in contempt of the RICO Judgment.  For example, in December 2016, Page revised the form investor contract to "strip[] out" "useless fat" and streamline the transactions.  Ex. 38.  In January and February 2017, Donziger asked Page to "take charge" and organize the recommended investor and service contracts for an upcoming trip to Ecuador.  *See* Ex. 39.  Both Josh Rizack, a consultant Donziger retained to organize financial records (*see* Ex. 40 at 14:7–17), and Mary Katherine Sullivan, who Donziger hired to manage investor documentation, create budgets, and receive and distribute funds (Dkt. 2116 ¶ 4), relied on Page to catalogue the operative investment agreements.  Ex. 41 (Rizack); Ex. 42 (Rizack); Ex. 43 (Sullivan).  Organizing the agreements was a task made more complex by Page's and Donziger's efforts to keep funder identities secret by anonymizing their investment agreements.  Page himself commented on the difficulties of keeping the contracts straight:  "We have to start using real names or codenames in these contracts!"  Ex. 44.

From July to October 2016, Page took the lead on revising a draft investment contract contemplating a $10 million investment from Daniel Israel.  *See, e.g.*, Ex. 45 (email attaching Page's revisions to the English and Spanish drafts of the contract); Ex. 46 ("I am working up all the documents now.").  In Page's own words, he "draft[ed] much of the contract and apparently draft[ed] all the supporting docs."  Ex. 47.  As part of these efforts, Page drafted correspondence for Rizack to send to Israel in an effort to secure the investment.  Ex. 48.  Page viewed his work

on the Israel deal as significant enough to request 20% of the transaction fee as compensation. Ex. 47. Donziger asked Page to come to Ecuador to finalize the documents for Israel's signature, calling Page's attendance "critical." Ex. 49. Page engaged in the negotiations with Israel knowing that the deal, if consummated, would lead to Donziger getting a "transaction fee." Ex. 47. Rather than noting that such an arrangement would constitute contempt of the RICO Judgment by allowing Donziger to monetize and profit from the Ecuadorian judgment, Page continued to participate in the negotiations and specified that his own fee should come out of Rizack's share of the transaction fee, as Page did not want to reduce Donziger's profit. *Id*.

Page also helped draft the agreements for many of the investments comprising the $2,367,500 that Donziger raised (*see* Dkt. 2209 at 22). In August and September 2016, Page revised and translated the John Van Merkensteijn (WDIS Finance LLC) investment agreement and advised Donziger on the documents necessary to close that transaction. *See, e.g.*, Exs. 50–53. Page later drafted and negotiated a side letter through which Van Merkensteijn invested an additional $100,000 in exchange for additional equity interest. Exs. 54, 55. Page also helped draft and translate the investment agreement for David Yass (Wellbeck Partners). Ex. 56.

On November 10, 2016, Page sent Donziger final drafts of Ian Watson's (Indigenous People Limited) investment agreement and related documents. Ex. 57. To secure the signature of Alan Lenczner, who represented the LAPs in Canada, Page helped negotiate a side letter through which Watson released Lenczner's firm from any responsibility to keep litigating the case if funding ran out. Ex. 58. Page then drafted at Donziger's request an addendum to Watson's agreement to fund a new investment. Ex. 59.

In December 2017, Page prepared the investment contracts for investor Tony Abbiati. Page circulated a "streamlined (and improved) version" of the form investment agreement and helped

develop and review the investment agreement that Abbiati later signed.  Ex. 60 (Page's "cleaned-up versions" of the investment agreement); Ex. 61 (Page receiving final versions of the Abbiati investment documents).

In December 2017, Donziger asked Page to handle requests from both Cliff Eisler and Lenczner to locate signed copies of Eisler's investment agreements.  Ex. 62; Ex. 63.  Donziger told Page that they "need[ed] to resolve the Cliff/Alan signing issue or [C]liff won't give more funds" and that "more $$ depends on it."  Exs. 64–65.  In January 2018, Page prepared an enhancement agreement to increase Eisler's interest.  Exs. 66 –68.

In January 2018, Page helped Donziger manage and then expand Glenn Krevlin's investment agreements, calculating the premium Krevlin was due on additional investments, and calculating Krevlin's total investment amount.  Exs. 44, 69.  Page also assisted Donziger with his successful effort to extract additional funding from Krevlin, as Page prepared a side letter for Krevlin's additional investment.  Ex. 70.

Throughout the fundraising process, Page advised Donziger on the legal meaning of the investor contracts and Donziger's authority under them.  For instance, in November 2016, Page addressed provisions on Lenczner's responsibility to continue to work on the case if funding was not available.  Ex. 71.  In November and December 2016, Page also advised Donziger on his authority to direct investor funds, which Page "interpreted" as very broad.  Exs. 72, 73.  Around the same time, Donziger asked Page if "our contracts with lawyers and funders [are] irrevocable should the [FDA] change hands and order the cancellation of the contracts"; Page responded, "As much as possible…"  Ex. 74.  In January 2018, Donziger asked Page to determine whether Lenczner could be removed from the agreement entirely. Ex. 75.  Page obliged.  As Page wrote to Donziger soon afterward regarding a draft of the January 2018 side letter for Glenn Krevlin's

16

additional investment, "Took out Alan because, yeah." Ex. 76.

### 2. Page Assisted Donziger in Responding to Investor Inquiries, in Contempt of the RICO Judgment

Page furthered Donziger's contempt by responding to investor inquiries. This included misrepresenting the facts about the RICO Judgment and the procurement of the Ecuadorian judgment. On August 4, 2016, Donziger forwarded Page an email from Van Merkensteijn's lawyers, who complained that Donziger had inaccurately represented this Court's finding that the Ecuadorian judgment had "copied extensively from eight LAP internal work product documents – documents which were not in the record, which Zambrano denied having used, and the presence of which in the Judgment defendants could not explain." Ex. 77 at 2 (quoting Dkt. 1874 at 218). Page drafted Donziger's response: "As for dear Judge Kaplan's quote, it is a typical masterwork of false and misleading information." *Id.* at 1.

