# EXHIBIT 114

```
DEPARTMENTAL DISCIPLINARY COMMITTEE
FIRST JUDICIAL DEPARTMENT
SUPREME COURT - APPELLATE DIVISION
---------------------------------------x

In the Matter of:                          RP #2018.7008

    STEVEN DONZIGER

---------------------------------------x

                          61 Broadway
                          New York, New York 10006
                          Monday, September 16, 2019

BEFORE:  JOHN HORAN, REFEREE

APPEARANCES:

For the Departmental Disciplinary Committee
First Judicial Department:
         61 Broadway
         2nd Floor
         New York, New York 10006

     BY: NAOMI GOLDSTEIN, ESQ.
         GEORGE DAVIDSON, ESQ.

For the Respondent:

     RICHARD FRIEDMAN, ESQ.
     MARTIN GARBUS, ESQ.
     AARON PAGE, ESQ.
```

**Carole Ludwig**
*Transcription Services*
**141 East Third Street #3E
New York, New York 10009
Phone: (212) 420-0771
Email: transcription420@aol.com**

```
                                                         121
 1              PAGE - CROSS (by Davidson)
 2        percent of any eventual recovery.
 3              MR. DAVIDSON:  And when was that?
 4              THE WITNESS:  I don't have the exact date
 5        but it was about two years ago.
 6              MR. DAVIDSON:  November of '17 ring a bell?
 7              THE WITNESS:  That would be about two years
 8        ago, yeah.
 9              MR. DAVIDSON:  And did you enter into an
10        agreement with the FDA at that time to
11        represent them?  You said you had a retainer
12        with the FDA a couple of years ago.
13              THE WITNESS:  Yeah, I mean the FDA has been
14        around since the beginning of the case. I mean
15        every time I go to Ecuador I'm meeting with my
16        clients, so yeah.
17              MR. DAVIDSON:  I'm just trying to
18        understand when the retainer agreement was
19        entered into in relation to the .25 percent
20        interest?
21              THE WITNESS:  Right, so that was an effort
22        to clarify arrangements and so forth. So I
23        think the same retainer agreement which
24        provided some degree of authorization also
25        provided that .25 percent both as an incentive
```

```
                                                      122
1             PAGE - CROSS (by Davidson)
2       for future work and compensation for past work.
3             MR. DAVIDSON:  Mr. Donziger has at one
4       point or another said that the nominal present
5       value, or the nominal value with interest of
6       the judgement is like $12 billion, would you
7       agree with that?
8             THE WITNESS:  Well, yeah, that figure, you
9       take the face value --
10            MR. DAVIDSON:  The face value of that,
11      number of years interest and so --
12            THE WITNESS:  Yeah, and then add interest
13      to it, for sure.
14            MR. DAVIDSON:  Even if we take a little
15      haircut and call it $11 billion, .25 of a
16      percent doesn't sound like very much, but were
17      that to come through you would get $27.5
18      million, is that right?
19            THE WITNESS:  So in a context where every
20      penny of the Ecuadorian judgment is covered,
21      yes.
22            MR. DAVIDSON:  And so to the extent that
23      any taint is removed from Mr. Donziger and it
24      becomes more likely that the judgement was
25      collected, that's good for you?
```

1         PAGE - CROSS (by Davidson)
2         THE WITNESS:  Yes.
3         MR. DAVIDSON:  You were also involved in
4     fundraising, assisting Mr. Donziger in
5     fundraising?
6         THE WITNESS:  Yes, I assisted him, yes.
7         MR. DAVIDSON:  And for several instances of
8     funding the investment by the funders went to
9     the, first to the Canadian firm that's handling
10    the enforcement proceeding there, is that
11    correct?
12        THE WITNESS:  Yeah, I think it varied per
13    the terms of each, you know, fundraising deal.
14    But yeah, I mean a lot of the fundraising was
15    for the purpose of supporting this litigation
16    in Canada and paying this Canadian lawyer.
17        MR. DAVIDSON:  Right. And in a number of
18    instances, monies from those investments came
19    back to Mr. Donziger?
20        THE WITNESS:  Yeah, that's my
21    understanding.
22        MR. DAVIDSON:  In late 2017 or thereabouts,
23    there was a couple of fundraising investments
24    that were obtained where Mr. Lenczner was
25    effectively cut out and the money only went to

```
                                                          134
1              PAGE - CROSS (by Davidson)
2      Mr. Donziger, do you recall that?
3              THE WITNESS:  So no, not really, there were
4      five or six different investments.  I mean I'm
5      not sure what cut out means, they were, there
6      was, I think what you're referring to, right,
7      is there was a role played by Mr. Lenczner and
8      his firm in some deals and then not in others,
9      and that's true.
10             MR. DAVIDSON:  There's an email that you
11     wrote which talks about cutting out Mr.
12     Donziger, I think I got that word write, and
13     you said where we cut out Alan because, yeah.
14     Now at that time that Alan did not participate
15     in the fundraising, that no many went to
16     Canadian counsel, Canadian counsel still had
17     active litigation to enforce the judgment,
18     right?
19             THE WITNESS:  They had, yes, I mean --
20             MR. DAVIDSON:  And neither you nor Mr.
21     Donziger had any client in that litigation
22     because Mr. Donziger ceased to represent the 47
23     Lago Agrio plaintiffs a couple of years before
24     that?
25             THE WITNESS:  No, that's not quite
```

