# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------x
                                           :
CHEVRON CORPORATION,                       :
                                           :
                    Plaintiff,             :
                                           :
        v.                                 :    Case No. 11 Civ. 0691 (LAK)
                                           :
STEVEN DONZIGER, et al.,                   :
                                           :
                    Defendants.            :
                                           :
------------------------------------------------------------x
```

# CHEVRON'S MEMORANDUM OF LAW IN OPPOSITION TO PATRICIO SALAZAR'S MOTION TO QUASH

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

STERN, KILCULLEN & RUFOLO LLC
325 Columbia Tpke, Ste 110
P.O. Box 992
Florham Park, New Jersey 07932-0992
Telephone: 973.535.1900
Facsimile: 973.535.9664

*Attorneys for Chevron Corporation*

# TABLE OF CONTENTS

Page

I. PRELIMINARY STATEMENT ................................................................. 1

II. BACKGROUND .................................................................................. 1

III. LEGAL STANDARDS ......................................................................... 6

IV. ARGUMENT ..................................................................................... 6

    A.   Quashing the Subpoenas Based on Rule 45's 100-Mile Rule Would Be In-
        appropriate. ......................................................................................... 7

    1.   The Subpoenas Are Valid Pursuant to Rule 69(a)(2) and New York State
        Law ...................................................................................................... 7

    2.   Even Under Rule 45, the Subpoenas Should Be Upheld ......................... 15

    B.   The Court Should Deny the Motion to Quash Because Salazar's Assertions
        of Privilege Are Inadequate and Unfounded .......................................... 22

    1.   Salazar's Motion to Quash Chevron's Subpoenas on Privilege Ground Is
        Improper and Premature ....................................................................... 22

    2.   Any Grounds for Privilege Have Been Waived ...................................... 24

    3.   Salazar's Ecuadorian Law Arguments Are Unavailing ......................... 28

    V. CONCLUSION ................................................................................ 31

## Cases

*Alfadda v. Fenn*,
149 F.R.D. 28 (S.D.N.Y. 1993) ........................................................30

*Amaprop Ltd. v. Indiabulls Fin. Servs. Ltd.*,
No. 10 CIV. 1853 PGG JCF, 2012 WL 4801452 (S.D.N.Y. Oct. 5, 2012)................10, 12, 13

*In re Application for Order Quashing Deposition Subpoenas*,
*dated July 16, 2002*, No. M8-85, 2002 WL 1870084 (S.D.N.Y. Aug. 14, 2002)..................20

*In re Application For Subpoena To Kroll*,
224 F.R.D. 326 (E.D.N.Y. 2004) ......................................................23

*Brumfield v. Dodd*,
No. CIV.A. 71-1316, 2013 WL 360572 (E.D. La. Jan. 30, 2013)...........................8

*Byers v. Burleson*,
100 F.R.D. 436 (D.D.C. 1983)..........................................................23

*Campaign for S. Equal. v. Bryant*,
197 F. Supp. 3d 905 (S.D. Miss. 2016)..................................................8

*In re Chevron Corp.*,
749 F. Supp. 2d 135 (S.D.N.Y.), *aff'd sub nom. Lago Agrio Plaintiffs v.*
*Chevron Corp.,* 409 Fed. Appx. 393 (2d Cir. 2010)..................................26

*In re Chevron Corp.*,
749 F. Supp. 2d 170 (S.D.N.Y. 2010)..............................................24, 26

*Chevron Corp. v. Salazar*,
275 F.R.D. 437 (S.D.N.Y. 2011), *objections overruled*, 2011 WL 13243797
(S.D.N.Y. Aug. 16, 2011) .......................................................24, 25, 26

*In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*,
No. 14-MC-2548 (VEC), 2019 WL 1988525 (S.D.N.Y. May 6, 2019)..........................28, 29

*Curtis v. Progressive N. Ins. Co.*,
No. CIV-17-1076-C, 2018 WL 2976432 (W.D. Okla. June 13, 2018) ...................16

*Dippel v. S.C. Farm Bureau*,
No. 4:16-CV-1605-RBH-TER, 2018 WL 5763690 (D.S.C. Nov. 2, 2018),
*aff'd sub nom. Dippel v. S.C. Farm Bureau Mut. Ins. Co.*, No.
416CV01605RBHTER, 2019 WL 132881 (D.S.C. Jan. 8, 2019) ...........................16

*DOMT, Inc. v. Smikle*,
No. CV 14-779, 2014 WL 12597586 (D.N.J. May 2, 2014) ...................................8

*El Salto, S. A. v. PSG Co.*,
   444 F.2d 477 (9th Cir. 1971) ................................................................10

*In re Elcommerce.com, Inc.*,
   No. 10-51396, 2011 WL 237619 (E.D. Mich. Jan. 24, 2011) ..................19

*In re Emergency Ex Parte Application of Godfrey*,
   No. 17-21631-CV-Cooke/Goodman, 2018 WL 1863749 (S.D. Fla. Feb. 22,
   2018), *report and recommendation adopted sub nom. In re Godfrey*, No. 17-
   21631-CIV-Cooke/Goodman, 2018 WL 1859344 (S.D. Fla. Mar. 15, 2018)........19

*First City, Texas-Houston, N.A. v. Rafidain Bank*,
   197 F.R.D. 250 (S.D.N.Y. 2000), *aff'd sub nom. First City, Texas Houston,
   N.A. v. Rafidain Bank*, 281 F.3d 48 (2d Cir. 2002)....................................10, 12, 13

*Fonar Corp. v. Johnson & Johnson*,
   227 U.S.P.Q. 886, 1985 WL 186693 (D. Mass. 1985) (cited with approval in
   *Carl Zeiss Jena GmbH v. Bio-Rad Labs. Inc.*, 98 Civ. 8012 (RCC) (DFE),
   2000 WL 1006371 (S.D.N.Y. July 19, 2000) ........................................25

*GMA Accessories, Inc. v. Elec. Wonderland, Inc.*,
   DF, 2012 WL 1933558 (S.D.N.Y. May 22, 2012) ..................................11

*In re Grand Jury Subpoena Dated Jan. 4, 1984*,
   750 F.2d 223 (2d Cir. 1984)..................................................................22

*In re Grand Jury Subpoena Dated July 6, 2005*,
   510 F.3d 180 (2d Cir. 2007)..................................................................22

*Grossman v. Schwarz*,
   125 F.R.D. 376 (S.D.N.Y. 1989) ..........................................................24

*Gucci Am., Inc. v. Curveal Fashion*,
   No. 09 Civ. 8458 (RJS) (THK), 2010 WL 808639 (S.D.N.Y. Mar. 8, 2010) ..................30, 31

*Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc.*,
   215 F.R.D. 466 (S.D.N.Y. 2003) ..........................................................22

*Irons v. Karceski*,
   74 F.3d 1262 (D.C. Cir. 1995) ................................................................6

*Jones v. Hirschfeld*,
   219 F.R.D. 71 (S.D.N.Y. 2003) ..............................................................6

*Kirschner v. Klemons*,
   No. 99 CIV. 4828 (RCC), 2005 WL 1214330 (S.D.N.Y. May 19, 2005) ................6

*Laydon v. Mizuho Bank, Ltd.*,
    183 F. Supp. 3d 409 (S.D.N.Y. 2016)............................................................29, 30

*Lyman v. St. Jude Med. S.C., Inc.*,
    580 F. Supp. 2d 719 (E.D. Wis. 2008).................................................................20

*NML Capital, Ltd. v. Republic of Argentina*,
    No. 03 CIV. 2507 TPG, 2011 WL 3897828 (S.D.N.Y. Sept. 2, 2011) ..................20

*Probulk Carriers Ltd. v. Marvel Int'l Mgmt. & Transportation*,
    180 F. Supp. 3d 290 (S.D.N.Y. 2016)...........................................15, 17, 18, 19, 21

*Reino De Espana v. Am. Bureau of Shipping*,
    No. 03 CIV 3573 (LTS) (RLE), 2005 WL 1813017 (S.D.N.Y. Aug. 1, 2005) ......29

*Retamco Operating, Inc. v. Carone*,
    No. CV0402997CBMRZX, 2007 WL 9752774 (C.D. Cal. June 29, 2007).....................10, 14

*Sabol v. Brooks*,
    469 F. Supp. 2d 324 (D. Md. 2006) ......................................................................13

*Schneider v. Nat'l R.R. Passenger Corp.*,
    72 F.3d 17 (2d Cir. 1995).......................................................................................13

*Schulman v. Saloon Beverage, Inc.*,
    No. 2:13-CV-193, 2014 WL 3353254 (D. Vt. July 9, 2014).................................20

*Sea Tow Int'l, Inc. v. Pontin*,
    246 F.R.D. 421 (E.D.N.Y. 2007) ...........................................................................23

*Sec'y of Labor, United States Dep't of Labor v. Kazu Constr., LLC*,
    No. CV 16-00077 ACK-KSC, 2017 WL 628455 (D. Haw. Feb. 15, 2017)...........16

*In re Shopping Carts Antitrust Litig.*,
    95 F.R.D. 299 (S.D.N.Y. 1982) .............................................................................23

*Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of
    Iowa*,
    482 U.S. 522 (1987)..........................................................................................21, 28

*In re Steinhardt Partners, L.P.*,
    9 F.3d 230 (2d Cir. 1993).......................................................................................25

*Sterne Kessler Goldstein & Fox, PLLC v. Eastman Kodak Co.*,
    276 F.R.D. 376 (D.D.C. 2011)...............................................................................23

*Technitrol, Inc. v. Digital Equip. Corp.*,
    18 Fed. R. Serv. 2d 561, 1974 WL 20497 (N.D. Ill. 1974) ...................................25

*U.S. Bank Nat. Ass'n v. James*,
    264 F.R.D. 17 (D. Me. 2010) ................................................................................16

