# EXHIBIT 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHEVRON CORPORATION,

          Plaintiff,

  -against-

                                    Case No. 11 Civ. 0691 (LAK)

STEVEN R. DONZIGER, et al.,

          Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DIRECT TESTIMONY OF SARA MCMILLEN

     I, SARA McMILLEN, under penalty of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, declare:

     1.     I am a scientist and Chevron employee. Since 2011, I have been one of 25 active Chevron Fellows and the first woman to be so named in more than 20 years. As a Fellow, I mentor young scientists and engineers in the company, and I arrange and conduct research and development projects related to environmental issues. To become a Chevron Fellow, one must have a career history of sustained exceptional achievement in an area of technical expertise, have shown significant technical leadership for the company and industry, be acknowledged by peers both within and outside the company as an expert in their field, be distinguished as an innovative developer and/or implementer of technical solutions, and have demonstrated an exceptional ability to apply one's expertise in creating business value for the company.

     2.     In 2004, I began serving as the lead Chevron scientist on the *Aguinda v. Chevron Corporation* litigation filed in Lago Agrio, Ecuador in 2003 (the "Ecuadorian litigation"). As



PLAINTIFF'S
EXHIBIT
**3300**
11 Civ. 0691 (LAK)



lead scientist, I was responsible for ensuring the claims against Chevron were thoroughly investigated to determine the facts. My specific responsibilities included: negotiating with the Ecuadorian Plaintiffs' team regarding the Sampling and Analysis Plans that both sides were to use in the judicial inspections in the case; identifying experts who could be nominated to conduct the judicial inspections; reviewing the Chevron-nominated technical expert reports for accuracy and scientific rigor; and coordinating Chevron's response to the reports submitted by the experts nominated by the Ecuadorian Plaintiffs or by Ecuadorian experts selected by the court. I also identified the experts for Chevron who responded to the "Cabrera" reports.

3.    My duties also included reading and responding to the unfounded cost estimates and outrageous statements the Ecuadorian Plaintiffs' lawyers, including Steven Donziger, and others on the Plaintiffs' team repeatedly made about the case in their press releases, on their websites, in press interviews, to Chevron's shareholders, and to government representatives. My responsibilities in the case required that I remain up-to-date on virtually all aspects of the Ecuadorian litigation and that I review closely what the Plaintiffs' team was saying both to the court and to the public.

4.    From early on in the case, I was suspicious that the Ecuadorian Plaintiffs' lawyers and their technical advisors were not conducting themselves honestly and were not involved in a truth-seeking process, which is how I viewed the judicial inspections. Due to the time I spent in Ecuador, my attendance at meetings between Chevron and the Ecuadorian Plaintiffs' representatives, my review of technical and other filings in the Ecuadorian litigation, and the reports I received regularly from my technical team, I was in a unique position to later investigate and uncover certain aspects of the Plaintiffs' team's fraud. I was involved in Chevron's attempts both in Ecuador and in the United States to discover the truth, including the



Plaintiff's Exhibit 3300   p. 2 of 37

lengthy process of uncovering and proving the true authorship of the reports submitted to the Ecuadorian Court by Mr. Cabrera and the true authorship of the judgment issued by Judge Zambrano on February 14, 2011 (the "Ecuadorian judgment").

5.     As part of this fact-finding process, I was personally involved in various discovery actions filed by Chevron in the United States, especially those filed against Stratus Consulting ("Stratus"), Dr. Charles Calmbacher, Steven Donziger, and Joseph Berlinger. I didn't know what a "1782" was when it was first mentioned to me, but I was thrilled that there was a legal procedure by which we could attempt to uncover what I believed was a fraud. I reviewed thousands of documents produced by Stratus, Mr. Donziger, and others. And when Chevron received the *Crude* outtakes, I personally viewed more than 200 hours of the footage. I also attended the depositions of Dr. Charles Calmbacher, David Chapman, Dick Kamp, Mark Quarles, Charles Champ, Ann Maest, Douglas Beltman, Bill Powers, and at least six days of Mr. Donziger's deposition. Reading these documents, reviewing these videos, and attending these depositions confirmed for me first-hand the importance of discovery in the United States. While I suspected in 2008 that Mr. Cabrera didn't write his own reports, Chevron did not have proof. We would never have known the extent of the fraud against Chevron without the successful 1782 discovery. Through discovery, we obtained the essential proof that our suspicions of the Plaintiffs' team's wrongdoing and the corruption of the Ecuadorian Court proceeding were correct.

6.     In my work on the case, as in all of my work, my responsibility and my duty—as a scientist and as a Chevron employee—was and is to seek the truth and to understand, discover, and report the facts. This scientific approach drove me personally to discover the truth regarding the litigation in Ecuador and the fraud perpetrated against the company. I consider it a matter of

3



personal integrity and professional responsibility as a scientist to be objective and report the facts. I was never asked by anyone working for or on behalf of Chevron to do anything inconsistent with that personal code. To the contrary, I was asked by people working on behalf of Chevron to investigate each claim made by Mr. Donziger and the Ecuadorian Plaintiffs and to determine and report the facts.

**My Background**

7. I was born and raised in Oklahoma. I currently live in San Rafael, California with my husband and my two sons, ages 13 and 16.

8. In 1977, at the age of twenty, I graduated with a Bachelor of Science (B.S.) degree in microbiology from Oklahoma State University. I immediately began working in research and development for an oil company in Tulsa, Oklahoma. In 1996, I obtained a Master of Science (M.S.) degree in biology from the University of Houston, while working full-time.

9. After obtaining my master's degree, I went to work as a research scientist for Chevron Research & Technology Company, a subsidiary of Chevron Corporation in Richmond, California. I conducted bioremediation research projects, including leading a project to develop bioremediation guidelines for Chevron. Throughout my career I have conducted research and development as a Chevron team leader, as chair of joint industry environmental research forums, and managing joint industry projects on remediation and health risk. I was promoted in 2004 to the position of Senior Staff Scientist and again in 2006 to the position of Consulting Environmental Scientist. In 2004, I chaired an international joint industry waste management group and collaborated with other scientists conducting bioremediation research, although my work as lead scientist in the Ecuadorian litigation eventually became a full-time responsibility. As I noted earlier, in 2011 I was named to my current position as a Chevron Fellow.

4



**The Ecuadorian Litigation: Uncovering the Fraud**

10.     I am testifying about the events I witnessed during the Ecuadorian litigation that led me to believe that the Ecuadorian Plaintiffs' team was committing fraud against Chevron. Although Chevron and the Ecuadorian Plaintiffs' team agreed to conduct judicial inspections to determine the facts, the inspections turned into media events whenever Ecuadorian Plaintiffs' attorney Steven Donziger was present. During the judicial inspection process, the Ecuadorian Plaintiffs falsified the findings and conclusions of one of their experts, Dr. Charles Calmbacher, which Chevron did not discover until much later, and blocked Chevron's attempts to have a court-ordered inspection of its laboratory, HAVOC, which I did not believe to be capable of conducting the analysis the Ecuadorian Plaintiffs' team said the laboratory was conducting. Unhappy with the judicial inspection process, the Ecuadorian Plaintiffs' team succeeded in canceling the judicial inspections and having a global damages expert, Richard Stalin Cabrera Vega, appointed by the Ecuadorian Court as a supposedly neutral, independent expert. Mr. Cabrera's lack of experience, pattern of behavior at the site inspections, and associations with the Ecuadorian Plaintiffs led me to suspect that Mr. Cabrera was not a neutral expert, but someone working directly with the Ecuadorian Plaintiffs' team. After a close review of the report that Mr. Cabrera submitted to the Ecuadorian Court and investigating the links between the report and the Ecuadorian Plaintiffs' team, and after being stymied in every effort to address these concerns with the Ecuadorian Court, Chevron brought a number of discovery actions in the United States against the Ecuadorian Plaintiffs' agents, including the environmental consulting firm Stratus Consulting, attorney Mr. Donziger, and the filmmaker who made a movie about the Ecuadorian litigation. The discovery confirmed that the Ecuadorian Plaintiffs' team had committed fraud against Chevron: engineering Mr. Cabrera's appointment as the global damages expert and commissioning Stratus to write Mr. Cabrera's report. When the Ecuadorian judgment was

5



Plaintiff's Exhibit 3300   p. 5 of 37

issued, I immediately reviewed the judgment and discovered that it too contained irregularities that indicated the Ecuadorian Plaintiffs' team had been involved in writing it. The Ecuadorian judgment relies on the Ecuadorian Plaintiffs' team's data that was not in the court record and borrows heavily from the fraudulent Cabrera Report even though it purported not to. I am also testifying about the collusion I witnessed between the Republic of Ecuador and the Ecuadorian Plaintiffs' team and the Ecuadorian Plaintiffs' team's attempts to stop remediation of sites in the former Concession area. I am also testifying about the pressure campaign the Ecuadorian Plaintiffs' team waged against Chevron in an attempt to get Chevron to pay them off, and my efforts to set the record straight, even while I felt the tactics used by the Ecuadorian Plaintiffs' team attacked me personally, tarnishing my reputation and generating hate mail to me that made me worry for my family's safety.

