THE LAW OFFICES OF
# ANDREW J. FRISCH, PLLC

ONE PENN PLAZA
53rd FLOOR
NEW YORK, NEW YORK 10119
(212) 285-8000
FAX: (646) 304-0352

JASON D. WRIGHT
ADMITTED IN NEW YORK, VIRGINIA
AND THE DISTRICT OF COLUMBIA
OF COUNSEL

November 18, 2019

*By ECF*
The Honorable Loretta A. Preska
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:  *Chevron Corp. v. Steven Donziger, et al.;*
            *Criminal Docket Number 19-561 (LAP);*
            *Civil Docket Number 11-0691*

Dear Judge Preska:

      On behalf of Steven Donziger, I write in reply to the Special Prosecutor's letter of November 13, 2019, and in further support of the pending application for modification of conditions of Mr. Donziger's pretrial release to eliminate home confinement and electronic monitoring. I respectfully request that the application, if it is not granted on the submissions, be calendared for oral argument after 3:00 on November 20, 2019, or any time on November 22, 2019, if the Court's calendar so permits.

      Ms. Glavin argues in opposition to the pending application that nothing has changed since Mr. Donziger first appeared before the Court on August 6, 2019, but she fails to acknowledge that the new position of Pretrial Services itself represents a change. Pretrial Services recommends a curfew of 10:00 p.m. to 7:00 a.m. secured by monitoring in lieu of home confinement, based on its first-hand evaluation of Mr. Donziger over the past three months and its resulting confidence that home confinement is not necessary. On November 15, 2019, because Ms. Glavin in her letter requests an opportunity to "explore" the "current position" of Pretrial Services at a hearing, I telephoned the assigned Pretrial Services Officer to determine if anything had changed since November 4, 2019, when I reported to the Court that Pretrial Services consented to a curfew. Officer Lea Harmon assured me, unequivocally, that the position of Pretrial Services remains the same. If Pretrial Services had a real reason for concern about Mr. Donziger, Ms. Glavin would have so advised the Court in her letter, but she did not do so because there is none.

The position of Pretrial Services is not the only changed circumstance since Mr. Donziger's first appearance before the Court. These other changes, not within the usual scope of consideration of Pretrial Services, demonstrate why not even a curfew is necessary. For example, since Mr. Donziger's first appearance in this Court, he has appeared on four separate days to answer the disciplinary charges based on the civil case from which the charges of criminal contempt in this case arise. Mr. Donziger is plainly engaging the issues, not running from them.

More, on September 9, 2019, a month after Mr. Donziger first appeared, he filed a brief in the Second Circuit in support of his appeal from the District Judge's order of civil contempt [*Chevron Corp. v. Donziger*, Case No. 19-1584], and a motion was made and granted to consolidate that appeal from an earlier one. *Chevron Corp. v. Donziger*, Case No. 18-855. These appeals challenge the entirety of the orders on which charges of criminal contempt are predicated. Mr. Donziger may win or lose these appeals, but pursuit of judicial redress is the opposite of flight.

Further, when Mr. Donziger first appeared on August 6, 2019, he had not had an opportunity to contact potential sureties. In our letter of November 4, 2019, we proffered as many as 18 additional sureties, but that number continues to grow and is now up to 27. Contrary to Ms. Glavin's apparent suggestion in her letter, these prospective sureties are not blindly supporting Mr. Donziger, but are mostly accomplished professionals, and include professors at Harvard Law School and the University of California at Davis, as well as numerous practicing lawyers in good standing. Sureties of their sophistication have necessarily done their homework before offering to tie their reputations to Mr. Donziger, whom they all have otherwise known for years, some for decades. Even more, unlike Mr. Donziger's first appearance, he is now represented by counsel who can advocate for him based on an independent investigation of the case. At the risk of speaking out of school, I have repeatedly told Ms. Glavin that, but for my understanding of the relevant professional rules, I would co-sign Mr. Donziger's bond myself and do so in a heartbeat with 1000% certainty that he is completely worthy of my trust.

