# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

CHEVRON CORPORATION,

                       Plaintiff,

         -against-

STEVEN DONZIGER, *et al.*,

                    Defendants.

11 Civ. 0691 (LAK) (RWL)

---

### Memorandum of Law in Support of Motion by Nonparties Joshua Rizack and The Rising Group Consulting, Inc. for Payment of Reasonable Fees and Modification of Protocol Deadlines

CARLTON FIELDS, P.A.

Michael L. Yaeger
Alex B. Silverman
405 Lexington Avenue, 36th Floor
New York, New York 10174
212.785.2577

*Attorneys for nonparties Joshua Rizack and The Rising Group Consulting, Inc.*

## CONTENTS

Page

AUTHORITIES ........................................................................................................ ii

INTRODUCTION .................................................................................................... 1

FACTS ..................................................................................................................... 2

A.  Events Prior to the September 13, 2019 Hearing ...................................... 2

B.  The September 13, 2019 Hearing .............................................................. 4

C.  Post-Hearing Protocol Negotiations ......................................................... 6

D.  Progress Under the Protocol to Date ......................................................... 7

    1.  Initial obligations under the Protocol & forensic reconstruction analysis ......................... 7

    2.  Size and cost of the remaining document review ........................... 11

DISCUSSION .......................................................................................................... 14

A.  Legal Standard ......................................................................................... 14

B.  Chevron's Subpoena, Chevron's Motion, and the Protocol have already placed, and will continue to place, an undue burden on Mr. Rizack's time and financial resources ........ 16

C.  Cost-Shifting is Mandatory Here ............................................................. 18

CONCLUSION ........................................................................................................ 21

## AUTHORITIES

Page(s)

No table of authorities entries found.No table of authorities entries found.

Nonparty respondents, Joshua Rizack and The Rising Group Consulting, Inc. (collectively, "Mr. Rizack"), move pursuant to Fed. R. Civ. P. 45 for payment by plaintiff Chevron Corporation ("Chevron") of the reasonable attorneys' fees and costs incurred by Mr. Rizack in connection with: (i) Chevron's nonparty subpoena, dated April 27, 2018 (the "Subpoena"); (ii) Chevron's Motion to Compel Mr. Rizack to Produce the Mirror Images of their Electronic Devices for Inspection, dated July 16, 2019 (Dkt. 2265) ("Chevron's Motion" or "Chv. Mot."), and (iii) the Review, Production and Forensic Inspection Protocol (the "Protocol") instituted by the Court's Order dated, October 7, 2019 (Dkt. 2362) (the "Order"). Mr. Rizack also moves under Rule 45 for modification of the production deadlines imposed by the Order and Protocol.

## INTRODUCTION

Without relief on costs and deadlines from this Court, Mr. Rizack will not be able to continue complying with the Protocol. After processing the relevant data, we've learned that applying the Protocol's search terms as ordered would require reviewing over 496,000 documents (not pages). Even after repeatedly conferring with Chevron's counsel to revise the search terms—a process that is still ongoing—the terms as presently modified still yield over 100,000 documents. The Protocol also requires that all documents be produced by December 2, 2019 (Protocol, ¶ 9(a)), which is this coming Monday.

Neither that December 2 deadline nor the cost of complying with the Protocol is feasible. Mr. Rizack simply cannot afford it. Even with assisted review technology and contract attorneys charging just $35 per hour, our e-discovery vendor estimates that its review of 100,000 documents would take at least 8 business days and cost approximately $61,475. That would be on top of the hundreds of hours of labor already required since July 2019 to negotiate with Chevron, brief and argue issues before the Court, negotiate the Protocol after the hearing, and make two initial productions in the last 30 days, all of which has resulted in fees totaling over $241,000. By itself, that

1

is more than Mr. Rizack can afford. If he has to pay an additional $61,475, bringing the total over $300,000, he'll be bankrupted, and he cannot in good conscience sign an e-discovery vendor contract he knows he cannot pay. And regardless of Mr. Rizack's personal resources, $300,000 is an objectively outrageous cost to impose on a nonparty individual.

We are mindful of the Court's statement on September 13, 2019 that "the question of who will absorb the costs of Mr. Rizack's attorney's fees is best deferred until after the protocol is executed and the fees incurred." Tr. 45. However, given Mr. Rizack's inability to pay the cost of complying with the Protocol, and the undue burden Chevron has already placed on him, we ask that the Court not defer awarding fees already incurred, and that Chevron also be ordered to pay the reasonable fees still to be incurred under the Protocol. As discussed below, Chevron's obligation to bear these costs has been made more tangible by the now-largely complete forensic data recovery analysis, which has not produced any evidence of the sort of deliberate deletion or obstruction of which Chevron accused Mr. Rizack. We also ask that the deadlines in the Protocol be stayed until the cost issues are resolved and an e-discovery vendor can be retained.

Finally, while we felt compelled to file because the December 2 deadline falls on the first working day after the upcoming holiday, we of course recognize that the same holiday makes the timing of this request inopportune, and we are more than willing to provide Chevron with additional time to respond to this Motion.

