UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
CHEVRON CORPORATION,                                    :
:
Plaintiff,                            :
:
v.                                      :      11 Civ. 0691 (LAK)
:
STEVEN DONZIGER, *et al*.,                               :
:
Defendants.                           :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**CHEVRON'S MEMORANDUM OF LAW IN OPPOSITION TO
MOTION BY NONPARTIES JOSHUA RIZACK AND THE RISING GROUP
CONSULTING, INC. FOR PAYMENT OF REASONABLE FEES AND
MODIFICATION OF PROTOCOL DEADLINES**

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

STERN, KILCULLEN & RUFOLO LLC
325 Columbia Tpke, Ste 110
P.O. Box 992
Florham Park, New Jersey 07932-0992
Telephone: 973.535.1900
Facsimile: 973.535.9664

*Attorneys for Chevron Corporation*

## TABLE OF CONTENTS

Page

I. PRELIMINARY STATEMENT ............................................................................................... 1

II. FACTUAL BACKGROUND ............................................................................................... 7

    A.   While Chevron Worked to Reduce the Volume of Documents to Be Reviewed, Rizack Filed His Motion Rather Than Meeting-and-Conferring. ................................... 7

    B.   Rizack's Recent Productions Further Confirm the Prior Productions Were Not Made in Good Faith and That Rizack Was Not Forthcoming in His Testimony .......... 11

III. ARGUMENT .................................................................................................................... 14

    A.   Rizack's Motion Is an Untimely and Unsupported Motion to Reconsider .................. 14

    B.   Beyond Its Procedural and Evidentiary Failures, Rizack's Motion Is Meritless .......... 16

    1.   The Documents Rizack Has Now Produced Show He Intentionally Withheld Discovery Based on Donziger's Instructions ................................................................ 16

    2.   Rizack's Complaints About Fees Do Not Warrant Reconsideration. .......................... 19

    3.   Rizack Fails to Carry His Burden on the Remaining Rule 45 Factors ........................ 21

    4.   The Fees Rizack Seeks Are Inappropriate for Shifting .................................................. 24

IV. CONCLUSION .................................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

## Cases

*In re 650 Fifth Ave. & Related Properties*,
2013 WL 12335763 (S.D.N.Y. Aug. 29, 2013) ..................................................................23

*In re Aggrenox Antitrust Litig.*,
2017 WL 4679228 (D. Conn. Oct. 18, 2017) .........................................................3, 19, 24, 25

*Anthropologie, Inc. v. Forever 21, Inc.*,
2009 WL 690126 (S.D.N.Y. Mar. 13, 2009) .....................................................................25

*In re First Am. Corp.*,
184 F.R.D. 234 (S.D.N.Y. 1998) ...................................................................................22

*G & E Real Estate, Inc. v. Avison Young-Washington*,
D.C., LLC, 317 F.R.D. 313 (D.D.C. 2016) ......................................................................24

*Hansberry v. Father Flanagan's Boys' Home*,
2004 WL 3152393 (E.D.N.Y. Nov. 28, 2004) .................................................................2, 16

*In re Honeywell Int'l, Inc. Sec. Litig.*,
230 F.R.D. 293 (S.D.N.Y. 2003) ...............................................................................21, 22

*IDC Financial Publishing, Inc. v. BondDesk Group, LLC*,
2017 WL 4863202 (E.D. Wis. Oct. 26, 2017) ....................................................................25

*Jonas v. Rich*,
2004 WL 1542231 (S.D.N.Y. July 8, 2004) ..............................................................1, 14, 15

*Kinoy v. Mitchell*,
67 F.R.D. 1 (S.D.N.Y. 1975) .......................................................................................15

*Lefta Assocs. v. Hurley*,
2011 WL 1793265 (M.D. Pa. May 11, 2011) .....................................................................24

*MPD Accessories B.V. v. Urban Outfitters*,
No. 12 CIV. 6501 LTS KNF, 2013 WL 7211833 (S.D.N.Y. Dec. 17, 2013) ...........................3

*Rosner v. United States*,
2018 WL 5981945 (S.D.N.Y. Nov. 14, 2018) ....................................................................14

*Rowe Entm't, Inc. v. William Morris Agency, Inc.*,
2002 WL 975713 (S.D.N.Y. May 9, 2002) .......................................................................23

*Sands Harbor Marina Corp. v. Wells Fargo Ins. Svcs. Of Oregon, Inc.*,
2018 WL 1701944 (E.D.N.Y. Mar. 31, 2018) ....................................................................24

## TABLE OF AUTHORITIES

Page

*Steward Health Care Sys. LLC v. Blue Cross & Blue Shield of Rhode Island*,
2016 WL 8716426 (E.D. Pa. Nov. 4, 2016) ...................................................................24, 25

*Tri-Star Pictures, Inc. v. Unger*,
171 F.R.D. 94 (S.D.N.Y. 1997) ............................................................................................9

*Tucker v. Am. Int'l Grp., Inc.*,
281 F.R.D. 85 (D. Conn. 2012)............................................................................................23

*Wells Fargo Bank, N.A. v. Konover*,
259 F.R.D. 206 (D. Conn. 2009)..........................................................................................20

*Winfield v. City of New York*,
2017 WL 2880556 (S.D.N.Y. July 5, 2017), *objections overruled*, 2017 WL
5054727 (S.D.N.Y. Nov. 2, 2017) ..........................................................................................3

**Rules**

Fed. R. Civ. Proc. 26................................................................................................................23

**Treatises**

8 Fed. Prac. & Proc. Civ. § 2008.2 (3d ed.)...........................................................................23

# I.  PRELIMINARY STATEMENT

The Court should deny Joshua Rizack's motion, which is in reality an untimely motion to reconsider the Court's September 13, 2019 order, one that Rizack supports with neither a change in controlling law nor any new probative evidence.  *See*, *e.g.*, *Jonas v. Rich*, 2004 WL 1542231, at *1 (S.D.N.Y. July 8, 2004) ("Rule 6.3 allows parties to move a Court to reconsider an order or opinion on grounds that the court overlooked 'controlling decisions or factual matters that were put before it on the underlying motion'") (citation omitted).

In its September 13 order, the Court instructed the parties to (1) meet-and-confer on the terms of the forensic protocol, (2) submit it to the Court for approval, and (3) then image and search Rizack's electronic devices to produce documents in accordance with that protocol.  Ex. 1 (Tr. 45:24-49:3, 50:7-51:3).  As ordered, the parties completed (1) and (2), which produced the Court's October 7 Forensic Protocol Order (the "Protocol").  Dkt. 2362.  Now, however, Rizack is refusing to comply with (3) because it supposedly is too expensive.  He thus wants the Court to order fee-shifting now, despite the lack of critical information.  But on September 13, this Court expressly ruled that determination of any attorney-fee shifting "is best deferred until after the protocol is executed and the fees incurred."  Ex. 1 (Tr. 45:18-19).  In so ruling, the Court of course anticipated that Rizack would incur fees meeting-and-conferring and producing documents, but nonetheless concluded that this was the correct course because it would "both promote cost consciousness and allow the Court to resolve the issue based on a more fully developed record, as we do not yet know some facts and factors that could be relevant to that analysis."  *Id*. at 45:20-23.  Far from warranting reconsideration, Rizack's motion confirms the wisdom of the Court's ruling and should be denied.

