```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 1/27/2020
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------X
   :
CHEVRON CORPORATION,   :
   :
          Plaintiff,   :
   :
     -against-   :
   :
STEVEN DONZIGER,   :
          Defendant.   :
   :
--------------------------------------------------------------X

11 Civ. 0691 (LAK) (RWL)

**REPORT AND RECOMMENDATION
TO HON. LEWIS A. KAPLAN:
MOTION FOR CONTEMPT
RE: AARON MARR PAGE**

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

Plaintiff Chevron Corporation moves for entry of an order holding non-party Aaron
Page and his law firm, Forum Nobis PLLC, in civil contempt pursuant to Federal Rule of
Civil Procedure 70(e) and Local Civil Rule 83.6 of the Local Rules of the United States
Court for the Southern District of New Yok.  Chevron's motion follows on the heels of the
Court's decision finding Defendant Steven Donziger in civil contempt for violating
injunctive provisions set forth in the Court's Judgment entered on March 4, 2014 and the
Default Judgment entered on April 23, 2018.  Chevron claims that Page and Forum Nobis
should be held in contempt for aiding and abetting Donziger's acts of contempt and for
committing contemptuous acts while acting as Donziger's lawyer, employee or agent.
Chevron requests compensatory sanctions and an award of attorneys' fees.  The Court
sets forth below its certified Findings of Fact; recommends staying further decision on the
motion until the Second Circuit Court of Appeals rules on Donziger's appeal of the earlier
decision holding him in contempt; and also provides conclusions on the merits in the event
the District Judge determines to proceed.

1

**Procedural Background**

The Court presumes the parties' familiarity with the extensive history of this case and sets forth in its certified Findings of Fact only those facts and procedural events relevant to determining the instant motion for contempt.  *See, e.g., Chevron Corp. v. Donziger*, 974 F. Supp.2d 362 (S.D.N.Y. 2014).

Chevron filed the instant motion on August 28, 2019.  Page submitted opposition papers, Chevron replied, and the motion was fully briefed and submitted as of October 16, 2019.[1]  The Court held a hearing on January 16, 2019, at which Page testified and the parties presented arguments.

**This Court's Contempt Authority**

Where, as here, the parties have not consented to the magistrate judge's exercise of plenary jurisdiction pursuant to 28 U.S.C. § 636(c), the magistrate judge's role with regard to a civil contempt motion is circumscribed by § 636(e).  Once the facts have been certified by the magistrate judge, "[t]he determination of whether the conduct constitutes contempt and, if so, what sanctions are appropriate are left to the discretion of the district court." *JSC Foreign Economic Association Technostroyexport v. International Development & Trade Services., Inc.*, No. 03 CV 5562, 2006 WL 1148110, at *1 (S.D.N.Y. Apr. 28, 2006); *see also Comverse, Inc. v. American Telecommunications., Inc. Chile S.A.*, No. 07 CV 11121, 2009 WL 464446, at *2 (S.D.N.Y. Feb. 24, 2009) (because the

---

[1] Chevron asks the Court to disregard Page's opposition papers because he filed them one day late notwithstanding having received an earlier extension.  (Reply, Dkt. 2369, at 2.)  While the Court does not condone late filings, the Court exercises its discretion to consider Page's opposition, given the circumstances of this case and that the question before the Court is one of contempt.

parties did not consent to the magistrate judge for all purposes, "this Court reviews the facts certified to determine whether the conduct constitutes contempt and to fashion an appropriate remedy."). On October 8, 2019 the Honorable Lewis A. Kaplan, United States District Judge, referred the instant motion to the undersigned for a report and recommendation.

## Certified Findings of Fact

### A.    The RICO Judgment and Default Judgment

1.    In 2011, as part of a larger effort to "extort" billions of dollars from Chevron, Donziger obtained a judgment in Ecuador, finding Chevron liable for billions of dollars based on claims of having caused environmental damage (the "Ecuador Judgment"). *Chevron*, 974 F. Supp.at 481.

2.    Three years later, in 2014, the Court issued a decision following trial finding Donziger liable under the federal RICO statute and New York common law for having procured, with the help of others, the Ecuador Judgment by using corrupt means, including bribery and submission of fraudulent evidence. *See Chevron*, 974 F. Supp. at 384, 567-603.[2]

3.    On March 4, 2014, the Court entered judgment in favor of Chevron against Donziger and his law firms as well as two Ecuadorian plaintiffs (the "RICO Judgment").

---

[2] The Second Circuit Court of Appeals affirmed the decision. *Chevron v. Donziger*, 833 F.3d 74, 81(2d Cir. 2016), *cert. denied*, 137 S. Ct. 2268 (2017). Summarizing what led to the Ecuador Judgment, the Court stated: "The record in the present case reveals a parade of corrupt actions by the LAPs' legal team [i.e., Donziger and his co-conspirators], including coercion, fraud, bribery, culminating in the promise to [the Ecuadorian Judge], of $500,000 from a judgment in the favor of the LAPs." 833 F.3d at 126.

(Dkt. 1875.)  Page learned of the RICO Judgment the same day it issued.[3]  He even Tweeted about it that same day.  (Declaration of Anne Champion, dated August 28, 2019, Dkt. 2317 ("Champion Decl."), Ex. 6.)

4.      Among other provisions, Paragraph 1 of the RICO Judgment "impose[d] a constructive trust for the benefit of Chevron on all property, whether personal or real, tangible or intangible, vested or contingent, that Donziger has received, or hereafter may receive, directly or indirectly, or to which Donziger now has, or hereafter obtains, any right, title or interest, directly or indirectly, that is traceable to the [Ecuador] Judgment of the enforcement of the Judgment anywhere in the world."  (Dkt. 1875 ¶ 1.)  Paragraph 1 also requires that Donziger "transfer and forthwith assign to Chevron all such property that he now has or hereafter may obtain."  (*Id.*)

5.      Paragraph 5 of the RICO Judgment "enjoined and restrained" Donziger "from undertaking any acts to monetize or profit from the [Ecuador] Judgment . . ., including without limitation by selling, assigning, pledging, transferring or encumbering any interest therein."  (Dkt. 1875 ¶ 5.)

6.      Citing Federal Rule of Civil Procedure 65(d)(2) ("Persons Bound" by Injunctions and Restraining Orders), Paragraph 8 of the RICO Judgment made the Judgment "binding upon the parties; their officers, agents, servants, employees, and attorneys; and any other persons who are in active concert and participation with any of the foregoing."  (Dkt. 1875 ¶ 8.)

---

[3] At the hearing, Page stipulated to his knowledge of the RICO Judgment.  (Transcript of Jan. 16, 2020 Hearing ("Tr.") at 6.)

7.      On April 23, 2018, the Court entered default judgment against the Amazon Defense Front ("FDA" by its native language initials) and other Ecuadorian defendants who did not appear (the "Default Judgment").  (Dkt. 1985.)  Page knew of the Default Judgment on the day, or soon after, it issued.[4]  (Champion Decl. Ex. 8.)

8.      The Default Judgment contained provisions similar to the RICO Judgment. Paragraph 1 of the Default Judgment thus "impose[d] a constructive trust for the benefit of Chevron on all property whether personal or real, tangible or intangible, vested or contingent, that Defaulted Defendants have received, or hereafter may receive, directly or indirectly, or to which the Defaulted Defendants now have, or hereafter obtain, any right, title or interest, directly or indirectly, that is traceable to the [Ecuador] Judgment of the enforcement of the Judgment anywhere in the world."  (Dkt. 1985 ¶ 1.)  Paragraph 1 also required each Defaulting Defendant to "transfer and forthwith assign to Chevron all such property that he or she now has or hereafter may obtain."  (*Id.*)

9.       Like Paragraph 5 of the RICO Judgment, Paragraph 4 of the Default Judgment "enjoined and restrained" the Defaulted Defendants "from undertaking any acts to monetize or profit from the [Ecuador] Judgment . . ., including without limitation by selling, assigning, pledging, transferring, or encumbering any interest therein."  (Dkt. 1985 ¶ 4.)

