# EXHIBIT K

```
                                                          Page 1
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------------------X
     CHEVRON CORPORATION,
 3
                                          PLAINTIFF,
 4
            -against-                   Case No.:
 5                                      11cv0691(LAK)
 6   STEVEN DONZIGER, ET AL,
 7                                       DEFENDANTS.
     ------------------------------------------X
 8
 9             DATE:  April 18, 2019
10             TIME:  11:11 A.M.
11
12        VIDEOTAPED TELECONFERENCED DEPOSITION
13   of AARON MARR PAGE, taken on behalf of the
14   Plaintiff, held at the offices of Meardon,
15   Sueppel & Downer, 122 South Linn Street,
16   Iowa City, Iowa 52240, before Randy R.
17   Dunn, RPR, CRR, CCR MO #193.
18
19
20
21
22
23
24
25
```

```
 1   A P P E A R A N C E S:
 2
 3
     GIBSON, DUNN & CRUTCHER, LLP
 4      Attorneys for the Plaintiff
        200 Park Avenue, 47th Floor
 5      New York, New York 10166
        BY:   ANNE CHAMPION,   ESQ.
 6            -and-
              SHANE BAUMGARDNER, ESQ.
 7      (212) 351-4000
 8
     STERN, KILCULLEN & RUFOLOL
 9      Attorneys for the Plaintiff
        325 Columbia Turnpike, Suite 110
10      Florham Park, New Jersey 07932
        BY:   JOEL SILVERSTEIN, ESQ.
11            -and-
              MICHAEL DINGER, ESQ.
12      (973) 535-1900
        (Via teleconference)
13
14
     LAW OFFICE OF STEVEN R. DONZIGER
15      Attorneys for the Defendants
        245 West 104th Street, #7D
16      New York, New York 10025
        BY:   STEVEN DONZIGER, ESQ.
17      Sdonziger@gmail.com
        (Via teleconference)
18
19   ALSO PRESENT:
20   Tim Perry, Videographer
21
         *            *              *
22
23
24
25
```

Page 291

1  that letter.  Tell me about those
2  conversations.  Who did you talk about it
3  with, Ms. Sullivan directly or her lawyer?
4       A.    I only talked to her lawyer.
5       Q.    Okay.  So what was said in
6  those conversations that led to that money
7  being transferred to you?
8       A.    I mean, a lot of different
9  things were said.  I mean, I don't know --
10 it was primarily directed by -- by Mr.
11 Libby.  She recognized that these were
12 funds she -- they weren't her funds, she
13 was holding them for the FDA and was trying
14 to figure out what to do with them and they
15 -- you know, and so --
16      Q.    You transferred the money
17 directly to Mr. Donziger so why wasn't the
18 money just transferred directly to him?
19      A.    Yeah, I mean, some of that is
20 laid out in the -- in the memos surrounding
21 it.  Um, that was a preference of Mr.
22 Libby.  Certainly, I think our view is that
23 it would have more naturally gone directly
24 to Mr. Donziger, and, you know, and I --
25      Q.    So you asked him to send it

1   directly to Mr. Donziger and he refused?
2        A.    Something like that.  I mean,
3   he indicated a strong preference to send it
4   to me.
5        Q.    And is that because he believed
6   that transferring the money to Mr. Donziger
7   would violate the RICO injunction?
8        A.    He never explained his
9   thinking.  I mean, I think he was new on
10  the case.  He knew -- I think he was just
11  feeling around, trying to find a way that
12  seemed the most cautious way to do what he
13  wanted, which was to -- get the documents
14  out of her hands, in a sense and, you know,
15  get the money out of her hands.  She wanted
16  to withdraw, she wanted to get out of the
17  case, and he was trying to help her
18  accomplish that.
19       Q.    Did you tell him that you would
20  be transferring the money directly back to
21  Mr. Donziger?
22       A.    I'm not sure if I did.  I
23  suspect he didn't ask.
24       Q.    But you and Mr. Donziger had an
25  agreement to that effect; isn't that

Page 293

1  correct?
2       A.    Uh, yes, yeah.  I mean, we -- I
3  -- we recognize that it was silly that they
4  were kind of coming to me because he's the
5  primary representative of the FDA, so if
6  FDA funds need to be returned, they ought
7  be returned to him.
8              This particular individual, Mr.
9  Libby, he was just -- he was flustered by a
10 lot of this, didn't understand a lot of
11 this.  He preferred to proceed as this and
12 for us, it was easier to say fine, do as
13 you wish and, you know, we'll, you know, we
14 will proceed once the funds are transferred
15 and the boxes were off, he was as out of it
16 as he could be.
17      Q.    So isn't it true that you also
18 paid yourself $50,000 out of those funds,
19 or rather, you transferred them to Mr.
20 Donziger and then he transferred 50,000
21 back to you?
22      A.    Yes.  So they were FDA funds
23 and, you know, Steven had authority to
24 spend those funds and we agreed that was a
25 good time to pay me a retainer.

