UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHEVRON CORPORATION,<br><br>    Plaintiff,<br><br>  v.<br><br>STEVEN DONZIGER *et al.*,<br><br>    Defendants. | 11 Civ. 0691 (LAK) |

## OBJECTIONS TO REPORT AND RECOMMENDATION

On January 27, 2020, Magistrate Judge Lehrburger issued a Report and Recommendation, DI 2451 ("R&R"), regarding Chevron's motion for contempt against undersigned third-party attorney Aaron Marr Page, DI 2316 ("Chevron Motion"). For present purposes, the R&R's critical operative recommendation is that this Court hold the Chevron Motion in abeyance, R&R at 20, pending resolution of Mr. Donziger's pending and fully-briefed appeal of this Court's contempt decision dated May 23, 2019 ("Donziger Contempt Opinion"). The wisdom and necessity of this recommendation is evident for all the reasons set forth in the R&R. Most critically, the Magistrate did not make its own determination that the Court's RICO Injunction (Dkt. 1875) was sufficiently "clear and unambiguous" for purposes of the civil contempt standard applied to undersigned, but rather imported that finding as law of the case from the Donziger Contempt Opinion that is on appeal. *See, e.g.*, R&R at 16 ("the [district court] already has determined that the injunctive provisions of the RICO Judgment are clear and unambiguous"); *id.* at 28 ("the [district court] already has rejected that very same interpretation of the RICO Judgment [based on reliance on the court's Stay/Clarification Opinion] in finding Donziger in contempt"). Undersigned reaffirms the

truth of the facts regarding his good faith belief that the Court had in fact "clearly and unambiguously" *authorized* litigation financing under the RICO Injunction, as set out in his response in opposition to the Chevron Motion, DI 2354 ("Opposition") at 14-15, and under oath in his declaration in support, DI 2355 ("Declaration") at ¶¶ 6-7, and further maintains that it is error to transfer the relevant Donziger findings ("clear and unambiguous" order, no diligent attempt to comply in a reasonable manner) to undersigned given key factual differences concerning undersigned. Opposition at 11-16; *id.* at 14 (noting lack of any corollary fact to Zelman situation). But more critically, the R&R's findings regarding undersigned, at 27-28, cannot be assessed independently: what counts as diligent efforts to comply, for example, obviously depends on whether the injunction was indeed as clear and unambiguous as everyone is now pretending.[1] Because this Court's "clear and unambiguous" findings are presently law of the case and inextricably interwoven with all the R&R findings, the Contempt Motion should be held in

---

[1] Although the R&R eschewed any need to decide whether a finding of actual knowledge or notice ***specifically of the key fact that the constructive trust applied to litigation finance proceeds*** was the necessary in this context, *see, e.g.*, R&R at 28 and n.20, undersigned maintains that such a finding is necessary as to both direct and vicarious theories of undersigned's alleged contempt, as explained in Section III of the Opposition. To the extent that the R&R suggests that actual knowledge is established, it does so only by once against ruling that undersigned's testimony is unavailing in light of the Donziger findings. R&R at 28. The R&R erroneously states that undersigned supported the lack of knowledge merely by reference to a single email memorandum, *id.*, when in fact undersigned testified extensively on the topic at deposition and subject to cross-examination, and argued in the Opposition far more broadly that:

> *none* of the communications or documents that Chevron cites in its Motion contain[] anything to suggest that I or others thought what we were doing was in any way improper or unlawful. The documents reflect that, in an open and uncomplicated manner, I responded to requests to revise or draft documents or explore relevant research questions [regarding the financing process]. I freely communicated not just within our team but with outside parties, including with attorneys from outside law firms including Kaye Scholer and Cohn Reznick that were specifically brought in by certain investors to perform due diligence on the investment and help negotiate its terms.

Declaration ¶ 7. To the extent the R&R makes any contrary finding regarding actual knowledge, despite its claim that it need not do so, it is in error for these reasons.

abeyance pending appeal as recommended by the R&R.[2]

As a contingency "in the event the District Court Judge proceeds with a determination on the merits" despite the recommended abeyance, the R&R made additional recommendations, namely that undersigned not be held in contempt for what the magistrate described as "his work to monetize the Ecuador Judgment," R&R at 21-22, but that he nonetheless be held in contempt and fully liable for (1) the entirety of $102,000 of claimed "personal debt" of Mr. Donziger owed to a friend of Mr. Donziger's, musician Roger Waters, that was purported "extinguished" by a $152,000 investment agreement that undersigned helped prepare as part of a team including Mr. Donziger, Mark Fenwick (associated with Mr. Waters), and lawyers from the Cohn Reznick firm, *id.* at 22-25, and (2) the entirety of $342,045.16 in litigation finance funds held by Ms. Katie Sullivan that, at the insistence of her counsel, were received by undersigned for the benefit of the Frente de Defensa de la Amazonía (FDA) and immediately thereafter transferred to Mr. Donziger per his instructions as a senior representative of the FDA, *id.* at 25-26.[3] The R&R also recommends

