**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------x
                                           :
CHEVRON CORPORATION,                       :
                                           :
                    Plaintiff,             :
                                           :
            v.                             :   Case No. 11 Civ. 0691 (LAK)
                                           :
STEVEN DONZIGER, et al.,                   :
                                           :
                    Defendants.            :
                                           :
-----------------------------------------------------------x
```

**CHEVRON CORPORATION'S RESPONSE TO AARON MARR PAGE'S
OBJECTIONS TO MAGISTRATE'S REPORT AND RECOMMENDATION
RE CONTEMPT (DKT. 2454)**

**TABLE OF CONTENTS**

Page

I.     PRELIMINARY STATEMENT ........................................................................... 1

II.    FACTUAL BACKGROUND .............................................................................. 3

     A.     Page Has Assisted Donziger's Unlawful Conduct Since 2005 ............................... 3

     B.     Page Had Actual Knowledge of the RICO and Default Judgments ....................... 5

     C.     Page Helped Donziger Extinguish $102,000 of Personal Debt Using Investor Funds Traceable to the Ecuadorian Judgment .......................................... 6

     D.     Page Transferred $342,045.16 of Investor Funds to Donziger's Personal Bank Account, and in Exchange Received $50,000 ................................................. 7

     E.     Page Failed to Transfer to Chevron the 0.25% Interest in the Ecuadorian Judgment ........................................................................................................... 8

     F.     Magistrate Judge Lehrburger Found That Page Committed Willful Contempt ........................................................................................................... 8

III.   STANDARD OF REVIEW ............................................................................... 9

IV.    ARGUMENT ................................................................................................ 10

     A.     Page Committed Multiple Acts of Willful Contempt ........................................... 10

          1.     Page Violated Paragraph 1 of the RICO Judgment and Paragraph 1 of the Default Judgment When He Transferred $342,045.16 of Investor Funds Traceable to the Ecuadorian Judgment to Donziger ........ 10

          2.     Page Violated Paragraphs 1 and 5 of the RICO Judgment When He Aided Donziger's Use of the Ecuadorian Judgment to Extinguish a $102,000 Personal Debt Owed to Roger Waters ..................................... 15

          3.     Page Continues to Violate Paragraph 1 of the Default Judgment By Not Transferring His Interest in the Ecuadorian Judgment to Chevron ................................................................................................ 18

     B.     Chevron Is Entitled to Compensatory Damages ................................................... 19

     C.     The Court Should Not Hold the Motion in Abeyance ........................................... 20

V.     CONCLUSION .............................................................................................. 20

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abu-Nassar v. Elders Futures, Inc.*,
   No. 88 CIV. 7906 (PKL), 1994 WL 445638 (S.D.N.Y. Aug. 17, 1994)................................16

*Aviv v. Brainard*,
   No. 18-cv-5088 (PKC), 2018 WL 4927912 (S.D.N.Y. Oct. 11, 2018) ..................................19

*Chevron Corp. v. Donziger*,
   384 F. Supp. 3d 465 (S.D.N.Y. 2019)...............................................................2, 4, 5, 8, 11, 18

*Garcia v. Portuondo*,
   459 F. Supp. 2d 267 (S.D.N.Y. 2006)............................................................................10, 17

*IndyMac Bank, F.S.B. v. Nat'l Settlement Agency, Inc.*,
   No. 07 CIV. 6865 LTSGWG, 2008 WL 4810043 (S.D.N.Y. Nov. 3, 2008) .........................10

*Jimenez v. Lilley*,
   No. 16-CV-8545 (AJN)(RWL), 2018 WL 2768644 (S.D.N.Y. June 7, 2018).......................10

*Norton's v. Sam's Club*,
   145 F.3d 114 (2d Cir. 1998)..............................................................................................14

*Pan Am. World Airways, Inc. v. Int'l. Bhd. of Teamsters*,
   894 F.2d 36 (2d Cir. 1990).................................................................................................16

*Shulman v. Chaitman LLP*,
   392 F. Supp. 3d 340 (S.D.N.Y. 2019)................................................................................14

*Software Freedom Conservancy Inc. v. Westinghouse Digital Electronics LLC*,
   812 F. Supp. 2d 483 (S.D.N.Y. 2011).................................................................................12

*Tavares v. City of New York*,
   No. 08 CIV. 3782 PAE, 2011 WL 5877548 (S.D.N.Y. Nov. 23, 2011)...........................10, 16

*Vaccariello v. XM Satellite Radio, Inc.*,
   295 F.R.D. 62 (S.D.N.Y. 2013) .........................................................................................10

**TABLE OF AUTHORITIES**
(continued)

Page(s)

**Statutes**

28 U.S.C. § 636(b) ..................................................................................................9

**Rules**

Fed R. Civ. P. 65(d) .............................................................................................12

Fed. R. Civ. P. 72(b) ........................................................................................9, 10

## I.       PRELIMINARY STATEMENT

Aaron Marr Page—described by Steven Donziger as his "right hand person" (Dkt. 2317-4)—has for more than a decade assisted Donziger in his efforts to extort Chevron using first the threat then the reality of the corrupt Ecuadorian judgment.  Most recently, Page and his one-man law firm, Forum Nobis PLLC, both directly violated the RICO and Default Judgments and aided and abetted Donziger's violations of those judgments.  Despite having full knowledge of the RICO Judgment, Page helped Donziger violate it by selling millions of dollars' worth of interests in the Ecuadorian judgment, most of which went to line Donziger's (and Page's) own pockets.  Page and Forum Nobis gained custody of hundreds of thousands of dollars traceable to the Ecuadorian judgment and then transferred them to Donziger, rather than Chevron, in violation of the RICO and Default Judgments' constructive trust.  While the full extent of Donziger's transfers to Page is still unknown, Page received at least $174,000 since issuance of the RICO Judgment (*see* Dkt. 2318 at ¶4), as well as an interest in the Ecuadorian judgment that he retains to this day.

