UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------ x

UNITED STATES OF AMERICA

        - against -                      19 CR 561 (LAP)
                                                  11 CV 691 (LAK)

STEVEN DONZIGER,

        Defendant.

------------------------------------------------------ x

       MEMORANDUM IN SUPPORT OF DISMISSAL OF THIS CASE WITH PREJUDICE
       AND IN REPLY TO THE PROSECUTION'S OPPOSITION TO PRETRIAL MOTIONS

                                                         Andrew J. Frisch
                                                          The Law Offices of Andrew J. Frisch
                                                          One Penn Plaza, Suite 5315
                                                          New York, New York 10119
                                                          (212) 285-8000
                                                          afrisch@andrewfrisch.com

                                                          *Attorneys for Steven Donziger*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------ x

UNITED STATES OF AMERICA

            - against -                           19 CR 561 (LAP)
                                                       11 CV 691 (LAK)

STEVEN DONZIGER,

            Defendant.

------------------------------------------------------ x

## Introduction

Steven Donziger hereby moves to dismiss this case with prejudice. In a distinctly contentious civil litigation pitting the interests of the Chevron Corporation against a human rights advocate representing poisoned Amazonians, Judge Kaplan filed criminal charges for the advocate's allegedly contemptuous violation of orders benefitting Chevron, which the United States Attorney declined to prosecute. In lieu of the United States Attorney, Judge Kaplan appointed lawyers from Seward & Kissel ("Seward") to prosecute Mr. Donziger. Eight months into this case, Seward has now belatedly disclosed a recent Seward-Chevron attorney-client relationship [Doc 62-1]; continues to assert attorney-client privilege on Chevron's behalf [Exhibit A]; and is otherwise inextricably tied to the oil and gas industry and Chevron, a so-called oil "major" or "supermajor." Seward's non-disclosure of the Seward-Chevron attorney-client relationship is deliberate malfeasance and undermines any claim that the relationship is irrelevant. The Seward attorneys admit that knew about the Seward-Chevron attorney-client relationship *before* they accepted Judge Kaplan's appointment in July 2019. Doc 62-1. If the relationship were truly irrelevant, it would have been disclosed at Mr. Donziger's arraignment in

2

August 2019 or when Mr. Donziger's counsel specifically asked Seward about the Seward-Chevron relationship and sought a judicial inquiry in December 2019.

Seward did not spontaneously make this disclosure. When Mr. Donziger's counsel specifically asked Seward about the full scope of Seward's ties to Chevron, the Seward prosecutors attempted to obfuscate the issue in open court with faux indignation that Mr. Donziger had the audacity even to question that the Seward attorneys could act as disinterested prosecutors. Transcript of Jan 6, 2020 ("Transcript") at 5-6, 13-16. They disclosed it just weeks ago only after Mr. Donziger acted on the obvious red flags and, completely on his own initiative, proffered an opinion of Professor Ellen Yaroshefsky [Doc 60-2], an undisputed expert in professional and prosecutorial ethics, that forced the hidden truth into the light of day.

A question left unanswered by Seward's belated disclosure is whether Seward fully disclosed its relationship with Chevron to Judge Kaplan before the Seward attorneys accepted Judge Kaplan's appointment. The question remains unanswered because Seward has expressly refused to answer it. When specifically asked by Mr. Donziger's counsel last week if Seward disclosed the Seward-Chevron attorney-client relationship to Judge Kaplan before the Seward attorneys accepted Judge Kaplan's appointment, Seward's co-General Counsel Mark J. Hyland said in writing that he did not deem the question appropriate to answer. Exhibit A.

Seward's expressed concern about the propriety of answering such an important question can be explained in one of two ways, either of which proves Seward's malfeasance. Seward may be concerned because, contrary to protocols of the Department of Justice which the Seward attorneys purport to be following, the Seward attorneys arrogated to themselves resolution of their apparently disqualifying conflict and kept it a secret for eight months, an

3

unacceptable act of concealment.

Alternatively, Seward may be concerned because, in fact, Seward disclosed its attorney-client relationship with Chevron to Judge Kaplan, but Judge Kaplan appointed the Seward attorneys anyway; failed to disclose the Seward-Chevron relationship to Mr. Donziger upon appointing the Seward attorneys; and said nothing when Mr. Donziger formally moved for a judicial inquiry of Seward's relationship with Chevron even though, as discussed below, Judge Kaplan has advised the Court of Appeals that his position is that he never actually recused himself from this criminal case. Under any of these scenarios, Seward had an independent duty to disclose its attorney-client relationship with Chevron to Mr. Donziger.

