# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHEVRON CORPORATION,

                 Plaintiff,

       v.

STEVEN DONZIGER, et al.,

                 Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11 Civ. 0691 (LAK)

**DECLARATION OF ANDREA E. NEUMAN IN SUPPORT OF CHEVRON CORPORA-TION'S LETTER BRIEF IN OPPOSITION TO RENEWED MOTION BY NONPARTIES JOSHUA RIZACK AND THE RISING GROUP CONSULTING, INC. FOR PAYMENT OF REASONABLE ATTORNEYS' FEES AND EXPENSES**

I, ANDREA E. NEUMAN, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I am an attorney licensed to practice law in the State of New York and before this Court.  I am a partner at the law firm of Gibson, Dunn & Crutcher LLP, and I am counsel for Chevron Corporation ("Chevron") in the above-captioned matter.  I make this declaration, based on personal knowledge, in Opposition to the Renewed Motion by Nonparties Joshua Rizack and The Rising Group Consulting, Inc. for Payment of Reasonable Attorneys' Fees and Expenses ("Letter Brief") (Dkt. 2470).  If called as a witness, I could and would testify competently as to the content of this declaration.

2.      For the Court's ease of reference, I have divided this declaration into the following topic areas: I. Rizack's Productions To-Date and Review Status; II. Billings by and Payments to Rizack's Counsel, Pre- and Post-December 3rd, and III. Invoice Issues With And Payments to Rizack's Forensic Expert, Crypsis.  Separate from Rizack's counsel and Forensic Expert, who

have billed Chevron a combined total of $585,084.15, Chevron has also received two invoices from Rizack Counsel's document review vendor, Epiq, totaling $19,597.50 for services rendered within the agreed upon budget, to which it has no objections.

3.      On the whole, Rizack accuses Chevron of "overwrought litigation tactics" and refusing to make payments.  Letter Brief at 1-2.  Rizack also contends that his production is complete and his Letter Brief not premature.  The facts of which I have personal knowledge contradict these assertions.

4.      The disputes Chevron has had regarding amounts invoiced by Carlton Fields and Crypsis, respectively, have been timely raised and pursued in good faith, as detailed further below. In sum, the delays in assessing and paying Crypsis bills were driven by Carlton Fields's multi-month delay in sending me the bills in the first instance and then a further multi-month delay before adequate invoices with appropriate descriptions of the work were received.  Nonetheless, Chevron agreed to pay both the undisputed amounts invoiced by Carlton Fields and Crypsis before Rizack filed his Letter Brief.  And my associate Ashley Fernandez and I had expressly confirmed that the Crypsis payment would be made before April 26, 2019, per the Protocol.  Indeed, as a practical matter, both payments would likely have issued before the Letter Brief was filed—though Chevron had no advance notice of the filing—but for pandemic-related challenges.

5.      As to Chevron's ability to complete an analysis of the Rizack production to date, this has been hampered by the fact that, since November 25, 2019, Rizack made no productions and then made a single production to Chevron on March 20, 2020, even though the Protocol provided for rolling productions.  Rizack then promptly filed his renewed motion for pre-December 3, 2019 attorneys' fees, without any meet-and-confer or notice on that issue and before producing

the four invoices on which that renewed motion is based.  Chevron thus had no opportunity to meet-and-confer on the relief sought in the letter brief as to pre-December fees before it was filed.

6.     Additionally, I was out of the office beginning on March 16, 2020 and Rizack's counsel should have received an out-of-office notice letting them know that I was likely unavailable until April 1, 2020.  During that time, I relocated my family outside of New York State to a location with lower risk of the COVID-19 issues that were then being predicted as likely to impede access to emergency medical care in New York as I have an extremely medically fragile son who requires access to emergency medical care for life-threatening issues on an unpredictable basis. While this contributed in part to the delay complained of, none of these issues were created by or should be attributed to Chevron, nor were any of the disputes raised for the purpose of any improper or unreasonable delay.

**I.     Rizack's Productions To-Date and Review Status**

7.     Since the Review, Production, and Forensic Inspection Protocol ("Protocol") was entered on October 7, 2019 (Dkt. 2362),  Rizack has made 3 productions totaling 4,767 documents:

- 1,504 documents were produced on October 30, 2019;

- 189 documents were produced on November 25, 2019; and

- 3,074 documents were produced on March 20, 2020.

8.     Attached hereto as **Exhibit 1** is a true and correct copy of an email from Alex Silverman to Andrea Neuman and Ashley Fernandez dated March 20, 2020 with the subject title "Chevron/Rizack Document Production" attaching a document titled "Rizack Privilege Log [03.20.2020]," which describes documents over which Rizack asserts attorney-client privilege and/or attorney work product.

