## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

CHEVRON CORPORATION,

                                        Plaintiff,

                -against-                                          11 Civ. 0691 (LAK) (RWL)

STEVEN DONZIGER, *et al.*,

                                        Defendants.

### Declaration of Kevin T. Faulkner in Further Support of Renewed Application by Nonparties Joshua Rizack and The Rising Group Consulting, Inc. for Reasonable Attorneys' Fees and Expenses

I, Kevin T. Faulkner, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I am a Vice President of The Crypsis Group ("Crypsis") and make this declaration based on my personal knowledge.

2.      I have over 16 years of experience in digital forensics and incident response, and over 21 years of experience working in technology. I have been working for Crypsis for 14 months. Prior to working for Crypsis, I worked at Stroz Friedberg as a Managing Director and head of the U.S. national digital forensics and incident response practice. I have testified, submitted affidavits, declarations, witness statements and/or expert reports in my capacity as a digital forensic expert approximately 50 times. In the last ten years I have offered testimony in the following courts:

- Connecticut Superior Court, Hartford, Complex Litigation

- New Jersey Superior Court, Somerset County – Law Division

- United States Bankruptcy Court, District of Delaware

- United States District Court for the District of Maryland

- United States District Court for the District of Massachusetts

- United States District Court for the Eastern District of New York

- United States District Court for the Northern District of California

- United States District Court for the Northern District of New York

- United States District Court for the Southern District of New York

3.     I was retained by counsel for Nonparties Joshua Rizack and The Rising Group Consulting, Inc. (collectively, "Rizack") in August 2019, before the Court implemented the Review, Production, and Forensic Inspection protocol that was ordered on October 7, 2019 (the "Order").

4.     After being retained, but prior to the Order, I consulted with Rizack's counsel regarding the technical aspects of certain procedures that Chevron proposed incorporating into a final protocol. This included, by way of example, procedures outlined in what eventually become Paragraph 5 of the Order. I also consulted regarding certain other items during negotiations between Rizack and Chevron, including as to the technical significance of language in earlier protocol versions proposed by Chevron. It was my opinion that certain language would have been imprecise from technical perspective (e.g., certain industry language contained in what eventually became Paragraph 5(a)).

5.     Once implemented, the Order required that I confer with Chevron's forensic expert, Spencer Lynch of Stroz Friedberg, to agree to a protocol to forensically analyze the data that I and my team at Crypsis collected from Mr. Rizack's devices and media accounts. As Mr. Lynch accurately states in his April 20, 2020 declaration (Dkt. 2481), he and I spent several hours discussing what steps should be taken to implement Crypsis' work under the Order. As a result of those conversations, we agreed to a series of steps that were memorialized in a document, entitled "Forensic Recovery Protocol" (hereinafter the "Protocol"). Lynch Decl., Ex. A.

6.     I submit this declaration to address discrete issues Chevron has raised concerning Crypsis' invoices for the consulting work I performed on this matter, which, pursuant to Paragraph 3 of the Order, are to be paid by Chevron. These issues were raised in Chevron's Opposition Letter (Dkt. 2480), the Lynch Declaration (Dkt. 2481), and the Neuman Declaration (Dkt. 2482).

7.     Before proceeding, I note that I spent an additional 5.25 hours (1.25 hours on April 23, 2020 and 4 hours on April 26, 2020), at $550 per hour, reviewing the three documents identified above and another 3.5 hours on April 30, 2020 preparing this declaration. I have thus incurred another $4,812.50 of billable time responding to Chevron's position, in a continued effort to collect the fees Crypsis is owed. This is on top of the 5 hours I incurred on February 25, 2020 to comply with Chevron's demand for additional invoicing details not kept in the ordinary course of Crypsis' business. My invoice for that work has already been submitted to Chevron for payment and is discussed further below.

**Crypsis' Budget**

8.     Mr. Lynch recounts discussions he and I had about setting the budget for Crypsis' work under the Order and Protocol. *See* Lynch Decl., ¶ 4. It was my general understanding that the budget we discussed was an initial budget – that is, a rough estimate – and that the budget could and would be increased if the work required by the Protocol ultimately demanded more time than could have been anticipated. This is consistent with the fact that the Order allows for budget increases, and expressly states that "Chevron shall not unreasonably withhold or delay in providing approval of a given budget." Order, ¶ 3.

