UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

        -against-

STEVEN DONZIGER,

           Defendant.

19 Cr. 561 (LAP)
11 Civ. 691 (LAK)

ORDER

LORETTA A. PRESKA, Senior United States District Judge:

    Defendant Steven Donziger faces six charges of criminal contempt under 18 U.S.C. § 401(3), which authorizes district courts to punish acts involving "disobedience or resistance to [the court's] lawful writ, process, order, rule, decree, or command." (See Order to Show Cause, dated July 30, 2019, 19 Cr. 561 ("Cr. dkt."), dkt. no. 1.) Mr. Donziger now moves to (1) disqualify all judges from the Southern District of New York ("S.D.N.Y."), and particularly the undersigned, from presiding over this case or to have a jury empaneled if an S.D.N.Y. judge presides; (2) disqualify the special prosecutors based on their law firm's ties to the oil and gas industry and Chevron Corporation ("Chevron"); and (3) dismiss the contempt charges with prejudice. (See Steven Donziger's Motions for Relief dated Feb. 27, 2020 ("Def. Mot."), Cr. dkt. no. 60.) For the reasons set forth below, Mr. Donziger's motions are DENIED.

1

## I.   BACKGROUND

This criminal contempt case is an offshoot of the civil action Chevron Corp. v. Donziger, 11 Civ. 691 (S.D.N.Y.), over which Judge Lewis A. Kaplan presides.  That case's procedural history is nearing galactic proportions, counting almost 2,500 docket entries as of the date of this order.  Given the nature of Mr. Donziger's motions in this contempt case, however, only a high-level overview is needed to give context for this decision.[1]

In 2011, Chevron initiated a civil lawsuit against Mr. Donziger alleging that he obtained an $8.6 billion judgment in Ecuador against Chevron through fraudulent and corrupt means. In 2014, following a lengthy trial, Judge Kaplan issued a decision and judgment in Chevron's favor against Mr. Donziger and others.  Chevron Corp. v. Donziger, 974 F. Supp. 2d 362 (S.D.N.Y. 2014).  Among other things, the judgment enjoined Mr. Donziger from enforcing the Ecuadorian judgment in the United States or attempting to profit from it and directed Mr. Donziger to transfer to Chevron all property that he had or might later obtain that could be traced to the Ecuadorian judgment.  (See Chevron v. Donziger, 11 Civ. 691 (S.D.N.Y.) ("civ. dkt."), dkt. no. 1875.)  In 2018, after the Court of Appeals affirmed Judge

---

[1]    The following facts are taken from the parties' submissions and the filings in the underlying civil case.

Kaplan's decision and the Supreme Court denied certiorari, Judge Kaplan issued a supplemental judgment awarding Chevron $813,602.71 in costs against Mr. Donziger and others.  (See civ. dkt. no. 1962.)

In 2018, Chevron initiated post-judgment discovery to identify assets available to enforce its judgment against Mr. Donziger and to assess his compliance with the judgment's injunctive provisions.  (See civ. dkt. nos. 1966, 1968, 2006, 2009, 2022.)  Mr. Donziger strenuously objected to many of Chevron's discovery requests, ultimately leading Judge Kaplan to enter an order finding that given Mr. Donziger's persistent stonewalling, he should turn over his electronic devices to a forensic expert so they could be imaged and examined for responsive documents.  (Civ. dkt. no. 2108.)  On October 25, 2018, Mr. Donziger submitted a letter explaining that he would be "unable to comply" with Judge Kaplan's orders, as doing so would give Chevron "near wholesale access to [his] confidential, privileged, and protected documents, without any legitimate basis."  (See civ. dkt. 2118.)  Mr. Donziger's letter expressly invited Judge Kaplan to hold him in contempt so that he could seek relief on various issues in the Court of Appeals.  (Id.)

On March 5, 2019, Judge Kaplan issued an order establishing a protocol (the "ESI protocol") to govern the collection, imaging, and examination of Mr. Donziger's electronic devices.

(Civ. dkt. 2172.)  The order directed Mr. Donziger first to provide a list of all his electronic devices and accounts to an appointed forensic expert and then to turn over his devices to the expert for imaging.  (Id. ¶ 4.)  Mr. Donziger did not comply with either directive and informed the forensic expert by e-mail that he had no intention of following Judge Kaplan's order. (Civ. dkt. no. 2173-1.)  In his e-mail, Mr. Donziger again advised that he would "voluntarily go into civil contempt" in order to obtain appellate review and would "not be producing documents until [his] due process rights were respected."  (Id.)

