1:11-cv-00691-LAK-RWL

18-855-cv (L)
*Chevron Corp. v. Donziger*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

——————

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Mar 04 2021

August Term, 2020

Argued: September 15, 2020      Decided: March 4, 2021

Docket Nos. 18-855-cv (L); 18-2191-cv; 19-1584-cv

——————

CHEVRON CORPORATION,

*Plaintiff - Counter-Defendant - Appellee,*

— v. —

STEVEN DONZIGER,

*Defendant - Counter-Claimant - Appellant,*

DONZIGER & ASSOCIATES, PLLC, THE LAW OFFICES OF STEVEN R. DONZIGER,

*Defendants - Counter-Claimants,*

PABLO FAJARDO MENDOZA, LUIS YANZA, FRENTE DE DEFENSA DE LA AMAZONIA, AKA AMAZON DEFENSE FRONT, SELVA VIVA SELVIVA CIA, LTDA, MARIA AGUINDA SALAZAR, CARLOS GREFA HUATATOCA, CATALINA ANTONIA AGUINDA SALAZAR, LIDIA ALEXANDRA AGUIN AGUINDA, PATRICIO ALBERTO CHIMBO YUMBO, CLIDE RAMIRO AGUINDA AGUINDA, LUIS ARMANDO CHIMBO YUMBO, BEATRIZ MERCEDES GREFA TANGUILA, LUCIO ENRIQUE GREFA TANGUILA, PATRICIO WILSON AGUINDA AGUINDA, CELIA IRENE VIVEROS CUSANGUA, FRANCISCO MATIAS ALVARADO YUMBO, FRANCISCO ALVARADO YUMBO, OLGA GLORIA GREFA CERDA, LORENZO

CERTIFIED COPY ISSUED ON 03/04/2021

Jose Alvarado Yumbo, Narcisa Aida Tanguila Narvaez, Bertha Antonia Yumbo Tanguila, Gloria Lucrecia Tangui Grefa, Francisco Victor Tanguila Grefa, Rosa Teresa Chimbo Tanguila, Jose Gabriel Revelo Llore, Maria Clelia Reascos Revelo, Maria Magdalena Rodri Barcenes, Hugo Gerardo Camacho Naranjo, Jose Miguel Ipiales Chicaiza, Heleodoro Pataron Guaraca, Luisa Delia Tanguila Narvaez, Lourdes Beatriz Chimbo Tanguil, Maria Hortencia Viver Cusangua, Segundo Angel Amanta Milan, Octavio Ismael Cordova Huanca, Elias Roberto Piyahua Payahuaje, Javier Piaguaje Payaguaje, Daniel Carlos Lusitand Yaiguaje, Benancio Fredy Chimbo Grefa, Guillermo Vicente Payagua Lusitante, Delfin Leonidas Payagu Payaguaje, Alfredo Donaldo Payagua Payaguaje, Miguel Mario Payaguaje Payaguaje, Teodoro Gonzalo Piaguaje Payaguaje, Fermin Piaguaje Payaguaje, Reinaldo Lusitande Yaiguaje, Luis Agustin Payagua Piaguaje, Emilio Martin Lusitand Yaiguaje, Simon Lusitande Yaiguaje, Armando Wilmer Piaguaje Payaguaje, Angel Justino Piaguag Lucitant, Kemperi Baihua Huani, Ahua Baihua Caiga, Pentibo Baihua Miipo, Dabota Tega Huani, Ahuame Huani Baihua, Apara Quemperi Yate, Bai Baihua Miipo, Bebanca Tega Huani, Comita Huani Yate, Cope Tega Huani, Ehuenguinto Tega, Gaware Tega Huani, Martin Baihua Miipo, Mencay Baihua Tega, Menemo Huani Baihua, Miipo Yatehue Kemperi, Minihua Huani Yate, Nama Baihua Huani, Namo Huani Yate, Omari Apica Huani, Omene Baihua Huani, Yehua Tega Huani, Wagui Coba Huani, Weica Apica Huani, Tepaa Quimontari Waiwa, Nenquimo Venancio Nihua, Compa Guiquita, Conta Nenquimo Quimontari, Daniel Ehuengei, Nantoqui Nenquimo, Okata Quipa Nihua, Cai Baihua Quemperi, Omayihue Baihua, Tapare Ahua Yete, Teweyene Luciana Nam Tega, Abamo Omene, Onenca Enomenga, Pego Enomenga, Wane Ima, Wina Enomenga, Cahuiya Omaca, Mima Yeti,

*Defendants.*[*]

---

[*] The Clerk of Court for the U.S. Court of Appeals for the Second Circuit is respectfully directed to amend the official caption as shown above.

3

_____

B e f o r e :

JACOBS, LYNCH, and SULLIVAN, *Circuit Judges.*

_____

Defendant-Appellant Steven Donziger appeals from an amended judgment of the United States District Court for the Southern District of New York (Kaplan, *J.*) awarding costs to Plaintiff-Appellee Chevron Corporation ("Chevron") pursuant to Federal Rule of Civil Procedure 54(d), several interlocutory orders declining to dismiss civil contempt proceedings against him and ordering compliance with post-judgment discovery, and a judgment and order finding him in civil contempt. We conclude that the district court did not err in awarding costs to Chevron. However, we also conclude that the district court was not clear and unambiguous in prohibiting Donziger from fundraising by selling interests in a fraudulently procured judgment.

We therefore AFFIRM the district court's amended judgment awarding costs to Chevron. We also AFFIRM in part and REVERSE in part the district court's contempt finding and VACATE the supplemental judgment awarding Chevron $666,476.34 in compensatory sanctions. Lastly, we VACATE the supplemental judgment awarding attorneys' fees and REMAND to the district court to determine the fees reasonably expended to secure the contempt findings affirmed on appeal.

Judge Sullivan DISSENTS in part in a separate opinion.

_____

THOMAS G. HUNGAR, Gibson, Dunn & Crutcher LLP,
    Washington, DC (Randy M. Mastro, Andrea E.
    Neuman, Gibson, Dunn & Crutcher LLP, New York,
    NY, William E. Thomson, Gibson, Dunn & Crutcher
    LLP, Los Angeles, CA, *on the brief*) for Plaintiff -
    Counter-Defendant - Appellee.

3

STEVEN R. DONZIGER, Pro Se, New York, NY *for Defendant - Counter-Claimant - Appellant.*

———————

GERARD E. LYNCH, *Circuit Judge*:

The pending appeals constitute the latest installment in the long-running litigation between Chevron Corporation ("Chevron") and Steven Donziger ("Donziger"); Donziger & Associates, PLLC; and the Law Offices of Steven R. Donziger (collectively, the "Donziger Defendants"). The saga began as a battle over environmental damage to Ecuador's Lago Agrio region of the Amazon Rainforest allegedly caused by Texaco, now owned by Chevron, in which Donziger represented a large number of indigenous people who claimed to have suffered from the destructive effects of Texaco's activities. But the current fight is not about Chevron's alleged pollution of the Amazon, which was litigated in the courts of Ecuador and culminated in a multi-billion dollar judgment against Chevron (the "Ecuadorian Judgment"). Rather, the three pending appeals relate to a subsequent civil Racketeer Influenced and Corrupt Organizations ("RICO") suit in which the United States District Court for the Southern District of New

York (Lewis A. Kaplan, *J.*) found that the Donziger Defendants and a group of Ecuadorian residents conspired to procure that judgment through illegal means.

Nor, however, do these appeals concern the merits of the RICO action, which has been authoritatively resolved against Donziger. In March 2014, after a seven-week trial, the district court entered a final judgment that principally awarded damages in the form of litigation costs to Chevron, imposed a constructive trust for Chevron's benefit on funds obtained by Donziger traceable to the Ecuadorian Judgment, and enjoined Donziger from seeking to enforce the Ecuadorian Judgment in the United States and from engaging in activities that would allow him to profit from the fraudulently procured judgment (the "Injunction," and, together with other remedies, the "RICO Judgment"). This Court affirmed the RICO Judgment, and the Supreme Court denied further review. *Chevron Corp. v. Donziger*, 833 F.3d 74 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 2268 (2017).

