UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHEVRON CORPORATION,

        Plaintiff,

   v.

STEVEN DONZIGER *et al.*,

        Defendants.

11 Civ. 0691 (LAK)

**RESPONSE PURSUANT TO DKT. 2610**

The Court has requested briefing on the impact of the Second Circuit's decision in *Chevron Corp. v. Donziger*, 990 F.3d 191 (2d Cir. 2021) ("the Decision"), on the analysis undergirding the Court's Report and Recommendations dated January 27, 2020, Dkt. 2451 ("R&R"). I will cut to the chase and keep it as simple as possible.

The Decision plainly eliminates the foundation of this Court's conclusion that it was contemptuous for me not to have "turned over to Chevron" the $342,045.16 in FDA investor funds that briefly passed through my client trust account in May 2018. R&R at 25-26. The Second Circuit held that Mr. Donziger could not be held in contempt for failing to so transfer FDA funds that he received and kept as personal payment. For the same reasons and many more besides,[1] I

---

[1] As I explained to the Court and in my objections to Judge Kaplan, the Court's finding was always erroneous under an accurate application of the Judge Kaplan's contempt analysis to the facts of the $342,045.16 transfer. Seeking to survive Second Circuit review, Judge Kaplan carefully circumscribed his Donziger contempt finding: it did *not* apply wholesale to the $1,242,985 that Mr. Donziger received in FDA funds, much of which he later disbursed to other lawyers and service providers, but only applied to a sub-set of $666,476.34 that Mr. Donziger, per Judge Kaplan's careful analysis, (a) had a "personal right to or interest in" and (b) "profited" from by dedicating to personal use. While this Court never bothered to conduct a similar analysis, the facts are clear that I never had any such right or interest in, or took any profit from, the $342,045.16, which passed exclusively and entirely through my client trust

cannot be held in contempt for a non-transfer of precisely the same funds and type of funds, either under the RICO Injunction or the identical operative language of the Default Judgment.[2]

The Decision further eliminates the foundation of the Court's fully erroneous conclusion that it was contemptuous for me to have edited a draft[3] of a financing agreement with Roger Waters that purportedly eliminated a prior "note" obligation purportedly owed on a "personal" basis by Mr. Donziger. As the Court explained with care, the contempt found was a "violat[ing] Paragraphs 1 and 5" or "participat[ing] with Donziger in violating Paragraphs 1 and 5" to "assist[] Donziger with profiting from the Ecuador Judgment" according to the profiting analysis set forth by Judge Kaplan. R&R at 22-23 (citing Kaplan Contempt Opinion, Dkt. 2209, at 69-70 ¶ 1c). Again, it was

---

    account per client instructions. The $50,000 that I later but contemporaneously received was payment for invoiced legal services, distinguishable again from the kind of "profit" that Judge Kaplan found where Mr. Donziger directly transferred funds, without any invoices or accounting, to credit card payments and family obligations. I will finally note that the Court never seriously grappled with the implications of its Recommendation, which would have required me to violate client instructions regarding client funds so as to effect a highly prejudicial seizure of those funds per an entirely untested and patently invalid (now affirmed as invalid) legal claim made by the client's opposition in ongoing litigation. That can hardly be regarded as the only non-contemptuous, much less ethical choice of conduct under the circumstances.

[2] R&R at 26 (re default judgment); *id.* at 19 ("Page cannot be held in contempt for 'assisting' Donziger in conduct that is not ultimately found to be contemptuous"). *See also*, *e.g.*, Chevron contempt motion at 28. While the Second Circuit took "no position as to whether Donziger could be held in contempt for any actions he took or payments he received after [entry of the default judgment]," it made clear that the answer to the question would turn on whether any such payments were "traceable to fundraising activities that followed the April 23, 2018 injunction." Decision at 52 n.14. *Id.* at n.12 (any theoretical contempt of the Default Judgment would require showing "payments received by Donziger after the date of the default judgment [that] can be traced specifically to sales of interests in the Ecuadorian Judgment that took place after the default judgment was entered"). None of the $342,045.16 was traceable to any judgment fundraising after this date; to my knowledge, there was no judgment fundraising after this date. Until Judge Kaplan re-addressed the relevance of the "collections" and "traceability" language in his Stay Opinion, it was "not unreasonable" to view funds raised in compliance with the anti-monetization provision as available to satisfy litigation expenses including retainer fees, notwithstanding the otherwise broad language of the constructive trusts in the injunctions themselves.

