UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHEVRON CORPORATION,

           Plaintiff,

  v.

STEVEN DONZIGER *et al.*,

           Defendants.

11 Civ. 0691 (LAK)

**REPLY**

Chevron continues to argue that I was clearly and unambiguously required to disobey client wishes and transfer client monies that I held in an attorney escrow account for a few days in May 2018 to Chevron, the client's long-time opponent and abuser. Chevron is left making what we might call a paragraph 1 "pure traceability—past present and future" argument:

- While the funds at issue were lawfully raised from FDA interests, they are nonetheless still "traceable" to the Ecuador Judgment.
- Paragraph 1 of the Default Judgment on its face requires enjoined persons (Defaulted Defendants or their agents) to transfer to Chevron all property they "have received . . . that is traceable to the [Ecuadorian] judgment."
- Non-transfer is automatically contemptuous, such that I must now pay Chevron Corporation the full amount of the monies that simply passed through my hands.

Judge Kaplan refused to make such a finding with respect to Mr. Donziger, with respect to *the exact same FDA funds* that were received by him as soon as they left my escrow account. *See* Dkt. 2209 at 60-61 (analyzing the $342.045.16 funds and characterizing them as [FDA] property when received). And in its March 4 opinion, the Second Circuit put the "pure traceability—past present and future" approach even farther out of reach, reversing Judge Kaplan's cautious application of paragraph 1 only to those "received" FDA-interest funds for which it could be established that Mr.

Donziger (a) took a "personal right to or interest in" and (b) "profited" from by dedicating to personal use. *See, e.g.*, Op. at 52 n.14.[1]

Desperately seeking a point of differentiation, Chevron claims that the Default Judgment changed everything because "[a]ny ambiguity introduced by the April 2014 stay opinion was premised on the idea that the RICO Judgment did not bind the non-appearing LAPs or the FDA," whereas the Default Judgment bound them. This is not a true or incomplete description of the ambiguity, *see infra*, but it is also a strange argument for Chevron make. It effectively proposes to limit the reach of the constructive trust to property *owned* by an enjoined person; *i.e.*, it didn't apply regarding Donziger, the RICO Injunction, and the $666,476.34 that was FDA property, received before the Default Judgment. But Judge Kaplan made clear that the contempt only arose upon *Mr. Donziger's* effective ownership—again, a more limited interpretation than pure "receipt," which is what Chevron now argues. The Second Circuit never questioned the finding that Mr. Donziger had an interest in property, thus putting it within the scope of the RICO Injunction even under Judge Kaplan's more limited theory. But it reversed nonetheless.

The Second Circuit focused on, first, the ambiguity of the scope of paragraph 1 itself, and second, the lawfulness under paragraph 5. As to the first, the Second Circuit was clear that "a reasonable person could interpret" Judge Kaplan's interpretation of the language of paragraph 1 of the RICO Injunction in the Stay Order "to mean that Donziger's [receipt of non-contingency fee monies] could continue as long as no *collection* occurred," Op. at 37 (emphasis original), and "that Donziger's interpretation of 'traceable'" as *traceable to a collection* was "consistent with the

---

[1] This Court recommended a contempt and compensatory sanction for undersigned without undertaking any such analysis. *Cf.* Dkt. 2621 at n.1.

Stay Order." *Id.* at 45. The language of the Default Judgment was of course identical,[2] and nothing about the different identity of enjoined parties in the two injunctions suggests any difference on the question of whether "traceable" inherently meant "traceable to a collection." Because that ambiguity was firmly in place and not resolved or impacted by issuance of the Default Judgment, a contempt finding based on my non-transfer of funds in May 2018 is not viable.[3]

The Second Circuit's second focus—lawfulness under paragraph 5—comes as no surprise. As noted, even Judge Kaplan appears to have been uncomfortable with a "pure traceability" approach and chose to locate the Donziger contempt in a murky combination of paragraph 1 traceability and paragraph 5 prohibited "profiting." It is notable that the Second Circuit rejected an overt attempt by Chevron to unwind this combo and better insulate the paragraph 1 contempt from the paragraph 5 problems.[4] Chevron argued that Judge Kaplan's stratagy of "'elect[ing]' not

---

[2] *See, e.g.*, Op. at 7 n.1 (the Default Judgment enjoined Defaulted Defendants "under the same terms" as the RICO Injunction).

