UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
                                   :

CHEVRON CORPORATION,              :

                                   :

                 Plaintiff,        :

                                   :

            -against-            :

                                   :

STEVEN DONZIGER, et al.,        :

                                   :

               Defendants.     :

---------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__5/17/2021__

11-CV-691 (LAK) (RWL)

**MODIFIED**
**REPORT AND RECOMMENDATION**
**TO HON. LEWIS A. KAPLAN:**
**MOTION FOR CONTEMPT**
**RE: AARON MARR PAGE**

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

In August 2019, Plaintiff Chevron Corporation moved for entry of an order holding non-party Aaron Marr Page and his law firm, Forum Nobis PLLC, in civil contempt pursuant to Federal Rule of Civil Procedure 70(e) and Rule 83.6 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York. Chevron's motion followed on the heels of the Court's May 23, 2019 decision finding Defendant Steven Donziger in civil contempt for violating injunctive provisions of the Court's RICO Judgment entered on March 4, 2014, and Default Judgment entered on April 23, 2018 (the "Donziger Contempt Ruling").

Chevron claimed that Page and Forum Nobis should be held in contempt for aiding and abetting Donziger's acts of contempt and for committing contemptuous acts while acting as Donziger's lawyer, employee, or agent.  As relief, Chevron requested compensatory sanctions and an award of attorneys' fees.  On October 8, 2019, the Honorable Lewis A. Kaplan, U.S.D.J., referred Chevron's motion to the undersigned for a report and recommendation.

This Court issued its Report and Recommendation on January 27, 2020, recommending that sanctions be imposed on Page and Forum Nobis but that further decision on the motion be stayed until the Second Circuit Court of Appeals ruled on Donziger's appeal of the Donziger Contempt Ruling (the "First R&R").  While the First R&R remained pending, the Second Circuit affirmed in large part and reversed in part the Donziger Contempt Ruling (the "Second Circuit Opinion").  Judge Kaplan then remanded the First R&R to the undersigned for reconsideration in light of the Second Circuit Opinion.  This Modified Report and Recommendation fulfills that directive.

The following sets forth the Court's certified Findings of Fact and recommends that sanctions not be imposed on Page or Forum Nobis in light of the Second Circuit Opinion and because some of the issues are now moot.

## Procedural Background

The Court presumes the parties' familiarity with the extensive history of this case and sets forth in its certified Findings of Fact only those facts and procedural events relevant to determining the instant motion.  *See, e.g.*, *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362 (S.D.N.Y. 2014), *aff'd*, 833 F.3d 74 (2d Cir. 2016).

Chevron filed the instant motion on August 28, 2019.  Page submitted opposition papers, Chevron replied, and the motion was fully briefed and submitted as of October 16, 2019.[1]  The Court held a hearing on January 16, 2020, at which Page testified and the parties presented arguments (the "Hearing").  The Court issued the First R&R on

---

[1] Chevron asked the Court to disregard Page's opposition papers because he filed them one day late notwithstanding having received an earlier extension.  (Dkt. 2369 at 2.) While the Court does not condone late filings, the Court exercised its discretion to consider Page's opposition, given the circumstances of this case and that the question before the Court is one of contempt.

January 27, 2020.  (Dkt. 2451.)  The parties filed objections.  On March 4, 2021, while review of the First R&R remained pending, the Second Circuit Court of Appeals rendered its decision on the Donziger Contempt Ruling.  (Dkt. 2605-1 ("Second Circuit Op.").)  Judge Kaplan remanded the First R&R to this Court for further consideration on March 26, 2021.  The Court then received briefing from the parties addressing the extent to which, if at all, the Second Circuit Opinion warrants a different outcome than the First R&R.  (Dkts. 2620-2621, 2628, 2630.)

## Findings Of Fact

### A.    The RICO Judgment And Default Judgment

1.      In 2011, as part of a larger effort to "extort" billions of dollars from Chevron, Donziger obtained a judgment in Ecuador, finding Chevron liable for billions of dollars based on claims of having caused environmental damage (the "Ecuador Judgment").  *Chevron*, 974 F. Supp. 2d at 481.

2.      Three years later, in 2014, the Court issued a decision following trial finding Donziger liable under the federal RICO statute and New York common law for having procured, with the help of others, the Ecuador Judgment by using corrupt means, including bribery and submission of fraudulent evidence.  *See Chevron*, 974 F. Supp. 2d at 384, 567-603.[2]

---

[2] The Second Circuit Court of Appeals affirmed the decision.  *Chevron Corp. v. Donziger*, 833 F.3d 74, 81 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 2268 (2017). Summarizing what led to the Ecuador Judgment, the Court stated: "The record in the present case reveals a parade of corrupt actions by the LAPs' legal team [(i.e., Donziger and his co-conspirators)], including coercion, fraud, bribery, culminating in the promise to [the Ecuadorian judge] of $500,000 from a judgment in the favor of the LAPs."  833 F.3d at 126.

3.     On March 4, 2014, the Court entered judgment in favor of Chevron against Donziger and his law firms as well as two Ecuadorian litigants (the "RICO Judgment"). (Dkt. 1875.)  Page learned of the RICO Judgment the same day it issued and Tweeted about it that same day.[3]  (Declaration of Anne Champion, dated Aug. 28, 2019, Dkt. 2317 ("Champion Decl."), Ex. 6.)