Page also assisted Donziger with answering a question from Watson and his counsel regarding how his percentage interest would be paid out in the event of a recovery. Ex. 78. Page also advised Donziger on how to answer questions from Eisler regarding his interest in the judgment and calculated that interest. Exs. 79, 80. Page also prepared materials for Donziger to share with investors, such as a chart regarding the Canada litigation that could be used to solicit investors in London (Ex. 81), as well as the investment opportunity memorandum that the Court cited in its opinion regarding Donziger's contempt (Dkt. 2209 at 20).

Page also advised that Donziger's circulation of investment solicitation memoranda likely did not violate the "securities laws or broker/dealer issues," telling him that "I think we're in the clear." Ex. 82. At the same time, Page recommended that Donziger and Rizack obtain professional websites to improve the investor presentations. *Id.*

### 3. Page Played a Key Role in the Monetization of the Ecuadorian Judgment to Compensate Himself, Donziger, and Others, in Contempt of the RICO Judgment

Page and Donziger also worked together to use the Ecuadorian judgment to compensate themselves and their supporters in violation of the RICO Judgment.

***Page Drafted Donziger's 2017 Retainer***.  In November 2016, Page drafted a service agreement for Donziger through which the FDA reaffirmed the validity of Donziger's interest and then guaranteed Donziger payment out of the FDA's share in the Ecuadorian judgment in the event that Donziger's interest were held to be invalid.  Ex. 83.  Page's work culminated in Donziger's November 2017 agreement with the FDA that reaffirmed his interest and granted Donziger a new and personal interest in the Ecuadorian judgment, in circumvention of Paragraph 1 of the RICO Judgment.  Dkt. 2209 at 36–40.

***Page Drafted Roger Waters's "Investment" Agreement***.  Page also helped Donziger extinguish a personal debt of Donziger using investor funds.  In December 2017, Donziger requested from Page a "superseding instrument that nullified" a "personal promissory note" by which Waters had loaned Donziger $102,000.  Ex. 84.  Page drafted and translated a superseding investment agreement with Waters for $152,000, which included the $102,000 that Waters lent to Donziger personally, in exchange for a percentage of the Ecuadorian judgment.  Exs. 85, 86.  Donziger edited Page's draft and sent the final version to Waters' counsel, which Waters signed in February 2017.  Exs. 86–88. Waters paid only $50,000—directly to Donziger—after executing the agreement. *See* Dkt. 2115-1, Ex. 2. Page thus facilitated Donziger's profit from the Ecuadorian judgment by cancelling Donziger's personal debts in exchange for Waters's interest in that judgment.

***Page Drafted Agreements Granting Judgment Interests to Donziger's Co-Counsel and Supporters***.  Donziger also enlisted Page's assistance in a campaign to pay co-counsel and other supporters with shares in the Ecuadorian judgment, asking Page to maintain copies of all contracts

under which the FDA granted the shares and to prepare summaries of the status of those investment contracts.  Ex. 89.  This practice occurred even *after* the Court entered the Default Judgment in April 2018, enjoining the FDA and its "agents" and "attorneys" from "selling, assigning, pledging, transferring, or encumbering any interest [in the Ecuador judgment]."  Dkt. 1985 ¶ 4.  Despite this prohibition, at Donziger's request, Ex. 90, Page drafted contracts by which the FDA transferred interests in the Ecuadorian judgment to Canadian activist Phil Fontaine and Canadian attorneys John Phillips and Peter Grant in April and May 2018.  Exs. 91 (Fontaine), 92 (Phillips, Grant).

Page drafted similar agreements for those who supported Donziger's pressure campaign: Karen Hinton, who has issued press releases under her own name, which Donziger had ghostwritten or heavily edited (*see* Dkt. 2113 at 17; Ex. 93); Patricio Salazar, an Ecuadorian lawyer and vocal Donziger supporter who has been quoted in Donziger's press releases (*see* Dkt. 2113 at 13–14; Ex. 94); Simon Billenness, who has organized efforts to increase shareholder pressure on Chevron, including shareholder resolutions and a shareholder complaint to the Securities and Exchange Commission (Dkt. 2113 at 15; Ex. 95); and Venezuelan-American activist Eva Golinger, who participated in the so-called "dirty hand of Chevron campaign" orchestrated by Ecuador and the LAPs (Dkt. 2113 at 16; Ex. 96).

***Page Drafted Agreements Granting Judgment Interests to Donziger's Personal Attorneys*.**  Page also drafted contracts granting shares in the Ecuadorian judgment to Donziger's personal counsel in this action, Richard Friedman and Zoe Littlepage (Exs. 97, 98), and his personal appellate counsel Deepak Gupta (Ex. 99).  Sullivan noted Page's key role, assuring him that "You [Page] and SRD [Donziger] will have final review before anything goes out, of course!"  Ex. 100.

***Page Drafted an Agreement Granting Himself an Interest in the Judgment*.**  In collaboration with Donziger, in July 2016, Page drafted an agreement awarding himself a 0.25% interest

in the Ecuadorian judgment, which Page described as a "small contingency contract with the FDA to fund part of my work on the case." Exs. 101, 102. Under the terms of the agreement, the FDA granted the interest "[i]n consideration of past and expected future professional services," such as Page's "service as a lawyer and advocate for the FDA . . . and Donziger." Ex. 103 at 2–3. Donziger lobbied the FDA to sign the agreement, and it was executed in January 2017. *Id.* at 5. Page sought and received Lenczner's signature on an "acknowledged and accepted" basis. Ex. 102.