135

1      PAGE - CROSS (by Davidson)
2      accurate.
3         MR. DAVIDSON:  Well straighten it out.
4         THE WITNESS:  Right, so the plaintiff side
5      of an enforcement action is complicated by the
6      fact that it's a popular action in Ecuador. So
7      while there were named plaintiffs, they were,
8      their status of beneficiaries of the judgment
9      was always somewhat unclear because they were
10     collective environmental claims, further
11     complicated by the fact that following the
12     Appellate Division, the Appellate decision in
13     Ecuador, they assigned, as directed by the
14     Court, the individuals assigned their interests
15     into a trust in Ecuador and the named
16     beneficiary of the trust is de Frente de
17     Defensa.  And all it is is in public documents.
18     And so, you know, and then there's proceedings
19     in Canada that were initiated at one time and
20     different things have changed.
21        So it's not exactly clear.  Now there are
22     other issues related to who, you know, there
23     have been some contests regarding relationships
24     with clients in Ecuador and so it's, my
25     understanding is that there are, you know,

```
                                                         136
 1               PAGE - CROSS (by Davidson)
 2         there's one group that would represent some
 3         plaintiffs, another group that would represent
 4         other plaintiffs. There's also de Frente de
 5         Defensa that has a legitimate role in enforcing
 6         the judgment as the beneficiary under the trust
 7         and so forth, has its own interest, so it's
 8         fairly complicated.  But we certainly were very
 9         involved in that litigation, very, very
10         involved.
11              MR. DAVIDSON:  Now isn't it true that the
12         counsel for the 47 plaintiffs in Ecuador who
13         signed the retainer, (indiscernible) retainer
14         agreement, has called you, Mr. Donziger and Mr.
15         Johnson, not you, sorry, as running a scam by
16         selling these interests in the judgment?
17              THE WITNESS:  So, yeah, not unlike a lot of
18         collective actions, there are rivalries and at
19         this point there's an individual who has chosen
20         to, you know, advance his own interests and his
21         own control and he does so in part by attacking
22         Mr. Donziger --
23              MR. DAVIDSON:  That's funny, because that's
24         the same thing they claim of Mr. Donziger, that
25         he's advancing his own interests.
```

```
                                                            137
 1                  PAGE - CROSS (by Davidson)
 2             THE WITNESS:  Yeah, it's a, I mean it is
 3        what it is.
 4             MR. DAVIDSON:  But at the time this money
 5        came in in these last two fundraising events,
 6        you had no litigation to fund and the money
 7        really supported Mr. Donziger for the most
 8        part, paid his mortgage.
 9             THE WITNESS:  You know, I would certainly
10        disagree with that. I wish we were in a place
11        where we had no litigation to fund but there
12        was lots of litigation, there were lots of
13        demands on that money from all over the place.
14        I mean to the extent, there's references to the
15        fact that the money no longer went to Mr.
16        Lenczner's firm, you know, the early, my
17        understanding of it roughly is that the early
18        investments were to shore him up because that
19        was absolutely critical that that happened, and
20        the vast majority of the funds went to Mr.
21        Lenczner's firm.  As he was paid up, as his
22        retainer was paid up and he was able to keep
23        working, then other priorities were addressed
24        with different fundraising agreements.
25             MR. DAVIDSON:  The other priorities, seem
```

138

1  PAGE - CROSS (by Davidson)
2  to be from the record, to pay Mr. Donziger's
3  mortgage and his child's school tuition and
4  things like that.
5      THE WITNESS:  Well he's a paid attorney on
6  the case, as well, yeah, so it was to pay his
7  fees which he then chooses to, he then may
8  choose to use his income to pay his mortgage
9  and his child's school fees.  He certainly was
10 entitled to fees under his own retainer
11 agreement, as well.
12     THE REFEREE:  Mr. Davidson, which period
13 are we in, is this collection period on the
14 judgment?
15     MR. DAVIDSON:  Yeah, this is a period at
16 the, let me just find my chronology here.  At
17 the end of, this is in late '17 we're talking
18 about.
19     THE REFEREE:  Okay.
20     MR. DAVIDSON:  In late '17, this is after
21 the Supreme Court had denied cert, it's, in
22 fact, after the motion to suspend in the
23 Appellate Division.  And at that time the
24 actions, such as it was, litigation on behalf
25 of people that live in Ecuador, was in Canada.

```
                                                    139
 1              PAGE - CROSS (by Davidson)
 2         And there was no litigation in which Mr.
 3         Donziger, other than defending himself there is
 4         no litigation in which he was representing
 5         Ecuadorians when he might raise these other
 6         funds.
 7              THE REFEREE:  Okay.
 8              MR. DAVIDSON:  That's my point and I think
 9         I made it.
10              THE REFEREE:  So he was raising money at
11         the time basically for himself is what you're
12         saying.
13              MR. DAVIDSON:  That's the point, yeah.
14         Okay, I have no further questions at this time.
15              THE REFEREE:  Any redirect, Mr. Freidman?
16    REDIRECT EXAMINATION
17    BY MR. FREIDMAN:
18              MR. FREIDMAN:  Have you seen Mr. Donziger
19         in your view do anything improper with the
20         money that he's raised?
21              THE REFEREE:  Well maybe you should
22         rephrase that, what does that mean?
23              MR. FREIDMAN:  What did that mean?  I mean,
24         what did we just hear, discovery for Chevron in
25         the post judgment proceeding or we're
```

```
                                                                221
 1
 2                      C E R T I F I C A T E
 3
 4           I, Carole Ludwig, certify that the foregoing
 5   transcript of proceedings in the State of New York,
 6   County of New York, was prepared using PC-based
 7   transcribing software and is a true and accurate record
 8   of the proceedings.
 9
10
11
12   Signature  Carole Ludwig
13
14   Date:   September 20, 2019
15
16
17
18
19
20
21
22
23
24
25
```