*U.S. Equal Employment Opportunity Comm'n v. Scott Med. Health Ctr., P.C.*,
    No. CV 16-225, 2018 WL 5312781 (W.D. Pa. Oct. 26, 2018) ................................8

*U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*,
    2000 WL 1253262 (S.D.N.Y. Sept. 1, 2000) .......................................................23

*United States v. Conces*,
    507 F.3d 1028 (6th Cir. 2007) ...............................................................................8

*United States v. McWhirter*,
    376 F.2d 102 (5th Cir. 1967) ...............................................................................11

*Universitas Educ., LLC v. Nova Grp., Inc.*,
    No. 11 CIV. 1590 LTS HBP, 2013 WL 57892 (S.D.N.Y. Jan. 4, 2013) ..........11, 12

*Urban Box Office Network, Inc. v. Interfase Managers*, *L.P.*,
    2004 WL 2375819 (S.D.N.Y. Oct. 21, 2004) .......................................................25

*Wahoo Int'l, Inc. v. Phix Doctor, Inc.*,
    No. 13CV1395-GPC BLM, 2014 WL 3573400 (S.D. Cal. July 18, 2014) .............16

*Wakefield v. ViSalus, Inc.*,
    No. 3:15-CV-1857-SI, 2019 WL 1309682 (D. Or. Mar. 22, 2019) .......................20

*Yukos Capital S.A.R.L. v. Feldman*,
    No. 15-CV-4964(LAK), 2016 WL 3181151 (S.D.N.Y. June 3, 2016) .........6, 18, 19

**Rules**

CPLR 3110(2) ..............................................................................................................7

CPLR 5224 ...................................................................................................................7

CPLR 5224(a)(3) ........................................................................................................11

Fed. R. Civ. P. 45(a)(1)(A)(iii) ...................................................................................10

Fed. R. Civ. P. 45(d)(3) ..............................................................................................17

Fed. R. Civ. P. 69(a)(1) .........................................................................................12, 13

Fed. R. Civ. P. 69(a)(2) ..............................................................................................12

**Treatises**

24 J. Moore, Moore's Federal Practice § 5507 ..........................................................22

9 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE § 45.50[5] ...................................6

## I. PRELIMINARY STATEMENT

Steven Donziger's "stonewalling of post-judgment discovery" (Dkt. 2108 at 2) has forced Chevron to pursue discovery from third parties with information relevant to Donziger's assets and to his violations of this Court's RICO injunction.  Here, Chevron has served valid document and deposition subpoenas under New York and federal law on Patricio Salazar, a key witness who possesses substantial information regarding Donziger's scheme to violate the RICO injunction by profiting from the Ecuadorian judgment.  Chevron's subpoenas to Salazar represent a rare—perhaps even singular—opportunity to obtain further discovery regarding these topics.

Salazar was served with the subpoenas while in New York City for business related to Donziger.  The subpoenas seek the production of documents and a deposition in New York.  The Court has personal jurisdiction over Salazar and he does not argue the contrary.  Instead, Salazar raises a number of technical arguments as to why the subpoenas should be quashed, then claims that the subpoenas must be quashed because all of the documents he holds are privileged.  The Court should reject each of these arguments and deny the motion.  The subpoenas are valid under New York state law and Rule 69(a)(2).  Among other things, there is no question that New York law permits Chevron to depose Salazar in "the county where he was served."  And Salazar's claims of privilege are unsupported, unfounded, and have been waived.

## II. BACKGROUND

Far from being a disinterested third party, Salazar has been a key figure in the Lago Agrio litigation in Ecuador and this case for years, playing an integral role in the FDA and Donziger's scheme to violate this Court's RICO Injunction through fundraising.  Although Salazar represents to this Court that his first involvement in the case came in 2015, *see* Dkt. 2349 at ¶¶ 4–5, in truth he has been involved since at least 2007.  In that year, Salazar and his brother, Augustin Salazar, worked with Donziger and the LAPs' legal team, ostensibly as counsel for the

Havoc laboratory—the LAPs' supposedly independent laboratory which purported to process environmental samples in the Lago Agrio litigation—to prevent a judicial inspection of the laboratory that Chevron had requested and an Ecuadorian court had ordered.  *See* Ex. 1;[1] Ex. 2 at 4–6 (Transcript of *Crude* outtake, in which Salazar explains his role in representing Havoc, along with his brother Augustin, in an effort to avoid judicial inspections related to the Ecuador litigation); Ex. 3 (LAP counsel and Havoc counsel discussing case strategy).

During the judicial inspection process, Chevron noticed that the LAPs began using Havoc to process more than 75% of their environmental samples.  Ex. 4 at ¶21.  Chevron became suspicious of the results Havoc produced because Havoc's analyses contained unexplained anomalies.  *Id*.  Upon investigation, Chevron discovered that Havoc was not an accredited laboratory at all.  *Id*.  As a result, Chevron obtained an order from an Ecuadorian court authorizing it to inspect the Havoc laboratory.  *Id*.

Internal LAP documents Chevron obtained later, including emails from Donziger himself, show that the LAPs worked feverishly with Salazar to prevent the inspection because they knew an inspection of Havoc would reveal the laboratory was producing fabricated results.  *See, e.g.*, Ex. 3 at 3 (email from Havoc counsel Pedro Cordova stating that they would "continue with the strategy initially set out, and we will prevent the judicial inspection from being carried out at all costs"); Ex. 5.  In one candid email, Donziger went so far as to say—in all caps—that an inspection of the Havoc laboratory "WOULD BE A DISASTER FOR THE LAGO AGRIO CASE."  Ex. 5.  In order to stop the "DISASTER" that would occur if outsiders were able to inspect the "lab," Donziger plotted an intimidation campaign that will be familiar to anyone who

---

[1]  All citations to "Ex. __" refer to the Declaration of Anne Champion, filed concurrently with this Memorandum of Law.

has followed the RICO case in this Court:  "We accuse all of them, including the judge of COR-RUPTION for still even thinking of ordering an illegal inspection with no basis in the law in or-der to favor a corrupt transnational that is killing innocent Ecuadorians."  *Id*.  Donziger sepa-rately instructed Havoc personnel to "under no circumstances allow the Texaco people in to in-spect… hire police, protesters, etc."  Ex. 6 at 2.

Donziger's campaign was successful.  Even though Chevron had initially received a court order authorizing an inspection, when Chevron attempted to inspect the Havoc laboratory on eight different occasions, it was blocked each time by Havoc and lawyers from Salazar Cordova acting in coordination with the LAPs' legal team.  Ex. 4 at ¶ 22.  Chevron was never able to in-spect the Havoc laboratory, though it did discover that the "laboratory" was housed in a residen-tial building with an exhaust duct sticking out of an upstairs window, suggesting that it was not a "real laboratory" at all.  *Id*.

The Havoc Lab episode was thus an early and revealing act of misconduct by Donziger and his team.  Although Havoc was ostensibly an independent laboratory, Havoc's counsel at the law firm Salazar Cordova (including Patricio and Augustin Salazar) coordinated closely with, and took direction from, the LAPs' counsel.  *See, e.g.*, Ex. 3 (LAP counsel and Havoc counsel discussing case strategy).  In fact, the LAPs paid for Salazar Cordova to represent Havoc.  Ex. 7.  Chevron does not know Salazar's full role in the case from 2007 through 2015, but it is striking that he would choose to misrepresent his prior involvement in a sworn statement to this Court.

Since at least 2016, Salazar has openly served as counsel to the FDA and has been a key figure in the LAPs' efforts to raise funding and enforce the Ecuadorian judgment.  *See* Ex. 8.  Documents produced by third parties demonstrate that Salazar was integral to Donziger's scheme to violate this Court's RICO injunction by profiting from funds raised through selling shares of

3

the Ecuadorian judgment. ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████ Subsequently, Salazar provided a legal opinion to the

FDA that approved Donziger's plan to sell interests in the judgment and made certain recom-

mendations regarding the language of the investment agreement.  Dkt. 2128-1. ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████ Additionally, in December 2017, Salazar filed an affi-

davit in the Canadian enforcement action purporting to have knowledge regarding the LAPs' fi-

nancial situation and whether they would be able to continue to prosecute the Canadian action in

light of a recent order to pay costs.  *See* Ex. 16 at ¶9.