**The Judicial Inspections and Steven Donziger**

11.     At the outset of the Ecuador litigation, the parties agreed and the Court ordered the inspection of 122 oil production sites located in the former Concession area. For most of the judicial inspections, experts were nominated by each side. At each judicial inspection site, these nominated experts took samples under the supervision of the judge at that site, sent their samples to a laboratory for testing and analysis, and then each submitted a written report of his or her findings and conclusions to the Ecuadorian Court. The Ecuadorian Court also appointed a third set of experts, known as the Settling Experts, who were to resolve any disputes between each side's experts' reports and findings. The Settling Experts attended the judicial inspections.

12.     I first visited Ecuador in May 2004 and have traveled to Ecuador at least 20 times in connection with the Ecuadorian litigation. The primary purpose for most of my visits was to attend ongoing judicial inspections. I personally attended 14 of the judicial inspections of well sites and production stations.

6



13.     The first judicial inspection I attended was for the well site called Sacha 6, on August 18, 2004. I also attended judicial inspections for the following sites: Sacha 21, Sacha 53, Sacha 13, Sacha 57, Sacha 14, Sacha 65, Shushufindi 67, Shushufindi 8, Shushufindi 7, Shushufindi 21, Shushufindi 18, Shushufindi 25, and Sacha Norte 2. When I did not personally attend a judicial inspection, I directed someone from the Chevron technical team to attend and to report directly to me the details of the inspection, unless there were security concerns.

14.     The first time I met Steven Donziger was in the summer of 2004 in Quito, Ecuador, at a meeting in preparation for conducting the judicial inspections. This was also the first time I met David Russell, the head of the Ecuadorian Plaintiffs' technical team at that time. I remember that Mr. Donziger ordered Mr. Russell to come to the meeting straight from the field in the Oriente region of Ecuador. We continued negotiations that evening at the Hotel Quito, and then on two additional occasions in the United States prior to the start of the judicial inspections.

15.     It was clear to me during that first meeting with Mr. Donziger and in my subsequent interactions with him that Mr. Donziger ran the show for the Plaintiffs. Mr. Donziger spoke and acted as though he had the authority to make all final decisions, and I never saw or heard anything that dispelled my initial understanding that he was the person in charge of the Ecuadorian Plaintiffs' team.

16.     From August 2004 to early 2006, the Ecuadorian lawyers speaking at the judicial inspections on behalf of the Plaintiffs were Dr. Alberto Wray and Dr. Monica Pareja. Dr. Pareja usually attended the judicial inspections as lead Ecuadorian counsel for the Plaintiffs. At this time, I recall that Pablo Fajardo was involved as part of the Ecuadorian Plaintiffs' legal team. Based on my observations of him and his interactions with other members of their legal team, he

7

appeared to be a junior member of the team.  Luis Yanza, who I understood to be associated with the Frente de Defensa de la Amazonía (the "FDA"), also attended most or all of the inspections that I attended.  The atmosphere at the judicial inspections attended only by the Ecuadorian lawyers was noticeably different than the atmosphere at those few that Mr. Donziger attended.

17.      Whenever Mr. Donziger attended a judicial inspection, it devolved into a media circus.  There would be significant media coverage, a much more combative atmosphere that seemed to be directed more at the media than at the Ecuadorian Court, and a bus of protesters would arrive, sometimes including indigenous people in native dress.  When Mr. Donziger was not present, the judicial inspections were relatively calm, routine legal proceedings.  While there were sometimes heated legal arguments amongst the lawyers, both sides collected their samples and resolved any disagreements in a cooperative, professional manner.  Few indigenous people attended the inspections and those who did were almost never in native dress.   And there was rarely any media coverage at all.

18.      Mr. Donziger escalated the circus atmosphere to a new level when he began showing up to judicial inspections with his own camera crew.  At the time (2006), I didn't know who they were, but in 2008 when he interviewed me I learned that the filmmaker was Joseph Berlinger.  I learned two years later from the *Crude* outtakes and Mr. Donziger's produced documents, that Mr. Donziger had recruited Mr. Berlinger to make the movie *Crude*.  In March 2006, while in the Lago Agrio airport waiting for a flight, I saw Mr. Donziger and the camera crew; Mr. Donziger came up to me and put his hands on both my shoulders and asked if a fight was going to break out on the plane.  I said, "I don't have anything to fight about, Steve."  On this same trip, during the flight from Quito back to the United States, I observed the cameramen

8



and the Plaintiffs' U.S. technical team members, including Bill Powers, high-fiving each other in first class, so I knew they were all working with Mr. Donziger.

**The Ecuadorian Plaintiffs Falsify Dr. Charles Calmbacher's Reports**

19.     Dr. Charles Calmbacher was the expert nominated by the Ecuadorian Plaintiffs for four of the judicial inspections: Sacha 6, Sacha 21, Sacha 94, and Shushufindi 48. I first met Dr. Calmbacher at the Sacha 6 judicial inspection, which was the first judicial inspection in the Ecuadorian litigation. By the time of the Sacha 53 inspection (the third inspection, held on September 1, 2004), it appeared from my observations of him that Dr. Calmbacher was physically ill. After he left Ecuador, the Plaintiffs' team filed a number of letters and reports purportedly signed by Dr. Calmbacher. I noticed that the signatures and Dr. Calmbacher's title on these documents were inconsistent, which led me to believe that Dr. Calmbacher had not signed all those documents personally. For example, one document was signed "Dr. Charles William Calmbacher," while another was signed "Dr. Chuck Calbacher." Below are examples of some of the fifteen signatures I reviewed:

Dr. Charles William Calmbacher
PERITO

Dr. Chuck Calbacher

Dr. Charles William Calmbacher
PERITO

(Sushufindi 48 judicial inspection report signature page (September 9, 2004); Request to the Court for Extension (September 22, 2004); Sacha 21 judicial inspection report signature page (August 19, 2004)).

9



20.     Based on these irregularities I had noted, Chevron brought the Calmbacher discovery action in Georgia in 2010. I was personally involved in preparing for that action. When I attended Dr. Calmbacher's deposition on March 29, 2010, I learned from Dr. Calmbacher's testimony that pages bearing Dr. Calmbacher's signature had been affixed without his knowledge to the reports for Sacha 94 and Shushufindi 48 (filed with the Ecuadorian Court on February 14, 2005 and March 8, 2005, respectively). He testified that he did not author the reports and that they contained findings and conclusions he did not make or agree with. While this shocked me, at the same time I recall feeling that it made sense to me because I had been unable to reconcile how Dr. Calmbacher could have come to the conclusions contained in those reports. That deposition was the first concrete proof that confirmed for me that a blatant act of fraud was committed against Chevron in the Ecuadorian litigation.

**Mr. Donziger Blocks the Inspection of HAVOC**

21.     Based on my personal involvement in the judicial inspections, I observed that the Ecuadorian Plaintiffs began using a laboratory called HAVOC to test the majority of their samples. In all, HAVOC analyzed more than 75% of the Plaintiffs' judicial inspection data. When I reviewed the results reported by HAVOC, they looked suspicious to me because of certain inexplicable anomalies, such as the reported results being below detection limits that could be achieved using state of the art equipment and methods in U.S. laboratories. Given these irregularities, I and others at my direction looked into HAVOC further and learned that HAVOC was not accredited by the Ecuadorian laboratory accrediting agency, the Organismo de Acreditación Ecuatoriano (the "OAE"). Given what we learned, I and others were involved in making sure that Chevron requested an order from an Ecuadorian court in Quito to inspect the HAVOC laboratory. And the Ecuadorian court granted Chevron's request.