Contrary to Ms. Glavin's suggestion, Mr. Donziger has no incentive to flee to Ecuador or anyplace else. Mr. Donziger is a lawyer who has lived in Manhattan for 25 years, has a son in eighth grade, and has surrendered his passport. Any "exposure to incarceration" does not itself establish an incentive to flee, especially without any insight into the prosecutor's view of the range of any permissible incarceration. *See* U.S.S.G. §§2J1.2, 2X5.1; *see also, e.g., United States v. Brennan*, 395 F.3d 59 (2d Cir 2005). Though we realize that the statute does not set a maximum sentence, the only prosecution of a lawyer for contempt in this Circuit that we have found, the case against attorney Bruce Cutler for repeatedly speaking to the press in contravention of Judge Glasser's repeated admonitions, resulted in a sentence of 90 days of house arrest [*see United States v. Cutler*, 58 F.3d 825, 838-89 (2d Cir. 1995)], fourteen days *fewer* than Mr. Donziger's home confinement to date.

As for Ms. Glavin's view of the purported strength of her case, it is the rare prosecution in this District in which the defendant can truthfully say that the United States Attorney declined to prosecute his case, and rarer still that the United States Attorney declined a request to prosecute urged by one of the Judges before whom the United States Attorney regularly appears. In fact, of the six charges of contempt that the District Judge recruited Ms. Glavin to prosecute, three are based solely on Mr. Donziger's alleged *delay* with orders with which he complied before the charges were filed (Counts One, Four and Five), and Mr. Donziger had a right to resist others without risking criminal contempt. *See, e.g., Maness v. Meyers*, 419 U.S. 449, 460 (1975) (a person may resist an order and not be guilty of contempt if compliance would disclose information that would cause irreparable injury); *In re Grand Jury Proceedings*, 601 F.2d 162 (5th Cir. 1979) (contempt is not necessarily proper when an order is resisted to preserve constitutional rights and attorney privileges); *United States v. Straub*, 508 F.3d 1003, 1011 (11th Cir. 2007). These facts themselves defeat any concern that more than the secured bond already in place is necessary.

Unlike civil contempt, charges of criminal contempt animate discussion about the defendant's state of mind so that "willful" disregard of a judge's order, not just the intentional violation thereof, must be established beyond a reasonable doubt as a prerequisite before consideration of criminal penalties. As part of a disposition or a trial, Mr. Donziger will testify to the context of the underlying civil litigation and the orders at issue which informed his state of mind. While Ms. Glavin relegates discussion of the civil case to a footnote, the following facts are, we believe, fully or substantially undisputed and themselves undermine her claim that Mr. Donziger "engaged in fraud and corruption to obtain a court judgment," or that the civil case establishes that his release requires any condition at all, and certainly nothing more than a secured bond:

- Like the charges of criminal contempt themselves, the United States Attorney declined to prosecute Mr. Donziger for the fraud alleged by Chevron despite venue in the Southern District and the readiness with which the United States Attorney otherwise reaches outside our national borders to take on difficult and unique criminal cases.

- Long before Chevron claimed fraud in Ecuador, the Ecuadorians impacted by Chevron's operations initiated a lawsuit in this District, before Chevron successfully fought to have it sent from this District to Ecuador on grounds of *forum non conveniens*, arguing, based on at least fourteen separate affidavits, that "Plaintiffs have adequate remedies in Ecuador, as other federal courts have concluded . . . Ecuadorian residents have litigated civil lawsuits against Texaco's subsidiary and other multinational companies, and those cases have proceeded without corruption, intimidation, or judicial malfeasance." *See, e.g, Aguinda v. Texaco*, Case No. 01-7756 (2d Cir. Dec. 2001), Brief for Defendant-Appellee ChevronTexaco at 3.

- Before the end of the subsequent trial in Ecuador, Chevron dissipated its assets in Ecuador, claiming to have done so for purely business reasons, but serving thereby to frustrate the plaintiffs' recovery.

- The Courts of Ecuador, reviewing the record *de novo*, carefully considered and categorically rejected Chevron's claims that the judgment against it should be nullified. The Sole Chamber of the Provincial Court of Sucumbíos, in an opinion issued January 13, 2012, examined what it called Chevron's "secret assistance" theory (that the plaintiffs' legal team somehow "ghostwrote" the judgment) and concluded that the allegation "does not lead anywhere without a good dose of imagination." It assured that all Chevron's "allegations have been considered," but concluded that "no reliable evidence of any crime ha[d] been found." Two years later, the National Court of Justice (the highest layer of direct appeal in the Ecuadorian system), also reviewed the record and concluded in a 220-page opinion that under Ecuadorian law, Chevron had "never demonstrated fraud, which it has been claiming without any legal support. We reiterate that it has not proven any omission or violation of procedure that would give rise to the nullity sought. The appellant's incessant harping in this regard departs from procedural good faith." These judicial opinions were filed as PX 431 and PX 8095 in the RICO case.