## FACTS

### A.    Events Prior to the September 13, 2019 Hearing

Mr. Rizack and his small business are nonparties to this case. In April 2018, Chevron served Mr. Rizack with the Subpoena seeking documents concerning the location of assets held by Steven Donziger, the main defendant in this case. *See* Dkt. 2266, App'x A. Mr. Rizack complied

with the Subpoena from the start, and by July 2019, he had produced documents on 8 separate occasions and testified in 2 full depositions. Given the limits on his technological and financial resources, Chevron's aggressive demands were not just significant burdens on his time but also cause for economic concern. These limits were, and are, very real, as Mr. Rizack has repeatedly made clear to Chevron's counsel. In order to stay within his means and minimize his costs, Mr. Rizack made those productions and submitted to those depositions without any professional document review technology, or even the assistance of counsel.

Unsatisfied with Mr. Rizack's compliance, Chevron filed a motion on July 16, 2019, seeking to compel adherence to an extraordinarily invasive, burdensome, and generally unwarranted forensic protocol that would have largely eliminated the role of Mr. Rizack and his counsel in the review. Chevron admitted that it modelled its proposed protocol on a virtually identical protocol designed specifically for Donziger. But that protocol was approved for Donziger only after a RICO judgment was entered against him and he was found to have engaged in a long pattern of obstruction resulting in civil contempt. *See* Dkt. 2171, slip op. at 3 (finding that Donziger "in virtually all respects has refused to cooperate," that he "admitted that he deliberately had withheld many" responsive documents, and that the protocol was "necessitated only by his obdurate refusal to make any serious, good faith effort to produce the documents he has been ordered to produce.").

Faced with an aggressive effort to essentially destroy his basic privacy rights, Mr. Rizack was forced to retain counsel in July 2019. What followed was a laborious, often contentious period of negotiations with Chevron's counsel regarding the contours of a procedure by which Mr. Rizack would continue to comply with the Subpoena, but now with professional guidance and technology.

Unable to agree on a protocol after lengthy negotiations, the Court directed Mr. Rizack and Chevron to file a joint letter setting forth their positions concerning any remaining points of disagreement. *See* Dkts. 2281, 2298. That letter was submitted on August 28, 2019 (the "Joint Letter") (Dkt. 2314), and on September 4, 2019, the Court set a hearing to address the issues discussed therein. That hearing took place on September 13, 2019 (the "Hearing"). *See* 9/13/19 Minute Entry.

**B.      The September 13, 2019 Hearing**

Following oral argument, the Court addressed the underlying question of "the extent to which Mr. Rizack, as a nonparty, should be governed by the same protocol, or extremely similar protocol, as was applied to Mr. Donziger, who is the defendant in the action." *See* Silverman Decl. Hearing Transcript ("Tr."), Ex. A at 43:25-44:3. The Court concluded that "Mr. Rizack is not similarly situated to Mr. Donziger, and the balance of interests – including privacy, cost, and otherwise – must be considered accordingly…" Tr. 44:6. Indeed, while Chevron repeatedly sought to "portray[] Mr. Rizack as being dishonest based on his having repeatedly made only partial productions, that Chevron determined were incomplete, and also based on his deposition testimony," the Court recognized that "Chevron's overall argument in this regard is overwrought and ignores the dividing line between when Mr. Rizack had legal representation and when he did not." Tr. 44:20-45:2. "In short," the Court explained, "the Donziger protocol that was applied for Mr. Donziger made sense given his proven and established lack of credibility and compliance with court orders. That has not been established here." Tr. 45:3.

One of Mr. Rizack's primary objections to Chevron's proposed protocols was that each version largely eliminated the role of his counsel by delegating decision-making authority to Chevron and/or its counsel. *See* Joint Ltr. at 10. The Court agreed that Chevron's insistence upon these terms was "unusual," and that while they may have been appropriate for the Donziger protocol,

the fact is that "Mr. Rizack is not Donziger and is not a party" to this case. Tr. 47:1. As such, the Court ruled that Mr. Rizack's counsel, not Chevron or its counsel, shall retain decision-making authority as to whether a document is responsive, privileged, or confidential. Tr. 47:18.

While finding that the overall protocol process is to be directed by Mr. Rizack's counsel (Tr. 48:6), the Court did direct the parties to meet and confer about certain issues, including the most effective way of running searches using the roughly 2,000 proposed search terms. Specifically, the Court directed the parties to consider employing assisted review technology to minimize the review (Tr. 47:20), and to confer if the as-ordered search terms still generate large numbers of false positives, "such that it may make sense to abandon the use of those particular terms." Tr. 47:20-48:4.

Another point of disagreement was whether Chevron's counsel was entitled to the forensic reconstruction and recovery reports to be prepared by Mr. Rizack's forensic expert, Kevin Faulkner of Crypsis Group ("Crypsis"). Mr. Rizack did not oppose having Crypsis perform a forensic inspection of his devices and accounts to recover files that may have been deleted, nor to producing to Chevron any responsive and non-privileged files recovered as part of that investigation. For reasons set forth in the Joint Letter, however, Mr. Rizack was, and continues to be, entirely opposed to providing Chevron's counsel with copies of the forensic inspection reports that Crypsis is currently in the process of finalizing. *See* Joint Ltr. at 11.