***First***, Rizack does not contend there has been any change in the governing law—because

1

there has not been any.

**Second**, Rizack provides no new evidence that could justify reconsideration of the Court's September 13 order. While Rizack points to two developments since September 13, he provides no admissible evidence in support of those events and they are not truly new.

  **a. Destruction/Recovery Investigation.** Rizack claims that his forensic expert (whom Chevron has agreed to pay Ex. 1 (Tr. 49:7-12)[1] has almost completed his Destruction/Recovery Investigation and concluded that there is "no evidence" that Rizack has "engaged in a systematic effort to 'obstruct discovery' and 'delete responsive documents.'" Dkt. 2403 ("Mot.") at 5-6. Rizack, however, provides no *evidence*, *i.e.*, *no expert affidavit*, confirming this. Indeed, Rizack includes not even a (hearsay) attorney declaration purporting to substantiate this claim, and he expressly refuses to allow Chevron to review and verify this assertion. Mot. at 10.

Because Rizack has not provided any competent evidence of the Destruction/Recovery Investigation, the claim as to the investigation's outcome cannot provide a proper basis for the Court to reconsider its September 13 order and adjudicate Chevron's property rights (liability to pay Rizack's attorneys' fees). For the same reason, any Rizack offer to make the Destruction/Recovery report available to the Court *in camera* fails to provide a proper basis to adjudicate or reconsider the attorneys' fees issue. It would be fundamentally unfair to base any such ruling on secret evidence that Chevron has had no opportunity to examine or rebut. *See* U.S. Const., amend. V; *see also Hansberry v. Father Flanagan's Boys' Home*, 2004 WL 3152393, at *4, n.9 (E.D.N.Y. Nov. 28, 2004) (declining to consider an affidavit submitted in camera during summary judgment motion because "an individual's right to due process includes a party's right to be aware and refute evidence against the merits of his case"); *Winfield v. City of New York*, 2017

---

[1] Unless otherwise indicated, all citations to Ex. __ refer to exhibits to the Declaration of Andrea E. Neuman.

WL 2880556, at *3 (S.D.N.Y. July 5, 2017), *objections overruled*, 2017 WL 5054727 (S.D.N.Y. Nov. 2, 2017) (noting a "presumption of a public right of access to . . . testimony or documents that a court relies on to perform its Article III duties and substantively adjudicate a matter").

      **b.   Amount of attorneys' fees that have been or will be incurred.**   Rizack also argues that if he complies with the Court's order "he'll be bankrupted."   Mot. at 2.   But Rizack provides no evidence of either his personal finances or his attorneys' fees—to date or reasonably anticipated—opting instead for unsupported argument.   This is insufficient to warrant reconsideration of the Court's order, and his failure to include any admissible evidence with his moving papers—precluding Chevron from responding to it—is fatal to his motion.   *See In re Aggrenox Antitrust Litig.*, 2017 WL 4679228, at *2 (D. Conn. Oct. 18, 2017) ("[W]hen claiming attorney's expenses, the movant must provide contemporaneously created time records that specify, for each attorney, the date, the hours expended, and the nature of the work done.") (citations omitted).[2]

      ***Third***, on the "merits" Rizack's motion is baseless.   Even if the Court were to look past the untimeliness of this motion—Local Rule 6.3 sets a 14-day deadline for such motions—and the complete lack of admissible evidence supporting it, the motion fails on its own terms.

      **a.   The supposed Destruction/Recovery Investigation analysis in no way vindicates Rizack or supports fee-shifting.**   Chevron sought the forensic examination because, when Chevron confronted Rizack at his deposition with documents on which he was copied but he did not produce, Rizack testified that he might have deleted them.   Ex. 2 (Rizack Dep. 293:16-25):

> Q:  Mr. Rizack, this is another e-mail between you and Mr. Donziger that was not
> produced by you.  Do you know why that would have been?

---

[2]  Nor may Rizack attempt to remedy this deficiency on reply.  *See MPD Accessories B.V. v. Urban Outfitters*, No. 12 CIV. 6501 LTS KNF, 2013 WL 7211833, at *2 (S.D.N.Y. Dec. 17, 2013) (where "reply papers improperly included new evidence in an effort to cure the evidentiary deficiencies in their original submission, [the court] did not err by refusing to consider portions of these reply papers because plaintiff did not have an opportunity to address such evidence").

A:  No.  I don't know if it was deleted or what have you.  I don't know.

*Id.* at 322:15-23:

Q:  The other e-mails that you didn't produce from 2016, do you know why those aren't produced the first time or at all, the ones that we have for Ms. Sullivan and for Mr. van Merkensteijn?

A:  Either they were deleted, or they didn't come up on the search.  I don't recall. I don't know.

Rizack's testimony that document deletion might have been the reason he failed to produce responsive documents provided a reasonable foundation for Chevron's belief, which Rizack implicitly acknowledged by stipulating to a forensic examination of his devices.  But the purported Destruction/Recovery Investigation analysis does not vindicate Rizack or support fee-shifting for another, more fundamental reason.  If it is true that the Destruction/Recovery Investigation analysis shows no systematic deletion, then, contrary to Rizack's testimony, document deletion is unlikely to be the reason that Rizack failed to produce responsive documents.

**b.  The documents that Rizack has now produced as a result of the Court's September 13 and October 7 orders, illuminate the true reason:  Rizack intentionally failed to produce the documents as a result of his behind-the-scenes coordination of his production with Donziger and Donziger's co-conspirator Aaron Marr Page.**  Rizack testified that he searched for and produced all documents he could find containing "Donziger" and that he was not withholding documents at Donziger's instruction, Ex. 2 (Rizack Dep. 30:6-8).  But in fact, prior to production, Rizack emailed Donziger a list of 475 responsive documents—of which, after consulting with Donziger, he produced only approximately 155 documents.  Ex. 3 at RIZ00000386-403.  Judging from their labels on Rizack's list, the documents Rizack withheld appear to be clearly responsive, and among them appear to be documents about which Chevron had inquired at his deposition.  *See, e.g.*, Ex. 2 (Rizack Dep. 250-52 (inquiring about budgets)).

4

Thus far, the only documents that Rizack has produced in response to the Court's forensic protocol orders are those expressly between Rizack and Donziger.  Given Rizack's intentional withholding of the bulk of these documents, there is no justification for shifting fees to Chevron.  On the contrary, the new evidence confirms that these fees should be borne by Rizack.

**c. The amount of fees supposedly incurred or to be incurred does not support shifting any, much less all, of the fees to Chevron.**  Even if the Court were to accept at face value the amount of fees that Rizack (without evidentiary support) claims he will have incurred if he complies with the Court's orders, and his (equally unsupported) claimed inability to pay such fees, the indicated fees would not justify departure from this Court's September 13 ruling.