10.      Like Paragraph 8 of the RICO Judgment, Paragraph 7 of the Default Judgment invoked Fed. R. Civ. P. 65(d)(2), stating that the Default Judgment is binding on not only the parties but also their agents, attorneys, and others.  (Dkt. 1985 ¶ 7.)

---

[4] At the Hearing, Page did not deny his knowledge of the Default Judgment on the day, or shortly after, it issued.

**B.     The Decision Holding Donziger in Contempt**

11.     On May 23, 2019, the Court found Donziger in willful contempt of the RICO Judgment in multiple respects (the "Donziger Contempt Ruling").  (Dkt. 2209.)

12.      As relevant here, Donziger violated Paragraph 1 of the RICO Judgment (the terms of which the Court found to be clear and unambiguous) by failing to transfer to Chevron a contingency interest in the Ecuador Judgment received by Donziger pursuant to his retainer agreement with the FDA. (Dkt. 2209 at 36-40, 69 ¶1a-b.)  Donziger subsequently purged himself of this contempt. (Dkt. 2216 ¶ 4.)

13.     The Court further found Donziger in contempt of Paragraph 5 of the RICO Judgment for committing to pay David Zelman, a life coach, "14/250 of an eighth of a point of whatever is recovered on the total claim" out of Donziger's "personal fees from this litigation."  (Dkt. 2209 at 42, 70 ¶ 3a.)

14.     The Court further found that "Donziger used at least $666,476.34 of investment funds for personal expenses, that those funds were traceable to the Ecuador Judgment, and that he had a personal right to or interest in those funds." (Dkt. 2209 at 58.)  In doing so, Donziger "profit[ed] from and fail[ed] to assign to Chevron funds traceable to the Ecuador Judgment," in violation of Paragraphs 1 and 5 of the RICO Judgment.  (*Id.*)

15.     The Court also found that Donziger had violated the RICO Judgment by monetizing the Ecuador Judgment but ultimately did not hold Donziger in contempt on that basis.  (Dkt. 2209 at 41-42.)

16.     In that regard, the Court found that Donziger admitted to arranging "sales of shares in the Ecuador Judgment to at least six investors since March 2014" and had

"raised over $2.4 million from investors in exchange for interests in the Ecuador Judgment totaling at least 1.28525 percent from at least May 2016 through 2018."  (Dkt. 2209 at 41, 53.)

17.     The Court rejected Donziger's argument, based on an April 25, 2014 order denying a stay pending appeal, that Paragraph 5 of the RICO Judgment did not prohibit Donziger from selling the FDA's interest (as distinct from Donziger's interest) in the Ecuador Judgment.  (Dkt. 2209 at 51-53.)

18.     Rather, the Court re-emphasized that the RICO Judgment "bars any and all acts to monetize or profit from the Ecuador Judgment, including without limitation sale, assignment, pledge, transfer or encumbrance of any interest therein." (Dkt. 2209 at 52.)

19.     Accordingly, "in the Court's view," Donziger "violated paragraph 5 [of the RICO Judgment] via his sales and efforts to sell interests in the Ecuador Judgment irrespective of whether the interests sold were in Donziger's contingent fee interest or the Ecuadorian Parties' interests in the Ecuador Judgment itself."  (Dkt. 2209 at 52.)

20.     "In the last analysis," however, the Court found it "unnecessary" to base its contempt holding under Paragraph 5 on this ground.  Instead, "the Court elect[ed] to rest its decision" on the ground that "Donziger, in consequence of his sales, has profited extensively from the Ecuador Judgment in violation of the RICO Judgment." (Dkt. 2209 at 52–53.)

21.     On May 27, 2019, Donziger appealed the Donziger Contempt Ruling to the Second Circuit.  (Dkt. 2211.)  The appeal remains pending.

### C.   Page's Role Before the RICO Judgment

22.   Page, a lawyer, is managing attorney of his own law firm, Forum Nobis PLLC.  (Dkt. 2209 at 32.)  Page, through Forum Nobis, has two clients: Donziger, and the FDA.  (Declaration of Aaron Marr Page, dated Oct. 3, 2019, Dkt. 2355 ("Page Decl.") ¶ 4; Champion Decl., Ex. 7 at 9:17-10:5, 10:11-21.)   Page also represented some of the individual Ecuadorian plaintiffs, known as "LAPs."  (Champion Decl. Ex. 7 at 10:17-19.)

23.   Page first met Donziger while in law school and began working full time for Donziger in 2005 after graduating from law school.  (Champion Decl. Ex. 11 at 1.)

24.   Page worked for Donziger until March 2007, when Page joined the law firm of Cleary, Gottlieb Steen & Hamilton as an associate attorney.  Even after joining that firm, Page continued to assist Donziger.  (Champion Decl. Ex. 12 at 274:7-9, 274:22-275:10, Ex. 13 at 1.)

25.   Page assisted Donziger with the Ecuador case and was involved in the efforts to procure the Ecuador Judgment.   *See, e.g., Donziger*, 974 F. Supp.2d at 410 n. 198, 421; *see also* 970 F. Supp. 2d 214, 225 (S.D.N.Y. 2013) (opinion before trial) (quoting Donziger in connection with the RICO case identifying Page as having "deep factual knowledge of the case"); No. 11-cv-691 (LAK), 2013 WL 1087236, at *18 n.161 (S.D.N.Y. March 15, 2013) (discovery ruling) (identifying Page email attaching and commenting on briefing in the Ecuador case).[5]

---

[5] Chevron's motion papers provide additional evidence of Page's involvement in the Ecuador case.  (Chevron Memorandum of Law, Dkt. 2316, at 8-10.)  The Court need not address that matter further as it is not material to determining whether Page should be held in contempt with respect to the RICO and Default Judgments.

26.     Page, through Forum Nobis, has represented Donziger as a client since 2010.  (Champion Decl. Ex. 7 at 9:17-10:5.)  Page played a "key advisory role" to Donziger at the RICO trial and was "at the hub of most of the critical work getting done".  (Champion Decl. Ex. 16 at ¶ 4.)  As Page describes it, his work for Donziger and his Ecuadorian clients has consisted of (1) direct representation of Donziger on a select number of matters; (2) provision of legal advice and research in a "secondary" or "supplemental advisory capacity"; and (3) draftsmanship and administrative work for Donziger, including preparation and revision of documents.  (Page Decl. ¶ 4.)

27.     Over the years Page has worked with Donziger, Page has received payments totaling more than $514,000 from Donziger and Donziger's investors.  (*See* Declaration of John Slavek, dated Aug. 28, 2019, Dkt. 2318 ("Slavek Decl.") Ex. 1.[6])

### D.    Page's Actions After the RICO Judgment

28.     **Page Assisted With Solicitation of and Drafting Contracts for Investors:**  Page has played an active role in Donziger's efforts following the RICO Judgment to enter into investment contracts to monetize and profit from the Ecuador Judgment.

29.     For example, between July and December 2016, Page revised form investor contracts.  (Champion Decl. Ex. 38, 45-48.)

30.     Page also helped draft and manage the specific investor agreements contributing to the more than two-million dollars raised by Donziger.  In particular, in the latter half of 2016, December 2017, and January 2018, Page drafted, revised or otherwise

---

[6] At the Hearing, the parties stipulated to the veracity of the Slavek Declaration.  (Tr. at 3:7-13, 4:18-19.)

assisted with investment contracts for John Van Merkensteijn (of WDIS Finance LLC) and David Yass (of Wellback Partners), Ian Watson (of Indigenous People Limited), Tony Abbiati, Cliff Eisler and Glenn Krevlin.  (Champion Decl. Ex. 50-70.)

31.    Page also participated in negotiations with investors purchasing shares in potential recovery from the Ecuador Judgment.  (Champion Decl. Ex. 47.)