Page 294

1   Q.     Why wasn't that -- you had been
2   paid other retainer payments by -- by Ms.
3   Sullivan; isn't that correct?
4   A.     Mm-hmm.
5   Q.     So why -- why weren't your
6   retainer payments paid before that time?
7   Why at this time that you transferred the
8   money to Mr. Donziger were you suddenly
9   given $50,000?
10  A.     Well, we moved from -- we moved
11  to a retainer model.  You know, I don't --
12  I think -- Yeah, right, there was -- I
13  guess I'm not really sure.  I would always
14  like to be paid retainers in advance.  It
15  is a preference, and I never get -- really
16  get that privilege.  But um, that was
17  available at that time and, um, you know,
18  all these subpoenas had just been served.
19  It was clear there was going to be a lot of
20  activity, a lot of need for legal work, and
21  it seemed an appropriate time to pay a
22  retainer.
23  Q.     So was it being paid for work
24  done in the past or for work that you were
25  going to do in the future?

Page 295

1    A.    So that was like I think the
2  one time in 15 years that, yeah, I was
3  actually paid for work that I actually had
4  to hold it on retainer for work to be done
5  in the future.  All the other payments I've
6  received have been for work performed.
7    Q.    Were you -- were you concerned
8  that funds would be frozen and you wouldn't
9  be able to be paid?
10   A.    Uh, yeah, maybe.  I mean, I'm
11 not sure if that's -- I don't know if we
12 thought through what that mechanism was
13 but, I mean, yeah, there is -- we were
14 concerned about -- yeah, I don't know.  I
15 mean, I know that I primarily wanted --
16 would prefer to have a retainer at all
17 times and that was available at this time,
18 and so it happened.  I don't know what -- I
19 don't think we had any specific
20 understanding of what, you know, what
21 issues were faced there.
22   Q.    Um, how did the letter that you
23 sent to Mr. Libby on May 2nd, 2018 come to
24 be?  Did he ask you to write this letter?
25   A.    Um, let's see.  Is this the one

```
                                              Page 306

 1        Q.    I will introduce as Exhibit
 2   5637, TD Bank 0000659 through 661.  So
 3   that's a TD Bank statement for Steven
 4   Donziger.  It shows a credit on May 10th of
 5   342,045.16.  Do you see that?
 6        A.    Mm-hmm.
 7        Q.    That's $900 less than the
 8   check; is that correct?  Do you know why
 9   that would be?
10        A.    Yeah, I don't understand that.
11        Q.    How did you send the money to
12   Mr. Donziger?
13        A.    Wire.
14        Q.    Is it the wire transfer fee?
15        A.    Of 900?  Wait a minute.  No,
16   no, no.  Wait hold on.  No, we're going the
17   wrong way.  No $100, right?  So 341.
18        Q.    Oh, I see what you're saying.
19        A.    Yeah, yeah.
20        Q.    Yeah, you're right.
21        A.    These two checks.  You add the
22   --
23        Q.    You're right.  They're actually
24   right.  It's right.  Thank you.  It's
25   getting a little late.
```

Page 307

1  So then on 5/10 he immediately
2  transferred back to you $50,000.  Do you
3  see that?
4      A.   Yeah.
5      Q.   Did you provide an invoice for
6  that amount?
7      A.   It was a retainer.
8      Q.   Um, but you had provided -- you
9  had provided invoices to Ms. Sullivan for
10 various retainer payments; isn't that
11 correct?
12     A.   Yeah.  There were some
13 outstanding invoices that I think I
14 probably then deducted from the retainer
15 fairly promptly.
16     Q.   But you didn't provide any
17 retainer -- an invoice for this retainer
18 payment?
19     A.   No.  Well, maybe.
20     Q.   You testified earlier that you
21 weren't normally paid retainers in advance.
22 Is this the first time you were paid a
23 retainer in advance?
24     A.   Yeah, tragic.
25     Q.   There's some other wire

Page 308

1  transfers there, $11,820 to Frente. Why is
2  Mr. Donziger transferring money to the
3  Frente?
4       A.   Well, I mean, this is -- we go
5  back to whatever the agreement is. I think
6  the agreement gives him authority -- you
7  know, I don't even know if I have that
8  agreement. But it gives, presumably -- no.
9  That agreement gives him authority to
10 disburse funds, right, and so that's what
11 he's doing here.
12      Q.   Do lawyers normally pay their
13 clients, though?
14      A.   Let's see.
15      Q.   Do you ever pay your clients?
16      A.   This is obviously -- the Frente
17 is not providing funds for representation,
18 so are there -- is it normal for a
19 litigation finance situation where the
20 lawyer is receiving fund from financiers to
21 then provide funds to -- fairly modest
22 funds to the client? I feel like that has
23 been done before. I don't know exactly
24 what that was for.
25      Q.   Do you know how much money Mr.

```
 1              C E R T I F I C A T E
 2
 3   STATE OF MISSOURI      )
                            : SS.:
 4   COUNTY OF ST. LOUIS    )
 5
 6         I, RANDY R. DUNN, a Notary Public for
 7   and within the State of Missouri, do hereby
 8   certify:
 9         That the witness whose examination is
10   hereinbefore set forth was duly sworn and
11   that such examination is a true record of
12   the testimony given by that witness.
13         I further certify that I am not
14   related to any of the parties to this
15   action by blood or by marriage and that I
16   am in no way interested in the outcome of
17   this matter.
18         IN WITNESS WHEREOF, I have hereunto
19   set my hand this 26th day of April 2019.
20
21
22
23         _____
           RANDY R. DUNN, RPR, CRR, CCR No. 193
24
25
```