---

[2] Undersigned objects that the R&R erred in finding that Mr. Donziger's appeal, which "divests [this Court] of its control over those aspects of the case involved in the appeal," did not divest this Court jurisdiction to resolve the Chevron Motion. R&R at 18-19. The "aspect of the case" on appeal is the dispute regarding whether the Court's RICO Injunction was sufficiently "clear and unambiguous" for contempt purposes in light of the Court's own interpretation of the meaning and scope of the RICO injunction in its April 2014 Opinion. As just noted, this "issue" is at the heart of the Chevron Motion and the R&R. Undersigned's arguments in this regard are set forth more fully in Section II of the Opposition.

[3] The factual narrative set forth in the R&R is often lacking in important contextual information and stretches characterizations of the facts to leave undersigned in an unflattering light. Just as undersigned largely set aside Chevron's mountainous misrepresentations and personal attacks in the Response, recognizing them as strategic distractions, undersigned does not intend to contest the nuances of the numerous potentially objectionable facts as stated in the R&R. Undersigned will make an exception for the magistrate's assertion in footnote 8 of the R&R that undersigned "participated in the mishandling and commingling of client funds" by transferring the funds to an account specified by Mr. Donziger that turned out to be a personal account (where, it appears, the funds were held for a day or two before being transferred to a business account). The magistrate cites no evidence that undersigned knew the account was a personal account (undersigned did not), and cites no authority and provides no explanation as to why undersigned should be considered accountable for the nature of Mr. Donziger's receipt of the funds. For example, the magistrate correctly does not pretend that there is any evidence

that undersigned be held in contempt for "failing to transfer to Chevron" the 0.25% contingency interest awarded to him by the FDA in consideration for his lengthy and involved work on Ecuador case. *Id.* at 26-27. Undersigned hereby objects to these recommendations and all necessary underlying factual findings and legal conclusions as follows. In light of these objections and the arguments in the Opposition generally, the Court should dismiss the Chevron Motion entirely.

1. <u>The $342,045.16 transfer</u>. The Court should reject this recommendation and dismiss any contempt claim pertaining to the $342,045.16 transfer for the reasons set out in Section I of the Opposition. In the Donziger Contempt Motion, the Court held that the mere receipt of litigation finance-raised funds "traceable to the Ecuador Judgment" (as the Court understands that language today) was ***not*** sufficient to trigger the obligation to turn the funds over to the constructive trust as required by Paragraph 1 of the RICO Injunction. Rather, the Court framed the relevant inquiry as follows:

> At least $1,242,985 of invested money was deposited, either directly or indirectly, into personal checking accounts owned by Donziger or business checking accounts nominally owned by his PLLC. All of it was traceable to the Ecuador Judgment as it reflected investments made in exchange for interests in that judgment. The total then ***would*** be subject to the constructive trust ***if*** it were "received" by Donziger or if he had "any right" to or "interest" in it. Assuming for purposes of this analysis that the funds Donziger raised and received initially belonged to the [FDA], the only remaining issue is the extent to which Donziger or his PLLC had any right to or interest in them.

DI 2209 at 53 (emphasis added). This analysis disposes of the Paragraph 1 claim against

---

that undersigned had any practical insight much less oversight regarding how Mr. Donziger handled his personal and law practice finances. Indeed, later in the R&R, the magistrate acknowledges that undersigned "was not the one 'calling the shots.'" R&R at 36. The magistrate also correctly never suggests that the transfer made at the instruction of Mr. Donziger as a senior representative of the FDA was without the FDA's lawful authorization. As such the assertion in footnote 8 is thus gratuitous, unsupported, and erroneous to the extent it purports to make any finding suggesting undersigned's "participation" in any mishandling of client funds.