After considering a substantial record and holding a lengthy evidentiary hearing, Magistrate Judge Lehrburger found that Page committed multiple acts of willful contempt.  Those findings are supported by clear evidence, and the relief Magistrate Judge Lehrburger recommended—which is designed to partially compensate Chevron for Page's contemptuous acts and ensure compliance with the RICO and Default Judgments—is reasonable in all respects.  Indeed, even further-reaching sanctions (including awarding Chevron its attorney's fees) would have been justified based on the finding that Page engaged in willful contempt.

Page continues to offer a series of excuses for his wrongful conduct, but identifies no legitimate reason to reject Magistrate Judge Lehrburger's recommendation.  Ample evidence supports all of Magistrate Judge Lehrburger's factual findings, and there is no reason to second-guess his conclusion that Page's testimony was not credible in material respects.  And Page makes no

meaningful effort to address Magistrate Judge Lehrburger's findings, and instead largely recycles the same flawed legal arguments he raised in his opposition to Chevron's contempt motion.

The reason Page has failed to mount a serious challenge to Magistrate Judge Lehrburger's factual findings is because Page's contemptuous acts, each committed with actual knowledge of the prohibitions of the RICO and Default Judgments, are beyond any serious dispute:

- Page drafted for Donziger many agreements with investors in the Ecuadorian judgment. *See, e.g.*, Dkts. 2317-38 – 39, 2317-44. Page also helped Donziger mislead those investors. For example, when an investor's attorney complained that Donziger misrepresented this Court's findings regarding the overlap between the Ecuadorian judgment and LAP internal work product, Page drafted Donziger's evasive response: "As for dear Judge Kaplan's quote, it is a typical masterwork of false and misleading information." (Dkt. 2317-77 at 1, 2).

- Page assisted Donziger in preparing an investment agreement "designed to supersede" a $102,000 debt Donziger personally owed to Roger Waters, in exchange for giving Waters an interest in the Ecuadorian judgment. Dkt. 2317-84.

- Page transferred $342,045.16 in investor funds to Donziger's personal bank account. *Chevron Corp. v. Donziger*, 384 F. Supp. 3d 465, 485–86 (S.D.N.Y. 2019). Two days later, Donziger transferred $50,000 of those funds back to Page. *Id.* at 487.

- Page drafted agreements granting interests in the Ecuadorian judgment for Donziger's supporters, including a 0.25% interest for himself. Dkts. 2317-101 – 103.

In light of this abundant evidence, Magistrate Judge Lehrburger found that Page "played an active role in Donziger's efforts following the RICO Judgment to enter into investment contracts to monetize and profit from the Ecuador Judgment." Dkt. 2541 ("R&R") at 9, ¶ 28. Rejecting as "not reliable" Page's testimony that he believed the Roger Waters transaction to be a "donation," Magistrate Judge Lehrburger found that Page drafted an agreement "that extinguished a personal debt of Donziger in exchange for an interest in the Ecuador Judgment." *Id.* at 12, ¶ 40 & n.7. He also found that Page obtained the proceeds of an account filled with investor funds and, at Donziger's direction, "wired the same amount to Donziger's personal bank account." *Id.* at 13, ¶¶ 43–44. Magistrate Judge Lehrburger further found that Page "[c]ollaborated with Donziger to

[f]inancially [r]eward [t]hemselves," including by drafting the agreement that granted Page a 0.25% interest in the Ecuadorian judgment. *Id.* at 11 ¶¶ 37–38.

Faced with these irrefutable findings, Page parrots Donziger's failed contempt defense, and asserts that this Court's April 25, 2014 stay opinion somehow altered the RICO Judgment. This Court has already rejected that argument—and for good reason, because nothing in the stay opinion could have changed the clear terms of the RICO Judgment, which was then on appeal to the Second Circuit. Page also contends that his transfer of $342,045.16 of investor funds to Donziger's personal bank account did not constitute contempt because Page supposedly did not have a right to those funds. But Page received $50,000 from those funds, and whether or not Page himself had an interest in all of those funds does not change the fact that the RICO and Default Judgments precluded the transfer of funds traceable to the Ecuadorian judgment to Donziger's account. Page tries to disclaim knowledge that Donziger was using the Ecuadorian judgment to cancel $102,000 in personal debt Donziger owed to Waters, but the documentary evidence shows that Page had full knowledge of that obligation and assisted Donziger in extinguishing it. Page also claims that he cannot be held in contempt of the Default Judgment because, in his view, it is "void for lack of jurisdiction and otherwise 'transparently invalid'" (Dkt. 2454 at 8), but this Court has found otherwise and the Default Judgment was not appealed. Dkt. 1985 at 1 n.1.

In sum, the Court should overrule Page's objections and accept the Magistrate's recommendation to find Page and Forum Nobis in contempt of Paragraph 1 of the RICO Judgment and Paragraph 1 of the Default Judgment, enter a judgment against them in the amount of $444,045.16, and order them to assign any and all interests in the Ecuadorian judgment to Chevron.

## II.    FACTUAL BACKGROUND

### A.    Page Has Assisted Donziger's Unlawful Conduct Since 2005

Page, an attorney licensed to practice in Washington, D.C. and Iowa (Dkt. 2317-9–2317-

10), met Donziger at a symposium in law school (Dkt. 2317-11 at 1) and soon after began doing legal research for Donziger related to the Ecuadorian litigation (Dkt. 2317-12 at 33:4–13). After his law school graduation, Page began working for Donziger (Dkt. 2317-11 at 1) and worked for him full-time until March 2007, when Page joined Cleary Gottlieb Steen & Hamilton as an associate attorney (Dkt. 2317-12 at 274:7–9). Page continued to assist Donziger even while working at Cleary; on at least one occasion, Page provided Donziger with legal research and analysis related to the Ecuadorian litigation. Dkt. 2317-13 at 1; Dkt. 2317-12 at 274:22–275:10.