Other critical questions remain shrouded in secrecy because Seward refuses to answer them. According to Seward's belated disclosure of the Seward-Chevron attorney-client relationship, Seward prepared "corporate forms" and issued "related legal opinions" for two of Chevron's foreign affiliates. Doc 62-1. As Chevron and Seward well know, the structure, ownership and operation of its foreign affiliates are and have been critical and even dispositive issues as Mr. Donziger's Ecuadorian clients have endeavored to enforce the Ecuadorian judgment against Chevron outside the United States. Yet Seward last week expressly declined to advise Mr. Donziger's counsel:

- for which foreign affiliates of Chevron did Seward prepare corporate forms?

- what information was sought on the corporate forms, by whom was the information sought, and to whom were the completed forms provided?

- did Seward limit its disclosure of its work for Chevron for the last ten years because it acted as Chevron's counsel in matters more than ten years ago?

Exhibit A. None of this information is privileged, and all of it remains undisclosed by Seward. Meanwhile, Mr. Donziger is now in his ninth month of home confinement because Seward has

successfully claimed that *he* cannot be trusted. Professor Yaroshefsky concluded that the Seward attorneys should be disqualified even before Seward belatedly disclosed the Seward-Chevron attorney-client relationship. Dismissal of this case with prejudice is the only proper remedy for the irreparable prejudice caused to Mr. Donziger.[1]

A.    *This Case Should Be Dismissed*

Seward disclosed its recent attorney-client relationship with Chevron for the first time just weeks ago in response to Mr. Donziger's pretrial motions. The Seward attorneys argue that their disinterest cannot objectively nor reasonably be questioned, but their own conduct proves them wrong. If the Seward attorneys were truly disinterested prosecutors complying with Department of Justice protocols as they claim, they would have disclosed their firm's recent attorney-client relationship with Chevron:

> • on August 6, 2019, when the Seward attorneys and Mr. Donziger first appeared in this case;
>
> • on December 19, 2019, when Mr. Donziger's counsel expressed concern to the Seward attorneys about Seward's ties to Chevron [Doc 51-1]; or
>
> • on January 5, 2020, when Mr. Donziger's counsel wrote to the Court, arguing that the Seward attorneys have "unlimited and unique access to the facts" and were stonewalling the issue [Doc 51 at 1-2]; or
>
> • on January 6, 2020, when Mr. Donziger's counsel unsuccessfully urged the Court to conduct a judicial inquiry of Seward about Seward's ties to Chevron. Transcript at 2-4.

---

[1] Alternatively, if the Court does not dismiss the case, and the charges against Mr. Donziger are not dismissed for the other reasons advanced in support of his pretrial motions, the case should start anew, as explained in Mr. Donziger's initial submission in support of these motions and herein, with (1) a Judge from another District or, alternatively, a Judge from this District randomly assigned; and (2) a different prosecutor independently appointed by the new Judge.

5

Instead of the transparency required by Department of Justice protocols and sober disclosure of the facts, the purportedly disinterested lead prosecutor, with fury not fully captured in the transcript, blamed Mr. Donziger for even raising the issue of Seward's ties to Chevron; berated him for being "unhappy that he is being prosecuted criminally;" and urged the Court to *advance* the date for trial rather than permit "attacking judges, attacking lawyers, impugning their reputations." *See, e.g.,* Transcript at 5-6. It was not until March 24, 2020, *after* Professor Yaroshefsky's opinion created the risk of a public hearing at which Seward's attorney-client relationship with Chevron might be revealed [Doc 60-2 at 9], that Seward disclosed what it had been concealing all along and which should have been disclosed *eight months earlier*. No criminal defendant should be forced to fight through a prosecutor's faux indignation to figure out what truth is thereby being obfuscated.

The prosecutor's attempt to misdirect Mr. Donziger's claim of bias by claiming that he is "*unhappy* that he is being prosecuted criminally" is especially disturbing. In opposition to Mr. Donziger's pretrial motions, the prosecutor similarly attempted to misdirect Mr. Donziger's claim of judicial bias by alleging his "*unhappiness* with Judge Kaplan's decisions." Memo at 15-16 (emphasis added). These motions establish judicial and prosecutorial abuse of power which the affected defendant has the right to call out.