9.     Attached hereto as **Exhibit 2** is a timeline depicting when Rizack sought and obtained legal advice from Stephen Wirth.

10.      Given the challenges of the current working environment—which were especially concentrated in late March and early April—and lacking advance notice of the March 20, 2020 production date, Chevron has not yet completed its review and analysis of Rizack's production.

11.      To date, Chevron has determined that Rizack's post-Protocol productions contain approximately 2,500 documents than were absent from Rizack's prior productions.  It should be noted that both his pre- and post-Protocol productions contain many near-duplicates and, as such, it is not possible to give precise document counts that exclude duplicates or near-duplicates.

12.      Pursuant to the Protocol, the parties agreed that Rizack's counsel would make rolling productions beginning with all the communications with Mr. Donziger, Protocol ¶ 9(a)—given that those could be pulled while other search terms continued to be narrowed, the high likelihood of relevance, and, per Chevron's view, the inapplicability of any privilege.  Specifically, the parties agreed that "Rizack's counsel *shall* prioritize the production of Documents sent to or from Donziger and *shall* make all good faith efforts to produce those documents by October 30, 2019."  Protocol ¶ 9(a) (emphasis added).  After making two initial productions, Rizack's counsel informed us on November 25, 2019, that he had produced nearly "all of the 'to/from Donziger' documents in the database" and that they would let us know if a "significant number of new files" were found.  Attached hereto as **Exhibit 3** is a true and correct copy of an email chain between Ashley Fernandez (counsel for Chevron) and Alex Silverman (counsel for Rizack) dated November 25, 2019 with the subject title "RE: Chevron-Rizack Protocol."  We have now determined, however, that four months later, on March 20, 2020, Rizack produced at least an additional 1,800 documents that comprised communications with Donziger.  No explanation was provided prior to or with the production as to why these documents were not produced in the fall of 2019 as agreed.  These additional Donziger documents were thus not available when Rizack's original fee motion

was briefed.  *See* Dkt. 2400 at 7-8 (claiming Rizack "thus far complied with all of his obligations under the Protocol," including productions of communications with Donziger).

13.     Finally, while we have not yet completed our review of Rizack's March 20, 2020 production, we noticed that certain attachments to responsive documents have not been produced. In response to our concern, Mr. Silverman told us that there were 6,900 documents associated with the documents produced ("family" documents) on March 20, 2020—more than double the initial production.  As the email exchange confirms, the parties had competing understandings as to the documents that would be produced.  Rizack produced only documents that actually hit upon a search term and omitted attachments families that did not hit upon a search term.  In our typical practice, when one document in a family is produced as responsive so is the rest of the family without a separate responsiveness review.  Accordingly, Chevron agreed and understood that Epiq (Rizack's document review vendor) would review only documents with hits and whether that document was responsive would determine the responsiveness of family documents which would not need to be independently reviewed for responsiveness.  Rizack's counsel had a different understanding and the parties are in the process of addressing this issue further.  Attached hereto as **Exhibit 4** is a true and correct copy of an email chain between Ashley Fernandez and Alex Silverman dated April 17, 2020 with the subject title "RE: Chevron/Rizack – Production."

14.     Attached hereto as **Exhibit 5** are highlighted excerpts from a true and correct copy of the transcript of the hearing held in this matter on September 13, 2019.

15.     Attached hereto as **Exhibit 6** are excerpts from a true and correct copy of the transcript of the deposition of Joshua Rizack on October 5, 2018.

16.     Attached hereto as **Exhibit 7** is a true and correct copy of an email dated September 20, 2015 from Joshua Rizack to Steven Donziger with the subject title "proposed budget" produced by J. Rizack and bearing Bates number RIZ00008157, in which 3Rizack advises on a budget and

states, "Don't make the mistake of asking for 1 year of funding.  How long will it take to get to the end game in Canada?  Alan [Lenczner, LAP's enforcement counsel in Canada] needs to agree to a fixed monthly cap amount that will get to the supreme court if necessary."

17.     Attached hereto as **Exhibit 8** is a true and correct copy of an email dated February 12, 2015 from Steven Donziger to Joshua Rizack with the subject title "how does this sound in event we need to use it; call and let's catch up" produced by J. Rizack and bearing Bates numbers RIZ00009275-76, containing a draft document concerning a potential settlement between Chevron and Mr. DeLeon (an investor).