9.     Ms. Neuman questions why I did not confer with Mr. Lynch on budget-related issues. *See* Neuman Decl., ¶ 44. The Protocol has a few sections about when experts should confer, but the only one conceivably relevant here is the section entitled, "Exceptions," which states:

"Should there be any exceptions or other issues that prevent this protocol from being carried out as written, Rizack's Expert and Chevron's Expert shall meet and confer and agree upon how to address the issue." I am very familiar with this language; I wrote it. The intention here, which I believe is reflected by the language, is that if there is some *technical* reason that certain steps outlined in the Order and/or the Protocol could not be carried out as written, then the experts would confer and agree on a solution. It was my understanding when I wrote this language – and still is my understanding today – that it applies solely to unanticipated technical issues. Because the Order states that *Chevron* – not Chevron's expert – would "provid[e] approval of a given budget" (Order, ¶ 3), I routed my request for a budget increase through counsel, rather than Chevron's expert. I still believe that is the proper chain of communication for a request of that nature, and I did not (and do not) see it as a requirement of the Order or the Protocol that I confer with Chevron's expert on financial matters, unless Chevron explicitly asked that I do so, which it did not.

### Sufficiency of Crypsis' Invoices

10.     Chevron raises a number of issues about the level of detail in Crypsis' invoices, apparently as a basis to contest payment of Crypsis' work under the Protocol.  However, Chevron has now at least implicitly acknowledged that it has received sufficient information to assess Crypsis' work, as I understand Chevron has issued payment to Crypsis of $75,800, and may have issued additional payment. I nonetheless respond to these issues below, in part because in addition to seeking payment from Chevron for *all* of Crypsis' unpaid fees, I am specifically seeking payment for the 17 total hours I had to work to respond to Chevron's demands for additional invoicing details, and to otherwise obtain payment, as discussed further below. Attached as **Exhibit 1** is an updated billing spreadsheet reflecting all of Crypsis' billable work on this matter through and including April 30, 2020, including the time I spent on this declaration.

11.     Mr. Lynch stated that "[t]he level of detail provided [in Crypsis' initial invoices] is not what I would expect in an invoice for these types of services." Lynch Decl., ¶ 7. Based on Mr. Lynch's experience, he states that he "would expect more detailed information to be available that would allow someone to determine, even at a high level, what process or analysis was represented by the time for a line item, and which device or devices were being subjected to that analysis." *Id.* I respond to these assertions below.

12.     First, Paragraph 3 of the Order, portions of which I helped draft, states that Crypsis' invoices must include "the amount due, description of the work and related unit cost, and hours worked…" Order, ¶ 3. The invoices must also include Crypsis' tax registration number and any sales, value added, or goods and services taxes. *Id.*

13.     As I understand Rizack's counsel has already advised Chevron, the level of detail that Mr. Lynch refers to in his declaration, and which Chevron ultimately demanded, is simply not what Crypsis typically provides to its clients, nor is it the type of information that Crypsis typically tracks in the ordinary course of business. Crypsis' standard procedure is to track time, and to then issue invoices including the following billing descriptions: "Case management", "Client meeting", "Data collection and preservation", "Review documents", "Evidence intake and processing", "Forensic analysis", "Project management", "Reporting", "Report review". Our staff track their time to that level of detail, and then enter it into Crypsis' time-tracking system, from which our invoices are generated. Despite this – and knowing that Paragraph 3 of the Order required more than Crypsis' usual level of detail – I made it a point to include additional details on our initial invoices regarding my and my team's work, such as "Review Proposed Order", "Work on data recovery under Forensics Protocol", "Work on analysis of deletion activity under Forensic Protocol", and "Call RE: Proposed Order."