In orders entered on May 23 and June 4, 2019, Judge Kaplan found Mr. Donziger in civil contempt for his refusal to comply with the ESI protocol and for several additional acts of disobedience.  (See civ. dkt. no. 2209; civ. dkt. no. 2222.) Specifically, Judge Kaplan concluded that Mr. Donziger had violated the civil judgment's injunctive terms by failing to transfer his rights to certain contingency fees on the Ecuadorian case and by pledging his interest in fees from that case in exchange for personal services.  (See civ. dkt. no. 2209 at 36-40, 18-19.)  Judge Kaplan further found that Mr. Donziger had violated a restraining notice Chevron served on him in an effort to enforce its money judgment.  (Id. at 58-61.)

Judge Kaplan took several measures to coerce Mr. Donziger's compliance with the disobeyed orders.  First, the May 23 and

4

June 4 contempt orders imposed escalating fines that would stop accruing once Mr. Donziger purged certain of his contempts. (See id. at 65, 69-71; civ. dkt. no. 2222.)  Second, Judge Kaplan issued an order directing Mr. Donziger to surrender his passport(s) to the Clerk of the Court.  (Civ. dkt. no. 2232.)

On June 12, 2019, Mr. Donziger filed an emergency motion to stay the fines and sanctions against him pending appeal.  (Civ. dkt. no. 2234.)  On June 28, 2019, Judge Kaplan suspended the fines from accumulating further, and on July 2, 2019, he entered an order granting in part and denying in part Mr. Donziger's emergency motion.  (Civ. dkt. nos. 2252, 2254.)  In that order, Judge Kaplan directed Mr. Donziger to surrender his passport(s) and declined to stay the outstanding order for Mr. Donziger to identify and produce his devices to the forensic expert.  (Civ. dkt. no. 2254.)  However, Judge Kaplan granted the stay with respect to the parts of the ESI protocol that would have permitted the disclosure of Mr. Donziger's data to Chevron, provided that Mr. Donziger file his appeal papers by no later than July 31, 2019.  (Id.)

Mr. Donziger did not comply with that order.  He failed to produce his devices to the forensic expert, failed to surrender his passport(s) to the Clerk, and failed to file his appellate brief by July 31 so as to trigger the conditional stay.  (See

Government's Opposition to Mr. Donziger's Pre-Trial Motions, dated Mar. 23, 2020 ("Opp."), cr. dkt. no. 62 at 11-12.)

On July 31, 2019, Judge Kaplan issued an order under Federal Rule of Criminal Procedure 42 directing Mr. Donziger to show cause why he should not be held in criminal contempt in violation of 18 U.S.C. § 401(3).  (Civ. dkt. no 2276.)  The order to show cause, which was made returnable before the undersigned, cited six charges for criminal contempt.  The first two concern Mr. Donziger's violation of the ESI protocol; the third concerns his failure to surrender his passports; and the fourth through sixth concern his violation of the civil judgment's injunctions on profiting from, and transferring interests traceable to, the Ecuadorian judgment.  (Id.)

Alongside the order to show cause, Judge Kaplan issued an order appointing Rita M. Glavin, Brian Maloney, and Sareen Armani -- private attorneys associated with the law firm Seward & Kissel LLP ("Seward") -- as special prosecutors in this criminal contempt case.  (See civ. dkt. no. 2277.)  The order noted that Judge Kaplan had previously tendered Mr. Donziger's prosecution to the United States Attorney for the Southern District of New York, but the United States Attorney's office "respectfully decline[d] on the ground that the matter would require resources that [it did] not readily have available."  (Id.)

On August 6, 2019, the Court arraigned Mr. Donziger, and he entered a plea of "not guilty." (See August 6, 2019 Hearing Transcript, cr. dkt. no. 18, at 12:24) On February 27, 2020, Mr. Donziger filed the pretrial motions now before the Court.