These appeals stem from yet another phase of the litigation, which ensued following the RICO Judgment. First, Donziger appeals a supplemental judgment quantifying the award of costs due to Chevron for successfully litigating the RICO action. Second, Donziger appeals several of the district court's orders

entered during the pendency of contempt proceedings initiated by Chevron arising out of Donziger's alleged violations of the Injunction. Third, Donziger appeals the court's final order and judgment finding Donziger in civil contempt of the Injunction and awarding sanctions and attorneys' fees to Chevron.

We conclude that the district court did not err in awarding costs to Chevron under Federal Rule of Civil Procedure 54(d). We also affirm the district court's finding that Donziger violated the Injunction in several respects and its judgment of civil contempt relating to those violations. However, we hold that the Injunction, previously affirmed by this Court and clear and far-reaching on its own terms, was insufficiently clear and unambiguous, when read alongside the district court's explanation of that Injunction in a subsequent opinion, in prohibiting Donziger from raising funds by selling interests in the Ecuadorian Judgment. Thus, we conclude that the district court erred in finding Donziger in contempt for engaging in that conduct.

We emphasize, however, that the district court's further elaboration on the terms of the Injunction in its contempt rulings have now clarified that the actions taken by Donziger that formed the basis of the now-vacated contempt findings *are* prohibited by the Injunction, such that any repetition of those actions in the

future would be in contempt of the Injunction.

## BACKGROUND

### I. The Injunction and Constructive Trust

After the RICO trial, the district court found by clear and convincing

evidence that the Donziger Defendants and two other defendants (the "LAP

Representatives" or "LAPs")[1] fraudulently procured the Ecuadorian Judgment

against Chevron through a pattern of racketeering activity in violation of 18

U.S.C. §§ 1962(c) and (d). *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 567-603

(S.D.N.Y. 2014) ("*Chevron I*"), *aff'd*, 833 F.3d 74 (2d Cir. 2016). Specifically, the

court found that Donziger, among other things, bribed the presiding judge to

enter a judgment in his clients' favor in exchange for $500,000 of the judgment's

proceeds; coerced the court to appoint a hand-picked expert whom Donziger

paid for favorable testimony; and ghost-wrote the Ecuadorian Judgment "in

---

[1] Chevron initiated the RICO action against dozens of defendants, including the
Donziger Defendants and 47 Ecuadorian individuals. Only two of the Ecuadorian
defendants answered the complaint. The post-trial RICO Judgment thus ran only
against the Donziger Defendants and the two appearing LAP Representatives.
On April 18, 2018, however, the district court clerk found the non-appearing
individuals in default (the "non-appearing defendants"). On April 23, 2018, the
district court enjoined those individuals under the same terms as the Donziger
Defendants and the appearing LAP Representatives.

whole or in major part" with only "light editing" by the judge who signed it. *Id.* at 558-60.

The district court's judgment awarded costs to Chevron as the prevailing party, enjoined Donziger from performing actions that would allow him to profit from the fraudulently procured Ecuadorian Judgment, and imposed a constructive trust on any proceeds accruing to Donziger from exploitation of that judgment. The Donziger Defendants appealed the RICO Judgment, but in 2016, this Court affirmed as "unchallenged" the district court's extensive findings "as to [Donziger's] fraud, coercion, and bribery." *Chevron Corp. v. Donziger*, 833 F.3d 74, 151 (2d Cir. 2016) ("*Chevron II*"). We also held that the district court had the authority to grant equitable relief under RICO and did not abuse its discretion in prohibiting Donziger "from profiting from the corrupt conduct that led to the [Ecuadorian Judgment] against Chevron." *Id*.

The Injunction, in relevant part, ordered the following:

> 1. The Court hereby imposes a constructive trust for the benefit of Chevron on all property, whether personal or real, tangible or intangible, vested or contingent, that Donziger has received, or hereafter may receive, directly or indirectly, or to which Donziger now has, or hereafter obtains, any right, title or interest,

8

directly or indirectly, that is traceable to the [Lago Agrio] Judgment or the enforcement of the [Lago Agrio] Judgment anywhere in the world . . . .

3. Donziger shall execute in favor of Chevron a stock power transferring to Chevron all of his right, title and interest in his shares of Amazonia [Recovery Limited] . . . .

5. Donziger and the LAP Representatives, and each of them, is hereby further enjoined and restrained from undertaking any acts to monetize or profit from the [Ecuadorian] Judgment, as modified or amended, or any New Judgment, including without limitation by selling, assigning, pledging, transferring or encumbering any interest therein.

6. Notwithstanding anything to the contrary in this Judgment, nothing herein enjoins, restrains or otherwise prohibits Donziger, the LAP Representatives, or any of them, from (a) filing or prosecuting any action for recognition or enforcement of the [Ecuadorian] Judgment or any New Judgment, or any for prejudgment seizure or attachment of assets based in courts outside the United States; or (b) litigating this action or any appeal of any order or judgment issued in this action.

Sp. App'x at 1-3.

After the district court issued the Injunction, the Donziger Defendants

moved for a stay pending appeal. In that motion, Donziger argued that the

Injunction wrongfully encroached on his ability to enforce the Ecuadorian

Judgment in other countries on behalf of his clients, devastated his law practice,

9

and would preclude his clients from financing an appeal by selling interests in the Ecuadorian Judgment.[2] These effects, Donziger argued, would inflict irreparable injury on him and his clients that could not be cured by a successful appeal.

On April 25, 2014, the district court granted the motion in part (the "Stay Order"), but rejected Donziger's contention that the Injunction imposed sweeping restrictions on his ability to represent the Lago Agrio plaintiffs in pursuing enforcement of the Ecuadorian judgment in other countries and to be paid for such work, explaining that the court "granted only narrow relief intended to preclude Donziger . . . from profiting from the misdeeds for which [he was] responsible." *Chevron Corp. v. Donziger*, 37 F. Supp. 3d 653, 655 (S.D.N.Y. 2014) ("*Chevron Stay Opinion*"). The Stay Order emphasized that "[n]othing in the [Injunction] prevent[ed] Donziger from continuing to work on the Lago Agrio case. Period." *Id*. at 658.

---

[2] Donziger's clients had financed the litigation by selling interests in the Ecuadorian Judgment, and the district court was keenly aware of this financing structure. *See, e.g, Chevron Corp. v. Donziger*, 37 F. Supp. 3d 653, 662 (S.D.N.Y. 2014) ("This case always has been financed . . . by outside investors, not the individual defendants.").

## II.    The Imposition of Costs

As part of its judgment in the RICO action, the district court ordered that "Chevron shall recover of Donziger . . . the costs of this action" pursuant to Rule 54(d)(1) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1920. Sp. App'x at 4. However, the amount of costs to be taxed against Donziger was not ascertained until much later, because the local rules require the prevailing party to file a notice of taxation of costs "within thirty (30) days after the final disposition of the appeal." S.D.N.Y. R. 54.1. After this Court affirmed the judgment on appeal, Chevron timely filed its notice of taxation of costs. The district court then ordered the clerk not to tax costs until any petition for certiorari was adjudicated by the Supreme Court. Thus, it was only on July 17, 2017, after the Supreme Court denied the petition, that the district court ordered the clerk to tax costs.

Donziger objected to the imposition of certain costs and wrote a letter to the clerk, asking her to "hold in abeyance any action regarding taxation of costs" until certain issues were fully resolved. Supp. App'x (18-855) at 46. Unsurprisingly, the clerk followed the court's order and taxed costs in the amount of $944,463.85 on August 8, 2017. On August 16, 2017, Donziger wrote to

11

the district court, objecting to the "exorbitant and unprecedented taxation of costs." *Id*. at 58. On November 9, 2017, the district court ordered the two special masters it had appointed to oversee discovery issues in the case to provide Donziger and the court with time records sufficient to allow Donziger to object to the reasonableness of their charges.[3] The district court required Donziger to file any objection by December 4, 2017. The court also ordered the special masters to file a report and recommendation ("R&R") setting forth how their costs should be allocated as between the parties by December 9, 2017.