[3] The alleged contempt here, just to be clear, was editing a draft agreement per client instructions in the middle of a work-stream process managed by numerous other individuals including lawyers from national law firm, Cohn Reznick. There is no allegation that undersigned conceived, arranged, signed, or received or enjoyed funds from this agreement or process. It was a single instance of editing a draft.

2

precisely this "profiting" analysis that was vacated by the Second Circuit. While the Second Circuit acknowledged the anti-monetization provision of paragraph 5 targeting Mr. Donziger's discrete interest in the Ecuador Judgment, there is no allegation that Mr. Donziger's judgment interest was ever part of the Roger Waters agreement at issue (or any prior agreement). The claim is that the extinguishment of the note was a personal profit on an agreement involving FDA interests, no different than if the agreement had provided a cash payment personally to Mr. Donziger. Because it was not contemptuous for Mr. Donziger to have received investor or donor funds, even for personal use or profit, the Court's contempt finding re the Roger Waters agreement also falls.[4]

---

[4] The Court's contempt finding re this agreement is also erroneous for many other reasons that I will attempt to briefly summarize without unduly crushing this brief with this footnote. Many of the reasons are set forth in my objections to Judge Kaplan, Dkt. 2454 at 6-7. First, the Court's finding is clearly erroneous based on the distorted chronology it adopted from Gibson Dunn's papers, as seen below:

> 40. Page also drafted an agreement that extinguished a personal debt of Donziger in exchange for an interest in the Ecuador Judgment. **In December 2017**, Donziger requested from Page a "superseding instrument that nullified" a "personal promissory note" by which investor Roger Waters had loaned Donziger $102,000. (Champion Decl. Ex. 84.) Page drafted a superseding investment agreement with Waters for $152,000, which included the $102,000 that Waters lent to Donziger personally, in exchange for a percentage of the Ecuador Judgment. (Champion Decl. Ex. 85-86.) **Following further editing by Donziger, Waters signed the agreement in February 2017**. (Champion Decl. Ex. 86-88.)

R&R at 12; Chevron contempt motion at 18 (same). In other words, the alleged contemptuous drafting occurred 11 months *before* the request for the "superseding instrument" and mention of the "personal promissory note." The Jan/Feb 2017 agreement made no mention of any personal promissory note, which is unsurprising since Mr. Donziger only "realiz[ed]" or recalled the promissory note in December 2017. Critically, ***nothing in the Jan/Feb 2017 agreement I edited purported to extinguish any prior obligation and cannot be understood to have had that effect because Mr. Donziger was trying to extinguish it 11 months later***. While the Court faulted me for "conspicuously" not contesting adequately the Waters agreement contempt claim, the reality is that it was one in a long line of absurdly distorted claims in Chevron's motion, many of which were dismissed or ignored by the Court as well, and it is the distortions and "hide the ball" tactics that are really "conspicuous." Among many other things, Chevron had the "personal note" in its possession but strategically declined to include it in the batch of 113 exhibits to its motion, instead saving it for cross-examination, where I saw it for the first time and was unable to carefully analyze it. Why? Perhaps because it references funds provided on October 28, 2013—funds I was quite familiar with, as I testified, because those funds went to pay for the 3-bedroom apartment and granola bars for the 15-member band of students, volunteers, and contingency-fee lawyers who worked the defense side RICO trial against Mr. Donziger and two Ecuadorian pollution victims. That is, the funds were not dedicated to personal use at all but rather used for cases expenses and thus subject to terms in Mr. Donziger's own contracts entitling him to compensation and indemnification from the Ecuadorian client base. This is consistent with the "Use of