[3] Similarly, the Court should also revisit its willfulness analysis, at pp. 28-29 and 35-36 of the R&R. Anticipating the core of the Second Circuit's March 4 Opinion, the Court found that the reasonableness defenses I had made applied exclusively to my understandings regarding the scope of allowed monetizing activity under the RICO Injunction. But in fact my good faith understanding of the injunctions was broader, as I testified to under oath and as I explained in a memo-to-file at the time:

> [E]ven accepting [the Default Judgment] at face value, it would not, for the same reasons outlined above, impose any constructive trust or any other limitation or prohibition as regards funds for case litigation expenses received in exchange for an interest in a future collection, *as opposed to funds or monies received as proceeds of an actual collection on the environmental judgment*. Moreover, even if paragraph 5 were improperly read to enjoin the FDA fund-raising of litigation expenses as some kind of "monetization," this injunction would only come into force on a going-forward basis from the date of the Default Judgment (April 23, 2018), and would not impact funds that were raised by the FDA prior to that date.

Mot. Contempt, Ex. 8 (email memorandum dated May 7, 2018) (emphasis added). The Second Circuit has now confirmed that acting on this limited understanding of the term "traceable" (used identically in the RICO Injunction and Default Judgment), drawn from the Stay Order, was "reasonable" or at least non-contemptuous. The Court's prior willfulness determination—which was always "a close[] call" and ultimately landed "at the low end of the willful spectrum"—should be reversed and removed.

[4] *See, e.g.*, Op. at 16 (describing argument that "even if Donziger were entitled to pay himself from the funds that he raised . . . those funds would have been property "traceable to the [Ecuadorian] Judgment' subject to the constructive trust in favor of Chevron under paragraph one").

3

to base [the Donziger contempt] on violation of the monetization provisions," R&R at 21, rendered all of Donziger's arguments on the lawfulness of his fund-raising activity "irrelevant." The Second Circuit didn't buy it.[5] Consistent with Judge Kaplan's actual approach, it effectively held that some degree of paragraph 5 violation is necessary to animate a non-transfer contempt. The few discussions in the Opinion of the Default Judgment reflect this understanding that enjoined monetizing activity would need to be at the root of any possible Default Judgment contempt. For example, footnote 12 references the possibility of "a contempt finding [that] could have been sustained based on the theory that payments received by Donziger after the date of the default judgment can be traced specifically to *sales of interests in the Ecuadorian Judgment that took place after the default judgment was entered*." And footnote 14 makes clear that the only basis available to avoid vacating any portion of the $666,476.34 would have been if some of it "was traceable to *fundraising activities* that followed the April 23, 2018 injunction."

Lest this last conclusion strike the Court as a step too far, it is worth noting the effectiveness and usefulness of a "lawfulness limitation" on the operation of the constructive trust in at least two different ways. First, now that all interests in the Ecuador Judgement are assertedly enjoined under the Default Judgment, the limitation does not prevent the RICO and Default Injunctions from enjoining all litigation financing and imposing a constructive trust over any property derived from prohibited monetizing activity—however unjust this result may be, in undersigned's personal opinion. Second, the limitation prevents the scope of the constructive trust from sweeping into areas that everyone seems to agree should be off-limits. For example, Chevron, Kaplan, and the Second Circuit all suggested that Mr. Donziger could have freely used donations to finance his continued work to enforce the Ecuador Judgment, even though the broad "enabled to acquire"

---

[5] *Id.* at 45 n.10.

definition of traceable used by Judge Kaplan would seem capable of encompassing such donations.[6] The limitation would also keep the constructive trust from raising problems if it were sought to be applied to, say, Mr. Donziger writing a book or accepting a fee from speaking engagement in which he talked about his life's work, including the Ecuador Judgment.[7]

* * *

Chevron does not dispute that the viability of the Court's already problematic proposed contempt finding regarding the $102,000 was eliminated by the Second Circuit opinion. *See* Dkt. 2621 at 2-3. It made no argument claiming the continued vitality of that finding and did not ask the Court to affirm that finding in the Court's response to Judge Kaplan's direction in Dkt. 2607. If Chevron attempts in reply to change course, the argument should be deemed forfeit, or at the very minimum undersigned should be granted an opportunity to further reply. Finally, as regards my 0.25% interest, in the prior briefing I reminded Chevron's counsel of an unresponded-to inquiry I made over a year ago on whether and how Chevron actually wished to receive some memorialization of a transfer of my interest. Dkt. 2621-1. Chevron's counsel directed to me a form of transfer that was included as an exhibit to the original contempt motion, which I appear to have missed. I regret the error. As indicated in earlier briefing, despite my substantial concerns regarding the extension of a default judgment injunction this far in this context, I have gone ahead and executed the form and provided the notarized original copy to Chevron's counsel.

---

[6] The language of paragraph 5—"monetize or profit"—is also a concern in this regard but is nonetheless plainly less sweeping than mere "traceable."

[7] *Cf.* Dkt. 2354 at 5-6.

5

DATED:   April 30, 2021                  Respectfully submitted,

                                                                             /s

Aaron M. Page
512 Clark Street
Iowa City, IA 52240
Tel: (202) 618-2218
Email: aaron@forumnobis.org

*Pro se*