4.     Among other provisions, Paragraph 1 of the RICO Judgment "impose[d] a constructive trust for the benefit of Chevron on all property, whether personal or real, tangible or intangible, vested or contingent, that Donziger has received, or hereafter may receive, directly or indirectly, or to which Donziger now has, or hereafter obtains, any right, title or interest, directly or indirectly, that is traceable to the [Ecuador] Judgment or the enforcement of the Judgment anywhere in the world."  (Dkt. 1875 ¶ 1.) Paragraph 1 also requires that Donziger "transfer and forthwith assign to Chevron all such property that he now has or hereafter may obtain."  (*Id.*)

5.     Paragraph 5 of the RICO Judgment "enjoined and restrained" Donziger "from undertaking any acts to monetize or profit from the [Ecuador] Judgment …, including without limitation by selling, assigning, pledging, transferring or encumbering any interest therein."  (Dkt. 1875 ¶ 5.)

6.     Citing Federal Rule of Civil Procedure 65(d)(2) ("Persons Bound" by Injunctions and Restraining Orders), Paragraph 8 of the RICO Judgment made the RICO Judgment "binding upon the parties; their officers, agents, servants, employees,

---

[3] At the Hearing, Page stipulated to his knowledge of the RICO Judgment.  (Transcript of Jan. 16, 2020 Hearing, Dkt. 2453-1 ("Tr."), at 6.)

4

and attorneys; and other persons who are in active concert and participation with any of the foregoing."  (Dkt. 1875 ¶ 8.)

7.      On April 23, 2018, the Court entered default judgment against the Amazon Defense Front (the "FDA," by its native language initials) and other Ecuadorian litigants who did not appear (the "Default Judgment").  (Dkt. 1985.)  Page knew of the Default Judgment on the day, or soon after, it issued.[4]  (*See* Champion Decl. Ex. 8.)

8.      The Default Judgment contained provisions similar to the RICO Judgment. Paragraph 1 of the Default Judgment thus "impose[d] a constructive trust for the benefit of Chevron on all property whether personal or real, tangible or intangible, vested or contingent, that the Defaulted Defendants have received, or hereafter may receive, directly or indirectly, or to which the Defaulted Defendants now have, or hereafter obtain, any right, title or interest, directly or indirectly, that is traceable to the [Ecuador] Judgment or the enforcement of the [Ecuador] Judgment anywhere in the world."  (Dkt. 1985 ¶ 1.)   Paragraph 1 also required each Defaulted Defendant to "transfer and forthwith assign to Chevron all such property that he or she now has or hereafter may obtain."  (*Id.*)

9.      Like Paragraph 5 of the RICO Judgment, Paragraph 4 of the Default Judgment "enjoined and restrained" the Defaulted Defendants "from undertaking any acts to monetize or profit from the [Ecuador] Judgment …, including without limitation by selling, assigning, pledging, transferring, or encumbering any interest therein."  (Dkt. 1985 ¶ 4.)

---

[4] At the Hearing, Page did not deny his knowledge of the Default Judgment on the day, or shortly after, it issued.

10. Like Paragraph 8 of the RICO Judgment, Paragraph 7 of the Default Judgment invoked Federal Rule of Civil Procedure 65(d)(2), stating that the Default Judgment is binding on not only the parties but also their agents, attorneys, and others. (Dkt. 1985 ¶ 7.)

**B.    The Donziger Contempt Ruling**

11. On May 23, 2019, the Court found Donziger in willful contempt of the RICO Judgment in multiple respects.  (Donziger Contempt Ruling, Dkt. 2209.)

12. As relevant here, the Court found that Donziger violated Paragraph 1 of the RICO Judgment, the terms of which the Court found to be clear and unambiguous, by failing to transfer to Chevron a contingency interest in the Ecuador Judgment received by Donziger pursuant to his retainer agreement with the FDA.  (Dkt. 2209 at 36-40, 69 ¶ 1a-b.)  Donziger subsequently purged himself of this contempt.  (Dkt. 2216 ¶ 4.)

13. The Court further found Donziger in contempt of Paragraph 5 of the RICO Judgment for committing to pay David Zelman, a life coach, "14/250 of an eighth of a point of whatever is recovered on the total claim" out of Donziger's "personal fees from this litigation."  (Dkt. 2209 at 42, 70 ¶ 3a.)

14. The Court further found that "Donziger used at least $666,476.34 of investment funds for personal expenses, that those funds were traceable to the Ecuador Judgment, and that he had a personal right to or an interest in those funds."  (Dkt. 2209 at 58.)  In doing so, Donziger "profit[ed] from and fail[ed] to assign to Chevron funds traceable to the Ecuador Judgment," in violation of Paragraphs 1 and 5 of the RICO Judgment.  (*Id.*)

6

15.    The Court also found that Donziger had violated the RICO Judgment by monetizing the Ecuador Judgment but ultimately did not hold Donziger in contempt on that basis.  (Dkt. 2209 at 41-42.)

16.    In that regard, the Court found that Donziger admitted to arranging "sales of shares in the Ecuador Judgment to at least six investors since March 2014" and had "raised over $2.4 million from investors in exchange for interests in the Ecuador Judgment totaling at least 1.28525 percent from at least May 2016 through 2018."  (Dkt. 2209 at 41, 53.)