***Page Was Paid With Investor Funds***.  Throughout early 2018, Page communicated with Sullivan regarding obtaining payment for his services out of the investor funds. For example, on January 12, 2018, Sullivan wrote to Page that she was wiring him funds and asked him whether he preferred check or electronic ACH payment "[g]oing forward." Ex. 104. On April 17, 2018, Page submitted to Sullivan and Donziger another invoice, in the amount of $7,500 for the period between March 10 and April 10, 2018. Ex. 105. Page also noted that Donziger had discussed the idea of placing him on a retainer instead of using monthly invoices. *Id.* In total, between March 5, 2014 and March 2019, Page was paid $107,000 and Forum Nobis was paid $67,500 out of investor funds. Slavek Decl., Ex. 1.

### 4.   Page Transferred Investor Funds to Donziger's Personal Account, in Violation of the RICO Judgment

While working with Donziger, Sullivan created an account, called "CWP," which stood for "Chevron Will Pay," that they used to "receive and disburse investor monies at Donziger's direction." Dkt. 2116 (Sullivan Decl. ¶¶ 49–50). In April 2018, when Sullivan stopped working for Donziger, Page contacted her, "threaten[ing] that, if [she] did turn the balance of CWP Account over to him, he and Steven [Donziger] would be forced to take legal action against [her]." *Id.* ¶ 56.

After entry of the Default Judgment, Sullivan sent Page two cashier's checks, dated May 3, 2018, totaling $342,045.16, and payable per Page's instructions to Aaron M Page fbo FDA. Dkt.

2209 at 27–29 (citing Dkt. 2116 ¶¶ 56–59 & Ex. 39).  These funds represented the remaining

balance in the "CWP" account, less expenses.  Dkt. 2116 (Sullivan Decl. at 57–60).  On May 8,

2018, Page wired the same amount to Donziger's personal account.  Dkt. 2209 at 29–30.  Two

days later, Donziger transferred the funds into a business account, then transferred $50,000 back

to Forum Nobis, $35,000 to his own personal checking, and $125,000 into another business ac-

count.  *Id.* at 32–33.[6]

Page attempted to justify his transfer of the funds to Donziger by preparing, in consultation

with Donziger, an "email memorandum" with a baseless purported "understanding" of the RICO

Judgment and Default Judgment.  Ex. 106 (Page planning the email memorandum with Donziger);

Ex. 107 (Page sending the email memorandum and then confirming that he would wire the funds

to Donziger).  This Court has rejected the "understanding" as contrary to the Court's April 25,

2014 stay opinion.  Dkt. 2209 at 43–53.[7]

* * *

Page was thus instrumental in helping Donziger violate Paragraphs 1 and 5 of the RICO

Judgment, and aided and abetted both Donziger's failure to transfer his personal interest under the

2017 retainer agreement and Donziger's personal profiting from the Ecuadorian judgment.

---

[6]  By transferring funds to Donziger's personal account, Ex. 112, Page knowingly participated in
the mishandling and commingling of client funds that he and Donziger caused to flow into and out
of Donziger's personal and non-client-trust accounts in violation of both of their ethical obliga-
tions.  *See* Dr. Moore Report (Dkt. 2269) at 5–10.  This Court has expressed its "hope[] that the
commingling of client and personal funds . . . that seems to have gone on here is extraordinary."
Dkt. 2209 at 55 n.177.

[7]  As the Court will recall, Donziger used a similar tactic when he prepared a memorandum that
attempted to justify the Cabrera fraud "by reference to 'another perspective'" purportedly provided
by Ecuadorian counsel.  *Donziger*, 974 F. Supp. 2d at 459–60.  The Court recognized that
Donziger's "attempt to cover himself in his memo by reference to 'another perspective,' and
his comparable position at [the RICO] trial, are fabrications and unpersuasive even in their own
terms."  *Id.*  Page's "email memorandum" is similarly unavailing and unpersuasive.

# III.    ARGUMENT

## A.    The Court Can Hold Nonparties Like Page in Contempt for Violating an Injunction as an Agent or Attorney of, or by Working in Active Concert or Participation With, a Party Bound by the Injunction

An injunction "bind[s]" an enjoined party's "officers, agents, servants, employees, and attorneys," and "other persons who are in active concert or participation" with the foregoing, so long as the nonparty has "actual notice" of the injunction. Fed. R. Civ. P. 65(d)(2); *see also* Dkt. 1875 ¶ 8. When such a nonparty "knowingly assists a defendant in violating an injunction," the nonparty "subjects himself to civil as well as criminal proceedings for contempt." *United States v. Paccione*, 964 F.2d 1269, 1274 (2d Cir. 1992) (quoting *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832 (2d Cir. 1930)); *see also* Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2956 (3d ed.) ("[N]onparties who have actual notice of an injunction and are guilty of aiding or abetting or acting in concert with a named defendant or the defendant's privy in violating the injunction[] . . . may be held in contempt."). This contempt authority over nonparties "gives force to injunctions and prevents parties from violating them by proxy." *Eli Lilly & Co. v. Gottstein*, 617 F.3d 186, 195 (2d Cir. 2010).

To establish a nonparty's contempt, the moving party must show that: (1) the nonparty had "actual notice" of the injunction, Fed. R. Civ. P. 65(d)(2); *Paccione*, 964 F.2d at 1269; and (2) the nonparty either (i) violated the injunction while acting as an enjoined party's "officer[], agent[], servant[], employee[], [or] attorney[,]" Fed. R. Civ. P. 65(d)(2)(B); *Aviv v. Brainard*, No. 18-CV-5088 (PKC), 2018 WL 4927912, at *3 (S.D.N.Y. Oct. 11, 2018), or (ii) was "in active concert or participation" with the enjoined party, or the party's "officers, agents, servants, employees, [or] attorneys," in violating the injunction, Fed. R. Civ. P. 65(d)(2)(C); *Bear U.S.A., Inc. v. Kim*, 71 F. Supp. 2d 237, 246 (S.D.N.Y. 1999) (Kaplan, J.). Here, Page satisfies both categories. Page is in contempt of the RICO Judgment because he acted at all times as Donziger's attorney, employee, and agent *and* in active concert with Donziger. Page is in further contempt of the Default Judgment

to the extent he acted as the FDA's attorney.