Salazar has also played a key role in Donziger's so-called pressure campaign.  At

Donziger's recent bar sanctions hearing, Salazar testified that he has repeatedly traveled to the

U.S. to attend Chevron shareholder meetings, where he has raised the LAPs' false allegations in

an attempt to pressure Chevron.  *See* Ex. 13; *see also* Ex. 14 (describing LAPs efforts to pressure

Chevron at 2018 shareholder meeting).

██████████████████████████████████████████████████████

█████████████████████████████████████████████ Salazar ultimately did re-

ceive a .25% interest in the Ecuadorian judgment—the same interest investors were paying

$250,000 for at the time.  *See* Dkt. 2116 at ¶33 (stating Patricio Salazar held an interest in the Ec-

uadorian judgment); Dkt. 2116-1 at Ex. 3 (cap table prepared by Katie Sullivan showing "PS" as

holding a .25% interest in the Ecuadorian judgment).  Thus, Salazar is anything but a disinter-

ested third-party.  He has been deeply involved in this case for years and took a significant finan-

cial stake in the Ecuadorian judgment after the RICO judgment had issued.[2]

On September 16, 2019, Chevron became aware that Salazar had traveled to New York to

attend a hearing regarding the appropriate sanction for Donziger's professional misconduct.  The

hearing was scheduled to last from September 16 through September 18.  In light of the fact that

such a key witness was now within the jurisdiction of this Court, Chevron took the opportunity

to serve Salazar with a document subpoena and deposition subpoena under New York state law

and the Federal Rules of Civil Procedure (collectively, the "Subpoenas").  *See* Dkt. 2349-1.  To

minimize the inconvenience on Salazar, Chevron set the place of the deposition and the place for

the production of documents in New York City—within a 20-minute subway ride of where Sala-

zar was served—and the date of the deposition for September 19—just one day beyond Salazar's

already-planned stay in New York.

On September 18, 2019, lawyers representing Salazar contacted Chevron to seek an ex-

tension of the time to respond or move to quash.  Ex. 18.  Chevron agreed to the extension, pro-

vided Salazar agreed to return to the United States should this Court enforce the Subpoenas.  *Id*.

---

[2]  Additionally, public records indicate that Salazar holds business interests in Florida, *see* Ex.
17 (Midland Atlantic LLC 2019 Annual Report showing Salazar as the Managing Member),
indicating that he may regularly transact business there.

Salazar agreed to those terms once Chevron stated that it would pay for the cost of Salazar's flight back to the United States from Ecuador. *Id.* Subsequently, the parties met and conferred via email regarding Salazar's objections. *Id.* Once Chevron articulated its position, Salazar's counsel rebuffed Chevron's attempts to further discuss the issues and, instead, filed the motion to quash. *Id.*

## III.  LEGAL STANDARDS

The moving party bears the burden of persuasion in a motion to quash a subpoena and for a protective order. *Jones v. Hirschfeld*, 219 F.R.D. 71, 74–75 (S.D.N.Y. 2003); *Kirschner v. Klemons*, No. 99 CIV. 4828 (RCC), 2005 WL 1214330, at *2 (S.D.N.Y. May 19, 2005) (quoting *Irons v. Karceski*, 74 F.3d 1262, 1264 (D.C. Cir. 1995) (placing the burden on the moving party and noting that "the party seeking to quash a subpoena bears a heavy burden of proof"). "[M]odification is generally preferred over quashing of a subpoena." *Yukos Capital S.A.R.L. v. Feldman*, No. 15-CV-4964(LAK), 2016 WL 3181151, at *3 n.11 (S.D.N.Y. June 3, 2016) (Kaplan, J.) (quoting 9 James Wm. Moore, Moore's Federal Practice § 45.50[5]).

## IV.  ARGUMENT

The Court should deny Salazar's motion to quash.  Salazar's key role in the operation of the FDA (and specifically Donziger's contumacious fundraising efforts) makes Salazar a central witness in these post-judgment proceedings.  Donziger's continued refusal to participate in post-judgment discovery means that Chevron is wholly reliant on obtaining essential discovery from third-parties like Salazar.  In response, Salazar does not dispute that he holds evidence relevant to these proceedings.  Instead, Salazar raises a number of technical arguments to avoid his obligations under the Subpoenas.  None are meritorious.

Salazar first contends that the Court should quash the Subpoenas based on Rule 45's 100-mile provision.  But Rule 45 does not govern here because the Subpoenas were validly served

under Rule 69(a)(2) and New York state law.  And even if Rule 45 were exclusively applicable, the Court should still enforce the Subpoenas, because modification, not quashal, is the appropriate remedy.  Finally, Salazar's privilege objections were improperly made and have been waived in this proceeding.

A.   **Quashing the Subpoenas Based on Rule 45's 100-Mile Rule Would Be Inappropriate.**

1.   **The Subpoenas Are Valid Pursuant to Rule 69(a)(2) and New York State Law**

The Court should deny Salazar's motion to quash based on Rule 45's geographical limitations because the Subpoenas are valid under Federal Rule of Civil Procedure 69(a)(2) and New York law.  Rule 69(a)(2) provides that a party may take post-judgment discovery "as provided in these rules or by the procedure of the state where the court is located."  Here, the Subpoenas were validly served under both federal law and New York state law, which provides that a judgment creditor may serve deposition and document subpoenas.  *See* CPLR 5224.  Unlike Rule 45, New York law provides that a deposition of a non-resident may be taken "within the county in which he is served."  *See* CPLR 3110(2).  Salazar does not contest the fact that this occurred here—he was personally served within Manhattan—and thus, there is no doubt that the Subpoenas are valid under New York law.  Indeed, Salazar makes no argument to the contrary.

Salazar's various arguments against applying the straightforward standards of Rule 69(a)(2) and New York law are without merit.  First, contrary to Salazar's assertion, Rule 69(a)(2) authorizes discovery to enforce both Chevron's money judgment and this Court's RICO injunction.  Second, as this Court has previously found, New York procedural rules—not Rule 45—govern subpoenas served pursuant to Rule 69(a)(2) and New York law.  Finally, Chevron's Subpoenas were, in fact, served under New York law, just as the Court previously found, and materially identical subpoenas served by Chevron were served pursuant to New York law.

### a.   Rule 69(a)(2) Authorizes the Discovery the Subpoenas Seek

There is no question that the discovery Chevron seeks is authorized by the federal rules, specifically Rule 69(a)(2).  As an initial matter, the Subpoenas' requests are clearly relevant to enforcing Chevron's three outstanding money judgments.  For instance, the second request seeks documents related to actions taken by Donziger or his agents to "monetize or profit from the Ecuador Judgment."  Dkt. 2349-1 at 5.  Similarly, the third request seeks documents regarding "property . . . that Donziger has received . . . that is traceable to the Ecuador Judgment."  *Id.* While it is true that the documents responsive to these requests would also be relevant to Chevron's claims that Donziger has violated this Court's RICO injunction, documents concerning monetization of the Ecuadorian judgment or property Donziger has obtained are also relevant to Chevron's efforts to enforce the money judgments it has obtained against Donziger.  Salazar fails to explain why it would be that the fact that the requests are relevant to *both* topics of discovery would make them improper under Rule 69(a)(2).

Second, Rule 69(a)(2) authorizes a party to seek discovery in aid of its efforts to enforce an injunction, as numerous courts have confirmed.  *See United States v. Conces*, 507 F.3d 1028, 1040 (6th Cir. 2007) (affirming district court order permitting discovery under Rule 69(a) to enforce injunction); *Campaign for S. Equal. v. Bryant*, 197 F. Supp. 3d 905, 914 (S.D. Miss. 2016) ("Under Federal Rules of Civil Procedure 65 and 69, plaintiffs are entitled to reasonable discovery to enforce an injunction against the parties bound by that injunction."); *Brumfield v. Dodd*, No. CIV.A. 71-1316, 2013 WL 360572, at *3 (E.D. La. Jan. 30, 2013) (authorizing discovery under Rule 69(a)(2) to enforce a consent decree); *DOMT, Inc. v. Smikle*, No. CV 14-779 (JBS/KMW), 2014 WL 12597586, at *2 (D.N.J. May 2, 2014) (noting that a plaintiff could obtain discovery under Rule 69(a)(2) to enforce an injunction entered by default judgment); *U.S. Equal Employment Opportunity Comm'n v. Scott Med. Health Ctr., P.C.*, No. CV 16-225, 2018

WL 5312781, at *1 (W.D. Pa. Oct. 26, 2018) (permitting discovery of non-monetary portion of a judgment pursuant to Rule 69(a)(2)).