10



Plaintiff's Exhibit 3300   p. 10 of 37

22.     A primary purpose of the requested inspection was to determine whether HAVOC had the equipment necessary to conduct the analyses the Plaintiffs claimed it was conducting. Accordingly, I arranged for a bilingual analytical chemist to fly to Ecuador to assist with the HAVOC inspection. After the first attempted inspection, I learned from Chevron representatives in Ecuador (and later observed photographs showing) that the HAVOC laboratory was in a house or residential building, which had an exhaust duct sticking out of the upstairs window. This further raised my suspicions that HAVOC was not a real laboratory. Based on my involvement in obtaining court orders to inspect the HAVOC laboratory, I know that the inside of the facility was never inspected because HAVOC would not permit the court-appointed expert or Chevron's legal team access to its facility. In total, Chevron attempted to inspect HAVOC on eight different occasions, and each time I arranged to have Chevron fly an analytical chemist to Ecuador for the inspection. But each time I was informed that Chevron was refused entry, and the ordered inspection never took place. Later, when I watched footage from the movie *Crude* and read documents produced by Mr. Donziger, I realized that it was Mr. Donziger who prevented the HAVOC inspection from occurring. He wrote that an inspection of HAVOC "WOULD BE A DISASTER FOR THE LAGO AGRIO CASE." (PX 909).

**The Ecuadorian Plaintiffs Abandon the Judicial Inspections**

23.     I knew from my work on the Chevron team that during the judicial inspection process there was a letter filed with the Ecuadorian Court by a man named Gustavo Pinto saying that, under an organization called CIGMYP, he and a Fernando Reyes were acting as "independent monitors" of the case. At the time, I was not aware of any role of Mr. Pinto or Mr. Reyes in the case. I did not see or interact with either of them. In 2010, however, I discovered while reading Mr. Donziger's notebook that he had secretly hired Mr. Reyes and Mr. Pinto to try to sway the opinions of the Ecuadorian Court and its Settling Experts. (PX 174). I remember

11

being particularly taken aback by what Mr. Donziger wrote about his "deal" with Mr. Pinto and Mr. Reyes: he wrote "feel like I have gone over to the dark side" and that this was a "bargain with the devil." (PX174).

24.    In February 2006, the Settling Experts issued their report on the first well site for which the parties had submitted competing expert reports, Sacha 53. On the day the Settling Experts' report was filed, it was faxed to Ricardo Reis Veiga while we were having a team meeting in Houston. We stayed up until 4:00 A.M. reading and analyzing the report together. Around that time, the Ecuadorian Plaintiffs' repeatedly asked the court to cancel the majority of the remaining judicial inspections. Chevron opposed these requests. On February 7, 2007, the Ecuadorian Court canceled all but five of the remaining judicial inspections.

**Mr. Cabrera's Site Inspections and Signs of Collusion**

25.    On March 19, 2007, the Court appointed Richard Stalin Cabrera Vega to be the single, neutral global damages expert. (PX 335). When I reviewed Mr. Cabrera's filed resume, I learned that Mr. Cabrera, a geologist, was unemployed at the time of his court appointment, and it was apparent to me he was not qualified for the global expert position. Based on my review of his resume, he could not possibly handle the complex task of a global inspection and assessment of former oil production sites. According to Mr. Cabrera's resume, he had no experience at all doing site assessments of oil field sites or serving as an expert witness in environmental litigation. Chevron objected to Mr. Cabrera's appointment as the court's independent global damages expert.

26.    Despite Chevron's objection, on June 13, 2007, Mr. Cabrera was sworn in as the court's global damages expert. (PX 342). Based on multiple Ecuadorian Court rulings, I understood that the global expert was supposed to be a neutral expert, operating with complete independence from the parties. And Mr. Cabrera swore "to perform his duties faithfully and in

12



accordance with science, technology, and the law, with complete impartiality and independence vis-à-vis the parties." (PX 342).

27. About two weeks later, on June 25, 2007, Mr. Cabrera filed his workplan. (PX 277R). Reading the workplan at the time raised my level of suspicion and concern even more because it was clear to me that, based on his qualifications, Mr. Cabrera could not have written the workplan and must have had assistance. Later, in the documents obtained from Mr. Donziger through discovery, I found the initial draft of "Cabrera's" workplan in a document Fajardo emailed to Mr. Donziger on March 21, 2007. (PX 843). Mr. Fajardo's draft of the workplan included a chart laying out who would perform the global expert's tasks, including a notation in the "Observations" column "Everyone silent" following the filing of the global expert report. (PX 843 at 4). I also read a June 22, 2007 email that Mr. Fajardo, identifying himself as "Lagarto 2," sent to Mr. Donziger about logging onto an email account "to learn about the plan" and asking him not to insert "any names in the document; just identify yourself as Lagarto 3." (PX 874). My suspicions were finally confirmed when Mr. Donziger admitted in his deposition that the Ecuadorian Plaintiffs' team had drafted the workplan filed by Mr. Cabrera with the court. Donziger Deposition at 04132:14-15 ("We drafted a work plan that we gave to [Cabrera].").

28. Based on my involvement at the time, I knew that Mr. Cabrera began his site inspections on July 4, 2007, and he told the Court that he had completed his site work on September 28, 2007. The Chevron technical team attending the Cabrera inspections reported to me daily. During the first week of Mr. Cabrera's field work, two particularly suspicious events were reported to me. First, Donald Moncayo, an activist for the FDA, and Silvio Jaya, a member of the Ecuadorian Plaintiffs' technical team from the judicial inspections, assisted Mr. Cabrera in

13



collecting samples on his first day of inspections. This was extremely disconcerting to me at the time since Mr. Cabrera was supposed to be the Court's independent expert, not someone working with the Plaintiffs' team. Second, a Chevron team reporting to me had encountered a team of biologists surveying fauna (such as bats, birds, and insects) at a different well site. The biologists told my team that the work they were doing for the court proceedings would be completed by the end of that week, but Chevron had never been informed by Mr. Cabrera or the Ecuadorian Court that this field work was being done. Thus, I suspected that Mr. Cabrera was a smoke-screen and that the actual scientific work was being done by others.

29.     Based on my involvement in the case at the time, I know that Chevron objected to the apparent FDA involvement in Mr. Cabrera's work and notified the Court in July 2007 of these suspicious circumstances suggesting a working relationship between them. Mr. Cabrera consistently denied any contact with the Ecuadorian Plaintiffs' team. Regarding the assistance from the Ecuadorian Plaintiffs' team that Chevron had observed and reported, he "admit[ed] that initially, a person associated with the plaintiff did provide me with logistical support for the expert examination" but claimed that "[a]fter the first days, I decided to rectify this situation and not allow any person associated with the parties to participate in my work in order to avoid absurd or ill-intentioned comments." He "condemn[ed]" the allegation that there was "preexisting information provided by the plaintiff that I allegedly will simply attach to my expert report" and "demand[ed] that these attorneys refrain from saying these kinds of things about me in the future." (PX 238). Cabrera repeatedly filed letters attesting to his independence, impartiality, fairness, and honesty, including saying in one letter "I should clarify that I do not have any relation or agreements with the plaintiff, and it seems to me to be an insult against me that I should be linked with the attorneys of the plaintiffs." (PX 281).

14



30.     Despite these denials, suspicious occurrences continued throughout the remainder of Mr. Cabrera's field work. I'll give you four examples reported to me. First, on at least one occasion, Mr. Cabrera arrived several hours late to a judicial inspection. The Chevron team, having arrived on time, stood around waiting for Mr. Cabrera for hours. Yet the Ecuadorian Plaintiffs' team arrived within minutes of Mr. Cabrera's arrival, indicating coordination or advance notice of the delay. Second, despite the fact that both parties were supposed to have access to observe Mr. Cabrera's sampling, Mr. Cabrera often roped off the areas where he was working so that our technical observers could not see what he was doing. Third, Mr. Cabrera refused to disclose the names of the members of his technical team and refused to provide copies of the chain of custody documents for his samples (which would have provided the signatures of people assisting him). Fourth, throughout the course of Mr. Cabrera's inspections, Luis Villacreces, who had worked on the Ecuadorian Plaintiffs' technical team and had been their designated expert at about a dozen of the judicial inspections, appeared to be directing specific locations for Mr. Cabrera to sample by tapping his foot in a specific spot and then nonchalantly walking away. Mr. Cabrera would then go to that exact spot and take a sample. Chevron's technical observers reported to me their conclusion that Mr. Villacreces had previously visited the sites to be inspected, and that it was Mr. Villacreces who was selecting specific sampling locations rather than Mr. Cabrera. These incidents furthered my suspicions that Mr. Cabrera secretly worked for the Ecuadorian Plaintiffs' team.