- The finding of bribery in the civil case is especially alarming, as it was exclusively based on the testimony of a disgraced former Ecuadorian judge, who was paid by Chevron starting with a lump sum of 40 times his monthly salary, then put on a monthly retainer at a rate of 20 times his former salary, prepped by Chevron lawyers for 53 days in advance of his RICO trial testimony, and later admitted to lying repeatedly about critical facts during his RICO testimony relied on by the District Judge for his findings. If those facts were themselves inadequate to defeat Chevron's claim of fraud, a forensic examination of computer hard drives in the Ecuadorian court's chambers disproved the allegation of "ghostwriting" at the heart of the witness's testimony – a fact for which Chevron never offered a persuasive explanation. Vast payments by an oil company to a fact witness in exchange for testimony that turns out to be admittedly perjurious is itself reason to reject Ms. Glavin's view that Mr. Donziger "engaged in fraud and corruption" that creates any incentive to flee.

- Before the civil trial in this District, John Keker, a Purple Heart recipient and one of the Nation's most highly-regarded lawyers who clerked for Supreme Court Justice Earl Warren, made the following highly-unusual observations in seeking to withdraw after representing Mr. Donziger for two years:

> This is an extraordinary case, which has degenerated into a Dickensian farce. Through scorched-earth litigation, executed by its army of hundreds of lawyers, Chevron is using its limitless resources to crush defendants and win this case through might rather than merit. There is no sign that Chevron wants a trial on the merits. Instead, it will continue its endless drumbeat of motions – for summary judgment, for attachment, to reinstate long-dismissed claims, for penetration of the attorney client privilege, for contempt and case-ending sanctions, to compel discovery already denied or deemed moot, etc., etc. – to have the case resolved in its favor without a trial. Encouraged by this Court's implacable hostility

to Donziger, Chevron will file any motion, however meritless, in the hope that the Court will use it to hurt Donziger.

*Chevron Corp. v. Donziger*, 11 CV 691 (LAK), Doc. 1100 at 1-2.

- Even before the RICO action against Mr. Donziger was ever filed and before any evidentiary hearing, the presiding Judge opined that Mr. Donziger and others were extorting Chevron, rhetorically asking, "Now, do the phrases Hobbs Act, extortion, RICO, have any bearing here?" [*In re Chevron*, 10-MC-002, Hearing Transcript of Sept. 23, 2010, at 24]; and later, before trial, emphasized that Chevron was "a company of considerable importance to our economy that employs thousands all over the world, that supplies a group of commodities, gasoline, heating oil, other fuels and lubricants on which every one of us depends every single day. I don't think there is anybody in this courtroom who wants to pull his car into a gas station to fill up and finds that there isn't any gas there because these folks [Ecuadorians] have attached it in Singapore or wherever else [as part of enforcing their judgment]." *Chevron Corp. v. Donziger*, 11 CV 691, Transcript of Hearing of Feb. 8, 2011, at 49-50. By contrast, the District Judge never expressed concern about Chevron's impact on the Amazon and its people, referring to them as the "so-called plaintiffs."

- Ms. Glavin advises the Court that Mr. Donziger "did not challenge any of [the District Judge's] factual findings on appeal," but Ms. Glavin, as part of her Rule 16 discovery in this case, produced testimony from Mr. Donziger's recent disciplinary hearing of Deepak Gupta, a highly-respected appellate lawyer who litigates frequently before the United States Supreme Court. Mr. Gupta testified at the disciplinary hearing that he devoted sixty pages of his appellate brief on Mr. Donziger's behalf challenging the District Court's factual findings, electing not to challenge sufficiency as a stand-alone appellate point because it would have been a "suicide mission" given the onerous appellate standard of review:

> The standard appellate brief is less than 60 pages. We devoted more than 60 pages of our appellate brief to contest - exclusively to contesting all critical aspects of the facts. Every step of the way, in every filing that we made, we made clear that we were contesting Chevron's and Judge Kaplan's account of the facts. So I think it's fair to say those facts were controverted in every critical respect.