The Court agreed that Chevron had not demonstrated any good reason to require the production of these reports, although the Court did allow Chevron to seek copies at a later date "if a sufficient showing is made that there is reason to believe that production of the reports to Chevron's counsel is warranted." Tr. 48:18-49:3. As detailed below, Crypsis' analysis is now substantially complete, and, despite Chevron's depictions of Mr. Rizack as engaged in a systematic effort to

"obstruct discovery" and "delete responsive documents" (*see* Chv. Mot. at 11-13, 17-18), the inspection yielded no evidence of such conduct.

Finally, in the Joint Letter, Mr. Rizack sought and continues to seek payment from Chevron of his reasonable attorneys' fees and costs to comply with the Subpoena, to respond to Chevron's Motion, and to complete the Protocol. As of the Hearing, Mr. Rizack had already incurred attorneys' fees that would qualify as "significant" by any measure, including Rule 45 of the Federal Rules of Civil Procedure. Chevron argued that Mr. Rizack waived his right to seek fees under Rule 45, but the Court disagreed, finding he had not waived any rights in regard to the Subpoena, including the right to seek his reasonable compliance costs from Chevron. Tr. 45:8.

The Court also held, however, that "the question of who will absorb the costs of Mr. Rizack's attorney's fees is best deferred until after the protocol is executed and the fees incurred," which the Court stated "will both promote cost consciousness and allow the Court to resolve the issue based on a more fully developed record, as we do not yet know some facts and factors that could be relevant to that analysis." Tr. 45:16. Notwithstanding that view, the Court also acknowledged that "in a clean slate situation, it would be Chevron's obligation to absorb these costs, particularly with the extent of the discovery they are seeking," and that "it certainly seems as if, at the moment, that Chevron would be bearing the large proportion of these costs." Tr. 49:19-50:3.

## C.  Post-Hearing Protocol Negotiations

Shortly after the Hearing, Mr. Rizack and Chevron began a second round of negotiations to craft a protocol consistent with the Court's September 13 rulings. Though not as contentious as the pre-Hearing negotiations, the post-Hearing negotiations still required nearly 3 weeks, roughly 8 draft protocols, and regular contact with Chevron's counsel, Mr. Rizack, and Crypsis.

Mr. Rizack and Chevron jointly submitted a final Proposed Order and Protocol on October 4, 2019 (Dkt. 2360-1), and the Court entered the Order instituting the Protocol on October 7, 2019. *See* Dkt. 2362. The Order was the culmination of hundreds of hours of attorney labor and over $155,000 in attorneys' fees arising from pre-Hearing negotiations, briefing of the Joint Letter, argument at the Hearing, and then three weeks of post-Hearing negotiations. Importantly, none of this effort included any of the substantive search, review, and production work that would be required to carry out the Protocol, which had just been ordered. As discussed below, Mr. Rizack has since incurred significant additional expenses complying with the Protocol, and there are still approximately 100,000 documents left to be reviewed.

**D.     Progress Under the Protocol to Date**

   **1.   Initial obligations under the Protocol & forensic reconstruction analysis**

Mr. Rizack has thus far complied with all of his obligations under the Protocol. Specifically, he: (i) provided Chevron with a list, under penalty of perjury, of all known "Devices" and "Media," as defined (Protocol ¶ 4); (ii) had Crypsis create "images" (as defined by the Protocol) of those Devices and Media (*id.* ¶ 5(a)); (iii) filed a copy of those images under seal with the Clerk of Court (*id.* ¶ 5(g)) (Dkt. 2368); and (iv) produced an initial set of documents on October 30, 2019 (*id.* ¶ 9(a)), which included approximately 1,500 documents comprised mostly of communications with Donziger. A second production with additional Donziger-related material was made on November 25, 2019.

In addition, Mr. Rizack has, through Crypsis, reached an agreement with Chevron's expert concerning the forensic reconstruction analysis required by Paragraph 8 of the Protocol.  As noted, Crypsis' investigation is now nearly complete.

Chevron demanded that Crypsis's analysis be performed based on its belief that Mr. Rizack had engaged in an "intentional strategy to obstruct discovery" by "deleting responsive documents" and by otherwise "deliberately stonewall[ing]" Chevron. *See* Memo of Law in Support of Chv. Mot. at 10, 18, and 21 (Dkt. 2266). Indeed, Chevron's unduly burdensome demands and the accusatory tone of its public filings concerning Mr. Rizack arose from the notion that he was engaging in some sort of systematic effort to delete responsive material. Mr. Rizack has consistently explained that he has never intentionally deleted any "responsive documents" and has never deleted any documents at the direction of "anyone," including Donziger. *See, e.g.*, Joint Ltr. at 14 (citing deposition testimony). But Chevron has disagreed, taking the position that deliberate deletion occurred, and that such deletion nullified its obligation to cover Mr. Rizack's reasonable attorneys' fees and costs in complying with the Subpoena, responding to Chevron's Motion, and carrying out the Protocol. The forensic data recovery analysis now squarely refutes Chevron's theory, and supports Mr. Rizack's request for payment of his reasonable costs of compliance.