Rizack seeks to recover all of his counsel's fees since their retention, in the amount of $241,000.  Although Rizack's lack of evidence of what fees were or will be incurred and for what purpose makes it difficult for Chevron to respond, it appears that most of these fees were incurred before or at the September 13 hearing at which the Court ruled that Rizack was *not* presently entitled to fee shifting ($107,000) and in negotiating the terms of the forensic protocol as ordered ($48,000).[3]  Following entry of the October 7 forensic Protocol order, Rizack claims $86,000 in fees for running search term iterations and producing 1,693 documents sent to or from Donziger.  This, even though, under the Protocol, any Rizack confidential documents would have already been removed and Judge Kaplan has long since ruled that Donziger waived any privilege for his communications.  Dkt. 2108.  Moreover, this $241,000 does not include Rizack's expert's fees, which Chevron has agreed to pay.  Nor does it include the cost for a third-

---

[3]  Rizack claims that he spent $107,000 "[d]efeating the most invasive portions of Chevron's prior proposals (i.e., up to and including the Hearing)" and later that "$155,000 in attorneys' fees [arose] from pre-Hearing negotiations, briefing of the Joint Letter, argument at the Hearing, and then three weeks of post-Hearing negotiations."  Mot. at 16, 7.  The difference of $48,000 must arise from the post-hearing negotiation of the protocol.

party vendor to review the results of the Protocol's search terms, which, subject to reasonable efficiency measures and agreed budget, Chevron has offered to pay.  Ex. 4.

**d.  In any event, Rizack fails to meet his burden to show entitlement to Rule 45 fee-shifting.**  The Court entered the September 13 order, in part, because it recognized that any proper determination of fee shifting would turn on facts that had not yet been established.  Indeed, whether fees shift under Rule 45 depends, *inter alia*, on the purported nonparty's level of involvement in the underlying action, but until Rizack produces all responsive documents, neither Chevron nor the Court can fully appreciate the role he has played with Donziger's now-adjudicated contempt of Judge Kaplan's RICO Judgment.  Rule 45 also requires the Court to consider whether the nonparty has an interest in the litigation's outcome, who is able to bear the costs, and the litigation's public importance.  On this, Rizack cannot possibly carry his burden.  As Donziger's bookkeeper, co-fundraiser, and a holder of a 0.25% interest in the Ecuadorian judgment, Rizack was intimately involved in Donziger's illicit attempts to monetize and profit from the Ecuadorian Judgment, and has an interest in the outcome of the litigation.  Chevron's ability to bear the costs is adequately accounted for in its agreement to pay Rizack's expert's fees (already $59,000, Ex. 5) and its offer to pay Rizack's reasonable third-party vendor fees.  In addition, the litigation's public importance, which Rizack conceded, and Rizack's discovery misconduct weigh against shifting costs to Chevron.

Finally, a large portion of the fees that Rizack seeks, as far as can be gleaned from his papers, are inappropriate because they are incurred in resisting, not complying with, the April 17, 2018 subpoena Chevron served on him (Dkt. 2266 at App'x C, the "Subpoena").  Mot. at 7, 16.

In sum, the record confirms that this entire endeavor to obtain a complete production from Rizack has been caused by (1) Donziger's refusal to comply with his discovery obligations,

including to turn over his electronic devices for imaging as ordered by the court, and (2) Rizack's decision to ally himself with Donziger and failure to make a full, good-faith production of his responsive documents. Chevron, therefore, respectfully requests that the Court deny Rizack's request for fees as an improper attempt at reconsideration under Local Rule 6.3 and un-warranted under Rule 45. At a minimum, the Court should defer deciding whether to shift any fees until after Rizack completes his production and the Court has the benefit of a full record.

## II.  FACTUAL BACKGROUND

### A.    While Chevron Worked to Reduce the Volume of Documents to Be Reviewed, Rizack Filed His Motion Rather Than Meeting-and-Conferring.

On October 7, 2019, the Court ordered the parties to comply with the Protocol they had jointly negotiated. Dkt. 2362. On October 22, 2019, Rizack's counsel ran the search terms set forth in Appendix C of the Protocol, removed Rizack's Personal/Confidential documents per the Protocol, and then informed Chevron that there were approximately 430,000 documents, includ-ing "families" (like attachments) that hit upon one or more of the terms ("Potentially Responsive Documents"). Rizack's counsel suggested search term modifications to reduce this volume, to which Chevron's counsel agreed. Rizack Ex. C at 28.

After running the modifications Rizack's counsel had proposed but before applying pre-dictive coding, Rizack's counsel informed Chevron that the number of Potentially Responsive Documents had not been appreciably reduced, but rather still totaled more than 400,000. *Id*. at 23-24. Rizack stated that he would file a letter "to let the Court know as soon as possible where things stand." *Id*. Chevron suggested that rather than burden the Court when the parties had not reached a stalemate, they should meet-and-confer. On a November 1 call, given that no personal or confidential documents remained in the review set, and Donziger had waived all privileges,

Chevron proposed to review and code documents for predictive coding under a Rule 502 attorneys'-eyes-only agreement to minimize Rizack's costs—which Rizack rejected.  *Id*. at 21-22.

Thereafter, Chevron engaged its forensic expert Spencer Lynch to propose search term alterations—which Chevron provided Rizack as Excel sheets to reduce any implementation costs.  Chevron's proposed search term modifications succeeded in drastically reducing the number of Potentially Responsive Documents.  Thus, by November 22, 2019, there were only 38,048 Potentially Responsive Documents (or 100,421 total documents if associated "family" documents like attachments were included).  *See* Ex. 18.  This represented a reduction of approximately 77% from the parties' starting point.  With the production deadlines approaching, the parties "agreed to indefinitely toll these deadlines while [Chevron] continue[d] to re-work the search terms to reduce the volume of Potentially Responsive Documents."  Rizack Ex. C at 5.

In tandem with the search term reduction process, Rizack represented he would produce all documents to or from Donziger by October 30, 2019.  *See* Dkt. 2362 at 9.  On that date, he produced 1,504 documents consisting of email communications and attachments.  Neuman Decl. ¶ 2.  After Chevron asked whether non-email communication existed (*e.g.*, text messages and WhatsApp communications), Rizack produced another 189 documents on November 25, 2019. *Id*.  Neither of these productions contained any of the 193 SMS text messages between Rizack and Donziger that are reflected in Donziger's phone records, which remain unproduced.  Decl. of Spencer Lynch, dated Dec. 18, 2019 ("Lynch Decl.") ¶ 5.  Furthermore, Rizack has not produced any Spanish documents, insisting that they first be translated but claiming he cannot afford it. Rizack Ex. C at 2.