32.    In a potential ten-million-dollar transaction with Daniel Israel, Page specified that his own fee should come out of someone's share of the transaction fee other than Donziger's (specifically Josh Rizack) so as not to reduce Donziger's take from the investment.  (Champion Decl. Ex. 47) ("I would be loath to take anything from your portion . . . .  I think apart from the transaction fee, you would be justified in paying yourself a percentage of your arrears?").

33.    From time to time, Page also advised Donziger on legal aspects of the investor contracts and Donziger's authority under them.  (Champion Decl. Ex. 71-76.)

34.    Page also assisted Donziger with, or advised Donziger about, solicitations for investment in the Ecuador Judgment, including, for example, preparing materials to share with investors, advising about application of the securities law to the investment solicitations, and recommending that Donziger obtain professional websites to improve investor presentations.  (Champion Decl. Ex. 81-82; Dkt. 2209 at 20.)

35.    Page also assisted Donziger in responding to investor inquiries, such as those about how percentage interests would be paid out in the event of recovery and calculation of interest.  (Champion Decl. Ex. 78-80.)

36.    A particularly notable example of Page's helping to respond to investors came on August 4, 2016, when the lawyers for one investor complained that Donziger

had inaccurately represented the Court's finding that the Ecuador Judgment had "copied extensively from eight LAP internal work product documents – documents which were not in the record, which Zambrano denied having used, and the presence of which in the Judgment defendants could not explain." (Champion Ex. 77 at 2 (quoting Dkt. 1874 at 218).) Page drafted Donziger's response: "As for dear Judge Kaplan's quote, it is a typical masterwork of false and misleading information." (*Id.* at 1.)

37.     **Page Collaborated with Donziger to Financially Reward Themselves:** In addition to facilitating investments in the Ecuador Judgment, Page also worked with Donziger to transfer interests in the Ecuador Judgment to financially benefit themselves. Page accomplished this primarily by drafting various agreements.

38.     With help from Donziger, in July 2016, Page drafted an agreement awarding himself a 0.25% interest in the Ecuador Judgment, which Page described as a "small contingency contract with the FDA to fund part of my work on the case." (Champion Ex. 101-103.) After Donziger lobbied the FDA to sign the agreement, it was executed in January 2017. (Champion Ex. 103 at 5.)

39.     Page also drafted a service agreement for Donziger through which the FDA reaffirmed the validity of Donziger's interest in the Ecuador Judgment and guaranteed Donziger payment out of the FDA's share in the event that Donziger's interest were held to be invalid. (Champion Decl. Ex. 83.) Page's work culminated in Donziger's November 2017 retainer agreement with the FDA. (Dkt. 2091-23.) That agreement reaffirmed Donziger's interest and granted Donziger a new personal interest in the Ecuador Judgment, which the Court determined should have been transferred to Chevron under Paragraph 1 of the RICO Judgment. (Dkt. 2209 at 36-40.) Unlike earlier retainer

agreements, the 2017 retainer agreement gave Donziger the final say in disposition of litigation funds.  (*Compare* Dkt. 2091-21 and 2091-22 *with* Dkt. 2091-23; Tr. at 11-12.)

40.     Page also drafted an agreement that extinguished a personal debt of Donziger in exchange for an interest in the Ecuador Judgment.  In December 2017, Donziger requested from Page a "superseding instrument that nullified" a "personal promissory note" by which investor Roger Waters had loaned Donziger $102,000. (Champion Decl. Ex. 84.)  Page drafted a superseding investment agreement with Waters for $152,000, which included the $102,000 that Waters lent to Donziger personally, in exchange for a percentage of the Ecuador Judgment.  (Champion Decl. Ex. 85-86.) Following further editing by Donziger, Waters signed the agreement in February 2017. (Champion Decl. Ex. 86-88.)  Waters then paid Donziger directly in an amount of only $50,000.  (Dkt. 2115-1, Ex. 2.)  In short, Page assisted Donziger in financially benefitting from the Ecuador Judgment by extinguishing Donziger's personal one-hundred and two-thousand-dollar debt.[7]

41.     After the Default Judgment, which enjoined the FDA and its agents and attorneys from "selling, assigning, pledging, transferring or encumbering any interest [in the Ecuador Judgment" (Dkt. 1985 ¶ 4), Page drafted contracts transferring interests in

---

[7] At the Hearing, Page denied knowing that the $102,000 was to extinguish Donziger's debt to Waters; rather, Page testified that he thought the extra $102,000 was a "donation." (Tr. at 67.)  This testimony, however, was not reliable.  For example, when asked why a "donation" would require a previous agreement that needed superseding, Page responded "Yeah.  That's a good question."  (Tr. at 67:12-14.)  And, the email trail clearly and convincingly shows that Page was aware that the Waters' agreement extinguished an earlier debt.  (*See* Champion Decl. Ex. 84.)  Meanwhile, no record evidence supports Page's contention that the $102,000 was a "donation."

the Ecuador Judgment to a Canadian activist and Canadian attorneys in April and May 2018.  (Champion Decl. Ex. 91-92.)

42.     Separate from his contingency payment agreement with the FDA, between March 2014 and March 2019, Page was paid $107,000 and Forum Nobis was paid $67,500, out of investor funds.  (Slavek Decl. Ex. 1.)

43.     **Page Transferred FDA Investor Funds to Donziger's Personal Account.**  To receive and disburse investor monies, an assistant to Donziger, Mary Sullivan, had created a bank account called "CWP" (standing for "Chevron Will Pay"). (Declaration of Mary K. Sullivan, dated Sept. 28, 2018, Dkt. 2116 ("Sullivan Decl."), ¶¶ 49-50.)  After Sullivan left her position with Donziger, and after the Default Judgment had been entered, Sullivan sent to Page two cashier checks totaling $342,045.16 made payable, at Page's instructions, for the benefit of FDA (Dkt. 2209 at 27-29 (citing Sullivan Decl. ¶¶ 56-59 & Ex. 39).)  Those funds represented the remaining balance of the CWP account, less expenses.  (Sullivan Decl. ¶¶ 57-60.)  Page received the funds into his Forum Nobis client trust account.  (Page Decl. ¶ 11.)

44.     On May 8, 2018, pursuant to Donziger's direction, Page wired the same amount to Donziger's personal bank account.  (Dkt. 2209 at 29-30; Page Decl. ¶ 11.) Two days later, Donziger transferred the funds into a business account, then transferred $50,000 back to Forum Nobis as payment for Page's legal services, $35,000 to Donziger's own personal checking account, and $125,000 into another business account.[8]  (Dkt. 2209 at 32-33; Page Decl. ¶ 11.)

---

[8] By transferring funds to Donziger's personal account, Page participated in the mishandling and commingling of client funds that he and Donziger caused to flow into and out of Donziger's personal and non-client-trust accounts in violation of their ethical

45.     Page attempted to justify the transfer of funds to Donziger by preparing, in consultation with Donziger, an "email memorandum" advancing a purported narrow "understanding" of the RICO and Default Judgments and affirming that Page is "aware of no Order" precluding transfers of any funds he received on behalf of FDA.  (Champion Decl. Ex. 106-107.)  The Court, however, already has rejected that "understanding" as meritless and contrary to the Court's April 25, 2014 opinion denying a stay of the RICO Judgment. (Dkt. 2209 at 45-53.)

## Standards for Civil Contempt

When a party fails to comply with a court order, he or she may be held in civil contempt if "(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." *Paramedics Electromedicina Comercial, Ltda v. GE Medical Systems Information Technologies., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004) (citing *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995)); *see also CBS Broadcasting, Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 98 (2d Cir. 2016) (reciting and applying the *Paramedics* factors).  All three elements must be met before contempt sanctions may be imposed. *King*, 65 F.3d at 1058; *New York State National Organization. for Women v. Terry*, 886 F.2d 1339, 1351 (2d Cir. 1989).  It is not necessary, however, to "establish[ ] that the violation was willful." *Paramedics*, 369 F.3d at 655 (citing *Donovan v. Sovereign Securities Ltd.*, 726 F.2d 55, 59 (2d Cir. 1984)).  The

---

obligations as attorneys.  (*See* Expert Report of Dr. Moore, Dkt. 2269, at 5-10.)  In the Donziger Contempt Ruling, the Court observed "that the commingling of client and personal funds . . . that seems to have gone on here is extraordinary."  (Dkt. 2209 at 55 n.177.)