4

undersigned. Neither Chevron not the magistrate even pretend that undersigned ever had any personal right to or interest in the $342,045.16 that he received into his attorney trust account, expressly for the benefit of the FDA, and immediately thereafter transferred to Mr. Donziger per Mr. Donziger's instructions as a more senior agent of the FDA. The Court in the Donziger Contempt Opinion did ***not*** hold that the $342,045.16, once received by Mr. Donziger, was immediately subject to the constructive trust, nor of course that the entirety of $1,242,985 in "traceable" funds was automatically subject to the constructive trust. Rather, before finding non-turnover to be in violation constructive trust, the Court found it necessary to establish not only Mr. Donziger's "personal right to or interest in" the funds but also that Mr. Donziger "profited" from the funds by dedicating them to personal use; only a yet more limited amount of $666,476.34 clearly satisfied this profit requirement.[4] As applied to undersigned, again there is no suggestion that undersigned profited from the $342,045.16.[5] Accordingly, in finding the entire $342,045.16 to be subject to turnover under Paragraph 1 the moment is was in undersigned's custody, the R&R

---

[4] While the Court observed that it may have been possible to find that Mr. Donziger had a "personal right to or interest in" the entire $1,242,985 based on Mr. Donziger's own characterization of the nature of those funds (namely that the funds were immediately his property in satisfaction of his arrearages, subject to redeployment to meet litigation expenses at his discretion), this would not change the analysis regarding undersigned, who, again, never had even the slightest pretense of a right to or interest in the $342,045.16.

[5] Undersigned was subsequently paid $50,000 to satisfy two months of unpaid invoices, with the remainder to be held in escrow on retainer for future work. This amount paid by Mr. Donziger was not found to be subject to turnover, unlike other of Mr. Donziger payments such as to his credit cards and the like. With respect to the question of whether the payment was nonetheless "traceable" to the Ecuador Judgment, the inquiry reveals the problematic lack of limitation in that concept as currently deployed by the Court—and the persistent lack of any explanation as to how the RICO Injunction both allows for the payment of "monthly retainers" to an enjoined lawyer yet somehow characterizes that lawyer's use of retainer funds to pay personal expenses as "profit." The Court chose not to engage the question in the Donziger Contempt Opinion, see DI 2209 at 57-58, perhaps based on a lack of adequate documentation that the relevant funds were indeed received by Mr. Donziger as monthly retainer fees. There is no question, however, that the $50,000 received by undersigned was provided to satisfy already submitted monthly retainer invoices, with the remainder held in escrow and debited in normal course to cover monthly retainer fees and expenses at the usual rate. *See* Declaration, Ex. A.

5

jettisons the Court's existing (and law of the case) approach, applying yet another new interpretation of the operation of the RICO Injunction—one which is sweepingly more broad and leads to far more draconian results than what the Court chose to apply to Mr. Donziger. For the many legal and equitable reasons set out in the Opposition and Declaration, this is improper and the recommendation should not be followed by the Court. The Court should adhere to its existing approach to analyzing the operation and effect of the constructive trust, which requires dismissal of any contempt claim pertaining to the $342,045.16.

2.  *The $152,000 agreement / $102,000 "personal" debt*. This R&R recommendation is erroneous because it is not clear that this financing arrangement was any different than the others for which the R&R found no contempt, and in any event there is no evidence that undersigned had actual knowledge that it was different when he engaged in the limited conduct (adapting a previous document into shape to articulate terms of the new arrangement negotiated by Mr. Donziger and others; *cf.* Declaration at ¶ 5) which was purportedly contemptuous. The R&R faults undersigned for "conspicuously" not addressing this particular financing arrangement in the Opposition, but this is merely because undersigned did not fully appreciate the nature of the claim until recently— and still believes it to be misguided. While a single email from the time period that undersigned prepared the draft document makes note of a "previous agreement," there is no mention of "personal" debt in that email or any other email from that time. *See* Chevron Motion, Ex. 88. In another email—almost a year later—Mr. Donziger informs undersigned that he is only just "realizing I signed a personal promissory note to [Fenwick/Waters] for the first 102" and requests "a superseding instrument that nullifie[s] that." *Id.* Ex. 84.[6] Chevron, meanwhile, "conspicuously"

---

[6] It does not appear to be accurate that the agreement drafted with undersigned's assistance actually did anything to "extinguish" any of Mr. Donziger's debt, personal or otherwise. The narrative set out by the R&R implies that it did largely by reversing the actual chronology:

6

chose not to file the "previous agreement" as an exhibit to the Contempt Motion or its reply in support (and treated this whole issue in the most cursory fashion in both papers), such that undersigned saw the agreement for the first time on the stand during cross-examination. PX 9115. While it is true that the agreement is not overtly executed by Mr. Donziger in a representative capacity, it still seems to undersigned that Mr. Donziger's execution of the note is fundamentally representative, given that, to undersigned's knowledge, all funds provided by Mr. Waters were intended to support (and did support) the Ecuador case broadly, including efforts to survive Chevron's retaliatory litigation in New York and probably inclusive of Mr. Donziger's own fees (although undersigned does not know one way or the other).[7] Notably, the sole relevant document that undersigned helped draft made clear in a "Use of Funds" paragraph that "[t]he Investment [inclusive of prior payments] shall be used to fund litigation and other expenses dedicated to collecting the Ecuador Judgment and other case-related expenses including but not limited to the defense of the U.S. Representative [Mr. Donziger] in U.S. courts." Ex. 88, ¶ 9. The R& R seems to want to put this financing arrangement in the same category as the Zelman agreement that the Court is familiar with. This is incorrect because the funds at issue here were not dedicated to an

---

In December 2017, Donziger requested from Page a "superseding instrument that nullified" a "personal promissory note" by which investor Roger Waters had loaned Donziger $102,000. (Champion Decl. Ex. 84.) Page drafted a superseding investment agreement with Waters for $152,000, which included the $102,000 that Waters lent to Donziger personally, in exchange for a percentage of the Ecuador Judgment. (Champion Decl. Ex. 85-86.)

R&R at 12. But the agreement undersigned worked on was finalized in January 2017, nearly a year *earlier* than Mr. Donziger's request for a nullification agreement. The January 2017 agreement makes no reference a personal promissory note—or even the "previous agreement" that was mentioned in Ex. 88—and does not extinguish or nullify anything. The fact that prior payments are referenced or included as part of the consideration for the grant of interest by no means automatically extinguishes prior consideration or guarantees related to those payments—indeed otherwise there would be no perceived need for a "superseding" agreement.

[7] Additionally, it appears, now that undersigned has finally had an opportunity to review the "previous agreement," that there was no viable debt to extinguish, because the agreement sets forth an obligation "payable solely" from and otherwise limited to "Gross Receipts," which arguably have never been received or ever will be received.

7

exclusively individual purpose but rather destined for use (and actually used) as "case funds" indistinguishably from other case funds raised from other financing arrangement. Although the R&R tries to avoid the "actual knowledge" question, *supra* at n.1, the finding on this issue illustrates the importance of requiring actual knowledge especially on a vicarious liability theory. It would be manifestly unfair to hold undersigned liable for consequences flowing from key facts as to which undersigned was not even aware at the time.

   3. <u>The 0.25% contingency interest</u>. The exclusive basis for the R&R recommendation of contempt regarding undersigned's "failure to transfer to Chevron" the 0.25% contingency interest is the application of Paragraph 1 of the Default Judgment, applied to undersigned as an attorney for the FDA pursuant to Paragraph 7 of the same. DI 1985. I respectfully object that this recommendation is in error because the Default Judgment is void for lack of jurisdiction and otherwise "transparently invalid," *United States v. Hendrickson*, 822 F.3d 812, 819 (6th Cir. 2016), as explained in the Opposition at pp. 7-8 n.4. Nonetheless, undersigned is simultaneously taking steps to relinquish the interest to the constructive trust subject to protections necessary in light of the pending appeal.

   4. <u>Sanctions</u>. Undersigned objects to the compensatory sanctions recommended in the R&R. There is not a sufficient causal connection between undersigned's limited conduct—merely transferring funds, and merely drafting a document pursuant to instructions by others and put to use by others—and any damages to Chevron. The clear implication from the facts is that events would have proceeded along similar lines absent undersigned's participation. The R&R's assertion that undersigned should be liable for the *entire* amount of funds that were received and used entirely by other people and merely passed through his hands or were distantly connected to his administrative work is unsupported and unjust. Indeed, the R&R's sanction recommendation is so

far removed from any attempt to assess the substantiality or genuine impact of undersigned's particular conduct on actual damages that it raises the strong implication that the true purpose of the sanctions is to vindicate the authority of the Court by means of a measure of punishment. This conclusion is supported by other aspects of the R&R's characterization of the facts which imply that it was wrongful for undersigned merely to express disagreement (and carefully explain the bases for that disagreement) with certain conclusions reached by this Court. *See, e.g.*, R&R at 10-11. Chevron has not and cannot adequately claim damages arising from undersigned's limited conduct as described in the R&R; the recommendation of the extraordinary sum of $444,045.16 in compensatory sanctions to be paid by undersigned to Chevron Corporation is unwarranted, unjust, and should not be followed.

DATED:     February 10, 2020               Respectfully submitted,

                                           _____/s_____
                                           Aaron M. Page
                                           512 Clark Street
                                           Iowa City, IA 52240
                                           Tel: (202) 618-2218
                                           Email: aaron@forumnobis.org

                                           *Pro se*