Page is "managing attorney" of Forum Nobis PLLC (*Donziger*, 384 F. Supp. 3d at 487), which appears to have no other employees. Dkt. 2317-17; Dkt. 2317-12 at 6:10–7:2; 11:14–17. Page, through Forum Nobis, has two clients: Donziger, whom Forum Nobis has represented since 2010 (Dkt. 2317-7 at 9:17–10:5) and the Amazon Defense Front ("FDA"), a defaulted defendant (Dkt. 2317-7 at 10:11–21; Dkt. 1985 ¶ 6.3). Page claims his representation of Donziger is "not subject to a precisely defined scope" and is not governed by any "written limitation." Dkt. 2317-7 at 15:19–16:15, 17:1–14. Page has also claimed to represent "some" of the Lago Agrio Plaintiffs ("LAPs") in the Ecuadorian litigation, a situation he has described as "complicated." Dkt. 2317-7 at 10:17–19. While the full extent to which Page has benefited financially from his work with Donziger remains unknown, Page has received payments totaling at least $514,000 from Donziger (including from an account containing investor funds that Donziger controlled) and Donziger's investors from 2006 through March of 2019—including at least $174,000 of payments made to Page and Forum Nobis after the RICO Judgment was entered. *See* Dkt. 2318 at ¶¶3–4.

Since March 2012, Page and Donziger have stayed in constant contact, exchanging a total of at least 8,057 phone calls and SMS text messages in that time period. Dkt. 2319 ¶ 6. Page also was a crucial element of Donziger's trial team in this action. *See* Dkt. 2317-15 at 2858:15-17

(Chevron's counsel noting that Page "sat in this courtroom every day"); Dkt. 2317-16 ¶ 4 (Donziger's counsel stating that Page "has played a key advisory role in assisting Mr. Donziger [to] meet his obligations in the RICO case as a *pro se* litigant").

Page has drafted and revised investor agreements, managed Donziger's portfolio of contracts, and advised Donziger on issues regarding the investor contracts. For example, from July to October 2016, Page took the lead on revising a draft investment contract contemplating a $10 million investment from Daniel Israel. *See, e.g.*, Dkt. 2317-45 (email attaching Page's revisions to the English and Spanish drafts of the contract); Dkt. 2317-46 ("I am working up all the documents now."). In Page's own words, he "draft[ed] much of the contract and apparently draft[ed] all the supporting docs" (Dkt. 2317-47) as well as correspondence sent to Israel in an effort to secure the funds (Dkt. 2317-48). Page worked on this deal knowing that, if consummated, it would lead to Donziger getting a "transaction fee," which would mean that Donziger was profiting from the Ecuadorian judgment. Dkt. 2317-47. Page even expressed concern that his own fee not reduce Donziger's profit: "I would be loath to take anything from your portion, knowing as I do how much you expended personally during RICO etc. I think apart from the transaction fee, you would be justified in paying yourself a percentage of your arrears?" *Id.*; R&R at 10 ¶ 32.

Page also helped draft the agreements for many of the investments that led to Donziger raising $2,367,500 after issuance of the RICO Judgment. *See Donziger*, 384 F. Supp. 3d at 482; Dkt. 2317-50 – 55 (John Van Merkensteijn); Dkt. 2317-56 (David Yass), Dkt. 2317-57 – 59 (Ian Watson); Dkt. 2317-60 – 61 (Tony Abbiati); Dkt. 2317-62 – 68 (Cliff Eisler); Dkt. 2317-44, Dkt. 2317-69 – 70 (Glenn Krevlin); R&R at 9-10 ¶ 30.

## B.     Page Had Actual Knowledge of the RICO and Default Judgments

The RICO and Default Judgments "impose[d] a constructive trust for the benefit of Chevron on all property, whether personal or real, tangible or intangible, vested or contingent" that

Donziger or the Defaulted Defendants have or might obtain "that is traceable to the Judgment or the enforcement of the Judgment anywhere in the world." *See* R&R at ¶¶ 4, 8. Donziger and the Defaulted Defendants were also "enjoined and restrained from undertaking any acts to monetize or profit from the [Ecuador] Judgment . . . , including without limitation by selling, assigning, pledging, transferring or encumbering any interest therein." *Id.* ¶¶ 5, 9. And both judgments are "binding upon the parties; their officers, agents, servants, employees, and attorneys; and other persons who are in active concert and participation with any of the foregoing." *Id.* ¶¶ 6, 10.

Page had actual knowledge of the RICO Judgment. R&R at 4 ¶ 3 and n.3; Dkt. 2453-1 at 6:16–20. On the day the RICO Judgment issued, Page and Donziger spoke on the phone five times for over twenty minutes (Dkt. 2317-32), and Page tweeted about the RICO Judgment the day it issued and two days later (Dkt. 2317-6). Page testified that he was aware of the RICO Judgment. 2317-7 at 138:17–19; R&R at 4 n.3; Dkt. 2453-1 at 6:16–20. While Page tried under oath to "equivocate about the extent of his familiarity with the RICO Judgment," Magistrate Judge Lehrburger found that "Page no doubt carefully reviewed and parsed the RICO Judgment and its injunction provisions as demonstrated, for instance, by the 'email memorandum' in which he purports to opine about the limits of the RICO Judgment." R&R at 23 n.14 (citing Dkt. 2317-107).

Page also had actual knowledge of the Default Judgment. R&R at 4 ¶ 7. On the day the Default Judgment issued, Page spoke with Donziger for over 26 minutes (Dkt. 2317-32), and two weeks later he wrote to Donziger that he was "aware that Judge Kaplan had recently issued a Default Judgment against the FDA and others (Dkt. 1985) that purports to apply the same terms of the Operative Judgment to the FDA and others." Dkt. 2317-8 at 2; *see also* R&R at 5 n. 4.

**C.     Page Helped Donziger Extinguish $102,000 of Personal Debt Using Investor Funds Traceable to the Ecuadorian Judgment**

Page helped Donziger personally profit from the Ecuadorian judgment by "draft[ing] an

agreement that extinguished a personal debt of Donziger in the amount of $102,000 in exchange for a percentage interest in the Ecuador Judgment." R&R at 24.  In December 2016 and January 2017, Page drafted and translated an investment agreement stating that Roger Waters would provide $152,000 in exchange for a percentage of the Ecuadorian judgment. Dkts. 2317-85 – 86.  Donziger edited Page's draft and sent the final version to Waters's counsel. Dkt. 2317-87.  In an email to Waters's counsel—on which Page was copied—Donziger specifically noted that the draft agreement prepared by Page was "designed to supersede our previous agreement." Dkt. 2317-84 at 2.  That "previous agreement" was a $102,000 promissory note between Waters and Donziger, which Donziger executed in his personal capacity in January 2016. Dkt. 2453-6.  Waters subsequently signed the investment agreement in January 2017.  Dkt. 2317-88.