Seward's attempt to dismiss its relationship with Chevron as irrelevant is not established by Mr. Hyland's declaration and is plainly unavailing. Mr. Hyland's carefully-worded declaration does not even purport to establish that the substance of the Seward-Chevron attorney-client relationship is unrelated to this case or the efforts of Mr. Donziger's Ecuadorian clients to untangle Chevron's foreign structure, ownership and operation.

Mr. Hyland claims that Seward's work for Chevron over the last ten years was limited to preparation of corporate forms for Chevron foreign affiliates and related legal opinions. In response to inquiries by Mr. Donziger's counsel, Mr. Hyland reported in an email that the identity of the foreign affiliates and the subject matter of the opinions are privileged. Exhibit A. Thus, Seward now acknowledges that it has a direct pre-existing relationship with Chevron and is honoring Chevron's current claim of privilege. Seward is simultaneously shrouding itself in the mantle of a disinterested sovereign prosecuting Chevron's adversary and evaluating, among other things, whether its client Chevron or its agents have provided false or misleading information in support of the pending criminal charges.

Mr. Hyland also declined to answer any of the following essential questions posed by Mr. Donziger's counsel, asserting in an email that Mr. Hyland's previously filed declaration "contains the information that Seward & Kissel LLP deems appropriate to provide:"

1. To clarify, is it your position that the identity of the foreign affiliates referred to in your declaration is privileged?

2. Is it your position that the "corporate forms" are themselves privileged, that is, (a) any form or template used is itself privileged; and/or (b) questions asked or information requested for which the corporate forms were prepared are themselves privileged?

3. Were the "corporate forms" filed with, submitted to, or otherwise provided to any third party or anyone outside of Chevron? If so, is it your position that the "corporate forms" as prepared are privileged?

4. You limit your declaration to the firm's work for Chevron and/or affiliates for "the last ten years." Did your firm perform any work for Chevron and/or any affiliate before "the last ten years" and, if so, what work?

5. As co-General Counsel to the firm, did the firm disclose the fact of the firm's representation of Chevron and/or foreign affiliates to Judge Kaplan in or about July 2019 at the time that attorneys from the firm were approached by and

>accepted Judge Kaplan's appointment to prosecute Mr. Donziger, and, if not, do you know why not?

Exhibit A.

Seward thus continues to stonewall. It is not clear whether Seward is doing so to protect itself for failing to disclose the full extent of the Seward-Chevron relationship either before accepting Judge Kaplan's appointment or when Mr. Donziger expressly asked the Court to conduct a judicial inquiry into the Seward-Chevron relationship. It is not clear whether Seward is doing so to hide facts that would further support Mr. Donziger's motion for disqualification. It is also not clear if Seward is stonewalling to protect Judge Kaplan from further allegations of bias if in fact Seward disclosed its attorney-client relationship with Chevron to Judge Kaplan before he appointed the Seward attorneys to prosecute Mr. Donziger anyway. Whatever the reasons for Seward's stonewalling, the damage to Mr. Donziger caused by Seward holding things too close to the vest is already irreparable.

The attorney-client privilege protects "confidential communications between a lawyer and a client relating to legal advice sought by the client." *In re Nassau County Grand Jury Subpoena Duces Tecum*, 4 N.Y.3d 665, 678 (2001). It does not protect the identity of a client [*id.* at 679], such as the identity of the Chevron foreign affiliates that attorney Hyland claims is privileged. More, "the privilege applies only to *confidential communications* with counsel . . . it does not immunize the underlying factual information . . . from disclosure to an adversary." *Niesig v. Team I*, 76 N.Y.2d 363, 372 (1990). Even a privileged communication may cease to be so if it is later disclosed to a third-party. *Ambac Assur. Corp. v. Countrywide Home Loans, Inc.*, 27 N.Y.3d 616, 624 (2016). Thus, privilege does not attach to the subject matter of the corporate forms prepared by Seward, the forms or requested information

themselves, nor the completed forms as provided by Seward or Chevron to third parties. Just the "appearance" of conflicting interests can be a factor compelling disqualification. *Tekni-Plex, Inc. v. Meyner and Landis*, 89 N.Y.2d 123, 130 (1996); *see also People v. Adams*, 20 N.Y.3d 608, 612 (2013) ("[T]he appearance of impropriety itself is a ground for disqualification . . . when the appearance is such as to 'discourage[] public confidence in our government and the system of law to which it is dedicated").