18.     Attached hereto as **Exhibit 9** is a true and correct copy of a text message dated November 23, 2016 from Steven Donziger to Joshua Rizack produced by J. Rizack and bearing Bates number RIZ00004294, in which Donziger states, "Start thinking about a new phase of fund-raising strategy."  Attached hereto as **Exhibit 26** is a true and correct copy of a text message dated November 23, 2016 from Steven Donziger to Joshua Rizack produced by J. Rizack and bearing Bates number RIZ0004295, in which Donziger states, "People we can hit up for 100 to 200 especially after we get that court decision out of Canada."

19.     Attached hereto as **Exhibit 10** is a true and correct copy of an email chain dated March 3, 2016 between Joshua Rizack and Steven Donziger with the subject title "for ecuador court order" produced by J. Rizack and bearing Bates numbers RIZ00008654-55, in which Donziger asks Rizack if he has "any ideas" on a document discussing a potential motion seeking to prevent Chevron from interfering with execution of the Ecuador Judgment.

20.     Attached hereto as **Exhibit 11** is a true and correct copy of an email chain dated October 7, 2016 between Jay Goldstein (counsel for an investor) and Joshua Rizack with the subject title "RE: Wellbeck Partners Signatures" produced by J. Rizack and bearing Bates number

RIZ00006601, in which Goldstein states "Please see the attached signed paperwork per your request" and attaches a signed letter from Jay Goldstein to Alan Lenczner, stating in part, "all funds to be wired into attorney escrow account should be distributed in accordance with the US Representative instructions," produced by J. Rizack and bearing Bates numbers RIZ00006602-6612.

21.     Attached hereto as **Exhibit 12** is a true and correct copy of a text message dated October 18, 2016 from David Yass (Rizack's friend whom he solicited) to Joshua Rizack produced by J. Rizack and bearing Bates number RIZ00004263, in which Yass states, "The lawyer here now has the funds and can wire out in the next 2 days."

22.     Attached hereto as **Exhibit 13** is a true and correct copy of an email chain dated October 24, 2016 between Aaron Marr Page and Joshua Rizack with the subject title "RE: critical -- need new investor papers asap" produced by J. Rizack and bearing Bates number RIZ00006529-6530 in which Rizack is asked to "work [] up" Watson's investment agreement and uses the abbreviation "jvm." Attached hereto as **Exhibit 25** is a text message dated November 23, 2016 from Steven Donziger to Joshua Rizack produced by J. Rizack and bearing Bates number RIZ00004318, in which Donziger states, "I need a list of all the contracts whether u have them or not please.  Send what u have again with the list.  Consult Aaron if necessary.  Thanks.  This is part of your responsibilities I can't d" [sic].     Attached hereto as **Exhibit 27** is a text message dated November 6, 2017 from Steven Donziger to Joshua Rizack produced by J. Rizack and bearing Bates number RIZ00004454, in which Donziger states, "Call me.  Meeting w huge fund today."  That same day, Donziger met with representatives of Elliott Capital Management to solicit funds.  ECF 1966 at 2.

## II.     Billings by and Payment of Rizack's Counsel Carlton Fields Pre- and Post-December 3rd

*Post-December 3rd Rizack Counsel Fees*:

23.     On January 6, 2020, this Court ordered Chevron to "pay reasonable attorneys' fees and expenses incurred by Rizack in his efforts to comply with the subpoena," since December 3, 2019.  Dkt. 2438.  Prior to the filing of Rizack's Letter Brief, I had received Carlton Fields's invoices for December 2019 through February 2020.  The first of these invoices was received on January 30, 2020.  Rizack Ex. 9.  While Chevron did not dispute any items on reasonableness, efficiency, or other grounds where the time spent was related to subpoena compliance, the invoices were not payable as sent because they included fees and expenses that were not incurred "comply[ing] with the subpoena."  Dkt. 2438.

24.     My associates and I have thus reviewed each Carlton Fields invoice and marked the time related to subpoena compliance that Chevron would be paying for and noting that the remainder was not within the Court's order.  These marked invoices were provided to Carlton Fields along with confirmation of Chevron's willingness to pay all the fees "incurred comply[ing] with the subpoena," and seeking to reach agreement on the legal services within the Court's order.  *E.g.*, Rizack Ex. 12.  In response, Carlton Fields took the position that "all of the entries on the bill [were] covered by the Court's order."  Attached hereto as **Exhibit 14** is a true and correct copy of an email chain between Ashley Fernandez and Michael Yaeger dated February 26, 2020 with the subject title "RE: Bill for December 2019."