5

14.     Having myself worked at Stroz Friedberg, for over 4 years, all with Mr. Lynch, I am familiar with the level of detail to which Stroz Friedberg tracks its time. Crypsis does not track or provide that level of detail in the ordinary course of its business and has found this to be acceptable to its customers. As stated, I nevertheless went above and beyond our usual level of detail in tracking and describing the working performed here based on Paragraph 3 of the Order.

15.     Moreover, I did not interpret Paragraph 3 as requiring that Crypsis' invoices include descriptions with sufficient detail for Chevron to evaluate whether it must pay for any given line item. Paragraph 3 also does not state that the "description of work" must be in line with the descriptions that Stroz Friedberg or other forensic consultants might provide their clients.

16.     Furthermore, Mr. Lynch's opinion regarding the adequacy of Crypsis' invoices was apparently based on his experience invoicing "clients." Lynch Decl., ¶ 7. Here, Crypsis' invoices were not ultimately going to Crypsis' client; they were being provided to an adversary for payment. In my experience, at Stroz Friedberg, at Crypsis, and at previous employers, it is common practice in consulting to limit the detail being provided to adversaries. It is also common practice to prepare invoices including less detail when it is known that those invoices would be shared with an adversary, and may have otherwise contained privileged information. Therefore, I respectfully disagree that Mr. Lynch's "experience invoicing clients" is the appropriate baseline for evaluating the sufficiency of Crypsis' invoices.

**Allocation of Resources and Time Spent On Particular Tasks**

17.     Mr. Lynch questions the necessity of my decision to send data to Crypsis' Los Angeles office, rather than having the work performed remotely. Lynch Decl., ¶ 9. While I do not believe Chevron has a right under the Order to scrutinize my decisions on how to staff the analysis for which I was retained, I shipped Rizack's data to LA so that Zach Ridgway, a Senior Consultant

in Crypsis' LA office, could assist with the analysis. Zach's has significant Digital Forensics experience, and his hourly rate is $375. Shipping him the data allowed him to more efficiently assist in the analysis, including specifically to assess whether any "wiping" tools or indications of wiping were present on Rizack's devices. Shipping the data to LA ultimately reduced the overall cost of the work performed and expedited its completion, compared to having me personally do all of the work, on which Zach was able to assist.

18.     Mr. Lynch comments on the amount of time required to collect data from the devices of one custodian. *See* Lynch Decl., 10. Ms. Neuman refers to this work as "Paragraph 5 tasks," in reference to Paragraph 5 of the Order. *See* Neuman Decl., ¶ 47. In this matter, we ended up collecting data from 10 devices or accounts. For an iPhone we took two images using different collection methods, and for the MacBook Pro we collected an encrypted image but then created a decrypted version for analysis. In total, that means we had 12 images in this matter. Mr. Lynch claims this took 22.25 hours (technically, once you back out a 0.75 hour call regarding data collection, there were 21.5 hours required). I believe given the complexities of some of the collections required here, this was a very reasonable amount of time.

19.     Mr. Lynch also states that 19.5 hours were spent making copies of images, and that he does not believe that amount seems reasonable. Lynch Decl., ¶ 10. He claims he "would not expect it to take more than 30 minutes, and at most an hour, of billable time to make a copy of an image." Here, my team and I copied 12 images 3 times, as required by the Order (Order, ¶ 5(g)), plus a fourth copy that was shipped to LA for analysis, as discussed above. Crypsis therefore copied 12 images 4 times, for a total of 48 image-copies.

20.     That 19.5 hours also includes the time I spent on quality control as it relates to the image copies, and to prepare the Appendix B certification required by the Order. *See* Order, ¶ 5(f).

Thus, backing out my time, the actual time billed for making copies is 11.5 hours for all 4 copies of 12 images. Further, in terms of volume, I note that the total size of the data collected from Rizack's devices is almost 4,000 gigabytes. The size of these images after compressing each still totaled 2,283 gigabytes which then had to be copied multiple times. In my experience, that is rather sizable for one custodian, especially having 2,283 gigabytes of image data after factoring in compression.