## II.  DISCUSSION

### a. Judicial Disqualification Motions

#### i.    Motion to Disqualify the Entire S.D.N.Y. Bench

In his first motion, Mr. Donziger seeks to disqualify every S.D.N.Y. judge from presiding over this case under 28 U.S.C. § 455(a). That provision requires judges to recuse themselves from proceedings in which their "impartiality might reasonably be questioned." 28 U.S.C. § 455(a). The key question on a judicial recusal motion is whether "a reasonable person, knowing all the facts, [would] conclude that the trial judge's impartiality could reasonably be questioned." United States v. Lovaglia, 954 F.2d 811, 815 (2d Cir. 1992). "Or phrased differently, would an objective, disinterested observer fully informed of the underlying facts entertain significant doubt that justice would be done absent recusal?" Id.

On an objective view of the facts, there is no basis for disqualifying the entire S.D.N.Y. bench here. In substance, Mr. Donziger's position is that all judges of the S.D.N.Y. are disqualified from presiding over his case because their colleague, Judge Kaplan, is "so associated" with the underlying

civil litigation that feelings of loyalty towards him will corrupt their ability to rule impartially.  (See Def. Mot. at 14-15.)  In United States v. Cutler, 796 F. Supp. 710 (E.D.N.Y. 1992), another criminal contempt case, the court considered and denied a similar motion seeking disqualification of the entire Eastern District of New York bench, observing that "[a]ll judges, whether trial or appellate, are called upon on an almost daily basis to review the decisions of other judges; it is a routine part of their work and friendship or collegiality plays no part in their decisions." Id. at 714.  The Court fully agrees with that assessment.  Reviewing the decisions of fellow judges is, simply put, part of the judicial job description.  To the extent such a review is called for here, it is neither extraordinary nor grounds for recusal.[2]  The motion to disqualify the S.D.N.Y. bench is therefore denied.

The Court must also address two subsidiary requests related to Mr. Donziger's S.D.N.Y.-wide recusal motion.  First, Mr. Donziger moves under Federal Rule of Criminal Procedure 21(a) to transfer this case to a district court outside the Second Circuit so that a judge unacquainted with Judge Kaplan may preside.  (Def. Mot. at 15.)  Rule 21(a) mandates transfer when

---

[2]    At bottom, however, the review here is of Mr. Donziger's actions or inactions.

there is a risk "that the defendant cannot obtain a fair and impartial trial" in the transferring district. Fed. R. Crim. P. 21(a). This rule is meant for cases where "prejudice . . . will make it difficult or impossible to select a fair and impartial jury," not cases where "it is claimed that the judge is biased." 2 Charles Alan Wright et al., Federal Practice & Procedure § 343 (4th ed. 2019) (emphasis added). Mr. Donziger does not argue that it would be difficult to empanel an impartial jury here -- he instead argues that transfer is required because he would not receive a fair bench trial in the Southern District of New York. But judicial bias is not grounds for a Rule 21(a) transfer, and, even if it were, for the same reasons set out regarding disqualification of the entire S.D.N.Y. bench, there is no risk that Mr. Donziger will not receive a fair trial before this Court. Accordingly, the request for a transfer to another district is denied.

Second, Mr. Donziger requests a jury trial if an S.D.N.Y. judge presides over his case. (Def. Mot. at 16-17.) He does not dispute, however, that contempt defendants charged under 18 U.S.C. § 401 are not entitled to a jury trial when the possible punishment does not exceed six-months incarceration or a $5,000 fine. See, e.g., United States v. Twentieth Century Fox Film Corp., 882 F.2d 656 (2d Cir. 1989). There is no reason to depart from that rule here. If the Court concludes before trial

that, in the event of a conviction, it would not impose a
sentence above the six-month or $5,000 thresholds, Mr. Donziger
will receive a bench trial.  Mr. Donziger's request for a jury
trial is therefore denied subject to renewal pending the Court's
determination of the potential sentencing and fine range.

ii. <u>Motion to Disqualify the Court</u>

Alongside his motion to disqualify all S.D.N.Y. judges, Mr.
Donziger specifically moves for this Court's recusal on grounds
that Judge Kaplan should not have transferred this case to the
undersigned after he purportedly recused himself from it.  (<u>See</u>
Def. Mot. at 15-16.)  As support for his argument, Mr. Donziger
cites Rule 16 of the S.D.N.Y. Rules for the Division of Business
Among District Judges ("RDB"), which states that "[i]f a judge
is disqualified or if a judge has presided at a mistrial or
former trial of the case, and requests reassignment, the
assignment committee shall transfer the case by lot."  This
argument fails for two reasons.