Though the special masters furnished their records to Donziger on November 21, 2017, Donziger failed to object to the reasonableness of the fees. Thus, on December 6, 2017, the district court found the costs reasonable and

---

[3] The district court had appointed two special masters to oversee the dozens of depositions that were scheduled in this case. Initially, the special masters' fees were to be split equally between the Plaintiff and the Defendants. Donziger objected to the appointment, citing his inability to pay the fees. To alleviate this concern, the district court ordered Chevron to advance all of the special masters' fees but allowed Chevron to "move, pursuant to Fed. R. Civ. P. 53(g)(3), for an allocation of part of the fees and costs advanced by it to one or more of the defendants" within 14 days after the submission of the special masters' final billings. J. App'x 78. Though the special masters submitted billings throughout the litigation, Chevron never moved for an interim allocation of the fees it had advanced; instead, it requested the special masters' fees as costs in its notice to the clerk.

deferred its decision on allocation pending the special masters' forthcoming R&R. That same day, Donziger filed an untimely letter to the district court objecting to the reasonableness of the costs and arguing that Chevron's attorneys committed misconduct throughout the case.

On December 8, 2017, the special masters filed their R&R, recommending that the defendants in the RICO action be held jointly and severally liable for 85% of their fees, as they considered the defendants responsible for most of the costs incurred. Donziger did not timely object to the R&R. On March 1, 2018, the district court accepted the R&R and amended the total costs imposed to $813,602.71, reflecting the assessment of 85% of the special masters' costs to defendants.

## III.    Contempt Proceedings in the District Court

After this Court affirmed the district court's RICO Judgment, Chevron began alerting the district court to alleged violations of the Injunction. On June 19, 2017, Chevron notified the court that Donziger had failed to transfer his shares of Amazonia Recovery Limited ("Amazonia") to the Clerk of the Court. On March 19, 2018, Chevron asserted that Donziger was in contempt of

13

paragraphs three and five of the Injunction because he had persisted in his failure to transfer his shares of Amazonia and had attempted to monetize the Ecuadorian Judgment by offering to sell an interest in the judgment's future proceeds to a hedge fund. In a letter dated May 11, 2018, Chevron argued that Donziger was also in contempt of paragraph one of the Injunction by failing to transfer *all* property traceable to the Ecuadorian Judgment to Chevron. Between September 2018 and May 2019, Chevron filed five motions to hold Donziger in contempt for violations of the Injunction and associated court orders.

In response to this flurry of contempt motions, Donziger began to raise concerns about his obligations under the Injunction as clarified by the Stay Order. On May 31, 2018, Donziger moved to dismiss Chevron's contempt motions and for declaratory relief in the form of a declaratory judgment stating that the Injunction does not prevent Donziger from, inter alia, attempting to enforce the Ecuadorian Judgment in non-U.S. jurisdictions and raising funds by selling interests in a recovery of the Ecuadorian Judgment – as opposed to shares in Donziger's specific contingency interest in that judgment – to cover litigation expenses. The district court denied the motion in June 2018, characterizing Donziger as arguing that the Injunction had been "modified by the [c]ourt's" Stay

14

Order, and rejecting that argument. Sp. App'x at 117.

On May 23, 2019, the district court entered its order holding Donziger in contempt of the Injunction (the "Contempt Order"). The Contempt Order found that Donziger violated the Injunction by, among other things, improperly monetizing and profiting from the Ecuadorian Judgment in violation of paragraphs one and five of the Injunction.[4] Specifically, the court found that Donziger sold shares in the Ecuadorian Judgment to at least six investors in exchange for over $1.2 million between January 2016 and June 2018 and paid himself with those funds.

--------

[4] The district court's contempt findings were very detailed. The Contempt Order found Donziger in contempt of the Injunction for: (1) failing to transfer and assign his right to a 6.3 percent contingent fee of moneys obtained from the Ecuadorian Judgment; (2) attempting to sell a portion of his personal contingent fee recovery in exchange for services; (3) monetizing and profiting from the Ecuadorian Judgment by using it to raise funds to pay his personal expenses; (4) transferring property in which he had an interest in violation of a restraining notice; and (5) violating a court order to provide forensic experts access to certain electronically stored information. On May 16, 2018, the district court had previously found Donziger in contempt of paragraph three of the Injunction for failing to transfer Amazonia stock to Chevron between March 4, 2014 and May 9, 2018, the date on which Donziger signed a stock power in favor of Chevron. Donziger challenges the contempt finding only as to his alleged profiting and monetizing of the Ecuadorian Judgment. Indeed, he expressly admits that he has not addressed any other "lingering civil contempts" in the present appeal. Appellant's Reply Br. at 7 n.6.

The court held that selling interests in the Ecuadorian Judgment to investors violated paragraph five of the Injunction because doing so allowed Donziger to "monetize or profit from the [j]udgment . . . by selling . . . any interest therein." Sp. App'x at 3. The court found that Donziger profited from the judgment because he paid himself for his legal work with the funds that he raised. Thus, the court found clear violations of paragraph five.

Even if Donziger were entitled to pay himself from the funds that he raised by selling interests in the Ecuadorian Judgment, the court concluded, those funds would have been property "traceable to the [Ecuadorian] Judgment" subject to the constructive trust in favor of Chevron under paragraph one. Sp. App'x at 2. The court reasoned that such funds were attributable to the judgment and therefore fell under a plain meaning of the word "traceable."

Donziger argued that he reasonably believed that his behavior did not violate the Injunction based on the assurances the district court provided him in the Stay Order: namely, that the Injunction would not prohibit him from continuing to work on the Lago Agrio case by pursuing enforcement of the Ecuadorian Judgment in countries other than the United States and to be paid for

such work "as he [had] been paid . . . over the past nine or ten years." *Chevron Stay Opinion*, 37 F. Supp. 3d at 658. The court rejected that argument. First, it noted that the Injunction was on appeal at the time that the Stay Order was issued, so the district court had no jurisdiction to modify it. Even if the Stay Order could have modified the Injunction, the court disagreed with Donziger's interpretation of the Stay Order. It rejected Donziger's reading of the Injunction as prohibiting monetizing or profiting from only *his* interest in the Ecuadorian Judgment, while allowing him to sell others' interests and pay himself from those funds. The court also rejected Donziger's argument that the Stay Order signaled that only funds collected from the *enforcement* of the Ecuadorian Judgment were subject to the constructive trust.

Ultimately, the district court found Donziger in contempt of the Injunction for, inter alia, taking "at least $666,476.34 of investor funds traceable to the Ecuador[ian] Judgment in violation of paragraphs 1 and 5 of the [Injunction]"and entered a supplemental judgment for Chevron in that amount. Sp. App'x at 201, 216. The district court further awarded Chevron $3,433,384.30 for reasonable attorneys' fees. Donziger contends the funds he received were payments for his monthly retainer or arrears on the retainer, which, in his view, he was allowed to

collect in compliance with the Injunction as he understood it.

## IV. The Appeals

This Opinion addresses three appeals pending before this Court. First, Donziger appeals from the supplemental judgment of the district court determining the amount of costs awarded to Chevron incurred in the litigation to obtain the RICO Judgment. Second, during the pendency of post-judgment civil contempt proceedings, Donziger filed an appeal challenging the district court's interlocutory orders denying several of his motions relating to those proceedings. Finally, at the conclusion of the contempt proceedings, Donziger appealed the court's order and supplemental judgment finding him in civil contempt and awarding Chevron compensatory sanctions.

## DISCUSSION

Donziger argues that imposing costs on him is inequitable due to the disparity of resources between the parties and Chevron's alleged misconduct during the RICO suit, and that, in any event, he had a right to a jury trial if costs were to be imposed. Next, Donziger contends that the district court erred in denying his Rule 12(b)(6) motion to dismiss Chevron's motions to hold him in

civil contempt and further erred in denying his motion for a declaratory

judgment clarifying the Injunction.[5] Lastly, Donziger argues that the district court

erred in finding him in contempt of the Injunction and awarding Chevron

compensatory sanctions. We take each argument in turn.[6]

---

[5] Donziger also argues that the district court erred in denying his motion for a protective order. However, that issue is now moot. An appeal becomes moot "when, by virtue of an intervening event, a court of appeals cannot grant any effectual relief whatever in favor of the appellant." *Calderon v. Moore*, 518 U.S. 149, 150 (1996) (internal quotation marks omitted). Donziger argues that his First Amendment right of association would be threatened if Chevron obtained access to his finances and associates. However, the relevant information has already been disclosed during the extensive discovery Chevron conducted on this matter. Additionally, Donziger waived any objection to the public disclosure of that information when he failed to object to Chevron's motion for leave to file its contempt motion without redactions. Thus, no "effectual relief" can be awarded that would make the already public information nonpublic again. *Id.*

[6] The parties disagree about whether this Court has jurisdiction over Donziger's appeal of the district court's interlocutory orders denying his motion to dismiss Chevron's contempt motions and declining to issue a declaratory judgment clarifying the Injunction. Donziger argues that these decisions "applied a fundamentally modified and broadened version of the injunctive relief that originally issued." Appellant's Br. (18-855) at 9. Thus, he argues, we have jurisdiction under 8 U.S.C. § 1292(a)(1), because these decisions effectively modified the district court's Injunction.