3

Finally, there is the Court's finding that my failure to "transfer[]to Chevron [my] .25% (or any additional percentage) interest in the Ecuador Judgment" constitutes contempt of the Default Judgment. As I have repeatedly explained, it is not clear to me that an intangible, continent interest would not already be part of the constructive trust set out in the Default Judgment merely by operation of the language wherein the Court "hereby imposes a constructive trust for the benefit of Chevron on all property . . . that is traceable to the Judgment."[5] Nor is it clear that the Default Judgment itself is valid, for the reasons articulated in Dkt 2354 at 7 n.4, nor that the scope of "traceability" for the constructive trust in the Default Judgment, even limited by the Decision, can lawfully reach as far as that of the RICO Judgment.[6]

More critically, however, Chevron never actually requested my interest before seeking to

---

Funds" clause in the purportedly contemptuous agreement I edited, which made clear that all of Mr. Waters' funds were for "case-related expenses including but not limited to the defense of the U.S. representative [Mr. Donziger] in U.S. courts." And while the Court takes me to task to my understanding of Mr. Waters' prior funds as a donation rather than a loan obligation, that is exactly the understanding of Mr. Waters himself, as he testified to under oath in a related hearing in September 2019. The objections go on: the lack of any showing that the limited editing work I provided to a team of parties and lawyers including the Cohn Reznick firm constituted substantial assistance under the necessary aiding and abetting standard, *cf.* Chevron brief at 22; the fact that the claim as whole effects an end run around the actual knowledge requirement for aiding and abetting, *cf.* Dkt. 2354 at 11-15; the failure to establish the alleged extinguishment of Mr. Donziger's personal debt (which was not extinguished, and was not personal, *supra*) as proven damages to Chevron as required for the matter the be subject to compensatory sanction, *see* Dkt. 2451 at 33 (explaining a theory of damages as to the $342,045.16 but nothing similar as to how the $102,000 constituted damage to Chevron), *see also* Chevron brief at 35 (*not* including the $102,000 in the damages that *Chevron itself* demanded); the lack of any attention to the limited role of my editing in awarding a full compensatory sanction, contrary to the interests of justice; and more. None of these arguments are necessary, however, in light of the fact that the Second Circuit Decision forecloses the contempt finding entirely, as argued in the text.

[5] The use of the "shall transfer" language is naturally directed at tangible property, for which an actual transfer is required.

[6] The reach of the latter was affirmed on the basis of a substantial record linked to specific individuals who appeared and defended the action, whereas the former would attach to dozens of individuals and organizations who never appeared and defended—not even counting all the "officers, agents, servants, employees, and attorneys; and other persons who are in active concert and participation" with those dozens of individuals. It would be quite a thing to say that all members of this class, which could include hundreds of people with diverse interests or assets arguably subject to a traceability analysis, are subject to precisely the same constructive trust obligations as Mr. Donziger.

4

hold me in contempt, and never, as it did with Mr. Donziger, provided a form it would consider sufficient to execute a "transfer." In concerned response to the Court's contempt finding on this point, I promptly sent Gibson Dunn attorneys the email attached hereto as Exhibit A, asking them to "Let me know what Chevron needs on this, I am willing to work something out."

Chevron's lawyers never even replied. We all know that this thing has nothing whatsoever to do with Chevron really wanting to add my minuscule contingent interest or any other of my savings or property to its ~$200 billion market cap, but you would think they would pretend a little harder that they even care.

## CONCLUSION

For the foregoing reasons, the Court should vacate its first two contempt findings (re the $342,045.16 and $102,000, in shorthand) and direct Chevron to, if it wishes, respond to my email and tell me how it would like to go about receiving a "transfer" of my theoretical, intangible, contingent 0.0025 share of the historic but beleaguered Ecuador Judgment.

DATED:    April 21, 2021           Respectfully submitted,

                                   _____/s_____
                                   Aaron M. Page
                                   512 Clark Street
                                   Iowa City, IA 52240
                                   Tel: (202) 618-2218
                                   Email: aaron@forumnobis.org

                                   *Pro se*