17.    The Court rejected Donziger's argument, based on an April 25, 2014 order denying a stay pending appeal (the "Stay Order"), that Paragraph 5 of the RICO Judgment did not prohibit Donziger from selling the FDA's interest (as distinct from Donziger's interest) in the Ecuador Judgment.  (Dkt. 2209 at 51-53.)

18.    Rather, the Court re-emphasized that the RICO Judgment "bars any and all acts to monetize or profit from the Ecuador Judgment, including without limitation sale, assignment, pledge, transfer or encumbrance of any interest therein."  (Dkt. 2209 at 52.)

19.    Accordingly, "in the Court's view," Donziger "violated paragraph 5 [of the RICO Judgment] via his sales and efforts to sell interests in the Ecuador Judgment irrespective of whether the interests sold were in Donziger's contingent fee interest or the Ecuadorian Parties' interests in the Ecuador Judgment itself."  (Dkt. 2209 at 52.)

20.    "In the last analysis," however, the Court found it "unnecessary" to base its contempt holding under Paragraph 5 on this ground.  Instead, "the Court elect[ed] to rest its decision" on the ground that "Donziger, in consequence of his sales, has profited

7

extensively from the Ecuador Judgment in violation of the RICO Judgment."  (Dkt. 2209 at 52-53.)

21.    On May 27, 2019, Donziger appealed the Donziger Contempt Ruling to the Second Circuit, leading to the Second Circuit Opinion.  (Dkt. 2211.)

**C.    The Second Circuit Opinion**

22.    The Second Circuit affirmed the Donziger Contempt Ruling "in all respects other than his participation in the sale of interests in the Ecuadorian Judgment (as distinct from interests in his own right to a portion of that judgment as a contingent fee)." (Second Circuit Op. at 31.)

23.    The Second Circuit held, however, that the Stay Order "injected ambiguity into an otherwise largely unambiguous [i]njunction" and "left open the possibility that Donziger could raise money as he had before, and continue to be paid from the money he raised."  (Second Circuit Op. at 38, 42.)  As a result, "it was not unreasonable for someone in Donziger's position to believe that he could continue monetizing his clients' interests in the Ecuadorian Judgment and pay himself with those proceeds."  (*Id.* at 43.)

24.    The Second Circuit therefore reversed that portion of the Donziger Contempt Ruling that had "sanctioned Donziger in the amount of $666,476.34 for 'profiting in [that amount] from the sale of interests in the Ecuador[ian] Judgment and his failure to assign and transfer to Chevron that profit.'"  (Second Circuit Op. at 50-51 (alterations in original) (quoting the Donziger Contempt Ruling).)

25.    The Second Circuit emphasized, however, that "[w]hatever ambiguity existed in the period between the issuance of the Stay Order and the contempt adjudication most emphatically no longer exists" and that "any loophole [Donziger] may

8

have seized upon in the language of the Stay Order has been resolved." (Second Circuit Op. at 49.)

26. In two footnotes, the Second Circuit also addressed the Default Judgment, which contained the same injunction as the RICO Judgment but extended it to the non-appearing defendants. Thus, "[f]or that reason as well, it can no longer be argued that Donziger is entitled to profit from the sale of their interests in the Ecuadorian Judgment." (Second Circuit Op. at 49 n.12.) The Court then noted what it was ***not*** deciding, making distinctions in regard to when certain monetizing events occurred in relation to the Default Judgment:

> Because the district court did not distinguish, in its contempt finding, between Donziger's actions before and after the default judgment was entered, and because Chevron does not argue that the finding can be sustained based solely on his actions after that date, we need not and do not address whether a contempt finding could have been sustained based on the theory that ***payments received*** by Donziger ***after the date of the default judgment*** can be traced specifically to ***sales of interests*** in the Ecuadorian Judgment that took place ***after the default judgment*** was entered.

(Second Circuit Op. at 49 n.12 (emphasis added).)

27. The Court of Appeals again referred to that undecided issue in a later footnote and stated that "[w]e vacate the entire [$666,476.34] sanction because it is not clear on this record how much, if any, of [that amount] was traceable to ***fundraising activities that followed*** the April 23, 2018 [Default Judgment and] injunction." (Second Circuit Op. at 52 n.14 (emphasis added).)

**D.     Page's Role Before The RICO Judgment**

28.     Page, a lawyer, is managing attorney of his own law firm, Forum Nobis PLLC.  (Dkt. 2209 at 32.)  Page, through Forum Nobis, has two clients: Donziger, and the FDA.  (Declaration of Aaron Marr Page, dated Oct. 3, 2019, Dkt. 2355 ("Page Decl."), ¶ 4; Champion Decl. Ex. 7 at 9:17-10:5, 10:11-21.)  Page also represented some of the individual Ecuadorian litigants, known as "LAPs."  (Champion Decl. Ex. 7 at 10:17-19.)

29.     Page first met Donziger while in law school and began working full time for Donziger in 2005 after graduating from law school.  (Champion Decl. Ex. 11 at 1.)

30.     Page worked for Donziger until March 2007, when Page joined the law firm of Cleary Gottlieb Steen & Hamilton LLP as an associate attorney.  Even after joining that firm, Page continued to assist Donziger.  (Champion Decl. Ex. 12 at 274:7-9, 274:22-275:10; Ex. 13 at 1.)