**B.    The Court Found Donziger Was in Contempt of Paragraphs 1 and 5 of the RICO Judgment, Among Other Things, by Monetizing and Personally Profiting from the Ecuadorian Judgment**

In its May 23, 2019 order, the Court found that Donziger was in willful contempt of the RICO Judgment and directed the Clerk to enter a supplemental judgment in favor of Chevron in the amount of $666,476.34—the minimum amount by which Donziger profited from the Ecuadorian judgment.  Dkt. 2209 at 57, 69–70.  In particular, Donziger has directed a campaign to raise funds by selling interests in the Ecuadorian judgment and profiting from the proceeds.  *Id.* at 20. To carry out this campaign, Donziger "creat[ed] an investment opportunity memorandum with the help of [his] partner, Aaron Marr Page, that directed all inquiries regarding potential investments to Donziger's attention."  *Id.* (footnote omitted) (citing Dkt. 2091–92 at ECF p. 2).  The efforts to solicit investors also included "instructing Mary Katherine Sullivan to seek out investors," "arranging an 'Ecuador Investor Call,'" and "communicating directly with investors."  *Id.* at 20–21.

Donziger succeeded in raising at least $2,367,500 from seven sources.  *Id.* at 22.  Of that amount, $1,525,940 went directly or indirectly into Donziger's accounts or accounts he controlled. *Id.* at 22–23.  These funds were commingled with Donziger's personal funds.  *Id.* at 31; *see also* Dr. Moore Report (Dkt. 2269) at 8–10.

The Court found that, from the investor funds transferred to Donziger's personal accounts, Donziger paid (1) $83,368.49 on his home mortgage, (2) $163,831.73 in American Express credit card bills, (3) $72,276.12 in TD Bank credit card bills, and (4) $212,000 directly to his wife.  *Id.* at 30.  Donziger also transferred $135,000 of investment funds to his wife from his business accounts.  *Id.* at 30–31.  On the basis of these transfers, the Court found that Donziger "received in his personal capacity . . . at least $666,476.34 of investor funds traceable to the Ecuador Judgment." *Id.* at 57.  Donziger's personal profiting from these funds—and his failure to transfer them to

23

Chevron as required by the constructive trust—was "in violation of paragraphs 1 and 5 of the RICO Judgment." *Id.* His personal profit was also a misappropriation of funds in violation of New York Rule of Professional Conduct 1.15(a). *See* Dr. Moore Report (Dkt. 2269) at 5–8. As further discussed below, Page was instrumental in virtually every aspect of Donziger's efforts to monetize and profit from the Ecuadorian judgment.

**C.**     **Page Is in Contempt of Paragraphs 1 and 5 of the RICO Judgment by Helping Donziger Monetize and Personally Profit From the Ecuadorian Judgment**

Page is in contempt of Paragraphs 1 and 5 of the RICO Judgment because he (1) had actual notice of the RICO Judgment; and (2) helped Donziger personally profit from the Ecuador judgment—conduct which the Court has already held to be contemptuous—while acting as Donziger's agent (*i.*e., on behalf of Donziger and under his control) and while in active concert or participation with Donziger. *See, e.g.*, *Aviv*, 2018 WL 4927912, at *3 (finding nonparty in contempt as an agent for acting "on behalf of" an enjoined party); *Bear U.S.A.*, 71 F. Supp. 2d at 246 (finding nonparty in contempt because it acted "in active concert or participation" with an enjoined party).

First, Page had actual notice of the March 4, 2014 RICO Judgment. He spoke with Donziger five times that day, Ex. 32, and then posted messages about the RICO Judgment on Twitter on March 4 and 6, *see* Ex. 6. On March 13, Chevron filed the RICO Judgment and accompanying opinion in the pending Section 1782 action against Page in the District of Maryland, which filing was electronically served via ECF, *see* Ex. 35. On June 4, 2014, Page filed a motion in that proceeding and acknowledged that this Court had "rendered judgment" "three months ago." Ex. 36 at 1. Emails and documents also show Page's actual knowledge of the RICO Judgment. *E.g.*, Exs. 5, 37. Page has admitted reading the RICO injunction. *See* Ex. 7 at 138:17–19.

Second, while having actual knowledge of the RICO Judgment, Page acted as Donziger's

agent while he assisted Donziger in monetizing and personally profiting from the Ecuadorian judgment, in violation of the RICO Judgment.  As described in Part III.B *supra*, the Court found that Donziger personally profited from the judgment by receiving in a "personal capacity" at least $666,476.34 of funds raised from investors and using the funds to pay his wife, his mortgage, and credit card bills.  Dkt. 2209 at 30–31, 57–58.  Page—who testified at his deposition that he is an "agent" of Donziger, Ex. 7 at 316:18–24—acted as an agent in helping Donziger raise these funds because he acted "on behalf of" Donziger, *Aviv*, 2018 WL 4927912, at \*3, and because Donziger had the "ability to 'control' [Page's] actions."  *In re SkyPort Glob. Commc'ns, Inc.*, No. 08-36737-H4-11, 2013 WL 4046397, at \*58 (Bankr. S.D. Tex. Aug. 7, 2013); *see also, e.g.*, *Tenn. Ass'n of Health Maint. Orgs., Inc. v. Grier*, 262 F.3d 559, 565 (6th Cir. 2001) (holding that nonparties were "agents" for purposes of Rule 65(d) where nonparties were "acting on behalf of the [party]" and "subject to [its] control").  Page also claims an attorney-client relationship with Donziger (*see* Ex. 7 at 316:18–21), and the RICO Judgment expressly binds Donziger's "attorneys," "[i]n accordance with Federal Rule of Civil Procedure 65(d)(2)."  Dkt. 1875.