Thus, Chevron's discovery related to both its money judgments and Donziger's violations of the RICO injunction is authorized under Rule 69(a)(2). That conclusion is consistent with this Court's prior rulings in this matter. For example, this Court previously noted that Chevron's deposition subpoena to Katie Sullivan was authorized under Rule 69 and New York law. *See* Dkt. 2044. The Court was aware that Chevron sought discovery regarding both money judgment enforcement and its efforts to prove Donziger had violated the RICO injunction. Yet, consistent with the authorities cited above, the Court did not order that the deposition could address only money judgment issues.

Salazar cites several cases for the proposition that discovery pursuant to Rule 69 must be confined to topics related to the judgment debtor's assets, but those authorities are inapposite. None of those cases involved a situation where a party sought to pursue discovery under Rule 69 to enforce an injunction. In fact, it appears that in each case the only operative judgment was an exclusively *money judgment*. Accordingly, those cases did not raise the question whether discovery relevant to showing violations of an injunctive order was permissible. But, as shown below, where, as here, the court has issued both money and non-money judgments, Rule 69(a)(2) authorizes discovery related to the court's non-monetary relief.

> **b.      Rule 45's Territorial Restrictions Do Not Apply to a Subpoena Served Under New York Law**

Next, Salazar argues that Rule 69 does not relax the territorial restrictions of Rule 45. But Salazar's argument misunderstands the issue. Rule 69 does not change the requirements of Rule 45. Rather, Rule 69 authorizes Chevron to serve subpoenas under New York law, which

does not include the same territorial restrictions as Rule 45.  The fact that subpoenas served under Rule 69(a)(2) and New York law need not comply with the provisions of Rule 45 has been recognized by a number of courts—including by this Court in this action.

The text of Rule 69(a)(2) is clear: "A judgment creditor proceeding under Rule 69(a) may utilize either state practice or the Federal Rules for taking depositions."  *El Salto, S. A. v. PSG Co.*, 444 F.2d 477, 484 n.3 (9th Cir. 1971).  Consistent with the clear language of Rule 69(a)(2), Courts in the Southern District have repeatedly held that subpoenas issued under Rule 69 are valid if they comply with *either* federal law *or* New York state law.  *See First City, Texas-Houston, N.A. v. Rafidain Bank*, 197 F.R.D. 250, 256 (S.D.N.Y. 2000), *aff'd sub nom. First City, Texas Houston, N.A. v. Rafidain Bank*, 281 F.3d 48 (2d Cir. 2002) ("Thus when Rule 69 discovery is sought from a party represented by an attorney, service may proceed either under Rule 5(b) of the Federal Rules of Civil Procedure or under the rules of service established in the relevant state."); *Amaprop Ltd. v. Indiabulls Fin. Servs. Ltd.*, No. 10 CIV. 1853 PGG JCF, 2012 WL 4801452, at *11 (S.D.N.Y. Oct. 5, 2012) ("So, if service on Indiabulls via Skadden was proper under either federal or New York law, the Hague Service Convention does not apply.").

This conclusion makes sense, particularly when viewed in the context of Rule 69's goal of providing parties seeking to enforce judgments with the broadest set of discovery tools.  *See Retamco Operating, Inc. v. Carone*, No. CV0402997CBMRZX, 2007 WL 9752774, at *1 (C.D. Cal. June 29, 2007) ("[T]he use of the disjunctive 'or' enlarges the possibilities for conducting post-judgment discovery; a party may use state procedures or federal procedures and therefore, implicitly, both.").  For example, Rule 45 authorizes three types of subpoenas: subpoenas to testify, subpoenas to produce documents, and subpoenas to allow the inspection of premises.  Fed. R. Civ. P. 45(a)(1)(A)(iii).  Thus, if a subpoena issued under Rule 69(a)(2) had to comply with

Rule 45, as Salazar claims, this would lead to the absurd conclusion that a judgment creditor could not serve an information subpoena, as permitted under New York law, seeking written answers to particular inquiries. *See* CPLR 5224(a)(3). Yet courts have repeatedly recognized that Rule 69(a)(2) authorizes the service of information subpoenas in New York. *See, e.g.*, *Universitas Educ., LLC v. Nova Grp., Inc.*, No. 11 CIV. 1590 LTS HBP, 2013 WL 57892, at *6 (S.D.N.Y. Jan. 4, 2013); *see also United States v. McWhirter*, 376 F.2d 102, 106 (5th Cir. 1967) (allowing use of written interrogatories under Rule 69 and Texas state law).

Indeed, this Court has reached the same conclusion in this very case. Earlier in these proceedings, Donziger challenged Chevron's subpoenas to Katie Sullivan arguing, *inter alia*, that he was not provided with notice of the subpoena as required by Rule 45(a)(4). But, as this Court correctly held, the subpoenas were properly served under New York law, which does not require notice to the judgment debtor. Dkt. 2044. Just as before, there is no reason to hold that a subpoena served under New York law is somehow subject to the requirements of Rule 45.

Once again, Salazar's authorities are not to the contrary. Salazar cites *GMA Accessories, Inc. v. Elec. Wonderland, Inc.* for the proposition that Rule 45 governs all subpoenas, regardless of the context in which they are issued, *see* No. 07 CIV. 3219 PKC DF, 2012 WL 1933558, at *5 (S.D.N.Y. May 22, 2012). But *GMA Accessories* supports Chevron's position, not Salazar's. The *GMA Accessories* court made the statement Salazar quotes in the context of discussing the applicable *federal* rules and, as a result, its statement regarding Rule 45's applicability was confined to subpoenas issued under *federal law*. *Id*. However, the court included a separate section in which it analyzed New York state procedure and explicitly recognized that "[i]n this case,

New York is the forum state, and thus discovery pursuant to New York procedures would be permissible here, under Rule 69." *Id*. at *6.[3]

Salazar's subsequent assertion that federal law must govern whenever there is a "conflict" between federal procedure and state procedure is meritless and stems from a misreading of Rule 69's text.  Rule 69(a)(1) governs the actual *enforcement* of a money judgment and provides that money judgments are "enforced by a writ of execution, unless the court directs otherwise." That provision goes on to state: "The procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies."  Thus, federal law governs when state law and federal law conflict as to writs of execution or other "proceedings supplementary to and in aid of judgment or execution."

However, *discovery* "[i]n aid of a judgment or execution" is governed by Rule 69(a)(2), not Rule 69(a)(1).  Rule 69(a)(2) provides that a party "may obtain [post-judgment] discovery from any person—including the judgment debtor—as provided in these rules or by the procedure of the state where the court is located."  Rule 69(a)(2) does not contain any provision that federal law governs where federal and state law "conflict," nor would it make sense to have included such a provision.  *See Carone*, 2007 WL 9752774, at *1 ("[T]he use of the disjunctive 'or' enlarges the possibilities for conducting post-judgment discovery; a party may use state procedures or federal procedures and therefore, implicitly, both.").

---

[3]  Salazar's reliance on *Universitas* is also misplaced.  In that case, the subpoenaed parties moved to quash by arguing that the judgment creditor had failed to comply with New York service rules when serving the subpoenas.  2013 WL 57892, at *6.  The court rejected these arguments, holding that the subpoenas were valid because they complied with federal rules on service.  *Id*.  This holding is consistent with *First City* and *Amaprop*, both of which held that service of a Rule 69 subpoena is valid when it complies with either New York law or federal law.  *See* 197 F.R.D. at 256; 2012 WL 4801452, at *11.

Courts in the Southern District have recognized that that there is no need to resolve a purported "conflict" between federal law and state law when a party is pursuing *discovery* as opposed to *enforcement*.  As noted above, the courts in *First City* and *Amaprop* both held that service of a Rule 69 subpoena is valid when it complies with *either* New York law *or* federal law.  *See* 197 F.R.D. at 256; 2012 WL 4801452, at *11.  When federal and state law "conflict" in the post-judgment discovery context, the court does not need to choose—discovery should be allowed if it complies with either state law or federal law.

The cases Salazar cites for the contrary position do not conflict with this result because they involve *enforcement*, not just discovery.  In *Schneider*, the Second Circuit considered whether state law or federal law should apply to determine whether a levy on a writ of execution was properly served.  *Schneider v. Nat'l R.R. Passenger Corp.*, 72 F.3d 17, 19 (2d Cir. 1995).  Consistent with Rule 69(a)(1), the Second Circuit found that federal law governed to the extent it conflicted with state law.  *Id*. at 19–20.  But that straightforward application of Rule 69(a)(1) is irrelevant to this motion, which arises under Rule 69(a)(2).