31.     The Ecuadorian Plaintiffs' court filings denied any improper contact with Mr. Cabrera. Mr. Donziger said in press releases that Chevron was afraid of Mr. Cabrera because he was independent. They never suggested, let alone admitted, while Mr. Cabrera's work was ongoing, that they were working with or assisting Mr. Cabrera or that they had drafted his

15



Plaintiff's Exhibit 3300   p. 15 of 37

workplan. My suspicions were heightened when in early 2008, I learned from the court filings

that Mr. Cabrera asked the Court to order the parties to provide him with three specific

categories of documents and in response, on February 18, 2008, the Plaintiffs provided eleven

categories of documents to Mr. Cabrera, but they refused to provide a copy of those documents

to Chevron. (2/18/2008 *Aguinda* filing).

32.     Later, in discovery proceedings in the United States, I learned from the court

filings in the 1782 proceedings that the Ecuadorian Plaintiffs argued that Stratus documents were

included in this February 2008 Ecuadorian filing, but they later abandoned that lie. It was not

until U.S.-based members of the Ecuadorian Plaintiffs' team were required to produce discovery

in the United States proving that they had actually written the Cabrera Report that the

Ecuadorian Plaintiffs belatedly first suggested there was nothing wrong with their secret

relationship and the ghostwriting of his report.

**The Ghostwritten Cabrera Report**

33.     Mr. Cabrera filed his global damages assessment (the "Cabrera Report") on

April 1, 2008. (PX 310). We knew that Mr. Cabrera was anticipating filing the report in late

March or in April, but neither I nor my colleagues at Chevron received notice as to the particular

day Mr. Cabrera would file the report. Accordingly, nobody from Chevron's team was present at

the Ecuadorian Court when Mr. Cabrera filed his report. Yet I later learned that Mr. Cabrera had

shown up to the Ecuadorian Court on April 1st with representatives of the Ecuadorian Plaintiffs.

After later seeing the movie *Crude* and reviewing the *Crude* outtakes, I confirmed that the *Crude*

film crew, the FDA's public relations coordinator (Lupita de Heredia), and a former FDA intern

(Aaron Page) were all present at the courthouse for Mr. Cabrera's filing of the report. (PX 83).

16



Plaintiff's Exhibit 3300   p. 16 of 37

34.     When I read Anexo V to the filed Cabrera Report, which identified Mr. Cabrera's supposed "team" of professionals he claimed had worked at his direction, it was the first time that I learned the names of the alleged "Cabrera team" members.

35.     I began reviewing the Cabrera Report the evening after it was filed.  From my review of the report, I started to put together evidence that Mr. Cabrera was not the report's author.  I first noticed that the report had multiple, internal inconsistencies, which led me to conclude that the Cabrera Report had been drafted by multiple authors and had not been reviewed from a technical perspective by a single individual.   I next learned that the bilingual members of our technical team thought that portions of the Cabrera Report had been originally written in English, a language Mr. Cabrera did not speak or write, and then translated into Spanish.  I then noted that the report also made unsupported assumptions throughout, always favoring the Ecuadorian Plaintiffs.  For example, Anexo H-1 had a chart that claimed to list the number of pits at each well site.  The chart was purportedly based on an analysis of aerial photographs.  Yet even where the chart stated "no evidence," "no data" or "does not exist" for an alleged pit, it would still include that pit in the Cabrera Report's pit count.

36.     I also determined there were publications cited in the Cabrera Report that were not attached and not available from a standard literature search.  Two of these reports, "Gallo. 2007, Diagnostico de la Fauna Terrestre y Macro Invertebrados en Pozos Operados por la Texaco" and "Martinez, E.C. 2007. Estudio botánico en 10 pozos operados por la Texaco durante 1964 y 1990 en la amazonia ecuatoriana con miras a su restauración", were written by Ecuadorian university professors Jose Nelson Gallo Velasco ("Gallo") and Carlos Eduardo Ceron Martinez ("Ceron"), respectively.  Both Ceron and Gallo were identified in Anexo V to the Cabrera Report as Cabrera team members.  I later found the two reports among the

17



Plaintiff's Exhibit 3300   p. 17 of 37

documents produced in the Stratus discovery proceeding. Upon reviewing them, I realized that these reports did not support the billions of dollars of ecological damage that Stratus had put in the Cabrera Report. Anexo O to the Cabrera Report recommended $874 million to $1.697 billion for "forest restoration," but the Ceron report concluded that only $3.5 million was needed for forest restoration.

37.     In addition to my own analysis, while I was helping with Chevron's response to the Cabrera Report, Chevron's lead lawyer in the Ecuadorian litigation, Adolfo Callejas, showed me an email from 2007 that Mr. Yanza accidentally sent to him instead of a different "Adolfo," Adolfo Maldonado, an activist with Acción Ecológica and Oil Watch International, groups that actively support the Ecuadorian Plaintiffs. The email discussed a contract under which Selva Viva would pay Oil Watch to conduct a survey of residents in the Oriente region, and to "document the testimonies of the people affected by petroleum operations"—a project that sounded very much like the "survey" included in the Cabrera Report. Both Dr. Callejas and I believed that the health survey in the Cabrera Report was likely the health survey referred to in the 2007 email that Dr. Callejas had inadvertently received.

38.     I was involved in the preparation of Chevron's rebuttal to the Cabrera Report filed September 15, 2008, which included more than two dozen expert reports. (PX 311). In addition to the expert reports, Chevron's rebuttal laid out evidence supporting the Ecuadorian Plaintiffs' team's suspected involvement in the Cabrera Report, including the email regarding the health survey that Dr. Callejas had received.

39.     On September 16, 2008, the Ecuadorian Plaintiffs filed comments, or "objections," to the Cabrera Report with the Ecuadorian Court. (PX 312). The Ecuadorian Plaintiffs did not state in that filing that they had made any contributions to or prepared any text

18



that was in the Cabrera Report. Rather, at several points, the comments claimed that the Ecuadorian Plaintiffs did not understand or were unsure of why certain statements or findings had been made in or were omitted from the Cabrera Report. For example, the Ecuadorian Plaintiffs claimed they "do not know why the expert did not consider more documentary information in his report." (PX 312 at 17). Thus, while most of the Ecuadorian Plaintiffs' comments generally endorsed the Cabrera Report, they also claimed the report's "omissions" "broadly favor the interest of the defendant." (PX 312 at 2). After the Cabrera Report came out, Mr. Fajardo emailed the Ecuadorian Plaintiffs' team to dictate their official response to the report. He wrote, "I think it is good to maintain a uniform line, PLEASE, WE ARE NOT HAPPY." (PX 1028).

40.     I learned that on November 17, 2008, Mr. Cabrera filed his response to the Ecuadorian Plaintiffs' comments (the "Supplemental Cabrera Report"), which I reviewed when I received it about a week later. (PX 313). On February 3, 2009, the Ecuadorian Plaintiffs filed comments on the Supplemental Cabrera Report. In those comments, the Plaintiffs claimed that although "[e]xpert Richard Cabrera has responded in an objective and scientific manner to the questions posed to him," the responses have "certain errors which continue to favor the interests of the defendant company . . ." As with the Ecuadorian Plaintiffs' September 16, 2008 comments and other Ecuadorian Plaintiffs' filings regarding Mr. Cabrera, there was no disclosure of the Ecuadorian Plaintiffs' team's role in drafting the Cabrera Report or the Supplemental Cabrera Report.

41.     Mr. Cabrera did not file any response to Chevron's rebuttal to the Cabrera Report until February 5, 2009. (PX 303). That filing, among other things, complained of having to



19

Plaintiff's Exhibit 3300   p. 19 of 37

respond to requests for information and reiterated that the report he filed as his own was "serious, objective and deeply impartial." (PX 303).

**Indications of Stratus as the Cabrera Report's Ghostwriter**

42.    In March 2009, I searched on the Internet for information about how to obtain a recently published book that one of Mr. Cabrera's listed team members, Dr. Carlos Beristain, had written about a health survey in Ecuador.   During my search, I came upon a website for a Spanish organization called HEGOA.   The website said that Dr. Beristain was a member of HEGOA, and it provided a summary of the work he had done with the support of the organization.   The information available on the HEGOA website stated that the FDA and Acción Ecológica participated in Dr. Beristain's 2007 research on the impacts of "Texaco's" operations in Ecuador: "*The first research is called reparations in socio-environmental conflict situations. The case of the impact of Texaco's oil activities in the Ecuadorian Amazon. The principal researcher is Carlos Martin Beristain, and the Ecuadorian organizations Ecological Action and Amazon Defense Front are participants.   The study seeks to develop proposals for comprehensive reparations in a scene of destruction and human rights violations on the basis of case studies of oil activity by the Texaco Company in the Ecuadorian Amazon.* Below is a screenshot of the webpage I found:

20





This confirmed to me that the Ecuadorian Plaintiffs' team, including members from Acción Ecológica and the FDA had been directly involved in the health survey relied on in the Cabrera Report.