> [I]'ve not had a client who was as unwavering in his desire to contest the facts throughout as Steven Donziger. . . [W]e faced an extremely difficult challenge as appellate counsel in getting into this appeal. That is because you have this massive fortress of alternative factual findings that the judge had issued. Any appellate lawyer knows that it's a kind of suicide mission to go in and take on 500 pages of factual findings under the clearly erroneous standard of review. At the same time, we felt that we had extremely strong legal arguments that we wanted to make.

> So we focused on the legal arguments in the legal argument section of the brief, but we also devoted an unusual amount of space in our filings and in subsequent filings to

contesting the facts vigorously and in particular to contest the really unusual nature of the factual development of the case.

[C]hevron's case, as we said on page two of the appellate brief, rested on the paid testimony of a witness who was paid over $1 million. He admitted to sweetening his – to changing his story multiple times to sweeten his deal with Chevron. That was the star witness for Chevron in this case. So we made that abundantly clear that Mr. Donziger was contesting the allegations against him.

Donziger Disciplinary Hearing at 359-61.[1]

- Ms. Glavin argues that Mr. Donziger's "fraudulent and corrupt acts" were extensively documented by the District Judge, but there are two starkly different sides of the story of the civil case, which was tried before a Judge without a jury, and at which the lesser civil standard of proof applied, resulting in findings that have been contradicted in whole or in part by seventeen appellate judges in Ecuador and ten in Canada, including in unanimous decisions of the highest courts in both countries. As Attorney Gupta testified at the disciplinary hearing:

> I want to say this delicately because it's not my habit to say anything adverse about – I have the greatest respect for the federal bench. I clerked for a federal judge, I practice[] before the federal courts. I have never seen a judge whose disdain for one side of the case was as palpable on the bench in ways that I think may not have always come through in the paper record. But it was fairly obvious that Judge Kaplan had great personal animosity for Steven Donziger . . . And actually that just made me more inclined to take on the appeal because I felt like a great injustice was being done.

Disciplinary Hearing at 357.

> You know, one really remarkable thing that I have never seen in any other case is that Chevron said they had billions of dollars in damages that they were seeking, but then dropped all of those claims on the eve of trial to deny Mr. Donziger a jury.

Disciplinary Hearing at 358.

> I came [to testify at this hearing] because I can't think of any other case that I have worked on that I think is as great a travesty of justice to a particular individual, and the way that the court system treats individual's rights.
>
> Mr. Donziger was effectively branded guilty by a single judge without having a jury, without having the kind of process that is typically afforded to someone before a serious accusation, before they have to face serious accusations of this sort of thing, and I feel very strongly about it. I wanted to be here to make it clear that I stand by him, not because I am being paid, not because I'm counsel in this proceeding. I'm not. But because my personal view is that this was a miscarriage of justice.

---

[1] The full transcript of attorney Gupta's testimony produced by Ms. Glavin, as well as the entirety of Mr. Donziger's disciplinary hearing, is available from the undersigned upon request.

6

> I believe that Mr. Donziger is a person of integrity. I believe that he is a person who -- you know he was a graduate of one of the best law schools. He could have taken a conventional path of the law, but he became a public defender. This is not a person who is motivated by greed. This is not a person who was trying to engage in the sort of thing that Judge Kaplan accused him of. This is someone who wanted to devote his career to defending the rights of the indigenous people in the Amazon who were the victims of pollution and he did so tenaciously. But that's not a crime.
>
> So I feel very strongly that he is not guilty of the things that he is being accused of. And I understand that the scope of this proceeding is however it's been defined, but I think -- I just want to say that I have -- and I didn't come to this conclusion lightly. I have read the record. I had to read all of this to prepare for the oral argument in the Second Circuit, to prepare all of these briefs. I've looked at the evidence and it is my habit to be extremely skeptical about the positions that I take. And my whole team, you know it was not just me. I have fantastic lawyers who went through all of these with a fine-tooth comb, and I am convinced that this is a travesty of justice.[2]

Donziger Disciplinary Hearing at 368-70.