The forensic reports required by the Protocol are still being finalized, but Crypsis has been able to informally advise that its investigation revealed **no** evidence that Mr. Rizack engaged in any sort of calculated scheme to intentionally delete or attempt to delete large groups of files from his Devices/Media, whether using data destruction software or any other means. While it is impossible to forensically determine what someone's mental state may have been while deleting a file, Crypsis advised that its investigation revealed no evidence to suggest Mr. Rizack undertook any other efforts that could be characterized as deliberate obstruction or obfuscation. Indeed, most of the deleted records recovered by Crypsis were automated system files likely deleted without any human action (e.g., temporary internet files purged over time and manufacturer-implemented operating system updates that delete older versions). And as detailed below, of the relatively few

files that likely would have been deleted by human action (e.g., Microsoft Office files and PDFs), non-deleted "active" copies of virtually all of them were located elsewhere, and have already been searched, reviewed, and produced to the extent responsive.

Crypsis's investigation was performed using multiple forensic and data recovery tools, as well as "File Carving,"[1] to help ensure that all recoverable files were identified and included in the search and review process. The vast majority of the Recovered Files were duplicative of numerous copies of "active" files that Mr. Rizack had already backed up to one or more other external hard drive Devices and/or Media accounts that were imaged and searched as part of the Protocol. In other words, these Recovered Files were not deleted, but simply moved from one computer Device to another Device or Media. In fact, deleting one copy of a file while retaining another in a different location is more fairly characterized as an act of *preservation*, rather than the sort of "deliberate obstruction" Chevron has described.

After accounting for the duplicate Recovered Files and applying the relevant date limitation (Protocol, ¶ 6(a)), a total of 1,571 Recovered Files remained, of which only 282 contained a search term and were not subject to exclusion for confidentiality (Protocol, ¶ 6(c)).[2] Of these 282 files, only **41** are known to be responsive, and all of them were included among other Donziger-related

---

[1] "File Carving" refers to a digital forensic technique used to locate and recover files or fragments of files stored in various locations on a computer. Carved files can include deleted files for which no file deletion record was recoverable, but can also include copies or fragments of files that were never in fact deleted and remain active on the relevant computer. File Carving may allow for the recovery of more data than other tools, but its evidentiary utility is also somewhat limited because carved files do not contain file names, folder paths, or dates associated with the recovered file/fragment, because the process sometimes yields items that were not actually deleted, and because it is difficult (and sometimes impossible) to determine if a carved file relates to a file that is active and stored elsewhere, or instead to a deleted file that could not have been found by any other means. Due to this uncertainty, all of the files identified using any one or more of Crypsis's forensic recovery tools are collectively referred to in this Motion as "Recovered Files." Unless specified otherwise, this phrase is not intended to suggest that any particular Recovered File was ever in fact deleted prior to recovery.

[2] The search terms run on the Recovered Files were those in effect in or around November 15, 2019.  As discussed below, the search terms were and continue to be in a state of flux due to the incredible volume of documents and false positives that were returned after running the search terms as ordered by the Court.

documents produced to Chevron on November 25, 2019.[3]  Of these 41 files, only **6** represent deleted files that were recovered; the remainder are carved files, which, as discussed, may or may not relate to files that were deleted.

In addition to the Recovered Files, there were also 22 deleted file records for user-created file types (Microsoft Office files, PDFs, etc.), the contents of which were unrecoverable using the techniques described above. These were the only deleted file records remaining after removing unrecoverable files that (i) were likely deleted through normal automated computer processes, and (ii) were otherwise accounted for because they matched with active files on the same computer or some other Device. Based on the names of these 22 files, it is clear that 21 of them relate solely to Mr. Rizack's consulting business, and are therefore non-responsive. It's unclear whether the one other file is responsive, and, in any event, documents with the same file name have already been produced. Once Crypsis' reports are provided to Carlton Fields, we would be happy to provide copies to the Court for review *in camera*, along with copies of the 41 Recovered Files produced on November 25th, and the two remaining Recovered Files that have not yet been produced.

Given these results, Chevron should be ordered to pay, at an absolute minimum, the reasonable attorneys' fees and expenses Mr. Rizack has incurred to date in connection with negotiating, litigating, and beginning to carry out the Protocol. Chevron has already imposed an extraordinary burden on Mr. Rizack in both money and time. It sought to justify these measures with accusations now shown to be false. There is no longer any reasonable basis for Chevron to delay in compensating Mr. Rizack, a nonparty, for the significant burden it has imposed to date.

---

[3]  Two other Recovered Files have not yet been produced. One is entirely in Spanish and must be translated before responsiveness can be assessed, but we note that this file appears to be identical to active files that must also be translated. It's unclear whether the second file falls within the relevant time period. Once these issues are resolved, these Recovered Files will be produced to Chevron if they are determined to be responsive.