Without initiating any meet-and-confer on the need for this motion or advance notice to

Chevron,[4] Rizack filed this motion for fees on November 27.  In substance, Rizack demands all the attorneys' fees he has incurred since retaining Carlton Fields, approximately $241,000.  Although Rizack has not provided information sufficient to enable Chevron or the Court to determine exactly how and when he incurred these costs or for what, parsing his Motion it appears that Carlton Fields billed $107,000 negotiating the Protocol and preparing for the September 13, 2019 hearing. Mot. at 16.  It billed another $48,000 in "three weeks of post-Hearing negotiations." Mot. at 7.  The balance of $86,000 seems to have been incurred running search term iterations and making two productions of 1,504 and 189 documents in October and November.

The vast majority of these attorneys' fees thus appear neither necessary nor for Chevron's benefit given that (1) Rizack has not reviewed  or produced any documents other than those that were to or from Donziger, Rizack Ex. C at 5, 20, 23; (2) the production of the Donziger documents did not necessitate much—if any—review by counsel, since they were most certainly responsive and, per the Protocol, Rizack could not withhold any documents on the basis of "any privilege claimed by, through, or on behalf of, directly or indirectly, [Donziger], or anyone acting on Donziger's behalf," Dkt. 2362 at 7; and (3) Chevron agreed to pay the tasks performed by Rizack's expert, which has thus far totaled $59,000.

If Rizack were concerned about costs, there are several steps and he and his counsel could have taken to drastically reduce the $241,000 they now seek from Chevron.  First, given that (a) neither Donziger nor Page claims to have been Rizack's lawyer, (b) Donziger has waived all privilege concerning their communications, and (c) Rizack had already removed all confidential or personal documents pursuant to Paragraph 6(c) of the Protocol, Rizack could have himself

---

[4] Local Rule 37.2 requires parties to confer before moving under Rules 26-37.  Rizack invokes Rule 26 but did not "make a genuine effort to resolve the dispute." *Tri-Star Pictures, Inc. v. Unger*, 171 F.R.D. 94, 99 (S.D.N.Y. 1997).

reviewed the documents his counsel intended to produce and raised any document-specific concerns with his counsel.  Second, Rizack produced only those few Spanish-language documents he claims he could afford to translate, Rizack Ex. C at 2, but he had no reason to translate anything prior to production.  None of the other third parties subpoenaed in this action has translated any Spanish-language documents, but rather have simply produced the Spanish documents.  Moreover, because the documents were attached to communications with Donziger and were not personal or confidential, they could have been produced with a high degree of confidence that nothing unresponsive was being revealed.  Third, Rizack should have forgone his counsel's improper redaction of documents based on relevance, which, when presented with adverse case law, they ended up withdrawing.  Ex. 19.

In his motion, Rizack tries to capitalize on the alleged results of the Destruction/Recovery Investigation, but this does not advance his case.  Rizack's claim that Chevron is not entitled to view the results of the Destruction/Recovery Investigation and the fact that it is not yet complete means that Chevron cannot verify whether the steps set forth in the Protocol were properly followed.  It would be improper to adjudicate Chevron's rights against it based on secret evidence.

Moreover, even absent such a review, the information Rizack has disclosed to-date raises serious concerns.  Rizack claims that his expert's analysis reveals that Rizack did not "intentionally delete or attempt to delete large groups of files from his devices."  Mot. 8.  This does not, however, confirm or deny whether Rizack selectively deleted key documents.  Without knowing which responsive files were deleted, it is impossible to determine if Rizack engaged in any pattern of deletion, even on a small scale.  For example, Rizack could have deleted 100 documents scattered across his devices relating to the solicitation of one potential investor.  Likewise, Rizack's assurance that most deleted files were "located elsewhere" does not shed light on

whether any deletion was intentional.  Mot. at 8-9.

In addition, at the time that Rizack filed his motion, Chevron was actively engaging in further negotiations to avoid burdening the Court.  Indeed, on December 5, Chevron set forth the proposal it was preparing when the motion was filed without notice.  Chevron suggested that Rizack's third-party vendor review only the 38,048 documents found to be responsive in the last search-term iteration—a 90% reduction from the original 430,000 documents—and employ Continuous Active Learning to further reduce that number.  *See* Ex. 4.  Chevron also offered to pay the reasonable third-party vendor fees incurred in reviewing those documents.  *Id*.  While this compromise would have resolved the issue, Rizack's counsel refused to engage in further discussions, asserting that it was "unreasonable to impose additional attorneys' fees on [Rizack]."  *Id*.

**B.    Rizack's Recent Productions Further Confirm the Prior Productions Were Not Made in Good Faith and That Rizack Was Not Forthcoming in His Testimony**

The documents Rizack has produced to date, though far from complete, evidence an individual intimately involved in Donziger's efforts—in which Rizack had a direct monetary interest—to illicitly monetize and profit from the Ecuadorian Judgment contrary to Judge Kaplan's RICO Judgment.  Rizack was thus not a true disinterested third-party unfairly ensnared in another's dispute.  Chevron will minimize repetition and highlight only the key points below:

**Donziger paid Rizack $175,881.82 for his pre-RICO role.**  Rizack began working as Donziger's accountant in around 2011,  "putting together [] Donziger's expenses related to the case." Ex. 2 (Rizack Dep. 15:8-12).  Rizack's bookkeeping did not create an accurate account of Donziger's expenses, but rather recorded every payment that Donziger *claimed* to be related to the litigation, without performing any independent inquiries or follow any accounting principles. Ex. 2 (Rizack Dep. 55:7-56:20; 58:15-25).  Despite Rizack's inconsistent testimony as to his compensation, Chevron's forensic accountant concluded that Rizack was paid at least

$175,881.82 from client funds.  Decl. of John A. Slavek, May 16, 2019, Dkt. 2268, ¶¶ 7, 9-12.

**Rizack continued to assist Donziger to monetize and profit from the Ecuadorian judgment after the RICO Judgment**.  Contrary to Rizack's assertions that he had a "tapering level of involvement," Ex. 1 (Tr. 17:18-19); Ex. 2 (Rizack Dep. 97:2-98:11), Rizack continued his extensive involvement in Donziger's fraud after the Court issued the RICO Judgment.  Indeed, Rizack developed return-on-investment schedules that Donziger used to solicit investors (*see e.g.*, Ex. 20), participated in calls with potential investors (Ex. 21), traveled internationally with Donziger to lure investors (Ex. 2 (Rizack Dep. 96:17-22)), was listed as a direct contact in investor solicitation materials (Ex. 22; Ex. 2 (Rizack Dep. 306:9-307:6)), and coordinated extensively with Donziger and Aaron Page to create investor contracts and related documents (*see, e.g.,* Ex. 23 (Donziger asks Rizack and Page to help with "investor protection issue[s]" noting that it "affects the interests of all investors including the two of you").