movant bears the burden of establishing that the requirements for contempt are met. *Latino Officers Association City of New York, Inc. v. City of New York*, 558 F.3d 159, 164 (2d Cir. 2009).

An order is clear and unambiguous when it "leaves no uncertainty in the minds of those to whom it is addressed" and instead allows them "to ascertain from the four corners of the order precisely what acts are forbidden." *King*, 65 F.3d at 1058 (internal citations and quotation marks omitted); *see also Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 292 (2d Cir. 2008) ("[T]he decree underlying contempt must be sufficiently clear to allow the party to whom it is addressed to ascertain precisely what it can and cannot do."). "The proper analysis focuses on 'whether [the order] unambiguously proscribes the challenged conduct,' not whether it is 'clear in some general sense.'" *Medina v. Buther*, No. 15 Civ. 1955, 2019 WL 581270, at *25 (S.D.N.Y. 2019) (quoting *Chao*, 514 F.3d at 292).

"A plaintiff must also clearly and convincingly demonstrate that 'defendants did not . . . comply with the order.'" *Medina*, 2019 WL 581270 at *25 (quoting *Latino Officers*, 558 F.3d at 164.   For civil contempt, "this clear and convincing standard requires 'proof adequate to demonstrate a reasonable certainty that a violation occurred.'" *Id.* (quoting *BeautyBank, Inc. v. Harvey Prince LLP*, 811 F. Supp. 2d 949, 956 (S.D.N.Y. 2011) (internal quotation omitted)).

As for the third requirement, "the court must determine 'whether defendants have been reasonably diligent and energetic in attempting to accomplish what was ordered.'" *Medina*, 2019 WL 581270 at *25 (quoting *Powell v. Ward*, 487 F. Supp. 917, 933 (S.D.N.Y. 1980), *aff'd and modified*, 643 F.2d 924 (2d Cir. 1981)). "When a defendant acts based on what appears to be 'a good faith and reasonable interpretation of [the

court's order],' he should not be held in contempt.'" *Id.* (quoting *Vertex Distribution, Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 889 (9th Cir. 1982) (alteration in original)). A defendant is not reasonably diligent, however, when they ignore a court order "or take only superficial actions that strain 'both the language and intent of the order.'" *Id.* (quoting *Powell*, 487 F. Supp. at 933-34). "It is even more troubling when a defendant takes actions 'that contravene the provisions of the order.'" *Id.* (quoting *Powell*, 487 F. Supp. at 934).

In finding Donziger in contempt of Paragraphs 1 and 5 of the RICO Judgment (Dkt. 2209), the Court already has determined that the injunctive provisions of the RICO Judgment are clear and unambiguous,[9] that proof of Donziger's non-compliance is clear and convincing, and that Donziger did not make diligent efforts to comply. The question here is whether Page, knowing of the RICO and Default Judgments, violated their injunctive provisions either while acting as Donziger's attorney or agent, or by acting in concert with Donziger to violate them.

### Standards for Holding Non-Parties Like Page in Contempt

Non-parties can be found in contempt of an injunction. An injunction "bind[s]" an enjoined party's "officers, agents, servants, employees, and attorneys," and "other persons who are in active concert or participation" with the foregoing, so long as the nonparty has "actual notice" of the injunction. Fed. R. Civ. P. 65(d)(2); *see also* Dkt. 1875 ¶ 8. When such a nonparty "knowingly assists a defendant in violating an injunction," the

---

[9] Because the relevant parts of the injunctive provisions of the Default Judgment track those of the RICO Judgment, the Default Judgment injunctive provisions are just as clear and unambiguous.

nonparty "subjects himself to civil as well as criminal proceedings for contempt." *United States v. Paccione*, 964 F.2d 1269, 1274 (2d Cir. 1992) (quoting *Alemite Manufacturing Corp. v. Staff*, 42 F.2d 832, 832 (2d Cir. 1930)); see also Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2956 (3d ed.) ("[N]onparties who have actual notice of an injunction and are guilty of aiding or abetting or acting in concert with a named defendant or the defendant's privy in violating the injunction[] . . . may be held in contempt."). This contempt authority over nonparties "gives force to injunctions and prevents parties from violating them by proxy." *Eli Lilly & Co. v. Gottstein*, 617 F.3d 186, 195 (2d Cir. 2010).

To establish a nonparty's contempt, the moving party must show that: (1) the nonparty had "actual notice" of the injunction, Fed. R. Civ. P. 65(d)(2); and (2) the nonparty either (i) violated the injunction while acting as an enjoined party's "officer[], agent[], servant[], employee[], [or] attorney[,]" Fed. R. Civ. P. 65(d)(2)(B); *Aviv v. Brainard*, No. 18-CV-5088 (PKC), 2018 WL 4927912, at *3 (S.D.N.Y. Oct. 11, 2018), or (ii) was "in active concert or participation" with the enjoined party, or the party's "officers, agents, servants, employees, [or] attorneys," in violating the injunction, Fed. R. Civ. P. 65(d)(2)(C); *Bear U.S.A., Inc. v. Kim*, 71 F. Supp. 2d 237, 246 (S.D.N.Y. 1999) (Kaplan, J.). Here, Page's conduct implicates both categories of non-party contempt: he acted as both Donziger's and the FDA's attorney and agent and also acted in concert with Donziger.[10] Similarly, Page can be held in contempt of the Default Judgment to the extent he acted as the FDA's attorney and agent.

---

[10] The record is not entirely clear on which occasions Page acted in his capacity of representing Donziger or FDA as an attorney or instead merely acted in concert with Donziger. But the Court need not make that specific determination as both Donziger and the FDA are bound by the RICO and Default Judgments, and in all relevant circumstances, Page acted in concert with Donziger.

**The Court Has Jurisdiction Over Page and Forum Nobis,
But the Instant Motion Should Be Held in Abeyance**

Between them, the parties raise two jurisdictional arguments.  Chevron asserts that the Court has personal jurisdiction over Page and Forum Nobis because courts "routinely exercise personal jurisdiction in contempt proceedings over nonparties on the basis that nonparties may not assist, aid, or abet a violation of an order that directly binds a party . . . over whom the court has personal jurisdiction."  *Aviv*, 2018 WL 4927912 at *1 (collecting cases).  This Court agrees, and Page does not argue otherwise.

Page instead raises a subject matter jurisdiction argument, arguing that Donziger's appeal of the Donziger Contempt Ruling divests this Court of jurisdiction.  (Opp. at 9-10, citing *Griggs v. Provident Consumer Discovery Co.*, 459 U.S. 56, 58 (1982) (an appeal "divests the district court of its control over those aspects of the case involved in the appeal").)  As Page puts it, "Because the [instant motion] relies directly on the contempt finding now on appeal and expressly and implicitly seeks to expand it, and because resolution of the Motion could require the Court to re-engage and re-analyze issues and aspects of the case now on appeal," the motion "sits squarely in the 'aspect of the case involved in the appeal.'"  (Opp. at 10., citing *Hom Sui Ching v. United States*, 298 F.3d 174, 180 n.5 (2d Cir. 2002).)

The Court briefly addressed this issue at an earlier juncture.  On May 23, 2019, the Court issued its decision holding Donziger in contempt but inadvertently did not include a statement of whether the Court denied or granted so much of the motion as sought to hold Donziger in contempt of a particular paragraph of a discovery protocol. (Dkt. 2209.)  The Court then issued an order finding Donziger in contempt of that particular provision.  (Dkt. 2219.)  Donziger moved to vacate that order, arguing that the Court was

18

divested of jurisdiction to issue the order because Donziger already had appealed the order finding him in contempt of other provisions of the discovery protocol.  (Dkt. 2221.) The Court denied Donziger's motion.  (Dkt. 2233.)  Acknowledging the divestiture rule, the Court held that a notice of appeal "does not – and cannot – strip the district court of and vest in the court of appeals jurisdiction over any issues not already decided in the lower court."  (*Id.* (citing *Webb v. GAF Corp.*, 78 F.3d 53, 55 (2d Cir. 1996).)