Waters paid only $50,000—directly to Donziger—after executing the agreement, despite the fact that the agreement credited him with providing $152,000 of funding. *See* Dkt. 2115-1 at Ex. 2, Dkt. 2317-88 at 6.  The remaining $102,000 came from the cancellation of Donziger's personal promissory note, a fact Donziger confirmed in a December 2017 email to Page in which Donziger noted, "I am realizing I signed a personal promissory note to them for the first 102," and asked Page for a "superseding instrument that nullified" that promissory note. Dkt. 2317-84.

**D.    Page Transferred $342,045.16 of Investor Funds to Donziger's Personal Bank Account, and in Exchange Received $50,000**

Page worked with Donziger to transfer $342,045.16 in funds traceable to the Ecuadorian judgment to Donziger's personal account, in violation of Paragraph 1 of the RICO Judgment and Default Judgment.  While working with Donziger, Katie Sullivan created an account, called "CWP" (for "Chevron Will Pay"), that was used to "receive and disburse investor monies at Donziger's direction." Dkt. 2116 ¶¶ 49–50.  On April 23, 2018, *after* this Court's Default Judg-

ment enjoined the FDA and its "agents" and "attorneys" from "selling, assigning, pledging, trans-

ferring, or encumbering any interest" (Dkt. 1985 ¶ 4) in the Ecuador judgment, Page contacted

Sullivan, "threaten[ing] that, if [she] did not turn the balance of CWP Account over to him, he and

Steven [Donziger] would be forced to take legal action against [her]." Dkt. 2116 ¶ 56. Sullivan

sent Page two cashier's checks totaling $342,045.16, payable per Page's instructions to "Aaron M

Page fbo FDA." *Donziger*, 384 F. Supp. 3d at 485 (citing Dkt. 2116 ¶¶ 56–59 & Dkt. 2317-39).

Page received this money and then transferred it to Donziger's personal account. R&R at 25;

*Donziger*, 384 F. Supp. 3d at 486. Two days later, Donziger transferred the funds to a business

account and then sent Forum Nobis $50,000. *Id.* at 486–87.

Page attempted to justify his transfer of the funds to Donziger by preparing, in consultation

with Donziger, an "email memorandum" with a purported "understanding" of the RICO Judgment

and Default Judgment as permitting this transfer. Dkt. 2317-106 (Page planning the email memo

with Donziger); Dkt. 2317-107 (Page sending the email memorandum and Donziger asking Page

to wire the funds to Donziger). Page's memorandum notes that the funds were received by him

"for the benefit of the FDA" and subsequently transferred to Donziger. Dkt. 2317-107.

**E.      Page Failed to Transfer to Chevron the 0.25% Interest in the Ecuadorian Judgment**

In collaboration with Donziger, Page drafted an agreement with the FDA awarding himself

a 0.25% interest in the Ecuadorian judgment. Dkts. 2317-101–2317-102. In January 2017, the

FDA granted the interest "[i]n consideration of past and expected future professional services,"

such as Page's "service as a lawyer and advocate for the FDA . . . and Donziger." Dkt. 2317-103

at 2–3. Page has not transferred this interest to Chevron, in violation of the Default Judgment.

**F.      Magistrate Judge Lehrburger Found That Page Committed Willful Contempt**

After extensive briefing, oral argument, and hearing testimony from Page himself, Magis-

trate Judge Lehrburger found Page aided and abetted Donziger in violating the RICO and Default

Judgments and directly violated those judgments himself.  Magistrate Judge Lehrburger has recommended that this Court hold Page in contempt for three separate acts: (1) helping Donziger extinguish a personal debt of $102,000 (R&R at 24); (2) transferring $342,045.16 in investor funds traceable to the Ecuadorian judgment to Donziger (*id.* at 25–26); and (3) failing to transfer Page's 0.25% interest in the Ecuadorian judgment to Chevron (*id.* at 26–27).  In making these findings, Magistrate Judge Lehrburger weighed Page's testimony and found it to be not credible in material respects.  For example, although Page "denied knowing that the $102,000 was to extinguish" a personal debt, Magistrate Judge Lehrburger found that Page's testimony that "he thought the extra $102,000 was a 'donation'" was supported by no documents and was "not reliable."  *Id.* at 12 n.7.

In light of Page and Forum Nobis's willful acts of contempt, Magistrate Judge Lehrburger recommended that this Court order them to pay $444,045.16 in compensatory damages to Chevron and assign to Chevron "any percentage interest they own" in the Ecuadorian judgment.  *Id.* at 37.

Magistrate Judge Lehrburger also found that Donziger's appeal of the contempt ruling against him did not divest the Court of jurisdiction to decide Chevron's motion.  *Id.* at 19.  To hold otherwise "would result in a de facto stay of this Court's orders and judgments as they applied to other persons, which the Court has already recognized is contrary to established precedent."  *Id.* at 19 (citing Dkt. 2233).  Nevertheless, he recommended that Chevron's motion be held in abeyance. *Id.* at 20.  Chevron objected to this recommendation.  Dkt. 2452.

### III.  STANDARD OF REVIEW

This Court referred Chevron's motion to hold Page in contempt to Magistrate Judge Lehrburger pursuant to 28 U.S.C. § 636(b) and Federal Rule of Civil Procedure 72.  When a party files timely objections to a Magistrate Judge's recommended findings and disposition of a "pretrial matter dispositive of a claim or defense," "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to . . . [and] may accept, reject,

or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions."  Fed. R. Civ. P. 72(b).