Seward claims that its work for Chevron is completely irrelevant because none of the Seward attorneys prosecuting this case performed any of the work and because the work was limited. Seward cites no authority for its position because there is none. Further, Seward has selectively revealed some details about its corporate work for Chevron, while hiding others, serving to stymie a fulsome analysis. The record before the Court compels disqualification. "An attorney's conflicts are ordinarily imputed to his firm based on the presumption that 'associated' attorneys share client confidences." *Hempstead Video, Inc. v. Incorporated Village of Valley Stream*, 409 F.3d 127, 133 (2d Cir. 2005); New York Rules of Professional Conduct 1.10(a) ("While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so . . . .").

Nor is the conflict resolved by the amount of revenue generated from the engagement. Apart from the absence of any authority supporting that view, Mr. Hyland's discussion of the fees earned by Seward for its work for Chevron omits the substantial income that Seward has enjoyed from Chevron's partners in the oil and gas industry and which Seward stands to gain from the industry because of an aggressive prosecution of Mr. Donziger.

9

Seward also ignores the inherent conflict between protecting Chevron's assertions of privilege in response to Mr. Donziger's request for information, while simultaneously acting as the sovereign in a case in which Chevron is adverse to Mr. Donziger. As the Court of Appeals instructs, because the "concept of [a disinterested prosecutor] is not altogether easy to define," "the practical impossibility of establishing that the conflict has worked to defendant's disadvantage dictates the adoption of standards under which a reasonable potential for prejudice will suffice." *Wright v. United States*, 732 F.2d 1048, 1056 (2d Cir. 1984) (citations and quotation marks omitted).

Seward's disinterestedness risks a reasonable potential for prejudice and more. Even before Seward's concealment of its attorney-client relationship with Chevron, Professor Yaroshefsky had concluded that Seward's ability to assume the mantle of the Department of Justice did not satisfy the objective standard for resolving the issue in part because "lawyers, like all people, are subject to influences that affect their decision making:"

> Inevitably, one's perspective, bounded by their role and experience, results in rationalizations in favor of clients, even if unintentionally. Even when people set out to make impartial judgments about a course of action, however, self-interest has a way of creeping in - unconsciously - to the decision process. Somehow the information is processed in a way that makes the outcome more desirable to the decision maker.

*Id.* at ¶¶ 55 (citation and quotation marks omitted); *see id.* at ¶56 ("Cognitive biases are a chronic issue is all matters, but studies point to particularized cognitive biases for prosecutors because of the significant power they wield and their unreviewable discretion").

Thus, even unaware of the Seward-Chevron attorney-client relationship, Professor Yaroshefsky had concluded that Seward's interests are so aligned with Chevron's . . . as to create a financial conflict of interest:

10

> In such a highly concentrated industry, the Seward firm's financial and business interests are dependent on the good will of Chevron and its related entities and other giants in the oil industry. Seward would not seek to act contrary to the interests of the few controlling large industry oil and gas companies and related entities.

*Id.* at ¶¶51 and 52. "It is an understatement to say that there is a potential and opportunity for bias by Seward lawyers:"

> It is equally an understatement to say that Seward counsel in the special prosecutor role undermines public trust and confidence in the perception of fairness of the legal system. The facts demonstrate a disqualifying conflict of interest under any objective standard.

*Id.* at ¶60; *see also id. at* ¶36 (prosecutors "are required to act with impartiality, neutrality and disinterestedness" in part because they are "afforded vast discretion where their decision-making is rarely transparent or judicially reviewable").

Professor Yaroshefsky's expert opinion that the Seward attorneys should be disqualified is effectively unrebutted. The professional experience of attorney Hyland, the Seward attorney who concluded in July 2019 that his Seward colleagues could stand in the shoes of the United States Department of Justice in this case [Doc 62-1], has been limited to commercial litigating for Seward's clients.[2] Attorney Hyland proffers no special expertise in professional or prosecutorial ethics.