25.     Examples of time for which Carlton Fields invoiced Chevron to which Chevron objects as outside the scope of the Court's January 6, 2020 order include:  The time that Carlton Fields spent researching and drafting Rizack's reply brief in support of his motion for attorneys' fees;  time spent on the task "REVIEW PAGE CONTEMPT ORDER" and to "DRAFT ASSIGNMENT OF INTEREST" and related legal advice that they gave Rizack in that regard; and time

spent researching Rizack's redaction of documents on improper relevance grounds. *See generally*, Rizack Ex. 9.

26.     Following our invoice review and designation of time spent on subpoena compliance issues versus time spent providing other legal services to Rizack, we have calculated the number of hours spent in each category and the related fees as shown on Carlton Fields invoices for fees incurred from December 2019 through March 2020 and concluded that, in total, there are $85,074 fees for subpoena compliance and $90,321.24 fees for other services. Attached hereto as **Exhibit 15** is a month-by-month chart containing these amounts and highlighted copies of Carlton Fields's invoices for that period from which the amounts were calculated.

27.     On the issue of payment to Carlton Fields and the timeliness thereof, the first Carlton Fields invoice was received on January 30, 2020 and Carlton Fields was aware that invoice processing, excluding objection issues, was generally a 60-day process, as that timing issue had been raised and addressed as to Crypsis's invoices during the Protocol negotiations. Chevron provided Carlton Field's with a highlighted version of its January invoice identifying fees objected to as not related to subpoena compliance on February 26, 2020. Rizack Ex. 12. While the payment of the undisputed portion of Carlton Fields's initial invoice was delayed by unanticipated pandemic issues, on April 7, 2020 we informed Rizack's counsel that Chevron would be paying $46,570 to Carlton Fields for all their fees related to complying with the subpoena from December 3, 2019 through February 2020. Attached hereto as **Exhibit 16** is a true and correct copy of an email chain between Ashley Fernandez and Michael Yaeger dated April 7, 2020 with the subject title "RE: Rizack bill" attaching highlighted copies of Carlton Fields's January and February invoices. That was the total of the undisputed fees that had been billed as of that date and that payment has been

made.  Chevron has since received a Carlton Fields bill for March time of which $38,504 relates to subpoena compliance and is processing that invoice for payment.

28.     Despite not pursing reasonableness objections as to time spent on subpoena compliance, we would note that Carlton Fields engaged a vendor (Epiq) to conduct a first-level review. Chevron received a budget from Epiq and the February and March invoices it has received fall within the allocated budget, appear reasonable, and are being paid.  Chevron has no information on the number of documents elevated for Carlton Fields's review, but the bulk of the documents produced were communications with Donziger and, thus, did not implicate any privilege and presumably required no or minimal relevance review.  Nonetheless, Carlton Fields has billed over 40 hours for document review time through the end of March.  We would also note that although Chevron suggested the use of software to eliminate "near duplicates," Rizack's production contains many near duplicates.  We do not know whether the software was utilized and proved ineffective or whether it was not utilized.  Attached hereto as **Exhibit 17** is a true and correct copy of an email chain between Ashley Fernandez and Alex Silverman dated February 12, 2020 with the subject title "RE: Chevron/Rizack Search Results" referencing the elimination of near duplicates.

*Pre-December 3rd Rizack Counsel Fees:*

29.     At no time prior to filing Rizack's renewed motion for fees did Rizack's counsel meet-and-confer with respect to whether Chevron would pay any of their reasonable pre-December 3, 2019 attorneys' fees and costs.  Nor did Rizack's counsel provide Chevron with any of its pre-December 3, 2019 invoices prior to Rizack's filing of his Letter Brief.  There was thus no opportunity to meet and confer on the issue of whether Chevron would agree to pay any portion of Rizack's pre-December attorneys' fees before the motion was filed.

30.    As to the total amount claimed in the Letter Brief for pre-December fees, Mr. Sil-verman's declaration states that Carlton Fields's fees incurred prior to December 3, 2019 are $272,973.10, but our calculation of the total invoices attached to Mr. Silverman's declaration as Exhibit 11 is $274,632.66.

31.    Since receipt on April 6, 2020, Chevron has been able to review the claimed fees and expenses and, applying the reasoning from the Court's January 6, 2020 Order (Dkt. 2438), calculated the number of hours spent complying with the subpoena for Rizack's pre-December 3, 2019 attorneys' fees and costs as $144,418.50 versus total fees billed of $274,632.66 for this pe-riod.  Attached hereto as **Exhibit 18** is a month by month chart containing these amounts and the highlighted copies of Carlton Fields invoices for that period used to calculate that amount.