21.     Mr. Lynch further questions the recovery and comparison efforts and why they took as much time as they did. *See* Lynch Decl., ¶ 11. He adds that he "would expect the comparison to be facilitated through using spreadsheets or databases..." *Id.* I did indeed use a Microsoft SQL database for this analysis. I suspect Mr. Lynch does not understand the scale of the analysis.

22.     We had multiple computers and hard drives to analyze in this case. Additionally the Protocol called for multiple, duplicative efforts to recover data to be performed using two different tools. We found that Mr. Rizack had numerous duplicate copies of information on several devices and accounts in a number of different formats. In total, we identified 11.7 million file records through the process outlined in the Protocol. It did take substantial time, as it was a substantial effort, to then analyze and compare all of this information. Please note these file counts include both active and deleted files, as well as folder entries.[1] I find this file count to be abnormally high for one custodian. Mr. Lynch would not have been privy to how many file records we were analyzing, because the Protocol did not require that I advise or confer with him on matters, such as these, that did not impede my ability to carry out the Protocol as written. Therefore, to form his opinion Mr. Lynch would have needed to assume a normal number of files were analyzed when estimating how long Crypsis' work should have taken.

---

[1]   I am not making any representations here as to the number of file entries that may have been "active" versus "deleted."

23.     Ms. Neuman similarly questions the amount of time taken for particular tasks. *See, e.g.*, Neuman Decl., ¶ 44 (implying that, "if Rizack had not deleted documents," Crypsis' work should have taken less time). As I understand Rizack's counsel has explained to Chevron in a prior email, this proposition is simply false. Again, the amount of effort relates to the number of devices, number of files, and complexity of scenarios needing to be analyzed on the devices. The end finding has little to no bearing on the amount of work that was required to obtain those findings in this matter.

24.     On the issue of "deletion," I note that due to cost issues, I still have not completed the reports required by the Order. *See* Order, ¶ 8. My understanding is that Chevron was not amenable to paying for this work, and so I did not perform it.

25.     As such, I take this opportunity to confirm that my investigation and analysis revealed no evidence that Mr. Rizack engaged in a process to intentionally delete or attempt to delete large groups of files from his Devices or Media; not by using data destruction software, or by any other means. While it is impossible to forensically determine a person's mental state when deleting a particular file, I located no evidence to suggest Mr. Rizack undertook efforts that I would characterize as deliberate obstruction or obfuscation.

26.     Most of the deleted records I and my team recovered were automated system files (e.g., temporary internet files purged over time and manufacturer-implemented operating system updates that delete older versions). These files were likely deleted without any human action. Moreover, of the files that likely would have been deleted by human action (e.g., Microsoft Office files and PDFs), non-deleted (i.e., "active") copies of virtually all of them were backed up to other external hard drive Devices and/or Media accounts imaged and searched as part of the Protocol.

In other words, these Recovered Files were not "deleted," but simply moved from one Device to another Device or Media.

**Time Spent in Cooperating with Chevron's Invoicing Objections and Information Requests**

27.     As stated above, the details on Crypsis' invoices as initially provided to Chevron were already beyond what Crypsis typically provides its clients. I only tracked and provided those additional details to comply with the Order's "description of work" requirement.

28.     Notwithstanding this, I understand Chevron had a right under the Order to protest Crypsis' invoices and request additional documentation. The Order states that Chevron will bear to cost of its demands in these respects. *See* Order, ¶ 3.

29.     I fully cooperated with Chevron whenever it demanded additional information concerning Crypsis' invoices. In order to respond to Chevron's protests and obtain payment, I spent a total of 17 hours between January 10, 2020 and April 30, 2020 speaking with Rizack's counsel, having a conference call with counsel for both Rizack and Chevron, preparing the requested information, reviewing documents, and working on this declaration. *See* Ex. 1. At $550 per hour, I have thus incurred a total of $9,350 of billable time to collect the fees Crypsis is owed. That was time I would have otherwise spent on billable work for unrelated matters.

30.     These fees were incurred in providing Chevron documentation it requested and/or in providing Chevron an opportunity to protest amounts Crypsis has billed.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed at New York, New York on this 1st day of  May , 2020.

Kevin T. Faulkner