First, a court's failure to follow the RDB's prescribed
procedures gives parties no basis for relief.  As their preamble
makes clear, the RBD rules "are adopted for the internal
management of the case load of the court and <u>shall not be deemed
to vest any rights in litigants or their attorneys</u>."  S.D.N.Y.
Loc. R. at 105 (emphasis added); <u>see</u> <u>also</u>, <u>e.g.</u>, <u>United States
v. Brennerman</u>, No. 17 Cr. 155 (LAK), 2017 WL 3421397, at *10 &

n. 105-06 (S.D.N.Y. Aug. 8, 2017) ("[T]he RDB vest no rights in
litigants -- they are for internal management only.") (collecting
cases).  Although Mr. Donziger recognizes that he has no rights
under the RDB, he contends nonetheless that the abstract
"principle of law" that the RBD embodies requires random
reassignment of this case.  (Def. Mot. at 15-16.)  He cites no
authority for that theory, and the Court rejects it.

Second, even if a recused judge were required to transfer
his or her case by random assignment, that rule would not apply
here, as Judge Kaplan never recused himself.  (See Hon. Lewis A.
Kaplan's Response to Petition for a Writ of Mandamus, Donziger
v. Chevron Corp., No. 20-464, dkt. no. 28 (2d Cir. Mar. 11,
2020) ("Mandamus Pet. Resp.") at 18 n.54, 44-47.)  To the extent
Mr. Donziger claims that Judge Kaplan had an obligation to
recuse himself, he is mistaken.  Federal Rule of Criminal
Procedure 42, the basis for this contempt case, mandates recusal
only when the "contempt involves disrespect or criticism of a
judge."  Fed. R. Crim. P. 42(a)(3).  The recusal requirement is
not triggered where, as here, criminal contempt charges flow
from an allegedly willful disobedience of court orders.  See
Goldfine v. United States, 268 F.2d 941, 947 (1st Cir. 1959)
(noting that Rule 42 has no mandatory disqualification provision
and that it is "routine" for the judge who issues the disobeyed
order to preside over the contempt trial).  Given that Judge

Kaplan was not required to recuse himself, there is no merit to Mr. Donziger's contention that his decision to transfer this case to the undersigned was somehow inappropriate.[3]

### b. Motion to Disqualify the Special Prosecutors

Mr. Donziger next seeks to disqualify the prosecutors whom Judge Kaplan appointed under Federal Rule of Criminal Procedure 42 after the U.S. Attorney's office declined to prosecute this case.[4]  Mr. Donziger argues that the relationship between their firm (Seward) and Chevron and the oil and gas industry creates a conflict of interest which undermines their ability to serve as disinterested prosecutors.  (See Def. Mot. at 17-24; Reply Memorandum of Law, dated Apr. 10, 2020 ("Reply"), cr. dkt. no. 65 at 5-12.)  That motion is also denied.

---

[3]    Mr. Donziger also asks the Court to "disclose how Judge Kaplan transferred [this] case and what information was relayed in doing so." (Def. Mot. at 16.)  That request is denied.  As far as the Court is aware, there is no rule of law that entitles a defendant to serve discovery demands on the presiding judge. In any event, the mandamus papers Judge Kaplan filed in one of Mr. Donziger's appeals describes how this case arrived on the Court's docket.  (See Mandamus Pet. Resp. at 17-19, 46-47 (explaining that this case came to the Court under RBD Rule 14, which provides that "[a]ny judge, upon written advice to the assignment committee, may transfer directly any case or any part of any case on that judge's docket to any consenting judge").  There is nothing improper about that transfer nor any reason for further disclosure.

[4]    Rule 42 provides, in relevant part, that "[t]he court must request that the contempt be prosecuted by an attorney for the government" and that "[i]f the government declines the request, the court must appoint another attorney to prosecute the contempt."  Fed. R. Crim. P. 42(a)(2).