Whether we have jurisdiction in this circumstance is a "close[] question" that requires looking at the merits of Donziger's argument. *Wilder v. Bernstein*, 49 F.3d 69, 72 (2d Cir. 1995). "In order to determine whether [interlocutory] ruling[s] modif[y] [an injunction], we must assess [the] merits because if the Judge correctly construed the [injunction], he did not modify it, but if he erred in his construction, he did modify it." *Id*. Because Donziger also appeals the district

# I. Standards of Review

A district court's award of costs is reviewed for abuse of discretion. *See In re Air Crash Disaster at John F. Kennedy Int'l Airport on June 24, 1975*, 687 F.2d 626, 629 (2d Cir. 1982).

We review a district court's contempt finding for abuse of discretion, though our review is "more exacting" than that standard typically connotes. *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 789 F.3d 29, 33 (2d Cir. 2015) (internal quotation marks omitted). Prior to finding a party in contempt, the "district court must find that the alleged contemnor had notice of the underlying order, that the terms of the order were clear and unambiguous, and that proof of noncompliance was clear and convincing." *Id.* Indeed, the order must leave "no doubt in the minds of those to whom it was addressed." *Drywall Tapers & Pointers of Greater New York v. Local 530*, 889 F.2d 389, 395 (2d Cir. 1989). Factual determinations underlying a contempt finding "are reviewed for clear error, but questions of

---

court's ultimate judgment finding him in contempt of the Injunction, we need not decide this question, since Donziger's appeal of the district court's final order finding him in contempt brings before this Court all of the parties' contentions regarding the meaning of the Injunction and thus moots his separate appeal of the related interlocutory orders.

law, including interpretation of the order, are reviewed *de novo*." *U.S. Polo Ass'n, Inc.*, 789 F.3d at 33.

An award of sanctions or attorneys' fees resulting from a contempt order is also reviewed for abuse of discretion. *See, e.g., CBS v. FilmOn.com, Inc.*, 814 F.3d 91, 100 (2d Cir. 2016); *Townsend v. Benjamin Enterprises, Inc.*, 679 F.3d 41, 58 (2d Cir. 2012).

## II.    Costs

### A. Scope of Appeal

Donziger does not challenge the district court's power to award to Chevron the costs of the litigation leading to the RICO Judgment. Nor does he argue that the special masters' fees fall outside the categories of expenses that can be taxed as costs. Rather, he argues that the district court "disregarded, distorted, or misapplied" several principles that should have compelled the court to find that awarding costs would be inequitable or unfair. Appellant's Br. (18-855) at 50. Specifically, Donziger argues that the district court erred in awarding costs to Chevron in light of the large disparity in resources between him and the oil company and the misconduct in which Donziger alleges that Chevron engaged

21

throughout the proceedings. He also argues that the district court ignored his objections to the taxation of certain costs. Lastly, Donziger argues that, under these circumstances, the Seventh Amendment provides him the right to a jury trial to determine the proper assessment of costs.

In response, Chevron argues that Donziger waived his right to challenge the award of costs when he failed to raise the issue in his appeal of the RICO Judgment. Although Donziger appealed the judgment in the RICO action, which not only included the Injunction but also ordered that Chevron was entitled to costs pursuant to Rule 54(d), he did not raise any issue in that appeal with respect to the award of costs. Thus, in Chevron's view, Donziger may challenge only the *amount* of costs taxed against him. For its part, the district court taxed costs on the assumption that Donziger had waived any arguments regarding costs that were inconsistent with the final judgment in the RICO action.

By failing to appeal the district court's general imposition of costs in his merits appeal of the RICO Judgment, Donziger waived any arguments inconsistent with that judgment. Arguments not raised on appeal are deemed abandoned and need not be reviewed by this Court. *Deep Woods Holdings, L.L.C.*

22

*v. Sav. Deposit Ins. Fund of Republic of Turkey*, 745 F.3d 619, 623 (2d Cir. 2014).

Moreover, "a legal decision made at one stage of litigation, unchallenged in a

subsequent appeal when the opportunity to do so existed, becomes the law of the

case for future stages of the same litigation, and the parties are deemed to have

waived the right to challenge that decision at a later time." *N. River Ins. Co. v.

Phila. Reinsurance Corp.*, 63 F.3d 160, 164 (2d Cir. 1995) (internal quotation marks

omitted). Thus, when Donziger appealed the March 18, 2014 judgment in the

RICO action but failed to challenge the award of costs during that appeal, he

waived any arguments regarding the general imposition of costs against him. In

other words, Donziger can now challenge only the *amount* of costs imposed, as

set by the supplemental judgment from which he now appeals.

Donziger's characterization of this result as "brutally unfair" misses the

mark. Appellant's Br. (18-855) at 52. He describes the merits appeal as

"extraordinarily complex" and asserts that he had only limited space to properly

address his numerous other legal arguments. *Id*. First, while this litigation may be

complex, that is of no matter here. Donziger was represented by counsel in his

merits appeal, and even if he were not, Donziger is not a typical pro se litigant; he

is an attorney, and this Court does not give special solicitude to pro se litigants

23

who are themselves attorneys. "[A] lawyer representing himself ordinarily receives no [special] solicitude at all." *Tracy v. Freshwater*, 623 F.3d 90, 102 (2d Cir. 2010).

Second, Donziger's assertion that he did not have enough space in his merits brief to address all of his arguments is not credible. In fact, Donziger sought and received leave to file an oversized brief of up to 29,000 words in his merits appeal, while our typical rules provide for a principal brief containing no more than 14,000 words. 2d Cir. R. 32.1(a)(4)(A). If Donziger needed more space, he could have asked for it, but he did not. In any event, litigants facing space limitations must make choices as to the issues that they wish to pursue in appeals, and abide by the consequences of their decisions.

In short, there is nothing unfair about this result. Donziger failed to object to the imposition of costs when he had the opportunity to do so, and, as a result, he has waived his arguments that a disparity of wealth between the parties, alleged misconduct on the part of Chevron's attorneys, or the district court's failure to provide him a jury trial to determine whether costs should be imposed

should have categorically precluded an award of costs.[7] His arguments regarding the amount of costs assessed and the allocation of fees earlier advanced by Chevron, however, which he could not have previously raised because the issues were resolved subsequent to Donziger's initial appeal, are not waived, and we address them here.

### B. Taxation of Costs

Donziger argues that the district court erred in allowing the clerk to tax

---

[7] Donziger's argument that "forcing [him] to empty out his life savings to an oil company that grosses $250 billion per year is . . . a clear abuse of discretion" is made as part of his discussion of the district court's power "to refuse to impose costs on the losing party at all." Appellant's Br. (18-855) at 49-50 (internal quotation marks omitted). That is a categorical objection to the award of costs that could have been raised in his earlier appeal and thus has been waived. Even if we were to construe that argument as challenging the *amount* of costs imposed or as objecting specifically to the division of responsibility for the special masters' fees and thus as properly raised in this appeal, the argument would be unavailing. The district court's allocation of costs relied on the special masters' conclusion, which Donziger did not timely challenge, that it was Donziger's obstructive conduct that resulted in expenses beyond what they should have been. It was hardly clear error for the district court to adopt that finding. In light of that conduct, and given that costs were sought in a litigation in which Donziger has been found liable for engaging in a pattern of racketeering involving corruption of a foreign judiciary resulting in a multi-billion dollar judgment, it was not an abuse of the court's equitable discretion in the matter of costs to award costs to Chevron, including the lion's share of the special masters' fees, notwithstanding the disparity in resources between the parties.

costs related to the special masters' fees because Chevron had failed to timely

seek allocation of those fees under an order from the district court. Therefore, he

argues, Chevron waived its right to recover those fees as costs at the conclusion

of the litigation.[8] His argument is not persuasive.