31.     Page assisted Donziger with the Ecuador case and was involved in the efforts to procure the Ecuador Judgment.  *See, e.g.*, *Donziger*, 974 F. Supp. 2d at 410 n.198, 421; *see also* 970 F. Supp. 2d 214, 225 (S.D.N.Y. 2013) (opinion before trial) (quoting Donziger in connection with the RICO case identifying Page as having "deep factual knowledge of the case"); No. 11-CV-691, 2013 WL 1087236, at *18 n.161 (S.D.N.Y. March 15, 2013) (discovery ruling) (identifying Page email attaching and commenting on briefing in the Ecuador case).[5]

---

[5] Chevron's motion papers provide additional evidence of Page's involvement in the Ecuador case.  (Chevron Memorandum of Law, Dkt. 2316, at 8-10.)  The Court need not address that matter further as it is not material to determining whether Page should be held in contempt with respect to the RICO and Default Judgments.

32.     Page, through Forum Nobis, has represented Donziger as a client since 2010.  (Champion Decl. Ex. 7 at 9:17-10:6.)  Page played a "key advisory role" to Donziger at the RICO trial and was "at the hub of most of the critical work getting done". (Champion Decl. Ex. 16 ¶ 4.)  As Page describes it, his work for Donziger and his Ecuadorian clients has consisted of (1) direct representation of Donziger on a select number of matters; (2) provision of legal advice and research in a "secondary" or "supplemental advisory capacity"; and (3) draftsmanship and administrative work for Donziger, including preparation and revision of documents.  (Page Decl. ¶ 4.)

33.     Over the years Page has worked with Donziger, Page has received payments totaling more than $514,000 from Donziger and Donziger's investors.  (*See* Declaration of John Slavek, dated Aug. 28, 2019, Dkt. 2318 ("Slavek Decl."), Ex. 1.[6])

E.     **Page's Actions After The RICO Judgment**

34.     **Page Assisted With Solicitation Of And Drafting Contracts For Investors:**  Page played an active role in Donziger's efforts following the RICO Judgment to enter into investment contracts to monetize and profit from the Ecuador Judgment.

35.     For example, between July and December 2016, Page revised form investor contracts.  (Champion Decl. Exs. 38, 45-48.)

36.     Page also helped draft and manage the specific investor agreements contributing to the more than two-million dollars raised by Donziger.  In particular, in the latter half of 2016, December 2017, and January 2018, Page drafted, revised, or

---

[6] At the Hearing, the parties stipulated to the veracity of the Slavek Declaration.  (Tr. at 3:7-13, 4:18-19.)

otherwise assisted with investment contracts for John Van Merkensteijn (of WDIS Finance LLC), David Yass (of Wellback Partners), Ian Watson (of Indigenous People Limited), Tony Abbiati, Cliff Eisler, and Glenn Krevlin.  (Champion Decl. Exs. 50-70.)

37.     Page also participated in negotiations with investors purchasing shares in potential recovery from the Ecuador Judgment.  (Champion Decl. Ex. 47.)

38.     In a potential ten-million-dollar transaction with Daniel Israel, Page specified that his own fee should come out of someone's share of the transaction fee other than Donziger's (specifically Josh Rizack) so as not to reduce Donziger's take from the investment.  (Champion Decl. Ex. 47 ("I would be loath to take anything from your portion ….  I think apart from the transaction fee, you would be justified in paying yourself a percentage of your arrears?").)

39.     From time to time, Page also advised Donziger on legal aspects of the investor contracts and Donziger's authority under them.  (Champion Decl. Exs. 71-76.)

40.     Page also assisted Donziger with, or advised Donziger about, solicitations for investment in the Ecuador Judgment, including, for example, preparing materials to share with investors, advising about application of the securities law to the investment solicitations, and recommending that Donziger obtain professional websites to improve investor presentations.  (Champion Decl. Exs. 81-82; Dkt. 2209 at 20.)

41.     Page also assisted Donziger in responding to investor inquiries, such as those about how percentage interests would be paid out in the event of recovery and calculation of interest.  (Champion Decl. Exs. 78-80.)

42.     **Page Collaborated With Donziger To Financially Reward Themselves:** In addition to facilitating investments in the Ecuador Judgment, Page also worked with

Donziger to transfer interests in the Ecuador Judgment to financially benefit themselves. Page accomplished this primarily by drafting various agreements.

43.     With help from Donziger, in July 2016, Page drafted an agreement awarding himself a 0.25% interest in the Ecuador Judgment, which Page described as a "small contingency contract with the FDA to fund part of my work on the case." (Champion Decl. Exs. 101-103.)  After Donziger lobbied the FDA to sign the agreement, it was executed in January 2017.  (Champion Decl. Ex. 103 at 5.)

44.     Page also drafted a service agreement for Donziger through which the FDA reaffirmed the validity of Donziger's interest in the Ecuador Judgment and guaranteed Donziger payment out of the FDA's share in the event that Donziger's interest were held to be invalid.  (Champion Decl. Ex. 83.)  Page's work culminated in Donziger's November 2017 retainer agreement with the FDA.  (Dkt. 2091-23.)  That agreement reaffirmed Donziger's interest and granted Donziger a new personal interest in the Ecuador Judgment, which the Court determined should have been transferred to Chevron under Paragraph 1 of the RICO Judgment.  (Dkt. 2209 at 36-40.)  Unlike earlier retainer agreements, the 2017 retainer agreement gave Donziger the final say in disposition of litigation funds.  (*Compare* Dkt. 2091-21, *and* Dkt. 2091-22, *with* Dkt. 2091-23; Tr. at 11-12.)