Donziger paid Page well for his work as Donziger's attorney and agent.  Donziger directed payments of post-RICO investor funds to Page totaling $174,500.  *See* Slavek Decl., Ex. 1 at rows 8–22.  These funds were traceable to the Ecuadorian judgment and, thus, subject to the constructive trust of Paragraph 1 of the RICO Judgment.  *See* Dkt. 2209 at 47–50.  Further, Donziger worked with the FDA to assign 0.25% in the Ecuadorian judgment to Page.  *See* Ex. 103.  With actual knowledge of the RICO Judgment, Page helped Donziger raise investor funds by, among other things:  (1) working with him to "creat[e] an investment opportunity memorandum . . . that directed all inquiries regarding potential investments to Donziger's attention," Dkt. 2209 at 20; (2) drafting, revising, and translating investment agreements at the direction of Donziger, *see, e.g.*, Exs. 51, 56,

67; 108;[8] (3) organizing investor contracts pursuant to Donziger's instruction to "take charge" of that, Ex. 39; (4) at Donziger's direction, drafting correspondence for Donziger or his associates to send to investors and potential investors, Exs. 48, 77; (5) answering investors' questions that Donziger forwarded to him, Ex. 109; and (6) negotiating with potential investor Daniel Israel, a multimillion-dollar investment that would have earned Donziger (and Page) a "transaction fee," Ex. 47.

For many of the same reasons, Page was also "in active concert or participation" with Donziger to violate the RICO Judgment.  A nonparty acts "in active concert or participation" with an enjoined party by "enabl[ing]" the enjoined party's violation of the injunction.  *Bear U.S.A.*, 71 F. Supp. 2d at 246; *see also, e.g.*, *Inst. of Cetacean Research v. Sea Shepherd Conservations Soc'y*, 774 F.3d 935, 949–50 (9th Cir. 2014) (holding that parties and nonparties to an injunction can be held in contempt if they "assist[]" in violating the injunction, including by "giving . . . the means to violate [the] injunction").  Page "enabled" Donziger to raise investor funds that Donziger then used for his personal profit.  For example, Page's drafting of investment agreements for Donziger "enabled" Donziger to provide potential investors with written offers of interests in the Ecuador judgment in exchange for payment.  *See, e.g.*, Ex. 67.  Page's drafting with Donziger of the investment "opportunity memorandum" "enabled" Donziger to solicit and recruit investors, including by misrepresenting this Court's findings in the RICO opinion.  Dkt. 2209 at 20.  Page also answered investors' questions forwarded by Donziger, such as van Merkensteijn's counsel's concern

---

[8]  Page drafted the agreements granting interests in the Ecuadorian judgment to John Phillips and Peter Grant *after* entry of the Default Judgment.  Ex 92.  This was particularly egregious contempt because—given that the Default Judgment binds the FDA—Page could no longer hide behind his flawed argument that the RICO Judgment allowed the FDA to grant interests in the Ecuadorian judgment.  Ex. 8.

about the Court's finding "that documents in the plaintiffs' internal files that had <u>never</u> been pro-
duced in discovery to Chevron or made part of the record showed up in the Zambrano judgment."
*See* Ex. 77 (emphasis in original).  Leaving aside the fraudulent nature of the misrepresentations
to the prospective investors to attempt to explain away this Court's findings of fraud, bribery and
corruption in the Ecuadorian litigation, Page's conduct "enabled" Donziger to persuade potential
investors to execute an investment agreement.  Because Page was "in active concert or participa-
tion" with Donziger in assisting in Donziger's contumacious conduct, Page too is in contempt of
the RICO Judgment.  *See, e.g.*, *People of State of N.Y. by Vacco v. Operation Rescue Nat.*, 80 F.3d
64, 70–71 (2d Cir. 1996) ("[B]y acting in concert with [the enjoined party] and with notice of the
1992 Injunction, the [nonparties] were also so bound.").

**D.**      **Page Is in Contempt of the RICO and Default Judgments as a Result of His May 2018
Transfer of Funds to Donziger, Even If Those Funds Belonged to the FDA**

Donziger's "substantially unfettered control over the funds in his hands. . . arguably means
that Donziger and his PLLC . . . had 'an interest' in every penny" (Dkt. 2209 at 55), including the
$342,045.16 that Page transferred to Donziger in May 2018.  Page's transfer of the funds to
Donziger violated paragraphs 1 and 5 of the RICO Judgment because the funds were subject to the
constructive trust under Paragraph 1 and Donziger profited from those funds in violation of Para-
graph 5.  To attempt to avoid contempt liability, Donziger and Page have argued that those funds
belonged to the FDA.  Ex. 8.  Not only does that argument fail under the "presumption that the
money belonged to Donziger" because "the money was wired into Donziger's personal bank ac-
count," *see* Dkt. 2209 at 60, but if that were the case, Page's fund transfer to Donziger would have
also constituted contempt of the Default Judgment in addition to contempt of the RICO Judgment.