Similarly, the *Sabol* case out of the District of Maryland involved a subpoena for a third-party to appear as part of a "proceeding supplementary" under Maryland law.  *See Sabol v. Brooks*, 469 F. Supp. 2d 324, 327 (D. Md. 2006) (noting that the judgment creditor had "initiated supplementary proceedings in aid of enforcement" and requested that the court issue a subpoena under the Maryland rules governing proceedings supplementary).  The *Sabol* court correctly recognized that proceedings supplementary are explicitly governed by Rule 69(a)(1)—not Rule 69(a)(2)—and so applied the subpoena rules from Rule 45, rather than the conflicting Maryland rules.  *Id.*  Far from being "squarely on point," *Sabol* is inapplicable to this motion.

In short, Rule 69(a)(2) allows Chevron to pursue discovery under either New York law or federal law, and the provisions of Rule 45 do not govern subpoenas served under New York law.

### c.    Chevron's Subpoenas Were Served Under New York Law

Finally, Salazar asserts that Chevron did not invoke New York state procedures and, thus, New York law is inapplicable.  In this, Salazar is wrong.  Chevron's Subpoenas were issued under both federal and New York law and is substantially identical to the Sullivan subpoena this Court already found to be issued pursuant to New York law.

Salazar's argument proceeds from the false premise that Chevron's Subpoenas must be construed as either Rule 45 subpoenas or New York subpoenas.  In reality, Chevron served the Subpoenas under both federal and New York law, as permitted by Rule 69.  *See Carone*, 2007 WL 9752774, at *1 (C.D. Cal. June 29, 2007) ("By specifying that the judgment creditor may use procedures under either State or federal law, however, the rule does not require the judgment creditor to make an election between federal and state procedures. Rather, the use of the disjunctive 'or' enlarges the possibilities for conducting post-judgment discovery; a party may use state procedures or federal procedures and therefore, implicitly, both.").

It is true that Chevron's Subpoenas included Rule 45 subpoena forms, but that fact is not dispositive.  Chevron's Subpoenas also included a separate document titled "subpoena" (rather than simply an "exhibit A"), which specifically stated that failure to comply with the Subpoenas would be punishable by contempt under the CPLR.  Dkt. 2349-1 at 1.  The language of Chevron's Subpoenas was identical to the language that Chevron used in its deposition and document subpoenas to Katie Sullivan (which also contained Rule 45 subpoena forms).  *Compare* Dkt. 2349-1 *with* Ex. 19 (Subpoena to Katie Sullivan and Streamline Family Office).  As discussed above, this Court properly found that the Sullivan subpoena was issued under New York law. Dkt. 2044.  Thus, Chevron had no reason to believe that it needed to employ any other language

or use a different format to invoke its right to pursue discovery under New York state law in this matter—nor should it be required to.

In sum, Rule 69 authorized Chevron to serve discovery requests pursuant to New York law in addition to federal law.  Rule 45 does not govern or modify subpoenas issued under New York law.  And, finally, Chevron's Subpoenas were issued under New York law.  As a result, the Court should deny Salazar's motion to quash on the basis of Rule 45's 100-mile rule because that provision is inapplicable to the state law subpoenas issued to Salazar.

### 2.    Even Under Rule 45, the Subpoenas Should Be Upheld

Contrary to Salazar's arguments, the Subpoenas should not be quashed even if they are construed as subpoenas issued exclusively under Rule 45.  Salazar was served with the Subpoenas while he was in New York on business related to this case.  Although there is no clear standard for what constitutes "regularly transact[ing] business in person" within the meaning of Rule 45, Salazar has admitted to conducting business in New York on several occasions over the last three years.  Additionally, as discussed above, Salazar has not been forthright with this Court regarding his involvement in this case generally, which raises at serious credibility issues regarding his representations about his business activities in New York, especially in light of his close association with Donziger and his financial stake in the case.

However, even if Salazar does not regularly conduct business in New York, the Court should not quash the Subpoenas.  As shown below, the document subpoena should not be quashed because the 100-mile rule does not apply when documents may be mailed or provided electronically.  And to the extent the Court finds that the Subpoenas violate the 100-mile rule, the appropriate remedy would be to modify the Subpoenas, not quash them.  This Court has repeatedly dealt with facts similar to these and has concluded that quashing a subpoena in these cir-

cumstances would be an "absurd result." *Probulk Carriers Ltd. v. Marvel Int'l Mgmt. & Transportation*, 180 F. Supp. 3d 290, 294 (S.D.N.Y. 2016). Salazar offers no reason to depart from the sound reasoning of these opinions and the authorities he cites in favor of quashing the Subpoenas are distinguishable and, often, outdated. Thus, even if this Court were to agree with Salazar that the Subpoenas do not comply with the 100-mile rule, it should modify the Subpoenas and require Salazar to comply with the Subpoenas as modified.

### a.   The Document Subpoena Is Valid

Even if the Court were to agree with Salazar's arguments regarding Rule 45, it should refuse to quash Chevron's document subpoena. Numerous courts have held that "[t]he 100-mile geographical limitation applies only to travel by a subpoenaed person, not to a situation where the subpoenaed records could be mailed or shipped." *Sec'y of Labor, United States Dep't of Labor v. Kazu Constr., LLC*, No. CV 16-00077 ACK-KSC, 2017 WL 628455, at *12 (D. Haw. Feb. 15, 2017); *Wahoo Int'l, Inc. v. Phix Doctor, Inc.*, No. 13CV1395-GPC BLM, 2014 WL 3573400, at *4 (S.D. Cal. July 18, 2014); *Dippel v. S.C. Farm Bureau*, No. 4:16-CV-1605-RBHTER, 2018 WL 5763690, at *1 (D.S.C. Nov. 2, 2018), *aff'd sub nom. Dippel v. S.C. Farm Bureau Mut. Ins. Co.*, No. 416CV01605RBHTER, 2019 WL 132881 (D.S.C. Jan. 8, 2019) (collecting cases). This is particularly true where, as here, "the information requested can be produced electronically." *See Curtis v. Progressive N. Ins. Co.*, No. CIV-17-1076-C, 2018 WL 2976432, at *2 (W.D. Okla. June 13, 2018); *see also U.S. Bank Nat. Ass'n v. James*, 264 F.R.D. 17, 19 (D. Me. 2010) (declining to quash a subpoena based on the 100-mile rule where the documents could be produced by mail).

Although the document subpoena requests that Salazar produce the documents at Gibson Dunn's offices in New York, Salazar could easily comply with the subpoena from Ecuador by

sending the requested documents electronically or by mailing the documents.   Indeed, that is the customary method of compliance.

### b.   If the Subpoenas Were Found to Violate the 100-Mile Rule, Modification Is the Appropriate Remedy

Salazar asserts that that the Court "must" quash a subpoena served outside of the witness's 100-mile radius.  But Salazar's argument ignores the clear language of Rule 45 and this Court's well-reasoned opinions in at least two cases with similar facts.  Where, as here, the subpoena was properly served on a foreign national while he was in the United States, modification of the subpoena is the appropriate remedy for any violation of the 100-mile rule.

### (i)   Rule 45 Permits Modification

The plain language of Rule 45 permits modification of a subpoena found not to comport with the 100-mile rule.  Rule 45(c)'s 100-mile rule provides that a subpoena may not compel the compliance of a third-party witness at a destination beyond "100 miles of where the person resides, is employed, or regularly transacts business in person."  But it is Rule 45(d)(3) that governs the remedy for violations of the 100-mile rule and provides that, "[o]n timely motion, the court for the district where compliance is required must quash *or modify* a subpoena that . . . requires a person to comply beyond the geographical limits specified in Rule 45(c)."  (Emphasis added).  Thus, while a court must take *some action* when a subpoena does not comport with the 100-mile rule, Rule 45 expressly provides that the court may modify the subpoena.

On at least two occasions, this Court, has confronted facts nearly identical to those in this case.  In both instances, this Court elected to modify the subpoena, rather than quashing it, calling the result for which Salazar here advocates "absurd."  *See Probulk*, 180 F. Supp. 3d at 293–94.  In *Probulk*, a Turkish citizen was served with a post-judgment subpoena while attending a film festival in Boston.  *Id.* at 292.  There was no indication that the Turkish citizen conducted

business within 100 miles of Boston, or that the subpoena at issue otherwise comported with the 100-mile rule. *Id.* However, as this Court noted, applying the 100-mile rule to quash the subpoena would have been an "absurd result":

> Applied literally, however, [the 100-mile rule] could well have the effect of preventing, for example, the enforcement of a subpoena (a) duly served on a foreign national (b) on the steps of the issuing courthouse (c) calling for a deposition within 100 yards of the place of service (d) during the witness's otherwise planned stay in the United States because that foreign national—although physically present quite near the place of the deposition—neither resides, nor is employed, nor regularly transacts business there. Thus, there is substantial reason to believe that the Rule should not be construed to require that absurd result.

*Id.* at 293–94.

As this Court noted, "[f]ortunately, there is no need to reach that question here" because the plain language of "Rule 45(d)(3) permits a court to modify a subpoena that" does not comport with the 100-mile rule. *Id*. at 294. The Court went on to modify the subpoena to require that the deposition be taken at a location agreed on by the parties or, in the alternative, within 100 miles of the witness's residence in Turkey. *Id*.