43.    Chevron filed the information I obtained from the HEGOA website with the Ecuadorian Court on March 13, 2009.  Following that filing, the language referring to the FDA and Acción Ecológica disappeared from the description of the project on the website.  Rather than admit to their collaboration with Dr. Beristain, the Ecuadorian Plaintiffs then responded to Chevron's filing by falsely accusing Chevron of fabricating what I had found on the website.

44.    I watched *Crude* on DVD several times when it came out in 2009.  When I saw Adolfo Maldonado present at a community meeting and Mr. Donziger saying that the purpose of the meeting was to assess damages, I was certain that this was part of the "Beristain health survey."  In March 2010, I watched the Netflix version of the same movie.  In the Netflix version I saw scenes showing Dr. Beristain working directly with Mr. Donziger, Pablo Fajardo, Luis

21



Plaintiff's Exhibit 3300   p. 21 of 37

Yanza, Adolfo Maldonado and other representatives of the Ecuadorian Plaintiffs that I had not seen in the DVD version of the same movie *Crude*. I and others had been very focused on this particular scene in the movie because of our suspicion that it depicted the Plaintiffs' team's involvement in the health survey supposedly conducted by Dr. Beristain. The discovery of the altered scenes in the Netflix version of the movie confirmed our suspicions in a dramatic way. Based in part on this discovery, Chevron filed a discovery action against the filmmaker, Joseph Berlinger.

45.    By watching the *Crude* outtakes obtained in that action, I and others on the Chevron team obtained the video evidence that not only confirmed my earlier suspicions about the Plaintiffs' secret collaboration with Mr. Cabrera, but showed what to me was jaw-dropping evidence of collusion and fraud on the part of the Ecuadorian Plaintiffs' team. Through the Berlinger and Donziger discovery actions, we were also able to obtain evidence demonstrating that it was Mr. Donziger and Mr. Fajardo who prevailed upon Mr. Berlinger to edit the film to remove the evidence of their collaboration with Dr. Beristain because the publication of that proof in the movie was "so serious that we could lose everything[.]" (PX 1097).

46.    In July of 2009, I had also learned that an anonymous source had reached out to Chevron's General Counsel regarding the authorship of the Cabrera Report. The source indicated he had knowledge that the Cabrera Report had been ghostwritten and that Stratus Consulting was involved. When I heard about this communication, I began to re-review the Cabrera Report for additional signs of ghostwriting and connections to Stratus.

47.    I had first learned that Stratus, an environmental consulting firm, was working for the Ecuadorian Plaintiffs in the fall of 2007 when Ricardo Reis Veiga asked me to review documents written by Stratus for the Ecuadorian Plaintiffs as part of a confidential mediation

22



between Chevron and the Ecuadorian Plaintiffs. A few weeks later, I met with Ann Maest and Doug Beltman of Stratus to discuss some technical issues. When I undertook to re-review the Cabrera Report, I found matching text between the mediation documents written by Stratus and the Cabrera Report.

48.     By late 2009, I had determined that some of the language and cost estimates from the Stratus mediation documents were used in the Cabrera Report. In all, I found the following links between Stratus and Stratus sub-contractors and the Cabrera Report through my investigation: a section of the Cabrera Report was taken verbatim from the Stratus materials, including discussions of crude oil, drilling mud, and produced water (PX 310 at 3, 8, and 9); the potable water system in Anexo R of the Cabrera Report was almost identical to the unprecedented proposal in the 2007 Stratus document "Estimated Remediation Costs for the Napo, Concession, Ecuador"; and the Cabrera Report imposed the same cleanup levels that the Stratus documents proposed, even though those levels were lower than what Ecuadorian regulations required.

49.     Chevron filed the evidence of these connections with the federal court in Denver, Colorado, as part of the basis for getting discovery from Stratus.

50.     Early on in the Stratus discovery proceeding, Chevron obtained a Microsoft Access database produced by Laura Belanger, who had worked as a Stratus subcontractor, entitled "BaseDeDatos20Junio2007.mdb." When I analyzed this database, I noted that it was the apparent source of a data-printout attached as Anexo 4 to Mr. Cabrera's February 5, 2009 response to Chevron's rebuttal to the Cabrera Report. (PX 303). Anexo 4 contained the date, hour and minute each datum was entered and these exactly matched the corresponding data entry

23



dates, hours and minutes reflected in the database produced by Ms. Belanger, showing that Mr. Cabrera's table must have been printed from Ms. Belanger's database.

51.    Below are two tables.  The first table is an excerpt of "Anexo 4" from the February 5, 2009 Cabrera response to Chevron's rebuttal to the Cabrera Report.  The second table is from Ms. Belanger's database "BaseDeDatos20Junio2007.mdb" in the tab entitled "InformacionDeFamilias[.]"  Although the order of the columns is changed, the text in the "Campo," "Apellido," and "Nombre" columns is identical.

**Table 1 - Excerpt from InformacionDeFamilia Table**

| NOMBRE | APELLIDO | XCOORD | YCOORD | CAMPO | POZOQUEAFE | OTROSPOZOS | N-MERODEAD | N-MERODENI | N-MEROANCI |
|---|---|---|---|---|---|---|---|---|---|
| Carmen | Mera | 289841.000000 | 9921772.000000 | Auca | 12.000000 | 0 | 2.000000 | 1.000000 | 0.000000 |
| Yolanda | Fejardo | 289874.000000 | 9922356.000000 | Auca | 12.000000 | 1 auca 30 | 2.000000 | 1.000000 | 0.000000 |
| Leonel | Corea | 289748.000000 | 9922278.000000 | Auca | 12.000000 | 0 | 6.000000 | 1.000000 | 0.000000 |
| Jose | Mashurrar | 290055.000000 | 9922036.000000 | Auca | 12.000000 | 1 auca 35 | 2.000000 | 3.000000 | 0.000000 |
| Manuel | Quezada | 289876.000000 | 9921278.000000 | Auca | 13.000000 | 0 | 4.000000 | 2.000000 | 0.000000 |
| Carlos | Quezada | 289954.000000 | 9920938.000000 | Auca | 13.000000 | 0 | 2.000000 | 4.000000 | 0.000000 |
| Arturo | Coles | 289986.000000 | 9920662.000000 | Auca | 13.000000 | 0 | 7.000000 | 1.000000 | 0.000000 |
| Pablo | Quezada | 289843.000000 | 9919908.000000 | Auca | 14.000000 | 0 | 3.000000 | 1.000000 | 0.000000 |
| Angel | Grefa | 289916.000000 | 9919892.000000 | Auca | 14.000000 | 0 | 3.000000 | 1.000000 | 0.000000 |
| Marlene | Encarnacion | 290094.000000 | 9919222.000000 | Auca | 14.000000 | 0 | 2.000000 | 2.000000 | 0.000000 |
| Francisco | Encarnacion | 289922.000000 | 9919270.000000 | Auca | 14.000000 | 0 | 2.000000 | 1.000000 | 0.000000 |
| Cleofe | Herrera | 289968.000000 | 9919272.000000 | Auca | 14.000000 | 0 | 6.000000 | 4.000000 | 0.000000 |

**Table 2 - Excerpt from Anexo 4 Spreadsheet - page 13**

| CAMPO | POZO QUE LE AFECTA | OTROS POZOS | APELLIDO | NOMBRE | # ADULTOS EN CASA | # NIÑOS | # ANCIANOS |
|---|---|---|---|---|---|---|---|
| Auca | 12 | | Mera | Carmen | 2 | 1 | 0 |
| Auca | 12 | 1 auca 30 | Fajardo | Yolanda | 2 | 1 | 0 |
| Auca | 12 | | Corea | Leonel | 6 | 1 | 0 |
| Auca | 12 | 1 auca 35 | Mashumar | Jose | 2 | 3 | 0 |
| Auca | 13 | | Quezada | Manuel | 4 | 2 | 0 |
| Auca | 13 | | Quezada | Carlos | 2 | 4 | 0 |
| Auca | 13 | | Coles | Arturo | 7 | 1 | 0 |
| Auca | 14 | | Quezada | Pablo | 3 | 1 | 0 |
| Auca | 14 | | Grefa | Angel | 3 | 1 | 0 |
| Auca | 14 | | Encarnacion | Marlene | 2 | 2 | 0 |
| Auca | 14 | | Encarnacion | Francisco | 2 | 1 | 0 |
| Auca | 14 | | Herrera | Cleofe | 8 | 4 | 0 |

\\\

\\\

\\\

\\\

\\\

24

52.    Below is a chart of the matching timestamps I referenced above. The left side shows the timestamp entries copied from the electronic database produced by Ms. Belanger. The right side is an image of the first eight entries from the column entitled "HORA ENTREVISTA" in Anexo 4 of Cabrera's February 2009 response to Chevron's rebuttal to the Cabrera Report. As can be seen, they are identical.

| TIMESTAMP | HORA ENTREVISTA |
|---|---|
| 2003-07-15 11:24:48 | |
| 2003-07-15 11:18:36 | 2003-07-15 11:24:48 |
| 2003-07-15 10:51:07 | 2003-07-15 11:18:36 |
| 2003-07-15 10:11:07 | 2003-07-15 10:51:07 |
| 2003-07-15 09:33:34 | 2003-07-15 10:11:07 |
| 2003-07-15 09:07:16 | 2003-07-15 09:33:34 |
| 2003-07-15 08:48:41 | 2003-07-15 09:07:16 |
| 2003-07-16 16:03:54 | 2003-07-15 08:48:41 |
| 2003-07-16 15:37:12 | 2003-07-16 16:03:54 |
| | 2003-07-16 15:37:12 |

53.    I further observed that another table in Ms. Belanger's database appeared to be an early version of the "pit inventory" filed as Anexo H-1 of the Cabrera Report.