      Mr. Donziger was indisputably an advocate dedicated to helping indigenous peoples and local communities of the Amazon play equally on the same fields of civil litigation, political influence, public messaging, and unlimited resources otherwise dominated by the Chevrons of the world. As established by internal Chevron documents, the company's stated goal was (and remains) to "demonize Donziger" as part of an express and concerted public relations and litigation strategy to distract from its poisoning of the Amazon and its bribery of its indispensable witness to implicate Donziger falsely. More, Chevron demonizes Mr. Donziger as much as to discredit him as part of a litigation strategy as to broadcast to any other similarly-motivated champion of Chevron's victims, in the Amazon or elsewhere in the world, that unrelenting scorched earth awaits. At Mr. Donziger's recent disciplinary hearing, there were as many as eight Chevron attorneys in the audience for each of the four days, texting the Committee's lawyers across the room even as witnesses testified. It is not unduly cynical to believe that the honor of the legal profession was not the overriding interest of Chevron in discharging a battalion of lawyers to attend the hearing and coach the Committee.

      As for Mr. Donziger's electronic devices, the subject of Count Five, Ms. Glavin expressly (and alarmingly) assumes Mr. Donziger's willfulness of the alleged contempt as a factor in opposition to this application before proving beyond a reasonable doubt that he so acted. She appears to believe that Mr. Donziger is obliged to capitulate to the criminal charge and abandon his defenses in order to be relieved of home confinement. Here too, she presses inferences of malevolence without allegiance to the record or the reality of the civil case.

---

[2] The decision of the international tribunal cited by Ms. Glavin as evidence of Mr. Donziger's untrustworthiness is of no moment: the tribunal was conducted in secret, Mr. Donziger was not a party to it, and it was otherwise fundamentally unfair, as we expect to discuss further as the case proceeds.

In June 2019, Mr. Donziger filed an emergency motion to stay the District Judge's order of civil contempt pending resolution of the appeal therefrom in the Second Circuit [Doc 2235, 2250], which embraced disclosure of the devices and passport referred to in the criminal charges. Mr. Donziger explained that the Judge's order would compel "disclosure of privileged, confidential, sensitive, and First-Amendment protected information to Chevron" that neither the Circuit nor District Courts could force Chevron to unlearn.[3] As for whether the "neutral" forensic expert was truly "neutral," Mr. Donziger explained that the ordered protocol, among other defects, permitted Chevron's attorneys unfettered discretion in reviewing ten percent of the disclosures to determine how the "neutral" protocol should program an automated search of the universe of disclosures. Mr. Donziger proposed, as an alternative, that he submit his devices to a forensic expert, as long as the expert was directed not to allow any access at all to Chevron, for search-programming purposes or otherwise, pending resolution of the pending appeal. Mr. Donziger told the District Judge that, even if his application was denied, he intended to "retain an expert to perform the imaging anyway in order to demonstrate my willingness to comply with any and all Court orders once my appellate rights have been respected." Reply Declaration of Steven Donziger, June 12, 2019, Doc 2250 at 2-4.

By now causing the devices to be imaged and secured, Mr. Donziger, again acting responsibly and with respect to the Court, has protected interests in the civil case, while also protecting his right to defend himself from these new criminal charges. As for the defense's decision not to disclose the locale of the devices and images or identify the vendor, any such disclosure would result in Chevron's lawyers descending on it, issuing subpoenas, making motions, and introducing a third-party to more unrelenting scorched earth.

We remain hopeful that the charges can be resolved in a way that both vindicates the authority of the District's Bench while also acknowledging the critically-important context not addressed by Ms. Glavin. Whatever the outcome of this case, Mr. Donziger will be here when it happens. We appreciate Officer Harmon's continued recommendation of a curfew, but the conditions of home confinement and monitoring should be completely eliminated.

Respectfully submitted,

/s/
Andrew J. Frisch

cc: Ms. Rita Glavin
Special Prosecutor

---

[3] *See, e.g., Maness v. Meyers*, 419 U.S. at 460; *In re Grand Jury Proceedings*, 601 F.2d at 162; *United States v. Straub*, 508 F.3d at 1011.