### 2.   Size and cost of the remaining document review

Chevron should at this time also be ordered to cover the reasonable fees for the work yet to be performed under the Protocol so that Mr. Rizack can retain an e-discovery vendor. The Protocol required that Mr. Rizack make a good faith effort to produce Donziger-specific documents as soon as possible. Mr. Rizack has now produced all or substantially all of those documents. As of the filing of this motion, however, there are still over 100,000 documents to review.  Reviewing these documents is still going to be a significant undertaking, and it has taken over 6 weeks and hundreds of hours or attorney and litigation support time even to reach this point.

The process began in early October when we (Mr. Rizack's counsel) started running the Protocol's search terms, as ordered by the Court, to identify the universe of documents to be reviewed. By email dated October 22, 2019, we provided Chevron's counsel with a breakdown of the initial search results. *See* Silverman Decl., Ex. B. As of that time, there were roughly 430,000 documents to review, although we had not yet "indexed" two Devices to make them searchable, nor had we excluded personal/confidential documents. *See* Protocol ¶ 6(c)(iii). After completing those processes, the number of documents increased to 496,337, again, using the search terms as ordered. Based on efforts by Carlton Fields, it became apparent that tens if not hundreds of thousands of these documents were false positives hitting on the noun "page" (e.g., "Page [X]" and "unsubscribe page"), and the verb "will" (e.g., "He will…").  Other generic words and names (e.g., Bank, Capital, Cohen, Lee, Grant, Gordon, and others), also resulted in hundreds of thousands of documents, of which thousands were known or strongly suspected to be false positives.

After a week's worth of communications, Chevron's counsel agreed to modify the search terms, but only to a degree, and, even as modified, the basic problem persisted. As explained in an email to Chevron's counsel dated October 31, 2019, the revised terms still yielded over 403,000

documents—an enormous review set by any measure. *See* Silverman Decl., Ex. C at 22. The Protocol presently requires that **all** responsive documents be produced by December 2, 2019. Protocol ¶ 9. While that deadline seemed daunting for logistical reasons alone, for financial reasons, it was virtually impossible for Mr. Rizack to meet. As we informed Chevron in the same October 31 email, to review and produce 403,000 documents by December 2, Epiq estimated it would cost roughly $210,000 even employing contract attorneys billed at $35/hour and using assisted review technology.[4] *Id.* We also emphasized that this estimate did not include Mr. Rizack's total attorneys' fees (then in the range of $170,000), and that Mr. Rizack, like the vast majority of people, could not afford either of these amounts, much less the estimated total sum of roughly $380,000. *Id.* Finally, we advised Chevron that "[g]iven the impending deadlines in the Protocol, we feel obligated to let the Court know as soon as possible where things stand" concerning the issues in this Motion. *Id.*

Bringing these issues to Chevron's attention at that particular time was important for several reasons. First, Chevron had already made clear it would not voluntarily pay for Mr. Rizack's reasonable attorneys' fees and costs in complying with the Subpoena and Protocol. Second, by late October, it had become apparent that it would not only be economically infeasible for Carlton Fields to do the first-level review of any documents beyond the limited production made on October 30, but also that Mr. Rizack could not afford to have that review performed by a document review vendor. He could not in good faith contract with a vendor he knew he could not pay. Finally, it also became evident that it would be impossible for Mr. Rizack to complete the Protocol at all, much less by December 2, without resolving these cost issues.

The October 31 email was followed by several additional meet-and-confers, including a

---

[4]  The October 31 email estimated Epiq's cost at $350,000. Upon receiving clarification from Epiq, we immediately advised Chevron's counsel on November 2, 2019 of Epiq's revised estimate of $210,000. *See* Ex. C at 21-22.

teleconference on Friday, November 1, 2019, and further emails over that weekend and during the subsequent three weeks. During this time, we continued to convey our concern that Mr. Rizack's finances make it impossible for him to comply with the Protocol as written, and that we need to inform the Court of his predicament. Chevron requested on multiple occasions that Mr. Rizack not seek relief, and that he instead have his counsel continue working with Chevron to reduce the size of the review. Every one of these discussions has required additional work to be performed, and additional attorneys' fees. Out of good faith, however, Mr. Rizack agreed to continue talking and working with Chevron to reduce the size of the review. In exchange, Chevron agreed to toll all deadlines imposed by the Protocol for one week. *See* Silverman Decl., Ex. C at 18-19.