Rizack's role was not passive.  He advised Donziger on how to handle investors, for example warning Donziger not to waste money traveling to meet with a potential investor until the prospect came back with "a real deal."  Ex. 24.  And, as noted previously, despite Rizack's attempts to conceal his fundraising involvement by lying about the identity of his close friend, he personally solicited a $200,000 investment from David Yass.  Dkt. 2266 at 11-13.  Finally, in February 2017, Donziger introduced Rizack to Canadian counsel Alan Lenczner, stating that Rizack "has helped me on the Ecuador case for many years . . . Helped us raise funds to pay your fees and he continues to do so."  Ex. 25.  Two months later, Donziger asked Rizack if he had any other investors.  Ex. 26.

**Rizack expanded his support for Donziger post-RICO**.  In August 2017, Donziger asked Rizack to "take [sic] more active role" with the budget.  Ex. 27.  Rizack drafted financial

information for Canadian counsel, describing amounts that would be sent to the Canadian litiga-
tion and amounts that would remain in Donziger's possession.  Ex. 28.  He also helped Donziger

provide information for presentations to attempt to justify Donziger's use of funds to the Ama-

zon Defense Front.  In December 2016, Donziger appealed to Rizack, stating "it is imperative we

prepare an investor presentation for the clients to show use of funds, debts, charts, etc.  Pablo is

attacking the Frente [Amazon Defense Front]on this point and if we lose the Frente we lose con-

trol of the case."  Ex. 29.

      **Rizack leverages his fundraising services to obtain an interest in the Ecuadorian**

**Judgment**.  In August, 2016, after duping David Yass into investing, but before Yass had signed

the contract, Rizack threatened to withhold the investment if Donziger did not first procure

Rizack an interest in the Ecuadorian Judgment.  Ex. 30.  Rizack told Donziger to "[g]o back to

the client and tell them I have raised this money, helped with other investors, and continue to

help raise funds.  I have other investors interested but I will not work without an agreement any

longer."  *Id*.  Donziger eventually caved and, after Rizack finalized the deal, the two traveled to

Ecuador to meet with the Amazon Defense Front to acquire this interest.  Ex. 31.  At the meet-

ing, Donziger represented that Rizack was an "expert in financing" who "help[ed] with fund rais-

ing."  Ex. 32.  On January 11, 2017, Donziger caused the Amazon Defense Front] to give Rizack

a 0.25% interest in the Ecuadorian Judgment—an interest for which other investors had to pay

$250,000.  This interest was clearly critical to Rizack.  As late as February 26, 2018, Rizack con-

tinued to hound Donziger to get the final signature, that of Alan Lenczner.  Ex. 33.

      **Rizack received at least a $10,000 kickback for procuring an investor**.  Rizack re-

ceived at least one $10,000 kickback for securing Yass's investment, Ex. 34, and planned to re-

ceive $250,000 fee from an investment that did not close, Ex. 30.

**Rizack is among Donziger's top contacts**.  Donziger's phone records reveal that since the RICO Judgment, Rizack has been among Donziger's top five contacts, with a total of 2,116 phone calls and text messages.  Lynch Decl. ¶ 5.

The record, therefore, does not suggest a "tapering" level of involvement.

### III.  ARGUMENT

**A.     Rizack's Motion Is an Untimely and Unsupported Motion to Reconsider**

Rizack's motion seeks to have the Court reconsider its September 13, 2019 order that the determination of any cost shifting under Rule 45 must in this case be brought after completion of the Protocol.  But Rizack fails to carry his burden to show any new facts or law warrant reconsideration, and his motion is, as a threshold matter, untimely.

Under Local Rule 6.3, a motion for reconsideration must be served within 14 days of the court's order.  S.D.N.Y. Local Rule 6.3.  The moving party must demonstrate "that the court overlooked controlling decisions or factual matters that were put before it on the underlying motion." *Jonas*, 2004 WL 1542231, at *1 (citations and quotations omitted).  "A motion for reconsideration is not an opportunity for making new arguments that could have been previously advanced." *Rosner v. United States*, 2018 WL 5981945, at *1 (S.D.N.Y. Nov. 14, 2018) (internal citations and quotations omitted).  Rizack fails to meet this standard.

During the September 13, 2019 hearing, this Court considered Rizack's argument that Chevron should be ordered to pay the costs Rizack incurred in responding to the Subpoena, but "agree[d] with Chevron that the question of who will absorb the costs of Mr. Rizack's attorney's fees is best deferred until after the protocol is executed and the fees incurred."  Ex. 1 (Tr. 45:16-19).  In the Court's view, this course would "both promote cost consciousness and allow the Court to resolve the issue based on a more fully developed record, as we do not yet know some facts and factors that could be relevant to that analysis."  *Id* at 45:17-23.  By this means, the

14

Court could determine "in retrospect, after production, whether there may be portions of those costs that are more rightly attributable to Mr. Rizack." *Id*. at. 49:23 – 50:1.

Rizack filed his motion on November 27, 2019, more than 10 weeks after entry of the order it seeks to have reconsidered. Accordingly, under Local Rule 6.3 it is untimely. *See Jonas*, 2004 WL 1542231 (holding that motion styled as one to vacate an order staying discovery was really a motion for reconsideration and was barred as untimely under Rule 6.3).

Nor does Rizack's motion satisfy the other criteria for a proper motion to reconsider. As noted, Rizack cannot point to any new controlling authority that would require the Court to revise its September 13 order—because there is none.

And Rizack does not submit any new evidence—or even argue that the Court overlooked old evidence—to support his claim that the Court should revisit and revise its September 13 order. While Rizack asks the Court to rule based, in part, on the Destruction/Recovery Investigation report, he fails to submit it or properly attest to its existence and content. In fact, the Destruction/Recovery Investigation analysis, by Rizack's own admission, is not yet complete. Mot. at 5, 7; Ex. 35. And even if it were complete, Rizack's refusal to permit Chevron to view the analysis, Mot. at 10, is prejudicial to Chevron. Indeed, were Rizack to attempt to submit actual evidence *in camera*, which he has not done, fundamental principles of due process would preclude the Court from considering or basing any adverse decision on such secret evidence. *See*, *e.g., Hansberry*, 2004 WL 3152393, at *4, n.9 (declining to consider affidavit *in camera* in support of summary judgment because "an individual's right to due process includes a party's right to be aware and refute evidence against the merits of his case."); *Kinoy v. Mitchell*, 67 F.R.D. 1, 15 (S.D.N.Y. 1975) ("[T]he Government presents the Court, in camera, with material which it asserts must be withheld from plaintiffs as privileged, yet which it requests the Court to consider

in ascertaining material facts and drawing legal conclusions concerning dispositive issues in the case.  In this Court's view such a course is wholly unacceptable.  Our system of justice does not encompass *ex parte* determinations on the merits of cases in civil litigation.").[5]

In the same vein, Rizack's contention that reconsideration is warranted because he supposedly will "be bankrupted" is unsupported with any actual evidence, as opposed to mere argument.  Moreover, whatever his financial circumstances, Rizack would have been well aware of them at the time of the September 13 Hearing.  Mot. at 16.  And even the attorneys' fees Rizack complains about are, in the main, not new:  According to Rizack, he had already incurred $107,000 costs "up to and including the hearing."  *Id.*  Rizack thus knew that attorneys' fees would be an issue at the time of the Hearing—his counsel even argued that the cost "would break him," Ex. 1 (Tr. 26:18-22)—yet failed to seek reconsideration until well past the deadline.  And in ordering that fees be addressed at the conclusion of the Protocol, it was plain to the Court that Rizack would incur attorneys' fees.