Applying that rubric here, the Court would not be divested of jurisdiction by Donziger's appeal of the decision holding him in contempt because that decision made no determination with respect to whether Page was in contempt.  Were it otherwise, a contemnor's appeal would result in a de facto stay of this Court's orders and judgments as they applied to other persons, which the Court already has recognized is contrary to established precedent.  (Dkt. 2233 at 2 & n.2 (adopting Chevron's arguments in ¶¶ 2&3 of Dkt. 2228).)

That said, the instant motion presents a different situation than the earlier discovery protocol motion.  In the earlier motion, the Court simply supplemented its previous order to address contempt with respect to a provision that had not already been previously ruled on and which had been inadvertently omitted from the earlier decision. Here, in contrast, whether Page should be held in contempt for assisting with or participating in Donziger's contemptuous conduct is dependent at least in part on how the decision holding Donziger in contempt fares on appeal.  Indeed, Page cannot be held in contempt for "assisting" Donziger in conduct that is not ultimately found to be contemptuous.  *See Levin v. Tiber Holding Corp.*, 277 F.3d 243, 250 (2d Cir. 2002) ("The district court erroneously held that Tiber aided and abetted a violation of the court order

without reaching the predicate question of whether Ardra itself committed contempt"); *Matrix Essentials v. Quality King Distributors, Inc.*, 346 F. Supp. 2d 384, 393 (E.D.N.Y. 2004) ("any aider and abettor liability can be imposed only if the court holds that those actually bound by the . . . Injunction have violated its terms").

Under these circumstances, the concerns underlying the divestiture rule come into play.  The scope of divestiture is "guided by concerns of efficiency," *United States v. Rodgers*, 101 F.3d 247, 251 (2d Cir. 1996), and designed "to avoid confusion or waste of time resulting from having the same issues before two courts at the same time."  *United States v. Salerno*, 868 F.2d 524, 540 (2d Cir. 1989) (internal citation omitted).  Here, issues on which Page's contempt hinges are currently before the Second Circuit Court of Appeals.  To make a determination on the instant motion that may have to be revisited in light of whatever the Second Circuit does invites potential inefficiency and inconsistency.

Accordingly, although this Court does not believe that Donziger's appeal of the decision finding him in contempt necessarily divests this Court of jurisdiction over the instant motion seeking to hold Page in contempt, this Court believes the interests for which the rule exists merit holding the instant motion in abeyance pending determination by the Second Circuit of Donziger's appeal.

Even so, in the event the District Court Judge proceeds with a determination on the merits, this Court sets forth its analysis regarding whether Page should be held in contempt.

## Page Should Not Be Held in Contempt for Monetizing Activity

As set forth in the Findings of Fact, Page engaged in at least four types of conduct that could expose him to contempt of the RICO and Default Judgments.[11]  First, he acted in concert with Donziger to monetize the Ecuador Judgment by drafting investor contracts, helping with investor solicitation materials, and advising and preparing responses to investors.  Second, Page assisted Donziger in furthering Donziger's ability to profit from the Ecuador Judgment, such as by drafting the agreement that extinguished Donziger's debt in return for a percentage of any recovery from the Ecuador Judgment.  Third, Page transferred funds to Donziger that should have been transferred to Chevron.  Fourth, Page received and retained for himself a .25% interest in the Ecuador Judgment.

Page argues that he cannot, or at least should not, be held in contempt for the first category: i.e., his work to monetize the Ecuador Judgment.  Page is correct.  The Donziger Contempt Ruling detailed Donziger's brazen conduct in monetizing the Ecuador Judgment.  The Court thus expressed its "view" that Donziger violated Paragraph 5 of the RICO Judgment "via his sales and efforts to sell interests in the Ecuador Judgment irrespective of whether the interests were in Donziger's contingent fee interest or the Ecuador Parties' interests in the Ecuador Judgment itself."  (Dkt. 2209 at 52.)  Ultimately, however, the Court "elected" not to base its decision finding Donziger in contempt on violation of the monetization provisions.  (Dkt. 2209 at 53.)  It would be inequitable for Page to be found in contempt for acting in concert or aiding and abetting that same

---

[11] Page does not dispute that he is bound by the RICO and Default Judgments' provisions binding "the parties' officers, agents, servants, employees and attorneys" and "other persons who are in active concert or participation" with those persons or parties as dictated by both the language of the Judgments and Fed. R. Civ. P. 65(d)(2).

conduct when that conduct did not ground the Court's finding of contempt against Donziger.[12]  *Levin*, 277 F.3d at 250; *Matrix Essentials*, 346 F. Supp.2d at 393.

Accordingly, Page should not be held in contempt of Paragraph 5 of the RICO Judgment for assisting Donziger with monetizing the Ecuador Judgment.  The only relevant inquiry then is whether Page is in contempt of Paragraph 1 of the RICO Judgment and Paragraph 1 of the Default Judgment.

## Page Committed Other Acts That Qualify as Contempt

The Findings of Fact as set forth above establish that Page may be held in contempt for violating the RICO and Default Judgments by assisting Donziger in extinguishing Donziger's personal debt, failing to turn over to Chevron money traceable to the Ecuador Judgment, and retaining his .25% interest in the Ecuador Judgment received from the FDA.[13]

### A.   Page Committed Contempt by Assisting Donziger to Extinguish Personal Debt with Ecuador Judgment Funds

Page knew of the RICO Judgment on or about the day it issued (a fact that Page does not dispute); and the Court already has held that the terms of that provision are clear

---

[12] Chevron faults Page for "dismissing" the Court's findings with respect to Donziger and monetization of the Ecuador Judgment, but nevertheless acknowledges that its claim of Page's contempt arises from his "assisting Donziger and the FDA," and does not mount a serious effort in reply to justify finding Page in contempt for assisting Donziger with monetization.  (Chevron Reply at 7-8.)

[13] The Court does not find it necessary to address the question of whether Page engaged in contempt by drafting agreements transferring interests in the Ecuador Judgment to Canadian lawyers and a Canadian activist. *See* Findings of Fact ¶ 41.  Moreover, in its request for compensatory sanctions, Chevron does not identify any specific damages associated with these incidents.

and unambiguous.[14]   The evidence clearly and convincingly shows that Page violated Paragraphs 1 and 5 while acting as Donziger's attorney or agent, and that Page acted in concert or participated with Donziger in violating Paragraphs 1 and 5.  *See* Fed. R. Civ. P 65(d)(B) and (C).

Paragraph 1 of the RICO Judgment "impose[d] a constructive trust for the benefit of Chevron on all property, whether personal or real, tangible or intangible, vested or contingent, that Donziger has received, or hereafter may receive, directly or indirectly, or to which Donziger now has, or hereafter obtains, any right, title or interest, directly or indirectly, that is traceable to the [Ecuador] Judgment of the enforcement of the Judgment anywhere in the world" and requires Donziger to transfer any such property to Chevron. (Dkt. 1875 ¶ 1.)  The Court found that Donziger was in willful contempt of Paragraph 1 "by virtue of his profiting in the amount of $666,476.34 from the sale of interests of the Ecuador Judgment and his failure to assign and transfer to Chevron that profit, which constitutes property that Donziger has received, or to which he had a right, title or interest, that is traceable to the Ecuador Judgment."[15]  (Dkt. 2209 at 69-70 ¶ 1c.)

---

[14] Page equivocates about the extent of his familiarity with the RICO Judgment, saying that he does not recall "closely studying" it but "had a strong impression of its scope and effect."  (Page Decl. ¶ 6.)  Page no doubt carefully reviewed and parsed the RICO Judgment and its injunctive provisions as demonstrated, for instance, by the "email memorandum" in which he purports to opine about the limits of the RICO Judgment. (Champion Decl. Ex. 107.)