"In making a *de novo* determination on a matter specifically objected to, a district court judge 'has discretion in the weight placed on the proposed findings and recommendations and may afford a degree of deference to the Report and Recommendation.'" *Jimenez v. Lilley*, No. 16-CV-8545(AJN)(RWL), 2018 WL 2768644, at *2 (S.D.N.Y. June 7, 2018) (quoting *Vaccariello v. XM Satellite Radio, Inc.*, 295 F.R.D. 62, 67 (S.D.N.Y. 2013)).  But "[t]o the extent . . . that the party makes only conclusory or general arguments, or simply reiterates the original arguments, the Court will review the Report strictly for clear error." *IndyMac Bank, F.S.B. v. Nat'l Settlement Agency, Inc.*, No. 07 CIV. 6865(LTS)(GWG), 2008 WL 4810043, at *1 (S.D.N.Y. Nov. 3, 2008).  And "[w]here the Magistrate Judge has made findings regarding witness credibility . . . the Court should not reject such findings unless it has heard the testimony itself." *Garcia v. Portuondo*, 459 F. Supp. 2d 267, 279 (S.D.N.Y. 2006) (Kaplan, J.).  "Courts generally do not consider new evidence raised in objections to a magistrate judge's report and recommendation." *Tavares v. City of New York*, No. 08 CIV. 3782(PAE), 2011 WL 5877548, at *2 (S.D.N.Y. Nov. 23, 2011).

## IV.     ARGUMENT

### A.     Page Committed Multiple Acts of Willful Contempt

The R&R's findings that Page engaged in willful contempt of the RICO and Default Judgments are supported by overwhelming evidence and should be adopted by this Court.

        **1.     Page Violated Paragraph 1 of the RICO Judgment and Paragraph 1 of the Default Judgment When He Transferred $342,045.16 of Investor Funds Traceable to the Ecuadorian Judgment to Donziger**

The evidence shows that Page willfully violated Paragraph 1 of both the RICO Judgment and the Default Judgment.  Page obtained from Katie Sullivan $342,045.16 traceable to the Ecuadorian judgment and promptly transferred it to Donziger, in exchange for a $50,000 payment from

those same funds.  By this transfer, Page, who as Donziger's agent was bound by the RICO in-

junction, "aided and abetted Donziger's receipt of funds traceable to the Ecuador Judgment that

should have been paid to Chevron," in violation of Paragraph 1 of the RICO Judgment.  R&R at

25–26.  Further, Page has claimed the $342,045.16 were funds "raised by the FDA" "for case

litigation expenses received in exchange for an interest in a future collection" on the Ecuadorian

judgment.  Dkt. 2317-8 at 2.  Page has also claimed that the funds "were FDA funds" that Donziger

"had authority to spend."  Dkt. 2317-7 at 293:22–25.  Assuming that they were, in fact, "FDA

funds," they should have been transferred to Chevron, not Donziger, under Paragraph 1 of the

Default Judgment.  *See Donziger*, 384 F. Supp. 3d at 475, 479 n.46, 492 n.146.

But instead of transferring these funds to Chevron, Page transferred the funds to Donziger's

personal bank account.  R&R at 25–26.  As Magistrate Judge Lehrburger found, regardless of how

Page thought the funds would be used, the fact remains that by this transfer "Page indisputably

facilitated delivery of traceable funds away from Chevron and to Donziger's personal account."

*Id.* at 25.  Page thus committed willful contempt of the RICO and Default Judgments due to his

transfer of $342,045.16 to Donziger.  *Id.* at 25–26.  Moreover, Page's acceptance of the $50,000

kickback from Donziger—out of the same funds Page transferred to Donziger (*id.* at ¶ 44) was a

direct contempt as Page's acceptance of this $50,000 payment not only aided and abetted

Donziger's and the FDA's breach of the constructive trust, but also constituted a direct violation

of Paragraph 1 of the RICO Judgment and Paragraph 1 of the Default Judgment.  *Id.* at 25–26.

Page attempts to defend his conduct by asserting that the funds he transferred belonged to

the FDA.  Dkt. 2454 at 5.  But as noted, that is beside the point because Page's transfer of FDA

funds traceable to the Ecuadorian judgment to Donziger (rather than Chevron) violates the Default

Judgment against the FDA.  Paragraph 1 of the Default Judgment commands that the FDA, and its

11

"agents" and "attorneys," "shall transfer and forthwith assign to Chevron" "all . . . property . . . that is traceable to the Judgment or the enforcement of the Judgment." Dkt. 1985 ¶¶ 1, 7; *see also id.*¶ 6.3 (defining "Defaulted Defendants" to include "Frente de Defensa de la Amazonia," *i.e.*, the FDA). Page, as an agent and attorney of the FDA, should have transferred these supposed "FDA funds" to Chevron, and not into Donziger's personal bank account.

Page claims that his receipt of the $342,045.16 did not violate Paragraph 1 of the RICO and Default Judgments because he did not have "any personal right to or interest" in the money. Dkt. 2454 at 4–5. But Page is wrong that he can be held in contempt only for profiting personally from those funds. Page's obligation to transfer those funds to Chevron did not turn on his having a personal right or interest in the funds, and in any event he ignores that he personally profited from them in the amount of $50,000. R&R at ¶ 14; *id.* at 25. Page was an attorney and agent for both Donziger and the FDA, acted in active concert and participation with them, and had actual knowledge of the RICO and Default Judgments. Page was therefore required to comply with the RICO and Default Judgments under Federal Rule of Civil Procedure 65(d)(2)(B)–(C), as well as under the express terms of both judgments. Dkt. 1875 ¶ 8 (RICO Judgment is binding upon the parties and their "agents" and "attorneys"); Dkt. 1985 ¶ 7 (same). Page's claim that he supposedly was just following orders from Donziger or the FDA does not help him. *See Software Freedom Conservancy Inc. v. Westinghouse Digital Elec. LLC*, 812 F. Supp. 2d 483 (S.D.N.Y. 2011) (granting contempt motion under Rule 65(d) despite bound non-party's excuse that it was just following FCC order). To the contrary, it is confirmation that Page was acting in active concert and participation with Donziger and the FDA. And Donziger, for his part, admitted at his bar disciplinary hearing (where Page represented him) that he personally profited from the funds that Page transferred to him. *See* Dkt. 2453-1 at 79:13–25 (Page represented Donziger); Dkt. 2453-12 at 794:10–

15 (when asked about the $342,045.16 at the disciplinary hearing, Donziger testified that "when

[the funds] hit my account it became my money and I hoped to . . . keep it all.").