The missteps in this case are intentional and unprecedented and can only be adequately remedied by dismissal, especially in the context of this case. Referee John R. Horan, a former Assistant United States Attorney in this District, described the Chevron Corporation's scorched-earth pursuit of Mr. Donziger as "extravagant, and at this point so unnecessary and punitive" in a "decidedly unusual" case in which Chevron's allegations of fraud were sustained

---

[2] *See https://www.sewkis.com/people/mark-hyland/.*

by Judge Kaplan alone in a civil case after the United States Attorney declined to prosecute. Doc 60-1 at 5, 10, 34. These missteps are especially at odds with the command of the United States Supreme Court that criminal contempt be invoked delicately and with great care.[3]

B.  *When Judge Kaplan concluded that he should not handle this case, he should have delegated all decisions, including designation of his replacement*

From Judge Kaplan's recent response to Mr. Donziger's pending petition for a writ of mandamus in the Court of Appeals [*In re Steven Robert Donziger*, Case No. 20-464, Doc. 35 ("Kaplan Response")], it is now clear that Judge Kaplan should not have made *any* decision in this criminal case, including which Judge should handle it, upon deciding that it should be handled by another Judge. It is Judge Kaplan's position that his apparent recusal from this criminal case was not an actual recusal. *See* Kaplan Response at 18 n 54. Judge Kaplan's position is untenable, as explained herein.[4]

In Judge Kaplan's response to Mr. Donziger's Petition for a writ of mandamus pending in the Court of Appeals, he declined to address the Petition head-on and explain why it was appropriate under the circumstances of this case for him to step aside, but still appoint the

---

[3] If the Court does not dismiss this case or otherwise disqualify the Seward attorneys, it should at least direct Seward to disclose the following information so that the Seward-Chevron relationship can be adequately evaluated: (1) the identity of the Chevron foreign affiliates for which Seward prepared corporate forms or provided legal advice; (2) any forms, templates or requests for information on which Seward relied in preparing corporate forms for the foreign affiliates; (3) the subject matter of the corporate forms and any factual information on which the legal opinions were based; (4) the corporate forms themselves if provided to any third party; and (5) any work done by Seward for Chevron or its affiliates before the last ten years.

[4] If the Court does not dismiss this case, the Court should leave no doubt that Judge Kaplan's purportedly apparent recusal is an actual recusal by recusing him *nunc pro tunc* as of July 2019, before Judge Kaplan picked his replacement and appointed Seward attorneys to prosecute Mr. Donziger for all the reasons previously stated and stated herein.

Judge and the prosecutors and make ongoing rulings that affect Mr. Donziger's rights. Instead, Judge Kaplan noted in passing, in a footnote, that judges "[o]n occasion . . . have" contempt cases handled by colleagues. *See* Kaplan Response at 48 n 146. Judge Kaplan's footnote cited to no such case, and he would be hard-pressed to argue that due process and fundamental fairness permitted him to keep this case, which is why, in fact, he recused himself, however Judge Kaplan may prefer to style the transfer.

A Judge may not be permitted to avoid the consequences of recusal by calling it something else. The Supreme Court has repeatedly expressed concern that the power of criminal contempt "often strikes at the most vulnerable and human qualities of a judge's temperament" [*Lewis v. United States*, 518 U.S. 322, 328-29 (1996)], can be abused to "give vent to personal spleen or respond to a personal grievance" [*Offutt v. United States*, 348 U.S. 11, 14 (1954)], and must therefore be exercised scrupulously and with great care. *See., e.g., Green v. United States*, 356 U.S. 165, 188 (1958).

Judge Kaplan cited general authority for a judge's discretionary power to preside over the judge's own case of contempt [Kaplan Response at 48-49], but declined to state the obvious reason why he abdicated his power to do so here: by transferring the case to Judge Preska, but labeling it as not-a-recusal, Judge Kaplan attempted to end-run the consequences of the recusal compelled by the facts of this case. He attempted to create the appearance of recusal, while retaining the right to arrange for his successor and, as established by the Petition, the power to rule in the case as he might choose. None of the cases cited by Judge Kaplan permit such mischief. *See, e.g., Goldfine v. United States*, 268 F.2d 941, 947 (1959) (finding no abuse of discretion in judge's failure to disqualify himself *sua sponte*, especially as the defendants