32.    In making the determination of amounts related to subpoena compliance and those that are unrelated, Chevron again did not make any adjustment to the billing based on whether the amount of time spent on any one task was reasonable or reflected any inefficiencies or other issues, but rather solely distinguished between whether the task was carried out in complying with the subpoena.  Though not pursuing reasonableness objections, if the Court awards pre-December attorneys' fees as Chevron understands and has applied that standard in Exhibit 18, Chevron notes that there were issues created by Carlton Fields that did drive up costs during this earlier timeframe. For example, the parties spent several months working to adjust search terms to reduce the hits to ultimately approximately 59,000 documents (excluding families) with the understanding that search terms would be treated as "or" not "and".  We determined from analyzing the data output however that this was not the case.  We raised the issue with Carlton Fields and they agreed that the searches were improperly run.  Attached hereto as **Exhibit 19** is a true and correct copy of an

email chain between Alex Silverman and Ashley Fernandez dated January 13, 2020 with the subject title "RE: Chevron/Rizack", the attachments of which have been omitted.  This meant that all the prior search hit data that was reviewed was in error and that the search terms had to be re-evaluated in light of this correction despite all prior time spent on this issue by Chevron and its forensic expert.

33.    Where the fees were incurred for work outside the scope of subpoena compliance as determined from our review as to either pre- or post-December 3rd fees, Chevron has not addressed reasonableness and would reserve any objections to the reasonableness of those fees should that become an issue.

III.    **Invoice Issues With and Payments to Rizack's Forensic Expert, Crypsis**

34.    In addition to moving for attorneys' fees and costs accrued prior to December 3, 2019, Rizack moves for payment of Crypsis's undisputed and disputed fees.  The Protocol expressly provides for the handling of undisputed and disputed Crypsis fees and Chevron had informed Rizack's counsel *prior* to the filing of his Letter Brief that, consistent with the terms of the Protocol, Chevron would be paying Crypsis's undisputed fees before April 26, 2020, and that it needed additional information on other issues related to Crypsis's billings before agreement on the currently disputed fees could be reached.  Rizack Ex. 8 at 2-3.

35.    Crypsis's work under the Protocol fell into 2 categories (Paragraph 5 and Paragraph 8) and Crypsis's disputed fees fall into the same 2 categories, as well as a third category for Crypsis charges falling outside the Protocol.  Specifically, under the Protocol, Crypsis had two tasks: (1) Pursuant to Paragraph 5, Crypsis was to forensically image and preserve Rizack's devices and media; and (2) Pursuant to Paragraph 8, Crypsis was to forensically analyze the images to "identify any evidence that relates to the integrity, authenticity, and completeness of the data held on the

Images" and "review activity involving the deletion, obfuscation, or destruction of any files from March 4, 2014 through the date on which a particular Image was created." Protocol at ¶¶ 5, 8. Crypsis's work in Category 2 was capped at a Crypsis-developed budget of $70,000, and its work in Category 1 was anticipated to be an insignificant cost item. *See* Protocol at ¶ 3. Attached hereto as **Exhibit 20** is a true and correct copy of an email chain between Michael Yaeger and Ashley Fernandez dated October 21, 2019 with the subject title "RE: Chevron-Rizack Protocol" attaching the Forensic Recovery Protocol confirming that the Crypsis budget was set "in the range of $60,000 to $70,000 USD" and that "Crypsis' work on this portion of the matter will not exceed $70,000 without additional approval from Chevron." This document also provides that the parties' experts would meet and confer if "any exceptions or other issues that prevent[ed] this protocol from being carried out as written" arose. *Id*. Crypsis was also required to bill Chevron "on a monthly basis" and provide sufficient detail as to "the amount due, description of the work and related unit cost, and hours worked" because the parties had agreed that Chevron would be entitled to review and approve Crypsis's invoice and would <u>not</u> "pay for any work that Rizack's Expert performs beyond the scope of this Protocol including, but not limited to, any work under the exclusive direction of Rizack's counsel in connection with any dispute between the parties to this Protocol." Protocol at ¶ 3.

36.     With regard to Crypsis's Paragraph 8 fees, Chevron objects to charges in excess of the agreed upon $70,000 budget and, separately, has reasonableness inquiries. With regard to Crypsis's Paragraph 5 fees, Chevron's objections are limited to specific reasonableness inquiries. With regard to Crypsis's fees falling outside Paragraphs 5 and 8, Chevron objects to some of these as either expressly excluded from payment by the terms of the Protocol or unreasonable. Some of these issues may have been resolvable pending discussions and negotiations with Crypsis without

the necessity of briefing, but any negotiation or any further discussion of disputed amounts has been unilaterally rejected by Carlton Fields.  There is no referenced exhibit for **Exhibit 21**.