The parties appear to agree that Young v. United States ex rel. Vuitton et Fils S.A., 481 U.S. 787 (1987) is the key authority on conflict issues involving special criminal contempt prosecutors.  In Vuitton, a group of civil litigants resolved a lawsuit by entering a settlement that enjoined the defendants from infringing plaintiff's trademarks.  Id. at 790-91.  After the settlement, plaintiffs uncovered evidence that the defendants were scheming to violate the injunction and raised it to the district court, which appointed the plaintiff's lawyers as special prosecutors to bring a criminal contempt case against the defendants.  Id. at 791-92.  A jury convicted defendants, and the Court of Appeals affirmed the conviction, rejecting defendants' argument that the district court violated defendants' right to have an impartial prosecutor by appointing plaintiff's lawyers as the special prosecutors.  Id. at 792-93.

On appeal, the Supreme Court reversed, holding that conflicts of interest rendered the appointment improper.  Id. at 787-88.  The Court explained that when lawyers for an interested party act as special prosecutors, they are torn between serving "two masters" -- the Government, on the one hand, whose sole interest is the "vindication of the court's authority," and the lawyer's private client, on the other, who may have divergent objectives.  Id. at 803-05, 814.  That structural conflict may create perverse incentives, as the lawyers could, for example,

"be tempted to bring a tenuously supported prosecution if such a course promises financial or legal rewards for the private client." Id. at 805.  The Court explained that even if the interested prosecutors never commit any misconduct, their appointment still creates the "potential for private interests to influence the discharge of public duty" and that "appearance of impropriety" alone is intolerable.  Id. at 805-06 (emphasis in original).  Vuitton therefore "stressed that a prosecutor seeking a contempt conviction must be both impartial in fact and appear to be so."  F.T.C. v. Am. Nat'l Cellular, 868 F.2d 315, 319 (9th Cir. 1989).

Mr. Donziger flags a few factual predicates that, in his view, require disqualifying the special prosecutors here.  (See Def. Mot. at 17-24; Reply at 5-12.)  First, he notes that Seward has clients with kinship to the oil industry, including (1) shipping clients that do business with major oil companies like Chevron, and (2) clients who have received funding from Oaktree Capital Management, a financial services firm with two directors who have served on Chevron's corporate board.  (Def. Mot. at 17-20.)  Mr. Donziger argues that given his status as the "Scourge of Big Oil" and the deeply bitter nature of his civil litigation with Chevron, the indirect links between Seward and Chevron "create a financial conflict of interest," as Seward would not "want to act contrary to the interests of the few controlling

14

large industry oil and gas companies and related entities."
(See id. at 21, 23 (quoting Declaration of Prof. Ellen
Yaroshefsky, dated Feb. 22, 2020 [dkt. no. 60-2] ¶¶ 50-51).)

The other factual predicate for disqualification comes from
a declaration the special prosecutors filed describing Seward's
previous attorney-client relationship with Chevron.  (See Decl.
of Mark J. Hyland, dated Mar. 23, 2020 ("Hyland Decl.") [dkt.
no. 62-1].)  In that declaration, Seward's Co-General Counsel
states that Seward prepared corporate forms and issued related
legal opinions for two Chevron foreign affiliates in 2016 and
2018.  (Id. ¶ 4.e & g.)  Those engagements were Seward's only
work for Chevron in the last ten years and generated around
$30,000 in legal fees and disbursements, amounting to less than
0.1% of Seward's 2016 and 2018 revenues.  (Id. ¶ 4.h.)  Despite
the minimal nature of that work, Mr. Donziger argues that it
creates a conflict of interest requiring the special
prosecutors' removal.  (See Reply at 5-12.)

Considering the facts through the lens of Vuitton,
disqualification is unwarranted.  First, the theory that Seward
has a financial conflict based on its clients' ties to Chevron
is wholly unconvincing.  Even if Seward's clients do a large
volume of business with Chevron and other oil companies, Mr.
Donziger makes no effort to explain how those clients could be
made better off or worse off or affected in any way whatsoever

depending on how the special prosecutors go about this case.  In
that sense, the situation here is nothing like Vuitton, where
the prosecutors had levers they could readily pull to promote
their client's financial interests.[5]  Here, on the other hand, no
scenario presents itself in which financial rewards for Seward's
clients might trickle down from the special prosecutors'
decisions.  To the extent Mr. Donziger argues that the
prosecutors might come at him harder than they otherwise would
to indulge their shipping clients, who may generally like to see
Chevron happy, that theory is far too attenuated to justify
relief.  The ties between Seward's clients and Chevron and the
oil industry create no conflicts of interest, real or potential,
of the ilk Vuitton warned against.