  As a preliminary matter, Chevron points out that Donziger did not follow

proper procedure when he raised this argument in letters and not in a motion.

That is true. However, given that the district court looked past its own

procedural rules to address Donziger's timeliness argument on the merits,[9] we

_____

[8] Donziger also argues that there was "clear evidence" that the special masters
were biased against him. Appellant's Br. (18-855) at 54. This is an argument that
Donziger could have raised in his merits appeal, and thus may not be raised now
in this subsequent appeal. *N. River Ins. Co.*, 63 F.3d at 164. Even if it were
properly before us, Donziger's three-sentence argument – which only references
arguments that he made to the district court – is conclusory, which itself results
in waiver. "Issues not sufficiently argued in the briefs are considered waived and
normally will not be addressed on appeal." *Norton v. Sam's Club*, 145 F.3d 114,
117 (2d Cir. 1998). "Appellants do not preserve questions for appellate review by
merely incorporating an argument made to the district court by reference in their
brief." *Lederman v. N.Y.C. Dep't of Parks and Recreation*, 731 F.3d 199, 203 n.1 (2d
Cir. 2013) (internal quotation marks and alteration omitted).

[9] In its order regarding costs, the district court noted that "[a]ll or substantially all
of [Donziger's] arguments could be rejected on the ground that he disregarded
court rules in seeking review of the Clerk's actions" by, for example, filing letters
to the clerk and the judge instead of filing a formal motion. Supp. App'x (18-855)
at 120, 150. But the district court proceeded to look past its own rules to decide
the merits of his arguments regarding the taxation of the special masters' fees. *Id*.

review the district court's decision. *See Somlyo v. J. Lu-Rob Enterprises, Inc.*, 932 F.2d 1043, 1048-49 (2d Cir. 1991) (describing a district court's "inherent discretion to depart from the letter of the Local Rules" and reviewing the result).

Donziger contends that Chevron forfeited its right to certain special masters' fees "when it failed to timely seek allocation of those fees under a very specific district court order." Appellant's Br. (18-855) at 53. That order, issued in response to Donziger's assertion that he could not afford to advance the special masters' fees, directed Chevron to advance those fees but allowed it to "move, pursuant to Fed. R. Civ. P. 53(g)(3), for an allocation of part of the fees and costs advanced by it" within 14 days after the submission of the special masters' final billings. J. App'x at 78. Chevron did not move for that allocation; instead it chose to wait until the conclusion of the litigation to recover the special masters' fees as part of its award of costs.

Donziger argues that the district court's order allowing Chevron to seek an

---

at 121 ("Accordingly, the application to review the taxation of costs – *except as it relates to the taxation of the special master fees and expenses* which, as discussed below, raises at least some issues that may be decided on the existing record and without briefing – is, to the extent it is denied, denied based on Donziger's failure to comply with the Federal Rules of Civil Procedure and the local rules of this Court." (emphasis added)).

allocation of the interim costs as they were incurred was, in effect, mandatory. Under his logic, because Chevron failed to avail itself of the opportunity to request an allocation of the fees earlier in the litigation, it is now barred from requesting the fees as costs at the conclusion of the litigation. The district court found that Donziger's interpretation of the order "makes little sense" because the order was meant to give "Chevron the option, but not the obligation, to move to recover on an interim basis any or all of the funds it advanced." Supp. App'x (18-855) at 149.

The district court's interpretation of its order is reasonable; Chevron did not waive its right to recover the special masters' fees that it advanced throughout the litigation. As the district court noted, the Federal Rules of Civil Procedure give the district court authority to "allocate payment among the parties after considering . . . the parties' means," and an interim allocation of payment "may be amended to reflect a decision on the merits." Fed. R. Civ. P. 53(g)(3). In addition, the Local Civil Rules provide that special masters' fees "are taxable as costs." S.D.N.Y. R. 54.1(c)(8). After considering the district court's order alongside these rules, it is clear that the district court did not abuse its discretion in awarding special masters' fees as costs to Chevron at the conclusion

28

of the litigation. *See United States ex rel. Evergreen Pipeline Constr. Co. v. Merritt Meridian Constr. Corp.*, 95 F.3d 153, 171 (2d Cir. 1996) ("[I]f costs are authorized, the determination of amounts is vested in the sound discretion of the district court.").

In summary, because Donziger failed to appeal the district court's judgment awarding costs to Chevron in the first instance, Donziger may challenge in this appeal only the *amount* of costs taxed against him, as that amount was ascertained after the conclusion of his first appeal. His only argument in that regard is that Chevron waived its right to recover the special masters' fees, because it failed to take advantage of the district court's order providing it the option of moving to recover those costs piecemeal throughout the litigation. However, the order did not *require* Chevron to proceed in that manner, and the Federal Rules of Civil Procedure, as well as the Local Civil Rules, allow the clerk to tax special masters' fees as costs at the conclusion of the litigation. The clerk did so, and the district court did not abuse its discretion when it issued its supplemental judgment awarding $813,602.71 in costs to Chevron.

### III.    Contempt

Prior to the district court's contempt finding, Donziger argued that the court's post-judgment discovery rulings showed that it had "implicitly modified" the Injunction as he understood it after the Stay Order. Appellant's Br. (18-855) at 4, 32. Thus, he was ready to "respectfully go into civil contempt as necessary to achieve an appeal on the merits of any alleged non-compliance with the modified injunction." *Id*. at 5. The court then held him in contempt. He appeals that decision, arguing that the court erred because the Injunction did not clearly prohibit his selling interests in the Ecuadorian Judgment to finance the litigation. Because we find that the Stay Order created ambiguity as to what precisely Donziger could no longer do to assist his clients in raising funds to continue their litigation efforts, we agree that the contempt finding on that limited issue cannot stand. *See Drywall,* 889 F.2d at 395 (holding that an injunction must leave "no doubt in the minds of those to whom it [is] addressed . . . precisely what acts are forbidden" to support a contempt finding).

Donziger does not challenge the district court's numerous other contempt findings in this appeal. *See* Appellant's Reply Br. at 7 n.6. Thus, any objection

Donziger may have to those findings of contempt has been waived. *See Norton v.*

*Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998). The district court's judgment finding

Donziger in contempt of its orders in all respects other than his participation in

the sale of interests in the Ecuadorian Judgment (as distinct from interests in his

own right to a portion of that judgment as a contingent fee) is therefore affirmed.

### A. The Injunction

The plain language of the Injunction as written is clear and expansive.

Paragraph one imposes "a constructive trust for the benefit of Chevron on *all*

property . . . which Donziger [had or would obtain] . . . that is traceable to the

[Ecuadorian] Judgment *or* the enforcement of the Judgment anywhere in the

world." Sp. App'x at 1-2 (emphasis added). Thus, the most logical reading of this

paragraph is that it prohibits Donziger from selling any interest he might have in

the Ecuadorian Judgment because such funds would be "traceable to the

[j]udgment," *id.*, and subject to the constructive trust.

Paragraph five is also far reaching. It forbids Donziger "from undertaking

*any* acts to monetize or profit from the [Ecuadorian] Judgment . . . including

without limitation by selling, assigning, pledging, transferring or encumbering

*any* interest therein." *Id*. at 3 (emphasis added). Standing alone, this language is most plausibly read to prohibit Donziger from raising funds by selling interests in the Ecuadorian Judgment to pay himself his retainer and use the funds thus obtained for personal expenses because that would constitute his profiting from the judgment by "selling . . . [an] interest therein." *Id*.

Paragraph six of the Injunction made clear what it did *not* prohibit. The district court evidently tailored the Injunction in light of its apparent understanding that it lacked authority to restrain Donziger from attempting to enforce the Ecuadorian Judgment abroad, *see Chevron Corp. v. Naranjo*, 667 F.3d 232, 243-44 (2d Cir. 2011) (noting that a court's attempt to preclude the enforcement of a foreign judgment in courts of other nations raises a grave "international comity concern[]"), or to interfere with Donziger's appeal of the RICO Judgment. Thus, the Injunction explicitly allows Donziger to "fil[e] or prosecut[e] any action for recognition or enforcement of the [Ecuadorian Judgment] . . . in courts outside the United States" and continue to "litigat[e] this action or any appeal of any order or judgment issued in this action." Sp. App'x at 3.