45.     Chevron alleged that Page also drafted an agreement that extinguished a personal debt of Donziger in exchange for an interest in the Ecuador Judgment.  The chronology and paper trail do not clearly support that allegation.  In December 2017, Donziger notified Page that "[w]e need to do a superseding instrument that nullifie[s]" a "personal promissory note" by which investor Roger Waters had loaned Donziger

$102,000.  (Champion Decl. Ex. 84.)  The evidence presented, however, does not show that Page drafted the "superseding agreement"; to the contrary, Donziger's email to Page states that "I'll draft the addendum I guess."[7]  (*Id.*)

46.    After the Default Judgment, which enjoined the FDA and its agents and attorneys from "selling, assigning, pledging, transferring or encumbering any interest [in the Ecuador Judgment]" (Dkt. 1985 ¶ 4), Page drafted contracts transferring interests in the Ecuador Judgment to a Canadian activist and Canadian attorneys in April and May 2018 (Champion Decl. Exs. 91-92).

47.    Separate from his contingency payment agreement with the FDA, between March 2014 and March 2019, Page was paid $107,000 and Forum Nobis was paid $67,500, out of investor funds.  (Slavek Decl. Ex. 1.)

48.    **Page Transferred FDA Investor Funds To Donziger's Personal Account After The Default Judgment:**  To receive and disburse investor monies, an assistant to Donziger, Mary Sullivan, created a bank account called "CWP" (standing for "Chevron Will Pay").  (Declaration of Mary K. Sullivan, dated Sept. 28, 2018, Dkt. 2116 ("Sullivan Decl."), ¶¶ 49-50.)  On May 3, 2018, after Sullivan left her position with Donziger, and after the Default Judgment had been entered, Sullivan closed the CWP account and transferred to Page, via cashier checks, $342,045.16 made payable, at Page's instructions, for the benefit of FDA  (the "FDA Funds").  (Dkt. 2209 at 27-29 (citing Sullivan Decl. ¶¶ 56-59 & Ex. 39).)  The FDA Funds represented the remaining

---

[7] The First R&R came to a different conclusion based on an incorrect chronology.  (*See* Page's Response regarding the Second Circuit Opinion, Dkt. 2621 ("Page Response"), at 3 n.4 (explaining the chronology).)

balance of the CWP account, less expenses.  (Sullivan Decl. ¶¶ 57-60.)  Page received the FDA Funds into his Forum Nobis client trust account.  (Page Decl. ¶ 11.)

49.     On May 8, 2018, pursuant to Donziger's direction, Page wired the same amount to Donziger's personal bank account.  (Dkt. 2209 at 29-30; Page Decl. ¶ 11.) Two days later, Donziger transferred the FDA Funds into a business account, then transferred $50,000 back to Forum Nobis as payment for Page's legal services, $35,000 to Donziger's own personal checking account, and $125,000 into another business account.[8]  (Dkt. 2209 at 32-33; Page Decl. ¶ 11.)

50.     In consultation with Donziger, Page prepared an "email memorandum," dated May 7, 2018, advancing his understanding of both the RICO and Default Judgments and affirming that Page is "aware of no Order" precluding transfers of any funds he received on behalf of the FDA.  (Champion Decl. Exs. 106-107.)  The "understanding" reflected in Page's memorandum is that his receipt and transfer of the FDA Funds as described above was permitted based on the Stay Order reflecting Judge Kaplan's interpretation of the RICO Judgment injunctive provisions – i.e., the same order that led to the Second Circuit Opinion holding that Donziger was not in contempt due to ambiguity created by the Stay Order.  (Champion Decl. Ex. 107.)

51.     Page reasoned that the injunctive provisions of the Default Judgment are the same as those from the RICO Judgment and therefore subject to the same

---

[8] By transferring funds to Donziger's personal account, Page participated in the mishandling and commingling of client funds that he and Donziger caused to flow into and out of Donziger's personal and non-client-trust accounts in violation of their ethical obligations as attorneys. (*See* Expert Report of Dr. Moore, Dkt. 2269, at 5-10.)  In the Donziger Contempt Ruling, the Court observed "that the commingling of client and personal funds … that seems to have gone on here is extraordinary."  (Dkt. 2209 at 55 n.177.)

interpretation.  (Champion Decl. Ex. 107 at 2 ¶ 8.)  He further reasoned that "even if paragraph 5 [of the Default Judgment] were improperly read to enjoin the FDA fund-raising of litigation expenses as some kind of 'monetization,' this injunction would only come into force on a going-forward basis from the date of the Default Judgment (April 23, 2018), and would not impact **funds that were raised by the FDA prior to that date**, such as the funds previously held by Ms. Sullivan."  (*Id.* (emphasis added).)