Paragraph 1 of the Default Judgment commands that the FDA, and its "agents" and "attor-
neys," "shall transfer and forthwith assign to Chevron" "all . . . property . . . that is traceable to the

Judgment or the enforcement of the Judgment." Dkt. 1985 ¶¶ 1, 7; *see also id.*¶ 6.3 (defining

"Defaulted Defendants" to include "Frente de Defensa de la Amazonia," *i.e.*, FDA).[9]   This para-

graph is identical (except for the parties who are enjoined) to Paragraph 1 of the RICO Judgment,

which the Court has found to be clear and unambiguous.  Dkt. 2209 at 36–37.

The evidence shows that Page knowingly violated Paragraph 1 of the Default Judgment.

Page has stated in writing that the $342,045.16 he received from Ms. Sullivan after issuance of the

Default Judgment were funds "raised by the FDA" "for case litigation expenses received in ex-

change for an interest in a future collection" on the Ecuadorian judgment. Ex. 8.  Page has also

testified that the funds "were FDA funds" that "Donziger had authority to spend." Ex. 7 at 293:22–

25; *see also id.* at 302:4–5 ("A. It's not Steven Donziger's money. This was FDA funds.").  This

would make the funds property "traceable" to that judgment and, hence, subject to the injunction

of Paragraph 1 that the FDA transfer the funds to Chevron.  *See* Dkt. 2209 at 8, 16 n.46, 43 n.146.

And even assuming these were "FDA funds," Donziger would have still been prohibited from

profiting from them as funds traceable to the Ecuadorian judgment pursuant to Paragraph 5 of the

RICO Judgment.

In direct violation of the Default Judgment, Page transferred the funds to Donziger instead

of to Chevron.  His behavior constitutes contempt of court.  This Court has held a non-party in

contempt for facilitating the sale of property where the non-party "had custody of" the property,

meaning the party "needed its cooperation even to access" it—much as Page had custody of what

---

[9]  Page simultaneously serves as an attorney for both Donziger and the FDA.  Ex. 7 at 316:18–
21; Ex. 103.  But given that Donziger's representation of the FDA conflicts with the interests of
his former clients (The Assembly of Communities Affected by Texaco and the 48 individual *Agu-
inda* plaintiffs) in violation of New York Rule of Professional Conduct 1.9(a), *see* Dkt. 2269
(Moore Opinion) at 22–23, Page's representation of both Donziger and the FDA presents an
equally clear conflict.

he claims were funds belonging to the FDA.  *Bear U.S.A.*, 71 F. Supp. 2d at 246.  Page later

accepted from Donziger a $50,000 kickback of these same funds.  But again, paragraph 1 of the

RICO Judgment and the Default Judgment imposed a constructive trust on funds "traceable to the

Judgment" and required that such funds be transferred to Chevron.  Dkts. 1875, 1985.  Page's

accepting of the transfer aided and abetted Donziger's and the FDA's breach of the constructive

trust.  Accordingly, Page is also in contempt of the Default Judgment due to his transfer of

$342,045.16 to Donziger in May 2018 and for his receipt of a $50,000 kickback for his misconduct.

**E.    Page's Contempts Should Also Be Attributed to His Law Firm, Forum Nobis**

        Forum Nobis, Page's one-man law firm, is also in contempt of the RICO Judgment as a

result of Page's contemptuous actions.  Where a contemnor "exercise[s] complete domination over

[a] corporation" and uses that entity to engage in contemptuous behavior, the contemnor's conduct

can be imputed to the entity to find it in contempt as well.  *Telenor Mobile Commc'ns AS v. Storm

LLC*, 587 F. Supp. 2d 594, 619 (S.D.N.Y. 2008), *aff'd*, 351 F. App'x 467 (2d Cir. 2009); *see also

Telenor Mobile Commc'ns AS v. Storm LLC*, 351 F. App'x 467, 469 (2d Cir. 2009) (such entities

are "jointly liable for [the contemnor's] contempt").  This Court has previously held a non-party

individual in contempt for his violations of a judgment binding a defendant organization, finding

that "[a]s a practical matter, the defendant and [the individual] are one and the same" given that

the individual served as "president and principal" of the organization.  *Spectacular Venture, L.P.

v. World Star Int'l, Inc.*, 927 F. Supp. 683, 685 (S.D.N.Y. 1996) (Kaplan, J.).

        The evidence shows that Forum Nobis is a one–man operation with no other employees

and is controlled entirely by Page.  Ex. 12 at 6:10–7:2, 11:14–20.  And Page used his alter-ego law

firm to violate the RICO Judgment and Default Judgment.  For example, as the Court has already

found, "Forum Nobis – of which Aaron Marr Page is managing attorney transferred the

$342,045.16 that Page had received from Sullivan's CWP account just a few days before into

Donziger's new personal account." Dkt. 2209 at 29–30, 32.  Page also used his Forum Nobis email account to help Donziger solicit funds in violation of the RICO Judgment.  *See, e.g.*, Ex. 77 (Page sending Donziger a draft email to address van Merkensteijn's lawyers' concerns about this Court's factual findings in the RICO Judgment, mischaracterizing the Court's findings regarding unfiled work product in the Ecuadorian judgment as "a typical masterwork of false and misleading information); Ex. 48 (Page sending Donziger and Rizack a draft email to a potential investor with a complete package of investment documents).

Because Page, an individual, effectively controls Forum Nobis to the point of dominance and has used it as an instrument to perpetrate his acts of contempt of this Court's orders, the Court should hold Forum Nobis in contempt as well.

**F.      This Court Has Jurisdiction to Hold Page and Forum Nobis in Contempt**

This Court has jurisdiction to hold Page and Forum Nobis in contempt of the RICO Judgment and Default Judgment.  "Courts routinely exercise personal jurisdiction in contempt proceedings over nonparties on the basis that nonparties may not assist, aid, or abet a violation of an order that directly binds a party . . . over whom the court has personal jurisdiction."  *Aviv*, 2018 WL 4927912, at *1 (collecting cases).  Exercise of jurisdiction over a nonparty arises from their "intentionally violating an . . . injunction," which is conduct "designed to have purpose and effect in the forum."  *Id.* at *2 (quoting *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 137 (2d Cir. 2014) (alteration in original).  This contempt authority over nonparties "gives force to injunctions and prevents parties from violating them by proxy."  *Eli Lilly*, 617 F.3d at 195 (holding nonparty submitted himself to the jurisdiction of the court when he aided and abetted violations of a protective order).