This Court faced nearly identical facts and reached a nearly identical result in *Yukos Capital S.A.R.L. v. Feldman*, No. 15-CV-4964(LAK), 2016 WL 3181151, at *1 (S.D.N.Y. June 3, 2016). In *Feldman*, a third-party witness who was a resident of the United Kingdom was served with a deposition subpoena in New York purporting to require his attendance at a deposition in New York. *Id.* at *1. The witness claimed that he could not be required to testify pursuant to the subpoena because he did not regularly transact business in New York. *Id*. This Court observed that "there is no question as to this Court's power to issue the subpoena, as to the validity of the personal service on [the witness] in New York, or as to the Court's jurisdiction over [the witness's] person." *Id*. at *2. Assuming, without deciding, that the witness's 15 visits in 6 years

were insufficient to establish that he "regularly transacts business" in New York, the Court re-

fused to quash the subpoena and, instead, modified the subpoena to allow for a deposition at a

mutually agreeable location or, failing an agreement, within 100 miles of the witness's residence

in the United Kingdom.  *Id*. at *3.

       The facts of this case are materially identical to *Probulk* and *Feldman* and the Court

should not depart from its well-reasoned decisions in those matters.  Salazar was properly served

within the district, conclusively establishing this Court's jurisdiction over his person.  *See Feld-

man*, 2016 WL 3181151 at *2.  Even assuming *arguendo* that the Subpoenas violate the 100-

mile rule, quashing a subpoena that required Salazar to attend a deposition at a nearby office dur-

ing his already planned stay in the United States would be an "absurd result."  *Probulk*, 180 F.

Supp. 3d at 293–94.  Other courts have reached the same conclusion and issued nearly identical

orders.  For instance, a court refused to quash a subpoena served on a Russian national while he

was in the United States and, instead, modified the subpoena to allow the parties to conduct a

deposition at a mutually agreeable location or, in the alternative, within 100 miles of the wit-

ness's residence in Moscow.  *In re Emergency Ex Parte Application of Godfrey*, No. 17-21631-

CV-Cooke/Goodman, 2018 WL 1863749, at *11 (S.D. Fla. Feb. 22, 2018), *report and recom-

mendation adopted sub nom. In re Godfrey*, No. 17-21631-CIV-Cooke/Goodman, 2018 WL

1859344 (S.D. Fla. Mar. 15, 2018); *see also In re Elcommerce.com, Inc.*, No. 10-51396, 2011

WL 237619, at *3 (E.D. Mich. Jan. 24, 2011) (avoiding an issue under the 100-mile rule by

modifying the subpoena to allow for a deposition within 100 miles of the witness's place of busi-

ness).

       Salazar attempts to muddy the waters by citing to a number of out-of-district and out-of-

circuit district court opinions to support his claim that—despite Rule 45(d)'s clear language—the

court must quash and has no discretion to modify a subpoena that does not otherwise comport with the 100-mile rule.  These citations are largely to out-of-context quotes.  Indeed, none of the cases that Salazar cites considered modification as an alternative to quashal, nor did any grapple with how Rule 45(d) could be construed to require quashing a subpoena when the Rule itself states that the subpoena may be quashed *or modified*.[4]  In fact, one of Salazar's own cases authorized a modification of the subpoena that changed the location of a deposition, thereby "resolv[ing] Defendants' concern about the 100–mile rule."  *See Schulman v. Saloon Beverage, Inc.*, No. 2:13-CV-193, 2014 WL 3353254, at *12 (D. Vt. July 9, 2014).  In short, none of Salazar's authorities justifies departing from this Court's prior, well-reasoned decisions directly on point.[5]

---

[4]  In at least two instances, this is because the cases concerned *trial subpoenas*, rather than deposition subpoenas.  *See Wakefield v. ViSalus, Inc.*, No. 3:15-CV-1857-SI, 2019 WL 1309682, at *1 (D. Or. Mar. 22, 2019); *Lyman v. St. Jude Med. S.C., Inc.*, 580 F. Supp. 2d 719, 733 (E.D. Wis. 2008).   This, of course, is significant because a court cannot modify the location of trial to comport with the 100-mile rule and, thus, these courts had no reason to consider whether they had discretion to modify a subpoena under Rule 45(d).

[5]  Salazar's fallback position is that the Court cannot order a deposition in Ecuador, but the weight of the authority is squarely against Salazar's argument.  To begin with, as discussed above, this Court and other courts have resolved these exact circumstances by ordering a deposition in a location agreed to by the parties or, in the alternative, in a foreign country.  Further, Rule 28(b) explicitly contemplates conducting depositions in a foreign country.  Under these circumstances, where the Court has clear personal jurisdiction over a witness, it makes perfect sense that the Court has the authority to order that witness to appear for a deposition irrespective of whether that deposition occurs in the United States or in a foreign country.  The two cases Salazar cites are distinguishable and contrary to Supreme Court precedent.  First, in *NML Capital*, the court admitted that it lacked personal jurisdiction over the witness.  *NML Capital, Ltd. v. Republic of Argentina*, No. 03 CIV. 2507 TPG, 2011 WL 3897828, at *2 (S.D.N.Y. Sept. 2, 2011).  And in both *NML Capital* and *In re Application to Quash*, the courts declined to order depositions in a foreign country under Rule 45 in part because the discovery could be sought through the Hague Convention.  *See id*. at *3 (noting that "[t]here are other well-known means for accomplishing" a deposition in a foreign country); *In re Application for Order Quashing Deposition Subpoenas, dated July 16, 2002*, No. M8-85, 2002 WL 1870084, at *6 (S.D.N.Y. Aug. 14, 2002) (declining to order a deposition in Japan due to the provisions of Japanese law, the Hague Convention, and international comity).  But the Supreme Court has expressly rejected that position, holding that the existence of the Hague Convention or other means of obtaining discovery from a foreign target

(ii)     **Contrary to Salazar's Claim, Chevron Acted in Good Faith**

Finally, Salazar claims the Court should refuse to exercise its discretion to modify the Subpoenas because Chevron supposedly acted in bad faith.  This assertion is unsupported by the record and belied by this Court's prior, on-point rulings that confirm the propriety of the Subpoenas.  It is abundantly clear that Salazar is not a disinterested third-party.  He plays an integral role in the FDA and was a key figure in Donziger's scheme to violate this Court's RICO Injunction through fundraising.  And Salazar was served in New York while on business *related to Donziger*.  Given that Salazar was in New York on business related to Donziger and documents produced by third parties show that the two have long worked closely together, Chevron had (and continues to have) ample reason to believe Salazar may regularly transact business in person in New York.  Indeed, Salazar concedes he *does* transact business in person in New York at least occasionally.

Without the benefit of discovery it would be impossible for a party like Chevron to conclusively determine whether a third-party made occasional or regular trips to a particular jurisdiction.  Additionally, there is no indication that the parties seeking discovery in *Probulk* or *Furman* had any particular level of knowledge regarding whether the witness did or did not regularly transact business in the United States when the subpoenas were served.  Indeed, in *Probulk*, the witness was served while in the United States to attend a film festival, and there is no indication

---

does not reduce a litigant's right to pursue that discovery under the Federal Rules.  *See Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa*, 482 U.S. 522, 533–47 (1987).  Additionally, it is very possible that the Court could order Salazar's deposition to occur in the United States.  As noted above, public records indicate that Salazar owns business interests in Florida and he likely regularly transacts business there.  *See*, *supra* at 5 n.1.

that the witness ever conducted business in person in the United States.  180 F. Supp. 3d at 292.

Salazar's bad-faith argument is contrary to the facts, contrary to the law, and should be rejected.

**B.     The Court Should Deny the Motion to Quash Because Salazar's Assertions of Privilege Are Inadequate,  Unfounded, and Has Been Waived**

In addition to his Rule 45 argument, Salazar claims that his deposition and document production should be quashed because they would invade the attorney-client privilege.  But Salazar's contention is meritless.  Not only are Salazar's assertions of privilege inadequate and, but they have been waived.  The party asserting the privilege bears the burden of establishing the "facts that are the essential elements of the privileged relationship, a burden not discharged by mere conclusory or ipse dixit assertions." *In re Grand Jury Subpoena Dated Jan. 4, 1984*, 750 F.2d 223, 224–25 (2d Cir. 1984) (citations and quotations omitted).  Salazar asserts only that the attorney-client privilege—and not attorney work product—bars his production and deposition, and thus has failed to meet the heavy burden of establishing that any documents sought were prepared in anticipation of litigation. *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180, 183 (2d Cir. 2007); *Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc.*, 215 F.R.D. 466, 474 (S.D.N.Y. 2003).  And Salazar has not even attempted to make the required showing of privilege, but rather provided only boilerplate privilege claims that are inadequate and untimely.  In fact, in his motion to quash, Salazar argues only that Ecuadorian law prohibits compelling production of documents and his deposition.  Thus, he has waived any argument that the documents sought are protected under U.S. law.  *See* Dkt. 1529 at 56.  Regardless, as explained below, Donziger's privilege waiver applies to any such assertions.