54.    But it wasn't until after August 2010, when the *Crude* outtakes were produced, that I realized for sure that Stratus had ghostwritten the Cabrera Report. Viewing what was happening in these outtakes—including the Ecuadorian Plaintiffs' team meeting with Mr.

25



Cabrera on March 3, 2007 to plan the global damages assessment—made me feel sickened and angry. (PX 36-42B; PX 2236; PX 2236A).

55.    It wasn't until 10 months after Chevron's filing of the Stratus discovery petition that Stratus finally delivered the bulk of its documents. On the evening of October 5, 2010, I was in Denver, Colorado, for the deposition of Douglas Beltman scheduled for the next day when Stratus finally turned over thousands of documents. We immediately began reviewing the Stratus documents, and within hours, we found a table in which Doug Beltman laid out who was writing each part of the Cabrera Report and who they would *say wrote each part*. According to this table, Mr. Cabrera did not write any portion of the "Cabrera" Report.

| List of Annexes for PG Report. | | | | |
|---|---|---|---|---|
| PG Report Section | Annex | Who will prepare | Attribution in PG Report | Notes |
| 2 Contamination | 2.1 Site-by-site presentation of contaminant data. | Quito office | Richard | 2.20. Tania is going to work on a new template that uses the stacked bars in proportion to heights. Doug gave Tania Ann's template table<br><br>Status of database on Calvera data? Ann will work with Luis V to resolve issues with the Calvera data.<br><br>(Gomez data?) |
| | 2.2 CVX operations history | Quito office (already written) | "?" | Luis V gave a draft copy to Doug on 2.21. It's on my hard drive. Need to send to Steven for his review. |
| | 2.3 Evaluation of the quality and usability of available data (includes comparison of CVX and SV data and explanation) | Quito office; Stratus (Ann) | Richard | 2.20 We probably have everything we're going to get as background info from Havoc.<br><br>We need to reach conclusions on data soon for incorporation into site-by-site. |
| | 2.4 Summary of historical data Summary of other contaminant data besides JI, Cabrera data (Agra, Woody Clyde, San Sebastian, etc.) | Quito office; Stratus (Preston and Ann) | Richard | Build from from Ann's "affidavit." Points to make: overall consistency of "other" data with JI data with respect to contamination; Region-wide contamination |

(PX 976).

\\\

\\\

\\\

\\\

\\\



Plaintiff's Exhibit 3300   p. 26 of 37

56.     Another chart produced by Stratus tracked its ongoing progress in ghostwriting

the Cabrera Report and included columns tracking Steven Donziger's review:

| D | E | F | G | H | I | J | K | L |
|---|---|---|---|---|---|---|---|---|
| Updated 3.12, 3.45 pm<br><br>Annex | Stratus in bold<br><br>Written by | Language written in | Draft finished? | Formatted? | If English, sent to translators on: | Returned from translators on: | English sent to SD for review on: | Spanish sent to SD for review? |
| Site-by-site contamination maps | Quito FDA | Spanish | - | | - | - | - | |
| Data QAQC | Stratus | English | Yes | Yes | 3.12 | | 3.12 | |
| Historical data summary | Stratus | English | Yes | Yes | 3.3 | 3.5 | 3.6 | Yes |
| Pit inventory and data | Quito FDA | Spanish | Yes | | - | | - | |
| Data extrapolation | Stratus | English | Yes | Yes | 2.29 | 3.4 | 3.4 | Yes |
| Environmental standards | Stratus | English | Yes | Yes | 3.7 | 3.12 | 3.7 | Yes |
| Toxicity of site chemicals to humans | Stratus | English | Yes | Yes | 2.29 | 3.4 | 3.4 | Yes |
| Survey of residents health, uses | Maldonado | Spanish | Yes | | - | | - | |
| Indigenous report | ? | Spanish | Yes | | - | | - | |
| Eco impacts from contamination | Stratus | English | Yes | Yes | 3.10 | | 3.10 | |
| Pit (plus) cleanup costs | Stratus | English | Yes | Yes | 3.8 | 3/10 | 3.6 | Yes |
| Health care costs | ? | Spanish | Yes | | - | - | - | |
| Potable water costs | Uni/Stratus | Spanish | Yes | | - | - | - | |
| PetroEcuador infrastructure improvements | Powers | Spanish | No | | - | - | - | |
| Value of human life losses | Stratus | English | Yes | Yes | 3.8 | 3.11 | 3.7 | Yes |
| Habitat losses at wells and stations | Stratus | English | Yes | Yes | 3.7 | | 3.7 | |
| Habitat losses at other areas | Gamboa | Spanish | | | - | | - | |
| Unjust enrichment | Powers/Stratus | English | No | | | | | |
| TexPet Remediation summary | Stratus | English | Yes | | 3.7 | 3.12 | | Yes |
| REPORT | Stratus | English | Yes | Yes | 3.12 | | 3.11 | |
| Section 1.2 of VSL annex | Stratus | English | Yes | Yes | 3.12 | | | |

(PX 1650).

57.     I almost fell off my chair. Stratus not only drafted the Cabrera Report, but

"cleaned and sanitized" the document in an attempt to hide its involvement. (PX 987). I learned

from these Stratus documents that Mr. Donziger had the final review and approval of all parts of

the report.

58.     My suspicions about "Beristain's health survey" were also confirmed by the

Stratus documents. Dr. Beristain and Stratus had exchanged emails about the survey and in one

email, Dr. Beristain sent Stratus a native version of the survey, with the footer "FDA/Action

Ecologica /OilWatch." Ann Maest and Doug Beltman traveled to Quito on March 17, 2008 to

make final edits to the report. I found that Mr. Prieto had edited the "Informe Sumario" on

27



Plaintiff's Exhibit 3300   p. 27 of 37

March 22, 2008, Mr. Donziger and Doug Beltman were editing the report on the evening of March 30, 2008, and someone using the gringograndote@gmail.com account emailed an electronic copy of the "Cabrera" report to Mr. Donziger on the morning of April 1, 2008—the day it was filed with the court. (PX 1022).

**Indications of the Lawyers Directing the Ghostwriting**

59.    One feature that I noted and found surprising in the communications I reviewed was how much the lawyers dictated to Stratus the terms of the ghostwritten Cabrera Report.  As a scientist, I found it particularly objectionable that the lawyers dictated technical details.  One February 2008 outline of the Cabrera Report by Stratus describes "2.21.2008 Questions for the attorneys."  One of the questions was "How do we deal with the ongoing PEPDA cleanup? They're cleaning up scores and scores of sites, we have no or little data on how good the cleanup is.  Our cost estimates assume that they haven't done anything, yet they have. ??"  The response was "Luis says proceed with the data we have. We essentially ignore it."  In other words, to determine what remediation was required at a site, they consciously decided to use outdated data that did not reflect recent remediation work.  Another exchange makes clear that the cleanup standard to be used in the Cabrera Report was dictated to Stratus by Mr. Donziger, and its task was to somehow justify it.