Throughout these discussions, Chevron has proposed various changes to make the review more manageable. First, they proposed an approach they've advocated since July 2019. Specifically, having Chevron's counsel, free of charge to Mr. Rizack, review between 1% and 5% of the documents as a "sample set" for predictive coding under a "Rule 502 Agreement." In other words, the proposal was to have Chevron's counsel, not Mr. Rizack's counsel, determine the responsiveness of thousands of documents. We declined this offer as inappropriate for the reasons outlined in the Joint Letter, and because the Court already agreed that this sort of procedure is "unusual" and inappropriate as it necessarily transfers responsiveness decision-making authority to Chevron and its lawyers. *See* Tr. 46-47. Further, Mr. Rizack should not have to give up his rights in order to alleviate the undue burden that Chevron has created.[5]

---

[5] It is worth noting that regardless of who performs it, predictive coding is not the technology best-suited to the document review here, nor to the initial investigatory purpose of narrowing the universe of documents by identifying potentially false positives. The better tool is Continuous Active Learning ("CAL"). CAL "learns" what is responsive and reshuffles documents accordingly on a "continuous" basis as any number of non-subject matter experts are actively reviewing the documents. By contrast, to be most effective, predictive coding requires an initial review of multiple seed sets by a single subject matter expert, usually an attorney on the case whose time is billed at a much higher rate. This causes multiple interruptions in the review process in order to wait for each seed set to be analyzed. For these reasons, CAL is generally regarded as more efficient and more effective than predictive coding.

More recently, Chevron proposed various changes to the actual search terms. After several rounds of changes, the most recent set of revised terms returned just over 100,000 documents. However, the roughly two months it has taken for us to arrive at that number was not without substantial cost in attorney and support staff time. And, of course, the 100,000+ documents still need to be reviewed. Epiq estimates that using contract attorneys and assisted review technology, a review of this volume would cost over $60,000 and take about 8 business days to complete once a contract is signed. Thus, a full review of all documents cannot be completed until after the Protocol's December 2 deadline for the production of all document. The size and cost of the review have made that deadline untenable.

As of this time, Chevron has agreed to indefinitely toll all of the Protocol's bi-weekly deadlines, except as to the Donziger documents, which were produced on November 25. This Motion thus comes at a natural breaking point in that the Donziger documents have been produced, Crypsis' analysis is nearly finished, and the bi-weekly deadlines are tolled.  Because Mr. Rizack simply cannot afford to review the remaining 100,000 documents, and with the December 2 deadline mere days away, we believe the issue of cost must be addressed.

## DISCUSSION

### A.    Legal Standard

Rule 45 governs nonparty subpoenas and protects nonparties from unduly burdensome discovery by shifting the costs of compliance to the party who served the subpoena. *See* Fed. R. Civ. P. 45(d). Indeed, the rule expressly provides that the party serving a subpoena or its counsel must "take reasonable steps to avoid imposing undue burden or expense" on a nonparty. Fed. R. Civ. P. 45(d)(1). If a court compels production with a nonparty subpoena, its order must ensure that the nonparty is "protected from significant expense resulting from compliance." *Id.* at (d)(2)(B); *In re*

*First Am. Corp.*, 184 F.R.D. 234, 238 (S.D.N.Y. 1998). Rule 45 further states that if a nonparty seeks to modify a subpoena, the court may order compliance if "the serving party … ensures that the subpoenaed person will be reasonably compensated." Fed. R. Civ. P. 45(d)(3)(B)–(C).

Courts in the Second Circuit have interpreted Rule 45 to "ma[k]e cost shifting *mandatory* in all instances in which a non-party incurs significant expense from compliance with a subpoena." *Sands Harbor Marina Corp. v. Wells Fargo Ins. Svcs. of Oregon, Inc.*, 2018 WL 1701944, at *3 (E.D.N.Y. Mar. 31, 2018) (emphasis added, quotation omitted); *see also In re Law Firms of McCourts and McGrigor Donald*, 2001 WL 345233 (S.D.N.Y. Apr. 9, 2001) ("Applicants have failed to satisfy the second requirement for compelling a non-party to bear some of the expense of production, i.e., that the non-party is better able to bear the cost."); *In re First Am. Corp.*, 184 F.R.D. 234, 240 (S.D.N.Y.1998). In deciding whether a nonparty should bear any costs, courts consider: "(1) whether the non-party actually has an interest in the outcome of the litigation; (2) whether the non-party can more readily bear the costs than the requesting party; and (3) whether the litigation is of public importance." *Sands Harbor*, 2018 WL 1701944, at *3.

Rule 45 should also be read with the related provisions of Rule 26, under which no "person" (party or nonparty) is required to produce electronically stored information if its source is shown to be "not reasonably accessible because of undue burden or cost." Fed. R. Civ. P. 26(b)(2)(B); *see also* Fed. R. Civ. P. 45(e)(1)(D) (analogous rule applicable to nonparty subpoenas). In balancing the burdens of compliance against the need for the information sought, "courts in this Circuit have held nonparty status to be a 'significant' factor in determining whether discovery is unduly burdensome." *Tucker v. Am. Int'l Grp.*, 281 F.R.D. 85, 92 (D. Conn. 2012) (citation omitted); *see also In re 650 Fifth Ave. & Related Properties*, 2013 WL 12335763, at *2-3 (S.D.N.Y. Aug. 29, 2013) (citing *Tucker* in emphasizing significance of "nonparty" status in finding demands requiring a

"significant allocation of resources" were unduly burdensome).