## B.    Beyond Its Procedural and Evidentiary Failures, Rizack's Motion Is Meritless

Even if this Court were to deem Rizack's Motion timely and overlook its complete lack of admissible evidence supporting its arguments, Rizack fails to carry his burden.

### 1.    The Documents Rizack Has Now Produced Show He Intentionally Withheld Discovery Based on Donziger's Instructions

Whether or not the Destruction/Recovery Investigation by Rizack's forensic expert shows, as Rizack argues, that he did not intentionally delete responsive documents, the record shows that Rizack engaged in discovery misconduct defeating Rizack's attempt to shift fees.

---

[5] Moreover, Rizack's attempt to rely on the Destruction/Recovery Investigation report would constitute grounds for disclosing the report to Chevron.  In September, this Court held that "if a sufficient showing is made that there is reason to believe that production of the reports to Chevron's counsel is warranted," Chevron could obtain them.  Ex. 1 (Tr. 48:18-49:3).  Rizack's reliance on those reports in his attempt to adjudicate the forced payment of money by Chevron, constitutes more than a sufficient showing.

As the Court is aware, prior to Chevron bringing its Motion to compel a forensic inspection of Rizack's electronic devices, of which Rizack stipulated to the bulk, Rizack made eight productions of approximately 1,200 documents, some of which were duplicates.  Neuman Decl. ¶ 2.  Rizack has now produced a total of 1,693 documents and communications that were sent to or from Donziger  and should have been produced.  *Id*.  In his new productions, there are approximately 240 new communications to or from Donziger that Rizack did not previously produce.[6] At the September 13 hearing, Rizack's counsel suggested to the Court that Rizack's admitted failure to produce all responsive documents—at least 400 of which Chevron was aware at the time of the September 13 hearing—was the result of a Rizack's lack of representation and his technical inability to conduct a proper search.  Ex. 1 (Tr. 17:23-18:5).  A review of Rizack's limited post-hearing productions to-date, however, shows that Rizack intentionally withheld responsive documents at Donziger's request—and then lied about it in deposition.

On April 17, 2018, Chevron served the Subpoena on Rizack.  *See* Dkt. 2266 at App'x C. Thereafter, Donziger and Rizack corresponded regarding ongoing post-judgment discovery. Donziger sent Rizack the deposition notices and testimony of other witnesses, Exs. 6, 7, 8, while Rizack forwarded correspondence from Chevron on to Donziger, Exs. 9, 10, 11, 12.  Rizack also previewed his productions to Donziger, Ex. 13 (sending Donziger his responses to the Subpoena and stating "[i]f you don't have any objection, I will forward the attached"), Ex. 14 (sending Donziger his responses with less documents than initially sent).  In return, Donziger warned Rizack not to produce anything before Donziger reviewed and approved.  *See* Exs. 15, 16.

---

[6]  As noted previously, Rizack did not produce documents with metadata and production information and produced many duplicates or near duplicates.  As a result, it is difficult to ascertain precisely how many documents Rizack produced and withheld.

Contrary to Rizack's testimony that he was not withholding documents at Donziger's instruction, Ex. 2 (Rizack Dep. 30:6-8), on March 7, 2019 Rizack emailed Donziger a document entitled "List of documents for Chevron" for Donziger to review pre-production.  Ex. 3.  The list contained 475 entries, and Donziger responded by telling Rizack that "this is like my entire online life" and instructed him to hold off producing until Donziger and Page could review.  Ex. 17.  As a result of this coordination with Donziger and Page, Rizack ultimately produced only around 155 documents of that review set, even though the approximately two-thirds that he withheld are facially responsive—e.g., "Case Budget.xlsx," "Distribution Escrow Agreement OFINAL.docx," "Engagement Agreement (Lago Agrio matter) (first).msg."

Furthermore, Rizack has no plausible excuse for his initial production shortfall of over 400 documents.  Rizack testified at deposition that, in making his productions, he searched the term "Donziger," Ex. 2 (Rizack Dep. 189:5-20), but he did not produce all documents containing that term.  When Chevron confronted him with correspondence with Donziger that other third-parties produced but he did not, Rizack testified that he might have deleted such documents.  *Id.* at 293:16-21, 302:15-25.  Now, however, Rizack is using the purported results of the Destruction/Recovery Investigation to argue he did not delete responsive documents.  Mot. at 8.  If this is true, it confirms that rather than having deleted responsive documents as indicated, Rizack chose not to produce them.  Far from exonerating Rizack, this demonstrates that he intentionally withheld responsive documents, and then perjured himself.

Nor is Rizack's previous lack of counsel an adequate explanation.  While it may be true that Rizack was technically unrepresented at the time of his first eight productions, he was receiving assistance from Donziger (a former lawyer) and Page (a present lawyer).  Ex. 17.  And, in any event, the deficiencies that led Chevron to request a forensic protocol in the first instance

were not due to a lay person's inability to conduct appropriate searches, but rather, a coordinated effort with Donziger to obstruct Chevron's access to responsive documents—and Rizack's testimony that the shortfall might have been due to deletions.

In sum, Rizack's bad faith and obstructionist tactics since Chevron served the Subpoena in April 2018, including withholding responsive documents after consulting with Donziger, lying during his depositions about it, and concealing the true extent of his involvement in Donziger's fraud, weigh against shifting costs to Chevron.  This Court previously acknowledged issues with Rizack's "trustworthiness."  Ex. 1 (Tr. 18:23-24).  *See In re Aggrenox Antitrust Litig.*, 2017 WL 4679228, at *11 (D. Conn. Oct. 18, 2017) (declining to award all fees sought when, in part, the nonparty "was notably intransigent and dilatory in its response to the subpoena, taking a full year and necessitating three interventions by the court to complete a review of 5,545 pages of documents.").  And Rizack's representations as to the Destruction/Recovery Investigation, if true, would demonstrate that, while Rizack did not delete responsive documents as he had testified, he did not produce them.  This would contradict his testimony that he may have deleted responsive documents,  Ex. 2 (Rizack Dep. 293:16-25, 322:15-23), which spurred the costly investigation.

## 2.    Rizack's Complaints About Fees Do Not Warrant Reconsideration.

As demonstrated in detail above in Section II.A, the majority of the fees about which Rizack complains were incurred *before* the Protocol was entered, and Chevron has worked proactively to lessen the burden on Rizack going forward by, among other things, agreeing to pay for Rizack's forensic expert, modifying the search terms, and indicating a willingness to pay for Rizack's outside vendor to review the focused set of 38,048 Potentially Responsive Documents identified by using Chevron's modified search terms.