[15] The Court also found Donziger in contempt of Paragraph 1 of the RICO Judgment by failing to transfer to Chevron his interest in the Ecuador Judgment pursuant to the 2017 retainer agreement with the FDA. (Dkt. 2209 at 69 ¶1a.)  To the extent Page assisted in drafting Donziger's retainer agreement (*see* Findings of Fact ¶ 39), there is no evidence that Page facilitated Donziger's failure to transfer his interest in the Ecuador Judgment to Chevron.  In any event, Donziger purged that particular contempt finding thus obviating the issue with respect to Page.  (Dkt. 2216 ¶ 4.)

Page assisted Donziger with profiting from the Ecuador Judgment in at least one clear respect. Page drafted an investor agreement that extinguished a personal debt of Donziger in the amount of $102,000 in exchange for a percentage interest in the Ecuador Judgment. (Findings of Fact ¶ 40.) Page thus helped Donziger personally profit in the amount of $102,000 traceable to the Ecuador Judgment in violation of Paragraphs 1 and 5 of the RICO Judgment.

Page conspicuously does not address this particular event in his opposition papers. Page does argue in reference to other acts that he had no knowledge of what Donziger did with the money that he obtained in selling interests in the Ecuador Judgment and had no influence over whether Donziger used the money for litigation financing, for legal services, or personal use. (Opp. at 6; Tr. at 32.) In some instances that may have been so. But in this particular instance, Page admittedly drafted the very agreement extinguishing Donziger's personal debt in exchange for an interest in the Ecuador Judgment. (*See* Tr. at 68 (Page affirming that he "prepared or helped prepare" drafts of that agreement).) And as set forth in the fact findings set forth earlier, the evidence convincingly shows, notwithstanding Page's equivocation at the hearing, that Page knew how the funds (i.e., $102,000 of debt) provided in exchange for the interest were to be used.[16]

---

[16] One aspect of the decision holding Donziger in contempt for profiting from sale of his interest in the Ecuador Judgment but for which Page should not be held in contempt based on the evidence before the Court is Donziger's "selling, assigning, pledging, transferring or encumbering part of his putative contingent fee interest to David Zelman in exchange for approximately $11,000 worth of personal services." (Dkt. 2209 at 70 ¶ 3a.) Nothing before the Court on this motion indicates that Page participated in or assisted Donziger with or even was aware of that particular transaction, and Chevron does not identify it as one for which it seeks compensatory sanctions.

Page also seems to suggest that Donziger's receipt of funds to compensate him for debt or services does not necessarily mean that Donziger "profited" so as to generate positive income.  (*See* Opp. at 4 n.2.)  Extinguishing debt to bring a negative balance to zero arguably would be an example.  But such a crabbed reading of RICO and Default Judgments would make no sense in the context of the injunctive prohibitions and the purpose served by them.  *See Medina*, 2019 WL 581270 at *25 (efforts that "strain both the language and intent of the order" cannot be considered a "reasonably diligent" reading of a court order prohibiting a contempt finding) (internal quotation marks and citations omitted).

**B.    Page Committed Contempt by Acting in Concert with Donziger to Transfer to Themselves, Not Chevron, Funds Traceable to the Ecuador Judgment.**

Page received and then transferred $342,045.16 in FDA investor funds to Donziger's personal bank account.  Those funds, initially held in the "Chevron Will Pay" account, were traceable to the Ecuador Judgment.  (Findings of Fact ¶ 43.)  Page thus violated Paragraph 1 of the RICO Judgment by transferring to Donziger funds traceable to the Ecuador Judgment that the RICO Judgment requires be turned over to Chevron.

Page asserts that he understood and intended that the funds would be used to finance FDA litigation efforts despite being temporarily parked in Donziger's personal account.  But even if that were so, Page indisputably facilitated delivery of traceable funds away from Chevron and to Donziger's personal account, a Paragraph 1 violation.  What's more, Page engaged in a second violation when he accepted as payment $50,000 that Donziger transferred back to Forum Nobis from the $342,045.16.  (Findings of Fact ¶ 44.)

Page's transfer of and receipt of part of the $342,045.16 violates Paragraph 1 of the RICO Judgment under either prong of non-party contempt liability.  Page aided and

abetted Donziger's receipt of funds traceable to the Ecuador Judgment that should have been paid to Chevron.  At the same time, Page violated Paragraph 1 in his capacity as Donziger's agent who is bound by the terms of the injunctive provisions.

The evidence also clearly and convincingly shows that Page's acts with respect to the $342,045.16 violated Paragraph 1 of the Default Judgment, the terms of which he knew on or about the time it was issued on April 23, 2018.  The Default Judgment expanded the persons held liable in connection with the Ecuador Judgment, including the FDA and all the LAPs.  (Dkt. 1985 at 1 n.1, ¶ 6.3.)  The terms of Paragraph 1 of the Default Judgment, which are no less clear and unambiguous than their counterparts in the RICO Judgment, imposed a constructive trust for the benefit of Chevron on all property received by the Defaulted Defendants that is traceable to the Ecuador Judgment and required those funds be transferred to Chevron. (Dkt. 1985 ¶¶ 1, 7.)  That is exactly what Page failed to do.  Because Page's receipt, temporary control and transfer of FDA funds obtained from sales of interests in the Ecuador Judgment occurred in May 2018, after entry of the Default Judgment (Findings of Fact ¶ 44), those acts violate Paragraph 1 of the Default Judgment no less than the RICO Judgment.

**C.    Page is In Contempt by Failing to Transfer to Chevron His Own Interest in the Ecuador Judgment.**

Page also is currently in contempt to the extent he has not transferred to Chevron his .25% (or any additional percentage) interest in the Ecuador Judgment that he possesses.  (*See* Findings of Fact ¶ 38.)  Without determining whether the transfer of that interest to Page in 2016 violated the RICO Judgment, Paragraph 1 of the Default Judgment imposes a constructive trust on any interest in the Ecuador Judgment "received" by the FDA or its attorneys or agents and requires them to transfer the property

to Chevron.  (Dkt. 1985 ¶¶ 1, 7.)  As FDA's attorney, Page is bound by this provision.  By maintaining his ownership and control of the .25% interest that he "received" (and which the FDA "received" before him), Page is in contempt of Paragraph 1 of the Default Judgment.

## Page's Arguments Do Not Absolve Him

In his defense, Page makes a number of arguments that do not stand up to scrutiny.[17]  To start, Page argues that finding him in contempt would be an "end run" around the "substantive elements of contempt (and aiding and abetting liability)."  (Opp. at 11.)  Page asserts that Chevron fails to meet its burden to show that his actions – separate and apart from Donziger's actions already found to be contemptuous – satisfy the elements of either aiding and abetting liability or contempt.  (*Id.*)  Page is wrong on both counts.

First, the Court fully established Donziger's underlying acts of contempt in the Donziger Contempt Ruling.  And the requisite elements needed to find Page in contempt for participating in or aiding and abetting in Donziger's contempt have been set forth and satisfied above.  Second, to the extent there are any acts for which the Court deems Page to be in contempt but for which there is no underlying act of contempt by Donziger, this Court concludes that all three elements of contempt have been proven:  the injunctive prohibitions are clear and unambiguous and bind Page as Donziger's attorney or agent no less than Donziger himself; the evidence of Page's violations of those provisions is

---

[17] Page also argues that he should not be held in contempt of Paragraph 5 for selling interests in the Ecuador Judgment because the Court did not rest its contempt findings against Donziger on that ground.  (Opp. at 3-5.)  As set forth earlier, this Court agrees.