Page asserts in a footnote that Magistrate Judge Lehrburger erred to the extent that he found

that Page acted with intent or "actual knowledge" to defy or violate the RICO or Default Judg-

ments' terms, including their Paragraph 1 constructive trusts. *See* Dkt. 2454 at 2 n.1.  But Page

cites only his own self-serving declaration and argument below and ignores the other evidence of

his willful and intentional violation of the RICO and Default Judgments and of his consciousness

that his conduct was wrongful, including:

- Page's own cross-examination testimony reflecting that Katie Sullivan's counsel, Frank Libby, refused to transfer the $342,045.16 directly to Donziger and required Page to represent that he was acting as an agent of the FDA and was "aware of no order or other writing from any source having the force or effect of precluding either Ms. Sullivan's transfer or [Page's] receipt of the materials and/or funds." Dkt. 2453-1 at 77:5–18.  On the stand, Page denied that Libby told him that he thought transferring the funds to Donziger would violate this Court's orders ("He just refused. . . . I don't know what he thought" (*id.* 77:6–8)), but conceded that the RICO Judgment "appear[ed] to be what" the language Libby required "references." *Id.* 77:17–78:18.  And Page's testimony on whether he had told Libby that he was going to immediately wire the funds to Donziger was contradictory and changed by the minute (*id.* 74:15–18, 76:20–77:4);

- A memo Page drafted to try to avoid liability, which Magistrate Judge Lehrburger and Page called a "CYA memo" (Dkt. 2317-8 at 2 ("[I]t remains my opinion, upon careful research and consideration, that neither the Operative Judgment, the Default Judgment, nor any other order from Judge Kaplan or any other court, nor any other provisions of law of which I am aware, imposes any limitation or restriction on the use of the funds received by me on behalf of the FDA."); Dkt. 2453-1 at 51:20–21 (Magistrate: "Well, there's a CYA memo.  But the question is whether it's a legitimate interpretation or not."); *id.* at 56:4 (Page: "And then paragraph 8 of my CYA memo . . ."));

- An email chain in which Page (and Donziger) encouraged others to destroy evidence relating to a meeting with a prospective investor and sought to justify that improper request as not "reflect[ing] anything problematic" (Dkt. 2116-2 at 2–8);

- An email chain between John Van Merkensteijn—an investor whose investing agreement Page drafted (Dkts. 2316-50–2316-53)—and his attorney, in which counsel expressed concerns that an agreement requiring payments originating in New York to be wired to Canadian counsel and then back to Donziger in New York "feels like the steps people may take when they are laundering money" (Dkt. 2114-9 at 74–77); and

13

- Page's drafting of Donziger's 2017 retainer, the purpose of which was to avoid the RICO Judgment. Dkt. 2317-83; *see also* Dkt. 2114-2 (providing that "the FDA hereby acknowledges, confirms, and undertakes to support Mr. DONZIGER's existing contractual INTEREST or, alternatively, to the extent it is necessary or useful, hereby grants Mr. DONZIGER and INTEREST in his own right equal to Mr. DONZIGER's existing contractual INTEREST").[1]

Page says that he "does not intend to contest the nuances of the numerous potentially objectionable facts as stated in the R&R" (Dkt. 2454 at 3 n.3), but that waives any challenge to those facts. *See, e.g.*, *Shulman v. Chaitman LLP*, 392 F. Supp. 3d 340, 345 (S.D.N.Y. 2019) ("A district court evaluating a magistrate judge's report may adopt those portions of the report to which no 'specific written objection' is made, as long as the factual and legal bases supporting the findings and conclusions set forth in those sections are not clearly erroneous or contrary to law."); *cf. Norton's v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal.").[2]

Accordingly, Page's attempt to dispute the Magistrate's adverse credibility finding falls far short. The evidence is more than sufficient to find that Page acted willfully and intentionally to violate the RICO and Default Judgments through numerous machinations.

---

[1]  At the contempt hearing, Page also testified that he refused to produce to Chevron boxes of documents in his possession that he conceded were responsive to Chevron's subpoena, and instead sent the boxes to Donziger (Dkt. 2453-1 at 84:22–86:16), who never produced them.

[2]  Page's conclusory complaint about Magistrate Judge Lehrburger's finding that Page aided Donziger in commingling client funds (Dkt. 2454 at 3 n. 3) is misplaced. Page has the burden to disprove the commingling finding, but his boilerplate objections do nothing of the sort. The record strongly supports the commingling finding. As Page conceded at the contempt hearing, he knew he was transferring the funds to a bank account in Donziger's personal name. *See* Dkt. 2453-1 at 78:22–79:1. In fact, from the face of the wire transfer instructions given by Donziger, it is clear the beneficiary of the transfer was Donziger, as there was no notation indicating the funds were to be deposited in a client trust account or any other law firm account. Dkt. 2317-107. And at his bar disciplinary hearing, Donziger testified unequivocally that these funds all belonged to him and that he "hoped to keep it all." Dkt. 2453-12 at 794:11–15. Page was present for Donziger's bar hearing testimony, which he had discussed with Donziger in advance. Dkt. 2453-1 at 79:19-25.

2.  **Page Violated Paragraphs 1 and 5 of the RICO Judgment When He Aided Donziger's Use of the Ecuadorian Judgment to Extinguish a $102,000 Personal Debt Owed to Roger Waters**

Page is also in contempt of the RICO Judgment for helping Donziger extinguish a $102,000 personal debt that Donziger owed to Roger Waters in exchange for an interest in the Ecuadorian judgment. By aiding and abetting Donziger's efforts to use interests in the Ecuadorian judgment to erase personal debts, Page enabled Donziger to profit personally from the Ecuadorian judgment, in clear violation Paragraphs 1 and 5 of the RICO Judgment.