13

commended the judge for making "every conscious effort to be objective and impartial"); *Nilva v. United States*, 352 U.S. 385, 396 (1957) (while acknowledging that a judge might abuse discretion in retaining and adjudicating his own charges of criminal contempt, finding no such abuse in the judge's *keeping* Nilva's case); *United States v. Berardelli*, 565 F.2d 24, 30 (2d Cir. 1977) (not error for Judge Bartels to preside over contempt trial of witness who refused to testify at a trial presided over by Judge Bartels pursuant to immunity granted by Judge Bartels). *See also United States v. Rojas*, 55 F.3d 61 (2d Cir. 1995) (defendant on appeal did not challenge Judge Duffy's exercise of discretion to keep the case); *United States v. Terry*, 802 F. Supp. 1094 (S.D.N.Y. 1992) (Judge Ward *kept* Terry's case).

Judge Kaplan's discussion of the District's Rules for the Division of Business Among Judges (the "Rules") proves the point. Judge Kaplan claims in response to Mr. Donziger's Petition for a writ of mandamus that Mr. Donziger's reliance on the Rules "dooms" at least part of the Petition because the Rules vest no rights in litigants. Kaplan Response at 46. The Petition, however, presses the unremarkable point that a Judge who steps down from a case must stop making decisions that affect it.

Mr. Donziger expressly acknowledged in his pretrial motions that the Rules "do not vest rights in litigants;" rather, they reflect the unassailable principle that a judge recused is a judge recused for all purposes, including selecting his replacement. Doc 60 at 15. Though Judge Kaplan faulted Mr. Donziger for seeking to vindicate rights under the Rules that Mr. Donziger did not assert, Judge Kaplan cited Rule 14 as his authority for having Judge Preska preside over this case, expressly glossing over what Judge Kaplan described as Rule 14's "exception not relevant here." Kaplan Response at 47. The exception deemed irrelevant by Judge Kaplan is

14

Rule 16, which provides that "[i]f a judge is disqualified or if a judge has presided at a mistrial or former trial of the case, and requests reassignment, the assignment committee shall transfer the case by lot." Rule 16 does not itself vest rights in litigants, but its animating principle exists outside the cabined context of the Rules. A Judge recused is a Judge recused. Judge Kaplan does not explain why he departed from this unassailable principle, Rule 16, or both.

Nowhere in Judge Kaplan's 55-page response to Mr. Donziger's 17-page Petition did Judge Kaplan explain why he concluded that another Judge should preside over this criminal case. The answer, however, is plain: Judge Kaplan has expressed his ideological allegiance with Chevron and his personal and professional disdain for Mr. Donziger. The lion's share of lawyers and non-lawyers who have followed this case for the past decade fully understand why Judge Kaplan should not preside over this case. *See, e.g.*, Paul Barrett, *Chevron Looks to Its Home Court for a Comeback Win*, Bloomberg Businessweek, July 14, 2011 ("Kaplan has signaled strongly where his sympathies lie. He doesn't disguise his disdain for the lead plaintiffs' attorney, Steven R. Donziger"); Daniel L. Greenberg, *Judge Appointing an Attorney To Pursue Steven Donziger Is Disconcerting*, The New York Law Journal (Letter to the Editor), Aug. 21, 2019 ("to wield [criminal process] in a matter where the acrimony between the judge and counsel has been front-page news for many years brings to mind the maxim that the appearance of justice is as important as justice itself"); *Chevron Corp. v. Donziger*, 11 CV 691 (LAK), Doc. 1100 at 1-2 (attorney John Keker noting Judge Kaplan's "implacable hostility" to Mr. Donziger, and Chevron's belief that Judge Kaplan will grant meritless applications to hurt Mr. Donziger); Donziger Disciplinary Hearing at 357 (attorney Deepak Gupta: "I have never seen a judge whose disdain for one side of the case was as palpable on the bench in ways that I think may not have

always come through in the paper record. But it was fairly obvious that Judge Kaplan had great personal animosity for Steven Donziger"); James North, *"How a Human Rights Lawyer Went From Hero to House Arrest,"* The Nation, March 31, 2020 (attorney Martin Garbus: "[i]n the courtroom, Kaplan displayed a rage, a fury, that he channeled against Steve. He tried to humiliate him. You wouldn't have to be an expert on the law to recognize it. It was brutal").