***Rizack's Delayed Submission of Crypsis's Invoices and Invoice Insufficiency***

37.     Rizack's counsel did not send Chevron any Crypsis invoices on the monthly basis that the Protocol required until December 2019—though Carlton Fields was apparently in receipt of Crypsis's invoices beginning in October 2019.  Specifically, due to what Carlton Fields described as an "oversight," it was only on December 5, 2019 that I first received Crypsis's invoices for fees dating back to September 2019.  Attached hereto as **Exhibit 22** is a true and correct copy of an email chain between Michael Yaeger and Andrea Neuman dated December 6, 2019 with the subject title "Re: Invoice for Crypsis."  The September and October Crypsis invoices received on December 5th totaled $56,707.50.  Rizack Exs. 1, 2.

38.     On December 17, 2019, Rizack's counsel sent the November Crypsis invoice stating it was "an invoice for Crypsis's billing through November (it is cumulative for all amounts through November)."  Rizack Ex. 3.  The total on the invoice was $59,006.25, which we initially understood pursuant to the noted parenthetical language to be the "cumulative" total amount then due from Chevron.

39.     When we undertook to review Crypsis's October – December bills for reasonableness and budget compliance, in consultation with Chevron's expert Mr. Lynch, we determined and Mr. Lynch confirmed that the invoices were so vague as to be unusable in determining whether the work being billed for fit within the Protocol parameters or the Paragraph 8 budget, or was substantively reasonable.  Lynch Decl. ¶¶ 6-7 *see* Rizack Exs. 1, 2.  For example, most entries simply provided: "Work on data recovery under Forensics Protocol" or "Data collection" without

any further elaboration.  *See* Rizack Exs. 1, 2.  Had we received Crypsis invoices starting in October, their adequacy could have been raised and addressed months earlier.

40.     On February 26, 2020, Rizack's counsel provided adequate revised Crypsis invoices.  Rizack Ex. 7 at 2.  The cover email clarified that Crypsis's fees to date were not $59,000—notwithstanding that their email described Crypsis's November bill as "cumulative"—but over $135,000.  We have since reviewed those invoices for reasonableness and Protocol compliance and identified "undisputed" versus "disputed" Crypsis fees per the Protocol.

***Chevron's Dispute of Crypsis's Paragraph 8 Fees in Excess of the Protocol $70,000 Budget***

41.     On November 27, 2019, before I had received any Crypsis invoices, Rizack represented to the Court that Crypsis's work was "now substantially complete."  Dkt. 2400 at 8 (statement made by counsel, no supporting Crypsis declaration was filed).  A week after this representation to the Court by counsel, in a December 5, 2019 email Rizack's counsel requested "an additional $40K of budget [for Crypsis] to complete the work under the protocol" because "unusually high file count with multiple duplicates from different points in time across all computers made the process take longer than expected to analyze and quality check" and "a large collection of email in a Mac format that required conversion."  Given the inconsistency between the representation to the Court that Crypsis's work was "substantially complete" and a request for a 60% budget increase so that Crypsis could "complete the work", Chevron informed Rizack's counsel on December 12, 2019 that it would "not agree to an increase in the budget under current circumstances" and asked that Rizack's counsel "ensure that Crypsis performs no work in excess of the approved budget."  Attached hereto as **Exhibit 23** is a true and correct copy of an email chain between Michael Yaeger to Andrea Neuman dated December 12, 2019 with the subject title "Crypsis' Budget."

42.     While only in receipt of the initial, vague invoices described above, I requested to speak with Crypsis in December for three reasons:  (1) to obtain clarification as to what work Crypsis had and had not completed to date under the relevant Protocol paragraphs, which could not be determined from their insufficient invoices; (2) to determine why Crypsis was requesting such a significant increase in their Paragraph 8 budget, especially as counsel had represented to the Court that their work was "substantially complete"; and (3) to determine whether approval of an additional budget and the related work was an appropriate use of client resources or whether Crypsis's work completed as of that time had, in fact, fulfilled the purpose of the Protocol and thus the unanticipated cost could be avoided.  Carlton Fields agreed to a call, which was scheduled for January 17, 2020.