Mr. Donziger's argument regarding Seward's former attorney-
client relationship with Chevron is stronger, but it fails, too,
because that relationship still does not raise the impartiality
problems that necessitated disqualification in Vuitton.

As an initial matter, the fact that Seward is not currently
serving as Chevron's counsel takes most of the steam out of Mr.

---

[5]    In Vuitton, the contempt charges involved breach of an
agreement that contained a sizeable liquidated damages clause in
favor of the special prosecutors' client.  481 U.S. at 805-06.
The Supreme Court noted that the prospect of triggering that
damages payout "had the potential to influence" the prosecutors'
decisions on who to prosecute, who to offer a plea bargain, and
who to offer immunity in exchange for cooperation.  Id.

Donziger's motion.  In Vuitton, unlike here, the lawyers were simultaneously serving as prosecutors and as plaintiff's counsel in underlying civil litigation.  Given that posture, there was no way to insulate the lawyers' duty of loyalty to the civil plaintiff from infecting their decision-making in the criminal contempt case.  See Vuitton, 481 U.S. at 806.  The Supreme Court noted, for example, that because they were wearing two hats at the same time, the lawyers might be tempted to exercise their investigatory powers in the contempt case to collect evidence for later use in civil litigation or to wield the civil claims as leverage for obtaining guilty pleas.  Id.[6]  There are no such dangers here.  Chevron is not a current Seward client, so there is no risk that the prosecutors might be tempted into using this case to further Chevron's interests elsewhere or into exercising their powers in service of any objective besides justice.

As Mr. Donziger points out, however, former attorney-client relationships can still theoretically give rise to conflicts for special prosecutors.  (See Reply at 5-7.)  The clearest danger

---

[6]     Other courts examining Vuitton issues have identified similar risks.  For instance, in F.T.C. v. American National Cellular, 868 F.2d 315, 319 (9th Cir. 1989), the Ninth Circuit explained that civil-litigants-turned-prosecutors cannot act impartially when their dual roles might tempt them to prosecute "to obtain documents or access to information useful in the underlying civil litigation" or "to abandon, press, or compromise a prosecution wholly apart from its merits to leverage settlement in the underlying litigation."

zone involves disclosure conflicts.  Suppose, for example, that
while Seward was serving as Chevron's counsel, it had received a
privileged message containing material, exculpatory evidence as
to Mr. Donziger.  In that instance, the special prosecutors
presumably would find themselves in a bind, as they could not
simultaneously respect Chevron's right to keep the message
confidential <u>and</u> Mr. Donziger's right to disclosure under <u>Brady
v. Maryland</u>, 373 U.S. 83 (1963).  The Court agrees that the risk
of a conflict like that would compel disqualification.

While that is an interesting hypothetical, there is no risk
of its coming to pass here, as Seward's prior work for Chevron --
completing corporate forms and opinion letters for Chevron's
foreign affiliates -- has absolutely nothing to do with this case.
Indeed, Mr. Donziger's attempts to connect this prosecution and
Seward's prior Chevron engagements border on the absurd.  First,
he suggests that Seward's work for Chevron might be relevant to
"the efforts of Mr. Donziger's Ecuadorian clients to untangle
Chevron's foreign structure."  (<u>See</u> <u>id.</u> at 4, 6.)  Mr. Donziger
does not even try to explain why he would be entitled to that
kind of information here.  That the details of Chevron's foreign
corporate structure might be of use to his Ecuadorian clients is
totally irrelevant and creates no conflict in this case.

Next, Mr. Donziger implies that privilege issues could
prevent the special prosecutors from disclosing whether "Chevron

or its agents have provided false or misleading information in support of the pending criminal charges." (Id. at 7.) For that conflict to arise, Seward would have needed to have received privileged information related to Mr. Donziger's case during the course of its attorney-client relationship with Chevron. See In re Cty. of Erie, 473 F.3d 413, 418 (2d Cir. 2007) ("[A]ttorney-client privilege protects confidential communications between client and counsel for the purpose of obtaining or providing legal assistance." (citation omitted)). Chevron hired Seward to prepare corporate forms. The idea that such an engagement might have involved disclosure of information even marginally relevant to Mr. Donziger is too farfetched to merit serious attention. Because Seward's earlier work for Chevron could not have touched on any topics germane to this case, the Court finds no potential conflicts that could constrain the prosecutors from discharging their disclosure obligations to Mr. Donziger.