Taken together, the terms of the Injunction at the time it was issued enjoined Donziger from monetizing or profiting from the Ecuadorian Judgment. It separately imposed a trust over Donziger's property that was or would be traceable to that judgment or its enforcement. Both of these provisions on their face appear to prohibit his practice of selling interests in the judgment to pay himself for legal work on the case. Finally, the Injunction was explicit in that it did not restrain Donziger from attempting to enforce the judgment abroad or limit Donziger's appeal of the action.

Contrary to Donziger's assertions, these terms are not facially inconsistent. That the Injunction allows Donziger to continue pursuing enforcement of the Ecuadorian Judgment abroad, which undoubtedly requires funding, does not mean that Donziger could himself monetize or profit from the judgment in the process of funding those efforts. Donziger could have continued his work by being paid legal fees from funds that were not traceable to the Ecuadorian Judgment. Nor would the Injunction preclude those of his clients who were not initially bound by the Injunction from pursuing those efforts with the assistance of other counsel retained on a contingency basis. In other words, it was possible for Donziger and his clients to comply with the Injunction and continue litigating

33

their case.

Donziger clearly recognized at the time the RICO Judgment was entered that the plain terms of the Injunction would affect his ability to continue to fundraise by leveraging the Ecuadorian Judgment; he brought several concerns about such effects to the court in his motion to stay. In his brief on the stay motion, he asserted that the Injunction would deprive him of "his . . . ability to work on" the case, which "constitutes [his] only personal source of earned income." J. App'x at 97. Specifically, he argued that "by broadly enjoining him from undertaking *any* acts to monetize or profit from the [j]udgment," the Injunction would "obliterate his [law] practice." *Id*. at 98 (internal quotation marks omitted) (emphasis in original). Furthermore, he noted that the Injunction also enjoined his co-defendants from monetizing the judgment, which would leave them "without sufficient funds to finance any appeal of this action . . . because even a contingency arrangement would monetize the judgment and therefore violate the order." *Id*. at 99.

That Donziger himself recognized that the Injunction would have dramatic effects on his ability to monetize the Ecuadorian Judgment is further evidence

34

that the Injunction as written and issued was unambiguous in prohibiting that

conduct. *See Drywall*, 889 F.2d at 395 (concluding that a party's complaint about

an injunction's effect can be evidence that the injunction was clear as to those

effects). As he himself explained, the Injunction would have far reaching effects

on his ability to monetize the judgment and pay himself from the funds thus

raised to continue litigating this case on behalf of his clients. Standing alone, the

Injunction was unambiguous and would support a contempt finding if Donziger

sold interests in the Ecuadorian Judgment to pay himself retainer payments and

arrears.

## B. The Stay Order

The district court, however, dismissed Donziger's concerns in its Stay

Order. It assured him that his concerns were unfounded, stating "[n]othing in the

[Injunction] prevents Donziger from continuing to work on the Lago Agrio case.

Period." *Chevron Stay Opinion*, 37 F. Supp. 3d at 658. It then went on to discuss

how Donziger could or could not be paid for such work.

### 1. Paragraph One

The court first discussed paragraph one of the Injunction. It recognized

35

that Donziger's compensation for his work on the case was governed by a retainer agreement that included both a monthly retainer and a contingent fee. In discussing what Donziger was prohibited from doing, the court distinguished payments to Donziger as part of his contingent fee from payments of the monthly retainer, stating that while "*any* payments *of a Contingent Fee* would be 'traceable to the [Ecuadorian] Judgment,' and thus subject to the constructive trust . . .[,] the same would not be true of Monthly Retainer payments unless those payments were traceable to the [Ecuadorian Judgment]." *Id*. (emphasis added). That language, standing alone, could still be read as prohibiting Donziger from receiving his monthly retainer if it were paid by funds raised by selling any share in the judgment. But the very next sentence of the Stay Order identified monies "traceable to the [Ecuadorian] Judgment" with "*collections* . . . funneled to Donziger as retainer payments." *Id*. (emphasis added). In full, that sentence stated: "Thus, at least as long as no *collections* are made in respect of the [Ecuadorian] Judgment and funneled to Donziger as retainer payments, the [Injunction] would not prevent Donziger from being paid, just as he has been paid . . . over the past nine or ten years." *Id*. (emphasis added).

Beginning that sentence with "[t]hus" signals that it was meant to clarify

36

the previous sentence's prohibition on paying the retainer from funds "traceable to the [Ecuadorian] Judgment." *Id*. The sentence goes on to describe what specific types of payments are prohibited: those derived from collections on the Ecuadorian Judgment channeled to Donziger in the form of retainer payments. The district court next explained that "as long as no collections are made [on] the [Ecuadorian] Judgment . . . the [Injunction] would not prevent Donziger from being paid, just as he has been paid . . . over the past nine or ten years." *Id*. This language, which a reasonable person could interpret to mean that Donziger's monthly retainer payments could continue as long as no *collection* occurred, introduced considerable ambiguity into the otherwise clear text of the injunction.

In the same vein, the court acknowledged that the Injunction would prevent "the payment of any Contingent Fee to Donziger, as any such payment would be traceable to the Judgment." *Id*. But preventing contingent fees, the court continued, would not keep Donziger from being paid for continuing the litigation, because Donziger had been paid to litigate the case for years, without receiving any contingent fees, and, since there was no prospect that the judgment would be collected during the pendency of the appeal, the Injunction did not prevent Donziger from carrying on as before. *Id*. at 658-59. Despite the

Injunction's language imposing a constructive trust on *all property* "traceable to the [j]udgment *or* the enforcement of the [j]udgment," Sp. App'x at 2, the Stay Order left open the possibility that Donziger could raise money as he had before, and continue to be paid from the money he raised.

There is no question that those fundraising efforts over the past years had included selling to investors shares in any eventual recovery. Such prior fundraising was known to the district court. Indeed, in the Stay Order itself, the district court clearly acknowledged its understanding that "[t]he litigation against Chevron has been funded by investors in exchange for shares of any eventual recovery," *Chevron Stay Opinion*, 37 F. Supp. 3d at 660.

In sum, however paragraph one of the Injunction might have been best construed on its face at the time it was issued, the Stay Order injected considerable uncertainty into it.

### 2. Paragraph Five

The district court went on to assure Donziger that paragraph five, too, was no obstacle to his pursuing the case, and being paid for his work – at least so long as he was not cashing in on his contingent fee share of the judgment. Donziger

told the court that the Injunction's prohibition on monetizing or profiting from the Ecuadorian Judgment "would have [an] irreparable effect on . . . his law practice." *Id*. at 659. "But," the district court emphatically said, "he is wrong." *Id*. The court explained:

> The point of paragraph 5 . . . was to prevent Donziger and the LAP Representatives from avoiding the effect of the constructive trust imposed on assets in their hands that otherwise would have been direct proceeds of the [Ecuadorian] Judgment by selling, assigning, or borrowing on *their interests* in the . . . Judgment and thus at least confusing the issue of traceability.

*Id*. at 659-60 (emphasis in original). The district court emphasized, in italics, that those bound by the Injunction could not sell or assign *their* interests in the judgment – not the interests of others. Indeed, that was "the [p]oint" of the paragraph. *Id*. at 659.

The court went on to dismiss Donziger's concern that the Injunction would keep him from being paid for continued work on the case. It stressed that Donziger himself acknowledged in his brief that the Injunction would deprive him "of *his* interest in a case to which he has devoted the better part of the last two decades." *Id*. at 660 (internal quotation marks omitted) (emphasis in

39

original). The court explained that the "practical effect" of paragraph five was to keep Donziger from "benefitting personally" by monetizing *his* interest – that is, his contingent right under his retainer agreement to a share – in the Ecuadorian Judgment, *id*., something that was not likely to occur given the small chance that any collection on the judgment would occur during the period when the appeal of the RICO Judgment was pending, which was the period for which the stay was sought. To a reasonable reader, that statement too would confirm what the district court itself said was the point of this portion of the Injunction: to prohibit Donziger from monetizing *his* contingent fee interest in the judgment.