<u>Standards For Civil Contempt</u>

When a party fails to comply with a court order, he or she may be held in civil contempt if "(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner."  *Paramedics Electromedicina Comercial, Ltda v. GE Medical Systems Information Technologies, Inc.*, 369 F.3d 645, 655 (2d Cir. 2004) (quoting *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995)); *see also CBS Broadcasting, Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 98 (2d Cir. 2016) (reciting and applying the *Paramedics* factors).  All three elements must be met before contempt sanctions may be imposed.  *King*, 65 F.3d at 1058; *New York State National Organization for Women v. Terry*, 886 F.2d 1339, 1351 (2d Cir. 1989).  It is not necessary, however, to "establish[ ] that the violation was willful."  *Paramedics*, 369 F.3d at 655 (citing *Donovan v. Sovereign Security, Ltd.*, 726 F.2d 55, 59 (2d Cir. 1984)).  The movant bears the burden of establishing that the requirements for contempt are met. *Latino Officers Association City of New York, Inc. v. City of New York*, 558 F.3d 159, 164 (2d Cir. 2009).

An order is clear and unambiguous when it "leaves no uncertainty in the minds of

16

those to whom it is addressed" and instead allows them "to ascertain from the four corners of the order precisely what acts are forbidden." *King*, 65 F.3d at 1058 (internal quotation marks and citations omitted); *see also Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 292 (2d Cir. 2008) ("the decree underlying contempt must be sufficiently clear to allow the party to whom it is addressed to ascertain precisely what it can and cannot do"). "The proper analysis focuses on 'whether [the order] unambiguously proscribes the challenged conduct,' not whether it is 'clear in some general sense.'" *Medina v. Buther*, No. 15-CV-1955, 2019 WL 581270, at *25 (S.D.N.Y. Feb. 13, 2019) (alteration in original) (quoting *Chao*, 514 F.3d at 292).

"A plaintiff must also clearly and convincingly demonstrate that 'defendants did not … comply with the order.'" *Medina*, 2019 WL 581270 at *25 (omission in original) (quoting *Latino Officers*, 558 F.3d at 164). For civil contempt, "this clear and convincing standard requires 'proof adequate to demonstrate a reasonable certainty that a violation occurred.'" *Id.* (quoting *BeautyBank, Inc. v. Harvey Prince LLP*, 811 F. Supp. 2d 949, 956 (S.D.N.Y. 2011)).

As for the third requirement, "the court must determine 'whether defendants have been reasonably diligent and energetic in attempting to accomplish what was ordered.'" *Medina*, 2019 WL 581270 at *25 (quoting *Powell v. Ward*, 487 F. Supp. 917, 933 (S.D.N.Y. 1980), *aff'd and modified*, 643 F.2d 924 (2d Cir. 1981)). "When a defendant acts based on what appears to be '"a good faith and reasonable interpretation of [the court's order]," he should not be held in contempt.'" *Id.* (alteration in original) (quoting *Vertex Distributing, Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885, 889 (9th Cir. 1982)). A defendant is not reasonably diligent, however, when they ignore a court order

"or take[ ] only superficial actions that 'strain both the language and intent of the order.'"
*Id.* (quoting *Powell*, 487 F. Supp. at 933-34).   "It is even more troubling when a
defendant takes actions 'that contravene the provisions of the order.'"   *Id.* (quoting
*Powell*, 487 F. Supp. at 934).

    In finding Donziger in contempt of the RICO Judgment, the Court determined
that the injunctive provisions of the RICO Judgment are clear and unambiguous, that
proof of Donziger's non-compliance was clear and convincing, and that Donziger did not
make diligent efforts to comply.   The only aspect of the Donziger Contempt Ruling that
the Second Circuit reversed, based on ambiguity created by the Stay Order, was with
respect to Donziger's monetizing his clients' interests in the Ecuador Judgment and
paying himself from those proceeds.   The question here is to what extent, after the
Second Circuit Opinion, Page can and should be found in contempt for violating the
injunctive provisions of the RICO Judgment and the Default Judgment.

### Standards For Holding Non-Parties Like Page In Contempt

    Non-parties can be found in contempt of an injunction.   An injunction "binds" an
enjoined party's "officers, agents, servants, employees, and attorneys," and "other
persons who are in active concert or participation" with the foregoing, so long as the
non-party has "actual notice" of the injunction.   Fed. R. Civ. P. 65(d)(2).   (*See also* Dkt.
1875 ¶ 8.)   When such a non-party "knowingly assists a defendant in violating an
injunction," the non-party "subjects himself to civil as well as criminal proceedings for
contempt."   *United States v. Paccione*, 964 F.2d 1269, 1274 (2d Cir. 1992) (quoting
*Alemite Manufacturing Corp. v. Staff*, 42 F.2d 832, 832 (2d Cir. 1930)); *see also* 11A
Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure

§ 2956 (3d ed. 2013) ("nonparties who have actual notice of an injunction and are guilty of aiding or abetting or acting in concert with a named defendant or the defendant's privy in violating the injunction[ ] … may be held in contempt").  This contempt authority over non-parties "gives force to injunctions and prevents parties from violating them by proxy."  *Eli Lilly & Co. v. Gottstein*, 617 F.3d 186, 195 (2d Cir. 2010).