Moreover, the record is clear that Page purposefully injected himself into Donziger's con-

temptuous activities in New York, including targeting New York investors, drafting and negotiating agreements with New York investors, wiring of substantial funds to and from New York, and aiding and abetting Donziger's contemptuous acts in and from New York. *See, e.g.*, Ex. 110 (Page assisting Donziger in "clos[ing] out the deal" with New York-based investor Merkensteijn); Ex. 111 (Page advising Donziger on how to respond to a question from New York-based investor Glenn Krevlin); Ex. 112 (transferring $342,045.16 into Donziger's New York-based bank account and receiving $50,000 from that account); Dkt. 2116 ¶ 16 (helping Donziger prepare investment memorandum to solicit potential investors in New York, such as Elliott Management); *cf. Cohen v. Maher*, No. 16 CV 265 (VB), 2017 WL 663553, at *6 (S.D.N.Y. Feb. 17, 2017) (finding specific jurisdiction where defendant sought and engaged in ongoing and substantial negotiations with New York plaintiffs).

**G.    The Court Should Order Page to Remedy Chevron's Losses Caused by His Contempt, Hold Him Jointly and Severally Liable for the Contempt Money Judgments Against Donziger, and Assign His Interest in the Ecuadorian Judgment to Chevron**

"[T]he sanctions imposed after a finding of civil contempt serve two functions: to coerce future compliance and to remedy past noncompliance." *Vuitton et Fils S. A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir. 1979). If the plaintiff has proved harm resulting from a violation of an injunction, the Court must award compensatory damages. *Milburn v. Coughlin*, 83 F. App'x 378, 380 (2d Cir. 2003); *Vuitton et Fils S. A.*, 592 F.2d at 130. Although Page need not have willfully defied the Court's orders in order to justify an award of attorneys' fees, *see Weitzman v. Stein*, 98 F.3d 717, 719 (2d Cir. 1996), the Court "would need to articulate persuasive grounds for any denial of compensation for the reasonable legal costs of the victim of contempt" if it finds Page's behavior was willful, *id.* at 719.

As detailed below, Chevron seeks an award of compensatory damages and attorneys' fees incurred litigating this motion and uncovering the evidence of Page's contempt to remedy Page's

past noncompliance with this Court's orders.  Chevron further seeks an order directing Page to assign any and all interests he has in the Ecuadorian judgment to Chevron.

***Compensatory Damages.***  Page aided and abetted Donziger's contempt and should be held jointly and severally liable for both money judgments entered in the contempt proceedings against Donziger:  one for compensatory damages in the amount of $666,476.34 (Dkt. 2209 at 73–74) and another for attorneys' fees and costs in the amount of $3,433,384.30 (Dkt. 2264).  *See N.Y. State Nat. Org. for Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir. 1989) (affirming award imposing joint and several liability for contempt sanctions).  Chevron would, of course, collect the awards only once.  Where a court has imposed sanctions on a party for contempt and finds that a nonparty aided and abetted the contempt, courts "extend the . . . sanctions to the [nonparty]."  *Weston Capital Advisors, Inc. v. PT Bank Mutiara*, 667 F. App'x 15, 17 (2d Cir. 2016).  Such is the case here. The Court found that Donziger committed contempt by, among other things, monetizing and personally profiting from the Ecuadorian judgment.  *See Chevron*, 2019 WL 2230244, at *26.  As shown herein, Page knowingly aided and abetted this contempt, and he should be held "jointly and severally" liable for the $666,476.34 in "actual losses suffered by [Chevron] due to [this] contumacy" (Dkt. 2209 at 73–74).  *Terry*, 886 F.2d at 1353.

Further, Page's aiding and abetting of Donziger's contempt warrants holding him jointly and severally liable for the full amount of attorneys' fees and costs the Court has already assessed against Donziger, $3,433,384.30.  In explaining the justification for this sanction, the Court found that "Donziger's intransigence is directly responsible for the considerable efforts Chevron was forced to undertake to get at the pertinent facts."  Dkt. 2264.  As shown, Page knowingly assisted the same "intransigence," *i.e.* Donziger's monetizing and personally profiting from the Ecuadorian

judgment, which required Chevron to "undertake" such "considerable efforts" during these contempt proceedings.  *See* Dkt. 2264.  Accordingly, the Court should "extend the . . . sanctions" to Page that it imposed on Donziger, *Weston Capital*, 667 F. App'x at 17, and require Page also to provide "compensation for the reasonable legal costs of the victim of contempt," *Weitzman*, 98 F.3d at 719.

Chevron is also entitled to the amount of $342,045.16—the amount of Chevron's injury resulting from Page's transfer of CWP funds to Donziger in violation of the RICO and Default Judgments' requirements to assign funds traceable to the Ecuadorian judgment to Chevron.  *See Aviv*, 2018 WL 4927912, at *3 (ordering payment to the Court Registry of the amount of money a nonparty transferred in violation of TRO); *Aviv v. Brainard*, 18-cv-5088 (PKC), ECF 152 (S.D.N.Y. Apr. 18, 2019) (releasing the funds to plaintiff).  $31,554.71 of this $342,045.16 is already contained within the judgment for $666,476.34.  Slavek Decl. ¶¶ 7–8, Ex. 2.