**1.     Salazar's Motion to Quash Chevron's Subpoenas on Privilege Ground Is Improper**

It is black letter law—codified in Local Rule 26.2—that, when served with a subpoena, a party cannot refuse to testify or produce documents based on a blanket assertion of privilege.  24

J. Moore, Moore's Federal Practice § 5507.  Rather, because the question of whether privilege applies must be examined on a case-by-case basis, the party asserting privilege must produce a privilege log.  *In re Application For Subpoena To Kroll*, 224 F.R.D. 326, 329 (E.D.N.Y. 2004); *In re Shopping Carts Antitrust Litig.*, 95 F.R.D. 299, 305 (S.D.N.Y. 1982) ("The extent to which any conversation or document is privileged must be determined on an individual case-by-case basis and not based on a blanket assertion by the party claiming the privilege.  The burden is on the party claiming the privilege to present the underlying circumstances or facts demonstrating the existence of the privilege to the court.").  A privilege log must be provided even for documents that typically constitute privileged information.  *Kroll*, 224 F.R.D. at 329.  Nor can a party evade a deposition by claiming that the questioner is likely to ask questions calling for privileged information.  Instead, the party must "attend the deposition and submit to the court for resolution any matters which allegedly violate the privilege." *Byers v. Burleson*, 100 F.R.D. 436, 439 (D.D.C. 1983).[6]

---

[6]  Salazar's authorities on this point are easily distinguished.  In *Sea Tow Int'l, Inc. v. Pontin*, the court applied the Second Circuit's "flexible approach" to weighing objections to a subpoena calling for the deposition of a party's counsel.  246 F.R.D. 421, 425-28 (E.D.N.Y. 2007).  The court ultimately declined to compel the deposition when it would "impose a substantial burden on plaintiff and would serve little purpose, other than to disrupt and prolong this litigation, when fact discovery is nearly closed." *Id*. at 428.  The court went on to quash the document subpoena when it was "patently overbroad" in addition to calling for privileged documents.  *Id*. at 428.  The District Court for the District of Columbia evaluated similar factors in *Sterne Kessler Goldstein & Fox, PLLC v. Eastman Kodak Co*. and concluded that a deposition of counsel was not merited when " the discovery [could] be obtained from other more appropriate sources, and any benefit from deposing the petitioner [was] outweighed by the burdens it [would] impose."  276 F.R.D. 376, 385 (D.D.C. 2011).  In contrast, Donziger's demonstrated refusal to produce relevant documents renders the Subpoenas not only necessary, but crucial.  Indeed, in the last case Salazar cites on this point, *U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 2000 WL 1253262, at *3, *5 (S.D.N.Y. Sept. 1, 2000), the court found that counsel depositions was necessary and appropriate when, *inter alia*, the "attorneys [were] likely to possess information which is relevant, indeed, crucial, to plaintiff's [] claims."

Contrary to these clear rules, Salazar has moved to quash the Subpoenas on blanket privilege grounds without producing a privilege log. Salazar does so at the same time that he acknowledges the impropriety of his actions. Mot. at 8 n.5. He goes on, in purported excuse, to maintain that it would be "an undue burden" to submit a privilege log "when it is doubtful that the subpoena is even lawful to begin with." *Id.* Absent is any citation to law upholding his position. Salazar should be ordered to comply with the Federal and Local Rules by providing a privilege log for documents he asserts are privileged and appearing for his deposition to raise any objections to specific questions purportedly calling for privileged information. To do otherwise would deprive Chevron and the Court of the ability to determine whether the assertions of privilege are proper, since "a party [is not] entitled to make a unilateral determination of the applicability of any privilege." *Grossman v. Schwarz*, 125 F.R.D. 376, 386–87 (S.D.N.Y. 1989).

## 2.     Any Grounds for Privilege Have Been Waived

### a.     Salazar's Failure to Produce a Privilege Log Constitutes Waiver of Any Potential Privilege That May Have Applied

Even if Salazar's privilege assertions were proper at this time, which they are not, Salazar has waived any privileges he may otherwise have asserted by not producing a privilege log. A party's failure to comply with court rules can result in an implied waiver of his client's privilege. *Chevron Corp. v. Salazar*, 275 F.R.D. 437, 446 (S.D.N.Y. 2011), *objections overruled*, 2011 WL 13243797 (S.D.N.Y. Aug. 16, 2011). Courts reason that, because the party "was not deprived of the opportunity to assert his objections due to" the manner in which the court ordered production, waiver is appropriate. *Id.*; *In re Chevron Corp.*, 749 F. Supp. 2d 170, 182 (S.D.N.Y. 2010); *see also Grossman*, 125 F.R.D. at 386–87. Here, not only did Salazar fail to produce a privilege log, he did so in full awareness of the consequences of his actions in citing to this Court's prior rulings. Mot. at 8 n.5. For this reason alone, his objections should be deemed waived.

24

### b. Donziger Has Waived Any Privilege That Might Have Applied to the Documents Called for in Chevron's Subpoenas

Furthermore, Salazar's privilege assertions are without merit for the independent reason that Salazar's documents are subject to the same privilege waiver that this Court found applicable to Steven Donziger. *See* Dkt. 2108. After Chevron served Donziger with a document production subpoena in April 2018—seeking, among other things, documents related to his attempt to profit from and monetize the Ecuador Judgment—Donziger failed to produce responsive documents and Chevron moved to compel production. *Id.* In deciding Chevron's second motion to compel production, this Court found that Donziger "waived or forfeited any claim of privilege to responsive documents and information that otherwise might have applied" and ordered Donziger to produce responsive documents. *Id.* Although Donziger has failed to comply, for the reasons explained below, his waiver transfers to Salazar and applies to the documents sought by the Subpoenas.

***Transferability***. When a party waives privilege by failing to provide a privilege log, that privilege is deemed an implied waiver and carries over to related cases. *Salazar*, 275 F.R.D. at 446–47; *see also In re Steinhardt Partners, L.P.*, 9 F.3d 230, 235 (2d Cir. 1993) (holding that production of attorney work product to the SEC waived that privilege in subsequent civil litigation); *Urban Box Office Network, Inc. v. Interfase Managers*, *L.P.*, 2004 WL 2375819, at *4 (S.D.N.Y. Oct. 21, 2004) (finding that the decision to disclose privileged documents in an arbitration waived that privilege in subsequent litigation). In addition, one attorney's waiver applies with equal force to documents held by co-counsel. *See Fonar Corp. v. Johnson & Johnson*, 227 U.S.P.Q. 886, 887, 1985 WL 186693, at *1 (D. Mass. 1985) ("One waiver thus waives the privilege as to all the lawyers working jointly on the matter.") (cited with approval in *Carl Zeiss Jena GmbH v. Bio-Rad Labs. Inc.*, 98 Civ. 8012 (RCC) (DFE), 2000 WL 1006371, at *1 (S.D.N.Y.

July 19, 2000)); *Technitrol, Inc. v. Digital Equip. Corp.*, 18 Fed. R. Serv. 2d 561, 1974 WL 20497, at *2 (N.D. Ill. 1974) ("Nor does the fact that these documents are from different counsel protect the privilege, since the privilege is the client's and involves the particular subject matter."). Here, Donziger and Salazar served as co-counsel to the FDA. Consequently, Donziger's waiver of the privilege applies with equal force to the documents held by Salazar.[7]

This is not the first time this Court has applied Donziger's waiver to individuals involved in the Ecuador litigation. In 2010, the Court found that Donziger had waived privilege by failing to produce a privilege log. *In re Chevron Corp.,* 749 F. Supp. 2d 135, 140 (S.D.N.Y.), *aff'd sub nom. Lago Agrio Plaintiffs v. Chevron Corp.,* 409 Fed. Appx. 393 (2d Cir. 2010)*; In re Chevron Corp.*, 749 F. Supp. 2d 170, 185 (S.D.N.Y.), *aff'd sub nom. Lago Agrio Plaintiffs,* 409 F. App'x 393. When Chevron issued subpoenas in a subsequent RICO action against the LAPs, Donziger's employees, and the LAPs' former attorneys, this Court upheld Magistrate Judge Francis's determination that, because it was Donziger's "intentional conduct" that led to the privilege waiver, privilege could not be asserted by those individuals even in a different action. *See Salazar*, 275 F.R.D. at 447. Here, Donziger has committed the exact same "intentional conduct," leading to another waiver of privilege. Dkt. 2108. The same reasoning this Court applied in 2011 applies in equal force here and Donziger's "intentional waiver" should be found to constitute a waiver of any assertion of privilege Salazar would raise over documents within the scope of Donziger's waiver.

---

[7] Here, privilege has been waived with respect to the documents in Donziger's possession—many of which are likely in Salazar's possession as well. The waiver applies to the documents and is transferrable. As a result, at a minimum, Salazar must produce all documents in his possession that would have been responsive to the Donziger subpoena.