**UBR Discovery Proceeding**

60.    Before obtaining any of the U.S. discovery, another indication of the Ecuadorian Plaintiffs' involvement in the Cabrera Report stood out to me.  Anexo R of the Cabrera Report recommended the construction of a complex potable water system in the region that was almost identical to the potable water system proposed in the 2007 mediation documents prepared for the Ecuadorian Plaintiffs by Stratus.  Because these documents were confidential and had not been provided to the Ecuadorian Court, I knew the Ecuadorian Plaintiffs' team must have provided

28



this document to Mr. Cabrera, or to whoever prepared "his" report. There was another sign that the Ecuadorian Plaintiffs had played some role in authoring or preparing Anexo R: the only one of Mr. Cabrera's disclosed experts (identified on Anexo V to the Cabrera Report) who had experience with potable water systems was Juan Cristobal Villao Yepez, who worked for the U.S. consulting firm Uhl, Baron, Rana & Associates, Inc. ("UBR"), and Figure 3 of Anexo R (a map of the proposed potable water system) contained UBR's name and logo. But Figure 3 also said the map is "based on the work of the Selva Viva team," which is what the Ecuadorian Plaintiffs' legal and technical team call themselves. And Figure 1 of Anexo R, which is another map almost identical to Figure 3 in terms of layout, color, and symbols, was stamped with the name and logo of the FDA. After reviewing Anexo R, I was certain that the Ecuadorian Plaintiffs' team had been involved in preparing it. Based on this information, Chevron filed a petition in a U.S. court to obtain evidence from UBR. The documents and testimony obtained from UBR in that proceeding further confirmed that UBR and Villao (a supposed member of Cabrera's "independent team") were retained and paid by the Ecuadorian Plaintiffs and that UBR wrote what became Anexo R.

**Discovering the Ghostwriting of the Ecuadorian Judgment**

61.     On February 14, 2011, the Ecuadorian Court issued the Ecuadorian judgment against Chevron. (PX 399). Given the evidence that the Ecuadorian Plaintiffs' lawyers and consultants ghostwrote the Cabrera Report, I was concerned that they may have similarly had a hand in drafting the Ecuadorian judgment. I obtained a copy of the Ecuadorian judgment only hours after it was served on the Chevron legal team and worked through the night to analyze its contents.

62.     Within 24 hours, I determined that the "judge" used the Ecuadorian Plaintiffs' internal "Selva Viva database" as the source of the data in the Ecuadorian judgment, and that

29



Plaintiff's Exhibit 3300   p. 29 of 37

numerous errors and oddities from this internal environmental sampling data compilation (PX 439 – PX 441) appeared in the Ecuadorian judgment. The errors and oddities—such as the use of unique sample names, treating "non-detect" results for mercury as if mercury had been detected, and reporting sample results in the wrong unit of measure—left no doubt in my mind that the author of the Ecuadorian judgment relied on the Ecuadorian Plaintiffs' lawyers' internal data compilation, rather than laboratory results filed with the Court, which did not contain these unique oddities.

63.     As amazing as it sounds, the judge used the Selva Viva database rather than the court record when discussing judicial inspection results. (PX 399 at 104, 105, 108-112). For example, on page 104 of the judgment, it says "se consider a las muestras ESN2-PIT3-SE2_sv…" In this example, the suffix "_sv" does not appear in the chain of custody, or in the sample identification shown in the laboratory results. The only place I or anyone on the Chevron team had seen this sample designation was in a copy of the Selva Viva database obtained via discovery. The use of the Selva Viva database explains why there were mistakes in the Ecuadorian judgment's discussion of the data. For example, in discussing the Ecuadorian Plaintiffs' mercury data, the author of the judgment makes the mistake of using "non-detects" (data indicating that a constituent is not detectable by analytical methods) as if they reflected the presence of mercury ("<7 mg/kg Hg"), dropping the "<" sign, because the Ecuadorian Plaintiffs deleted all the "<" signs (as reflected in the Selva Viva database and as noted in the Stratus documents).

64.     Unit errors in the Ecuadorian judgment are likewise explained by its author's reliance on the Ecuadorian Plaintiffs' internal data compilation. Specifically, I noticed that both the Ecuadorian judgment and the Ecuadorian Plaintiffs' lawyers' data compilation wrongly list

30



certain sample results in milligrams per kilogram (mg/kg). The laboratory results filed with the Ecuadorian Court for those samples show they should have been reported in micrograms per kilogram (μg/Kg). Consequently, both the Ecuadorian judgment and the Ecuadorian Plaintiffs' data compilation overstate by a factor of one thousand the concentration of the same substances at the same sites.

65.     In the weeks and months after the Ecuadorian judgment was issued, I also realized that, contrary to its claim that the Cabrera Report would "not be taken into account," the Ecuadorian judgment incorporated and derived data and conclusions from the Cabrera Report. The most striking example of the Ecuadorian judgment's reliance on the Cabrera Report is its stated pit count of 880.

66.     The number of pits in the former Concession area had been the subject of much contention in the Ecuadorian litigation, and consequently, I was familiar with various estimated pit counts. The 880 pit count in the Ecuadorian judgment perplexed me because I did not see how the Ecuadorian Court could have arrived at that number. In its request for clarification of the Ecuadorian judgment, Chevron asked for the court's source for the 880 pit count. The court responded that it "analyzed the various aerial photographs that form a part of the record and that were certified by the Military Geographic Institute." (PX 429 at 15). But I knew from the aerial photograph evidence that it is not possible to derive an exact pit count of 880 from them. This is because aerial photographs existed in the court record for only approximately two-thirds of the sites and many of the photographs were of very poor quality.

67.     The only pit count estimate in the vicinity of 880 pits was the Cabrera Report's Anexo H-1 estimate of 916 pits. In investigating the source of the Ecuadorian judgment's 880 pit count, I noted that the Ecuadorian judgment purported to exclude harm caused by

31



Petroecuador. When the Stratus spreadsheet used to create Anexo H-1 of the Cabrera Report is sorted to exclude pits identified as "Petroecuador pits" and sites designated as "no impact," it comes out to exactly 880 pits—the same number claimed in the Ecuadorian judgment.

68. Closer inspection of the Ecuadorian judgment revealed other evidence that its author had access to the Ecuadorian Plaintiffs' lawyers' internal documents. As I reviewed the Ecuadorian judgment, I noticed an oddly worded sentence about produced water containing petroleum solvents such as benzene. I recalled that I saw this same odd wording in a report written by Dr. Richard Clapp ("Clapp Report") that had been produced to Chevron in discovery. The Clapp Report was not filed with the Ecuadorian Court and I could not find it on the internet or published elsewhere. Yet when I re-reviewed the report, I found text from the unfiled Clapp Report appeared verbatim in the Ecuadorian judgment. (PX 2169). These are the connections between the Ecuadorian judgment and the Ecuadorian Plaintiffs' internal documents that I identified. Subsequent analysis identified many more connections. I have no doubt based on my own analysis that members of the Ecuadorian Plaintiffs' team had actually written the Ecuadorian judgment.

**Collusion Between Mr. Donziger, the Ecuadorian Plaintiffs, and the Republic of Ecuador**

69. One issue that came to my attention frequently was the connection between the government of Ecuador and the Ecuadorian Plaintiffs. Since the Ecuador litigation sought to impose on Chevron cleanup and social obligations that would otherwise fall to the Ecuadorian government, the motivation for the Ecuadorian government's support of the Ecuadorian Plaintiffs was obvious to me. There was evidence early on and throughout the case that the Ecuadorian government funded portions of the case against Chevron. Documents produced by Mr. Donziger showed that Petroecuador funded the Ecuadorian Plaintiffs' survey of issues

allegedly related to oil contamination in the former concession area. This survey, known as Bejarano 2003, generated the data I discussed earlier as appearing in Anexo 4 of Cabrera's February 2009 response. Petroecuador's funding of another survey (Pallares & Yepez) is mentioned in a December 16, 2004 email sent by then Ecuadorian Plaintiffs' counsel, Mr. Bonifaz, stating that the study had been carried out by Manuel Pallares and others using PetroEcuador's funds.

70. I also discovered long after the fact that shortly before Mr. Cabrera was appointed, the Ecuadorian government awarded the FDA $160,000 for the generation of data for an "Environmental Liabilities Information System," then $185,000 for "Management of Information on the Socio-Environmental Problems of the Areas Affected by the Petroleum Activity in Sucumbíos and Orellana." (2007.02.22 Ecuador Official Register, No. 26 at 6). I have reviewed the documents the FDA submitted in satisfaction of the contract and note that one of those reports listed some of the supposed Cabrera team members in Anexo V of the Cabrera Report —David Torres, Luis Miguel García Aragón, and Ranil Senanayake. But the work was not attributed to Richard Cabrera or his team: that report claims instead that the study was "carried out by the Amazon Defense Front, under a services contract" with the Ecuadorian Ministry of the Environment. Another indication of cooperation I saw was data overlap between Ministry of the Environment files and the Cabrera Report. Chevron obtained a file titled "Fuentes contaminación AUCA.XLSX" from the Ministry of the Environment that lists pits and areas in the Oriente requiring remediation. The purported areas matched those in the Stratus spreadsheet used to create Anexo H-1 of the Cabrera Report to multiple decimal places, indicating that they must be one and the same or are derived from the same source.