Rule 26 provides an additional vehicle for shifting the costs of unduly burdensome and/or costly discovery demands to the requesting party. *See* Fed. R. Civ. P. 26(c)(1) ("The court may, for good cause, issue an order to protect a … person from … undue burden or expense" of complying with discovery demands); *Rowe Entm't, Inc. v. William Morris Agency, Inc.*, 2002 WL 975713, at *2 (S.D.N.Y. May 9, 2002) (while there are no "firm rules" as to whether a court should protect a party from "undue burden or expense," courts may consider "the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.") (internal quotations omitted).

**B.     Chevron's Subpoena, Chevron's Motion, and the Protocol have already placed, and will continue to place, an undue burden on Mr. Rizack's time and financial resources**

The Subpoena and the Protocol have been, and continue to be, unduly burdensome for Mr. Rizack by any reasonable measure. As an initial matter, he has now made 10 separate document productions—8 without counsel—and has submitted to 2 full depositions, both also without representation. *Accord Tucker*, 281 F.R.D. at 96 (motion to compel forensic search denied as unduly burdensome where nonparty had already performed two prior searches, "ultimately producing several hundred pages of documents in two phases").

He has now been forced to retain counsel in order to protect his rights in the face of Chevron's Motion and the originally proposed protocol. Defeating the most invasive portions of Chevron's prior proposals (i.e., up to and including the Hearing) cost over $107,000. To date, Mr. Rizack's attorneys' fees are over $241,000, and there are still 100,000 documents to review and produce. That number is smaller than the nearly half-a-million documents that we began with, but is still a huge undertaking. Even using assisted review technology and contract attorneys costing $35/hour, it is estimated to cost over $60,000 to perform a first-level review of this material. That

does not include the cost for Carlton Fields to perform a second-level review of even a sample set of documents marked responsive; additional meet-and-confers with Chevron's counsel; or a potential third deposition, and the costs of preparing Mr. Rizack for and defending him at that potential deposition. Less burdensome discovery has been deemed unduly burdensome for cost-shifting purposes, even when imposed on an actual party. *See, e.g.*, *Rowe Entm't*, 2002 WL 975713, at *9 n.4 (undue burden factor met where estimated costs were only upwards of $200,000). Again, New York courts treat burdens of this kind as even more significant when they are imposed on a non-party, such as Mr. Rizack. *See, e.g.*, *Tucker*, 281 F.R.D. at 92; *In re 650 Fifth Ave.*, 2013 WL 12335763, at *2-3.

While the cost for contract attorneys to review documents is to some degree fixed, the cost of negotiating, litigating, and conferring about protocol issues is not. Indeed, most of the legal fees Mr. Rizack has incurred to date are not attributable to substantive document review. Instead, they are almost entirely attributable to Chevron's "take it or leave it" style of negotiation and litigation, and its not infrequent refusal to adopt a more practical approach. Only in the last 2 weeks has Chevron started to acknowledge the untenable size of the review and to take steps to meaningfully reduce it. It has taken 4 months and a court order placing Mr. Rizack's counsel in the "driver's seat" of this process for Chevron to begin displaying this sort of practicality. And now, with over 100,000 documents still left to review, Mr. Rizack does not have sufficient funds to retain the contract attorneys necessary to review these documents, nor to pay his counsel to continue conferring with Chevron's counsel for additional days, weeks, or months. To be sure, he is not opposed to further meet-and-confers regarding ways to cut down the document population—he simply cannot afford the discussion necessary to do so. The cost of this endeavor is already far beyond the point of being "significant." Absent relief, the cost for him to carry out the Protocol will likely to

17

bankrupt him, or otherwise force his counsel to withdraw.

Further, while this Motion has referred to the remaining document count as being 100,000, we emphasize that the search terms still are not even finalized as of the filing of this Motion. Chevron's counsel forwarded the most recent list of proposed search term revisions on November 21, 2019, and we sent back a breakdown of the search results the next day. *See* Ex. C at 002. We have exchanged emails on unrelated topics since then, but Chevron still has not advised whether it wishes to treat the November 21 revisions as "final." This adds another layer of uncertainty warranting the Court's intervention.

Accordingly, Chevron's demands have placed an undue burden on Mr. Rizack and, absent relief, they will continue to do so. The burden is not only financial. This process was already ongoing for over a year when Mr. Rizack retained counsel. Now 4 months and over $241,000 later, the process is not even close to complete. It has required and will continue to require significant time and energy, it has been and will continue to be stressful and invasive, and it has forced Mr. Rizack to withstand multiple public attacks on his character. Unfounded attacks of the kind Chevron has put in public filings threaten Mr. Rizack's livelihood.