Under these circumstances, there is no reason for the Court to reconsider its decision to

19

defer consideration whether fees should be shifted before production is complete.  First, as explained below, fee shifting under Rule 45 is a fact-specific determination that requires, *inter alia*, a determination of the nonparty's involvement in the underlying action.  *See infra*, Part III.B.3. To date, Rizack has produced 1,693 documents since the Court ordered compliance with the Protocol.  Neuman Decl. ¶ 2.  But this new production includes only communications in which Donziger was a participant, excludes documents that were largely in Spanish, and includes near-duplicates.  *See* Rizack Ex. C.  Although those documents confirm Rizack's substantial involvement in Donziger's effort to monetize and profit from the Ecuadorian Judgment, they provide far from the complete picture.  They lack, for example, communications between Rizack and investors, Donziger's co-conspirators, and Donziger's clients.  In addition, there appear to be further deficiencies within Rizack's production.  While the record shows there was extensive text messaging between Rizack and Donziger, Lynch Decl. at ¶ 5, Rizack has not produced any text messages.  Without full production, Chevron is deprived of important evidence to demonstrate that Rizack is not entitled to fee shifting, and the Court does not have a complete picture to consider.

Second, in ordering fees to be addressed only after those costs had been incurred, this Court noted that such action would "promote cost consciousness."  Ex. 1 (Tr. 45).  Rizack's Motion indicates that this has not occurred.  According to Rizack, his counsel has incurred $241,000 in fees, of which $155,000 arise from negotiations, briefing, and argument at the Hearing, Mot. 7, and approximately $86,000 arise from Rizack's October and November 2019 productions of 1,693 communications sent to or from Donziger.  Under the terms of the Protocol, Rizack could not withhold or redact any document based on "any privilege claimed by, through, or on behalf of, directly or indirectly" of Donziger.  Dkt. 2362 at 5.  And, any communication with Donziger, was, by its very nature, responsive.  Spending $86,000 in making these productions appears to be

the type of wasteful incursion of costs that the Court's September 13 order intended to limit. Rizack's further baseless redaction of documents in his November 25th production on the grounds of relevance confirms that his "review" is not for Chevron's benefit, but a means to rack up necessary attorneys' fees or pursue his own interests.  Ex. 19.

### 3.    Rizack Fails to Carry His Burden on the Remaining Rule 45 Factors

Under Federal Rule of Civil Procedure 45, courts will protect non-parties from "significant expense resulting from compliance" with a subpoena, but "[p]rotection from significant expense does not mean that the requesting party necessarily must bear the entire cost of compliance. . . . [A] non-party can be required to bear some or all of its expense where the equities of a particular case demand it." *In re Honeywell Int'l, Inc. Sec. Litig.*, 230 F.R.D. 293, 303 (S.D.N.Y. 2003) (citations omitted) (alterations in original).  In determining whether to shift fees under Rule 45, courts consider "(1) whether the non-party actually has an interest in the outcome of the litigation; (2) whether the non-party can more readily bear the costs than the requesting party; and (3) whether the litigation is of public importance." *Wells Fargo Bank, N.A. v. Konover*, 259 F.R.D. 206, 207 (D. Conn. 2009).  Rizack had conceded the litigation's public importance.  Mot. at 19 ("Chevron's case against Donziger is arguably of 'public importance[.]'")

Where, as here, the respondent "is not the classic disinterested party subject to a subpoena from a party to a lawsuit to which it has no connection," the costs do not shift.  *Wells Fargo Bank*, 259 F.R.D. at 207; *In re Honeywell Int'l, Inc. Sec. Litig.*, 230 F.R.D. at 302–03 (declining to shift costs from the defendant's third-party financial auditor when it was "not a classic disinterested nonparty").  Far from being disinterested, Rizack was, and is, deeply involved in Donziger's scheme to violate the RICO Judgment by monetizing and profiting from the Ecuadorian Judgment.  Rizack admitted to organizing Donziger's funds and expenses, including judgment investments, to soliciting investors, and to helping create investor contracts.  *See* Part II.B.

The facts strongly mirror the case Rizack invokes, *In re First American*, in which a nonparty had to bear some of the "the expenses incurred in lifting the legal impediments that prevented compliance with the Subpoena" when its "position as auditor gave it unique access to documents that may be critical in unraveling a bank fraud of unprecedented scale and, perhaps, a correspondingly unique responsibility." *In re First Am. Corp.*, 184 F.R.D. 234, 242 (S.D.N.Y. 1998).

Rizack attempts to distance himself from his material self-interest in the outcome of this litigation by claiming he "has no interest in whether Chevron ultimately collects on the RICO judgment against Donziger." Mot. at 18. But Donziger and his co-conspirators' efforts to raise funds, in which Rizack played a substantial role, are central to the litigation. Moreover, Rizack holds a 0.25% interest in the corrupt Ecuadorian Judgment, which the record shows he fought hard to obtain. If Donziger's fundraising is found to violate the RICO Judgment, that will adversely affect Rizack's ability to see a return on that investment, which depends on investors' continued funding of enforcement abroad. As Donziger told him, Rizack's "success is tied to the success (and hard work) of others so [they] must move together for all to win." Ex. 30.[7]

Chevron has already agreed to bear reasonable of the forensic inspection and review of the search term results. Per the terms of the Protocol, Chevron is already required to pay Rizack's expert, including the fees associated with imaging all of Rizack devices and conducting the Destruction/Recovery Investigation. Furthermore, Chevron has offered to pay the reasonable fees of Rizack's third-party vendor to conduct the relevancy review. *See* Ex. 4. All that Rizack

---

[7] Rizack has an interest in the Ecuadorian Judgment which is one of the key subjects of this litigation. Rizack's claim that he offered to assign his interest to Chevron and Chevron rejected it (Mot. at 19) is misleading. Rizack "offered" to give up his interest only if Chevron covenanted not to sue him before having access to the evidence of Rizack's full role. If Rizack wants to renounce his interest and assign it to Chevron, there is no impediment to him doing so. Thus far, however, he has not done so and his supposed willingness appears to be an in-court talking point. His failure to do so underscores that his claim to be a disinterested third party is baseless.

is expected to pay going forward are the attorneys' fees for whatever degree of second-level re-
view he decides his counsel should undertakes for his benefit.  These fees would have been
lower had Rizack made a good faith effort to produce all responsive documents.  And Rizack has
not provided any evidence demonstrating that he cannot afford the costs of compliance.  This is a
tactic of Donziger's in this and related actions.  *See, e.g.*, Dkt. 1963 at 19-20 ("Donziger has not
submitted any affidavits, declarations or other evidence of his own financial circumstances or
those of his clients in support of his motion to review the taxation of costs.")[8]

Finally, Rizack cites Rule 26(b)(2)(B) as additional support for his assertion that he is en-
titled to fee shifting, but that gets him no farther.  Under Rule 26, Rizack, as "the party from
whom discovery is sought," has the burden of "show[ing] that the information is not reasonably
accessible."  Fed. R. Civ. P. 26.  Accessibility, however, does not refer merely to volume but
also, the location and whether documents can be retrieved—such as "deleted information, infor-
mation on backup media, [or] 'legacy data.'"  8 Fed. Prac. & Proc. Civ. § 2008.2 (3d ed.).[9]

In contrast here, the parties have already agreed to abide by the Protocol and the docu-
ments have been made accessible by way of Rizack's expert at Chevron's expense.  Any burden
now is in reviewing documents for responsiveness—which any party must do at its own expense.