clear and convincing as set forth above; and, despite his protests to the contrary, Page did not make diligent efforts to reasonably comply with the provisions he has violated; the incidents described above are not ones that merely fell through the cracks or escaped diligent efforts to prevent them.[18]

Page also argues that he lacked actual knowledge that the RICO Judgment prohibited exchanging FDA's interests in the Ecuador Judgment for litigation funds to be used on behalf of the FDA in its continued efforts to enforce the Ecuador Judgment.  As support for his lack of knowledge, he cites to the "email memorandum" he authored setting forth a narrow interpretation of the RICO Judgment.[19]  (Opp. at 14; Champion Decl. Ex. 8.)  But the Court already has rejected that very same interpretation of the RICO Judgment in finding Donziger in contempt.  (Dkt. 2209 at 51-52); *see also Taggart v. Lorenzen*, 139 S. Ct. 1795, 1802 (2019) ("A party's subjective belief that she was complying with an order ordinarily will not insulate her from civil contempt if that belief was objectively unreasonable").[20]

---

[18] "A contemnor's failure to diligently comply with an order may only be excused if compliance is 'factually impossible.' It is the defendant's burden to prove 'clearly, plainly and unmistakably' that 'compliance is impossible.'" *Jolen, Inc. v. Kundan Rice Mills, Ltd.*, No. 19-CV-1296, 2019 WL 2949988, at *3 (S.D.N.Y. July 9, 2019) (quoting *Badgley v. Santacroce*, 800 F.2d 33, 36 (2d Cir. 1986) and *Huber v. Marine Midland Bank*, 51 F.3d 5, 10 (2d Cir. 1995)).  Page has presented no proof of impossibility to comply, let alone proof that is clear, plain and unmistakable.

[19] Page's constrained reading of the RICO Judgment is premised on his purported interpretation of the Court's decision denying stay of the RICO Judgment pending appeal. *See Chevron Corp. v. Donziger*, 37 F. Supp.3d 653, 661 (S.D.N.Y. 2014).  Indeed, Page's opposition is laced with repeated reference to the Court's stay decision as justification for his actions.  (*E.g.*, Opp. at 4, 5, 10, 13.)

[20] Page maintains that while the determination as to whether injunctive terms are clear and unambiguous normally "is an objective one," the standard for him, as an alleged aider and abettor, should be subjective, grounded on actual knowledge.  (Opp. at 14.)  As set

In any event, this Court does not rest its contempt findings on monetizing interests in the Ecuador Judgment in violation of Paragraph 5 of the RICO Judgment, just as the Court ultimately did not rest Donziger's contempt on that ground.  Moreover, Page's argument fails to excuse his repeated violations of the Default Judgment, which expressly applies to the FDA's interests in the Ecuador Judgment.

## Page's Violations May Be Imputed to Forum Nobis

Forum Nobis, Page's law firm, is also in contempt as a result of Page's contemptuous actions.  Where a contemnor "exercise[s] complete domination over [a] corporation" and uses that entity to engage in contemptuous behavior, the contemnor's conduct can be imputed to the entity to find it in contempt as well. *Telenor Mobile Communications AS v. Storm LLC*, 587 F. Supp. 2d 594, 619 (S.D.N.Y. 2008), *aff'd*, 351 F. App'x 467 (2d Cir. 2009); *see also Spectacular Venture, L.P. v. World Star International, Inc.*, 927 F. Supp. 683, 685 (S.D.N.Y. 1996) (Kaplan, J.) (holding non-party individual in contempt for his violations of a judgment binding a defendant organization, finding that "[a]s a practical matter, the defendant and [the individual] are one and the same" given that the individual served as "president and principal" of the organization).

The evidence shows that Forum Nobis is a one-man operation with no other employees and is controlled entirely by Page.  (Champion Decl. Ex. 12 at 6:10-7:2, 11:14-20.)  And Page used his alter-ego law firm to violate the RICO Judgment and Default Judgment, such as when, as the Court has already found, "Forum Nobis – of which Aaron Marr Page is managing attorney – transferred the $342,045.16 that Page had received

_____

forth above, however, the issue is moot given that this Court does not base a contempt finding under the RICO Judgment on Page's litigation financing activity.

from Sullivan's CWP account just a few days before into Donziger's new personal account." (Dkt. 2209 at 29-30, 32.) Because Page, an individual, effectively controls Forum Nobis to the point of dominance and has used it as an instrument to perpetrate acts in contempt of this Court's orders, Forum Nobis should be held in contempt as well.[21]

## Contempt Sanctions

Sanctions for civil contempt have both a compensatory and a coercive component. "Under traditional principles of equity practice, courts have long imposed civil contempt sanctions to coerce the defendant into compliance with an injunction or compensate the complainant for losses stemming from the defendant's noncompliance with an injunction." *Taggart*, 139 S. Ct. at 1801 (internal quotation marks and citation omitted); *see also Weitzman v. Stein,* 98 F.3d 717, 719 (2d Cir. 1996) ("sanctions for civil contempt serve two purposes: to coerce future compliance and to remedy any harm past noncompliance caused the other party"); *CBS Broadcasting*, 814 F.2d at 101 ("Civil sanctions have two purposes: to coerce compliance with a court order and to compensate a plaintiff.").

Chevron asks for judgment imposing sanctions on Page and Forum Nobis: (1) holding Page and Forum Nobis jointly and severally liable with Donziger for the money judgments entered by the Court against Donziger in the contempt proceedings against him in the amounts of $666,476.36 and $3,433,384.30; (2) requiring Page and Forum Nobis to pay Chevron for the $342,045.16 that they transferred to Donziger (recognizing and accounting for the fact that $31,554.71 of that amount is contained within the judgment for $666,476.36); (3) assigning to Chevron any and all interests owned by Page

---

[21] Page has not attempted to argue otherwise in opposition.

or Forum Nobis in the Ecuador Judgment; and (4) awarding Chevron attorneys' fees. (Dkt. 2315 at 2.)  Page's opposition does not address the relief requested at all.  This Court recommends that some but not all of the requested contempt sanctions be granted.

## A.    Standards for Contempt Sanctions

Compensatory sanctions are meant to remedy the harm caused by the contemnor. *See Hutto v. Finney*, 437 U.S. 678, 691 (1978) (a "remedial fine" for contempt "compensates the party who won the injunction for the effects of his opponent's noncompliance.").  The purpose of compensatory sanctions is "not to vindicate the court's authority but to make reparation to the injured party and restore the parties to the position they would have held had the injunction been obeyed."  *Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir. 1979).  Indeed, once damages are established, "[t]he district court is not free to exercise its discretion and withhold an order in civil contempt awarding [them]." *Id.*; *Weitzman*, 98 F.3d at 720 ("It is error to withhold damages that are supported by the record.").

Recovery of compensatory damages, however, is not a given.  To establish a basis for compensatory sanctions, "'the moving party must demonstrate a causal connection between the contemnor's contemptuous behavior and the alleged damages.'" *Broker Genius Inc. v. Seat Scouts LLC*, No. 17-CV-8627, 2019 WL 2462333, at *2 (S.D.N.Y. June 13, 2019) (quoting *Grand v. Schwarz*, No. 15-cv-8779, 2018 WL 4026735, at *2 (S.D.N.Y. Aug. 23, 2018)).  Moreover, the injured party may be compensated only for the damages they can prove.  *Vuitton et Fils*, 592 F.2d at 130.

In contrast to compensatory sanctions, which look to the past, coercive sanctions take aim at the future.  "A sanction coerces a defendant when it 'force[s] the contemnor

to conform his conduct to the court's order.'" *CBS Broadcasting,* 814 F.3d at 101 (quoting *Terry,* 159 F.3d at 93).   Factors considered in determining whether to impose coercive sanctions include "(1) the character and magnitude of the harm threatened by the continued contumacy; (2) the probable effectiveness of any suggested sanction in bringing about compliance; and (3) the contemnor's financial resources and the consequent seriousness of the burden of the sanction upon him."  *Dole Fresh Fruit Co. v. United Banana Co.*, 821 F.2d 106, 110 (2d Cir. 1987); *see also Broker Genius*, 2019 WL 2462333, at *2 (quoting and applying the *Dole* factors).