The evidence shows that Page drafted and translated an investment agreement stating that Waters would provide $152,000 in exchange for a percentage of the Ecuadorian judgment. Dkts. 2317-85–2317-86. Donziger noted to Waters's counsel in an email on which Page was copied that the agreement was "designed to supersede our previous agreement." Dkt. 2317-84 at 1. The "previous agreement" Donziger referenced was a $102,000 promissory note between Waters and Donziger, which Donziger executed in his personal capacity in January 2016. Dkt. 2453-6.

Waters signed the investment agreement in January 2017, superseding the promissory note and enriching Donziger. Dkt. 2317-86–2317-88. Evidence verifies that Waters paid only $50,000 to Donziger after executing the superseding agreement, despite the fact that it credited him with providing $152,000 of funding, because Waters had made "earlier payments." *See* Dkt. 2115-1, Dkt. 2317-88 at 3 ¶ 4. The remaining $102,000 came from the cancellation of Donziger's personal promissory note, which Donziger confirmed in a December 2017 email to Page: "I am realizing I signed a personal promissory note to them for the first 102." Dkt. 2317-84 at 1. The January 2017 investment agreement made clear that Waters would be contributing only an additional $50,000 because he had already made "earlier payments," and the agreement "supersede[d] all prior agreements, understandings and negotiations between the Parties," which covered Donziger's personal promissory note. Dkt. 2317-88 at 3 ¶ 4, 7 ¶ 22. Thus, Page's claim that Donziger's December

2017 email is irrelevant because it came after the Waters agreement that Page worked on (which was signed in January 2017), Dkt. 2454 at 6 n.6, misses the mark. Donziger's December 2017 email just confirms the effect of the express terms of the January 2017 agreement that Page drafted.

Page admits that he did not raise before Magistrate Judge Lehrburger any of the arguments he now makes. Dkt. 2454 at 6; *see also* R&R at 24 (noting that "Page conspicuously does not address this particular event in his opposition papers."). According to Page, he did not do so because he "did not fully appreciate the nature of the claim until recently—and still believes it to be misguided." Dkt. 2454 at 6. But Page's decision not to take this claim seriously is not an excuse for his failure to raise arguments below. Because it is undisputed that Page's "arguments were not raised before Magistrate Judge [Lehrburger], and are not submitted as objections but as new arguments," they are "untimely" and need not be considered. *Abu-Nassar v. Elders Futures, Inc.*, No. 88 CIV. 7906 (PKL), 1994 WL 445638, at *4 n.2 (S.D.N.Y. Aug. 17, 1994).[3]

Even if the Court were to consider Page's new arguments, it should still find that Page violated the RICO Judgment when he drafted the Waters investment agreement. Page does not contest the fact that he drafted the investment agreement and, as discussed above, documentary evidence shows that Page was aware that it was to supersede Donziger's prior agreement with Waters. At the evidentiary hearing, Page's only explanation for the prior agreement was that he supposedly thought it referred to a "donation" Waters had made to the Ecuador litigation. Dkt.

---

[3]  Courts generally decline to consider arguments and evidence raised for the first time in objections to a report and recommendation. *See, e.g.*, *Pan Am. World Airways, Inc. v. Int'l. Bhd. of Teamsters*, 894 F.2d 36, 40 n.3 (2d Cir. 1990) (district court did not abuse its discretion in denying request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Tavares*, 2011 WL 5877548 at *2. And for good reason: "If the Court were to consider formally these untimely contentions, it would unduly undermine the authority of the Magistrate Judge by allowing litigants the option of waiting until a Report is issued to advance additional arguments." *Abu-Nassar*, 1994 WL 445638, at *4 n.2.

2453-1 at 68:9–71:19.  But Page could not explain why a "donation" would require nullifying a "previous agreement" or why a donation would be converted into an interest in the Ecuadorian judgment.  *Id.* at 69:13–22.  Magistrate Judge Lehrburger specifically found that Page's testimony regarding the Waters transaction "was not reliable" and concluded that "no record evidence supports Page's contention that the $102,000 was a 'donation.'"  R&R at 12 n.7.  This credibility finding is entitled to substantial deference and this "Court should not reject such findings unless it has heard the testimony itself."  *Garcia*, 459 F. Supp. 2d at 279.  The record also forecloses Page's other challenges to the contempt finding relating to the Waters agreement.  First, Page suggests that although Donziger executed the promissory note in his personal capacity, it should be deemed to be signed in his capacity as a representative of the FDA because the funds were allegedly used to fund the case.  But the terms of the promissory note are clear—it imposed a personal obligation on Donziger to repay the $102,000 Waters lent to him.  Dkt. 2453-6 at 1.  Nothing in the record suggests Donziger and Waters intended the note to be signed by Donziger in any representative capacity.  To the contrary, Donziger expressly acknowledged that he had "signed a personal promissory note" for the $102,000.  Dkt. 2317-84.

Page also argues that the Waters agreement did not allow Donziger to profit because the investment agreement specified that the funds would be used for case expenses.  But that is beside the point because the Waters investment agreement extinguished Donziger's *personal* obligation to repay Waters $102,000 in exchange for an interest in the Ecuadorian judgment.  This agreement therefore enriched Donziger in the amount of $102,000 by cancelling his personal debt.  Page offers no evidence to support his assertion that the funds were, in fact, used for case expenses.[4]

---

[4]  Page suggests that there was no valid debt to extinguish because the promissory note specified that Donziger would repay Waters from funds collected pursuant to the Ecuadorian judgment.  But

The Waters funds were delivered directly to Donziger.  Dkt. 2115-1, Ex. 2.  And this Court has already found that Donziger engaged in extensive commingling of investor and personal funds, using investor funds to pay for his personal expenses.  *See Donziger*, 384 F. Supp. 3d at 485–87.  Page can point to no basis in the record to conclude that Donziger treated the Waters funds differently and used them exclusively for case expenses.