More compelling than the Bar and the public, *Judge Kaplan* appears to understand why he should not preside over this case, which is why he did not exercise discretion to keep the case as did the judges in *Goldfine*, *Nilva*, *Berardelli*, *Rojas,* and *Terry*. Mr. Donziger argues in his Petition, and argues here, that nothing in the law justifies a half-recusal. Judge Kaplan's not-a-recusal recusal did not comport with the Supreme Court's command that the power of criminal contempt be invoked scrupulously and with great care.[5]

C.   *Judge Kaplan's Charges of Criminal Contempt Are Unprecedented and Insufficient*

Judge Kaplan filed charges of criminal contempt that do not meet the standard for criminal contempt. Mr. Donziger's conduct did not "constitute misbehavior which rises to the level of an obstruction of and an imminent threat to the administration of justice . . . . accompanied by the intention on the part of the contemnor to obstruct, disrupt or interfere with the administration of justice." *In re Williams*, 509 F.2d 949, 960 (2d Cir. 1975) (citing *Eaton v. City of Tulsa*, 415 U.S. 697 (1974); *In re Little*, 404 U.S. 553 (1972). By definition, criminal contempt was not "'the least possible power adequate to the end proposed'" [*United States v. Lumumba*, 741 F.2d 12, 15 (2d Cir. 1984) (*quoting Anderson v. Dunn*, 19 U.S. (6 Wheat.) 204,

---

[5] If this case is not dismissed, Judge Kaplan should be recused *nunc pro tunc* as of July 2019, and the case should start anew with a Judge from another District or, alternatively, a Judge randomly assigned. That Judge should independently appoint Seward's replacement.

231 (1821)], as Mr. Donziger had already complied with three of the orders at issue and was appealing the basis for three others.  These charges do not sound in criminal contempt.

The prosecutors fail to cite to any precedent for charges of criminal contempt that punish an attorney resisting disclosures protected by client and constitutional privileges for which the attorney could not even be held in civil contempt.  *See Maness v. Meyers*, 419 U.S. 449, 460 (1975) (a person may resist an order and not be guilty of contempt if compliance would reveal information that would cause irreparable injury); *In re Grand Jury Proceedings*, 601 F.2d 162 (5th Cir. 1979) (contempt is not necessarily proper when an order is resisted to preserve constitutional rights and attorney privileges); *United States v. Straub*, 508 F.3d 1003, 1011 (11th Cir. 2007).

Nor do the prosecutors cite relevant precedent for charges of criminal contempt based on a judge's bait-and-switch that expressly authorized an attorney to act in a certain way and then sustained his adversary's purported outrage when the attorney acted precisely as the judge had authorized.[6]  Seward with a flourish cites to occasions when Mr. Donziger purportedly failed to seek or obtain a stay of an order or file a particular notice of appeal, but criminal

---

[6] Judge Kaplan had assured Mr. Donziger in an order issued in April 2014 that he was free to help his clients fund continuing litigation efforts against Chevron and be paid from those funds for his work.  11-cv-691 Dkt. 1901 at 36.  When Mr. Donziger did precisely that, and his clients began making significant progress towards enforcing the judgment against Chevron in Canada, Chevron filed a motion in 2018 claiming that Mr. Donziger actually was *not* allowed to help his clients raise funds and get paid from those funds.  Judge Kaplan then granted the Chevron motion prohibiting this precise conduct that he previously had authorized, applied his new decision retroactively, and sanctioned Mr. Donziger by ordering him to disgorge to Chevron all the funds that Judge Kaplan has said he could earn in those previous years for his work on the case.  11-cv-691 Dkt. 1966.

contempt is reserved for "misbehavior which rises to the level of an obstruction of and an imminent threat to the administration of justice," not alleged procedural missteps for which less oppressive remedies exist.  The Seward prosecutors in their defense of Judge Kaplan give short shrift to the mountain of motions and letters filed by Mr. Donziger in opposition to Judge Kaplan's orders in which Mr. Donziger respectfully requested that Judge Kaplan address the unfairness of his rulings and permit Mr. Donziger to seek review by the Court of Appeals.