43.     On the January 17, 2020 call, Kevin Faulkner of Crypsis, Alex Silverman of Carlton Fields, Ashley Fernandez of Gibson Dunn, and I spoke for approximately 30 minutes.  Rizack's allegation that I attempted to "depose" Mr. Faulkner during this call has no basis in fact.  To address whether $40,000 in additional work was necessary to accomplish the Protocol's purpose of determining whether there was a destruction/deletion issue with Rizack's devices, I asked Mr. Faulkner early in the call if Crypsis had performed enough work to confirm that the destruction of documents was not an ongoing issue of concern with Rizack's devices.  In response, Mr. Silverman instructed Mr. Faulkner not to answer that question or any questions related to any conclusions he had reached in performing the forensic analysis.  I explained to Mr. Silverman that this significantly limited our ability to assess the necessity or reasonableness of the substantial budget increase requested, but accepted his position on the instruction and moved to the remaining topics. I also asked Mr. Faulkner what Protocol tasks were not yet completed and he stated that Crypsis's primary remaining task was drafting the report(s) set forth in the Protocol.  What I did not know

at the time of this January call–and what was not revealed during the call–was that Crypsis had begun exceeding its $70,000 Paragraph 8 budget in mid-November and by the time of the January call was already $30,350 over that budget.  Thus, I assumed based on the call that the additional $40,000 being requested was essentially for report writing.  This did not appear reasonable given that, among other reasons, the cost of any reports had been included in the original $70,000 budget. Rizack Ex. 6 at 3 ("In the original Crypsis budget was there $40,000 budgeted for reports? If not, how much of the original $70,000 budget was budgeted for reports and why is the amount currently claimed to be $40,000?").

44.     Following the call, given Rizack's prior representation to the Court that Crypsis's work was nearly complete, as well Mr. Faulkner's confirmation that the primary task outstanding was writing formal reports, we affirmed that Chevron would not approve an additional $40,000 budget.  We further detailed Chevron's concerns, confirmed by its consultation with its own forensic expert, as to the lack of detail on Crypsis's invoices, raised issues as to why neither Chevron nor Chevron's expert was consulted before Crypsis had exhausted the $70,000 budget, and inquired as to why Crypsis expended most of the initial $70,000 budget recovering files if Rizack had not deleted documents.  Lynch Decl. ¶¶ 6-7, 12.  Of particular concern was why Mr. Faulkner did not meet-and-confer with Mr. Lynch, as required under the Forensic Recovery Protocol if an unexpected amount of time and expense was required in his efforts to comply with the protocol. Lynch Decl. ¶ 12.  The reasons for the  failure to seek timely approval of a budget increase have never been addressed by Carlton Fields or Crypsis.  *See* Rizack Ex. 6 at 2-3.

45.     The Crypsis invoices provided in late February, which allowed a review of Crypsis's work by Protocol task for the first time, revealed however that Crypsis had exhausted nearly half of its Paragraph 8 budget *within the first 10 days* of performing tasks under Paragraph 8, from

October 23, 2019 through November 2, 2019, and then began exceeding its budget on November 12, 2019, just a few weeks after the budget was agreed to and before any budget increase was requested.  Rizack Ex. 7 at 8.  It is thus difficult to discern any valid reason that this budget issue was not promptly noticed and raised with Chevron.  Whatever the reason that was not done, the result was that Chevron was never given the opportunity to approve the budget increase before the Crypsis fees were incurred, but rather had been provided incomplete information throughout the discussions of the post-hoc budget increase request such that Chevron's time spent on that issue was misdirected and wasted and it was prevented from narrowing the scope of Crypsis's work if appropriate

46.    As to the factual contention that the requested budget increase or ultimately the budget overage and Crypsis's efforts were "proportional to (a) the rigorous and time-consuming process that Mr. Faulkner and Mr. Lynch, on Chevron's behalf, agreed was appropriate and nec-essary to thoroughly search for evidence of data destruction, combined with (b) the voluminous and duplicative manner in which Mr. Rizack stored his data across multiple devices," Rizack Ex. 7, and partially explained by the "large collection of email in a Mac format that required conver-sion," Ex. 23: (1) the "rigorous" process was known and discussed in order to develop  the Para-graph 8 budget, Lynch Decl. ¶ 4, so that does not explain the overage; (2) the "Mac format" issue appears to have arisen on November 21, 2019, after the exhaustion of the budget, and is included with other charges that appear to total $2,612.50 and thus, while the precise cost of the "Mac issue" cannot not be determined, it does not appear significant, Rizack Ex. 7; and (3) while the "file recovery" efforts do appear as a significant cost driver for Paragraph 8 fees, in consultation with Chevron's forensic expert Mr. Lynch, Ashley Fernandez and I noted, and communicated to