As one final point, the Court notes that Seward's past work for Chevron was de minimis. In the last decade, Seward handled only two Chevron matters -- one in 2016 and one in 2018 -- and they generated less than 0.1% of the firm's revenues in those years. (Hyland Decl. ¶ 4.e-h.) The Court recognizes that a conflict or at least an appearance of impropriety could arise in situations where the former client accounted for a non-trivial portion of the law firm's income or otherwise had a tight-knit relationship

19

with the firm.  In that circumstance, gratitude for past business or an appetite for future business could potentially color the prosecutor's decisionmaking.  That danger is not present here.  In light of the extremely limited scope of Seward's work for Chevron, their former relationship does not risk a conflict for the prosecutors or otherwise give rise to an appearance of impropriety.  Mr. Donziger's motion to disqualify the special prosecutors is therefore denied.[7]

**c. Motion to Dismiss the Contempt Charges**

Having resolved the various disqualification motions, the Court now turns to Mr. Donziger's motion to dismiss the charges.

Many of Mr. Donziger's arguments can only be resolved at trial on a more fully developed factual record.  In particular, Mr. Donziger argues that (1) he lacked the intent needed to support a contempt conviction, (2) at least one of the orders he allegedly violated was ambiguous, and (3) he would have suffered irreparable harm if he complied with orders requiring disclosure of constitutionally protected or privileged information.  (See

---

[7]   Mr. Donziger also asks the Court to (1) dismiss the charges against him because the prosecutors waited too long to disclose Seward's prior relationship with Chevron, or (2) compel Seward to disclose further details regarding its Chevron work.  (Reply at 5, n. 3, n. 7.)  Both requests are denied.  Mr. Donziger has not demonstrated any prejudice from the timing of the Seward/Chevron disclosure that would justify outright dismissal, and the information Seward already provided makes clear that the prior Chevron matters create no potential conflicts for the special prosecutors.  No further information is needed.

Def. Mot. at 25-26, 28, 30.)   These arguments all involve fact
questions the Court cannot resolve at this juncture and are thus
not grounds for dismissal.   See e.g., United States v. Cutler,
815 F. Supp. 599, 610 (E.D.N.Y. 1993) ("[W]hether these . . .
statements really were the result of defendant's willful
violation of a clear and definite order is a question of fact
that must await a trial on the merits.").

Mr. Donziger's remaining arguments are all unavailing.

First, he contends that some of the criminal charges were
unwarranted because he purged the underlying contempt by taking
corrective action before Judge Kaplan issued the order to show
cause.  (See Def. Mot. at 24, 32-33.)   This argument fails
because it misunderstands the crucial distinction between civil
contempt, which serves to coerce compliance with an outstanding
order, and criminal contempt, which punishes the contemnor for a
"completed act of disobedience."   See International Union,
United Mine Workers of America v. Bagwell, 512 U.S. 821, 829
(1994) (citation and internal quotation marks omitted).   In the
same way that a car theft defendant cannot extricate himself
from exposure by eventually returning the stolen vehicles, a
contempt defendant is not entitled to dismissal because he
eventually complied with the previously disobeyed orders.   Mr.
Donziger's purging theory therefore fails.

Mr. Donziger next argues that some of his alleged contempt was "benign" or "too trivial" for criminal sanctions. (See Def. Mot. at 24.)  This argument is meritless.  Mr. Donziger cites no authority for the proposition that only the most egregious contempts warrant criminal charges, and the Court is aware of none.  To the contrary, the case law acknowledges that criminal contempt includes "a broad range of conduct, from trivial to severe." United States v. Carpenter, 91 F.3d 1282, 1284 (9th Cir. 1996).  That the defendant pegs the contempt at the lower end of that spectrum is not a basis for dismissing his charges.