### C. Contempt Finding

In May 2019, more than five years after the district court issued its Stay Order, the court found Donziger in contempt for, inter alia, "rais[ing] money in exchange for shares of his . . . *client[s']* interest in [the Ecuadorian Judgment]" and using the funds for his "personal benefit" instead of placing the funds in the constructive trust. Sp. App'x at 186 (emphasis added). Donziger argues that he reasonably relied on the Stay Order to interpret his responsibilities under the Injunction. In his view, the district court's contempt finding "radically changed . . . the court's prior interpretation" of its Injunction, as there is "no way to

40

reconcile" the Stay Order with the district court's current interpretation of the Injunction. Appellant's Br. (19-1584) at 3.

Both the district court and Chevron note that the Stay Order lacked any power to modify the Injunction because Donziger appealed the Injunction before the Stay Order was issued. Thus, Chevron argues, "the plain meaning of the terms of the [Injunction] must control." Appellee's Br. (19-1584) at 47. Even if the Stay Order could have an effect on the Injunction, Chevron argues that Donziger's interpretation of the order is erroneous and would create absurd results contrary to the Injunction's "clear purpose." *Id*. at 49.

The district court and Chevron are correct that the Stay Order could not and did not modify the Injunction, but that is not the question that we are tasked with deciding. While "[t]he filing of a notice of appeal . . . divests the district court of its control over those aspects of the case involved in the appeal," *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982), what Donziger contends happened here is not that the Stay Order *modified* the Injunction, but rather that the Stay Order communicated the court's interpretation of what the Injunction prohibited. Thus, we are not asked to decide what is the best reading of the Injunction; instead, we must answer whether the Injunction, as its terms were

41

conveyed to Donziger, "left no doubt in [Donziger's] mind . . . precisely what acts [were] forbidden." *Drywall*, 889 F.2d at 395. Given the district court's assurances in its Stay Order, we hold it was not.

Far from a modification, the district court clearly believed its Stay Order was consistent with the Injunction. In addressing Donziger's various concerns, the court, at several points, characterized those concerns as contrary to "the terms of the [Injunction]." *See, e.g., Chevron Stay Opinion*, 37 F. Supp. 3d at 658. The district court indicated that its Stay Order was written to explain the Injunction's "practical effect[s]," *id*. at 660, in response to Donziger's concerns about those effects. Surely the district court had the authority to explain its Injunction while it was on appeal, and, in fact, "[w]hen the district judge who is being asked to interpret an injunction is the same judge who entered it," courts give "heavy weight" to that interpretation on review. *Schering Corp. v. Illinois Antibiotics Co.*, 62 F.3d 903, 908 (7th Cir. 1995). In turn, the parties subject to that injunction should be entitled to rely on the issuing court's professed interpretation of it and tailor their behavior accordingly.

The Stay Order injected ambiguity into an otherwise largely unambiguous Injunction. While the Injunction forbid Donziger "from undertaking *any* acts to

monetize or profit from the [j]udgment," including by selling interests in it, Sp.

App'x at 3, the court assured Donziger "the [Injunction] would not prevent [him]

from being paid, just as he ha[d] been paid" before, but that he could not be paid

from *collections* on the judgment. *Chevron Stay Opinion*, 37 F. Supp. 3d at 658.

Despite the Injunction's creation of a constructive trust on *all* property "traceable

to the [j]udgment or the enforcement of the [j]udgment," Sp. App'x at 2 – words

that could reasonably be read to include funds raised by selling interests in the

judgment – the Stay Order pronounced that "[n]othing in the [Injunction]

prevents Donziger from continuing to work on the . . . case. Period.", *Chevron

Stay Opinion*, 37 F. Supp. 3d at 658, and that he could continue to be paid his

monthly retainer from funds raised to pursue the litigation, "as he ha[d] been

paid" in the past, *id*., which both the district court and Donziger knew to be by

monthly retainer payments drawn from funds largely raised by selling to

investors contingent shares in any eventual judgment.

Given the district court's own interpretation of the Injunction, it was not

unreasonable for someone in Donziger's position to believe that he could

continue monetizing his clients' interests in the Ecuadorian Judgment and pay

himself with those proceeds because, as the district court itself noted, that is how

the case "always has been financed." *Id*. at 662. But, five years after the district court issued the Stay Order, it found him in contempt for (among other things) doing exactly that.

An Injunction must comply with Federal Rule of Civil Procedure 65(d)(1), which requires that "[e]very order granting an injunction . . . must . . . state its terms specifically; and describe in reasonable detail . . . the act or acts restrained or required." And, critically, a party may be in contempt only for a violation of "a clear and unambiguous order." *Drywall*, 889 F.2d at 395. Thus, the central question on review of a contempt order is whether the injunction "left no doubt in the minds of those to whom it was addressed . . . precisely what acts [were] forbidden." *Id*. Read in light of the Stay Order, the Injunction failed to accomplish that.

Chevron argues that Donziger's interpretation of the Stay Order is too narrow and would render portions of the Injunction ineffective. It further contends that the interpretation is inconsistent with the district court's listing of "all rights to any contingent fee" as an example of property traceable to the Ecuadorian Judgment. Sp. App'x at 2. Chevron also takes issue with Donziger's interpretation of paragraph five's prohibition on monetizing and profiting from

44

the judgment, arguing that the Injunction and Stay Order allow Donziger to

continue his work *as a lawyer* on this case (by, for example, receiving charitable

donations to support his work), but it prohibits him from accepting any funds

traceable to the Ecuadorian Judgment as a profit.[10]

Chevron is correct that Donziger's interpretation of "traceable" is not well

supported by the text of the Injunction. But his interpretation is consistent with

the Stay Order, which was the district court's authoritative explanation of what

the Injunction prohibited Donziger from doing, issued in direct response to

Donziger's argument that the Injunction, given its literal meaning, was so broad

that it should be stayed pending this Court's review. The Injunction, the court

explained, permitted Donziger to continue to be paid "just as he ha[d] been," *i.e.*,

by selling interests in the judgment, as long as he was not paid by *collections* on

the judgment. *Chevron Stay Opinion*, 37 F. Supp. 3d at 658. The district court

recognized that Donziger's compensation for his work on the Ecuadorian case

was governed by a retainer agreement that included both a monthly retainer and

---

[10] Chevron also contends that the district court's findings under paragraph one
are irrelevant because the district court "rest[ed] its [contempt] decision on"
Donziger's violations of paragraph five. Sp. App'x at 197. However, in its
Contempt Order, the district court explicitly held Donziger in "violation of
paragraphs 1 *and* 5 of the [Injunction]." *Id*. at 201 (emphasis added).

a contingent fee. The court made clear that "any payments of a Contingent Fee" were subject to the Injunction. *Id.* It then contemplated that some monthly retainer payments could be "traceable to the [Ecuadorian Judgment]," *id.*, but that not *all* retainer payments were prohibited. Finally, it explained that Donziger could continue to be paid his monthly retainer as long as the funds were not "collections . . . made in respect of the [judgment]." *Id.* The district court clearly contemplated not only that Donziger could continue working on this case, but that he could continue to be *paid for* his work as he previously had – with funds raised by selling interests in the judgment.

Finally, Chevron argues that the Stay Order confirms that the Injunction prohibited Donziger from selling *any* interest in the judgment, not just his own. The Stay Order says no such thing. In fact, it indicates Donziger and the LAP Representatives were prohibited only from "selling, assigning, or borrowing on *their interests* in the [Ecuadorian] Judgment," *id.* at 660 (emphasis in original), suggesting that they could sell other interests in the judgment. That is what Donziger did here.