To establish a non-party's contempt, the moving party must show that: (1) the non-party had "actual notice" of the injunction, Fed. R. Civ. P. 65(d)(2); and (2) the non-party either (i) violated the injunction while acting as an enjoined party's "officer[ ], agent[ ], servant[ ], employee[ ], [or] attorney[,]" Fed. R. Civ. P. 65(d)(2)(B); *Aviv v. Brainard*, No. 18-CV-5088, 2018 WL 4927912, at \*3 (S.D.N.Y. Oct. 11, 2018), or (ii) was "in active concert or participation" with the enjoined party, or the party's "officers, agents, servants, employees, [or] attorneys," in violating the injunction, Fed. R. Civ. P. 65(d)(2)(C); *Bear U.S.A., Inc. v. Kim*, 71 F. Supp. 2d 237, 246 (S.D.N.Y. 1999) (Kaplan, J.).  Here, Page's conduct implicates both categories of non-party contempt: he acted as both Donziger's and the FDA's attorney and agent and also acted in concert with Donziger.[9]  Similarly, Page can be held in contempt of the Default Judgment to the extent he acted as the FDA's attorney and agent.  In any event, Page does not dispute that he is bound by the RICO and Default Judgments' provisions binding "the parties' officers, agents, servants, employees, and attorneys" and "other persons who are in active concert or participation" with those persons or parties as dictated by both the

---

[9] The record is not entirely clear on which occasions Page acted in his capacity of representing Donziger or the FDA as an attorney or instead merely acted in concert with Donziger.  But the Court need not make that specific determination as both Donziger and the FDA are bound by the RICO and Default Judgments, and in all relevant circumstances, Page acted in concert with Donziger.

language of the RICO and Default Judgments and Federal Rule of Civil Procedure 65(d)(2).

## The Court Has Jurisdiction Over Page And Forum Nobis

Between them, the parties raise two jurisdictional arguments.  Chevron asserts that the Court has personal jurisdiction over Page and Forum Nobis because courts "routinely exercise personal jurisdiction in contempt proceedings over nonparties on the basis that nonparties may not assist, aid, or abet a violation of an order that directly binds a party … over whom the court has personal jurisdiction."  *Aviv*, 2018 WL 4927912 at *1 (collecting cases).  This Court agrees, and Page does not argue otherwise.

Page instead raised a subject matter jurisdiction argument, arguing that Donziger's appeal of the Donziger Contempt Ruling divests this Court of jurisdiction to consider Page's alleged contempt of that ruling.  (Page's Response in Opposition to Motion for Contempt, Dkt. 2354, at 9-10 (citing *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58, 103 S. Ct. 400, 402 (1982) (an appeal "divests the district court of its control over those aspects of the case involved in the appeal")).)  As the Second Circuit has resolved the appeal, the divesture issue is moot and need not be addressed further.

## Page Should Not Be Held In Contempt

As set forth in the Findings of Fact, Page engaged in at least three types of conduct that Chevron contends could expose him to contempt of the RICO and Default Judgments.  First, he acted in concert with Donziger to monetize the Ecuador Judgment by drafting investor contracts, helping with investor solicitation materials, and advising

and preparing responses to investors.  Second, after the Default Judgment, Page received and transferred the FDA Funds to Donziger instead of Chevron.  Third, Page received and retained for himself a 0.25% interest in the Ecuador Judgment.[10]

## A.   Monetization Activity

The First R&R determined that Page should not be held in contempt with respect to the first category – drafting investor contracts and other efforts to monetize the Ecuador Judgment to generate funding for continued litigation.   That is definitively so in light of the Second Circuit Opinion, which reversed the contempt finding against Donziger due to ambiguity created by the Stay Order.[11]

## B.   Receipt And Transfer Of The FDA Funds

The main point of contention as to whether Page should be held in contempt following the Second Circuit Opinion focuses on Page's receipt and transfer to Donziger of the $342,045.16 of FDA Funds, and his receipt of $50,000 from those proceeds as payment for legal services.   The FDA Funds, initially held in the "Chevron Will Pay" account, were generated from sales of interests in the Ecuador Judgment.   Chevron

---

[10] The First R&R included a fourth category of conduct: specifically, assisting Donziger in profiting from the Ecuador Judgment by drafting the agreement for the Roger Waters investment that extinguished Donziger's debt in return for a percentage of any recovery from the Ecuador Judgment.  As noted earlier, the proven facts do not support that claim.  In any event, Chevron has clarified that it is not pursuing that claim.  (Chevron's Reply regarding the Second Circuit Opinion, Dkt. 2628 ("Chevron Reply"), at 2 n.1.)

[11] To be clear, just as the Second Circuit made clear, the Second Circuit has laid to rest any ambiguity that may have been created by the Stay Order, such that Donziger, and Page, "can no longer sell *any* interests in the Ecuadorian Judgment for *any* reason, and use the proceeds for his benefit, whether for business or personal expenses or as part of a monthly retainer or arrears, or profit from such sales in any way whatsoever, without violating the Injunction and risking a contempt finding." (Second Circuit Op. at 49-50 (emphasis in original).)

contends that Page thus violated Paragraph 1 of the Default Judgment by transferring to Donziger funds traceable to the Ecuador Judgment that should have been turned over to Chevron. Chevron further argues that Page engaged in a second violation when he accepted as payment $50,000 that Donziger transferred back to Forum Nobis from the FDA Funds. The First R&R concluded that both actions violated the RICO Judgement and the Default Judgment and warranted holding Page in contempt. In light of the Second Circuit Opinion, however, this Court concludes that Page should not be held in contempt for those transactions.