*Attorneys' Fees.*  "A reasonable counsel fee, necessitated by the contempt proceedings, may be included as an item of damage."  Local Civil Rule 83.6(a).  Page acted willfully, just as the Court found Donziger did, meaning that attorneys' fees are warranted.  Dkt. 2209 at 68–69. "A willful contempt is one where the 'contemnor had actual notice of the court's order, was able to comply with it, did not seek to have it modified, and did not make a good faith effort to comply." *Bear*, 71 F. Supp. 2d at 249.  As detailed above, Page had notice of the RICO and Default Judgments.  His knowledge is imputed to his law firm, for which he is currently managing attorney. *New York City Dist. Council of Carpenters Pension Fund v. G & M Drywall Sys. Inc.*, No. 07 CIV. 1969 (CM), 2010 WL 2291490, at *9 (S.D.N.Y. June 1, 2010) ("Mr. Silverman's status as a partner means that his personal knowledge would be imputed to his firm.").  Page could have complied with the judgments but chose to violate them over a period of years.  The Court has already rejected

Donziger's flawed legal analysis of what the RICO Injunction prohibited, Dkt. 2209 at 41–58—an analysis Page appears to have manufactured (Ex. 8)—and found Donziger's contempt was willful.  It should do the same for Page.  And in light of Page's willful contempt of the RICO and Default Judgments, Chevron is entitled to its "reasonable counsel fee[s]."  *See* Local Civil Rule 83.6(a).[10]  If this request for relief is granted, Chevron will file a separate motion substantiating the amount of fees and costs it has incurred.

*Assignment of Interest.*  The Court should order Page to execute a transfer and assignment of his 0.25% interest in the Ecuadorian judgment to Chevron in the form attached to the Champion Declaration as Exhibit 113.  Under the terms of Page's agreement with the FDA, he received this interest "[i]n consideration of past and expected future professional services," such as his "service as a lawyer and advocate for the FDA . . . and Donziger."  Ex. 103.  These "services" include (and post-RICO, consist almost exclusively of) Page's past and ongoing assistance to Donziger in committing the contumacious acts described above.

The Default Judgment requires the FDA and its agents and attorneys to "transfer and forthwith assign to Chevron" "all property," including "contingent" property, "that is traceable to the Judgment."  Dkt. 1985 ¶¶ 1, 7.  Page is an agent and attorney for the FDA.  *See* Ex. 114.  Further, an interest in the Ecuadorian judgment is without doubt property "traceable" to that judgment.  *See* Dkt. 2209 at 39.  Accordingly, the Default Judgment requires Page, as an agent and

---

[10]  Moreover, in the alternative, "an award of attorneys' fees would be an appropriate sanction . . . whether or not the contempt was willful" if such an award would provide Chevron "with an added incentive to monitor and enforce an opponent's compliance with a court order by allowing them to recover their expenses in exposing noncompliance."  *Shady Records, Inc. v. Source Enterprises, Inc.*, 351 F. Supp. 2d 64, 67–68 (S.D.N.Y. 2004) (citations omitted).  An award of attorneys' fees would provide an incentive for Chevron to continue monitoring Page's compliance with the RICO Judgment, because monitoring Page's noncompliance is not without cost, as indicated by Chevron's (conservative) fee request against Donziger.  *See* Dkts. 2243–46.

attorney for the FDA, to "transfer and forthwith assign to Chevron" the executory and contingent interest in the judgment that the FDA has improperly assigned to him for past and ongoing services. Dkt. 1985 ¶ 1.

Similarly, Page should be required to transfer his interest to Chevron because Donziger orchestrated Page's reception of an interest in the Ecuadorian judgment as a reward for Page's assistance in Donziger's acts of contempt.  *See* Ex. 40 at 263:10–267:13.  Further, Page acted as Donziger's agent by drafting investment agreements and helping orchestrate procurement of investor funds that Donziger used for his personal expenses.  Page thus stepped into Donziger's shoes as his agent, and should not be permitted to profit from that contempt any more than his principal, whom he knew to be bound by this Court's lawful orders.  Under the RICO Judgment, any reward that Page got for helping Donziger profit should be assigned to Chevron.

## IV.    CONCLUSION

For these reasons, the Court should find Page and Forum Nobis in contempt of Paragraphs 1 and 5 of the RICO Judgment (and/or Paragraph 1 of the Default Judgment) and order them to: (i) compensate Chevron by entering a judgment holding them jointly and severally liable with Donziger for the money judgments this Court entered against Donziger in the contempt proceedings against him in the amounts of $666,476.34 and $3,433,384.30, and entering a judgment against Page and Forum Nobis for the $342,045.16 that they transferred to Donziger (accounting for the fact that $31,554.71 of this $342,045.16 is contained within the judgment for $666,476.34 (Slavek Decl. ¶¶ 7–8, Ex. 2)); and (ii) assign any and all interests in the Ecuadorian judgment to Chevron.  The Court should also award Chevron its attorneys' fees related to the acts of willful contempt by Page and Forum Nobis, including fees Chevron incurred in uncovering their contempt and in bringing this motion.

Dated: August 28, 2019

Respectfully submitted,

*/s/ Randy M. Mastro*
Randy M. Mastro
Andrea E. Neuman
Anne Champion
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY  10166
Telephone: 212.351.4000
Facsimile: 212.351.4035

William E. Thomson
333 South Grand Avenue
Los Angeles, California 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520
Email: WThomson@gibsondunn.com

Stern, Kilcullen & Rufolo LLC
Herbert J. Stern
Joel M. Silverstein
325 Columbia Tpke, Ste 110
P.O. Box 992
Florham Park, New Jersey 07932-0992
Telephone:  973.535.1900
Facsimile:  973.535.9664
Email: hstern@sgklaw.com
Email: jsilverstein@sgklaw.com

*Attorneys for Chevron Corporation*