*Scope*.  Salazar cannot assert privilege over any document responsive to the Subpoenas because all of the documents Chevron seeks from Salazar fall clearly within the scope of the sub-poena Chevron served on Donziger in April 2018 and all of the documents were within Donziger's possession, custody, or control.  Chevron seeks three categories of documents from Salazar: (1) "documents relating to any attempted or completed sale" of "interest[s] in . . . the Ecuador Judgment;" (2) "documents reflecting or relating to any acts" taken by Donziger "to monetize or profit from the Ecuador Judgment;" and (3) "documents reflecting or relating to any property . . . that Donziger has received . . . that is traceable to the Ecuador Judgment."  Dkt. 2349-1 at 5.  These requests are virtually identical to Requests 19, 20, 21, and 22 in Chevron's subpoena to Donziger.  Dkt. 1988-1 at 12–13.

There is no document that could conceivably be responsive to Donziger's subpoena, but not to Salazar's.  And, given Donziger's role as attorney to the FDA and its U.S. representative, Dkt. 2114-2 at Ex. 23, and his role as an individual deeply involved in attempts to monetize and profit from the Ecuador Judgment, the documents Chevron now seeks from Salazar were, and still are, in Donziger's possession, custody, or control.  Indeed, in 2013, this Court found that "as the coordinator and supervisor of the LAPs' team, Mr. Donziger largely has controlled its fund-ing," and that because Donziger "controlled the funding and managed the litigation strategy," he also "controlled at least to some degree the salaries of the Ecuadorian lawyers [and] had and has the ability to obtain documents from his Ecuadorian team."  Dkt. 1529 at 38, 42.

Six years later, Donziger's control over fundraising and the accompanying control over fundraising documents continues.  As a result, documents held by the FDA's counsel—in this case, Salazar—are within Donziger's possession, custody, or control, just as they were in 2013.

Consequently, Salazar cannot assert privilege over these documents because any such privilege has already been waived.

### 3.    Salazar's Ecuadorian Law Arguments Are Unavailing

Salazar's attempts to escape production by selective reference to Ecuadorian law are to no avail.  Salazar argues that "[b]ecause the relevant privilege here is between an Ecuadorian lawyer and his Ecuadorian client, Ecuadorian law will apply to define the scope of the attorney-client privilege" and that, in turn, Ecuadorian law prevents production of documents and topics called for by the Subpoenas.  Mot. at 9-10.  This is incorrect.

First, the Court has held that Donziger has waived "any claim of privilege" over the documents.  That includes any applicable privilege under Ecuadorian law.  Thus, what Ecuadorian law may or may not provide with respect to privilege is immaterial.

Even if Donziger's waiver did not waive the attorney client privilege in Ecuador, and even if Ecuadorian law, in fact, prohibited Salazar from producing documents responsive to the Subpoenas, "[i]t is well settled that [foreign] statutes do not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute." *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa*, 482 U.S. 522, 544, 107 n.29 (1987).

Instead, if a conflict between foreign and U.S. law exists, the court must conduct a comity analysis to determine if it should allow foreign law to frustrate discovery authorized under U.S. law.  *See In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*, No. 14-MC-2548 (VEC), 2019 WL 1988525, at *2 (S.D.N.Y. May 6, 2019).  Here, Salazar has failed to make any argument that this Court should defer to Ecuadorian law and, consequently, has waived any such argument.  Even if Salazar had not waived this argument, however, the Court should decline to allow Ecuadorian privilege law to frustrate discovery in this case.

Courts consider several factors in determining whether foreign law should prohibit production:

> (1) the importance to the investigation or litigation of the documents or other information requested; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative means of securing the information; (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine the important interests of the state where the information is located; (6) the hardship of compliance on the party or witness from whom discovery is sought; and (7) the good faith of the party resisting discovery.

*Id*. This Court conducted just such an analysis in 2013 and held that Ecuadorian privilege law could not outweigh the need for discovery in this matter. Dkt. 1529 at 59–67, 78–80. That result was correct then and correct now. The balance of the relevant factors weighs heavily in Chevron's favor.

First, the documents and information the Subpoenas seek are without question important to this litigation. Donziger's—and his associates'—efforts to monetize and profit from the Ecuador Judgment are key to demonstrating whether there are other unknown violations of the RICO Injunction in addition to those uncovered to date. Because the evidence Chevron seeks "is directly probative to the issues of the case," this factor weighs in favor of Chevron. *Reino De Espana v. Am. Bureau of Shipping*, No. 03 CIV 3573 (LTS) (RLE), 2005 WL 1813017, at *7 (S.D.N.Y. Aug. 1, 2005).

Second, Chevron seeks only three, narrow categories of documents. Thus, the specificity of the requests weighs in Chevron's favor. *See Laydon v. Mizuho Bank, Ltd.*, 183 F. Supp. 3d 409, 421 (S.D.N.Y. 2016) (requests for discrete categories of relevant documents sufficiently specific).

Third, the documents sought largely originated in the United States.  Donziger's fundraising efforts have centered on U.S. investors and he and his associates have drafted the investment agreements in the U.S.

Fourth, Chevron has few—if any—alternative means of acquiring this information.  Indeed, it is Donziger's refusal to engage in discovery that has forced Chevron to issue third-party subpoenas and even those have had varying degrees of success.  In fact, Chevron has been forced to move to compel full productions from numerous third parties, demonstrating the difficulty of obtaining responsive documents.  Moreover, it is possible that Salazar possesses documents that no other person or entity, aside from Donziger, has.

Fifth, the balance of national interests, which is the most important factor, weighs in Chevron's favor.  *See Laydon*, 183 F. Supp. 3d at 422–25.  Although Ecuador has an interest in preventing its lawyers from revealing confidential information, the United States also has "a substantial interest in fully and fairly adjudicating matters before its courts."  *Gucci Am., Inc. v. Curveal Fashion*, No. 09 Civ. 8458 (RJS) (THK), 2010 WL 808639, at *5 (S.D.N.Y. Mar. 8, 2010) (quotations omitted).  This interest is particularly important where, as here, the plaintiff is attempting to enforce an injunction issued pursuant to the RICO statute. *See* Dkt. 1529 at 64–65.  Finally, the fact that Ecuador has not intervened to object to disclosure weighs against a finding that Ecuador has strong national interests at stake.  *See Alfadda v. Fenn*, 149 F.R.D. 28, 34 (S.D.N.Y. 1993) ("[A] foreign government's failure to express a view that the disclosure at issue threatens its national interests militates against a finding that strong national interests of the foreign country are at stake."); Dkt. 1529 at 65.  Additionally, any interest Ecuador may have had in protecting privileged information related to the enforcement of the Ecuadorian judgment has been stripped here, where a Bilateral Investment Treaty ("BIT") arbitration tribunal has found

that the Ecuadorian judgment was procured through fraud and that enforcement of that judgment would constitute a violation of international law.  *See* Dkt. 2082 (describing the findings of the BIT panel in its Track II Award).

Finally, with respect to hardship, while Salazar says that he could be subject to civil and criminal penalties (in theory), he "has not submitted any authority regarding the likelihood of prosecution, conviction, or imposition of the maximum sentence or fine, if [he] is compelled to disclose information pursuant to [this Court's] order." *Gucci*, 2010 WL 808639, at \*6.  In fact, Ecuadorian counsel has submitted documents and materials throughout this case without being subject to any penalty.  *See* Dkt. 1529 at 66–67.

In sum, Salazar's privilege objections are premature with respect to his deposition.  Additionally, Salazar's claim of privilege with respect to documents is improper as he has not submitted a privilege log.  For this reason, and because Donziger's privilege waiver extends to Salazar, any claim of privilege has been waived.  Finally, Salazar has not raised U.S. privilege and, instead, relies solely on Ecuadorian privilege.  But Salazar has not even attempted to argue that this Court should defer to Ecuadorian law in this matter—and a comity analysis shows that the Court should not do so.

## V.  CONCLUSION

For the foregoing reasons, the Court should deny Salazar's motion to quash and enforce the Subpoenas as served.

Dated: October 18, 2019                       Respectfully submitted,


                                              */s/ Randy M. Mastro*
                                              Randy M. Mastro
                                              Andrea E. Neuman
                                              Anne Champion

31

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY  10166
Telephone: 212.351.4000
Facsimile: 212.351.4035

William E. Thomson
333 South Grand Avenue
Los Angeles, California 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520
Email: WThomson@gibsondunn.com

Stern, Kilcullen & Rufolo LLC
Herbert J. Stern
Joel M. Silverstein
325 Columbia Tpke, Ste 110
P.O. Box 992
Florham Park, New Jersey 07932-0992
Telephone:  973.535.1900
Facsimile:  973.535.9664
Email: hstern@sgklaw.com
Email: jsilverstein@sgklaw.com

*Attorneys for Chevron Corporation*