33



Plaintiff's Exhibit 3300   p. 33 of 37

71.    I have not traveled to Ecuador since 2011 and would not go now due to concerns for my personal security. I fear for Chevron's attorneys, experts, and witnesses in Ecuador as a result of the Correa regime's public denouncements and threats against anyone working for or with Chevron. These threats continue to this day. Correa has called Chevron an "enemy of the country," and state-owned media has recently published the names of Chevron's attorneys and experts in Ecuador, calling them "traitors," "criminals," "immoral people," and "collaborators" in what he calls Chevron's effort to "suffocate Ecuador." Correa also recently went to Lago Agrio as part of his campaign against Chevron, where he dipped his hand in a pit of fresh crude oil for the cameras. The pit chosen for this photo op—the sole pit at the AG-04 well site—was one that Petroecuador, not TexPet, was obligated to remediate. Ironically, Petroecuador had regulatory approval to remediate that pit several years ago (March 19, 2006), but Mr. Donziger and the Ecuadorian Plaintiffs' team successfully prevented that work from being completed. In 2006, Petroecuador confirmed that it was responsible for remediating the pit at AG-04 under the PEPDA (Project to Eliminate Pits in the Amazon District) program. However, in 2007, the Ecuadorian Plaintiffs, in a letter ghostwritten for Richard Cabrera to sign and submit, asked the Ecuadorian Court to order that the PEPDA remediation, including specifically the work at AG-04, be stopped. In 2009, when Petroecuador wanted to re-start remediation efforts it stated publicly that remediation of areas that included the entire former Concession area would cost $96 million. (PX 1142). When Mr. Fajardo emailed Mr. Donziger about this, Mr. Donziger responded to "go to Correa and put an end to this shit once and for all." (PX 1142).

**Mr. Russell's Remediation Cost Estimate**

72.    I remained on good, professional terms with Dave Russell even after he stopped working for Mr. Donziger in 2005. From time to time he shared with me his personal opinions about the case. He told me in 2005 that he had informed Mr. Donziger several times in 2004 and

34



Plaintiff's Exhibit 3300   p. 34 of 37

2005 that his $6 billion remediation cost estimate that Mr. Donziger liked to trumpet publicly was exaggerated, inaccurate, and based on invalid assumptions, and that Mr. Donziger should stop using it. Mr. Russell even offered to develop a new, more accurate estimate as a consultant for Chevron, but I did not respond to that offer, and he was never retained by Chevron. When I saw in early 2006 that Amazon Watch had repeated Mr. Russell's cost estimate in a letter to the SEC, I forwarded that letter to Mr. Russell. Shortly after that, in February 2006, Mr. Russell informed me that he had sent Mr. Donziger and Amazon Watch a "cease-and-desist" letter and he sent me a copy of the letter. (PX 764). In the letter, Mr. Russell disavowed his remediation estimate as inaccurate and based on misrepresentations made to him by Mr. Donziger before any sampling and analysis had been conducted in Ecuador. Even after I saw this letter, I still saw the $6 billion figure cited by the Ecuadorian Plaintiffs' team in their press releases and elsewhere. I continued to communicate with Mr. Russell from time to time, and he continued to follow the case and share his opinions with me.

**The Death of Pablo Fajardo's Brother**

73.     In October 2007, I and three other Chevron employees met with David Baker of the San Francisco Chronicle. In the course of the interview, Mr. Baker mentioned Mr. Donziger's allegation of Mr. Fajardo's brother being killed by someone hired by Chevron. We responded by saying, "You can't really believe Chevron would have someone murdered?" He responded that he thought it was plausible. I can't describe how offended I was. I re-lived that moment years later while watching *Crude* outtakes when I saw Mr. Donziger on film leaving the offices of the San Francisco Chronicle in April 2007—smiling and crowing about getting "publicity as part of a legal case" and how "[t]he business of plaintiffs' law" was "[t]o make fucking money." (PX 57). Knowing how he had made the grotesque allegation regarding murder to the Chronicle reporter, his cynical and cavalier statement about "fucking money"

35



disgusted me. And of course, in Mr. Fajardo's official report to the Ecuadorian police at the time

of the murder, he had confirmed that his brother was killed by local Ecuadorians with whom he

had an ongoing personal dispute and who had threatened him previously. To this

day, I cannot believe that someone would make a false murder accusation just because it might

help him get money, but that is exactly what Mr. Donziger apparently did.

**Joe Berlinger and *Crude***

74.     While in Coral Gables, Florida, in the summer of 2008, I was interviewed by Mr.

Berlinger for his movie, *Crude*. I agreed to the interview because I believed Mr. Berlinger when

he told Chevron he wanted to make a balanced documentary. The information I provided during

my interview was truthful. But Mr. Berlinger edited my interview for the movie *Crude* to create

the opposite impression. For example, during one portion of the interview when I was saying

that poor health in the Oriente region of Ecuador was due primarily to poor sanitation, the

cameras cut away to the image of a fresh oil sheen that I know came from a recent spill. And

when I saw the outtakes that Mr. Berlinger and the Ecuadorian Plaintiffs' lawyers had fought so

hard to keep secret, I was amazed to see and hear Mr. Berlinger and his crew joking with Mr.

Donziger about using onions to make it appear that someone was crying, repeating a running

joke about doing "cinema fakité," and Mr. Donziger joking, after one of his many rants about

Texaco, how he "could have been a propagandist." I was dismayed to see that the scene of an oil

sheen was from a recent Petroecuador spill, but that Mr. Donziger claimed it was due to Texaco.

And when I saw later in the *Crude* outtakes that Mr. Berlinger had captured hours of footage

showing Mr. Donziger's dishonesty and corruption of the case—including Mr. Donziger meeting

with Mr. Cabrera before he was even appointed by the Court and his instruction to his paid

consultant, Dick Kamp, "don't talk about that"; Mr. Donziger telling his clients' paid consultants

Bill Powers and Ann Maest to pretend to be with an independent NGO when they appeared at a

36



Plaintiff's Exhibit 3300   p. 36 of 37

judicial inspection; and Mr. Donziger giddily reveling in the advantage his side had that the "judge thinks he'll be killed" if he rules in favor of Chevron—but Mr. Berlinger put none of that footage into the movie, I realized just how much Mr. Berlinger used and abused me.

75.     Following the release of *Crude*, I received hate mail from random individuals, saying things like "You are an awful person who deserves every bad thing" and "I hope Chevron pays you handsomely for the lies you are introducing into this world, How you sleep at night is beyond my comprehension," and calling me a "whore." And Mr. Berlinger himself said about me: "That's one of the deeper and more troubling aspects of those interviews. I think she believes every word coming out of her mouth. She's been down there, but she's drunk the Kool-Aid." If anyone had drunk the Kool-Aid, it was Mr. Berlinger. Throughout my life, and throughout my career as a scientist, I have prided myself on my honesty and dedication to the truth. And the hate mail scared me and made me worry for the safety of my children. Although I knew that Mr. Berlinger and Mr. Donziger were working hand in glove, it was not until Mr. Donziger finally produced documents in response to Chevron's discovery petition that I realized just how much control Mr. Donziger had to be able to use this film as a propaganda piece. Indeed, he essentially commissioned the movie, directed the cameramen, secured its funding, had "say" in its content and would go "off the record" when it suited him, and was even paid for appearing in it.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this $\cancel{8}$ day of October, 2013 at San Rafael, California.

Sara McMillen

37



*Chevron Corp. v. Donziger*,
No. 11 Civ. 0691 (LAK)


## **Exhibits Cited in Sara McMillen Witness Statement (PX 3300)**


Offered for the Truth:

- PX 909
- PX 174
- PX 335
- PX 342
- PX 843
- PX 874
- PX 83
- PX 311
- PX 1028
- PX 1097
- PX 36-PX 42
- PX 976
- PX 1650
- PX 987
- PX 1142
- PX 764
- PX 57
- PX 2236


Not Offered for the Truth

- PX 277
- PX 238
- PX 281
- PX 310
- PX 312
- PX 313
- PX 303
- PX 400
- PX 439-441
- PX 429
- PX 2169
- PX 1022



PLAINTIFF'S
EXHIBIT
**3300A**
11 Civ. 0691 (LAK)