## C.     Cost-Shifting is Mandatory Here

The cost-shifting factors also favor Mr. Rizack. *See Sands Harbor*, 2018 WL 1701944, at *3. The first factor is whether the nonparty has an interest in the outcome of the litigation, and Mr. Rizack has no interest in whether Chevron ultimately collects on the RICO judgment against Donziger. Mr. Rizack was not named in the RICO complaint, was not alleged to be a co-conspirator in that case, and has never received any other judgment or factual finding against him that would conceivably give him an interest in whether Chevron collects against Donziger. Chevron has previously emphasized Mr. Rizack's 0.25% interest in the Ecuador judgment, but that is a red

herring. The Subpoena is about Chevron's ability to collect on the RICO judgement entered against Donziger in *this* case, and perhaps secondarily about discovering efforts by Donziger to undermine the RICO judgment. The Ecuador judgment was entered in a separate case. Mr. Rizack's minimal interest in the Ecuador judgment does not justify imposing on him the burdens of complying with Chevron's Subpoena, its motion, and the Protocol. In any event, as detailed in the Joint Letter, Mr. Rizack already offered to assign the 0.25% claim to Chevron as part of an early global resolution of Chevron's Motion, and Chevron rejected the offer. Accordingly, the first factor weighs in favor of Mr. Rizack.

The second factor is whether the nonparty can more readily bear the costs of compliance than the requesting party. Mr. Rizack is an individual with a small consulting business. Chevron, by contrast, has reported $70 billion in revenue for the first two quarters of 2019. Chevron cannot suggest that Mr. Rizack has a similar capacity to bear costs. Last, while Chevron's case against Donziger is arguably of "public importance," that one factor does not outweigh the rest. There's no reason to exempt a huge company from its duty to pay a man's reasonable costs.

Accordingly, Mr. Rizack is entitled to an order requiring Chevron to bear all of his reasonable attorneys' fees and costs to comply with Chevron's discovery demands.

At the hearing, Your Honor already acknowledged that "in a clean slate situation, it would be Chevron's obligation to absorb these costs, particularly with the extent of the discovery they are seeking," and that "it certainly seems as if, at the moment, that Chevron would be bearing the large proportion of these costs." Tr. 49-50. We recognize that Your Honor also stated that deferring decision on this particular issue until completion of the Protocol will "promote cost consciousness and allow the Court to resolve the issue based on a more fully developed record, as we do not yet know some facts and factors that could be relevant to that analysis." Tr. 45. But we respectfully

19

submit that the recent developments regarding the results of Crypsis's forensic analysis, as well as the size, scope, and cost of the review, as detailed above, tip the balance of factors so as to require relief before discovery is complete.

Regarding cost consciousness, we have already addressed this issue in a number of ways. First, we have staffed this matter with just two primary attorneys, one shareholder and one associate, and have delegated to less-expensive junior associates and support staff whenever possible. In addition, rather than paying a third-party to host the massive amount of data we are dealing with here, Carlton Fields is hosting all of the data internally for free. We are also using internal litigation technology experts to perform all document management and search-related tasks at a fraction of the rate charged for similar services by third-party vendors. And as discussed, once the issue of funding is resolved, we have already arranged for a reputable document review vendor (Epiq) to provide contract attorneys charging $35/hour to perform a first-level review of the roughly 100,000 remaining documents using assisted review technology. We note that Epiq's estimated cost does not and would not include any mark-up by Carlton Fields.  Instead, the cost of that work, estimated to be $61,000, would simply be charged and invoiced directly by Epiq. We are happy to provide the Court with copies of our invoices for *in camera* review, and to the extent that we are able, we are happy to provide any additional information that the Court may deem relevant to this decision.

We recognize that the timing of this request is particularly inopportune given the upcoming Thanksgiving holiday, and we are more than willing to provide Chevron with additional time to respond to this Motion; we just felt we had to apprise the Court of our predicament because the December 2nd deadline falls on the first working day after the holiday. As noted, this request also comes at a natural decision point in that the forensic reporting is nearing completion and all documents that Carlton Fields can reasonably be expected to review and produce on its own have been

produced. Carlton Fields cannot undertake any of the remaining review in a cost-effective manner, and Mr. Rizack simply cannot afford more expenses. Therefore, work under the Protocol cannot continue until the cost issues are resolved, and, absent such relief, Carlton Fields may be forced to withdraw from this matter prior to its final resolution. Given this issues, and with the Protocol's ultimate December 2nd deadline for the production of all documents less than a week away, we felt we had no choice but to bring these issues to the Court's attention.

## CONCLUSION

Accordingly, Mr. Rizack respectfully requests that the Court: (i) not defer awarding the portion of attorneys' fees already incurred; (ii) order that Chevron pay the reasonable fees still to be incurred under the Protocol, including the fees of a document review vendor; and (iii) order that all deadlines in the Protocol be indefinitely stayed until the cost issues outlined in this letter are resolved, at which time more realistic production deadlines could be set.

Dated: November 27, 2019
     New York, New York

               Respectfully submitted,

               CARLTON FIELDS, P.A.

               By:  /s/ Michael L. Yaeger
                   Michael L. Yaeger
                   Alex B. Silverman
                   405 Lexington Avenue, 36th Floor
                   New York, New York 10174-0002
                   212.785.2577

                   *Attorneys for nonparties Joshua Rizack and*
                   *The Rising Group Consulting, Inc.*