---

[8]  In fact, Rizack's legal fees are lower than his financial benefit from Donziger (cash payments and interest in the
Ecuadorian judgment) and close to the amount he talked his friend, Yass, into investing—which he leveraged into
$10,000 and an interest in the Ecuadorian judgment for which others paid $250,000.  *See supra* Part II.B.

[9]  Rizack's reliance on *Tucker* is misplaced.  Indeed, in *Tucker*—a case that did not discuss fee shifting—the court
found that the plaintiff's discovery request was overly broad under Rule 26(b)(2)(C), not the subsection Rizack in-
vokes, when obtaining a former employee's email would require imaging *82 devices*.  *Tucker v. Am. Int'l Grp., Inc.,*
281 F.R.D. 85, 93 (D. Conn. 2012).  Rizack's other cases are also distinguishable.  *See In re 650 Fifth Ave. & Re-
lated Props.*, 2013 WL 12335763 (S.D.N.Y. Aug. 29, 2013) (finding defendant's motion to compel the production
of a document that likely did not exist was unduly burdensome as it would require "a significant allocation of re-
sources far beyond the evidentiary value of the information to be produced"); *Rowe Entm't, Inc. v. William Morris
Agency, Inc.*, 2002 WL 975713, at *2 (S.D.N.Y. May 9, 2002) ("the costs of the production of moving defendants'
e-mail communications" shifted to the plaintiff when, *inter alia*, there was little likelihood of a successful search).
Rizack's productions demonstrate that the search will yield responsive documents.

4.      **The Fees Rizack Seeks Are Inappropriate for Shifting**

As Rizack's own cited cases make clear, attorneys' fees may be reimbursed only if reasonable. *Sands Harbor Marina Corp. v. Wells Fargo Ins. Svcs. Of Oregon, Inc.*, 2018 WL 1701944, at *4 (E.D.N.Y. Mar. 31, 2018).  Fees incurred for work done for the benefit of the movant are considered unreasonable.  *Id.* at *7-8.  Thus, fees incurred in connection with negotiations between the parties as to costs and production deadlines do not shift to the moving party. *See id.*; *In re Aggrenox Antitrust Litig.*, 2017 WL 4679228, at *10 (D. Conn. Oct . 18, 2017) (fees associated with arguing with counsel about costs and production deadlines did not shift). Likewise "expenses . . . related—directly or indirectly—to [a non party's] efforts to resist the subpoena" cannot be recouped under Rule 45.  *In re Aggrenox*, 2017 WL 4679228, at *9; *G & E Real Estate, Inc. v. Avison Young-Washington*, 317 F.R.D. 313, 318 (D.D.C. 2016) ("[T]he efforts that [nonparty] undertook to litigate fiercely and to expend significant resources on the document review effort are not 'significant expenses resulting from compliance.'").

Finally, attorneys' fees incurred reviewing documents for privilege are generally not shifted to the moving party.  *See Steward Health Care Sys. LLC v. Blue Cross & Blue Shield of R.I.*, 2016 WL 8716426, at *4 (E.D. Pa. Nov. 4, 2016) ("It is clear from the facts, despite what it has alleged, that [the third party's] attorneys' fees were incurred as a result of its own desire to check for privileged and confidential documents. These types of attorneys' fees are not subject to reimbursement under Rule 45."); *Lefta Assocs. v. Hurley*, 2011 WL 1793265, at *4 (M.D. Pa. May 11, 2011) (declining to award "fees [that] appear[ed] largely related to efforts by the bank to protect its own interests in connection with its compliance with the subpoena, by independently reviewing these documents itself to determine claims of privilege it might assert.").

Rizack claims that $107,000 of the $241,000 he has incurred to date arose from events "up to and including the [September 13, 2019] hearing."  Mot. at 16.  But "none of [that] effort

included any of the substantive search, review, and production work that would be required to carry out the Protocol." *Id*. at 7.  Those fees, therefore, are not "expenses resulting from compliance" and thus cannot be shifted to Chevron.  *See In re Aggrenox Antitrust Litig.*, 2017 WL 4679228, at *9.  The remaining fees are presumably attributable to further negotiations and reviewing the documents produced to or from Donziger for privilege and/or to assess Rizack's culpability and exposure to future action from Chevron.  As such, Chevron bears no responsibility for those fees.  *Steward Health Care Sys.*, 2016 WL 8716426, at *4.

Furthermore, some of the fees—though Chevron cannot determine with precision how much based on the Motion's sparse information—were necessarily expended conducting baseless redactions based on relevancy.  *See Anthropologie, Inc. v. Forever 21, Inc.*, 2009 WL 690126 (S.D.N.Y. Mar. 13, 2009); *IDC Fin. Publ'g, Inc. v. BondDesk Grp., LLC*, 2017 WL 4863202, at *3 (E.D. Wis. Oct. 26, 2017) ("The court does not see a compelling reason to alter the traditionally broad discovery allowed by the rules by letting the defendants unilaterally redact large portions of their responsive documents on relevance grounds.").  These are not properly shifted to Chevron.

Finally, the notion that Chevron should have to cover Rizack's legal fees with respect to all future productions and any future deposition is untenable, especially in the abstract and on an incomplete record.  Chevron has already had to depose Rizack twice because of his production deficiencies, and Chevron will have no reason to depose him again unless he has withheld significant evidence.  Forcing Chevron to pay both its and Rizack's legal fees is unreasonable.

## IV.  CONCLUSION

Chevron respectfully requests that the Court deny Rizack's motion.

Dated: December 18, 2019                    Respectfully submitted,

New York, New York                          GIBSON, DUNN & CRUTCHER LLP

                         */s/ Randy M. Mastro*

Randy M. Mastro
Andrea E. Neuman
Anne M. Champion
200 Park Avenue
New York, New York 10166
Telephone: 212.351.4000
Facsimile: 212.351.4035
Email: RMastro@gibsondunn.com
Email: ANeuman@gibsondunn.com

William E. Thomson
333 South Grand Avenue
Los Angeles, California 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520
Email: WThomson@gibsondunn.com

STERN, KILCULLEN & RUFOLO LLC
Herbert J. Stern
Joel M. Silverstein
325 Columbia Tpke, Ste 110
P.O. Box 992
Florham Park, New Jersey 07932-0992
Telephone:  973.535.1900
Facsimile:  973.535.9664
Email: hstern@sgklaw.com
Email: jsilverstein@sgklaw.com

*Attorneys for Chevron Corporation*

26