Regardless of the type or amount (if any) of sanctions imposed, the district court also "may award appropriate attorney fees and costs to a victim of contempt." *Weitzman*, 98 F.3d at 719.   "In deciding whether to award fees, courts have focused on the "willfulness of the contemnor's misconduct." *Id.*; *see also Vuitton et Fils*, 592 F.2d at 130 ("[I]t is appropriate for the court . . . to award the reasonable costs of prosecuting the contempt, including attorney's fees, if the violation of the decree is found to have been willful.").  It remains an open question whether a finding of willfulness is required to award fees. *Jacobs v. Citibank, N.A.*, 318 F. App'x 3, 5 n.3 (2d Cir. 2008).   However, while it "may not necessarily be a prerequisite to an award of fees and costs, a finding of willfulness strongly supports granting them."  *Weitzman*, 98 F.3d at 719.   To survive review after finding willfulness, a district court "would need to articulate persuasive grounds for any denial of compensation for the reasonable legal costs of the victim of contempt."  *Id.*

**B.    Compensatory Sanctions**

The Court finds that compensatory sanctions against both Page and Forum Nobis are appropriate in the amount of $444,045.16.  Of that, $102,000 is the personal profit to Donziger he received, and which Page facilitated, by exchanging an interest in the Ecuador Judgment for eliminating a personal debt.  The remaining $342,045.16 is the amount of funds that Page received and then transferred to Donziger's personal account rather than to Chevron as required by Paragraph 1 of both the RICO and Default Judgments.  Once he received those funds – funds raised in exchange for percentage interests in the Ecuador Judgment – Page had an obligation to transfer them to Chevron, regardless of whether he thought that the funds would be used to finance FDA litigation efforts.  Instead, Page transferred the funds directly to Donziger's personal account. Page should now be required to pay that same amount to Chevron to compensate it for its loss.  Indeed, the Court must impose these compensatory sanctions.  *Vuitton et Fils*, 592 F.2d at 130; *Weitzman*, 98 F.3d at 720.

In addition, as compensation for failure to comply with the requirement that he transfer to Chevron any interest received in the Ecuador Judgment pursuant to Paragraph 1 of both the RICO and Default Judgments, Page and Forum Nobis should be ordered to assign to Chevron the .25% interest and any additional percentage interest they own in the Ecuador Judgment.

The Court does not find, however, that Chevron has sufficiently established its right to compensation from Page for the money judgments entered by the Court against Donziger in the contempt proceedings against him in the amounts of $666,476.36 (compensatory sanctions) and $3,433,384.30 (attorneys' fees).  That is because Chevron

33

has not clearly and convincingly demonstrated how Page's specific contempt violations as set forth above are tied to the amounts totaling $666,476.36. In other words, Chevron has not shown to what extent Page caused, or contributed to, the events underlying the specific amount of contempt sanctions against Donziger. *See Broker Genius*, 2019 WL 2462333, at *2 ("'the moving party must demonstrate a causal connection between the contemnor's contemptuous behavior and the alleged damages'") (quoting *Grand*, 2018 WL 4026735, at *2). Page clearly assisted or participated in some of Donziger's contempt violations. But the Court does not have before it proof as to whether Page did so with respect to any or all of Donziger's violations by which he profited in the amount of $666,476.36.

The Court also is not persuaded by Chevron's argument that both Donziger's 2017 retainer agreement with the FDA and the investor contracts gave Donziger unfettered control over litigation funds. (*See* Motion at 27; Tr. at 26-27.) Chevron argues that by having drafted those agreements, Page enabled Donziger to make personal use of litigation funds traceable to the Ecuador Judgment, which is exactly what Donziger did. Chevron did present proof that Donziger used funds from the $666,476.36 for his personal expenses. (Slavek Decl. Ex. 2.) But Chevron makes too far a leap in tagging Page with contempt for what Donziger actually did with the funds. Indeed, the language on which Chevron relies on says that "the U.S. Representative [i.e., Donziger] shall retain final authority regarding use of funds in the event of any conflict of opinion," but that is preceded by the requirement that the investment funds "shall be used to fund" the litigation and that the investor is entitled to consult with Donziger regarding how the funds are spent. (Champion Decl., Ex. 38.) That language could be construed simply to mean

34

that Donziger has the unrestricted right to make the final decision as to how litigation funds are to be used in the litigation.  It does not necessarily provide a pathway to personal use of funds.  And if it is, then taking that path is on Donziger, not Page.

Accordingly, the Court recommends that Page not be held jointly and severally liable for Donziger's contempt sanctions.

## C.    Coercive Sanctions

Chevron's motion does not request, and this Court finds no reason to award, separate coercive sanctions at this time.

## D.    Reasonable Attorneys' Fees

Whether to award fees turns, at least in part, on whether Page acted willfully.  That is because even if not a pre-requisite to an award of fees, "a finding of willfulness strongly supports granting them."  *Weitzman*, 98 F.3d at 719.  "A contempt is willful where it is 'committed with a specific intent to consciously disregard an order of the court, or where the defendant knows or should reasonably be aware he or she is in the wrong.'"  *Objective Solutions International, Ltd. v. Gammon*, No. 07Civ. 2347, 2008 WL 538445, at *4 (S.D.N.Y. Feb. 25, 2008) (quoting *Doral Produce Corp. v. Paul Steinberg Associates*, Inc., 347 F.3d 36 (2d Cir.2003) (discussing willfulness in the context of criminal contempt)).

The record does not establish that Page had a "specific intent to consciously disregard" either the RICO Judgment or the Default Judgment.  Whether Page "knew or should reasonably be aware [he was] in the wrong" is a closer call.  As discussed earlier, Page claims lack of actual knowledge that his activity violated the RICO Judgment given his purported interpretation of its reach.  But, again, the behavior to which that argument is addressed is litigation financing, which this Court has made clear is not the basis for

35

Page's contempt.  Rather, it is Page's assistance in helping Donziger personally profit from funds traceable to the Ecuador Judgment, Page's transfer of funds to Donziger's personal account rather than to Chevron (as well as Page's acceptance of $50,000 from those same funds), and Page's failure to transfer to Chevron his percentage interest in the Ecuador Judgment.  At the very least, Page should reasonably have been aware that these acts were improper.  Accordingly, a determination can be made that Page acted willfully, albeit at the low end of the willful spectrum.

That said, the Court has deep concerns about awarding Chevron its fees.  First, a great deal of Chevron's motion for contempt focuses on conduct – monetizing the Ecuador Judgment to finance litigation – that this Court has made clear should not be a basis for finding Page in contempt.  It would be inequitable for Page to underwrite Chevron's pursuit of unsuccessful claims and arguments.  That is particularly so in light of the Court's explicit statements in the Donziger Contempt Ruling that it ultimately was not finding Donziger in contempt for monetizing the Ecuador Judgment.  Second, while Page assisted Donziger underlying the events at issue, he was not the one "calling the shots."  At all relevant times, Donziger led the way.  While that alone is not an excuse, this Court believes that in the context of this particular case, it is a relevant factor. Accordingly, this Court recommends that attorneys' fees not be awarded to Chevron.

## Conclusion

For the foregoing reasons, this Court certifies the Findings of Fact set forth above and recommends that the merits of Chevron's motion to hold Page in contempt be stayed pending determination of the appeal of the Donziger Contempt Ruling.  In the event the Court nevertheless proceeds on the merits, this Court recommends that Page be found

in contempt for the specific acts and violations identified above. The Court further recommends compensatory sanctions to Chevron in the amount of $444,045.16 and a mandate that Page and Forum Nobis assign to Chevron any percentage interest they own in the Ecuador Judgment. Chevron's motion should otherwise be denied.

To the extent not discussed herein, the Court has considered the parties' remaining arguments and finds them to be without merit. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the Chambers of the Honorable Lewis A. Kaplan, U.S.D.J., United States Courthouse, 500 Pearl Street, New York, NY 10007 and to the Chambers of the undersigned, United States Courthouse, 500 Pearl Street, New York, New York 10007. **Failure to file timely objections will preclude appellate review.**

Respectfully submitted,

ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated:      January 27, 2020
            New York, New York

Copies transmitted to all counsel of record.