### 3. Page Continues to Violate Paragraph 1 of the Default Judgment By Not Transferring His Interest in the Ecuadorian Judgment to Chevron

Page's possession of an interest in the Ecuadorian judgment violates Paragraph 1 of the Default Judgment, which requires the FDA and its agents and attorneys to "transfer and forthwith assign to Chevron" "all property," including "contingent" property, "that is traceable to the Judgment." Dkt. 1985 ¶¶ 1, 7.  By his own admission, Page is an agent (Dkt. 2317-107 (referring to himself as a "representative" of the FDA)) and attorney for the FDA (Dkt. 2317-102), and this Court has already found that an interest in the Ecuadorian judgment is property "traceable" to that judgment.  *See Donziger*, 384 F. Supp. 3d at 491.  The Default Judgment thus requires Page, as an agent and attorney for the FDA, to "transfer and forthwith assign to Chevron" the executory and contingent interest in the judgment that the FDA improperly assigned to him.  Dkt. 1985 ¶ 1.  Page's willful failure to do so is contemptuous.

Page makes almost no effort to defend his contemptuous possession of an interest in the Ecuadorian judgment.  Page's only objection is to refer the Court to his argument before Magistrate Judge Lehrburger that the Default Judgment is void for lack of jurisdiction.  But this Court has

---

by its own terms, the promissory note created a personal, legal duty for Donziger to repay $102,000 to Waters from Ecuadorian Judgment proceeds.  The likelihood Donziger would be able to repay Waters does not influence the existence of the underlying obligation, which Page helped to cancel by drafting the investment agreement.  And to the extent Page is arguing that Donziger's gain is a contingent one, Paragraph 1 of the RICO Judgment expressly applies to "contingent" property.

already found contrary to Page's jurisdictional argument and that finding has not been appealed. *See* Dkt. 1985 at 1 n.1 ("It holds also that it has personal jurisdiction over all of the Defaulted Defendants, substantially for the reasons stated in DI 1977, at 15–18.").

Page's continued possession of an interest in the Ecuadorian Judgment also shows Page's specific intent to consciously disregard the Default Judgment. Page admitted that his conduct was intentional at the evidentiary hearing, claiming that his possession of the interest might provide an avenue to challenge the Default Judgment. *See* Dkt. 2453-1 at 53:5–17. Page has thus made a conscious, strategic choice to ignore this Court's Default Judgment.[5]

**B.    Chevron Is Entitled to Compensatory Damages**

In light of Page's multiple acts of willful contempt, the Court should award Chevron compensatory damages in the amount of $444,045.16, the amount Magistrate Judge Lehrburger recommended. The amount corresponds to Chevron's injury resulting from Page's contemptuous conduct, namely, Page's aiding of Donziger in his effort to extinguish a personal debt of $102,000 and Page's transfer of $342,045.16 to Donziger in violation of the RICO and Default Judgments. This award of compensatory damages is consistent with the damages awarded in similar cases of civil contempt involving funds transferred in violation of a court order. *See, e.g.*, *Aviv v. Brainard*, No. 18-cv-5088 (PKC), 2018 WL 4927912, at *3 (S.D.N.Y. Oct. 11, 2018) (ordering payment of the amount of money a nonparty transferred in violation of a TRO).

Page objects to the recommendation that Chevron be awarded these compensatory sanctions, claiming that "[t]here is not a sufficient causal connection between the undersigned's limited conduct—merely transferring funds, and merely drafting a document pursuant to instructions by

---

[5] Page did contact Chevron's counsel regarding a conditional transfer of his interest, but has never offered to make an unconditional transfer as required by the Default Judgment.

others and put to use by others—and any damages to Chevron." Dkt. 2454 at 8.  But the causal

link is clear:  Page's actions caused a loss to Chevron of the $342,045.16 that Page transferred to

Donziger, and of the $102,000 that Waters gave to Donziger.  That Chevron, due to Page's actions,

did not receive funds it was entitled to constitutes an injury for which it should be compensated.

**C.      The Court Should Not Hold the Motion in Abeyance**

Page asks this Court to hold Chevron's motion in abeyance pending resolution of

Donziger's appeal of the contempt ruling against him.  Dkt. 2454 at 1–3.  Chevron objected to this

portion of the R&R (Dkt. 2452 at 6–8) and will not repeat those arguments in full here.  In sum,

Magistrate Judge Lehrburger correctly recognized that, as this Court has held, a notice of appeal

"'does not—and cannot—strip the district court of and vest in the court of appeals jurisdiction over

any issues not already decided by the lower court.'"  R&R at 19 (quoting Dkt. 2233 at 1).

Donziger's appeal of the contempt decision—which made no determination as to whether Page

was in contempt—thus did not divest this Court of jurisdiction over Page.  R&R at 19.

Page argues that Chevron's motion should be held in abeyance pending resolution of

Donziger's appeal because Magistrate Judge Lehrburger purportedly "did not make [his] own de-

termination" that the RICO Judgment was "sufficiently 'clear and unambiguous,'" but rather "im-

ported that finding as law of the case from the Donziger Contempt Opinion that is on appeal."

Dkt. 2454 at 1.  But that is not correct:  Magistrate Judge Lehrburger independently "conclude[d]"

that "the injunctive prohibitions are clear and unambiguous."  R&R at 27.

**V.      CONCLUSION**

The Court should reject Page's objections, find that Page and Forum Nobis committed

willful contempt of the RICO and Default Judgments, enter judgment against them for

$444,045.16, require them to assign to Chevron forthwith all interests in the Ecuadorian judgment,

and grant such further relief as the Court deems appropriate.

Dated: February 24, 2020

Respectfully submitted,

*/s/ Randy M. Mastro*_____
Randy M. Mastro
Andrea E. Neuman
Anne Champion
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY  10166
Telephone: 212.351.4000
Facsimile: 212.351.4035

William E. Thomson
333 South Grand Avenue
Los Angeles, California 90071
Telephone: 213.229.7000
Facsimile: 213.229.7520
Email: WThomson@gibsondunn.com

Stern, Kilcullen & Rufolo LLC
Herbert J. Stern
Joel M. Silverstein
325 Columbia Tpke, Ste 110
P.O. Box 992
Florham Park, New Jersey 07932-0992
Telephone:  973.535.1900
Facsimile:  973.535.9664
Email: hstern@sgklaw.com
Email: jsilverstein@sgklaw.com

*Attorneys for Chevron Corporation*