    The prosecutors claim that a decision of a private arbitration panel sitting in den Haag in the Netherlands (that is, *not* the International Court of Justice which sits in the Hague or any other quasi-government entity) shows that "Judge Kaplan was not alone" in sustaining Chevron's allegation that it was defrauded by Mr. Donziger.  Memo at 4.  In fact, Judge Kaplan is very much alone.  The government of Ecuador is currently appealing the very legitimacy of the private arbitration in the Netherlands, which barred Mr. Donziger and his clients from making arguments, presenting evidence, or even appearing.  The tribunal even refused to accept or even consider a brief *amicus curiae* from the International Institute for Sustainable Development, a widely-respected charitable organization.

    If the Seward prosecutors were truly interested in the truth as opposed to serving a more parochial master, they would not so feverishly deny the undisputed truth that Chevron's key witness in support of its allegations of fraud, an Ecuadorian judge, admitted under oath at the arbitration that he had repeatedly committed perjury at Judge Kaplan's bench trial, having been paid by Chevron a virtual king's ransom given the witness's humble circumstances.  That witness was the indisputable *sine qua non* of Chevron's claims that Mr. Donziger had fraudulently obtained the judgment in Ecuador.  Adam Klasfeld, "Ecuadorian Judge Backflips on Explosive

18

Testimony for Chevron," courthousenews.com, October 26, 2015 (the witness had "a contract with Chevron for various perks, including at least $326,000, an immigration attorney and a car, as a ' paid for" participant in the oil giant's self-styled witness-protection program").

The Seward prosecutors' claims to the contrary notwithstanding, it remains the truth that the only courts in the world (including the United States) which have heard *all* the relevant evidence against Chevron are the high courts of Ecuador, which concluded that Chevron's claim of fraud "does not lead anywhere without a good dose of imagination," and that Chevron never demonstrated fraud, which it has been claiming without any legal support." Efforts continue or will continue to enforce the Ecuadorian judgment against Chevron and its subsidiaries, as a ruling of this Court and courts of Canada an Ecuador permit. *See Chevron Corp. v. Danziger et al.*, 833 F.3d 74 (2d Cir. 2016).

Before Judge Kaplan filed his charges of criminal contempt, he urged professional discipline of Mr. Donziger, but even that effort was rebuffed. At Judge Kaplan's urging, this District's Grievance Committee referred Mr. Donziger to the First Department's Grievance Committee, recommending that the First Department invoke collateral estoppel to advance the "sincere hope" that Mr. Donziger be disciplined. Referee Horan, however, rejected Judge Kaplan's view of Mr. Donziger, recommending that a pre-hearing interim suspension of Mr. Donziger's license to practice to law be lifted. Referee Horan found that Mr. Donziger "[i]n his testimony before me . . . was candid and clear and showed no sign of dissembling or evasiveness." Exhibit A to Memo of Feb. 27, 2020 at 12, 33. Referee Horan gave less weight to Judge Kaplan's view than witnesses who testified under oath to Mr. Donziger's character, who

Referee Horan described as not the sort "who would carelessly toss off an opinion about character or misrepresent [Mr. Donziger's] reputation in the world community." *Id.* at 35.

D.      *Seward's Conflict Renders it Impossible to Comply With its Obligations*

In acknowledging their obligation to produce communications with Chevron or its agents as required by the principles of *Brady v. Maryland*, 373 U.S. 83 (1963), the Seward attorneys give us their word that they can be trusted timely to comply. Memo at 33. Their word is meaningless. These same Seward attorneys concealed Seward's attorney-client relationship with Chevron for eight months until the risk of revelation became too great; scolded Mr. Donziger for even questioning their standing as disinterested prosecutors; and continue to stonewall disclosure of non-privileged details of the Seward-Chevron relationship so that the full extent of Seward's disinterestedness can be assessed. By concealing Seward's attorney-client relationship with Chevron, these prosecutors have already violated the principles of *Brady*. They cannot be trusted to comply with it now.[7]

Respectfully submitted,

Andrew J. Frisch
The Law Offices of Andrew J. Frisch
One Penn Plaza, Suite 5315
New York, New York 10119
(212) 285-8000
afrisch@andrewfrisch.com

*Attorneys for Steven Donziger*

---

[7] Alternatively, if the case is not dismissed, the Court should (1) order the Seward attorneys immediately to produce all materials evidencing communications between Seward and Gibson Dunn related to this case; and (2) issue the same order to Gibson Dunn or permit Mr. Donziger to submit a subpoena for the Court's signature to Gibson Dunn for these materials.