Rizack's counsel, that we questioned Crypsis's efficiency in performing the file recovery, includ-ing spending 91 hours ($50,050) on the single task "Recover files and compare anything recovered with active files" and many more hours "QC"ing those same efforts.  Rizack Ex. 7 at 8; Lynch Decl. ¶ 11.  Despite these types of concerns, Chevron agreed to pay the full $70,000 Paragraph 8 budget as "undisputed" given that, even if this and other apparent inefficiencies in Paragraph 8 were addressed with appropriate reductions, the agreed budget had nonetheless likely been ex-pended.

***Chevron's Objections to Crypsis's Paragraph 5 Fees***

47.     Crypsis's invoices include $18,343.75 in charges for what appear to be performing the Paragraph 5 tasks of imaging  the devices of a single custodian (Rizack).  As these were antic-ipated to be fairly insubstantial fees, they were excluded from the Crypsis budget by agreement.  I was therefore surprised by these charges.  Upon review and in consultation with Chevron's foren-sic expert, Lynch Decl ¶ 10, we objected to Crypsis spending 22.25 hours collecting the data from Rizack's images and another 19.5 hours making copies of those images—$17,493.75 in charges–as not reasonable.  Rizack Ex. 7 at 8.  Our forensic expert informed us that the amount of time spent imaging a single individual's devices was "on the high side" and that "it [did] not seem reasonable to bill nearly the same amount of time to copy those same images" and explained why that was the case.  Lynch Decl. ¶ 10.  Chevron has already paid $850 (the cost of the hard drives used to make copies of Rizack's devices) and because Carlton Fields has refused to enter into any discussions or negotiation as to the other Paragraph 5 tasks' reasonableness, I have been unable to ascertain the reason these standard tasks resulted in atypically high fees.  Given Chevron's forensic expert's views on these charges and absent further information, Chevron has processed payment

for the cost charged for imaging the devices and half the cost charged for copying the devices—$13,325 in total.

***Chevron's Objections to Crypsis Fees For Work Outside the Protocol***

48.     Finally, of the $16,362.50 of work Crypsis billed for tasks falling outside the Paragraph 5 and 8 Protocol categories, Chevron has paid $4,950 for time Crypsis spent negotiating and drafting the Forensic Recovery Protocol with its forensic expert.  Chevron objected to the following Crypsis's tasks that were incurred outside Protocol parameters but billed to Chevron:

- $6,875 in litigation support provided to Rizack's counsel by Crypsis prior to the Protocol being finalized, which is excluded from payment by the Protocol which states in Paragraph 3, "Chevron will not pay for any work that Rizack's Expert performs beyond the scope of this Protocol including, but not limited to, any work under the exclusive direction of Rizack's counsel in connection with any dispute between the parties to this Protocol"; and

- $4,537 spent by Crypsis to revise its invoices so that they could be analyzed consistent with the terms of the Protocol, which is not a typical client cost and could have been easily avoided had Rizack's counsel and Crypsis provided adequate invoices in the first instance.

***Chevron's Payment of Crypsis's Undisputed Fees to Date***

49.     Upon receipt of the detailed Crypsis invoices in late February, we confirmed that Chevron would review the bills and pay all undisputed amounts within 60 days as required by the Protocol.  Rizack Ex. 8.  When Chevron and Rizack negotiated the 60-day term in September 2019, Chevron explained then that invoices could not be "reviewed, processed and paid in less than 60 days."  Attached hereto as **Exhibit 24** is a true and correct copy of an email chain between Alex Silverman, Michael Yaeger, Andrea Neuman, and Ashley Fernandez dated September 26, 2019 with the subject title "Re: Chevron/Rizack".

50.     On April 7, 2020, Chevron further informed Rizack's counsel that it would be making a payment for the full budgeted amount of $70,000 plus the Paragraph 5 fees associated with

copying the images and the fees Crypsis incurred negotiating the Forensic Recovery Protocol—

$75,800 total—notwithstanding its objections to many of Crypsis's costs, and asked to meet-and-

confer as to all disputed fees.  Rizack's counsel declined to meet-and-confer further.  Ex. 21.  That

payment has been made, and as noted above, Chevron has also processed an additional $13,325

for assumed reasonable Paragraph 5 fees.

Executed on this 20th day of April, 2020 at Kailua-Kona, Hawaii.

*/s/ Andrea E. Neuman*

Andrea E. Neuman