Third, Mr. Donziger argues that Judge Kaplan's resort to criminal charges conflicts with the "principle that only the least possible power adequate to the end proposed should be used in contempt cases." Young v. United States ex rel. Vuitton et Fils S.A., 481 U.S. 787, 801 (1987) (citation, quotation marks, and alterations omitted).  From the facts set forth in the parties' papers, however, it appears that Mr. Donziger left Judge Kaplan with no real option other than criminal charges. Mr. Donziger is alleged to have repeatedly defied court orders, openly invited civil contempt, and refused to budge even when faced with coercive sanctions.  That course of conduct gives "no basis for thinking that more orders, warnings, or threats would have produced improvement." In re Holloway, 995 F.2d 1080, 1087 (D.C. Cir. 1993); see also In re Levine, 27 F.3d 594, 595 (D.C.

Cir. 1994) ("When the presiding judge makes serious and repeated efforts to require a lawyer to abide by the judge's orders, it is difficult to discern 'what lesser remedy [the judge] could have reasonably employed.'" (quoting Holloway, 995 F.2d at 1087)).  The Court therefore disagrees that contempt charges were excessive or unwarranted under the circumstances alleged.

Lastly, Mr. Donziger argues that because some of his allegedly contemptuous acts reflected "persistent, ethically-grounded and strenuous advocacy," his case is similar to In re McConnell, 370 U.S. 230 (1962), which reversed the contempt conviction of a lawyer who insisted on pursuing a forbidden line of questioning at trial.  McConnell is inapposite, however, as it addresses the requirements for contempt under 18 U.S.C. § 401(1), which prohibits in-court acts that "obstruct the administration of justice," not § 401(3), the statute Mr. Donziger is charged under, which prohibits "disobedience" of lawful court orders.  See McConnell, 370 U.S. at 233.  Moreover, Mr. Donziger is mistaken in suggesting that McConnell condones "ethically-grounded" defiance of court orders.  (See Def. Mot. at 24.)  Criminal contempt jurisprudence has no safe harbor for conscientious objectors.  Indeed, the law is clear that "a party may not challenge a court's order by violating it" -- instead, "he must move to vacate or modify the order, or seek relief [in the Court of Appeals]."  United States v. Cutler, 58 F.3d 825, 832

(2d Cir. 1995).  Accordingly, <u>McConnell</u> does not provide any grounds for dismissing the charges against Mr. Donziger.

### d. Disclosure of the Government's Communications with Gibson Dunn & Crutcher LLP

In his final pretrial motion, Mr. Donziger requests an order under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), directing the Government to disclose all of its communications with counsel from Gibson Dunn & Crutcher LLP ("Gibson Dunn"), Chevron's lawyers in the underlying civil case.  (<u>See</u> Def. Mot. at 33-37.) Mr. Donziger argues, without providing any meaningful basis for his suspicions, that Gibson Dunn could be feeding misleading information about him to the Government and that disclosure is needed so he can satisfy himself that nothing sinister is afoot.

However, Mr. Donziger's speculation that the universe is conspiring against him is not a basis for compelling disclosure. Like all other criminal defendants, he is "only entitled to disclosure of statements expressly authorized by Rule 16 or otherwise discoverable as exculpatory under <u>Brady</u>, or impeaching under 18 U.S.C. § 3500."  <u>United States v. Souza</u>, No. 06 Cr. 806 (SLT), 2008 WL 753736, at *2 (E.D.N.Y. Mar. 19, 2008).  The Government indicated that it is complying with its disclosure obligations, including under <u>Brady</u>, and will continue to do so. (Opp. at 33.)  Because Mr. Donziger gives the Court no reason to doubt the truthfulness of the special prosecutors'

representations, his request for the Gibson Dunn communications is denied.  See, e.g., United States v. Fallas, No. 09 Cr. 342 (LAP), 2010 WL 3468605, at *2 (S.D.N.Y. Aug. 19, 2010) (denying motion for Brady disclosures when the Government represented that "it will produce any Brady material promptly upon learning of its existence").

To the extent that Mr. Donziger states that if the disclosure he requests is not permitted, he will subpoena non-parties Gibson Dunn and Chevron, the Court is not aware of any rule that requires the Court's permission for the parties to initiate discovery.

III.   **CONCLUSION**

To the extent they are not addressed above, the Court has considered Mr. Donziger's remaining arguments and finds them unavailing.  For the foregoing reasons, Mr. Donziger's pretrial motions are DENIED.

SO ORDERED.

Dated: May 7, 2020
       New York, New York

_____
LORETTA A. PRESKA
Senior U.S. District Judge