"The judicial contempt power is a potent weapon," *Int'l Longshoremen's Ass'n, Local 1291 v. Phila. Marine Trade Ass'n*, 389 U.S. 64, 76 (1967), limited by a

46

"more rigorous" abuse of discretion review to cases in which the injunction left *"no doubt . . .* precisely what acts [were] forbidden," *CBS*, 814 F.3d at 98, quoting *Drywall*, 889 F.2d at 395 (emphasis added). However clear the original language of the Injunction, the Stay Order muddied the waters. Donziger argued that the Injunction should be stayed because it limited his activities in ways that he contended would be irreparable if he succeeded in overturning the order on appeal. The district court assured him that it would not limit him in those ways, and Donziger was entitled to rely on those assurances. The Stay Order made clear that it was the district court's intention to "preclude Donziger . . . from profiting from the misdeeds for which [he was] responsible" and from "benefitting personally, at Chevron's expense." *Chevron Stay Opinion*, 37 F. Supp. 3d at 655, 660. But, whatever the district court's intention might have been, the language in the Stay Order was not "clear and unambiguous" in prohibiting Donziger's fundraising activities. *U.S. Polo Ass'n, Inc.*, 789 F.3d at 33. By finding Donziger in contempt for continuing those activities, the district court exceeded the bounds of its discretion.[11]

---

[11] Our dissenting colleague reads the Injunction and Stay Order and offers an interpretation of the two documents under which they are "entirely consistent." Dissent at 6. We do not suggest that his reading is unreasonable. But the question

Lest this Opinion be taken as somehow vindicating Donziger, it is important to put our holding in context. Our ruling today has no effect on, and does not in any way call into question, the district court's thorough and fully persuasive fact findings and legal conclusions, which we have already affirmed in full, establishing Donziger's violations of law and ethics that added up to a pattern of racketeering in violation of the RICO statute. Nor does it question in any way the district court's conclusions that Donziger acted in contempt of the Injunction that resulted from the RICO Judgment in numerous ways. Indeed, except with respect to the very specific alleged violation of the Injunction discussed in this Opinion, Donziger does not even attempt to challenge the district court's findings of his contumacious conduct.

Nor should there be any mistaken conclusion that this Opinion somehow authorizes any continued belief on Donziger's part that the Injunction permits,

---

before us is not whether his interpretation is reasonable, or even whether it might be the most reasonable reading of the district court's intentions. The question rather is whether, after the district court's assurances in its Stay Order, someone in Donziger's position could reasonably conclude that the sanctioned conduct was allowed. We conclude that, in light of the Stay Order, a reasonable person could have so interpreted the injunction, and that until that ambiguity was dispelled, a finding of contempt for acting in a manner consistent with that interpretation cannot be sustained. Nothing in the dissent persuades us otherwise.

going forward, his prior practice of continuing to receive legal fees, or to profit in

any manner from the sale of interests of any kind in the Ecuadorian Judgment.

Let us be very clear about what we are *not* holding, and about what Donziger can

– and more importantly cannot – now reasonably believe about his actions going

forward. Whatever ambiguity existed in the period between the issuance of the

Stay Order and the contempt adjudication most emphatically no longer exists.

The district court made clear in its Contempt Order that the Injunction prohibits

Donziger from monetizing others' interests in the Ecuadorian Judgment and

paying himself with those proceeds. That interpretation, as we have emphasized

throughout this Opinion, is fully consistent with the actual text of the Injunction.

Moreover, as we concluded in *Chevron II*, the issuance of an injunction of that

breadth was entirely justified by the district court's well supported fact findings,

and was well within the bounds of its remedial discretion. Any ambiguity that

Donziger may have perceived in the Injunction on the basis of the district court's

statements in the Stay Order has now been resolved, and any loophole he may

have seized upon in the language of the Stay Order has been closed.[12] Moving

---

[12] In any event, the non-appearing defendants have since been enjoined from selling their own interests in the Ecuadorian Judgment, as the district court found them in default and entered an identical injunction against them. For that reason

forward, Donziger should have "no doubt," *Drywall*, 889 F.2d at 395, that he can

no longer sell *any* interests in the Ecuadorian Judgment for *any* reason, and use

the proceeds for his benefit, whether for business or personal expenses or as part

of a monthly retainer or arrears, or profit from such sales in any way whatsoever,

without violating the Injunction and risking a contempt finding.

    We cannot, however, uphold a contempt finding on the basis of conduct

that, at the time it was committed, could reasonably have been construed as

outside the terms of the Injunction as the district court had explained it in

denying a stay of the Injunction pending appeal.

### D. Remedy

    To remedy Donziger's contempt, the district court sanctioned Donziger in

the amount of $666,476.34 for "profiting in [that amount] from the sale of

_____

as well, it can no longer be argued that Donziger is entitled to profit from the sale
of their interests in the Ecuadorian Judgment. Because the district court did not
distinguish, in its contempt finding, between Donziger's actions before and after
the default judgment was entered, and because Chevron does not argue that the
finding can be sustained based solely on his actions after that date, we need not
and do not address whether a contempt finding could have been sustained based
on the theory that payments received by Donziger after the date of the default
judgment can be traced specifically to sales of interests in the Ecuadorian
Judgment that took place after the default judgment was entered.

interests in the Ecuador[ian] Judgment and his failure to assign and transfer to Chevron that profit."[13] Sp. App'x at 213-14. It then awarded Chevron reasonable attorneys' fees for successfully prosecuting its motions to hold Donziger in contempt for his violations. Chevron's request for attorneys' fees sought reimbursement for all fees incurred in prosecuting its contempt motions, without distinguishing amounts attributable to pursuing different theories of contempt. The district court granted the request in full, awarding Chevron $3,433,384.30 in attorneys' fees.

Because we reverse the district court's contempt finding as to Donziger's violation of paragraphs one and five of the Injunction for monetizing the non-appearing defendants' interests in the Ecuadorian Judgment, we must vacate the associated relief. *See, e.g., E.E.O.C. v. Local 638 . . . Local 28 of Sheet Metal Workers' Int'l Ass'n*, 753 F.2d 1172, 1181 (2d Cir. 1985) (vacating relief where the underlying contempt was vacated). Thus, the district court's sanction in the

---

[13] The district court also imposed coercive fines to compel Donziger to assign to Chevron all of his rights to any contingent fee and to comply with the forensic inspection order. Donziger failed to challenge the underlying contempt finding for failing to assign those interests, so we do not disturb the district court's sanctions related to that finding.

amount of $666,476.34 is VACATED.[14]

We also vacate an award of attorneys' fees when an underlying finding of civil contempt is reversed. *See, e.g., New York State Nat'l Org. for Women v. Terry*, 41 F.3d 794, 797 (2d Cir. 1994) (vacating attorneys' fees when the underlying contempt was vacated). Here, however, the district court's award of attorneys' fees covers work for findings that we affirm on appeal. Therefore, we REMAND to the district court to reassess Chevron's request for fees based on the contempt

---

[14] The district court calculated its sanction from data presented in a forensic financial investigator's analysis of Donziger's bank accounts. It found that "[t]he evidence shows that from January 1, 2016 to June 30, 2018, $1,315,973.31 was deposited into Donziger's accounts from external sources. Approximately $1,242,985.00 of that amount came from investors." Sp. App'x at 200. Of those funds, Donziger received at least $666,476.34 "in his personal capacity either through direct payments of invoices or through payments to cover personal expenses." *Id*. at 201. As noted above, we take no position as to whether Donziger could be held in contempt for any actions he took or payments he received after April 23, 2018, the date of the default judgment and injunction against the non-appearing defendants, who, of course, were the only individuals with any interest in the Ecuadorian Judgment on which Donziger could have reasonably believed, between the date of the Stay Order and the imposition of a parallel injunction against them, that he was permitted to raise money. We vacate the entire sanction because it is not clear on this record how much, if any, of the $666,476.34 was traceable to fundraising activities that followed the April 23, 2018 injunction.

findings upheld on appeal.[15]

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's supplemental judgment in the RICO action awarding costs to Chevron, and DISMISS as moot Donziger's interlocutory appeal of orders entered during the pendency of the contempt proceedings (Docket No. 18-2191). We AFFIRM the district court's contempt findings, with the following exception. We REVERSE the district court's contempt finding as to Donziger's sale of interests in the Ecuadorian Judgment other than of interests in his contingent share of that judgment, and VACATE the supplemental judgments awarding Chevron $666,476.34 in compensatory sanctions related to that erroneous finding and attorneys' fees. We REMAND the matter to the district court to determine the fees reasonably expended to secure the contempt findings affirmed on appeal, and for any further proceedings consistent with this Opinion.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

---

[15] While Donziger takes issue with the district court's calculation of the attorneys' fees as a "blend" of work done on the contempt findings collectively, he does not challenge the reasonableness of the award. Appellant's Br. (19-1584) at 24-25.