The time line of events concerning the FDA Funds, particularly in relation to when the Default Judgment was entered, is important to consider for this analysis. The FDA Funds were raised before the Default Judgment. (*See* Champion Decl. Ex. 107 at 2 ¶ 8 (Page indicating that the FDA Funds were raised prior to the Default Judgment); Page Response at 2 n.2 ("to my knowledge, there was no judgment fundraising after [the Default Judgment]").) The Default Judgment issued on April 23, 2018. On May 3, 2018, the Forum Nobis client trust account received the FDA Funds. On May 8, 2018, Page transferred the FDA Funds to Donziger's personal account. On May 10, 2018, Donziger transferred the FDA Funds into business accounts except for $35,000, which he paid to himself, and $50,000, which he paid to Forum Nobis as payment for Page's legal services. In other words, the FDA Funds were raised prior to the Default Judgment, but Page's receipt and transfer of those funds, and his firm's receipt of $50,000 from the funds, took place soon after entry of the Default Judgment.

The FDA Funds represent the proceeds of monetizing investment in the Ecuador Judgment for the purposes of financing litigation, including payment to Donziger himself

– activity that the Second Circuit held could not be the basis for contempt under the RICO Judgment in light of the ambiguity created by the Stay Order.  Page merely acted as a conduit for what Donziger otherwise could have done directly; Page should not be held in contempt for facilitating activity for which Donziger could not be held in contempt.

Entry of the Default Judgment prior to Page's receipt and transfer of the FDA Funds does not lead to a different outcome.  That is because the relevant injunctive provisions of the Default Judgment track those of the RICO Judgment and therefore are subject to the same ambiguity created by the Stay Order.  That the Default Judgment imposed the same prohibitions on Donziger's clients (i.e., the FDA and others) did not lessen ambiguity as to whether Donziger and his legal team could continue to make use of, and pay themselves from, funds previously raised by selling investment interests in the Ecuador Judgment.  Chevron therefore errs when it asserts that the Second Circuit Opinion has "no effect" on this Court's previous conclusions from the First R&R. (Chevron's Further Briefing regarding the Second Circuit Opinion, Dkt. 2620, at 7.)

The same is true for Forum Nobis' receipt of $50,000 from the FDA Funds, transferred by Donziger as payment for Page's legal fees.  Chevron characterizes the $50,000 payment to Forum Nobis as a "kickback" and argues that the payment cannot be for legal fees because Forum Nobis invoices had been paid up to that point in time; Page never previously had been paid a retainer that large; and at the time the payment issued, Page separately had been claiming entitlement to a retainer of $7,500 per month.  (Chevron Reply at 4-5.)  To be sure, those "circumstances" raise suspicions, but they are insufficient to prove that the $50,000 was not in fact for legal services.

23

The Second Circuit Opinion's footnotes of what it did not decide are instructive on this point.  The Second Circuit did not address whether a contempt finding could be "based on the theory that payments received by Donziger *after* the date of the default judgment can be traced specifically to sales of interests in the Ecuadorian Judgment that took place *after* the default judgment was entered."  (Second Circuit Op. at 49 n.12 (emphasis added).)  And it expressly recognized that the "entire" sanction imposed on Donziger should be vacated because the record was not clear to what extent, if any, that amount "was traceable to *fundraising activities* that *followed* the [Default Judgment]."  (*Id.* at 52 n.14 (emphasis added).)  In other words, the Second Circuit left unanswered whether contempt could be found for fundraising activities that took place *after* the Default Judgment, as distinct from funds raised from efforts made *before* the Default Judgment.  The FDA Funds received and transferred by Page indisputably were raised prior to the Default Judgment and therefore do not fall under the issue that the Second Circuit did not address.

In any event, Page's receipt and transfer of the FDA Funds, and his receipt of the $50,000 from that amount as payment for legal services, is the type of conduct that the Second Circuit found was not subject to contempt under the RICO Judgment because of the ambiguity created by the Stay Order.  The injunctive provisions of the Default Judgment being the same as those of the RICO Judgment, the same conclusion is warranted here.  Page should not be held in contempt for transferring the FDA Funds to Donziger, nor for receiving the portion of those funds paid to his firm for legal services.

**C.      Retention Of The 0.25% Interest In The Ecuador Judgment**

The First R&R recommended holding Page in contempt for failing to transfer his 0.25% interest in the Ecuador Judgment.  As Chevron acknowledges, however, "this issue is now moot" because, since that time, Page has agreed to transfer and has transferred his 0.25% interest to Chevron.  (Chevron Reply at 5.)   Accordingly, there is no longer a basis to find Page in contempt on this basis.

**Contempt Sanctions**

This Court recommends that Page and Forum Nobis not be held in contempt. Accordingly, the Court need not and does not address what kind or amount of sanctions otherwise would be appropriate.

**Conclusion**

For the foregoing reasons, this Court certifies the Findings of Fact set forth above and recommends that Chevron's motion for contempt sanctions be denied in its entirety. To the extent not discussed herein, the Court has considered the parties' remaining arguments and finds them to be without merit.

**Procedures For Filing Objections**

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days to file written objections to this Report and Recommendation.  Such objections shall be filed with the Clerk of Court, with extra copies delivered to the Chambers of the Honorable Lewis A. Kaplan, U.S.D.J., United States Courthouse, 500 Pearl Street, New York, NY 10007, and to the Chambers of the undersigned, United States Courthouse, 500 Pearl Street,

New York, NY 10007.  **FAILURE TO FILE TIMELY OBJECTIONS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.**

Respectfully submitted,

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated:      May 17, 2021
            New York, New York

Copies transmitted this date to all counsel of record
and to non-party, pro se, Aaron Marr Page via ECF.